**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## TENTH NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Plan Supplement").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3972] (the "Confirmation Order").

**PLEASE TAKE FURTHER NOTICE THAT** on September 27, 2023, the Debtors filed the *Sixth Notice of Filing of Plan Supplement* [Docket No. 3583] (the "Sixth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on October 20, 2023, the Debtors filed the *Seventh Notice of Filing of Plan Supplement* [Docket No. 3869] (the "Seventh Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on October 30, 2023, the Debtors filed the *Eighth Notice of Filing of Plan Supplement* [Docket No. 3935] (the "Eighth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on December 20, 2023, the Debtors filed the *Ninth Notice of Filing of Plan Supplement* [Docket No. 4132] (the "Ninth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Tenth Plan Supplement" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, Eighth Plan Supplement, and the Ninth Plan Supplement, the "Plan Supplement")[3], which includes the following documents:

| Exhibit | Document |
|---------|----------|
| A | Registration Rights Agreement |
| A-1 | (Redline) Registration Rights Agreement |
| B | Schedule of Retained Causes of Action |
| B-1 | (Redline) Schedule of Retained Causes of Action |
| C | MiningCo Organizational Documents |
| D | Plan Sponsor Contribution Agreement |
| D-1 | (Redline) Plan Sponsor Contribution Agreement |
| E | Schedule of Released and Exculpated Parties |
| E-1 | (Redline) Schedule of Released and Exculpated Parties |
| F | Equity Incentive Plan |

---

[3]    **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, the Eighth Plan Supplement, and the Ninth Plan Supplement.

| G | MiningCo Management Agreement |
| G-1 | (Redline) MiningCo Management Agreement |
| H | Identities of MiningCo Board Members |
| I | Schedule of Excluded Parties |
| I-1 | (Redline) Schedule of Excluded Parties |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights, including those provided in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re: Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

*[Rest of page intentionally left blank]*

New York, New York
Dated: January 25, 2024

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:           joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:           patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Annex 1

**I.**    ***Notice of Filing of Plan Supplement*** **[Docket No. 3115].**

    <u>Exhibit</u>      <u>Document</u>

       A         Schedule of Released and Exculpated Parties

       B         ADR Procedures

**II.**    ***Second Notice of Filing of Plan Supplement*** **[Docket No. 3273].**

    <u>Exhibit</u>      <u>Document</u>

       A         Schedule of Retained Causes of Action

       B         Schedule of Equitably Subordinated Claims

       C         Schedule of Excluded Parties

**III.**    ***Third Notice of Filing of Plan Supplement*** **[Docket No. 3444].**

    <u>Exhibit</u>      <u>Document</u>

       A         New Organizational Documents

       B         Identities of the members of the New Board of NewCo

       C         Schedule of Rejected Executory Contracts and Unexpired Leases

       D         Schedule of Assumed Executory Contracts and Unexpired Leases

       E         Litigation Administrator Agreements

       F         Identity of Litigation Administrator

       G         Identities of Litigation Oversight Committee Members

       H         Employee Transition Services Agreement

       I         Plan Administrator Budget

       J         ADR Procedures (Redline at Exhibit J-1)

       K         Schedule of Retained Causes of Action (Redline at Exhibit K-1)

**IV.**   ***Fourth Notice of Filing of Plan Supplement*** **[Docket No. 3483].**

| <u>Exhibit</u> | <u>Document</u> |
| --- | --- |
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) NewCo Organizational Documents |

**V.**   ***Fifth Notice of Filing of Plan Supplement*** **[Docket No. 3550].**

| <u>Exhibit</u> | <u>Document</u> |
| --- | --- |
| A | Identities of the members of the New Board of NewCo |
| A-1 | (Redline) Identities of the members of the New Board of NewCo |

**VI.**    ***Sixth Notice of Filing of Plan Supplement*** [Docket No. 3583].

| Exhibit | Document |
| --- | --- |
| A | Identities of Litigation Oversight Committee Members |
| A-1 | (Redline) Identities of Litigation Oversight Committee Members |
| B | Coinbase Prime Brokerage Agreement |
| B-1 | (Redline) Coinbase Prime Brokerage Agreement |
| C | Litigation Administrator Agreement |
| C-1 | (Redline) Litigation Administrator Agreement |
| D | Plan Administrator Agreement |
| D-1 | (Redline) Plan Administrator Agreement |
| E | Schedule of Excluded Parties |
| E-1 | (Redline) Schedule of Excluded Parties |
| F | Board Observer Agreement |
| G | Identities of the Board Observers |
| H | NewCo Board Terms |

**VII.**    ***Seventh Notice of Filing of Plan Supplement*** [Docket No. 3869].

| Exhibit | Document |
| --- | --- |
| A | Schedule of Retained Causes of Action |
| A-1 | (Redline) Schedule of Retained Causes of Action |
| B | ADR Procedures |
| B-1 | (Redline) ADR Procedures |
| C | ADR Valuation Form |
| D | Litigation Administrator Agreement |
| D-1 | (Redline) Litigation Administrator Agreement |
| E | Plan Administrator Agreement |

| E-1 | (Redline) Plan Administrator Agreement |
| F | Paxos Agreement |
| F-1 | (Redline) Paxos Agreement |
| G | Coinbase Agreement |
| G-1 | (Redline) Coinbase Agreement |
| H | Schedule of Released and Exculpated Parties |
| H-1 | (Redline) Schedule of Released and Exculpated Parties |
| I | Registration Rights Agreement |
| J | U.S. Bitcoin Management Agreement |
| J-1 | (Redline) U.S. Bitcoin Management Agreement |
| K | Proof Group IP License |
| K-1 | (Redline) Proof Group IP License |
| L | U.S. Bitcoin Cedarvale Interim Services Agreement |
| L-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |
| M | PayPal Distribution Services Agreement |

**VIII.    *Eighth Notice of Filing of Plan Supplement* [Docket No. 3935].**

| **Exhibit** | **Document** |
| --- | --- |
| A | Paxos Agreement |
| A-1 | (Redline) Paxos Agreement |
| B | Litigation Administrator Agreement |
| B-1 | (Redline) Litigation Administrator Agreement |
| C | U.S. Bitcoin Management Agreement |
| C-1 | (Redline) U.S. Bitcoin Management Agreement |
| D | U.S. Bitcoin Cedarvale Interim Services Agreement |
| D-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |

IX.    ***Ninth Notice of Filing of Plan Supplement*** [Docket No. 4132].

| **Exhibit** | **Document** |
|---|---|
| A | MiningCo Management Agreement |
| B | U.S. Bitcoin Cedarvale Interim Services Agreement |
| B-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |

## Exhibit A

**Registration Rights Agreement**

*DRAFT*

## INVESTORS' AND REGISTRATION RIGHTS AGREEMENT

This Investors' and Registration Rights Agreement (this "***Agreement***"), dated as of [●], is entered into by and among Ionic Digital Inc., a Delaware corporation (the "***Company***"), and U.S. Data Management Group, LLC, a Delaware limited liability company ("***USBTC***" and, together with the Company, the "***Parties***").

**WHEREAS**, on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "***Plan***"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "***MiningCo Implementation Motion***," and together with the Plan, the "***MiningCo Plan***");

**WHEREAS,** the Bankruptcy Court entered its Order confirming the Plan on November 9, 2023, and its Order granting the MiningCo Implementation Motion on December 22, 2023;

**WHEREAS,** pursuant to the Plan, USBTC and the Company entered into that certain Plan Sponsor Contribution Agreement, dated as of [●] (the "***Contribution Agreement***"), pursuant to which, among other things, USBTC agreed to purchase a total of $12,756,000 worth of shares of the Company's Class A common stock, par value $0.00001 per share (as further defined below, the "***Class A Common Stock***"), from the Company and/or in secondary market purchases (as such term is defined in the Contribution Agreement, the "***Plan Sponsor Shares***");

**WHEREAS,** pursuant to the Plan, the Company and USBTC entered into that certain Warrant Agreements, dated as of [●] (the "***Warrant Agreement***"), pursuant to which, among other things, USBTC received warrants to purchase shares of Class A Common Stock (the "***Warrant Shares***");

**WHEREAS,** pursuant to the Plan, USBTC and the Company entered into that certain Restricted Stock Agreement, dated as of [●] (the "***Restricted Stock Agreement***"), pursuant to which, among other things, USBTC agreed to purchase shares of Class A Common Stock from the Company subject to certain terms and conditions (the "***Restricted Stock Agreement Shares***" and, with the Plan Sponsor Shares and the Warrant Shares, the "***Initial Shares***");

**WHEREAS,** the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement all contemplate that the Parties will enter into a registration rights agreement; and

**WHEREAS,** the Parties are entering into this Agreement in furtherance of the aforementioned provisions of the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the Parties hereby agree as follows:

1.    <u>Definitions</u>. As used in this Agreement, the following terms have the meanings indicated:

"*Affiliate*" means, with respect to any specified Person, a Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such specified Person.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined under Rule 405.

"*Board*" means the board of directors of the Company.

"*Business Day*" means any day other than a Saturday, Sunday, any federal holiday or any other day on which banking institutions in the State of New York are authorized or required to be closed by law or governmental action.

"*Class A Common Stock*" means the Company's Class A common stock, par value $0.00001 per share, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"*Commission*" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or Exchange Act.

"*Company Securities*" means any equity interest of any class or series in the Company.

"*Controls*," "*Controlled by*" and "*under common Control with*" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Effective Date*" means the time and date that a Registration Statement is first declared effective by the Commission or otherwise becomes effective.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*FINRA*" means the Financial Industry Regulatory Authority.

"*Holder*" means (a) USBTC, unless and until USBTC ceases to hold any Registrable Securities; and (b) any holder of Registrable Securities to whom registration rights conferred by this Agreement have been transferred in compliance with <u>Section 9(e)</u> hereof; *provided*, that any Person referenced in clause (b) of this definition shall be a Holder only if such Person agrees in writing to be bound by and subject to the terms and conditions set forth in this Agreement.

"*Material Adverse Change*" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market in the United States; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (c) a material outbreak or escalation of armed hostilities or other international or national calamity involving the United States or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any event, change, circumstance or effect that is or is reasonably likely to be materially adverse to the business, properties, assets, liabilities, condition (financial or otherwise), operations, results of operations or prospects of the Company and its subsidiaries taken as a whole.

"***Person***" means an individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited partnership, limited liability company, joint stock company, estate, trust, government (or an agency or subdivision thereof) or other entity of any kind.

"***Proceeding***" means any action, claim, suit, proceeding or investigation (including a preliminary investigation or partial proceeding, such as a deposition) pending or, to the knowledge of the Company, threatened.

"***Prospectus***" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A, Rule 430B or Rule 430C promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"***Registrable Securities***" means the Shares; *provided*, *however*, that Registrable Securities shall not include: (a) any Shares that have been registered under the Securities Act and disposed of pursuant to an effective Registration Statement or otherwise transferred to a Person who is not entitled to the registration rights and other rights hereunder; (b) any Shares that have been sold or transferred by the Holder thereof pursuant to Rule 144 (or any similar provision then in force under the Securities Act) and the transferee thereof does not receive "restricted securities" as defined in Rule 144, as a result of which the legend on any certificate or book-entry notation, as the case may be, representing such Registrable Security restricting transfer of such Registrable Security has been removed; (c) any Shares that are eligible for resale without restriction (including any limitation thereunder on volume or manner of sale) and without the need for current public information pursuant to any provision of Rule 144 (or any similar provision then in force under the Securities Act); and (d) any Shares that cease to be outstanding (whether as a result of repurchase and cancellation, conversion or otherwise).

"***Registration Statement***" means a registration statement of the Company in the form required to register under the Securities Act, the Exchange Act or other applicable law for the resale of the Registrable Securities in accordance with the intended plan of distribution of each Holder included therein, and including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***Rule 144***" means Rule 144 promulgated by the Commission pursuant to the Securities Act.

"***Rule 405***" means Rule 405 promulgated by the Commission pursuant to the Securities Act.

"***Rule 415***" means Rule 415 promulgated by the Commission pursuant to the Securities Act.

"***Rule 424***" means Rule 424 promulgated by the Commission pursuant to the Securities Act.

"***Rule 430A***" means Rule 430A promulgated by the Commission pursuant to the Securities

Act.

"***Rule 430B***" means Rule 430B promulgated by the Commission pursuant to the Securities Act.

"***Rule 430C***" means Rule 430C promulgated by the Commission pursuant to the Securities Act.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Selling Expenses***" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder in connection with such sale (except as set forth in Section 5).

"***Shares***" means the shares of Class A Common Stock now held or hereafter acquired by the Holders, including without limitation the Initial Shares and any other shares of Class A Common Stock held by the Holders as of the date hereof, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"***Shelf Registration Statement***" means a Registration Statement filed with the Commission on Form S-3 (or any successor form or other appropriate form under the Securities Act) for an offering to be made on a continuous or delayed basis pursuant to Rule 415 (or any similar rule that may be adopted by the Commission) or, if the Company is not then eligible to file on Form S-3, on Form S-1 or any other appropriate form under the Securities Act, or any successor rule that may be adopted by the Commission, and all amendments and supplements to such Registration Statement (including post-effective amendments), covering the Registrable Securities, as applicable.

"***Trading Market***" means the principal national securities exchange on which Registrable Securities are listed.

"***Underwritten Offering***" means an underwritten offering of Class A Common Stock for cash (whether a Requested Underwritten Offering or in connection with a public offering of Class A Common Stock by the Company, stockholders or both), excluding an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4 or Form S-8 or an offering on any registration statement form that does not permit secondary sales.

"***USBTC Management Agreement***" means that certain Management Services Agreement, dated as of [●], by and between the Company and USBTC.

"***VWAP***" means, as of a specified date and in respect of Registrable Securities, the volume weighted average price for such security on the Trading Market for the five trading days immediately preceding, but excluding, such date.

"***WKSI***" means a "well-known seasoned issuer" as defined under Rule 405.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections refer to sections of this Agreement; (c) the terms "include," "includes," "including" and words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "hereto,"

"herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall include all rules and regulations promulgated thereunder, and references to any law or statute shall be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable law or statute; (h) references to any Person include such Person's successors and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated.

2.      <u>Registration</u>.

   (a)      <u>Initial Shelf Registration Statement</u>.

      (i)      Notwithstanding anything to the contrary contained in this Agreement, as soon as practicable following the first date of the Company's eligibility to file a Registration Statement on Form S-3 (but no later than 30 days following such date), the Company shall use reasonable best efforts to file with the Commission a Shelf Registration Statement on Form S-3 (as such Registration Statement may be amended from time to time, the "***Initial Shelf Registration Statement***"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall have timely requested inclusion therein of some or all of its Registrable Securities by written notice to the Company. The Company shall use its reasonable best efforts to have the Initial Shelf Registration Statement declared effective by the Commission as soon as reasonably practicable after the Company files the Initial Shelf Registration Statement but no later than the fifth Business Day following the date on which the Commission informs the Company that it does not intend to review the Initial Shelf Registration Statement or the fifth Business Day following the resolution or clearance of all Commission comments to the Initial Shelf Registration Statement, as applicable.

      (ii)      The Company shall use reasonable best efforts to keep the Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date on which all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "***Initial Shelf Expiration Date***").

      (iii)      Until the Initial Shelf Expiration Date, the Company shall file any supplements or post-effective amendments required to be filed by applicable law so that (A) the Initial Shelf Registration Statement does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (B) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K.

   (b)      <u>Demand Registration</u>.

      (i)      Subject to the provisions of <u>Section 2(b)(x)</u>, USBTC shall have the option and right, exercisable by delivering a written notice to the Company (a "***Demand Notice***"), to require the Company to, pursuant to the terms of and subject to the limitations contained in this Agreement, prepare and file with the Commission a Registration Statement registering the offering and sale of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice, which may include sales on a delayed or continuous basis pursuant to Rule 415 on a Shelf Registration Statement (a "***Demand Registration***"). The Demand Notice must set forth the number of Registrable Securities that USBTC and other Holders, as applicable, intend to include in such Demand Registration and the intended timing and method of disposition thereof.

Notwithstanding anything to the contrary herein, in no event shall the Company be required to effectuate a Demand Registration unless the Registrable Securities of the Holders to be included therein after compliance with Section 22(b)(ii) and Section 2(b)(x): (i) have an aggregate value of at least $7,500,000 based on the VWAP or (ii) represent at least 15% of the Registrable Securities eligible for registration in accordance with Section 2(b)(x) (the "*Minimum Amount*") as of the date of the Demand Notice.

(ii)       Within five Business Days (or if the Registration Statement will be a Shelf Registration Statement, within two Business Days) after the receipt of the Demand Notice, the Company shall give written notice of such Demand Notice to all Holders and, within 30 days after receipt of the Demand Notice (except if the Company is not then eligible to register for offer and resale the Registrable Securities on Form S-3, in which case, within 90 days thereof), shall, subject to the limitations of this Section 2(b), file a Registration Statement in accordance with the terms and conditions of, and the intended timing and method of disposition described in, the Demand Notice, which Registration Statement shall cover all of the Registrable Securities eligible for registration in accordance with Section 2(b)(x) that the Holders shall in writing request to be included in the Demand Registration (such request to be given to the Company within three Business Days (or if the Registration Statement will be a Shelf Registration Statement, within one Business Day) after receipt of notice of the Demand Notice given by the Company pursuant to this Section 2(b)(ii)). The Company shall use reasonable best efforts to cause such Registration Statement to become, as soon as reasonably practicable after the filing thereof, and remain continuously, effective under the Securities Act until the earlier of (A) 180 days (or three years if a Shelf Registration Statement is requested) after the Effective Date of such Registration Statement or (B) the date on which all Registrable Securities covered by such Registration Statement have been sold or otherwise disposed of or such Shares are no longer Registrable Securities (the "*Effectiveness Period*"); *provided*, *however*, that such period shall be extended for a period of time equal to the period the Holders refrain from selling any securities included in such Registration Statement at the request of an underwriter of the Company or the Company pursuant to this Agreement.

(iii)       Subject to the other limitations contained in this Agreement, the Company is not obligated hereunder to effect (A) a Demand Registration within 90 days after the closing of any Requested Underwritten Offering, (B) more than a total of four Demand Registrations, and (C) a subsequent Demand Registration pursuant to a Demand Notice if a Registration Statement covering all of the Registrable Securities held by the Holders shall have become and remains effective under the Securities Act and is sufficient to permit offers and sales of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice in accordance with the intended timing and method of disposition thereof specified in the Demand Notice; *provided*, that a demand for a Shelf Registration Statement shall not count against the number of allowable Demand Registrations for subclause (B) of this paragraph. No Demand Registration shall be deemed to have occurred for purposes of this Section 2(b)(iii) if the Registration Statement relating thereto does not become effective or is not maintained effective for its entire Effectiveness Period, in which case USBTC shall be entitled to an additional Demand Registration in lieu thereof. Further, a Demand Registration shall not constitute a Demand Registration for purposes of this Section 2(a)(iii) if, as a result of Section 2(b)(vi), there is included in the Demand Registration less than the Minimum Amount of Registrable Securities.

(iv)       A Holder may withdraw all or any portion of its Registrable Securities included in a Demand Registration from such Demand Registration at any time prior to the effectiveness of the applicable Registration Statement. Upon receipt of a notice from USBTC that USBTC (and/or other applicable Holders) are withdrawing all of their Registrable Securities from

the Demand Registration such that the remaining amount of Registrable Securities to be included in the Demand Registration is below the Minimum Amount, the Company shall cease all efforts to secure effectiveness of the applicable Registration Statement. Such registration nonetheless shall be deemed a Demand Registration for purposes of Section 2(b)(iii) unless (A) USBTC shall have paid or reimbursed the Company for all reasonable and documented out-of-pocket fees and expenses incurred by the Company in connection with the withdrawn registration of such Registrable Securities (based on the number of securities USBTC sought to register, as compared to the total number of securities included in such Demand Registration) or (B) the withdrawal is made following the occurrence of a Material Adverse Change or pursuant to the Company's request for suspension pursuant to Section 3(o).

(v)     The Company may include in any such Demand Registration other Company Securities for sale for its own account or for the account of any other Person, subject to Section 2(b)(vi) and Section 2(e)(iii).

(vi)     In the case of a Demand Registration not being underwritten, if USBTC advises the Company that in its reasonable opinion the aggregate number of securities requested to be included in such registration exceeds the number that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the Company shall include in such Demand Registration only that number of securities that, in the reasonable opinion of USBTC, will not have such adverse effect, with such number to be allocated as follows: (A) first, pro-rata among all Holders (including USBTC) that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Holder, (B) second, if there remains availability for additional securities to be included in such Demand Registration, to the Company, and (C) third, if there remains availability for additional securities to be included in such Demand Registration following the allocation provided in clauses (A) and (B) above, to any other holders of Company Securities entitled to participate in such Demand Registration, if applicable, based on the relative number of Company Securities such holder is entitled to include in such Demand Registration.

(vii)     Subject to the limitations contained in this Agreement, the Company shall effect any Demand Registration on such appropriate registration form of the Commission (A) as shall be selected by the Company and (B) as shall permit the disposition of the Registrable Securities in accordance with the intended method of disposition specified in the Demand Notice; *provided*, that if the Company becomes, and is at the time of its receipt of a Demand Notice, a WKSI, the Demand Registration for any offering and selling of Registrable Securities shall be effected pursuant to an Automatic Shelf Registration Statement, which shall be on Form S-3 (if available to the Company. If at any time a Registration Statement on Form S-3 is effective and a Holder provides written notice to the Company that it intends to effect an offering of all or part of the Registrable Securities included on such Registration Statement, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable such offering to take place.

(viii)     Without limiting Section 3, in connection with any Demand Registration pursuant to and in accordance with this Section 2(b), the Company shall (A) promptly prepare and file or cause to be prepared and filed (1) such additional forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary or advisable to register or qualify the Registrable Securities subject to such Demand Registration, including under the securities laws of such jurisdictions as the Holders shall reasonably request; *provided*, *however*, that no such qualification shall be required in any jurisdiction where, as a result thereof,

the Company would become subject to general service of process or to taxation or qualification to do business in such jurisdiction solely as a result of such registration and (2) such forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary to apply for listing or to list the Registrable Securities subject to such Demand Registration on the Trading Market and (B) do any and all other acts and things that may be reasonably necessary or appropriate or reasonably requested by the Holders to enable the Holders to consummate a public sale of such Registrable Securities in accordance with the intended timing and method of distribution thereof.

(ix)    In the event a Holder transfers Registrable Securities included on a Registration Statement and such Registrable Securities remain Registrable Securities following such transfer, at the request such Holder, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable the transferee of such Registrable Securities to offer and sell such Registrable Securities pursuant to such Registration Statement; *provided*, that in no event shall the Company be required to file a post-effective amendment to the Registration Statement unless (A) such Registration Statement includes only Registrable Securities held by the Holder, Affiliates of the Holder or transferees of the Holder or (B) the Company has received written consent therefor from each other Holder for whom Registrable Securities have been registered on (but not yet sold under) such Registration Statement, other than the Holder, Affiliates of the Holder or transferees of the Holder.

(x)    USBTC's option and right with respect to Demand Registrations set forth in this Section 2(b) shall apply to the Registrable Securities as follows: (A) with respect to the Plan Sponsor Shares, immediately upon the earlier to occur of the expiration of the Lock-Up Period (as such term is defined in the Plan Sponsor Contribution Agreement) or, with respect to such Plan Sponsor Shares as shall have vested thereupon, the commencement of the Unlock Period (as such term is defined in the Plan Sponsor Contribution Agreement); (B) with respect to the Restricted Stock Agreement Shares, immediately upon the vesting of the Restricted Stock Agreement Shares in accordance with the terms of the Restricted Stock Agreement; (C) with respect to the Warrant Shares, immediately upon the Exercise Period Commencement Date (as such term is defined in the Warrant Agreements); and (D) with respect to such Shares that USBTC may acquire after the date hereof, upon the earliest to occur of the events set forth in subclauses (A), (B) or (C) of this Section 2(b)(x) following the acquisition of such Shares.

(c)    Requested Underwritten Offering. If USBTC is able to effectuate a Demand Registration pursuant to the terms of Section 2(b) (or has previously effectuated a Demand Registration pursuant to Section 2(b) but has not engaged in an Underwritten Offering in respect of such Demand Registration) USBTC shall have the option and right, exercisable by delivering written notice to the Company of its intention to distribute Registrable Securities that are then not otherwise subject to restrictions on transfer other than those provided by applicable securities law by means of an Underwritten Offering (an "***Underwritten Offering Notice***"), to require the Company, pursuant to the terms of and subject to the limitations of this Agreement, to effectuate a distribution of any or all of its and other Holders' Registrable Securities by means of an Underwritten Offering pursuant to a new Demand Registration or pursuant to an effective Registration Statement covering such Registrable Securities (a "***Requested Underwritten Offering***"); *provided*, that if the Requested Underwritten Offering is pursuant to a new Demand Registration, then the Registrable Securities requested to be included in such Requested Underwritten Offering equal or exceed the Minimum Amount. The Underwritten Offering Notice must set forth the number of Registrable Securities that are intended to be included in such Requested Underwritten Offering. The Company shall propose three or more nationally prominent firms of investment bankers reasonably acceptable to USBTC to act as the managing underwriter or managing underwriters in connection with such Underwritten Offering from which USBTC shall select the managing underwriter or

managing underwriters. USBTC, in connection with any other Holder participating in such Underwritten Offering, shall determine the pricing of the Registrable Securities offered pursuant to any Requested Underwritten Offering and the applicable underwriting discounts and commissions and determine the timing of any such Requested Underwritten Offering. Notwithstanding the foregoing, the Company is not obligated to effect more than a total of three Requested Underwritten Offerings, but in no more than (x) two within 90 days after the closing of an Underwritten Offering and (y) two within any 12-month period. Any Requested Underwritten Offering (other than the first Requested Underwritten Offering made in respect of a prior Demand Registration) shall constitute a Demand Registration of USBTC for purposes of Section 2(b)(iii) (it being understood that if requested concurrently with a Demand Registration then, together, such Demand Registration and Requested Underwritten Offering shall count as one Demand Registration); *provided, however*, that a Requested Underwritten Offering shall not constitute a Demand Registration of USBTC for purposes of Section 2(b)(iii) if, as a result of Section 2(e)(iii)(A), the Requested Underwritten Offering includes less than the lesser of (i) Registrable Securities having a VWAP measured on the effective date of the related Registration Statement of $7,500,000 and (ii) two-thirds of the number of Registrable Securities set forth in the applicable Underwritten Offering Notice.

(d)    Block Trades. Notwithstanding anything contained in this Section 2, in the event a sale of Registrable Securities is an underwritten transaction requiring the involvement of the Company but not involving (i) any "road show" or (ii) a lock-up agreement of more than 45 days to which the Company is a party, and which is commonly known as a "block trade" (a "***Block Trade***"), (1) the requesting Holder or Holders shall (A) give at least three Business Day prior notice in writing of such transaction to the Company (B) with respect to any Block Trade, identify the potential underwriter in such notice with contact information for such underwriter; and (2) the Company shall cooperate with such requesting Holder or Holders to the extent it is reasonably able and shall not be required to give notice thereof to other Holders or permit their participation therein unless reasonably practicable. Any Block Trade shall be for at least $2,000,000 in expected gross proceeds. The Company shall not be required to effectuate more than three Block Trades in any 90-day period. For the avoidance of doubt, a Block Trade shall not constitute a Requested Underwritten Offering.

(e)    Piggyback Registration and Piggyback Underwritten Offering.

(i)    If the Company shall, at any time, propose to file a registration statement under the Securities Act with respect to an offering of Class A Common Stock (other than a registration statement on Form S-4 or Form S-8 filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan and other than a Demand Registration), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least five Business Days, except if the registration statement will be a Shelf Registration Statement, at least three Business Days, before) the anticipated filing date (the "***Piggyback Registration Notice***"). The Piggyback Registration Notice shall offer all Holders the opportunity to include for registration in such registration statement the number of Registrable Securities as they may request in writing (a "***Piggyback Registration***"). The Company shall use commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests for inclusion therein within ten Business Days or, if the Piggyback Registration will be on a Shelf Registration Statement, within five Business Day, after sending the Piggyback Registration Notice. Each Holder shall be permitted to withdraw all or part of such Holder's Registrable Securities from a Piggyback Registration by giving written notice to the Company of its request to withdraw; *provided*, that (A) such request must be made in writing and delivered prior to the effectiveness of such Registration Statement and (B) such withdrawal shall be irrevocable and, after making such withdrawal, such Holder shall no longer have any right to include Registrable Securities in the Piggyback Registration as to which such withdrawal was made. Notwithstanding

9

anything to the contrary in this Section 2(e)(i), if the Underwritten Offering pursuant to this Section 2(e)(i) is a "bought deal" (other than a variable price reoffer) or Overnight Underwritten Offering and the Managing Underwriter advises the Company that the giving of notice pursuant to this Section 2(e)(i) would have an adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Offering, no such notice shall be required. Any withdrawing Holder shall continue to have the right to include any Registrable Securities in any subsequent Registration Statement as may be filed by the Company with respect to offerings of Class A Common Stock, all upon the terms and conditions set forth herein.

(ii)     If the Company shall, at any time, propose to conduct an Underwritten Offering (including a Requested Underwritten Offering), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least ten Business Days, except if the Underwritten Offering will be made pursuant to a Shelf Registration Statement, at least five Business Days, before) the commencement of such Underwritten Offering, which notice shall set forth the principal terms and conditions of the issuance, including the proposed offering price or range of offering prices (if known), the anticipated filing date of the related Registration Statement (if applicable) and the number of shares of Class A Common Stock that are proposed to be registered (the "***Underwritten Offering Piggyback Notice***"). Receipt of any Underwritten Offering Piggyback Notice required to be provided in this Section 2(e)(ii) to Holders shall be kept confidential by the Holder until such proposed Underwritten Offering is (A) publicly announced or (B) such Holder receives notice that such proposed Underwritten Offering has been abandoned, which such notice shall be provided as reasonably practicable by the Company. The Underwritten Offering Piggyback Notice shall offer the Holders the opportunity to include in such Underwritten Offering (and any related registration of Company Securities, if applicable) the number of Registrable Securities as they may request in writing (an "***Underwritten Piggyback Offering***"); *provided*, *however*, that in the event that the Company proposes to effectuate the subject Underwritten Offering pursuant to an effective Shelf Registration Statement other than an Automatic Shelf Registration Statement, only Registrable Securities of Holders that are subject to an effective Shelf Registration Statement may be included in such Underwritten Piggyback Offering, unless the Company is then able to file an Automatic Shelf Registration Statement and, in the reasonable judgment of the Company, the filing of the Automatic Shelf Registration Statement including Registrable Securities of Holders that are not otherwise included in an effective Shelf Registration Statement would not have any material adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Piggyback Offering. The Company shall use commercially reasonable efforts to include in each such Underwritten Piggyback Offering such Registrable Securities for which the Company has received written requests for inclusion therein within ten Business Days or, if such Underwritten Piggyback Offering will be made pursuant to a Shelf Registration Statement, within five Business Day after sending the Underwritten Offering Piggyback Notice. Each Holder shall be permitted to withdraw all or part of its Registrable Securities from an Underwritten Piggyback Offering at any time prior to the effectiveness of the applicable Registration Statement, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iii)     If the managing underwriter or managing underwriters of an Underwritten Offering advise the Company and the Holders that, in their reasonable opinion, the inclusion of all of the Registrable Securities requested for inclusion in the subject Underwritten Offering (and any related registration, if applicable) (and any other Class A Common Stock proposed to be included in such Underwritten Offering) exceeds the number of shares of Class A Common Stock that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the Company Securities offered or the market for the Company Securities offered,

10

the Company shall include in such Underwritten Offering (and any related registration, if applicable) only that number of shares of Class A Common Stock proposed to be included in such Underwritten Offering (and any related registration, if applicable) that, in the reasonable opinion of the managing underwriter or managing underwriters, will not have such significant adverse effect, with such number of shares of Class A Common Stock to be allocated as follows: (A) in the case of a Requested Underwritten Offering, (1) first, pro-rata among all Holders (including USBTC) that have requested to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, (2) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to the Company, and (3) third, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of shares of Class A Common Stock then held by each such holder; and (B) in the case of any other Underwritten Offerings, (x) first, to the Company, (y) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, pro-rata among all Holders desiring to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, and (z) third, if there remains availability for additional shares of Class A Common Stock to be included in such registration, pro-rata among any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of Class A Common Stock then held by each such holder. If any Holder disapproves of the terms of any such Underwritten Offering, such Holder may elect to withdraw therefrom by written notice to the Company and the managing underwriter(s) delivered on or prior to the time of the commencement of such Underwritten Offering. Any Registrable Securities withdrawn from such Underwritten Offering shall be excluded and withdrawn from the registration, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iv)    The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2(e) at any time in its sole discretion whether or not any Holder has elected to include Registrable Securities in such Registration Statement. The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 5.

3.    Registration and Underwritten Offering Procedures. The procedures to be followed by the Company and each Holder electing to sell Registrable Securities in a Registration Statement pursuant to this Agreement, and the respective rights and obligations of the Company and such Holder, with respect to the preparation, filing and effectiveness of such Registration Statement and the effectuation of any Underwritten Offering, are as follows:

(a)    In connection with a Demand Registration, the Company will, at least five Business Days prior to the anticipated filing of the Registration Statement and any related Prospectus or any amendment or supplement thereto (other than, after effectiveness of the Registration Statement, any filing made under the Exchange Act that is incorporated by reference into the Registration Statement) (for purposes of this subsection, supplements and amendments shall not be deemed to include any filing that the Company is required to make pursuant to the Exchange Act or any amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), (i) furnish to such Holders and the representatives of such Holders copies of all such documents prior to filing and (ii) provide such Holders and the representatives of such Holders the opportunity to (A) review and comment on such documents and (B) object to any information pertaining to such Holder and its plan of distribution that is contained therein, and, in either

11

such case, the Company shall use commercially reasonable efforts to address any changes reasonably requested by such Holder prior to the filing of the Registration Statement.

(b)      In connection with a Piggyback Registration, Underwritten Piggyback Offering or a Requested Underwritten Offering, the Company will, at least five Business Days (or in the case of a Shelf Registration Statement or an offering that will be made pursuant to a Shelf Registration Statement, at least three Business Day) prior to the anticipated filing of any initial Registration Statement that identifies the Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), as applicable, furnish to such Holders copies of any such Registration Statement or related Prospectus or amendment or supplement thereto that identify such Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name such Holders and provide information with respect thereto). The Company will also use commercially reasonable efforts to address in each such document when so filed with the Commission such comments as such Holders reasonably shall propose prior to the filing thereof.

(c)      The Company will use commercially reasonable efforts to, as promptly as reasonably practicable, (i) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement as may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for its Effectiveness Period and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the applicable Holders; (ii) cause the related Prospectus to be amended or supplemented by any required prospectus supplement and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond to any comments received from the Commission with respect to each Registration Statement and, as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement that pertains to such Holders as a selling stockholders but not any comments that would result in the disclosure to such Holders of material and non-public information concerning the Company; and (iv) cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable such Holders to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof.

(d)      The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement and the disposition of all Registrable Securities covered by a Registration Statement.

(e)      The Company will notify such Holders who are included in a Registration Statement as promptly as reasonably practicable: (i)(A) when a Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement in which such Holder is included has been filed; (B) when the Commission notifies the Company whether there will be a "review" of the applicable Registration Statement and when the Commission comments in writing on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each of such Holders that pertain to such Holders as selling stockholders); and (C) with respect to each applicable Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to such Registration Statement or Prospectus or for additional information that pertains to such Holders as sellers of Registrable Securities; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement covering any or

12

all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence (but not the details) of any event or passage of time that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company either promptly files a prospectus supplement to update the Prospectus or a Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the Registration Statement, which, in either case, contains the requisite information that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a material fact necessary to make the statements therein, in the light of circumstances under which they were made, not misleading.

(f)     The Company will use commercially reasonable efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, as promptly as reasonably practicable, or if any such order or suspension is made effective during any Blackout Period or Suspension Period, as promptly as reasonably practicable after such Blackout Period or Suspension Period ends.

(g)     During the Effectiveness Period, the Company will furnish to each such Holder, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Holder (including those incorporated by reference) as promptly as reasonably practical after the filing of such documents with the Commission; *provided*, that the Company will not have any obligation to provide any document pursuant to this clause that is available on the Commission's EDGAR system.

(h)     The Company will as promptly as reasonably practical deliver to each Holder, without charge, as many copies of each Prospectus (including each form of prospectus) authorized by the Company for use and each amendment or supplement thereto as such Holder may reasonably request during the Effectiveness Period. Subject to the terms of this Agreement, including <u>Section 9(b)</u>, the Company consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(i)     The Company will cooperate with such Holders to facilitate the timely preparation and delivery of certificates (or book-entry shares) representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates (or book-entry shares) shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holder may request in writing. In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the Effective Date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to, and maintained with, its transfer agent, together with any other authorizations, certificates and directions required by the transfer agent that authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the applicable Holder of such Registrable Securities under the Registration Statement.

(j)        Upon the occurrence of any event contemplated by Section 3(e)(v), as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)        With respect to Underwritten Offerings, subject to the right of a Holder to withdraw such Holder's Registrable Securities from an Underwritten Offering in accordance with the terms of this Agreement, (i) the right of any Holder to include such Holder's Registrable Securities in an Underwritten Offering shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein, (ii) each Holder participating in such Underwritten Offering severally agrees to enter into and execute an underwriting agreement in customary form and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangement approved by the Persons entitled to select the managing underwriter hereunder and (iii) each Holder participating in such Underwritten Offering severally agrees to complete and execute all questionnaires, powers of attorney, indemnities, and other documents customarily and reasonably required under the terms of such underwriting arrangement. Any such underwriting agreement to be entered into among the Company, managing underwriter of such offering and each Holder participating in such Underwritten Offering shall contain representations and warranties by such Holders and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions on the part of selling stockholders. All of the representations and warranties by, and the other agreements on the part of, the Company to, and for the benefit of, the underwriter of such offering, included in each such underwriting agreement shall also be made to, and for the benefit of, such Holder participating in such Underwritten Offering, and any or all of the conditions precedent to the obligations of such underwriter under such underwriting agreement shall be conditions precedent to the obligations of such Holders. No Holder shall be required in any such underwriting agreement to make any representations or warranties to, or agreements with, the Company or the underwriter other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Securities, such Holder's intended method of distribution and any other representations required by applicable law or reasonably required by the underwriter or the Company. The Company hereby agrees that, in connection with any Underwritten Offering in accordance with the terms hereof, it will negotiate in good faith and execute all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangement, including using commercially reasonable efforts to procure customary legal opinions and auditor "comfort" letters.

(l)        For a reasonable period of time prior to the filing of any Registration Statement and throughout the Effectiveness Period, the Company will make available, upon reasonable notice at the Company's principal place of business or such other reasonable place as determined by the Company in its discretion, for inspection during normal business hours by a representative of the selling Holders, the managing underwriter and any attorneys or accountants retained by the selling Holders or managing underwriter, all such financial and other information and books and records of the Company, and cause the officers, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act; *provided*, *however*, that any information that is not generally publicly available at the time of delivery of such information shall be kept confidential by such Persons unless disclosure of such information is required by court or administrative order or, in the opinion of counsel to such Person, applicable law, in which case, such Person shall be required to give the Company written

14

notice of the proposed disclosure prior to such disclosure and, if requested by the Company, assist the Company in seeking to prevent or limit the proposed disclosure.

(m)    In connection with any Requested Underwritten Offering, the Company will use commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable notice, to meet with prospective investors in presentations, meetings and road shows.

(n)    Each Holder agrees to furnish to the Company any other information regarding the Holder and the distribution of such securities as the Company reasonably determines is required to be included in any Registration Statement or any Prospectus or prospectus supplement relating to an Underwritten Offering.

(o)    Notwithstanding any other provision of this Agreement, the Company shall not be required to file a Registration Statement (or any amendment thereto) or effect a Requested Underwritten Offering (or, if the Company has filed a Shelf Registration Statement and has included Registrable Securities therein, the Company shall be entitled to suspend the offer and sale of Registrable Securities pursuant to such Registration Statement) for a period of up to 60 days if (i) the Board determines that a postponement is in the best interest of the Company and its stockholders generally due to a pending transaction involving the Company (including a pending securities offering by the Company), (ii) the Board determines such registration would render the Company unable to comply with applicable securities laws or (iii) the Board determines such registration would require disclosure of material information that the Company has a bona fide business purpose for preserving as confidential (any such period, a "**Blackout Period**"); *provided*, *however*, that in no event shall any Blackout Period together with any Suspension Period exceed an aggregate of 120 days in any 12-month period. In the event that a Registration Statement withdrawn pursuant to this Section 3(o) relates to a Demand Registration pursuant, then USBTC shall be entitled to withdraw the Demand Registration and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 2(b)(iii). In effecting a Blackout Period, the Company shall not disclose any material non-public information that is the basis for such Blackout Period to a Holder without the express written consent of such Holder.

(p)    In connection with an Underwritten Offering, the Company shall use commercially reasonable efforts to provide to each Holder named as a selling stockholder in any Registration Statement a copy of any auditor "comfort" letters and customary legal opinions, in each case that have been provided to the managing underwriter in connection with the Underwritten Offering, not later than the Business Day prior to the effective date of such Registration Statement.

(q)    In connection with any Underwritten Offering made pursuant to a Registration Statement filed pursuant to Section 2, if requested by the managing underwriter in an Underwritten Offering, each Holder shall execute a customary "lock-up" agreement with the underwriters of such Underwritten Offering containing a lock-up period equal to the shorter of (i) the shortest number of days that a director of the Company or "executive officer" (as defined under Section 16 of the Exchange Act) of the Company contractually agrees with the underwriters of such Underwritten Offering not to sell any Company Securities following such Underwritten Offering and (ii) 90 days from the date of the execution of the underwriting agreement with respect to such Underwritten Offering. Notwithstanding the foregoing, any discretionary waiver or termination of this lock-up provision by the Company or the underwriters with respect to any of the Holders shall apply to the other Holders as well, pro rata based upon the number of shares subject to such obligations.

(r)    Notwithstanding anything to the contrary in this Agreement, any Holder may make a written election (an "**Opt-Out Election**") to no longer receive from the Company any Demand Notice, Piggyback Registration Notice or Underwritten Offering Piggyback Notice (each, a "**Covered Notice**"),

15

and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such Covered Notice to such Holder from the date of receipt of such Opt-Out Election and such Holder shall have no right to participate in any Registration Statement or Underwritten Offering as to which such Covered Notices pertain. An Opt-Out Election shall remain in effect until it has been revoked in writing and received by the Company. A Holder who previously has given the Company an Opt-Out election may revoke such election at any time in writing, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Elections.

4.    No Inconsistent Agreements; Additional Rights. The Company shall not hereafter enter into, and is not currently a party to, any agreement with respect to its securities that is inconsistent in any material respect with the rights granted to the Holders by this Agreement. The Company shall not, prior to the termination of this Agreement, grant any registration rights that are superior to, conflict with, or would otherwise prevent the Company from performing, the rights granted to the Holders hereby.

5.    Registration Expenses. All Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration, Requested Underwritten Offering, Piggyback Registration or Underwritten Piggyback Offering (in each case, excluding any Selling Expenses) shall be borne by the Company, whether or not any Registrable Securities are sold pursuant to a Registration Statement or whether or not a Registration Statement is filed or becomes effective. "***Registration Expenses***" means all expenses incurred in connection with registrations, filings or qualifications pursuant to Section 2 and Section 3, (i) registration and filing fees (including fees and expenses (A) with respect to filings required to be made with the Trading Market, (B) in compliance with applicable state securities or "Blue Sky" laws and (C) with respect to filings with FINRA), (ii) printing expenses (including expenses of printing certificates for Company Securities and of printing Prospectuses if the printing of Prospectuses is reasonably requested by a Holder of Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel, auditors and accountants, (v) Securities Act liability insurance, if the Company so desires such insurance, (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement, (vii) all expenses relating to marketing the sale of the Registrable Securities, including expenses related to conducting a "road show" and (viii) reasonable and documented fees and expenses of one counsel to the Holders reasonably acceptable to the Company and selected by the Holders that hold a majority of the Registrable Securities to be included in such filing in connection with the filing or amendment of any Registration Statement or Prospectus hereunder. In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and all salaries and expenses of their officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on the Trading Market.

6.    Indemnification.

(a)    The Company shall indemnify and hold harmless each Holder, its Affiliates and each of their respective officers and directors and any agent thereof (collectively, "***Holder Indemnified Persons***"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Holder Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act or otherwise (collectively, "***Losses***"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, in any preliminary prospectus (if the

16

Company authorized the use of such preliminary prospectus prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current); *provided*, *however*, that the Company shall not be liable to any Holder Indemnified Person to the extent that any such claim arises out of, is based upon or results from an untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder Indemnified Person, in its capacity as such, or any underwriter specifically for use in the preparation thereof. The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement. This indemnity shall be in addition to any liability the Company may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder Indemnified Person or any Indemnified Party and shall survive the transfer of such securities by such Holder. Notwithstanding anything to the contrary herein, this Section 6 shall survive any termination or expiration of this Agreement indefinitely.

(b)    In connection with any Registration Statement in which a Holder participates, such Holder, solely in its capacity as such, shall, severally and not jointly, indemnify and hold harmless the Company, its Affiliates and each of their respective officers, directors and any agent thereof, to the fullest extent permitted by applicable law, from and against any and all Losses as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, in any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), but only to the extent that the same are made in reliance and in conformity with information relating to the Holder furnished in writing to the Company by such Holder, solely in its capacity as such, expressly for use therein. This indemnity shall be in addition to any liability such Holder may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party (as defined below). In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder from the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)    Any Person entitled to indemnification hereunder (each, an "***Indemnified Party***") shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks

indemnification and (ii) unless in such Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and indemnifying party may exist with respect to such claim or there may be reasonable defenses available to the Indemnified Party that are different from, or additional to, those available to the indemnifying party, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the Indemnified Party without its consent (but such consent may not be unreasonably withheld, delayed or conditioned). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (in addition to any local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless, in the reasonable judgment of any Indemnified Party, there may be one or more legal or equitable defenses available to such Indemnified Party that are in addition to, or may conflict with, those available to another Indemnified Party with respect to such claim. Failure to give prompt written notice as provided in clause (i) above shall not release the indemnifying party from its obligations hereunder.

(d)    If the indemnification provided for in this Section 6 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any Losses referred to herein, the indemnifying party, in lieu of indemnifying such Indemnified Party thereunder, shall, to the extent permitted by applicable law, contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the Indemnified Party, on the other hand, in connection with the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact that resulted in such Losses, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the Indemnified Party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or alleged statement or omission or alleged omission; *provided*, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder.

7.    Facilitation of Sales Pursuant to Section 4(a)(7), Rule 144 and Rule 144A.

(a)    The Company will provide reasonable access to management for confirmatory due diligence meetings, as the Holders may reasonably request, to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act.

(b)    To the extent is shall be required to do so under the Exchange Act, the Company shall timely file the reports required to be filed by it under the Exchange Act or the Securities Act (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144) and shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act pursuant to Rule 144, Rule 144A or Section 4(a)(7) of the Securities Act. Upon the request of any Holder in connection with such Holder's sale pursuant to Rule 144 the Company shall deliver to such Holder a written statement as to whether it has complied with the applicable requirements.

8.    Voting. At any time during which the USBTC Management Agreement is in full force and effect, USBTC in its capacity as stockholder or proxy holder of the Company, irrevocably and unconditionally agrees that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company: (i) USBTC shall cause to be voted at such meeting (or validly execute and return and cause such consent to be

18

granted with respect to) all of such Initial Shares (including those obtained by dividends, stock splits, and similar transactions with respect to the Initial Shares, but not, for the avoidance of doubt, including shares of Common Stock otherwise acquired by USBTC) owned as of the record date for such meeting (or the date that any written consent is executed by USBTC)(the "**Covered Shares**") in accordance with the recommendations of the board of directors of the Company and (ii) USBTC shall not commit any act that restricts its legal power, authority and right to vote all of the Covered Shares to vote (or execute and return an action by written consent) then beneficially owned by it or otherwise prevent or disable it from performing any of its obligations under this Section 8. Without limiting the generality of the foregoing, except for this Agreement, USBTC shall not (A) enter into any voting agreement with any person with respect to any of the Covered Shares, (B) grant any person other than the Company or its designees any proxy (revocable or irrevocable) or power of attorney with respect to any of the Covered Shares, (C) deposit any of the Covered Shares in a voting trust or otherwise enter into any agreement or arrangement with any person (other than the Company) limiting or affecting its legal power, authority or right to vote the Covered Shares in accordance with this Section 8, (D) acquire, offer or propose to acquire or solicit an offer to sell any securities of the Company, (E)(1) except as permitted by the USBTC Management Agreement, make, engage in, or in any way participate in any "solicitation" of "proxies" (as such terms are used in the rules of the Securities and Exchange Commission promulgated under Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but without regard to the exclusion set forth in Rule 14a-1(l)(2)(iv) promulgated under the Exchange Act or any consents to vote, call or seek to call a meeting of stockholders or otherwise seek to influence the timing of any meeting of stockholders, or (2) seek the removal of any member of the board of directors or otherwise seek representation on the board of directors in any manner (in each case other than with respect to the Class B Directors (as such term is defined in the Company's certificate of incorporation) or as otherwise contemplated in the USBTC Management Agreement), (F) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the Exchange Act) or otherwise act in concert with any other Person with respect to any securities of the Company or any actions prohibited by this Section 8] or (G) disclose publicly any intention to take any action prohibited by this Section 8. USBTC hereby grants the Company an irrevocable proxy to vote all shares of Class A Common Stock owned by it in accordance with this Section 8, _provided_, _however_, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the USBTC Management Agreement.

9.    Miscellaneous.

(a)    Remedies. In the event of actual or potential breach by the Company of any of its obligations under this Agreement, each Holder, in addition to being entitled to exercise all rights granted by applicable law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b)    Discontinued Disposition. Upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (ii) through (v) of Section 3(e) (provided that the Company shall not disclose any material non-public information that is the basis for such notice to the Holder without the express written consent of the Holder), each Holder will forthwith discontinue disposition of any applicable Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement as contemplated by Section 3(j) or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration

Statement (a "**Suspension Period**"). The Company may provide appropriate stop orders to enforce the provisions of this Section 9(b).

      (c)      Amendments and Waivers. No provision of this Agreement may be waived or amended except in a written instrument signed by the Company, USBTC and Holders that hold a majority of the Registrable Securities as of the date of such waiver or amendment, *provided*, *however*, that any waiver or amendment that would have a disproportionate adverse effect on a Holder relative to the other Holders shall further require the consent of such Holder. The Company shall provide prior notice to all Holders of any proposed waiver or amendment. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

      (d)      Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Section 9(d) prior to 5:00 p.m. in the time zone of the receiving party on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Agreement later than 5:00 p.m. in the time zone of the receiving party on any date and earlier than 11:59 p.m. in the time zone of the receiving party on such date, (iii) the Business Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) upon actual receipt by the Party to whom such notice is required to be given. The address for such notices and communications shall be as follows:

| | |
|---|---|
| If to the Company: | 2332 Galiano Street, 2nd Floor<br>Coral Gables, Florida  33134<br>Email: joel@ionicdigital.com<br>Attention: Joel Block, CFO |
| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Email: echange@cgsh.com<br>Attention: Elizabeth A. Chang |
| If to USBTC: | 1101 Brickell Ave., N-1500<br>Miami, Florida 33131<br>Email: legalteam@hut8.io and<br>asher@usbitcoin.com<br>Attention: Asher Genoot |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |
| If to any Holder other than USBTC: | To the address set forth for such Holder in the joinder agreement in the form set forth in Exhibit A hereto. |

(e)    <u>Successors and Assigns; Transfer of Registration Rights</u>.

(i)    This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns. Except as provided in <u>Section 9(e)(ii)</u>, this Agreement, and any rights or obligations hereunder, may not be assigned without the prior written consent of the Company and USBTC. The Company may not assign its rights or obligations hereunder without the prior written consent of USBTC.

(ii)    Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment or other conveyance (any of the foregoing, a "***Transfer***") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws and the Company's certificate of incorporation and bylaws then in effect; (b) such transferee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement substantially in the form set forth in <u>Exhibit A</u> hereto and delivers it to the Company as promptly as reasonably practicable; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee and identifying the Registrable Securities with respect to which such rights are being Transferred and provide the amount of any other capital stock of the Company beneficially owned by such transferee; *provided, however*, that (i) except with respect to an Affiliate of USBTC, any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. Following a Transfer in accordance with this <u>Section 9(e)</u>, the Company shall update the applicable prospectus to include the transferee as a selling holder thereunder promptly upon the receipt of the required information from such transferee.

(f)    <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than the Parties or their respective successors and permitted assigns and any Indemnified Party, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

(g)    <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile or electronic mail transmission, such signature shall create a valid binding obligation of the Party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such signature delivered by facsimile or electronic mail transmission were the original thereof.

(h)    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any

suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

(i)     <u>Cumulative Remedies</u>. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(j)     <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Parties shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the Parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(k)     <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby, whether oral or written.

(l)     <u>Termination</u>. Except for <u>Section 8</u> (which shall terminate upon the termination or expiration of the USBTC Management Agreement) and <u>Section 6</u>, this Agreement shall terminate as to any Holder when all Registrable Securities held by such Holder no longer constitute Registrable Securities.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**IONIC DIGITAL INC.**

By:_____

Name:_____

Title:_____


**U.S. DATA MANAGEMENT GROUP, LLC**

By:_____

Name:_____

Title:_____

*Signature Page to Investors' and Registration Rights Agreement*

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Investors' and Registration Rights Agreement, dated as of [●], and as amended from time to time (the "Investors' and Registration Rights Agreement"), among Ionic Digital Inc. (the "Company") and the stockholders of the Company parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Investors' and Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Holder" under, the Investors' and Registration Rights Agreement as of the date hereof as if he, she or it had executed the Investors' and Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Investors' and Registration Rights Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**[JOINING PARTY]**

By:_____

Name:_____

Title:_____

Address:_____

Date:_____

## Exhibit A-1

**(Redline) Registration Rights**

~~BR Draft 10.13.2023~~*DRAFT*

## INVESTORS' AND REGISTRATION RIGHTS AGREEMENT

This Investors' and Registration Rights Agreement (this "***Agreement***"), dated as of [●], is entered into by and among [~~NewCo~~,Ionic Digital] Inc.], a Delaware corporation (the "***Company***"), and [~~Fahrenheit~~U.S. Data Management Group, LLC]], a Delaware limited liability company ("***~~Fahrenheit~~USBTC***" and, together with the Company, the "***Parties***").

**WHEREAS**, on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "***Plan***")~~;~~, as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "***MiningCo Implementation Motion***," and together with the Plan, the "***MiningCo Plan***");

**WHEREAS,** ~~on [●],~~ the Bankruptcy Court entered its Order confirming the Plan on November 9, 2023, and its Order granting the MiningCo Implementation Motion on December 22, 2023;

**WHEREAS,** pursuant to the Plan, ~~Fahrenheit~~USBTC and the Company entered into that certain Plan Sponsor Contribution Agreement, dated as of [●] (the "***Contribution Agreement***"), pursuant to which, among other things, ~~Fahrenheit~~USBTC agreed to purchase a total of $12,75~~0~~6,000,~~000~~ worth of shares of the Company's Class A common stock, par value $[~~●~~]0.00001 per share (as further defined below, the "***Class A Common Stock***"), from the Company and/or in secondary market purchases (as such term is defined in the Contribution Agreement, the "***Plan Sponsor Shares***");

**WHEREAS,** pursuant to the Plan, the Company and ~~Fahrenheit~~USBTC entered into that certain Warrant Agreements, dated as of [●] (the "***Warrant Agreement***"), pursuant to which, among other things, ~~Fahrenheit~~USBTC received warrants to purchase shares of Class A Common Stock (the "***Warrant Shares***");

**WHEREAS,** pursuant to the Plan, ~~Fahrenheit~~USBTC and the Company entered into that certain [Restricted Stock Agreement], dated as of [●] (the [***"Restricted Stock Agreement"***]), pursuant to which, among other things, ~~Fahrenheit~~USBTC agreed to purchase shares of Class A Common Stock from the Company subject to certain terms and conditions (the "***Restricted Stock Agreement Shares***" and, with the Plan Sponsor Shares and the Warrant Shares, the "***Initial Shares***");

**WHEREAS,** the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement all contemplate that the Parties will enter into a registration rights agreement; and

**WHEREAS,** the Parties are entering into this Agreement in furtherance of the aforementioned provisions of the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement.

AMERICAS 124964997

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the Parties hereby agree as follows:

1.    <u>Definitions</u>. As used in this Agreement, the following terms have the meanings indicated:

"***Affiliate***" means, with respect to any specified Person, a Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such specified Person.[1]

"***Automatic Shelf Registration Statement***" means an "automatic shelf registration statement" as defined under Rule 405.

"***Board***" means the board of directors of the Company.

"***Business Day***" means any day other than a Saturday, Sunday, any federal holiday or any other day on which banking institutions in the State of New York are authorized or required to be closed by law or governmental action.

"***Class A Common Stock***" means the Company's Class A common stock, par value $[●]0.00001 per share, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"***Commission***" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or Exchange Act.

"***Company Securities***" means any equity interest of any class or series in the Company.

"***Controls***," "***Controlled by***" and "***under common Control with***" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Effective Date***" means the time and date that a Registration Statement is first declared effective by the Commission or otherwise becomes effective.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"~~***Fahrenheit Management Agreement***~~" ~~means that certain Management Agreement, dated as of [●], by and between the Company and Fahrenheit.~~

"***FINRA***" means the Financial Industry Regulatory Authority.

"***Holder***" means (a) ~~Fahrenheit~~USBTC, unless and until ~~Fahrenheit~~USBTC ceases to hold any Registrable Securities; and (b) any holder of Registrable Securities to whom registration rights conferred by this Agreement have been transferred in compliance with <u>Section 9(e)</u> hereof; *provided*, that any Person referenced in clause (b) of this definition shall be a Holder only if such

---

[1] ~~NTD: TBD if there are specific Affiliates we want to add in for Fahrenheit specifically.~~

AMERICAS 124964997

Person agrees in writing to be bound by and subject to the terms and conditions set forth in this Agreement.

"*Material Adverse Change*" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market in the United States; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (c) a material outbreak or escalation of armed hostilities or other international or national calamity involving the United States or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any event, change, circumstance or effect that is or is reasonably likely to be materially adverse to the business, properties, assets, liabilities, condition (financial or otherwise), operations, results of operations or prospects of the Company and its subsidiaries taken as a whole.

"*Person*" means an individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited partnership, limited liability company, joint stock company, estate, trust, government (or an agency or subdivision thereof) or other entity of any kind.

"*Proceeding*" means any action, claim, suit, proceeding or investigation (including a preliminary investigation or partial proceeding, such as a deposition) pending or, to the knowledge of the Company, threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A, Rule 430B or Rule 430C promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means the Shares; *provided*, *however*, that Registrable Securities shall not include: (a) any Shares that have been registered under the Securities Act and disposed of pursuant to an effective Registration Statement or otherwise transferred to a Person who is not entitled to the registration rights and other rights hereunder; (b) any Shares that have been sold or transferred by the Holder thereof pursuant to Rule 144 (or any similar provision then in force under the Securities Act) and the transferee thereof does not receive "restricted securities" as defined in Rule 144, as a result of which the legend on any certificate or book-entry notation, as the case may be, representing such Registrable Security restricting transfer of such Registrable Security has been removed; (c) any Shares that are eligible for resale without restriction (including any limitation thereunder on volume or manner of sale) and without the need for current public information pursuant to any provision of Rule 144 (or any similar provision then in force under the Securities Act); and (d) any Shares that cease to be outstanding (whether as a result of repurchase and cancellation, conversion or otherwise).

"*Registration Statement*" means a registration statement of the Company in the form required to register under the Securities Act, the Exchange Act or other applicable law for the resale of the Registrable Securities in accordance with the intended plan of distribution of each Holder included therein, and including any Prospectus, amendments and supplements to each

AMERICAS 124964997

such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***Rule 144***" means Rule 144 promulgated by the Commission pursuant to the Securities Act.

"***Rule 405***" means Rule 405 promulgated by the Commission pursuant to the Securities Act.

"***Rule 415***" means Rule 415 promulgated by the Commission pursuant to the Securities Act.

"***Rule 424***" means Rule 424 promulgated by the Commission pursuant to the Securities Act.

"***Rule 430A***" means Rule 430A promulgated by the Commission pursuant to the Securities Act.

"***Rule 430B***" means Rule 430B promulgated by the Commission pursuant to the Securities Act.

"***Rule 430C***" means Rule 430C promulgated by the Commission pursuant to the Securities Act.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Selling Expenses***" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder in connection with such sale (except as set forth in Section 5).

"***Shares***" means the shares of Class A Common Stock now held or hereafter acquired by the Holders, including without limitation the Initial Shares and any other shares of Class A Common Stock held by the Holders as of the date hereof, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"***Shelf Registration Statement***" means a Registration Statement filed with the Commission on Form S-3 (or any successor form or other appropriate form under the Securities Act) for an offering to be made on a continuous or delayed basis pursuant to Rule 415 (or any similar rule that may be adopted by the Commission) or, if the Company is not then eligible to file on Form S-3, on Form S-1 or any other appropriate form under the Securities Act, or any successor rule that may be adopted by the Commission, and all amendments and supplements to such Registration Statement (including post-effective amendments), covering the Registrable Securities, as applicable.

"***Trading Market***" means the principal national securities exchange on which Registrable Securities are listed.

4

"***Underwritten Offering***" means an underwritten offering of Class A Common Stock for cash (whether a Requested Underwritten Offering or in connection with a public offering of Class A Common Stock by the Company, stockholders or both), excluding an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4 or Form S-8 or an offering on any registration statement form that does not permit secondary sales.

"***USBTC Management Agreement***" means that certain Management Services Agreement, dated as of [●], by and between the Company and USBTC.

"***VWAP***" means, as of a specified date and in respect of Registrable Securities, the volume weighted average price for such security on the Trading Market for the five trading days immediately preceding, but excluding, such date.

"***WKSI***" means a "well-known seasoned issuer" as defined under Rule 405.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections refer to sections of this Agreement; (c) the terms "include," "includes," "including" and words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "hereto," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall include all rules and regulations promulgated thereunder, and references to any law or statute shall be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable law or statute; (h) references to any Person include such Person's successors and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated.

2.     Registration.

(a)     Initial Shelf Registration Statement.

(i)     Notwithstanding anything to the contrary contained in this Agreement, as soon as practicable following the first date of the Company's eligibility to file a Registration Statement on Form S-3 (but no later than 30 days following such date), the Company shall use reasonable best efforts to file with the Commission a Shelf Registration Statement on Form S-3 (as such Registration Statement may be amended from time to time, the "***Initial Shelf Registration Statement***"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall have timely requested inclusion therein of some or all of its Registrable Securities by written notice to the Company. The Company shall use its reasonable best efforts to have the Initial Shelf Registration Statement declared effective by the Commission as soon as reasonably practicable after the Company files the Initial Shelf Registration Statement but no later than the fifth Business Day following the date on which the Commission informs the Company that it does not intend to review the Initial Shelf Registration Statement or the fifth Business Day following the resolution or clearance of all Commission comments to the Initial Shelf Registration Statement, as applicable.

(ii)     The Company shall use reasonable best efforts to keep the Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date on which all Registrable

5

Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "***Initial Shelf Expiration Date***").

(iii)    Until the Initial Shelf Expiration Date, the Company shall file any supplements or post-effective amendments required to be filed by applicable law so that (A) the Initial Shelf Registration Statement does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (B) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K.

(b)    <u>Demand Registration</u>.

(i)    Subject to the provisions of <u>Section 2(b)(x)</u>, ~~Fahrenheit~~<u>USBTC</u> shall have the option and right, exercisable by delivering a written notice to the Company (a "***Demand Notice***"), to require the Company to, pursuant to the terms of and subject to the limitations contained in this Agreement, prepare and file with the Commission a Registration Statement registering the offering and sale of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice, which may include sales on a delayed or continuous basis pursuant to Rule 415 on a Shelf Registration Statement (a "***Demand Registration***"). The Demand Notice must set forth the number of Registrable Securities that ~~Fahrenheit~~<u>USBTC</u> and other Holders, as applicable, intend to include in such Demand Registration and the intended timing and method of disposition thereof. Notwithstanding anything to the contrary herein, in no event shall the Company be required to effectuate a Demand Registration unless the Registrable Securities of the Holders to be included therein after compliance with <u>Section 22(b)(ii)</u> and <u>Section 2(b)(x)</u>: (i) have an aggregate value of at least $~~[15] million~~<u>7,500,000</u> based on the VWAP or (ii) represent at least ~~[15%]~~ of the Registrable Securities eligible for registration in accordance with <u>Section 2(b)(x)</u> (the "***Minimum Amount***")² as of the date of the Demand Notice.

(ii)    Within ~~[five]~~ Business Days (or if the Registration Statement will be a Shelf Registration Statement, within ~~[two]~~ Business Days) after the receipt of the Demand Notice, the Company shall give written notice of such Demand Notice to all Holders and, within ~~[30]~~ days after receipt of the Demand Notice (except if the Company is not then eligible to register for offer and resale the Registrable Securities on Form S-3, in which case, within ~~[90]~~ days thereof), shall, subject to the limitations of this <u>Section 2(b)</u>, file a Registration Statement in accordance with the terms and conditions of, and the intended timing and method of disposition described in, the Demand Notice, which Registration Statement shall cover all of the Registrable Securities eligible for registration in accordance with <u>Section 2(b)(x)</u> that the Holders shall in writing request to be included in the Demand Registration (such request to be given to the Company within three Business Days (or if the Registration Statement will be a Shelf Registration Statement, within ~~[one]~~ Business Day) after receipt of notice of the Demand Notice given by the Company pursuant to this <u>Section 2(b)(ii)</u>). The Company shall use reasonable best efforts to cause such Registration Statement to become, as soon as reasonably practicable after the filing thereof, and remain continuously, effective under the Securities Act until the earlier of (A) 180 days (or three years if a Shelf Registration Statement is requested) after the Effective Date of such Registration Statement or (B) the date on which all Registrable Securities covered by such Registration Statement have been sold or otherwise disposed of or such Shares are no

---

² ~~NTD: Business team to discuss Minimum Amount thresholds.~~

AMERICAS 124964997

longer Registrable Securities (the "***Effectiveness Period***"); *provided*, *however*, that such period shall be extended for a period of time equal to the period the Holders refrain from selling any securities included in such Registration Statement at the request of an underwriter of the Company or the Company pursuant to this Agreement.

(iii)     Subject to the other limitations contained in this Agreement, the Company is not obligated hereunder to effect (A) a Demand Registration within 90 days after the closing of any Requested Underwritten Offering, (B) more than a total of ~~[four]~~ Demand Registrations, and (C) a subsequent Demand Registration pursuant to a Demand Notice if a Registration Statement covering all of the Registrable Securities held by the Holders shall have become and remains effective under the Securities Act and is sufficient to permit offers and sales of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice in accordance with the intended timing and method of disposition thereof specified in the Demand Notice; *provided*, that a demand for a Shelf Registration Statement shall not count against the number of allowable Demand Registrations for subclause (B) of this paragraph. No Demand Registration shall be deemed to have occurred for purposes of this Section 2(b)(iii) if the Registration Statement relating thereto does not become effective or is not maintained effective for its entire Effectiveness Period, in which case ~~Fahrenheit~~USBTC shall be entitled to an additional Demand Registration in lieu thereof. Further, a Demand Registration shall not constitute a Demand Registration for purposes of this Section 2(a)(iii) if, as a result of Section 2(b)(vi), there is included in the Demand Registration less than the Minimum Amount of Registrable Securities.

(iv)     A Holder may withdraw all or any portion of its Registrable Securities included in a Demand Registration from such Demand Registration at any time prior to the effectiveness of the applicable Registration Statement. Upon receipt of a notice from ~~Fahrenheit~~USBTC that ~~Fahrenheit~~USBTC (and/or other applicable Holders) are withdrawing all of their Registrable Securities from the Demand Registration such that the remaining amount of Registrable Securities to be included in the Demand Registration is below the Minimum Amount, the Company shall cease all efforts to secure effectiveness of the applicable Registration Statement. Such registration nonetheless shall be deemed a Demand Registration for purposes of Section 2(b)(iii) unless (A) ~~Fahrenheit~~USBTC shall have paid or reimbursed the Company for all reasonable and documented out-of-pocket fees and expenses incurred by the Company in connection with the withdrawn registration of such Registrable Securities (based on the number of securities ~~Fahrenheit~~USBTC sought to register, as compared to the total number of securities included in such Demand Registration) or (B) the withdrawal is made following the occurrence of a Material Adverse Change or pursuant to the Company's request for suspension pursuant to Section 3(o).

(v)     The Company may include in any such Demand Registration other Company Securities for sale for its own account or for the account of any other Person, subject to Section 2(b)(vi) and Section 2(e)(iii).

(vi)     In the case of a Demand Registration not being underwritten, if ~~Fahrenheit~~USBTC advises the Company that in its reasonable opinion the aggregate number of securities requested to be included in such registration exceeds the number that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the Company shall include in such Demand Registration only that number of securities that, in the reasonable opinion of

7

~~Fahrenheit~~USBTC, will not have such adverse effect, with such number to be allocated as follows: (A) first, pro-rata among all Holders (including ~~Fahrenheit~~USBTC) that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Holder, (B) second, if there remains availability for additional securities to be included in such Demand Registration, to the Company, and (C) third, if there remains availability for additional securities to be included in such Demand Registration following the allocation provided in clauses (A) and (B) above, to any other holders of Company Securities entitled to participate in such Demand Registration, if applicable, based on the relative number of Company Securities such holder is entitled to include in such Demand Registration.

(vii)    Subject to the limitations contained in this Agreement, the Company shall effect any Demand Registration on such appropriate registration form of the Commission (A) as shall be selected by the Company and (B) as shall permit the disposition of the Registrable Securities in accordance with the intended method of disposition specified in the Demand Notice; *provided*, that if the Company becomes, and is at the time of its receipt of a Demand Notice, a WKSI, the Demand Registration for any offering and selling of Registrable Securities shall be effected pursuant to an Automatic Shelf Registration Statement, which shall be on Form S-3 (if available to the Company. If at any time a Registration Statement on Form S-3 is effective and a Holder provides written notice to the Company that it intends to effect an offering of all or part of the Registrable Securities included on such Registration Statement, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable such offering to take place.

(viii)    Without limiting Section 3, in connection with any Demand Registration pursuant to and in accordance with this Section 2(b), the Company shall (A) promptly prepare and file or cause to be prepared and filed (1) such additional forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary or advisable to register or qualify the Registrable Securities subject to such Demand Registration, including under the securities laws of such jurisdictions as the Holders shall reasonably request; *provided*, *however*, that no such qualification shall be required in any jurisdiction where, as a result thereof, the Company would become subject to general service of process or to taxation or qualification to do business in such jurisdiction solely as a result of such registration and (2) such forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary to apply for listing or to list the Registrable Securities subject to such Demand Registration on the Trading Market and (B) do any and all other acts and things that may be reasonably necessary or appropriate or reasonably requested by the Holders to enable the Holders to consummate a public sale of such Registrable Securities in accordance with the intended timing and method of distribution thereof.

(ix)    In the event a Holder transfers Registrable Securities included on a Registration Statement and such Registrable Securities remain Registrable Securities following such transfer, at the request such Holder, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable the transferee of such Registrable Securities to offer and sell such Registrable Securities pursuant to such Registration Statement; *provided*, that in no event shall the Company be required to file a post-effective amendment to the Registration Statement unless (A) such Registration Statement includes only Registrable Securities held by the Holder, Affiliates of the Holder or transferees of the Holder or (B) the Company has received written consent therefor from each other Holder for whom Registrable

8

Securities have been registered on (but not yet sold under) such Registration Statement, other than the Holder, Affiliates of the Holder or transferees of the Holder.

(x)        ~~Fahrenheit's~~USBTC's option and right with respect to Demand Registrations set forth in this Section 2(b) shall apply to the Registrable Securities as follows: (A) with respect to the Plan Sponsor Shares, immediately upon the earlier to occur of the expiration of the Lock-Up Period (as such term is defined in the Plan Sponsor Contribution Agreement) or, with respect to such Plan Sponsor Shares as shall have vested thereupon, the commencement of the Unlock Period (as such term is defined in the Plan Sponsor Contribution Agreement); (B) with respect to the Restricted Stock Agreement Shares, immediately upon the vesting of the Restricted Stock Agreement Shares in accordance with the terms of the Restricted Stock Agreement; (C) with respect to the Warrant Shares, immediately upon the Exercise Period Commencement Date (as such term is defined in the Warrant Agreements); and (D) with respect to such Shares that ~~Fahrenheit~~USBTC may acquire after the date hereof, upon the earliest to occur of the events set forth in subclauses (A), (B) or (C) of this Section 2(b)(x) following the acquisition of such Shares.[3]

---

[3] ~~NTD: Conform definitions/usage among the various agreements as required.  Currently 1 RSA and multiple Warrant Agreement are contemplated (add back in applicable if that changes).~~

9

AMERICAS 124964997

(c)    <u>Requested Underwritten Offering</u>. If ~~Fahrenheit~~[4]USBTC is able to effectuate a Demand Registration pursuant to the terms of <u>Section 2(b)</u> (or has previously effectuated a Demand Registration pursuant to <u>Section 2(b)</u> but has not engaged in an Underwritten Offering in respect of such Demand Registration) ~~Fahrenheit~~USBTC shall have the option and right, exercisable by delivering written notice to the Company of its intention to distribute Registrable Securities that are then not otherwise subject to restrictions on transfer other than those provided by applicable securities law by means of an Underwritten Offering (an "***Underwritten Offering Notice***"), to require the Company, pursuant to the terms of and subject to the limitations of this Agreement, to effectuate a distribution of any or all of its and other Holders' Registrable Securities by means of an Underwritten Offering pursuant to a new Demand Registration or pursuant to an effective Registration Statement covering such Registrable Securities (a "***Requested Underwritten Offering***"); *provided*, that if the Requested Underwritten Offering is pursuant to a new Demand Registration, then the Registrable Securities requested to be included in such Requested Underwritten Offering equal or exceed the Minimum Amount. The Underwritten Offering Notice must set forth the number of Registrable Securities that are intended to be included in such Requested Underwritten Offering. The Company shall propose three or more nationally prominent firms of investment bankers reasonably acceptable to ~~Fahrenheit~~USBTC to act as the managing underwriter or managing underwriters in connection with such Underwritten Offering from which ~~Fahrenheit~~USBTC shall select the managing underwriter or managing underwriters. ~~Fahrenheit~~USBTC, in connection with any other Holder participating in such Underwritten Offering, shall determine the pricing of the Registrable Securities offered pursuant to any Requested Underwritten Offering and the applicable underwriting discounts and commissions and determine the timing of any such Requested Underwritten Offering. Notwithstanding the foregoing, the Company is not obligated to effect more than a total of ~~[three]~~ Requested Underwritten Offerings, but in no more than (x) two within 90 days after the closing of an Underwritten Offering and (y) two within any 12-month period. Any Requested Underwritten Offering (other than the first Requested Underwritten Offering made in respect of a prior Demand Registration) shall constitute a Demand Registration of ~~Fahrenheit~~USBTC for purposes of <u>Section 2(b)(iii)</u> (it being understood that if requested concurrently with a Demand Registration then, together, such Demand Registration and Requested Underwritten Offering shall count as one Demand Registration); *provided*, *however*, that a Requested Underwritten Offering shall not constitute a Demand Registration of ~~Fahrenheit~~USBTC for purposes of <u>Section 2(b)(iii)</u> if, as a result of <u>Section 2(e)(iii)(A)</u>, the Requested Underwritten Offering includes less than the lesser of (i) Registrable Securities having a VWAP measured on the effective date of the related Registration Statement of $~~[●]  million~~7,500,000 and (ii) ~~[two-thirds]~~ of the number of Registrable Securities set forth in the applicable Underwritten Offering Notice.

(d)    <u>Block Trades</u>. Notwithstanding anything contained in this <u>Section 2</u>, in the event a sale of Registrable Securities is an underwritten transaction requiring the involvement of the Company but not involving (i) any "road show" or (ii) a lock-up agreement of more than ~~[45]~~ days to which the Company is a party, and which is commonly known as a "block trade" (a "***Block Trade***"), (1) the requesting Holder or Holders shall (A) give at least ~~[three]~~ Business Day prior notice in writing of such transaction to the Company (B) with respect to any Block Trade, identify the potential underwriter in such notice with contact information for such underwriter; and (2) the Company shall cooperate with such requesting Holder or Holders to the extent it is reasonably able and shall not be required to give notice thereof to other Holders or permit their participation therein unless reasonably practicable. Any

---

~~[4] NTD: Intention is to limit the demand right to Fahrenheit, but to allow all Holders to participate pro rata.~~

AMERICAS 124964997

Block Trade shall be for at least $[2,000,000] in expected gross proceeds. The Company shall not be required to effectuate more than [three] Block Trades in any 90-day period. For the avoidance of doubt, a Block Trade shall not constitute a Requested Underwritten Offering.

(e)     Piggyback Registration and Piggyback Underwritten Offering.

(i)     If the Company shall, at any time, propose to file a registration statement under the Securities Act with respect to an offering of Class A Common Stock (other than a registration statement on Form S-4 or Form S-8 filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan and other than a Demand Registration), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least five Business Days, except if the registration statement will be a Shelf Registration Statement, at least three Business Days, before) the anticipated filing date (the "**_Piggyback Registration Notice_**"). The Piggyback Registration Notice shall offer all Holders the opportunity to include for registration in such registration statement the number of Registrable Securities as they may request in writing (a "**_Piggyback Registration_**"). The Company shall use commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests for inclusion therein within [ten] Business Days or, if the Piggyback Registration will be on a Shelf Registration Statement, within [five] Business Day, after sending the Piggyback Registration Notice. Each Holder shall be permitted to withdraw all or part of such Holder's Registrable Securities from a Piggyback Registration by giving written notice to the Company of its request to withdraw; _provided_, that (A) such request must be made in writing and delivered prior to the effectiveness of such Registration Statement and (B) such withdrawal shall be irrevocable and, after making such withdrawal, such Holder shall no longer have any right to include Registrable Securities in the Piggyback Registration as to which such withdrawal was made. Notwithstanding anything to the contrary in this Section 2(e)(i), if the Underwritten Offering pursuant to this Section 2(e)(i) is a "bought deal" (other than a variable price reoffer) or Overnight Underwritten Offering and the Managing Underwriter advises the Company that the giving of notice pursuant to this Section 2(e)(i) would have an adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Offering, no such notice shall be required. Any withdrawing Holder shall continue to have the right to include any Registrable Securities in any subsequent Registration Statement as may be filed by the Company with respect to offerings of Class A Common Stock, all upon the terms and conditions set forth herein.

(ii)     If the Company shall, at any time, propose to conduct an Underwritten Offering (including a Requested Underwritten Offering), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least [ten] Business Days, except if the Underwritten Offering will be made pursuant to a Shelf Registration Statement, at least [five] Business Days, before) the commencement of such Underwritten Offering, which notice shall set forth the principal terms and conditions of the issuance, including the proposed offering price or range of offering prices (if known), the anticipated filing date of the related Registration Statement (if applicable) and the number of shares of Class A Common Stock that are proposed to be registered (the "**_Underwritten Offering Piggyback Notice_**"). Receipt of any Underwritten Offering Piggyback Notice required to be provided in this Section 2(e)(ii) to Holders shall be kept confidential by the Holder until such proposed Underwritten Offering is (A) publicly announced or (B) such Holder receives notice that such proposed Underwritten Offering has been abandoned, which such notice shall be provided as reasonably practicable by the Company. The Underwritten Offering

11

Piggyback Notice shall offer the Holders the opportunity to include in such Underwritten Offering (and any related registration of Company Securities, if applicable) the number of Registrable Securities as they may request in writing (an "***Underwritten Piggyback Offering***"); *provided*, *however*, that in the event that the Company proposes to effectuate the subject Underwritten Offering pursuant to an effective Shelf Registration Statement other than an Automatic Shelf Registration Statement, only Registrable Securities of Holders that are subject to an effective Shelf Registration Statement may be included in such Underwritten Piggyback Offering, unless the Company is then able to file an Automatic Shelf Registration Statement and, in the reasonable judgment of the Company, the filing of the Automatic Shelf Registration Statement including Registrable Securities of Holders that are not otherwise included in an effective Shelf Registration Statement would not have any material adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Piggyback Offering. The Company shall use commercially reasonable efforts to include in each such Underwritten Piggyback Offering such Registrable Securities for which the Company has received written requests for inclusion therein within [ten] Business Days or, if such Underwritten Piggyback Offering will be made pursuant to a Shelf Registration Statement, within [five] Business Day after sending the Underwritten Offering Piggyback Notice. Each Holder shall be permitted to withdraw all or part of its Registrable Securities from an Underwritten Piggyback Offering at any time prior to the effectiveness of the applicable Registration Statement, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iii)    If the managing underwriter or managing underwriters of an Underwritten Offering advise the Company and the Holders that, in their reasonable opinion, the inclusion of all of the Registrable Securities requested for inclusion in the subject Underwritten Offering (and any related registration, if applicable) (and any other Class A Common Stock proposed to be included in such Underwritten Offering) exceeds the number of shares of Class A Common Stock that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the Company Securities offered or the market for the Company Securities offered, the Company shall include in such Underwritten Offering (and any related registration, if applicable) only that number of shares of Class A Common Stock proposed to be included in such Underwritten Offering (and any related registration, if applicable) that, in the reasonable opinion of the managing underwriter or managing underwriters, will not have such significant adverse effect, with such number of shares of Class A Common Stock to be allocated as follows: (A) in the case of a Requested Underwritten Offering, (1) first, pro-rata among all Holders (including ~~Fahrenheit~~USBTC) that have requested to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, (2) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to the Company, and (3) third, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of shares of Class A Common Stock then held by each such holder; and (B) in the case of any other Underwritten Offerings, (x) first, to the Company, (y) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, pro-rata among all Holders desiring to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, and (z) third, if there remains availability for additional shares of Class A Common Stock to be included in such registration, pro-rata among any other holders of Class A Common

12

Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of Class A Common Stock then held by each such holder. If any Holder disapproves of the terms of any such Underwritten Offering, such Holder may elect to withdraw therefrom by written notice to the Company and the managing underwriter(s) delivered on or prior to the time of the commencement of such Underwritten Offering. Any Registrable Securities withdrawn from such Underwritten Offering shall be excluded and withdrawn from the registration, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iv)    The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2(e) at any time in its sole discretion whether or not any Holder has elected to include Registrable Securities in such Registration Statement. The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 5.

3.    Registration and Underwritten Offering Procedures. The procedures to be followed by the Company and each Holder electing to sell Registrable Securities in a Registration Statement pursuant to this Agreement, and the respective rights and obligations of the Company and such Holder, with respect to the preparation, filing and effectiveness of such Registration Statement and the effectuation of any Underwritten Offering, are as follows:

(a)    In connection with a Demand Registration, the Company will, at least five Business Days prior to the anticipated filing of the Registration Statement and any related Prospectus or any amendment or supplement thereto (other than, after effectiveness of the Registration Statement, any filing made under the Exchange Act that is incorporated by reference into the Registration Statement) (for purposes of this subsection, supplements and amendments shall not be deemed to include any filing that the Company is required to make pursuant to the Exchange Act or any amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), (i) furnish to such Holders and the representatives of such Holders copies of all such documents prior to filing and (ii) provide such Holders and the representatives of such Holders the opportunity to (A) review and comment on such documents and (B) object to any information pertaining to such Holder and its plan of distribution that is contained therein, and, in either such case, the Company shall use commercially reasonable efforts to address any changes reasonably requested by such Holder prior to the filing of the Registration Statement.

(b)    In connection with a Piggyback Registration, Underwritten Piggyback Offering or a Requested Underwritten Offering, the Company will, at least five Business Days (or in the case of a Shelf Registration Statement or an offering that will be made pursuant to a Shelf Registration Statement, at least three Business Day) prior to the anticipated filing of any initial Registration Statement that identifies the Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), as applicable, furnish to such Holders copies of any such Registration Statement or related Prospectus or amendment or supplement thereto that identify such Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name such Holders and provide information with respect thereto). The Company will also use commercially reasonable efforts to address in each such document when so filed with the Commission such comments as such Holders reasonably shall propose prior to the filing thereof.

13

AMERICAS 124964997

(c)     The Company will use commercially reasonable efforts to, as promptly as reasonably practicable, (i) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement as may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for its Effectiveness Period and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the applicable Holders; (ii) cause the related Prospectus to be amended or supplemented by any required prospectus supplement and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond to any comments received from the Commission with respect to each Registration Statement and, as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement that pertains to such Holders as a selling stockholders but not any comments that would result in the disclosure to such Holders of material and non-public information concerning the Company; and (iv) cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable such Holders to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof.

(d)     The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement and the disposition of all Registrable Securities covered by a Registration Statement.

(e)     The Company will notify such Holders who are included in a Registration Statement as promptly as reasonably practicable: (i)(A) when a Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement in which such Holder is included has been filed; (B) when the Commission notifies the Company whether there will be a "review" of the applicable Registration Statement and when the Commission comments in writing on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each of such Holders that pertain to such Holders as selling stockholders); and (C) with respect to each applicable Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to such Registration Statement or Prospectus or for additional information that pertains to such Holders as sellers of Registrable Securities; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence (but not the details) of any event or passage of time that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company either promptly files a prospectus supplement to update the Prospectus or a Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the Registration Statement, which, in either case, contains the requisite information that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a

AMERICAS 124964997

material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f)      The Company will use commercially reasonable efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, as promptly as reasonably practicable, or if any such order or suspension is made effective during any Blackout Period or Suspension Period, as promptly as reasonably practicable after such Blackout Period or Suspension Period ends.

(g)      During the Effectiveness Period, the Company will furnish to each such Holder, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Holder (including those incorporated by reference) as promptly as reasonably practical after the filing of such documents with the Commission; *provided*, that the Company will not have any obligation to provide any document pursuant to this clause that is available on the Commission's EDGAR system.

(h)      The Company will as promptly as reasonably practical deliver to each Holder, without charge, as many copies of each Prospectus (including each form of prospectus) authorized by the Company for use and each amendment or supplement thereto as such Holder may reasonably request during the Effectiveness Period. Subject to the terms of this Agreement, including Section 9(b), the Company consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(i)      The Company will cooperate with such Holders to facilitate the timely preparation and delivery of certificates (or book-entry shares) representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates (or book-entry shares) shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holder may request in writing. In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the Effective Date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to, and maintained with, its transfer agent, together with any other authorizations, certificates and directions required by the transfer agent that authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the applicable Holder of such Registrable Securities under the Registration Statement.

(j)      Upon the occurrence of any event contemplated by Section 3(e)(v), as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)      With respect to Underwritten Offerings, subject to the right of a Holder to withdraw such Holder's Registrable Securities from an Underwritten Offering in accordance with the

15

terms of this Agreement, (i) the right of any Holder to include such Holder's Registrable Securities in an Underwritten Offering shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein, (ii) each Holder participating in such Underwritten Offering severally agrees to enter into and execute an underwriting agreement in customary form and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangement approved by the Persons entitled to select the managing underwriter hereunder and (iii) each Holder participating in such Underwritten Offering severally agrees to complete and execute all questionnaires, powers of attorney, indemnities, and other documents customarily and reasonably required under the terms of such underwriting arrangement. Any such underwriting agreement to be entered into among the Company, managing underwriter of such offering and each Holder participating in such Underwritten Offering shall contain representations and warranties by such Holders and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions on the part of selling stockholders. All of the representations and warranties by, and the other agreements on the part of, the Company to, and for the benefit of, the underwriter of such offering, included in each such underwriting agreement shall also be made to, and for the benefit of, such Holder participating in such Underwritten Offering, and any or all of the conditions precedent to the obligations of such underwriter under such underwriting agreement shall be conditions precedent to the obligations of such Holders. No Holder shall be required in any such underwriting agreement to make any representations or warranties to, or agreements with, the Company or the underwriter other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Securities, such Holder's intended method of distribution and any other representations required by applicable law or reasonably required by the underwriter or the Company. The Company hereby agrees that, in connection with any Underwritten Offering in accordance with the terms hereof, it will negotiate in good faith and execute all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangement, including using commercially reasonable efforts to procure customary legal opinions and auditor "comfort" letters.

(l)    For a reasonable period of time prior to the filing of any Registration Statement and throughout the Effectiveness Period, the Company will make available, upon reasonable notice at the Company's principal place of business or such other reasonable place as determined by the Company in its discretion, for inspection during normal business hours by a representative of the selling Holders, the managing underwriter and any attorneys or accountants retained by the selling Holders or managing underwriter, all such financial and other information and books and records of the Company, and cause the officers, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act; *provided*, *however*, that any information that is not generally publicly available at the time of delivery of such information shall be kept confidential by such Persons unless disclosure of such information is required by court or administrative order or, in the opinion of counsel to such Person, applicable law, in which case, such Person shall be required to give the Company written notice of the proposed disclosure prior to such disclosure and, if requested by the Company, assist the Company in seeking to prevent or limit the proposed disclosure.

(m)    In connection with any Requested Underwritten Offering, the Company will use commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable notice, to meet with prospective investors in presentations, meetings and road shows.

(n)    Each Holder agrees to furnish to the Company any other information regarding the Holder and the distribution of such securities as the Company reasonably determines is required to be

16

AMERICAS 124964997

included in any Registration Statement or any Prospectus or prospectus supplement relating to an Underwritten Offering.

(o)     Notwithstanding any other provision of this Agreement, the Company shall not be required to file a Registration Statement (or any amendment thereto) or effect a Requested Underwritten Offering (or, if the Company has filed a Shelf Registration Statement and has included Registrable Securities therein, the Company shall be entitled to suspend the offer and sale of Registrable Securities pursuant to such Registration Statement) for a period of up to [60] days if (i) the Board determines that a postponement is in the best interest of the Company and its stockholders generally due to a pending transaction involving the Company (including a pending securities offering by the Company), (ii) the Board determines such registration would render the Company unable to comply with applicable securities laws or (iii) the Board determines such registration would require disclosure of material information that the Company has a bona fide business purpose for preserving as confidential (any such period, a "***Blackout Period***"); *provided*, *however*, that in no event shall any Blackout Period together with any Suspension Period exceed an aggregate of 120 days in any 12-month period. In the event that a Registration Statement withdrawn pursuant to this <u>Section 3(o)</u> relates to a Demand Registration pursuant, then ~~Fahrenheit~~USBTC shall be entitled to withdraw the Demand Registration and, if such request is withdrawn, it shall not count against the limits imposed pursuant to <u>Section 2(b)(iii)</u>. In effecting a Blackout Period, the Company shall not disclose any material non-public information that is the basis for such Blackout Period to a Holder without the express written consent of such Holder.

(p)     In connection with an Underwritten Offering, the Company shall use commercially reasonable efforts to provide to each Holder named as a selling stockholder in any Registration Statement a copy of any auditor "comfort" letters and customary legal opinions, in each case that have been provided to the managing underwriter in connection with the Underwritten Offering, not later than the Business Day prior to the effective date of such Registration Statement.

(q)     In connection with any Underwritten Offering made pursuant to a Registration Statement filed pursuant to <u>Section 2</u>, if requested by the managing underwriter in an Underwritten Offering, each Holder shall execute a customary "lock-up" agreement with the underwriters of such Underwritten Offering containing a lock-up period equal to the shorter of (i) the shortest number of days that a director of the Company or "executive officer" (as defined under Section 16 of the Exchange Act) of the Company contractually agrees with the underwriters of such Underwritten Offering not to sell any Company Securities following such Underwritten Offering and (ii) [90] days from the date of the execution of the underwriting agreement with respect to such Underwritten Offering. Notwithstanding the foregoing, any discretionary waiver or termination of this lock-up provision by the Company or the underwriters with respect to any of the Holders shall apply to the other Holders as well, pro rata based upon the number of shares subject to such obligations.

(r)     Notwithstanding anything to the contrary in this Agreement, any Holder may make a written election (an "***Opt-Out Election***") to no longer receive from the Company any Demand Notice, Piggyback Registration Notice or Underwritten Offering Piggyback Notice (each, a "***Covered Notice***"), and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such Covered Notice to such Holder from the date of receipt of such Opt-Out Election and such Holder shall have no right to participate in any Registration Statement or Underwritten Offering as to which such Covered Notices pertain. An Opt-Out Election shall remain in effect until it has been revoked in writing and received by the Company. A Holder who previously has given the

17

AMERICAS 124964997

Company an Opt-Out election may revoke such election at any time in writing, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Elections.

4.       No Inconsistent Agreements; Additional Rights. The Company shall not hereafter enter into, and is not currently a party to, any agreement with respect to its securities that is inconsistent in any material respect with the rights granted to the Holders by this Agreement. The Company shall not, prior to the termination of this Agreement, grant any registration rights that are superior to, conflict with, or would otherwise prevent the Company from performing, the rights granted to the Holders hereby.

5.       Registration Expenses. All Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration, Requested Underwritten Offering, Piggyback Registration or Underwritten Piggyback Offering (in each case, excluding any Selling Expenses) shall be borne by the Company, whether or not any Registrable Securities are sold pursuant to a Registration Statement or whether or not a Registration Statement is filed or becomes effective. "***Registration Expenses***" means all expenses incurred in connection with registrations, filings or qualifications pursuant to Section 2 and Section 3, (i) registration and filing fees (including fees and expenses (A) with respect to filings required to be made with the Trading Market, (B) in compliance with applicable state securities or "Blue Sky" laws and (C) with respect to filings with FINRA), (ii) printing expenses (including expenses of printing certificates for Company Securities and of printing Prospectuses if the printing of Prospectuses is reasonably requested by a Holder of Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel, auditors and accountants, (v) Securities Act liability insurance, if the Company so desires such insurance, (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement, (vii) all expenses relating to marketing the sale of the Registrable Securities, including expenses related to conducting a "road show" and (viii) reasonable and documented fees and expenses of one counsel to the Holders reasonably acceptable to the Company and selected by the Holders that hold a majority of the Registrable Securities to be included in such filing in connection with the filing or amendment of any Registration Statement or Prospectus hereunder. In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and all salaries and expenses of their officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on the Trading Market.

6.       Indemnification.

(a)       The Company shall indemnify and hold harmless each Holder, its Affiliates and each of their respective officers and directors and any agent thereof (collectively, "***Holder Indemnified Persons***"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Holder Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act or otherwise (collectively, "***Losses***"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, in any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement

18

AMERICAS 124964997

thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current); *provided*, *however*, that the Company shall not be liable to any Holder Indemnified Person to the extent that any such claim arises out of, is based upon or results from an untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder Indemnified Person, in its capacity as such, or any underwriter specifically for use in the preparation thereof. The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement. This indemnity shall be in addition to any liability the Company may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder Indemnified Person or any Indemnified Party and shall survive the transfer of such securities by such Holder. Notwithstanding anything to the contrary herein, this <u>Section 6</u> shall survive any termination or expiration of this Agreement indefinitely.

(b)     In connection with any Registration Statement in which a Holder participates, such Holder, solely in its capacity as such, shall, severally and not jointly, indemnify and hold harmless the Company, its Affiliates and each of their respective officers, directors and any agent thereof, to the fullest extent permitted by applicable law, from and against any and all Losses as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, in any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), but only to the extent that the same are made in reliance and in conformity with information relating to the Holder furnished in writing to the Company by such Holder, solely in its capacity as such, expressly for use therein. This indemnity shall be in addition to any liability such Holder may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party (as defined below). In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder from the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)     Any Person entitled to indemnification hereunder (each, an "***Indemnified Party***") shall (i) give prompt written notice to the indemnifying party of any claim with respect to which

19

AMERICAS 124964997

it seeks indemnification and (ii) unless in such Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and indemnifying party may exist with respect to such claim or there may be reasonable defenses available to the Indemnified Party that are different from, or additional to, those available to the indemnifying party, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the Indemnified Party without its consent (but such consent may not be unreasonably withheld, delayed or conditioned). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (in addition to any local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless, in the reasonable judgment of any Indemnified Party, there may be one or more legal or equitable defenses available to such Indemnified Party that are in addition to, or may conflict with, those available to another Indemnified Party with respect to such claim. Failure to give prompt written notice as provided in clause (i) above shall not release the indemnifying party from its obligations hereunder.

(d)    If the indemnification provided for in this <u>Section 6</u> is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any Losses referred to herein, the indemnifying party, in lieu of indemnifying such Indemnified Party thereunder, shall, to the extent permitted by applicable law, contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the Indemnified Party, on the other hand, in connection with the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact that resulted in such Losses, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the Indemnified Party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or alleged statement or omission or alleged omission; *provided*, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder.

7.    <u>Facilitation of Sales Pursuant to Section 4(a)(7), Rule 144 and Rule 144A.</u>[5]

(a)    The Company will provide reasonable access to management for confirmatory due diligence meetings, as the Holders may reasonably request, to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act.

(b)    To the extent is shall be required to do so under the Exchange Act, the Company shall timely file the reports required to be filed by it under the Exchange Act or the Securities Act (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144) and shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act pursuant to Rule 144, Rule 144A or Section 4(a)(7) of the Securities Act. Upon the request of any Holder in connection with such Holder's sale pursuant to Rule 144 the Company shall

---

[5] NTD: To discuss facilitation as this is expected to be an important source of liquidity Fahrenheit (in particular, 4(a)(7) and Rule 144A sales).

AMERICAS 124964997

deliver to such Holder a written statement as to whether it has complied with the applicable requirements.

8.      <u>Voting</u>. At any time during which the ~~Fahrenheit~~USBTC Management Agreement is in full force and effect, ~~Fahrenheit~~USBTC in its capacity as stockholder or proxy holder of the Company, irrevocably and unconditionally agrees that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company: (i) ~~Fahrenheit~~USBTC shall cause to be voted at such meeting (or validly execute and return and cause such consent to be granted with respect to) all of such Initial Shares (including those obtained by dividends, stock splits, and similar transactions with respect to the Initial Shares, but not, for the avoidance of doubt, including shares of Common Stock otherwise acquired by ~~Fahrenheit~~USBTC) owned as of the record date for such meeting (or the date that any written consent is executed by ~~Fahrenheit~~USBTC)(the "***Covered Shares***") in accordance with the recommendations of the board of directors of the Company and (ii) ~~Fahrenheit~~USBTC shall not commit any act that restricts its legal power, authority and right to vote all of the Covered Shares to vote (or execute and return an action by written consent) then beneficially owned by it or otherwise prevent or disable it from performing any of its obligations under this <u>Section 8</u>. Without limiting the generality of the foregoing, except for this Agreement, ~~Fahrenheit~~USBTC shall not (A) enter into any voting agreement with any person with respect to any of the Covered Shares, (B) grant any person other than the Company or its designees any proxy (revocable or irrevocable) or power of attorney with respect to any of the Covered Shares, (C) deposit any of the Covered Shares in a voting trust or otherwise enter into any agreement or arrangement with any person (other than the Company) limiting or affecting its legal power, authority or right to vote the Covered Shares in accordance with this <u>Section 8</u>, (D) acquire, offer or propose to acquire or solicit an offer to sell any securities of the Company, ~~[~~(E)(1) except as permitted by the ~~Fahrenheit~~USBTC Management Agreement, make, engage in, or in any way participate in any "solicitation" of "proxies" (as such terms are used in the rules of the Securities and Exchange Commission promulgated under Section 14 of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), but without regard to the exclusion set forth in Rule 14a-1(l)(2)(iv) promulgated under the Exchange Act or any consents to vote, call or seek to call a meeting of stockholders or otherwise seek to influence the timing of any meeting of stockholders, or (2) seek the removal of any member of the board of directors or otherwise seek representation on the board of direct~~ive~~ors in any manner (in each case other than with respect to the Class B Directors (as such term is defined in the Company's certificate of incorporation) or as otherwise contemplated in the ~~Fahrenheit~~USBTC Management Agreement), (F) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the Exchange Act) or otherwise act in concert with any other Person with respect to any securities of the Company or any actions prohibited by this <u>Section 8</u>] or (G) disclose publicly any intention to take any action prohibited by this <u>Section 8</u>. ~~Fahrenheit~~USBTC hereby grants the Company an irrevocable proxy to vote all shares of Class A Common Stock owned by it in accordance with this <u>Section 8</u>, *provided*, *however*, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the ~~Fahrenheit~~USBTC Management Agreement.

9.      <u>Miscellaneous</u>.

(a)      <u>Remedies</u>. In the event of actual or potential breach by the Company of any of its obligations under this Agreement, each Holder, in addition to being entitled to exercise all rights granted by applicable law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the

21

provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b)    <u>Discontinued Disposition</u>. Upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (ii) through (v) of <u>Section 3(e)</u> (provided that the Company shall not disclose any material non-public information that is the basis for such notice to the Holder without the express written consent of the Holder), each Holder will forthwith discontinue disposition of any applicable Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement as contemplated by <u>Section 3(j)</u> or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement (a "***Suspension Period***"). The Company may provide appropriate stop orders to enforce the provisions of this <u>Section 9(b)</u>.

(c)    <u>Amendments and Waivers</u>. No provision of this Agreement may be waived or amended except in a written instrument signed by the Company, ~~Fahrenheit~~USBTC and Holders that hold a majority of the Registrable Securities as of the date of such waiver or amendment, *provided*, *however*, that any waiver or amendment that would have a disproportionate adverse effect on a Holder relative to the other Holders shall further require the consent of such Holder. The Company shall provide prior notice to all Holders of any proposed waiver or amendment. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

(d)    <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this <u>Section 9(d)</u> prior to 5:00 p.m. in the time zone of the receiving party on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Agreement later than 5:00 p.m. in the time zone of the receiving party on any date and earlier than 11:59 p.m. in the time zone of the receiving party on such date, (iii) the Business Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) upon actual receipt by the Party to whom such notice is required to be given. The address for such notices and communications shall be as follows:



| If to the Company: | 2332 Galiano Street, 2nd Floor<br>Coral Gables, Florida  33134<br>~~[NewCo, Inc.]~~Email: joel@ionicdigital.com<br>Attention: Joel Block, CFO |
| | ~~[●]~~<br>~~Attention: [●]~~<br>~~E-mail: [●]~~ |
| with a copy to: | ~~With copy to:~~<br><br>Cleary Gottlieb Steen & Hamilton LLP |

AMERICAS 124964997

| | One Liberty Plaza |
| | [●] |
| | ~~Attention:  [●]~~ |
| | ~~E-mail:  [●]~~New York, NY 10006 |
| | Email: echange@cgsh.com |
| | Attention: Elizabeth A. Chang |
| If to ~~Fahrenheit~~USBTC: | 1101 Brickell Ave., N-1500 |
| | Miami, Florida 33131 |
| | [●] |
| | ~~E-mail: [●]~~ |
| | ~~Attention: [●]~~Email: legalteam@hut8.io and asher@usbitcoin.com |
| | Attention: Asher Genoot |
| with a copy to: | |
| | ~~Brown Rudnick LLP~~ |
| | Brown Rudnick LLP, |
| | 7 Times Square, |
| | New York, NY 10036 |
| | Email: jfitzsimons@brownrudnick.com |
| | Attention: Jonathan Fitzsimons |
| If to any Holder other than ~~Fahrenheit~~ USBTC: | To the address set forth for such Holder in the joinder agreement in the form set forth in Exhibit A hereto. |

(e)    Successors and Assigns; Transfer of Registration Rights.

(i)    This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns. Except as provided in Section 9(e)(ii), this Agreement, and any rights or obligations hereunder, may not be assigned without the prior written consent of the Company and ~~Fahrenheit~~USBTC. The Company may not assign its rights or obligations hereunder without the prior written consent of ~~Fahrenheit~~USBTC.

23

AMERICAS 124964997

(ii)    Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment or other conveyance (any of the foregoing, a "***Transfer***") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws and the Company's certificate of incorporation and bylaws then in effect; (b) such transferee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement substantially in the form set forth in <u>Exhibit A</u> hereto and delivers it to the Company as promptly as reasonably practicable; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee and identifying the Registrable Securities with respect to which such rights are being Transferred and provide the amount of any other capital stock of the Company beneficially owned by such transferee; *provided, however*, that (i) [except with respect to an Affiliate of ~~Fahrenheit~~USBTC,][6] any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. Following a Transfer in accordance with this <u>Section 9(e)</u>, the Company shall update the applicable prospectus to include the transferee as a selling holder thereunder promptly upon the receipt of the required information from such transferee.

(f)    <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than the Parties or their respective successors and permitted assigns and any Indemnified Party, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

(g)    <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile or electronic mail transmission, such signature shall create a valid binding obligation of the Party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such signature delivered by facsimile or electronic mail transmission were the original thereof.

(h)    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum. Each party acknowledges and agrees that any controversy which

---

[6] NTD: Affiliates TBD.  We can further limit this to identified Affiliates if required.

24

AMERICAS 124964997

may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

(i)    Cumulative Remedies. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(j)    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Parties shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the Parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(k)    Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby, whether oral or written.

(l)    Termination. Except for Section 8 (which shall terminate upon the termination or expiration of the ~~Fahrenheit~~USBTC Management Agreement) and Section 6, this Agreement shall terminate as to any Holder when all Registrable Securities held by such Holder no longer constitute Registrable Securities.

*[Signature page follows.]*

25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

[NewCo, Inc.]

**IONIC DIGITAL INC.**

By:_____

Name:

Title:

Name:_____

Title:_____

**U.S. DATA MANAGEMENT GROUP, LLC**

[Fahrenheit LLC]

By:_____

Name:

Title:

Name:_____

Title:_____

*Signature Page to Investors' and Registration Rights Agreement*

AMERICAS 124964997

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Investors' and Registration Rights Agreement, dated as of [●], and as amended from time to time (the "Investors' and Registration Rights Agreement"), among [NewCo,Ionic Digital Inc.] (the "Company") and the stockholders of the Company parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Investors' and Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Holder" under, the Investors' and Registration Rights Agreement as of the date hereof as if he, she or it had executed the Investors' and Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Investors' and Registration Rights Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

[JOINING PARTYJOINING PARTY]

By: _____

By: _____
Name: [●]
Title: [●]
Name: _____

Title: _____

Address: [●]_____

Date: [●]_____

**<u>Exhibit B</u>**

**Schedule of Retained Causes of Action**

## Schedule of Retained Causes of Action

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan;** *provided that***, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein**."

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity**."

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I.    Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on <u>Schedule 1</u> attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) arising from or relating to CEL Token, including claims arising from actions or inactions affecting the price of CEL Token and claims arising from the distribution of CEL Token to former employees, insiders of the Debtors, or other third parties; (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.  Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.  Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan, including account holders and all other parties, for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.  Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud,

misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.    Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws.  For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.    Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.    Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

## VIII.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-

judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members,  equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

## IX.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Date Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

## X.    Claims Related to Contracts and Leases

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition,

4

interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.*, Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494–497, 526 |
| Celsius Network Limited | Do Kwon, a/k/a Kwon Do-hyung | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Equities First Holdings, LLC | - | - | Breach of contract, commercial loan default action, failure to return collateral, bad faith |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | EZ Blockchain Services, LLC | - | - | Breach of contract, turnover |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric Ventures Group SARL,* Case No. 22-10964 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.,* Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.,* Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX Mark Lamb | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent inducement |
| Celsius Mining LLC Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc. Luna Squares LLC | - | - | Breach of contract, bad faith, willful misconduct |

7

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| | Cosmos Infrastructure LLC | | | |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br><br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Terraform Labs Pte. Ltd. | *In re Terraform Labs Pte. Ltd.*, Case No. 24-10070 (BLS) | U.S. Bankruptcy Court for the District of Delaware | Negligence, fraud, market manipulation |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |
| Celsius Network Limited<br><br>Celsius Network LLC | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*, | U.S. Bankruptcy Court for the Southern District of New York | Prepetition preferential transfers and related claims |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|--------|-----------|-------------------------------|------------------|------------------|
|  |  | Case No. 22-10943 (MEW) |  |  |
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |

**<u>Exhibit B-1</u>**

**(Redline) Schedule of Retained Causes of Action**

## ~~Exhibit A~~

### Schedule of Retained Causes of Action

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in** <u>**Article VIII**</u> **of the Plan;** ***provided that***, **notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.**"

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**"

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I. Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on <u>Schedule 1</u> attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) arising from or relating to CEL Token, including claims arising from actions or inactions affecting the price of CEL Token and claims arising from the distribution of CEL Token to former employees, insiders of the Debtors, or other third parties; (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.    Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.    Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan, including account holders and all other parties, for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.    Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any

claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.       Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws.  For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.      Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.     Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

## VIII.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to

litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members,  equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

## IX.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

## X.    Claims Related to Contracts and Leases

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants,

environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.,* Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct<br><br>Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494–497, 526 |
| Celsius Network Limited | Do Kwon, a/k/a Kwon Do-hyung | – | – | Negligence, fraud, market manipulation |
| Celsius Network Limited | Equities First Holdings, LLC | - | - | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network | EZ Blockchain | - | - | Breach of contract, turnover |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Limited | Services, LLC | | | |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric Ventures Group SARL*, Case No. 22-10964 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.*, Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.*, Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX Mark Lamb | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent inducement |
| Celsius Mining LLC Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc. Luna Squares LLC Cosmos | - | - | Breach of contract, bad faith, willful misconduct |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| | Infrastructure LLC | | | |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br><br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (~~mg~~MG) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Terraform Labs Pte. Ltd. | *In re Terraform Labs Pte. Ltd.*, Case No. 24-10070 (BLS) | U.S. Bankruptcy Court for the District of Delaware | Negligence, fraud, market manipulation |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |
| Celsius Network Limited<br>Celsius Network LLC | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) | U.S. Bankruptcy Court for the Southern District of New York | Prepetition preferential transfers and related claims |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |

**<u>Exhibit C</u>**

**MiningCo Organizational Documents**

# IONIC DIGITAL INC.

## AMENDED & RESTATED CERTIFICATE OF INCORPORATION

Ionic Digital Inc., a Delaware corporation, hereby certifies as follows:

1. The name of this corporation is "Ionic Digital, Inc." The date of the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was January 5, 2024 under the name Arbelco Inc. The corporation filed a Certificate of Amendment of Certificate of Incorporation with the Secretary of State of the State of Delaware on January 12, 2024 to change its name to Ionic Digital Inc.

2. The Amended & Restated Certificate of Incorporation of this corporation attached hereto as Exhibit A, which is incorporated herein by this reference, and which restates, integrates and amends the provisions of the Certificate of Incorporation of this corporation, has been duly adopted by this corporation's Board of Directors and by the stockholders in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, with the approval of this corporation's stockholders having been given by written consent without a meeting in accordance with Section 228 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, this corporation has caused this Amended & Restated Certificate of Incorporation to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

Dated: January        , 2024            IONIC DIGITAL INC.
                                        By:
                                        Name: Matt Prusak
                                        Title: Authorized Officer

## <u>EXHIBIT A</u>

## IONIC DIGITAL INC.

## AMENDED & RESTATED CERTIFICATE OF INCORPORATION

## ARTICLE I: NAME

The name of the corporation is Ionic Digital Inc. (the "***Corporation***").

## ARTICLE II: AGENT FOR SERVICE OF PROCESS

The address of the registered office of this Corporation in the State of Delaware is 251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

## ARTICLE III: PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "***General Corporation Law***").

## ARTICLE IV: AUTHORIZED STOCK

**1.** <u>**Total Authorized**</u>. The total number of shares of all classes of stock that the Corporation has authority to issue is 1,015,000,001 shares, consisting of 1,000,000,000 shares of Class A Common Stock, $0.00001 par value per share (the "***Class A Common Stock***"), 1 share of Class B Common Stock, $1.00 par value per share (the "***Class B Common Stock***" and, with the Class A Common Stock, the "***Common Stock***"), and 15,000,000 shares of Preferred Stock, $0.00001 par value per share ("***Preferred Stock***").

**2.** <u>**Designation of Additional Series**</u>.

(a) The Board of Directors of the Corporation (the "***Board***") is hereby expressly authorized, subject to any limitations prescribed by the law of the State of Delaware and this Amended and Restated Certificate of Incorporation (as the same may be amended and/or restated from time to time, including by a Certificate of Designation, this "***Certificate of Incorporation***"), to provide for the issuance of the shares of Preferred Stock in one or more series, and, by filing a Certificate of Designation pursuant to the applicable law of the State of Delaware ("***Certificate of Designation***"), to establish from time to time the number of shares to be included in each such series, to fix the designation, vesting, powers (including voting powers, full or limited, or no voting powers), preferences and relative, participating, optional or other special rights, if any, of the shares of each such series and any qualifications, limitations or restrictions thereof, and, except where otherwise provided in the applicable Certificate of Designation, to thereafter increase (but not above the total number of authorized shares of the Preferred Stock) or decrease (but not below the number of shares of such series then outstanding) the number of shares of any

2

such series. The number of authorized shares of Preferred Stock may also be increased or decreased (but not below the number of shares thereof then outstanding) by such affirmative vote as may be required at that time by the General Corporation Law.

(b) Except as otherwise expressly provided in this Certificate of Incorporation and in any Certificate of Designation designating any series of Preferred Stock pursuant to the foregoing provisions of this <u>Article IV</u>, any new series of Preferred Stock may be designated, fixed and determined as provided herein by the Board without approval of the holders of Common Stock or the holders of Preferred Stock, or any series thereof, and any such new series may have powers, preferences and rights, including, without limitation, voting powers (which may be full or limited or no voting powers), dividend rights, liquidation rights, redemption rights and conversion rights, senior to, junior to or pari passu with the rights of the Common Stock, any series of Preferred Stock or any future class or series of capital stock of the Corporation.

(c) Except as otherwise required by law and subject to the rights of the sole holder of the Class B Common Stock (the "***Class B Holder***") set forth in <u>Article IV, Section 3(h)</u> of this Certificate of Incorporation, each outstanding share of Class A Common Stock shall entitle the holder thereof to one vote on each matter properly submitted to the stockholders of the Corporation for their vote. Holders of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including the adoption or amendment of any Certificate of Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock).

**3. <u>Rights of Class A Common Stock and Class B Common Stock</u>**

(a) *<u>Status of Class A and Class B Common Stock Generally</u>*.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding, the holders of shares of Class A Common Stock shall be entitled to receive ratably in proportion to the number of shares of Class A Common Stock held by them such dividends and distributions (payable in cash, stock or otherwise), if any, as may be declared thereon by the Board at any time and from time to time out of any funds of the Corporation legally available therefor.

(b) *<u>Voting Generally</u>*.  Except as otherwise expressly provided by this Certificate of Incorporation (including <u>Article IV, Section 3(h)</u> of this Certificate of Incorporation) and in any Certificate of Designation designating any series of Preferred Stock or as required by applicable law, the holders of shares of Common Stock shall (i) be entitled to notice of any stockholders' meeting in accordance with the Amended & Restated Bylaws of the Corporation (as the same may be amended and/or restated from time to time, the "***Bylaws***") and (ii) have one vote for each share of Common Stock which is outstanding in his, her, its or their name on the books of the Corporation on all matters on which stockholders are entitled to vote generally.

(c) *<u>No Cumulative Voting</u>*.  The holders of the Common Stock shall not have cumulative voting rights (as defined in Section 214 of the General Corporation Law).

3

(d) *No Class B Common Stock Dividend or Distribution Rights*.  Dividends and other distributions shall not be declared or paid on the Class B Common Stock.

(e) *Liquidation, Dissolution or Winding Up*.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding or any other outstanding class or series of stock of the Corporation having a preference over or the right to participate with the Common Stock as to distributions, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of all outstanding shares of Class A Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder, and the Class B Holder as such, shall not be entitled to receive any assets of the Corporation in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

(f) *Class B Common Stock Ownership*.  The share of Class B Common Stock shall be issued only to, and shall be held only by, U.S. Data Management Group LLC, a Delaware limited liability company and subsidiary of Hut 8 Corp. ("**Hut 8**"), and Affiliates (as such term is defined in the Management Services Agreement dated as of [●], 2024, by and among the Corporation, Hut 8, as such agreement may be amended, supplemented, restated or otherwise modified from time to time (the "**Management Services Agreement**")) of Hut 8 (including all successors of Hut 8 or such Affiliates by way of merger or consolidation) (the "**Permitted Class B Owners**"). Any purported sale, transfer, pledge or other disposition of the share of Class B Common Stock to any person other than a Permitted Class B Owner shall be null and void ab initio and of no force and effect.

(g) *No Preemptive Rights*.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding, no stockholder of the Corporation shall have preemptive rights to acquire additional, unissued or treasury shares of the Corporation or securities of the Corporation convertible into or carrying a right to subscribe to or acquire shares of the Corporation, whether such preemptive rights are purported to be granted by a provision in this Certificate of Incorporation, the Bylaws or by contract.

(h) *Class B Common Stock Consent Rights*.  To the fullest extent permitted by law, without the consent of the Class B Holder, and subject to any other applicable stockholder approval requirements required by law, and to the preferential or other rights of any holders of Preferred Stock then outstanding, the Corporation shall not take, and shall cause its subsidiaries not to take or consummate, any of the following actions or transactions (any such action or transaction without such prior written consent being null and void ab initio and of no force or effect): amend, alter, modify, or repeal this Certificate of Incorporation, or the Bylaws, including the amendment of this Certificate of Incorporation by the adoption or amendment of any Certificate of Designation or similar document, or amend the organizational documents of any subsidiary of the Corporation, in any such case in any manner that adversely affects the rights or powers of the Class B Common Stock or the Class B Directors (as defined below), including (i) with respect to the power and authority of the Class B Holder to elect two directors; (ii) increase the authorized number of directors constituting the Whole Board (as defined below) to more than eight; or (iii)

4

increase or decrease the number of authorized shares of Class B Common Stock, or authorize the issuance of or issue any shares of Class B Common Stock.  The term "***Whole Board***" shall mean the total number of authorized directors at the time such action is taken, whether or not there exist any vacancies in previously authorized directorships.

**4. Class B Common Stock Redemption**.

(a) Immediately upon the termination of the Management Services Agreement in accordance with its terms, the Corporation shall immediately effect, out of funds legally available therefor, a redemption of the outstanding share of Class B Common Stock (a "***Class B Redemption***") for a price per share equal to $1.00 per share of Class B Common Stock (the "***Class B Redemption Price***").

(b) To effect a Class B Redemption, the Corporation shall send written notice (the "***Class B Redemption Notice***") to the Class B Holder.  Each Class B Redemption Notice shall state: (i) that the outstanding share of Class B Common Stock shall be redeemed; (ii) the date of the closing of the Class B Redemption, which date shall not be sooner than 10 days following the date of the Class B Redemption Notice (the "***Class B Redemption Date***"), and the Class B Redemption Price; and (iii) the manner of the Class B Redemption, including the manner and place designated for surrender by the holder to the Corporation or the Corporation's transfer agent, as applicable, of his, her, its or their certificate, if any, representing the share of Class B Common Stock to be redeemed.

(c)  If on the Class B Redemption Date, the Class B Redemption Price is paid (or tendered for payment) for all of the outstanding share of Class B Common Stock to be redeemed on such Class B Redemption Date, then on such date all rights of the Class B Holder with respect to the share of Class B Common Stock so redeemed and paid or tendered shall cease, and such share of Class B Common Stock shall no longer be deemed issued and outstanding.  The certificate, if any, representing the share of Class B Common Stock shall be legended to reflect the restrictions on transfer and automatic redemption provided for herein.

**5. Non-Voting Equity**. The Corporation shall not issue nonvoting equity securities to the extent prohibited by Section 1123(c)(6) of title 11 of the United States Code (as amended, the "***Bankruptcy Code***"); <u>*provided*</u>, <u>*however*</u>, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE V: AMENDMENT OF BYLAWS

Subject to the rights of the Class B Holder set forth in <u>Article IV, Section 3(h)</u> of this Certificate of Incorporation, the Board shall have the power to adopt, amend or repeal the Bylaws without the assent or vote of the stockholders in any manner not inconsistent with the laws of the State of Delaware or this Certificate of Incorporation.  Subject to the rights of the Class B Holder set forth in <u>Article IV, Section 3(h)</u> of this Certificate of Incorporation, any adoption, amendment or

repeal of the Bylaws by the Board shall require the approval of a majority of the directors then in office. Subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation and to the rights of any class or series of stock of the Corporation, the stockholders shall also have the power to adopt, amend or repeal the Bylaws by the affirmative vote of the holders of a majority of the voting power of all then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

## ARTICLE VI: MATTERS RELATING TO THE BOARD OF DIRECTORS

**1. Director Powers**. Except as otherwise provided by the General Corporation Law, the Bylaws or this Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

**2. Number and Election of Directors**.

(a) Subject to Section 2(b) of this Article VI, the total number of directors constituting the Whole Board shall be fixed from time to time exclusively by resolution adopted by a majority of the directors then in office Board.

(b) For so long as the share of Class B Common Stock remains outstanding, unless prior written consent of the Class B Holder is obtained to increase the authorized number of directors constituting the Whole Board to more than eight (in accordance with Article IV, Section 3(h) of this Certificate of Incorporation), the Whole Board shall consist of not more than eight directors, two of which shall be nominated and elected exclusively by the Class B Holder (the "***Class B Directors***"), voting as a separate class. One of the two Class B Directors shall initially be Asher Genoot. The holders of the Class A Common Stock, voting as a separate class, shall have the exclusive right to elect the remaining directors.

(c) Subject to Section 2(b) of this Article VI, the vote required for the election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors (for the avoidance of doubt, holders of shares of Class A Common Stock are not entitled to vote on the election of the Class B Directors).

**3. Classified Board**. Subject to any special rights of the holders of one or more series of Preferred Stock to elect additional directors, the directors shall be divided, with respect to the time for which they hold office, into three classes designated as Class I, Class II and Class III, respectively (the "***Classified Board***"). The Board is authorized to assign members of the Board already in office to Class I, Class II or Class III, which assignments shall become effective at the same time that the Classified Board becomes effective. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the Board. Class B Directors shall not be re-assigned to a class other than the class to which a Class B Director was initially assigned, unless any re-assignment is consented to by the Class B Holder and the Board. The number of directors in each class shall be divided as nearly equal as is practicable. The initial term of office of the Class I directors shall expire at the Corporation's first annual meeting of stockholders after

6

the date of the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware (the "***Initial Annual Meeting***"), which shall be held no earlier than January 31, 2024 and no later than October 1, 2025; the initial term of office of the Class II directors shall expire at the Corporation's first annual meeting of stockholders following the Initial Annual Meeting; and the initial term of office of the Class III directors shall expire at the Corporation's second annual meeting of stockholders following the Initial Annual Meeting.  At each annual meeting of stockholders following the date of the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware, directors elected to succeed those directors of the class whose terms then expire shall be elected for a term of office expiring at the third succeeding annual meeting of stockholders after their election.

**4.  Term**. Each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal; *provided, however,* that the term of any Class B Director shall terminate immediately upon the effective date of a Class B Redemption. Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary of the Corporation.

5. **Removal.** Subject to any special rights of the holders of one or more outstanding series of Preferred Stock, any director shall be removed from the Board at any time only (i) with cause and (ii) by the affirmative vote of the holders of a majority of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote thereon, voting together as a single class, *provided, however*, that a Class B Director shall only be removed from office, with or without cause, by the Class B Holder. No increase or decrease in the number of directors constituting the Board shall shorten the term of any incumbent director.

**6. Board Vacancies and Newly Created Directorships**. Subject to any special rights of the holders of one or more outstanding series of Preferred Stock and the rights of Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation, any vacancy occurring in the Board for any cause and any newly created directorship resulting from any increase in the authorized number of directors shall, unless (a) the Board determines by resolution that any such vacancies or newly created directorships shall be filled by the stockholders or (b) as otherwise provided by law, be filled only by the affirmative vote of a majority of the directors (other than the Class B Directors) then in office, even if less than a quorum, or by a sole remaining director, and shall not be filled by the stockholders, *provided, however,* that, unless no share of Class B Common Stock is then outstanding, any vacancy in the Board of a director elected by the Class B Holder or otherwise designated as a Class B Director (a "***Class B Vacancy***"), whether such vacancy results from death, resignation, retirement, disqualification, removal from office, or other cause, shall be filled only by the Class B Holder. Any director elected to fill a vacancy or newly created directorship in accordance with the preceding sentence shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

7

**7. <u>Vote by Ballot</u>**. The election of directors need not be by written ballot unless the Bylaws shall so provide.

## ARTICLE VII: LIMITATION OF LIABILITY

**1. <u>Limitation of Liability</u>**. To the fullest extent permitted by law, neither a director of the Corporation nor an officer of the Corporation shall be personally liable to the Corporation or to its stockholders for monetary damages for breach of fiduciary duty as a director or officer, as applicable. No amendment to, modification of or repeal of this Section 1 of Article VII shall apply to or have any effect on the liability or alleged liability of any director or officer of the Corporation for or with respect to any acts or omissions of such director or officer occurring prior to such amendment, modification or repeal. Without limiting the effect of the preceding sentence, if the General Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of a director or officer, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law, as so amended.

**2. <u>Indemnification</u>**. To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify and hold harmless, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether brought by or in the right of the Corporation (including whether to procure a judgment in its favor) or otherwise, whether civil, criminal, administrative, legislative, investigative or other nature and including any and all appeals (collectively, each a "***Proceeding***") by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (an "***Indemnitee***"), against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, excise taxes under the Employee Retirement Income Security Act of 1974, as amended, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such Indemnitee in connection with such Proceeding. To the fullest extent permitted by applicable law, expenses (including attorneys') fees incurred by an Indemnitee in defending any Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that the Indemnitee is not entitled to be indemnified under this <u>Article VII, Section 2</u> or otherwise. The rights to indemnification and advancement of expenses conferred by this <u>Article VII, Section 2</u> shall be contractual rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his, her or their heirs, executors and administrators. Notwithstanding the foregoing provisions of this <u>Article VII Section 2</u>, except for Proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board. The

indemnification and advancement of expenses provided by, or granted pursuant to, this Article VII, Section 2 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under this Certificate of Incorporation as it may be further amended from time to time, the Bylaws or any statute, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

**3. No Limitation**.  This Article VII shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than Indemnitees.

**4. Vested Rights**.  Any repeal or amendment of this Article VII by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate of Incorporation inconsistent with this Article VII, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any Proceeding (regardless of when such Proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

## ARTICLE VIII: MATTERS RELATING TO STOCKHOLDERS

**1. No Action by Written Consent of Stockholders**. Subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting; _provided_, _however_, that prior to a Class B Redemption, the Class B Holder may act by written consent in lieu of a meeting, solely with respect to matters for which the Class B Holder is entitled to vote as a separate class.

**2. Special Meeting of Stockholders**. Special meetings of the stockholders of the Corporation shall be called only by (a) the Chairperson of the Board, (b) the Board acting pursuant to a resolution adopted by a majority of the directors then in office, or (c) the Board upon the holders of at least 25% of the voting power of all then-outstanding shares of voting stock entitled to vote on any matter to be brought before the proposed special meeting delivering a written request (which request shall state the purpose(s) of the meeting to be called) to the Secretary of the Corporation in accordance with the procedures and other requirements set forth in the Bylaws.

**3. Advance Notice of Stockholder Nominations and Business Transacted at Special Meetings**. Advance notice of stockholder nominations for the election of directors of the

9

Corporation and of other business to be brought by stockholders before any meeting of stockholders of the Corporation shall be given in the manner provided in the Bylaws. Business transacted at special meetings of stockholders shall be limited to the purpose or purposes stated in the notice of meeting.

## ARTICLE IX: CHOICE OF FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by law, be the sole and exclusive forum for: (a) any derivative action, suit or proceeding brought on behalf of the Corporation; (b) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed or allegedly owed by, or other wrongdoing by, any director, officer, stockholder, employee or agent of the Corporation to the Corporation or the Corporation's stockholders; (c) any action, suit or proceeding asserting a claim against the Corporation or any director, officer, stockholder, employee or agent of the Corporation arising pursuant to, or seeking to enforce any right, obligation or remedy under, any provision of the General Corporation Law, this Certificate of Incorporation or the Bylaws or as to which the General Corporation Law confers jurisdiction on the Court of Chancery of the State of Delaware; (d) any action, suit or proceeding to interpret, apply, enforce or determine the validity of this Certificate of Incorporation or the Bylaws; (e) any action asserting a claim against the Corporation or any director, officer, stockholder, employee or agent of the Corporation governed by the internal affairs doctrine; or (f) any other action, suit or proceeding asserting an "internal corporate claim" as that term is defined in Section 115 of the General Corporation Law. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by the General Corporation Law, this Certificate of Incorporation or the Bylaws, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. Any person or entity owning, purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Article IX.

## ARTICLE X: BUSINESS COMBINATION LAW

The Corporation shall not be governed by, or subject to, Section 203 of the General Corporation Law.

## ARTICLE XI: CERTAIN CORPORATE OPPORTUNITIES

1. **No Agency**.  Nothing contained in this Certificate of Incorporation or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders.

2. **Corporate Opportunities Generally**.  (x) Directors who are not employees or officers of the Corporation or its subsidiaries and (y) stockholders of the Corporation (other than stockholders of the Corporation who are employees of the Corporation or its subsidiaries), solely by virtue of each such stockholder's status as a stockholder of the Corporation (such members of the Board

and stockholders, the "*Identified Persons*" and each, individually, an "*Identified Person*"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its affiliates, directly or indirectly, now engages or may engage or (b) otherwise competing with the Corporation or any of its affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the General Corporation Law, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its affiliates, except as provided in Article XI, Section 3 of this Certificate of Incorporation. Subject to Article XI, Section 3 of this Certificate of Incorporation, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or himself and the Corporation or any of its affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

**3. Certain Limitations**.

(a) Notwithstanding Article XI, Section 2 of this Certificate of Incorporation, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (i) expressly offered to such person solely in his, her or their capacity as a director, officer, consultant or employee of the Corporation or (ii) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

(b) In addition to and notwithstanding the provisions of this Article XI, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (i) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (ii) from its nature, would not be reasonable for the Corporation to pursue or (iii) is one in which the Corporation has no interest or reasonable expectancy.

**4. Related Companies**.  Subject to any contractual obligations between an Identified Person and the Corporation or its subsidiaries, the Identified Persons may now own, may continue to own, and from time to time may acquire and own, to the fullest extent permitted by applicable law, investments in one or more other entities (such entities collectively, "*Related Companies*") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall

11

not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, solely by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective affiliates, (c) none of the duties imposed on an Identified Person by law do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's stockholders or any of their respective affiliates in any such business or as to any such opportunities.

**5. <u>Other Protections</u>**.  This <u>Article XI</u> shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Certificate of Incorporation, the Bylaws or applicable law.

**6. <u>Amendments</u>**.  Neither the alteration, amendment, addition to or repeal of this <u>Article XI</u>, nor the adoption of any provision of this Certificate of Incorporation (including any Certificate of Designation) inconsistent with this <u>Article XI</u>, shall eliminate or reduce the effect of this <u>Article XI</u> in respect of any business opportunity first identified, or any other matter occurring, or any cause of action, suit or claim that, but for this <u>Article XI</u>, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption.

## ARTICLE XII: RESTRICTIONS ON THE TRANSFER OF SHARES

Notwithstanding anything to the contrary, at any time prior to later of (A) the effectiveness of the Corporation's registration statement on Form 10 filed with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended (the "***Exchange Act Registration***") or (B) the listing by the Corporation of the Corporation's Class A Common Stock on a registered securities exchange (the "***Listing***"), no outstanding shares of the Corporation's Class A Common Stock that have been or in the future are issued may be transferred, including but not limited to any sale, assignment, pledge, conveyance, hypothecation, grant of a security interest, gift or other transfer or disposition of such share or any legal, economic, or beneficial interest in such share, as well as by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Securities Exchange Act of 1934, as amended, respectively) whether or not for value and whether voluntary or involuntary, (any such transfer, a "***Transfer***"), unless the Board (or a duly authorized committee thereof), in its sole and absolute discretion and prior to the occurrence of such Transfer, approves in writing of such Transfer (by resolution, unanimous written consent or otherwise). Any such Transfer, if permitted, will be subject to such terms and conditions as the

Board may prescribe, in its sole discretion. Any Transfer effected without the prior written approval of the Board pursuant to this Article XII prior to the later of (A) the Exchange Act Registration or (B) the Listing shall be considered null and void ab initio and of no force and effect.

Notwithstanding the foregoing, any of the following Transfers of shares of the Corporation's Class A Common Stock may occur prior to the later of the Exchange Act Registration and the Listing without prior written approval by the Board pursuant to this Certificate of Incorporation: (1) any Transfer required by law or (2) any Transfer to an executor or guardian of the stockholder upon the death or disability of such stockholder, (all such Transfers referred to in clauses (1) and (2), a "*Permitted Transfer*"); provided that the transfer restrictions described in this Article XII will continue to apply to any of the Corporation's Class A Common Stock transferred pursuant to any such Permitted Transfer. In the event there is any such Permitted Transfer, the stockholder (or custodian or guardian of or anyone with power of attorney over such stockholder) effecting the Permitted Transfer must, to the extent permitted by applicable law, provide written advance notice of the Permitted Transfer (including, for the avoidance of doubt, the identities of the recipients of the shares pursuant to the Permitted Transfer and, if applicable, the reason such Permitted Transfer is required by law) to the Secretary of the Board prior to the occurrence of the Permitted Transfer. In connection with the Board's consideration for approval of any Transfer or in the case of any notification to the Board of any Permitted Transfer, the Board may reasonably request additional information and/or documentation from the stockholder (or custodian or guardian of or anyone with power of attorney over such stockholder) and/or the transferee.

## ARTICLE XIII: AMENDMENT OF CERTIFICATE OF INCORPORATION

If any provision of this Certificate of Incorporation shall be held to be invalid, illegal, or unenforceable, then such provision shall nonetheless be enforced to the maximum extent possible consistent with such holding and the remaining provisions of this Certificate of Incorporation (including, without limitation, all portions of any section of this Certificate of Incorporation containing any such provision held to be invalid, illegal, or unenforceable, which is not invalid, illegal, or unenforceable) shall remain in full force and effect. The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation: _provided_, _however_, that, notwithstanding any other provision of this Certificate of Incorporation or any provision of law that might otherwise permit a lesser vote or no vote (but subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation and the rights of any series of Preferred Stock set forth in any Certificate of Designation), but in addition to any vote of the holders of any class or series of the stock of the Corporation required by law or by this Certificate of Incorporation, the affirmative vote of the holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal such provisions of Certificate of Incorporation.

**********

13

**AMENDED AND RESTATED**
**BYLAWS OF IONIC DIGITAL INC.**
(Effective as of        , 2024)

**ARTICLE I**
**CORPORATE OFFICES**

Section 1.1    Registered Office. The registered office of Ionic Digital Inc. (the "**Corporation**") shall be set forth in the Corporation's Certificate (as defined below). References in these amended and restated bylaws (these "**Bylaws**") to the certificate of incorporation, as the same shall be amended and/or restated from time to time (the "**Certificate**"), shall include the terms of any certificate of designations of any series of preferred stock of the Corporation ("**Preferred Stock**").

Section 1.2    Other Offices. The Corporation also may have offices at such other places, both within and without the State of Delaware, as the Board of Directors of the Corporation (the "**Board**") may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 2.1    Time and Place of Meetings. Annual and special meetings of stockholders shall be held at any time and place, within or without the State of Delaware, or in whole or in part by means of remote communication, as shall be designated by the Board. In the absence of any such designation, stockholders' meetings shall be held at the Corporation's principal executive office.

Section 2.2    Annual Meeting. At the annual meeting, directors shall be elected and any other business properly brought before the meeting may be transacted. The Board may cancel, postpone or reschedule any previously scheduled annual meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

Section 2.3    Special Meeting.

(i)    A special meeting of the stockholders, other than those required by statute, may be called at any time only in the manner provided in the Certificate and these Bylaws. The Board may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

(ii)    The notice of a special meeting shall include the purpose for which the meeting is called. Only such business shall be conducted at a special meeting of stockholders as shall have been set forth in the notice of such meeting. Nothing contained in this Section 2.3(ii) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the Board may be held.

(iii)    Subject to Section 2.3(iv), the Board shall call a special meeting of stockholder upon the written request (the "***Meeting Request***") of the stockholders of record of at least 25%, in the aggregate, of the voting power of the outstanding shares of all classes of shares entitled to vote at such a meeting (the "***Required Percentage")***, delivered to the secretary of the Corporation (the "***Secretary***"). The Board shall designate a date for such special meeting not more than 90 days after the date that the Secretary received the valid Meeting Request (the "***Request Delivery Date***"). In fixing a date and time for any special meeting requested by stockholders of record, the Board may consider such factors as it deems relevant, including without limitation, the nature of the matters to be considered, the facts and circumstances related to any request for a meeting, and any plan of the Board to call an annual meeting or special meeting.

(iv)    *Stockholder Request for Special Meeting*.

(a)    Any Meeting Request shall be signed and dated by one or more stockholders of record and each beneficial owner, if any, on whose behalf the Meeting Request is being made, or—in each case—such stockholder's or beneficial owner's duly authorized agent (each, a "***Requesting Stockholder***"), and shall set forth: (1) a statement of the specific purpose of the meeting and the matters proposed to be acted on at the meeting, the reasons for conducting such business at the meeting and any material interest of the Requesting Stockholder in such business; (2) the name and address of each Requesting Stockholder as it appears on the Corporation's stock ledger (or, with respect to all shares to be included in the Required Percentage that are owned beneficially but not of record by each such Requesting Stockholder, the name of each broker, bank or custodian (or similar entity) of each such Requesting Stockholder with respect to such shares); (3) the number of shares of each class of voting shares owned of record and beneficially by each such Requesting Stockholder; (4) a description of all arrangements or understandings between any Requesting Stockholder and any other person regarding the meeting and the matters proposed to be acted on at the meeting; (5) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws or the Certificate, the language of the proposed amendment) conforming in all material respects with the requirements of Section 14(a) of the Securities Exchange Act of 1934 and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "***Exchange Act***"); and (6) all of the information regarding the Requesting Stockholders that would be required by Section 2.4(iii)–(v) of these Bylaws if each Requesting Stockholder were intending to make a nomination or to bring any other matter before a stockholder meeting (except that, for purposes of this paragraph, references to the "Noticing Stockholder" and "Holders" shall instead refer to each "Requesting Stockholder"); (7) an agreement by the Requesting Stockholder to notify the Corporation

2

promptly in the event of (x) any disposition prior to the time of the special meeting of any shares held by a Requesting Stockholder as of the date on which the Meeting Request was delivered to the Secretary and (y) any other change prior to the time of the special meeting in the shares owned by any Requesting Stockholder; and (8) an acknowledgement that (x) the Requesting Stockholder is entitled to vote at such special meeting, (y) any disposition prior to the date of the special meeting of any capital stock of the Corporation including any Requesting Stockholder's shares as of the date on which the Meeting Request was delivered to the Secretary shall be deemed to be a revocation of such Meeting Request with respect to such disposed shares and (z) that any decrease in the Requesting Stockholders' aggregate share ownership to less than the Required Percentage shall be deemed to be an absolute revocation of such Meeting Request. The requirement set forth in clause (6) of the immediately preceding sentence shall not apply to (x) any stockholder of record, or beneficial owner, as applicable, who has provided a written request solely in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act, by way of a solicitation statement filed on Schedule 14A or (y) any stockholder of record that is a broker, bank or custodian (or similar entity) and is acting solely as nominee on behalf of a beneficial owner. A Requesting Stockholder may revoke its request for a special meeting at any time by written revocation delivered to the Secretary, and if, following such revocation, there are un-revoked Meeting Requests from less than the Required Percentage, the Board, in its discretion, may cancel the special meeting.

(b)     The Board shall have the authority to determine not to call a special meeting requested by stockholders if (a) the Board has called or calls an annual or special meeting of stockholders to be held not more than 90 days after the Request Delivery Date and the purpose of such stockholder meeting includes (among any other matters properly brought before the meeting) the purpose specified in the Meeting Request; (b) within 12 months prior to the Request Delivery Date, an annual or special meeting was held that considered the purpose specified in the Meeting Request or an identical or substantially similar item of business (as determined in good faith by the Board in its sole and absolute discretion), except for the election of one or more directors; (c) the Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; or (d) such request was made in violation of Regulation 14A under the Exchange Act, to the extent applicable, or other applicable law. The Board is authorized to determine in good faith the purpose of a stockholder meeting. If none of the Requesting Stockholders appears

or sends a qualified representative to present the business and/or nominations specified in the Meeting Request to be presented for consideration, or any Requesting Stockholder or any nominee for director (as applicable) acted contrary to any representation, certification or agreement required by this Section 2.3 (or otherwise failed to comply with this Section 2.3 (or any law, rule or regulation identified in this Section 2.3 or Section 2.4)) or provided false or misleading information to the Corporation, the Corporation need not present such business for a vote at the special meeting (and any such nominee shall be disqualified from standing for election or re-election), notwithstanding that proxies in respect of such business may have been received by the Corporation.

Section 2.4    Advance Notice Procedures for Director Nominations and Business Proposals.

(i)    *Annual Meetings of Stockholders*. At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, nominations of persons for election to the Board or other proposals of business to be transacted at an annual meeting of stockholders must be: (a) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof) with respect to such meeting, (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by a stockholder of the Corporation who (1) is a stockholder of record at the time of the giving of the notice required by this Section 2.4, on the record date for the determination of stockholders entitled to notice of and to vote at such annual meeting and at the time of such annual meeting, (2) is entitled to vote at such annual meeting and (3) has timely complied in proper written form with the procedures set forth in this Section 2.4. In addition, for business to be properly brought before an annual meeting by a stockholder, such business must be a proper matter for stockholder action pursuant to these Bylaws and applicable law. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board, for the avoidance of doubt, clause (c) of this Section 2.4(i) shall be the exclusive means for a stockholder to bring business before an annual meeting of stockholders.

(ii)    For business to be properly brought before an annual meeting by a stockholder of record pursuant to clause Section 2.4(i)(c) above, the stockholder of record bringing the notice (the "***Noticing Stockholder***") must have delivered (as defined below) notice thereof in proper written form, setting forth all information required under this Section 2.4, to the Secretary at the principal executive offices of the Corporation. In order to be timely, the Noticing Stockholder's notice must be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business (as defined below) on the 90th day nor earlier than the Close of Business on the 120th day before the one-year anniversary of the preceding year's annual meeting; *provided*, *however*, that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or

4

delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting (other than as a result of adjournment), then, for notice by any Noticing Stockholder to be timely, it must be so delivered to the Secretary not earlier than the Close of Business on the 120th day prior to such annual meeting and not later than the Close of Business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which a Public Announcement (as defined below) of the date of such annual meeting is first made by the Corporation. In no event shall any adjournment, recess, rescheduling or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described in this Section 2.4. Notwithstanding anything in this Section 2.4(ii) to the contrary, in the event that the number of directors to be elected to the Board (other than any Class B Directors (as such term is defined in the Certificate, "***Class B Directors***")) is increased (subject, in all cases, to <u>Article IV, Section 3(h)</u> of the Certificate) and there is no Public Announcement by the Corporation naming all of the nominees for director proposed by the Board (other than any Class B Directors) or specifying the size of the increased Board at least 10 days prior to the last day a Noticing Stockholder may deliver a notice of nominations in accordance with the second sentence of this Section 2.4(ii), a Noticing Stockholder's notice required by this Section 2.4(ii) shall also be considered timely, but only with respect to proposed nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business on the 10th day following the day on which a Public Announcement of such increase is first made by the Corporation.

(iii)     To be in proper written form, the Noticing Stockholder's notice must also set forth:

(a)     as to each person whom the Noticing Stockholder proposes to nominate for election or re-election as a director (1) the name, age, business address and residence address of the person, (2) a complete biography and statement of such person's qualifications in compliance with the provisions of Item 401 (or any successor provision) of Regulation S-K, as amended ("***Regulation S-K***"), under the Securities Act of 1933, as amended (the "***Securities Act***"), including the principal occupation or employment of the person (at present and for the past five years), (3) the Specified Information (as defined below) for the person and any immediate family member (as defined below) of the person, or any affiliate or associate (each, as defined below) of the person, (4) a complete and accurate description of all agreements, arrangements and understandings between such person, on the one hand, and each Holder and any Stockholder Associated Person (each, as defined below), on the one hand, during the prior three years, including, without limitation, a complete and accurate description of all direct and indirect compensation and other material monetary or non-monetary agreements, arrangements and understandings (whether written or oral) during the past three years between such person and such parties (including, without limitation all biographical, related party transaction and other information that would be required to be disclosed pursuant

5

to Item 404 (or any successor provision) promulgated under Regulation S-K of the Exchange Act if the Holder or any Stockholder Associated Person were the "registrant" for purposes of such rule and such person was a director or executive officer of such registrant), (5) any other information relating to the person that would be required to be disclosed in a proxy statement or any other filings required to be made in connection with solicitations of proxies for the election of directors in a contested election or that is otherwise required pursuant to and in accordance with Section 14 of the Exchange Act (including such person's written consent to being named in proxy statements as a proposed nominee of the Noticing Stockholder and to serving as a director if elected), and (6) a completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4;

(b) as to any other business that the Noticing Stockholder proposes to bring before the meeting (1) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Certificate, and/or these Bylaws, the text of the proposed amendment(s)), (3) a description of all agreements, arrangements and understandings between each Holder and any Stockholder Associated Person and any other person or persons (including such persons' names) in connection with the proposal of such business by the Noticing Stockholder and any material interest of each such Holder or any Stockholder Associated Person in such business, and (4) a complete and accurate description of any material interest of each such Holder or any Stockholder Associated Person in or with respect to such business; and

(c) as to the Noticing Stockholder and any beneficial owner on whose behalf the nomination is being made or the other business is being proposed (collectively with the Noticing Stockholder, the "***Holders***" and, each, a "***Holder***"): (1) the name and address of each Holder, as the name and address appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (2) (aa) the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each Holder or any Stockholder Associated Person (provided that, for the purposes of this Section 2.4, any such person shall in all events be deemed to beneficially own any class or series of shares of capital stock or other securities of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future (whether such right is exercisable immediately or only after

6

the passage of time or the fulfillment of a condition or both)), (bb) any short position, profits interest, option, warrant, convertible security, stock appreciation right or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock or other securities of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of capital stock or other securities of the Corporation, or any derivative or synthetic arrangement having the characteristics of a long position in any class or series of shares of capital stock or other securities of the Corporation, or any contract, derivative, swap or other transaction or series of transactions designed to produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock or other securities of the Corporation, including due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock or other securities of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock or other securities of the Corporation through the delivery of cash or other property, or otherwise, and without regard to whether the Holder or any Stockholder Associated Person may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Derivative Instrument***") directly or indirectly owned or held, including beneficially, by each Holder or any Stockholder Associated Person, (cc) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which each Holder or any Stockholder Associated Person has any right to vote or has granted a right to vote any class or series of shares of capital stock or other securities of the Corporation, (dd) any agreement, arrangement, understanding, relationship or otherwise, including any repurchase or similar so-called "stock borrowing" agreement or arrangement engaged in, directly or indirectly, by any Holder or Stockholder Associated Person, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of any class or series of shares of capital stock or other securities of the Corporation by, manage the risk of price changes for, or increase or decrease the voting power of, such Holder or any Stockholder Associated Person with respect to any class or series of shares of capital stock or other securities of the Corporation, or which provides, directly or indirectly, the opportunity to profit or share in any profit derived from any decrease in the price or value of

any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "*Short Interest*"), and any Short Interest held by each Holder or any Stockholder Associated Person within the last 12 months in any class or series of shares of capital stock or other securities of the Corporation, (ee) any rights to dividends or payments in lieu of dividends on shares of capital stock of the Corporation owned beneficially by each Holder or any Stockholder Associated Person that are separated or separable from the underlying shares of capital stock or other securities of the Corporation, (ff) any proportionate interest in any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or other entity in which any Holder or any Stockholder Associated Person is a general partner or directly or indirectly beneficially owns an interest in a general partner of a general or limited partnership, or is the manager or managing member or directly or indirectly beneficially owns an interest in the manager or managing member of a limited liability company or other entity, (gg) any direct or indirect legal, economic or financial interest (including a Short Interest) of each Holder or any Stockholder Associated Person in the outcome of (I) any vote to be taken at any annual or special meeting of stockholders of the Corporation, or (II) any meeting of stockholders of any other entity with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under these Bylaws, (hh) any direct or indirect interest of each Holder or any Stockholder Associated Person in any contract with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), and (ii) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any affiliate of the Corporation, or any officer, director or employee of such affiliate (all information contained in subclause (2) of this Section 2.4(iii)(c) shall be referred to as the "*Specified Information*"), (3) a representation by the Noticing Stockholder that such stockholder is a holder of record of shares of capital stock of the Corporation entitled to vote at such meeting, will continue to be a stockholder of record of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person at the meeting to propose such nomination or other business, (4) any other information relating to each Holder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement and form of proxy or other filings

required to be made in connection with solicitations of proxies for, as applicable, the election of directors in a contested election and/or the proposal pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (5) a representation by the Noticing Stockholder as to whether any Holder and/or any Stockholder Associated Person intends or is part of a group which intends: (aa) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect the proposed nominee or to approve or adopt the other business being proposed, and/or (bb) otherwise to solicit proxies from stockholders in support of such nomination or other business, (6) a certification by the Noticing Stockholder that each Holder and any Stockholder Associated Person has complied with all applicable federal, state and other legal requirements in connection with its acquisition of shares of capital stock or other securities of the Corporation and/or such person's acts or omissions as a stockholder of the Corporation, (7) the information and statement required by Rule 14a-19(b) of the Exchange Act (or any successor provision), (8) the names and addresses of other stockholders (including beneficial owners) known by any Holder, proposed nominee or Stockholder Associated Person to provide financial or otherwise material support with respect to such nominations and/or proposals (it being understood that delivery of a revocable proxy with respect to such nominations and/or proposals shall not in itself require disclosure under this clause (8)), and, to the extent known, the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each such other stockholder or beneficial owner, (9) any agreements that would be required to be described or reported pursuant to Item 5 or Item 6 of Schedule 13D or filed as exhibits pursuant to Item 7 of Schedule 13D (regardless of whether the requirements to file a Schedule 13D are applicable to such stockholder or beneficial owner), (10) a representation by the Noticing Stockholder as to the accuracy of the information set forth in the notice, including, without limitation, any information provided pursuant to subclauses (iii)(a)(6) and (iv) of this Section 2.4 and (11) any other information as the Corporation may reasonably request, delivered within ten (10) business days of such request.

(iv)     The Corporation may also, as a condition to any such nomination or other business being deemed properly brought before a meeting of stockholders, require any Holder or any proposed nominee to deliver to the Secretary, within five (5) Business Days (as defined below) of any such request, such other information as may reasonably be requested by the Corporation, including (a) such other information as may reasonably be required by the Board, in its sole discretion, to determine (1) the eligibility of any such proposed nominee to serve as a director of

the Corporation, and (2) whether any such proposed nominee qualifies as an "independent director" or "audit committee financial expert," or otherwise meets heightened standards of independence, under applicable law, securities exchange rule or regulation or any publicly disclosed corporate governance guideline or committee charter of the Corporation, and (b) such other information that the Board determines, in its sole discretion, could be material to a reasonable stockholder's understanding of the diversity and independence, or lack thereof, of any such proposed nominee. Any Noticing Stockholder that no longer intends to nominate a nominee as a director of the Corporation, or no longer intends to solicit proxies for the election of a nominee as a director of the Corporation, shall promptly notify the Corporation.

(v)     In addition to the other requirements of this Section 2.4, each person who a Noticing Stockholder proposes to nominate for election or re-election as a director of the Corporation must deliver in writing (in accordance with the time periods prescribed for delivery of notice under this Section 2.4) to the Secretary at the principal executive offices of the Corporation (a) a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request of any stockholder of record identified by name within five (5) Business Days of such written request), and (b) a written representation and agreement (in the form provided by the Secretary upon written request of any stockholder of record identified by name within five (5) Business Days of such written request) that such person (1) is not and will not become a party to (aa) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (solely for purposes of this Section 2.4, a "***Voting Commitment***") that has not been disclosed to the Corporation, or (bb) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (2) is not and will not become a party to any agreement, arrangement or understanding (whether written or oral) with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, (3) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable rules of the exchanges upon which the securities of the Corporation are listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation, and (4) in such person's individual capacity and on behalf of any Holder on whose behalf the nomination is being made, intends to serve a full term if elected as a director of the Corporation.

(vi)     *Special Meetings of Stockholders*. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting: (i) by or at the direction of the Board and (ii) provided that the Board has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (1) is a stockholder of record on the date of the giving of the notice provided for in this Section 2.4, on the record date for the determination of stockholders entitled to notice of, and to vote at, such special meeting and at the time of such special meeting,

10

(2) is entitled to vote at such special meeting, and (3) complies with the notice procedures set forth in this Section 2.4. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board, any Noticing Stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the Noticing Stockholder's notice as required by Section 2.4(i) (including the completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4) shall be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not earlier than the Close of Business on the 120th day prior to the special meeting and not later than the Close of Business on the later of the 90th day prior to the special meeting or the 10th day following the day on which Public Announcement of the date of the special meeting and of the nominees proposed by the Board to be elected at such meeting is first made by the Corporation. In no event shall the Public Announcement of an adjournment, recess, rescheduling or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described above.

(vii)    *General.*

(a)    Only such persons who are nominated in accordance with the procedures set forth in subsections (i) and (ii) of this Section 2.4 (in the case of an annual or special meeting) shall be eligible for election to serve as directors and only such other business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.4. Except as otherwise provided by law, the Certificate or these Bylaws, the Chair of the Board shall have the power and duty to determine whether a nomination or any other business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in these Bylaws (including whether the Noticing Stockholder or other Holder, if any, on whose behalf the nomination is being made or other business is being proposed solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such Noticing Stockholder's nominee or other business in compliance with such stockholder's representation as required by clauses (5) and (7) of Section 2.4(iii)(c)). If any proposed nomination or other business was not made or proposed in compliance with these Bylaws, the chair of the meeting of stockholders shall have the power and duty to declare to the meeting that any such nomination or other business was not properly brought before the meeting and in accordance with the provisions of these Bylaws, and that such nomination or other business not properly brought before the meeting shall be disregarded and/or shall not be transacted.

(b)    In addition, to be considered timely, a Noticing Stockholder's notice shall be further updated and supplemented, if necessary, so that the information provided or required to be provided in such notice shall be true and correct as of the record date for the meeting and as of the date that is ten (10) Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof, and such update and supplement shall be delivered to the Secretary at the principal executive offices of the Corporation not later than five (5) Business Days after the record date for the meeting in the case of the update and supplement required to be made as of the record date, and not later than eight (8) Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof in the case of the update and

11

supplement required to be made as of ten (10) Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof. In addition, if the Noticing Stockholder has delivered to the Corporation a notice relating to the nomination of directors, the Noticing Stockholder shall deliver to the Corporation not later than eight (8) Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof reasonable evidence that it has complied with the requirements of Rule 14a-19 of the Exchange Act (or any successor provision). For the avoidance of doubt, the obligation to update and supplement set forth in this paragraph or any other Section of these Bylaws shall not (x) limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, (y) extend any applicable deadlines hereunder or (z) enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business and/or resolutions proposed to be brought before a meeting of stockholders.

(c)     Notwithstanding anything to the contrary in these Bylaws, if the Noticing Stockholder (or a qualified representative of the Noticing Stockholder) does not appear at the annual or special meeting of stockholders, as applicable, to present a nomination or other business, such nomination shall be disregarded and such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 2.4, to be considered a "qualified representative" of the Noticing Stockholder, a person must be authorized by a document authorizing another person or persons to act for such stockholder as proxy at the meeting of stockholders and such person must produce the document or a reliable reproduction of such document at the meeting of stockholders. A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder. If it is determined that such transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information upon which such inspectors or such persons relied.

(d)     Any stockholder directly or indirectly soliciting proxies from other stockholders must use a proxy card color other than white, which shall be reserved for exclusive use by the Board. If any stockholder or Stockholder Associated Person provides notice pursuant to Rule 14a-19(b) under the Exchange Act, such stockholder or Stockholder Associated Person shall deliver to the Corporation, within five (5) business days prior to the applicable meeting, reasonable evidence that it has met the requirements of Rule 14a-19 under the Exchange Act.

(e)     Notwithstanding anything in these Bylaws to the contrary, unless otherwise required by law, if any stockholder or Stockholder Associated Person (i) provides notice pursuant to Rule 14a-19(b) under the Exchange Act with respect to any stockholder nominee and (ii) subsequently fails to comply with the requirements of Rule 14a-19(a)(2) or Rule 14a-19(a)(3) under the Exchange Act, or fails to timely provide reasonable evidence sufficient to satisfy the Corporation that such stockholder or Stockholder Associated Person has met the requirements of

12

Rule 14a-19 under the Exchange Act, then the nomination of each such stockholder nominee shall be disregarded, notwithstanding that proxies or votes in respect of the election of such stockholder nominee may have been received by the Corporation (which proxies and votes shall be disregarded except for the purpose of determining a quorum).

(f)     For purposes of these Bylaws,

(1)     "*affiliate*" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(2)     "*associate*" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(3)     "*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to close;

(4)     "*Close of Business*" on a particular day means 5:00 p.m. local time at the principal executive offices of the Corporation, and, if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day;

(5)     "*delivered*" means, solely for purposes of this Article II, both (x) hand delivery, overnight courier service or sent and received by certified or registered mail, return receipt requested, in each case, to the Secretary at the principal executive offices of the Corporation, and (y) electronic mail to the Secretary;

(6)     "*immediate family member*" means a person's child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law and anyone (other than a tenant or employee) sharing the household of such person;

(7)     "*Public Announcement*" means disclosure (x) in a press release released by the Corporation, provided such press release is released by the Corporation following its customary procedures, as reported by the Dow Jones News Service, Associated Press or a comparable national news service, or is generally available on internet news sites, or (y) in a document publicly filed by the Corporation with the

SEC pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and

(8)    "**_Stockholder Associated Person_**" of any Holder means (x) any affiliate or any associate of such Holder or any member of a "group" (as such term is used in Rule 13d-5 under the Exchange Act (or any successor provision at law)) with such holder, (y) any person controlling, controlled by or under common control with such Holder, and (z) any immediate family member of such Holder.

(viii)    *Other Requirements and Rights*. In addition to the foregoing provisions of this Section 2.4, a stockholder must also comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.4. Notwithstanding anything to the contrary contained in this Section 2.4, the sole holder of shares of Class B Common Stock (as defined in the Certificate) (such sole holder, the "**_Class B Holder_**") shall not be subject to the notice procedures set forth in this Section 2.4 with respect to nominations of persons for election to the Board as Class B Directors at any annual or special meeting of stockholders of the Corporation. Nothing in this Section 2.4 shall be deemed to affect any rights of:

(a)    a stockholder to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act; or

(b)    the Corporation to omit a proposal from the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act.

Section 2.5    Notice of Stockholders' Meetings. The Corporation shall give a notice in writing of the place, if any, date and hour of each meeting of stockholders and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Such notice may be delivered personally, by mail or by any other manner allowed by the General Corporation Law of the State of the Delaware (the "**_General Corporation Law_**"). Without limiting the manner by which notice otherwise may be given effectively to stockholders, if such notice is mailed, it shall be deemed to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the record of the Corporation. Except as otherwise provided in the General Corporation Law, the Certificate or these Bylaws, the written notice of any meeting of stockholders shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

Section 2.6      Quorum. The holders of one-third of the aggregate voting power of the capital stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders, except where a different quorum is required by the General Corporation Law, the Certificate or these Bylaws. Where a separate vote by a class or series or classes or series is required, one-third of the outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum (as to such class or series) entitled to take action with respect to that vote on that matter, except as otherwise provided by law, the Certificate or these Bylaws. Abstentions and non-votes by brokers are counted as present for purposes of determining a quorum.

If a quorum is not present or represented at any meeting of the stockholders, then either (i) the chair of the meeting, or (ii) the holders of a majority of the shares entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

Section 2.7      Adjourned Meeting; Notice. When a meeting is adjourned to another time and/or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are (i) announced at the meeting at which the adjournment is taken, (ii) displayed, during the time scheduled for the meeting, on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication or (iii) set forth in the notice of meeting given in accordance with these Bylaws. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or a new record date for stockholders entitled to vote is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.8      Conduct of Business. The Board may, to the extent not prohibited by law or in contravention of the provisions of these Bylaws or the Certificate, adopt such rules and regulations for the conduct of meetings of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the chair of any meeting of stockholders shall have the exclusive right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of the chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present, including regulation of the manner of voting and the conduct of discussion; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chair of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on or the elimination of time allotted to questions or comments by participants; and (vi) restrictions on the

15

use of cell phones, audio or video recording devices and other devices at the meeting. The chair of any meeting of stockholders shall be designated by the Board; in the absence of such designation, the Chair of the Board, if any, the Lead Independent Director (as defined below) (in the absence of the Chair of the Board), the Chief Executive Officer (in the absence of the Chair of the Board and the Lead Independent Director) or the President (in the absence of the Chair of the Board and the Lead Independent Director and the Chief Executive Officer), or in their absence any other director or officer of the Corporation selected by the Board, shall serve as chair of the stockholder meeting. The chair of the meeting shall have the power, right and authority to convene, recess or adjourn any meeting of stockholders.

Section 2.9   Voting.

(i)      *Voting Rights.* Except as may be otherwise provided by law, the Certificate, these Bylaws or any Certificate of Designation (as such term is defined in the Certificate), each stockholder of record of any series of Preferred Stock shall be entitled at each meeting of the stockholders to such number of votes, if any, for each share of such stock as may be fixed in the Certificate or in the resolution or resolutions adopted by the Board providing for the issuance of such stock, the Class B Holder shall be entitled to the voting rights set forth in the Certificate, and each stockholder of record of the Corporation's Common Stock (as defined in the Certificate) shall be entitled at each meeting of the stockholders to one vote for each such share of such stock registered in such stockholder's name on the books of the Corporation on the date fixed pursuant to Section 2.11 of these Bylaws as the record date for the determination of stockholders entitled to notice of and to vote at such meeting. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.

(ii)      *Vote Required.* Except as otherwise required by law, the Certificate or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of the shares cast shall be the act of the stockholders. Except as with respect to the election of Class B Directors and except as otherwise required by law, the Certificate or these Bylaws, the vote required for election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(iii)      *Abstentions and Broker Non-Votes.* In determining the number of votes cast for or against, as applicable, a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast. A non-vote by a broker will be counted for purposes of determining a quorum but not for purposes of determining the number of votes cast.

Section 2.10   No Stockholder Action by Written Consent Without a Meeting. Except as otherwise set forth in the Certificate, subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting.

Section 2.11    Record Dates.

(i)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting.

(ii)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 2.12    Proxies. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy but such proxy, whether revocable or irrevocable, must comply with the applicable requirements of Delaware law.

Section 2.13    List of Stockholders Entitled to Vote. The Corporation shall prepare no later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of 10 days ending on the day before the meeting date: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list was provided with the notice of the meeting; or (ii) during ordinary business hours, at the principal place of business of the Corporation. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

## ARTICLE III
## DIRECTORS

Section 3.1    Board Power. The business and affairs of the Corporation shall be managed by and under the direction of the Board, except as may be otherwise provided in the General Corporation Law or the Certificate. In addition to the powers and authority expressly conferred upon them by applicable law or by the Certificate or these Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, except as otherwise specifically required by law or as otherwise provided in the Certificate.

Section 3.2    Board Size. Subject to the provisions of the Certificate, the Board shall consist of no less than five members and no more than 15 members, each of whom shall be a natural person. The number of directors shall be determined from time to time solely by resolution of the Board in accordance with the provisions of the Certificate. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 3.3    Election, Qualification and Term of Office of Directors. Except as provided in Section 3.4 of these Bylaws and subject to the provisions of the Certificate, each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders unless so required by the Certificate or these Bylaws. The Certificate or these Bylaws may prescribe other qualifications for directors.

Section 3.4    Removal of Directors. Directors may be removed from the Board at any time as provided in the Certificate.

Section 3.5    Resignation and Vacancies.

(i)    Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the director. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Acceptance of such resignation shall not be necessary to make it effective.

(ii)    Vacancies and newly created directorships on the Board shall be filled in the manner provided in the Certificate. A person so elected to fill a vacancy or newly created directorship shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

18

Section 3.6    Place of Meetings; Meetings by Remote Communication. The Board may hold meetings, both regular and special, either within or without the State of Delaware. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of remote communication, including without limitation, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.7    Regular Meetings. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

Section 3.8    Special Meetings; Notice. Special meetings of the Board for any purpose or purposes may be called at any time by the Chairperson of the Board, the Lead Independent Director (if any), a Class B Director, the Chief Executive Officer or a majority of the directors then in office, at such times and places as such person or persons shall designate. Notice of special meetings of the Board shall be given to each director by mailing it to such director's residence or usual place of business (accompanied by an electronic transmission of such notice) at least twenty-four (24) hours before the date of the meeting or by telephone or electronic transmission at least twenty-four (24) hours before the meeting. Notice need not be given to any director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting the lack of notice to such person, either before the meeting or when it begins. Notice of any adjourned meeting need not be given, other than by announcement at the meeting at which the adjournment is taken.

Section 3.9    Quorum; Voting. At all meetings of the Board, (i) a majority of the total number of directors (other than the Class B Directors) then in office plus (ii) at least one of the Class B Directors shall constitute a quorum for the transaction of business, unless a greater number is required by applicable law. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present; provided, however, that clause (ii) of the immediately preceding sentence shall not be required to constitute a quorum if (A) a meeting has been adjourned for at least two days on two consecutive occasions due to the failure of clause (ii) of the immediately preceding sentence to be satisfied and (B) at the third consecutive re-convened meeting (held at least two days after the previously adjourned meeting), the absence of Class B Directors is the cause of a quorum not being satisfied. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate or these Bylaws.

Section 3.10    Board Action by Written Consent Without a Meeting. Unless otherwise restricted by the Certificate or these Bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and any consent may be documented, signed and delivered in any manner permitted

by Section 116 of the General Corporation Law. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of proceedings of the Board or committee.

Section 3.11    Fees and Compensation of Directors. Unless otherwise restricted by the Certificate or these Bylaws, the Board shall have the authority to fix the compensation, including fees, equity grants and reimbursement of expenses, of directors for services to the Corporation in any capacity.

Section 3.12    The Chair of the Board. The Chair of the Board shall have the powers and duties customarily and usually associated with the office of the Chair of the Board. The Chair of the Board shall preside at meetings of the stockholders and of the Board.

Section 3.13    Lead Independent Director. In the event that the Chair of the Board is an employee or officer of the Corporation, the Board may choose to appoint from its members a lead independent director from among their members that are Independent Directors (as defined below) (such director, the "***Lead Independent Director***"), which may be the Chair of the Board if the Chair is independent. If the Board appoints a Lead Independent Director, such Lead Independent Director shall perform such duties and possess such powers as are assigned by the Board, including presiding at all meetings at which the Chair of the Board is not present and calling meeting's of the Corporation's independent directors. For purposes of these Bylaws, "***Independent Director***" has the meaning ascribed to such term under the rules of the exchange upon which the Corporation's Class A Common Stock is primarily traded.

## ARTICLE IV
## COMMITTEES

Section 4.1    Committees of Directors. The Board shall appoint one or more of its members to an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee, and may from time to time establish by resolution adopted by a majority of the entire Board, additional committees of its members. Subject to Section 4.5 of these Bylaws, the Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board or in these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; *provided, however,* that no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the General Corporation Law to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation. A Director's membership on a committee shall terminate on the date of his, her or their death or resignation, removal or disqualification from the Board, but the Board may at any time for any reason remove any individual committee member from any committee and the Board may, subject to any requirements specifically set forth in this Article IV, fill any committee vacancy.

Section 4.2    Committee Minutes. Each committee shall keep regular minutes of its meetings and report its actions to the Board.

20

Section 4.3     Meetings and Action of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)     Section 3.6 (place of meetings and meetings by telephone);

(ii)    Section 3.7 (regular meetings);

(iii)   Section 3.8 (special meetings; notice);

(iv)    Section 3.9 (quorum; voting); *provided, however*, that the provisions of Section 3.9 regarding the presence of a Class B Director to establish a quorum shall not be required for committees upon which no Class B Director serves;

(v)     Section 3.10 (action without a meeting); and

(vi)    Section 7.5 (waiver of notice) with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(a)     the time of regular meetings of committees may be determined by resolution of the committee or the chair of such committee; and

(b)     special meetings of committees may also be called by resolution of the committee or the chair of such committee.

The Board may adopt rules for the governance of any committee not inconsistent with the provisions of these Bylaws. Any committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board. Unless the Board provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board provides otherwise, each committee designated by the Board may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business.

Section 4.4     Subcommittees. Unless otherwise provided under applicable law, or in the Certificate, these Bylaws or the resolutions of the Board designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

Section 4.5    Class B Directors. For so long as that certain Mining Management Services Agreement by and between the Corporation and U.S. Data Management Group LLC, a Delaware limited liability company and subsidiary of Hut 8 Corp. dated as of [●], 2024 remains in full force and effect, to the extent permissible under applicable law and the listing rules of any exchange upon which the Corporation's securities are traded, any committee of the Board, including without limitation any committee that oversees: (i) material investments or divestitures, strategic transactions and other significant transactions not in the ordinary course of the Corporation's business, and (ii) the Corporation's governance and the evaluation of nominees for election to the Board (including, without limitation, any nominating committee that satisfies Nasdaq Listing Rule 5605(e)(2) or Section 303A.04 of the New York Stock Exchange Listed Company Manual), shall include at least one Class B Director; provided, however, for the avoidance of doubt, that any committee of the Board performing the functions of an audit committee (including, without limitation, any audit committee that satisfies Nasdaq Listing Rule 5605(c) or Section 303A.06 of the New York Stock Exchange Listed Company Manual) shall not be required to include a Class B Director in accordance with applicable law and listing rules.

## ARTICLE V
## OFFICERS

Section 5.1    Officers. The officers of the Corporation shall be a Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board. Any number of offices may be held by the same person. In its discretion, the Board may choose not to fill any office for any period as it may deem advisable; provided, however, that there shall always be (i) a Chief Executive Officer, (ii) a Secretary and (iii) a Chief Financial Officer.

Section 5.2    Appointment of Officers. The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws, subject to the rights, if any, of an officer under any contract of employment. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Article V for the regular election to such office.

Section 5.3    Subordinate Officers. The Board may appoint, or empower the Chief Executive Officer to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine.

Section 5.4    Removal and Resignation of Officers. Any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board. Any officer may resign at any time by giving written or electronic notice to the Corporation; provided, however, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the officer. Any resignation shall take effect at the date of the receipt of that notice or at any

22

later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

Section 5.5    Vacancies in Offices. Any vacancy occurring in any office of the Corporation shall be filled by the Board as provided in Section 5.2 and 5.3.

Section 5.6    Representation of Shares of Other Corporations. The Chair of the Board, the Lead Independent Director, the Chief Executive Officer, the Chief Financial Officer the Secretary, or any other person authorized by the Board, the Chair of the Board, the Lead Independent Director or the Chief Executive Officer is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

Section 5.7    Authority and Duties of Officers. All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

Section 5.8    The Chief Executive Officer. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board, ultimate authority for decisions relating to the supervision, direction and management of the affairs and the business of the Corporation customarily and usually associated with the position of Chief Executive Officer, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation. If at any time the office of the Chair and Lead Independent Director of the Board shall not be filled, or in the event of the temporary absence or disability of the Chair of the Board and the Lead Independent Director, the Chief Executive Officer shall perform the duties and exercise the powers of the Chair of the Board unless otherwise determined by the Board.

Section 5.9    The Secretary.

(i)    The Secretary shall attend meetings of the Board and meetings of the stockholders and record all votes and minutes of all such proceedings in a book or books kept for such purpose. The Secretary shall have all such further powers and duties set forth in these Bylaws and as are customarily and usually associated with the position of Secretary or as may from time to time be assigned to him or her by the Board, the Chair of the Board, or the Chief Executive Officer.

Section 5.10    The Chief Financial Officer.

(i)    The Chief Financial Officer shall be responsible for maintaining the Corporation's accounting records and statements, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation. The Chief Financial Officer

23

shall also maintain adequate records of all assets, liabilities and transactions of the Corporation and shall assure that adequate audits thereof are currently and regularly made. The Chief Financial Officer shall have all such further powers and perform all such further duties as are customarily and usually associated with the position of Chief Financial Officer, or as may from time to time be assigned to him or her by the Board, the Chair of the Board or the Chief Executive Officer. Unless a treasurer has been appointed separately in accordance with these Bylaws, the Chief Financial Officer shall also perform the duties customarily and usually associated with the position of treasurer.

## ARTICLE VI
## CAPITAL STOCK

Section 6.1    Stock Certificates; Uncertificated Shares. The shares of the Corporation may be represented by certificated or uncertificated shares and may be evidenced by a book-entry system maintained by the registrar of such shares, as determined by the Corporation in accordance with applicable law. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

(i)    Shares with Certificates. Each certificate of stock issued by the Corporation shall be signed (either manually or in facsimile) by any two authorized officers of the Corporation representing the number of shares registered in certificate form. If any person who signed a certificate no longer holds office when the certificate is issued, the certificate will be nonetheless valid. The Corporation shall not have power to issue a certificate in bearer form. If the Board chooses to issue shares of stock evidenced by a certificate or certificates, each individual certificate shall include the following on its face: (i) the Corporation's name, (ii) the fact that the Corporation is organized under the laws of Delaware, (iii) the name of the person to whom the certificate is issued, (iv) the number of shares represented thereby, (v) the class of shares and the designation of the series, if any, which the certificate represents, and (vi) such other information as required under the Certificate or applicable law or as may be lawful. If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series (and the authority of the Board to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate shall state on its front or back that the Corporation will furnish the stockholder this information in writing, without charge, upon request.

(ii)    Shares without Certificates. If the Board chooses to issue shares of stock without certificates, the Corporation, if required by the Exchange Act, shall, within a reasonable time after the issue or transfer of shares without certificates, send the stockholder a written notice containing the information required to be set forth or stated on certificates pursuant to the General Corporation Law. The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

Section 6.2    Lost, Stolen or Destroyed Certificates. Except as provided in this Section 6.2, no new certificates for shares shall be issued to replace a previously issued certificate unless

24

the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed. The Corporation may, subject to Section 167 of the General Corporation Law, determine the conditions upon which a new share certificate or uncertificated shares may be issued in place of any certificate alleged to have been lost, stolen or destroyed. The Corporation may, in its sole discretion, require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 6.3    Dividends. The Board, subject to any restrictions contained in the Certificate or applicable law, may declare and pay dividends upon the shares of the Corporation's capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock, subject to the provisions of the Certificate.

Section 6.4    Transfer of Stock. Transfers of record of shares of stock of the Corporation shall be made only upon its books by the holders thereof, in person or by an attorney duly authorized, and, if such stock is certificated, upon the surrender of a certificate or certificates for a like number of shares, properly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer; provided, however, that such succession, assignment or authority to transfer is not prohibited by the Certificate, these Bylaws, applicable law or contract.

Section 6.5    Stock Transfer Agreements. The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law.

Section 6.6    Registered Stockholders. The Corporation:

(i)    shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii)    shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)    shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**ARTICLE VII**
**MANNER OF GIVING NOTICE AND WAIVER**

Section 7.1    Notice of Stockholders' Meetings. Notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the

25

stockholder at such stockholder's address as it appears on the Corporation's records. An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

Section 7.2    Notice by Electronic Transmission. Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the General Corporation Law, the Certificate or these Bylaws, any notice to stockholders given by the Corporation under any provision of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if:

(i)    the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent; and

(ii)   such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(I)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(II)   if by electronic mail, when directed to the stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) of the General Corporation Law;

(III)  if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and

(IV)   if by any other form of electronic transmission, when directed to the stockholder.

26

An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

An "*electronic transmission*" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

Section 7.3    Notice to Stockholders Sharing an Address. Except as otherwise prohibited under the General Corporation Law, without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the provisions of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any stockholder who fails to object in writing to the Corporation, within 60 days of having been given written notice by the Corporation of its intention to send the single notice, shall be deemed to have consented to receiving such single written notice.

Section 7.4    Notice to Person with Whom Communication Is Unlawful. Whenever notice is required to be given under the General Corporation Law, the Certificate or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate under the General Corporation Law, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Section 7.5    Waiver of Notice. Whenever notice is required to be given to stockholders, directors or other persons under any provision of the General Corporation Law, the Certificate or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders or the Board, as the case may be, need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate or these Bylaws.

## ARTICLE VIII
## <u>INDEMNIFICATION</u>

Section 8.1    <u>Indemnification of Directors and Officers in Third Party Proceedings</u>. Subject to the other provisions of this <u>Article VIII</u>, the Corporation shall indemnify and hold harmless, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether civil, criminal, administrative, legislative, investigative or other nature and including any and all appeals (collectively, each a "***Proceeding***") (other than an action by or in the right of the Corporation to procure a judgement in its favor) by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, excise taxes under the Employee Retirement Income Security Act of 1974, as amended, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

Section 8.2    <u>Indemnification of Directors and Officers in Actions by or in the Right of the Corporation</u>. Subject to the other provisions of this <u>Article VIII</u>, the Corporation shall indemnity, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgement in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

28

Section 8.3    Successful Defense. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in defense of any Proceeding described in Section 8.1 or Section 8.2, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith to the extent not already advanced pursuant to Section 8.5.

Section 8.4    Indemnification of Others. Subject to the other provisions of this Article VIII, the Corporation shall have power to indemnify its employees and its agents to the extent not prohibited by the General Corporation Law or other applicable law. The Board shall have the power to delegate the determination of whether employees or agents shall be indemnified to such person or persons as the Board determines.

Section 8.5    Advanced Payment of Expenses. To the fullest extent permitted by applicable law, expenses (including attorneys' fees) incurred by an officer or director of the Corporation in defending any Proceeding shall be paid by the Corporation, and expenses (including attorneys' fees) incurred by the Corporation's employees and agents in defending any Proceeding shall be paid by the Corporation, in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the person, to repay such amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that such person is not entitled to be indemnified under this Article VIII or the General Corporation Law.

Section 8.6    Non-Exclusivity of Rights. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate (including the indemnification provisions set forth in Article VII, Section 2 of the Certificate) or any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

Section 8.7    Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the General Corporation Law.

Section 8.8    Survival. Notwithstanding anything to the contrary, the rights to indemnification and advancement of expenses conferred by this Article VIII shall be contract rights and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

29

Section 8.9    Effect of Repeal or Modification. Any amendment, alteration or repeal of this Article VIII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to such amendment, alteration or repeal.

Section 8.10    Certain Definitions. For purposes of this Article VIII, references to the "*Corporation*" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. For purposes of this Article VIII, references to "*other enterprises*" shall include employee benefit plans; references to "*fines*" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "*serving at the request of the Corporation*" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "*not opposed to the best interests of the Corporation*" as referred to in this Article VIII.

## ARTICLE IX
## GENERAL MATTERS

Section 9.1    Execution of Corporate Contracts and Instruments. Except as otherwise provided by law, the Certificate or these Bylaws, the Board may authorize any officer or officers, or agent or agents, to enter into any contract or execute any document or instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 9.2    Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

Section 9.3    Seal. The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 9.4    Construction; Definitions. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Certificate and the General Corporation Law shall govern the construction of these Bylaws. Without limiting the generality of

30

this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person.

## ARTICLE X
## AMENDMENTS

The Board and stockholders may adopt, amend and repeal the Bylaws in the manner provided in the Certificate.

**<u>Exhibit D</u>**

**Plan Sponsor Contribution Agreement**

*DRAFT*

**Ionic Digital Inc.**

---

**PLAN SPONSOR CONTRIBUTION AGREEMENT**

---

## PLAN SPONSOR CONTRIBUTION AGREEMENT

This Plan Sponsor Contribution Agreement (this "Agreement"), is made as of _____, 2024, by and between Ionic Digital Inc., a Delaware corporation (the "Company"), and U.S. Data Management Group LLC, a Delaware limited liability company, doing business as US Bitcoin Corp. (the "Plan Sponsor").

**WHEREAS,** on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Plan"); and

**WHEREAS**, on August 17, 2023, the Debtors filed their fourth revised *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Disclosure Statement"); and

**WHEREAS,** on August 17, 2023, the Bankruptcy Court entered its Order approving the Disclosure Statement and granting related relief; and

**WHEREAS,** on November 9, 2023, the Bankruptcy Court entered its Order confirming the Plan and granting related relief; and

**WHEREAS**, pursuant to the Plan, the Company will issue to the Plan Sponsor, and the Plan Sponsor shall purchase from the Company, up to $12,756,000 of shares of the Company's Class A common stock, par value $0.00001 per share (the "Common Stock"), subject to the terms and conditions herein and enter into that certain Management Services Agreement by and between the Company and the Plan Sponsor dated on the date hereof (the "Management Agreement").

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Plan Sponsor hereby represent and agree as follows:

       1.     ISSUANCE AND CONTRIBUTION.

       (a)     Initial Investment. By wire transfer to the Company of immediately available funds on the date of purchase of the Common Stock, the Plan Sponsor shall purchase from the Company for an aggregate purchase price of $6,378,000 (the "Initial Plan Sponsor Investment") the number of shares of Common Stock (the "Initial Plan Sponsor Shares") equal to

1

the product of: (i) the sum of all outstanding shares of Common Stock issued or anticipated to be issued on the Effective Date (as defined under the Plan) (the "Issued Shares") *plus* (ii) the number of shares of Common Stock reserved for issuance in accordance with the Plan for Claims (as defined in the Plan) that are Disputed (as defined in the Plan), as well as any other shares of Common Stock that are reserved for issuance or subject to holdbacks as of the Effective Date of the Plan (the "Reserve Shares") *plus* (iii) the number of shares of Common Stock reserved for issuance in accordance with any equity incentive plan approved or contemplated under the Plan or approved by the board of directors of the Company on the Effective Date (the "Plan Shares", and together with Reserve Shares and the Issued Shares, the "Effective Date Shares"); *multiplied by* (iii) a fraction, the numerator of which is the Initial Plan Sponsor Investment, and the denominator of which is the [Plan Value (as such term is defined under the Plan)][1], which for the avoidance of doubt shall not include the Initial Plan Sponsor Investment (the "Company Net Asset Value"). An illustrative calculation of the foregoing formula is depicted below.

| (The sum the Issued Shares *plus* the Reserve Shares *plus* the Plan Shares) | × | Initial Plan Sponsor Investment (*i.e.*, $6,378,000) |
|---|---|---|
| | | Company Net Asset Value as of Effective Date (not including Initial Plan Sponsor Investment) |

Subject to the conditions specified in Section 5 hereof, the closing of the issuance and purchase of the Common Stock contemplated by this Section 1(a) will take place on the Effective Date (as defined in the Plan) (the "Initial Closing Date") upon the declaration of the effectiveness of the Plan in accordance with its terms.

(b)    Subsequent Investments.

i.    Subject to Section 1(b)(ii), the Manager shall purchase from the Company, for an aggregate purchase price of $6,378,000, the number of shares of Common Stock equal to the product of: the number of the Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock) *multiplied by* a fraction, the numerator of which is $6,378,000, and the denominator of which is the Company Net Asset Value.

ii.    Subject to the conditions specified in Section 5 hereof, the closing of the issuance and purchase of the Common Stock contemplated by this Section 1(b) (a "Subsequent Closing") will take place on the first Business Day after the earlier to occur of (A) the Exchange Act Registration Statement (as defined below) being declared effective, or (B) so long as the Company has not terminated the Management Agreement

---

[1] **Note to Draft**: The definition of Plan Value to be confirmed under the Plan that will be published by the Debtors on the measurement date prior to the Effective Date. To be equivalent to Company net asset value as of Effective Date.

2

pursuant to the Section 2(b)(iii)(H) thereof, May 1, 2024 (such date a "<u>Subsequent Closing Date</u>").

(c)    For the purposes of this Agreement, (1) "<u>Subsequent Plan Sponsor Investment</u>" shall mean any purchase price payable by the Plan Sponsor in accordance with the subsequent investments set forth in <u>Section 1(b)</u>, (2) "<u>Plan Sponsor Investment</u>" shall mean the sum of the Initial Plan Sponsor Investment and the Subsequent Plan Sponsor Investment, (3) "<u>Plan Sponsor Shares</u>" shall mean, collectively, the shares of Common Stock purchased in the Initial Plan Sponsor Investment and the Subsequent Plan Sponsor Investment, and (4) "<u>Closing Date</u>" shall refer to each of the Initial Closing Date for purposes of the Initial Plan Sponsor Investment and the Subsequent Closing Date for the Subsequent Plan Sponsor Investment.

(d)    For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Plan Sponsor shall be solely responsible for any monetary obligations owed by it under this Agreement.

2.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

As of the date hereof and as of each Closing Date, the Company represents and warrants to the Plan Sponsor as follows:

(a)    The Company is duly incorporated and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b)    The Company has the requisite corporate or other applicable power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite action.

(c)    This Agreement has been duly and validly executed and delivered by the Company and constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(d)    The Plan Sponsor Shares have been duly authorized and, upon payment of the Initial Plan Sponsor Investment and/or the Subsequent Plan Sponsor Investment, as the case maybe, pursuant to the terms of this Agreement, will be validly issued, fully paid and nonassessable, and conform in all material respects to the description thereof set forth in the Disclosure Statement and the Exchange Act Registration Statement (as defined below).

(e)    Neither the Company, nor any of its subsidiaries, is and, immediately after giving effect to the offering and sale of the Plan Sponsor Shares and the application of the proceeds thereof, will be an "investment company", as such term is defined in the Investment Company Act of 1940, as amended, including the rules and regulations of the Securities and Exchange Commission (the "<u>Commission</u>") promulgated thereunder.

(f)    Solely with respect to the Subsequent Closing, a registration statement on Form 10 (File No. [●]), as amended (the "<u>Exchange Act Registration Statement</u>"), in respect of

3

the Common Stock has been filed with the Commission, and the Exchange Act Registration Statement in the form heretofore delivered to the Plan Sponsor has become effective.

(g)     Solely with respect to the Subsequent Closing, the financial statements included in the Exchange Act Registration Statement, together with the related schedules and notes, present fairly in all material respects the financial position of the Company and its subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and its subsidiaries for the periods specified. Said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved. The supporting schedules, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein. The summary financial information included in the Exchange Act Registration Statement present fairly in all material respects the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein.

(h)     The Initial Plan Sponsor Shares were offered and sold pursuant to an exemption from registration under the Securities Act of 1933, as amended, including the rules and regulations of the Commission promulgated thereunder (the "Securities Act"), provided by Section 1145(a) of the Bankruptcy Code.

3.     REPRESENTATIONS AND WARRANTIES OF THE PLAN SPONSOR.

As of the date hereof and as of each Closing Date, the Plan Sponsor represents and warrants to the Company as follows:

(a)     The Plan Sponsor is duly organized and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b)     The Plan Sponsor has the requisite corporate power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Plan Sponsor of the transactions contemplated hereby have been duly authorized by all requisite action.

(c)     This Agreement has been duly and validly executed and delivered by the Plan Sponsor and constitutes the valid and binding obligation of the Plan Sponsor, enforceable against the Plan Sponsor in accordance with its terms.

(d)     The execution, delivery and performance by Plan Sponsor of this Agreement, including the consummation of the transactions contemplated hereby will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Plan Sponsor pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Plan Sponsor is a party or by which Plan Sponsor is bound or to which any of the property or assets of Plan Sponsor is subject; (ii) Plan Sponsor's organizational documents or under any law, rule, regulation, agreement or other obligation by which Plan Sponsor is bound; and (iii) any statute or any

4

judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Plan Sponsor or any of their respective properties, that would reasonably be expected to have a material adverse effect on the ability of the Plan Sponsor to enter into and timely perform its obligations under this Agreement.

(e)     The Plan Sponsor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(f)     The Plan Sponsor acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, liabilities, properties, contracts, employee matters, regulatory compliance, business risks, and prospects) of the Company and its affiliates, and, in making its determination to proceed with the transactions contemplated hereby, the Plan Sponsor has relied, is relying, and will rely, solely, on the representations of the Company set forth herein (the "Express Representations") and the results of the Plan Sponsor's own independent investigation and verification and has not relied on, is not relying on, and will not rely on any information, statements, disclosures, documents, projections, forecasts or other material made available to the Plan Sponsor or any of its affiliates, advisors, or representatives, in any "dataroom", any "information presentation" or similar document, or any Projections (defined below) or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of the Company or any of its affiliates, Celsius Network LLC or any of its affiliates, or any predecessor, advisors or representative of any of the foregoing (the "Disclaimed Persons"), or any failure of any of the Disclaimed Persons to disclose or contain any information, except for the Express Representations. The Plan Sponsor acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to the Plan Sponsor and on which the Plan Sponsor may rely in connection with the transactions contemplated hereby and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, statutory, whether in written, electronic or oral form are, in each case, specifically disclaimed by the Company and the foregoing persons.

(g)     Without limiting the generality of the foregoing, in connection with the investigation by the Plan Sponsor, the Plan Sponsor and its advisors and representatives have received or may receive certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in any "information presentation" or similar document, any dataroom, any management meetings, etc.) (collectively, "Projections"). The Plan Sponsor acknowledges and agrees that (i) such Projections are being provided solely for the convenience of the Plan Sponsor to facilitate its own independent investigation, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) the Plan Sponsor is familiar with such uncertainties, and (iv) the Plan Sponsor is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections). The Disclaimed Persons are intended third party beneficiaries of these paragraphs 3(f) and 3(g) and shall be entitled to enforce this these paragraphs 3(f) and 3(g) as if a party directly hereto.

4.      COMPLIANCE WITH THE SECURITIES ACT.

(a)     The parties agree that the Plan Sponsor Shares are "restricted securities" under the Securities Act and have not been registered under the Securities Act nor qualified under any state securities laws, and that the Plan Sponsor Shares are offered and sold in reliance upon the exemption from the registration requirements of the Securities Act provided in Section 4(a)(2) under the Securities Act and Regulation D promulgated under the Securities Act or Section 1145(a) of the Bankruptcy Code.

(b)     To the extent applicable, the Plan Sponsor Shares issued by the Company in connection with this Agreement (unless registered under the Securities Act and the Company determines in its reasonable discretion that such legend is not required) may be stamped or imprinted with a legend in substantially the following form:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SECURITIES IS EFFECTIVE UNDER THE ACT OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL SATISFACTORY TO THE COMPANY."

5.      CONDITIONS TO CLOSING.

(a)     The obligations of the Plan Sponsor to purchase and pay for the Plan Sponsor Shares is subject to the following condition precedent: (i) the representations and warranties of the Company contained in Section 2 hereof shall be true and correct as of the applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, and (iii) solely for purposes of the Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, either (x) the Exchange Act Registration Statement has become effective or (y) the Company has not terminated the Management Agreement pursuant to Section 2(b)(iii)(H) therein (the "Form 10 Termination Right").

(b)     The obligations of the Company to issue and sell the Plan Sponsor Shares is subject to the following conditions precedent: (i) the representations and warranties of the Plan Sponsor contained in Section 3 hereof shall be true and correct as of the applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, (iii) the Plan Sponsor has delivered to the Company the Initial Plan Sponsor Investment or the Subsequent Plan Sponsor Investment (as applicable) by wire transfer of immediately available funds, and (iv) solely for purposes of the Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, either (x) the

Exchange Act Registration Statement has become effective or (y) the Company has not terminated the Management Agreement pursuant to the Form 10 Termination Right.

6.        LOCK-UP.

(a)        Lock-up Period. Subject to the provisions of Section 6(b) hereof, during the period beginning from the date hereof and continuing until the second anniversary of the Initial Closing Date (the "Lock-up Period"), the Plan Sponsor shall, without the prior written consent of the Company (which consent shall have been approved by the audit committee of the Company's board of directors), not either directly or indirectly: (i) offer, sell, contract to sell, hypothecate or pledge, grant any option to purchase or otherwise dispose of, make any short sale or otherwise transfer or dispose of, directly or indirectly, the Initial Plan Sponsor Shares; (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Initial Plan Sponsor Shares, whether any such transaction is to be settled by delivery of such Initial Plan Sponsor Shares, in cash or otherwise, or (iii) public announcement of any intention to effect any transaction specified in clause (i) or (ii) hereof, _provided_, _however_, that the foregoing restrictions shall not apply to sales or other dispositions of Initial Plan Sponsor Shares, in each case that are made exclusively between and among the Plan Sponsor and its affiliates, including its members, and including distributions, transfers or dispositions without consideration by the Plan Sponsor to its members or other equity holders (such transferees collectively referred as, the "Permitted Transferees"), _provided, further_, that, simultaneously with such transfer or distribution, as the case may be, such Permitted Transferees execute a joinder agreement substantially in the form attached hereto as Exhibit A.

(b)        Unlock Period. During the period commencing on the first anniversary of the Initial Closing Date and expiring at the conclusion of the Lock-up Period (the "Unlock Period"):

(i)        In the event that, during the Unlock Period, the Trading Price (defined below) of the Common Stock is equivalent to or greater than 150% of the NAV Per Share (defined below), the Plan Sponsor and its Permitted Transferees may collectively sell up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees;

(ii)        In the event that, during the Unlock Period, the Trading Price of the Common Stock is equivalent to or greater than 200% of the NAV Per Share on the Closing Date, the Plan Sponsor and its Permitted Transferees may collectively sell (in addition to Common Stock sold in accordance with clause (i) above) up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees (for the avoidance of doubt, it is clarified that the Plan Sponsor and its Permitted Transferees shall not collectively sell more than 60% of the Initial Plan Sponsor Shares they hold collectively during the Unlock Period).

   7. <u>DEFINED TERMS</u>. For the purposes of this Agreement:

   (a) "<u>Business Day</u>" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

   (b) "<u>NAV Per Share</u>" shall mean the Company Net Asset Value divided by the Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock).

   (c) "<u>OTC Bulletin Board</u>" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

   (d) "<u>Pink OTC Markets</u>" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB, and OTC Pink.

   (e) "<u>Trading Price</u>" shall mean as of any particular date: (a) the volume-weighted average price for the Common Stock on any national securities exchange for any 10 Business Days within any 30-consecutive Business Day period Days ending on (and including) the Business Day immediately preceding the date of measurement as reported by Bloomberg; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the highest bid and lowest asked prices for the Common Stock on all such exchanges at the end of such day; (c) if on any such day the Common Stock is not listed on a national securities exchange, the closing sales price of the Common Stock as quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association for such day; or (d) if there have been no sales of the Common Stock on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association on such day, the average of the highest bid and lowest asked prices for the Common Stock quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association at the end of such day; in each case of clauses (b) through (d), averaged over 20 consecutive Business Days ending on the Business Day immediately prior to the day as of which "Trading Price" is being determined; provided, that if the Common Stock is listed on any national securities exchange, the term "Business Day" as used in this sentence means Business Days on which such exchange is open for trading. If at any time the Common Stock is not listed on any national securities exchange or quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association, the "Trading Price" of the Common Stock shall be the fair market value per share as determined in good faith by the Company's board of directors.

   8. <u>VOTING</u>. At any time during which the Management Agreement is in full force and effect, the Plan Sponsor and any Permitted Transferees, in their capacity as stockholders or proxy holders of the Company, irrevocably and unconditionally agree that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company, the Plan Sponsor and such Permitted Transferees shall vote or cause to be voted at such meeting (or execute and return an action by written consent with respect to) all Plan Sponsor Shares owned by the Plan Sponsor

or the Permitted Transferee (as applicable) as of the record date for such meeting (or the date that any written consent is executed by the Plan Sponsor or the Permitted Transferees (as applicable)) in accordance with the recommendations of the board of directors of the Company. The Plan Sponsor hereby grants the Company an irrevocable proxy to vote the Plan Sponsor Shares as provided in this Section 8, *provided*, *however*, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the Management Agreement.

9.      INTERPRETATION OF THIS AGREEMENT.

(a)     Directly or Indirectly. Where any provision in this Agreement refers to action to be taken by any party, or which such party is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such party.

(b)     Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

(c)     Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (i) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (ii) such party has considered the implications of this waiver; (iii) such party makes this waiver voluntarily; and (iv) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9(c).

(d)     Section Headings. The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(e)     Construction. This Agreement has been freely and fairly negotiated between the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.

9

10.    <u>MISCELLANEOUS</u>.

(a)    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission). Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 10(a)</u>).

| | |
|---|---|
| If to the Company: | Coral Gables, Florida  33134<br>Email: joel@ionicdigital.com<br>Attention: Joel Block, CFO |
| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Email: echange@cgsh.com<br>Attention: Elizabeth A. Chang |
| If to the Plan Sponsor: | 1101 Brickell Ave., N-1500<br>Miami, Florida 33131<br>Email: legalteam@hut8.io and<br>asher@usbitcoin.com<br>Attention: Asher Genoot |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |
| If to a Permitted Transferee: | The address set forth in the joinder<br>agreement in the form set forth<br>in <u>Exhibit A</u> hereto. |

(b)    <u>Cumulative Remedies</u>. The rights and remedies provided in this Agreement are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

(c)    <u>Successor and Assigns; No Third Party Beneficiaries</u>. This Agreement is not assignable by the either party without the prior written consent of the other party. This Agreement and its rights, powers and duties set forth herein will inure to the benefit of and be

10

binding upon the successors and permitted assigns of each of the parties. This Agreement is for the sole benefit of the Company and the Plan Sponsor and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

(d)    Non-Recourse. This Agreement may only be enforced against, and any claim, action, or proceeding based upon, arising out of or related to this Agreement may only be brought against, the persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, affiliate, agent, advisor, or representative of any party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any dispute related hereto, and (ii) in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Non-Recourse Person. The Non-Recourse Persons are intended third party beneficiaries of this Section 10(d) and shall be entitled to enforce this Section 10(d) as if a party directly hereto

(e)    Equitable Relief. Each of the Company and the Plan Sponsor acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

(f)    Survival. All representations and warranties of the parties contained in this Agreement shall survive the applicable Closing Date.

(g)    Entire Agreement; Amendment and Waiver. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter contained herein, and supersedes all prior understandings among such parties with respect to the matters covered herein. This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Plan Sponsor.

(h)    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid will not be affected thereby.

(i)    Counterparts; Facsimile and PDF Signatures. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which

together will be considered one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or portable document format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, each of the parties has executed this Plan Sponsor Contribution Agreement as of the date first above written.

**Ionic Digital Inc.**

By: _____

Name:

Title:

**U.S Data Management Group LLC**

By: _____

Name:

Title:

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Plan Sponsor Contribution Agreement, dated as of _____, 2024, and as amended from time to time (the "Plan Sponsor Contribution Agreement"), by and between Ionic Digital Inc. (the "Company") and U.S. Data Management Group, LLC. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan Sponsor Contribution Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Plan Sponsor Contribution Agreement as of the date hereof as if he, she or it had executed the Plan Sponsor Contribution Agreement as the Plan Sponsor. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the Plan Sponsor contained in the Plan Sponsor Contribution Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**[JOINING PARTY]**

By:_____
Name:_____
Title:_____

Address:_____

_____

_____

Date:_____

**<u>Exhibit D-1</u>**

**(Redline) Plan Sponsor Contribution Agreement**

*DRAFT*

[NewCo, ~~Ionic Digital~~ Inc.]

---

**PLAN SPONSOR CONTRIBUTION AGREEMENT**

---

## PLAN SPONSOR CONTRIBUTION AGREEMENT

This Plan Sponsor Contribution Agreement (this "Agreement"), is made as of [●]_____, 2024, by and between ~~NewCo,~~Ionic Digital Inc.~~],~~ ~~[~~a Delaware corporation~~]~~ (the "Company"), and ~~Fahrenheit,~~U.S. Data Management Group LLC~~],~~ ~~[~~a Delaware limited liability company~~]~~, doing business as US Bitcoin Corp. (the "Plan Sponsor").

**WHEREAS,** on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Plan"); and

**WHEREAS**, on August 17, 2023, the Debtors filed their fourth revised *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Disclosure Statement"); and

**WHEREAS,** on August 17, 2023, the Bankruptcy Court entered its Order approving the Disclosure Statement and granting related relief; and

**WHEREAS,** on ~~[●]~~November 9, 2023, the Bankruptcy Court entered its Order confirming the Plan and granting related relief; and

**WHEREAS**, pursuant to the Plan, the Company will issue to the Plan Sponsor, and the Plan Sponsor shall purchase from the Company, up to $12,75~~0~~6,000,~~000~~ of shares of the Company's Class A common stock, par value $[~~●~~]0.00001 per share (the "Common Stock"), subject to the terms and conditions herein and enter into that certain Management Services Agreement by and between the Company and the Plan Sponsor dated on the date hereof (the "~~Fahrenheit~~ Management Agreement")~~; and~~.

~~**WHEREAS**, as of the date of this Agreement, the Company has also entered into that certain US Bitcoin management agreement~~ U.S. Data Management Group, LLC ~~(the "~~US Bitcoin Management Agreement~~")~~.

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Plan Sponsor hereby represent and agree as follows:

1. <u>ISSUANCE AND CONTRIBUTION.</u>

1

(a)    Initial Investment. By wire transfer to the Company of immediately available funds on the date of purchase of the Common Stock, the Plan Sponsor shall purchase from the Company for an aggregate purchase price of $[33,188,119]6,378,000 (the "Initial Plan Sponsor Investment") the number of shares of Common Stock (the "Initial Plan Sponsor Shares") equal to the product of: (i) the sum of all outstanding shares of Common Stock issued or anticipated to be issued on the Effective Date (as defined under the Plan) (the "Issued Shares") *plus* (ii) the number of shares of Common Stock reserved for issuance in accordance with the Plan for Claims (as defined in the Plan) that are Disputed (as defined in the Plan),[1] as well as any other shares of Common Stock that are reserved for issuance or subject to holdbacks as of the Effective Date of the Plan (the "Reserve Shares") *plus* (iii) the number of shares of Common Stock reserved for issuance in accordance with any equity incentive plan approved or contemplated under the Plan or approved by the board of directors of the Company on the Effective Date (the "Plan Shares", and together with Reserve Shares and the Issued Shares, the "Effective Date Shares"); *multiplied by* (iii) a fraction, the numerator of which is the Initial Plan Sponsor Investment, and the denominator of which is the [Plan Value (as such term is defined under the Plan)][21], which for the avoidance of doubt shall not include the Initial Plan Sponsor Investment (the "Company Net Asset Value"). An illustrative calculation of the foregoing formula is depicted below.

| (The sum the Issued Shares *plus* the Reserve Shares *plus* the Plan Shares) | × | Initial Plan Sponsor Investment (*i.e.*, $33,188,1196,378,000) |
|---|---|---|
| | | Company Net Asset Value as of Effective Date (not including Initial Plan Sponsor Investment) |

Subject to the conditions specified in Section 5 hereof, the closing of the issuance and purchase of the Common Stock contemplated by this Section 1(a) will take place on the Effective Date (as defined in the Plan) (the "Initial Closing Date") upon the declaration of the effectiveness of the Plan in accordance with its terms.

(b)    Subsequent Investments.

i.    ~~If the Company extends the Initial Term or the first Term Extension (as defined in each of the Fahrenheit Management Agreement) under the Fahrenheit Management Agreement, the Plan Sponsor shall, on the first business day of the first Term Extension or second Term Extension (as applicable),~~Subject to Section 1(b)(ii), the Manager shall purchase from the Company, for an aggregate purchase price of $[6,37811,881000], the number of shares of Common Stock equal to the product of: the number of the Effective Date Shares (as adjusted to take into account any stock

---

[1] ~~**W&C Note to Draft:** Language aligned to Warrant Agreement.~~

[21] **Note to Draft**: The definition of Plan Value to be confirmed under the Plan that will be published by the Debtors on the measurement date prior to the Effective Date. To be equivalent to ~~NewCo~~Company net asset value as of Effective Date.

split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock) *multiplied by* a fraction, the numerator of which is $[6,378~~11,881~~000], and the denominator of which is the Company Net Asset Value.

ii. ~~If the Company extends the Initial Term (as defined in the US Bitcoin Management Agreement) under the US Bitcoin Management Agreement, the Plan Sponsor shall purchase from the Company, for an aggregate purchase price of $[3,188,119], the number of shares of Common Stock equal to the product of: the number of Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock) *multiplied by* a fraction, the numerator of which is $[3,188,119], and the denominator of which is the Company Net Asset Value.~~

ii. ~~iii.~~ Subject to the conditions specified in <u>Section 5</u> hereof, the closing of the issuance and purchase of the Common Stock contemplated by this <u>Section 1</u>~~(b)~~<u>(b) (a "Subsequent Closing")</u> will take place on the first ~~b~~<u>B</u>usiness ~~date of each Term Extension~~<u>Day after the earlier to occur of (A) the Exchange Act Registration Statement</u> (as defined ~~in the Fahrenheit~~<u>below) being declared effective, or (B) so long as the Company has not terminated the</u> Management Agreement ~~or US Bitcoin Management Agreement, as applicable) (each~~ <u>pursuant to the Section 2(b)(iii)(H) thereof, May 1, 2024 (</u>such date a "<u>Subsequent Closing Date</u>").

(c)    For the purposes of this Agreement, (1) "<u>Subsequent Plan Sponsor Investment</u>" shall mean any purchase price payable by the Plan Sponsor in accordance with the subsequent investments set forth in <u>Section 1</u>~~(b)~~<u>1(b)</u>, (2) "<u>Plan Sponsor Investment</u>" shall mean the sum of the Initial Plan Sponsor Investment and ~~any~~<u>the</u> Subsequent Plan Sponsor Investment~~s~~, (3) "<u>Plan Sponsor Shares</u>" shall mean, collectively, the shares of Common Stock purchased in the Initial Plan Sponsor Investment and ~~any~~<u>the</u> Subsequent Plan Sponsor Investment, and (4) "<u>Closing Date</u>" shall refer to each of the Initial Closing Date for purposes of the Initial Plan Sponsor Investment and ~~any~~<u>the</u> Subsequent Closing Date~~s~~ for ~~each applicable~~<u>the</u> Subsequent Plan Sponsor Investment.

(d)    For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Plan Sponsor shall be solely responsible for any monetary obligations owed by it under this Agreement.

2.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

As of the date hereof and as of each Closing Date, the Company represents and warrants to the Plan Sponsor as follows:

(a)    The Company is duly incorporated and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b)    The Company has the requisite corporate or other applicable power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite action.

(c)    This Agreement has been duly and validly executed and delivered by the Company and constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(d)    The Plan Sponsor Shares have been duly authorized and, upon payment of the Initial Plan Sponsor Investment and/or ~~each~~the Subsequent Plan Sponsor Investment, as the case maybe, pursuant to the terms of this Agreement, will be validly issued, fully paid and nonassessable, and conform in all material respects to the description thereof set forth in the Disclosure Statement and the Exchange Act Registration Statement (as defined below).

(e)    Neither the Company, nor any of its subsidiaries, is and, immediately after giving effect to the offering and sale of the Plan Sponsor Shares and the application of the proceeds thereof, will be an "investment company", as such term is defined in the Investment Company Act of 1940, as amended, including the rules and regulations of the Securities and Exchange Commission (the "Commission") promulgated thereunder.

(f)    ~~A~~Solely with respect to the Subsequent Closing, a registration statement on Form 10 (File No. [●]), as amended (the "Exchange Act Registration Statement"), in respect of the Common Stock has been filed with the Commission, and the Exchange Act Registration Statement in the form heretofore delivered to the Plan Sponsor has become effective.

(g)    ~~The~~Solely with respect to the Subsequent Closing, the financial statements included in the Exchange Act Registration Statement, together with the related schedules and notes, present fairly in all material respects the financial position of the Company and its subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and its subsidiaries for the periods specified. Said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved. The supporting schedules, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein. The summary financial information included in the Exchange Act Registration Statement present fairly in all material respects the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein.

(h)    The Initial Plan Sponsor Shares were offered and sold pursuant to an exemption from registration under the Securities Act of 1933, as amended, including the rules and regulations of the Commission promulgated thereunder (the "Securities Act"), provided by Section 1145(a) of the Bankruptcy Code.

3.    REPRESENTATIONS AND WARRANTIES OF THE PLAN SPONSOR.

As of the date hereof and as of each Closing Date, the Plan Sponsor represents and warrants to the Company as follows:

(a)        The Plan Sponsor is duly organized and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b)        The Plan Sponsor has the requisite ~~limited liability company or other applicable~~corporate power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Plan Sponsor of the transactions contemplated hereby have been duly authorized by all requisite action.

(c)        This Agreement has been duly and validly executed and delivered by the Plan Sponsor and constitutes the valid and binding obligation of the Plan Sponsor, enforceable against the Plan Sponsor in accordance with its terms.

(d)        The execution, delivery and performance by Plan Sponsor of this Agreement, including the consummation of the transactions contemplated hereby will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Plan Sponsor pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Plan Sponsor is a party or by which Plan Sponsor is bound or to which any of the property or assets of Plan Sponsor is subject; (ii) Plan Sponsor's organizational documents or under any law, rule, regulation, agreement or other obligation by which Plan Sponsor is bound; and (iii) any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Plan Sponsor or any of their respective properties, that would reasonably be expected to have a material adverse effect on the ability of the Plan Sponsor to enter into and timely perform its obligations under this Agreement.

(e)        The Plan Sponsor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(f)        The Plan Sponsor acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, liabilities, properties, contracts, employee matters, regulatory compliance, business risks, and prospects) of the Company and its affiliates, and, in making its determination to proceed with the transactions contemplated hereby, the Plan Sponsor has relied, is relying, and will rely, solely, on the representations of the Company set forth herein (the "Express Representations") and the results of the Plan Sponsor's own independent investigation and verification and has not relied on, is not relying on, and will not rely on any information, statements, disclosures, documents, projections, forecasts or other material made available to the Plan Sponsor or any of its affiliates, advisors, or representatives, in any "dataroom", any "information presentation" or similar document, or any Projections (defined below) or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of the Company or any of its affiliates, Celsius

Network LLC or any of its affiliates, or any predecessor, advisors or representative of any of the foregoing (the "Disclaimed Persons"), or any failure of any of the Disclaimed Persons to disclose or contain any information, except for the Express Representations. The Plan Sponsor acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to the Plan Sponsor and on which the Plan Sponsor may rely in connection with the transactions contemplated hereby and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, statutory, whether in written, electronic or oral form are, in each case, specifically disclaimed by the Company and the foregoing persons.

(g)     Without limiting the generality of the foregoing, in connection with the investigation by the Plan Sponsor, the Plan Sponsor and its advisors and representatives have received or may receive certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in any "information presentation" or similar document, any dataroom, any management meetings, etc.) (collectively, "Projections"). The Plan Sponsor acknowledges and agrees that (i) such Projections are being provided solely for the convenience of the Plan Sponsor to facilitate its own independent investigation, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) the Plan Sponsor is familiar with such uncertainties, and (iv) the Plan Sponsor is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections). The Disclaimed Persons are intended third party beneficiaries of these paragraphs 3(f)(f) and 3(g)(g) and shall be entitled to enforce this these paragraphs 3(f)(f) and 3(g)(g) as if a party directly hereto.

4.     COMPLIANCE WITH THE SECURITIES ACT.

(a)     The parties agree that the Plan Sponsor Shares are "restricted securities" under the Securities Act and have not been registered under the Securities Act nor qualified under any state securities laws, and that the Plan Sponsor Shares are offered and sold in reliance upon the exemption from the registration requirements of the Securities Act provided in Section 4(a)(2) under the Securities Act and Regulation D promulgated under the Securities Act or Section 1145(a) of the Bankruptcy Code.

(b)     To the extent applicable, the Plan Sponsor Shares issued by the Company in connection with this Agreement (unless registered under the Securities Act and the Company determines in its reasonable discretion that such legend is not required) may be stamped or imprinted with a legend in substantially the following form:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SECURITIES IS EFFECTIVE UNDER THE ACT OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT

HAS BEEN RENDERED BY COUNSEL SATISFACTORY TO THE COMPANY."

5.      CONDITIONS TO CLOSING.

(a)      The obligations of the Plan Sponsor to purchase and pay for the Plan Sponsor Shares is subject to the following condition precedent: (i) the representations and warranties of the Company contained in Section 2 hereof shall be true and correct as of the applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, and (iii) solely for purposes of ~~any~~the Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, either (x) the Exchange Act Registration Statement has become effective or (y) the Company has ~~extended the Fahrenheit~~not terminated the Management Agreement ~~through the first Term Extension and/or second Term Extension, as applicable and (iv) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(ii) hereof, the Company has extended the US Bitcoin Management Agreement through the Term Extension~~pursuant to Section 2(b)(iii)(H) therein (the "Form 10 Termination Right").

(b)      The obligations of the Company to issue and sell the Plan Sponsor Shares is subject to the following conditions precedent: (i) the representations and warranties of the Plan Sponsor contained in Section 3 hereof shall be true and correct as of the applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, (iii) the Plan Sponsor has delivered to the Company the Initial Plan Sponsor Investment or the Subsequent Plan Sponsor Investment (as applicable) by wire transfer of immediately available funds, and (iv) solely for purposes of ~~any~~the Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, either (x) the Exchange Act Registration Statement has become effective or (y) the Company has ~~extended the Fahrenheit~~not terminated the Management Agreement ~~through the first Term Extension and/or second Term Extension, as applicable and (iv) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(ii) hereof, the Company has extended the US Bitcoin Management Agreement through the Term Extension.~~ pursuant to the Form 10 Termination Right.

6.      LOCK-UP.

(a)      Lock-up Period. Subject to the provisions of Section 6(b) hereof, during the period beginning from the date hereof and continuing until the second anniversary of the Initial Closing Date (the "Lock-up Period"), the Plan Sponsor shall, without the prior written consent of the Company (which consent shall have been approved by the audit committee of the Company's board of directors), not either directly or indirectly: (i) offer, sell, contract to sell, hypothecate or pledge, grant any option to purchase or otherwise dispose of, make any short sale or otherwise transfer or dispose of, directly or indirectly, the Initial Plan Sponsor Shares; (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Initial Plan Sponsor Shares, whether any such transaction is to be settled by delivery of such Initial Plan Sponsor Shares, in cash or otherwise,

or (iii) public announcement of any intention to effect any transaction specified in clause (i) or (ii) hereof, *provided*, *however*, that the foregoing restrictions shall not apply to sales or other dispositions of Initial Plan Sponsor Shares, in each case that are made exclusively between and among the Plan Sponsor and its affiliates, including its members, and including distributions, transfers or dispositions without consideration by the Plan Sponsor to its members or other equity holders (such transferees collectively referred as, the "Permitted Transferees"), *provided, further*, that, simultaneously with such transfer or distribution, as the case may be, such Permitted Transferees execute a joinder agreement substantially in the form attached hereto as Exhibit A.

(b)    Unlock Period. During the period commencing on the first anniversary of the Initial Closing Date and expiring at the conclusion of the Lock-up Period (the "Unlock Period"):

(i)    In the event that, during the Unlock Period, the Trading Price (defined below) of the Common Stock is equivalent to or greater than 150% of the NAV Per Share (defined below), the Plan Sponsor and its Permitted Transferees may collectively sell up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees; ~~and~~

(ii)    In the event that, during the Unlock Period, the Trading Price of the Common Stock is equivalent to or greater than 200% of the NAV Per Share on the Closing Date, the Plan Sponsor and its Permitted Transferees may collectively sell (in addition to Common Stock sold in accordance with clause (i) above) up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees (for the avoidance of doubt, it is clarified that the Plan Sponsor and its Permitted Transferees shall not collectively sell more than 60% of the Initial Plan Sponsor Shares they hold collectively during the Unlock Period).

7.    ~~DEFINED~~DEFINED TERMS. For the purposes of this Agreement:

(a)    "Business Day" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

(b)    "NAV Per Share" shall mean the Company Net Asset Value divided by the Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock).

(c)    "OTC Bulletin Board" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

(d)    "Pink OTC Markets" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB, and OTC Pink.

(e)   "Trading Price" shall mean as of any particular date: (a) the volume-weighted average price for the Common Stock on any national securities exchange for any 150 Business Days within any 30-consecutive Business Day period Days ending on (and including) the Business Day immediately preceding the date of measurement as reported by Bloomberg; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the highest bid and lowest asked prices for the Common Stock on all such exchanges at the end of such day; (c) if on any such day the Common Stock is not listed on a national securities exchange, the closing sales price of the Common Stock as quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association for such day; or (d) if there have been no sales of the Common Stock on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association on such day, the average of the highest bid and lowest asked prices for the Common Stock quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association at the end of such day; in each case of clauses (b) through (d), averaged over 20 consecutive Business Days ending on the Business Day immediately prior to the day as of which "Trading Price" is being determined; provided, that if the Common Stock is listed on any national securities exchange, the term "Business Day" as used in this sentence means Business Days on which such exchange is open for trading. If at any time the Common Stock is not listed on any national securities exchange or quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association, the "Trading Price" of the Common Stock shall be the fair market value per share as determined in good faith by the Company's board of directors.

8.   VOTING. At any time during which the ~~Fahrenheit~~ Management Agreement is in full force and effect, the Plan Sponsor and any Permitted Transferees, in their capacity as stockholders or proxy holders of the Company, irrevocably and unconditionally agree that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company, the Plan Sponsor and such Permitted Transferees shall vote or cause to be voted at such meeting (or execute and return an action by written consent with respect to) all Plan Sponsor Shares owned by the Plan Sponsor or the Permitted Transferee (as applicable) as of the record date for such meeting (or the date that any written consent is executed by the Plan Sponsor or the Permitted Transferees (as applicable)) in accordance with the recommendations of the board of directors of the Company. The Plan Sponsor hereby grants the Company an irrevocable proxy to vote the Plan Sponsor Shares as provided in this Section 8, _provided_, _however_, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the ~~Fahrenheit~~ Management Agreement.

9.   INTERPRETATION OF THIS AGREEMENT.

(a)   Directly or Indirectly. Where any provision in this Agreement refers to action to be taken by any party, or which such party is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such party.

(b)      Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

(c)      Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (i) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (ii) such party has considered the implications of this waiver; (iii) such party makes this waiver voluntarily; and (iv) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9(c).

(d)      Section Headings. The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(e)      Construction. This Agreement has been freely and fairly negotiated between the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.

10.      MISCELLANEOUS.

(a)      Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission). Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10(a)).

If to the Company:

Coral Gables, Florida  33134
[COMPANY ADDRESS]
E-mail: [E-MAIL ADDRESS]
Attention: [TITLE OF OFFICER]Email:
joel@ionicdigital.com
Attention: Joel Block, CFO

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
[COMPANY LAW FIRM]
E-mail: [E-MAIL ADDRESS]
Attention: [ATTORNEY NAME]New
York, NY 10006
Email: echange@cgsh.com
Attention: Elizabeth A. Chang

If to the Plan Sponsor:

1101 Brickell Ave., N-1500
Miami, Florida 33131
[PLAN SPONSOR ADDRESS]
E-mail: [E-MAIL ADDRESS]
Attention:    [TITLE OF OFFICER]Email: legalteam@hut8.io
and asher@usbitcoin.com
Attention: Asher Genoot

with a copy to:

Brown Rudnick LLP
7 Times Square,
New York, NY 10036
Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

If to a Permitted Transferee:

The address set forth in the
joiner agreement in the form set forth
in Exhibit A hereto.

(b)    Cumulative Remedies. The rights and remedies provided in this Agreement are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

(c)    Successor and Assigns; No Third Party Beneficiaries. This Agreement is not assignable by the either party without the prior written consent of the other party. This Agreement and its rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. This Agreement is for the sole benefit of the Company and the Plan Sponsor and their respective successors and

permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

(d)     Non-Recourse. This Agreement may only be enforced against, and any claim, action, or proceeding based upon, arising out of or related to this Agreement may only be brought against, the persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, affiliate, agent, advisor, or representative of any party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any dispute related hereto, and (ii) in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Non-Recourse Person. The Non-Recourse Persons are intended third party beneficiaries of this Section 10(d)(d) and shall be entitled to enforce this Section 10(d)(d) as if a party directly hereto

(e)     Equitable Relief. Each of the Company and the Plan Sponsor acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

(f)     Survival. All representations and warranties of the parties contained in this Agreement shall survive the applicable Closing Date.

(g)     Entire Agreement; Amendment and Waiver. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter contained herein, and supersedes all prior understandings among such parties with respect to the matters covered herein. This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Plan Sponsor.

(h)     Severability. If any provision of this Agreement or the application of such provision to any person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid will not be affected thereby.

(i)    <u>Counterparts; Facsimile and PDF Signatures</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or portable document format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, each of the parties has executed this Plan Sponsor Contribution Agreement as of the date first above written.

[NewCo, **Ionic Digital** Inc.]

By: _____

Name:

Title:

**Fahrenheit U.S Data Management Group LLC**

By: _____

Name:

Title:

[Signature Page to Plan Sponsor Contribution Agreement]

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Plan Sponsor Contribution Agreement, dated as of [●]_____, 2024, and as amended from time to time (the "Plan Sponsor Contribution Agreement"), among [NewCo, Inc.]by and between Ionic Digital Inc. (the "Company") and the stockholders of the Company parties theretoU.S. Data Management Group, LLC. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan Sponsor Contribution Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Plan Sponsor Contribution Agreement as of the date hereof as if he, she or it had executed the Plan Sponsor Contribution Agreement as the Plan Sponsor. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the Plan Sponsor contained in the Plan Sponsor Contribution Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.


[JOINING PARTY]


By:_____
Name:___[●]_____
Title:____[●]_____

Address:[●]_____

.

.

Date:[●]_____

## **Exhibit E**

**Schedule of Released and Exculpated Parties**

### Schedule of Released Parties

Pursuant to the Plan, the following parties shall be Released Parties and shall receive the benefit of the releases provided in the Plan, in addition to the Released Parties specifically enumerated in the Plan.[1] **For the avoidance of doubt, no Releasing Party shall be permitted to assert any Released Claim against any Released Parties after the Plan is confirmed.** If any Holder of a Claim or Interest opts out of the Plan's third-party release provisions pursuant to the opt-out procedures approved by the Court, such Holder shall not be a Releasing Party.

| | ADDITIONAL RELEASED AND EXCULPATED PARTIES |
|---|---|
| 1. | Each individual who is employed by the Debtors on the date the Disclosure Statement Order is entered to the extent that each such employee is not (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties. The identities of these individuals will be attached to the final version of the Confirmation Order. For the avoidance of doubt, Tal Bentov shall be a Released Party. |
| 2. | Each of the following:  (a) Coinbase, Inc., (b) Coinbase Custody Trust Company, LLC, (c) PayPal, Inc.,  (d) Paxos Trust Company, LLC, (e) Paxos Technology Solutions, LLC, and (f) each such Entity listed in (a)–(e)'s financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as the same may be amended, modified, revised, or supplemented from time to time, the "Plan").

## List of Released Employees

Brooke Airey

David Albert

Sheree Alexander

Adrian Alisie

Haneen Badran
Tal Bentov

Oliver Berglas

Matti Blecher

Oren Blonstein

Guillermo Bodnar

Johnny Chirse

Yin Choi

Christina Ciancarelli

Quinita Clark

Daniel Delano

Ron Deutsch

Graham Dodd

Cameron Drummond Rey

Shanica Eddy

Zachary Evans

Jenny Fan

Darian Faulkner

Christopher Ferraro

Janet Fulay

Matthew Furrow

Paul Gambardella

Ofer Ganot

Alexandra Garvin

Niraj Gautam

Joseph Golding-Ochsner

Cameron Guthrie

Mariana Hall

Ashley Harrell

Sean Hart

Isaak Israel

Zeran Ji

Franklin Ji

Mark Kendall

Mohsin Khandwala

Riki Kouly

John Lambros

Quinn Lawlor

Richard Man

Anthony Massimiani

Jeffrey Morgan

Tia Nel

Connor Nolan

Katherine Osadetz

Daniel Pali

Pratibha Pandey

Edward Perdomo

Kent Rahman

George Rajah

Trunshedda Ramos

Charles Roberts

Peter Salyga

Gilbert Sanchez

Christopher Schroeder

Aswan Seetharaman

Chanda Shobert

Kai Tang

Harry Tappen

Randall Tokar

David Veksler

Victor Vesnaver Jr.

Tammi Walsh

Erica Watters

Daniel Wendt

Melissa Williams-Glover

Mykael Wilson

Melissa Workman

## Exhibit E-1

**(Redline) Schedule of Released and Exculpated Parties**

## Schedule of Released Parties

Pursuant to the Plan, the following parties shall be Released Parties and shall receive the benefit of the releases provided in the Plan, in addition to the Released Parties specifically enumerated in the Plan.[1]  **For the avoidance of doubt, no Releasing Party shall be permitted to assert any Released Claim against any Released Parties after the Plan is confirmed.**  If any Holder of a Claim or Interest opts out of the Plan's third-party release provisions pursuant to the opt-out procedures approved by the Court, such Holder shall not be a Releasing Party.

| | ADDITIONAL RELEASED AND EXCULPATED PARTIES |
|---|---|
| 1. | Each individual who is employed by the Debtors on the date the Disclosure Statement Order is entered to the extent that each such employee is not (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.  The identities of these individuals will be attached to the final version of the Confirmation Order.  For the avoidance of doubt, Tal Bentov shall be a Released Party. |
| 2. | Each of the following:  (a) Coinbase, Inc., (b) Coinbase Custody Trust Company, LLC, (c) PayPal, Inc.,  (d) Paxos Trust Company, LLC, (e) Paxos Technology Solutions, LLC, and (f) each such Entity listed in (a)–(e)'s financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as the same may be amended, modified, revised, or supplemented from time to time, the "Plan").

**List of Released Employees**

Brooke Airey

David Albert

Sheree Alexander

Adrian Alisie

Haneen Badran
Tal Bentov

Oliver Berglas

Matti Blecher

Oren Blonstein

Guillermo Bodnar

Johnny Chirse

Yin Choi

Christina Ciancarelli

Quinita Clark

Daniel Delano

Ron Deutsch

Graham Dodd

Cameron Drummond Rey

Shanica Eddy

Zachary Evans

Jenny Fan

Darian Faulkner

Christopher Ferraro

Janet Fulay

Matthew Furrow

Paul Gambardella

Ofer Ganot

Alexandra Garvin

Niraj Gautam

Joseph Golding-Ochsner

Cameron Guthrie

Mariana Hall

Ashley Harrell

Sean Hart

Isaak Israel

Zeran Ji

Franklin Ji

Mark Kendall

Mohsin Khandwala

Riki Kouly

John Lambros

Quinn Lawlor

Richard Man

Anthony Massimiani

Jeffrey Morgan

Tia Nel

Connor Nolan

Katherine Osadetz

Daniel Pali

Pratibha Pandey

Edward Perdomo

Kent Rahman

George Rajah

Trunshedda Ramos

Charles Roberts

Peter Salyga

Gilbert Sanchez

Christopher Schroeder

Aswan Seetharaman

Chanda Shobert

Kai Tang

Harry Tappen

Randall Tokar

David Veksler

Victor Vesnaver Jr.

Tammi Walsh

Erica Watters

Daniel Wendt

Melissa Williams-Glover

Mykael Wilson

Melissa Workman

## Exhibit F

**Equity Incentive Plan**

# IONIC DIGITAL INC.

---

## OMNIBUS INCENTIVE PLAN

---

## ARTICLE I
## PURPOSE

The purpose of this Ionic Digital Inc. Omnibus Incentive Plan (this "**Plan**") is to promote the success of the Company's business for the benefit of its stockholders by enabling the Company to offer Eligible Individuals cash and stock-based incentives in order to attract, retain, and reward such individuals and strengthen the mutuality of interests between such individuals and the Company's stockholders. This Plan is effective as of the date set forth in Article XIV.

## ARTICLE II
## DEFINITIONS

For purposes of this Plan, the following terms shall have the following meanings:

**2.1**    "**Affiliate**" means a corporation or other entity controlled by, controlling, or under common control with the Company. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through the ownership of voting or other securities, by contract or otherwise.

**2.2**    "**Applicable Law**" means the requirements relating to the administration of equity-based awards and the related shares under U.S. state corporate law, U.S. federal and state securities laws, the rules of any stock exchange or quotation system on which the shares are listed or quoted, and any other applicable laws, including tax laws, of any U.S. or non-U.S. jurisdictions where Awards are, or will be, granted under this Plan.

**2.3**    "**Award**" means any award under this Plan of any Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Units, Performance Award, Other Stock-Based Award, or Cash Award. All Awards shall be evidenced by and subject to the terms of an Award Agreement.

**2.4**    "**Award Agreement**" means the written or electronic agreement, contract, certificate, or other instrument or document evidencing the terms and conditions of an individual Award. Each Award Agreement shall be subject to the terms and conditions of this Plan.

**2.5**    "**Board**" means the Board of Directors of the Company.

**2.6**    "**Cash Award**" means an Award granted to an Eligible Individual pursuant to Section **9.3** of this Plan and payable in cash at such time or times and subject to such terms and conditions as determined by the Committee in its sole discretion.

**2.7**    "**Cause**" means, unless otherwise determined by the Committee in the applicable Award Agreement, with respect to a Participant's Termination of Service, the following: (a) in the case where there is no employment agreement, offer letter, consulting agreement, change in control agreement, or similar agreement in effect between the Company or an Affiliate and the Participant at the time of the grant of the Award (or where there is such agreement in effect but it does not define "cause" (or words of like import)), the Participant's (i) willful neglect in the performance of the Participant's duties to the Company or willful or repeated failure or refusal to perform such duties, (ii) engagement in conduct in connection with the Participant's employment or services for the Company, which results, or could reasonably be expected to result in, material harm to the business or reputation of the Company or an Affiliate, (iii) conviction of, or plea of guilty or no contest to (A) any felony or (B) any other crime that results, or could reasonably be expected to result in, material harm to the business or reputation of the Company or an Affiliate, (iv) material violation of the written policies of the Company, including but not limited to those relating to sexual harassment or the disclosure or misuse of confidential information, or those set forth in the manuals or statements of policy of the Company, (v) fraud or misappropriation, embezzlement, or misuse of funds or property belonging to the Company or an Affiliate, (vi) act of personal dishonesty that involves personal profit in connection with the Participant's employment with the Company or an Affiliate, or (vii) any breach of any non-competition, non-solicitation, no-hire, or confidentiality covenant between the Participant and the Company or an Affiliate; or (b) in the case where there is an employment agreement, offer letter, consulting agreement, change in control agreement, or similar agreement in effect between the Company or an Affiliate and the Participant at the time of the grant of the Award that defines "cause" (or words of like import), "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" only applies on occurrence of a change in control, such definition of "cause" shall not apply until a change in control (as defined in such agreement) actually takes place and then only with regard to a termination thereafter.

**2.8**    "**Change in Control**" means and includes each of the following, unless otherwise determined by the Committee in the applicable Award Agreement or other written agreement with a Participant approved by the Committee:

(a)    any Person (other than the Company, any trustee or other fiduciary holding securities under any employee benefit plan of the Company, or any company owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of the Company), becoming the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities, excluding for purposes herein, acquisitions pursuant to a Business Combination (as defined below) that does not constitute a Change in Control as defined in Section **2.8**(b);

(b)    a merger, reorganization, or consolidation of the Company or in which equity securities of the Company are issued (each, a "**Business Combination**"), other than a merger, reorganization or consolidation that would result in the voting securities of the Company

2

outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its direct or indirect parent) more than 50% of the combined voting power of the voting securities of the Company or such surviving entity (or, as applicable, a direct or indirect parent of the Company or such surviving entity) outstanding immediately after such merger, reorganization or consolidation; provided, however, that a merger, reorganization or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person (other than those covered by the exceptions in Section 2.8(a)) acquires more than 50% of the combined voting power of the Company's then outstanding securities shall not constitute a Change in Control;

(c)     during the period of two consecutive years, individuals who, at the beginning of such period, constitute the Board together with any new director(s) (other than a director designated by a Person who has entered into an agreement with the Company to effect a transaction described in Sections 2.8(a) or (b)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the two year period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof; or

(d)     a complete liquidation or dissolution of the Company or the consummation of a sale or disposition by the Company of all or substantially all of the Company's assets other than the sale or disposition of all or substantially all of the assets of the Company to a Person or Persons who beneficially own, directly or indirectly, 50% or more of the combined voting power of the outstanding voting securities of the Company at the time of the sale.

Notwithstanding the foregoing, with respect to any Award that is characterized as "nonqualified deferred compensation" within the meaning of Section 409A of the Code, an event shall not be considered to be a Change in Control under this Plan for purposes of payment of such Award unless such event is also a "change in ownership," a "change in effective control," or a "change in the ownership of a substantial portion of the assets" of the Company within the meaning of Section 409A of the Code.

2.9     "Change in Control Price" means the highest price per Share paid in any transaction related to a Change in Control as determined by the Committee in its discretion.

2.10     "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time. Any reference to any section of the Code shall also be a reference to any successor provision and any guidance and treasury regulation promulgated thereunder.

2.11     "Committee" means any committee of the Board duly authorized by the Board to administer this Plan; provided, however, that unless otherwise determined by the Board, the Committee shall consist solely of two or more members of the Board who are each (a) a "non-employee director" within the meaning of Rule 16b-3(b), and (b) "independent" under the listing standards or rules of the securities exchange upon which the Common Stock is traded, but only to the extent such independence is required in order to take the action at issue pursuant to such standards or rules. If no committee is duly authorized by the Board to administer this Plan, the term "Committee" shall be deemed to refer to the Board for all purposes under this Plan. The Board

may abolish any Committee or re-vest in itself any previously delegated authority from time to time, and will retain the right to exercise the authority of the Committee to the extent consistent with Applicable Law.

2.12    "**Common Stock**" means the common stock, $0.00001 par value per share, of the Company.

2.13    "**Company**" means Ionic Digital Inc., a Delaware corporation, and its successors by operation of law.

2.14    "**Consultant**" means any natural person who is an advisor or consultant or other service provider to the Company or any of its Affiliates.

2.15    "**Detrimental Conduct**" means, as determined by the Company, a Participant's serious misconduct or unethical behavior, including any of the following: (a) any violation by the Participant of a restrictive covenant agreement that the Participant has entered into with the Company or an Affiliate (covering, for example, confidentiality, non-competition, non-solicitation, non-disparagement, *etc*.); (b) any conduct by the Participant that could result in the Participant's Termination of Service for Cause; (c) the commission of a criminal act by the Participant, whether or not performed in the workplace, that subjects, or if generally known would subject, the Company or an Affiliate to public ridicule or embarrassment, or other improper or intentional conduct by the Participant causing reputational harm to the Company, an Affiliate, or a client or former client of the Company or an Affiliate; (d) the Participant's breach of a fiduciary duty owed to the Company or an Affiliate or a client or former client of the Company or an Affiliate; (e) the Participant's intentional violation, or grossly negligent disregard, of the Company's or an Affiliate's policies, rules, or procedures; or (f) the Participant taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to the Company or an Affiliate.

2.16    "**Disability**" means, unless otherwise determined by the Committee in the applicable Award Agreement, with respect to a Participant's Termination of Service, any physical or mental disability or infirmity of a Participant that prevents the performance of the Participant's duties for a period of (a) 90 consecutive days or (b) 120 non-consecutive days during any 12-month period. Any question as to the existence, extent, or potentiality of a Participant's Disability upon which the Participant and the Company cannot agree shall be determined by a qualified, independent physician mutually selected by the Company and the Participant or the Participant's representative (which approval shall not be unreasonably withheld, delayed or conditioned). The determination of any such physician shall be final and conclusive for all purposes of this Plan.

2.17    "**Dividend Equivalent Rights**" means a right granted to a Participant under this Plan to receive the equivalent value (in cash or Shares) of dividends paid on Shares.

2.18    "**Effective Date**" means the effective date of this Plan as defined in **Article** XIV.

2.19    "**Eligible Employee**" means each employee of the Company or any of its Affiliates. An employee on a leave of absence may be an Eligible Employee.

**2.20**   "**Eligible Individual**" means an Eligible Employee, Non-Employee Director, or Consultant who is designated by the Committee in its discretion as eligible to receive Awards subject to the terms and conditions set forth herein.

**2.21**   "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time. Reference to a specific section of the Exchange Act or regulation thereunder shall include such section or regulation, any valid regulation or interpretation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing, or superseding such section or regulation.

**2.22**   "**Fair Market Value**" means, for purposes of this Plan, unless otherwise required by any applicable provision of the Code or any regulations issued thereunder, as of any date and except as provided below, the last sales price reported for the Common Stock on the applicable date: (a) as reported on the principal national securities exchange in the United States on which it is then traded, listed or otherwise reported or quoted or (b) if the Common Stock is not traded, listed, or otherwise reported or quoted, the Committee shall determine in good faith the Fair Market Value in whatever manner it considers appropriate, taking into account the requirements of Section 409A of the Code. For purposes of the grant of any Award, the applicable date shall be the trading day immediately prior to the date on which the Award is granted. For purposes of the exercise of any Award, the applicable date shall be the date a notice of exercise is received by the Committee or, if not a date on which the applicable market is open, the next day that it is open. Notwithstanding the foregoing, with respect to any Award granted on the pricing date of the Company's initial public offering, the Fair Market Value shall mean the initial public offering price of a Share as set forth in the Company's final prospectus relating to its initial public offering filed with the Securities and Exchange Commission.

**2.23**   "**Family Member**" means "family member" as defined in Section A.1.(a)(5) of the general instructions of Form S-8.

**2.24**   "**Incentive Stock Option**" means any Stock Option granted to an Eligible Employee who is an employee of the Company or its Subsidiaries under this Plan and that is intended to be, and is designated as, an "Incentive Stock Option" within the meaning of Section 422 of the Code.

**2.25**   "**Non-Employee Director**" means a director on the Board who is not an employee of the Company.

**2.26**   "**Non-Qualified Stock Option**" means any Stock Option granted under this Plan that is not an Incentive Stock Option.

**2.27**   "**Other Stock-Based Award**" means an Award granted under **Article** IX of this Plan that is valued in whole or in part by reference to, or is payable in or otherwise based on, Shares, but may be settled in the form of Shares or cash.

**2.28**   "**Participant**" means an Eligible Individual to whom an Award has been granted pursuant to this Plan.

**2.29**    "**Performance Award**" means an Award granted under **Article** VIII of this Plan contingent upon achieving certain Performance Goals.

**2.30**    "**Performance Goals**" means goals established by the Committee as contingencies for Awards to vest and/or become exercisable or distributable.

**2.31**    "**Performance Period**" means the designated period during which the Performance Goals must be satisfied with respect to the Award to which the Performance Goals relate.

**2.32**    "**Person**" means any "person" as such term is used in Sections 13(d) and 14(d) of the Exchange Act.

**2.33**    "**Restricted Stock**" means an Award of Shares granted under **Article** VII of this Plan.

**2.34**    "**Restricted Stock Unit**" means an unfunded, unsecured right to receive, on the applicable settlement date, one Share or an amount in cash or other consideration determined by the Committee to be of equal value as of such settlement date, subject to certain vesting conditions and other restrictions.

**2.35**    "**Rule 16b-3**" means Rule 16b-3 under Section 16(b) of the Exchange Act as then in effect or any successor provision.

**2.36**    "**Section 409A of the Code**" means the nonqualified deferred compensation rules under Section 409A of the Code and any applicable treasury regulations and other official guidance thereunder.

**2.37**    "**Securities Act**" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Reference to a specific section of the Securities Act or regulation thereunder shall include such section or regulation, any valid regulation or interpretation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing, or superseding such section or regulation.

**2.38**    "**Shares**" means shares of Common Stock.

**2.39**    "**Stock Appreciation Right**" means a stock appreciation right granted under **Article** VI of this Plan.

**2.40**    "**Stock Option**" or "**Option**" means any option to purchase Shares granted pursuant to **Article** VI of this Plan.

**2.41**    "**Subsidiary**" means any subsidiary corporation of the Company within the meaning of Section 424(f) of the Code.

**2.42**    "**Ten Percent Stockholder**" means a Person owning stock representing more than 10% of the total combined voting power of all classes of stock of the Company or its Subsidiaries.

**2.43**    "<u>**Termination of Service**</u>" means the termination of the applicable Participant's employment with, or performance of services for, the Company and its Affiliates. Unless otherwise determined by the Committee, (a) if a Participant's employment or services with the Company and its Affiliates terminates but such Participant continues to provide services to the Company and its Affiliates in a non-employee capacity, such change in status shall not be deemed a Termination of Service with the Company and its Affiliates and (b) a Participant employed by, or performing services for an Affiliate that ceases to be an Affiliate shall also be deemed to have incurred a Termination of Service provided the Participant does not immediately thereafter become an employee of the Company or another Affiliate. Notwithstanding the foregoing provisions of this definition, with respect to any Award that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, a Participant shall not be considered to have experienced a "Termination of Service" unless the Participant has experienced a "separation from service" within the meaning of Section 409A of the Code.

## ARTICLE III
## ADMINISTRATION

**3.1**    <u>**Authority of the Committee**</u>. This Plan shall be administered by the Committee. Subject to the terms of this Plan and Applicable Law, the Committee shall have full authority to grant Awards to Eligible Individuals under this Plan. In particular, the Committee shall have the authority to:

      (a)    determine whether and to what extent Awards, or any combination thereof, are to be granted hereunder to one or more Eligible Individuals;

      (b)    determine the number of Shares to be covered by each Award granted hereunder;

      (c)    determine the terms and conditions, not inconsistent with the terms of this Plan, of any Award granted hereunder (including, but not limited to, the exercise or purchase price (if any), any restriction or limitation, any vesting schedule or acceleration thereof, or any forfeiture restrictions or waiver thereof, regarding any Award and the Shares, if any, relating thereto, based on such factors, if any, as the Committee shall determine, in its sole discretion);

      (d)    determine the amount of cash to be covered by each Award granted hereunder;

      (e)    determine whether, to what extent, and under what circumstances grants of Options and other Awards under this Plan are to operate on a tandem basis and/or in conjunction with or apart from other awards made by the Company outside of this Plan;

      (f)    determine whether and under what circumstances an Award may be settled in cash, Shares, other property, or a combination of the foregoing;

      (g)    determine whether, to what extent and under what circumstances cash, Shares, or other property and other amounts payable with respect to an Award under this Plan shall be deferred either automatically or at the election of the Participant;

(h)    modify, waive, amend, or adjust the terms and conditions of any Award, at any time or from time to time, including but not limited to Performance Goals;

(i)    determine whether a Stock Option is an Incentive Stock Option or Non-Qualified Stock Option;

(j)    determine whether to require a Participant, as a condition of the granting of any Award, to not sell or otherwise dispose of Shares acquired pursuant to the exercise or vesting of an Award for a period of time as determined by the Committee, in its sole discretion, following the date of the acquisition of such Award or Shares; and

(k)    modify, extend, or renew an Award, subject to **Article** XI and Section **6.8**(g) of this Plan.

3.2    **Guidelines**. Subject to **Article** XI of this Plan, the Committee shall have the authority to adopt, alter, and repeal such administrative rules, guidelines, and practices governing this Plan and perform all acts, including the delegation of its responsibilities (to the extent permitted by Applicable Law and applicable stock exchange rules), as it shall, from time to time, deem advisable; to construe and interpret the terms and provisions of this Plan and any Award issued under this Plan (and any agreements or sub-plans relating thereto); and to otherwise supervise the administration of this Plan. The Committee may correct any defect, supply any omission, or reconcile any inconsistency in this Plan or in any agreement relating thereto in the manner and to the extent it shall deem necessary to effectuate the purpose and intent of this Plan. The Committee may adopt special rules, sub-plans, guidelines, and provisions for persons who are residing in or employed in, or subject to, the taxes of any domestic or foreign jurisdictions to satisfy or accommodate applicable foreign laws or to qualify for preferred tax treatment of such domestic or foreign jurisdictions.

3.3    **Decisions Final**. Any decision, interpretation, or other action made or taken in good faith by or at the direction of the Company, the Board, or the Committee (or any of its members) arising out of or in connection with this Plan shall be within the absolute discretion of all and each of them, as the case may be, and shall be final, binding, and conclusive on the Company and all employees and Participants and their respective heirs, executors, administrators, successors, and assigns.

3.4    **Designation of Consultants/Liability; Delegation of Authority**.

(a)    The Committee may employ such legal counsel, consultants, and agents as it may deem desirable for the administration of this Plan and may rely upon any opinion received from any such counsel or consultant and any computation received from any such consultant or agent. Expenses incurred by the Committee or the Board in the engagement of any such counsel, consultant, or agent shall be paid by the Company. The Committee, its members, and any person designated pursuant to this Section **3.4** shall not be liable for any action or determination made in good faith with respect to this Plan. To the maximum extent permitted by Applicable Law, no officer of the Company or member or former member of the Committee or of the Board shall be liable for any action or determination made in good faith with respect to this Plan or any Award granted under it.

(b)      The Committee may delegate any or all of its powers and duties under this Plan to a subcommittee of directors or to any officer of the Company, including the power to perform administrative functions (including executing agreements or other documents on behalf of the Committee) and grant Awards; <u>provided</u> that, such delegation does not (i) violate Applicable Law, or (ii) result in the loss of an exemption under Rule 16b-3(d)(1) for Awards granted to Participants subject to Section 16 of the Exchange Act in respect of the Company. Upon any such delegation, all references in this Plan to the "Committee," shall be deemed to include any subcommittee or officer of the Company to whom such powers have been delegated by the Committee. Any such delegation shall not limit the right of such subcommittee members or such an officer to receive Awards; <u>provided</u>, <u>however</u>, that such subcommittee members and any such officer may not grant Awards to himself or herself, a member of the Board, or any executive officer of the Company or an Affiliate, or take any action with respect to any Award previously granted to himself or herself, a member of the Board, or any executive officer of the Company or an Affiliate. The Committee may also designate employees or professional advisors who are not executive officers of the Company or members of the Board to assist in administering this Plan, <u>provided</u>, <u>however</u>, that such individuals may not be delegated the authority to grant or modify any Awards that will, or may, be settled in Shares.

3.5      <u>Indemnification</u>. To the maximum extent permitted by Applicable Law and to the extent not covered by insurance directly insuring such person, each current and former officer or employee of the Company or any of its Affiliates and member or former member of the Committee or the Board shall be indemnified and held harmless by the Company against any cost or expense (including reasonable fees of counsel acceptable to the Committee) or liability (including any sum paid in settlement of a claim with the approval of the Committee), and advanced amounts necessary to pay the foregoing at the earliest time and to the fullest extent permitted, arising out of any act or omission to act in connection with the administration of this Plan, except to the extent arising out of such officer's, employee's, member's, or former member's own fraud or bad faith. Such indemnification shall be in addition to any right of indemnification that the current or former employee, officer or member may have under Applicable Law or under the by-laws of the Company or any of its Affiliates. Notwithstanding anything else herein, this indemnification will not apply to the actions or determinations made by an individual with regard to Awards granted to such individual under this Plan.

**ARTICLE IV**
**SHARE LIMITATION BRACKET THE EVERGREEN SECTION**

4.1      <u>Shares</u>. The aggregate number of Shares that may be issued pursuant to this Plan shall not exceed 4,317,960 Shares (subject to any increase or decrease pursuant to this **Article** IV), which may be either authorized and unissued Shares or Shares held in or acquired for the treasury of the Company or both. The number of Shares that may be issued or used under this Plan shall be subject to an annual increase on January 1 of each calendar year beginning in 2025, and ending and including 2034, equal to the lesser of (a) 4% of the aggregate number of Shares outstanding on December 31 of the immediately preceding calendar year and (b) such smaller number of Shares as is determined by the Board. The aggregate number of Shares that may be issued or used with respect to any Incentive Stock Option shall not exceed 4,317,960 Shares (subject to any increase or decrease pursuant to <u>Section **4.1**</u>). Any Award under this Plan settled in cash shall not be counted against the foregoing maximum share limitations. Any Shares subject to an Award that expires or

9

is canceled, forfeited, or terminated without issuance of the full number of Shares to which the Award related will again be available for issuance under this Plan. Notwithstanding anything to the contrary contained herein, Shares subject to an Award under this Plan shall again be made available for issuance or delivery under this Plan if such Shares are (i) Shares tendered in payment of an Option, (ii) Shares delivered or withheld by the Company to satisfy any tax withholding obligation, (iii) Shares covered by a stock-settled Stock Appreciation Right or other Awards that were not issued upon the settlement of the Award, or (iv) Shares subject to an Award that expires or is canceled, forfeited, or terminated without issuance of the full number of Shares to which the Award related.

4.2     **Substitute Awards**. In connection with an entity's merger or consolidation with the Company or the Company's acquisition of an entity's property or stock, the Committee may grant Awards in substitution for any options or other stock or stock-based awards granted before such merger or consolidation by such entity or its affiliate ("**Substitute Awards**"). Substitute Awards may be granted on such terms as the Committee deems appropriate, notwithstanding limitations on Awards in this Plan. Substitute Awards will not count against the Shares authorized for grant under this Plan (nor shall Shares subject to a Substitute Award be added to the Shares available for Awards under this Plan as provided under Section **4.1** above), except that Shares acquired by exercise of substitute Incentive Stock Options will count against the maximum number of Shares that may be issued pursuant to the exercise of Incentive Stock Options under this Plan, as set forth in Section **4.1** above. Additionally, in the event that a Person acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grants pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under this Plan and shall not reduce the Shares authorized for grant under this Plan (and Shares subject to such Awards shall not be added to the Shares available for Awards under this Plan as provided under Section **4.1** above); provided that, Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not Eligible Employees or Non-Employee Directors prior to such acquisition or combination.

4.3     **Adjustments**.

(a)     The existence of this Plan and the Awards granted hereunder shall not affect in any way the right or power of the Board or the stockholders of the Company to make or authorize (i) any adjustment, recapitalization, reorganization, or other change in the Company's capital structure or its business, (ii) any merger or consolidation of the Company or any Affiliate, (iii) any issuance of bonds, debentures, or preferred or prior preference stock ahead of or affecting the Shares, (iv) the dissolution or liquidation of the Company or any Affiliate, (v) any sale or transfer of all or part of the assets or business of the Company or any Affiliate, or (vi) any other corporate act or proceeding.

(b)     Subject to the provisions of Section **10.1**:

(i)    If the Company at any time subdivides (by any split, recapitalization or otherwise) the outstanding Shares into a greater number of Shares, or combines (by reverse split, combination, or otherwise) its outstanding Shares into a lesser number of Shares, then the respective exercise prices for outstanding Awards that provide for a Participant-elected exercise and the number of Shares covered by outstanding Awards shall be appropriately adjusted by the Committee to prevent dilution or enlargement of the rights granted to, or available for, Participants under this Plan; provided that, the Committee in its sole discretion shall determine whether an adjustment is appropriate.

(ii)    Excepting transactions covered by Section 4.3(b)(i), if the Company effects any merger, consolidation, statutory exchange, spin-off, reorganization, sale or transfer of all or substantially all the Company's assets or business, or other corporate transaction or event in such a manner that the Company's outstanding Shares are converted into the right to receive (or the holders of Common Stock are entitled to receive in exchange therefor), either immediately or upon liquidation of the Company, securities or other property of the Company or other entity, then, subject to the provisions of Section 10.1: (A) the aggregate number or kind of securities that thereafter may be issued under this Plan; (B) the number or kind of securities or other property (including cash) to be issued pursuant to Awards granted under this Plan (including as a result of the assumption of this Plan and the obligations hereunder by a successor entity, as applicable); or (C) the exercise or purchase price thereof, shall be appropriately adjusted by the Committee to prevent dilution or enlargement of the rights granted to, or available for, Participants under this Plan; provided that, the Committee in its sole discretion shall determine whether an adjustment is appropriate.

(iii)    If there shall occur any change in the capital structure of the Company other than those covered by Section 4.3(b)(i) or 4.3(b)(ii), any conversion, any adjustment, or any issuance of any class of securities convertible or exercisable into, or exercisable for, any class of equity securities of the Company, then the Committee shall adjust any Award and make such other adjustments to this Plan to prevent dilution or enlargement of the rights granted to, or available for, Participants under this Plan; provided that, the Committee in its sole discretion shall determine whether an adjustment is appropriate.

(iv)    In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other extraordinary transaction or change affecting the Shares or the Share price, including any securities offering or other similar transaction, for administrative convenience, the Committee may refuse to permit the exercise of any Award for up to 60 days before or after such transaction.

(v)    The Committee may adjust the Performance Goals applicable to any Awards to reflect any unusual or non-recurring events and other extraordinary items, impact of charges for restructurings, discontinued operations, and the cumulative effects of accounting or tax changes, each as defined by generally accepted accounting principles or as identified in the Company's financial statements, notes to the financial statements, management's discussion and analysis, or other Company public filing.

11

(vi)     Any such adjustment determined by the Committee pursuant to this Section **4.3(b)** shall be final, binding, and conclusive on the Company and all Participants and their respective heirs, executors, administrators, successors, and permitted assigns. Any adjustment to, or assumption or substitution of, an Award under this Section **4.3(b)** shall be intended to comply with the requirements of Section 409A of the Code and Treasury Regulation §1.424-1 (and any amendments thereto), to the extent applicable. Except as expressly provided in this Section **4.3** or in the applicable Award Agreement, a Participant shall have no additional rights under this Plan by reason of any transaction or event described in this Section **4.3**.

**4.4**     **Annual Limit on Non-Employee Director Compensation**. In each calendar year during any part of which this Plan is in effect, a Non-Employee Director may not receive Awards for such individual's service on the Board that, taken together with any cash fees paid to such Non-Employee Director during such calendar year for such individual's service on the Board, have a value in excess of $1,000,000 (calculating the value of any such Awards based on the grant date fair value of such Awards for financial reporting purposes); provided that, (a) the Committee may make exceptions to this limit, except that the Non-Employee Director receiving such additional compensation may not participate in the decision to award such compensation or in other contemporaneous decisions involving compensation for Non-Employee Directors and (b) for the calendar year in which the pricing date of the Company's initial public offering occurs or for any calendar year in which a Non-Employee Director (i) first commences service on the Board, (ii) serves on a special committee of the Board, or (iii) serves as lead director or non-executive chair of the Board, additional compensation may be provided to such Non-Employee Director in excess of such limit.

## ARTICLE V
## ELIGIBILITY

**5.1**     **General Eligibility**. All current and prospective Eligible Individuals are eligible to be granted Awards. Eligibility for the grant of Awards and actual participation in this Plan shall be determined by the Committee in its sole discretion. No Eligible Individual will automatically be granted any Award under this Plan.

**5.2**     **Incentive Stock Options**. Notwithstanding the foregoing, only Eligible Employees who are employees of the Company or its Subsidiaries are eligible to be granted Incentive Stock Options under this Plan. Eligibility for the grant of an Incentive Stock Option and actual participation in this Plan shall be determined by the Committee in its sole discretion.

**5.3**     **General Requirement**. The vesting and exercise of Awards granted to a prospective Eligible Individual are conditioned upon such individual actually becoming an Eligible Employee, Consultant, or Non-Employee Director, as applicable.

## ARTICLE VI
## STOCK OPTIONS; STOCK APPRECIATION RIGHTS

**6.1**     **General**. Stock Options or Stock Appreciation Rights may be granted alone or in addition to other Awards granted under this Plan. Each Stock Option granted under this Plan shall be of one of two types: (a) an Incentive Stock Option or (b) a Non-Qualified Stock Option. Stock

Options and Stock Appreciation Rights granted under this Plan shall be evidenced by an Award Agreement and subject to the terms, conditions and limitations in this Plan, including any limitations applicable to Incentive Stock Options.

**6.2**    **Grants**. The Committee shall have the authority to grant to any Eligible Individual one or more Incentive Stock Options, Non-Qualified Stock Options, and/or Stock Appreciation Rights; provided, however, that Incentive Stock Options may only be granted to an Eligible Employee who is an employee of the Company or its Subsidiaries. To the extent that any Stock Option does not qualify as an Incentive Stock Option (whether because of its provisions or the time or manner of its exercise or otherwise), such Stock Option or the portion thereof which does not so qualify shall constitute a separate Non-Qualified Stock Option.

**6.3**    **Exercise Price**. The exercise price per Share subject to a Stock Option or Stock Appreciation Right shall be determined by the Committee at the time of grant; provided that, the per share exercise price of a Stock Option or Stock Appreciation Right shall not be less than 100% (or, in the case of an Incentive Stock Option granted to a Ten Percent Stockholder, 110%) of the Fair Market Value at the time of grant. Notwithstanding the foregoing, in the case of a Stock Option or Stock Appreciation Right that is a Substitute Award, the exercise price per Share for such Stock Option or Stock Appreciation Right may be less than the Fair Market Value on the date of grant; provided that, such exercise price is determined in a manner consistent with the provisions of Section 409A of the Code and, if applicable, Section 424(a) of the Code.

**6.4**    **Term**. The term of each Stock Option or Stock Appreciation Right shall be fixed by the Committee; provided that, no Stock Option or Stock Appreciation Right shall be exercisable more than ten years (or, in the case of an Incentive Stock Option granted to a Ten Percent Stockholder, five years) after the date on which the Stock Option or Stock Appreciation Right, as applicable, is granted.

**6.5**    **Exercisability**. Unless otherwise provided by the Committee in accordance with the provisions of this Section **6.5**, Stock Options and Stock Appreciation Rights granted under this Plan shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant. The Committee may, but shall not be required to, provide for an acceleration of vesting and exercisability in the terms of any Award Agreement upon the occurrence of a specified event. Unless otherwise determined by the Committee, if the exercise of a Non-Qualified Stock Option or Stock Appreciation Right within the permitted time periods is prohibited because such exercise would violate the registration requirements under the Securities Act or any other Applicable Law or the rules of any securities exchange or interdealer quotation system, the Company's insider trading policy (including any blackout periods) or a "lock-up" agreement entered into in connection with the issuance of securities by the Company, then the expiration of such Non-Qualified Stock Option or Stock Appreciation Right shall be extended until the date that is 30 days after the end of the period during which the exercise of the Non-Qualified Stock Option or Stock Appreciation Right would be in violation of such registration requirement or other Applicable Law or rules, blackout period or lock-up agreement, as determined by the Committee; provided, however, that in no event shall any such extension result in any Non-Qualified Stock Option or Stock Appreciation Right remaining exercisable after the ten-year term of the applicable Non-Qualified Stock Option or Stock Appreciation Right.

13

**6.6**    __Method of Exercise__. Subject to any applicable waiting period or exercisability provisions under __Section 6.5__, to the extent vested, Stock Options and Stock Appreciation Rights may be exercised in whole or in part at any time during the term of the applicable Stock Option or Stock Appreciation Right, by giving written notice of exercise (which may be electronic) to the Company specifying the number of Stock Options or Stock Appreciation Rights, as applicable, being exercised. Such notice shall be accompanied by payment in full of the exercise price (which shall equal the product of such number of Shares to be purchased multiplied by the applicable exercise price). The exercise price for the Stock Options may be paid upon such terms and conditions as shall be established by the Committee and set forth in the applicable Award Agreement. Without limiting the foregoing, the Committee may establish payment terms for the exercise of Stock Options pursuant to which the Company may withhold a number of Shares that otherwise would be issued to the Participant in connection with the exercise of the Stock Option having a Fair Market Value on the date of exercise equal to the exercise price, or that permit the Participant to deliver cash or Shares with a Fair Market Value equal to the exercise price on the date of payment, or through a simultaneous sale through a broker of Shares acquired on exercise, all as permitted by Applicable Law. No Shares shall be issued until payment therefor, as provided herein, has been made or provided for. Upon the exercise of a Stock Appreciation Right a Participant shall be entitled to receive, for each right exercised, up to, but no more than, an amount in cash and/or Shares (as chosen by the Committee in its sole discretion) equal in value to the excess of the Fair Market Value of one Share on the date that the right is exercised over the Fair Market Value of one Share on the date that the right was awarded to the Participant.

**6.7**    __Non-Transferability__. No Stock Option or Stock Appreciation Right shall be transferable by the Participant other than by will or by the laws of descent and distribution, and all Stock Options and Stock Appreciation Rights shall be exercisable, during the Participant's lifetime, only by the Participant. Notwithstanding the foregoing, the Committee may determine, in its sole discretion, at the time of grant or thereafter that a Non-Qualified Stock Option that is otherwise not transferable pursuant to this __Section 6.7__ is transferable to a Family Member of the Participant in whole or in part and in such circumstances, and under such conditions, as specified by the Committee. A Non-Qualified Stock Option that is transferred to a Family Member pursuant to the preceding sentence (a) may not be subsequently transferred other than by will or by the laws of descent and distribution and (b) remains subject to the terms of this Plan and the applicable Award Agreement. Any Shares acquired upon the exercise of a Non-Qualified Stock Option by a permissible transferee of a Non-Qualified Stock Option or a permissible transferee pursuant to a transfer after the exercise of the Non-Qualified Stock Option shall be subject to the terms of this Plan and the applicable Award Agreement.

**6.8**    __Termination__. Unless otherwise determined by the Committee at grant or, if no rights of the Participant are reduced, thereafter, subject to the provisions of the applicable Award Agreement and this Plan, upon a Participant's Termination of Service for any reason, Stock Appreciation Rights may remain exercisable following a Participant's Termination of Service as follows:

(a)    __Termination by Death or Disability__. Unless otherwise provided in the applicable Award Agreement, or otherwise determined by the Committee at the time of grant or, if no rights of the Participant are reduced, thereafter, if a Participant's Termination of Service is by reason of death or Disability, all Stock Options and Stock Appreciation Rights that are held by

14

such Participant that are vested and exercisable at the time of the Participant's Termination of Service may be exercised by the Participant (or in the case of the Participant's death, by the legal representative of the Participant's estate) at any time within a period of one year from the date of such Termination of Service, but in no event beyond the expiration of the stated term of such Stock Options and Stock Appreciation Rights; provided, however, that, in the event of a Participant's Termination of Service by reason of Disability, if the Participant dies within such exercise period, all unexercised Stock Options and Stock Appreciation Rights held by such Participant shall thereafter be exercisable, to the extent to which they were exercisable at the time of death, for a period of one year from the date of such death, but in no event beyond the expiration of the stated term of such Stock Options and/or Stock Appreciation Rights.

(b)    Involuntary Termination Without Cause. Unless otherwise provided in the applicable Award Agreement or otherwise determined by the Committee at the time of grant or, if no rights of the Participant are reduced, thereafter, if a Participant's Termination of Service is by involuntary termination by the Company without Cause, all Stock Options and Stock Appreciation Rights that are held by such Participant that are vested and exercisable at the time of the Participant's Termination of Service may be exercised by the Participant at any time within a period of 90 days from the date of such Termination of Service, but in no event beyond the expiration of the stated term of such Stock Options or Stock Appreciation Rights.

(c)    Voluntary Resignation. Unless otherwise provided in the applicable Award Agreement or otherwise determined by the Committee at the time of grant or, if no rights of the Participant are reduced, thereafter, if a Participant's Termination of Service is voluntary (other than a voluntary termination described in Section **6.8**(d) hereof), all Stock Options and Stock Appreciation Rights that are held by such Participant that are vested and exercisable at the time of the Participant's Termination of Service may be exercised by the Participant at any time within a period of 30 days from the date of such Termination of Service, but in no event beyond the expiration of the stated term of such Stock Options or Stock Appreciation Rights.

(d)    Termination for Cause. Unless otherwise provided in the applicable Award Agreement or determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, if a Participant's Termination of Service (i) is for Cause or (ii) is a voluntary Termination of Service (as provided in Section **6.8**(c)) after the occurrence of an event that would be grounds for a Termination of Service for Cause, all Stock Options and Stock Appreciation Rights, whether vested or not vested, that are held by such Participant shall thereupon immediately terminate and expire as of the date of such Termination of Service.

(e)    Unvested Stock Options and Stock Appreciation Rights. Unless otherwise provided in the applicable Award Agreement or determined by the Committee at the time of grant or, if no rights of the Participant are reduced, thereafter, Stock Options and Stock Appreciation Rights that are not vested as of the date of a Participant's Termination of Service for any reason shall terminate and expire as of the date of such Termination of Service.

(f)    Incentive Stock Option Limitations. To the extent that the aggregate Fair Market Value (determined as of the time of grant) of the Shares with respect to which Incentive Stock Options are exercisable for the first time by an Eligible Employee during any calendar year under this Plan and/or any other stock option plan of the Company or any Subsidiary exceeds

15

$100,000, such Options shall be treated as Non-Qualified Stock Options. In addition, if an Eligible Employee does not remain employed by the Company or any Subsidiary at all times from the time an Incentive Stock Option is granted until three months prior to the date of exercise thereof (or such other period as required by Applicable Law), such Stock Option shall be treated as a Non-Qualified Stock Option. Should any provision of this Plan not be necessary in order for the Stock Options to qualify as Incentive Stock Options, or should any additional provisions be required, the Committee may amend this Plan accordingly, without the necessity of obtaining the approval of the stockholders of the Company.

(g)    Modification, Extension and Renewal of Stock Options. The Committee may (i) modify, extend, or renew outstanding Stock Options granted under this Plan (provided that, the rights of a Participant are not reduced without such Participant's consent and provided, further, that such action does not subject the Stock Options to Section 409A of the Code without the consent of the Participant), and (ii) accept the surrender of outstanding Stock Options (to the extent not theretofore exercised) and authorize the granting of new Stock Options in substitution therefor (to the extent not theretofore exercised). Notwithstanding the foregoing, an outstanding Option may not be modified to reduce the exercise price thereof nor may a new Option at a lower price be substituted for a surrendered Option (other than adjustments or substitutions in accordance with **Article** IV), unless such action is approved by the stockholders of the Company.

**6.9    Automatic Exercise**. The Committee may include a provision in an Award Agreement providing for the automatic exercise of a Non-Qualified Stock Option or Stock Appreciation Right on a cashless basis on the last day of the term of such Option or Stock Appreciation Right if the Participant has failed to exercise the Non-Qualified Stock Option or Stock Appreciation Right as of such date, with respect to which the Fair Market Value of the Shares underlying the Non-Qualified Stock Option or Stock Appreciation Right exceeds the exercise price of such Non-Qualified Stock Option or Stock Appreciation Right on the date of expiration of such Option or Stock Appreciation Right, subject to Section **13.4**.

**6.10    Other Terms and Conditions**. As the Committee shall deem appropriate, Stock Options and Stock Appreciation Rights may be subject to additional terms and conditions or other provisions, which shall not be inconsistent with any of the terms of this Plan.

## ARTICLE VII
## RESTRICTED STOCK; RESTRICTED STOCK UNITS

**7.1    Awards of Restricted Stock and Restricted Stock Units**. Shares of Restricted Stock and Restricted Stock Units may be granted alone or in addition to other Awards granted under this Plan. The Committee shall determine the Eligible Individuals to whom, and the time or times at which, grants of Restricted Stock and/or Restricted Stock Units shall be made, the number of shares of Restricted Stock or Restricted Stock Units to be awarded, the price (if any) to be paid by the Participant (subject to Section **7.2**), the time or times within which such Awards may be subject to forfeiture, the vesting schedule and rights to acceleration thereof, and all other terms and conditions of the Awards. The Committee shall determine and set forth in the Award Agreement the terms and conditions for each Award of Restricted Stock and Restricted Stock Units, subject to the conditions and limitations contained in this Plan, including any vesting or forfeiture conditions.

The Committee may condition the grant or vesting of Restricted Stock and Restricted Stock Units upon the attainment of specified Performance Goals or such other factor as the Committee may determine in its sole discretion.

**7.2**    **Awards and Certificates**. Restricted Stock and Restricted Stock Units granted under this Plan shall be evidenced by an Award Agreement and subject to the following terms and conditions and shall be in such form and contain such additional terms and conditions not inconsistent with the terms of this Plan, as the Committee shall deem desirable:

(a)    Restricted Stock.

(i)    Purchase Price. The purchase price of Restricted Stock shall be fixed by the Committee. The purchase price for shares of Restricted Stock may be zero to the extent permitted by Applicable Law, and, to the extent not so permitted, such purchase price may not be less than par value.

(ii)    Legend. Each Participant receiving Restricted Stock shall be issued a stock certificate in respect of such shares of Restricted Stock, unless the Committee elects to use another system, such as book entries by the Company's transfer agent, as evidencing ownership of shares of Restricted Stock. Such certificate shall be registered in the name of such Participant, and shall, in addition to such legends required by Applicable Law, bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock.

(iii)    Custody. If stock certificates are issued in respect of shares of Restricted Stock, the Committee may require that any stock certificates evidencing such shares be held in custody by the Company until the restrictions thereon shall have lapsed, and that, as a condition of any grant of Restricted Stock, the Participant shall have delivered a duly signed stock power or other instruments of assignment (including a power of attorney), each endorsed in blank with a guarantee of signature if deemed necessary or appropriate by the Company, which would permit transfer to the Company of all or a portion of the shares subject to the Award of Restricted Stock in the event that such Award is forfeited in whole or part.

(iv)    Rights as a Stockholder. Except as provided in Section **7.3**(a) and this Section **7.2**(a) or as otherwise determined by the Committee in an Award Agreement, the Participant shall have, with respect to the shares of Restricted Stock, all of the rights of a holder of Shares, including, without limitation, the right to receive dividends, the right to vote such shares, and, subject to and conditioned upon the full vesting of shares of Restricted Stock, the right to tender such shares; provided that, the Award Agreement shall specify on what terms and conditions the applicable Participant shall be entitled to dividends payable on the Shares.

(v)    Lapse of Restrictions. If and when the Restriction Period expires without a prior forfeiture of the Restricted Stock, the certificates for such Shares shall be delivered to the Participant. All legends shall be removed from said certificates at the time of delivery to the Participant, except as otherwise required by Applicable Law or other limitations imposed by the Committee.

(b)    Restricted Stock Units.

17

(i)    <u>Settlement</u>. The Committee may provide that settlement of Restricted Stock Units will occur upon or as soon as reasonably practical after the Restricted Stock Units vest or will instead be deferred, on a mandatory basis or at the Participant's election, in a manner intended to comply with Section 409A of the Code.

(ii)    <u>Rights as a Stockholder</u>. A Participant will have no rights of a stockholder with respect to Shares subject to any Restricted Stock Unit unless and until Shares are delivered in settlement of the Restricted Stock Units.

(iii)    <u>Dividend Equivalent Rights</u>. If the Committee so provides, a grant of Restricted Stock Units may provide a Participant with the right to receive Dividend Equivalent Rights. Dividend Equivalent Rights may be paid currently or credited to an account for the Participant, settled in cash or Shares, and subject to the same restrictions on transferability and forfeitability as the Restricted Stock Units with respect to which the Dividend Equivalent Rights are granted and subject to other terms and conditions as set forth in the Award Agreement.

### 7.3    <u>Restrictions and Conditions</u>.

(a)    <u>Restriction Period</u>. The Participant shall not be permitted to transfer shares of Restricted Stock awarded under this Plan or vest in Restricted Stock Units during the period or periods set by the Committee (the "**Restriction Period**") commencing on the date of such Award, as set forth in the applicable Award Agreement and such agreement shall set forth a vesting schedule and any event that would accelerate vesting of the Restricted Stock and/or Restricted Stock Units. Within these limits, based on service, attainment of Performance Goals pursuant to <u>Section 7.3(a)</u>, and/or such other factors or criteria as the Committee may determine in its sole discretion, the Committee may condition the grant or provide for the lapse of such restrictions in installments in whole or in part, or may accelerate the vesting of all or any part of any Award of Restricted Stock or Restricted Stock Units and/or waive the deferral limitations for all or any part of any Award of Restricted Stock or Restricted Stock Units.

(b)    <u>Termination</u>. Unless otherwise provided in the applicable Award Agreement or determined by the Committee at grant or, if no rights of the Participant are reduced, thereafter, upon a Participant's Termination of Service for any reason during the relevant Restriction Period, all Restricted Stock or Restricted Stock Units still subject to restriction will be forfeited in accordance with the terms and conditions established by the Committee at grant or thereafter.

**ARTICLE VIII**
**PERFORMANCE AWARDS**

The Committee may grant a Performance Award to a Participant payable upon the attainment of specific Performance Goals either alone or in addition to other Awards granted under this Plan. The Performance Goals to be achieved during the Performance Period and the length of the Performance Period shall be determined by the Committee upon the grant of each Performance Award. The conditions for grant or vesting and the other provisions of Performance Awards (including, without limitation, any applicable Performance Goals) need not be the same with respect to each Participant. Performance Awards may be paid in cash, Shares, other property, or

any combination thereof, in the sole discretion of the Committee as set forth in the applicable Award Agreement.

## ARTICLE IX
## OTHER STOCK-BASED AND CASH AWARDS

**9.1**    **Other Stock-Based Awards**. The Committee is authorized to grant to Eligible Individuals Other Stock-Based Awards that are payable in, valued in whole or in part by reference to, or otherwise based on or related to Shares, including but not limited to, Shares awarded purely as a bonus and not subject to restrictions or conditions, Shares in payment of the amounts due under an incentive or performance plan sponsored or maintained by the Company, stock equivalent units, and Awards valued by reference to the book value of Shares. Other Stock-Based Awards may be granted either alone or in addition to or in tandem with other Awards granted under this Plan.

Subject to the provisions of this Plan, the Committee shall have authority to determine the Eligible Individuals, to whom, and the time or times at which, such Other Stock-Based Awards shall be made, the number of Shares to be awarded pursuant to such Awards, and all other conditions of the Awards. The Committee may also provide for the grant of Shares under such Awards upon the completion of a specified Performance Period. The Committee may condition the grant or vesting of Other Stock-Based Awards upon the attainment of specified Performance Goals as the Committee may determine, in its sole discretion.

**9.2**    **Terms and Conditions**. Other Stock-Based Awards made pursuant to this **Article IX** shall be evidenced by an Award Agreement and subject to the following terms and conditions and shall be in such form and contain such additional terms and conditions not inconsistent with the terms of this Plan, as the Committee shall deem desirable:

(a)    Non-Transferability. Subject to the applicable provisions of the Award Agreement and this Plan, Shares subject to Other Stock-Based Awards may not be transferred prior to the date on which the Shares are issued or, if later, the date on which any applicable restriction, performance, or deferral period lapses.

(b)    Dividends. Unless otherwise determined by the Committee at the time of the grant of an Other Stock-Based Award, subject to the provisions of the Award Agreement and this Plan, the recipient of an Other Stock-Based Award shall not be entitled to receive, currently or on a deferred basis, dividends or Dividend Equivalent Rights in respect of the number of Shares covered by the Other Stock-Based Award.

(c)    Vesting. Any Other Stock-Based Award and any Shares covered by any such Other Stock-Based Award shall vest or be forfeited to the extent so provided in the Award Agreement, as determined by the Committee, in its sole discretion.

(d)    Price. Shares under this **Article IX** may be issued for no cash consideration. Shares purchased pursuant to a purchase right awarded pursuant to an Other Stock-Based Award shall be priced, as determined by the Committee in its sole discretion.

**9.3**    __Cash Awards__. The Committee may from time to time grant Cash Awards to Eligible Individuals in such amounts, on such terms and conditions, and for such consideration, including no consideration or such minimum consideration as may be required by Applicable Law, as it shall determine in its sole discretion. Cash Awards may be granted subject to the satisfaction of vesting conditions or may be awarded purely as a bonus and not subject to restrictions or conditions, and if subject to vesting conditions, the Committee may accelerate the vesting of such Awards at any time in its sole discretion. The grant of a Cash Award shall not require a segregation of any of the Company's assets for satisfaction of the Company's payment obligation thereunder.

## ARTICLE X
## CHANGE IN CONTROL PROVISIONS

**10.1**    __Benefits__. In the event of a Change in Control of the Company, and except as otherwise provided by the Committee in an Award Agreement or any applicable employment agreement, offer letter, consulting agreement, change in control agreement, or similar agreement in effect between the Company or an Affiliate and the Participant, a Participant's unvested Awards shall not vest automatically and a Participant's Awards shall be treated in accordance with one or more of the following methods as determined by the Committee:

(a)    Awards, whether or not then vested, shall be continued, be assumed, or have new rights substituted therefor, as determined by the Committee in a manner consistent with the requirements of Section 409A of the Code, and restrictions to which shares of Restricted Stock or any other Award granted prior to the Change in Control are subject shall not lapse upon a Change in Control and the Restricted Stock or other Award shall, where appropriate in the sole discretion of the Committee, receive the same distribution as other Shares on such terms as determined by the Committee; __provided__ that, the Committee may decide to award additional Restricted Stock or other Awards in lieu of any cash distribution. Notwithstanding anything to the contrary herein, for purposes of Incentive Stock Options, any assumed or substituted Stock Option shall comply with the requirements of Treasury Regulation Section 1.424-1 (and any amendment thereto).

(b)    The Committee, in its sole discretion, may provide for the purchase of any Awards by the Company for an amount of cash equal to the excess (if any) of the Change in Control Price of the Shares covered by such Awards, over the aggregate exercise price of such Awards; __provided__, __however__, that if the exercise price of an Option or Stock Appreciation Right exceeds the Change in Control Price, such Award may be cancelled for no consideration.

(c)    The Committee may, in its sole discretion, terminate all outstanding and unexercised Stock Options, Stock Appreciation Rights, or any Other Stock-Based Award that provides for a Participant-elected exercise, effective as of the date of the Change in Control, by delivering notice of termination to each Participant at least 20 days prior to the date of consummation of the Change in Control, in which case during the period from the date on which such notice of termination is delivered to the consummation of the Change in Control, each such Participant shall have the right to exercise in full all of such Participant's Awards that are then outstanding (without regard to any limitations on exercisability otherwise contained in the Award Agreements), but any such exercise shall be contingent on the occurrence of the Change in Control; __provided__ that, if the Change in Control does not take place within a specified period after giving

20

such notice for any reason whatsoever, the notice and exercise pursuant thereto shall be null and void.

(d)    Notwithstanding any other provision herein to the contrary, the Committee may, in its sole discretion, provide for accelerated vesting or lapse of restrictions, of an Award at any time.

## ARTICLE XI
## TERMINATION OR AMENDMENT OF PLAN

Notwithstanding any other provision of this Plan, the Board or the Committee may at any time, and from time to time, amend, in whole or in part, any or all of the provisions of this Plan (including any amendment deemed necessary to ensure that the Company may comply with any Applicable Law), or suspend or terminate it entirely, retroactively or otherwise; provided, however, that, unless otherwise required by Applicable Law or specifically provided herein, the rights of a Participant with respect to Awards granted prior to such amendment, suspension, or termination may not be materially impaired without the consent of such Participant and, provided, further, that without the approval of the holders of the Shares entitled to vote in accordance with Applicable Law, no amendment may be made that would: (a) increase the aggregate number of Shares that may be issued under this Plan (except by operation of Section 4.1); (b) change the classification of individuals eligible to receive Awards under this Plan; (c) reduce the exercise price of any Stock Option or Stock Appreciation Right; (d) grant any new Stock Option, Stock Appreciation Right, or other award in substitution for, or upon the cancellation of, any previously granted Stock Option or Stock Appreciation Right that has the effect of reducing the exercise price thereof; (e) exchange any Stock Option or Stock Appreciation Right for Common Stock, cash, or other consideration when the exercise price per Share under such Stock Option or Stock Appreciation Right exceeds the Fair Market Value of a Share; or (f) take any action that would be considered a "repricing" of a Stock Option or Stock Appreciation Right under the applicable listing standards of the national exchange on which the Common Stock is listed (if any). Notwithstanding anything herein to the contrary, the Board or the Committee may amend this Plan or any Award Agreement at any time without a Participant's consent to comply with Applicable Law, including Section 409A of the Code. The Committee may amend the terms of any Award theretofore granted, prospectively or retroactively, but, subject to Article IV or as otherwise specifically provided herein, no such amendment or other action by the Committee shall materially impair the rights of any Participant without the Participant's consent.

## ARTICLE XII
## UNFUNDED STATUS OF PLAN

This Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payment as to which a Participant has a fixed and vested interest but which is not yet made to a Participant by the Company, nothing contained herein shall give any such Participant any right that is greater than those of a general unsecured creditor of the Company.

## ARTICLE XIII
## GENERAL PROVISIONS

**13.1    Lock-Up; Legend**. The Committee may require each person receiving Shares pursuant to a Stock Option or other Award under this Plan to represent to and agree with the Company in writing that the Participant is acquiring the Shares without a view to distribution thereof. The Company may, in connection with registering the offering of any Company securities under the Securities Act, prohibit Participants from, directly or indirectly, selling or otherwise transferring any Shares or other Company securities during any period determined by the underwriter or the Company. In addition to any legend required by this Plan, the certificates for such Shares may include any legend that the Committee deems appropriate to reflect any restrictions on transfer. All certificates for Shares delivered under this Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Common Stock is then listed or any national securities exchange system upon whose system the Common Stock is then quoted, and any Applicable Law, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions. If the Shares are held in book-entry form, then the book-entry will indicate any restrictions on such Shares.

**13.2    Other Plans**. Nothing contained in this Plan shall prevent the Board from adopting other or additional compensation arrangements, subject to stockholder approval if such approval is required, and such arrangements may be either generally applicable or applicable only in specific cases.

**13.3    No Right to Employment/Directorship/Consultancy**. Neither this Plan nor the grant of any Award hereunder shall give any Participant or other employee, Consultant or Non-Employee Director any right with respect to continuance of employment, consultancy or directorship by the Company or any Affiliate, nor shall there be a limitation in any way on the right of the Company or any Affiliate by which an employee is employed or a Consultant or Non-Employee Director is retained to terminate such employment, consultancy, or directorship at any time.

**13.4    Withholding of Taxes**. A Participant shall be required to pay to the Company or one of its Affiliates, as applicable, or make arrangements satisfactory to the Company regarding the payment of, any income tax, social insurance contribution or other applicable taxes that are required to be withheld in respect of an Award. The Committee may (but is not obligated to), in its sole discretion, permit or require a Participant to satisfy all or any portion of the applicable taxes that are required to be withheld with respect to an Award by: (a) the delivery of Shares (which are not subject to any pledge or other security interest) that have been both held by the Participant and vested for at least six months (or such other period as established from time to time by the Committee in order to avoid adverse accounting treatment under applicable accounting standards) having an aggregate Fair Market Value equal to such withholding liability (or portion thereof); (b) having the Company withhold from the Shares otherwise issuable or deliverable to, or that would otherwise be retained by, the Participant upon the grant, exercise, vesting, or settlement of the Award, as applicable, a number of Shares with an aggregate Fair Market Value equal to the amount

22

of such withholding liability; or (c) by any other means specified in the applicable Award Agreement or otherwise determined by the Committee.

**13.5**   **Fractional Shares**. No fractional Shares shall be issued or delivered pursuant to this Plan. The Committee shall determine whether cash, additional Awards, or other securities or property shall be used or paid in lieu of fractional Shares or whether any fractional shares should be rounded, forfeited, or otherwise eliminated.

**13.6**   **No Assignment of Benefits**. No Award or other benefit payable under this Plan shall, except as otherwise specifically provided in this Plan or under Applicable Law or permitted by the Committee, be transferable in any manner, and any attempt to transfer any such benefit shall be void, and any such benefit shall not in any manner be liable for or subject to the debts, contracts, liabilities, engagements, or torts of any person who shall be entitled to such benefit, nor shall it be subject to attachment or legal process for or against such person.

**13.7**   **Clawbacks; Detrimental Conduct**.

(a)   Clawbacks. All awards, amounts, or benefits received or outstanding under this Plan will be subject to clawback, cancellation, recoupment, rescission, payback, reduction, or other similar action in accordance with any Company clawback or similar policy or any Applicable Law related to such actions. A Participant's acceptance of an Award will constitute the Participant's acknowledgement of and consent to the Company's application, implementation, and enforcement of any applicable Company clawback or similar policy that may apply to the Participant, whether adopted before or after the Effective Date, and any Applicable Law relating to clawback, cancellation, recoupment, rescission, payback, or reduction of compensation, and the Participant's agreement that the Company may take any actions that may be necessary to effectuate any such policy or Applicable Law, without further consideration or action.

(b)   Detrimental Conduct. Except as otherwise determined by the Committee, notwithstanding any other term or condition of this Plan, if a Participant engages in Detrimental Conduct, whether during or after the Participant's service, in addition to any other penalties or restrictions that may apply under this Plan, Applicable Law or otherwise, the Participant must forfeit or pay to the Company the following:

(i)   any and all outstanding Awards granted to the Participant, including Awards that have become vested or exercisable;

(ii)   any cash or Shares received by the Participant in connection with this Plan within the 36-month period immediately before the date the Company determines the Participant has engaged in Detrimental Conduct; and

(iii)   the profit realized by the Participant from the sale, or other disposition for consideration, of any Shares received by the Participant under this Plan within the 36-month period immediately before the date the Company determines the Participant has engaged in Detrimental Conduct.

**13.8**   **Listing and Other Conditions**.

23

(a)      Unless otherwise determined by the Committee, as long as the Common Stock is listed on a national securities exchange or system sponsored by a national securities association, the issuance of Shares pursuant to an Award shall be conditioned upon such Shares being listed on such exchange or system. The Company shall have no obligation to issue such Shares unless and until such Shares are so listed, and the right to exercise any Option or other Award with respect to such Shares shall be suspended until such listing has been effected.

(b)      If at any time counsel to the Company advises the Company that any sale or delivery of Shares pursuant to an Award is or may in the circumstances be unlawful or result in the imposition of excise taxes on the Company under Applicable Law, the Company shall have no obligation to make such sale or delivery, or to make any application or to effect or to maintain any qualification or registration under the Securities Act or otherwise, with respect to Shares or Awards, and the right to exercise any Option or other Award shall be suspended until, based on the advice of said counsel, such sale or delivery shall be lawful or will not result in the imposition of excise taxes on the Company.

(c)      Upon termination of any period of suspension under this Section **13.8**, any Award affected by such suspension which shall not then have expired or terminated shall be reinstated as to all Shares available before such suspension and as to Shares which would otherwise have become available during the period of such suspension, but no such suspension shall extend the term of any Award.

(d)      A Participant shall be required to supply the Company with certificates, representations, and information that the Company requests and otherwise cooperate with the Company in obtaining any listing, registration, qualification, exemption, consent, or approval that the Company deems necessary or appropriate.

**13.9      Governing Law**. This Plan and actions taken in connection herewith shall be governed and construed in accordance with the laws of the State of Delaware, without reference to principles of conflict of laws.

**13.10      Construction**. Wherever any words are used in this Plan in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

**13.11      Other Benefits**. No Award granted or paid out under this Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of the Company or its Affiliates or affect any benefit or compensation under any other plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

**13.12      Costs**. The Company shall bear all expenses associated with administering this Plan, including expenses of issuing Shares pursuant to Awards hereunder.

**13.13      No Right to Same Benefits**. The provisions of Awards need not be the same with respect to each Participant, and such Awards to individual Participants need not be the same in subsequent years.

24

**13.14   Death/Disability**. The Committee may in its discretion require the transferee of a Participant to supply it with written notice of the Participant's death or Disability and to supply it with a copy of the will (in the case of the Participant's death) or such other evidence as the Committee deems necessary to establish the validity of the transfer of an Award. The Committee may also require the agreement of the transferee to be bound by all of the terms and conditions of this Plan.

**13.15   Section 16(b) of the Exchange Act**. It is the intent of the Company that this Plan satisfy, and be interpreted in a manner that satisfies, the applicable requirements of Rule 16b-3 as promulgated under Section 16 of the Exchange Act so that Participants will be entitled to the benefit of Rule 16b-3, or any other rule promulgated under Section 16 of the Exchange Act, and will not be subject to short-swing liability under Section 16 of the Exchange Act. Accordingly, if the operation of any provision of this Plan would conflict with the intent expressed in this Section **13.15**, such provision to the extent possible shall be interpreted and/or deemed amended so as to avoid such conflict.

**13.16   Deferral of Awards**. The Committee may establish one or more programs under this Plan to permit selected Participants the opportunity to elect to defer receipt of consideration upon exercise of an Award, satisfaction of performance criteria, or other event that absent the election would entitle the Participant to payment or receipt of Shares or other consideration under an Award. The Committee may establish the election procedures, the timing of such elections, the mechanisms for payments of, and accrual of interest or other earnings, if any, on amounts, Shares or other consideration so deferred, and such other terms, conditions, rules, and procedures that the Committee deems advisable for the administration of any such deferral program.

**13.17   Section 409A of the Code**. This Plan and Awards are intended to comply with or be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed, and interpreted in accordance with such intent. To the extent that any Award is subject to Section 409A of the Code, it shall be paid in a manner that will comply with Section 409A of the Code. Notwithstanding anything herein to the contrary, any provision in this Plan that is inconsistent with Section 409A of the Code shall be deemed to be amended to comply with or be exempt from Section 409A of the Code and, to the extent such provision cannot be amended to comply therewith or be exempt therefrom, such provision shall be null and void. The Company shall have no liability to a Participant, or any other party, if an Award that is intended to be exempt from, or compliant with, Section 409A of the Code is not so exempt or compliant or for any action taken by the Committee or the Company and, in the event that any amount or benefit under this Plan becomes subject to penalties under Section 409A of the Code, responsibility for payment of such penalties shall rest solely with the affected Participants and not with the Company. Notwithstanding any contrary provision in this Plan or Award Agreement, any payment(s) of "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) that are otherwise required to be made under this Plan to a "specified employee" (as defined under Section 409A of the Code) as a result of such employee's separation from service (other than a payment that is not subject to Section 409A of the Code) shall be delayed for the first six months following such separation from service (or, if earlier, until the date of death of the specified employee) and shall instead be paid (in a manner set forth in the Award Agreement) upon expiration of such delay period.

**13.18   Data Privacy**. As a condition of receipt of any Award, each Participant explicitly and unambiguously consents to the collection, use, and transfer, in electronic or other form, of personal data as described in this Section **13.18** by and among, as applicable, the Company and its Affiliates, for the exclusive purpose of implementing, administering, and managing this Plan and Awards and the Participant's participation in this Plan. In furtherance of such implementation, administration, and management, the Company and its Affiliates may hold certain personal information about a Participant, including, but not limited to, the Participant's name, home address, telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), information regarding any securities of the Company or any of its Affiliates, and details of all Awards (the "**Data**"). In addition to transferring the Data amongst themselves as necessary for the purpose of implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan, the Company and its Affiliates may each transfer the Data to any third parties assisting the Company in the implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan. Recipients of the Data may be located in the Participant's country or elsewhere, and the Participant's country and any given recipient's country may have different data privacy laws and protections. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain, and transfer the Data, in electronic or other form, for the purposes of assisting the Company in the implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or the Participant may elect to deposit any shares of Common Stock. The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage this Plan and Awards and the Participant's participation in this Plan. A Participant may, at any time, view the Data held by the Company with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant, or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel the Participant's eligibility to participate in this Plan, and in the Committee's discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

**13.19   Successor and Assigns**. This Plan shall be binding on all successors and permitted assigns of a Participant, including, without limitation, the estate of such Participant and the executor, administrator, or trustee of such estate.

**13.20   Severability of Provisions**. If any provision of this Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and this Plan shall be construed and enforced as if such provisions had not been included.

**13.21   Headings and Captions**. The headings and captions herein are provided for reference and convenience only, shall not be considered part of this Plan, and shall not be employed in the construction of this Plan.

## ARTICLE XIV
## EFFECTIVE DATE OF PLAN

The Plan's effective date (the "**Effective Date**") is the date following entry of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to the Company's voluntary Chapter 11 case filed on July 13, 2022, on which the plan of reorganization of the Company becomes effective in accordance with its terms, with such approval of such Bankruptcy Court being in lieu of initial approval by stockholders of the Company.

## ARTICLE XV
## TERM OF PLAN

No Award shall be granted pursuant to this Plan on or after the tenth anniversary of the earlier of the date that this Plan is adopted or the date of stockholder approval, but Awards granted prior to such tenth anniversary may extend beyond that date.

\*        \*        \*        \*        \*

**IONIC DIGITAL INC.**

_____

**EMPLOYEE STOCK PURCHASE PLAN**

_____

**ARTICLE I**
**PURPOSE**

The Plan's purpose is to assist employees of the Company and its Designated Companies in acquiring a share ownership interest in the Company, and to help such employees provide for their future security and to encourage them to remain in the employment of the Company and its Subsidiaries.

The Plan consists of two components: the Section 423 Component and the Non-Section 423 Component. The Section 423 Component is intended to qualify as an "employee stock purchase plan" under Section 423 of the Code and shall be administered, interpreted and construed in a manner consistent with the requirements of Section 423 of the Code. In addition, this Plan authorizes the grant of Options under the Non-Section 423 Component, which need not qualify as Options granted pursuant to an "employee stock purchase plan" under Section 423 of the Code; such Options granted under the Non-Section 423 Component shall be granted pursuant to separate Offerings containing such sub-plans, appendices, rules or procedures as may be adopted by the Administrator and designed to achieve tax, securities laws or other objectives for Eligible Employees and the Designated Companies in locations outside of the United States. Except as otherwise provided herein or determined by the Administrator, the Non-Section 423 Component will operate and be administered in the same manner as the Section 423 Component. Offerings intended to be made under the Non-Section 423 Component will be designated as such by the Administrator at or prior to the time of such Offering.

For purposes of this Plan, the Administrator may designate separate Offerings under the Plan, the terms of which need not be identical, in which Eligible Employees will participate, even if the dates of the applicable Offering Period(s) in each such Offering is identical; <u>provided</u> that, the terms of participation are the same within each separate Offering under the Section 423 Component as determined under Section 423 of the Code. Solely by way of example and without limiting the foregoing, the Company could, but shall not be required to, provide for simultaneous Offerings under the Section 423 Component and the Non-Section 423 Component of the Plan.

**ARTICLE II**
**DEFINITIONS**

As used in the Plan, the following words and phrases have the meanings specified below, unless the context clearly indicates otherwise:

**2.1**    "**<u>Administrator</u>**" means the Committee, or such individuals to which authority to administer the Plan has been delegated under <u>Section 7.1</u> hereof.

**2.2** "**Affiliate**" means a corporation or other entity controlled by, controlling, or under common control with the Company. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such person, whether through the ownership of voting or other securities, by contract or otherwise.

**2.3** "**Agent**" means the brokerage firm, bank or other financial institution, entity or person(s), if any, engaged, retained, appointed or authorized to act as the agent of the Company or an Employee with regard to the Plan.

**2.4** "**Board**" means the Board of Directors of the Company.

**2.5** "**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time. Any reference to any section of the Code shall also be a reference to any successor provision and any guidance and treasury regulation promulgated thereunder.

**2.6** "**Committee**" means any committee of the Board duly authorized by the Board to administer this Plan; provided, however, that unless otherwise determined by the Board, the Committee shall consist solely of two or more members of the Board who are each (a) a "non-employee director" within the meaning of Rule 16b-3(b), and (b) "independent" under the listing standards or rules of the securities exchange upon which the Common Stock is traded, but only to the extent such independence is required in order to take the action at issue pursuant to such standards or rules. If no committee is duly authorized by the Board to administer this Plan, the term "Committee" shall be deemed to refer to the Board for all purposes under this Plan. The Board may abolish any Committee or re-vest in itself any previously delegated authority from time to time, and will retain the right to exercise the authority of the Committee to the extent consistent with applicable law.

**2.7** "**Common Stock**" means the common stock, $0.00001 par value per share, of the Company.

**2.8** "**Company**" means Ionic Digital Inc., a Delaware corporation, and its successors by operation of law.

**2.9** "**Compensation**" of an Employee means the gross base compensation received by such Employee as compensation for services to the Company or any Designated Company, including base salary, wages, prior week adjustment and overtime payments, commissions, annual incentive compensation or other payments made under any annual bonus program, vacation pay, holiday pay, jury duty pay, funeral leave pay, and military leave pay but excluding payments made under any special or one-time bonus programs (*e.g.*, retention or sign-on bonuses), education or tuition reimbursements, travel expenses, business and moving reimbursements (including tax gross ups and taxable mileage allowance), imputed income arising under any group insurance or benefit program, income received in connection with any share options, share appreciation rights,

2

restricted shares, restricted share units or other compensatory equity awards, fringe benefits, other special payments and all contributions made by the Company or any designated Subsidiary for the Employee's benefit under any employee benefit plan now or hereafter established. The Administrator, in its discretion, may establish a different definition of Compensation for an Offering, which for the Section 423 Component shall apply on a uniform and nondiscriminatory basis. Further, the Administrator will have discretion to determine the application of this definition to Eligible Employees outside the United States.

2.10    "**Designated Company**" means each Affiliate and Subsidiary, including any Affiliate and Subsidiary in existence on the Effective Date and any Affiliate and Subsidiary formed or acquired following the Effective Date, that has been designated by the Administrator from time to time in its sole discretion as eligible to participate in the Plan, in accordance with Section 7.2 hereof, such designation to specify whether such participation is in the Section 423 Component or Non-Section 423 Component. A Designated Company may participate in either the Section 423 Component or Non-Section 423 Component, but not both. Notwithstanding the foregoing, if any Affiliate or Subsidiary is disregarded for U.S. federal income tax purposes in respect of the Company or any Designated Company participating in the Section 423 Component, then such disregarded Affiliate or Subsidiary shall automatically be a Designated Company participating in the Section 423 Component. If any Affiliate or Subsidiary is disregarded for U.S. federal income tax purposes in respect of any Designated Company participating in the Non-Section 423 Component, the Administrator may exclude such Affiliate or Subsidiary from participating in the Plan, notwithstanding that the Designated Company in respect of which such Affiliate or Subsidiary is disregarded may participate in the Plan.

2.11    "**Effective Date**" means the date the Plan is adopted, as defined on the signature page hereto.

2.12    "**Eligible Employee**" means any Employee of the Company or a Designated Company, except that the Administrator may exclude any or all of the following unless prohibited by applicable law, Employees:

(a)    who are customarily scheduled to work 20 hours or less per week;

(b)    whose customary employment is not more than five months in a calendar year;

(c)    who have been employed less than two years;

(d)    who are not employed by the Company or a Designated Company prior to the applicable Enrollment Date occurs;

(e)    any Employee who is a "highly compensated employee" of the Company or any Designated Company (within the meaning of Section 414(q) of the Code), or that is such a "highly compensated employee" (i) with compensation above a specified level, (ii) who is an

3

officer or (iii) who is subject to the disclosure requirements of Section 16(a) of the Exchange Act; or

(f)    any Employee who is a citizen or resident of a jurisdiction outside the United States (without regard to whether they are also a citizen of the United States or a resident alien (within the meaning of Section 7701(b)(1)(A) of the Code)) if either (i) the grant of the Option is prohibited under the laws of the jurisdiction governing such Employee, or (ii) compliance with the laws of the jurisdiction would cause the Section 423 Component, any Offering thereunder or an Option granted thereunder to violate the requirements of Section 423 of the Code; provided that, any exclusion shall be applied in an identical manner under each Offering to all Employees in accordance with Treas. Reg. § 1.423-2(e).

Notwithstanding the foregoing, any Employee who, after the granting of the Option, would be deemed for purposes of Section 423(b)(3) of the Code to possess 5% or more of the total combined voting power or value of all classes of shares of the Company or any Subsidiary shall not be an Eligible Employee. For purposes of the preceding sentence, the rules of Section 424(d) of the Code with regard to the attribution of share ownership shall apply in determining the share ownership of an individual, and shares which an Employee may purchase under outstanding options shall be treated as shares owned by the Employee.

Further, with respect to the Non-Section 423 Component, (A) the Administrator may limit eligibility further within a Designated Company so as to only designate some Employees of a Designated Company as Eligible Employees, and (B) to the extent any restrictions in this definition are not consistent with applicable local laws, the applicable local laws shall control.

**2.13**    "**Employee**" means any person who renders services to the Company or a Designated Company in the status of an employee within the meaning of Section 3401(c) of the Code. "Employee" shall not include any director of the Company or a Designated Company who does not render services to the Company or a Designated Company in the status of an employee within the meaning of Section 3401(c) of the Code. For purposes of the Plan, the employment relationship shall be treated as continuing intact while the individual is on military leave, sick leave or other leave of absence approved by the Company or a Designated Company and meeting the requirements of Treas. Reg. § 1.421-1(h)(2). Where the period of leave exceeds three months, or such other period specified in Treas. Reg. § 1.421-1(h)(2), and the individual's right to reemployment is not guaranteed either by statute or by contract, the employment relationship shall be deemed to have terminated on the first day immediately following such three-month period, or such other period specified in Treas. Reg.§ 1.421-1(h)(2).

**2.14**    "**Enrollment Date**" means the first date of each Offering Period.

**2.15**    "**Exercise Date**" means the last day of each Purchase Period, except as provided in Section 5.2 hereof.

**2.16**    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time. Reference to a specific section of the Exchange Act or regulation thereunder shall include such section or regulation, any valid regulation or interpretation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing, or superseding such section or regulation.

**2.17**    "**Fair Market Value**" means, as of any date, the value of the Common Stock determined as follows:

(a)    If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange or Nasdaq Stock Market), (ii) listed on any national market system or (iii) listed, quoted or traded on any automated quotation system, the Fair Market Value of a Share shall be the closing sales price for a Share as quoted on such exchange or system for such date or, if there is no closing sales price for a Share on the date in question, the closing sales price for a Share on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(b)    If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, the Fair Market Value of a Share shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a Share on such date, the high bid and low asked prices for a Share on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c)    If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, the Fair Market Value of a Share shall be established by the Administrator in good faith.

**2.18**    "**Grant Date**" means the first day of an Offering Period.

**2.19**    "**New Exercise Date**" has the meaning set forth in Section 5.2(b) hereof.

**2.20**    "**Non-Section 423 Component**" means those Offerings under the Plan, together with the sub-plans, appendices, rules or procedures, if any, adopted by the Administrator as a part of this Plan, in each case, pursuant to which Options may be granted to Eligible Employees that need not satisfy the requirements for Options granted pursuant to an "employee stock purchase plan" that are set forth under Section 423 of the Code.

**2.21**    "**Offering**" means an offer under the Plan of an Option that may be exercised during an Offering Period as further described in Article IV hereof. Unless otherwise specified by the Administrator, each Offering to the Eligible Employees shall be deemed a separate Offering, even if the dates and other terms of the applicable Purchase Periods of each such Offering are identical and the provisions of the Plan will separately apply to each Offering. To the extent

permitted by Treas. Reg. § 1.423-2(a)(1), the terms of each separate Offering under the Section 423 Component need not be identical; provided that, the terms of the Section 423 Component and an Offering thereunder together satisfy Treas. Reg. § 1.423-2(a)(2) and (a)(3).

**2.22** "**Offering Period**" means one or more periods to be selected by the Administrator in its sole discretion with respect to which Options shall be granted to Participants. The duration and timing of Offering Periods may be established or changed by the Administrator at any time, in its sole discretion and may consist of one or more Purchase Periods. Notwithstanding the foregoing, in no event may an Offering Period exceed 27 months.

**2.23** "**Option**" means the right to purchase Shares pursuant to the Plan during each Offering Period.

**2.24** "**Option Price**" means the purchase price of a Share hereunder as provided in Section 4.2 hereof.

**2.25** "**Parent**" means any entity that is a parent corporation of the Company within the meaning of Section 424 of the Code.

**2.26** "**Participant**" means any Eligible Employee who elects to participate in the Plan.

**2.27** "**Payday**" means the regular and recurring established day for payment of Compensation to an Employee.

**2.28** "**Plan**" means this Employee Stock Purchase Plan, including both the Section 423 Component and Non-Section 423 Component and any other sub-plans or appendices hereto, as amended from time to time.

**2.29** "**Plan Account**" means a bookkeeping account established and maintained by the Company in the name of each Participant.

**2.30** "**Purchase Period**" means one or more periods within an Offering Period, as determined by the Administrator in its sole discretion. The duration and timing of Purchase Periods may be established or changed by the Administrator at any time, in its sole discretion. Notwithstanding the foregoing, in no event may a Purchase Period end after the end of the Offering Period under which it is established.

**2.31** "**Section 409A**" means the nonqualified deferred compensation rules under Section 409A of the Code and any applicable treasury regulations and other official guidance thereunder.

**2.32** "**Section 423 Component**" means those Offerings under the Plan that are intended to meet the requirements under Section 423(b) of the Code.

**2.33** "**Share**" means shares of Common Stock.

6

**2.34** "**Subsidiary**" means any subsidiary corporation of the Company within the meaning of Section 424(f) of the Code.

**2.35** "**Tax-Related Items**" means any U.S. and non-U.S. federal, provincial, state and/or local taxes (including, without limitation, income tax, social insurance contributions, fringe benefit tax, employment tax, stamp tax and any employer tax liability which has been transferred to a Participant) for which a Participant is liable in connection with his or her participation in the Plan.

**2.36** "**Treas. Reg.**" means U.S. Department of the Treasury regulations.

**2.37** "**Withdrawal Election**" has the meaning set forth in Section 6.1(a) hereof.

**ARTICLE III**
**PARTICIPATION**

**3.1** **Eligibility**.

(a)    Any Eligible Employee who is employed by the Company or a Designated Company on a given Enrollment Date for an Offering Period shall be eligible to participate in the Plan during such Offering Period, subject to the requirements of Article IV and V hereof, and, for the Section 423 Component, the limitations imposed by Section 423(b) of the Code.

(b)    No Eligible Employee shall be granted an Option under the Section 423 Component which permits the Participant's rights to purchase Shares under the Plan, and to purchase shares under all other employee stock purchase plans of the Company, any Parent or any Subsidiary subject to Section 423 of the Code, to accrue at a rate which exceeds $25,000 of fair market value of such shares (determined at the time such Option is granted) for each calendar year in which such Option is outstanding at any time. The limitation under this Section 3.1(b) shall be applied in accordance with Section 423(b)(8) of the Code.

**3.2** **Election to Participate; Payroll Deductions**.

(a)    Each individual who is an Eligible Employee as of an Offering Period's Enrollment Date may elect to participate in such Offering Period and the Plan by delivering to the Company or an Agent designated by the Company an enrollment form including a payroll deduction authorization (which may be in an electronic format or such other method as determined by the Company in accordance with the Company's practices) (a "**Participation Election**") no later than the period of time prior to the applicable Enrollment Date determined by the Administrator, in its sole discretion. Except as provided in Section 3.2(e) hereof, an Eligible Employee may participate in the Plan only by means of payroll deduction.

(b)    Subject to Section 3.1(b) hereof and except as may otherwise be determined by the Administrator, payroll deductions (i) shall equal at least 1% of the Participant's Compensation as of each Payday of the Offering Period following the Enrollment Date, but not more than 10% of the Participant's Compensation as of each Payday of the Offering Period

7

following the Enrollment Date; and (ii) shall be expressed as a whole number percentage. Subject to Section 3.2(e) hereof, amounts deducted from a Participant's Compensation with respect to an Offering Period pursuant to this Section 3.2 shall be deducted each Payday through payroll deduction and credited to the Participant's Plan Account.

(c)     Unless otherwise determined by the Administrator, following at least one payroll deduction, a Participant may increase or decrease the percentage of Compensation or the fixed dollar amount designated in his or her enrollment form, subject to the limits of this Section 3.2, or may suspend his or her payroll deductions, at any time during an Offering Period; provided, however, that the Administrator may limit the number of changes a Participant may make to his or her payroll deduction elections during each Offering Period in the applicable Offering (and in the absence of any specific designation by the Administrator, a Participant shall be allowed one change to his or her payroll deduction elections during each Offering Period). Any such change or suspension of payroll deductions shall be effective with the first full payroll period following ten business days after the Company's receipt of the new enrollment form (or such shorter or longer period as may be specified by the Administrator in the applicable Offering). In the event a Participant suspends his or her payroll deductions, such Participant's cumulative payroll deductions prior to the suspension shall remain in his or her account and shall be applied to the purchase of Shares on the next occurring Exercise Date and shall not be paid to such Participant unless he or she withdraws from participation in the Plan pursuant to Section 6.1.

(d)     Upon the completion of an Offering Period, each Participant in such Offering Period shall automatically participate in the immediately following Offering Period at the same payroll deduction percentage as in effect at the termination of such Offering Period, unless such Participant delivers to the Company or an Agent designated by the Company a different Participation Election with respect to the successive Offering Period in accordance with Section 3.2(a) hereof, or unless such Participant becomes ineligible or otherwise modifies the Participant's election for participation in the Plan.

(e)     Notwithstanding any other provisions of the Plan to the contrary, in non-U.S. jurisdictions where participation in the Plan through payroll deductions is prohibited or otherwise problematic under applicable local laws (as determined by the Administrator in its sole discretion), the Administrator may provide that an Eligible Employee may elect to participate through contributions to the Participant's Plan Account in a form acceptable to the Administrator in lieu of or in addition to payroll deductions; provided, however, that, for any Offering under the Section 423 Component, the Administrator must determine that any alternative method of contribution is applied on an equal and uniform basis to all Eligible Employees in the Offering. Any reference to "payroll deductions" in this Section 3.2 (or in any other section of the Plan) will similarly cover contributions by other means made pursuant to this Section 3.2(e).

8

## ARTICLE IV
## PURCHASE OF SHARES

**4.1**   <u>Grant of Option</u>. The Company may make one or more Offerings under the Plan, which may be successive or overlapping with one another, until the earlier of: (i) the date on which all Shares available under the Plan have been purchased or (ii) the date on which the Plan is suspended or terminates. No Offering shall commence prior to the date on which the Company's registration statement on Form S-8 is filed with the U.S. Securities and Exchange Commission in respect of the Plan. The Administrator shall designate the terms and conditions of each Offering in writing, including without limitation, the Offering Period and the Purchase Periods. Each Participant shall be granted an Option with respect to an Offering Period on the applicable Grant Date. Subject to the limitations of <u>Section 3.1(b)</u> hereof, the number of Shares subject to a Participant's Option shall be determined by dividing (a) such Participant's payroll deductions accumulated prior to an Exercise Date and retained in the Participant's Plan Account on such Exercise Date by (b) the applicable Option Price; <u>provided</u> that, in no event shall a Participant be permitted to purchase during each Offering Period more than $25,000 worth of shares of Common Stock (subject to any adjustment pursuant to <u>Section 5.2</u> hereof). The Administrator may, for future Offering Periods, increase or decrease, in its absolute discretion, the maximum number of Shares that a Participant may purchase during any Purchase Periods under such future Offering Periods. Each Option shall expire on the last Exercise Date for the applicable Offering Period immediately after the automatic exercise of the Option in accordance with <u>Section 4.3</u> hereof, unless such Option terminates earlier in accordance with <u>Article VI</u> hereof.

**4.2**   <u>Option Price</u>. The Option Price shall equal 85% of the lesser of the Fair Market Value of a Share on (a) the applicable Grant Date and (b) the applicable Exercise Date, or such other price designated by the Administrator.

**4.3**   <u>Purchase of Shares</u>.

(a)   On each Exercise Date for an Offering Period, each Participant shall automatically and without any action on such Participant's part be deemed to have exercised the Participant's Option to purchase at the applicable Option Price the largest number of whole Shares which can be purchased with the amount in the Participant's Plan Account, subject to the limitations set forth in the Plan. Unless otherwise determined by the Administrator in advance of an Offering or in accordance with applicable law, any balance that is remaining in the Participant's Plan Account (after exercise of such Participant's Option) as of the Exercise Date shall be carried forward into the next Offering Period, unless the Participant has properly elected to withdraw from the Plan, has ceased to be an Eligible Employee or with respect to the maximum limitations set forth in <u>Section 3.1(b)</u> and <u>Section 4.1</u>. Any balance not carried forward to the next Offering Period in accordance with the prior sentence shall promptly be refunded as soon as administratively practicable to the applicable Participant.

(b)   As soon as practicable following each Exercise Date, the number of Shares purchased by such Participant pursuant to <u>Section 4.3(a)</u> hereof shall be delivered (either in share

9

certificate or book entry form), in the Company's sole discretion, to either (i) the Participant or (ii) an account established in the Participant's name at a stock brokerage or other financial services firm designated by the Company. The Company may require that shares be retained with such brokerage or firm for a designated period of time and/or may establish procedures to permit tracking of disqualifying dispositions of such shares.

4.4  **Transferability of Rights**. An Option granted under the Plan shall not be transferable, other than by will or the applicable laws of descent and distribution, and is exercisable during the Participant's lifetime only by the Participant. No option or interest or right to the Option shall be available to pay off any debts, contracts or engagements of the Participant or the Participant's successors in interest or shall be subject to disposition by pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempt at disposition of the Option shall have no effect.

## ARTICLE V
## PROVISIONS RELATING TO COMMON STOCK

5.1  **Shares Reserved**. Subject to adjustment as provided in Section 5.2 hereof, the aggregate number of Shares that may be issued pursuant to rights granted under the Plan shall be 763,592 Shares. Shares made available for sale under the Plan may be authorized but unissued shares or treasury Shares. If any right granted under the Plan shall for any reason terminate without having been exercised, the Shares not purchased under such right shall again become available for issuance under the Plan.

5.2  **Adjustments Upon Changes in Capitalization, Dissolution, Liquidation, Merger or Asset Sale**.

(a)    Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares which have been authorized for issuance under the Plan but not yet placed under Option, as well as the price per share and the number of Shares covered by each Option under the Plan which has not yet been exercised shall be proportionately adjusted for any increase or decrease in the number of issued Shares resulting from a share split, reverse share split, share dividend, combination, amalgamation, consolidation, reorganization, arrangement or reclassification of the Shares, or any other increase or decrease in the number Shares effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Administrator, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Shares subject to an Option.

10

(b)    <u>Dissolution or Liquidation</u>. In the event of the proposed dissolution or liquidation of the Company, the Offering Periods then in progress shall be shortened by setting a new Exercise Date (the "**New Exercise Date**"), and shall terminate immediately prior to the consummation of such proposed dissolution or liquidation, unless provided otherwise by the Administrator. The New Exercise Date shall be before the date of the Company's proposed dissolution or liquidation. The Administrator shall notify each Participant in writing, at least ten business days prior to the New Exercise Date, that the Exercise Date for the Participant's Option has been changed to the New Exercise Date and that the Participant's Option shall be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in <u>Section 6.1</u> hereof or the Participant has ceased to be an Eligible Employee as provided in <u>Section 6.2</u> hereof.

(c)    <u>Merger or Asset Sale</u>. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each outstanding Option shall be assumed or an equivalent Option substituted by the successor corporation or a parent or subsidiary of the successor corporation. If the successor corporation refuses to assume or substitute for the Option, any Offering Periods then in progress shall be shortened by setting a New Exercise Date and any Offering Periods then in progress shall end on the New Exercise Date. The New Exercise Date shall be before the date of the Company's proposed sale or merger. The Administrator shall notify each Participant in writing, at least ten business days prior to the New Exercise Date, that the Exercise Date for the Participant's Option has been changed to the New Exercise Date and that the Participant's Option shall be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in <u>Section 6.1</u> hereof or the Participant has ceased to be an Eligible Employee as provided in <u>Section 6.2</u> hereof.

**5.3**    <u>**Insufficient Shares**</u>. If the Administrator determines that, on a given Exercise Date, the number of Shares with respect to which Options are to be exercised may exceed the number of Shares remaining available for sale under the Plan on such Exercise Date, the Administrator shall make a pro rata allocation of the Shares available for issuance on such Exercise Date in as uniform a manner as shall be practicable and as it shall determine in its sole discretion to be equitable among all Participants exercising Options to purchase Shares on such Exercise Date, and unless additional shares are authorized for issuance under the Plan, no further Offering Periods shall take place and the Plan shall terminate pursuant to <u>Section 7.5</u> hereof. If an Offering Period is so terminated, then the balance of the amount credited to the Participant's Plan Account which has not been applied to the purchase of Shares shall be paid to such Participant in one lump sum in cash within 30 days after such Exercise Date, without any interest thereon (except as may be required by applicable local laws).

**5.4**    <u>**Rights as Shareholders**</u>. With respect to Shares subject to an Option, a Participant shall not be deemed to be a shareholder of the Company and shall not have any of the rights or privileges of a shareholder. A Participant shall have the rights and privileges of a shareholder of the Company when, but not until, the Shares have been deposited in the designated brokerage account following exercise of the Participant's Option.

## ARTICLE VI
## TERMINATION OF PARTICIPATION

**6.1** **Cessation of Contributions; Voluntary Withdrawal**.

(a)    A Participant may cease payroll deductions during an Offering Period and elect to withdraw from the Plan by delivering written notice of such election to the Company or an Agent designated by the Company in such form and at such time prior to the Exercise Date for such Offering Period as may be established by the Administrator (a "**Withdrawal Election**"). In the event a Participant elects to withdraw from the Plan, amounts then credited to such Participant's Plan Account shall be returned to the Participant in one lump-sum payment in cash within 30 days after such election is received by the Company, without any interest thereon (except as may be required by applicable local laws), and the Participant shall cease to participate in the Plan and the Participant's Option for such Offering Period shall terminate upon receipt of the Withdrawal Election.

(b)    A Participant's withdrawal from the Plan shall not have any effect upon the Participant's eligibility to participate in any similar plan which may hereafter be adopted by the Company or in succeeding Offering Periods which commence after the termination of the Offering Period from which the Participant withdraws.

(c)    A Participant who ceases contributions to the Plan during any Offering Period shall not be permitted to resume contributions to the Plan during that Offering Period.

**6.2** **Termination of Eligibility**. Upon a Participant's ceasing to be an Eligible Employee, for any reason, such Participant's Option for the applicable Offering Period shall automatically terminate, the Participant shall be deemed to have elected to withdraw from the Plan, and any balance on such Participant's Plan Account shall be paid to such Participant or, in the case of the Participant's death, to the person or persons entitled thereto pursuant to applicable law, within 30 days after such cessation of being an Eligible Employee, without any interest thereon (except as may be required by applicable local laws). If a Participant transfers employment from the Company or any Designated Company participating in the Section 423 Component to any Designated Company participating in the Non-Section 423 Component, such transfer shall not be treated as a termination of employment, but the Participant shall immediately cease to participate in the Section 423 Component; however, any contributions made for the Offering Period in which such transfer occurs shall be transferred to the Non-Section 423 Component, and such Participant shall immediately join the then-current Offering under the Non-Section 423 Component upon the same terms and conditions in effect for the Participant's participation in the Section 423 Component, except for such modifications otherwise applicable for Participants in such Offering. A Participant who transfers employment from any Designated Company participating in the Non-Section 423 Component to the Company or any Designated Company participating in the Section 423 Component shall not be treated as terminating the Participant's employment and shall remain a Participant in the Non-Section 423 Component until the earlier of (i) the end of the current Offering Period under the Non-Section 423 Component, or (ii) the Enrollment Date of the first

12

Offering Period in which the Participant is eligible to participate following such transfer. Notwithstanding the foregoing, the Administrator may establish different rules to govern transfers of employment between companies participating in the Section 423 Component and the Non-Section 423 Component, consistent with the applicable requirements of Section 423 of the Code.

## ARTICLE VII
## GENERAL PROVISIONS

**7.1** __Administration__.

(a)     The Plan shall be administered by the Committee, which shall be composed of members of the Board. The Committee may delegate administrative tasks under the Plan to the services of an Agent or Employees to assist in the administration of the Plan, including without limitation, determining the Designated Companies participating in the Plan, establishing and maintaining an individual securities account under the Plan for each Participant, determining enrollment and withdrawal deadlines and determining exchange rates. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

(b)     It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with the provisions of the Plan. The Administrator shall have the power, subject to, and within the limitations of, the express provisions of the Plan:

(i)     To establish and terminate Offerings;

(ii)     To determine when and how Options shall be granted and the provisions and terms of each Offering (which need not be identical);

(iii)     To select Designated Companies in accordance with __Section 7.2__ hereof; and

(iv)     To construe and interpret the Plan, the terms of any Offering and the terms of the Options and to adopt such rules for the administration, interpretation, and application of the Plan as are consistent therewith and to interpret, amend or revoke any such rules. The Administrator, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan, any Offering or any Option, in a manner and to the extent it shall deem necessary or expedient to administer the Plan, subject to Section 423 of the Code for the Section 423 Component.

(c)     The Administrator may adopt rules or procedures relating to the operation and administration of the Plan to accommodate the specific requirements of local laws and procedures; __provided__ that, the adoption and implementation of any such rules and/or procedures would not cause the Section 423 Component to be in noncompliance with Section 423 of the Code. Without limiting the generality of the foregoing, the Administrator is specifically authorized to adopt rules and procedures regarding handling of participation elections, payroll deductions,

13

payment of interest, conversion of local currency, payroll tax, withholding procedures and handling of share certificates which vary with local requirements.

(d)     The Administrator may adopt sub-plans applicable to particular Designated Companies or locations, which sub-plans may be designed to be outside the scope of Section 423 of the Code. The rules of such sub-plans may take precedence over other provisions of this Plan, with the exception of <u>Section 5.1</u> hereof, but unless otherwise superseded by the terms of such sub-plan, the provisions of this Plan shall govern the operation of such sub-plan.

(e)     All expenses and liabilities incurred by the Administrator in connection with the administration of the Plan shall be borne by the Company. The Administrator may employ attorneys, consultants, accountants, appraisers, brokers or other persons. The Administrator, the Company and its officers and directors shall be entitled to rely upon the advice, opinions or valuations of any such persons. All actions taken and all interpretations and determinations made by the Administrator in good faith shall be final and binding upon all Participants, the Company and all other interested persons. No member of the Board or Administrator shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Options, and all members of the Board or Administrator shall be fully protected by the Company in respect to any such action, determination, or interpretation. Any and all risks resulting from any market fluctuations or conditions of any nature and affecting the price of Shares are assumed by the Participant.

**7.2     <u>Designation of Affiliates and Subsidiaries</u>**. The Administrator shall designate from time to time the Affiliates and Subsidiaries that shall constitute Designated Companies, and determine whether such Designated Companies shall participate in the Section 423 Component or Non-Section 423 Component; <u>provided</u>, <u>however</u>, that an Affiliate that does not also qualify as a Subsidiary may be designated only as participating in the Non-Section 423 Component. The Administrator may designate an Affiliate or Subsidiary, or terminate the designation of an Affiliate or Subsidiary, without the approval of the shareholders of the Company.

**7.3     <u>Reports</u>**. Individual accounts shall be maintained for each Participant in the Plan. Statements of Plan Accounts shall be given to Participants at least annually, which statements shall set forth the amounts of payroll deductions, the Option Price, the number of shares purchased and the remaining cash balance, if any.

**7.4     <u>No Right to Employment</u>**. Nothing in the Plan shall be construed to give any person (including any Participant) the right to remain in the employ of the Company, a Parent or a Subsidiary or to affect the right of the Company, any Parent or any Subsidiary to terminate the employment of any person (including any Participant) at any time, with or without cause, which right is expressly reserved.

**7.5     <u>Amendment and Termination of the Plan</u>**.

14

(a)     The Board may, in its sole discretion, amend, suspend or terminate the Plan at any time and from time to time. To the extent necessary to comply with Section 423 of the Code (or any successor rule or provision), with respect to the Section 423 Component, or any other applicable law, regulation or stock exchange rule, the Company shall obtain shareholder approval of any such amendment to the Plan in such a manner and to such a degree as required by Section 423 of the Code or such other law, regulation or rule.

(b)     If the Administrator determines that the ongoing operation of the Plan may result in unfavorable financial accounting consequences, the Administrator may in its discretion modify or amend the Plan to reduce or eliminate such accounting consequence including, but not limited to:

(i)     altering the Option Price for any Offering Period including an Offering Period underway at the time of the change in Option Price;

(ii)    shortening any Offering Period so that the Offering Period ends on a new Exercise Date, including an Offering Period underway at the time of the Administrator action; and

(iii)   allocating Shares.

Such modifications or amendments shall not require shareholder approval or the consent of any Participant.

(c)     Upon termination of the Plan, the balance in each Participant's Plan Account shall be refunded as soon as practicable after such termination, without any interest thereon (except as may be required by applicable local laws).

**7.6     Use of Funds; No Interest Paid**. All funds received by the Company by reason of purchase of shares of Shares under the Plan shall be included in the general funds of the Company free of any trust or other restriction and may be used for any corporate purpose (except as may be required by applicable local laws). No interest shall be paid to any Participant or credited under the Plan (except as may be required by applicable local laws).

**7.7     Term; Approval by Shareholders**. No Option may be granted during any period of suspension of the Plan or after termination of the Plan. The Plan shall be submitted for the approval of the Company's shareholders within 12 months after the date of the Board's initial adoption of the Plan. Options may be granted prior to such shareholder approval; provided, however, that such Options shall not be exercisable prior to the time when the Plan is approved by the shareholders; provided, further that if such approval has not been obtained by the end of the 12-month period, all Options previously granted under the Plan shall thereupon terminate and be canceled and become null and void without being exercised.

**7.8     Effect Upon Other Plans**. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for the Company, any Parent or any Subsidiary. Nothing

in the Plan shall be construed to limit the right of the Company, any Parent or any Subsidiary (a) to establish any other forms of incentives or compensation for employees of the Company or any Parent or any Subsidiary, or (b) to grant or assume Options otherwise than under the Plan in connection with any proper corporate purpose, including, but not by way of limitation, the grant or assumption of options in connection with the acquisition, by purchase, lease, merger, amalgamation, combination, arrangement, consolidation or otherwise, of the business, shares or assets of any corporation, firm or association.

      **7.9**    **Conformity to Securities Laws**. Notwithstanding any other provision of the Plan, the Plan and the participation in the Plan by any individual who is then subject to Section 16 of the Exchange Act shall be subject to any additional limitations set forth in any applicable exemption rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by applicable law, the Plan shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

      **7.10**    **Notice of Disposition of Shares**. Each Participant shall give the Company prompt notice of any disposition or other transfer of any Shares, acquired pursuant to the exercise of an Option granted under the Section 423 Component, if such disposition or transfer is made (a) within two years after the applicable Grant Date or (b) within one year after the transfer of such Shares to such Participant upon exercise of such Option. The Company may direct that any certificates evidencing shares acquired pursuant to the Plan refer to such requirement.

      **7.11**    **Tax Withholding**. At the time of any taxable event that creates a withholding obligation for the Company or any Parent, Affiliate or Subsidiary, the Participant will make adequate provision for any Tax-Related Items. In their sole discretion, and except as otherwise determined by the Administrator, the Company or the Designated Company that employs or employed the Participant may satisfy their obligations to withhold Tax-Related Items by (a) withholding from the Participant's wages or other compensation, (b) withholding a sufficient whole number of Shares otherwise issuable following exercise of the Option having an aggregate value sufficient to pay the Tax-Related Items required to be withheld with respect to the Option and/or shares, or (c) withholding from proceeds from the sale of Shares issued upon exercise of the Option, either through a voluntary sale or a mandatory sale arranged by the Company.

      **7.12**    **Governing Law**. The Plan and all rights, agreements and obligations hereunder shall be administered, interpreted and enforced under the laws of the state of Delaware, without regard to the conflict of law rules thereof or of any other jurisdiction.

      **7.13**    **Notices**. All notices or other communications by a Participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

      **7.14**    **Conditions to Issuance of Shares**.

(a)     Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates or make any book entries evidencing Shares pursuant to the exercise of an Option by a Participant, unless and until the Administrator has determined, with advice of counsel, that the issuance of such Shares is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any securities exchange or automated quotation system on which the Shares are listed or traded, and the Shares are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Administrator may require that a Participant make such reasonable covenants, agreements, and representations as the Administrator, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements.

(b)     All certificates for Shares delivered pursuant to the Plan and all Shares issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to comply with U.S. and non-U.S. federal, provincial, state or local securities or other laws, rules and regulations and the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted, or traded. The Administrator may place legends on any certificate or book entry evidencing Shares to reference restrictions applicable to the Shares.

(c)     The Administrator shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Option, including a window-period limitation, as may be imposed in the sole discretion of the Administrator.

(d)     Notwithstanding any other provision of the Plan, unless otherwise determined by the Administrator or required by any applicable law, rule or regulation, the Company may, in lieu of delivering to any Participant certificates evidencing Shares issued in connection with any Option, record the issuance of Shares in the books of the Company (or, as applicable, its transfer agent or share plan administrator).

If, pursuant to this Section 7.14, the Administrator determines that Shares will not be issued to any Participant, the Company is relieved from liability to any Participant except to refund to the Participant such Participant's Plan Account balance, without interest thereon (except as may be required by applicable local laws).

**7.15   Equal Rights and Privileges**. All Eligible Employees granted Options pursuant to an Offering under the Section 423 Component shall have equal rights and privileges under this Plan to the extent required under Section 423 of the Code so that the Section 423 Component qualifies as an "employee stock purchase plan" within the meaning of Section 423 of the Code. Any provision of the Section 423 Component that is inconsistent with Section 423 of the Code shall, without further act or amendment by the Company or the Board, be reformed to comply with the equal rights and privileges requirement of Section 423 of the Code. Eligible Employees

17

participating in the Non-Section 423 Component need not have the same rights and privileges as each other, or as Eligible Employees participating in the Section 423 Component.

**7.16   Rules Particular to Specific Countries**. Notwithstanding anything herein to the contrary, the terms and conditions of the Plan with respect to Participants who are tax residents of a particular non-U.S. country or who are non-U.S. nationals or employed in non-U.S. jurisdictions may be subject to an addendum to the Plan in the form of an appendix or sub-plan (which appendix or sub-plan may be designed to govern Offerings under the Section 423 Component or the Non-Section 423 Component, as determined by the Administrator). To the extent that the terms and conditions set forth in an appendix or sub-plan conflict with any provisions of the Plan, the provisions of the appendix or sub-plan shall govern. The adoption of any such appendix or sub-plan shall be pursuant to Section 7.1 above. Without limiting the foregoing, the Administrator is specifically authorized to adopt rules and procedures, with respect to Participants who are non-U.S. nationals or employed in non-U.S. jurisdictions, regarding the exclusion of particular Affiliates or Subsidiaries from participation in the Plan, eligibility to participate, the definition of Compensation, handling of payroll deductions or other contributions by Participants, payment of interest, conversion of local currency, data privacy security, payroll tax, withholding procedures, establishment of bank or trust accounts to hold payroll deductions or contributions; provided that, the adoption and implementation of any such rules and/or procedures would not cause the Section 423 Component to be in noncompliance with Section 423 of the Code.

**7.17   Section 409A**. The Section 423 Component of the Plan and the Options granted pursuant to Offerings thereunder are intended to be exempt from the application of Section 409A. Neither the Non-Section 423 Component nor any Option granted pursuant to an Offering thereunder is intended to constitute or provide for "nonqualified deferred compensation" within the meaning of Section 409A. Notwithstanding any provision of the Plan to the contrary, if the Administrator determines that any Option granted under the Plan may be or become subject to Section 409A or that any provision of the Plan may cause an Option granted under the Plan to be or become subject to Section 409A, the Administrator may adopt such amendments to the Plan and/or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions as the Administrator determines are necessary or appropriate to avoid the imposition of taxes under Section 409A, either through compliance with the requirements of Section 409A or with an available exemption therefrom.

\* \* \* \* \*

The Plan's effective date (the "**Effective Date**") is the date following entry of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to the Company's voluntary Chapter 11 case filed on July 13, 2022, on which the plan of reorganization of the Company becomes effective in accordance with its terms, with such approval of such Bankruptcy Court being in lieu of initial approval by shareholders of the Company.

18

## **Exhibit G**

**MiningCo Management Agreement**

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## Ionic Digital Inc.

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) Ionic Digital Inc., a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "**MiningCo Implementation Motion**," and together with the Plan, the "**MiningCo Plan**");

**WHEREAS**, on December 17, 2023, the Manager and Celsius Mining LLC entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**") on November 9, 2023, and its Order granting the MiningCo Implementation Motion on December 27, 2023;

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the MiningCo Plan went effective pursuant to its terms and the terms of the Confirmation Order and the order granting the MiningCo Implementation Order;

**WHEREAS**, on the Effective Date, the MiningCo Assets (as defined in the Mining Plan), including the Mining (as defined in the MiningCo Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the MiningCo Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Appointment. The Company hereby engages the Manager on a non-exclusive basis, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement; provided, however, that if the Company elects to have any Person other than the Company provide any portion of the Services or work on the Projects (an "**Outside Service Provider**"), the Company and its Affiliates shall have no liability for such services delivered or work performed by such Person and shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the action or inaction of an Outside Service Provider. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of

this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof. Notwithstanding the foregoing, the Initial Term shall be automatically extended by the Term Extension in the event that the Company EH/s is equal to or greater than 23 EH/s (the "**EH/s Target**") at any point on or prior to the third anniversary of this Agreement (taking into account any period that the Term was tolled pursuant to Section 2(b)(iii)(H) and Section 2(d)(v)(D)) (such third anniversary or deemed third anniversary of the Agreement, the "**EH/s Target Deadline**") and, for the avoidance doubt, the Company may not provide a Non-Renewal Notice if such EH/s Target has been achieved at any point on or prior to the EH/s Target Deadline. For purposes of this Agreement, "**Company EH/s**" means, for a given time, the number of exahash per second (EH/s) of Bitcoin mining capacity calculated as the sum of the name plate hashrate of Company owned Bitcoin mining rigs installed and operating at facilities owned and operated by the Company at such time. Exhibit E shows the method of calculation used in calculating the EH/s Target.

(b)     Termination. This Agreement may be terminated only as follows:

(i)     By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)     By the Manager:

(A)     in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); or

(B)     in the event that Matt Prusak ("**Prusak**") is terminated without cause by the Company from his role as interim Chief Executive Officer of the Company during the six month period following the execution of this Agreement ("**Interim CEO Period**"); or

(iii)     By the Company, during the Initial Term or the Term Extension:

(A)     in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)     in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)     if Asher Genoot ("**Genoot**") (1) ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or (2) is indicted of any act

3

which is a felony involving financial crimes or theft of corporate property; *provided* that if such cessation of employment or indictment takes place on or after the first anniversary of the date of this Agreement, the Company shall only have the right to terminate this Agreement if, within six months following such cessation of employment or indictment, the Manager has not terminated Genoot's employment (to the extent applicable) and appointed a Qualified Replacement. "**Qualified Replacement**" means an individual, or individuals, who, in aggregate if applicable, have comparative and demonstrated experience in bitcoin mining operations and the ability to provide services substantially similar in the aggregate to the Services;

(D)    in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

(F)    in the event that the EH/s Target has not been achieved on or prior to the EH/s Target Deadline; <u>provided</u> that the Company may terminate this Agreement pursuant to this Section 2(b)(iii)(F) only after the EH/s Target Deadline; <u>provided</u> <u>further</u> that if the Company terminates this Agreement pursuant to this Section 2(b)(iii)(F), the Company shall be deemed to have elected to enter into a Transition Period of at least six months (commencing no earlier than the EH/s Target Deadline) in accordance with Section 2(d)(ii) hereof;

(G)    in the event of a Change of Control of the Company; or

(H)    in the event that the New Board, acting in its fiduciary capacity, determines by no later than June 1, 2024 (the "**Liquidity Deadline**") that there is not a reasonable likelihood that the Form 10 filing for the registration of securities in the Company will achieve effectiveness.

(iv)    For the purposes of this Agreement, (A) "**Change of Control**" means the Company's consummation of a sale, exchange or other transfer to third party, whether by merger, acquisition or otherwise, whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Company, (ii) of more than 50% of the voting power of the outstanding securities of the Company by a third party or (iii) any reorganization, merger or consolidation in which the Company is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party and (B) "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any

4

transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.

(c)      Termination Event Procedures. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)      The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)      Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)      Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(iv)      Termination pursuant to Section 2(b)(iii)(H) shall be effective 14 calendar days following the Non-Terminating Party's receipt of the applicable Termination Notice; provided that during such 14 days, Manager shall perform Transition Services (as defined below) to the Company; provided, however that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services.

(d)      Effect of Termination.

(i)      Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms. For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)      Upon the termination of this Agreement pursuant to Sections 2(b)(iii)(A) – (G) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the

5

"**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a).

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), Section 2(b)(iii)(G) or Section 2(b)(iii)(H) or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement;

(B)    any Unvested Shares (as defined in the Restricted Stock Purchase Agreement) and/or any Unvested Warrants (as defined in the Warrant Agreements) (such agreements together, the "**Equity Agreements**" and such securities, together, the "**Unvested Securities**"), shall be, immediately and without any action on the part of the Company, New Board, the Manager or any other person, cancelled for no consideration in accordance with the terms of the respective Equity Agreements and the Manager shall cease to have any rights with respect thereto; and

(C)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a prorated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), or Section 2(b)(iii)(G), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable) (the "**Termination Payment Amount**"), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; provided that if this Agreement is terminated pursuant to Section 2(b)(iii)(G), at the election of the Company or any third party acquiror

6

of the Company involved in such Change of Control, the Termination Payment Amount shall be converted to equity in the Company at a price per share equal to, (x) the market trading price per share if such shares are traded on a publicly recognized securities exchange at the time of such Change of Control, or (y) the price per share of the Company in such Change of Control transaction, if such shares are not traded on a publicly recognized securities exchange at the time of such Change of Control; and

(B)    all Unvested Securities which would have vested after the date of termination had the Services been performed for the remainder of the then-current Initial Term or Term Extension (as applicable) shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest, in accordance with the terms of the respective Equity Agreement; provided, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements).

(v)    If this Agreement is terminated pursuant to Section 2(b)(iii)(H), then:

(A)    the Manager shall continue to perform (in whole or part) the Services, and shall continue to be compensated, in accordance with the terms of this Agreement through the effective date of termination; provided, however, that except as expressly provided for in such agreement, the Manager shall not be obligated to incur any out of pocket costs in connection with the performance of such Services;

(B)    the Company will pay to the Manager, as liquidated damages, an amount equal to 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for a further twelve months past the effective date of such termination in one lump-sum, due upon the effective date of such termination (the "**Form 10 LDs**"); and

(C)    all Unvested Securities which would have vested in accordance with the terms of the respective Equity Agreement in the twelve month period after the effective date of such termination had the Services been performed during such period shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest; provided, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements); provided, however, that

(D)    in the event that the Company files a Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the

Liquidity Deadline, the Company shall, at its election (i) enter into a reinstatement of this Agreement with Manager for the remainder of the Initial Term existing on the effective date of the Agreement's termination, on the same terms and conditions as this Agreement, except as may be required to document the reinstatement and modifications to the Term and the EH/s Target Deadline, or (ii) promptly pay to the Manager an amount equal to the Termination Payment Amount *minus* any Form 10 LDs already actually paid to the Manager, plus all consideration that would have been owed to the Manager under Section 5 had the Agreement remained in effect through the Initial Term (less the consideration paid to the Manager under Section 2(d)(v)(C)). In no event shall the foregoing amount be a negative amount.

(vi)     Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager (x) receives all amounts payable pursuant to Sections 2(d)(i) – (v) and (y) all of the Unvested Securities are vested pursuant to Section 2(d)(iv)(B) or Section 2(d)(v)(B) (as applicable), such payment and receipt of Unvested Securities shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(vi) shall not result in any double payment by the Company for the same underlying obligation.

(vii)     The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.     Services.

(a)     Services. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on Exhibit A hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on Exhibit B hereto (collectively, the "**Projects**").

4.     Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company.

(a)     The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on Exhibit B hereto.

8

(b)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with Exhibit A for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(c)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(d)    Executive Management Team. Subject to the written approval of the New Board and the terms of the applicable employment agreements to be entered into between the Company and the applicable individuals, (1) Prusak will serve as the interim Chief Executive Officer of the Company for no less than the Interim CEO Period; provided that (A) Company shall have the right to terminate Prusak "for cause" during such Interim Period, (B) Company shall promptly disclose to Prusak any retention of a search firm or similar advisor to seek his potential replacement during such Interim CEO Period, and (C) upon the expiration of such Interim CEO Period, the Company shall have the right to terminate Prusak in its sole discretion; and (2) Joel Block will serve as the initial Chief Financial Officer of the Company; provided that, any action taken by the New Board with respect to Joel Block's employment agreement shall not create any breach of any obligations by Company towards, or rights with respect to, USBTC hereunder (Prusak and Joel Block, together with their respective successors or replacements, the "**Executive Management Team**"). Subject to the foregoing and Section 2(b)(ii)(B), each member of the Executive Management Team shall serve at the pleasure of the New Board.

(e)    Obligations of the Manager. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

9

(v)    Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)    Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(e)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)    (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

In the event that there has not been Substantial Completion (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services (as defined in the Cedarvale Agreement) in accordance with Section 3 and Section 4 of the Cedarvale Agreement which shall apply to this Agreement *mutatis mutandis*

(f)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)    Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)    Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)    At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(f)(iii) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget. In the event that the Manager's performance of a Service or completion of a Project requires funds in excess of those approved in the most recent Budget, the Manager shall not be responsible or liable for any failures or delays in the performance of such Service or completion of such Project, solely to the extent that such failures or delays are caused by such funding shortfall.

5.    Compensation for Services and Expense Reimbursement.

(a)    Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $20,376,200, which shall be paid in quarterly installments each in an amount equal to $5,094,050 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided, however, that, (i) any Project Based Mining Management Fee Adjustment caused primarily by the action or inaction of an Outside Service Provider shall not result in such Project Based Mining Management Fee Adjustment being deducted from the Base Mining Management Fee (ii) during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment

Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor Index) ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)    <u>Equity Compensation for Services</u>. As additional consideration for providing the Services to the Company, the Company shall, simultaneously with the execution hereof (the "**Equity Fee**"):

(i)    execute and deliver to the Manager that certain Restricted Stock Purchase Agreement between the Company and the Manager, dated as of the date hereof (the "**Restricted Stock Purchase Agreement**") which shall include the issuance of certain Incentive Units (as defined therein) to Manager;

(ii)    execute and deliver to the Manager those certain Warrant Agreements between the Company and the Manager, dated as of the date hereof (the "**Warrant Agreement**"); and

(iii)    execute and deliver to Manager that certain Contribution Agreement between the Company and the Manager, dated as of the date hereof (the "**Contribution Agreement**").

The Manager shall, simultaneously with the execution hereof, (x) execute and deliver to the Company each of the Restricted Stock Purchase Agreement, the Warrant Agreement and the Contribution Agreement, and (y) pay to Company in immediately available funds all amounts due under the Contribution Agreement for the Acquired Shares (as such term is defined therein). Notwithstanding anything to the contrary herein, the Company's obligations under this Agreement are conditional, and shall only become effective, upon the Closing (as such term is defined in the Contribution Agreement).

(c)    <u>Interest on Unpaid Amounts</u>. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u>, <u>however</u>, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)    <u>Review and Objections</u>.

(i)    During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, <u>provided</u>, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to Kroll, or if Kroll is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)    <u>Expenses</u>.

(i)    The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on <u>Exhibit A</u>, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through

Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)    The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.

(iii)    The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments

not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving

practices (<u>provided</u> any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    <u>Intellectual Property</u>.

(a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicensable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).

(c)    Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

(d)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

(e)    "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall

16

provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.      Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of $10,000,000 in the aggregate (the "**Liability Cap**"), unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, knowing violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"), subject to the last sentence of this Section 8. Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business. In addition, the Liability Cap shall not apply to: (1) with respect to the Company's liability, (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) with respect to the Manager's liability, (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.      Indemnification.

(a)      Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or knowing violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be

binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the Lancium Agreement.

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, knowing violation of law or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except to the extent such alleged infringement, misappropriation, or other violation arises out of the performance of the Services pursuant to the Company's instructions regarding the performance of such Services, where the infringement, misappropriation, or other violation could not have been avoided while following the Company's instructions. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in

18

connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than twelve months ("**Unrestricted Employees**"); provided further that at the Company's request, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the six month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

11.    Force Majeure.

(a)    Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (in each case of the foregoing, to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period (the "**Force Majeure Period**"), if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced by, at the Company's election, up to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is 200 megawatts; provided, however, that in the event the Company elects to use any Outside Service Provider to manage the Company's mining assets, as a result of which the average aggregate nameplate capacity (in megawatts) of Miners under Use for the 90-day period immediately prior to any Excluded Event (the "**Revised Capacity**") is below 200 megawatts, then after the Force Majeure Period, if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below the Revised

Capacity, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is the Revised Capacity (the "**Fee Reduction**"). In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized. In the event that there is a reduction in the Mining Management Fee payable to the Manager under this Section 11(b) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such reduction occurs, at the Company's election, the Company may offset the amount of such Mining Management Fee reduction against the next payment due to Manager under this Agreement or require the Manager to pay to the Company by wire transfer of immediately available cash the amount of such Mining Management Fee reduction. In the event that a Fee Reduction results in the Mining Management Fee on an annualized basis dropping below the Minimum Fee, then the Manager may elect not to perform the Services or complete or deliver the Projects under this Agreement, and if the Manager so elects the Company shall not be obligated to pay the Mining Management Fee, until such time that the Mining Management Fee on an annualized basis is at least equal to the Minimum Fee. "**Miners under Use**" shall refer to the miners and/or other computing power used to secure and validate digital asset networks managed by Manager or leased to (or otherwise made available to) the Manager from a third party, in each case of such miners or computing power, that are used in providing the Services. "**Minimum Fee**" shall mean an amount equal to $5,376,200.

(c)    During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally

recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

| | |
|---|---|
| If to the Company: | 2332 Galiano Street, 2nd Floor<br>Coral Gables, Florida  33134<br>Email: joel@ionicdigital.com<br>Attention: Joel Block, CFO |
| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Email: echange@cgsh.com<br>Attention: Elizabeth A. Chang |
| If to USBTC: | 1101 Brickell Ave., N-1500<br>Miami, Florida 33131<br>Email: legalteam@hut8.io and asher@usbitcoin.com<br>Attention: Asher Genoot |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.   Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.   Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.   Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.   Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.   Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.   No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expense</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

Ionic Digital Inc.

By_____
Name:
Title:


U.S. Data Management Group, LLC

By_____
Name:
Title:

*DRAFT*

## Exhibit A

**Services**

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 1. | Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| 2. | Use and integration of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee |
| 3. | Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| 4. | Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| 5. | Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| 6. | Customer contract management will be performed by the Manager through its hosting team except for customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Fixed fee |
| 7. | Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |
| 8. | Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial | Fixed fee |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). | |
| 9. | Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| 10. | Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. | Fixed fee |
| 11. | Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| 12. | Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| 13. | Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. | Fixed fee |
| 14. | The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| 15. | Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company and development of upgrades, updates, modifications, enhancements or improvements to such software. For example, custom user interfaces or features requested by the Company, or any other dedicated services or resources that are needed solely for the Company's operations, other than use and integration of the Manager's proprietary miner management software and report generation software referred to in #2 above. | Pass-Through Expenses |

26

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 16. | Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| 17. | Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| 18. | Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |
| 19. | Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| 20. | Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| 21. | Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| 22. | Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| 23. | Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |

65111313 v38

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 24. | Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| 25. | Insurance related expenses. | Pass-Through Expenses |
| 26. | Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| 27. | Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| 28. | Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| 29. | Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| 30. | Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| 31. | Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |
| 32. | Any additional staff hired by the Manager with the Company's prior written approval for the purposes of the Manager providing the Company with customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Pass-Through Expenses |

65111313 v38

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 33. | Effort or resources requested by the Company in order to maintain GAAP-compliant books and records for each Bitcoin mining facility that are dedicated resources to operate software or processes that are different to what the Manager would otherwise provide for itself or its other customers. | Pass-Through Expenses |
| 34. | Specialized training of staff beyond what training otherwise conducted by the Manager in its own business or that would otherwise be required to run site operations. | Pass-Through Expenses |
| 35. | Discretionary advisory or implementation projects that are beyond the scope of base management services. For example, the base management services shall include monthly/quarterly reporting and reviews on items such as financial and operational performance, market outlook, competitive landscape, etc., whereas staff that the Company requests be seconded to the Company shall constitute a pass-through expense. | Pass-Through Expenses |

65111313 v38

## Exhibit B

### Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this <u>Exhibit B</u>, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this <u>Exhibit B</u>, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; <u>provided</u>, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

2. To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

3. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

4. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

5. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

6. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

7. The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in the accompanying letter agreement.

8.    The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in the accompanying letter agreement.

9.    The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; <u>provided</u>, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

## Exhibit C

### Insurance Requirements

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.

   Employer's Liability with limits no less than:

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

     ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

     iii) $1,000,000 Bodily Injury by Disease (Each Employee)

  d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

  e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## <u>Exhibit D</u>

### Prohibited Change of Control Parties

Any party listed below, including any Affiliate of such party, or any of their respective successors by way of reorganization, merger, acquisition or otherwise.

1. Core Scientific
2. Mawson Infrastructure Group
3. Riot Platforms
4. Marathon Digital Holdings
5. Iris Energy
6. Cleanspark
7. Galaxy Digital
8. TeraWulf
9. Argo Blockchain
10. Greenidge Generation
11. Stronghold
12. HIVE Blockchain
13. Bit Digital
14. Frontier
15. Bitdeer
16. Global[X]Digital
17. EZ Blockchain

## Exhibit E

### Calculation of EH/s Target

| Site | Site MW | Exahash |
|---|---|---|
| Garden | 12 | 0.35 |
| Rebel | 25 | 0.76 |
| Stiles | 20 | 0.65 |
| East Stiles | 30 | 1.01 |
| **Total** | 87 | 2.77 |

## Exhibit G-1

**(Redline) MiningCo Management Agreement**

*PRIVILEGED AND CONFIDENTIAL*
**W&C Draft: December 13, 2023**

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [~~MiningCo,~~Ionic Digital **Inc.**~~]~~

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [~~MiningCo,~~Ionic Digital **Inc.**~~]~~, a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "**MiningCo Implementation Motion**," and together with the Plan, the "**MiningCo Plan**");

**WHEREAS**, on [~~●~~]December 17, 2023, the Manager and [Celsius Mining LLC~~]~~ entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**") on [●]November 9, 2023, and its Order granting the MiningCo Implementation Motion on [●]December 27, 2023;

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the MiningCo Plan went effective pursuant to its terms and the terms of the Confirmation Order and the order granting the MiningCo Implementation Order;

**WHEREAS**, on the Effective Date, the [MiningCo Assets] (as defined in the Mining Plan), including the Mining (as defined in the MiningCo Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the MiningCo Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Appointment. The Company hereby engages the Manager on a non-exclusive basis, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement; provided, however, that if the Company elects to have any Person other than the Company provide any portion of the Services or work on the Projects (an "**Outside Service Provider**"), the Company and its Affiliates shall have no liability for such services delivered or work performed by such Person and shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the action or inaction of an Outside Service Provider. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2

2.      Term and Termination.

(a)      Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof. Notwithstanding the foregoing, the Initial Term shall be automatically extended by the Term Extension in the event that the Company EH/s is equal to or greater than [23][1] EH/s (the "**EH/s Target**") at any point on or prior to the third anniversary of this Agreement (taking into account any period that the Term was tolled pursuant to Section 2(b)(iii)(H) and Section 2(d)(v)(D)) (such third anniversary or deemed third anniversary of the Agreement, the "**EH/s Target Deadline**") and, for the avoidance doubt, the Company may not provide a Non-Renewal Notice if such EH/s Target has been achieved at any point on or prior to the EH/s Target Deadline. For purposes of this Agreement, "**Company EH/s**" means, for a given time, the number of exahash per second (EH/s) of Bitcoin mining capacity calculated as the sum of the name plate hashrate of Company owned Bitcoin mining rigs installed and operating at facilities owned and operated by the Company at such time. Exhibit E shows the method of calculation used in calculating the EH/s Target.[2]

(b)      Termination. This Agreement may be terminated only as follows:

(i)      By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)      By the Manager:

(A)      (ii)  By the Manager in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); or

(B)      in the event that Matt Prusak ("**Prusak**") is terminated without cause by the Company from his role as interim Chief Executive Officer of the

---

[1]  **Note to Draft**: EH/s number which would be equal to a 20 EH/s increase over existing rate.

[2]  **Note to Draft**: Four rows—Site—Garden, Rebel, Styles, East Styles, second column, Exahash, MW, Total

AMERICAS 124751481
65200189 v1

Company during the six month period following the execution of this Agreement ("**Interim CEO Period**"); or

(iii)    By the Company, during the Initial Term or the Term Extension:

(A)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)    in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)    if Asher Genoot ("**Genoot**") (1) ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or (2) is indicted of any act which is a felony involving financial crimes or theft of corporate property; *provided* that if such cessation of employment or indictment takes place on or after the first anniversary of the date of this Agreement, the Company shall only have the right to terminate this Agreement if, within six months following such cessation of employment or indictment, the Manager has not terminated Genoot's employment (to the extent applicable) and appointed a Qualified Replacement. "**Qualified Replacement**" means an individual, or individuals, who, in aggregate if applicable, have comparative and demonstrated experience in bitcoin mining operations and the ability to provide services substantially similar in the aggregate to the Services;

(D)    [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;]³

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

(F)    in the event that the EH/s Target has not been achieved on or prior to the EH/s Target Deadline; provided that the Company may terminate this Agreement pursuant to this Section 2(b)(iii)(F) only after the EH/s Target Deadline; provided further that if the Company terminates this Agreement pursuant to this Section 2(b)(iii)(F), the Company shall be deemed to have

---

³ **Note to Draft: Reserved.**

4

AMERICAS 124751481
65200189 v1

elected to enter into a Transition Period of at least six months (commencing no earlier than the EH/s Target Deadline) in accordance with Section 2(d)(ii) hereof;

(G)    in the event of a Change of Control of the Company; or

(H)    in the event that the New Board, acting in its fiduciary capacity, determines by no later than ~~May~~June 1, 2024 (the "**Liquidity Deadline**") that there is not a reasonable likelihood that the Form 10 filing for the registration of securities in the Company will achieve effectiveness.

(iv)    [For the purposes of this Agreement, (A) "**Change of Control**" means the Company's consummation of a sale, exchange or other transfer to third party, whether by merger, acquisition or otherwise, whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Company, (ii) of more than 50% of the voting power of the outstanding securities of the Company by a third party or (iii) any reorganization, merger or consolidation in which the Company is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party and (B) "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.]⁴

(c)    <u>Termination Event Procedures</u>. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the

---

⁴ ~~**Note to Draft: Reserved.**~~

AMERICAS 124751481
65200189 v1

Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(iv)    Termination pursuant to Section 2(b)(iii)(H) shall be effective 14 calendar days following the Non-Terminating Party's receipt of the applicable Termination Notice; provided that during such 14 days, Manager shall perform Transition Services (as defined below) to the Company; provided, however that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services.

(d)    Effect of Termination.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms.[5] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Sections 2(b)(iii)(A) – (G) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a).

---

[5] Note to Draft: Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

AMERICAS 124751481
65200189 v1

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), Section 2(b)(iii)(G) or Section 2(b)(iii)(H) or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement;

(B)    any Unvested Shares (as defined in the Restricted Stock Purchase Agreement) and/or any Unvested Warrants (as defined in the Warrant Agreements) (such agreements together, the "**Equity Agreements**" and such securities, together, the "**Unvested Securities**"), shall be, immediately and without any action on the part of the Company, New Board, the Manager or any other person, cancelled for no consideration in accordance with the terms of the respective Equity Agreements and the Manager shall cease to have any rights with respect thereto; and

(C)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a prorated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), or Section 2(b)(iii)(G), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable) (the "**Termination Payment Amount**"), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; underlined provided that if this Agreement is terminated pursuant to Section 2(b)(iii)(G), at the election of the Company or any third party acquiror of the Company involved in such Change of Control, the Termination Payment Amount shall be converted to equity in the Company at a price per share equal to, (x) the market trading price per share if such shares are traded on a publicly recognized securities exchange at the time of such Change of Control, or (y) the price per share of the Company in such Change of Control transaction, if such shares are not traded on a publicly recognized securities exchange at the time of such Change of Control; and

(B)    all Unvested Securities which would have vested after the date of termination had the Services been performed for the remainder of the then-current Initial Term or Term Extension (as applicable) shall immediately

7

AMERICAS 124751481
65200189 v1

and without any action on the part of the Company, New Board, the Manager or any other person, vest, in accordance with the terms of the respective Equity Agreement; <u>provided</u>, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements).

(v)        If this Agreement is terminated pursuant to Section 2(b)(iii)(H), then:

(A)    the Manager shall continue to perform (in whole or part) the Services, and shall continue to be compensated, in accordance with the terms of this Agreement through the effective date of termination; <u>provided</u>, <u>however</u>, that except as expressly provided for in such agreement, the Manager shall not be obligated to incur any out of pocket costs in connection with the performance of such Services;

(B)    the Company will pay to the Manager, as liquidated damages, an amount equal to 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for a further twelve months past the effective date of such termination in one lump-sum, due upon the effective date of such termination (the "**Form 10 LDs**"); and

(C)    all Unvested Securities which would have vested in accordance with the terms of the respective Equity Agreement in the twelve month period after the effective date of such termination had the Services been performed during such period shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest; <u>provided</u>, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements); <u>provided</u>, <u>however</u>, that

(D)    in the event that the Company files a Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the Liquidity Deadline, the Company shall, at its election (i) enter into a reinstatement of this Agreement with Manager for the remainder of the Initial Term existing on the effective date of the Agreement's termination, on the same terms and conditions as this Agreement, except as may be required to document the reinstatement and modifications to the Term and the EH/s Target Deadline, or (ii) promptly pay to the Manager an amount equal to the Termination Payment Amount *minus* any Form 10 LDs already actually paid to the Manager, plus all

8

AMERICAS 124751481

65200189 v1

consideration that would have been owed to the Manager under Section 5 had the Agreement remained in effect through the Initial Term (less the consideration paid to the Manager under Section 2(d)(v)(C)). In no event shall the foregoing amount be a negative amount.]

(vi)    Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager (x) receives all amounts payable pursuant to Sections 2(d)(i) – (v) and (y) all of the Unvested Securities are vested pursuant to Section 2(d)(iv)(B) or Section 2(d)(v)(B) (as applicable), such payment and receipt of Unvested Securities shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(vi) shall not result in any double payment by the Company for the same underlying obligation.

(vii)   The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.    <u>Services</u>.

(a)    <u>Services</u>. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on <u>Exhibit A</u> hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on <u>Exhibit B</u> hereto (collectively, the "**Projects**").

4.    <u>Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company</u>.

(a)    The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on <u>Exhibit B</u> hereto.

(b)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with <u>Exhibit A</u> for such month. The Manager shall also provide the Company with a quarterly report no later

9

than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(c)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(d)    Executive Management Team. Subject to the written approval of the New Board and the terms of the applicable employment agreements to be entered into between the Company and the applicable individuals, (1) ~~Matt~~ Prusak (**"Prusak"**) will serve as the interim Chief Executive Officer of the Company for no less than ~~six months following the execution of this Agreement~~the Interim CEO Period; provided that (A) Company shall have the right to terminate Prusak "for cause" during such ~~six month~~Interim ~~p~~Period, (B) Company shall promptly disclose to Prusak any retention of a search firm or similar advisor to seek his potential replacement during such ~~six month~~Interim CEO ~~p~~Period, and (C) upon the expiration of such ~~six month~~Interim CEO ~~p~~Period, the Company shall have the right to terminate Prusak in its sole discretion; and (2) Joel Block will serve as the initial Chief Financial Officer of the Company; provided that, any action taken by the New Board with respect to Joel Block's employment agreement shall not create any breach of any obligations by Company towards, or rights with respect to, USBTC hereunder (Prusak and Joel Block, together with their respective successors or replacements, the "**Executive Management Team**"). Subject to the foregoing and Section 2(b)(ii)(B), ~~E~~each member of the Executive Management Team shall serve at the pleasure of the New Board.

(e)    Obligations of the Manager. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

10

(v)     Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)    Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)   Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)  Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(e)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other party harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

In the event that there has not been Substantial Completion (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the

AMERICAS 124751481
65200189 v1

Services (as defined in the Cedarvale Agreement) in accordance with Section 3 and Section 4 of the Cedarvale Agreement which shall apply to this Agreement *mutatis mutandis*

(f)     Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)     Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)     Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)     At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(f)(iii) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget. In the event that the Manager's performance of a Service or completion of a Project requires funds in excess of those approved in the most recent Budget, the Manager shall not be responsible or liable for any failures or delays in the performance of such Service or completion of such Project, solely to the extent that such failures or delays are caused by such funding shortfall.

5.     Compensation for Services and Expense Reimbursement.

(a)     Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $20,376,200, which shall be paid in quarterly installments each in an amount equal to $5,094,050 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided,

AMERICAS 124751481
65200189 v1

however, that, (i) any Project Based Mining Management Fee Adjustment caused primarily by the action or inaction of an Outside Service Provider shall not result in such Project Based Mining Management Fee Adjustment being deducted from the Base Mining Management Fee (ii) during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its                    successor                    Index)                    ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)    Equity Compensation for Services. As additional consideration for providing the Services to the Company, the Company shall, simultaneously with the execution hereof (the "**Equity Fee**"):

(i)    execute and deliver to the Manager that certain Restricted Stock Purchase Agreement between the Company and the Manager, dated as of the date hereof (the "**Restricted Stock Purchase Agreement**") which shall include the issuance of certain Incentive Units (as defined therein) to Manager;

(ii)    execute and deliver to the Manager those certain Warrant Agreements between the Company and the Manager, dated as of the date hereof (the "**Warrant Agreement**"); and

(iii)    execute and deliver to Manager that certain Contribution Agreement between the Company and the Manager, dated as of the date hereof (the "**Contribution Agreement**").

The Manager shall, simultaneously with the execution hereof, (x) execute and deliver to the Company each of the Restricted Stock Purchase Agreement, the Warrant Agreement and the Contribution Agreement, and (y) pay to Company in immediately available funds all amounts due under the Contribution Agreement for the Acquired Shares (as such term is defined therein). Notwithstanding anything to the contrary herein, the Company's obligations under this Agreement are conditional, and shall only become effective, upon the Closing (as such term is defined in the Contribution Agreement).

AMERICAS 124751481
65200189.v1

(c)    <u>Interest on Unpaid Amounts</u>. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u>, <u>however</u>, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)    <u>Review and Objections</u>.

(i)    During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, <u>provided</u>, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[6] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by

---

[6] **BR NTD**: To confirm Kroll not currently utilized by any party.

14

independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)    Expenses.

(i)    The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)    The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.

(iii)    The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar

15

quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.     <u>Confidentiality</u>.

(a)     During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or

16

AMERICAS 124751481
65200189 v1

quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Intellectual Property.

(a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicensable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any

17

AMERICAS 124751481
65200189 v1

of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)      All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).

(c)      Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

(d)      The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

(e)      "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.      Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of [$10,000,000 in the aggregate][7] (the "**Liability Cap**"), unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, knowing violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"), subject to the last sentence of this Section 8. Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or

---

[7] ~~**Note to Draft**: Reserved.~~

AMERICAS 124751481
65200189 v1

consequential damages, including, without limitation, loss of profits or lost business. In addition, the Liability Cap shall not apply to: (1) with respect to the Company's liability, (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) with respect to the Manager's liability, (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    Indemnification.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or knowing violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, knowing violation of law or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except to the extent such alleged infringement, misappropriation, or other violation arises out of the performance of the Services pursuant to the Company's instructions regarding the performance of such Services, where the infringement, misappropriation, or other violation could not have been avoided while following the Company's instructions.  The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the

19

extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

    (c) <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

    10. <u>Non-Solicitation</u>. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); <u>provided</u>, that, from and after the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than twelve months ("**Unrestricted Employees**"); <u>provided</u> <u>further</u> that at the Company's request, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the six month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

AMERICAS 124751481
65200189 v1

11.   <u>Force Majeure</u>.

(a)   Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (in each case of the foregoing, to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

(b)   Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period (the "**Force Majeure Period**"), if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced by, at the Company's election, up to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is 200 megawatts; provided, however, that in the event the Company elects to use any Outside Service Provider to manage the Company's mining assets, as a result of which the average aggregate nameplate capacity (in megawatts) of Miners under Use for the 90-day period immediately prior to any Excluded Event (the "**Revised Capacity**") is below 200 megawatts, then after the Force Majeure Period, if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below the Revised Capacity, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is the Revised Capacity (the "**Fee Reduction**"). In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized. In the event that there is a reduction in the Mining Management Fee payable to the Manager under this <u>Section 11(b)</u> with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such reduction occurs, at the Company's election, the Company may offset the amount

AMERICAS 124751481
65200189 v1

of such Mining Management Fee reduction against the next payment due to Manager under this Agreement or require the Manager to pay to the Company by wire transfer of immediately available cash the amount of such Mining Management Fee reduction. In the event that a Fee Reduction results in the Mining Management Fee on an annualized basis dropping below the Minimum Fee, then the Manager may elect not to perform the Services or complete or deliver the Projects under this Agreement, and if the Manager so elects the Company shall not be obligated to pay the Mining Management Fee, until such time that the Mining Management Fee on an annualized basis is at least equal to the Minimum Fee. "**Miners under Use**" shall refer to the miners and/or other computing power used to secure and validate digital asset networks managed by Manager or leased to (or otherwise made available to) the Manager from a third party, in each case of such miners or computing power, that are used in providing the Services. "**Minimum Fee**" shall mean an amount equal to $5,376,200.

(c)       During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.      <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.      <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.      <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

If to the Company:              [COMPANY ADDRESS]
                                Email: [EMAIL ADDRESS]
                                Attention: [TITLE OF OFFICER TO RECEIVE
                                NOTICES]

                                2332 Galiano Street, 2nd Floor

22

AMERICAS 124751481

65200189 v1

Coral Gables, Florida  33134
Email: joel@ionicdigital.com
Attention: Joel Block, CFO

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
[COMPANY LAW FIRM]New York, NY 10006
Email: [EMAIL ADDRESS]echange@cgsh.com
Attention: [ATTORNEY NAME]

Elizabeth A. Chang

If to the ManagerUSBTC:

[MANAGER ADDRESS]
Email: [EMAIL ADDRESS]
Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]

1101 Brickell Ave., N-1500
Miami, Florida 33131
Email: legalteam@hut8.io and asher@usbitcoin.com
Attention: Asher Genoot

with a copy to:

Brown Rudnick LLP
7 Times Square.
New York, NY 10036
Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

15.   <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.   <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.   <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended

23

AMERICAS 124751481
65200189 v1

to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.   Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.   Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.   Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.   Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.   Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A

24

signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expense</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

AMERICAS 124751481
65200189 v1

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]Ionic Digital Inc.

By_____
Name:
Title:

U.S. Data Management Group, LLC

By_____
Name:
Title:

SIGNATURE PAGE
MANAGEMENT AGREEMENT

65200189 v1

*DRAFT*

## Exhibit A

**Services**

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 1. | Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| 2. | Use and integration of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee |
| 3. | Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| 4. | Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| 5. | Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| 6. | Customer contract management will be performed by the Manager through its hosting team except for customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Fixed fee |
| 7. | Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 8. | Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). | Fixed fee |
| 9. | Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| 10. | Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. | Fixed fee |
| 11. | Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| 12. | Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| 13. | Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. | Fixed fee |
| 14. | The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| 15. | Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company and development of upgrades, updates, modifications, enhancements or improvements to such software. For example, custom user interfaces or features requested by the Company, or any other dedicated services or resources that are needed solely for the Company's operations, other than use and integration of the | Pass-Through Expenses |

AMERICAS 124751481
65111313 v2438
65200189 v1

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | Manager's proprietary miner management software and report generation software referred to in #2 above. | |
| 16. | Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| 17. | Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| 18. | Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |
| 19. | Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| 20. | Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| 21. | Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| 22. | Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use | Pass-Through Expenses |

AMERICAS 124751481

65111313 v2438

65200189 v1

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | reasonable efforts to support litigation or collections agency. | |
| 23. | Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |
| 24. | Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| 25. | Insurance related expenses. | Pass-Through Expenses |
| 26. | Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| 27. | Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| 28. | Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| 29. | Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| 30. | Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| 31. | Any costs related to working with third party energy companies or dedicated asset | Pass-Through Expenses |

AMERICAS 124751481
65111313 v2438
65200189 v1

| No. | Description of Service / Activity | Fee Structure |
|-----|----------------------------------|---------------|
|     | management personnel. |  |
| 32. | Any additional staff hired by the Manager with the Company's prior written approval for the purposes of the Manager providing the Company with customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Pass-Through Expenses |
| 33. | Effort or resources requested by the Company in order to maintain GAAP-compliant books and records for each Bitcoin mining facility that are dedicated resources to operate software or processes that are different to what the Manager would otherwise provide for itself or its other customers. | Pass-Through Expenses |
| 34. | Specialized training of staff beyond what training otherwise conducted by the Manager in its own business or that would otherwise be required to run site operations. | Pass-Through Expenses |
| 35. | Discretionary advisory or implementation projects that are beyond the scope of base management services. For example, the base management services shall include monthly/quarterly reporting and reviews on items such as financial and operational performance, market outlook, competitive landscape, etc., whereas staff that the Company requests be seconded to the Company shall constitute a pass-through expense. | Pass-Through Expenses |

AMERICAS 124751481

65111313 v2438

65200189 v1

**Exhibit B**

**Projects**

The Manager and the Company acknowledge that the covenants and targets/milestones in this
Exhibit B, and the transactions contemplated thereby, may be documented in one or more
agreements by and among the Manager, the Company, and/or their Affiliates, and any third
parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent
that the provisions of a Definitive Agreement directly conflict with those contained in this
Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or
waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement;
provided, that any silence on an obligation or condition in such Definitive Agreement shall not
be construed as an intention to waive such obligation or condition.

1. The Manager shall use its commercially reasonable efforts to contribute to the Company
   the leasehold and development rights to a 240 MW behind-the-meter site on economic
   terms no worse than those available to the Manager identified to the Debtors and the
   Committee during the bid process, subject to KYC, approval, and commercial
   discussions with the independent power producer jointly developing such site. To the
   extent that the Manager is unable to contribute such 240 MW site, it shall use
   commercially reasonable efforts to contribute a site (or sites) of substantially similar
   economics.[8]

2. To the extent that the Debtors or the Company, as applicable, elect not to purchase the
   Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility
   for a 5-year term at substantially similar terms to the machines hosted at the Beowulf
   facility.

3. The Manager will offer up to 50 MW of immediately available containers and
   transformers currently owned by the Manager, and other supplies to the Debtors or the
   Company, as applicable, at the lower of its cost to obtain such items or market prices.

4. In the event that the Company elects to build the Barber Lake facility, and in an effort to
   save lead times in connection therewith, the Manager will offer the Company a
   three-month option to purchase the substation materials that the Manager currently has on
   its balance sheet for cost.

5. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable,
   for a 5-year term, or a period to be negotiated between the Manager, the Manager's
   partner, the Debtors and the Committee.

---

[8] **W&C Note to Draft**: USBTC to provide update on this site.

6.  The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

7.  The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

8.  The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

9.  The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*: <br><br> The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000 <br><br> Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*: <br><br> The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 | Costs in excess of the cap <br><br> Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

AMERICAS 124751481
65111313 v24

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| MW Facility (for a total of 400 MW). These capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**[Exhibit C][9]**

**Insurance Requirements**

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i) $1,000,000 Bodily Injury by Accident (Each Accident)

   ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

[9] **W&C Note to Draft:** Subject to further review against insurance package proposal being prepared by Fahrenheit.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)   $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

AMERICAS 124751481
65111313 v24

**Exhibit D**

**Prohibited Change of Control Parties**

Any party listed below, including any Affiliate of such party, or any of their respective successors by way of reorganization, merger, acquisition or otherwise.

1.  Core Scientific
2.  Mawson Infrastructure Group
3.  Riot Platforms
4.  Marathon Digital Holdings

5. Bitfarms

5.  ~~6.~~ Iris Energy
6.  ~~7.~~ Cleanspark
7.  ~~8.~~ Galaxy Digital
8.  ~~9.~~ TeraWulf
9.  ~~10.~~ Argo Blockchain
10. ~~11.~~ Greenidge Generation

12. Cipher Mining

11. ~~13.~~ Stronghold
12. ~~14.~~ HIVE Blockchain
13. ~~15.~~ Bit Digital
14. ~~16.~~ Frontier
15. ~~17.~~ Bitdeer
16. Global[X]Digital
17. EZ Blockchain

**Exhibit E**

**Calculation of EH/s Target**

| **Site** | **Site MW** | **Exahash** | ~~**Total**~~ |
|----------|-------------|-------------|-------|
| **Garden** | **12** | **0.35** | |
| **Rebel** | **25** | **0.76** | |
| **Styiles** | **20** | **0.65** | |
| **East Styiles** | **30** | **1.01** | |
| **Total** | **87** | **2.77** | |

AMERICAS 124751481
65111313 v24

**<u>Exhibit H</u>**

**Identities of MiningCo Board Members**

## **New Board Directors**

Pursuant to the Plan, the initial Board of Directors of MiningCo (the "**New Board**") will be composed of eight members: (i) two of whom were selected by the Mining Manager; (ii) four of whom were selected by the Committee, in its sole discretion; and (iii) two of whom were selected by the Committee and consented to by the Mining Manager.

The Committee previously determined that its six-candidate slate should be composed of four independent directors and two prepetition creditors of the Debtors. To facilitate the Committee's final selection, the Committee's legal and financial advisors assembled resumes, collected board questionnaires, conducted interviews with prospective board members along with the Committee members, and hired an independent investigator to conduct comprehensive background checks on candidates who all agreed to the investigations.

Upon extensively deliberating and diligently reviewing the qualifications, experience and independence of each of the candidates, the Committee voted to select Elizabeth A. LaPuma, Max Holmes, Emmanuel Aidoo, and Frederick Arnold as the independent directors to the New Board. The Committee members who sought appointment to the New Board were not eligible for the independent director seats. The other prepetition creditors were considered for those seats. At the direction of the Committee's legal advisors, the Committee members seeking appointment to the New Board recused themselves from the deliberations regarding the remaining New Board seats. After lengthy discussions with the Committee's legal and financial advisors, the remaining members of the Committee who did not seek appointment to the New Board voted to select Scott Duffy and Thomas DiFiore as the prepetition creditors to the New Board. Detailed profiles of the New Board directors are included on the following page.

The Committee also determined to appoint three prepetition creditors selected by the Earn Ad Hoc Group as observers to the board. Those individuals are Brett Perry, Joe Lehrfeld, and Simon Dixon. Their biographies are included following the New Board directors.

### New Board Directors



**ASHER GENOOT**

Asher Genoot is a proven entrepreneur with experience building and operating companies across the United States and China.

Asher currently serves as the President of US Bitcoin Corp (USBTC), which builds and operates data centers for bitcoin production. Since co-founding USBTC in December 2020, he has scaled the venture-backed company into one of the largest bitcoin mining organizations in the world, with funding from the likes of Peter Thiel (Thiel Capital), Eric Schmidt (Steele Perlot), Naval Ravikant (AngelList), and Justin Mateen (Tinder). Asher most recently led USBTC's takeover, and turnaround of approximately 580 MW of distressed mining assets in the Chapter 11 bankruptcy proceeding of Compute North. USBTC today manages more than 730 MW of capacity across data centers in Texas, Nebraska, and New York. Earlier this year, the company announced a merger of equals with Canadian miner Hut 8 (NASDAQ: HUT).

Prior to US Bitcoin Corp, Asher founded Curio Education, a Shanghai-based edtech startup that scaled to more than 130 employees. He is the Co-founder and Managing Partner of Flagship Endeavors, a venture incubator focused on consumer products.

Asher holds a Bachelor of Science in Business Administration from the University of Southern California, where he graduated summa cum laude at 19 years old. He is a member of YPO (Young Presidents Organization) and the Forbes 30 Under 30 Class of 2023.



**ELIZABETH A. LAPUMA**

Elizabeth A. LaPuma brings over two decades of financial advisory and board expertise across diverse industries. With a strong background in originating and structuring complex financial transactions, she is a trusted advisor to numerous business leaders.

Ms. LaPuma currently chairs the Audit Committee and is on the Compensation and Governance Committees at WeWork. Additionally, Ms. LaPuma is a board member for other businesses within the fintech, artificial intelligence, healthcare, consumer, and real estate sectors.

Prior to these roles, Ms. LaPuma was a Managing Director and Head of Balance Sheet Advisory at UBS. Prior to UBS, she was a Managing Director and head of Asset Management Services at Alvarez & Marsal, advising governments and financial institutions on diverse assets. Ms. LaPuma's earlier career includes roles at BlackRock, Lazard Frères & Co. LLC, Credit Suisse and Perella Weinberg Partners L.P.

Ms. LaPuma received her Master of Business Administration in Finance as a Palmer Scholar, Bachelor of Science in Finance and Bachelor of Arts in International Relations (Magna Cum Laude) from the Wharton School and The School of Arts and Sciences at the University of Pennsylvania.



### EMMANUEL AIDOO

Emmanuel Aidoo is a recognized leader in digital assets advisory, private capital, and restructuring banking. With a strong track record in navigating complex financial landscapes, he specializes in digital assets, blockchain technology, and innovative investment solutions. At Perella Weinberg Partners, Emmanuel leads the digital assets advisory division, driving growth and positioning the firm as a market leader in blockchain and cryptocurrencies. Previously at Credit Suisse AG for over two decades, he played key roles, including Head of Digital Assets Markets, where he advanced the firm's blockchain strategy. Emmanuel's achievements include pioneering proof-of-concepts, strategic investments in blockchain projects, and thought leadership in the global blockchain community. Aidoo has been recognized by Forbes on their Blockchain 50 list (2020), Business Insider's list of Top 10 Transforming Finance (2019) and American Banker (2018). He has served as a member of the World Economic Forum (WEF) Digital Asset Steering Committee and as the Chair of SIFMA's Blockchain Roundtable.

Emmanuel studied Computer Science at Brunel University in Uxbridge, England.



### FREDERICK ARNOLD

Frederick Arnold a seasoned professional having served in numerous operating and board positions typically in highly complex situations.  He has a long track record creating value through operational improvement, and also has deep experience in board governance, strategic transactions and global capital markets. His current board positions include Lehman Brothers Holdings Inc. (current chairman, post-emergence), where he was appointed to the board by major creditors to help oversee this vast and intricate global bankruptcy estate; Navient Corporation (NASDAQ: NAVI), where he was brought onto the board as a new, independent voice for value creation when activist investor Canyon Partners was threatening a proxy battle; and Metropolitan Gaming Holdco Ltd. where he was appointed by Silver Point Capital to chair and help grow the former EMEA casino businesses of Caesars Entertainment.

Previous Board Positions include Corporate Capital Trust (NYSE: CCT) where he served as Chairman of the Board and played a pivotal role in the growth and eventual merger of this NYSE-listed BDC; Valaris PLC (NYSE: VAL), a large offshore drilling company;  The We Company (WeWork), where he served on a special committee tasked with addressing a critical governance challenge after the departure of the charismatic founder and CEO; CIFC Corp (NASDAQ), which managed billions of dollars of CLO's; and Syncora Holdings (SYCRF), where he

3

led a period of strategic change and significant value creation after active hedge funds suggested he join the board.

Fred has a strong track record leading finance functions in private equity-owned global companies. He excels in improving processes, reducing costs, generating cash, and increasing enterprise value. In addition, he has two decades of investment banking experience at firms including Lehman Brothers and Smith Barney, where he provided strategic financial advice to major corporations and growth companies, specializing in acquisitions, divestitures, and global capital markets transactions.

Fred holds a J.D. from Yale Law School, an MA in Jurisprudence from Oxford University, and a BA in Economics, summa cum laude, from Amherst College.

### MAX HOLMES



Max Holmes is a seasoned professional with decades of experience spanning multiple sectors of the finance industry. Since 2015, he has been the Chief Investment Officer of Haven Asset Management LLC, an SEC registered investment advisor in Greenwich CT. In addition, since 2015 he has been a Senior Advisor to American Industrial Partners (AIP), a private equity firm in New York with AUM of over $10 billion focused on industrial companies.

Previously, from 2017 to 2022, Max was the Chair and CEO of Haven Holdings Inc., an insurance holding company with operations in Wisconsin and Puerto Rico. Before that, from 2005 to 2016, he was the Founder and Chief Investment Officer of Plainfield Asset Management LLC, a distressed, event and special situations asset manager in Greenwich CT with AUM of over $5 billion (including hedge funds and a Business Development Company), which invested in over 400 businesses across a wide variety of industries and capital structures.

Max's career also includes serving as a Managing Director at D.E. Shaw & Co., where he led its Distressed Securities Group. He also worked previously at RBC Capital Markets, Gleacher NatWest, Salomon Brothers, and Drexel Burnham Lambert in Beverly Hills CA.

Since 1993, Max has been an Adjunct Professor of Finance at the Stern Graduate School of Business at New York University, where he teaches "Bankruptcy and Reorganization."

Max received a J.D. from Columbia Law School, an M.B.A. from Columbia Business School, and an A.B. from Harvard College. Max is a member of the bar in New York and Texas and has held numerous licenses from a variety of regulatory bodies.

### SCOTT DUFFY



4

Scott Duffy is the CEO of ICB Solutions, Inc. where he has grown assets from under $2,500 to over $60 million since 2011. With a keen interest in cryptocurrency, Scott has mined Bitcoin, participated in Ethereum's growth, and developed a successful e-commerce partnership grossing over $250,000 annually. He has contributed to organizations like the Association of Governmental Accountants, American Society of Military Comptrollers, Ohio State Bar Association, and Nationwide Mutual Insurance Company.

Scott currently co-chairs the Official Committee of Unsecured Creditors at Celsius Network, contributing to negotiations, mining strategy, and fostering cooperation among stakeholders. He was previously an accountant at Defense Finance and Accounting Service (DFAS) in Columbus, where he managed complex operations, including ERP system deployments and financial system integration.

Scott holds a Bachelor of Science in Finance and Business Administration from Ohio Dominican University.



**THOMAS DIFIORE**

Thomas DiFiore has been the Dealer Principal at Fullerton Auto Group since 2015. As an early Bitcoin adopter, he started a mining company that successfully solo mined over 200 blocks. For more than 8 years, he has been a member of the Advisory Council for the Somerset Patriots, the Yankees AA affiliate team. Additionally, Thomas leads a business consulting firm focused on operational and management strategies and serves as the President of a reinsurance business, managing both claims and investment decisions for the asset pool.

Tom attended Gettysburg College where he was a member of the football program.



**JORDAN LEVY**

Jordan Levy currently serves as a Managing Partner at SBNYvc (formerly SoftBank Capital NY) and Seed Capital Partners, an early-stage Venture Capital Fund he co-founded in late 1999. SBNY is a venture capital fund specializing in mobile, social media, eCommerce, and digital media investments in early-stage technology companies. In addition, he serves as a Co-Managing Partner of Z80 Labs, an Accelerator Fund created in 2013 in Buffalo NY to help kick-start the start-up ecosystem. Prior to co-founding Seed Capital Partners, he was co-founder of Upgrade Corporation of America and was President, co-CEO and co-Chair of its predecessor companies SOFTBANK Services Group and ClientLogic (now SITEL Worldwide). Jordan currently serves on the Board of Directors of several technology companies including Rebelmouse, Strategic Financial Solutions and Take2. Until recently he served on the Boards of ACV Auctions, US Bitcoin (acquired by HUT8 HUT:NASDAQ), Synacor, Buzzfeed, WorkMarket (acquired by ADP), Fieldens acquired by WeWork), Ziplist (acquired by Advance Newhouse, OMGPOP (acquired by Zynga) KickApps (acquired by KIT Digital), XO Soft

(acquired by CA), Hyperpublic (acquired by Groupon), Huffington Post (acquired by AOL) and VirginMega (acquired by Nike).  He also serves on the board of Mount Sinai Medical Center Foundation Executive Committee.  He also serves as Chair Emeritus and as a board member of 43North, the single largest business plan competition ever held in the US with $5MM in prizes awarded annually, which he founded as part of the Buffalo Billion Initiative in 2014.  He also serves on the board of the 43N Foundation Inc.

## Observers to the Board



### BRETT PERRY

With a wealth of entrepreneurial experience spanning over three decades, Brett Perry has an impressive track record of identifying and transforming innovative concepts into thriving business ventures.

Armed with a degree in earth science/geology, Brett embarked on his entrepreneurial journey by establishing an environmental consulting and engineering company specializing in investigating and remediating environmentally contaminated sites. Notably, Exxon Corporation exclusively relied on his company's expertise for the removal of leaking underground storage tanks and the subsequent cleanup, leading to regulatory closure of their retail gas stations in the southwestern United States.

Recognizing early in his career the demand for specialized title industry services specifically tailored to environmental due diligence, Brett has forged over time a broad network of abstractors capable of delivering customized title searches nationwide. His firm also boasts extensive knowledge of renewable energy locations, conducting environmental encumbrance searches for numerous solar and wind farms throughout the United States, including at sites associated with Celsius' mining operations. Brett's company has earned a well-deserved reputation as a leader in providing real estate records and environmental data, including housing the largest archive of orthoimagery in the United States. Brett's company recently expanded its horizons into film studio productions and integration of AI for valuable data extraction. Brett's career reflects his status as a visionary, forward-thinker with a remarkable ability to discern and exploit untapped business opportunities.

Brett was one of the Top 50 Creditors in the Celsius bankruptcy cases. He helped found the Ad Hoc Earn Group and played a pivotal role as a member of its Steering Committee.



### JOE LEHRFELD

Joe Lehrfeld is the Founder of JSL Ventures Inc. With over 25 years of experience as an executive, entrepreneur, and investor, Joe is known for his strategic insight and commitment to driving consistent growth. His expertise spans across diverse sectors including technology, real estate, and healthcare.

With a Bachelors in Psychology (graduating Summa Cum Laude), completion of all coursework for NYS Nursing Home Administration Certification, and a Masters in Social Work with a concentration in Business/Organizational development, Joe brings a unique blend of empathy, analytical skills and business acumen to his ventures. His wealth of experience, strategic mindset, data-driven

and elegant operational systems approach have set the standard for excellence in his endeavors.

Joe's career is characterized by a remarkable track record of success. As the President and majority shareholder of a New York-based medical transportation company, Joe increased annual sales and elevated profit margins consistently over an 18-year period. During that time, he sponsored and structured seven additional healthcare-related acquisitions, startups, and mergers. He also sat on the New York State Regional Emergency Medical Services Council and several industry associations.

Throughout his entrepreneurial journey, Joe has continuously studied emerging technologies, and founded and invested in dozens of startups as well as Bitcoin (2015) and Ethereum (2016), showcasing a deep curiosity and understanding of transformative trends. Joe was a significant Celsius creditor and served as a member of the Steering Committee of the Ad Hoc Earn Group in the Celsius bankruptcy cases.

**SIMON DIXON**



Simon Dixon mastered in Economics, is an ex-investment banker, stockbroker and trader, who left the corporate world in 2006 to go on to become a public speaker on banking and monetary reform.

In 2011, Simon published his second book: 'Bank To The Future - Protect Your Future Before Governments Go Bust'. It was the first published book in the world to include Bitcoin written shortly after Bitcoin launched. Simon presented the company he co-founded and is the CEO of Bnk To The Future at the first Bitcoin conference in Europe in 2011 when Bitcoin was $3. Bnk To The Future is one of the longest standing companies in Bitcoin and one of the world's first regulated crypto securities business. Bnk To The Future pooled together investors that later invested in the shares of Bitcoin companies like Kraken, Coinbase, Blockchain.com, Bitstamp, Circle, Robinhood and over 100 others.

Simon is the Inventor of the first bitcoin bond which launched in 2014 in Iceland. The former UK Prime Minister, Boris Johnson, sought advice from Simon on the country's bitcoin strategy. Isle of Man, the first country in the world to support Bitcoin, also sought advice from Simon on building 'crypto valley'. In 2022, Simon was invited to El Salvador to meet with President Bukele and government officials to discuss the country's Bitcoin sovereign debt strategy. El Salvador is the first country in history to make Bitcoin legal tender.

Simon is regularly quoted & appearing in much of the major press & media including BBC, FT, CNBC, Reuters, Bloomberg, Wall Street Journal to mention a few.

## Exhibit I

**Schedule of Excluded Parties**

## Schedule of Excluded Parties

Pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**"), in addition to any other Excluded Parties specifically enumerated in the Plan, the following parties and each of their Affiliates and Related Parties are Excluded Parties as such term is defined therein.[1]

The Excluded Parties shall not receive the protections of the Plan's release, injunction, or exculpation provisions.  **For the avoidance of doubt, no Excluded Party shall constitute a Released Party or Exculpated Party in any capacity and all claims against the Excluded Parties that are held by the Debtors or Holders of Claims and Interests are expressly preserved.**

**This Schedule of Excluded Parties may be amended, modified, or supplemented by the Debtors and the Committee at any time prior to the date the Confirmation Order is entered by the Court**.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 1. | Adam Carver |
| 2. | Akshay Nayak |
| 3. | Alameda Research Ltd. |
| 4. | Alchemy Capital Partners LP |
| 5. | Alexander Christy |
| 6. | Alexander Mashinsky |
| 7. | Aliza Landes |
| 8. | AM Ventures Holding, Inc. |
| 9. | Amber Technologies Limited |
| 10. | Amir Ayalon |
| 11. | Amtrust Underwriters, Inc. on behalf of Associated Industries Insurance Company, Inc. |
| 12. | Anderson Tax |
| 13. | ANV Insurance |
| 14. | Aslihan Denizkurdu |
| 15. | Atlantic Insurance |
| 16. | Ayalon Insurance |
| 17. | BadgerDAO |
| 18. | Bancor |
| 19. | Battlestar Capital, LLC |
| 20. | B-Brick, Inc. |
| 21. | Benjamin Armstrong |
| 22. | Beowulf Energy LLC |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 23. | Berkley Insurance Company |
| 24. | Beyond Associates LLC |
| 25. | BitBoy Crypto |
| 26. | Bits of Sunshine LLC |
| 27. | BJ Investment Holdings, LLC |
| 28. | Blockchain Access UK Ltd. |
| 29. | Bradley Condit |
| 30. | Chainanlysis Inc. |
| 31. | Circle Internet Financial, LLC |
| 32. | Circle UK Trading Company Limited |
| 33. | Cloudflare, Inc. |
| 34. | Coin Bureau |
| 35. | Core Scientific Inc. |
| 36. | Cosmos Infrastructure LLC |
| 37. | Crum and Forster Specialty Insurance Company |
| 38. | Crypto Lark |
| 39. | CryptoWendyO |
| 40. | Darren Yarwood |
| 41. | DeFiRate |
| 42. | Deloitte & Touche LLP |
| 43. | Deloitte Tax LLP |
| 44. | Dennis Reichelt |
| 45. | Ditto PR |
| 46. | Do Kwon, a/k/a Kwon Do-hyung |
| 47. | Eddie Moon |
| 48. | Endurance American Insurance Company |
| 49. | European Media Finance LTD |
| 50. | Equities First Holdings, LLC |
| 51. | EZ Blockchain Services, LLC |
| 52. | Fabric Ventures Group Sarl |
| 53. | Falvey Insurance Group |
| 54. | Fireblocks Inc. |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 55. | Four Thirteen LLC |
| 56. | Frank Van Etten |
| 57. | FTX Trading Ltd. |
| 58. | Grant Thornton LLP |
| 59. | Guy Turner |
| 60. | Haines Watts London LLP |
| 61. | Hanoch "Nuke" Goldstein |
| 62. | Harumi Urata-Thompson |
| 63. | HDR Global Trading Limited (t/a BitMEX) |
| 64. | High Throughput Productions, LLC |
| 65. | Hudson Insurance Group |
| 66. | Indian Harbor Insurance Company |
| 67. | Into the Block Corp. |
| 68. | Invest Answers |
| 69. | Iterative OTC, LLC |
| 70. | James Mullarney |
| 71. | Jason Perman |
| 72. | Jason Stone |
| 73. | Jeremie Beaudry |
| 74. | Johannes Treutler |
| 75. | Julie La Point |
| 76. | Jump Trading, LLC |
| 77. | Kairon Labs BV |
| 78. | KeyFi, Inc. |
| 79. | Koala1 LLC |
| 80. | Koala 2 LLC |
| 81. | Koala 3, LLC |
| 82. | Kost Forer Gabbay & Kasierer |
| 83. | KPMG Somekh Chaikin |
| 84. | Kristine Meehan Mashinsky (née Kristine M. Meehan) |
| 85. | Lark Davis |
| 86. | Liquidity Technologies Ltd. (t/a CoinFLEX) |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 87. | Lloyds of London Republic Vanguard Insurance Company |
| 88. | Luna Squares LLC |
| 89. | Mambu Tech B.V. |
| 90. | Markel Insurance |
| 91. | Mark Lamb |
| 92. | Mawson Infrastructure Group Inc. |
| 93. | Mazars LLP |
| 94. | MF Partners, Ltd. |
| 95. | Michael Alfred |
| 96. | Migdal Insurance Company |
| 97. | MVP Workshop d.o.o. Beograd-Zemun and its shareholders |
| 98. | Nektar ACS Corp. |
| 99. | Nyman Lipson Paul, LLP |
| 100. | Patrick Martin |
| 101. | Peter Graham |
| 102. | Prime Trust LLC |
| 103. | Profluent Trading UK Ltd. |
| 104. | QBE Insurance Company |
| 105. | Quoine Pte. Ltd. (d/b/a Liquid Exchange) |
| 106. | Realm Insurance Company |
| 107. | Reliz Limited |
| 108. | Rhodium Enterprises, Inc. |
| 109. | Rod Bolger |
| 110. | Rodney Sunada-Wong |
| 111. | Ron Sabo |
| 112. | Roni Cohen-Pavon |
| 113. | Sabre56 Corp. |
| 114. | Shawn Hopkinson |
| 115. | Shlomi Daniel Leon |
| 116. | StakeHound SA |
| 117. | Starstone Insurance |
| 118. | Subranmaniam Vijay Konduru |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 119. | Terraform Labs Pte. Ltd. |
| 120. | Tether International Ltd. |
| 121. | Tether Limited |
| 122. | The Wolf of Bitcoin |
| 123. | Three Arrows Capital Ltd. |
| 124. | Timothy Shedd |
| 125. | Tom McCarthy |
| 126. | Tushar Nadkarni |
| 127. | United States Fire Insurance Company |
| 128. | USAStrong.io |
| 129. | Voyager Digital Holdings, Inc. |
| 130. | Walter Johnson |
| 131. | Wintermute Trading Ltd. |
| 132. | XL Specialty Insurance Company |
| 133. | Yarden Noy |
| 134. | Yaron Shalem |
| 135. | Zachary Wildes |
| 136. | Zen Blockchain Foundation (d/b/a Horizen) |
| 137. | Zurich Insurance Group |
| 138. | All auditors of the Debtors |
| 139. | All promoters, marketers, and advertisers of the Debtors, including account holders and other parties who had agreements with Celsius concerning payments for referrals or who publicly disseminated referral codes through social media platforms or similar channels. |
| 140. | All Entities identified on the Schedule of Retained Causes of Action or associated with the claims and causes of action preserved on the Schedule of Retained Causes of Action. |
| 141. | Unless otherwise released pursuant to the Plan, all Entities currently party to adversary proceedings in the Debtors' Chapter 11 Cases. |
| 142. | All mediate and intermediate transferees of such Excluded Parties. |
| 143. | All parties with outstanding prepetition litigation against any of the Debtors and/or any party subject to any actual or potential counterclaim by the Debtors. |
| 144. | All Professionals of the Debtors not expressly released under the Plan, including all law firms retained by the Debtors prior to the Petition Date other than (1) Kirkland & Ellis LLP, (2) Akin Gump Strauss Hauer & Feld LLP, (3) White & Case LLP, (4) A.M. Saccullo Legal LLC; and (5) any law firm list on the Debtors' *Statement of Amounts Paid by the Debtors to Ordinary Course Professionals* in these Chapter 11 Cases as of August 13, 2022 [Docket Nos. 1455; 1954; 2557; 3120]. For the avoidance of doubt any such law |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| | firms are not "current attorneys" of the Debtors and are not Released Parties under the Plan. |
| 145. | Any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party, *provided* that all individuals who are employed by the Debtors on the date the Disclosure Statement Order is entered and that are not specifically identified as an Excluded Party on this Schedule of Excluded Parties (as such schedule may be amended prior to the date the Confirmation Order is entered) shall be Released and Exculpated except to the extent such employee is later arrested, indicted, or found liable by a court of competent jurisdiction of bad acts and omissions in connection with his or her role with the Debtors, in which case any release provided in the Plan shall be null and void and all statutes of limitation shall be tolled during such time; *provided*, *further* that any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party who subsequently enters into an agreement that includes a provision that they shall be identified as a Released Party shall be a Released Party. |
| 146. | Any Released Party that is later arrested, indicted, or found liable by a court of competent jurisdiction for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time. |
| 147. | Account Holder Avoidance Actions against Released Parties shall not be released unless released pursuant to the Account Holder Avoidance Action Settlement. |
| 148. | All Avoidance Actions against Entities that are not Account Holders. |
| 149. | All Affiliates and Related Parties of Excluded Parties |

**<u>Exhibit I-1</u>**

**(Redline) Schedule of Excluded Parties**

**Schedule of Excluded Parties**

Pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. ~~3222~~3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**"), in addition to any other Excluded Parties specifically enumerated in the Plan, the following parties and each of their Affiliates and Related Parties are Excluded Parties as such term is defined therein.[1]

The Excluded Parties shall not receive the protections of the Plan's release, injunction, or exculpation provisions. **For the avoidance of doubt, no Excluded Party shall constitute a Released Party or Exculpated Party in any capacity and all claims against the Excluded Parties that are held by the Debtors or Holders of Claims and Interests are expressly preserved**.

**This Schedule of Excluded Parties may be amended, modified, or supplemented by the Debtors and the Committee at any time prior to the date the Confirmation Order is entered by the Court**.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 1. | Adam Carver |
| 2. | Akshay Nayak |
| 3. | Alameda Research Ltd. |
| 4. | Alchemy Capital Partners LP |
| 5. | Alexander Christy |
| 6. | Alexander Mashinsky |
| 7. | Aliza Landes |
| 8. | AM Ventures Holding, Inc. |
| 9. | Amber Technologies Limited |
| 10. | Amir Ayalon |
| 11. | Amtrust Underwriters, Inc. on behalf of Associated Industries Insurance Company, Inc. |
| 12. | Anderson Tax |
| 13. | ANV Insurance |
| 14. | Aslihan Denizkurdu |
| 15. | Atlantic Insurance |
| 16. | Ayalon Insurance |
| 17. | BadgerDAO |
| 18. | Bancor |
| 19. | Battlestar Capital, LLC |
| 20. | B-Brick, Inc. |
| 21. | Benjamin Armstrong |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

| | **SCHEDULE OF EXCLUDED PARTIES** |
|---|---|
| 22. | Beowulf Energy LLC |
| 23. | Berkley Insurance Company |
| 24. | Beyond Associates LLC |
| 25. | BitBoy Crypto |
| 26. | Bits of Sunshine LLC |
| 27. | BJ Investment Holdings, LLC |
| 28. | Blockchain Access UK Ltd. |
| 29. | Bradley Condit |
| 30. | Chainanlysis Inc. |
| 31. | Circle Internet Financial, LLC |
| 32. | Circle UK Trading Company Limited |
| 33. | Cloudflare, Inc. |
| 34. | Coin Bureau |
| 35. | Core Scientific Inc. |
| 36. | Cosmos Infrastructure LLC |
| 37. | Crum and Forster Specialty Insurance Company |
| 38. | Crypto Lark |
| 39. | CryptoWendyO |
| 40. | Darren Yarwood |
| 41. | DeFiRate |
| 42. | Deloitte & Touche LLP |
| 43. | Deloitte Tax LLP |
| 44. | Dennis Reichelt |
| 45. | Ditto PR |
| 46. | Do Kwon, a/k/a Kwon Do-hyung |
| 47. ~~6.~~ | Eddie Moon |
| 48. ~~7.~~ | Endurance American Insurance Company |
| 49. ~~8.~~ | European Media Finance LTD |
| 50. ~~9.~~ | Equities First Holdings, LLC |
| 51. | EZ Blockchain Services, LLC |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 0. | |
| 52. 1. | Fabric Ventures Group Sarl |
| 53. 2. | Falvey Insurance Group |
| 54. 3. | Fireblocks Inc. |
| 55. 4. | Four Thirteen LLC |
| 56. 5. | Frank Van Etten |
| 57. 6. | FTX Trading Ltd. |
| 58. 7. | Grant Thornton LLP |
| 59. 8. | Guy Turner |
| 60. 9. | Haines Watts London LLP |
| 61. 0. | Hanoch "Nuke" Goldstein |
| 62. 1. | Harumi Urata-Thompson |
| 63. 2. | HDR Global Trading Limited (t/a BitMEX) |
| 64. 3. | High Throughput Productions, LLC |
| 65. 4. | Hudson Insurance Group |
| 66. 5. | Indian Harbor Insurance Company |
| 67. 6. | Into the Block Corp. |
| 68. 7. | Invest Answers |
| 69. 8. | Iterative OTC, LLC |
| 70. 9. | James Mullarney |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 71. ~~0.~~ | Jason Perman |
| 72. ~~1.~~ | Jason Stone |
| 73. ~~2.~~ | Jeremie Beaudry |
| 74. ~~3.~~ | Johannes Treutler |
| 75. ~~4.~~ | Julie La Point |
| 76. | Jump Trading, LLC |
| 77. | Kairon Labs BV |
| 78. ~~5.~~ | KeyFi, Inc. |
| 79. ~~6.~~ | Koala1 LLC |
| 80. ~~7.~~ | Koala 2 LLC |
| 81. ~~8.~~ | Koala 3, LLC |
| 82. ~~9.~~ | Kost Forer Gabbay & Kasierer |
| 83. ~~0.~~ | KPMG Somekh Chaikin |
| 84. ~~1.~~ | Kristine Meehan Mashinsky (née Kristine M. Meehan) |
| 85. ~~2.~~ | Lark Davis |
| 86. ~~3.~~ | Liquidity Technologies Ltd. (t/a CoinFLEX) |
| 87. ~~4.~~ | Lloyds of London Republic Vanguard Insurance Company |
| 88. ~~5.~~ | Luna Squares LLC |
| 89. ~~6.~~ | Mambu Tech B.V. |
| 90. ~~7.~~ | Markel Insurance |
| 91. | Mark Lamb |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 92. ~~8.~~ | Mawson Infrastructure Group Inc. |
| 93. ~~9.~~ | Mazars LLP |
| 94. ~~0.~~ | MF Partners, Ltd. |
| 95. ~~1.~~ | Michael Alfred |
| 96. ~~2.~~ | Migdal Insurance Company |
| 97. ~~3.~~ | MVP Workshop d.o.o. Beograd-Zemun and its shareholders |
| 98. ~~4.~~ | Nektar ACS Corp. |
| 99. ~~5.~~ | Nyman Lipson Paul, LLP |
| 100. ~~6.~~ | Patrick Martin |
| 101. ~~7.~~ | Peter Graham |
| 102. ~~8.~~ | Prime Trust LLC |
| 103. ~~9.~~ | Profluent Trading UK Ltd. |
| 104. ~~00.~~ | QBE Insurance Company |
| 105. | Quoine Pte. Ltd. (d/b/a Liquid Exchange) |
| 106. ~~01.~~ | Realm Insurance Company |
| 107. ~~02.~~ | Reliz Limited |
| 108. ~~03.~~ | Rhodium Enterprises, Inc. |
| 109. ~~04.~~ | Rod Bolger |
| 110. ~~05.~~ | Rodney Sunada-Wong |
| 111. ~~06.~~ | Ron Sabo |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 112. ~~07.~~ | Roni Cohen-Pavon |
| 113. ~~08.~~ | Sabre56 Corp. |
| 114. | Shawn Hopkinson |
| 115. ~~09.~~ | Shlomi Daniel Leon |
| 116. ~~10.~~ | StakeHound SA |
| 117. ~~11.~~ | Starstone Insurance |
| 118. ~~12.~~ | Subranmaniam Vijay Konduru |
| 119. | Terraform Labs Pte. Ltd. |
| 120. ~~13.~~ | Tether International Ltd. |
| 121. ~~14.~~ | Tether Limited |
| 122. ~~15.~~ | The Wolf of Bitcoin |
| 123. ~~16.~~ | Three Arrows Capital Ltd. |
| 124. ~~17.~~ | Timothy Shedd |
| 125. ~~18.~~ | Tom McCarthy |
| 126. ~~19.~~ | Tushar Nadkarni |
| 127. ~~20.~~ | United States Fire Insurance Company |
| 128. ~~21.~~ | USAStrong.io |
| 129. ~~22.~~ | Voyager Digital Holdings, Inc. |
| 130. ~~23.~~ | Walter Johnson |
| 131. ~~24.~~ | Wintermute Trading Ltd. |
| 132. | XL Specialty Insurance Company |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 25. | |
| 133. 26. | Yarden Noy |
| 134. 27. | Yaron Shalem |
| 135. 28. | Zachary Wildes |
| 136. 29. | Zen Blockchain Foundation (d/b/a Horizen) |
| 137. 30. | Zurich Insurance Group |
| 138. 31. | All auditors of the Debtors |
| 139. 32. | All promoters, marketers, and advertisers of the Debtors, including account holders and other parties who had agreements with Celsius concerning payments for referrals or who publicly disseminated referral codes through social media platforms or similar channels. |
| 140. 33. | All Entities identified on the Schedule of Retained Causes of Action or associated with the claims and causes of action preserved on the Schedule of Retained Causes of Action. |
| 141. 34. | Unless otherwise released pursuant to the Plan, all Entities currently party to adversary proceedings in the Debtors' Chapter 11 Cases. |
| 142. 35. | All mediate and intermediate transferees of such Excluded Parties. |
| 143. 36. | All parties with outstanding prepetition litigation against any of the Debtors and/or any party subject to any actual or potential counterclaim by the Debtors. |
| 144. 37. | All Professionals of the Debtors not expressly released under the Plan, including all law firms retained by the Debtors prior to the Petition Date other than (1) Kirkland & Ellis LLP, (2) Akin Gump Strauss Hauer & Feld LLP, (3) White & Case LLP, (4) A.M. Saccullo Legal LLC; and (5) any law firm list on the Debtors' *Statement of Amounts Paid by the Debtors to Ordinary Course Professionals* in these Chapter 11 Cases as of August 13, 2022 [Docket Nos. 1455; 1954; 2557; 3120]. For the avoidance of doubt any such law firms are not "current attorneys" of the Debtors and are not Released Parties under the Plan. |
| 145. 38. | Any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party, *provided* that all individuals who are employed by the Debtors on the date the Disclosure Statement Order is entered and that are not specifically identified as an Excluded Party on this Schedule of Excluded Parties (as such schedule may be amended prior to the date the Confirmation Order is entered) shall be Released and Exculpated except to the extent such employee is later arrested, indicted, or found liable by a court of competent jurisdiction of bad acts and omissions in connection with his or her role with the Debtors, in which case any release provided in the Plan shall be null and void and all statutes of limitation shall be tolled during such time; *provided*, *further* that any current or former director, officer, employee, |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| | independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party who subsequently enters into an agreement that includes a provision that they shall be identified as a Released Party shall be a Released Party. |
| 146. ~~39.~~ | Any Released Party that is later arrested, indicted, or found liable by a court of competent jurisdiction for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time. |
| 147. ~~40.~~ | Account Holder Avoidance Actions against Released Parties shall not be released unless released pursuant to the Account Holder Avoidance Action Settlement. |
| 148. ~~41.~~ | All Avoidance Actions against Entities that are not Account Holders. |
| 149. ~~42.~~ | All Affiliates and Related Parties of Excluded Parties |