Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE DEBTORS' EX PARTE MOTION FOR AN ORDER
UNDER FEDERAL RULES OF BANKRUPTCY PROCEDURE
2004 AND 9016 FOR SUBPOENAS FOR EXAMINATION OF,
AND PRODUCTION OF DOCUMENTS FROM, RELIZ LIMITED,
RELIZ TECHNOLOGY GROUP HOLDINGS, AND NICK HAMMER**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their counsel, hereby submit this motion for the entry of an order pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern Districts of New York, made applicable to this matter by Rule 2004-1 of the Local Bankruptcy Rules for the Southern District of New York; and Federal Rule of Civil Procedure ("Federal Rule") 45, made applicable to this matter by Bankruptcy Rule 9016, authorizing, among other things, subpoenas for the examination of, and the production of documents from, Reliz Limited ("Reliz"), Reliz Technology Group Holdings ("Reliz Technology"), and Nick Hammer ("Hammer"), the CEO of Reliz .  The Debtors respectfully represent as follows:

### Preliminary Statement

1.      After Reliz's loan from Celsius became due more than two-and-a-half years ago, and after binding arbitration awards confirmed Reliz's obligation more than eight months ago, Reliz has failed to satisfy its long-past-due debt, except for a negligible test payment.  Despite Celsius's repeated efforts to persuade Reliz to comply with its obligations without need for judicial involvement, Reliz has stonewalled.

2.      The dispute arises from a Digital Asset Lending Agreement between Celsius and Reliz dated December 3, 2019, (the "Lending Agreement"), the terms of which were incorporated into a Loan Term Sheet dated June 8, 2020, (the "Term Sheet" and together with the Lending Agreement, the "Loan Agreement"), under which Celsius loaned 4,098.36 ETH (the "Borrowed Amount" or the "Loan") to Reliz.

3.      Reliz borrowed those funds to invest in the Grayscale Ethereum Trust (the "Grayscale Trust"). Ex. F, Term Sheet, at 1. According to the Term Sheet, the loan was payable on the earlier of July 8, 2021, or the date on which Reliz sold its Grayscale Trust shares. *Id.*

4.      On February 3, 2021, Reliz sold its shares in the Grayscale Trust, thereby making the Loan immediately due. Reliz, however, has failed to repay the Loan.

5.      At that time, had Reliz repaid the Loan and associated fees, this matter would have been resolved. But Reliz refused to repay the Loan. For more than three months, Celsius sought repayment. When it became clear, however, that Reliz would not comply with its contractual obligations, Celsius initiated binding arbitration in England through a Notice of Arbitration on May 20, 2021, in accordance with the arbitration clause in the Lending Agreement. Ex. G, Lending Agreement, ¶ 21.

6.      The primary dispute in the arbitration was whether Reliz was obligated to repay the Borrowed Amount in ETH—Celsius's position—or with ETH of equivalent value to 1,000,000 USD—Reliz's position. Because the USD price of ETH had increased significantly since the time of the Loan, Reliz would have owed significantly less under the latter interpretation (approximately 635 ETH) than the amount of ETH it borrowed (4,098.36 ETH).

7.      The arbitration process took more than two years, including significant discovery and briefing and culminating in a four-day evidentiary hearing before an arbitrator in January 2023, which featured testimony from three fact witnesses and two expert witnesses. On May 25, 2023, the arbitrator, in a partial award (the "First Partial Award"), ordered Reliz "[t]o deliver to Celsius ETH 4,098.36." Ex. H, First Partial Award, ¶ 189.2.

8.     Reliz has paid only a test payment of 0.2 ETH to Celsius under the First Partial Award, meaning that 4,098.16 ETH of Reliz's obligation under that Award remain due and outstanding to Celsius.

9.     The amounts of Reliz's liability to Celsius for the "Late Fee" and "Borrow Fee" detailed in the Lending Agreement were not resolved by the First Partial Award and were instead reserved for a subsequent award.  On August 3, 2023, the arbitrator, in another partial award (the "Second Partial Award"), ordered Reliz to pay 40.9836 ETH (covering the Borrow Fee) and 4,104,196 USD (covering the Late Fee for the period between February 4, 2021 and July 11, 2023) to Celsius.

10.     In another partial award (the "Third Partial Award," and, together with the First Partial Award and Second Partial Award, the "Partial Awards"), issued on January 8, 2024, the arbitrator ordered Reliz to pay Celsius 942,250.52 GBP (covering the majority of the costs of the arbitration) and 595,650.75 USD (covering the Late Fee for the period between July 12, 2023, and December 19, 2023).  In the Third Partial Award, the arbitrator also ordered Reliz to pay post-award interest award in relation to the costs of 942,250.52 GBP at the rate of 7.25% per annum.

11.     Pursuant to the Partial Awards, Reliz owes Celsius a total of 4,139.1436 ETH (accounting for Reliz's nominal payment of 0.2 ETH), 4,699,846.75 USD, and 942,250.52 GBP. ETH's market value this calendar year has ranged from $2,200 USD to over $2,600 USD—meaning Reliz's financial obligation to Celsius exceeds $16 million USD.

12.     Reliz still has not paid to Celsius the amounts owed, leading to significant questions about whether Reliz has sufficient assets to make good on its debt.  Reliz has repeatedly sought to evade its obligations under the Loan Agreement, including by obfuscating its use of funds obtained

under the Loan, its corporate structure and governance, and its relationships with its affiliates, officers, and directors.

13.     Consequently, the Debtors are forced to bring this motion to compel discovery of crucial information regarding Reliz's assets, its ability to satisfy its debts, the use of any Loan funds, the movement of any funds between Reliz and its corporate affiliates, officers, and directors, and whether Reliz Technology and Hammer caused, enabled, or directed Reliz's past and continuing breaches under the Loan Agreement or its refusal to satisfy its obligations to Celsius under the Partial Awards.

## Relief Requested

14.     Pursuant to Bankruptcy Rule 2004, the Debtors hereby move the Court for entry of an order (i) directing Reliz, Reliz Technology, and Hammer to produce to the Debtors the documents described in **Exhibits A, B, and C** to this motion (the "Requests for Production of Documents") within fourteen days from the date of service or at such other time as counsel may agree and (ii) ordering a corporate deposition of Reliz, as described in **Exhibit D**, within five days after the deadline for the substantial completion of document production, or at such other time as counsel may agree.  Reliz, Reliz Technology, and Hammer are charged with the duty to supplement their answers to the Requests for Production of Documents if they later learn that such answers are in some respect incomplete or incorrect.  The Debtors also respectfully request that the Court enter an order pursuant to Bankruptcy Rule 2004, substantially in the form of the proposed order attached hereto as **Exhibit E**, authorizing the Debtors to serve the Requests for Production of Documents.

**Jurisdiction and Venue**

15.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

17.     The statutory bases for the relief requested herein are Section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., (the "Bankruptcy Code") and Bankruptcy Rules 2004 and 9016.

**Factual Background**

### I.    The Reliz Entities

18.     Reliz is a company incorporated under the laws of the Cayman Islands and has its registered office at 4th floor Century Yard, Cricket Square, Georgetown, Grand Cayman.  Reliz does business as "Blockfills."

19.     Reliz Technology is a Delaware Limited Liability Company with headquarters in Chicago, Illinois.  Reliz Technology is the sole Director of Reliz.  Reliz Technology is believed to be the sole owner of Reliz.

20.     Hammer is the Chief Executive Officer and co-founder of Reliz.  On information and belief, Hammer resides in Illinois.

II.    **Celsius and Reliz Enter into the Lending Agreement and the Term Sheet.**

21.    On December 3, 2019, Celsius and Reliz entered into the Lending Agreement, the terms of which were incorporated into the Loan of ETH that Celsius would make to Reliz.  The Lending Agreement stated: "Any dispute between the parties, unless amicably resolved by the parties, shall be finally settled by arbitration in accordance with the terms set forth hereunder. . . . The arbitrator shall not be bound by any rules of procedure or evidence but shall apply the substantive laws of United Kingdom in determining any matters before him."  Ex. G, Lending Agreement, ¶ 21.1.

22.    On June 8, 2020, Celsius and Reliz entered into the Term Sheet, which finalized the terms of the Loan and specified that Celsius would lend Reliz 4,098.36 ETH and that "[t]he loan will be used exclusively to purchase shares of the Grayscale Ethereum Trust (ETHE)."  Ex. F, Term Sheet, at 1.  At the time of the Loan, the Borrowed Amount was equivalent in value to 1,000,000 USD.  *Id.*  The Loan would become due on the earlier of July 8, 2021, or the date on which Reliz sold its shares in the Grayscale Trust.  *Id.*

23.    The Term Sheet also specified a "Borrow Fee" of 1% and "Collateral Amount" of 250,000 USD.  *Id.* at 1.  The Lending Agreement also set a "Late Fee" consisting of "eighteen percent (18%) (annualized, calculated daily) of the notional amount of the Loan as valued at 12:00 am New York time each Calendar Day, that is incurred by the borrower for each Calendar Day that Loan repayment is overdue . . . ."  Ex. G, Lending Agreement, ¶ 2.

24.    Pursuant to the Lending Agreement and Term Sheet, Celsius loaned Reliz the Borrowed Amount, and Reliz invested the Borrowed Amount in the Grayscale Trust.  Following the Term Sheet, Reliz also deposited the collateral in Celsius's bank account with Signature Bank at 565 Fifth Avenue, New York, NY 10017.

III.    **Reliz Defaults on the Loan Agreement**

25.     Between January 28, 2021, and February 1, 2021, Reliz sold its shares in the Grayscale Trust.  On February 3, 2021, Reliz notified Celsius that it had sold its shares in the Grayscale Trust, and, pursuant to the Lending Agreement, the Loan became due on that date.

26.     Reliz, however, failed to return the Borrowed Amount or pay the Borrow Fee.  As the Loan became past due, Reliz also failed to pay the Late Fee.

IV.    **Celsius Initiates Arbitration and Prevails at Arbitration**

27.     Pursuant to the Lending Agreement, and as a result of Reliz's failure to repay the Borrowed Amount after it sold shares in the Grayscale Trust, Celsius initiated arbitration through a Notice of Arbitration on May 20, 2021.  Ex. I, Notice of Arbitration.  The primary dispute in arbitration was whether Reliz was obligated to repay the Borrowed Amount with the amount borrowed in ETH (4,098.36 ETH) or with ETH of equivalent value to 1,000,000 USD at the time of repayment (approximately 635 ETH).

28.     On July 20, 2021, Celsius and Reliz jointly appointed Richard Salter QC as sole arbitrator.  Ex. J, Terms of Appointment.  In the Terms of Appointment, Celsius and Reliz also clarified an ambiguous reference in the Lending Agreement to the "the substantive laws of United Kingdom," Ex. G, Lending Agreement, ¶ 21.1, by specifying: "All issues arising in the arbitration (including all matters relating to the validity, interpretation, or performance of the Agreement and/or the Term Sheet) shall be determined in accordance with the law of England and Wales ('English law')," Ex. J, Terms of Appointment, ¶ 8.1.

29.     After the parties exchanged discovery and statements of case, the arbitrator held an evidentiary hearing from January 9, 2023, to January 12, 2023.

30.    On May 25, 2023, the arbitrator awarded the First Partial Award, which found that Reliz was obligated to repay Celsius the Borrowed Amount of 4,098.36 ETH.  Ex. H, First Partial Award, ¶ 188.1.  The arbitrator further ordered Reliz "[t]o deliver to Celsius ETH 4,098.36; . . . To pay the outstanding Borrow Fee due under clause 4.1 of the Lending Agreement; . . . To pay the Late Fee due under Clause 4.3 of the Lending Agreement."  *Id.* ¶ 189.2.  The First Partial Award reserved judgment on the amount of the Borrow Fee and the Late Fee that Reliz owed Celsius.  *Id.* ¶ 191.1.

31.    On August 3, 2023, following further evidentiary submissions, the arbitrator issued the Second Partial Award, which resolved that the Borrow Fee was 40.98 ETH, and that the Late Fee for the period of February 4, 2021, through July 11, 2023, was 4,104,196 USD.  Ex. K, Second Partial Award, ¶¶ 71.1.1, 71.2.3.  The arbitrator ordered Reliz "to pay the Borrow Fee of ETH 40.9836 (or its USD or GBP equivalent at the time of payment) to Celsius," and "to pay [the Late Fee of 4,104,196 USD] (or its GBP equivalent at the time of payment) to Celsius."  *Id.* ¶¶ 71.1.2, 71.2.3.  The arbitrator also ordered: "Upon repayment in full of the Borrowed Amount and payment in full of the Borrow Fee, Celsius (if it has not already applied the Collateral in one of the ways in paragraph 71.3.1.1 above) must return the Collateral to Reliz in the manner specified in Clause 5.7 of the Lending Agreement."  *Id.* ¶ 71.3.1.2.

32.    On January 8, 2024, the arbitrator issued the Second Partial Award, which resolved the issue of the costs of the Arbitration and an outstanding issue related to the Late Fee.  The arbitrator ordered Reliz "to pay to Celsius . . . [t]he sum of £942,250.52 in respect of the costs of the Arbitration to date," "[s]imple interest on that sum from the date of this Third Partial Award until payment at the rate of 7.25% per annum," and "[t]he further sum of USD 595,650.75 in

respect of the Late Fee accrued for the period from12 [sic] July 2023 until 19 December 2023."
Ex. L, Third Partial Award, ¶¶ 87–87.3.

V.    **Reliz Fails to Satisfy the Partial Awards**

33.    On June 6, 2023, Reliz made a 0.2 ETH test payment to Celsius.  Since then, Reliz
has made no other payments to Celsius since the Partial Awards were issued.

**Requested Examination**

34.    To maximize the value of the estate for all creditors, the Debtors seek to examine
materials related to the Loan Agreement and Reliz's corporate structure and governance.  The
requested examination will permit the Debtors to evaluate whether Reliz has adequate assets to
satisfy the judgment in question (which it has not paid), as well as whether Reliz Technology and
Hammer are liable to Celsius for acts related to the Loan Agreement and Reliz's failure to pay the
amounts owed under the Partial Awards.  Celsius has attempted to obtain information from Reliz
regarding these issues, including by conferring with and requesting information from Reliz's
counsel and requesting to meet with Reliz personnel.  So far, Reliz has only provided unaudited,
high-level financial statements.

35.    The discovery that the Debtors seek is narrowly tailored to the critical information
about the digital assets loaned to Reliz and Reliz's failure to repay them.  The requested
information should be readily available to Reliz, Reliz Technology, and Hammer because the
information relates to the Loan, which is a material investment by Reliz, the basic relationships
between Reliz, Reliz Technology, and Hammer, and Reliz's failure to satisfy the Partial Awards.

36.    To facilitate the necessary discovery, the Debtors respectfully request that the Court
enter the proposed order granting their motion and requiring Reliz, Reliz Technology, and Hammer

to produce documents responsive to the requests, contained in Exhibits A, B, and C, and requiring a corporate deposition of Reliz, contained in Exhibit D.

## Basis for Relief

37.   Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a).  The purposes of Rule 2004 discovery are to assist with "determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); see also *St. Clair v. Cadles of Grassy Meadows II, LLC*, 550 B.R. 655, 659 (E.D.N.Y. 2016) ("The purpose of a Rule 2004 examination is to allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate.") (internal quotations omitted).  Rule 2004 is a key "pre-litigation device" for assessing potential claims in connection with the bankruptcy estate, *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005), and permits the examination without the requirement of an adversary proceeding, *In re Recoton Corp.*, 307 B.R. at 755.

38.   In light of Rule 2004's purpose of facilitating the proper administration of the bankruptcy estate, "the scope of a Rule 2004 examination is very broad," and "a third party who has a relationship with the debtor may be subject to a Rule 2004 examination in order to aid in discovery of assets."  See *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr.S.D.N.Y.1991)).  Reliz so qualifies because Reliz is a party to an agreement with Celsius, and Hammer qualifies because he entered into the agreement on Reliz's behalf as its Chief Executive Officer.  Reliz, Reliz Technology and Hammer qualify because the Debtors may have material claims against each of them that would "affect the administration of the debtor's estate."  *See* Fed. R. Bankr. P. 2004(b).

The Debtors may properly bring this motion because they are parties in interest.  *See In re Washington Mut., Inc.*, 408 B.R. 45, 53 (Bankr. D. Del. 2009) (granting the debtors' Rule 2004 motion).

39.     Bankruptcy Rule 2004 authorizes a broad scope of examination that includes both document production and testimony related to the "property" of a debtor.  Fed. R. Bankr. P. 2004(b)–(c).  The permissible scope of a Rule 2004 examination is "unfettered and broad."  *In re Washington Mut., Inc.*, 408 B.R. at 49 (internal quotations omitted); *see also In re Hughes*, 281 B.R. at 226.  Notably, "[t]he scope of examination permitted pursuant to Rule 2004 is wider than that allowed under the Federal Rules of Civil Procedure."  *St. Clair*, 550 B.R. at 668; *see also In re Corso*, 328 B.R. at 383.

40.     Rule 2004 discovery is warranted when the movant has good cause for a Rule 2004 examination.  *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004).  Good cause exists when "the examination is necessary to establish the claim of the party seeking the examination, or if the denial of such request would cause the examiner undue hardship or injustice."  *Id.* at 268, 270. The court may also "balanc[e] the competing interests of the parties, weighing the relevance of and necessity for the information sought by the examiner against the extent of inconvenience and intrusion to the witness."  *In re Kreiss*, 46 B.R. 164, 165 (Bankr. E.D.N.Y. 1985); *see also In re Pub. Serv. Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr. D.N.H. 1988).

41.     Rule 2004 discovery is appropriate here because the Debtors have good cause for a Rule 2004 examination.  *See In re Metiom, Inc.*, 318 B.R. at 268.  The examination is necessary to enable the Debtors to obtain key documents and information for evaluating whether Reliz has sufficient assets to satisfy the Partial Awards, whether Reliz has transferred assets to its corporate affiliates, officers, and directors to ensure it is judgment proof, whether Reliz Technology and

Hammer are liable to Celsius for acts related to the Loan Agreement and, thus, whether Celsius has claims against Reliz, Reliz Technology, and Hammer.

42.     Only Reliz, Reliz Technology, and Hammer have this key information and documents.  Because the Debtors have no other way to obtain these documents and information, denial of this motion would impose undue hardship on the Debtors and preclude them from assessing whether they have potential claims against Reliz, Reliz Technology, and Hammer, which may materially affect recovery for the secured and unsecured creditors.

43.     The Debtors anticipate that the initial request for production of documents and the corporate deposition set forth in Exhibits A and B hereto will need to be supplemented as the Debtors learn more facts, and therefore request that the Court impose a continuing obligation on Reliz, Reliz Technology, and Hammer to respond to discovery requests and deposition notices made by the Debtors.

## **Reservation of Rights**

44.     Nothing contained in this motion or any actions taken pursuant to any order granting the relief requested by this motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid, and the Debtors expressly reserve their rights to contest

the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

45.      This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Bankruptcy Rule 9013 1(a).

## Notice

46.      The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; (h) Reliz, Reliz Technology, and Hammer; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

47.      No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Washington, D.C.
Dated: January 30, 2024

*/s/ T.J. McCarrick*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:        judson.brown@kirkland.com
              tj.mccarrick@kirkland.com
              grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in*
*Possession*

## Exhibit A

**Requests for Production of Documents to Reliz Limited**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THE DEBTORS' RULE 2004 DOCUMENT DISCOVERY REQUESTS TO RELIZ LIMITED

Pursuant to Rule 45 of the Federal Rules of Civil Procedure (the "Federal Rules"), Rules

2004, 9014, and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

and Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern Districts of New York (the "Local Rules"), made applicable to this matter by Rule 2004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") request that Reliz Limited ("Reliz"), Reliz Technology Group Holdings ("Reliz Technology"), and Nick Hammer ("Hammer") produce for their inspection and copying all documents and tangible things requested below ("Request for Production of Documents" or "Request") in accordance with the definitions and instructions set forth below at the offices of their counsel, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at another agreed-upon location. Each of the following Requests is continuing in nature, such that if Reliz, Reliz Technology, and Hammer obtain or discover additional responsive Documents or Communications at a later date, such Documents and Communications are to be made available promptly to the Debtors for inspection and copying.

## **DEFINITIONS**

For the purposes of these Requests, the following Definitions shall apply:

1.     "All," "any," or "each" shall have the meaning afforded to them by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, shall each be construed as encompassing any and all.

2.     "Borrowed Amount" refers to the 4,098.36 ETH loaned by Celsius to Reliz under the Loan Agreement.

3.     "Celsius" refers to Celsius Network Limited, an English-registered company.

4.      "Communication" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

5.      "Concerning" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means "relating to," "referring to," "describing," "evidencing" or "constituting."

6.      "Constituting," "referring to," "regarding," "in connection with," "relating to," "describing," or "evidencing" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

7.      "Document" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

8.      "Electronically Stored Information" has the broadest possible meaning under Federal Rule 34, made applicable to this matter by Bankruptcy Rule 2004-1, and refers to all computer or electronically stored or generated data and information, and includes all attachments to and enclosures with any requested item, and all drafts thereof; information stored in any format and on any storage media, including: hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable; all associated metadata that is

maintained or saved, which includes: a Document's or Communication's title or name, file name, date and time of creation, date and time of last edit, identity of author, identity of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information.

9.     The "Grayscale Trust" refers to the Grayscale Ethereum Trust.

10.    "Hammer" refers to Nick Hammer, the Chief Executive Officer and co-founder of Reliz.

11.    "Including" shall not be construed to limit the scope of any Request.

12.    The "Lending Agreement" refers to the Digital Asset Lending Agreement entered into between Celsius and Reliz dated December 3, 2019.

13.    The "Loan" refers to the transaction in which Celsius loaned 4,098.36 ETH to Reliz under the Loan Agreement.

14.    The "Loan Agreement" means the agreement formed by the Lending Agreement and the Term Sheet.

15.    "Person" or "Persons" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

16.    "Personal Electronic Accounts" means addresses, accounts, or handles on email platforms, social media websites, websites (e.g., Reddit), messaging applications, collaboration tools (e.g., Slack, Microsoft Teams), chat rooms, blogs, online forums, text messages, or social media or networking websites, applications, services, software, or other communications platforms (including but not limited to those involving video sharing, photograph sharing,

blogging, messaging, or ephemeral messaging, such as WhatsApp, Signal, Telegram, "X" (f/k/a Twitter), Bloomberg, Facebook, or LinkedIn for which You have or had an account, or for which You have used someone else's account to conduct activity.

17.     "Personal Electronic Devices" means mobile or cellular phones, computers, laptops, tablets, smart watches, e-book readers, gaming devices, personal digital assistants, or other pieces of electronic equipment with the capability to store, record, a transmit, reproduce, display, or receive text, images/video, or audio data, in Your possession, custody, or control.

18.     "Reliz" or "You" refers to Reliz Limited, a Cayman-incorporated corporation.

19.     "Reliz Technology" refers to Reliz Technology Group Holdings, a Delaware Limited Liability Company.

20.     "Term Sheet" refers to the Loan Term Sheet dated June 8, 2020, that incorporated the terms of the Lending Agreement.

21.     "Why," "how," "when," and "whether" shall also include each of the other.

22.     Whenever necessary to bring within the scope of a Request information that might otherwise be construed to be outside its scope:

        a.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

        b.      The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

        c.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "and" and "or" shall be construed either

disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

**<u>INSTRUCTIONS</u>**

1.      To the extent that You have already produced to the Debtors and the Committee some Documents or Communications in response to a particular Request, the Request shall be construed as requesting only Documents and Communications that You have not yet produced.

2.      For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3.      Each Request herein shall be construed independently and not with reference to any other Request, for the purposes of limitation.

4.      In responding to these Requests, You shall furnish all Documents and Communications that are available to You, including Documents and Communications that are in the possession of any of Your present or former agents, employees or representatives, or otherwise subject to Your custody or control, including, but not limited to, all responsive Documents and Communications on Your Personal Electronic Devices and Personal Electronic Accounts.

5.      If You contend that part of a Request is objectionable, You shall state the legal and factual basis for Your objection with specificity, and You shall produce Documents and Communications fully in response to that part of the Request that You do not contend is objectionable.

6.      If in the course of responding to these Requests You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response.

7.      If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

8.      If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

9.      If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents and Communications in response to the remainder of the Request that You do not consider to be overbroad.

10.     You shall produce each Document and Communication in its entirety, without abbreviation or redaction other than for privileged information.

11.     Documents and Communications provided in response hereto shall be produced as they are kept in the ordinary course of business or shall be organized and labelled to correspond with the categories in these Requests.

12.     You shall produce as a separate Document or Communication any Document or Communication that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document or Communication without such marks.

13.     In the event that any Document or Communications called for hereby was formerly in Your possession, custody, or control and has been lost or destroyed, that Document or Communication is to be identified in writing as follows: (1) addressor, addressee, Person who prepared or authorized the Document, indicated or blind copies; (2) date of preparation or transmittal; (3) subject matter; (4) number of pages, attachments, or appendices; (5) all Persons to

whom distributed; (6) date of loss or destruction; and (7) if destroyed, the manner of destruction, reason for destruction, Persons authorizing destruction, and Persons who destroyed the Document.

14.    These Requests are continuing in nature, up to and during the course of trial.  In the event that You obtain additional information that is responsive to these Requests, You shall promptly supplement Your response to each such Request to the extent permitted by the applicable rules.

15.    In the event You seek to withhold or redact any Document or Communication on the basis that it is properly entitled to some privilege or other limitation of discovery, You shall produce as much of the Document or Communication concerned as to which no claim of privilege or other limitation of discovery is made.  With Documents, Communications, or portions of Documents or Communications for which a claim of privilege or other limitation of discovery is made, You are instructed to provide a numeral list of the Documents and Communications for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information: (i) the type of Document or Communication; (ii) the name and capacity of each author and recipient of the Document or Communication; (iii) the general subject matter of the Document or Communication in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the Document or Communication; (v) such other information as is sufficient to identify the Document or Communication for a subpoena *duces tecum*, including, where appropriate, the author(s) of the Document or Communication, the addressee(s) of the Document or Communication, and any other

recipient(s) shown in the Document or Communication, and, where not apparent, the relationship

of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information

referenced in (i)–(v) above for each enclosure or attachment to each listed Document or

Communication if the enclosure or attachment is also withheld from production.  Notwithstanding

the assertion of any privilege or other protection, any requested Document or Communication that

contains responsive, non-privileged, or protected information should be disclosed or produced, but

that portion of a Document or Communication for which the privilege or other protection is

asserted may be redacted, provided that the redacted portion is identified and described

consistently according to the requirements listed herein.

16.    You shall produce all Electronically Stored Information in accordance with the

following specifications:

a.    Form of Production: Produce Electronically Stored Information in single-

page tiff format (Group IV tiff at 300 dpi) with standard Concordance formatted

load file (.dat), including all metadata.  Name each tiff file with a unique name

matching the bates number labelled on the corresponding page.  Group every

10,000 tiffs into a new folder; do not create a separate folder for each Document

and Communication.

b.    Image Load File: Provide an image load file Opticon file (.opt) that contains

Document and Communication boundaries, page counts, and volume information.

c.    Document and Communication Text: For Documents and Communications

that were originally stored as native electronic files and which do not have

redactions, produce the extracted full text (not OCR) from the body of each

Document or Communication in separate document-level *.txt files named for the

beginning bates number of the associated Document or Communication.  Provide OCR text for Documents and Communications without extracted text available (non-searchable PDFs, etc.).  Group 1000 document text files per incrementally named "TEXT" directories, separate from image directories.  For Documents and Communications that were originally stored as native electronic files and which have redactions, produce the OCR text from the redacted image(s) associated with each Document and Communication, in separate document-level *.txt files named for the beginning bates number of the associated Document and Communication. Clearly label any redacted material to show the redactions on the tiff image.  Also provide a comma-delimited extracted text list file with each Document's and Communication's beginning bates number along with the path to the associated extracted text/OCR text file.

d.      Native Production for Certain File Types: For files created by Excel or other spreadsheet programs, PowerPoint or other special presentation programs, database files, or any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the files in native and tiff formats.  Name the produced native file with the bates number on the first page of the corresponding tiff production of the file/document.  Group native files within incrementally named "NATIVE" directories, separate from images directories.

e.      De-duplication: Produce a single copy of each electronic Document for which exact duplicates exist.  For email messages, consolidate duplicates based on

11

MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties.

17.     The time period for these Requests is from January 1, 2019, to the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      All Documents and Communications between You and any of Your directors, officers, or affiliates, including Reliz Technology and Hammer, concerning the Loan or Loan Agreement.

2.      All Documents and Communications concerning Your accounting treatment of the Loan.

3.      All Documents and Communications concerning Your investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

4.      All Documents and Communications concerning Your use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

5.      All Documents and Communications concerning the identity of Persons authorized to perform or direct or control Your performance of Your obligations, including as determined by the arbitrator, under the Loan Agreement or authorized to decide whether to perform those obligations, and the scope, terms, and conditions of that authorization.

6.      All Documents and Communications relied on in performing Your obligations, including as determined by the arbitrator, under the Loan Agreement or deciding whether to perform those obligations.

7.      All Documents and Communications concerning Your intent or ability to perform Your obligations, including as determined by the arbitrator, under the Loan Agreement.

8.      All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of any assets, liabilities, or equity between You and any of Your directors, officers, or affiliates, including Reliz Technology and Hammer.

9.      Documents sufficient to show the identity of all Your officers and directors, including the titles of all those officers and directors.

10.     Documents sufficient to show all Your assets, including the identity of the Persons who own those assets and the location of those assets.

11.     Documents sufficient to show all Your liabilities, including the identity of the Persons who owe those liabilities.

12.     Documents sufficient to show the identity and relationship of all Your affiliates, including the Persons who own those affiliates, the percentages they own, and, if applicable, the location where they are registered or incorporated and the identity of their directors and officers.

13.     All Documents and Communications reflecting Your corporate separateness from any of Your affiliates, including separate board materials, employees, financial statements, tax filings, and books and records.

14.     Documents and Communications sufficient to show the identity of all the Persons who own or control Your Equity, including the amount of Your equity owned or controlled by all those Persons.

15.     All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of Your equity.

16.     All minutes concerning Your board meetings and all Documents and Communications provided to Your directors for board meetings.

13

Washington, D.C.
Dated: January 30, 2024

*/s/ T.J. McCarrick*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:    judson.brown@kirkland.com
tj.mccarrick@kirkland.com
grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
ross.kwasteniet@kirkland.com
chris.koenig@kirkland.com
dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit B**

**Requests for Production of Documents to Reliz Technology Group Holdings**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
| | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
| | ) (Jointly Administered) |

### THE DEBTORS' RULE 2004 DOCUMENT DISCOVERY REQUESTS TO RELIZ TECHNOLOGY GROUP HOLDINGS

Pursuant to Rule 45 of the Federal Rules of Civil Procedure (the "Federal Rules"), Rules

2004, 9014, and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

and Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern Districts of New York (the "Local Rules"), made applicable to this matter by Rule 2004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") request that Reliz Limited ("Reliz"), Reliz Technology Group Holdings ("Reliz Technology"), and Nick Hammer ("Hammer") produce for their inspection and copying all documents and tangible things requested below ("Request for Production of Documents" or "Request") in accordance with the definitions and instructions set forth below at the offices of their counsel, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at another agreed-upon location. Each of the following Requests is continuing in nature, such that if Reliz, Reliz Technology, and Hammer obtain or discover additional responsive Documents or Communications at a later date, such Documents and Communications are to be made available promptly to the Debtors for inspection and copying.

## **DEFINITIONS**

For the purposes of these Requests, the following Definitions shall apply:

1.      "All," "any," or "each" shall have the meaning afforded to them by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, shall each be construed as encompassing any and all.

2.      "Borrowed Amount" refers to the 4,098.36 ETH loaned by Celsius to Reliz under the Loan Agreement.

3.      "Celsius" refers to Celsius Network Limited, an English-registered company.

4.    "Communication" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

5.    "Concerning" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means "relating to," "referring to," "describing," "evidencing" or "constituting."

6.    "Constituting," "referring to," "regarding," "in connection with," "relating to," "describing," or "evidencing" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

7.    "Document" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

8.    "Electronically Stored Information" has the broadest possible meaning under Federal Rule 34, made applicable to this matter by Bankruptcy Rule 2004-1, and refers to all computer or electronically stored or generated data and information, and includes all attachments to and enclosures with any requested item, and all drafts thereof; information stored in any format and on any storage media, including: hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable; all associated metadata that is

maintained or saved, which includes: a Document's or Communication's title or name, file name, date and time of creation, date and time of last edit, identity of author, identity of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information.

9.      The "First Partial Award" refers to the May 25, 2023, award ordered by the Sole Arbitrator.

10.     The "Grayscale Trust" refers to the Grayscale Ethereum Trust.

11.     "Hammer" refers to Nick Hammer, the Chief Executive Officer and co-founder of Reliz.

12.     "Including" shall not be construed to limit the scope of any Request.

13.     The "Lending Agreement" refers to the Digital Asset Lending Agreement entered into between Celsius and Reliz dated December 3, 2019.

14.     The "Loan" refers to the transaction in which Celsius loaned 4,098.36 ETH to Reliz under the Loan Agreement.

15.     The "Loan Agreement" means the agreement formed by the Lending Agreement and the Term Sheet.

16.     The "Partial Awards" means the First Partial Award and the Second Partial Award.

17.     "Person" or "Persons" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

18.     "Personal Electronic Accounts" means addresses, accounts, or handles on email platforms, social media websites, websites (e.g., Reddit), messaging applications, collaboration

tools (e.g., Slack, Microsoft Teams), chat rooms, blogs, online forums, text messages, or social media or networking websites, applications, services, software, or other communications platforms (including but not limited to those involving video sharing, photograph sharing, blogging, messaging, or ephemeral messaging, such as WhatsApp, Signal, Telegram, "X" (f/k/a Twitter), Bloomberg, Facebook, or LinkedIn for which You have or had an account, or for which You have used someone else's account to conduct activity.

19.    "Personal Electronic Devices" means mobile or cellular phones, computers, laptops, tablets, smart watches, e-book readers, gaming devices, personal digital assistants, or other pieces of electronic equipment with the capability to store, record, a transmit, reproduce, display, or receive text, images/video, or audio data, in Your possession, custody, or control.

20.    "Reliz" refers to Reliz Limited, a Cayman-incorporated corporation.

21.    "Reliz Technology" or "You" refers to Reliz Technology Group Holdings, a Delaware Limited Liability Company.

22.    The "Second Partial Award" refers to the August 3, 2023, award ordered by the Sole Arbitrator.

23.    The "Sole Arbitrator" refers to Richard Salter KC.

24.    "Term Sheet" refers to the Loan Term Sheet dated June 8, 2020, that incorporated the terms of the Lending Agreement.

25.    "Why," "how," "when," and "whether" shall also include each of the other.

26.    Whenever necessary to bring within the scope of a Request information that might otherwise be construed to be outside its scope:

a.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

b.      The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

c.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

## **INSTRUCTIONS**

1.      To the extent that You have already produced to the Debtors and the Committee some Documents or Communications in response to a particular Request, the Request shall be construed as requesting only Documents and Communications that You have not yet produced.

2.      For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3.      Each Request herein shall be construed independently and not with reference to any other Request, for the purposes of limitation.

4.      In responding to these Requests, You shall furnish all Documents and Communications that are available to You, including Documents and Communications that are in the possession of any of Your present or former agents, employees or representatives, or otherwise subject to Your custody or control, including, but not limited to, all responsive Documents and Communications on Your Personal Electronic Devices and Personal Electronic Accounts.

5.      If You contend that part of a Request is objectionable, You shall state the legal and factual basis for Your objection with specificity, and You shall produce Documents and Communications fully in response to that part of the Request that You do not contend is objectionable.

6.      If in the course of responding to these Requests You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response.

7.      If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

8.      If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

9.      If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents and Communications in response to the remainder of the Request that You do not consider to be overbroad.

10.     You shall produce each Document and Communication in its entirety, without abbreviation or redaction other than for privileged information.

11.     Documents and Communications provided in response hereto shall be produced as they are kept in the ordinary course of business or shall be organized and labelled to correspond with the categories in these Requests.

12.     You shall produce as a separate Document or Communication any Document or Communication that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document or Communication without such marks.

13.     In the event that any Document or Communications called for hereby was formerly in Your possession, custody, or control and has been lost or destroyed, that Document or Communication is to be identified in writing as follows: (1) addressor, addressee, Person who prepared or authorized the Document, indicated or blind copies; (2) date of preparation or transmittal; (3) subject matter; (4) number of pages, attachments, or appendices; (5) all Persons to whom distributed; (6) date of loss or destruction; and (7) if destroyed, the manner of destruction, reason for destruction, Persons authorizing destruction, and Persons who destroyed the Document.

14.     These Requests are continuing in nature, up to and during the course of trial.  In the event that You obtain additional information that is responsive to these Requests, You shall promptly supplement Your response to each such Request to the extent permitted by the applicable rules.

