**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CELSIUS NETWORK LLC, *et al.*,

Post-Effective Date Debtors.

NOT FOR PUBLICATION

Chapter 11

Case No. 22-10964 (MG)

---

### MEMORANDUM OPINION GRANTING IN
### PART AND DENYING IN PART SUBSTANTIAL CONTRIBUTION APPLICATIONS

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Attorneys for the Post-Effective Date Debtors*
601 Lexington Avenue
New York, New York 10022
By:    Joshua A. Sussberg, Esq.

300 North LaSalle Street
Chicago, Illinois, 60654
By:    Patrick J. Nash, Jr., Esq.
        Ross M. Kwasteniet, Esq.
        Christopher S. Koenig, Esq.
        Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors* 1221 Avenue of the Americas
New York, New York 10020
By:    David M. Turetsky, Esq
        Samuel P. Hershey, Esq
        Joshua D. Weedman, Esq

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:    Keith H. Wofford, Esq.

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
By:    Gregory F. Pesce, Esq.

555 South Flower Street
Suite 2700
Los Angeles, CA 90071
By:    Aaron Colodny, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Suite 1006
New York, NY 10014
By:    Mark Bruh, Esq.
        Shara Cornell, Esq.

McCARTER & ENGLISH, LLP
*Attorneys for the Borrower Ad Hoc Group*
Worldwide Plaza
825 Eighth Avenue, 31st Floor
New York, NY 10019
By:    David Adler, Esq.

VENABLE LLP
*Attorneys for Ignat Tuganov*
151 West 42nd St. New York, New York 10036
By:    Jeffrey S. Sabin, Esq.
        Andrew Currie, Esq.

TROUTMAN PEPPER HAMILTON SANDERS LLP
*Attorneys for the Ad Hoc Group of Withhold Account Holders*
4000 Town Center, Suite 1800
Southfield, MI 48075
By:    Deborah Kovsky-Apap, Esq.

OFFIT KURMAN, P.A.
*Attorneys for the Ad Hoc Group of Earn Account Holders*
590 Madison Avenue, 6th Floor
New York, NY 10022
By:    Jason A. Nagi, Esq.

1954 Greenspring Drive, Suite 605
Timonium, Maryland 21093
By:    Joyce A. Kuhns, Esq.

ERVIN COHEN & JESSUP LLP
*Attorneys for Simon Dixon and BNK To The Future*
9401 Wilshire Blvd., 12th Floor
Beverly Hills, CA 90212
By:     David Tarlow, Esq.
        William Chistopher Manderson, Esq.
        Chase Aleksander Stone, Esq.

TOGUT SEGAL & SEGAL LLP
*Attorneys for Ad Hoc Group of Custodial Account Holders*
1 Pennsylvania Plaza, Suite 3335
New York, NY 10119
By:     Kyle J. Ortiz
        Bryan M. Kotliar, Esq.

*Pro se* Creditor Jason Amerson

*Pro se* Creditor Rebecca Gallagher

*Pro se* Creditor Johan Bronge

*Pro se* Creditor Immanuel Herrmann

*Pro Se* Creditor Daniel Frishberg

*Pro se* Creditor Cathy Lau

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Currently pending before this Court are ten[1] substantial contribution applications (the

"Applications") filed in connection with the reorganization of Celsius Network LLC, *et al.*

("Celsius" or "Debtors").  The parties who filed Applications and amounts sought are as follows:

1. Ad Hoc Group of Custodial Account Holders ("Custody Group") through counsel Togut,
   Segal & Segal LLP ("Togut").  ("Custody App.," ECF Doc. # 3660.)
   a.  Fees Sought: **$740,447.50**
   b.  Expenses Sought: **$0.00**

2. Ad Hoc Group of Withhold Account Holders ("Withhold Group") through counsel
   Troutman Pepper Hamilton Sanders LLP ("Troutman").  ("Withhold App.," ECF Doc. #
   3663.)

---

[1]      The Pending Withdrawal Group withdrew its substantial contribution application (ECF Doc. # 3673) at the
hearing on January 11, 2024.  (*See* Jan. 11, 2024 Hr'g Tr. 101:13–18.)

      a. Fees Sought: **$183,871.00**
      b. Expenses Sought: **$3,745.61**

3. Ad Hoc Group of Earn Account Holders ("Earn Group") through counsel Offit Kurman, P.A. ("Offit"). ("Earn App.," ECF Doc. # 3654.)
      a. Fees Sought: **$326,262.00**
      b. Expenses Sought: **$6,774.55**[2] for counsel and **$4,830.82** for *pro se* participation related to the Class Claim Mediation[3]
      c. **Future** Fees sought: **$100,000.00**

4. Borrower Ad Hoc Group ("Borrower Group") through counsel McCarter & English ("M&E"). ("Borrower App." ECF Doc. # 3671.)[4]
      a. Fees Sought: **$1,018,265.50**
      b. Expenses Sought: **$1,957.97**

5. Ignat Tuganov ("Tuganov") through his counsel Venable LLP ("Venable"). (The "Tuganov App.," ECF Doc. # 3666, supplemented by the "Venable Time Records," (ECF Doc. # 4010-1) and the "Suppl. Tuganov App.," ECF Doc. # 4158.)
      a. Fees Sought: **$1,577,949.50** ($1,383,089.00 pre-Confirmation and $194,860.00 post-confirmation)
      b. Expenses Sought: **$6,803.46**
      c. **Future** Fees Sought: **$300,000.00**

6. Simon Dixon ("Dixon") on behalf of BNK to the Future ("BF"), through counsel Ervin Cohen & Jessup LLP ("ECJ"). ("Dixon Declaration," ECF Doc. # 3670, "Dixon/BF App.," ECF Doc. # 3672, and amended at ECF Doc. # 3799, "Amended Dixon/BF App," together "Dixon/BF Apps.")
      a. Fees Sought: **$506,722.50**
      b. Expenses Sought: **$20,982.20**
      c. **Future** Fees Sought: **$50,000.00**

7. *Pro Se* Daniel Frishberg ("Frishberg"). ("Frishberg App.," ECF Doc. # 3675.)
      a. Expenses Sought: **$626.98**
      b. **Future** Fees Sought: **$1,000.00**

8. *Pro Se* Immanuel J. Herrmann ("Herrmann"). ("Herrmann App.," ECF Doc. # 3674.)
      a. Expenses Sought: **$1,143.90**
      b. **Future** Fees Sought: **$1,000**

---

[2]    At the Hearing, counsel for the Earn Group indicated that this number was $6,934.55 (Jan. 11, 2024 Hr'g Tr. 34); the Earn App. itself requested $6,774.55 (Earn App. ¶ 10).

[3]    The Earn Group is seeking reimbursement "expenses incurred by those members of the Ad Hoc Earn Group who participated in the Mediation and, in the instance of Rebecca Gallagher, expenses she incurred as a lead Plaintiff in connection with the Committee Class Action [all] totaling $4,830.82." (Earn App. ¶ 10.)

[4]    The hearing on the Borrower App. was adjourned several times at the request of its counsel. Based on the Court's analysis and conclusions regarding the principles applicable to evaluating substantial contribution applications, the Court concludes that a hearing on the Borrower App. Is unnecessary for the Court to rule on the application. Therefore, this Opinion includes the Court's rulings with respect to all the applications.

9. *Pro Se* Rebecca Gallagher ("Gallagher"). ("Gallagher App.," ECF Doc. # 3662.)
    a. Expenses Sought: **20 ETH** (as of 2/26/2024, equivalent to **$63,633.8**)

10. *Pro Se* Zachary Wildes ("Wildes"). ("Wildes App.," ECF Doc. # 3615.)
    a. Expenses Sought: **$42,525.00.**

The following parties filed objections, summarized as follows:

1. United States Trustee ("UST"). ("UST Objection," ECF Doc. # 4018)
    a. Omnibus objection to all Applications

2. Debtors filed:
    a. A limited objection ("Debtors' Limited Objection," ECF Doc. # 4025)
        i. **Objecting** to: the Wildes App., Gallagher App., Dixon/BF Apps., and Pending Withdrawal App.
        ii. **Supporting**: the Earn App., Custody App., Withhold App., Tuganov App., Herrmann App., and Frishberg App. (and the Borrower App., for which it later retracted support).
    b. An objection to the Borrower App., ("Debtors' Borrower Objection," ECF Doc. # 4179)

3. The Official Committee of Unsecured Creditors' ("Committee") filed:
    a. A limited objection ("Committee Statement," ECF Doc. # 4027)
        i. **Objecting** to: portions of the Dixon/BF Apps.
        ii. **Supporting**: The Earn App., Custody App., Withhold App., Borrower App., Gallagher App.,[5] Tuganov App., and portions of the Dixon/BF Apps.
    b. An objection joining the Debtors' Borrower Objection ("Committee Borrower Objection," ECF Doc. # 4183)

4. *Pro Se* Jason Amerson ("Amerson"). ("Amerson Objection," ECF Doc. # 4015)
    a. Objecting to the Dixon/BF Apps.

5. *Pro Se* Cathy Lau ("Lau"). ("Lau Objection," ECF Doc. # 4043)
    a. Objecting to the Dixon/BF Apps.

Parties filed responses in support of their applications as follows:

1. Tuganov filed the "Tuganov Reply," ECF Doc. # 4184

2. The Earn Group filed the "Earn Reply," ECF Doc. # 4185, and the "Kuhns Declaration," ECF Doc. # 4187

---

[5] The Committee does not take an affirmative stance on the Gallagher App.'s request for 20 ETH, but rather supports the reimbursement of her expenses and other compensation "as the Court deems appropriate." (Committee Objection ¶ 6.)

3.  The Withhold Group filed the "Withhold Reply," ECF Doc. # 4186

4.  The Custody Group filed the "Custody Reply," ECF Doc. # 4188

5.  Dixon/BF filed the "Dixon/BF Reply," ECF Doc. # 4189

6.  Gallagher filed the "Gallagher Reply," ECF Doc. # 4191

7.  Frishberg filed the "Frishberg Reply," ECF Doc. # 4193

8.  Herrmann filed the "Herrmann Reply," ECF Doc. # 4194

The Court has determined that certain matters and actions constituted substantial
contributions while others did not. While the actions of ad hoc groups advancing their interests
and the interests of similarly situated creditors typically do not qualify as substantial
contributions, this case was unique in many respects, and their role in coordinating the interests
of hundreds of thousands of creditors, and facilitating the orderly progression of the case, was a
significant factor in ultimately confirming the Plan. In the words of the Debtors' counsel:

> [T]his is an extremely unique case for a variety of reasons . . . other than the
> Committee, there were no represented parties and the vast majority of the
> creditors here are unsophisticated retail investors, over 600,000 of them.
> And so from the very early stages of the case, we as the Debtors were
> focused on how are we ever going to confirm a plan, how are we ever going
> to get support of retail investors . . . [when] there is not somebody that we
> can go to as a conduit who is representing them. . . . The first six months of
> the case there were so many individual pro se motions largely from Earn
> account holders . . . we were trying to put a tent around the circus and tried
> to streamline it into one proceeding. . . . [T]hat was incredibly inefficient,
> led to dozens of objections, required many depositions, required testimony
> of witnesses and ultimately was a very expensive endeavor. And
> importantly, the Earn Ad Hoc Group was not there for that. . . . The Custody
> and Withhold experience was different because . . . [the creditors] felt like
> they had a voice. They felt like they had somebody that was representing
> them. And I think that it ultimately inured to the benefit of the estate and
> reduced the cost of the estate that we had one streamlined litigation with a
> represented party who was representing the interest not only of their specific
> clients, but of similarly situated clients. And I think given the
> administrative run rate of these cases, the cost that we would have all

6

incurred to deal with what certainly would have been many more pro se motions, letters, objections, was significantly reduced.