15.     In the event You seek to withhold or redact any Document or Communication on the basis that it is properly entitled to some privilege or other limitation of discovery, You shall produce as much of the Document or Communication concerned as to which no claim of privilege or other limitation of discovery is made.  With Documents, Communications, or portions of Documents or Communications for which a claim of privilege or other limitation of discovery is made, You are instructed to provide a numeral list of the Documents and Communications for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following

information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information: (i) the type of Document or Communication; (ii) the name and capacity of each author and recipient of the Document or Communication; (iii) the general subject matter of the Document or Communication in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the Document or Communication; (v) such other information as is sufficient to identify the Document or Communication for a subpoena *duces tecum*, including, where appropriate, the author(s) of the Document or Communication, the addressee(s) of the Document or Communication, and any other recipient(s) shown in the Document or Communication, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)–(v) above for each enclosure or attachment to each listed Document or Communication if the enclosure or attachment is also withheld from production.  Notwithstanding the assertion of any privilege or other protection, any requested Document or Communication that contains responsive, non-privileged, or protected information should be disclosed or produced, but that portion of a Document or Communication for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

16.     You shall produce all Electronically Stored Information in accordance with the following specifications:

a.      Form of Production: Produce Electronically Stored Information in single-page tiff format (Group IV tiff at 300 dpi) with standard Concordance formatted load file (.dat), including all metadata.  Name each tiff file with a unique name matching the bates number labelled on the corresponding page.  Group every

10,000 tiffs into a new folder; do not create a separate folder for each Document and Communication.

b.        Image Load File: Provide an image load file Opticon file (.opt) that contains Document and Communication boundaries, page counts, and volume information.

c.        Document and Communication Text: For Documents and Communications that were originally stored as native electronic files and which do not have redactions, produce the extracted full text (not OCR) from the body of each Document or Communication in separate document-level *.txt files named for the beginning bates number of the associated Document or Communication.  Provide OCR text for Documents and Communications without extracted text available (non-searchable PDFs, etc.).  Group 1000 document text files per incrementally named "TEXT" directories, separate from image directories.  For Documents and Communications that were originally stored as native electronic files and which have redactions, produce the OCR text from the redacted image(s) associated with each Document and Communication, in separate document-level *.txt files named for the beginning bates number of the associated Document and Communication.  Clearly label any redacted material to show the redactions on the tiff image.  Also provide a comma-delimited extracted text list file with each Document's and Communication's beginning bates number along with the path to the associated extracted text/OCR text file.

d.        Native Production for Certain File Types: For files created by Excel or other spreadsheet programs, PowerPoint or other special presentation programs, database files, or any other file types that reasonably require viewing in their native format

11

for a full understanding of their content and meaning, produce the files in native and tiff formats.  Name the produced native file with the bates number on the first page of the corresponding tiff production of the file/document.  Group native files within incrementally named "NATIVE" directories, separate from images directories.

e.    De-duplication: Produce a single copy of each electronic Document for which exact duplicates exist.  For email messages, consolidate duplicates based on MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties.

17.    The time period for these Requests is from January 1, 2019, to the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All Documents and Communications concerning the Loan or Loan Agreement.

2.    All Documents and Communications concerning Your accounting treatment of the Loan.

3.    All Documents and Communications concerning Reliz's accounting treatment of the Loan.

4.    All Documents and Communications concerning Your investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

5.    All Documents and Communications concerning Reliz's investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

6.      All Documents and Communications concerning Your use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

7.      All Documents and Communications concerning Reliz's use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

8.      All Documents and Communications concerning Your authorization to perform or direct Reliz's performance of Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement or authorized to decide whether to perform those obligations, and the scope, terms, and conditions of that authorization.

9.      All Documents and Communications relied on in performing or authorizing or directing Reliz's performance of Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement or deciding whether to perform those obligations.

10.     All Documents and Communications concerning Your intent for Reliz to perform Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement.

11.     All Documents and Communications concerning Reliz's intent or ability to perform Reliz's obligations, including as determined by the arbitrator under the Loan Agreement.

12.     All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of any assets, liabilities, or equity between You and any of Your directors, officers, or affiliates, including Reliz and Hammer.

13.     Documents sufficient to show all Your assets, including the identity of the Persons who own those assets and the location of those assets.

14.     Documents sufficient to show all Your liabilities, including the identity of the Persons who owe those liabilities.

15.    Documents sufficient to show the identity and relationship of all Your affiliates, including the Persons who own those affiliates, the percentages they own, and, if applicable, the location where they are registered or incorporated and the identity of their directors and officers.

16.    All Documents and Communications reflecting Your corporate separateness from any of your affiliates, including separate board materials, employees, financial statements, tax filings, and books and records.

17.    Documents and Communications sufficient to show the identity of all the Persons who own or control Your Equity, including the amount of Your equity owned or controlled by all those Persons.

18.    All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of Your equity.

19.    All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of Reliz's equity.

Washington, D.C.
Dated: January 30, 2024

*/s/ T.J. McCarrick*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:     (202) 389-5200
Email:          judson.brown@kirkland.com
                tj.mccarrick@kirkland.com
                grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit C**

**Requests for Production of Documents to Nick Hammer**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
| | ) |
| Debtors. | ) |
| | ) |

Chapter 11

Case No. 22-10964 (MG)

(Jointly Administered)

### THE DEBTORS' RULE 2004 DOCUMENT DISCOVERY REQUESTS TO NICK HAMMER

Pursuant to Rule 45 of the Federal Rules of Civil Procedure (the "Federal Rules"), Rules

2004, 9014, and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

and Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern

Districts of New York (the "Local Rules"), made applicable to this matter by Rule 2004-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"),

the above-captioned debtors and debtors in possession (collectively, the "Debtors") request that

Reliz Limited ("Reliz"), Reliz Technology Group Holdings ("Reliz Technology"), and Nick

Hammer ("Hammer") produce for their inspection and copying all documents and tangible things

requested below ("Request for Production of Documents" or "Request") in accordance with the

definitions and instructions set forth below at the offices of their counsel, Kirkland & Ellis LLP,

601 Lexington Avenue, New York, New York 10022, or at another agreed-upon location. Each

of the following Requests is continuing in nature, such that if Reliz, Reliz Technology, and

Hammer obtain or discover additional responsive Documents or Communications at a later date,

such Documents and Communications are to be made available promptly to the Debtors for

inspection and copying.

## **DEFINITIONS**

For the purposes of these Requests, the following Definitions shall apply:

1.      "All," "any," or "each" shall have the meaning afforded to them by Local Rule

26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of

doubt, shall each be construed as encompassing any and all.

2.      "Borrowed Amount" refers to the 4,098.36 ETH loaned by Celsius to Reliz under

the Loan Agreement.

3.      "Celsius" refers to Celsius Network Limited, an English-registered company.

4.      "Communication" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

5.      "Concerning" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means "relating to," "referring to," "describing," "evidencing" or "constituting."

6.      "Constituting," "referring to," "regarding," "in connection with," "relating to," "describing," or "evidencing" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

7.      "Document" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

8.      "Electronically Stored Information" has the broadest possible meaning under Federal Rule 34, made applicable to this matter by Bankruptcy Rule 2004-1, and refers to all computer or electronically stored or generated data and information, and includes all attachments to and enclosures with any requested item, and all drafts thereof; information stored in any format and on any storage media, including: hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable; all associated metadata that is

maintained or saved, which includes: a Document's or Communication's title or name, file name, date and time of creation, date and time of last edit, identity of author, identity of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information.

9.     The "Grayscale Trust" refers to the Grayscale Ethereum Trust.

10.     "Hammer" or "You" refers to Nick Hammer, the Chief Executive Officer and co-founder of Reliz.

11.     "Including" shall not be construed to limit the scope of any Request.

12.     The "Lending Agreement" refers to the Digital Asset Lending Agreement entered into between Celsius and Reliz dated December 3, 2019.

13.     The "Loan" refers to the transaction in which Celsius loaned 4,098.36 ETH to Reliz under the Loan Agreement.

14.     The "Loan Agreement" means the agreement formed by the Lending Agreement and the Term Sheet.

15.     "Person" or "Persons" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

16.     "Personal Electronic Accounts" means addresses, accounts, or handles on email platforms, social media websites, websites (e.g., Reddit), messaging applications, collaboration tools (e.g., Slack, Microsoft Teams), chat rooms, blogs, online forums, text messages, or social media or networking websites, applications, services, software, or other communications platforms (including but not limited to those involving video sharing, photograph sharing,

blogging, messaging, or ephemeral messaging, such as WhatsApp, Signal, Telegram, "X" (f/k/a Twitter), Bloomberg, Facebook, or LinkedIn for which You have or had an account, or for which You have used someone else's account to conduct activity.

17.     "Personal Electronic Devices" means mobile or cellular phones, computers, laptops, tablets, smart watches, e-book readers, gaming devices, personal digital assistants, or other pieces of electronic equipment with the capability to store, record, a transmit, reproduce, display, or receive text, images/video, or audio data, in Your possession, custody, or control.

18.     "Reliz" refers to Reliz Limited, a Cayman-incorporated corporation.

19.     "Reliz Technology" refers to Reliz Technology Group Holdings, a Delaware Limited Liability Company.

20.     "Term Sheet" refers to the Loan Term Sheet dated June 8, 2020, that incorporated the terms of the Lending Agreement.

21.     "Why," "how," "when," and "whether" shall also include each of the other.

22.     Whenever necessary to bring within the scope of a Request information that might otherwise be construed to be outside its scope:

        a.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

        b.      The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

        c.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "and" and "or" shall be construed either

disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

## **INSTRUCTIONS**

1.      To the extent that You have already produced to the Debtors and the Committee some Documents or Communications in response to a particular Request, the Request shall be construed as requesting only Documents and Communications that You have not yet produced.

2.      For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3.      Each Request herein shall be construed independently and not with reference to any other Request, for the purposes of limitation.

4.      In responding to these Requests, You shall furnish all Documents and Communications that are available to You, including Documents and Communications that are in the possession of any of Your present or former agents, employees or representatives, or otherwise subject to Your custody or control, including, but not limited to, all responsive Documents and Communications on Your Personal Electronic Devices and Personal Electronic Accounts.

5.      If You contend that part of a Request is objectionable, You shall state the legal and factual basis for Your objection with specificity, and You shall produce Documents and Communications fully in response to that part of the Request that You do not contend is objectionable.

6.      If in the course of responding to these Requests You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response.

7.     If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

8.     If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

9.     If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents and Communications in response to the remainder of the Request that You do not consider to be overbroad.

10.     You shall produce each Document and Communication in its entirety, without abbreviation or redaction other than for privileged information.

11.     Documents and Communications provided in response hereto shall be produced as they are kept in the ordinary course of business or shall be organized and labelled to correspond with the categories in these Requests.

12.     You shall produce as a separate Document or Communication any Document or Communication that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document or Communication without such marks.

13.     In the event that any Document or Communications called for hereby was formerly in Your possession, custody, or control and has been lost or destroyed, that Document or Communication is to be identified in writing as follows: (1) addressor, addressee, Person who prepared or authorized the Document, indicated or blind copies; (2) date of preparation or transmittal; (3) subject matter; (4) number of pages, attachments, or appendices; (5) all Persons to

whom distributed; (6) date of loss or destruction; and (7) if destroyed, the manner of destruction, reason for destruction, Persons authorizing destruction, and Persons who destroyed the Document.

14.    These Requests are continuing in nature, up to and during the course of trial.  In the event that You obtain additional information that is responsive to these Requests, You shall promptly supplement Your response to each such Request to the extent permitted by the applicable rules.

15.    In the event You seek to withhold or redact any Document or Communication on the basis that it is properly entitled to some privilege or other limitation of discovery, You shall produce as much of the Document or Communication concerned as to which no claim of privilege or other limitation of discovery is made.  With Documents, Communications, or portions of Documents or Communications for which a claim of privilege or other limitation of discovery is made, You are instructed to provide a numeral list of the Documents and Communications for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information: (i) the type of Document or Communication; (ii) the name and capacity of each author and recipient of the Document or Communication; (iii) the general subject matter of the Document or Communication in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the Document or Communication; (v) such other information as is sufficient to identify the Document or Communication for a subpoena *duces tecum*, including, where appropriate, the author(s) of the Document or Communication, the addressee(s) of the Document or Communication, and any other

recipient(s) shown in the Document or Communication, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)–(v) above for each enclosure or attachment to each listed Document or Communication if the enclosure or attachment is also withheld from production. Notwithstanding the assertion of any privilege or other protection, any requested Document or Communication that contains responsive, non-privileged, or protected information should be disclosed or produced, but that portion of a Document or Communication for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

16. You shall produce all Electronically Stored Information in accordance with the following specifications:

a. Form of Production: Produce Electronically Stored Information in single-page tiff format (Group IV tiff at 300 dpi) with standard Concordance formatted load file (.dat), including all metadata. Name each tiff file with a unique name matching the bates number labelled on the corresponding page. Group every 10,000 tiffs into a new folder; do not create a separate folder for each Document and Communication.

b. Image Load File: Provide an image load file Opticon file (.opt) that contains Document and Communication boundaries, page counts, and volume information.

c. Document and Communication Text: For Documents and Communications that were originally stored as native electronic files and which do not have redactions, produce the extracted full text (not OCR) from the body of each Document or Communication in separate document-level *.txt files named for the

beginning bates number of the associated Document or Communication.  Provide OCR text for Documents and Communications without extracted text available (non-searchable PDFs, etc.).  Group 1000 document text files per incrementally named "TEXT" directories, separate from image directories.  For Documents and Communications that were originally stored as native electronic files and which have redactions, produce the OCR text from the redacted image(s) associated with each Document and Communication, in separate document-level *.txt files named for the beginning bates number of the associated Document and Communication.  Clearly label any redacted material to show the redactions on the tiff image.  Also provide a comma-delimited extracted text list file with each Document's and Communication's beginning bates number along with the path to the associated extracted text/OCR text file.

d.      Native Production for Certain File Types: For files created by Excel or other spreadsheet programs, PowerPoint or other special presentation programs, database files, or any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the files in native and tiff formats.  Name the produced native file with the bates number on the first page of the corresponding tiff production of the file/document.  Group native files within incrementally named "NATIVE" directories, separate from images directories.

e.      De-duplication: Produce a single copy of each electronic Document for which exact duplicates exist.  For email messages, consolidate duplicates based on

MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties.

17.     The time period for these Requests is from January 1, 2019, to the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     All Documents and Communications concerning the Loan or Loan Agreement.

2.     All Documents and Communications concerning Your accounting treatment of the Loan.

3.     All Documents and Communications concerning Reliz's accounting treatment of the Loan.

4.     All Documents and Communications concerning Your investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

5.     All Documents and Communications concerning Reliz's investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

6.     All Documents and Communications concerning Your use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

7.     All Documents and Communications concerning Reliz's use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

8.     All Documents and Communications concerning Your authorization to perform or direct Reliz's performance of Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement or authorized to decide whether to perform those obligations, and the scope, terms, and conditions of that authorization.

9.      All Documents and Communications relied on in performing or authorizing or directing Reliz's performance of Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement or deciding whether to perform those obligations.

10.      All Documents and Communications concerning Your intent for Reliz to perform Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement.

11.      All Documents and Communications concerning Reliz's intent or ability to perform Reliz's obligations, including as determined by the arbitrator, under the Loan Agreement.

12.      All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of any assets, liabilities, or equity between You and any of Reliz or Reliz Technology.

13.      All Documents and Communications concerning the sale, purchase, loan, borrowing, or transfer of Reliz's equity.

14.      Documents sufficient to show the identity and relationship of all Reliz's and Reliz Technology's affiliates, including the Persons who own those affiliates, the percentages they own, and, if applicable, the location where they are registered or incorporated and the identity of their directors and officers.

15.      All Documents and Communications reflecting Reliz's corporate separateness from any of Reliz's affiliates, including separate board materials, employees, financial statements, tax filings, and books and records.

Washington, D.C.
Dated: January 30, 2024

/s/ T.J. McCarrick

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:     (202) 389-5000
Facsimile:     (202) 389-5200
Email:         judson.brown@kirkland.com
               tj.mccarrick@kirkland.com
               grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

14

**<u>Exhibit D</u>**

**Rule 2004(c) Corporate Deposition Notice**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:   (202) 389-5000
Facsimile:   (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE DEBTORS' RULE 2004(c) CORPORATE**
**DEPOSITION NOTICE OF RELIZ LIMITED**

PLEASE TAKE NOTICE that pursuant to Federal Rules of Bankruptcy Procedure

2004(c) and 9016 (the "Bankruptcy Rules"), which make Federal Rule of Civil Procedure 45

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

applicable to these chapter 11 cases (the "Federal Rules"), the above-captioned Debtors will take the deposition upon oral examination of Reliz Limited ("Reliz"), beginning at 9:00 a.m. (prevailing Eastern Time) on February 9, 2024, at the office of Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022, or an alternative place as agreed upon by the Debtors and Montana.  The matters to be inquired into are described in **Exhibit A** hereto (attached), and the designated corporate representative(s) should be prepared to testify to these matters.  The deposition will proceed before an officer authorized by law to administer oaths, will be recorded by audio, video, and/or stenographic means, and will continue from day to day until completed.

[*Remainder of page intentionally left blank*]

Washington, D.C.
Dated: January 30, 2024

/s/ T.J. McCarrick

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:    judson.brown@kirkland.com
          tj.mccarrick@kirkland.com
          grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
          ross.kwasteniet@kirkland.com
          chris.koenig@kirkland.com
          dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

## DEFINITIONS

The following definitions of terms apply to all of the Topics of Examination. Unless otherwise defined herein, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense.

1.       "All," "any," or "each" shall have the meaning afforded to them by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, shall each be construed as encompassing any and all.

2.       "Borrowed Amount" refers to the 4,098.36 ETH loaned by Celsius to Reliz under the Loan Agreement.

3.       "Celsius" refers to Celsius Network Limited, an English-registered company.

4.       "Communication" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

5.       "Concerning" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means "relating to," "referring to," "describing," "evidencing" or "constituting."

6.       "Constituting," "referring to," "regarding," "in connection with," "relating to," "describing," or "evidencing" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

7.      "Document" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

8.      The "Grayscale Trust" refers to the Grayscale Ethereum Trust.

9.      "Hammer" refers to Nick Hammer, the Chief Executive Officer and co-founder of Reliz.

10.      "Including" shall not be construed to limit the scope of any Request.

11.      The "Lending Agreement" refers to the Digital Asset Lending Agreement entered into between Celsius and Reliz dated December 3, 2019.

12.      The "Loan" refers to the transaction in which Celsius loaned 4,098.36 ETH to Reliz under the Loan Agreement.

13.      The "Loan Agreement" means the agreement formed by the Lending Agreement and the Term Sheet.

14.      "Person" or "Persons" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

15.      "Reliz" or "You" refers to Reliz Limited, a Cayman-incorporated corporation.

16.      "Reliz Technology" refers to Reliz Technology Group Holdings, a Delaware Limited Liability Company.

17.    "Term Sheet" refers to the Loan Term Sheet dated June 8, 2020, that incorporated the terms of the Lending Agreement.

18.    "Why," "how," "when," and "whether" shall also include each of the other.

19.    Whenever necessary to bring within the scope of a Topic of Examination information that might otherwise be construed to be outside its scope:

     a.    In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

     b.    The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

     c.    In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

## TOPICS OF EXAMINATION

You shall produce one or more witnesses to testify thoroughly and accurately on the following topics, including Documents and Communications produced by You related to them:

1.    Your Communications with any of Your directors, officers, or affiliates, including Reliz Technology and Hammer, concerning the Loan or Loan Agreement.

2.    Your accounting treatment of the Loan.

3.    Your investments, including the sale, purchase, loan, borrowing, or transfer of shares, in the Grayscale Trust, including the position and performance of any of those investments.

4.      Your use of the Borrowed Amount, including to purchase or borrow any asset or other legal right.

5.      The authorization of any Person to perform or direct or control Your performance of Your obligations or to decide whether You would perform Your obligations, including as determined by the arbitrator, under the Loan Agreement

6.      Your decision how and whether to perform Your obligations, including as determined by the arbitrator, under the Loan Agreement.

7.      Your intent or ability to perform Your obligations, including as determined by the arbitrator, under the Loan Agreement.

8.      The sale, purchase, loan, borrowing, or transfer of any assets, liabilities, or equity between You and any of Your directors, officers, or affiliates, including Reliz Technology and Hammer.

9.      The identity of all Your officers and directors, including the titles and responsibilities of all those officers and directors.

10.     The identity of all the Persons who own or control Your Equity, including the amount of Your equity owned or controlled by all those Persons.

11.     The sale, purchase, loan, borrowing, or transfer of Your equity.

Washington, D.C.
Dated: January 30, 2024

/s/ T.J. McCarrick
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:        judson.brown@kirkland.com
              tj.mccarrick@kirkland.com
              grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in*
*Possession*

**<u>Exhibit E</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )   Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | )   Case No. 22-10964 (MG) |
| | ) |
|          Debtors. | )   (Jointly Administered) |
| | ) |

**ORDER AUTHORIZING THE DEBTORS TO ISSUE SUBPOENAS**
**UNDER FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004**
**AND 9016 TO RELIZ LIMITED, RELIZ TECHNOLOGY GROUP HOLDINGS,**
**AND NICK HAMMER AND GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] for entry of an order (this "Order"), (a) authorizing the Debtors to issue subpoenas under Federal Rules of Bankruptcy Procedure 2004 and 9016 to Reliz Limited ("Reliz"), Reliz Technology Group Holdings ("Reliz Technology"), and Nick Hammer ("Hammer") and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

their creditors, and other parties in interest; and this Court having found that the Debtors' notice

of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and

no other notice need be provided; and this Court having reviewed the Motion; and this Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and upon all the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      Reliz, Reliz Technology, and Hammer shall comply with the document requests

attached to the Motion as **Exhibits A, B, and C** by no later than five days after the entry of this

Order and provide the productions to the Debtors.

3.      Reliz, Reliz Technology, and Hammer shall comply with the corporate deposition

notice attached to the Motion as **Exhibit D** by no later than five days after the deadline for the

substantial competition of document production.

4.      To the extent necessary, the Debtors' rights are reserved to request depositions and

any additional documents under Bankruptcy Rule 2004 based on any other information that may

be revealed as a result of the documents and testimony provided pursuant to this Order.

5.      This Order is without prejudice to the Debtors' rights to file further motions seeking

additional documents and testimony pursuant to Bankruptcy Rule 2004(a) or any other applicable

law.

6.      Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any

particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

7.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, including, but not limited to, any discovery disputes that may arise between or among the parties and to interpret, implement and enforce the provisions of this Order.

New York, New York
Dated: _____, 2024

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit F</u>**

**Term Sheet**

**ANNEX B**

**LOAN TERM SHEET**

Loan # <u>C1234</u>

The following loan term agreement dated **06/08/2020** incorporates all of the terms of the Master Digital Asset Loan Agreement entered into by Celsius Network Ltd ("Lender") and the Borrower (as provided in the Agreement and specified below) on **12/03/2019** and the following specific terms:

| | |
|---|---|
| Lender: | Celsius Network Ltd. |
| Borrower: | Reliz Ltd. |
| Digital Asset: | ETH |
| Amount | 4,098.36 |
| Spot price: | $244 |
| Amount in USD: | $1,000,000 |
| Loan Type: | Term |
| Loan Term: | 13 months, or sale of shares in ETHE, whichever is sooner |
| Maturity Date: | 07/08/2021 |
| Borrow Fee: | 1% |
| Borrow Fee Payable in: | ETH |
| Collateral Asset: | USD |
| Collateral Amount: | 250,000 |
| Collateral Level: | 25% |
| Margin Call Level: | N/A |
| Reverse Call Level: | N/A |

**Additional terms:**

*The loan will be used exclusively to purchase shares of the Grayscale Ethereum Trust (ETHE). Once the loan and remaining interest are repaid to Celsius, Celsius will be paid any excess of the proceeds from the sale of the ETHE shares less the loan amount as follows:*

*i.) Preferred interest at an annualized 6% rate on the loan amount, as allowed by the excess proceeds, and paid in either ETH or USD; and*

*ii.) Profit-sharing of 70% of any remaining excess proceeds, paid in ETH or USD*

*USD Collateral Wiring Instructions:*
Beneficiary Account: 1503222589
Beneficiary Name: Celsius Network Limited
Beneficiary Address: 1 Bartholomew Lane, London, UK, EC2N 2AX
Beneficiary Bank: Signature Bank
ABA/Routing Number: 026013576
Beneficiary Bank Address: 565 Fifth Avenue, New York, NY 10017
(International) SWIFT Code: SIGNUS33XXX

Celsius Signet USD Wallet Address:  0xb1a40c44e57eb6335e506dda306c6577df1087d2

LENDER:  Celsius Network Ltd

By: *Harumi Urata-Thompson*

Name:  Harumi Urata-Thompson

Title: Chief Financial Officer

Date:  6/8/2020

BORROWER: Reliz Ltd

By: *Mick Hammer*

Name: Nick Hammer

Title: Principal

Date: 6/8/2020

**Exhibit G**

**Lending Agreement**



**DIGITAL ASSET LENDING AGREEMENT**

Between: **Celsius Network Ltd** (the "**Lender**"), a company whose registered office is at 35 Great St. Helen's, London, UK EC3A 6AP; and _Reliz Ltd_____ (the "**Borrower**"), a company whose registered office is at _4th floor Century Yard, Cricket Sqr, Georgetown, Gr. Cayman, KY1-1209_ The Lender and the Borrower together the "**Parties**" and each a "**Party**".

**INTRODUCTION:**

(A)    This Digital Asset Loan Agreement, including its Annexes, (the "**Agreement**") sets out the terms on which the Borrower may, from time to time, seek to initiate a transaction pursuant to which the Lender will lend Digital Asset(s) to Borrower and the Borrower will return Digital Assets, e.g. BTC or ETH, at or upon Loan termination or maturity, subject to no event of default occurring.

(B)    This Agreement has effect from _____12/3/2019_____ (the "**Commencement Date**").

**It is agreed** as follows:

1.  **INTERPRETATION**

    1.1.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders.

    1.2.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.

2.  **DEFINITIONS**

"**Authorized Agent**" has the meaning set forth in Annex A.

"**Borrow Fee**" means the fee paid by the Borrower to the Lender for the Loan.

"**Borrowed Amount**" means the amount of Digital Asset(s) actually lent by the Lender to the Borrower under a Loan made pursuant to and subject to this Agreement.

"**Borrower Bank Account**" means the Borrower's designated bank account agreed with the Lender from time to time.

"**Business Day**" means any day other than a Saturday, Sunday or a public holiday in the United States.

"**Calendar Day**" means each and every day of the week.

"**Change of Control**" means a transaction or series of related transactions in which a person or group of affiliated (or otherwise related) persons acquire shares representing more than fifty percent (50%) of the outstanding voting shares of either Party.

"**Collateral**" means an amount in either: (a) U.S. Dollars calculated as a percentage of the Borrowed Amount as valued at a spot rate agreed upon in the Loan Term Sheet, or (b) Currency agreed upon, as provided by the Borrower to the Lender as collateral for the Loan.

"**Callable Option**" means the Borrower and Lender each have the option to redeliver or recall an Open Deal Loan at any time during the term of the deal.

"**Digital Asset**" means Bitcoin (BTC), Ether (ETH) or any digital asset that the Parties may agree upon in writing.

"**Due Date**" means a Maturity Date or Recall Delivery Date.

"**Event of Default**" has the meaning specified in Section 8.

"**Hard Fork**" means a permanent divergence in the blockchain, which commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token.

"**Hard Fork Notice**" means a notice sent by the Lender to the Borrower indicating that a Hard Fork has occurred and that the Borrower has sixty (60) days to transfer any New Tokens to the Lender.

"**Late Fee**" means the additional fee of eighteen percent (18%) (annualized, calculated daily) of the notional amount of the Loan as valued at 12:00 am New York time each Calendar Day, that is incurred by the borrower for each Calendar Day that Loan repayment is overdue in accordance with Section 4.3.

"**Loan**" means a loan of Digital Asset by the Lender to the Borrower subject to this Agreement.

"**Loan Request**" means a request for a Loan.

"**Loan Effective Date**" means the date upon which a Loan begins.

"**Maturity Date**" means the date upon which a Loan is terminated.

"**New Tokens**" means any tokens that are created as a result of a Hard Fork.

"**Open Deal**" means a Loan without a Maturity Date where the Borrower may redeliver the Digital Asset or the Lender may recall the Digital Asset at any time, subject to the terms of this Agreement.

"**Recall Request**" means a request by the Lender, in respect of an Open Deal Loan, for the return by the Borrower of the Recall Amount.

DocuSign Envelope ID: C820DC61-B851-1A5C-8551-1DFA7399980B

"**Recall Amount**" means the portion (or entirety) of Digital Asset loaned to the Borrower in respect of which the Lender has made a Recall Request.

"**Request Time**" has the meaning given at Section 3.1.

"**Term Deal**" means a Loan with a predetermined Maturity Date, where only the Borrower can return the Digital Asset prior to the Maturity Date.

3. **GENERAL OPERATION**

Loan Procedure

3.1.  During the Term of this Agreement, at a particular time and on a Calendar Day (the "<u>Request Time</u>"), an Authorized Agent of the Borrower may by email directed to \_\_\_\_trading@celsius.network_____ request from the Lender a Loan of a specific number of Digital Asset including the Pricing Terms (a "<u>Lending Request</u>").

3.2.  The Lending Request shall contain the following information:

   (i)     the Digital Asset and its amount that the Borrower wishes to borrow;
   (ii)    the Pricing Terms;
   (iii)   the Loan type: Term Deal or an Open Deal;
   (iv)    the Loan Effective Date; and
   (v)     if the Loan is a Term Deal, the Maturity Date.

3.3.  The Lender shall by email directed to the Borrower, inform the Borrower whether the Lender agrees to make such a Loan, at the Lender's sole discretion. For the avoidance of doubt, the Lender shall not be obligated to provide a Loan or any portion thereof unless the Lender confirms in writing the Lending Request or any portion thereof, and to the extent of such written confirmation.

3.4.  The specific terms of a Loan shall be recorded using the Loan Term Sheet attached as Annex B of this Agreement.

Open Deal Loan

3.5.  Where the Parties agree that a Loan shall be on an Open Deal basis, the Lender may, at any time on a Calendar Day (the "<u>Recall Request Time</u>"), exercise the Callable Option and make a Recall Request to recall all or any portion of Digital Asset loaned to the Borrower (the "<u>Recall Amount</u>"). The Borrower will then have  _2 business days_____ (hours/days) from the Recall Request Time to deliver the Recall Amount to the Lender.

3.6.  The Borrower may, at any time on a Calendar Day (the "<u>Redelivery Date</u>"), exercise the Callable Option and redeliver all or any portion of Digital Asset loaned to Borrower.

Term Deal Loan

3.7.  Where the Parties agree that a Loan shall be on a Term Deal basis, the Lender shall not have the right to recall all or any portion of Digital Asset loaned to the Borrower in advance of the Maturity Date, except in accordance with Section 9.1.

DocuSign Envelope ID: C820DC61-B851-4A5C-8561-1DFA7399980B

3.8.   The Borrower may at any time on a Calendar Day (the "Redelivery Date") redeliver all or any portion of Borrowed Amount loaned to Borrower.

3.9.    If the Borrowed Amount has not been returned before the Maturity Date, the Borrower shall commence redelivery on or before on the Maturity Date.

Drawable Loans

3.10. Lender may agree to guarantee availability of Digital Asset for loans upon a Loan Request from the Borrower or its Authorized Agent (a "Drawable Loan"). Lender shall set a term for the Drawable Loan, the Borrow Rate for the amount of the Drawable Loan that is not borrowed ("Undrawn Loan") and the Borrow Rate for the amount of the Drawable Loan that is borrowed ("Drawn Loan").

3.11. If Lender and Borrower agree to Drawable Loan they shall execute a Loan Term Sheet at that time, and at each subsequent delivery of a Drawn Loan, which indicates (i) the amount of the Drawable Loan that is an Undrawn Loan and a Drawn Loan, (ii) the Borrower Fee for each of the Undrawn Loan and the Drawn Loan, and (iii) the expiration date of the Drawable Loan.

3.12. The Borrow Rate of the Undrawn Loan accrues from the date the first Loan Term Sheet for the Drawable Loan is executed. All Drawn Loans are callable. Borrow Fees on any Undrawn Loans and Drawn Loans shall be paid in accordance with Clause 4 below. No Collateral is required for an Undrawn Loan. Collateral for a Drawn Loan shall be delivered in accordance with Clause 5 below.

Termination of Loan

3.13.   Loans will terminate:

(i)    If a Term Deal, upon redelivery by Borrower of the Borrowed Amount at the Maturity Date or sooner;

(ii)   If an Open Deal, upon redelivery by Borrower of the Borrowed Amount once the Borrower or Lender exercises the Callable Option;

(iii)  If a Drawable Loan, upon redelivery by Borrower of all Borrowed Amount currently drawn as part of a Drawn Loan, and either (1) the end of the term of the Drawable Loan or (2) the notification by Borrower that it will end the Drawable Loan; Or

(iv)   If either a Term Deal, an Open Deal or a Drawable Loan, upon an Event of Default as defined in Section VII.

## 4.  **BORROW FEES AND TRANSACTION FEES**

Borrow Fee Calculation

4.1.   Following an accepted Lending Request, an agreed Borrow Fee will be recorded in the relevant Loan Term Sheet. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and the Lender, as provided for on a Loan Term Sheet.

4.2.   The Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.

<u>Late Fee</u>

4.3.  Where the Borrower fails to return any Digital Asset by an applicable Due Date, the Borrower shall incur the Late Fee for each Calendar Day that the repayment of the Digital Asset is overdue.

<u>Payment of Borrow Fees and Late Fees</u>

4.4.  An invoice shall be sent monthly (on such Calendar Day or such other day as the Lender may determine) and shall include any Borrow Fees and any Late Fees (the "<u>Invoice Amount</u>") outstanding.  The Invoice Amount shall be payable as provided for on the Loan Term Sheet. Without prejudice to Section 9.1(i), the Borrower shall have up to five Business Days to submit payment for the invoice (the "<u>Invoice Due Date</u>").

<u>Taxes and Fees</u>

4.5.  All transfer or other taxes or third-party fees payable with respect to the transfer and/or return of any Borrowed Amount, Invoice Amount or other amount under this Agreement shall be paid by the Borrower.

5.  **COLLATERAL REQUIREMENTS**

<u>Collateral</u>

5.1.  Before the Lender commences a Loan on behalf of the Borrower, the Borrower shall provide the Collateral. The Collateral shall be an amount in the Currency agreed upon calculated as a percentage of the Borrowed Amount, as valued at a spot rate agreed upon in the Loan Term Sheet.

5.2.  The Lender shall be entitled to use the Collateral to conduct its digital asset lending and borrowing business, including transferring the Collateral to bank accounts that are not controlled by the Lender and to pay any Borrow Fees.

<u>Margin Calls</u>

5.3.  If during the term of a Loan the value of the Digital Asset representing the Borrowed Amount increases by the percentage agreed upon by the Parties in the Loan Term Sheet (such rate, the "<u>Margin Call Spot Rate</u>"), Lender shall have the right to require the Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the borrowed Digital Asset at the Margin Call Spot Rate (the "<u>Additional Collateral</u>").

5.4.  If the Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>Collateral Call</u>") to the Borrower at the email address indicated in Section 12.1 that sets forth:

(i)   the Margin Call Spot Rate and

(ii)  the amount of Additional Collateral required based on the Margin Call Spot Rate.

DocuSign Envelope ID: C820DC61-B851-1A5D-8551-1DE47399080B

The Borrower shall transfer the Additional Collateral to the Lender within the time set forth in the Collateral Call. If Borrower fails to transfer the Additional Collateral within the number of hours specified in this subsection (ii), and the value of the borrowed Digital Asset as indicated by the Margin Call Spot Rate exceeds the spot rate indicated in the Loan Term Sheet by a certain percentage agreed between the Lender and the Borrower, the Lender may declare an Event of Default under Section 8 below.

<u>Payment of Additional Collateral</u>

5.5. Payment of the Additional Collateral shall be made in the Currency agreed upon through Borrower's Digital Wallet to Lender or by bank wire to the account specified in the Loan Term Sheet necessary to make the USD Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate.

<u>Default or Failure to Return Loan</u>

5.6. In the event that Borrower does not return the Borrowed Amount when due, the Lender may apply the Collateral for the payment of any liability or obligation or indebtedness of the Borrower created by this Agreement, including, but not limited to using the Collateral to purchase Digital Asset to replenish Lender's supply of the relevant Digital Asset.

<u>Return of Collateral</u>

5.7. Upon the redelivery of any Borrowed Amount and payment of all Borrow Fees, Lender shall initiate the return of Collateral to either (a) the Borrower's Bank Account (in the name of Borrower); or (b) the Borrower's Digital Asset Wallet as provided in Annex B.

6. **HARD FORKS**

<u>No Immediate Termination of Loans Due to Hard Fork</u>

6.1. For the avoidance of doubt, a hard fork in a relevant Digital Asset blockchain will not result in any outstanding Loans being immediately terminated.