In a normal Chapter 11 case, I would be offended if an ad hoc group filed a substantial contribution motion because I would say they're doing what they did in order to advance their own interests. . . . [U]nder the American judicial system parties ordinarily bear their own expenses.  This case is different.  We would not be standing here today if not for these parties because I'm not sure that we would have gotten support for any Chapter 11 plan. . . . [The settlements] are the cornerstones of the Plan.

(Jan. 11, 2024 Hr'g Tr. 64:15–25, 65:1–17, 66:1–11, 67:12–23.)

Accordingly, the Court finds that certain efforts, including those in furtherance of these "cornerstone" settlements, constitute substantial contributions.  Several Applications requested fees for post-confirmation activities.  All of the activities which constituted substantial contributions occurred *prior* to confirmation; therefore, there are no awards for any post-confirmation activities.

The Court **GRANTS IN PART** the Custody App., the Earn App., the Withhold App., the Tuganov App., the Dixon App., and the Frishberg App.  The Court **DENIES** the Borrower App., the Herrmann App., the Gallagher App., and the Wildes App.

Exhibit A attached to this Opinion includes the amounts awarded with respect to each application.  The reasons for the Court's determinations are explained below.

## I.   BACKGROUND

### A.  Involvement of the Custody Group and Withhold Group in the Celsius Bankruptcy

Prior to this bankruptcy, Debtors encouraged its customers to place their cryptocurrency in interest-bearing accounts called "Earn Rewards," which were pooled to generate returns.  (Withhold App. ¶ 5.)  Facing state regulatory actions, the Debtor stopped accepting deposits for this program and instead offered a new "Custody" program in the states that allowed it and a "Withhold" account in the states that did not allow it.  (*Id*.)  On June 12, 2022, the Debtors

7

"paused" all withdrawals, swaps, and transfers of any cryptocurrency on all the Debtors' platforms (the "Pause").  (UST Objection at 8.)  Each individual account holder and group of account holders requested the return of, or access to, assets on the Debtors' platforms.  (UST Objection at 8.)  However, each group of customer accounts had a different relationship with the Debtors and the assets the Debtors held.  (*Id*.)  The Pause presented the question whether Custody users could recover their property and the status of the Custody withdrawals following the Pause.  (Custody App. ¶ 11.)

At the start of this bankruptcy case, the Debtors identified the treatment of the Withhold account holders as "critical" to the outcome of these cases, since there was uncertainty surrounding whether these accounts were property of the Debtor's estate and whether the answer to this question was different for the assets in the Earn Program, Custody Program, and Withhold Program.  (Withhold App. ¶ 8.)

The Custody Group was formed in August 2022.  (Custody App. ¶ 12.)  Consequently, on August 31, 2022, the Custody Group filed a complaint against the Debtors for declaratory judgment, stating that the assets held in Custody accounts were not property of the Estates under section 541 of the Bankruptcy Code (the "Custody Complaint").  (*Id.* ¶ 13.)  The Debtors also filed a motion ("Debtor's Custody Motion," ECF Doc. # 670) to approve the return of some, but not all, assets held in the Custody Program ("Custody Assets").  (*Id*.)  Namely, the assets approved for return were (a) only ever held in the Custody Program ("Pure Custody Assets") and (b) transferred into the Custody Program within 90 days of the date of the bankruptcy petition and, at the time of transfer, were worth less than $7,575 (the "Transferred Custody Assets").  (*Id*.)

On or about August 10, 2022, the Withhold Ad Hoc Group organized itself.  On

September 7, 2022, the Withhold Group filed a motion ("Withhold Motion") for relief from the

automatic stay for these creditors to withdraw their sums, claiming the funds were not property

of the Debtors' Estates.  (Withhold App. ¶ 11.)  Since issues in the Withhold Motion overlapped

with those in the Debtors' Custody Motion and the Custody Complaint, the Court ordered the

Debtor, the Committee, and the two ad hoc groups to meet and confer to reach a path forward on

these issues.  (*Id.* ¶ 12.)

Following negotiations, the Custody Group and Withhold Group filed a joint stipulation

(ECF Doc. # 1044) outlining a bifurcated, two-phase briefing schedule to ascertain the status of

Custody and Withhold assets.  (*Id.* ¶ 14.)  Phase I involved resolving whether the assets in the

Withhold and Custody Programs were Estate property, and Phase II involved determining

whether the Debtors were allowed to continue to hold those assets where Debtors may have

potential preference claims.  (*Id.*)

On December 7, 2022, following trial on Phase I issues, this Court concluded that the

Custody assets in the Debtors' segregated Custody wallets were property of the Custody

customers, not the Debtors.  (UST Objection at 9–10, citing "Initial Custody Withdrawal Order,"

ECF Doc. # 1767.)  As a result, Custody Assets, other than Pure Custody Assets and Transferred

Custody Assets, would not be returned to Custody users absent further litigation pursuant to the

"Phase II" briefing schedule or a resolution among the parties.  (*Id.*)

The Court also ruled that cryptocurrency transferred into Withhold accounts that were not

supported by the platform were not property of the Debtors' Estates ("Ineligible Withhold

Assets").  (*Id.* ¶ 15–16.)  However, the Court did not rule regarding eligible Withhold Accounts,

which comprised the entirety of the Withhold Group.  (*Id.* ¶ 15–16.)  Nevertheless, the Withhold

Group conferred with the Debtors regarding a proposed order and further identification of Ineligible Withhold Assets. (*Id.* ¶ 15.) In the Initial Custody Withdrawal Order, the Court reserved decision on the "shortfall" balance not held in those programs, which was approximately 6% across all coins though it varied on a coin-by-coin basis. (Custody App. ¶ 15.) The Court also determined that Custody Assets subject to potential preference actions would not be released without a resolution of those issues. (*Id.*)

The Custody Group worked with the Debtors and Committee to resolve the remaining Phase II issues to ultimately reach a consensual resolution on the shortfall issue. (*Id.* ¶ 17.) The resolution stipulated that all cryptocurrency eligible for distribution under the Initial Custody Withdrawal Order would be withdrawn less a 6% holdback across all coins, subject to later determination by the Court or a resolution between the parties. (*Id.* ¶ 18.) The Custody Group worked with the Debtors and eligible Custody users to facilitate the withdrawals and, after extensive negotiations, the parties reached a settlement (the "Custody Settlement") resolving the Phase II issues. (*Id.* ¶¶ 18, 20.) The settlement allowed Custody users to voluntarily "opt in" to receive 72.5% of their Custody Assets over two distributions and forfeit the remaining 27.5% in exchange for a release. (*Id.*) The Custody Settlement also resolved the shortfall issue by allowing withdrawal of 100% of Pure Custody Assets and Transferred Custody Assets. (*Id.*) The Court approved the Custody Settlement on March 21, 2023 (ECF Doc. # 2291), which was incorporated into the Debtors' confirmed Plan (the "Plan," ECF Doc. # 4239). (*Id.* ¶¶ 21, 23.)

On March 28, 2023, the Debtors and the Withhold Group also finalized a settlement ("Withhold Settlement") of the Phase II issues. (Withhold App ¶¶ 18–20.) The settlement provided that Withhold account holders were entitled to 15% of their allowed claim as an in-kind distribution with the remaining 85% treated as an Earn claim. (*Id.*) This settlement required the

same distribution under the Debtor's Plan to *all* Withhold account holders, not merely members of the Withhold Group.  (*Id.* ¶ 20.)

### B.  Involvement of the Earn Group and Borrower Group in the Celsius Bankruptcy

Prior to this bankruptcy, the Debtors offered differing cryptocurrency vehicles, including a "borrow" account.  (Borrower App. ¶ 2.)  In this program, customers would enter into a loan agreement with Celsius, pledging their cryptocurrency as collateral.  (*Id.* ¶ 3.)  On October 3, 2022, the Borrower Group was formed.  (*Id.* at 2.)  The Group requested removal of the Debtors' prior management (ECF Doc. # 334).  (*Id.*)  Once removed, the Borrower Group requested Plan mediation, which estate fiduciaries opposed.  (*Id.* at 2–3.)

The Borrower Group later filed an adversary proceeding ("Borrower Complaint," ECF Doc. # 2001) seeking a determination of the rights and remedies of the Borrower account holders.  (*Id.* at 3.)  Shortly thereafter, the Debtors designated NovaWulf as the stalking horse bidder, whose proposal extended Borrower's loans for five to six years and return of collateral upon repayment.  (*Id.*)  This proposal was ultimately rejected in favor of the Fahrenheit proposal, which did not propose such an extension and, instead, provided that the loans would receive the "setoff treatment," so the Borrower Group deemed the chosen proposal unacceptable.  (*Id.*)

On April 10, 2023, the Committee filed a motion (the "Class Claim Motion") seeking authority to file a class action "assert[ing] fraud, misrepresentation, and other statutory claims against each Debtor entity to solve the 'unprecedented collective action problem' of 'hundreds of thousands' of the Debtors' creditors asserting individual non-contract claims against the Debtors," which this Court granted.  (UST Objection at 17, citing ECF Doc. ## 2399, 2496.)  On April 12, 2023, the Earn Group, representing over 600,000 Earn account holders, formed.  (Earn App. ¶ 1.)

Significant conflict existed among the Earn and Borrower contingencies regarding their treatment under the Plan. (Earn App. ¶¶ 2–3.) These parties nevertheless reached a settlement regarding the Class Claim issues in July 2023, signing a term sheet (the "Class Claim Term Sheet") after three days of intensive mediation ("Class Claim Mediation") before the Honorable Michael E. Wiles. (*Id.* ¶¶ 2–4.) The settlement provided that the Plan would be "amended to provide for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders . . . [and other parties] under Section 503(b)(3)(D). (*Id.*; *see also* ECF Doc. # 3064 at 44.)[6] The settlement agreement (the "Class Claim Settlement") allowed each Earn account holder the choice to opt out, yet only 1.06% did so. (*Id.* ¶ 5, citing ECF Doc. #3574.)

The Class Claim Settlement was embodied in the Plan and included the option for Borrowers to repay their loans, rather than be forced into setoff. (*Id.*) The Settlement also provided that Borrowers have priority over Earn creditors on "crypto only" distributions for Borrowers who selected such treatment and an "enhanced" recovery to those borrowers electing class claim treatment. (*Id.*) Per the Voting Report, the Retail Borrower Class (Class 2) voted 96.33% by amount and 98.83% by number in favor of the Plan. (*Id.* at 4.)

On July 25, 2023, the Earn Group held a public forum to gauge the concerns of the larger Earn constituency, which resulted in the Earn Group filing its Reservation of Rights to the Amended Disclosure Statement on August 3, 2023. (*Id.* ¶ 6, citing ECF Doc. #3159.) Given that the Earn Group represented the largest group of stockholders of NewCo, the filing resulted in intense negotiations among major stakeholders regarding governance issues of the NewCo. (*Id.*) After the filing of a supplemental reservation of rights (ECF Doc. #3267), good faith dialogues

---

[6] This resulted in the fees of the parties being named in the definition of "Administrative Expense" *if* the Court approved their substantial contribution applications.

continued which ultimately resulted in: (i) the Earn Group's selection of three board observers to the NewCo Board, each of whom is a significant Earn account holder; (ii) the appointment of an Earn claimant to the Litigation Oversight Committee; and (iii) the Earn Group's further negotiation and signing of a Plan Support Agreement (the "PSA," ECF Doc. # 3516).  (*Id.* ¶¶ 6–8.)  The Earn Group and related parties also held public forums to educate the larger constituency on the complex ballot.  (*Id.* ¶ 7.)  In line with their obligations under the PSA, the Earn Group held multiple public forums in support of the Plan before the ballot deadline and sent out reminders via Twitter to encourage creditors to vote to accept the Plan.  (*Id.* ¶ 9.)  Thus far, the Earn Group has been funded by its members in the amount of $159,484.00.  (*Id.* ¶ 11.)