<u>Redelivery of Borrowed Digital Asset</u>

6.2. The Lender has the right to any New Tokens created as a result of a Hard Fork in relation to borrowed Digital Asset. Following a Hard Fork the Lender shall be entitled to send the Borrower a Hard Fork Notice following which the Borrower shall have up to sixty (60) days to:

(i)    transfer the New Tokens directly to the Lender,
(ii)   transfer the borrowed Digital Asset to the Lender so that the Lender can split the New Tokens itself and return the borrowed Digital Asset to the Borrower,
(iii)  make a Digital Asset payment reflecting the value of the New Tokens, using the agreed upon spot rate at the moment of repayment, or
(iv)   make a U.S. Dollar cash payment reflecting the value of the New Tokens, using the agreed upon spot rate at the moment of repayment.

7. **REPRESENTATIONS AND WARRANTIES**

DocuSign Envelope ID: C820DC61-B851-4A5C-8551-1DE47399030B

7.1.  The Parties represent and warrant to each other on the Commencement Date and on the date of each Loan Request made by the Borrower, that this Agreement has:

(i)  been duly and validly authorized, executed and delivered on behalf of the Borrower and the Lender respectively; and

(ii)  constitutes the legal, valid and binding obligations enforceable against the Borrower and the Lender respectively in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies).

7.2.  The Lender represents and warrants that, at the time of the making of the Loan, it owns or has the right to use the Digital Asset as provided for in this Agreement.

## 8.  EVENT OF DEFAULT

8.1.  Each of the following circumstances shall constitute an Event of Default:

(i)  the failure of the Borrower to return any Borrowed Amount when due;

(ii)  the failure of the Borrower to pay any Invoice Amount or Additional Collateral when due;

(iii)  any material breach of this Agreement;

(iv)  any representation or warranty made in this Agreement proves to be untrue in any material respect as of the date of making or deemed making thereof;

(v)  any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings instituted by or against the Borrower and not dismissed within thirty (30) days of their initiation.

## 9.  REMEDIES

9.1.  Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option:

(i)  declare the entire Borrowed Amount, Invoice Amount and any other amounts owing under this Agreement to be immediately due and payable,

(ii)  terminate this Agreement upon notice to Borrower, and

(iii)  exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.

9.2.  In the event that the Borrower fails to pay any amounts due hereunder, the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable legal fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

9.3.  Borrower hereby acknowledges that its obligations hereunder are recourse obligations and are not limited to any other recoveries including, but not limited to recovery from use by Lender of any or all of the Collateral.  The obligations of the Borrower from time to time to repay the Borrowed amount, Invoice Amount, any other amounts owing under this Agreement, and all other amounts due and obligations owing under this Agreement all of which shall be full recourse obligations of the Borrower.

## 10. RIGHTS AND REMEDIES CUMULATIVE

Any delay or omission by the Lender to enforce an obligation or exercise any right or remedy under this Agreement shall not be construed as a waiver of such obligation, right or remedy or of any other rights or remedies hereunder. No waiver by either party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties. All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## 11. INDEMNITY

Provided that there has been no breach of the Lender's representation at Section 7.2, the Borrower shall indemnify and hold harmless the Lender from and against any and all claims, demands, losses, expenses and liabilities of any and every nature (including legal fees) that the Lender may incur or that may be asserted against the Lender arising out of the Lender's lending of Digital Asset to the Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to the Lender's gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity shall be a continuing obligation of the Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

## 12. NOTICES

12.1. Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

**Borrower:**

| | |
|---|---|
| Name: | Reliz |
| Address: | 400 North May Street |
| City, State/Country: | Chicago, il usa |
| Postal Code: | 60642 |
| Attn: | Brad Nagela |
| Email: | trading@blockfills.com |

**Lender:**

Celsius Network Ltd

35 Great St. Helen's

London, United Kingdom

EC3A 6AP

or

DocuSign Envelope ID: C820DC61-B951-4A5C-8561-1DEA73999B0B

to its US Affiliate, Celsius Network, Inc.

in care of its Registered Agent,

Incorporating Services, Ltd.

3500 S. Dupont Highway

Dover, Delaware 19901

USA


Attn: Legal

Email: legal@celsius.network

12.2. Either Party may change its address by giving the other Party written notice.

## 13. MODIFICATIONS

No modification or amendment to this Agreement shall be effective unless agreed in writing and signed by both Parties.

## 14. TERMINATION

14.1. This Agreement may be terminated as set forth in Section 9(1)(ii) or upon 30 days' notice by either party to the other.

14.2. In the event of a termination of this Agreement, any loaned Digital Asset shall be returned immediately and any Invoice Amount and other amounts owed shall be payable immediately.

14.3. The Lender shall not be obliged to return any Collateral until the Borrower has paid the Borrowed Amount and all other amounts owing under this Agreement, including all Invoiced Amounts.

## 15. TRANSFER

15.1. Except under Section 15.2, neither Party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party (such consent to not be unreasonably withheld).

15.2. In the event of a Change of Control of Lender or Borrower, prior written consent shall not be required provided such Party provides the other Party with written notice prior to the consummation of such Change of Control.

## 16. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

## 17. SEVERABILITY

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## 18. COUNTERPARTS

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same Agreement.

## 19. RELATIONSHIP OF PARTIES

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the Parties.

## 20. RIGHTS OF THIRD PARTIES

This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

## 21. SUBMISSION TO ARBITRATION; WAIVER OF COURT AND JURY TRIAL

21.1. Arbitration Terms. Any dispute between the parties, unless amicably resolved by the parties, shall be finally settled by arbitration in accordance with the terms set forth hereunder. In such case, the place of arbitration of any dispute shall be London. The language to be used in the arbitration proceedings shall be English. The arbitration shall be conducted before a mutually appointed sole arbitrator. In the absence of agreement as to the identity of the arbitrator within seven (7) days of first demand of any of the parties, then the arbitrator shall be appointed by the chairman of the United Kingdom Bar. Any award rendered by the arbitrator shall be final and binding upon the parties. The arbitration shall be conducted under the rules and procedures set forth by the United Kingdom Arbitration Law - 1968, which rules and procedures are deemed to be incorporated by reference into this Section. The arbitrator shall not be bound by any rules of procedure or evidence but shall apply the substantive laws of United Kingdom in determining any matters before him. The arbitrator shall be liable to give written grounds for its decision. Judgment upon any award rendered may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. Each party shall pay its own expenses of the arbitration, and the expenses of the arbitrator shall be equally shared between the parties, unless the arbitrator assesses as part of their award all or any part of the arbitration expenses of a party (including reasonable attorneys' fees) against the other party. Any arbitration proceeding hereunder shall be conducted on a confidential basis.

21.2. SUBMISSION TO ARBITRATION. EACH OF BORROWER AND LENDER IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES OR CELSIUS INCLUDING ANY CONFIRMATION OR ANY LOAN OR RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE AND (B) WAIVES, TO THE

DocuSign Envelope ID: C820DC61-B851-4A5C-8561-1DEA7399980B

Ref. Lending Digital Assets

FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY COURT AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF ITS PLACE OF RESIDENCE OR DOMICILE.

21.3.  WAIVER OF COURT AND WAIVER JURY TRIAL. EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES ANY RIGHT THAT IT MAY HAVE TO FILE ANY CLAIMS IN ANY COURT OF LAW OR SEEK A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT. ANY CONFIRMATION, ANY LOAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Ref. Lending Digital Assets

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the Commencement Date.

LENDER: Celsius Network Ltd

By: _____Jessica Khater_____
A22FCDB6046D4BC...

Name: _____Jessica Khater_____

Title: _____Head of Institutional Lending_____

Date: _____12/3/2019_____


BORROWER: _____Reliz Ltd_____

By: _____Blockfills_____
E75CB23F4609471...

Name: _____Brad Nagela_____

Title: _____Head of Trading_____

Date: _____12/3/2019_____

DocuSign Envelope ID: C820DC61-B951-4A5C-8541-1DE17399990B

## ANNEX A

## AUTHORIZED AGENTS*

The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section 3 of the Agreement:

Name:  Brad Nagela_____

Email:  trading@blockfills.com_____


Name:  Nick Hammer_____

Email:  Nick@blockfills.com_____


*Authorized Agents must be listed as the Beneficial Owners in the Celsius Network Corporate Application. If another person is designated as an Authorized Agent, they must be an Officer of the Borrower and must complete Know Your Customer (KYC) Verification and onboarding.

DocuSign Envelope ID: C830DC61-B851-4A5C-8551-1DE473990303

## ANNEX B

## LOAN TERM SHEET

The following loan agreement incorporates all of the terms of the Digital Asset Loan Agreement entered into by the Lender and Borrower (as provided in the Agreement and specified below) on _____ and the following specific terms:

| | |
|---|---|
| Lender: | Celsius Network Ltd |
| Borrower: | _____ |
| Digital Asset: | _____    Digital Asset Spot Price: _____ |
| Amount of Digital Asset: | _____ (Coin)  OR _____ (USD Equivalent) |
| Loan Type: | _____ |
| Loan Term: | _____ |
| Borrow Fee: | _____ % annually, calculated and charged monthly |
| Borrow Fee Payable in: | _____ |
| Collateral Type: | _____ |
| Collateral Amount: | _____    Collateral Spot Price:    _____ |
| Collateral Percentage: | _____ % of Digital Asset Loan Value |
| Margin Call Spot Rate: | _____ % Rise |
| Additional Terms: | _____ |
| | _____ |

USD Collateral Wiring Instructions:

Beneficiary Account: 1503222589
Beneficiary Name: Celsius Network Limited
Beneficiary Address: 35 Great St Helens, London, United Kingdom, EC3A 6AP
Beneficiary Bank: Signature Bank
ABA/Routing Number: 026013576
Beneficiary Bank Address: 565 Fifth Avenue, New York, NY 10017
(International) SWIFT Code: SIGNUS33XXX

Digital Asset Wallet Address of Borrower:    _____

Digital Asset Wallet Address of Celsius:    _____

LENDER: Celsius Network Ltd                BORROWER: _____

By: _____            By: _____

Name:  _____            Name: _____

Title: _____            Title: _____

Date: _____            Date: _____



## Certificate Of Completion

Envelope Id: D830DC61B6514A5C85411DD47399480B
Subject: Blockfills_2019 Celsius Digital Asset Loan Agreement.pdf
Source Envelope:
Document Pages: 14
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 2
Initials: 0

Status: Completed

Envelope Originator:
Jessica Khater
jessica@celsius.network
IP Address: 109.245.237.30

## Record Tracking

Status: Original
        12/3/2019 10:29:57 AM

Holder: Jessica Khater
        jessica@celsius.network

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Blockfills<br>trading@blockfills.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>**Blockfills**<br>E75CB23F4609471...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 185.217.117.127 | Sent: 12/3/2019 10:32:19 AM<br>Viewed: 12/3/2019 10:33:08 AM<br>Signed: 12/3/2019 10:53:49 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 12/3/2019 10:33:08 AM<br>  ID: 84b31cd7-1864-4cd2-a63f-6d8576ae5b9a | | |
| Jessica Khater<br>jessica@celsius.network<br>Head of Institutional Lending<br>Celsius Network Inc.<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Jessica Khater*<br>A22FCDB6046D4BC...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 109.245.237.30 | Sent: 12/3/2019 10:32:19 AM<br>Viewed: 12/3/2019 12:52:29 PM<br>Signed: 12/3/2019 12:52:58 PM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Trading Desk<br>tradingdesk@celsius.network<br>Head of Institutional Trading<br>Celsius Trading Desk<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/3/2019 12:52:59 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 10/4/2019 12:41:07 PM<br>  ID: 51c0a885-c247-4d2c-9f66-93fada63c4e6 | | |

| Witness Events | Signature | Timestamp |
| --- | --- | --- |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 12/3/2019 12:52:59 PM |
| Certified Delivered | Security Checked | 12/3/2019 12:52:59 PM |
| Signing Complete | Security Checked | 12/3/2019 12:52:59 PM |
| Completed | Security Checked | 12/3/2019 12:52:59 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 9/10/2019 7:47:21 AM
Parties agreed to: Blockfills, Trading Desk

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Celsius Network Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Celsius Network Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ashley@celsius.network

**To advise Celsius Network Inc. of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ashley@celsius.network and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Celsius Network Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ashley@celsius.network and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Celsius Network Inc.**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ashley@celsius.network and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Celsius Network Inc. as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Celsius Network Inc. during the course of your relationship with Celsius Network Inc..

**<u>Exhibit H</u>**

**First Partial Award**

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

### CELSIUS NETWORK LTD

<u>Claimant</u>

-and-

### RELIZ LTD

<u>Respondent</u>

────────────────────────────

### PARTIAL AWARD

────────────────────────────

### <u>The Tribunal</u>

### Richard Salter KC

<u>Sole Arbitrator</u>

## (A)    The Arbitration Agreement

1.    This is my Partial Award on all issues except the matters referred to in paragraph 191 below and the costs of the arbitration.  It follows the evidential hearing which took place between 9 and 12 January 2023.

2.    The Claimant, Celsius Network Ltd ("**Celsius**") and the Respondent, Reliz Limited ("**Reliz**") are parties to a Digital Asset Lending Agreement dated 3 December 2019 ("**the Lending Agreement**"), the terms of which were incorporated into a Loan Term Sheet dated 8 June 2020 ("**the Term Sheet**").

3.    The transaction recorded in the Term Sheet was a loan by Celsius to Reliz of ETH 4,098.36[1].  As recorded in the Term Sheet, that was at the time USD 1m's worth of ETH.  When the time for repayment arrived, a dispute arose between Celsius and Reliz as to whether the principal amount that Reliz was obliged to repay to Celsius was USD 1m's worth of ETH at the exchange rate current at the date of repayment (amounting to about ETH 635) or was the originally lent amount of ETH 4,098.36.

4.    Clause 21 of the Lending Agreement provides as follows:

> **Any dispute between the parties, unless amicably resolved by the parties, shall be finally settled by arbitration in accordance with the terms set forth hereunder. In such case, the place of arbitration of any dispute shall be London. The language to be used in the arbitration proceedings shall be English. The arbitration shall be conducted before a mutually appointed sole arbitrator. In the absence of agreement as to the identity of the arbitrator within seven (7) days of first demand of any of the parties, then the arbitrator shall be appointed by the chairman of the United Kingdom Bar. Any award rendered by the arbitrator shall be final and binding upon the parties. The arbitration shall be conducted under the rules and procedures set forth by the United Kingdom Arbitration Law - 1968, which rules and procedures are deemed to be incorporated by reference into this Section. The arbitrator shall not be bound by any rules of procedure or evidence but shall apply the substantive laws of United Kingdom in determining any matters before him. The arbitrator shall be liable to give written grounds for its decision. Judgment upon any award rendered may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. Each party shall pay its own expenses of the arbitration, and the expenses of the arbitrator shall be equally shared between the parties, unless the arbitrator assesses as part of their award all or any part of the arbitration expenses of a party (including reasonable attorneys' fees) against the other party. Any arbitration proceeding hereunder shall be conducted on a confidential basis.**

---

[1]    Ether ("**ETH**") is the native cryptocurrency on the Ethereum blockchain.  See paragraph 67 below.

2

5.      This dispute having arisen between the parties, Celsius commenced this arbitration by a Notice of Arbitration dated 20 May 2021, issued pursuant to clause 21 of the Lending Agreement.

6.      I was appointed as the mutually agreed sole arbitrator for the purposes of this arbitration by an exchange of emails dated 20 and 26 May 2021.  My appointment was subsequently confirmed by written Terms of Appointment signed by the parties and by me in July and August 2021 ("**the Terms of Appointment**").  Clause 8 of the Terms of Appointment recorded the parties' agreement as to the law, procedure, and rules of evidence applicable to the arbitration.

## (B)    The parties and their representatives

7.      The Claimant, Celsius Network Ltd ("**Celsius**"), is a company incorporated under the laws of England and Wales and has its registered office at The Harley Building, 77 - 79 New Cavendish Street, London, England, W1W 6XB.

8.      The Respondent, Reliz Limited ("**Reliz**"), is a company incorporated under the laws of the Cayman Islands and has its registered office at 4th floor Century Yard, Cricket Square, Georgetown, Grand Cayman.  Reliz trades as "Blockfills",

9.      Celsius is represented in this arbitration by Mr Christopher Langley of counsel from Fountain Court Chambers, and by Mr Laurence Lieberman, Ms Georgina Jones, Ms Jennifer Gregor and Ms Kate Hamblin of Taylor Wessing LLP.

10.     Reliz is represented in this arbitration by Mr Tony Singla KC and Mr Crawford Jamieson of counsel from Brick Court Chambers, and by Ms Philippa Charles, Mr Daniel Wilmot[2], Mr Louis Peacock-Young and Mr Sean Nolan of Stewarts Law LLP.

## (C)    Procedural matters

11.     Reliz served its Response to the Notice of Arbitration on 2 July 2021.  On 4 October 2021 Celsius served its Statement of Case.

12.     Following correspondence with the parties in which each party set out its proposals in relation to the future conduct of the arbitration, on 15 October 2021 I issued Procedural Order No 1.  In relation to the one strongly contested issue, which related to the relevance of expert evidence, I refused Celsius's request that I should pre-emptively exclude such evidence.  Instead, I ordered Reliz to serve any proposed expert evidence at the same time as it served its Rejoinder, so that Celsius (if so advised) could renew its objection at that stage, having seen the evidence in question.

---

[2]      Ms Charles left Stewarts Law LLP with effect from 1 February 2023 and was replaced as the supervising partner for this matter by Mr Wilmot.

13. Otherwise, Procedural Order No 1 set out the timetable for the progress of the arbitration towards a substantive evidential hearing. That timetable included timings relating to expert evidence, if any, designed to ensure that the expert process should not delay the progress of the arbitration. The timetable laid down in Procedural Order No 1 was thereafter varied and extended from time to time, both by agreement between the parties and by the order which I made on 14 September 2022.

14. Further statements of case were served as follows:

14.1 Reliz served its Statement of Defence and Counterclaim on 9 November 2021.

14.2 Celsius served its Reply and Defence to Counterclaim on 2 December 2021.

14.3 Reliz served its Rejoinder and Reply to Defence to Counterclaim on 14 January 2022.

15. Pursuant to Procedural Order No 1, Reliz served with its Rejoinder and Reply to Defence to Counterclaim the Report dated 14 January 2022 of its proposed expert witness, Mr Steffen Hennig of Fideres Partners LLP. Celsius did not renew its application to exclude expert evidence, but instead served the report of its own expert witness, Ms Debbie Revill of Kroll Advisory Limited.

16. Between January and May 2022, the parties made requests of each other for production of documents and on 28 May 2022 I made rulings on those requests to which objections had been made and persisted in.

17. On 17 May 2022, the parties agreed that the substantive hearing should take place in the week beginning 9 January 2023.

18. On July 13, 2022, Celsius Network LLC and certain of its affiliates (including Celsius, the Claimant in this arbitration), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the US Bankruptcy Court for the Southern District of New York. The cases are pending before the Honorable Martin Glenn and are being jointly administered under Case No 22-10964.

19. On 8 August 2022 the parties exchanged documents pursuant to paragraphs 1 and 2 of Procedural Order No 1.

20. On 26 August 2022, Reliz applied for directions, including a stay of the arbitration, on the grounds that the financial position of Celsius, as evidenced (inter alia) by the Chapter 11 proceedings referred to in paragraph 18 above, gave grounds to believe that Celsius would be unable either to pay Reliz's costs of the arbitration (were an order for costs to be made in Reliz's favour), or to pay its share of my fees and the other common costs and expenses of the arbitration. Pursuant to directions which I

4

gave on 28 August 2022, Celsius responded to that application on 7 September 2022, Reliz replied on 12 September 2022 and Celsius made a further response on 13 September 2022.

21. I ruled on Reliz's applications on 14 September 2022, refusing to stay the arbitration or to order Celsius to provide security for Reliz's own costs, but ordering the parties (under clause 23 of the Terms of Appointment) each to deposit sums by way of security for my fees and the estimated future costs and expenses of the arbitration.

22. On 13 September 2022 the parties exchanged the following witness statements:

    22.1   On behalf of Celsius:

        22.1.1  The First Witness Statement of Patrick Holert dated 12 September 2022, with accompanying exhibit PH1.

        22.1.2  The First Witness Statement of Connor Nolan dated 13 September 2022, with accompanying exhibit CN1.

    22.2   On behalf of Reliz:

        22.2.1  The First Witness Statement of Nick Hammer dated 13 September 2022 with accompanying exhibit NH1.

23. At the times relevant to this dispute:

    23.1   Mr Holert was the Financial Risk Officer and Mr Nolan was an Operations Analyst at Celsius; and

    23.2   Mr Hammer was the CEO and co-founder (with Mr Gordon Wallace) of Reliz.

24. On 14 October 2022 Reliz deposited the sum required by my 14 September 2022 order into the fundholding account opened for that purpose at my request by the LCIA. Celsius made its equivalent deposit with the LCIA on 17 October 2022.

25. On 18 October 2022, the parties exchanged the following further witness statements:

    25.1   The Second Witness Statement of Mr Holert dated 17 October 2022.

    25.2   The Second Witness Statement of Mr Hammer dated 18 October 2022

26.    The experts, Mr Hennig and Ms Revill, met on 7 November 2022 and thereafter produced a Joint Memorandum dated 23 November 2022.  Supplemental Expert Reports from Mr Hennig and Ms Revill were exchanged on 7 December 2022.

27.    In the course of preparation for the hearing, Celsius objected to the Reliz's proposal to include in the bundle of documents for us at the hearing a report of the decision of US District Judge Conlon in the 1990 case of *Holert v University of Chicago*.  On 9 December 2023, I ruled that the report should be included *de bene esse*, without prejudice to any submissions that might be made at the hearing itself as to the use (if any) which could be made of the decision, including (without limitation) as to its admissibility, probative value and use in cross-examination.

28.    Following comments from me on an earlier draft, on 29 December 2022 the parties agreed the proposed timetable for the hearing and on 3 January 2023 exchanged Skeleton Arguments.

29.    The substantive hearing eventually took place before me between 9 and 12 January 2023 at the offices of Taylor Wessing LLP.  A live transcription service and nightly transcript of the hearing was provided by TrialView Ltd.   Mr Langley (on behalf of Celsius) and Mr Singla KC (on behalf of Reliz) each made oral opening and closing submissions.  Mr Holert, Mr Hammer, Ms Revill and Mr Hennig all gave evidence in person and were cross-examined.  Mr Nolan (by agreement between the parties) give his evidence by video-link and was also cross-examined.

30.    Thereafter, by agreement, the parties exchanged further written submissions on the capital gains tax position.   The parties' agreed directions in relation to these submissions were communicated to me in an email dated 31 January 2023 from Taylor Wessing LLP, which enclosed copies of the relevant correspondence exchanged between the parties following the hearing.   Pursuant to those agreed directions, Reliz made further submissions in a letter dated 6 February 2023 (and its enclosures); Celsius made further submissions in a letter dated 17 February 2023; and Reliz replied by letter dated 23 February 2023.

## (D)    The nature of the dispute between the parties

31.    As pleaded in paragraph 23 of Reliz's Statement of Defence and Counterclaim:

**Simply put, the central dispute between the Parties is:**

**a.   Whether the Parties' Agreement was for a loan of 4098.36 ETH which was to be repaid by way of the redelivery of 4098.36 ETH (*Celsius's case*); or**

> **b.   Whether the Parties' Agreement was for a loan of the ETH equivalent to US\$ 1,000,000 from time to time which was be to be repaid by way of redelivery of the ETH equivalent to US\$ 1,000,000 (*Reliz's case*).**

32.    In brief outline, Celsius's primary case is that, on the proper interpretation of the words used in the Lending Agreement and the Term Sheet in their contractual and commercial context, the principal amount that Reliz was required to repay was the ETH 4,098.36 that was originally lent.

33.    In equally brief summary, Reliz's case is that Celsius's case:

> **.. ignores the significance of the surrounding factual matrix which provides important context to the interpretation and application of the terms of the Agreement .. [Celsius's] proposed interpretation .. does not make commercial sense when viewed from the perspective of either Party at the time of the Agreement ..**[3]

34.    In order to get to the commercial result for which it contends, Reliz not only relies upon arguments as to interpretation, properly so called, but also asserts (in the alternative) that the terms of the Master Agreement were varied by the Term Sheet and/or that there was a collateral contract and/or that the terms of the Master Agreement and the Term Sheet should be rectified on the basis of common mistake[4].

35.    Celsius' response is that Reliz's case is inconsistent with the express terms of the Agreement and the Term Sheet, makes no commercial sense, and is otherwise "fanciful for multiple reasons". Celsius disputes the existence of any collateral contract and denies that any grounds exist for rectification.

36.    The issues which I have to decide are therefore as follows:

36.1    On the true interpretation of the Lending Agreement and the Term Sheet, was Reliz obliged to redeliver ETH 4,098.36 or only the ETH equivalent of USD 1 million at the exchange rate ruling at the repayment date;

36.2    If, on the true interpretation of the Lending Agreement and the Term Sheet, Reliz would otherwise have been obliged to redeliver ETH 4,098.36:

---

[3]    Reliz's Statement of Defence and Counterclaim, para 3

[4]    Reliz' Statement of Defence and Counterclaim refers to this as "mutual" mistake, using the terminology adopted by Lord Atkin in *Bell v Lever Bros* [1932] AC 161.  However, "cases in this category are now usually referred to as 'common' mistake, for normally the mistake is legally relevant only if both parties have contracted under the same misapprehension": Beale (ed), *Chitty on Contracts* (34th edn, Sweet & Maxwell 2021) para [8-001] and fn 6. "One reason for using the phrase "common mistake" is to reduce the risk of confusion with .. "mutual misunderstanding" (where the parties are at cross-purposes as to the terms of the contract)" (ibid).

36.2.1   Did the parties make a collateral contract providing that Reliz was nevertheless only obliged to redeliver the ETH equivalent of USD 1 million at the exchange rate ruling at the repayment date; or

36.2.2   Should the contractual documentation be rectified so as to provide that Reliz was only obliged to redeliver the ETH equivalent of USD 1 milion at the exchange rate ruling at the repayment date?

## (E)   The Lending Agreement

37.   The contractual documents signed by the parties are at the heart of this dispute. I therefore begin by setting out the terms of the Lending Agreement which are relied on by the parties.

38.   Recital (A) to the Lending Agreement says that:

**This Digital Asset Lending Agreement, including its Annexes, (the "Agreement") sets out the terms on which [Reliz] may, from time to time, seek to initiate a transaction pursuant to which [Celsius] will lend Digital Asset(s) to [Reliz] and [Reliz] will return Digital Assets, e.g. BTC or ETH, at or upon Loan termination or maturity, subject to no event of default occurring.**

Clause 2 (Definitions) provides that:

**"Digital Asset" means Bitcoin (BTC), Ether (ETH) or any digital asset that the Parties may agree upon in writing.**

39.   Clause 3 (General Operation) of the Lending Agreement provides as follows:

**Loan Procedure**

**3.1. During the Term of this Agreement, at a particular time and on a Calendar Day (the "Request Time"), an Authorized Agent of the Borrower may by email directed to trading@celsius.network request from the Lender a Loan of a specific number of Digital Asset including the Pricing Terms (a "Lending Request").**

**3.2. The Lending Request shall contain the following information:**

**(i)   the Digital Asset and its amount that the Borrower wishes to borrow;**

**(ii)   the Pricing Terms;**

**(iii) the Loan type: Term Deal or an Open Deal;**

**(iv) the Loan Effective Date; and**

**(v)   if the Loan is a Term Deal, the Maturity Date.**

8

**3.3. The Lender shall by email directed to the Borrower, inform the Borrower whether the Lender agrees to make such a Loan, at the Lender's sole discretion. For the avoidance of doubt, the Lender shall not be obligated to provide a Loan or any portion thereof unless the Lender confirms in writing the Lending Request or any portion thereof, and to the extent of such written confirmation.**

**3.4. The specific terms of a Loan shall be recorded using the Loan Term Sheet attached as Annex B of this Agreement.**

**…**

**Term Deal Loan**

**3.7. Where the Parties agree that a Loan shall be on a Term Deal basis, the Lender shall not have the right to recall all or any portion of Digital Asset loaned to the Borrower in advance of the Maturity Date, except in accordance with Section 9.1.**

**3.8. The Borrower may at any time on a Calendar Day (the "Redelivery Date") redeliver all or any portion of Borrowed Amount loaned to Borrower.**

**3.9. If the Borrowed Amount has not been returned before the Maturity Date, the Borrower shall commence redelivery on or before on the Maturity Date.**

40. Clauses 4 (Borrow Fees and Transaction Fees) and 5 (Collateral Requirements) of the Lending Agreement provide for fees and collateral, in the following terms:

**Borrow Fee Calculation**

**4.1. Following an accepted Lending Request, an agreed Borrow Fee will be recorded in the relevant Loan Term Sheet. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and the Lender, as provided for on a Loan Term Sheet.**

**4.2. The Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.**

**Late Fee**

**4.3. Where the Borrower fails to return any Digital Asset by an applicable Due Date, the Borrower shall incur the Late Fee for each Calendar Day that the repayment of the Digital Asset is overdue.**

**Payment of Borrow Fees and Late Fees**

**4.4. An invoice shall be sent monthly (on such Calendar Day or such other day as the Lender may determine) and shall include any Borrow Fees and any Late Fees (the "Invoice Amount") outstanding. The Invoice Amount shall be payable as provided for on the Loan Term Sheet. Without**

prejudice to Section 9.1(i), the Borrower shall have up to five Business Days to submit payment for the invoice (the "Invoice Due Date").

**Taxes and Fees**

4.5. All transfer or other taxes or third-party fees payable with respect to the transfer and/or return of any Borrowed Amount, Invoice Amount or other amount under this Agreement shall be paid by the Borrower.

**Collateral**

5.1. Before the Lender commences a Loan on behalf of the Borrower, the Borrower shall provide the Collateral. The Collateral shall be an amount in the Currency agreed upon calculated as a percentage of the Borrowed Amount, as valued at a spot rate agreed upon in the Loan Term Sheet.

5.2. The Lender shall be entitled to use the Collateral to conduct its digital asset lending and borrowing business, including transferring the Collateral to bank accounts that are not controlled by the Lender and to pay any Borrow Fees.

**Margin Calls**

5.3. If during the term of a Loan the value of the Digital Asset representing the Borrowed Amount increases by the percentage agreed upon by the Parties in the Loan Term Sheet (such rate, the "Margin Call Spot Rate"), Lender shall have the right to require the Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the borrowed Digital Asset at the Margin Call Spot Rate (the "Additional Collateral").

5.4. If the Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "Collateral Call") to the Borrower at the email address indicated in Section 12.1 that sets forth:

(i)   the Margin Call Spot Rate and

(ii)   the amount of Additional Collateral required based on the Margin Call Spot Rate.

The Borrower shall transfer the Additional Collateral to the Lender within the time set forth in the Collateral Call. If Borrower fails to transfer the Additional Collateral within the number of hours specified in this subsection (ii), and the value of the borrowed Digital Asset as indicated by the Margin Call Spot Rate exceeds the spot rate indicated in the Loan Term Sheet by a certain percentage agreed between the Lender and the Borrower, the Lender may declare an Event of Default under Section 8 below.

**Payment of Additional Collateral**

5.5. Payment of the Additional Collateral shall be made in the Currency agreed upon through Borrower's Digital Wallet to Lender or by bank wire

**to the account specified in the Loan Term Sheet necessary to make the USD Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate.**

**Default or Failure to Return Loan**

**5.6. In the event that Borrower does not return the Borrowed Amount when due, the Lender may apply the Collateral for the payment of any liability or obligation or indebtedness of the Borrower created by this Agreement, including, but not limited to using the Collateral to purchase Digital Asset to replenish Lender's supply of the relevant Digital Asset.**

**Return of Collateral**

**5.7. Upon the redelivery of any Borrowed Amount and payment of all Borrow Fees, Lender shall initiate the return of Collateral to either (a) the Borrower's Bank Account (in the name of Borrower); or (b) the Borrower's Digital Asset Wallet as provided in Annex B.**

41.   Clause 8 (Events of Default) makes (among other events) "the failure of the Borrower to return any Borrowed Amount when due" an event of default, and clause 9 (Remedies) specifies (inter alia) that:

**9.2 In the event that the Borrower fails to pay any amounts due hereunder, the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable legal fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.**

42.   Clause 16 (Entire Agreement) states that:

**This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.**

Clause 19 (Relationship of the Parties) provides that:

**Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the Parties.**

and clause 21 (Submission to Arbitration; Waiver of Court and Jury Trial) provides for all disputes to be settled by arbitration.  The material terms of clause 21.1 are set out in paragraph 3 above.

43.   As presaged in the terms set out above, Annex B to the Lending Agreement provides a pro-forma Loan Term Sheet.   This pro-forma differs in some respects from the Term Sheet used for the transaction with which this dispute is concerned.  The material parts are set out below:

Ref. Lending Digital Assets

**ANNEX B**

**LOAN TERM SHEET**

The following Lending Agreement incorporates all of the terms of the Digital Asset Lending Agreement entered into by the Lender and Borrower (as provided in the Agreement and specified below) on _____ and the following specific terms:

| | |
|---|---|
| Lender: | Celsius Network Ltd |
| Borrower: | _____ |
| Digital Asset: | _____    Digital Asset Spot Price: _____ |
| Amount of Digital Asset: | _____ (Coin) OR _____ (USD Equivalent) |
| Loan Type: | _____ |
| Loan Term: | _____ |
| Borrow Fee: | _____% annually, calculated and charged monthly |
| Borrow Fee Payable in: | _____ |
| Collateral Type: | _____ |
| Collateral Amount: | _____ |
| Collateral Spot Price: | _____ |
| Collateral Percentage: | _____% of Digital Asset Loan Value |
| Margin Call Spot Rate: | _____% Rise |
| Additional Terms: | _____ |
| | _____ |

## (F)    The Term Sheet

44.    The Term Sheet in fact used for the transaction with which this dispute is concerned is in the following terms:

**ANNEX B**

**LOAN TERM SHEET**

<u>Loan C1234</u>

The following loan term agreement dated 06/08/2020 incorporates all of the terms of the Master Digital Asset Lending Agreement entered into by Celsius Network Ltd ("Lender") and the Borrower (as provided in the Agreement and specified below) on 12/03/2019 and the following specific terms:

| | |
|---|---|
| Lender: | Celsius Network Ltd. |
| Borrower: | Reliz Ltd. |
| Digital Asset: | ETH |
| Amount | 4,098.36 |
| Spot price: | $244 |

12

| | |
|---|---|
| Amount in USD: | $1,000,000 |
| Loan Type | Term |
| Loan Term | 13 months, or sale of shares in ETHE, whichever is sooner |
| Maturity Date: | 07/08/2021 |
| Borrow Fee: | 1% Borrow Fee Payable in:  ETH |
| Collateral Asset: | USD |
| Collateral Amount: | 250,000 |
| Collateral Level: | 25% |
| Margin Call Level: | N/A |
| Reverse Call Level: | N/A |
| Additional terms: | |

*The loan will be used exclusively to purchase shares of the Grayscale Ethereum Trust (ETHE). Once the loan and remaining interest are repaid to Celsius, Celsius will be paid any excess of the proceeds from the sale of the ETHE shares less the loan amount as follows:*

*i.) Preferred interest at an annualized 6% rate on the loan amount, as allowed by the excess proceeds, and paid in either ETH or USO; and*

*ii.) Profit-sharing of 70% of any remaining excess proceeds, paid in ETH or USD*

## (G)   The expert witnesses

45.    The expert evidence on both sides was directed towards the comparative commerciality of the disputed versions of the agreement between the parties.   Mr Hennig gave expert evidence on behalf of Reliz.  He gave evidence that the risk of the appreciation of the value of the ETH was not naturally hedged by other aspects of the transaction.  He also provided a detailed mathematical risk return analysis.  His overall conclusions were that:

> **.. Under the Celsius Interpretation , Celsius did not assume any downside risk .. [and] retained the majority of the upside potential.  Under the Reliz Interpretation of the repayment terms, both parties show upside and downside scenarios .. The Reliz Interpretation of the repayment terms shows a more balanced split of potential returns and risks under the same assumptions.**

> **Under these assumptions, the Reliz Interpretation falls within the plausible range of professional investing precepts while the Celsius Interpretation, in my opinion, falls outside the range of plausible agreements.**

> **Consequently, it is my opinion that professional market participants, as I understand Celsius and Reliz to be, would not have negotiated a split of risks and rewards as implied by the Celsius Interpretation ..**

13

46.     Ms Revill gave expert evidence in response on behalf of Celsius.  There was no real dispute between her and Mr Hennig as to the facts relating to hedging, though she was less familiar than Mr Hennig with some of the mathematical concepts which he deployed.  The disagreement between them was mainly about how imperfect or inexact a hedge could be while still remaining a commercially reasonable hedge.

47.     Ms Revill was not able to dispute the calculations in Mr Hennig's risk return analysis.  However, she expressed the view that that analysis:

> **.. does not present a range of outcomes that would have realistically been considered that the point the parties entered into the agreement and is therefore irrelevant ..**

48.     Mr Hennig was an impressive witness, and Ms Revill seemed much less at home with mathematical analysis than he was. To the extent, however, that Mr Hennig went further, and expressed views as to what the parties would or would not have agreed, it seems to me that his evidence went beyond the proper province of an expert witness. Those sorts of questions are for me, as the tribunal of fact, taking into account *all* the available evidence, not just the matters referred to by Mr Hennig.  In particular, there was no evidence that, before entering into the transaction, either party had themselves carried out the sort of detailed hedging and risk return modelling that has been carried out after the event by Mr Hennig.  Nor, in the nature of things, are such analyses the only considerations which might motivate a party to enter into a particular transaction.