On November 9, 2023, the order confirming the Debtors' chapter 11 plan (the "Confirmation Order," ECF Doc. # 3972) was entered by this Court.  Shortly after the Confirmation Order was entered, the SEC informed the Debtors that it would not approve the pre-clearance letter for the NewCo Transaction, but that it would not require pre-clearance for the Debtors to pursue registration of a mining-only company.[7]  In response, the Debtors and Committee filed a motion (the "Wind-Down Motion," ECF Doc. # 4050) seeking to activate the "toggle" option in the Plan to pivot to a mining-only public company.  The Borrower Group objected to the Wind-Down Motion, arguing that the MiningCo Transaction was a material modification, that this Court lacked jurisdiction to hear the proposed MiningCo Transaction pending appeal of the Confirmation Order, and that, due to its "material impact" on creditors (namely, tax implications for Borrower Group members), it required new disclosures, re-

---

[7]    To obtain pre-clearance from the SEC, the Debtors were required to submit audited financial statements to the SEC.  While the Debtors' historical Mining business had audited financial statements, the "staking" business that was operated by a different Celsius entity did not have audited financial statements.  (Wind-Down Motion ¶ 20.) The SEC was unwilling to waive the requirement.  Without pre-clearance, the Debtors concluded it was not feasible to pursue the NewCo Transaction.

solicitation, and a new vote.  (Borrower Objection ¶¶ 32, 37.)  The Borrower Objection was

ultimately overruled, and the Court entered an opinion granting the Wind-Down Motion ("Wind-

Down Opinion," *In re Celsius Network LLC*, 656 B.R. 327 (Bankr. S.D.N.Y. 2023).)

### C.  Tuganov Involvement in the Celsius Bankruptcy

Tuganov is an individual creditor.  Believing that a Ponzi investigation was crucial to

resolving this matter, Tuganov filed and prosecuted pleadings seeking to expand the scope of the

Examiner's investigation to include facts that would support a Ponzi adjudication.  (Tuganov

Reply ¶ 14(c).)  The Committee and Debtors both objected to Tuganov's response to the

Examiner's investigation requesting the Examiner probe whether the Debtor engaged in a Ponzi

scheme.  (Tuganov App. ¶ 9.)  Subsequently, Tuganov, the Committee, the Debtor, and the

Examiner entered a stipulation modifying the scope of the Examiner's Order (ECF Doc. # 1343)

directing the Examiner to expand the investigation to include Ponzi inquiries.  (*Id.*)  This

investigation resulted in a 476-page report that suggested that the Debtors had, in fact, operated

as a Ponzi scheme.  (*Id.* ¶ 10.)

Based on these findings, Tuganov filed an adversary proceeding against the Debtors.

(*Id.*)  The Committee reached out to Tuganov to discuss timing and potential risks and benefits

of a Ponzi adjudication.  (*Id.*)  The Committee sought the guidance, input and previous case

pleadings from Tuganov's counsel, Venable, given that Venable had handled many Ponzi cases.

(*Id.* ¶ 11.)  To minimize the costs of the litigation on the estate, Tuganov negotiated a stipulation

with the Debtors and the Committee to stay the adversary proceeding, which the Court approved

on April 27, 2023.  (*Id.* ¶ 12.)

Having thoroughly discussed a Ponzi adjudication, Tuganov suggested that the

Committee utilize a class proof of claim procedure to streamline the non-contract claim process.

(*Id*. ¶ 13.)  The Committee followed this suggestion by filing a consolidated class proof of claim

against all Debtors on behalf of all customers for fraud and other non-contract claims.  (*Id*. ¶ 13.)

In response to the Class Claim Motion (ECF Doc. # 2474), Tuganov highlighted certain

infirmities in the Committee's motion, after which Tuganov and the Committee worked together

to propose a consensual order to resolve the issues.  (*Id*.)  The Court then authorized the

Committee to file the class claim.  (*Id*.)  The Committee requested that Tuganov serve as one of

the three class representatives.  (*Id*. ¶ 14.)  In this role, Tuganov and Venable assisted in

preparing pleadings in connection with the Class Claim and in facilitating the resolution of this

matter in Class Claim Mediation.  (*Id*.)  Concurrently, Tuganov highlighted facts that ran counter

to the then-settlement among the Debtors, the Committee, and the Borrower customers.  (*Id*. ¶

15.)  This ultimately resulted in the settlement being abandoned because the Borrower account

holders would have received wrongful treatment at the expense of other creditors.  (*Id*.)

On December 13, 2022, Venable suggested that mediation be a cost-effective means for

addressing the concerns of many parties.  (*See* "Mediation Motion," ECF Doc. #1680.)  The

Debtors and Committee both objected, and the Court denied the Mediation Motion.  (Tuganov

App. ¶ 16.)  However, after it became clear that the Borrower settlement was unworkable, the

Court ordered mediation.  (*Id*. ¶ 17.)  Parties attest that Venable was instrumental in facilitating a

consensus that resulted in a settlement of the Class Claim.  (*Id*. ¶ 18.)  Furthermore, Venable

provided key insights into the development of the Plan Term Sheet and the PSA.  (*Id*.)

### D.  Dixon and BF Involvement in the Celsius Bankruptcy

Dixon, the CEO of BF (a cryptocurrency investment platform), was a creditor in the

bankruptcy.  (Dixon Declaration ¶ 1.)  Dixon has over a decade of expertise in cryptocurrencies

and has been a creditor in other crypto bankruptcies (including Mt. Gox and Bitfinex).

(Dixon/BF App. ¶ 16; Dec. 21, 2023 Hr'g Tr. 110:21–23, 111:7.)  Since July 15, 2022 (the

"Petition Date"), Dixon, representing BF as a creditor and in his personal capacity, worked with

the Debtors and their creditors in developing and securing approval for a successful plan of

reorganization.  (*Id.* ¶ 1.)  Dixon has held various unpaid positions, including plan consultant,

consultant to the Earn Group, and a key signatory to the PSA.  (*Id.*)

Additionally, given Dixon's knowledge and extensive social media following, the

Debtors and the Committee formally sought Dixon's help to, among other things, provide:

> (1) [C]ritical outreach and communication directed specifically to
> unsecured creditors (designed to enhance their understanding of the Chapter
> 11 plan process overall); (2) guidance and support to Plan proponents during
> the bid process to investigate, develop, and eventually advocate for key
> features of the reorganization, which are now critical parts of the Plan; (3)
> consulting services to the Ad Hoc committees, including strategic planning
> advice, as well as working as a formal Plan Consultant on behalf of the
> Debtor; and (4) above all, leverage his influence, unique knowledge, and
> qualifications to facilitate the Plan confirmation process with the intention
> of maximizing value to the Estate for all unsecured creditors, and, where
> possible, save significant costs.

(*Id.* ¶ 3.)

In the course of his involvement, Dixon retained various professionals.  (*Id.* ¶ 5.)  BF

retained Brown Rudnick LLP ("BR") as its legal counsel and DBK Financial Services Ltd.

("DBK") as its investment banker to help design and advise on a chapter 11 plan framework,

which became a critical feature of the ultimate prevailing bid proposed by NovaWulf,

Fahrenheit, and BRIC.  (*Id.* ¶¶ 27–28.)  Dixon retained ECJ and DBK to provide guidance on

corporate governance issues and act as an intermediary between himself and counsel to the other

parties.  (*Id.* ¶ 39.)  BF had to release BR because BR had been retained by Fahrenheit.  (*Id.* ¶

39.)

### E. *Pro se* Creditor Involvement in the Celsius Bankruptcy

#### 1. Mr. Frishberg

Mr. Frishberg has been an active *pro se* creditor in this case.  In July 2023, Mr. Frishberg attended the Class Claim Mediation between the Earn Group, Borrower Group, Committee, and Debtors in New York.  (Frishberg App. ¶ 6.)  The resultant Term Sheet noted that the Plan should be amended to provide for the reasonable and documented expenses and legal fees incurred by *pro se* participants.  (*Id*. citing ECF Doc. # 3064.)

Mr. Frishberg's contributions were listed as follows: reminding Debtors' counsel to file a claim against Voyager, agreeing to withdraw his adversary proceeding, participating as a bellwether claimant, settling substantive consolidation and Class Claims by agreeing to dismiss some appeals, obtaining a ruling from this Court that the Debtors' did not have as much insurance as they claimed, interviewing regulatory and other government entities, appealing the "Customer Contract Claims Order."  (*Id.* at 11–12.)  Mr. Frishberg spent thousands of hours on this case with respect to the negotiations, mediation, and other activities.  (*Id.* at 18–19.)

#### 2. Mr. Herrmann

Mr. Herrmann has also been an active *pro se* creditor in this bankruptcy case.  His involvement includes creditor-to-creditor conversations and assisting in the allowance of *pro se* creditor participation on issues related to the examiner, ultimately leading to Phase II of the Examiner's Report (ECF Doc. #820).  (Herrmann App. at 2.)  He also joined the Committee and other groups in filing various group appeals, including the Earn Appeal, Customer Contract Claims Appeal, and Customer Class Claims Cross-Appeal.  (*Id.* at 2–3.)

Mr. Herrmann filed an adversary proceeding (Case No. 23-01025) that was resolved through the Class Claim Settlement.  (*Id.* at 3–4.)  Stipulated to in the Class Claim Settlement

Term Sheet, Mr. Herrmann was one party listed in the definition of "Administrative Expense" whose fees would be reimbursed subject to a successful substantial contribution application. (*Id.* at 4–5 citing ECF Doc. # 3064.)

### 3. Ms. Gallagher

Ms. Gallagher served as one of three lead plaintiffs for the Class Claim. (Gallagher App. ¶ 1.) The Court approved the appointment of Ms. Gallagher as a Class Representative on June 12, 2023. (*See* ECF Doc. # 2795.) Prior to this, on May 17, 2023, the Committee moved to certify a class of account holders in the Class Claim asserting claims of fraud, misrepresentation, and other non-contract claims against Debtors. (UST Objection at 18, citing ECF Doc. # 2670.) Ms. Gallagher submitted a declaration in support of the certification of the Class Claim. (*See* ECF Doc. #2674.) Over 30,000 Proofs of Claim were filed against the Debtors. (Gallagher App. ¶ 1.) Following mediation, on July 20, 2023 the parties moved for entry of a settlement providing for an extra 5% recovery for all claimants who opted in. (UST Objection at 19, citing ECF Doc. # 3064.) On August 14, 2023, the Court approved the Class Claim Settlement. (*Id.* at 20, citing ECF Doc. # 3288.)