## (H)   The factual witnesses

49.     Mr Holert and Mr Nolan, on behalf of Celsius, and Mr Hammer on behalf of Reliz, all gave evidence and were cross examined.  Their evidence - particularly that of Mr Hollert and Mr Hammer - was, in some important respects, contradictory. I nevertheless gained the impression that each of them now genuinely believed that his particular recollection of the history of this matter was correct.  It was, however, common ground that both sides were heavily engaged in the digital currency market at the material time and entered into (and have entered into) a great many transactions, both at about the relevant time and over the intervening period.  In the circumstances, it is unsurprising that many of the answers given by each of the witnesses to questions about points of detail seemed to me to be reconstructions rather than recollections, and to be coloured by an understandable desire to support a particular viewpoint.

50.     The demeanour of the witnesses in trying to recall matters did not, in general, point in any meaningful way to which of them had the more reliable memory.  As Leggatt LJ has observed[5]:

---

[5]     *R (on the application of SS (Sri Lanka)) v Secretary of State for the Home Department* [2018] EWCA Civ 1391, [2018] Imm AR 1348, at [41].

14

> **.. No doubt it is impossible, and perhaps undesirable, to ignore altogether the impression created by the demeanour of a witness giving evidence. But to attach any significant weight to such impressions in assessing credibility risks making judgements which at best have no rational basis and at worst reflect conscious or unconscious biases and prejudices .. Rather than attempting to assess whether testimony is truthful from the manner in which it is given, the only objective and reliable approach is to focus on the content of the testimony and to consider whether it is consistent with other evidence (including evidence of what the witness asset another occasions) and with known or probable facts ..**

51.     Nor could I derive any significant assistance in deciding where the truth lies from the finding of District Judge Conlon in Mr Holert's case against the University of Chicago[6] that Mr Holert had at the start of his career used a misleading resumé to obtain employment. The situation with which that case appears to have been concerned happened more than 30 years ago, and in an entirely different context.  In any event, under the well-known principles established in *Hollington v Hewthorn*[7], District Judge Conlon's findings are not themselves admissible (much less conclusive) evidence of the facts which he then found.  Mr Holert was cross-examined about all this and, although he accepted that that had been the court's finding in 1990, disputed the detail of the facts. I am in no position to resolve those satellite disputes in this arbitration.

52.     As Leggatt J (as he then was) observed in *Gestmin SGPS SA v Credit Suisse (UK) Ltd*[8]:

> **.. the best approach for a judge to adopt in the trial of a commercial case is .. to place little if any reliance at all on witnesses' recollections of what was said in meetings and conversations, and to base factual findings on inferences drawn from the documentary evidence and known or probable facts ..**

As Leggatt J went on to say, this does not mean that oral testimony serves no useful purpose: and it is clear that a proper awareness of the fallibility of human memory cannot relieve a fact-finding tribunal from the task making findings of fact based upon *all* of the available evidence[9].

53.     However, in a case such as the present, reference to the objective facts and documents[10], to the witnesses' motives, and to the overall probabilities will, it seems to me, usually be a better guide to the truth than even the most confident recollections of

---

[6]     *Holert v. University of Chicago*, US District Court for the Northern District of Illinois - 751 F. Supp. 1294 (N.D.Ill. 1990) November 26, 1990.

[7]     [1943] KB 587.  See also *Calyon v Michailaidis* [2009] UKPC 34; and *Rogers v Hoyle* [2014] EWCA Civ 257; [2015] QB 265

[8]     [2013] EWHC 3560 (Comm), [2020] 1 CLC 428 at [22].

[9]     *Kogan v Martin* [2019] EWCA Civ 1645, [2020] FSR 3 at [88], per Floyd LJ

[10]    See *Simetra Global Assets Ltd v Ikon Finance Ltd* [2019] EWCA Civ 1413, [2019] 4 WLR 112 at [48], per Males LJ.

15

the witnesses[11]. That remains so, even though most of the relevant events here took place less than 3 years before the evidential hearing.

## (I)   Findings of fact

54.    Directing myself in accordance with those principles, I therefore make the findings of fact set out below.

55.    In the doing so, I shall from time to time intersperse into the narrative extracts from the evidence given by Mr Holert, Mr Noland and Mr Hammer, and will draw attention to some of the conflicts of recollection in that evidence. I will not interrupt the chronology of events by seeking to resolve those conflicts here, but will do so, to the extent necessary, in the course of my analysis in Section J below.

### (I.1)   The parties and their relationship

56.    According to Mr Hollert:

> .. Celsius is a diversified financial service company which operates a lending platform.   Celsius takes deposits from its customers in cryptocurrencies, generates yields through lending on those deposited cryptocurrencies (through charging interest and other profit generating activities), uses those yields to pay awards to the depositing customers, and ultimately returns the same amount of cryptocurrencies to those customers and keeps the margin to finance its operations ..

57.    According to the Celsius Network Terms of Use, as updated on 5 March 2020:

> .. Celsius Network is the next generation of Digital Assets-related services, serving as a value-driven lending and borrowing platform for all members of the Celsius Network community.   Celsius Network allows Users to take advantage of a variety of services .. including: becoming members in the Celsius platform and community; hold[ing] your Digital Assets in the Celsius wallet and gain[ing] rewards; applying for dollar loans with Digital Assets as collateral; and instantly transfer[ring] Digital Assets to other users through our innovative CelPay feature ..

58.    Matters which have emerged in connection with Celsius's insolvency[12] nevertheless suggest that Celsius's business activities may not always have been as straightforward as the descriptions in paragraphs 56 and 57 above might suggest.  For example, on 7 July 2022, the Vermont Department of Financial Regulation issued an Investor Alert saying that:

> .. Celsius deployed customer assets in a variety of risky and illiquid investments, trading, and lending activities.   Celsius compounded these

---

[11]      Cf the classic statement of Robert Goff LJ in *The Ocean Frost* [1985] 1 Lloyd's Rep 1 at 57.
[12]      See paragraph 18 above.

> **risks by using customer assets as collateral for additional borrowing to pursue leveraged to investment strategies ..**

Similarly, in the Preliminary Statement filed by the State of New York on 5 January 2023 in its action against Mr Alex Mashinsky (the founder and CEO of Celsius), it was said that, although Mr Mashinsky "promoted Celsius as a safe alternative to banks", "Celsius was actually engaged in risky investment strategies".

59.    I cannot determine whether these allegations made against Celsius by public authorities in the United States of America are true.  They are at present simply allegations. However, the very fact of Celsius's insolvency provides some indication that it was at least sometimes prepared, using the cryptocurrencies deposited with it by its customers, to undertake investments involving a significant element of risk.  For this and other reasons, I therefore do not accept Mr Holert's blanket assertion that "it was not Celsius's practice to take cross-currency risk on a loan".

60.    As for Reliz, according to Mr Hammer:

> **.. Reliz does business as "Blockfills".  It is a fintech company focused on digital assets with a small proprietary trading vertical and client-facing verticals including trading infrastructure, software solutions, liquidity provision and execution in spot, futures and options markets, structured products, commercial lending and mining where we supplied technology and trading solutions to institutions.  Nearly all of what Reliz does is focused on cryptocurrencies (we do a very small amount of forex and commodities as well ..). We provide technical infrastructure, tech applications, risk management applications, execution and clearing services.  All of our clients are business to business.  They include crypto exchanges, banks, hedge funds, asset managers, broker-dealers and family offices ..**

61.    Celsius and Reliz had traded with each other several times prior to the trade which is the subject of this arbitration.  According to Mr Hammer:

> **.. Celsius was an active lender and borrower in the industry.  By late 2019 [Reliz] were actively looking for lending and borrowing counterparties to meet demand from Blockfills' clients that wanted over-collateralised (or sometimes under-collateralised ..) commercial loans that we were brokering through our platform.  This work fit well with Celsius, which operated a business incorporating both the taking of cryptocurrency as client deposits and offering loans backed by cryptocurrency deposits but which, unlike Blockfills, dealt with mostly retail investors.  The relationship with Blockfills was also a good fit for Celsius because it gave them access to institutional businesses that would not trade with a retail platform like Celsius ..**

62.     Also according to Mr Hammer:

17

> **.. Around late 2019 we started doing basic loans with Celsius .. These early loans were undertaken on the basis of over-collateralisation of the fiat value of the cryptocurrency element .. [and] were much different to the one which is in dispute in this case ..**
>
> **.. Celsius used term sheets provided by Blockfills for [these] other lending transactions .. and to my recollection we had never even used a Celsius-drafted term sheet prior to the Grayscale Trade**

63.  Mr Hammer's evidence that the previous transactions between Celsius and Reliz had been documented on Reliz term sheets is corroborated by two "BF borrower term sheet - base and term" documents dating from March and December 2019, which have been electronically signed on behalf of both Celsius and Reliz.   These record transactions under which Celsius lent USD to Reliz in exchange for BTC.   On the repayment date, Celsius was obliged to redeliver BTC and Reliz to redeliver USD.

64.  Neither of these Reliz term sheets made reference to any Master Agreement.   It was nevertheless common ground that on 12 March 2019 Ms Jessica Khater (as Head of Institutional Lending) on behalf of Celsius and Mr Brad Nagela (as Head of Trading) on behalf of Reliz signed the Lending Agreement.   (Ms Khater left Celsius and Mr Nagela (independently) left Reliz sometime in the spring of 2020.   Neither, therefore, features thereafter in the story of this transaction.)

65.  The Reliz term sheet dating from March 2019 suggests that Mr Hammer is wrong to date the outset of the relationship between Celsius and Reliz to late 2019, and that the commercial relationship between the parties began in about March 2019, at about the time that the Lending Agreement was signed.

### (I.2)   *The arbitrage strategy*

66.  The background to this dispute is an arbitrage strategy, involving an attempt to take advantage of a disparity between the price in USD at which shares in the Grayscale Ethereum Trust ("**GET**") were trading and the net asset value ("**NAV**") of those shares as a proportion of the ETH held by GET.

67.  Ether ("**ETH**") is the native cryptocurrency on the Ethereum blockchain[13].   It was developed between 2013 and 2015 and presently represents the second largest cryptocurrency after Bitcoin.

68.  It is not always straightforward to invest directly in cryptocurrencies.   In consequence, a number of what may be described as "repackaging structures" have evolved to make

---

[13]      According to Part 1 of the Form 10-K filed by the Greyscale Ethereum Trust with the US SEC for the fiscal year ended 31 December 2020 (**GET's SEC Filing**"), ETH are "digital assets that are created and transmitted through the operations of the peer-to-peer Ethereum Network, a decentralised network of computers that operates on cryptographic protocols".

such investment easier and safer for investors.  As Mr Hennig explains, these:

> **.. issue regular securities (e.g. fund shares) to investors and use the proceeds to acquire a portfolio of cryptocurrencies which is then held by a sufficiently equipped and protected custodian on behalf of fund investors ..**

69.     GET is one such repackaging structure.  It is a Delaware Statutory Trust, formed on 13 December 2017 by Grayscale Investments LLC.  According to GET's SEC Filing, the shares in GET, which are quoted on OTCQX[14] under the symbol "**ETHE**":

> **.. are intended to offer investors an opportunity to participate in Digital Asset Markets through an investment in securities ..**

The sole asset held by GET is ETH, and:

> **.. The investment objective of [GET] is for the Shares (based on ETH per Share) to reflect the value of the ETH held by [GET], determined by reference to the Index Price, less [GET's] expenses and other liabilities ..**

> **.. While an investment in the Shares is not a direct investment in ETH, the Shares are designed to provide investors with a cost-effective and convenient way to gain investment exposure to ETH ..**

In other words, the purpose behind the creation of GET was to enable investors to get approximately the same economic effect by buying ETHE – i.e. the quoted shares in GET – as they would have got by buying ETH directly.

70.     At the outset, GET did not operate a redemption program for its shares. For that and other reasons, throughout 2020 the shares in GET did not reflect the NAV in ETH of those shares, but instead traded in USD at a significant premium to the NAV.

71.     It was, however, possible for certain qualified investors to buy shares from GET at the NAV, provided that they paid for those shares with ETH.  It was thus possible for such a qualified investor to use ETH to buy shares in GET at a price well below the price at which those shares were then trading in USD in the market.  The catch was that those shares then had to be held for a lock-up period, during which the premium might potentially reduce or even disappear.

72.     In September 2019, Mr Mashinsky of Celsius had lunch with Mr Brooke Stoddard, the Sales Director of Grayscale.  Mr Stoddard followed that lunch up with an email dated 23 September 2019.  Shortly thereafter, Celsius and Grayscale began the process of "on-boarding [Celsius] as a Grayscale investor across [the Grayscale] family of products".  In the course of this, Grayscale sent an email dated 10 October 2019 to Celsius, saying that:

---

[14]     A US exchange operated by the OTC Markets Group.

19

> **.. On the Investment Preferences & Accreditation form, it's noted that [Celsius] has a "moderately conservative" risk tolerance and that it's disagrees with the statement "I am comfortable with investments that have limited liquidity and may take several years to sell".**
>
> **Can you confirm your full understanding that the Grayscale investment vehicles are illiquid products that are fully restricted to the first twelve months and have unique risks and liquidity characteristics ..**

73.   Discussions between Celsius and Grayscale then ceased.   However, in March 2020, Celsius revived its interest in Grayscale.  On 23 March 2020, Mr Holert joined in a conference call with Grayscale and then sent the following email to Mr Mashinsky and others in the Celsius team, drawing attention to the opportunity represented by the premium over NAV at which GET was then trading:

> **The Grayscale funds are open ended, and only close for subscriptions two weeks at the end of each month. We could subscribe to them at any other times.**
>
> **- New shares in the funds are sold at NAV, and after a one year holding period required by Reg 144, can be sold at market price. The current market price is $ 75/share and the latest NAV price is $13/share.**
>
> **-Grayscale charges a high management fee of 2.5% of NAV. If we invested 100 ETH in the fund, our holding would be worth 97.5 ETH after one year.**
>
> **The premium of market price over NAV on the funds is too much to ignore. We should definitely subscribe to some shares from the Celsius balance sheet.**

74.   Celsius, however, continued to have concerns as to whether it was itself able, from a compliance point of view, to invest directly in GET.  On 8 April 2020 Mr Assaf Iram, Celsius' Head of Trading Desk, sent an internal email (copied to Mr Mashinsky, Mr Holert and Mr Nolan) lamenting the fact that other institutions were "doing the trade with Grayscale and making a lot of money", and saying that:

> **.. I think we should focus on making this trade available to us one way or another as soon as possible ..**

### *(I.3)   The negotiations between Celsius and Reliz*

75.   Shortly thereafter, Mr Iram floated with Mr Neil van Huis of Reliz the idea of a possible trade involving the purchase of ETHE by Reliz using ETH lent by Celsius. The two exchanged a series of WhatsApp messages about this possibility between 10 and 20 April 2020, in the course of which:

   75.1   On 10 April, Mr van Huis said that it seemed likely that Reliz's regulated entity was qualified to buy ETHE, but that "we need to check with our

compliance if we have the proper authority to make that investment on your behalf or even alone ourselves" and would get back to Mr Iram.   Mr Iram responded by saying that "we can make Millions here", "it will take us a year", and "we have the supply [of ETH]".   Mr van Huis answered that by saying "Yes.  Your supply + our licence = millions together".

75.2   On 14 April, Mr Iram and Mr van Huis discussed the potential risks of the proposed transaction.   Mr van Huis asked Mr Iram "did you say you know people who we can borrow grayscale shares from? bc it seems like it is quite important to hedge this trade".   After a discussion about potential sources of ETHE, Mr Iram said "but look in terms of risk we can figure it out together who takes the risk of the trade", to which Mr van Huis responded "yes sure, but the return structure will change if we cannot short the actual shares.  bc if you sell swaps to protect the ETH directional risk, the actual return structure I think will be different.  We are looking into all of these things for both [Reliz] and Celsius benefit.  Just wanted to check with you in case you already knew people who had shares we could borrow".   Mr Iram replied "but as I explained I don't have exposure to ETH price .. I am crypto to crypto".

75.3   On 15 April, Mr Iram and Mr van Huis exchanged messages setting up a call for the following day between their respective teams including (on the Celsius side) Mr Holert.

76.   Mr Hammer was not involved in these early discussions between Mr Iram and Mr van Huis but was soon consulted by Mr van Huis.  According to Mr Hammer:

> **.. My understanding of Celsius's idea was that they had lots of ETH they needed to monetise and on which they needed to get a yield and it was looking for counterparties to invest in the [GET] with it ..**

77.   On 16 April 2020, Grayscale sent to Mr van Huis a copy of the Grayscale Digital Asset Investment Report for Q1 2020, which they described as "record-breaking".  Mr van Huis forwarded this to Mr Hammer, under cover of an email, saying "Here's to hoping premiums continue and we earn them".

78.   Grayscale also sent its report to Celsius.  Mr Mashinsky of Celsius commented in an internal email:

> **.. Notice that 88% of ETH trust is funded by institutions so the gap that exists with the public markets will be captured by the "institutional ETH lender" who can also short the stock to lock in the margin ..**

Mr Iram responded;

> **.. We will try to lock the profits asap as well.  This is something that we will have to take into consideration ..**

79.   The Celsius Investment Committee (which included Mr Holert, Mr Mashinsky, Mr Iram and Ms Harumi Urata-Thompson, Celsius's Chief Financial Officer) met on 16 April 2020.  As confirmed by the minutes of that meeting, which were circulated by email, it approved (inter-alia) a USD 10m investment "through partner" in GET.

80.   On 16 April 2020 Mr Iram invited Mr Holert to edit the "Grayscale Calcs" spreadsheet which Mr Iram had produced and in which he had modelled the potential returns to each party under 3 scenarios.  In each, the "Principal of Loan" to be made by Celsius was expressed to be USD 1m.  The scenarios differed in the inputs of collateral amounts and investment returns to Celsius.  Each scenario modelled the "1 Year Return on ETHE" at 0%, 10%, 25%, 50%, 100%, 200%, and 300%, calculated as that percentage of the principal amount invested (i.e. the USD 1m loan, less the collateral amount). In each scenario, there was no reference to ETH, only to USD.

81.   The modelling of these particular returns in this spreadsheet seems to me to be consistent with Mr Holert's evidence that:

> **.. The premium was really the only reason why I was interested in Celsius making a loan to Reliz to acquire shares in the [GET]. Celsius did not make the loan to Reliz to speculate on changes in ETH prices. Nor did we have an expectation that the value of shares in ETHE would increase. We weren't really concerned with the price of the shares, just the premium ..**

82.   The "version history" of this spreadsheet shows that Mr Holert and/or Mr Iram edited this spreadsheet on 16-20 April 2020, 6 May 2020, 2 June 2020 and finally on 4 June 2020, only a few days before the Term Sheet was signed on 8 June 2021.

83.   Mr Holert explained in his evidence that:

> **.. I recall that we used USD as a reference currency when working on these models so that we could put the loan into context within the Celsius portfolio ..**
>
> **.. Celsius has a USD basis for its balance sheet and for its purposes, and so I would generally convert cryptocurrency loans that Celsius made into USD so that I could keep track of Celsius's overall exposure ..**
>
> **.. When discussing the loan with Reliz, I would often just use the USD reference amount of USD 1 million.  As Reliz also used USD as a reference point, it was convenient for both sides to use USD as a reference point rather than coins ..**

84.   Mr Hammer's recollection was partly in line with this but went further. According to Mr Hammer:

> **.. In all of my conversations with Celsius when we discussed the loan this was in USD not the USD reference amount of US$ 1 million.  The products**

> **settled in USD and the investment was always predicated on US$ 1 million. We only talked about ETH when we agreed to take the equivalent of US$1 in ETH to make the Grayscale trade, and in reference to hedging the exposure because the settlement would be done in USD once the Grayscale shares were liquidated ..**

85.   On 20 April 2020 Mr Holert sent to Mr Iram an email headed "Blockfills Proposal". This set out two options, each providing for a loan by Celsius to Reliz of USD 1m at 1% pa, but with different levels of collateral and different shares of the returns.  Mr Holert's email also told Mr Iram that he proposed to contact Mr van Huis "to dive deeper into their financials to see if we could provide more than USD1mil".

86.   Later that same day, Mr Iram sent an email to Mr van Huis (copied to Mr Holert), forwarding these proposals produced by Mr Holert.  That email stated:

> **These are 2 different proposals regarding the Greyscale trade, let us know if you have any questions.**
>
> **Option 1:**
>
> **We would provide a loan of USD1,000,000 to Blockfills with 30% collateral at an interest rate of 1%/year. Additionally, in the event of positive returns on a sale of shares in the Grayscale trust fund, a preferred return of up to 6% would be paid to Celsius. For any further returns above the interest rate and preferred return, a 70% share of any returns would be paid to Celsius as profit sharing.**
>
> **Option 2:**
>
> **We would provide a loan of USD1,000,000 to Blockfills with 50% collateral at an interest rate of 1%/year. Additionally, in the event of positive returns on a sale of shares in the Grayscale trust fund, a preferred return of up to 4% would be paid to Celsius. For any further returns above the interest rate and preferred return, a 60% share of any returns would be paid to Celsius as profit sharing.**
>
> **Let me know what you think, and when you can connect.**

87.   The following day, Mr Iram sent an internal email saying that Reliz was "evaluating our proposal" and that he hoped that "we will have an agreement by the end of this week".  Two weeks later, on 4 May 2020, Mr Holert sent an internal email comparing the benefits of investing in ETHE with simply making loans of ETH, and saying:

> **.. Keep in mind that the market premium on ETHE to NAV is 500% and we can only make 7-8% loans of ETH .. We are trying to move forward $1-2mil deals for ETH with  .. Blockfills .. We should be hearing back on our proposal to Blockfills soon .. I agree that we should move forward with the ETH loans but this is a distant second option to buying shares in ETHE ..**

88.   On 5 May 2020, Mr Holert sent an email to Mr Iram asking whether Mr van Huis had "given any feedback on our proposal", to which Mr Iram replied that "we were supposed to get it yesterday".  Also on 5 May, Mr Hammer sent to Mr Holert updated financial information about Reliz, and a video conference between the parties was held later that day to discuss this information.

89.   On 7 May 2020 Mr Hammer sent to Mr Hollard an "Investor Deck", saying in his email "we look forward to working with you on this Grayscale deal": and on 8 May 2020 Mr van Huis sent an email to Mr Iram (replying to his 20 April email), saying:

> **.. Since we had our recent follow-up with [Mr Holert] regarding financials, would it be best to schedule a Monday or Tuesday call to discuss the proposal?  I know [Mr Holert] wanted to have a few days to discuss with [Mr Iram] since our last phone call.  Just in the spirit of keeping things moving, please let us know if Monday or Tuesday works and we can all discuss this ..**

According to Mr Hammer, he and Mr van Huis had a call with Mr Holert and Mr Iram on 8 May 2020.

90.   According to Mr Hammer:

> **.. on a call which .. took place either in late April or early May 2020 between me [Mr Van Huis]. [Mr Holert] and [Mr Iram] [the parties discussed] that that Blockfills didn't care whether or not the premium would be there (because this would have been a very small amount for Blockfills).  [Mr van Huis] and I told [Mr Holert] over the phone that the only reason we were interested in the trade was to go long ETH ..**

> **.. We discussed that both parties expected the premium to reduce during the investment ..**

91.   Mr Holert also recalls specifically discussing on a call with Reliz the potential profitability for both parties of the transaction and the risk that the premium could decline.  However, according to Mr Holert, Mr Hammer's account "just doesn't reflect the reality of the discussions":

> **The only basis for the loan that was ever discussed with Reliz was realising a positive return based on the premium ..**

> **.. Everyone thought that some premium, probably in the region of 25% to 50% would remain, which would make the loan profitable ..**

> **.. that once Reliz sold its shares in [GET] there would be sufficient proceeds left to be shared between us once Reliz have either bought ETH in the market using the proceeds or otherwise returned the ETH that was borrowed to Celsius ..**

24

92.     On 20 May 2020 Mr Iram exchanged WhatsApp messages with Mr Nolan asking him to add details to a term sheet for a proposed transaction with Reliz, to be discussed at the following day's Investment Committee meeting.  Those details were: Principal: USD 1,000,000; Currency; ETH; Purpose: Purchase shares in Grayscale ETHE fund; Collateral: 25%;; Term: 13 months, or sale of shares in ETHE, whichever is sooner; Interest: 1%, paid monthly; At maturity, and following sale of shares in Grayscale ETHE, Borrower will return the following to Celsius: (i) Principal amount of loan (ii) In the event of positive return on sale of shares, 6% of returns (iii) Profit-sharing of 70% of returns.

93.     These details were subsequently confirmed by Mr Holert in an email sent on 21 May 2020, in which he said "let me know if you think we should talk to [Mr van Huis] and [Mr Hammer] again to confirm.  In a subsequent email, Mr Nolan said:

**.. So the loan is for one million USD worth of ETH ..**

94.     These exchanged resulted in the following draft Loan Term Sheet prepared by Mr Nolan:

Loan# C1234

**ANNEX B**

**LOAN TERM SHEET**

The following loan term agreement dated 5/20/2020 incorporates all of the terms of the Master Digital Asset Lending Agreement entered into by Celsius Network Ltd ("Lender") and the Borrower (as provided in the Agreement and specified below) on   12/3/2019     and the following specific terms:

| | | |
|---|---|---|
| Lender | Celsius Network Ltd | |
| Borrower | Reliz Ltd | |
| Digital Asset: | ETH | Digital Asset Spot Price:  $210.50 |
| Amount of Digital Asset: | 4,750.59 (Coin) | OR  $1,000,000   (USD Equivalent) |
| Loan Type: | Term Loan | |
| Loan Term: | 13 months, or sale of shares in ETHE, whichever is sooner | |
| Borrow Fee: | 1 % annually, calculated and charged monthly | |
| Borrow Fee Payable in: | ETH | |
| Collateral Asset: | USD | Collateral Spot Price:$1.00 |
| Collateral Amount: | $250,000   (Coin) | OR  $250,000   (USD Equivalent) |
| Collateral Level: | 25 % of Loan Value | Spot Rate Change: 25 % |
| Margin Call Level: | 15 % | Margin Refund Level:    % |
| Additional Terms: | 1. Purpose: Purchase shares in Grayscale ETHE fund | |
| | 2. Extension of term: mutually agreement | |
| | 3. At maturity, and following sale of shares in Grayscale ETHE, borrower will return the following to Celsius: | |
| |      i.) Principal amount of loan | |

25

> ii.) In event of positive return on sale of shares, 6% of returns
>
> ii.) Profit sharing of 70% of returns

This draft Loan Term Sheet generally followed the format of Annex B to the Lending Agreement (set out in paragraph 43 above).

95.   It seems that this draft Loan Term Sheet was then sent to Reliz.  On 21 May 2020 Mr Holert sent an email to Mr Nolan, asking him to send the draft term sheet to him for review when it was ready, but Mr Nolan replied:

> **.. I already sent it out last night .. Would you like me to pull it back?  I was under the impression we needed this done ASAP ..**

96.   After a further exchange of emails between Mr Holert and Mr Nolan, Mr Holert then sent an email to Mr Iram (copied to Mr Nolan) saying:

> **.. Since this is a first time deal of this type, I thought the term sheet would come back to me, before going to Blockfills.  The terms that were sent are not exactly right.  On the preferred interest, it is not clear that this only applies on returns up to 6%.  On the profit-sharing, it is also not clear that this only applies to positive returns about the preferred interest.  In the event that the ETHE shares are sold as a loss, I do not want them to come back to us and say that we agreed to take 70% of any losses.  Please update the term sheet and send back to me to double check ..**

97.   Also on 21 May 2020, there was a meeting of Reliz's Executive Committee.  Mr Adam Krauszer, who was one of the members of that committee, made the following post-meeting note:

> **If I have any time this weekend, look at the Grayscale deal**
> **o Celsius gives us $1M as a loan**
> **o We put up some collateral.**
> **o We buy crypto**
> **o We buy grayscale**
> **o Allocate to cred or geo?**

98.   According to Mr Hammer:

> **.. I made the ultimate decision to enter into the trade with the Risk Committee at Blockfills consisting of me, Neil van Huis, Adam Krauszer and Gordon Wallace. .. The discussions were consistent with the terms described by [Mr Iram] in the email of 20 April 2020. .. We went over the terms, including that it would be a US$1 million loan and that Celsius was going to send US$1 million worth of ETH .. We discussed whether we wanted to go long ETH, which we were all bullish about ..**
>
> **.. We agreed that we would accept the deal but we had to figure out who is hedging the ETH.  We then went back to Celsius on the call .. Which was**

the call on which Celsius said they would hedge the ETH, and it was following that that we agreed to make the Trade ..

99.   Mr Holert and Mr Hammer both agree that, at some point in the negotiations, the parties did discuss hedging.  According to Mr Hammer:

> .. there was a phone call in May during the negotiations in which the risk of a change in the value of ETH and the question of hedging was discussed. That call took place between me and [Mr van Huis] of [Reliz] and [Mr Holert] and [Mr Iram] of Celsius.

> We asked who would be handling hedging of the ETH given price fluctuations .. and offered to hedge the position for ourselves and for Celsius. [Mr Iram] and [Mr Holert] agreed that if the market went up they would need to buy more ETH at the end of the trade if they wanted to retain the same amount of ETH and thus someone would have to buy more ETH to hedge against this risk. They said they would handle this ..

100.   As set out in paragraph 106 below, Mr Holert's evidence was that this conversation happened not in May but in June, very shortly before the Term Sheet was signed, and that it was Reliz rather than Celsius who agreed to buy any ETH required at the end of the trade.

101.   It was also Mr Hammer's evidence that:

> .. Capital gains was mentioned briefly; we expressed that there would be taxes involved in the trade .. We told Celsius that they would have the tax responsibility.  This was communicated to  Patrick Holert - we told him we weren't taking the tax liability. He said this was ok ..

By contrast, Mr Holert's evidence was that:

> .. I don't recall specifically discussing CGT with Reliz.  I don't think we discussed it at all ..

102.   As I have said, I will deal with the resolution of these various conflicts of evidence between Mr Holert and Mr Hammer in the course of my analysis in Section J below.

103.   On 22 May 2020, Mr Hammer emailed Mr Holert, saying:

> .. I have the docusign.  Thank you.  Realistically, I do not think we will have a final decision until Tuesday I hope that is ok ...

104.   On 2 June 2020, Mr van Huis sent an email to Mr Holert (copied to Mr Iram), saying:

> .. Can we schedule time to final the agreement terms tomorrow?  I know we have thrown some ideas back and forth and I want to get it nailed down, completed and move this deal to the finish line ..

> **Please let me know when you are free.**

105.    Mr Hammer then sent an email to Mr van Huis, copied to Mr Iram, saying:

> **.. I am good with the term sheet.  We are ready to go on our end tomorrow.  Let me know what times work ..**

Mr Iram responded, suggesting that the parties should execute the following day at 3 pm EST.

106.    That did not happen, although there were zoom calls between the parties on both Tuesday 2 June and Wednesday 3 June.   According to Mr Holert:

> **.. During one of the calls that we had with Reliz in early June, just prior to the loan being made, I recall [Mr Hammer] or [Mr van Huis ] saying that they were better than Celsius at going into the market to buy ETH. .. They clearly said they wanted to be the party that took USD and bought ETH to repay the loan ..**

> **.. In a call with [Mr Hammer] and [Mr van Huis] prior to the execution of the loan, [Mr Iram] and I specifically discussed with them the risks of a collapse in the premium and the currency risk of a significant change in USD/ETH prices and which party would be responsible for assuming this risk. [Mr Hammer] and [Mr van Huis ]told [Mr Iram] and myself they would manage the risks. I recall that they said that it was within their expertise to go into the market and buy ETH and that they would take responsibility for hedging.  I did not tell Reliz that Celsius would hedge and I am not aware of anyone else at Celsius having done so ..**

107.    On Friday 5 June 2020, Mr Hammer sent an email to Mr van Huis and Mr Iram (copied to Mr Holert) saying:

> **.. We are all set with Grayscale except for one thing.  Can I call either of you as it pertains directly to the ETH ..**

108.    There was then an exchange of emails between Mr Nolan and Mr Holert, in which Mr Nolan sent Mr Holert an image of a draft of what was in substance to become the Term Sheet in paragraph 43 above, and said:

> **.. I know we discussed last time and wanted to be clear - but are the additional terms correct for the Blockfills deal ..**

109.    Mr Holert responded to Mr Nolan and Mr Iram, thanking Mr Nolan for checking, confirming that the terms are correct, and asking Mr Iram:

> **.. Do you feel comfortable proceeding with the deal?  Or, do you want to change the terms, so that Celsius holds the shares in ETHE ..**

110.   On Saturday 6 June 2020 Mr Hammer sent an email saying that "we are all set to make the trade Monday morning.  All good!".  And some point on 6 June 2020 a final pre-trade call took place between the parties.

111.   The parties eventually both signed the Term Sheet using DocuSign on Monday, 8 June 2020.

*(I.4)   Events after the Term Sheet was signed*

112.   I now turn to events which occurred after the Term Sheet was signed and which are therefore not available as aids to interpreting the contract made between the parties by the Term Sheet[15].

113.   The loan which Celsius made to Reliz on 8 June 2020 was recorded by Mr Nolan in Celsius' Loan Book as a loan of ETH 4,098.36.  That loan book. Included a "current value" column, which calculated the current value of the loan by multiplying ETH 4,098.36 by the current USD price of ETH. The loan book entries included the interest (in ETH) due on the loan, but made no reference to ETHE or the profit share.

114.   On 30 June 2020 Celsius produced an Invoice addressed to Reliz which included a line seeking ETH 2.4702 interest on the "Asset" of ETH 4,098.36 with a "Value@Contract" of USD1m.  Celsius continue to send similar invoices (minus the "Value@Contract") to Reliz each month during the period of the loan.

115.   On 4 August 2020 Celsius and Reliz entered into a Digital Asset Lending for Lease Assets Agreement governed by the laws of the State of New York. Under that agreement, Celsius lent BTC 278.7688 to Reliz in connection with a Master Lease Agreement of the same date between Reliz (as lessor) and Core Scientific Inc.  That Digital Asset Lending agreement was amended in September 2020 to substitute reference to a lease under which Vaeerus Mining SPV2 LLC was lessee.

116.   On 18 September 2020 Celsius and Reliz entered into a Fiat Lending for Lease Assets Agreement, also governed by New York law, under which Celsius lent USD 2,687,600 to Reliz in connection with a Master Lease Agreement between Reliz (as lessor) and Backbone Hosting Solutions Inc.

117.   On 5 December 2020 Mr Holert sent an email to Mr Hammer asking for updated financial information about Reliz, and adding:

> **.. Also, we have previously issued a loan for ETH 4098.36 to Reliz to invest
> in shares of the Grayscale ETHE fund. As the lock-up period for the**

---

[15]   See eg *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619 at [21], per Lord Neuberger of Abbotsbury PSC, in relation to subsequently occurring or discovered facts; and Hugh Beale (ed), *Chitty on Contracts* (fn 4 above) at [15-060] in relation to subsequent conduct.

> shares is coming up shortly, please let me know your plans whether you
> will be selling the shares ..

Mr Hammer responded the same day, promising to send across "Q3 info" and saying:

> .. We can set up a call to discuss Greyscale plans any time. It performed
> very well as you probably know.  Let's discuss that this week ..

After the call between them, Mr Hammer sent an email to Mr Holert on 10 December
2020, saying that:

> .. In response to Grayscale, I have reached out to them and I am awaiting
> liquidation instructions.  I will keep you posted on that ..

Mr Hammer followed that up by a further email on 12 December 2020, reminding Mr
Holert that Reliz could not sell any of its Grayscale shares until 6 January 2021,

118.  On 27 January 2021, Mr Hammer sent an email to Mr Holert and others at Celsius,
informing them that Reliz was about to start liquidating its ETHE shares. That email
went on to say:

> ..  We owe you 4098.36 ETH back plus your profits and interest on the
> principal. Can you tell us if you would like the profits to be paid back in
> USD or equivalent in ETH? The principle of the investment should be
> paid back in ETH ..

119.  However, at this point, Mr Gordon Wallace at Reliz (to whom that email from Mr
Hammer had been copied) intervened.  Mr Wallace immediately responded to Mr
Hammer, querying whether he can correctly have understood the trade, and saying[16]:

> .. Nick, there is no way we owe them that much ETH.  At this price that's
> more than the gross of the whole trade. It has to be different than that. Do
> we have the term sheet? ..

120.  On 28 January 2021, Mr Holert and Mr Hammer spoke on the telephone, following
which Mr Holert sent an email to Mr Hammer, copied to Ms Urata-Thompson at
Celsius, which said:

> .. I just talked with Nick, and he will be returning our loan principal of
> ETHE plus interest, and returning profits from the deal in the USD
> through Cygnet over the next two days. Please let Nick know if you
> require him to transfer the USD in any other way ..