Ms. Gallagher sought additional recovery[8] "to compensate for the contribution of [her] time, effort and energy in preparing for the Committee Class Claim, and [her] role in serving as a Lead Plaintiff in the Committee Class Claim Action." (Gallagher App. at 1.) In support of her application, Ms. Gallagher asserted that her role as lead plaintiff amounts to a substantial contribution because the settlement of the Class Claim prevented protracted and costly litigation

---

[8]   Gallagher's expenses for serving as lead plaintiff in connection with the Class Claim (specifically to attend a pre-mediation meeting with Herrmann) are requested (and have been approved) in the Earn App. (Earn App. ¶ 10, Exhibit A.)

of the over 30,000 claims and led to an additional 5% recovery thereby benefitted all creditors.
(*Id.* at 2.)

### 4. Mr. Wildes

Mr. Wildes was one of the *pro se* creditors involved in the discovery dispute with the

Committee. (UST Objection at 26.) On September 12, 2023, the Committee requested a

discovery conference with the Court, which took place on September 18, 2023. Following the

discovery conference, Mr. Wildes settled with the Committee. (*See* Settlement Agreement

Regarding CEL Token Valuation Dispute, the "Discovery Settlement," ECF Doc. # 3486-1.) As

part of the Discovery Settlement, the Debtors and Committee agreed not to oppose Wildes'

Substantial Contribution Application. (UST Objection at 27.) Mr. Wildes seeks reimbursement

of consulting and legal fees incurred in connection with the dispute. (Wildes App. ¶ 1.)

## II.    **LEGAL STANDARD**

Section 503(b) of the Bankruptcy Code provides that:

> (b) After notice and a hearing, there shall be allowed administrative
> expenses, other than claims allowed under section 502(f) of this title,
> including—
>
> . . . .
>
> (3) the actual, necessary expenses, other than compensation and
> reimbursement specified in paragraph (4) of this subsection, incurred by—
>
>     . . . .
>
> (D) a creditor, an indenture trustee, an equity security holder, or a committee
> representing creditors or equity security holders other than a committee
> appointed under section 1102 of this title, in making a substantial
> contribution in a case under chapter 9 or 11 of this title;
>
>     . . . .
>
> (4) reasonable compensation for professional services rendered by an
> attorney or an accountant of an entity whose expense is allowable under

19

> subparagraph . . . (D) . . . of paragraph (3) of this subsection, based on the
> time, the nature, the extent, and the value of such services, and the cost of
> comparable services other than in a case under this title, and reimbursement
> for actual, necessary expenses incurred by such attorney or accountant;
> (5) reasonable compensation for services rendered by an indenture trustee
> in making a substantial contribution in a case under chapter 9 or 11 of this
> title, based on the time, the nature, the extent, and the value of such services,
> and the cost of comparable services other than in a case under this title;

11 U.S.C. § 503(b)(3)–(5).

Accordingly, sections 503(b)(3) and (4) permit a debtor to reimburse a party's reasonable professional fees and expenses incurred while making a substantial contribution to a bankruptcy case. *See, e.g., In re Granite Partners, L.P.*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).

The term "substantial contribution" is not defined in the Bankruptcy Code, but courts have recognized that the substantial contribution inquiry is factual, taken in consideration of the policy goals of the Bankruptcy Code. *See In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010). Substantial contributions awards are "designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses." *In re Granite Partners*, 213 B.R. at 445. To qualify as "substantial," the benefit to the estate must be "more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *In re Dana Corp.,* 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (*citing Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994)). Thus, creditors face an "especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." (*Id.* (internal citations omitted).) Similarly, awards are not designed "to reward . . . unofficial committees who merely furthered their own or their constituents' interests." *In re Bayou Grp. LLC*, 431 B.R. at 562.

A substantial contribution reimbursement, rather, "is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration

20

of the estate." *In re Am. Preferred Prescription, Inc.*, 194 B.R. 721, 727 (Bankr. E.D.N.Y. 1996)

(citing *In re Best Products Co.*, Inc., 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994)).  Extensive case

participation alone, or efforts that "[duplicate] those of professionals already compensated by the

estate," are not substantial contributions.  *In re Bayou Grp. LLC*, 431 B.R. at 561.  Accordingly,

"the majority of cases allowing creditors' substantial contribution claims . . . have, therefore,

found that the creditor played a leadership role that normally would be expected of an estate-

compensated professional but was not so performed."  *Id.* at 562.

The burden of proof is on the applicant, and "entitlement to an award must be established

by a preponderance of the evidence."  *In re Synergy Pharms. Inc.*, 621 B.R. 588, 610 (Bankr.

S.D.N.Y. 2020) (citing *In re Ocean Blue Leasehold Property LLC*, 414 B.R. 798, 809 (Bankr.

S.D. Fla. 2009)).  Courts apply the substantial contribution test in "hindsight" and, as such, must

consider whether the applicant has provided an actual benefit to the case.  *In re Granite Partners*,

213 B.R. at 447.  Thus, the applicant "must show a 'causal connection' between the service and

the contribution."  *Id*. (citing *Matter of DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir.

1997)).

Courts in this Circuit have considered the following factors in determining whether the

"substantial contribution" test has been satisfied: (i) whether the services in question were

provided to benefit all parties in the case (not merely a class or creditors or interest holders), (ii)

whether the services conferred a direct, significant and demonstrably positive benefit to the

estate, and (iii) whether the services were duplicative of services performed by others (such as

estate professionals).  *See, e.g. In re Synergy Pharms Inc.,* 621 B.R. at 609 (citing *Trade Creditor

Grp. v. L.J. Hooker Corp. (In re Hooker Invs., Inc.)*, 188 B.R. 117, 120–21 (S.D.N.Y. 1995),

*aff'd*, 104 F.3d 349 (2d Cir. 1996)).  As Judge Garrity explained in *Synergy Pharmaceuticals*,

"services that warrant a substantial contribution award 'generally take the form of constructive contributions in key reorganizational aspects, when *but for* the role of the creditor, the movement towards final reorganization would have been substantially diminished.'" *In re Synergy Pharms., Inc.*, 621 B.R. at 610 (citing *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at \*2 (Bankr. S.D.N.Y. Aug. 5, 2014)).

Courts have awarded fees and expenses for substantial contributions where the creditor took a leadership role in a case, thereby achieving results that the estate-compensated professionals either could not achieve or did not attempt to achieve. *See In re Granite Partners, L.P.*, 213 B.R. at 451 (illustrating that unofficial committee's counsel facilitation of important settlements, help in resolving confirmation obstacles and establishment of the post-confirmation administration of the estates constituted a substantial contribution to the case that all parties agreed upon); *see also Marcus Montgomery Wolfson & Burten, P.C. v. AM Int'l (In re AM Int'l)*, 203 B.R. 898, 901–06 (D. Del. 1996) (indicating how AMI Shareholders Group, who argued that the plan grossly undervalued the reorganized debtor and assumed a leadership role before and after the appointment of the AMI Equity Committee, was instrumental in the warrant structure development permitting equity holders to capture the value in the debtor's stock, thus receiving substantial contribution reimbursement); *In re Texaco, Inc.*, 90 B.R. 622, 627–29 (Bankr. S.D.N.Y. 1988) (concluding that attorneys who filed prepetition derivative action insisting on additional disclosure regarding third party releases under the plan ultimately protected the interests of, and added potential value for, all shareholders).

Courts have denied substantial contribution applications when the applicant fails to show a causal connection between their actions and the benefit to the estate, when there was no demonstrable benefit to the estate, and where the work was duplicative of other estate-

compensated professionals.  *See, e.g., In re Granite Partners, L.P.*, 213 B.R. at 449–54.  Once a substantial contribution has been demonstrated, the applicant must then establish that the requested fees are "reasonable . . . based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title," and that the expenses are "actual and necessary."  11 U.S.C. § 503(b)(4); *see also In re Bayou Group, LLC*, 431 B.R. at 566.

A creditor is not entitled to an award for time his or her attorney spent on tasks lacking a causal relationship to the substantial contribution or relating to client services, including time spent on "case administration, monitoring and education," which the applicant must prove by a preponderance of the evidence.  *See* 11 U.S.C. § 503(b)(3)–(4); *see also In re Granite Partners*, 213 B.R. at 451–52 (noting that segregating compensable and non-compensable services would be a "herculean task" that the court should not be obliged to do, given that burden of proof falls on the applicant).

Additionally, bankruptcy courts disagree whether professionals other than attorneys or accountants, such as financial advisors, are compensable as substantial contributions.  4 COLLIER ON BANKRUPTCY 503.11 (16th 2023) (describing the disagreement between the courts); *see also In re Granite Partners*, 213 B.R. at 454 (finding that section 503(b)(4) limits reimbursement to attorneys and accountants, thereby disallowing compensation for financial advisors); *In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007), *aff'd*, 406 F. App'x 634 (3d Cir. 2011) (finding that management consultant fees were non-compensable under section 503(b)(4)); *In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006), *subsequently aff'd*, 308 F. App'x 824 (5th Cir. 2009*)* (stating the inability to "award expert witness (or financial advisor) fees under Code § 503(b)(4)"); *Matter of Baldwin-United Corp.*, 79 B.R. 321, 341 (Bankr. S.D. Ohio 1987)

23

(holding that § 503(b)(4) "limits compensation to attorneys and accountants only"); *In re Keene Corp.*, 208 B.R. 112, 116 n.8 (Bankr. S.D.N.Y. 1997) (dicta). *But see In re ITC Deltacom, Inc.*, No. 02-11848(MFW), 2006 WL 839395, at *1 (D. Del. Mar. 29, 2006) (finding that § 503 includes financial advisors); *cf. In re AM Int'l Inc.*, 203 B.R. 898, 904–905 (D. Del. 1996) (granting substantial contribution to a financial advisor without addressing the scope of § 503(b)(4)).

## III.   DISCUSSION

### A. Debtor and Committee Support

Various Applications were supported or unopposed by the Debtors and Committee per the terms of various settlements. The Debtors supported the Earn App., the Custody App., the Withhold App., the Tuganov App., the Herrmann App., and the Frishberg App. (together, the "Debtors Supported Applications"). (Debtors' Limited Objection ¶ 2 n.6.) The Debtors characterized their Supported Applications as those of parties "actively involved in these Chapter 11 Cases and . . . key participants in the Settlements, all of which resolved critical legal issues regarding the treatment of certain classes contained within the Plan and further propelled the Chapter 11 Cases forward to a successful resolution . . . ." (*Id*. ¶ 2.)

The Debtors explained that these parties "brought creative solutions and unique perspectives to complex issues requiring bespoke solutions," and whose "support for the Settlements and the Plan likely built additional consensus and votes for the Plan, and thereby helped the Debtors exit chapter 11 quicker than without such support." (*Id*.) During the Hearing, counsel for the Debtors re-emphasized the support for the ad hoc groups, stating that:

> [W]e would simply not be here without the ad hoc groups. I don't believe that we would have a confirmable plan. I don't think that we would have had the votes that we had. It was integral to the process that these individuals who are unsophisticated in terms of the Bankruptcy Code had

24

counsel representing them and advising them on the way that bankruptcy works. Before these ad hoc groups were involved, we saw all sorts of motions. You saw motions to convert the cases to Chapter 7, you saw motions to force mediation. You saw a variety of lift stay motions.

And order really came to the case in large part because of these represented parties. And as I said at the beginning of my argument, I think pro se parties filed less court filings because they saw that there was a lawyer on the scene who was representing their interests and they didn't necessarily need to be involved. So I think that this case is very unique and their contributions are different from the contributions of your ordinary ad hoc group who are really just representing their own interests. Each of these groups has done what they can to move the cases forward.

We had a disorganized group of creditors before the arrival of these ad hoc groups. This is very different from a normal case that has sophisticated parties. And it really brought order to the case that was crying out for it.