121.  Ms Urata-Thompson's response that "it's ok, happy to take USD" and offering
banking details was circulated by Mr Wallace to Mr Krauszer within Reliz.  Mr
Krauszer responded by saying:

---

[16]     Punctuation added for clarity.

> **.. OK.  So will need slightly more ETH than the original number to cover interest, correct? I can calculate the exact number ..**

Mr Hammer then sent an email to Ms Urata-Thompson, saying:

> **.. We can settle the balance into USD.  Our back office will generate a reconciliation. Thanks for the trade. This worked out great for both parties ! ..**

122.   Mr Wallace then sent an email to Mr Hammer which he copied to Ms Urata-Thompson, saying:

> **.. Adam and I are executing the exit and will get you a statement with the avg price, principal interest, profits and our collateral. We plan on returning everything in $s, please confirm that's ok.  I assume you want the $s to your Signet? ..**

123.   Ms Urata-Thompson responded, saying:

> **.. Yes Signet works. Thank you. Glad this deal worked out well ..**

124.   However, Mr Holert then sent an email to Ms Urata-Thompson, copied to Mr Hammer, Mr Wallace and Mr Krauszer at Reliz, saying:

> **.. Principal and interest need to be returned in ETH, profits returned in USD ..**

125.   On 3 February 2021, Mr Wallace sent an email to Ms Urata-Thompson, confirming that Reliz had sold its ETHE shares over the period between Thursday, 28 January and Monday, 1 February 2021. Later that day, Mr Wallace sent a further email giving "the breakdown of the Grayscale investment" which showed "Celsius Share of Profit" as USD 2,698,793.75 and "Blockfills Share of Profit" as being USD 1,136,625.89.

126.   The breakdown included with that email showed a total of $2,448,793.75 as "Amount of USD owed (Profit - initial collateral)" and 665.47 as the "Number of ETH to Send for Principal + Interest.  The calculation of the "Net Proceeds" and "Net Profit" stated that that the "Grayscale Closeout Proceeds" were USD 5,942,875.56, but deducted from that sum just over USD 1m in respect of Capital Gains Tax, leaving a profit from the transaction to be shared of USD 3,855,419.64.

127.   Ms Urata-Thompson initially responded simply with thanks and with details of the wallet and the account to which the funds should be transferred.  However, prompted (inter alia) by a Slackchat comment by Mr Nolan, later that day she sent a further email, saying:

31

> **.. According to the original term sheet, we have a 4098.36 principal plus the last interest that should show up on your breakdown sheet. Please verify ..**

128. On 4 February 2021 Mr Holert (who had not been on the original circulation list for the 3 February emails) followed that up with an email to Ms Urata-Thompson, copied to Mr Hammer, Mr Wallace and Mr Krauszer and Reliz, taking issue with Mr Wallace's calculation and saying:

> **.. Our understanding has always been that this was a loan for ETH 4098.36 and that this would be returned as principal before any profit sharing. Please kindly send this full principal amount for the loan, and revise the profit sharing ..**

129. Meanwhile, Mr Hammer had forwarded by email to Mr Wallace and Mr Krauszer a copy of the 20 April 2020 email from Asaf Iram, which set out the "2 different proposals regarding the Grayscale trade"[17]. Mr Krauszer's response was "Game, Set, Match. Nick is right and has the receipts!".

130. Mr Hammer followed this up on 4 February 2021 with an email to Ms Urata-Thompson and Mr Holert, which attached a copy of the 20 April 2020 email from Asaf Iram, and which set out Reliz's position, as follows:

> **As you are aware, we finished liquidating the Grayscale position this week and we sent you a reconciliation. Upon review of system entries for the transaction into our back office and reviewing the trade term sheet details and your email proposal the following holds true.**
>
> **• After reviewing with the trading team and back office, the email sent by myself on Jan 27 was an oversight and incorrect.**
>
> **• Please review the email sent by Asaf and Patrick cc'd below. We chose investment option # 1. This is an exact match to the term sheet and is what our trade desk used to put the positions on. The trade was predicated upon a $1 million ETH investment struck at $244 and equated to $1,000,000. All correspondence speaks to a $1,000,000 investment which is why we gave you $250k in collateral**
>
> **• After reviewing our correspondence your traders, specifically Asaf said that they would hedge the ETH position. Patrick was on the phone call.**
>
> **• When we purchased the Grayscale shares the ETH is converted to ETHE shares that are not convertible back into ETH. Blockfills can buy ETH with your proceeds but that is your decision.**
>
> **• There are tax implications to the trade that you need to pay 70% of. These are taxable income events.**

---

[17] See paragraph 86 above.

131.   Thereafter solicitors became involved on both sides, resulting eventually in the Notice of Arbitration issued by Celsius on 20 May 2021.

## (J)    Analysis (including the relevant law)

132.   There was no material dispute between the parties as to the legal principles which I should apply in resolving this dispute. It is therefore convenient for me to deal with the law in the course of my analysis of the parties' cases and submissions.

133.   I shall deal with the three issues identified in paragraph 36 above in the order there set out.

### (J.1)   Interpretation

134.   I begin by considering the true interpretation of the Lending Agreement and the Term Sheet.

135.   The general principles of interpretation which I should apply were not in dispute. They have been elucidated in the familiar line of decisions of the House of Lords and the Supreme Court, beginning with *Investors Compensation Scheme Ltd v West Bromwich Building Society*[18] and culminating (at least for the time being) in *Wood v Capita Insurance Services Ltd*[19].   In *Trillium (Prime) Property GP Limited v Elmfield Road Limited*[20] Lewison LJ said of these authorities that he would:

> **.. not attempt to distil or paraphrase that learning. As Lord Hodge said at [9], the legal profession has sufficient judicial statements of that nature ..**

I propose respectfully to adopt the same approach.

136.   It is right however, that I should record the emphasis placed by Mr Singla KC on the principle (perhaps most clearly enunciated in *Rainy Sky SA v Kookmin Bank*[21]) that:

> **.. where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense ..**

and on the need to be fully aware, particularly in the case of short and/or imperfectly drafted contracts, of the implications for interpretation of the factual matrix, including (where appropriate):

> **.. the understandings derived from [the parties'] relationship which has evolved over time ..**[22]

---

[18]      [1998] 1 WLR 896, HL
[19]      [2017] UKSC 24, [2017] AC 1173.
[20]      [2018] EWCA Civ 1556 at [9].
[21]      [2011] UKSC 50, [2011] 1 WLR 2900 at [30, per Lord Clarke of Stone-cum-Ebony

137. Mr Singla also relied on the principle that "the terms of the clauses which are incorporated into the parties' contract may not always be entirely appropriate to the contract and which they are incorporated"[23] and that, if there is a tension between the express terms of a specifically negotiated contract (here, the Term Sheet) and those which are incorporated by reference to another document (here, the Lending Agreement), precedence should normally should be given to the document (ie the Term Sheet) which has been specifically negotiated[24].

138. Finally, Mr Singla relied on the principle that obvious mistakes in the parties' written agreement may be corrected as part of the process of interpretation, provided only (a) that there is a clear mistake, and (b) that it is clear what correction ought to be made to cure that mistake[25].

139. It was common ground that the previous negotiations between the parties and their declarations of subjective intent cannot be used as aids to interpretation of the contract eventually made by them. Those matters are relevant and admissible only in an action for rectification[26]. It follows that I must disregard much of the narrative of those negotiations in Section I above when seeking to interpret the parties' agreement, except to the extent that that narrative demonstrates that a relevant background fact was known to the parties.

140. The two interrelated background facts upon which Reliz particularly relies are the investment objectives of the parties and the commercial consequences of the two rival interpretations. Both of these, Reliz argues, were known to both parties at the time they signed the Term Sheet, and therefore form part of the commercial background against which that agreement falls to be interpreted.

141. With regard to the parties' investment objectives, it is Reliz's case that Celsius was aware that Reliz's commercial objective was to go long in ETH:

> **.. from [Reliz's] perspective the primary purpose of entering into the Agreement was to benefit from the significant profit potential of an increase in the value of ETH itself. It could do this through the trade because the shares in the Trust were intended to track the price of ETH. Its investment in the shares in the Trust was therefore an opportunity to**

---

[22]   *Chitty on Contracts* (fn 4 above) at [15-086]. See also *Wood v Capita* (fn 19 above) at [10] and [13], per Lord Hodge JSC.

[23]   Lewison, *The Interpretation of Contracts* (7th edn, Sweet & Maxwell 2020) at [3-83].

[24]   See *Modern Building (Wales) Ltd v Limmer & Trinidad Co Ltd* [1975] 1 WLR 1281 at 1289F-G, per Buckley LJ; *Tradigrain SA v King Diamond Marine Ltd (The "Spiros C")* [2000] 2 All ER (Comm) 542 at [78] per Rix LJ; and *Edgeworth Capital (Luxembourg) SARL v Aabar Investments PJS* [2018] EWHC 1627 (Comm) at [76], per Popplewell J.

[25]   See *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, at [22] to [25], per Lord Hoffmann.

[26]   See *Chartbrook Ltd v Persimmon Homes Ltd* (fn 25 above), at [28] to [47], per Lord Hoffmann, and *Chitty on Contracts* (fn 4 above) at [15-059].

> take a 'long' position in respect of the price of ETH (the price of which the
> shares tracked) and to do so on a leveraged basis (i.e. by investing US$1
> million worth of ETH in the Trust having only posted US$250,000 of
> collateral) and at the Net Asset Value. Whether the shares were trading at
> a premium itself was no more than an additional benefit to Reliz ..[27]

142. In that connection, Reliz relies primarily both on the evidence of Mr Hammer that he
communicated this commercial objective to Celsius[28] and on the inherent
commerciality of the transaction from Reliz' point of view.

143. With regard to the latter factor, Mr Hennig's unchallenged evidence was that, during
and immediately prior to the relevant period, there was only a "moderate" correlation
between the price of ETH and the price of ETHE.   The price of ETHE did not track
the price of ETH closely during 2019 and 2020 but deviated substantially.   According
to Mr Hennig, Reliz's purchase of ETHE therefore provided only "an inefficient and
imperfect hedge" against movements in the price of ETH.   Indeed, "in the worst case
it may not be a hedge at all or even magnify the exposure".

144. Mr Hennig's tables, however, demonstrated that, provided that the USD price of
ETHE remained at > 4% premium to the NAV, the proceeds from sale of the ETHE
would be sufficient to repurchase the original ETH investment.   That is because the
NAV of GET is directly correlated with the price of ETH.   The nature of the
transaction therefore provided a practical hedge for Reliz against increases in the price
of ETH provided that the price of ETHE remained at a >4% premium to the NAV.
Mr Hennig readily accepted this, when cross-examined.

145. Even so, Mr Hennig's tables also demonstrated that, if the transaction (as Celsius
contends) required Reliz to return the ETH 4,098.36 and not (as Reliz contends) only
the ETH equivalent of USD 1 million at the date of repayment, there was a significant
imbalance between the likely risks and rewards of the transaction for Celsius and
those for Celsius.   As Mr Hennig's reports state:

> .. under the Celsius Interpretation, Celsius will make a profit under any
> scenario, while Reliz will make a profit for scenarios where the premium
> on maturity is higher than 10% and will make a loss if the premium on
> maturity is below 4% ..

> .. [Whereas] [u]nder the Reliz Interpretation, there are scenarios for each
> party where it would make a profit and other scenarios where it would
> make a loss ..

> .. [U]nder the Reliz interpretation the range of potential outcomes reflects
> better a split of the upside potential of 70%/30% between Celsius and
> Reliz given the higher downside risk for Celsius under various scenarios.

---

[27]   Statement of Defence and Counterclaim, para 25(e).
[28]   See paragraph 90 above.

> **Under the Celsius interpretation, only Reliz assumes downside risk in certain scenarios while simultaneously only retaining 30% of the upside potential ..**
>
> **The remaining risk for Celsius is that of non-performance or default by Reliz under the contract.**

146.   Mr Hennig also points out that (on the Celsius interpretation) it would have been more profitable for Reliz instead to have used the USD 250k that it put up as collateral to buy ETH so as to make its own direct investment in ETHE.

147.   Mr Hennig's tables, as he pointed out in cross-examination, did not take into account the effect of CGT or of any other tax payable in connection with the purchase and sale of ETHE.  If CGT were payable on any gain, that would have the effect of reducing the net proceeds of sale of the ETHE, and would therefore increase the prospect that those net proceeds would be insufficient to fund the re-purchase of the required amount of ETH.

148.   The issue of CGT was a matter of considerable controversy between the parties, both as to the question of whether any CGT was in fact payable by Reliz and as to the question of whether the parties had that factor in mind at the time when they entered into the transaction.

149.   Reliz's pleaded position, reflecting the calculation in the breakdown sent by Reliz to Celsius on 3 February 2021[29], was that CGT was payable on the amount of the capital gain on the ETHE and that the parties knew when they made the agreement that that would be the case.  As pleaded in paragraph 25(g)(iii) of Reliz's Statement of Defence and Counterclaim[30]:

> **.. as the parties were aware at the time of the Agreement, the liquidation process would need to account for the capital gains tax payable on the capital gain of the cost of the shares against the price for which they were sold. In the current case, the rate at which that capital gain was payable was 21%. Therefore, not only would the cost of re- purchasing the ETH on the open market only differ from the proceeds of the liquidation by the level of any premium on the shares in the Trust, but Reliz would have had to account for capital gains before re- purchasing the ETH ..**

This was denied by Celsius in its Reply and Defence to Counterclaim[31], which stated:

> **.. is denied that the applicability or otherwise of capital gains tax has any relevance to the correct interpretation of the Agreement and the Term Sheet. It was a matter for Reliz alone to assess the tax implications of liquidating its investment ..**

---

[29]   See paragraphs 125 and 126 above.
[30]   See also paragraphs 25(f) and 46(b)(iv)
[31]   See paragraphs 31.5, 31.6.2 and 45.5.

36

> **.. Neither capital gains tax nor its applicable rate was discussed by the Parties. It was a matter for Reliz to assess the tax implications of the transaction ..**

150.   These issues having been raised on the face of the parties' statements of case, Celsius requested disclosure of all documents relevant to them in its document production Request 4.   Reliz objected to this request on grounds of relevance and materiality, asserting not merely that the request was too widely drawn but also that "the tax liability on the proceeds of the trade arose as a matter of law" and therefore required no evidential justification from disclosure.

151.   In my ruling on 28 May 2022[32], I granted Celsius's request in a modified form, requiring the parties to produce (subject to any appropriate redactions on grounds of confidentiality) all documents (if any) within their possession or control in the following categories:

> **Documents that would:**
>
> **(a) support or undermine Reliz's case that it was liable to pay 21% capital gains tax on the investment in the Grayscale Trust; or**
>
> **(b) support or undermine Reiz's case that the parties were aware of this liability at the time of the Agreement; or**
>
> **(c) support or undermine Celsius' case that it was not aware of any such liability.**

In the event, Reliz produced no documents specifically responding to this request, on the basis that no such documents were identified in its searches

152.   I have already drawn attention, in paragraph 101 above, to the sharp conflict between the evidence given by Mr Hammer and Mr Holert on this topic at the hearing.

153.   Because the issue seem to me to be an important one, and had not been fully explored during the hearing, I invited the parties either to reach agreement or to make further submissions about it.  In the event, I received lengthy further written submissions from both parties on these issues[33].

154.   In the Appendix to its 6 February 2023 submissions, Reliz enclosed and invited me to take into account, in particular, two documents which had not previously been produced: (1) a redacted copy of Reliz's Subscription Agreement for GET, in which it gave its business address as in Chicago and expressly confirmed that it was "a 'United States person' for US federal income tax purposes", and (2) a form W-8BEN-E "Certificate of Status of Beneficial Owner for United States Tax Withholding and

---

[32]        See paragraph 16 above.
[33]        See paragraph 30 above.

Reporting", in which Reliz stated that it was the beneficial owner and (in Part III, "Claim of Tax Treaty Benefits") certified that it was a resident of the Cayman Islands within the meaning of the income tax treaty between the United States and that country, and claimed the benefit of the treaty on the basis that is was a "Company with an item of income that meets active trade or business test".

155.   Celsius submits that I should disregard these documents, produced after the conclusion of the evidential hearing, on the basis that "it is now too late to reopen factual issues when closing submissions have already been made and the documents were not able to be put to the factual witnesses".  Reliz, by contrast, argues that it would be unfair to exclude these further documents because "Celsius had failed to plead that it disputed that CGT was in fact payable on the sale of the shares", and because "it was obviously in contemplation at the hearing that the factual evidence might be reopened to deal with this issue .. [and] .. Celsius raise no objection".  In Reliz's submission, there was no need for these documents to be put to the factual witnesses because, on their face, the documents establish the position.

156.   I am unable to accept Reliz's submissions concerning these documents.  It is true that Celsius pleaded no positive case in relation to whether CGT was payable.  However, Celsius clearly denied Reliz's assertion that it was.  That matter was therefore plainly in issue on the face of the statements of case.  Indeed, it was the subject of a specific request for document production on which I ruled (in large measure) in Celsius' favour.

157.   Perhaps more importantly, these documents do not seem to me to establish the position with regard to GCT with any clarity.  It is true that the Subscription Agreement acknowledges that Reliz is a US Person for tax purposes.  However, the form W-8BEN-E which has now been produced appears to claim relief from US tax for Reliz on the basis of a double taxation treaty between the Cayman Islands and the USA.  It therefore remains uncertain whether any CGT was in fact payable, either in the USA or in the Cayman Islands.

158.   Had these documents been produced in accordance with my 28 May 2022 ruling, as they should have been, these issues might perhaps have been illuminated as a result of an application for further specific disclosure.  In any event, they could and should have been explored with the relevant factual witnesses.  In the circumstances, even were I now to take these documents into account, I would not be able to reach any relevant conclusion adverse to Celsius's case on the basis of them.  As it is, the right and fair course seems to me to be to exclude them from consideration.

159.   At this point, I am considering only the issue of interpretation.  What is relevant for that purpose is whether the suggested liability to CGT was a fact that was known to or was reasonably available to both parties at the time of the transaction.  Celsius's argument is that it was not, because it was known to both sides that Reliz was

incorporated in the Cayman Islands, which is well-known to be a "tax friendly" jurisdiction. Celsius's case is that it therefore assumed that tax was irrelevant. This, Celsius argues, is consistent with the internal spreadsheet which it produced to calculate the potential profit[34], which makes no reference to CGT.

160. Reliz, by contrast, argues that it was clearly known to both sides that the ETHE were listed on a US exchange[35], and that any profit made on sale of the ETHE would therefore be declared by the exchange to the IRS, resulting in a charge to US tax. Reliz also argues that the due diligence carried out by Celsius prior to the transaction must have revealed Reliz's connections to the USA. Finally, Reliz relies on Mr Hammer's evidence that the CGT liability was expressly discussed.

161. On balance, it seems to me to be unlikely that the parties had a possible liability to CGT in mind that the time when they entered into the transaction. No documents from that period evidence any such consideration by either of the parties. At least in the case of Celsius, one of its internal documents (the internal spreadsheet which it produced to calculate the potential profit, which was accessed only a few days prior to the signature of the Term Sheet[36]) suggests the contrary. Celsius's case that it assumed, from Reliz's place of incorporation, that tax was not relevant does not seem to me to be improbable, even given the fact that the ETHE were listed on a US exchange.

162. I do not accept Mr Hammer's evidence that the issue of CGT was expressly discussed. The terms of Mr Hammer's 4 February 2021 email[37], in which (following the intervention of Mr Wallace) Mr Hammer sought to re-write the originally contrary description of the transaction in his 27 January 2021 email[38] "upon review of system entries for the transaction into our back office and reviewing the trade term sheet details and your email proposal" reinforce my overall view that much of Mr Hammer's evidence consists of reconstruction rather than true recollection. The overall probabilities, so far as I can assess them by reference to the objective facts and the documents, point in favour of my accepting Mr Holert's contrary evidence on this point.

163. With that background in mind, I now turn to consider the express terms of the contractual documentation. The Term Sheet defines the "Digital Asset" as "ETH" and the "amount" as 4,098.36. The Term Sheet expressly incorporates "all of the terms of the [Lending Agreement]", clause 3.8 of which requires Reliz to "commence redelivery" of the "Borrowed Amount" on or before the maturity of the loan. Clause 2

---

[34]     See paragraphs 80 to 82 above.
[35]     See paragraph 69 above.
[36]     See paragraphs 80 to 82 above.
[37]     See paragraph 130 above.
[38]     See paragraph 118 above.

of the Lending Agreement defines the "Borrowed Amount" as "the amount of Digital Asset(s) actually lent by the Lender to the Borrower".

164.   Under the transaction, Celsius "actually lent" ETH 4,098.36 to Reliz.  That was the Digital Asset which Celsius actually provided to Reliz: and that fact is entirely unaffected by the circumstance that a further line in the Term Sheet includes an "Amount in USD" of USD 1 million.  Moreover, the fact that the Term Sheet provides that the "Borrow Fee" is to be paid in ETH  and that the "Collateral Asset"  is USD 250,000 both seem to me to be pointers in favour of the idea that the amount to be repaid was intended to be the ETH.4,098.36 originally lent.

165.   It seems to me that the ordinary and natural meaning of these provisions is that, at the end of the "Loan Term" (relevantly defined in the Term Sheet as "sale of shares in ETHE"), Reliz's obligation is to redeliver to Celsius the amount of ETH 4.098.36 that it was originally lent by Celsius.   That is simply what the contractual documentation says.

166.   I take fully into account the fact that, even disregarding the possible adverse effect of any CGT, this was a transaction which (on that interpretation) both sides could have appreciated involved a balance of risks and rewards that was significantly more favourable to Celsius than to Reliz.  Mr Hennig was also undoubtedly right to point out that commercial men will generally favour a more even balance between the risks which they run and the rewards which they hope to achieve.

167.   I must nevertheless bear in mind the point forcefully made in *Arnold v Britton*[39] that I should:

**.. be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of the wisdom of hindsight.**

**The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed.  Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party ..**

168.   Contrary to the evidence of Mr Hammer – which, as I have said, I believe to be an honest but misconceived reconstruction after the event - I do not think that either party went into this transaction focusing on the effect of possible movements in the price of ETH.  The documents which I have seen indicate to me that the parties' focus, and

---

[39]   Fn 15 above at [20], per Lord Neuberger of Abbotsbury PSC.

their joint commercial purpose in entering into this transaction, was to benefit from the (at times very substantial) positive difference between the price of ETHE and the NAV of GET.

169.   In the circumstances, the issue of correcting a mistake in the words used as part of the process of interpretation does not arise.

170.   I therefore hold that, as the wording of the Lending Agreement and the Term Sheet presently stand, Reliz's redelivery obligation on sale of the ETHE was (as Celsius contends) to redeliver ETH 4.098.36.

### (J.2)   Collateral contract

171.   The first alternative argument put forward by Mr Singla, if I did not accept his primary case on construction, was that the proposal put forward in Celsius's 20 April 2020 email[40] formed the basis of a collateral agreement that the principal of the loan made by Celsius to Reliz should be USD 1 million.

172.   This alternative case is pleaded in paragraphs 49 to 51 of Reliz's Statement of Defence and Counterclaim as follows:

> .. it is Reliz's position that when the Parties entered into the Agreement in June 2020, although they agreed to incorporate all of the terms of the Master Agreement, in fact they reached a collateral agreement which had the effect of varying the terms in that they agreed that Celsius would seek repayment of the equivalent of US$1,000,000 of ETH rather than 4,098.36 ETH.
>
> This was evident on the terms of the Term Sheet consistent with the basis of those terms which were set out in Celsius' initial proposal for the trade and subsequent assurances that it made to Reliz that the loan was for (the ETH equivalent of) US$1,000,000, to be repaid in (the ETH equivalent of) US$1,000,000 ..

173.   As to the relevant law, it was common ground between the parties that a pre-contractual representation by one party to the other may in certain circumstances give rise to an enforceable contract that is collateral to the main transaction:   As is stated in *Chitty*[41]:

> .. the courts are prepared in some circumstances to treat a statement intended to have contractual effect as a separate contract or warranty, collateral to the main transaction. In particular, they will do so where one party refuses to enter into the contract unless the other gives him an

---

40     See paragraph 86 above.
41     *Chitty on Contracts* (fn 4 above) at [15-018] to [15-020]

> **assurance on a certain point or unless the other promises not to enforce a term of the written agreement ..**
>
> **.. Consideration for the collateral contract is normally provided by entering into the main contract ..**
>
> **.. the effect of a collateral contract may be to vary the terms of the main contract ..**

174.   The Lending Agreement contains (in clause 16) an "entire agreement" clause[42] which might at first blush be thought to preclude any argument along these lines.  As has been judicially observed:

> **.. The normal reason for the inclusion of an entire agreement clause is to dispose of the risk that some collateral contract or additional terms may be discovered in the undergrowth of the parties' negotiations ..**
>
> **.. If the parties agree that the written contract is to be the entire contract, it is no business of the courts to tell them that they do not mean what they have said ..**[43]

175.   Mr Singla argued that clause 16 of the Lending Agreement did not stand in the way of my finding the existence of a collateral contract in the present case, because clause 16 applied only to "this Agreement" (ie to the Lending Agreement itself) and not to the Term Sheet. I have some difficulty with that argument, because the Term Sheet expressly incorporates all of the terms of the Lending Agreement, including the "entire agreement" provisions of clause 16.  In my view, clause 16 of the Lending Agreement would preclude me from finding the sort of collateral contract arising from statements in pre-contractual negotiations for which Reliz now contents.

176.   In any event, however, a collateral contract of this kind requires the making by one party to another of a statement intended to have contractual effect.  Celsius's 20 April 2020 email was not such a statement.  It was a proposal, made some 6 weeks before the Term Sheet was signed on 8 June 2020.  It contained no representation as to what any Term Sheet that was eventually signed by the parties might say.  Reliz's pleading refers also to the making of relevant "subsequent assurances": but I find as a fact that no such relevant "assurances" were made..

177.   In the circumstances, I hold that no such collateral contract ever came into existence.

---

[42]   See paragraph 42 above.

[43]   *North Eastern Properties Ltd v Coleman* [2010] EWCA Civ 277, [2010] 1 WL.R 2715 at [55], per Briggs J and at [82]–[83], per Longmore LJ.

### *(J.3)   Rectification*

178.   The final argument put forward on Reliz's behalf is that, in agreeing to the wording of the Lending Agreement and the Term Sheet as they presently stand, the parties made a common mistake.  The parties both intended and understood the other to intend that the "Borrowed Amount" which Reliz was liable to repay should be the ETH equivalent of USD 1 million at the time of repayment.  The Lending Agreement and the Term Sheet should therefore be rectified to give effect to that common intention.

179.   This alternative case is pleaded in paragraphs 52 to 55 of Reliz's Statement of Defence and Counterclaim as follows:

> **.. if (which is denied) on the true construction of the Term Sheet, the Borrowed Amount is the fixed amount of 4,098.36 ETH, Reliz's position is that that term was incorporated as a result of the Parties' mutual mistake, in that they both understood and intended that the Borrowed Amount would be the ETH equivalent from time to time of US$1,000,000 ..**

> **.. In the present case, it is clear that the Parties intended to execute a document which reflected their common intention that the Borrowed Amount would be the ETH equivalent from time to time of US$1,000,000.**

> **In the premises, the Parties' mutual mistake requires the Term Sheet to be rectified to provide for the Borrowed Amount to be defined as such, and Reliz shall, in the alternative, seek a declaration of rectification to the said effect ..**

180.   As to the law, it was not in dispute that:

> **.. [B]efore a written contract may be rectified on the basis of a common mistake, it is necessary to show either (1) that the document fails to give effect to a prior concluded contract or (2) that, when they executed the document, the parties had a common intention in respect of a particular matter which, by mistake, the document did not accurately record.**

> **In the latter case it is necessary to show not only that each party to the contract had the same actual intention with regard to the relevant matter, but also that there was an "outward expression of accord"—meaning that, as a result of communication between them, the parties understood each other to share that intention ..**[44]

181.   As to the standard of proof required to establish a claim for rectification:

> **.. The explanation for the statements that "convincing proof" is needed where rectification is claimed lies in the very nature of the allegation that**

---

[44]   *FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd* [2019] EWCA Civ 1361, [2020] Ch 365 at [176].per Leggatt LJ (giving the judgment of the court).  See also *Porter v Stokes* [2023] UKPC 11 at [37] to [43], per Lord Briggs.

**the written instrument does not record the parties' common intention. It is not, in truth, the standard of proof which is high, thereby differing from the normal civil standard, but that sufficiently strong proof is needed to counteract the evidence of the parties' intention displayed by the instrument itself ..**

**.. The fact that the parties to a contract have approved particular language as the appropriate expression of their bargain is thus often itself cogent evidence that the document correctly records their common intention, so that convincing proof will be needed to displace that inference ..[45]**

182.   In the present case, Reliz does not rely upon any prior concluded contract, but on a common intention which it says is demonstrated by the evidence which I have set out in Section (I) above.  By way of documentary evidence, Reliz particularly relies upon:

182.1   Mr Iram's and Mr Holert's "Grayscale Calcs" spreadsheet, which refers only to USD[46];

182.2   The proposals contained in the 20 April 2020 email, which refer to "a loan of USD1,000,000 to Blockfills"[47];

182.3   The WhatsApp message from Mr Iram to Mr Nolan; which describes the loan transaction as "Principal: USD 1,000,000; Currency; ETH"[48];

182.4   Mr Holert's email to Mr Iran on 21 May 2020, confirming these terms[49];

182.5   Mr Nolan's email to Mr Holert of 21 May 2020, which says "So the loan is for one million USD worth of ETH"[50];

182.6   The first draft of the Term Sheet which (unlike the Term Sheet eventually signed) says "Amount of Digital Asset: 4,750.59 (Coin) OR $1,000,000 (USD Equivalent)" and that "At maturity, and following sale of shares in Grayscale ETHE, borrower will return the following to Celsius: (i.) Principal amount of loan"[51].

182.7   Mr Krauszer's note of 22-23 May 2020, which describes his understanding of the transaction as "Celsius gives us $1M as a loan .. We buy crypto"[52].

---

[45]   *Tartsinis v Navona Management Co* [2015] EWHC 57 (Comm) at [85], per Leggatt J.
[46]   See paragraphs 80 to 82 above.
[47]   See paragraph 86 above.
[48]   See paragraph 92 above.
[49]   See paragraph 93 above.
[50]   See paragraph 93 above.
[51]   See paragraph 94 to 96 above.
[52]   See paragraph 97 above.

183.  Reliz also relies upon the evidence of Mr Hammer that, in a telephone call (which he says happened in May), Mr Holert and Mr Iram expressly agreed that it would be Celsius that was responsible for hedging against any appreciation in the price of ETH[53].

184.  As against this, Celsius relies upon what I have already held to be the natural and ordinary meaning of the words of the parties' signed agreement.  It also relies upon the fact that:

184.1  In the nature of things, one or other of the parties to the transaction had to bear the risk of fluctuations in the value of ETH.  Mr Hammer understood from the outset that Celsius had "lots of ETH they needed to monetise and on which they needed to get a yield"[54], and must therefore have understood that Celsius would need to get back the ETH that it was lending to Reliz;.

184.2  Celsius itself (though Mr Nolan) immediately recorded the loan in its loan book as a loan of ETH 4098.36, not of USD 1m worth of ETH[55];

184.3  Celsius sent regular monthly invoices to Reliz in relation to the interest due (in ETH) on the "Asset" of ETH 4,098.36;

184.4  On 5 December 202o Mr Holert sent an email to Mr Hammer (which Mr Hammer did not correct) saying that "we have previously issued a loan for ETH 4,098.36 to Reliz"[56].

184.5  On 27 January 2021, Mr Hammer sent an email to Mr Holert, which said "We owe you 4098.36 ETH back plus your profits and interest on the principal"[57].  Mr Hammer only changed his stance when Mr Wallace pointed out to him how unprofitable the trade would be on this basis.  Mr Wallace did not say that his recollection of the trade was different, but only that "It *has* to be different than that"[58].

185.  Celsius also relies upon the evidence of Mr Holert that he had no time agreed to hedge the risk of an appreciation in the value of ETH but that, on the contrary, Mr Hammer agreed that Reliz (rather than Celsius) would do so in the course of a telephone call (which Mr Holert says happened in June)[59].

---

[53]  See paragraph 99 above.
[54]  See paragraph 76 above.
[55]  See paragraph 113 above
[56]  See paragraph 117 above.
[57]  See paragraph 118 above.
[58]  See paragraph 119 above (emphasis added).
[59]  See paragraph 106 above.

186.   For the reasons explained in paragraphs 49 to 53 and 162 above, I attach little importance to the conflicting evidence of Mr Holert and Mr Hammer.  Their evidence seemed to me in large measure to consist of reconstruction rather than true recollections.   As for the documentary evidence and the inherent probabilities, it does not seem to me to establish the clear common intention required to make out a case for rectifying the Term Sheet and Lending Agreement so as to provide for the terms contended for by Reliz.   On the contrary, I am satisfied, taking into account all of the evidence in the case, that Celsius and Reliz intended to enter into an agreement which required Reliz to repay the ETH 4098.36 which was lent to it, and that both Reliz and Celsius generally believed (until Reliz realised the financial consequences) that they had in fact done so.

187.   In consequence, I hold that Reliz has failed to make out its claim for rectification.

## (K)   Conclusions

188.   For the reason set out above, I therefore hold that:

188.1  On the true interpretation of the Lending Agreement and the Term Sheet, Reliz was obliged on sale of the ETHE (inter alia) to re-deliver to Celsius the ETH 4,098.36 that it had borrowed.

188.2  On the facts of the case, Reliz has failed either:

188.2.1 To establish the existence of any collateral contract varying or superseding that obligation; or

188.2.2 To make out its claim for rectification.

189.   It follows that Celsius is entitled to the following relief claimed by it:

189.1  A declaration that Reliz in breach of the terms of the contract set out in the Term Sheet (incorporating the terms of the Lending Agreement) by failing to redeliver ETH 4,098.36.

189.2  An order requiring Reliz:

189.2.1 To deliver to Celsius ETH 4,098.36;

189.2.2 To pay the outstanding Borrow Fee due under clause 4.1 of the Lending Agreement;

189.2.3 To pay the Late Fee due under Clause 4.3 of the Lending Agreement.

46

190. It also follows that Reliz's Counterclaim falls to be dismissed.

191. I invite the parties to seek to reach agreement:

    191.1 As to the quantum of the outstanding Borrow Fee and Late Fee due; and

    191.2 As to the costs of this Arbitration[60]; and

    191.3 As to any other disputed matters within the scope of this reference which I have not resolved in this Partial Award.

If agreement cannot be reached, I will give directions for the exchange of written submissions leading to a further Partial or a Final Award.

192. Finally, I express my gratitude once again to the parties and their representatives for their cooperation in the conduct of this arbitration and for their very cogent and helpful submissions.

**Richard Salter KC**
Sole Arbitrator

**Place of arbitration: London**

25 May 2023

---

[60] As to which, as recorded in the email sent on 3 February 2023 by Stewarts Law LLP, "(1) the parties have agreed to submit any respective cost schedules and submissions on costs once the parties are aware of the Tribunal's conclusions on liability and quantum via a Partial Award; and (2) that the parties shall seek to agree on the timing for any such schedules and submissions to be submitted to the Sole Arbitrator once the Partial Award has been delivered, failing which the parties can seek directions from the Sole Arbitrator".

## **Exhibit I**

**Notice of Arbitration**

**IN THE MATTER OF AN ARBITRATION**

**B E T W E E N :**

**CELSIUS NETWORK LTD**       <u>Claimant</u>

**- and -**

**RELIZ LTD**       <u>Respondent</u>

---

**NOTICE OF ARBITRATION**
**DATED 20 MAY 2021**

---

To:    Reliz Ltd of 4th Floor Century Yard, Cricket Square, Georgetown, Gr. Cayman, KY1-1209

## A.    INTRODUCTION

1.    This is a formal notice for the commencement of an arbitration which is served pursuant to Clause 21 of the Digital Asset Lending Agreement entered into by Celsius Network Ltd ("**Celsius**") and Reliz Ltd ("**Reliz**") on 3 December 2019 (the "**Agreement**"), the terms of which were incorporated into a Loan Term Sheet dated 8 June 2020 (the "**Term Sheet**"), which provides for any dispute between the parties (unless amicably resolved) to be finally settled by arbitration. `H19` `H334`

2.    As set out more fully below, this Notice of Arbitration arises out of and in connection with a loan of a digital asset in the amount of 4,098.36 ETH made by Celsius as lender to Reliz as borrower. Contrary to the terms of the Agreement and the Term Sheet, Reliz has failed to re-deliver to Celsius the amount of 4,098.36 ETH by way of repayment of the loan as due, plus the additional sums due under those agreements comprised of the Borrow Fee and Late Fee on the Borrowed Amount (as defined in the Agreement), and any further sums due by way of preferred interest and a profit-sharing under the Additional terms of the Term Sheet.

3.    In accordance with Clause 21.1 of the Agreement, Celsius hereby requires the `H19`

dispute between the parties to be referred to arbitration, and further requires you to agree the appointment of an arbitrator within 7 days of this Notice (a proposal for which is set out in Section E below).