(Jan. 11, 2024 Hr'g Tr. 71:12–25, 72:1–8.)

The Debtors Limited Objection specifically address Tuganov's counsel, Venable, as having gone "above and beyond merely advocating for [its] client—[its] actions had a demonstrable impact on the Debtors' Estates and as such, his efforts constitute a substantial contribution." (*Id.*) During the Hearing, Counsel again reiterated support, emphasizing that Togut had been "instrumental" in expanding the scoper of the Examiner's report, and that he was "helpful in mediation and in helping drive concensus there. I don't believe we would have been able to do it without him or his counsel." (Jan. 11, 2024 Hr'g Tr. 72:23–25, 73:1–3.)

The Committee supported the Earn App., the Custody App., the Withhold App., and the Dixon/BF Apps. in part (together, the "Committee's Supported Applications"). (Committee Statement ¶ 3.) The Committee did not expressly support the applications of Herrmann or Gallagher[9] but noted their "participation in achieving the [Class Claim Settlement] significantly

---

[9]      At the Hearing, counsel to the Committee stated that it "defer[red] to the Court as to what is a reasonable expense with respect to [Ms. Gallagher]." (Jan. 11, 2024 Hr'g Tr. 76:15–16.)

streamlined distributions, reduced administrative expenses and . . . enable[d] the Debtors to get funds back to creditors quicker," thus constituting a substantial contribution.  (*Id*. ¶ 5.)

The Committee premised its support for these Applications on the parties having "negotiated separate settlements with the Debtors and the Committee that were widely accepted by their respective classes and were integral to confirmation of the Plan" and having "developed methods to communicate with wider groups of creditors, similarly situated and otherwise, which was essential for many of those creditors to understand these complicated cases and protect their rights."  (*Id*. ¶ 3.)  The Committee further contended the settlements "contributed to the equitable distribution of the Debtors' estates, building consensus, and moving these cases towards confirmation.  Accordingly, those efforts benefited the Debtors' estates as a whole."  (*Id.* ¶ 4.)

The settlements the Debtors reached with the applicants included language that contractually obligated non-opposition to some Applications.  The fee and expense reimbursement language in the settlements with the Custody Group and Withhold Group read: "[t]he Debtors agree not to object to or otherwise oppose . . . [the] filing of applications pursuant to section 503(b)(3)(D) of the Bankruptcy Code for payment of the reasonable and documented fees and out of pocket expenses . . . ."  ("Custody Settlement," ECF Doc. # 2291-1 § 9; "Withhold Settlement," ECF Doc. # 2509 at 5.)  Similarly, the Class Claim Motion provided that the Plan "[shall] provide for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating pro se claimants in their individual capacities, and Ignat Tuganov, under Section 503(b)(3)(D) of the Bankruptcy Code . . . ."  ("Class Claim Motion," ECF Doc. # 3064 at 44.)  The Debtors and Committee also agreed to not oppose substantial contribution applications by Mr. Wildes or Mr. Caceres and by Dixon.  ("Discovery

Settlement," ECF Doc. # 3486-1; "Plan Support Agreement," ECF Doc. # 3516.)  Accordingly, *affirmative support* by Debtors and Committee, who are economic stakeholders—as opposed to merely the bargained-for *non-opposition*—is given weight as the Court deems appropriate.[10]

### B.  UST Objection

The UST objected to all the Applications, raising similar concerns about the Applications of both ad hoc groups and the individuals.  (*See* UST Objection at 8.)

The UST characterized the Applications of the ad hoc groups as both duplicative and unnecessary.  (*Id.* at 36.)  Specifically, the UST claimed that the issues presented by the Custody Group in the Custody App. would have otherwise been dealt with by the Debtors, who identified the very same issues at the first-day hearing.  (*Id.* at 44–45.)   The UST claimed that the Withhold App., by the Group's own admission, "[did] not even try to argue that it benefitted other creditors but merely stated [its] efforts 'were aimed at ser[ving] the more general good.'" (*Id.* at 48.)  The UST also emphasized that benefits to the estate listed by the Earn Group were, in fact, benefits for either specific account holders or no one at all.  (*Id.* at 32, 46.)

The UST emphasized the lack of clarity or connection between the actions of the individuals and case events that constitute a substantial contribution.  (*Id.* at 46–47, 48, 54, 57–58, 59–60.)  The UST stressed that Mr. Tuganov's substantial contribution to this case is unclear, given that estate-paid professionals were "already in active negotiations regarding the Examiner and the Examiner's scope," so Mr. Tuganov's claim is moot.  (*Id.* at 48–49.)  As for Mr. Dixon, the UST argues that he did make a single substantive filing on the docket, and that Mr. Dixon's "various positions with and related to Celsius since the Petition Date" were unpaid.  (*Id.* at 54.)

---

[10]      The Debtors emphasized this point during the hearing: "I had frankly expected to file a milquetoast joinder and stand up here and have some brief remarks and let the applicants carry the water.  But we think it's appropriate because they have really done so much to move the cases forward."  (Jan. 11, 2024 Hr'g Tr. 74:9–14.)

The UST claimed that the Frishberg App., the Herrmann App., the Gallagher App., and the Wildes App. all lack the requisite causality to establish a substantial contribution. (*Id.* at 47, 57, 58–60.) Specifically, the UST maintains that Mr. Frishberg and Mr. Herrmann did not establish how their participation in the Class Claim Mediation constituted a substantial contribution, especially in light of the attendance of other parties. (*Id.* at 57–58.) The UST also argued that Ms. Gallagher and Mr. Wildes, by not providing detail of their efforts as it relates to the estate, do not attempt to demonstrate their substantial contributions to the estate. (*Id.* at 47, 59–60.)

### C.  Custody Group Application

The Custody Group, through its counsel Togut, sought **$740,447.50** in fees and **$0.00** in expenses for the period of August 1, 2022 through August 31, 2023. (Custody Reply ¶ 4.) The Custody App. is supported by the Debtors and Committee and opposed by the UST.

The Custody Group emphasized that the Custody Settlement was "the very first broad-based customer settlement agreement reached by the Debtors in these Chapter 11 Cases and forms one of the many building blocks for the Debtors' proposed plan." (Custody App. ¶ 22.) The party contended that the Custody Settlement formed the basis for many settlements incorporated into the Plan and that the resolution of the Custody issues advanced the bankruptcy process and allowed the Debtors to avoid expensive preference actions and the litigation costs of determining the Custody users' status. (*Id.* ¶¶ 40–41.) The Custody Group further argued that the Custody Settlement increased the Debtors' Estates since it provided Custody users who did not opt into the Settlement with the option to receive the same 72.5% recovery by voting in favor of the Plan. (*Id.* ¶¶ 23, 38.) The Custody Group also noted that, based on the voting report ("Voting Report," ECF Doc. # 3560), the Custody account holders accepted or were deemed to accept the plan by 99% in number and 98% in amount. (Custody App. ¶ 25.) Togut estimated

that the Debtors received more than $37.7 million in value from these figures and the 27.5% of the Custody Assets remaining in the Debtors' Estates. (*Id.* ¶¶ 25, 38.)

The UST argues that the Custody Group's contributions were duplicative of the Debtors' and the Committee's efforts, as the issues presented by the Custody Group would have otherwise been dealt with by the Debtors. (UST Objection at 44.) The UST also argues that the Custody App. fails under the reasonableness standard because the fee details contain no meaningful breakdown in categories of work making it difficult to determine which fees are reasonable and compensable, and even so, there are several entries related to case administration and client communications. (*Id.* at 45–46.) The Custody Group argues that its representation was not duplicative of other estate professionals since the Debtors initially refused to return the Custody Assets, and the Custody users had interests adverse to other claimants. (*Id.* ¶ 43.)

The Custody App. is evaluated by asking (i) whether the services in question were provided to benefit all parties in the case, (ii) whether the services conferred a direct, significant and demonstrably positive benefit to the estate, and (iii) whether the services were duplicative of services performed by others. *See, e.g. In re Synergy Pharmaceuticals, Inc.*, 621 B.R. at 609.

Thorough examination establishes that the Custody Group's actions constituted a substantial contribution in part. Resolving Custody treatment issues moved this case towards plan confirmation since the Settlement resolved substantial preference issues and avoided the possibility of "thousands if not tens of thousands of preference lawsuits, and confirmation objections." (Custody App. ¶ 41.) While the UST may be correct that the Debtors and Committee would *eventually* have resolved these issues, the existence and involvement of the Custody Group meant that the Debtors did not need to individually respond to and potentially litigate an onslaught of *pro se* letters, objections, or lawsuits.

The savings to the estate of marshalling the issues though the Custody Group is not pure

conjecture: the Debtors' experience with the Earn account holders, prior to the creation of the

Earn Group, provides insight into the proverbial cat-herding the Debtors had to undertake

without a single representative counterparty, and is an apt comparison here:

> The Custody and Withhold experience was different because of the involvement of the Custody and Withhold ad hoc groups. Very early on in the case, they filed their litigation. And I think if you compare the filings of the Earn accountholders and of the Custody and Withhold accountholders, there were almost none for Custody and Withhold because they felt like they had a voice. They felt like they had somebody that was representing them. And I think that it ultimately inured to the benefit of the estate and reduced the cost of the estate that we had one streamlined litigation . . .
>
> [G]iven the administrative run rate of these cases, the cost that we would have all incurred to deal with what certainly would have been many more pro se motions, letters, objections, was significantly reduced by the experience that we had with Custody and Withhold. Had these ad hoc groups not had been here, we would have had to go through the Earn experience all over again. We would have had to file a motion about ownership of property of the estate and we likely would have had dozens of objections and had to put on testimony. I think it is beyond a doubt if you compare the Earn experience with the Custody and Withhold experience, it's wildly different because of [their] participation.

(Jan. 11, 2024 Hr'g Tr. (Koenig) 65:20–25, 66:1–5, 67:17–55.)

Thus, the source of the substantial contribution is not necessarily that other similarly

situated Custody account holders *benefitted* from the actions of the Custody Group, or that the

Custody Group *participated* in a settlement. That argument could be made in any bankruptcy

where a small group of creditors advocate for themselves and reach a settlement which

incidentally benefits other similar creditors. Rather, the distinguishing factor here (which applies

to the other ad hoc groups as well) is that the existence of these groups allowed for even the

*possibility* of settlement *discussions*, and the ultimate effectuation of the resulting settlements,

rather than the Debtors burning through estate resources by playing whack-a-mole with

thousands of individual creditors.  It was the "when [the Debtors] got to deals with the Custody

and Withhold Ad Hoc Groups" that they "realized that we had a good chance to propose and

confirm a plan . . . because we knew that we had groups of creditors that had organized, that

could reach a reasonable and value-maximizing settlement . . . that would allow these estates to

move forward and get out of bankruptcy."  (*Id.* 68:1–8.)

    Rather than being *duplicative* of the Debtors' or Committee's efforts, the Custody Group

(and other ad hoc group's) were complimentary, allowing the bankruptcy process to function as

designed and intended.  Thus, the Custody Group's efforts in effectuating the Custody

Settlement fall squarely within the ambit of "services take the form of constructive contributions

in key reorganizational aspects, when but for the role of the [applicant], the movement towards

final reorganization would have been substantially diminished."  *In re Synergy Pharms., Inc.*,

621 B.R. at 610 (quoting *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at *2

(Bankr. S.D.N.Y. Aug. 5, 2014) (internal quotation marks omitted)).