4.     In accordance with Clause 12.1 of the Agreement, this Notice of Arbitration has been served by e-mail to Reliz at [trading@blockfills.com](mailto:trading@blockfills.com), marked for the attention of Brad Nagela.     H17

5.     This Notice of Arbitration has also been served by e-mail to Reliz's attorneys, Fox Swibel Levin & Carroll LLP, marked for the attention of Martin Carroll.

## B.    BACKGROUND TO THE DISPUTE AND NATURE OF CLAIM

6.     On 3 December 2019, the parties entered into the Agreement. As recorded in Recital A, the Agreement set out the terms on which Reliz (as Borrower) may, from time to time, seek to initiate a transaction pursuant to which Celsius (as Lender) will lend Digital Asset(s) to Reliz and Reliz will return Digital Assets (e.g. BTC or ETH) at or upon the termination or maturity of the loan.     H10

7.     The Agreement provides, *inter alia*, as follows (capitalised terms are as defined in the Agreement):

    7.1    **Clause 2** sets out the meaning of certain defined terms, including the following:     H10

> …
>
> "**Borrowed Amount**" means the amount of Digital Asset(s) actually lent by the Lender to the Borrower under a Loan made pursuant to and subject to this Agreement.
>
> …
>
> "**Collateral**" means an amount in either: (a) U.S. Dollars calculated as a percentage of the Borrowed Amount as valued at a spot rate agreed upon in the Loan Term Sheet, or (b) Currency agreed upon, as provided by the Borrower to the Lender as collateral for the Loan.
>
> …
>
> "**Digital Asset**" means Bitcoin (BTC), Ether (ETH) or any digital asset that the Parties may agree upon in writing.
>
> "**Due Date**" means a Maturity Date or Recall Delivery Date.

2

"**Event of Default**" has the meaning specified in Section 8.

…

"**Late Fee**" means the additional fee of eighteen percent (18%) (annualized, calculated daily) of the notional amount of the Loan as valued at 12:00 am New York time each Calendar Day, that is incurred by the borrower for each Calendar Day that Loan repayment is overdue in accordance with Section 4.3.

…

"**Loan**" means a loan of Digital Asset by the Lender to the Borrower subject to this Agreement.

…

"**Maturity Date**" means the date upon which a Loan is terminated.

…

"**Term Deal**" means a Loan with a predetermined Maturity Date, where only the Borrower can return the Digital Asset prior to the Maturity Date.

7.2   **Clause 3** sets out the loan procedure as follows:                                    H12

7.2.1   By Clause 3.1, a request could be made for a Loan of a specific number of Digital Asset including the Pricing Terms (referred to as a "Lending Request").

7.2.2   By Clause 3.2, the Lending Request had to contain certain information, including the Digital Asset and its amount that Reliz wished to borrow, and the Pricing Terms.

7.2.3   By Clause 3.3, there was no obligation on Celsius to make the Loan.

7.2.4   By Clause 3.4, the specific terms of the Loan were to be recorded using the Loan Term Sheet attached as Annex B to the Agreement.

7.2.5   In relation to a Term Deal Loan, Clause 3.8 provides that Reliz may at any time on a Calendar Day (the "Redelivery Date") redeliver all or any portion of the Borrowed Amount loaned to it. Clause 3.9 provides that if the Borrowed Amount is not returned before the Maturity Date, Reliz is required to commence "redelivery" on or

3

before the Maturity Date.

7.2.6    Clause 3.13 provides that a Term Deal will terminate upon "redelivery" by the Borrower of the Borrowed Amount at the Maturity Date or sooner, or upon an Event of Default.

7.3    **Clause 4** sets out the relevant Borrow Fee and transaction fees. Clause 4.3 provides that where Reliz fails to return any Digital Asset by an applicable Due Date, Reliz shall incur the Late Fee for each Calendar Day that the repayment of the Digital Asset is overdue. <sub>H13</sub>

7.4    **Clause 8** provides that an Event of Default includes: (i) the failure of Reliz to return any Borrowed amount when due; (ii) the failure of Reliz to pay any Invoice Amount or Additional Collateral when due; and (iii) any material breach of the Agreement. <sub>H16</sub>

7.5    **Clause 9** sets out the available remedies as follows: <sub>H16</sub>

7.5.1    Clause 9.1 provides that on the occurrence and during the continuation of any Event of Default, Celsius may, at its option: (i) declare the entire Borrowed Amount, Invoice Amount and any other amounts owing under the Agreement to be immediately due and payable; (ii) terminate the Agreement upon notice to Reliz; and (iii) exercise all other rights and remedies available to Celsius hereunder, under applicable law, or in equity.

7.5.2    Clause 9.2 provides that in the event that Reliz fails to pay any amounts due under the Agreement, Reliz shall pay to the Celsius upon demand all reasonable costs and expenses, including without limitation, reasonable legal fees and court costs incurred by Celsius in connection with the enforcement of its rights under the Agreement.

7.6    **Clause 13** provides that no modification or amendment to the Agreement shall be effective unless agreed in writing and signed by both parties. <sub>H18</sub>

7.7    **Clause 16** provides that the Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes any <sub>H18</sub>

4

prior negotiations, understandings and agreements.

8.      On 8 June 2020, the parties entered into the Term Sheet pursuant to which Celsius    H334
        agreed to lend and Reliz agreed to borrow 4,098.36 ETH. The Term Sheet expressly
        incorporates all of the terms of the Agreement. The Term Sheet also provides, *inter
        alia*, as follows:

   8.1      The Digital Asset is defined as ETH, in the amount of 4,098.36.

   8.2      At the time of the Term Sheet, ETH had a spot price of USD 244.
            Accordingly, at that time, the value of 4,098.36 ETH in USD was
            approximately USD 1 million.

   8.3      The Loan Term was 13 months, or sale of shares in the ETHE (meaning the
            Grayscale Ethereum Trust), whichever was sooner.

   8.4      The Borrow Fee was 1%, and was payable in ETH.

   8.5      The Collateral Asset was USD250,000. No margin call level was specified.

   8.6      The additional terms were as follows:

               The loan will be used exclusively to purchase shares of the Grayscale
               Ethereum Trust (ETHE). Once the loan and remaining interest are
               repaid to Celsius, Celsius will be paid any excess of the proceeds from
               the sale of the ETHE shares less the loan amount as follows:

               i.) Preferred interest at an annualized 6% rate on the loan amount, as
               allowed by the excess proceeds, and paid in either ETH or USD; and

               ii.) Profit-sharing of 70% of any remaining excess proceeds, paid in
               ETH or USD.

9.      On 8 June 2020, Celsius transferred 4098.36 ETH to Reliz.

10.     On 10 June 2020, Reliz used the 4098.36 ETH to purchase shares in the Grayscale
        Ethereum Trust.

11.     On 27 January 2021, Nick Hammer of Reliz sent an email to Patrick Holert and    H647
        Harumi Urata-Thompson of Celsius (timed at 11:52), which stated as follows:

               "We are going to begin the liquidation process of the ETHE grayscale shares.
               We owe you 4,098.36 ETH back plus your profits and interest on principal.
               Can you tell us if you would like the profits to be paid back in USD or

5

equivalent in ETH? The principal of the investment should be paid back in ETH."

12. On 3 February 2021, Reliz sold and/or liquidated its shares in the Grayscale Ethereum Trust.

13. In accordance with the Term Sheet, the sale of shares in the Grayscale Ethereum Trust constituted the Maturity Date for the Loan (if it occurred, as it did, sooner than 13 months from the date of the Term Sheet). **H334**

14. Accordingly, Reliz was required by Clause 3.9 of the Agreement to commence redelivery of the Borrowed Amount (being 4,098.36 ETH) on or before 3 February 2021. **H13**

15. Further, Reliz was required to pay the following sums incurred under the Agreement and Term Sheet which were also outstanding as at 3 February 2021:

   15.1 The Borrow Fee (at a rate of 1%, payable in ETH, as per the Term Sheet);

   15.2 Preferred interest at an annualized 6% rate on the loan amount, as allowed by the excess proceeds, and to be paid in either ETH or USD; and

   15.3 Celsius' profit-sharing of 70% of any remaining excess proceeds, to be paid in ETH or USD.

16. On 3 February 2021, Reliz provided Celsius with a breakdown of the proceeds received by Reliz on the sale and/or liquidation of its shares in the Grayscale Ethereum Trust, which stated that Reliz's proceeds totalled USD 5,942,875.56. Celsius reserves its rights to claim preferred interest and profit-sharing under the Additional terms of the Term Sheet in respect of Reliz's sale of its shares in the Grayscale Ethereum Trust. **H725**

17. On 3 February 2021, Reliz failed to redeliver the Borrowed Amount of 4,098.36 ETH and/or pay the Borrow Fee, which then totalled 26.95 ETH.

18. As a result of Reliz's failure to redeliver 4,125.31 ETH (comprising the Borrowed Amount and Borrow Fee as at 3 February 2021), it is in breach of the terms of the Agreement and the Term Sheet.

19. This default is continuing. The Borrow Fee is therefore continuing to accrue on the

6

Borrowed Amount at a daily rate of 0.1123 ETH.

20.     Reliz is also obliged to pay the Late Fee under Clause 4.3 of the Agreement, which     H14
        is (and continues to be) incurred by Reliz for each Calendar Day that the Loan is
        overdue. As at the date of this Notice, Celsius estimates the Late Fee to amount to
        approximately USD 470,862.46.

21.     Accordingly, as at the date of this Notice, the amount outstanding from Reliz to
        Celsius under the Agreement and Term Sheet is at least 4,137.21 ETH, plus USD
        470,862.46 in respect of the Late Fee and any preferred interest and profit sharing
        that may be owing to Celsius pursuant to the Additional terms of the Term Sheet.

## C.     RELIEF SOUGHT

22.     Celsius seeks relief against Reliz as follows:

    22.1    A declaration that Reliz in breach of the Agreement and Term Sheet by
            failing to redeliver 4,098.36 ETH.

    22.2    An order requiring Reliz to deliver to Celsius 4,098.36 ETH.

    22.3    An order requiring Reliz to pay the outstanding Borrow Fee due (which, as
            at the date of this Notice, totals 38.85 ETH).

    22.4    An order requiring Reliz to pay the Late Fees due under Clause 4.3 of the
            Agreement, which at the time of this Notice amount to approximately USD
            470,862.46.

    22.5    An order requiring Reliz to pay any applicable preferred interest and profit
            share that may be owing to Celsius under the Additional terms of the Term
            Sheet.

    22.6    In the alternative, an order for damages.

    22.7    An order requiring Reliz to pay all reasonable costs and expenses, including
            without limitation, reasonable legal fees and court costs incurred by Celsius
            in connection with the enforcement of its rights under the Agreement.

7

## D.     THE ARBITRATION AGREEMENT

23.     Celsius has commenced this arbitration against Reliz in accordance with the terms
of the Agreement.

24.     Clause 21 sets out the agreed terms regarding dispute resolution. In full, Clause 21     H19
states as follows:

> ### 21. SUBMISSION TO ARBITRATION; WAIVER OF COURT AND JURY TRIAL
>
> 21.1. Arbitration Terms. Any dispute between the parties, unless amicably resolved by the parties, shall be finally settled by arbitration in accordance with the terms set forth hereunder. In such case, the place of arbitration of any dispute shall be London. The language to be used in the arbitration proceedings shall be English. The arbitration shall be conducted before a mutually appointed sole arbitrator. In the absence of agreement as to the identity of the arbitrator within seven (7) days of first demand of any of the parties, then the arbitrator shall be appointed by the chairman of the United Kingdom Bar. Any award rendered by the arbitrator shall be final and binding upon the parties. The arbitration shall be conducted under the rules and procedures set forth by the United Kingdom Arbitration Law - 1968, which rules and procedures are deemed to be incorporated by reference into this Section. The arbitrator shall not be bound by any rules of procedure or evidence but shall apply the substantive laws of United Kingdom in determining any matters before him. The arbitrator shall be liable to give written grounds for its decision. Judgment upon any award rendered may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. Each party shall pay its own expenses of the arbitration, and the expenses of the arbitrator shall be equally shared between the parties, unless the arbitrator assesses as part of their award all or any part of the arbitration expenses of a party (including reasonable attorneys' fees) against the other party. Any arbitration proceeding hereunder shall be conducted on a confidential basis.
>
> 21.2. SUBMISSION TO ARBITRATION. EACH OF BORROWER AND LENDER IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES OR CELSIUS INCLUDING ANY CONFIRMATION OR ANY LOAN OR RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE AND (B) WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY COURT AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF ITS PLACE OF RESIDENCE OR DOMICILE.
>
> 21.3. WAIVER OF COURT AND WAIVER JURY TRIAL. EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES ANY RIGHT THAT IT MAY HAVE TO FILE ANY CLAIMS IN ANY COURT OF LAW OR SEEK A TRIAL BY JURY IN ANY ACTION, PROCEEDING

8

OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT. ANY CONFIRMATION, ANY LOAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

25. On a proper construction, the arbitration agreement further provides for:

25.1 the arbitration to take place in London;

25.2 London to be the seat of the arbitration;

25.3 the arbitration to be subject to the Arbitration Act 1996;

25.4 the dispute to be determined in accordance with the substantive laws of England and Wales; and

25.5 any dispute as to the appointment of the arbitrator falls to be determined by the Chair of the UK Bar Council.

## E.   THE ARBITRAL TRIBUNAL

26. We hereby require you to agree the appointment of an arbitrator within 7 days of this Notice pursuant to clause 21.1 of the Agreement.

27. Celsius proposes the appointment of Mr Richard Salter QC of 3 Verulam Buildings, London, England or Mr John Taylor QC of Fountain Court Chambers, London, England and invites Reliz to select one of them within the 7 days referred to in paragraph 26 above.

28. Once the arbitrator has been appointed, Celsius will make proposals to Reliz for the appropriate procedure and timetable in respect of the arbitration.

**20 May 2021**

**Taylor Wessing LLP (Solicitors to the Claimant)**
**5 New Street Square**
**London EC4A 3TW**
**United Kingdom**
**Ref: ULML/UGYJ/CEL62.U1**

9

## **Exhibit J**

**Terms of Appointment**

DocuSign Envelope ID: 1B3A34D5-F95D-4821-9E6B-3435116680B0

IN THE MATTER OF AN ARBITRATION

B E T W E E N :

## CELSIUS NETWORK LIMITED

**Claimant**

### - and -

## RELIZ LIMITED

**Respondent**

---

TERMS OF APPOINTMENT

*of the Arbitrator*

RICHARD SALTER QC

---

## (A)    The parties

1.    The details of the parties and their representatives are as follows:

1.1.    <u>Claimant</u>

**Celsius Network Limited**          (**"Celsius"**)
The Harley Building
77 - 79 New Cavendish Street
London W1W 6XB

Represented by:

**Laurence Lieberman** (Partner, Disputes & Investigations, *Taylor Wessing LLP*)
L.lieberman@taylorwessing.com
**Georgina Jones** (Senior Associate, Disputes and Investigations, *Taylor Wessing LLP*)
G.jones@taylorwessing.com
**Christopher Langley** (Counsel, *Fountain Court Chambers*)
cl@fountaincourt.com

Address for communications by post or hand delivery/courier service:

**Taylor Wessing LLP**
5 New Street Square
London EC4A 3TW
United Kingdom

Ref: ULML/UGYJ/CEL62.U1

1

1.2.    <u>Respondent</u>

**Reliz Limited**                    (**"Reliz"**)
4th floor Century Yard
Cricket Square
Georgetown
Grand Cayman
KY1-1209

Represented by:

**Martin B Carroll** (Managing Partner and Litigation Chairman, *Fox Swibel Levin & Carroll LLP*)
MCarroll@foxswibel.com
**Philippa Charles** (Partner and Head of International Arbitration, *Stewarts Law LLP*)
(pcharles@stewartslaw.com)
**Louis Peacock-Young** (Associate, International Arbitration, *Stewarts Law LLP*)
(lpeacock-young@stewartslaw.com)
**Ronan D'Cruz** (Senior Paralegal, *Stewarts Law LLP*)
 (rdcruz@stewartslaw.com)
**Tony Singla QC** (Counsel, Brick Court Chambers)
(tony.singla@brickcourt.co.uk)

Address for communications by post or hand delivery/courier service:

**Stewarts Law LLP**
5 New Street Square,
London EC4A 3BF
United Kingdom

Ref: PC/LPY/Reliz

## (B)    Appointment of the Arbitrator

2.    Clause 21 ("**Clause 21**") of the Digital Asset Lending Agreement dated 3 December 2019 between Celsius and Reliz ("**the Agreement**"), the terms of which were incorporated into a Loan Term Sheet dated 8 June 2020 ("**the Term Sheet**"), provides that:

> **Any dispute between the parties, unless amicably resolved by the parties, shall be finally settled by arbitration in accordance with the terms set forth hereunder. In such case, the place of arbitration of any dispute shall be London. The language to be used in the arbitration proceedings shall be English. The arbitration shall be conducted before a mutually appointed sole arbitrator. In the absence of agreement as to the identity of the arbitrator within seven (7) days of first demand of any of the parties, then the arbitrator shall be appointed by the chairman of the United Kingdom Bar. Any award rendered by the arbitrator shall be final and binding upon the parties. The**

2

DocuSign Envelope ID: 1B3A34D5-F95D-4821-9F6B-3435F6689C85

**arbitration shall be conducted under the rules and procedures set forth by the United Kingdom Arbitration Law - 1968, which rules and procedures are deemed to be incorporated by reference into this Section. The arbitrator shall not be bound by any rules of procedure or evidence but shall apply the substantive laws of United Kingdom in determining any matters before him. The arbitrator shall be liable to give written grounds for its decision. Judgment upon any award rendered may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. Each party shall pay its own expenses of the arbitration, and the expenses of the arbitrator shall be equally shared between the parties, unless the arbitrator assesses as part of their award all or any part of the arbitration expenses of a party (including reasonable attorneys' fees) against the other party. Any arbitration proceeding hereunder shall be conducted on a confidential basis**

3.    Disputes having arisen in relation to the Agreement and/or the Term Sheet which have not been amicably resolved, the parties have agreed by an exchange of emails dated 20 and 26 May 2021 that all such disputes between the parties should be resolved in accordance with Clause 21 by:

> **Richard Salter QC**                    (**"the Arbitrator"**)
> 3 Verulam Buildings,
> Gray's Inn
> London WC1R 5NT
> rsalter@3vb.com

acting as sole arbitrator.

4.    The Parties hereby confirm the appointment of the Arbitrator on and subject to the terms set out in these Terms of Appointment and confirm that the Arbitrator has been validly appointed in accordance with the relevant terms of the arbitration agreement contained in the Agreement and/or the Term Sheet.

5.    The Arbitrator shall be and remain impartial and independent of the Parties.

6.    The Parties confirm that they waive any possible objection to the appointment of the Arbitrator on the grounds of potential conflict of interest and/or lack of independence or impartiality in respect of matters known to the Parties at the date of signature of these Terms of Appointment.

## (C)    Place and language of the Arbitration

7.    In accordance with Clause 21:

> 7.1.    The place or "seat" of the arbitration shall be London, England.

> > 7.1.1.    Hearings and meetings shall be conducted in London, unless otherwise agreed between the parties.

3

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

DocuSign Envelope ID: 1B3A34D5-F95D-4821-B5E6B-34251F6889B5

> 7.1.2.   After consulting the parties (and unless otherwise agreed by them), the Arbitrator may nevertheless conduct hearings and meetings by telephone or video-conference.

7.2.    The language to be used in the arbitration proceedings shall be English.

## (D)    Applicable law, procedure, and evidence

8.    In accordance with Clause 21:

8.1.    All issues arising in the arbitration (including all matters relating to the validity, interpretation, or performance of the Agreement and/or the Term Sheet) shall be determined in accordance with the law of England and Wales ("**English law**")

8.2.    Subject to any mandatory provisions of English law, this arbitration shall be conducted in accordance with the Arbitration Act 1996.   Accordingly:

> 8.2.1.   The Arbitrator shall:
>
> > 8.2.1.1. act fairly and impartially as between all parties, giving each a reasonable opportunity of putting its case and dealing with that of its opponent(s); and
> >
> > 8.2.1.2. adopt procedures suitable to the circumstances of the arbitration, avoiding unnecessary delay and expense, so as to provide a fair, efficient and expeditious means for the final resolution of the parties' dispute.
>
> 8.2.2.   Subject to any mandatory provisions of English law, the Arbitrator shall have the widest discretion in relation to the conduct of the arbitration.   After giving the parties a reasonable opportunity to state their views (and unless otherwise agreed by them), the Arbitrator may make any procedural order he considers appropriate with regard to the fair, efficient and expeditious conduct of the arbitration, including (without prejudice to the generality of the foregoing):
>
> > 8.2.2.1. limiting the length or content of, or dispensing with, any written statement of case;
> >
> > 8.2.2.2. limiting the written and/or oral testimony of any witness;
> >
> > 8.2.2.3. employing technology to enhance the efficiency and expeditious conduct of the arbitration (including any hearing);
> >
> > 8.2.2.4. deciding the stage of the arbitration at which any issue or issues shall be determined, and in what order;
> >
> > 8.2.2.5. dispensing with a hearing;

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

DocuSign Envelope ID: 61B3A34D5-F95D-4821-95E6B-3435U6680085D

8.2.2.6.  setting an appropriate period of time for any stage of, or step to be taken in, the arbitration including with regard to the conduct of any hearing; and

8.2.2.7.  making any other order that the Arbitrator considers appropriate in the circumstances of the arbitration.

8.3.  The Arbitrator shall not be bound by any strict rules of evidence. However, as appropriate, the Arbitrator may have regard to the 2020 IBA Rules on the Taking of Evidence in International Commercial Arbitration.

9.  The Parties shall at all times do everything necessary in good faith for the fair, efficient and expeditious conduct of the arbitration.

## (E)  Communications

10.  All notices or other written communications shall be sent to the representatives of the Parties at the addresses set out in paragraph 1 above and to the Arbitrator at the address set out in paragraph 3 above, unless and until any change of address is formally notified to all persons listed in those paragraphs.

11.  All notices or written communications of less than 20 pages shall be sent only by e-mail. All notices or other written communications of 20 or more pages (including all formal submissions and all attachments or exhibits thereto) shall be sent (in addition to any other method used) both by e-mail and by post or hand delivery/courier service, which should include (in addition to hard copies) digital copies on a flash drive of all such communications, submissions, attachments and exhibits.

12.  The Parties shall send copies of correspondence between them to the Arbitrator only if it pertains to a matter in relation to which the Arbitrator is required to take some action or to be apprised of some relevant event.

13.  The Parties agree that there shall be no *ex parte* communication between either Party or its representatives and the Arbitrator regarding any matter in these proceedings, save in respect of routine administrative matters, and that all written communications by one Party to the Arbitrator shall be copied simultaneously to the other Party.

## (F)  Remuneration and Expenses of the Arbitrator

### (F1)  Fees

14.  The Arbitrator will be remunerated at the rate of £650.00 per hour and £6,500.00 per sitting day, for all work reasonably carried out in connection with these arbitration proceedings.

### (F2)  Booking fees

15.  For each day reserved for a hearing, the Arbitrator will charge booking fees as follows:

15.1.  Upon the fixing of any hearing dates, the Arbitrator will charge a booking fee amounting to 25% of the daily rate multiplied by the number of days reserved.

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

DocuSign Envelope ID: 1B3A34D5-F95D-4821-95GB-3435F6680985

15.2.   Four (4) months before any hearing dates or upon the fixing of any hearing dates (if fixed less than four months before the hearing dates), the Arbitrator will charge a further booking fee amounting to 25% of the daily rate multiplied by the number of days reserved.

15.3.   One (1) month before any hearing dates or upon the fixing of any hearing dates (if fixed less than one month before the hearing dates), the Arbitrator will charge a further booking fee amounting to 25% of the daily rate multiplied by the number of days reserved.

The above booking fees will be payable and non-returnable in the event of the cancellation or adjournment of the hearing in question. Credit for booking fees will be given against fees payable in respect of the hearing days in question.

*(F3)   VAT, review of rates, and payment*

16.    All fees are subject to UK VAT (if applicable) at the prevailing rate.

17.    The Arbitrator reserves the right to review the above rates on each anniversary of his acceptance of appointment.

18.    The Arbitrator may submit periodic bills for his fees and for reimbursement of disbursements at monthly intervals. Without prejudice to the Parties' positions as to the liability for the costs of the Arbitration, including in respect of each party's legal fees, the Parties agree that they shall each be responsible for one half of those fees to await any reallocation at the conclusion of the Arbitration. Unless otherwise specified, all fees are payable within fourteen (14) days of receipt of a fee note.   The Arbitrator may charge interest at 6% p.a. on all overdue fees.

19.    The Arbitrator may, in his absolute discretion, require payment of all fees up to the date thereof in advance of issuing any Partial or Final Award.

*(F4)   Expenses*

20.    The Arbitrator shall be reimbursed in respect of all disbursements and expenses reasonably incurred in connection with the arbitration, including but not limited to business class travel, hotel, courier, internet, telephone, video-conference and copying.

21.    Expenses relating to administrative and support services engaged for the purposes of the arbitration, including but not limited to the cost of hearing rooms and reporters, shall be paid directly by the parties in equal shares.

*(F5)   Hearings etc overseas*

22.    If the Arbitrator is required to travel outside England (whether for hearings or deliberations), travelling time, waiting time and any other time reasonably spent abroad in connection with the arbitration, either before, during or after any hearings or deliberations, and including weekends, will be charged at half the daily rate. The Arbitrator reserves the right to charge an increased daily rate if he is required to sit outside England.

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

DocuSign Envelope ID: 1B3A34D5-F95D-4821-9E6B-3495J6698985

*(F6)    Deposits*

23.    The Arbitrator may, in his absolute discretion, request the parties to pay deposits to cover the likely fees and expenses for the whole arbitration or any part thereof.  A request for deposits may be made at any stage and further deposits may be sought if the sum deposited is unlikely to cover the fees and expenses incurred or likely to be incurred. All sums so paid will, after discharge of all fees and expenses, be returned either to the party who paid the deposit or in accordance with any direction contained in the Award. All requests for deposits from the parties shall be discharged equally by the parties but if one party defaults, the other shall pay the full amount.

*(F7)    Settlement, abandonment or resignation*

24.    If the arbitral reference is settled or abandoned without an award being made, or if the Arbitrator resigns, he shall be entitled to payment for work done and for expenses incurred to date.

## (G)    Confidentiality

25.    The Parties and the Arbitrator shall keep confidential all deliberations, decisions and awards in the arbitration, together with all materials in the proceedings created for the purpose of the arbitration and all other documents or evidence produced by another Party in the proceedings not otherwise in the public domain, save and to the extent that disclosure may be required of a Party or the Arbitrator:

    25.1.  by a legal duty;

    25.2.  to protect or pursue a legal right;

    25.3.  to enforce or challenge an award or remove the Arbitrator, in legal proceedings;

    25.4.  to auditors, legal, or other professional advisors;

    25.5.  to insurers or reinsurers;

    25.6.  to regulators; or

    25.7.  as agreed in writing between the parties.

26.    For the avoidance of doubt, it is agreed that in preparing and presenting its case no Party shall be precluded from communicating with prospective witnesses, experts or other sources of information or materials.

## (H)    Arbitrator's Immunity from Suit

27.    The Arbitrator shall not be required to be a party or witness in any judicial or other proceedings arising out of this arbitration.

28.    Save in relation to the consequences of conscious and dishonest wrongdoing, the Arbitrator shall not be and the Parties shall not seek to make the Arbitrator liable to any Party in respect of any act or omission in connection with any matter related to this arbitration, and the Parties agree jointly and severally to indemnify the Arbitrator, and

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

hold him harmless in respect of any liabilities, costs or claims whatsoever in relation thereto.

## (I)    Change of Representation

29.    Any addition or change to a party's legal representation after the date of these Terms of Appointment must be notified to the other party and to the Arbitrator within 48 hours of such addition or change. The parties agree the Arbitrator may withhold approval of any intended change or addition to a party's legal representatives where such change or addition could compromise the Arbitrator or the finality of any award (on the grounds of possible conflict or other like impediment). In deciding whether to grant or withhold such approval, the Arbitrator shall have regard to the circumstances, including: the general principle that a party may be represented by a legal representative chosen by that party, the stage which the arbitration has reached, the efficiency resulting from maintaining the Arbitrator in place throughout the arbitration and any likely wasted costs or loss of time resulting from such change or addition.

## (J)    These Terms of Appointment

30.    These Terms of Appointment are governed by English law.

31.    These Terms of Appointment may be signed on separate counterparts, each of which when signed shall be treated for all purposes as a single original document.

**Signed:**

..................................    ...................................

(for **Celsius**)    (for **Reliz**)

...................................

(**Arbitrator**)

Dated _____ 2021

8

Doc ID: 2af507a56eefa492f2596fa3b24af7800df8499f

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Salter Terms of Appointment |
| **FILE NAME** | Terms of Appointment 170621 (1).docx.pdf |
| **DOCUMENT ID** | 2af507a56eefa492f2596fa3b24af7800df8499f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **07 / 20 / 2021** 16:42:48 UTC | Sent for signature to Nick Hammer (nick@blockfills.com) from nick@blockfills.com IP: 73.210.0.205 |
| **VIEWED** | **07 / 20 / 2021** 16:46:44 UTC | Viewed by Nick Hammer (nick@blockfills.com) IP: 73.210.0.205 |
| **SIGNED** | **07 / 20 / 2021** 16:46:57 UTC | Signed by Nick Hammer (nick@blockfills.com) IP: 73.210.0.205 |
| **COMPLETED** | **07 / 20 / 2021** 16:46:57 UTC | The document has been completed. |

Powered by ▽ **HELLOSIGN**

**<u>Exhibit K</u>**

**Second Partial Award**

*Confidential*

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

### CELSIUS NETWORK LTD

Claimant

-and-

### RELIZ LTD

Respondent

---

### SECOND
### PARTIAL AWARD

---

### The Tribunal

### Richard Salter KC

Sole Arbitrator

*Confidential*

## (A)    Background

1.  The disputes which are the subject of this reference arise under a Digital Asset Lending Agreement dated 3 December 2019 ("**the Lending Agreement**") between the Claimant, Celsius Network Ltd ("**Celsius**") and the Respondent, Reliz Limited ("**Reliz**"), the terms of which were incorporated into a Loan Term Sheet dated 8 June 2020 ("**the Term Sheet**").

2.  I was appointed as the mutually agreed sole arbitrator for the purposes of this arbitration by an exchange of emails dated 20 and 26 May 2021. My appointment was subsequently confirmed by written Terms of Appointment signed by the parties and by me in July and August 2021.

3.  Following an evidential hearing which took place between 9 and 12 January 2023 ("**the January Hearing**"), on 25 May 2023 I delivered my first Partial Award ("**the First Partial Award**") on all issues except the matters referred to in paragraph 191 of the First Partial Award.

4.  In paragraphs 188 to 190 of the First Partial Award, I held as follows:

    **[188]  For the reason set out above, I therefore hold that:**

    **[188.1]  On the true interpretation of the Lending Agreement and the Term Sheet, Reliz was obliged on sale of the ETHE (inter alia) to re-deliver to Celsius the ETH 4,098.36 that it had borrowed.**

    **[188.2]  On the facts of the case, Reliz has failed either:**

    **[188.2.1]  To establish the existence of any collateral contract varying or superseding that obligation; or**

    **[188.2.2]  To make out its claim for rectification.**

    **[189]  It follows that Celsius is entitled to the following relief claimed by it:**

    **[189.1]  A declaration that Reliz in breach of the terms of the contract set out in the Term Sheet (incorporating the terms of the Lending Agreement) by failing to redeliver ETH 4,098.36.**

    **[189.2]  An order requiring Reliz:**

    **[189.2.1]  To deliver to Celsius ETH 4,098.36;**

    **[189.2.2]  To pay the outstanding Borrow Fee due under clause 4.1 of the Lending Agreement;**

> **[189.2.3] To pay the Late Fee due under Clause 4.3 of the Lending Agreement.**

**[190] It also follows that Reliz's Counterclaim falls to be dismissed.**

5.    In paragraph 191 of the First Partial Award, I stated that:

> **[191} I invite the parties to seek to reach agreement:**
>
> > **[191.1]  As to the quantum of the outstanding Borrow Fee and Late Fee due; and**
> >
> > **[191 .2]  As to the costs of this Arbitration; and**
> >
> > **[191.3]  As to any other disputed matters within the scope of this reference which I have not resolved in this Partial Award.**
>
> **If agreement cannot be reached, I will give directions for the exchange of written submissions leading to a further Partial or a Final Award.**

6.    By letter dated 12 June 2023 Celsius asked me to give an immediate direction requiring Reliz to pay by midday New York time (5pm UK time) on Tuesday 13 June 2023 the 4,098.16 ETH which in paragraph 189.2.1 of the First Partial Award I had ordered Reliz to pay to Celsius.  I directed that Reliz should have an opportunity to respond to this request and, by email dated 14 June 2023, Reliz objected to Celsius' request on the ground that, having made my order in paragraph 189.2.1, I no long retained jurisdiction to give the direction sought.   Having considered the parties' submissions, I upheld Reliz's objection and declined to make the direction sought by Celsius.

7.    By email dated 30 June 2023, the parties confirmed that they had failed to reach agreement in relation to the matters reserved in paragraph 191 of the First Partial Award, but had agreed on a timetable for the exchange of submissions in relation to those matters.   I confirmed my approval of that timetable by email the same day.

8.    Pursuant to that agreed timetable:

8.1    Reliz made submissions in respect of paragraphs 191.1 and 191.3 of the First Partial Award under cover of an email dated 30 June 2023;

8.2    Celsius made submissions in response under cover of an email dated 11 July 2023;

8.3    Reliz made further submissions in reply under cover of an email dated 18 July 2023.

9.    I have carefully considered the parties' helpful submissions and the enclosures to those submissions.  Having done so, I now make this, my Second Partial Award, to deal with

these issues.  I reserve for a further award or awards all issues relating to costs and/or to the other matters referred to in paragraph 72 below.

## (B)    The contractual provisions

10.    The provisions of the Lending Agreement and the Term Sheet are already set out in detail in Sections (E) and (F) of the First Partial Award.  It may nevertheless be helpful to set out again here some of the provisions of Clauses 4 and 5 of the Lending Agreement and the full terms of the Term Sheet.

11.    Clauses 4 and 5 of the Lending Agreement provide as follows:

> **[4]    Borrow Fee Calculation**
>
> **[4.1]    Following an accepted Lending Request, an agreed Borrow Fee will be recorded in the relevant Loan Term Sheet. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and the Lender, as provided for on a Loan Term Sheet.**
>
> **[4.2]    The Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.**
>
> **Late Fee**
>
> **[4.3]    Where the Borrower fails to return any Digital Asset by an applicable Due Date, the Borrower shall incur the Late Fee for each Calendar Day that the repayment of the Digital Asset is overdue.**
>
> **Payment of Borrow Fees and Late Fees**
>
> **[4.3]    An invoice shall be sent monthly (on such Calendar Day or such other day as the Lender may determine) and shall include any Borrow Fees and any Late Fees (the "Invoice Amount") outstanding. The Invoice Amount shall be payable as provided for on the Loan Term Sheet. Without prejudice to Section 9.1(i), the Borrower shall have up to five Business Days to submit payment for the invoice (the "Invoice Due Date").**
>
> **Taxes and Fees**
>
> **4.5.    All transfer or other taxes or third-party fees payable with respect to the transfer and/or return of any Borrowed Amount, Invoice Amount or other amount under this Agreement shall be paid by the Borrower.**

4

**[5]    Collateral**

**5.1    Before the Lender commences a Loan on behalf of the Borrower, the Borrower shall provide the Collateral. The Collateral shall be an amount in the Currency agreed upon calculated as a percentage of the Borrowed Amount, as valued at a spot rate agreed upon in the Loan Term Sheet.**

**5.2.    The Lender shall be entitled to use the Collateral to conduct its digital asset lending and borrowing business, including transferring the Collateral to bank accounts that are not controlled by the Lender and to pay any Borrow Fees.**

**…**

**Default or Failure to Return Loan**

**5.6.    In the event that Borrower does not return the Borrowed Amount when due, the Lender may apply the Collateral for the payment of any liability or obligation or indebtedness of the Borrower created by this Agreement, including, but not limited to using the Collateral to purchase Digital Asset to replenish Lender's supply of the relevant Digital Asset.**

**Return of Collateral**

**5.7.    Upon the redelivery of any Borrowed Amount and payment of all Borrow Fees, Lender shall initiate the return of Collateral to either (a) the Borrower's Bank Account (in the name of Borrower); or (b) the Borrower's Digital Asset Wallet as provided in Annex B.**

12.    The Term Sheet provides as follows:

**ANNEX B**

**LOAN TERM SHEET**

<u>Loan C1234</u>

The following loan term agreement dated 06/08/2020 incorporates all of the terms of the Master Digital Asset Lending Agreement entered into by Celsius Network Ltd ("Lender") and the Borrower (as provided in the Agreement and specified below) on 12/03/2019 and the following specific terms:

| | |
|---|---|
| Lender: | Celsius Network Ltd. |
| Borrower: | Reliz Ltd. |
| Digital Asset: | ETH |
| Amount | 4,098.36 |

| | |
|---|---|
| Spot price: | $244 |
| Amount in USD: | $1,000,000 |
| Loan Type | Term |
| Loan Term | 13 months, or sale of shares in ETHE, whichever is sooner |
| Maturity Date: | 07/08/2021 |
| Borrow Fee: | 1% Borrow Fee Payable in:  ETH |
| Collateral Asset: | USD |
| Collateral Amount: | 250,000 |
| Collateral Level: | 25% |
| Margin Call Level: | N/A |
| Reverse Call Level: | N/A |

Additional terms:

*The loan will be used exclusively to purchase shares of the Grayscale Ethereum Trust (ETHE). Once the loan and remaining interest are repaid to Celsius, Celsius will be paid any excess of the proceeds from the sale of the ETHE shares less the loan amount as follows:*

*i.) Preferred interest at an annualized 6% rate on the loan amount, as allowed by the excess proceeds, and paid in either ETH or USD; and*

*ii.) Profit-sharing of 70% of any remaining excess proceeds, paid in ETH or USD*

## (C)   The Borrow Fee

### (C1)   *The arguments of the parties*

13.    Celsius's case is that the Borrow Fee which Reliz is liable to pay under Clause 4.1 of the Lending Agreement and the provisions of the Term Sheet should be calculated at the rate of 1% per annum of the Borrowed Amount of ETH 4,098.36, calculated daily (equivalent to a daily rate of ETH 0.1123) for each day from 8 June 2020 (when the loan was made) until repayment in full of the Borrowed Amount.