    Second, the Custody Group's benefits to the Estates go beyond their role in streamlining

the process of negotiating and settling with Custody holders—by effectuating the Custody

Settlement, the Debtors' Estates retained $37.7 million of cryptocurrency via the Custody

Account Holders forfeiting 27.5% of their Custody account balances.  (Custody App. ¶ 38.)

Custody assets were account holder property; thus, this division was not merely a compromise to

avoid a determination of who owned the assets, but rather an additional significant and

demonstrable benefit to the Estates, which further tips the scale in favor of the Custody Group.

*See In re KiOR, Inc.*, 567 B.R. 451, 459 (D. Del. 2017) (internal citations omitted).

    However, the applicant must prove the expenses were necessary and related to the

specific benefit incurred—here, the "cornerstone" Custody Settlement—and may not be

compensated for "case administration, monitoring and education; such services are deemed to be performed for client." *In re Granite Partners, L.P.*, 213 B.R. at 453.  The UST noted that Custody App. is replete with time billed to case administration and client communication.  (UST Objection at 39–40; *see* Custody App, Ex. B, Ex. 1.)  In the Custody Reply, the Custody Group retracted its expense request entirely.  (Custody Reply ¶ 4.)  The revised Togut Time Detail in the Custody Reply also took a voluntary haircut of $48,505.50 in fees.  (Custody Reply ¶ 4.)

Nevertheless, a large portion of the Togut time records is for non-compensable activities, such client services and case administration, *In re Granite Partners, L.P.*, 213 B.R. at 451, or do not relate to the activities which the Court has recognized as a substantial contribution. "Ultimately, what constitutes a substantial contribution must be left to the informed discretion of the Court based upon the time sheets and other relevant evidence." *Matter of Baldwin-United Corp.*, 79 B.R. 321, 338 (Bankr. S.D. Ohio 1987).  Although the Court "should not be required to engage in the 'herculean' task of segregating compensable from non-compensable services," given the unique circumstances of this case, the Court has undertaken that herculean task.  *In re Granite Partners*, 213 B.R. at 452.  The Court finds that **$175,622.00** in requested fees a reasonable award.  This award encompasses the Custody Group's contributions to the Settlement, Plan and Estate as a whole per a factual inquiry by the Court.  The Custody App. is thus **GRANTED** in that amount.

### D.  Withhold Group Application

The Withhold Group, through counsel Troutman, sought **$183,871.100** in fees and **$3,745.61** in expenses.  (Withhold App. ¶ 24; Withhold Reply ¶ 18.)  The Withhold Group argued that they acted not only for their own benefit, but for the benefit of all Withhold account holders and for the "general good."  (Withhold App. ¶ 24 ¶ 28.)  The Withhold Settlement was

made available to all Withhold account holders, who overwhelmingly accepted by the Plan. (*Id.* ¶ 29.) Specifically, Withhold Claims (Class 7) voted in favor 98.79% by number and 82.56% by amount. (*Id.* ¶¶ 21–22.) Further, the Withhold Group maintained that it provided an actual and demonstrable benefit to the estate, citing to *Mirant Corp.* for the proposition that properly allocating value among creditors can constitute a substantial contribution. (*Id.* ¶ 32–33; *see also* 354 B.R. at 132.)

The Withhold Group, similarly to the Custody Group with respect to the Custody Settlement, contended that the Withhold Settlement prevented protracted, costly litigation over a gateway legal issue. (*Id*. ¶¶ 33–34.) The Withhold Group argues that the Withhold Settlement paved the way for a largely consensual plan and preserved 85% of the Withhold assets[11] for the benefit of the Debtors' Estates and its general unsecured creditors. (*Id.*) The Withhold Settlement resolved the status of the Withhold assets and relieved creditors stuck in limbo without further costly litigation on key legal issues all while helping a largely consensual plan be reached. (*Id.* ¶ 21.) Consequently, the Withhold Group claimed its contribution not only benefitted themselves, but the case as a whole. (*Id.* ¶ 35.) The Withhold Group argued that its services were not duplicative of estate professionals as they served as a "necessary counterpoint" between the Withhold account holders and the Debtors and Committee. (*Id.* ¶ 36.) The Withhold Group also asserts that its fee and expense request is reasonable and specifically notes that it is not seeking reimbursement for its "objection to the Debtors' Disclosure Statement, negotiation of the ADR Procedures set forth in the Plan, or participation in the confirmation hearing." (*Id.* ¶ 38.)

---

[11]    Withhold assets were valued at approximately $12.3 million at the time of the Pause.

The analysis for the Withhold Group's contribution is evaluated according to the same criteria discussed in the Custody Group inquiry, and is incorporated by reference. While a bankruptcy settlement may not typically constitute "rare and extraordinary circumstance when the creditor's involvement truly enhances the administration of the estate," *In re Am. Preferred Prescription, Inc.*, 194 B.R. at 727, here, as with the Custody Group, the Withhold Group's involvment in the Class Claim Mediation and resulting settlement—considering their role as representative for a numerous and diffuse class of creditors who could not otherwise be bargained with collectively—constitutes a compensable substantial contribution.

Accordingly, this Court finds that **$84,524.00** in requested fees are reasonable with respect to the Withhold Groups contribution. The Withhold App. is **GRANTED** in that amount.

This total does not include any expenses. "With respect to time records for services rendered, vague descriptions which lack the details necessary to permit the court to assess the reasonableness of the applicant's work are also not permitted." *In re GSC Grp., Inc.*, 502 B.R. 673, 742 (Bankr. S.D.N.Y. 2013) (internal citation omitted)). The expenses requested by Troutman did not include sufficient detail or were exceedingly general and could not be deciphered by this Court as to its relation to the Class Claim Mediation.

### E.  Earn Group Application

The Earn Group, through counsel Offit, sought **$326,262.00** in fees, **$6,774.55** in expenses incurred by counsel, and **$4,830.82** in expenses incurred by members who participated in the Class Claim Mediation and, in the instance of Rebecca Gallagher, expenses incurred as a lead plaintiff. (Earn App. ¶ 10.) Offit sought payment and reimbursement for the period of April 12, 2022 through September 28, 2023. (*Id.* ¶ 25.) Offit stated that $13,590 in fees were

expended preparing the Earn App. (*Id.*) Offit also "reserve[d] the right to seek" future fees and expenses through the Effective Date of $100,000.00. (*Id.* ¶ 26.)

The Earn Group contended that its services aided parties beyond its constituency and that its services provided a demonstrable benefit upon the estate. (*Id.* ¶ 17.) Specifically, the Earn Group listed the following benefits to the estate: (1) "[c]reating and maintaining a global forum to educate and build Plan consensus among Earn and other account holders," (2) "[p]laying a critical role in resolving the Earn versus Borrower claim treatment disputes, through the Mediation," (3) "[p]romoting the mechanism, through the Term Sheet, for resolving the [Class Claim], saving the estate significant litigation costs and boosting creditor recovery up to 105% of scheduled claims with respect to over 30,000 individual, non-claims against the Debtors," (4) "[n]egotiating the placement of three significant Earn account holders on the NewCo Board, thus assuring additional Earn creditor 'eyes and ears' going forward," (5) "[n]egotiating the placement of a significant Earn account holder to the LOC, which is responsible for pursuing future litigation recoveries for unsecured creditors," and (6) "[p]romoting Plan acceptance actively and extensively through social and other media, contributing to an unprecedented level of support for a plan in a Chapter 11 cryptocurrency case." (*Id.*)

The Earn Group maintained that its services did not duplicate estate professionals' efforts since they provided a voice to the larger Earn faction, alerted the Debtors and Committee to governance issues for NewCo, and promoted creditor confidence in the Plan. (*Id.*)

The Earn Group attended the Class Claim Mediation with a lead plaintiff and other creditors, and the resulting settlement resolved the significant conflict of the Earn and Borrower constituencies regarding treatment under the Plan. (Earn App. ¶¶ 2–3.). The analysis for the Earn Group's contribution is evaluated according to the criteria discussed *supra* in the Custody

Group and Withhold Group inquiries.  Based on the same reasoning, the Earn Group's

contributions related to the Class Claim Mediation constitute a substantial contribution

The Court agrees with the Earn Group that its services were not duplicative of estate

professionals, and critically, provided a voice to the larger Earn constituency's concerns.  (*See id.*

¶ 17.)  Before the Earn Group came "on the scene," the Earn creditors, who were "far and away

the largest constituency" had proved to be a "bit of an unruly and disorganized group."  (Jan. 11,

2024 Hr'g Tr. (Koenig) 69:16, 69:19–20.)  During the first six months of the case, there was an

onslaught of "individual pro se motions largely from Earn accountholders who were trying to

litigate the issue of property."  (*Id.* 65:8–10.)  The Debtors and Committee were proceeding in

"fits and starts trying to come up with an efficient process" to address the tens of thousands of

proofs of claim.  (*Id.* 69:1–5, 70:13–15.)  Though the property issues were eventually resolved

by the Court's ruling on Earn assets (*see* ECF Doc. # 1822; *In re Celsius Network LLC*, 647 B.R.

631 (Bankr. S.D.N.Y. 2023)), the process undertaken was "was incredibly inefficient, led to dozens

of objections, required many depositions, required testimony of witnesses and ultimately was a very

expensive endeavor.  And importantly, the Earn Ad Hoc Group was not there for that."  (*Id.* 65:14–

17.)

When the mediation motion was first filed, the Debtors opposed it because they "did not

believe that it was a good use of time or resources to negotiate with a couple of individual *pro se*

creditors," acknowledging the futility of attempting to "build a consensus by negotiating with a

couple of creditors in a room."  (*Id.* 69:4–8.)  The emergence of the Earn Group represented a

sea change: it reduced the expensive flood of *pro se* letters and motions to a comparative trickle,

as creditors with valid concerns felt represented.  The Debtors were finally able to negotiate with

a single counterparty rather than attempting to address each one-off communication: it was

"when Ms. Kuhns got on the scene and organized her group," that the Debtors finally felt

36

"comfortable that negotiating with the Earn Ad Hoc Group meant negotiating with Earn . . . it was only because of the emergence of the Earn Ad Hoc Group that we felt mediation was reasonable and appropriate at the time that it was, and that mediation was widely successful . . . [the resulting Class Claim Settlement] is another cornerstone of the plan." (*Id.* 69:11–12, 69:13–25, 70:1.)

Provided that "[c]reditors face an especially difficult burden in passing the substantial contribution test since they are presumed to act primarily in their own interests," the Earn Group overcame that burden with respect to the Class Claim Mediation. *In re Dana Corp.*, 390 B.R. at 108 (internal citations omitted). Bringing order to the prior chaos of the Earn constituency, and resolving the Class Claim with the Debtors was no small feat and, as such, the Earn Group provided a substantial contribution to the cases.

Offit also requested expense reimbursement related to its attorneys' and various *pro se* creditors' participation in the Class Claim Mediation in their capacities as Earn Group members: Emmanuel Herrmann, Rebecca Gallagher, Daniel Frishberg, and Brett Perry. (*See* Earn App. Group Member Expense Records, "Earn Member Exp. Records," ECF Doc. # 3654-1.) Having established that the Class Claim Settlement constituted a substantial contribution, expenses relating to its attendance (by both *pro se* creditors and Offit attorneys, as counsel to the Earn Group) will be reimbursed in full.

Ms. Gallagher was lead plaintiff. While her expenses relate to a pre-mediation meeting, the meeting was "crucial" in Ms. Gallagher's decision to serve as lead plaintiff that, as Ms. Gallagher argues and this Court agrees, was made for the benefit of all creditors without personal gain. (*Id.*; Earn Reply ¶ 9.)