14.    Reliz's case, by contrast, is that the Borrow Fee which it is liable to pay is ETH 40.98, being a flat fee of 1% of the Borrowed Amount.

15.    Celsius submits (in summary) that:

15.1    The interpretation for which Celsius contends is more consistent with the provisions of the contractual documents when taken as a whole.  Clause 4.2 (which provides that "The Lender shall calculate any Borrow Fees owed on a daily basis" and clause 4.4 (which provides that "An invoice shall be sent monthly and shall include any Borrow Fees ..") of the Lending Agreement both

6

clearly imply that the Borrow Fee is one that accrues on a daily basis and is not a flat sum irrespective of the number of days that the loan is outstanding.

15.2    Celsius's interpretation also makes better commercial sense.  Lenders usually charge interest on loans as the time value of the money lent.  In the present case, the Borrow Fee is the equivalent of interest on the ETH 4,098.36 lent.

15.3    Celsius's interpretation is also consistent with the parties' conduct during the period of the Loan.  As recorded in paragraphs 114 and 184.3. of the First Partial Award, Celsius sent Reliz monthly invoices including the Borrow Fee that had accrued on the Loan for the relevant calendar month, calculated at the daily rate of ETH 0.1123.  Reliz did not challenge these invoices at the time.  On the contrary, in response to the November 2020 invoice, Mr Hammer sought clarification from Celsius that the Borrow Fees were payable as "balloon payments at maturity" which Celsius confirmed.  Reliz did not take issue with this until this dispute arose, and the point is raised only by inference (and not in specific terms) in its Statements of Case.

16.    Reliz argues (again in summary)  that:

16.1    Reliz's interpretation is what the Term Sheet expressly provides for.  Under the Term Sheet, the "Borrow Fee" is "1%" and "Payable in: ETH".  Accordingly, the Borrow Fee is the fixed sum of 1% of the loan's principal.  Celsius's interpretation involves reading into the contractual documentation words that are not there.

16.2    The provisions in clauses 4.2 and 4.4 of the Lending Agreement do not override the clear words of the Term Sheet and must be read in their context.  The "calculation" at a "daily rate" referred to in Clause 4.2 is for the purposes only of assessing the amount of Borrow Fee accrued for the purpose of the monthly invoicing process.  It does not, however, change the fact that the parties agreed, and the Term Sheet expressly provides for, a fixed Borrow Fee of 1%..

16.3    The relatively low flat-rate Borrow Fee for which Reliz contends makes good commercial sense in circumstances where the objective of the transaction was to share the profit from the proceeds of sale of the ETHE to be bought with the loan, and the terms of the transaction provided for Celsius to receive "Preferred interest at an annualized 6% rate on the loan amount, as allowed by the excess proceeds".  By contrast, on Celsius's interpretation, Celsius would receive (as well as its 70% share of the profits) "interest" twice over in the event that the excess proceeds from the sale of the ETHE were sufficient.

16.4 The parties' post-contractual conduct relied upon by Celsius is inadmissible in interpreting the contract. In any event, the invoiced amounts in relation to this loan were never paid.

16.5 By contrast, the contemporary documents support Reliz's interpretation. Celsius's "Grayscale Calcs" spreadsheet (which is pre-contractual) (see paragraphs 80 to 82 of the First Partial Award) identifies the Borrow Fee as USD 10,000 (ie 1% of USD 1M), despite the anticipated Maturity Date falling 13 months after the date of contract. Likewise, Reliz's Grayscale investment returns breakdown dated 3 February 2021 (which is post-contractual) (see paragraphs 125 and 126 of the First Partial Award) identifies the Borrow Fee as USD 10,000.

## (C2)  *Analysis*

17. This issue turns on the true interpretation of the relevant provisions of the Lending Agreement and the Term Sheet, in their contractual and commercial context. In approaching this issue, I must therefore have regard to the background facts (to the extent admissible) and must apply the principles of interpretation set out in Sections I and J1 of the First Partial Award.

18. In an ordinary loan transaction, the commercial commonsense of Celsius's interpretation would be obvious. Lenders expect a return on their loan which is proportioned both to the amount of the loan and to its period. When they express an interest rate without reference to a period, it usually goes without saying that it is intended to be a rate per annum.

19. This, however, was not a straightforward loan transaction. The loan was made expressly for a specific purpose, "exclusively to purchase shares of the Grayscale Ethereum Trust". It was part of an arbitrage strategy intended to take advantage of the premium of the market price of ETHE over the NAV of the fund (see the findings in Sections I2, I3 and J1 of the First Partial Award). The terms of the transaction also included a specific provision for interest in the event that the transaction, as anticipated, turned out to be profitable. In those circumstances, the interpretative weight of the usual commercial commonsense seems to me to be slight. There is, it seems to me, nothing improbable about the idea of a flat-rate Borrow Fee in the circumstances of the present, unusual, case.

20. Similarly, the weight to be given to the provisions in clauses 4.2 and 4.4 of the Lending Agreement is less than it might otherwise have been, given that those provisions are part of a standard form primarily intended for use in more orthodox transactions of loan. It was common ground between the parties that the parts of the monthly invoices rendered by Celsius which related to this loan were not intended to be (and were not) paid on a monthly basis.

21.    Nor can any real assistance in interpreting the terms of the contract relating to the Borrow Fee be derived either from the contemporary documents or from the parties post-contractual conduct.  Celsius's "Grayscale Calcs" spreadsheet was an internal document intended very roughly to model the "1 Year Return on ETHE" (see paragraph 80 of the First Partial Award).  Its authors may well not have focused on the 13 month Maturity Date.  Reliz's Grayscale investment returns breakdown post-dates the contract. It, like the invoices submitted by Celsius and like Mr Hammer's reaction to them, is inadmissible as an aid to interpretation.

22.    I am therefore left with the express words of the Term Sheet, "1% Borrow Fee Payable in: ETH".  The ordinary and natural meaning of those words provides, in my judgment, for a flat fee of 1%, as contended for by Reliz.  In my judgment, neither the contractual nor the commercial context in which those words were used provides any warrant for implying into this provision the additional words "per annum", as contended for by Celsius.

23.    I therefore conclude that, on this point, Reliz has the better of the argument and that the Borrow Fee that Reliz should have paid (and is still liable to pay) is the flat fee of ETH 40.98.

## (D)    The Late Fee

### (D1)    *A penalty?*

24.    Clause 4.3 of the Lending Agreement provides for Reliz to "incur the Late Fee for each Calendar Day that the repayment of the Digital Asset is overdue"  Clause 2 provides that

> **"Late Fee" means the additional fee of eighteen percent (18%) (annualized, calculated daily) of the notional amount of the Loan as valued at 12:00 am New York time each Calendar Day that is incurred by the borrower for each Calendar Day that Loan repayment is overdue in accordance with Section 4.3...**

25.    In relation to the Late Fee, Reliz takes a preliminary point, which is that Clause 4.3 is a penalty clause which, as a result, is unenforceable.  It is therefore Reliz's case that the Late Fee does not arise, and that no alternative measure of default interest arises, whether under the Lending Agreement and Term Sheet or by operation of law.

26. Celsius' position is that, in relation to that issue, I have made my award and so no longer have jurisdiction to deal with this point. It relies upon the well-established rule that, even in relation to a partial award[1]:

> .. once an arbitrator has given his award, subject only to the correction of errors, or the power to make an additional award in respect of a claim presented to him but not dealt with in the award, under section 57 of the Act, the arbitrator has no jurisdiction to revisit the matters decided or to take any other steps in relation to that part of the reference. He is, to use the Latin phrase, "*functus officio*" ..[2]

27. In Celsius's submission, having already made an order in paragraph 189.2.3 of the First Partial Award requiring Reliz "To pay the Late Fee due under Clause 4.3 of the Lending Agreement", it is not now open to me to revisit the question of whether the Late Fee is payable or not. The issue now raised by Reliz is not a matter that goes to "the quantum of the outstanding .. Late Fee due" within paragraph 191.1, but to the question of whether the Late Fee is due at all. That, Celsius argues, is a matter which I have already decided.

28. Nor, in Celsius's submission, does this issue fall within the reservation in paragraph 191.3 of the First Partial Award in relation to "any other disputed matters within the scope of this reference which I have not resolved". Reliz did not plead or argue before or during the hearing that the Late Fee was an unenforceable penalty. Instead, it first raised this issue in its submissions on 30 June 2023.

29. Celsius also argues that Reliz is precluded from raising this issue at this late stage, either by an issue estoppel arising from the First Partial Award and/or by the rule in *Henderson v Henderson*[3] and/or on general grounds of procedural fairness.

30. Reliz, however, argues that Celsius's position is misconceived and that Reliz's argument that clause 4.3 is a penalty is not an argument in relation to "liability", nor is my jurisdiction in respect of "quantum" artificially limited in the way that Celsius contends. According to Reliz. "By its nature, an argument in respect of a penalty clause arises in the context of damages because penalty clauses are secondary obligations which arise when liability is established in respect of a primary obligation, usually where the secondary obligation applies as an alternative to common law damages (a sub-set of which are so-called 'agreed damages' clauses). Clause 4.3 is one such clause. It therefore does not follow that because liability has been determined in respect of a

---

[1] See *Emirates Trading Agency LLC v Sociedade de Fomento Industrial Private Ltd* [2015] EWHC 1452 (Comm) at [22]-[26, per Popplewell J.

[2] *Paul Price v Ian Carter (t/a Ian Carter Building Contractors)* [2010 EWHC 1451 (TCC) at [61], per Edwards-Stuart J. See also Sutton, Gill and Gearing, *Russell on Arbitration* (24th edn, Sweet & Maxwell 2015) at [6-166] and following.

[3] (1843) 3 Hare 100, [1843] 67 ER 313. See now *Virgin Atlantic Airways v Zodiac Seats UK* [2014] AC 160, and *Denaxe Ltd v Cooper* [2023] EWCA Civ 752.

10

primary obligation (as is the case here), *ipso facto*, the question of whether damages flow from a secondary obligation, or whether it is a penalty, has been superseded by that decision. Indeed, it is only consequent on the decision in respect of the primary obligation that the question of whether the secondary obligation is a penalty arises"

31.  Reliz goes on to submit that: "To the extent that determination [of the quantum of the Late Fee] requires an analysis of, for example, how the contractual provisions relevant to the operation and calculation and quantum of the Late Fee are to be interpreted and applied (within which falls the question of whether, properly construed and applied, they constitute a penalty clause), none of that analysis was conducted in the Partial Award. The contract sets out that the Late Fee arises if the Borrowed Amount is not paid by the Due Date. The [First] Partial Award decided the question of what the Borrowed Amount was, and whether it had been returned (or tendered). That decision having been made, the [First] Partial Award determined that the Late Fee was, in principle, due. That is not equivalent to determining how the Late Fee provisions operate; that question is one that neither has been considered, or answered, in the [First] Partial Award".

32.  In my judgment, Celsius has the better of this argument. Reliz is undoubtedly right to say that I did not, in the First Partial Award, conduct any analysis of the issue of whether the Late Fee was unenforceable as a penalty. That was because that issue was one that, at the stage, had neither been pleaded nor argued. It had not even been hinted at. It appeared to me which I made the First Partial Award that both parties accepted that, if I determined that Reliz's defence of tender did not succeed, the Late Fee would be payable. That was what the contract between them expressly provided.

33.  Reliz is also right to say that, in consequence "the Partial Award determined that the Late Fee was, in principle, due". I made a specific order to that effect in paragraph 189.2.3 of the First Partial Award.

34.  I do not, however, accept Reliz's further argument that that determination in some way leaves open the issue of whether the Late Fee is an unenforceable penalty. The suggestion that, having already determined (as an issue of liability) that the Late Fee is payable and in consequence having ordered that it should be paid, I can now determine (as an issue of quantum) that the Late Fee is *not* payable because (in law) it is an unenforceable penalty and therefore should declare that it is *not* to be paid, seems to me, with respect, to part company with reality.

35.  I therefore accept Celsius's argument that I have no jurisdiction to reopen the issue of whether the Late Fee is payable and should be paid.

36.  As an independent ground for my decision, I also accept Celsius's argument that (even if I had retained jurisdiction to do so) it would in any event be wholly unfair for me to allow this point to be raised at this late stage. For the reasons explained below, it seems

11

to me that the issue of whether the Late Fee provisions, in the particular circumstances of this case, provide for an unenforceable penalty is one that could well be fact-sensitive. It might well therefore have been subject of relevant further evidence at the hearing in January 2023, had the point been one that was raised (as it should have been) at the proper time in the Statements of Case.

37.   Turning to the substance of Reliz's argument, it is plain that the Late Fee is payable upon breach of a contractual obligation and is therefore a secondary obligation which is *prima facie* within the scope of the rule against penalties.  That does not, however, of itself mean that the provisions requiring payment of  the Late Fee are, by virtue of that rule, automatically unenforceable.  As is stated in *Chitty*[4]:

> **.. The law on this topic has been fundamentally rewritten by the decision of the Supreme Court in the cases (heard together) of *Cavendish Square Holding BV v Makdessi* and *ParkingEye Ltd v Beavis*[5]. A clause is enforceable if it meets the traditional test that it does not extravagantly exceed a genuine attempt to estimate in advance the loss which the claimant would be likely to suffer from a breach of the obligation in question, but the true test is whether the party to whom the sum is payable had a legitimate interest in ensuring performance by the other party and the sum payable in the event of breach is not extravagant or unconscionable in comparison to that interest ..**

38.   Nugee J neatly summarised the relevant test in *Holyoake v Candy*[6]:

> **.. Where the rule applies, the test for whether a contractual provision is a penalty is whether the impugned provision is a secondary obligation which imposes a detriment on the contract-breaker out of all proportion to any legitimate interest of the innocent party in the enforcement of the primary obligation ..**

> **.. what is necessary in each case is to consider first whether (and if so what) legitimate business interest is served and protected by the clause, and second, whether, assuming such an interest to exist, the provision made for the interest is nevertheless in the circumstances extravagant, exorbitant or unconscionable ..**

39.   In the *Cavendish Square* case[7], a majority stated that whether a clause is a penalty is a question of construction. From this it follows, Lords Neuberger and Sumption said, that the test must be applied as of the date of the agreement, not when it falls to be enforced[8]. It also follows that it must be considered, like any other issue of construction, by

---

[4]     Beale (ed), *Chitty on Contracts* (34th edn, Sweet & Maxwell 2021) para [29-203]
[5]     [2015] UKSC 67, [2016] AC 1172.
[6]     [2017] EWHC 3397 (Ch) at [467].
[7]     Fn 5 above.
[8]     *Chitty* (fn 4 above) para [29-210].

reference to the facts which were known or reasonably available to both parties at that time, rather than at some later stage[9].

40.   In relation to ordinary commercial contracts of loan, a comparatively modest increase in the contractual rate of interest following breach has frequently been upheld, on the basis of the increased risk in lending to a party in default[10].   As Bryan J observed in *Cargill International Trading Pte Ltd v Uttam Galva Steels Ltd*[11]

> **.. it is self-evident .. that there is a good commercial justification for charging a higher rate of interest on an advance of money after a default in repayment. The person who has defaulted is necessarily a greater credit risk and 'money is more expensive for a less good credit risk than for a good credit risk' ..**

41.   In the present case, however, the increased credit risk of Reliz following default is not the only legitimate interest which Celsius might have claimed to be protecting by the Late Fee.   The loan was of ETH, the exchange rate of which against USD and other major fiat currencies was known by both parties to be volatile. It is Celsius's case that "cryptocurrencies [such as ETH] are capable of high yields .. if Celsius makes a loan of a digital asset to a borrower and the borrower does not return the digital asset on time, then Celsius is unable to use the amount of digital asset that was loaned to the borrower to: (i) Replenish its balance sheet; (ii) make returns of deposits to existing customers; (iii) pay rewards to customers; and/or (iv) make further loans (including loans at a higher rate of return). There is therefore a commercial cost to Celsius for the period that the digital asset is overdue, in terms of both the opportunity cost in that Celsius is not able to deploy those assets on more advantageous terms than it has agreed with the borrower, as well as potentially a direct cost which may arise if Celsius has to go out into the market to buy digital assets to use (or return to customers) while its loans are outstanding. If this point had been raised in the arbitration, evidence could have been

---

[9]   "When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties": *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619 at [21], per Lord Neuberger of Abbotsbury PSC.

[10]   See eg *Lordsvale Finance v Bank of Zambia* [1996] QB 752 (1% uplift*); ZCCM Investments Holdings plc v Konkola Copper Mines plc* (rate increasing in stages from 2.5% to 10% over LIBOR); *Cargill International Trading Ltd v Uttam Galva Steels Ltd* [2019] EWHC 476 (Comm) (LIBOR + 12%); *Taiwan Scott Co Ltd v the Masters Golf Company Ltd* [2009] Civ 685 (15%); *Davenham Trust Plc v Homegold* [2009] WLUK 368 (36%) (but see *White v Davenham Trust Limited* [2011] Bus LR 615); *Holyoake v Candy* [2017] EWHC 3397 (Ch) (50%); *Cargill International Trading Pte Ltd v Uttam Galva Steels Ltd* [2019] EWHC 476 (Comm) (LIBOR + 12%*); ICICI Bank UK plc v Assam Oil Co Ltd* [2019] EWHC 750 (Comm) (4% uplift); *Lombard North Central plc v European Skyjets Ltd* [2020] EWHC 679 (QB) (5% uplift); *Biosol Renewables UK Ltd v Lovering* [2021] EWHC 71 (Comm) (1.5% per month); *Bedford Investments Ltd v Sellman* [2021] EWHC 799 (Comm) (standard rate 3% per month, concessionary rate 1.25%).   Contrast *Ahuja Investments Ltd v Victorygame Ltd* [2021] EWHC 2382 (Ch), where HHJ Hodge QC held that a default interest rate of 12 % per month, compounded monthly, representing a fourfold (400%) increase in the interest rate applicable prior to default, was properly to be characterised as a penalty.

[11]   [2019] EWHC 476 (Comm) at [50].

produced to establish the yields available not only in the context of Celsius' business but also more broadly in the industry".

42.  Reliz disputes this. It submits that this is not an unusual case where Celsius has any legitimate interest beyond the performance of the primary obligation itself. The fact that the loan was of ETH cannot justify what it describes as "the exorbitant and extravagant amount" of the Late Fee.

43.  As to the lost opportunity cost, Reliz submits that "because Celsius pooled the cryptocurrency it held at any one time, Celsius would always be in a position to pursue the opportunities it considered had the highest potential return, because it would have a pool of cryptocurrency available. The cryptocurrency it had not received from a non-paying counterparty was, in effect, the cryptocurrency which fell to be allocated to the lowest performing opportunity at any one time". Reliz also suggests that a significant amount of evidence about likely returns was in fact given during the January hearing, partly during the cross-examination of Mr Hammer (who suggested average rates of about 4.75% on loans of ETH) and partly from Mr Holert, who at one point said that Celsius "could loan the same Ethereum at 7, 8, 9%".

44.  As to Celsius' need to have ETH and the issue of price volatility, Reliz submits that Celsius' business model meant that it did not need to buy ETH to be able to return ETH to its customers, as it had spare ETH available. In any event, Celsius's Terms of Business meant that any losses to Celsius could, at Celsius' option, be passed on and "absorbed" by those customers..

45.  Looking at the issue in the round, it does not seem to me that, in the context of a loan of ETH (as opposed to a loan of a more stable fiat currency), the stipulated Late Fee rate of 18% per annum is so self-evidently extravagant or unconscionable that no further evidence on the point could possibly affect the issue. The circumstances of each case are different, but in that context it is noteworthy that in *Holyoake*[12] it was not even argued that a default interest rate of 15% compounded monthly was an extravagant or exorbitant rate for a commercial agreement.

46.  With regard to evidence, I of course accept that there was indeed some evidence given at the January Hearing about average interest rates on loans of ETH. Since the principal issue under consideration at the January Hearing was an issue of construction, there was also evidence about the relevant facts known to both parties at the time when they made their agreement. However, none of that evidence was specifically directed to the two issues identified by Nugee J in *Holyoake*: (1) the nature and extent of Celsius' legitimate business interest in the timely return of the ETH which it had lent (which the Late Fee was designed to protect), and (2) whether the Late Fee was, in all the circumstances, extravagant, exorbitant or unconscionable when regard is had to that interest. In

---

[12]  Fn 6 above at [485].

particular, the issue of the extent of Celsius' legitimate interest (if any) in protecting itself against the volatile exchange rates between ETH and USD was never fully explored.

47.    In my judgment, it is no answer for Reliz to say that sufficient evidence on these points can nevertheless now be found somewhere in the mass of evidence directed to other issues.  The burden of proof that the Late Fee is penal would (if the issue had been properly raised) have been on Reliz[13]: but Celsius would have been entitled to challenge that evidence and to lead its own evidence directed specifically to answer the criticisms made by Reliz..   Reliz's failure to raise this issue in its Statements of Case has deprived Celsius of that opportunity

48.    It would therefore, in my judgment, be unfair and unjust to Celsius now to allow Reliz belatedly to raise this issue.  For that reason also, I hold that Reliz is not now able to raise this issue for decision on its merits

### (D2)   When did the Loan become "overdue"?

49.    There is a dispute between the parties as to whether the Late Fee is due from 3 February 2021 (as Celsius contends) or only from  8 July 2021 (as Reliz contends).

50.    Clause 4.3 of the Lending Agreement applies where Reliz has "fail[ed] to return any Digital Asset by an applicable Due Date".  The Term Sheet provides that this loan was a "Term" loan for a "Loan Term" of "13 months, or sale of shares in ETHE, whichever is sooner" and with a "Maturity Date" of 8 July 2021. Clause 2 of the Lending Agreement relevantly provides that:

> **"Calendar Day" means each and every day of the week.**
>
> **"Due Date" means a Maturity Date ..**
>
> **"Maturity Date" means the date upon which a Loan is terminated**
>
> **"Term Deal" means a Loan with a predetermined Maturity Date, where only the Borrower can return the Digital Asset prior to the Maturity Date.**

51.    .  Clause 3.13 of the Lending Agreement provides that:

> **Termination of loan**
>
> **[3.13]    Loans will terminate:**
>
> > **(i)    If a Term Deal, upon the redelivery by Borrower of the Borrowed Amount at the Maturity Date or sooner;**
> >
> > **..**

---

[13]    See *Ahuja Investments Ltd v Victorygame Ltd* [2021] EWHC 2382 (Ch) at [138(1)].

> **(iv)**   **If ..  a Term Deal  .. upon an Event of Default as defined in section VII**

52. Celsius's case is that, whilst the Term Sheet stated that the Maturity Date was 8 July 2021 (13 months from the 8 June 2020 date of the Term Sheet), the Term Sheet also expressly provided that the Loan Term was "13 months, or sale of shares in ETHE, whichever is sooner".  Reliz completed the sale of the shares in ETHE on 3 February 2021.  It follows that the Maturity Date was 3 February 2021, being the earlier of the 8 July 2021 or the sale of the shares in ETHE.

53. That was also Reliz's pleaded case.  Paragraph 62 of Reliz's Statement of Defence and Counterclaim pleads that 3 February 2021 was the date by which the liquidation of the shares completed: and in paragraph 63 of its Statement of Defence and Counterclaim Reliz goes on to admit paragraph 23 of Celsius's Statement of Case.  That pleads:

> **In accordance with the Term Sheet, the sale of shares in the Grayscale Trust constituted the Maturity Date for the Loan (if it occurred, as it did, sooner than 13 months from the date of the Term Sheet).**

In paragraph 74, Reliz also counterclaims for:

> **(b) A declaration that Reliz is obliged to deliver to Celsius the ETH equivalent of US$1,000,000 as of <u>3 February 2021 (the Maturity Date under the Agreement, being the date on which the shares in the Trust were sold)</u>, together with the applicable preferred interest and profit share arising out of the liquidation of the shares in the Trust, of US$5,942,875.56 ( being US$2,448,793.75);**

> **(c). A declaration that, Reliz having tendered the sum of US$2,448,793.75 and 665.47 ETH on 3 February 2021, no further Borrow Fee or Late Fee is due from Reliz to Celsius following that date ..** [14]

54. Reliz now argues, however, that clause 3.9 permits the Borrower to commence re-delivery before the Maturity Date in a Term Deal Loan.  "Accordingly while Reliz tendered re-delivery of the Digital Asset on 3 February 2021, the Maturity Date (and thus the actual termination of the agreement) was 8 July 2021. Consequently, the Late Fee .. applies only from 8 July 2021, not 3 February 2021".

55. According to Reliz, the contractual scheme contemplates two separate things: (1) the crystallisation of what Reliz had to repay, which occurred on 3 February 2021; and (2) the Maturity Date, which was expressly stated in the Term Sheet to be 8 July 2021. Reliz submits that both parties incorrectly conflated these two dates and wrongly treated the first rather than the second of them of them as the "Maturity Date".

---

[14]     Emphasis added.

56. Reliz argues that this loan was a "Term Deal" with a predetermined Maturity Date. Under such a loan, the Borrower has the right to repay prior to the Maturity Date, but the Lender has no right to demand early repayment. The provision in the Term Sheet that the "Loan Term" was to be "13 months, or sale of shares in ETHE, whichever is sooner", meant that Reliz, once it had sold the ETHE, could choose to repay the Borrowed Amount and any interest and profits early. But if it did not do so, the contractually specified Maturity Date would remain as 8 July 2021.

57. I have carefully considered these arguments. However, Reliz's suggested interpretation of the "Loan Term" provision in the Term Sheet seems to me to give no effect to the words "or sale of shares in ETHE". Those words were not necessary to give Reliz the right to repay the loan early, since that right was expressly provided for in the definition of "Term Deal".

58. There is plainly a disjunction between the stated Maturity Date of 8 July 2021 and the provision that the Loan Term should be until "sale of shares in ETHE", if sooner. It is, however, possible to give effect to both provisions by reading them together as providing for the loan to be repayable either 13 months after its inception – ie on 8 July 2021 - or on sale of the ETHE, if sooner. Such an interpretation has the merit of giving effect to both parts of the time stipulations in the Term Sheet. It therefore seems to me to be the meaning which a reasonable person, having all the background knowledge reasonably available to the parties that the time when they made their agreement, would give to these provisions.

59. It also seems to me to be the one which makes most commercial sense. The Term Sheet expressly provided that the loan should be used exclusively for the purpose of buying ETHE, and for the division of the USD proceeds upon the subsequent sale of the ETHE that had been bought with the loan. It makes little commercial sense to impute to the parties an intention that the loan should continue as (in practice) a loan of the USD proceeds of sale once that commercial venture was completed.

60. I therefore hold that the date on which Reliz should have returned the Borrowed Amount of ETH 4,098.36 was 3 February 2021. That is the "Due Date" date by reference to which the "Calendar Days overdue" for the purposes of the Late Fee should be calculated.

### (D3)   *The Collateral*

61. As contractually required, Reliz deposited USD 250,000 with Celsius as Collateral. It is common ground that that Collateral has not been returned.

62. In broad summary, clause 5.6 of the Lending Agreement entitles Celsius, in the event that the Borrowed Amount is not returned by the Due Date, to apply the Collateral in reduction of the amount owed by Reliz. Clause 5.7 of the Lending Agreement requires

Celsius, once it has been paid the Borrowed Amount and the Borrow Fee, to return the Collateral[15].

63.    It is plain that the Collateral is to be held by Celsius as security, and that Celsius therefore cannot retain it once the liability for which the Collateral is security has been discharged.  Celsius does not dispute that, and I will so declare.  Reliz, however, goes further and argues that Celsius, either under Clause 4.6 or by way of mitigation, should be held or be deemed to have applied the collateral on the Due Date of 3 February 2021, correspondingly reducing the Borrowed Amount of ETH outstanding, on the basis of which the Late Fee is to be calculated.

64.    In general terms, I can see the broad commercial sense of this argument.  By it, Reliz seeks to assert or to construct something akin to a transactional equitable set-off between Reliz's obligation to repay the Borrowed Amount and Celsius' obligation to repay the Collateral.  Unfortunately for Reliz, there are at least two insuperable legal objections to it.

65.    First, "equitable set-off is concerned with monetary claims.  A person cannot retain an asset by way of equitable set-off against a money claim"[16].  Reliz's obligation in relation to the Borrowed Amount is to pay the cryptocurrency, ETH: and, at least for these purposes, "at present, crypto-tokens are unlikely to be regarded as money under the law of England and Wales"[17]. The application of the rules of equitable set-off would be uncertain, even if the law were to develop so as to treat ETH (and other cryptocurrencies) as analogous to foreign currency.  As Derham notes, "There is little authority on the question of foreign currency claims in the context of equitable set-off"[18].

66.    Secondly – and perhaps more importantly – the availability of any such remedy is impliedly excluded by the terms of the Lending Agreement.  Clause 5.6 of the Lending Agreement does not oblige Celsius to apply the collateral in reduction of the amounts owed, and clause 5.7 of the Lending Agreement only requires repayment once the

---

[15]    For the full terms of these clauses, see paragraph 11 above.

[16]    Derham, *The Law of Set-Off* (4th edn, OUP 2010) para [3.02], citing *Smith (Administrator of Cosslett (Contractors) Ltd) v Bridgend CBC* [2001] UKHL 58, [2002] 1 AC 336 at [36], per Lord Hoffmann.

[17]    Law Commission, *Digital Assets: Final Report* (Law Com No 412, June 2023) para [9.100].  "We think, and consultees agreed, that crypto-tokens denominated in their own notional unit of account are currently unlikely to be (or to be treated as) money in the same way as fiat currency. One reason for this is that crypto-tokens in this context (sometimes referred to as "crypto-currencies") are "self-anchored mathematic creatures" whose value depends on different structural and social concepts compared to existing fiat currencies. In addition, holding a crypto-token (such as bitcoin) in itself generates no right to exchange that token for legal tender": ibid, para [9.9].

[18]    Derham, *The Law of Set-Off* (fn 16 above) para [5.92].  Debts in foreign currency are specifically included within the scope of insolvency set-off by Insolvency Rules 2016 rr 14.24(8)(b)(i) and 14.25(8)(b)(i).  Neither party has addressed any arguments to me based upon the fact that Celsius has (as recorded in para [18] of the First Partial Award) petitioned in the US for relief under Chapter 11 of the US Bankruptcy Code.

18

Borrowed Amount and the Borrow Fee have been paid in full[19].  On their true interpretation, it seems to me that these provisions impliedly exclude any kind of equitable set-off such as might operate as a substantive defence to Celsius' claim..

*(D4)   Quantum*

67.   Celsius has submitted a calculation of the Late Fee down to 11 July 2023, claiming a total of USD 4,104,196.   Reliz has stated that that figure is "not admitted, and the calculation methodology described and resulting calculations conducted are not accepted".  Reliz has not, however, given any details of any specific aspects of the calculations to which it objects, apart from advancing the argument in relation to the Collateral discussed in section (D3) above, and saying that the overall result is "plainly exorbitant and disproportionate".

68.   The contractually mandated calculation involves identifying the ETH/USD price at 12:00am New York time on the Calendar Day.  Celsius has used as a proxy the USD/ETH closing price each day from Yahoo Finance.  In the absence of any relevant evidence or submissions to the contrary from Reliz, that seems to me to be a practical and justifiable approach to this calculation.  I can see no obvious errors in Celsius's overall approach, which I therefor accept..

69.   Unfortunately, because of the complicated nature of the calculation, I am unable myself to carry that calculation forward from 11 July 2023 to the date of this Second Partial Award.   I therefore propose to make an award in Celsius's favour in relation to the Late Fee of USD 4,104,196 down to 11 July 2023, and to make a declaration as to its entitlement from that date forward until payment.

70.   Celsius has not made any claim for statutory interest.  For completeness I should, however, mention that Celsius' entitlement to the Late Fee is a contractual right which compensates Celsius for being kept out of the amount which should have been paid to it.  That contractual right gives no entitlement to any element of compounding.  For these reasons, there is no need for me to exercise my separate statutory power to award interest on the Borrowed Amount under the Arbitration Act 2006 s 49(3) (down to the date of the award) or s 49(4) (from the date of the award until payment)..

## (E)   Disposition

71.   For the reasons set out above, I therefore make the following declarations and orders:

71.1   In relation to the Borrow Fee:

---

[19]   In the context of termination, clause 14.3 of the Lending Agreement similarly provides that "The Lender shall not be obliged to return any Collateral until the Borrower has paid the Borrowed Amount and all other amounts owing under this Agreement, including all Invoiced Amounts".

71.1.1   I declare that the Borrow Fee payable by Reliz to Celsius is a flat fee of ETH 40.98; and

71.1.2   I order Reliz to pay the Borrow Fee of ETH 40.9836 (or its USD or GBP equivalent at the time of payment) to Celsius.

71.2   With regard to the Late Fee:

71.2.1   I declare that the Due Date for the return of the Borrowed Amount was 3 February 2021, and that, for the purposes of the calculation of the Late Fee under Clause 4.3 of the Lending Agreement, the Borrowed Amount therefore became overdue on 4 February 2021.

71.2.2   I declare that, until the Borrowed Amount is repaid in full, Reliz is liable to pay to Celsius in USD a Late Fee at the rate of 18% per annum calculated daily on the notional amount of the unpaid Borrowed Amount on that day as valued in USD at 12:00 am New York time.

71.2.3   In respect of the period from 4 February 2021 until 11 July 2023, I declare that the Late Fee (calculated in accordance with paragraph 71.2.2 above) amounts to USD 4,104,196 and I order Reliz to pay that sum (or its GBP equivalent at the time of payment) to Celsius.

71.2.4   In respect of the period from 12 July 2023 until payment, I order Reliz to pay the Late Fee (calculated in accordance with paragraph 71.2.2 above) to Celsius, the amount to be agreed or, in default of agreement, to be settled by me.

71.3   With regard to the Collateral:

71.3.1   I declare that:

71.3.1.1   While the Borrowed Amount remains unpaid, Celsius may (under Clause 5.6 of the Lending Agreement) in its discretion apply the Collateral in reduction of the Borrowed Amount, the Borrow Fee or the Late Fee (including, but not limited to, using the Collateral to purchase ETH);

71.3.1.2   Upon repayment in full of the Borrowed Amount and payment in full of the Borrow Fee, Celsius (if it has not already applied the Collateral in one of the ways in paragraph 71.3.1.1 above) must return the Collateral to Reliz

20

*Confidential*

in the manner specified in Clause 5.7 of the Lending Agreement.

72.    I reserve for a further award or awards:

72.1   All issues (both as to liability and quantum) concerning the costs of this Arbitration (including but not limited to any issues arising under clause 9.2 of the Lending Agreement);

72.2   To the extent (if any) necessary, determination of the amounts payable under paragraph 71.2.4 above; and

72.3   To the extent (if any) necessary, any other disputed matters within the scope of this reference in relation to which I still retain jurisdiction and which I have not so far resolved, either in the First Partial Award or in this Second Partial Award.

**Richard Salter KC**
Sole Arbitrator

**Place of arbitration: London**

3 August 2023

21

## **Exhibit L**

**Third Partial Award**

*Confidential*

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND IN THE MATTER OF AN ARBITRATION**

BETWEEN:

### CELSIUS NETWORK LTD

<u>Claimant</u>

-and-

### RELIZ LTD

<u>Respondent</u>

———————————————————
### THIRD PARTIAL AWARD
———————————————————

**The Tribunal**

**Richard Salter KC**

<u>Sole Arbitrator</u>

1

*Confidential*

## (A)    Background

1.    This is my Third Partial Award, which deals with the costs of the Arbitration and with an outstanding issue in relation to the Late Fee.

2.    By way of background, the disputes which are the subject of this reference arise under a Digital Asset Lending Agreement dated 3 December 2019 ("**the Lending Agreement**") between the Claimant, Celsius Network Ltd ("**Celsius**") and the Respondent, Reliz Limited ("**Reliz**"), the terms of which were incorporated into a Loan Term Sheet dated 8 June 2020 ("**the Term Sheet**").