Precedent supports incentive fees to lead plaintiffs in class actions, which Ms. Gallagher

did not receive; as such, it is reasonable to provide at least reimbursement of expenses.  *See, e.g.,*

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (holding that incentive

awards "compensate class representatives for work done on behalf of the class, to make up for

financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize

their willingness to act as a private attorney general"); *see also Berry v. Schulman*, 807 F.3d 600,

613 (4th Cir. 2015) (citing *Rodriguez*, 563 F.3d at 958–59); *Humphrey v. United Way of Tex.*

*Gulf Coast*, 802 F. Supp. 2d 847, 868 (S.D. Tex. 2011) (same); *Sauby v. City of Fargo*, No. 3:07-

CV-10, 2009 WL 2168942, at *2 (D.N.D. July 16, 2009) (same).

Reimbursement related to the Class Claim Mediation does not, however, include

reimbursement of other miscellaneous expenses.  "[Section 503(b)(3)(D)] requires the

bankruptcy judge to . . . distinguish between expenses incurred in making a substantial

contribution to the case and expenses lacking that causal connection, the latter being

noncompensable."  *Matter of DP Partners Ltd. P'ship*, 106 F.3d 667, 673–74 (5th Cir. 1997);

*see also Matter of Baldwin-United Corp.*, 79 B.R. 321, 341 (Bankr. S.D. Ohio 1987) (stating that

"[t]he lack of any time sheets or receipts makes it impossible for [the court] . . . to determine how

the requested fees and expenses were generated, let alone whether they constituted a substantial

contribution to the case."))  The lack of detail provided by Mr. Herrmann in his miscellaneous

expenses and failure to demonstrate why the webhosting charges constitute a substantial

contribution does not allow this Court to determine that they were causally connected.  (*See* Earn

Member Exp. Records.)  Accordingly, those expenses will not be reimbursed.

Accordingly, based on review of the Offit Time Records, Court finds that **$101,020.94** in

requested fees and expenses by Offit is a reasonable award, and the Earn App is **GRANTED** in

38

that amount.  This award encompasses the Earn Group's requested expenses related *only* to the attendance of the Class Claim Mediation for both attorneys and Earn Group members.[12]

### F.  Borrower Group Application

The Borrower Group, through counsel M&E, sought **$1,018,265.50** in fees and **$1,957.97** in expenses.  (Borrower App. ¶ 4.)  M&E is only seeking payment and reimbursement for time expended after October 3, 2022.  (*Id.* ¶ 15.)  The analysis for the Borrower Group's contribution is evaluated following the criteria discussed *supra* in the Custody Group, Withhold Group and Earn Group inquiries.

Here, the Borrower Group does not satisfy the high burden of its actions constituting a substantial contribution.  Substantial contributions are evaluated in "hindsight" and, as such, must consider whether the applicant has provided actual benefits to the case.  *In re Granite Partners*, 213 B.R. at 447.  Substantial contributions "are those which foster and enhance, rather than retard or interrupt the progress of reorganization."  *In re Richton Int'l Corp.*, 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981).

It is true that the Borrower Group participated in the Class Claim Mediation, along with the other ad hoc groups.  However, the Borrower Group's objection to the Wind-Down Motion threw an unnecessary and blatantly self-interested wrench in the pivot of the Orderly Wind-Down—which, as discussed in Wind-Down Opinion granting the Wind-Down Motion, appeared to be a decision made only by its steering committee, not even by the group as a whole.  (*See* Wind-Down Opinion at 25.)  This attempted destruction of value did not "foster and enhance" the reorganization, but rather disrupted its progress.  (*Id*.)  The Debtors and Committee, who had

---

[12]    For the avoidance of doubt, the award does not include the "Miscellaneous Group Expenses Subtotal" of $6.954.55, third-party "Twitter monitoring," docket summary or extraction services, or Google workspace hosting.

initially supported the Borrower App., both retracted their support based on the Borrower's objection to the Wind-Down Motion.

Even if the Borrower Group had satisfied the burden of making a substantial contribution, M&E provided no substantiation of their fees or their expenses. (*See id*. at 52.)  The Borrower Group promised to "provide unredacted copies of McCarter's time records to the [UST] and the Court not later than October 9, 2023," but failed to do so.  (Borrower App. ¶ 13; *see also* UST Objection at 45.)  As such, it is impossible for the Court to determine the reasonableness of their request, and since this burden rests on each applicant, the Borrower App. fails independently on these grounds.  *See In re Synergy Pharms., Inc.*, 621 B.R. at 610.  Therefore, the Borrower Group's Application is **DENIED**.

### G.  Tuganov Application

Tuganov, through counsel Venable, sought reimbursement for services provided from October 17, 2022 through December 29, 2023.  The initial Tuganov App. sought **$1,383,089.00** in fees and **$6,803.46** in expenses.  (Tuganov App. ¶ 33.)  At the time of the Tuganov App., he also sought reimbursement of future fees of **$300,000.00**.  (*Id.* ¶ 21.)  The Second Tuganov App. sought **$194,860.50** in fees for work done on September 12, 2023 through and including November 9, 2023 (the "Confirmation Period").  The Third Tuganov App. sought **$180,991.00** in fees for work done on November 10, 2023 through and including December 29, 2023 (the "Post-Confirmation Period").

Tuganov argued that his Ponzi filings and his support and negotiations in the Class Claim Mediation were substantial contributions, claiming that "Venable's participation in this process was invaluable to the estate-paid professionals."  (Tuganov App. ¶¶ 11, 27.)  Tuganov also contended his actions went beyond his own self-interest, since expanding the scope of the

Examiner's investigation was for all creditors' benefit and ultimately resulted in consensus at the Mediation. (*Id.* ¶ 28.) Tuganov also maintained that his fees and expenses are reasonable since he sought reimbursement only for costs related to benefits that he and Venable conferred upon the estate and that details of those costs were provided to the UST and this Court. (*Id.* ¶ 34.)

The analysis for the Pending Withdrawal Group's contribution is evaluated by asking (i) whether the services in question were provided to benefit all parties in the case, (ii) whether the services conferred a direct, significant and demonstrably positive benefit to the estate, and (iii) whether the services were duplicative of services performed by others. *See In re Synergy Pharmaceuticals, Inc.*, 621 B.R. at 610. Unlike the ad hoc groups, Tuganov did not represent an independent constituency; nevertheless, his efforts and involvement went over and beyond those of a creditor acting merely to protect his interests, and conferred significant benefits on the Debtors' estates.

The contributions of Tuganov and Venable are highlighted by both the Debtors and Committee. The Debtors emphasize that "[i]n particular, counsel to Ignat Tuganov . . . went above and beyond merely advocating for his client – his actions had a demonstrable impact on the Debtors' Estates." (*See* Debtors' Limited Objection ¶ 2.) The Committee stated that "[Tuganov's participation] helped clarify the Debtors' prepetition conduct and provided a common set of facts through which the parties could weigh their relative rights" and "provided valuable insight in addressing key issues in the construction of the Plan and Class Claim Settlement. (Committee Statement ¶ 7.)

Here, the Court agrees with the Debtors and the Committee with respect to Tuganov and Venable having made substantial, non-duplicative contributions towards expanding the scope of

the Examiner's Report and towards the Class Claim, which incorporates the Borrower

Settlement.

First, Tuganov's application meets the *Synergy Pharmaceuticals* substantial contribution

standard with respect to his non-duplicative services with respect to the Examiner's Report,

Class Claim and Borrower Settlement.  (*Id*.; *see also* Debtors' Limited Objection ¶ 2; Tuganov

App. ¶¶ 11, 27, 28, 34.)  As Tuganov correctly argued, *but-for* his efforts to expand the

Examiner's report, the scope of the fraud would not have come to light.  (Tuganov Reply ¶

14(c).)  Although it was ultimately the Examiner who created the valuable report and not

Tuganov, courts have found substantial contribution in similar circumstances when an applicant

successfully advocates for the appointment of a receiver and the delegation of certain duties to

them. *Bayou Group*, 431 B.R at 555.  Further, the Committee and Debtors explicitly objected to

including a Ponzi investigation in the Examiner's scope of inquiry, demonstrating non-

duplicative efforts.  (Tuganov Reply ¶ 14(c).)  The resulting investigation produced evidence of

a Ponzi enterprise, which served as the basis for the Class Claim complaint and the resulting

Class Claim Settlement.  (Tuganov App. ¶¶ 27–28.)

Courts have denied substantial contribution applications when the applicants fail to

demonstrate the causal connection between their actions and the benefit to the estate.  *In re

Synergy Pharms., Inc.*, 621 B.R. at 610.  However, Tuganov is unique among the participants in

the Class Clam Mediation and Settlement in that, *but-for* his efforts, there would not have been a

Class Claim *to settle*, as the claims arose in response to the fraud uncovered by the Examiner's

Report.

Further, Tuganov's counsel's wealth of experience with similar Ponzi cases proved

invaluable to Estate professionals.  The Committee leveraged Venable's experience by using its

pleadings as precedent for the Class Claim Motion. (Tuganov App. ¶ 11.) Further, Tuganov and

Venable helped resolve various "infirmities" in the Committee's Class Claim Motion, including

that the Motion had not indicated who would be entitled to vote with respect to the Class Claim,

in what amount, who would be entitled to settle the Class Claim, and the types of non-contractual

claims that would be asserted in the Class Claim. (*Id.* ¶ 13.)

Tuganov highlights his involvement in the Borrower Settlement, namely his pointing out

various defects that led to abandonment of the initial plan and pivot to a mediation. (Tuganov

App ¶¶ 15–17.) Given the Class Claim Mediation and Settlement's incorporation of the

Borrower Settlement, Tuganov's involvement with respect to the Borrower Settlement is just as

invaluable to and was an integral piece of moving these bankruptcy cases forward. (*See* Jan. 11,

2024 Hr'g Tr. 110:3–13.) Accordingly, Tuganov's involvement in the Borrower Settlement

classifies as a compensable substantial contribution.

The Court has reviewed the time records and contributions of Tuganov and Venable in

this bankruptcy case and finds **$479,643.94** in requested fees and expenses is a reasonable award.

The Tuganov App. is **GRANTED** in this amount.

### H.  Dixon and BF Application

Dixon, representing BF, by and through its counsel ECJ, sought reimbursement for a total

of **$506,722.50** in fees and **$20,982.20** in expenses. (Amended Dixon/BF App. ¶¶ 11, 19.) The

breakdown of fees and expenses is as follows: **$**222,688.50 in professional fees and $614.20 in

expenses for BR; $59,034.00 in professional fees and $368.00 in expenses for DBK; and

$225,000.00 in professional fees and $20,000.00 in expenses for ECJ. (*Id.*) ECJ also requested

reasonable future fees and expenses of $50,000.00 for anticipated services through the Effective

Date. (*Id.* ¶ 7.) Dixon filed a declaration in support of the Dixon/BF App. ("Dixon

Declaration," ECF Doc. #3670).  Dixon and BF reduced the requested fees and expenses by 50%
of the actual amounts incurred in assisting in the administration of this case.  (Dixon/BF App. ¶
9.)