3.    I was appointed as the mutually agreed sole arbitrator for the purposes of this arbitration by an exchange of emails dated 20 and 26 May 2021.  My appointment was subsequently confirmed by written Terms of Appointment signed by the parties and by me in July and August 2021.

4.    Following an evidential hearing which took place between 9 and 12 January 2023 ("**the January Hearing**"), on 25 May 2023 I delivered my first Partial Award ("**the First Partial Award**") on all issues except the matters referred to in paragraph 191 of the First Partial Award.

5.    In paragraphs 188 to 190 of the First Partial Award, I held as follows:

> **[188]  For the reason set out above, I therefore hold that:**
>
> > **[188.1]    On the true interpretation of the Lending Agreement and the Term Sheet, Reliz was obliged on sale of the ETHE (inter alia) to re-deliver to Celsius the ETH 4,098.36 that it had borrowed.**
> >
> > **[188.2]    On the facts of the case, Reliz has failed either:**
> >
> > > **[188.2.1]  To establish the existence of any collateral contract varying or superseding that obligation; or**
> > >
> > > **[188.2.2]  To make out its claim for rectification.**
>
> **[189]  It follows that Celsius is entitled to the following relief claimed by it:**
>
> > **[189.1]    A declaration that Reliz in breach of the terms of the contract set out in the Term Sheet (incorporating the terms of the Lending Agreement) by failing to redeliver ETH 4,098.36.**
> >
> > **[189.2]    An order requiring Reliz:**
> >
> > > **[189.2.1]  To deliver to Celsius ETH 4,098.36;**

> > **[189.2.2] To pay the outstanding Borrow Fee due under clause 4.1 of the Lending Agreement;**
>
> > **[189.2.3] To pay the Late Fee due under Clause 4.3 of the Lending Agreement.**
>
> **[190]   It also follows that Reliz's Counterclaim falls to be dismissed.**

6.    In paragraph 191 of the First Partial Award, I stated that:

> **[191}   I invite the parties to seek to reach agreement:**
>
> > **[191.1]   As to the quantum of the outstanding Borrow Fee and Late Fee due; and**
>
> > **[191 .2]   As to the costs of this Arbitration; and**
>
> > **[191.3]   As to any other disputed matters within the scope of this reference which I have not resolved in this Partial Award.**
>
> **If agreement cannot be reached, I will give directions for the exchange of written submissions leading to a further Partial or a Final Award.**

7.    By email dated 30 June 2023, the parties confirmed that they had failed to reach agreement in relation to the matters reserved in paragraph 191 of the First Partial Award but had agreed on a timetable for the exchange of submissions in relation to those matters.  By email the same day, I confirmed my approval of that timetable, which deferred submissions in relation to costs until after I had made a further partial award in relation to all other matters.  Thereafter, the parties duly made submissions in accordance with that timetable in relation to the Borrow Fee, the Late Fee and the USD 250,000 deposited by Reliz with Celsius as Collateral ("**the Collateral**").

8.    On 3 August 2023 I delivered my second Partial Award ("**the Second Partial Award**").  In paragraph 71 of the Second Partial Award, I made the following declarations and orders:

> **71.1   In relation to the Borrow Fee:**
>
> > **71.1.1   I declare that the Borrow Fee payable by Reliz to Celsius is a flat fee of ETH 40.98; and**
>
> > **71.1.2   I order Reliz to pay the Borrow Fee of ETH 40.9836 (or its USD or GBP equivalent at the time of payment) to Celsius.**
>
> **71.2   With regard to the Late Fee:**
>
> > **71.2.1   I declare that the Due Date for the return of the Borrowed Amount was 3 February 2021, and that, for the purposes of the calculation of the Late Fee under Clause 4.3 of the**

Lending Agreement, the Borrowed Amount therefore became overdue on 4 February 2021.

71.2.1  I declare that, until the Borrowed Amount is repaid in full, Reliz is liable to pay to Celsius in USD a Late Fee at the rate of 18% per annum calculated daily on the notional amount of the unpaid Borrowed Amount on that day as valued in USD at 12:00 am New York time.

71.2.3  In respect of the period from 4 February 2021 until 11 July 2023, I declare that the Late Fee (calculated in accordance with paragraph 0 above) amounts to USD 4,104,196 and I order Reliz to pay that sum (or its GBP equivalent at the time of payment) to Celsius.

71.2.4  In respect of the period from 12 July 2023 until payment, I order Reliz to pay the Late Fee (calculated in accordance with paragraph 0 above) to Celsius, the amount to be agreed or, in default of agreement, to be settled by me.

71.3  With regard to the Collateral:

71.3.1  I declare that:

71.3.1.1  While the Borrowed Amount remains unpaid, Celsius may (under Clause 5.6 of the Lending Agreement) in its discretion apply the Collateral in reduction of the Borrowed Amount, the Borrow Fee or the Late Fee (including, but not limited to, using the Collateral to purchase ETH);

71.3.1.2  Upon repayment in full of the Borrowed Amount and payment in full of the Borrow Fee, Celsius (if it has not already applied the Collateral in one of the ways in paragraph 0 above) must return the Collateral to Reliz in the manner specified in Clause 5.7 of the Lending Agreement.

9.    In paragraph 71 of the Second Partial Award, I reserved for a further award or awards:

72.1  All issues (both as to liability and quantum) concerning the costs of this Arbitration (including but not limited to any issues arising under clause 9.2 of the Lending Agreement);

72.2  To the extent (if any) necessary, determination of the amounts payable under paragraph 0 above; and

72.3  To the extent (if any) necessary, any other disputed matters within the scope of this reference in relation to which I still retain

*Confidential*

> **jurisdiction and which I have not so far resolved, either in the First Partial Award or in this Second Partial Award.**

10.    In the email attaching the Second Partial Award, I set out the agreed timetable for submissions relating to the principle and quantum of the costs of the arbitration. Pursuant to that agreed timetable:

   10.1    Celsius made submissions under cover of an email dated 18 August 2023;

   10.2    Reliz made submissions in response under cover of an email dated 1 September 2023;

   10.3    Celsius made further submissions in reply under cover of an email dated 15 September 2023.

11.    I also received, under cover of emails dated 8 September 2023, further submissions from Celsius in relation to the Late Fee.  These invited me to make a further Order pursuant to paragraph 71.2.4 of the Second Partial Award.  By email sent that same day, I invited Reliz to respond to the applications made in those emails.  Reliz did not do so.

12.    On 8 November 2023, I notified the parties that my further partial award was ready in draft, to be delivered once the parties had made further deposits with the LCIA in equal shares to cover my fees.   Celsius deposited its share on 17 November 2023, but Reliz did not do so.   Eventually, Celsius paid the share due from Reliz on 21 December 2023.

13.    On 20 December 2023, Celsius wrote, asking (a) that (in addition to any other orders which I might make about costs) I should order Reliz to repay to Celsius the payment which it was then in the process of making in respect of Reliz's share of my fees; and (b) when making a further Order pursuant to paragraph 71.2.4 of the Second Partial Award in respect of the Late Fee, I should do so in respect of the period up to 19 December 2023 (in relation to which Celsius provided a calculation of the amount which it claimed was due).  By email sent that same day, I invited Reliz to provide any submission in response by 4pm on Wednesday 3 January 2024.  Once more, Reliz did not do so.

14.    I have carefully considered all the parties' helpful submissions and the enclosures to those submissions.  Having done so, I now make this, my Third Partial Award.  I reserve for a further award or awards the final matters referred to in paragraph 88 below.

*Confidential*

## (B)    The law about losts

### (B1)    The Arbitration Act

15.    The Arbitration Act 1996 s 61 provides that:

> **(1)    The tribunal may make an award allocating the costs of the arbitration[1] as between the parties, subject to any agreement of the parties.**

> **(2)`    Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs.**

As is stated in Russell on Arbitration:[2]

> **Accordingly, the tribunal has a discretion to award the costs of the arbitration as between the parties, although this power is subject to anything that the parties have agreed and is also subject to the general principle set out in s.61(2) that costs follow the event.**

16.    The Arbitration Act 1996 s 63(3) states that:

> **The tribunal may determine by award the recoverable costs of the arbitration on such basis as it thinks fit.  If it does so, it shall specify—**

> **(a)    the basis on which it has acted, and**

> **(b)    the items of recoverable costs and the amount referable to each.**

17.    The Arbitration Act 1996 s 63(5) further provides that:

> **Unless the tribunal or the court determines otherwise—**

> **(a)    the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and**

> **(b)    any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party.**

---

[1]    Defined in the Arbitration Act 1996 s 59(1) as (a) the arbitrators' fees and expenses; (b) the fees and expenses of any arbitral institution concerned; and (c) the legal or other costs of the parties.  By s 59(2) this includes the costs of or incidental to any proceedings to determine the amount of the recoverable costs of the arbitration.

[2]    David St John Sutton, Judith Gill, Matthew Gearing, *Russell on Arbitration* (24th edn, Sweet & Maxwell 2015) ("***Russell***") at [6-133]

6

## (B2)   Costs in proceedings in Court

18.    In litigation in the Courts of England and Wales, the general rule provided in CPR[3] 44.2(2) is similarly:

> **.. that the unsuccessful party will be ordered to pay the costs of the successful party; but the court may make a different order ..**

19.    As Gloster J observed in *HLB Kidsons (a Firm) v Lloyds Underwriters*[4]:

> **The court's discretion as to costs is a wide one. The aim always is to "make an order that reflects the overall justice of the case" .. the question of who is the "successful party" for the purposes of the general rule must be determined by reference to the litigation as a whole .. The court may, of course, depart from the general rule, but it remains appropriate to give "real weight" to the overall success of the winning party .. The question of who is the successful party "is a matter for the exercise of common sense" .. Success, for the purposes of the CPR , is "not a technical term but a result in real life" .. The matter must be looked at "in a realistic … and … commercially sensible way" ..**
>
> **There is no automatic rule requiring reduction of a successful party's costs if he loses on one or more issues. In any litigation, especially complex litigation such as the present case, any winning party is likely to fail on one or more issues in the case .. "the court can properly have regard to the fact that in almost every case even the winner is likely to fail on some issues" ..**

20.    CPR 44.3(1) nevertheless prevents the Court from allowing costs "which have been unreasonably incurred or are unreasonable in amount".  In deciding what is reasonable in that context, it has been said that:

> **.. The touchstone is not the amount of costs which it was in a party's best interests to incur but the lowest amount which it could reasonably have been expected to spend in order to have its case conducted and presented proficiently, having regard to all the relevant circumstances. Expenditure over and above this level should be for a party's own account and not recoverable from the other party.  This approach is first of all fair.  It is fair to distinguish between, on the one hand, costs which are reasonably attributable to the other party's conduct in bringing or contesting the proceeding or otherwise causing costs to be**

---

[3]        The Civil Procedure Rules 1998, SI 1998 No 3132, as amended.
[4]        [2007] EWHC 2699 (Comm), [2008] 3 Costs LR 427 at [10] and [11] (citations omitted).

**incurred and, on the other hand, costs which are attributable to a party's own choice about how best to advance its interests ..**[5]

21.    Under CPR 44.3, the burden of proof as to whether costs were reasonably incurred or were reasonable in amount depends upon whether the assessment of those costs is to be conducted on the standard or on the indemnity basis, the latter basis favouring the receiving party.    On an assessment on the standard basis, only costs which are proportionate to the matters in issue may be allowed. Costs which are disproportionate in amount may be disallowed or reduced even if they were reasonably or necessarily incurred.  There is no similar test when costs are assessed on the indemnity basis.  It has been said that the latter difference makes an award of indemnity costs to the receiving party "considerably more favourable" than an award on the standard basis[6].

22.    In *Excelsior Commercial and Industrial Holdings Limited v Salisbury Hammer Aspen and Johnson*[7], Lord Woolf CJ said:

> **[32] .. [B]efore an indemnity order can be made, there must be some conduct or some circumstance which takes the case out of the norm. That is the critical requirement.**

Waller LJ agreed, saying:

> **[39] The question will always be: is there something in the conduct of the action or the circumstances of the case which takes the case out of the norm in a way which justifies an order for indemnity costs?**

Laws LJ agreed with both judgments.  Many subsequent cases enumerating the sorts of factors to be taken into account can be found summarised in the notes at paragraphs 44.3.8 and 44.3.9 of the *White Book.*

23.    It appears, however, that no such exceptional factor is required to justify an order for assessment on the indemnity basis where the paying party has agreed by contract to pay the receiving party's reasonable costs of enforcing its rights. A contractual claim for a costs indemnity should ordinarily be given effect: see eg *Gomba Holdings (UK) Ltd v Minories Finance Ltd (No.2)*[8]; *Church Commissioners for England v Ibrahim*[9]; *Chaplair Ltd v Kumari*[10]; *Macleish v Littlestone*[11]; and *Alafco Irish Aircraft Leasing Sixteen Ltd v Hong Kong Airlines Ltd*[12].

---

[5]    *Kazakhstan Kagazy Plc v Zhunus* [2015] EWHC 404 (Comm) at [13], per Leggatt J.
[6]    *Lownds v Home Office* [2002] EWCA Civ 365, [2002] 1 WLR 2450, CA, at [6] per Lord Woolf MR.
[7]    [2002] EWCA Civ 67
[8]    [1993] Ch 171 at [35(ii)], per Scott LJ (giving the judgment of the Court).
[9]    [1997] 1 EGLR 13.
[10]    [2015] EWCA Civ 798, [2015] HLR 39 at [45], per Patten LJ.
[11]    [2016] EWCA Civ 127 at [38] to [44], per Briggs LJ.
[12]    [2019] EWHC 3668 (Comm) at [6] to [12], per Moulder J.

24.  CPR 44.5 nevertheless contains a rebuttable presumption that, when assessing costs payable under a contract, those costs should, unless the contract expressly provides otherwise, be limited to those which have been reasonably incurred and are reasonable in amount.

## (C)   The relevant provisions of the Lending Agreement

25.  In the present case, there are two contractual provisions which deal directly with the issue of costs:

> 25.1   Clause 9.2 of the Lending Agreement provides that:
>
>> **In the event that the Borrower fails to pay any amounts due hereunder, [Reliz] shall pay to [Celsius] upon demand all reasonable costs and expenses, including without limitation, reasonable legal fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.**
>
> 25.2   Clause 21.1 of the Lending Agreement, which deals the resolution of disputes by arbitration, provides that:
>
>> **Each party shall pay its own expenses of the arbitration, and the expenses of the arbitrator shall be equally shared between the parties, unless the arbitrator assesses as part of their award all or any part of the arbitration expenses of a party (including reasonable attorneys' fees) against the other party.**

## (D)   The contentions of the parties

26.  On behalf of Celsius, it is submitted that Celsius is entitled to its full costs of the arbitration, both as a matter of contract under clause 9.2 of the Lending Agreement and as a matter of discretion under s 61 on the basis that Celsius has succeeded on all the issues of liability and on the vast majority of the issues in relation to quantum.

27.  Celsius also submits that, to the extent that I do not award Celsius the entirety of its incurred costs under clause 9.2 of the Lending Agreement, I should exercise my power under s 63(5) to "determine otherwise" and should assess Celsius' costs "on an indemnity basis".  That is because, in Celsius's submission, Reliz has acted unreasonably in not accepting Celsius's various settlement offers and in relation to various procedural matters which have increased the costs of the arbitration.

28.  As set out in Taylor Wessing's letter dated 15 September 2023, Celsius claims a total of £1,113,907.57, made up as follows:

9

|  | **Amount** |
|---|---|
| **Arbitrator** | £63,797.49 |
| **Taylor Wessing** | £786,333.66 |
| **Counsel** | £145,275.00 |
| **Expert** | £88,292.50 |
| **Other disbursements** | £30,208.92 |
| **Total** | **£1,113,907.57** |

Additionally, Celsius claims the further sums which it paid on 17 November and 21 December 2023 in respect of my fees[13].

29.   Finally, Celsius submits that I should exercise the power under the Arbitration Act 1996 s 49(4) to award post-award interest on Celsius's costs.  Celsius submits that, by analogy with the rate payable under the Late Payment of Commercial Debts (Interest) Act 1998, such interest should be at the rate of 8% above the Bank of England's base rate from time to time.

30.   On behalf of Reliz, it is accepted that Reliz has lost "substantially on a number of the matters in dispute" and that "in principle Celsius should be entitled to claim a portion of its costs".  Reliz's position is, however, that the amount claimed by Celsius goes beyond the amount which it is reasonable for Celius to claim (or for the Tribunal to award) and should, in any event, be reduced to reflect Reliz's success in the arbitration in relation to 3 matters: (a) Celsius' unsuccessful application to me for an order, subsequent to the First Partial Award, requiring Reliz to pay the Borrowed Amount identified in the First Partial Award within a specified time; (b) the dispute between the parties as to the amount of the Borrow Fee, which I decided in Reliz's favour in the Second Partial Award; and (c) Reliz's application for directions in relation to the Collateral, to which I acceded in the Second Partial Award.

31.   As for Celsius' argument that I should assess its costs "on an indemnity basis", Reliz first of all argues that this is a concept provided for in litigation by the express provisions of the CPR, and which has no equivalent in the context of arbitration.  In any event, Reliz submits that there is nothing in the way in which it has conducted its defence of this case which "takes the case out of the norm in a way which justifies an order for indemnity costs".

---

[13]   See paragraph 12

32.     With regard to Celsius's claim for post-award interest on any award of costs, Reliz submits that the Late Payment of Commercial Debts (Interest) Act 1998 has no direct application and the rate payable under that Act should not be adopted. Reliz argues that the rate payable under the 1998 Act is not intended to be compensatory but is intended to act as a deterrent to late payment of commercial debts[14]. By contrast, under s 49:

> **.. the Tribunal has a discretion as to the rate of interest to be applied but it must act fairly and should keep in mind that the purpose of interest is to compensate the successful party for not having had at his disposal the amount awarded for a period of time. This is underlined by the reference in ss 49(3) and (4) to interest being awarded as the Tribunal considers meets the justice of the case ..**[15]

## (E)     Discussion and conclusions

### (E1)     Interpreting the relevant provision of the Lending Agreement

33.     The CPR provisions and the cases considering them which I have mentioned above are concerned with rules and principles specific to litigation in Court, and so are not directly applicable to arbitration. They nevertheless reflect the accumulated experience and wisdom of many years. The general principles embodied in them can therefore, in my judgment, often provide a valuable guide to the correct approach, even in the different statutory and procedural context of the much more consensual process of arbitration.

34.     Against that background it seems to me that:

34.1     Unless I find that there is good reason to the contrary (either generally or in relation to any specific item or items), I ought in exercising my powers to make an award to costs under s 61 to give effect to Celsius' entitlement under clause 9.2 of the Lending Agreement to "all reasonable costs and expenses" incurred in enforcing its rights.

34.2     On the proper interpretation of the relevant contractual provisions:

34.2.1     The word "reasonable" in clause 9.2 of the Lending Agreement qualifies both the incurring and the amount of Celsius' costs and expenses. Clause 9.2 therefore requires Reliz to pay (and I should award under s 61) only those of Celsius's costs and expenses that have both been reasonably incurred for that purpose and that are reasonable in amount.

---

[14]     See *Martrade Shipping & Transport GmbH v United Enterprises Corporation* [2014] EWHC1884 (Comm) at [12].

[15]     *Russell* at [6-120].

34.2.2   For these purposes, the concept of what is reasonable broadly reflects the ideas discussed in the quotation in paragraph 20 above: that is, the lowest amount which Celsius could reasonably have been expected to spend in order to have its case conducted and presented proficiently, having regard to all the relevant circumstances.

34.2.3   The provision in clause 21.1 of the Lending Agreement for costs sharing is intended to deal simply with the position prior to the making of any award as to costs.  That, in the overall context of the Lending Agreement, is its correct interpretation.  Further and in any event, as a provision entered into before the dispute arose, it would otherwise be invalid under the Arbitration Act 1996 s 60[16].  Clause 21.1 therefore does not prevent me from making an award of costs under s 61 and/or from thereby giving effect to Celsius' rights under clause 9.2.

## (E2)   The successful party

35.   Under s 61(2) of the Arbitration Act 1996, as in litigation in Court, the general (though not invariable) rule is that costs should follow the event.  Taking all the circumstances of the case into account it is clear to me that, for the purposes of s 61(2), Celsius was overall the successful party.  Celsius has achieved an Award again Reliz requiring Reliz to pay almost the entirety of the amounts claimed.

36.   Reliz is correct to say that it, rather than Celsius, has succeeded on the 3 items identified at the end of paragraph 30 above.  In the overall scheme of things, however, these items are very minor ones.  Applying by analogy the principles discussed in paragraph 19 above they do not, in my judgment, prevent Celsius from very clearly being the successful party overall.

37.   Celsius's success overall in the arbitration for the purposes of s 61(2) of the Arbitration Act 1996 therefore provides a further reason, independent of Celsius' rights under clause 9.2 of the Lending Agreement, why I should make an order for Reliz to pay to Celsius the great majority of Celsius' costs of the arbitration.

38.   Applying by analogy the principles set out in paragraph 19 above, it does not seem to me to be "appropriate" for the purposes of s 61(2) to make a different order in relation to the costs attributable to items (b) (the dispute between the parties as to the amount

---

[16]   Which provides that "An agreement which has the effect that a party is to pay the whole or part of the costs of the arbitration in any event is only valid if made after the dispute in question has arisen.": see *Russell* at  [6-134], citing *Roger Shashoua v Mukesh Sharma* [2009] EWHC 957 at [12], [28] and [29], per Cooke J. "[S]ection 60 exists for the very reason that parties agree to English arbitration with clauses of this kind in their agreement. [The relevant] [c]lause .. does not count for nothing in the sense that the arbitrators can take it into account but are not bound by it" (ibid at [29]).

of the Borrow Fee) and (c) (Reliz's application for directions in relation to the Collateral) identified in paragraph 30 above, in relation to which Reliz was successful. Those matters were simply aspects of the overall litigation, in relation to which Celsius overall was successful, even though it failed on those particular matters.

39.    However, item (a) (Celsius's unsuccessful application to me for an order, subsequent to the First Partial Award, requiring Reliz to pay the Borrowed Amount identified in the First Partial Award within a specified time) stands, in my judgment, on a rather different footing.  It was a specific and self-contained application, which I found to be misconceived.  In litigation, the costs of such an application would normally be dealt with separately and would usually follow the event of the application rather than that of the case overall.  In the circumstances, it seems to me it to be appropriate to reduce the costs awarded to Celsius by an amount sufficient to reflect its failure on that application.  In the overall scheme of things, however, the reduction will necessarily be a very small one.

## (E3)    The indemnity basis and the effect of offers to settle

40.    As I have said in paragraph 33 above, the provisions of the CPR dealing with costs generally reflect many years of experience and wisdom.  In particular, the provisions of CPR Part 44 and CPR Part 36 are attempts to give effect to the very practical ideas that the costs regime should encourage parties to settle their cases and should discourage them from behaving improperly or unreasonably in connection with their litigation (including by unreasonably refusing offers of settlement).

41.    Nevertheless, the detailed rules in the CPR have no specific equivalent in arbitration and, in my judgment, cannot be imported even by analogy.  No similar detailed structure may be found either in the Arbitration Act 1996 or in the Terms of Appointment which govern this arbitration.

42.    It therefore does not seem to me to be a useful exercise for me to consider how I would have exercised my discretion had I been sitting, not as an arbitrator, but as a Judge of the Commercial Court and therefore both entitled and required to apply those detailed rules.  I must, instead, apply the principles set out in the Arbitration Act 1996, and make such order as to costs as in my judgment, meets the justice of the case having regard to all relevant circumstances.

43.    Taking those principles in terms, I have already held under s 61 that, except in relation to one small item, I should make an order in Celsius' favour.   The next matter which I have to decide is whether, for the purposes of s 63(5)[17] (which prescribes the usual basis on which the recoverable costs of the arbitration should be determined) I should

---

[17]    See paragraph 17 above.

(as Celsius submits) "determine otherwise" and adopt a basis that is more favourable to Celsius.

44.     Celsius submits (in summary) that:

    44.1    The complexity of the way in which Reliz's defended the claim unnecessarily increased the costs.  In particular, it unnecessarily increased the length and complexity of the statements of case, the scope of document production, and the matters to be covered in witness evidence;

    44.2    Reliz's insistence upon leading expert evidence to bolster its case (which was resisted by Celsius) caused delay and unnecessarily increased costs.

    44.3    Reliz's unsuccessful application for a stay on the grounds of Celsius' financial position resulted in delay and further wasted costs.

    44.4    Reliz wasted costs by unreasonably insisting upon the inclusion of *Holert v University of Chicago* in the hearing bundle,

    44.5    Reliz's approach to the issue of Capital Gains Tax unreasonably increased costs.

    44.6    Reliz's refusal to agree the quantum of the outstanding Borrow Fee and Late Fee and/or to reach agreement in relation to the costs of the arbitration unreasonably increased costs.

45.     Celsius also submits that I should take into account Reliz's failure to beat the various settlement offers made by Celsius, both open and "without prejudice save as to costs".

46.     Reliz, by contrast, submits that it was entitled fully to defend its position.  Its case was reasonably made and reasonably advanced on the basis of the honestly held recollections of its witnesses.  It was not unreasonable for it to lead expert evidence to support its case.  Indeed, in some respects, the Tribunal preferred the evidence of Reliz's expert to that of the expert called by Celsius and took it into account in the First Partial Award.

47.     Reliz further submits that it was entirely reasonable for it to apply for a stay on the grounds of the Chapter 11 proceedings affecting the Celsius group.  Although its application for a stay was not successful, the application did result in an order for security.  As for the other matters relied upon by Celsius, these are in reality no more than ordinary aspects of a hard-fought dispute and do not justify any special order as to costs.  Indeed, in relation to the Borrow Fee, Reliz's arguments were successful.

48.  As to the rejection of the various offers made by Celsius, Reliz submits that neither the Arbitration Act 1996 nor the Terms of Appointment provide for the sort of automatic consequences set out in CPR Part 36.   In the context of the parties' cases, where Celsius was arguing for repayment in ETH and Reliz for repayment in USD, and in the context of the volatile ETH/USD exchange rate, Reliz's approach both to making its own offers and to rejecting those made by Celsius was not unreasonable - certainly, not so unreasonable as to justify a departure from the regime prescribed by s 63(5).

49.  I have carefully considered the matters advanced by Celsius as reasons for me to "determine otherwise" for the purposes of s 63(5).   In my judgment, however, they do not provide a sufficient reason for me to do so, whether considered individually or collectively.

50.  The complexity of the defence advanced by Reliz undoubtedly increased the cost of the arbitration.   However, none of the overlapping defences relied upon by Reliz was legally unreasonable, having regard to Reliz's view of the facts.   Although, in general, I preferred the evidence of Celsius' witnesses as more consistent with the contemporary documents and the overall probabilities, I held that the different recollection of Reliz's witnesses was honestly held, though mistaken[18].   It was not, in my judgment, unreasonable of Reliz to advance its defences in the way which it did.

51.  As to expert evidence, Reliz is correct to say that I took the evidence of its expert witness, Mr Hennig (in relation to the inherent commerciality of the transaction from Reliz' point of view) fully into account in the First Partial Award[19].   Reliz is also, in my judgment, right to say that its application for a stay was not an unreasonable response to the Chapter 11 proceedings involving the Celsius group and did in fact result in the grant of some relief, albeit not the stay that Reliz had asked for.

52.  Taken overall, the matters relied upon by Celsius which are summarised in paragraph 44 above are no more than the expected "cut and thrust" of hard-fought litigation.   Celsius' success on many of these matters is simply an aspect of its overall success in the arbitration, and not something that justifies a departure in its favour from the normal rules as to costs to be found in s 63(5).

53.  Celsius' best argument, it seems to me, is that it has had to incur and to continue incurring costs after making settlement offers which it has ultimately beaten.   The offers and counter-offers made by each party are listed in Schedule 3 to Celsius' submissions dated 18 August 2023.   Among those offers I bear in mind, in particular, Celsius' offer made by letter dated 16 February 2022 to accept 80% of its claim in full and final settlement.   At that stage, the costs on both sides were only about a quarter of the final figures.

---

[18]  See section J1 of the First Partial Award, particularly at paragraphs 162 and 168, where I describe the evidence of Mr Hammer as "an honest but misconceived reconstruction after the event".

[19]  See eg paragraphs 143 to 147 of the First Partial Award.

54.     However, as I have already noted in paragraph 41 above, there is no general equivalent in the law of arbitration to the specific provisions in CPR Part 36 for the costs and interest consequences of a claimant beating its own earlier offer to settle. In the absence of such a framework, I think it would be wrong to import those consequences by analogy.  It does not seem to me that, in the particular circumstances of the present arbitration, Reliz's conduct in refusing Celsius's various offers would justify me (either on its own or in combination with the other matters relied upon by Celsius) in adopting a different basis that laid down by s 63(5) for the determination of the recoverable costs of this arbitration.

## (F)     Quantum and Award in relation to costs

### (F1)   Arbitrator's fees

55.     Celsius' submissions dated 15 September 2023 claim a total of £63,797.49 in respect of my fees. Reliz did not challenge this figure, but I must make the following adjustments to arrive at the proper amount to award:

  55.1   Add £8,412.27 as the total of (a) the share of my fees in relation to this Third Partial Award payable from Celsius' funds already held by the LCIA (£2,054.91), and (b) the two sums in relation to those fees paid by Celsius on 17 November and 21 December 2023 (£6,357.36).

  55.2   Deduct £1,245.83 as the fees charged by me which were referable to Celsius's unsuccessful application for an order, subsequent to the First Partial Award, requiring Reliz to pay the Borrowed Amount identified in the First Partial Award within a specified time.

56.     This gives a final figure of **£70,963.92** under this head.

### (F2)   Taylor Wessing's Fees

57.     Celsius' submissions dated 15 September 2023 claim a total of £786,333.66 in respect of the fees of Taylor Wessing.

58.     Celsius submits that its legal team was "lean and included a partner, senior associate, associate and trainee, all at reasonable (discounted) hourly rates".  Celsius also submits that it conducted its side of the arbitration in an entirely reasonable manner, and that its claim for fees is entirely justified, on the basis that each item was both reasonably incurred and reasonable in amount.

*Confidential*

59.   Reliz, by contrast, submits that the rates charged by Celsius' legal team are well above the guideline hourly rates published by HMCTS as an aid to summary assessment of court costs.   Reliz also submits that the number of hours charged on the case by Partners and Senior Associates are higher than reasonably necessary, and that certain stages appear to have incurred unreasonably high fees.   Reliz submits that I should reflect these points by making a discount of between 30% and 35% from the total amount claimed.

60.   Celsius has provided schedules of costs which provide only a little more information than would normally be available on a summary assessment in Court.   Reliz submits that it is for Celsius to prove its case.   However, neither party has submitted that I should undertake a detailed assessment, with all the costs and delay that that would involve.   In the circumstances, it seems to me inevitable that I must take a reasonably broad-brush approach.

61.   In seems to me that some modest discount from the full amount claimed is required.   Reliz is correct that the hourly rates charged to Celsius by Taylor Wessing are in excess of the guideline rates in force at the relevant times.   They are not in anyway out of line in my experience with the rates actually charged and allowed for specialist and complicated litigation such as this.   Indeed, by comparison with some City rates, they are modest.   However, the fact that it may have been reasonable for Taylor Wessing to charge and for Celsius these rates does not necessarily mean that they are reasonable in the sense explained in paragraph 20 above.

62.   There is also some modest force in Reliz's points, both about the weighting of the hours charged between more expensive senior solicitors and those more junior, and so cheaper, and about the high overall cost of work on the Procedural Timetable and on preparation for the final hearing.    Finally, I must make a small deduction to reflect, not only Celsius' own costs, also those needlessly incurred by Reliz, in relation to Celsius' unsuccessful application for an order in relation to time of payment.

63.   Taking these points and all the circumstances of the case into account, it seems to me that I should only award to Celsius 80% of the amount claimed in respect of the fees of Taylor Wessing.

64.   That gives a final figure of **£629,066.93** under this head.

(F3)   Counsel

65.   Celsius claims £145,275.00 in respect of fees paid to counsel.   Celsius instructed Christopher Langley, a junior counsel (2011 call) of Fountain Court Chambers.

17

66.    Mr Langley faced leading and junior counsel instructed on behalf of Reliz.  Reliz makes no specific complaints about Mr Langley's fees, which seem in general to be both reasonable in amount and to have been reasonably incurred.

67.    It is nevertheless my experience that some of the time for which counsel reasonably charges is in many cases the result of more detailed preparation on the part of instructing solicitors than the lowest amount reasonably required to conduct and present the case proficiently.

68.    In the circumstances, and consistently with the view which I have taken of the hours spent overall by Celsius' legal team, it seems to me that it is appropriate on the facts of the present case to make a modest deduction of 10% from these fees to reflect these factors.

69.    That produces an award of **£132,547.50** under this head.

## (F4)    Expert's fees

70.    Celsius claims £88,292.50 as the fees charged by its expert.

71.    Although this is a disbursement, and Reliz makes no specific complaints about it, it is again my experience that some of the time for which expert witnesses charge is often the result of more detailed preparation on the part of the legal team than the lowest amount reasonably required to conduct and present case proficiently.

72.    In the circumstances, and consistently with the view which I have taken of the hours spent overall by Celsius' legal team, it seems to me that it is appropriate on the facts of the present case to make a modest deduction of 10% from these fees to reflect these factors.

73.    That produces a final figure under this head of **£79,463.25.**

## (F5) Other disbursements

74.    Celsius claims £30,208.92 in respect of other disbursements.  Reliz makes no specific challenge to any of the items comprised under this head.

75.    In the circumstances, I propose to award the full amount of **£30,208.92.**

## (F6)    Summary

76.    Those decisions produce a total award in relation to costs of **£942,250.52**, made up as follows:

|  | **Amount** |
|---|---|
| **Arbitrator** | £70,963.92 |
| **Taylor Wessing** | £629,066.93 |
| **Counsel** | £132,547.50 |
| **Expert** | £79,463.25 |
| **Other disbursements** | £30,208.92 |
| **Total** | **£942,250.52** |

77.    That sum represents about 85% of the total amount claimed by Celsius in relation to costs, which seems to me to be a fair, just and reasonable award in all the circumstances.


## (G)    Post-Award interest

78.    In view of its entitlement to the Late Fee, Celsius rightly makes no claim for post-award interest in relation to the substantive amounts which I have awarded other than in relation to costs.

79.    In relation to costs, however, it seems to me to be right that I should exercise the power under the Arbitration Act 1996 s 49(4) to award post-award interest.

80.    This is not a case falling within the Late Payment of Commercial Debts (Interest) Act, the interest rate under which is set for the purposes of deterrence. The purpose of an award of costs under s 49(4) of the Arbitration Act 1996 is simply to compensate the receiving party for being kept out of its money.

81.    In the circumstances, the appropriate rate of interest seems to me to be 2% above Bank of England Base Rate, to reflect my (very approximate) assessment of the cost of borrowing to Celsius.  Since Base Rate is presently 5.25%, that produces an award of post-award interest award in relation to costs at the rate of 7.25% per annum.


## (H)    The Late Fee

82.    Reliz has not paid any part of the Borrowed Amount, the Borrow Fee and the Late Fee which I ordered it to pay under the First Partial Award and the Second Partial Award.

19

83.    In the circumstances, the Late Fee has continued to accrue.  Celsius has produced a further Calculation of the Late Fee for the period from 12 July 2023 to 19 December 2023 amounting to USD.595,650.75.  Reliz has not challenged that calculation, though it has not accepted it, and the calculation appears on its face to have been correctly made.

84.    In the circumstances, it is right that I should make a further award in relation to that **USD 595,650.75**.

85.    The Late Fee will continue to accrue until payment.  I urge the parties to reach agreement on the sums accruing from 20 December 2023 until the date of payment. Reliz' conduct to date, however, makes me fear that that will not happen.

86.    In the circumstances, it seems to me that I have no option but to render this award as a Third Partial Award, and to reserve jurisdiction to make a further award in respect of the Late Fee payable by Reliz to Celsius from 20 December 2023 until the Borrowed Amount is repaid in full.

## (I)    Summary

87.    I therefore find and award that Reliz is liable to pay to Celsius, and accordingly Order Reliz to pay, in addition to the amounts awarded in the First Partial Award and the Second Partial Award, the following sums:

   87.1    The sum of **£942,250.52** in respect of the costs of the Arbitration to date;

   87.2    Simple interest on that sum from the date of this Third Partial Award until payment at the rate of 7.25% per annum;

   87.3    The further sum of **USD 595,650.75** in respect of the Late Fee accrued for the period from 12 July 2023 until 19 December 2023.

88.    I reserve jurisdiction to make a further award or awards in respect of:

   88.1    The Late Fee payable by Reliz to Celsius from 20 December 2023 until the Borrowed Amount is repaid in full; and

*Confidential*

88.2    Any further costs of the Arbitration attributable to any applications for and the making of any such further awards.

**Richard Salter KC**

Sole Arbitrator

**Place of Arbitration: London, England, United Kingdom.**

**Date: 8 January 2024**

21