Unlike the ad hoc groups, Dixon did not represent a large, unwieldy constituency.
However, the Court finds that two actions taken by Dixon constitute substantial contributions:
first, causing the Debtor to retain its cryptocurrency assets rather than liquidating them, which
due to their appreciation during the bankruptcy significantly expanded the size of the estate, and
ultimately resulted in the higher-than-projected distributions that the Debtors have been able to
make; and second, his efforts in formulating the unique plan structure, including its "toggle"
feature which was ultimately implemented.  (Dixon/BF Reply ¶ 4 (discussing the "instrumental
role Mr. Dixon played in convincing the Debtors and the UCC *not* to liquidate the Estate's liquid
cryptocurrency in the early stages of the Chapter 11 process," which Dixon estimates increased
creditor recoveries by "at least 55%," or $1.5 billion; Dixon/BF App. ¶¶ 26–28 (discussing how
Dixon developed a framework which "became a critical feature" of the eventual Plan).)
Although the UST argued that the work was duplicative of estate professionals, it appears that
Dixon had a substantial role in formulating the basic design of the Plan.  (*See* UST Objection at
54.)  This included the structure of using a Plan Sponsor and possibility of a pivot to the Orderly
Wind Down that included a mining-only public company, which was ultimately approved.
(Dixon/BF App. ¶ 62.)  This Court finds that the efforts contributing to formulating elements of
the Plan were a substantial contribution, given that these actions "truly enhance[d] the
administration of the estate."  *In re Am. Preferred Prescription, Inc.*, 194 B.R. at 727.

Dixon's other argument for reimbursement, that his communication and coordination
between creditor constituencies was a substantial contribution, fails.  This is a role undertaken by

estate professionals, and Dixon and BF's role here duplicated their efforts.  There is no conclusive evidence to assert that BF and Dixon were the *but-for* cause of creditor support, since the Committee also engaged in creditor communications via social media.  (UST Objection at 55; *see also In re Synergy Pharms., Inc.*, 621 B.R. at 610.)  Accordingly, the only compensable work by Dixon and BF for substantial contribution award is the work related to (1) plan formulation and (2) the efforts that caused the Debtor to retain its cryptocurrency holdings. Based on the Court's review of time records submitted, the Court finds efforts related to these contributions compensable in the amount of **$127,444.50**.  The Dixon/BF Apps. are **GRANTED** in that amount.

### I.  Frishberg Application

Mr. Frishberg sought **$629.98** in expenses relating to the Class Claim Mediation. (Frishberg App. ¶ 6.)  Mr. Frishberg is also preemptively requesting approval for reimbursement up to **$1,000.00** for reasonable future expenses.  (*Id.* ¶ 7.)

Reimbursement for a substantial contribution requires a substantial contribution more than an incidental benefit arising from activities that the creditor would otherwise pursue in protecting their interest.  *In re Dana Corp.*, 390 B.R. at 108.  Here, Mr. Frishberg invested his time and efforts far beyond that of a regular creditor protecting their interest.  While creditors "are presumed to act primarily in their own interests," *In re Bayou Grp. LLC*, 431 B.R. at 562, throughout the course of these cases, the Court has observed Mr. Frishberg zealously promoting the interests of the creditor body as a whole, far over and beyond what would be expected given the size of his claim.  Mr. Frishberg, who has advocated "based on principle" for the "benefit of the [Estates] and all creditors," presents a rare case that overcomes the presumption of primarily self-interested action.  (Frishberg App. at 19.)  Mr. Frishberg's requested expenses relating to the

Class Claim Mediation, therefore, are expenses compensable within section 503(b) of the
Bankruptcy Code, which speaks to expenses incurred by a creditor.  *See* 11 U.S.C. §
503(b)(3)(D).

However, as the UST correctly contends, not all of Mr. Frishberg's requests are
compensable as a substantial contribution award.  (UST Objection at 59.)  Only "actual and
necessary" expenses incurred in making the substantial contribution are reimbursable, which
does not include Frishberg's requests for filing fees, travel for his adversary proceeding (to
which the discussion of the Herrmann App., *infra*, applies), and future expenses.  (*Id.*; *see also In
re Granite Partners, L.P.*, 213 B.R. at 451.)  Accordingly, Mr. Frishberg's $363.34 for expenses
related to his adversary proceeding, and future fees of $1,000 are non-compensable, whereas his
expense request for **$263.64** in connection with the Class Claim Mediation are compensable.
Accordingly, the Frishberg App. is **GRANTED** in the amount of $263.64.

### J.  Herrmann Application

Mr. Herrmann sought reimbursement for various filing fees and pacer fees for appeals-
related filings not available on Stretto, which sum to a total of **$1,143.90**.  (Herrmann App. at 7.)
Herrmann also requests approval of additional future fees and expenses not to exceed **$1,000**.
(*Id.* at 6.)

Finding a substantial contribution for any creditor who raises, and then agrees to drop, a
case it believes meritorious renders meaningless the "especially difficult burden in passing the
'substantial contribution' test."  (*Id.*)  These actions do not constitute a substantial contribution,
and rewarding them would invite applications for raising and then dropping actions against a
debtor.

Mr. Herrmann argues that his appeal of the Earn order constituted a substantial

contribution because it "kept ambiguity alive with respect to Earn *vs* Borrow claims" and "gave

Earn creditors more leverage going into mediation." (Herrmann App. at 3.) This argument is

unpersuasive. The Class Claim Mediation constituted a substantial contribution to the case

because it provided a global resolution to issues that would otherwise have been addressed in a

costly, inefficient, and piecemeal manner. The internal details of the mediation—*i.e.,* which

parties had more leverage, why they had that leverage, and how that leverage factored into the

final deal—is not relevant to the Court's finding. Further, evidence relating to settlement

discussions and negotiations would be prohibited the Federal Rules of Evidence. *See* FED. R.

EVID. 408(b) (excluding "conduct or statement made during compromise negotiations").

The Court notes that Mr. Herrmann's expenses for participation in the Class Claim

Mediation were approved *supra* through the Earn App. However, Mr. Herrmann's separate

application has not demonstrated a substantial contribution, and it is **DENIED**.

### K. Gallagher Application

Ms. Gallagher does not request any reimbursement for fees or expenses, but requests an

additional distribution of **20 ETH** in recognition of her role as one of the three lead plaintiffs in

the Class Claim. (Gallagher App. at 1.)

Substantial contribution payments are meant to reimburse a party for the professional fees

and expenses incurred in making that contribution. *See, e.g., In re Granite Partners, L.P.*, 213

B.R. at 445. The purpose of substantial contribution awards is not to provide additional

disbursements or payments.

During the Hearing, Ms. Gallagher expressed that she had "put just as much effort into

this" and "[felt her] time and effort . . . [was] equally as valuable" as the counsel retained by

other individuals.  (Jan. 11, 2024 Hr'g Tr. 95:24–25, 96:1–7.)  While lead plaintiffs in class actions may receive some additional distribution for their effort, any additional recovery for lead plaintiffs would properly have been included in the terms of the Class Claim Settlement; it is not the Court's role to re-write that contract.

Ms. Gallagher's *expenses* incurred in her role as lead plaintiff have been approved for reimbursement through the Earn App., which are permitted under section 503(b)(3)(D) of the Bankruptcy Code, which speaks to "actual, necessary expenses" incurred by, *inter alia*, a "creditor."  11 U.S.C. § 503(b)(3)(D).  The plain terms of the statute, however, do not permit the Court to grant Ms. Gallagher her requested distribution.  Besides expenses, the Bankruptcy Code allows substantial contribution awards for "reasonable compensation for professional services *rendered by an attorney* or *accountant*" or "an *indenture trustee*."  11 U.S.C. § 503(b)(3)–(4) (emphasis added).  Notwithstanding Ms. Gallagher's belief that her time is just as valuable as the professionals, she does not fall within the ambit of the statute, nor her request an expense under section 503(b)(3)(D).  Accordingly, Ms. Gallagher's application must be **DENIED**.

### L.  Wildes Application

Wildes does not explicitly request an amount for reimbursement but attaches two invoices totaling **$42,525.00**.  (Wildes App. ¶¶ 3, 5.)  This amount represents $22,050 for consulting services from Sanbar Performance Corp., of which a deposit of $4,500 has been paid, and $20,475 of legal services from RJG Law, of which $2,000 has been paid.  (*Id.*)

Reimbursement for a substantial contribution still requires the existence of a substantial contribution, which Mr. Wildes has not attempted to argue.  *See In re Dana Corp.*, 390 B.R. at 108.  The Debtors and the UST correctly noted that Mr. Wildes does not attempt to demonstrate what contribution, much less what substantial contribution, he made to the estate.  (Debtors'

Limited Objection ¶ 4; UST Objection at 47.)  While Mr. Wildes ultimately settled his discovery dispute with the Committee and the Committee did not object to the Wildes App., he still has the burden of demonstrating a substantial contribution before he is entitled to reimbursement. Accordingly, the Wildes App. is **DENIED**.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the substantial contribution applications of (1) the Custody Group, (2) the Withhold Group, (3) the Earn Group, (4) Tuganov, (5) Dixon and BF and (6) Mr. Frishberg are **GRANTED IN PART** and the substantial contribution applications of (1) the Borrower Group, (2) Mr. Hermann, (3) Ms. Gallagher, and (4) Mr. Wildes are **DENIED**.

For purposes of clarity, the Court's substantial contribution awards are set forth in Exhibit A attached to this Opinion.

**IT IS SO ORDERED.**

Dated:    February 29, 2024
New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge

**EXHIBIT A**

| Party | Law Firm | Document | Amount Awarded |
|---|---|---|---|
| Custody Group | Togut, Segal & Segal | Custody App., ECF Doc. # 3660 | $175,622.00 |
| | | Custody Reply, ECF Doc. # 4188 | |
| Withhold Group | Troutman Pepper Hamilton Sanders | Withhold App., ECF Doc. # 3663. | $84,524.00 |
| | | Withhold Reply, ECF Doc. # 4186 | |
| Earn Group | Offit Kurman | Earn App., ECF Doc. # 3654 | $101,020.94 |
| | | Earn Reply, ECF Doc. # 4185 | |
| | | Kuhns Declaration, ECF Doc. # 4187 | |
| Borrower Group | McCarter & English | Borrower App., ECF Doc. # 3671 | **DENIED** |
| Tuganov | Venable | Tuganov App., ECF Doc. # 3666 | $479,643.94 |
| | | Venable Time Records, ECF Doc. # 4010-1 | |
| | | Second Tuganov App., ECF Doc. # 4158 | |
| | | Tuganov Reply., ECF Doc. # 4184 | |
| | | Third Tuganov App., ECF Doc. # 4211 | |
| Simon Dixon ("Dixon") on behalf of BNK to the Future ("BF") | Ervin Cohen & Jessup | Dixon/BF App., ECF Doc. # 3672 | $127,444.50 |
| | | Dixon Declaration, ECF Doc. # 3670 | |
| | | Amended Dixon/BF App, ECF Doc. # 3799 | |
| | | Dixon/BF Reply, ECF Doc. # 4189 | |
| Daniel Frishberg | n/a | Frishberg App., ECF Doc. # 3675 | $258.66 |

| | | Frishberg Reply, ECF Doc. # 4193 | |
|---|---|---|---|
| Immanuel J. Herrmann | n/a | Herrmann App., ECF Doc. # 3674 | **DENIED** |
| | | Herrmann Reply, ECF Doc. # 4194 | |
| Rebecca Gallagher | n/a | Gallagher App., ECF Doc. # 3662 | **DENIED** |
| | | Gallagher Reply, ECF Doc. # 4191 | |
| Zachary Wildes | n/a | Wildes App., ECF Doc. # 3615 | **DENIED** |