Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK, LLC,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY  10004

14

15                    March 20, 2024

16                    11:04 AM

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KS

1    HEARING re Hybrid Hearing re:  Post-Effective Date Debtors

2    Motion Seeking Entry of an Order (I) Approving Automatic

3    Revocation of Presumed Mistaken Convenience Claim Elections,

4    (II) Approving Optional Revocation Procedure for Eligible

5    Convenience Claim Elections, and (III) Granting Related

6    Relief.  (Doc. ## 4372, 4417, 4530, 4336, 4433, 4434, 4485,

7    4713, 4732)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    ARTUR ABREU, Pro Se

4

5    WESLEY CHANG, Pro Se

6

7    CHRISTIAN FUNCK, Pro Se

8

9    LAURA MCNEIL, Pro Se

10

11    RIECE KECK, Pro Se

12

13    GEORGE STANBURY, Pro Se

14

15    KIRKLAND & ELLIS LLP

16          Attorneys for the Debtor

17          300 North LaSalle

18          Chicago, IL 60654

19

20    BY:  CHRIS KOENIG

21

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2          Attorneys for the U.S. Trustee

3          Alexander Hamilton Custom House

4          One Bowling Green, Room 534

5          New York, NY 10004

6

7    BY:  SHARA CLAIRE CORNELL

8          MARK BRUH

9          BRIAN S. MASUMOTO

10

11    ALSO PRESENT:

12    JIN WU

13    ANDREA AMULIC

14    SAMUEL ARGIER

15    TONIAH BARNES

16    DAVID BARSE

17    THOMAS G. BAULDREE

18    CHRIS BECIN

19    JOSE I. BELTRAN

20    BLAINE G. BERNARD

21    JEFFREY BERNSTEIN

22    INGO BEUTLER

23    CHRISTOPHER BRADHAM

24    KYLE BRAY

25    PAUL BREUDER

Page 5

1    DONALD ENEM BRINK

2    JOHAN BRONGE

3    RALPH MICHAEL BURTON II

4    CARL COTE

5    VITOR CUNHA

6    SHIRLEY CARROLL

7    RICKIE CHANGE

8    PAOLO CIAMARONE

9    CHRISTINA CIANCARELLI

10   JOSHUA CLARK

11   CHRISTOPHER COCO

12   SONDA CORI COHEN

13   AARON COLODNY

14   FREDDY COLON

15   LAFAYETTE A. COOK

16   CAM CREWS

17   OONA E. CRUSELL

18   JOSHUA CRUZ

19   DAVID J. DALHART

20   FLORENT DAVID

21   YVONNE M. DEHART

22   THOMAS DIFIORE

23   TRISTAN DIAZ

24   SIMON DIXON

25   SHARON DOW

Page 6

1   SCOTT DUFFY

2   JEROME DUFOURG

3   JOHN PETER DZARAN

4   SIMON ELIMELECH

5   JEFFREY D. EATON

6   JANELL ECKHARDT

7   JAMES ENGEL

8   DAVID AVERY FAHEY

9   AAMIR S. FAROOQ

10  BARRY FLOWETS

11  TYSON FOIANINI

12  DEBORAH FRANKEL

13  DARIOUS-VLADIMIR GHEORGHE

14  REBECCA GALLAGHER

15  MARJORIE N. GARCIA FRANCO

16  JALSIEGH GEARY

17  MIRA HAQQANI

18  MONIQUE D. HAYES

19  ROBERTO HERNANDEZ

20  SAMUEL P. HERSHEY

21  KAITLYN HITTELMAN

22  JOHN HITTI

23  PERRY D. HOLLOMAN

24  JOHANNA C. HOLLOMAN

25  JASON IOVINE

1    THIBAULT ITART-LONGUEVILLE

2    FRANCES JONES

3    KRILL KHAN

4    DAVID KAHN

5    DAN KAPLAN

6    YARA KASS-GERGI

7    ROBERT KAUFMANN

8    TRAVIS KEENEY

9    SOPHIE KELLER

10   NATE KELLER

11   JOHN H. KNAB

12   RIKI KOULY

13   TOMMY KUSTERS

14   ROSS KWASTENIET

15   SERBAN LUPU

16   CHRISTOPHER LACKEY

17   LISA R. LANG

18   JENNIFER LARKIN

19   SOLEI K. LARKSON

20   DAN LATONA

21   CATHY LAU

22   JOSEPH LEHRFELD

23   MARK S. LEONARD

24   NICOLE A. LEONARD

25   PIETRO V. LICARI

Page 8

1    XI LIN

2    MAARTEN MAAN

3    JAY MACELHENNEY

4    DAVE K. MALHOTRA

5    KEVIN M. MANUS

6    DANIEL J. MAREE

7    CHASE MARSH

8    CAROL MAUNDER

9    EOIN PAUL MCANESPY

10   KEVIN MCCARTHY

11   MARTIN RUDGE MCNEILL

12   JOHN MELLEIN

13   TOM MERCURI

14   MARK CASEY MILLER

15   LAYLA MILLIGAN

16   CARLA MOORE

17   KEITH NOYES

18   RICHARD OSWALD

19   SHAWN P. PARPART

20   MILIN PATEL

21   JEFF PATTON

22   ANDERS PEDERSON-BJERGAARD

23   GREGORY F. PESCE

24   RICHARD PHILIPS

25   WEI QIANG

Page 9

1   JONATHAN RODRIGUES

2   CARL D. ROBINSON

3   MARK ROBINSON

4   JONATHAN RODRIGUEZ

5   LIZ ROVIRA

6   NAIDU SANDRANA

7   JOSEPH E. SARACHEK

8   MICHAEL SAKISSIAN

9   DAVID SCHNEIDER

10   NOAH M. SCHOTTENSTEIN

11   WILLIAM D. SCHROEDER

12   ELENA SELEZNEVA

13   DAVID SENES

14   EZRA SERRUR

15   MATTHEW W. SILVERMAN

16   LUKE SPANGLER

17   COURTNEY BURKS STEADMAN

18   PAUL D. STORVICK

19   ASHLEY LAUREN SWIM

20   LUCY L. THOMSON

21   DAVID TURESTKY

22   ELVIN TURNER

23   PIOTR MAREK UJMA

24   TIMOTHY JOHN VANN

25   EZRA VAZQUEZ-D'AMICO

```
 1    TONY VEJSELI

 2    LORENZ DIETER WAGENER

 3    CAROLINE WARREN

 4    KEITH WOFFORD

 5    GUOHUA XU

 6    RISHI YADAV

 7    ANDREW YOON

 8    GOLSHID ZAHIREMAMI

 9    JARNO BERG

10    ED G. BIRCH

11    SANTOS CACERES

12    SIMON CONOR DEEHAN

13    VINCENT GUYADER

14    RAKESH PATEL

15    HEIN VAN DER WIELEN

16    RICK ARCHER

17    AARON BENNET

18    CLARA ELLEN GEOGHEGAN

19    UDAY GORREPATI

20    TAYLOR HARRISON

21    DIETRICH KNAUTH

22    MIKE LEGGE

23    JONATHAN RANDLES

24    TIMOTHY REILLY

25    VINCE SULLIVAN
```

Page 11

1    CATHY TA

2    MAUDE TIPTON

3    ALEX WOLF

4    ZACHARY ZABIB

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning, Mr.

4      Koenig.

5              MR. KOENIG:  Good morning, Your Honor.

6              THE COURT:  Are you feeling lonely in the

7      courtroom?

8              MR. KOENIG:  Yeah.  Mr. McCarrick at the last

9      hearing said something like he'd lost all of his friends.

10     And I think that sums it up.

11             THE COURT:  All right.  I don't mean to make fun.

12     Just for those who are on Zoom, Mr. Koenig is the only one

13     in the courtroom, obviously besides the judge and staff.

14             Mr. Koenig, go ahead.

15             MR. KOENIG:  Thanks, Your Honor.  For the record,

16     Chris Koenig of Kirkland & Ellis for the post-effective-date

17     Debtors.

18             So, Your Honor, there's been a bit of

19     correspondence on the docket about the claims process.  It

20     feels like the early days of the case again.  We only have

21     one motion this morning that is I would describe almost

22     uncontested.  So with Your Honor's indulgence, I think it

23     makes sense to give you some context for the distribution

24     process, how things are going, common issues and things of

25     that nature, especially given the number of creditors that

Page 13

1    we have on the phone.

2           So this is the most complicated claims

3    distribution process that I've ever been a part of.  We are

4    slated to make distributions to nearly 400,000 people in

5    almost every country in the world.  It's over 150 countries.

6    And we will be distributing to anyone who is eligible to

7    receive cryptocurrency, we will give them cryptocurrency,

8    Bitcoin and Ethereum.  And we will be distributing U.S.

9    Dollars to anyone who cannot receive cryptocurrency for any

10   reason.  And this distribution process is very complicated

11   because we worked to give creditors what they demanded from

12   us; a distribution in cryptocurrency to the extent they

13   could receive it.

14          Our creditors are people who are bought into the

15   power and benefits of crypto.  We held on to the crypto

16   through the bankruptcy.  We did not sell it.  Other debtors

17   have sold it.  That would have been the easy thing to do.

18   FTX sold their crypto and is making distributions in U.S.

19   Dollars.  But we know from our conversations with the

20   Committee, ad hoc groups, and individual creditors, our

21   creditors wanted crypto.  And to the extent we were able to

22   give it to them, we wanted to do that.

23          Now of course we have to be able to give it to

24   them in a way that is regulatorily compliant.  One of the

25   major issues in this entire case was what did the regulators

Page 14

1    think about our distributions.  And we worked carefully with

2    them to make sure that we were making distributions that

3    they were okay with.  We worked with them to make

4    distributions of Bitcoin and Eth only, not of other alt

5    coins like Sushi Coin or Dogecoin or all of the other tokens

6    that Celsius offered prepetition.

7              So we've worked with regulators to do something

8    that they would support.  And Your Honor may remember we

9    actually had no objections from regulators to confirmation I

10   think as part of that process.

11             So we developed a very complex distribution plan

12   to give as many people crypto as possible while complying

13   with all regulations, which I will come back to in a moment.

14   We spent months preparing for this incredibly complicated

15   distribution.  We started negotiating with potential

16   distribution agents last summer and we selected Coinbase and

17   PayPal around the time of the disclosure statement.

18   Coinbase and PayPal are some of the largest and most trusted

19   cryptocurrency distribution partners in the world.  We

20   wanted to select partners that allowed us to make the most

21   distributions of cryptocurrency to the most possible people

22   while fully complying with all regulatory requirements in

23   all of the different jurisdictions.  That includes Know Your

24   Customer and Anti-Money Laundering requirements, KYC and

25   AML.

Page 15

1              Those requirements are really important.  Because

2      I don't want to wake up and read the front page of the Wall

3      Street Journal and it turns out that we have distributed

4      currency to a Russian oligarch or a terrorist organization

5      or anything like that.  And that's important to the

6      regulators too of course.  So we found trusted distribution

7      partners who were fully regulatorily compliant in all of

8      these jurisdictions.

9              So let's go back to January where we were at the

10     peak of our preparation for the effective date.  We were

11     preparing to send billions of dollars to hundreds of

12     thousands of people all over the world.  And we thought at

13     the time that about 90 percent of those distributions could

14     be in cryptocurrency.  And about ten percent that for

15     various reasons, the most important of which is what

16     jurisdiction are you in.  PayPal is our distribution agent

17     in the United States.  Coinbase is our international

18     distribution agent.  Coinbase, we have about 150 countries

19     where we have customers to distribute to.  Coinbase services

20     about half of them.  And it's mostly the larger

21     jurisdictions; Western Europe, larger Asian countries and

22     the larger countries.

23             If you live in a smaller country in South America,

24     perhaps Coinbase doesn't have the license to distribute to

25     you.  And of course if I don't have a distribution partner

Page 16

1        that is allowed to distribute to you, we have to give you

2        dollars.  That's the only thing we can do.

3               So what we did is we designed and we developed a

4        master claims management system that had every creditor in

5        the case.  And what we thought -- could give them the

6        crypto or give them cash based on where we thought they

7        lived at the time based on our record.

8               Now, that's not perfect.  If I thought that you

9        lived in California, Your Honor, but you had actually moved

10       to Botswana, a place that Coinbase doesn't support, there's

11       going to be a little bit of movement of course.  But we

12       believe that 90 percent of our creditors could get crypto.

13       We reserved enough Bitcoin and Ethereum to make

14       distributions to those people.  And the plan provides that

15       for anybody that can't get cryptocurrency, we will give them

16       an equivalent amount of cash.

17              Now, the most complicated thing about this

18       distribution is that bitcoin is -- the price fluctuates.  I

19       hesitate to call it a commodity because of the legal

20       implications.  But for simplicity's sake, I'll say it's a

21       commodity.

22              THE COURT:  Moved a little bit since the start of

23       this case, hasn't it?

24              MR. KOENIG:  It moved a little bit since the

25       effective date, in fact, which is what I'm getting to.

Page 17

1          So the plan drew a line in the sand.  Here is the

2     distribution record date on which point we calculate all

3     distributions.  So it's the cryptocurrency distribution

4     record date.  And that date was set at 15 days before the

5     effective date, which turned out to be January 16th, 2024.

6     Now, that was important because we set aside an amount of

7     cash and crypto to make sure that we could comply with our

8     obligations under the plan.  We had to reserve enough

9     crypto, we had to reserve enough cash because we knew that

10    it was possible that bitcoin as a commodity could fluctuate

11    up or fluctuate down, and there has to be a date at which we

12    all look and say this is the price, all of those sorts of

13    things.

14          So, for example, if somebody was entitled to

15    receive one Bitcoin and ten Ethereum.  And we could reserve

16    crypto.  It's very easy.  Reserve one Bitcoin and ten

17    Ethereum.  If you lived in a place that we couldn't give you

18    crypto or we didn't believe we could give you crypto for

19    whatever reason, we reserved an equivalent amount of cash at

20    January 16th prices.  On January 16th, Bitcoin was about

21    $43,000 and Ethereum was about $2,600.  Now, those prices

22    are about double what they were on the petition date and

23    they've gone up significantly more since.

24          But what we did was the best that we could do tat

25    the time with the information we had.  And we were complying

Page 18

1    with the plan, which set a date on which the calculations

2    would have been made.

3         Now, of course since January the price of crypto

4    has gone up.  And that is great news for most of our

5    creditors.  If you received crypto and you received Bitcoin,

6    that Bitcoin is now worth $63,000, $65,000 when it was worth

7    $43,000.  If you received a U.S. Dollar check for $43,000, I

8    understand perhaps your frustration that, oh, if only I

9    could have received crypto, I would have received 65 instead

10   of 43.  But se can't see into the future with a crystal

11   ball.  All we could do was the best that we could at the

12   time.  And as of January 16th, those are the prices.

13        And if the prices had gone the other way, those

14   creditors would have said, boy, Bitcoin was $43,000 on the

15   effective date.  You should have given me $43,000.

16        So it's very difficult with this commodity that is

17   so fluid in price.  And it's so expensive to hedge.  We

18   couldn't have bought hedges for this just to have it.  But

19   we understand the frustration of creditors that have

20   received cash instead of crypto.  But we sold the crypto

21   that would have otherwise gone to them on or around January

22   16th in accordance with the plan.  There's nothing else that

23   we can do.  I've read all the letters that they -- boy, they

24   should make me whole, they should account for the runup in

25   prices.  We can't do that.  We sold their crypto a month-

Page 19

1     and-a-half ago.  We are doing our best.

2             And the whole point of the motion here today is to

3     try to do our best by as many people as humanly possible.

4     It's a very unusual motion.  I've never filed it before.  I

5     hope to never have to file it again.  But I hope that Your

6     Honor and the parties listening know that we are endeavoring

7     to do our very best by everybody in this process.  It's very

8     complicated and some things just can't be done.  And there

9     were steps that had to be taken in January to prepare for

10    this eventuality.  And yes, crypto went up.  And that is

11    such great news for so many of our creditors.  I think it

12    justifies the strategy we took in the case.  But I don't

13    think anybody has been inequitably treated.  It is what the

14    plan says.  It is what the plan says.

15            So with that, I want to quickly turn to the status

16    of distributions and how has it been going.  So my colleague

17    --

18            THE COURT:  Either now or when you finish that, I

19    also want to hear about the status of the first two -- the

20    rest of the shares of MiningCo.

21            MR. KOENIG:  Yes, no, wonderful.  And I've got a

22    couple of other quick topics.

23            THE COURT:  That's fine.  Go in your --

24            MR. KOENIG:  Thank you, Your Honor.  And I

25    appreciate the preview.

Page 20

1          So my colleague, Ms. Golic, we filed some slides

2     last night, Your Honor, to sort of illustrate how it's

3     going.  And, Deanna, I believe that you made Ms. Golic a co-

4     presenter.  So if she could present some of the slides.  And

5     I'll start on this slide right here.

6          This sort of walks through our different

7     distribution channels and how it's been going.  And these

8     percentages on the right column are the percentages of

9     people that are eligible to receive a distribution.

10          THE COURT:  Let me ask you for a moment.

11          MR. KOENIG:  Yes.

12          THE COURT:  So for anyone who has access to ECF,

13     these slides were filed as ECF Docket 4732.

14          MR. KOENIG:  Thank you, Your Honor.

15          THE COURT:  Go ahead.

16          MR. KOENIG:  So this presentation lays out as of

17     yesterday the amount of people that have successfully

18     claimed distributions.  And there's percentages on the right

19     that say successfully distributed.  And there's a footnote

20     that's too small perhaps to read on the screen.  But what it

21     says is the percentages are of people that are eligible to

22     receive distributions.  They're people that opt out of the

23     class claim settlement and they're going to litigate their

24     claims before Your Honor at some point in time.  They're not

25     part of the denominator because they're just not eligible to

Page 21

1    receive claims.  Those sorts of things.

2         So today is I believe the 47th day after the

3    effective date.  And we have successfully distributed --

4    that means somebody has actually claimed -- it is in their

5    account and it is in their hands, they can do whatever they

6    want with it.  86 percent if they were assigned to PayPal or

7    Venmo.  And again, those are U.S. creditors predominantly.

8         Of the remaining 14 percent that haven't claimed a

9    distribution, 11 percent of them have not done the necessary

10   KYC process to register for their distribution, or they just

11   haven't clicked on their code.  So with PayPal, eligible

12   creditors get two emails with individualized codes.  They go

13   onto PayPal's website, they type in the code.  And if

14   everything is correct, it will just be deposited in their

15   account.

16        THE COURT:  Just for creditors in the United

17   States who elected for crypto, where can they look to find

18   the instructions that you've just described as to what to do

19   in the case that they -- you say three percent that have

20   failed to onboard, et cetera.  Where can they look to get

21   the directions as to what to do?

22        MR. KOENIG:  Thank you, Your Honor.  So in the

23   email that everybody receives, there are links to FAQs and

24   other help services that are there.  We filed several claims

25   distribution updates.  The company has an FAQ as well.

Page 22

1    Those are all in filings on the docket.  They are pretty

2    prominently titled.  You know, Debtor's first update on

3    distributions, Debtor's second update on distributions.  And

4    anybody listening, if you can't find it, feel free to reach

5    out to and we'll be happy to --

6              THE COURT:  Let me suggest this.  After the

7    hearing today, put it on the docket again so somebody

8    doesn't have to search the entire docket looking for it.

9              MR. KOENIG:  Wonderful.

10             THE COURT:  There will be -- almost at the very

11   bottom of the ECF list will be the directions again for

12   anyone who hasn't done it so far.

13             MR. KOENIG:  Yes.  And maybe what we'll do is like

14   a notice of, you know, important distribution filings and

15   we'll take the three or four of them and we'll just compile

16   them all in one.  That might make it even easier.

17             So of the 11 percent, some of them just haven't

18   completed the KYC process, which is on them.  And they

19   should have received instructions on how to do that, or they

20   just haven't typed in their codes.  Or they've typed in

21   their codes and they're having some sort of problem.  I'm

22   sure you've read those letters, just as we have.  We've read

23   them.  We've investigated them.  I would say all of them

24   that we've reviewed, there appears to be some sort of issue

25   on their end.  Haven't actually completed the KYC, they're

1    not actually typing in the code right.  We're doing our best

2    to respond to those individual creditors and try to point

3    them in the right direction.  But it's challenging.

4              THE COURT:  Who do they contact if they haven't

5    been able to successful do this?

6              MR. KOENIG:  Right.  So there is a ticketing

7    system that is on all of these different FAQs and so on and

8    so forth that you can put in your problem and you can select

9    on a dropdown, I'm having trouble claiming at PayPal.  And

10   that will route you to the right people that will get you a

11   quick answer.

12             THE COURT:  Okay.

13             MR. KOENIG:  And I think that that's very

14   important.  And then three percent failed onboarding, which

15   means they've provided their information and they are -- the

16   shorthand is banned by PayPal for whatever reason.  They

17   violated their terms of service in the past, and so PayPal

18   doesn't want to service somebody that's scammed them out of

19   a prior distribution.  Which, you know, it is what it is.

20   We will migrate those users to Coinbase first if we can.

21   And if they are banned at Coinbase too, we will give them

22   Fiat.

23             Now, the interesting thing here is -- so I talked

24   about the January 16th issue and how we had to set it aside.

25   If we're holding Bitcoin and Ethereum for somebody and it

Page 24

1    turns out they can't receive it because they fail onboarding

2    or they move to a country that -- we thought they were in

3    California but they're actually in some country that

4    Coinbase doesn't service.  The plan provides that we can

5    sell that crypto and give them whatever the proceeds are.

6    Because I actually have the crypto.  We have the crypto I

7    should say.  So if today we converted somebody that was

8    banned at PayPal to Fiat and you were going to get one

9    Bitcoin, you would get one Bitcoin -- whatever today's

10   prices are.  I've seen a lot of letters and a lot of

11   concerns saying Celsius is going to steal the overage.  If

12   we have it, we will give it to you.  Nobody is stealing

13   anything.  Nobody is stealing anything.  So that's the

14   PayPal --

15           THE COURT:  May I ask this?

16           MR. KOENIG:  Yeah.

17           THE COURT:  You just provided I think important

18   information.  It doesn't appear to affect a very large

19   number of creditors, but it does.

20           MR. KOENIG:  yes.

21           THE COURT:  Is there a place where they can look

22   and see essentially what you've just said?  In other words,

23   if people had elected crypto and you're not currently able

24   to provide it because PayPal or Coinbase won't do it but

25   you're holding the crypto, given the runup in the price

1    since January 16th, it's important.  Is there a place they

2    can look and see what you've just said?

3              MR. KOENIG:  Yes.  And in the notice that we

4    filed, which we will refile.  And it is in -- what we've

5    done is we've been trying to improve the process.  And I

6    think communications is the area that we worked very hard on

7    this process.  I think we were surprised by the overwhelming

8    number of inquiries.  In the days after the effective date,

9    we had thousands of inquiries a day and our queue got up to

10   20,000.

11             THE COURT:  I haven't received thousands, but as

12   you know, because my clerks have made sure when we've

13   receive inquiries, we've made sure that both the Debtor and

14   the Committee have received copies of it.  They may have

15   received it directly, but we've made sure of that.

16             MR. KOENIG:  Yes, right.  And we've done our best

17   to respond to people as promptly as possible.  But we have

18   taken steps to improve our communication strategy and sort

19   of continue to build the airplane out as we're flying it.  I

20   mean, we had a very good plan, but there's always ways you

21   can improve the process.

22             And so many letters complained about slow

23   responses of form responses.  We pointed people to FAQs and

24   form answers because that works for the vast majority of

25   people.  And there are people that have said, boy, why can't

Page 26

1    you just push my individual distribution through?  Well, I

2    do have 15,000 people saying that.  And we have tried to

3    triage and focus on common issues and focus on issues that

4    will resolve issues for the most people at once rather than

5    sort of playing whack-a-mole and solving this person's

6    individual issue and then that person's individual issue.

7    So we focused on inquiries that were more time-sensitive and

8    would allow us to get to common answers.

9            THE COURT:  So the slide you have on the screen,

10   overall 80 percent of the distributions have successfully

11   occurred so far.

12           MR. KOENIG:  Yes.  And --

13           THE COURT:  Twenty percent still leaves a lot,

14   but...

15           MR. KOENIG:  Right.  And that includes the Fiat

16   distributions, too.  So if it's just the crypto

17   distributions, it's 85 percent total.  It's 86 percent at

18   PayPal, 83 percent at Coinbase, and a blended 85.  And I'll

19   go through Coinbase in a moment.  But just on the

20   communications before I lose the thread.

21           We've been listening to the requests for more

22   detailed and personalized responses.  And we've been working

23   to improve our communication strategy to make sure that

24   people get more frequent updates from us.  So our goal that

25   we set about a week-and-a-half ago was that every creditor

Page 27

1    that has not received a distribution should get a new email

2    from us with the status, what do they need to do, what are

3    the next steps.  And for some of them it should be, you

4    know, you'll receive a reattempt next week, and for some of

5    them you have a little bit more of a complicated situation,

6    but here is the status.

7            We're almost done with those distributions.  We've

8    sent our more than 150,000 emails.  And I am pleased to

9    report that in the last week we've made a lot of progress on

10   these numbers.  They would have been lower last week.  We

11   made quite a bit of progress.

12           But we've developed solutions that will help us

13   respond to creditors quicker.  The process is complicated

14   because the company, Celsius, is directing the

15   distributions.  But we're not actually making the

16   distributions.  Coinbase, PayPal, and our Fiat partners are

17   making the distributions.  So we rely on data from them to

18   say, you know, this distribution failed to Chris Koenig for

19   whatever reason.  We have to get that data back.  And we've

20   been working with them to develop an improved system so that

21   the people making the distribution, Coinbase and PayPal, can

22   give us information in more real time that will allow the

23   people answering the flood of creditor questions more

24   promptly so that we have the latest and greatest technology.

25   But it is complicated.

1          But we've now largely caught up on communications.

2    The outstanding tickets are much lower than they've been in

3    the last few weeks.  And just anecdotally in the last three,

4    four, five days, we have seen that number go way down as our

5    new communication strategy rolled out.  And as these

6    distribution numbers go up, we have fewer questions because

7    people have fewer outstanding issues.  Which is very good.

8          So I talked about PayPal a little bit.  Let me

9    talk about Coinbase quickly.  And then I have a couple of

10   other quick topics because I know there's  a lot of people

11   on the line, and some of them raised some of these topics.

12         So Coinbase doesn't have codes.  If you have an

13   account -- if I have an account at Coinbase for Chris Koenig

14   and the KYC matches, because they need to make sure that I'm

15   the same Chris Koenig that is a customer of Celsius -- I

16   won't bore Your Honor with the details, but it is

17   complicated.  If I have a fully-KYC'd account with Coinbase

18   and they know that I'm the right Chris Koenig, when Coinbase

19   goes to attempt the distribution, if it worked, I get an

20   email that says congratulations, you just received crypto

21   from Celsius.  That's the happy path.  That's easy, no

22   problem.

23         If you -- but Coinbase is going to attempt

24   everyone regardless of -- they don't check first to see does

25   Chris Koenig have an account, their system just tries me.

Page 29

1    And if it works, great.  And if not, it comes back with a

2    failure that says Chris Koenig doesn't have a KYC'd account.

3    And I get an email that says, Chris, we just tried you, it

4    didn't work.  You know, you need to complete KYC, you need

5    to open an account.  Here are links to what you need to do.

6         And so Coinbase first tried these distributions

7    around February 14th, about two weeks after the effective

8    date.  And a number of people it worked, and a number of

9    people hadn't set up accounts yet, which I totally

10   understand.  Those people initially got a communication

11   because we had understood in that moment that they would

12   never be able to get something from Coinbase.  It was more

13   akin to Coinbase has banned you, then you don't have a KYC

14   account.  We looked into it because those numbers seemed

15   high to us.  And it turned out that it was just a

16   misunderstanding.  Those people just didn't have an account.

17   So those people subsequently got an email from us that said

18   that earlier communication was in error, please go and open

19   an account, do the KYC.  We will try you again.  We will try

20   you on a periodic basis.

21        On Monday, Coinbase ran it again, and a full third

22   of the outstanding accounts had done what they needed to do

23   and had opened an account and had provided Coinbase and we

24   distributed a full third of the outstanding amounts from

25   Coinbase.  That number was a little bit over 70 percent

1    literally two days ago.  So we are making progress.  And

2    similarly here, you see sort of a same percentage.  You have

3    of the remaining 17 percent, 13 percent just haven't done

4    the KYC properly and need to do it or need to create an

5    account or something like that.  And about four percent, the

6    data that we have suggests that they may not ever be able to

7    meet the KYC because they are on some sort of banned list or

8    whatever the case may be.  Those people will be migrated to

9    Fiat.  And again, same explanation goes for PayPal.  If we

10   have their crypto, we will sell it and we will give them the

11   proceeds, whatever they are at the time.  So we've made a

12   lot of progress recently with Coinbase.

13            I had, again, just sort of anecdotally.  But as

14   you can imagine, I have a number of phone calls with lawyers

15   and pro se alike these days.  And in the last couple of

16   days, I would say half of those calls were cancelled because

17   people said I appreciate your time, but I just got my

18   distribution.  Again, it's anecdotal evidence, but I think

19   the data bears it out that the process is working.  And I

20   think that we're ahead of the curve.  In large retail

21   bankruptcies, it can take quite some time for distributions

22   to go out.  And in the other large crypto bankruptcies, it

23   took time, too.  In one of them, it took 30 days for them to

24   start the process.  14 days in, we distribute 75 percent of

25   the value and 50 days in we've distributed 85 percent of the

Page 31

1    value.  And, frankly, three-quarters of the remaining value

2    to be distributed, we're waiting on somebody to open an

3    account or complete KYC, and there's only so much that we

4    can do there.  People are getting regular communications

5    from us, obviously, to remind them to do those sorts of

6    things.

7              But what I will say to Your Honor is, you know, I

8    want this number to be as high as possible as quick as

9    possible.  But it's sort o f the 80/20 rule of 80 percent of

10   the time -- 20 percent of the time is spent on solving the

11   first 80 percent of the problem, but the last problems are

12   the more difficult ones to solve.  We've gotten emails from

13   people who are like, I understand, you thought I lived in

14   California.  I now live in Botswana.  We can help that

15   person, but that's a very manual process and it's going to

16   take a little bit of time.

17             So we are endeavoring to get distributions out to

18   people as quickly as possible, but I don't expect this

19   number to hit 95 percent in a month.  It's going to be a

20   little bit slower going.  Now that we've solved all the

21   common problems, we're going down to the brass tacks of the

22   difficult, individualized problems.

23             Okay, just a couple of other updates.  And I

24   apologize for being long-winded, but I think it's important.

25             So Fiat.  Fiat is the third row on this chart.

Page 32

```
 1     It's U.S. Dollars.  So unfortunately, we had to change our

 2     bank in February.  We were with Flagstar, who had bought

 3     Signature Bank.  And they unfortunately were running into

 4     their own distress.  And the irony is not lost on me that in

 5     a crypto bankruptcy we are worried more about the security

 6     of the U.S. Dollars than of the crypto.  I have to say that

 7     out loud.

 8             So we moved banks because it would be a disaster

 9     if our banking partner went under and took our money with

10     it.  So we transferred to a new bank successfully, but it

11     took a few weeks to migrate and to get a new corporate

12     account set up and all of the bells and whistles that you

13     need to get the services online that allows us to send

14     checks and wires all over the world.  And Fiat is one of the

15     other I would say success stories where we overhauled the

16     process based on initial feedback.

17             So our plan had been to send checks to everybody

18     eligible to receive Fiat, which is very inexpensive, it's

19     very simple, and it works.  But 45 percent of our creditors

20     live outside the United States.  And when we sent

21     communications right after the effective date saying we're

22     going to send you a check, please update your address if

23     you've moved recently, people said, whoa, whoa, whoa, I live

24     in a country where the post doesn't get delivered regularly,

25     the post is corrupt, people steal checks, my bank won't
```

Page 33

1    deposit a U.S. Dollar check.  You need another solution.

2             So we used the timing delay to our advantage from

3    moving banks and we overhauled the system.  Anybody with a

4    claim of at least a thousand dollars can get a wire transfer

5    for this, which should solve the problem for the

6    international people.  Eligible creditors should receive a

7    communication by the end of the week asking for wire

8    transfer instructions.  We've asked for quite a few of them

9    already.  We just keep going out to more and more people as

10   we hear of this issue.

11            THE COURT:  How are you dealing with potential

12   security issues regarding wire transfers to ensure that

13   these are the proper accounts?

14            MR. KOENIG:  For sure.  I mean, there is as you

15   can imagine a validation and security process that I am not

16   equipped to go through in detail.  But rest assured that our

17   banking partner does this for a living and the company does

18   this for a living.

19            THE COURT:  And your banking partner is who now?

20            MR. KOENIG:  Pardon?

21            THE COURT:  Who is the current banking partner?

22            MR. KOENIG:  Oh my god.  It's totally blanking on

23   me.  I'll get it when I sit back down.  But it's a

24   significant bank.  I'm just totally blanking on it.  But we

25   are confident in the process.  Frankly, the biggest problem

Page 34

1    we've had is getting people to send us the right

2    information.  Because we can only complete a wire transfer

3    if they fill out the form correctly.

4            THE COURT:  You need a routing number.

5            MR. KOENIG:  And some of these creditors don't

6    speak English as a principal language, which is totally

7    understandable. But we'll get back a wire transfer form that

8    has their name and their address, and we need the name of

9    the bank.

10           THE COURT:  Have you prepared wire transfer

11    instructions --

12           MR. KOENIG:  Yes.

13           THE COURT:  And has that been distributed to all

14    of these people?

15           MR. KOENIG:  Yes.  And we've continued to update

16    the form to make it even more clear over time as the first

17    round of it.  You know, we would say bank's address, and

18    people would put their own address.  And so the second time

19    we go through and we say, no, we really need the bank

20    address, not your address and make it as crystal clear as

21    possible for people.

22          So as I said, by the end of the week, anybody over

23    a thousand dollars will be contacted us and have the

24    opportunity to receive a wire.  And even for those under a

25    thousand dollars.  If you tell us you can't receive a check,

Page 35

1    we'll work to get you a wire.  And those people are going to

2    get a communication from us by the end of the week saying we

3    will send you a check, here's where you can update your

4    address.  And if you tell us affirmatively that you can't

5    receive a check, we will give you a wire, too.  And so by

6    the end of next week, we will have attempted all wires where

7    creditors gave us correct and complete wire instructions as

8    of yesterday and we'll just ramp up from there.  Okay.  That

9    is the update on Fiat.

10            So again, Fiat is a little bit behind the

11   eightball as you can see from the numbers just because the

12   banking delay, number one.  And we overhauled the system to

13   make sure that people that were receiving Fiat could

14   actually deposit it.  Because I don't want to send a check

15   to somebody and they can't deposit it, we have to cancel the

16   check and it's a whole thing.  All right.

17            One of the other areas of concern has been from

18   corporate creditors, as Your Honor may have read in some of

19   the letters.  Unfortunately, our agreement with Coinbase

20   only allows us to distribute to 100 corporate creditors.

21   Those are corporations, LLCs, trusts, and other non-

22   individual entities.  So if there was an LLC and the account

23   was in the name of the LLC rather than the individual

24   person.  They are I'll call them a corporate creditor.

25            The universe here is small but significant.  Just

1    for Your Honor's edification, there's about 1,800 corporate

2    creditors.  They have a total of $78 million in claims.

3    Those are --

4              THE COURT:  Give me that number again.  How many?

5              MR. KOENIG:  1,800 corporate creditors with a

6    total of $78 million in claims.  Now, those are big numbers.

7    But in the scope of Celsius, remember that we have about

8    400,000 creditors with claims big enough to receive a

9    distribution, and they have about $5 billion in claims.  So

10   it's about a half a percent by number and a little bit more

11   than one percent by dollar amount.

12             Corporate creditors are a challenge to KYC and to

13   distribute to.  For you and me, Your Honor, individuals, if

14   I want to sign up with Coinbase, I give them my driver's

15   license, I give them my Social Security number.  Coinbase

16   has a vendor that they run through and they go, yeah, this

17   person is who he says he is.  He's not on the banned list,

18   he's not a Russian oligarch, good to go.

19             If the corporate creditor is I Love Crypto, LLC,

20   how do you figure out who that person is?  A lawyer has to

21   read the LLC agreement.  Right?  And that structure may be

22   several levels up and you need to make sure that the

23   ultimate beneficiary is not a Russian oligarch.  And so we

24   negotiated this point --

25             THE COURT:  Just so the record is clear, you've

Page 37

```
 1   reference several times Russia.  There is a regime in place

 2   that prevents distributions to certain categories of

 3   creditors.

 4         MR. KOENIG:  Thank you, Your Honor.  Federal rules

 5   and regulations that prevent us from sending money to

 6   certain recipients who are affiliated with terrorist

 7   organizations or regimes that the U.S. Government --

 8         THE COURT:  The sanctions regime in effect with

 9   respect to Russia currently in effect restricts any

10   distributions to a fairly broad swatch of individuals or

11   entities.

12         MR. KOENIG:  And that is one of the points  of the

13   KYC AML process.

14         THE COURT:  Okay.  Just so that everybody

15   understands why in part such care has to be taken.  Indeed,

16   I have another case where about $8 million is frozen in New

17   York because it can't be returned to Russia because the

18   creditors include sanctioned parties.

19         MR. KOENIG:  Interesting.

20         THE COURT:  This is not a Celsius-specific

21   problem, it's a more general problem because of the

22   sanctions regime in effect.  Go ahead.

23         MR. KOENIG:  So again, if the creditor is an LLC,

24   a lawyer has to read the LLC agreement and then you have to

25   figure out who the ultimate beneficiaries are.  And that's a
```

1    complicated and expensive process.  It was one of the

2    harder-fought negotiations that we had with distribution

3    agents because we have 1,800 creditors and we want to

4    distribute crypto to as many of them as possible.  We landed

5    on 100 corporate creditors.  For better or for worse, that

6    was the best that we could do.  And there was a point in

7    time where we thought we were going to get zero.  And there

8    are 1,800 people.  And --

9              THE COURT:  How are you going to deal with the

10   other 1,700?

11             MR. KOENIG:  They are getting Fiat.  And that is

12   the only thing that we can do.

13             So the plan and the disclosure statement said if

14   you cannot get cryptocurrency for any reason, including

15   because there is not a distribution agent that can send to

16   you in a fully regulatory compliant way, you will get U.S.

17   Dollars.  And so we're sort of back to the conversation that

18   I had at the beginning of my presentation where if you were

19   outside of the top 100, we reserved for you Fiat because we

20   did not have a slot for you as of the effective date.  And

21   I've read the letters of people that, you know, they wish

22   that we had done some other process to select.  What we did

23   was we wanted to make the most out of those 100 slots.  And

24   there's any number of ways you could have done it.  We

25   looked at the data, and of the 1,800 creditors, half of

1    them, 900 have less than $5,000 in claims.  Those are

2    relatively small in this case.  Those 900 people

3    collectively have about $1 million of claims.  That's -- and

4    again, $78 million in claims total.

5            So I've seen the question, oh, the Debtors should

6    have run a lottery.  Well, if we had run a lottery and we

7    had used one of the 100 slots on somebody who was entitled

8    to receive $25, that doesn't seem like a very good use of

9    limited resources.

10           So what we did is we went out to the top 250

11   creditors by size and said do you want cryptocurrency or do

12   you not care.  This was in January.  And we said if you were

13   indifferent, please let us use the slot on somebody who

14   really cares.  And there were creditors that said I don't

15   care, send cash.  Those creditors may be kicking themselves

16   now with the run-up in prices, but it is what it is.

17           But it shows that as of January 16th, nobody

18   should have cared.  It was --

19           THE COURT:  They may have gotten their money and

20   reinvested it in Bitcoin.

21           MR. KOENIG:  Yeah, exactly.  They could have done

22   that.  But, you know, I understand -- same as I understand

23   the frustration of the people that live in countries all

24   over the world that we can't distribute crypto to.  They see

25   people that are getting more in their mind.  But we are

1     giving them what the plan requires.  And I'll stand behind

2     our process as the process that we believed was going to get

3     the most use out of limited resources and to get the most

4     amount of crypto to the most amount of creditors.  And it's

5     complicated and it's frustrating I'm sure, but that is what

6     it is.  And so there's corporate creditors that are saying,

7     well, you should make me whole for the runup in crypto

8     prices.  I sold their crypto on January 16th, and the price

9     has gone up.  We can give them the Fiat, but it is what it

10    is.  Okay.

11             CLERK:  Sorry, Judge.  We have a raised hand.

12             THE COURT:  Not yet, Deanna.

13             MR. KOENIG:  I'm almost done, Your Honor.

14             The convenience class, that is the subject of this

15    morning's motion, so I'll table that.  And then on the

16    loans, Your Honor may recall that we had an option for

17    borrowers to sort of refinance the principal balance of

18    their loans.  The main reason was tax treatment for those

19    individuals.  We had about 350 individuals that elected that

20    treatment.  We've been working with the lenders to refinance

21    them.  We closed our first cohort, a small cohort, but it

22    was a large dollar amount actually with about six or seven

23    creditors last week.  And we are doing about another hundred

24    this week.  And again, there's like 350 that initially

25    elected it, and some of those people have fallen away and

Page 41

1    have decided that they don't want to do that after all.  So

2    we'll give them their normal distributions.

3              Your Honor, I have been speaking for quite a

4    while.  There have been quite a few letters.  Is there

5    anything that -- oh, you wanted me to address the MiningCo

6    stock.  Those discussions remain ongoing.  It's difficult

7    for me to speak to it because that process is confidential

8    with the SEC.  But Your Honor and the other parties should

9    rest assured that I do not represent the MiningCo, I

10   represent Celsius.  But for my understanding, those

11   conversations are ongoing and I am hesitant to characterize

12   them for fear of breaching confidentiality.  But there has

13   not been a development that is -- you know, the SEC has not

14   denied the application, nor has it granted it.  Those

15   conversations remain ongoing, which, frankly, is what we

16   have expected.

17             I've been speaking for a while.  Is there anything

18   Your Honor was hoping I would address before I get to the

19   motion?

20             THE COURT:  No.

21             MR. KOENIG:  Thank you, Your Honor.

22             THE COURT:  Well, let me -- before you get to the

23   motion, I am going to allow creditors who wish to be heard

24   to speak.  Just so we are clear about this process, my

25   courtroom deputy, who is not in the courtroom, she is able

Page 42

1    to see raised hands on her computer.  And she will try and

2    do this in the order in which  hands are raised to identify

3    people.  I ask you to keep your comments brief if possible.

4    But I do want to hear what you have to say.

5             Deanna, can you indicate the first person to be

6    heard?

7             CLERK:  Yes.  We have Laura McNeil.

8             THE COURT:  All right.  Ms. McNeil?

9             MS. MCNEIL:  Hi, Your Honor.  Thank you for

10   allowing me to speak today.  My name is Laura McNeil, and

11   this is the first court hearing I've attended, participated

12   in.

13            I've been following the bankruptcy court updates

14   all along wherein I've waited patiently throughout this

15   process.  But I now feel like it's time to speak up.

16            I am here with two other creditors today, Wesley

17   Chang and Riece Keck.  And we are representing a group of

18   over 80 corporate creditors found and connected with in a

19   very short amount of time over various social media

20   channels.  Together, we wrote a letter with all of our names

21   and we submitted this to the Court on Monday.  We encourage

22   you to read Docket Number 4719, as it outlines the great

23   inequity we are all experiencing in regards to receiving USD

24   distributions.

25            The majority of the corporate creditors we

Page 43

1    represent have retirement accounts, family trusts, wills,

2    and non-conventional corporate accounts aimed at

3    safeguarding our financial futures.

4              I personally manage nine accounts.  Seven of these

5    are corporate accounts that are all self-directed IRAs which

6    are sole-operator LLCs with retirement funds.  Four of these

7    accounts are for my parents' IRAs and contain their entire

8    life savings, which they have not had access to for well

9    over a year-and-a-half, largely affecting their retirement

10   and their livelihood.  This has severely affected all of our

11   mental health, not knowing when, if, or how much of our

12   funds we get back.  My parents worked hard for decades and

13   they put their entire net worth into these tax-sheltered

14   accounts with Celsius under the false pretenses their funds

15   would be safe.

16             The reason I am speaking to you today is to bring

17   to your attention how corporate creditors are not getting

18   equitable treatment with their distributions.  The Debtor

19   selected only a hundred corporate accounts, as you heard

20   earlier, to receive their distribution through

21   cryptocurrency with Coinbase.  And the other accounts were

22   told they were to receive U.S. Dollar distributions based on

23   January 16th crypto prices.  However, it's been over two

24   months and most of us are still waiting to receive any

25   distribution.

Page 44

1          In Chris Koenig's opening statement, he said we

2      could do what we wanted with these funds.  But most of us

3      have still not even received these funds.

4          Since then, Bitcoin has gone up about 60 percent

5      and Ethereum has gone up about 40 percent in price.  This is

6      a huge discrepancy from the January 16th prices.  Selecting

7      100 accounts mean that those accounts got preferential

8      treatment.  The debtor had a fiduciary responsibility to be

9      equitable and they breached this duty.  We feel the Debtors

10     were negligent in not trying to find a distribution partner

11     to service all corporate accounts equally.

12          In Kirkland & Ellis's recent docket, filing number

13     4623, (indiscernible) that accounts are unable to receive

14     cryptocurrency distributions, and all of selected that

15     option.  The Debtors could sell the liquid cryptocurrency

16     and the creditor will receive liquid cryptocurrency at

17     prevailing market price as close to the expected date of the

18     cash distribution as possible.  If we as corporate creditors

19     are to be compensated with U.S. Dollars, we should also be

20     able to receive these distributions at prevailing market

21     prices as close as possible to our distribution.  To pay us

22     at significantly lower January 16th crypto prices and have

23     us wait over two months is another example of how this

24     process has been inequitable.  Our crypto should have never

25     been sold.  However, if the Debtors were going to liquidate

Page 45

1    assets, they should have had a viable banking partner able

2    to distribute these funds as close as possible to when they

3    were sold as they specify they are doing for other

4    creditors.  This is yet another example of how these

5    distributions have not been equitable across creditors.  Why

6    should corporate creditors, including my parents, be treated

7    differently than any other creditor?  As the U.S. justice

8    system (indiscernible), people are to be treated

9    impartially, fairly, equally, and reasonably by the law.

10           Your Honor, on behalf of myself, my parents, and a

11   growing list of over 80 corporate creditors we have

12   connected with, we are asking that you rule that was not an

13   equitable solution for corporate creditors.

14           In Chris Koenig's opening statement, he said if we

15   have it, we will give it to you.  Well, we understand that

16   Kirkland & Ellis has retained $165 million to use to remedy

17   (indiscernible) such as this.  And we kindly request you

18   order these distributions to be made equitably so all

19   creditors are treated fair and equal as required by law.

20           Specifically we are requesting the Court to order

21   distributions be made in cryptocurrency.  And where this is

22   not possible, corporate accountholders should receive U.S.

23   Dollars at current prevailing market cryptocurrency prices

24   as close as possible to when they are sold to match

25   treatment of other creditors receiving U.S. Dollars.

1          For the few corporate accounts that have already

2    received U.S. Dollar distributions, we ask that they be made

3    whole based on the prevailing market rate when they received

4    their distributions just as Kirkland & Ellis have stated

5    other creditors will receive.  These requests will ensure

6    all creditors are treated fair and equal.

7          Your Honor, thank you for your time and your

8    consideration.

9          THE COURT:  All right, thank you.  I haven't read

10   your filing, ECF 4719.  I would ask that the Debtors respond

11   in writing to it on ECF and I'll determine how to take it

12   up.

13          MR. KOENIG:  Understand.  We will do so.

14          THE COURT:  All right.  Thank you, Mr. McNeil.

15          All right, Deanna, who is next?

16          CLERK:  We have Wesley Chang, I believe.  Wesley,

17   can you unmute?

18          MR. CHANG:  Yes, hello.  Thank you, Your Honor,

19   for giving us the opportunity to speak.  I don't know if

20   you're able to see me on the screen.

21          THE COURT:  I can't see you on the screen.  I can

22   see your name on the screen.  Go ahead, Mr. Chang.

23          MR. CHANG:  Okay, all right.  Yes, again, my name

24   is Wesley Chang.  I am a (indiscernible) creditor who owns

25   (indiscernible) Earn, Loan, and corporate accounts with

Page 47

1    Celsius.

2            Mr. Koenig earlier spoke about doing their best to

3    ensure equitable distribution.  And I am here to

4    resoundingly dispute that claim as well as other claims that

5    he has made this morning.

6            The Debtors could not secure a distribution

7    partner.  Financial issues with their banking partners,

8    logistics, complexities, miscalculation of distribution.

9    This is all documented through the dockets that were

10   submitted by all the creditors.  So I just don't feel that

11   Debtors have much credibility.

12           As you heard from Ms. McNeil and as you'll hear

13   from Mr. Keck, we are here to represent all corporate

14   creditors who have been informed that we will not be getting

15   distribution in the form of cryptocurrency as we have all

16   requested.

17           According to the Docket 4623 by Kirkland & Ellis

18   on March 13th, the reason for the Debtor's inability to

19   distribute currently co corporate creditors was due to an

20   onboarding process and compliance requirement being

21   significantly more demanding for corporate creditors.  And

22   we spoke about that earlier.  I understand.  But as Mr.

23   Koenig spoke about the AML and KYC compliance, we were all

24   subject to KYC process through Celsius even after the

25   bankruptcy effective date.  But the Debtors still took it

Page 48

1    upon themselves to involve a third party distributor, which

2    obviously added more complexity to the distribution process,

3    which is where we are now a month later.  We still haven't

4    gotten anything.  And as a result, they were allowed to

5    enter into an agreement that limited equitable distribution

6    for those outside of top 100 accounts.

7           Docket 4220, again, filed by Kirkland & Ellis back

8    on January 11th stipulated that if you are not eligible to

9    receive a distribution in cryptocurrency due to your

10   particular circumstances, we will receive -- you will

11   receive distribution in U.S. Dollars.

12          (indiscernible) this was a huge miscalculation on

13   the Debtor's part and there should be no practical reason

14   for those corporate creditors who selected cryptocurrency as

15   the form of payment to receive cash distribution.  We feel

16   that this is a clear failing on the Debtor's commitment to

17   ensure equitable distribution.

18          The topic of equitable distribution naturally took

19   the front stage due to the spike in Bitcoin and Ethereum

20   prices as of recent.  But such headline could have been

21   avoided had the Debtors at their own discretion, again,

22   could have exercised fair and equitable judgement by

23   committing (indiscernible) deficiency.

24          And Docket 4319, filed on February 15th, the

25   Debtor state U.S. Dollar distribution will be distributed as

1    soon as reasonably possible after the effective date of the

2    plan.  Due to what Debtors classified as a logistical

3    complexity, as soon as reasonably possible didn't

4    materialize.  So even if for some reason distribution must

5    be made in cash, we ask the Court to establish a rule that

6    cash wire transfer distributions be made within five

7    business days from the new effective date that should be

8    established, or cash value at the time of distribution be

9    within five percent of the Bitcoin and Ethereum value.  We

10   have to have that type of rule to be (indiscernible).

11   Otherwise, we'll be back in the court arguing this point.

12            So in closing, I want to reiterate Ms. McNeil

13   briefly -- what she touched on earlier.  The corporate

14   accounts are mostly owned by single-member LLCs with IRA and

15   retirement funds of her parents and her relatives.  And that

16   is -- and that goes for most of the corporate creditors,

17   including mine.

18            So we ask Your Honor to be fair in your

19   (indiscernible) and consideration of those who really need a

20   fair treatment.  Your Honor, please have mercy on all of us

21   and grant us the equitable distribution we all deserve.

22   Thank you for your time.

23            THE COURT:  Thank you, Mr. Chang.

24            Let me hear next -- Deanna, who is next?

25            CLERK:  We have Riece Keck.

Page 50

1              THE COURT:  All right.

2              CLERK:  Apologies if I got the wrong name.

3              THE COURT:  Thank you.  Mr. Keck, go ahead.

4              MR. KECK:  Hello, Your Honor.  My name is Riece

5    Keck and I am a corporate creditor based here in the United

6    States.  For context, I have a claim with Celsius of

7    approximately $305,000.

8              I am here today to raise concerns about the

9    inequitable treatment of corporate creditors in the Celsius

10   bankruptcy case.  I am for context one of those who is

11   scheduled to receive distributions in U.S. Dollars.

12   Although I did originally request cryptocurrency, I was

13   initially somewhat indifferent due to the similar Bitcoin

14   prices on January 16th and the effective date.

15             However, the significant delay in receiving funds

16   and the recent appreciation of Bitcoin and Ethereum have

17   materially impacted my distribution.  If paid in

18   cryptocurrency, my claim would currently be worth

19   approximately $82,000 more than the U.S. distribution at

20   current prices.

21             There are three primary issues that I want to

22   raise with treatment of corporate creditors.  First, as

23   we've discussed, is that only 100 corporate creditors could

24   receive cryptocurrency while the rest receive U.S. Dollars.

25             Now, I fully understand the reasoning for picking

1    U.S. Dollars, as Mr. Koenig mentioned, in the instance of

2    regulatory or compliance issues.  However, increased

3    administrative burden is not a valid reason for unequal

4    treatment.  Debtors should have found an additional

5    distribution partner capable of handling the (indiscernible)

6    corporate creditors.

7              Secondly, as Mr. Koenig mentioned, the funds were

8    liquidated on January 16th.  However, this was done without

9    a proper banking partner in place, which has caused delays

10   and prevented creditors from benefiting from recent

11   cryptocurrency appreciation.  And as Mr. Koenig mentioned,

12   only 18 percent of wires have gone out.

13             Your Honor briefly mentioned earlier that those

14   corporate creditors could have reinvested, which I actually

15   did intend to do, as I anticipated a wire shortly after the

16   effective date.  However, as of today, I still have yet to

17   receive anything.  So had things gone out on time, I could

18   have done that.  But the Debtors failed to accommodate that.

19             And then third, individual creditors who are

20   unable to receive cryptocurrency through Coinbase and PayPal

21   are assured that their crypto will be sold at current prices

22   while corporate creditors are not afforded the same

23   treatment.

24             So, Your Honor, I believe these issues violate

25   fundamental principles of bankruptcy law.  First, in unfair

Page 52

1      discrimination, and I believe the Debtors have unfairly

2      discriminated against similarly-situated creditors by

3      treating corporate creditors differently.

4              Secondly, breach of fiduciary duty.  The Debtors

5      breached their fiduciary duties by failing to secure a

6      distribution partner capable of servicing all corporate

7      accounts equitably.

8              Third, inconsistent treatment.  The Debtor's own

9      statements indicate that creditors unable to receive

10     cryptocurrency, individual creditors, will receive proceeds

11     at prevailing market prices, but corporate creditors are

12     forced to accept outdated prices.

13             And fourth, unnecessary liquidation.  The Debtors

14     should not have liquidated cryptocurrency assets prematurely

15     without a viable banking partner, which has caused harm to

16     corporate creditors.

17             Now, I understand that those distributions -- or

18     those assets were sold on January 16th.  However, as a

19     previous creditor mentioned, Kirkland & Ellis has withheld

20     back $165 million to ensure equal and fair treatment of all

21     creditors.  And I ask that you rule fairly to those of us

22     who have been unable to receive cryptocurrency.  Thank you

23     for your time.

24             THE COURT:  Thank you.  Deanna, next?

25             CLERK:  Next is George Stanbury.

```
 1              THE COURT:  All right.  Mr. Stanbury?

 2              MR. STANBURY:  Good morning, Your Honor.  Thank

 3      you very much for all of your patience and effort in this

 4      (indiscernible).  I have simply two questions to ask.  The

 5      first, how did you value (indiscernible) value our U.S.

 6      Dollar (indiscernible) for purposes of the distribution.

 7              And my second question is since any distribution

 8      (indiscernible) upon receiving a distribution

 9      (indiscernible), why didn't I and others ever receive the

10      distribution letter?

11              THE COURT:  I'm sorry, Mr. Stanbury, I'm not sure

12      I understood your point.

13              MR. KOENIG:  Your Honor, I think I heard the

14      second point, which was --

15              THE COURT:  You have to identify yourself.

16              MR. KOENIG:  I'm sorry.  Chris Koenig from

17      Kirkland for Celsius.

18              I think what Mr. Stanbury said was he has not

19      received a PayPal code yet.  And he was asking why.

20              Mr. Stanbury, if you -- we'll refile on the docket

21      tonight the FAQ with all of the different emails and

22      ticketing systems.  But if you email me, my email is on all

23      of Celsius' filings, Chris.Koenig@Kirkland.com.  If you

24      email me your question, we will come back to you promptly.

25      And of course you are free to address the judge.  But if
```

Page 54

1    your question is why haven't I received my code y et, I

2    standing here don't know that, and I would have to check my

3    records.

4              THE COURT:  Go ahead, Mr. Stanbury, if you want to

5    say anything else.

6              MR. STANBURY:  The first question was how did you

7    value the price or the value of an alt coin such as

8    (indiscernible) for purposes of distribution.

9              MR. KOENIG:  Right.  So what happened, Mr.

10   Stanbury, is there was a table --

11             THE COURT:  And it's Mr. Koenig who is speaking.

12   Go ahead.

13             MR. KOENIG:  I'm sorry.  Mr. Koenig speaking to

14   Mr. Stanbury.

15             Mr. Stanbury, the plan provided for a table that

16   would be set for a conversion of different types of

17   cryptocurrency into each other.  But if you had a claim for

18   ADA, that claim was set on the petition date pursuant to the

19   Bankruptcy Code.  And so whatever the price of ADA was on

20   that date is the claim that you have.  And then we

21   distributed to you Bitcoin and Ethereum at prices that were

22   as of January 16th.  So if your question is what was the

23   price of ADA, the price of ADA was the price that you had in

24   your account.  That's your claim against Celsius.  That was

25   set on the petition date of July 13th, 2022.  And then you

Page 55

1    got Bitcoin and Ethereum that -- let's just say that the

2    value of your account as of July 13th, 2022 was $10,000.

3    The plan provided that you would get Bitcoin and Ethereum

4    valued as of January 16th, 2024.  And it's about 57, 58

5    percent as the initial distribution.  So if you have a

6    $10,000 claim, you've got Bitcoin and Ethereum that as of

7    January 16 was worth $57,000 or $58,000.  And then what the

8    Bitcoin and Ethereum was worth sort of goes up and down with

9    the market.

10            Does that help answer your question?

11            MR. STANBURY:  Yes, thank you.

12            MR. KOENIG:  You're very welcome.  If you have

13    anything else, as I said, please email me.

14            THE COURT:  All right.  Deanna, next?

15            CLERK:  Christian Funck.

16            THE COURT:  I'm sorry, say it again, Deanna?

17            CLERK:  The name is Christian Funck, F-u-n-c-k.

18            MR. FUNCK:  Yes, hello.  Can you hear me?

19            THE COURT:  Yes, I can.  Go ahead, Mr. Funck.

20            MR. FUNCK:  Your Honor, thank you for your time.

21    I'm calling out of Europe.  I am calling from one of the

22    creditor class, the Borrow class.  And we sent a letter

23    yesterday, and it's about the unfair discrimination between

24    the actual creditor class, but also within the actual credit

25    class itself.

Page 56

1           In our case, in the Borrow class, it was mentioned

2      by Mr. Koenig that refinancing is only for tax reasons.

3      That is not correct.  Many people are refinancing because

4      they actually cannot pay back the loan themselves but they

5      don't want to lose their crypto.  But the situation is as

6      follows.  Some within the credit class or the Borrow class,

7      they have been able to pay off the loan or settle the loan

8      (indiscernible) prices whilst we that want to refinance, our

9      loans cannot (indiscernible) prices (indiscernible) have to

10     do it at market prices.  And at the moment that would give

11     us around, you know, almost half of the amount of coins back

12     than other people in our same class that's been able to

13     receive.

14           Therefore, we think that it's unfair

15     discrimination and we would like to (indiscernible) funds

16     set aside to remedy that or to at least (indiscernible)

17     refinance (indiscernible) excess effective date pricing just

18     like all the others.

19           And finally, if you allow me to comment, also what

20     we try to understand is that our assets have in the meantime

21     since the petition date (indiscernible) almost risen by 370

22     percent.  The question is where does that upside get to or

23     go to.

24           Thank you for your time.

25           THE COURT:  Thank you.

Page 57

1           MR. KOENIG:  Your Honor, I'm happy to address --

2      Chris Koenig, Kirkland.

3           So what Mr. Funck is talking about is under the

4      plan, borrowers had three options.  The default option was

5      setoff.  That means that they no longer owe the loan to

6      Celsius.  It is forgiven.  And in exchange, we will reduce

7      the collateral that we were holding for them in an equal

8      amount.  So they get a hundred percent recovery because they

9      owed us -- if they had a million dollar loan, they owed us a

10     million dollars, and we are forgiving that loan.  And in

11     exchange, we will reduce their account effectively by a

12     million dollars.

13          That is the default treatment, and that is the

14     treatment that overwhelming borrowers selected because that

15     was the simple treatment and that's what made the most

16     sense.

17          Your Honor ruled as part of confirmation the

18     collateral belongs to Celsius.  It does not belong to the

19     borrowers.  And the borrowers had a claim, an unsecured

20     claim for the difference.  They had a setoff right, and then

21     they had a claim for the difference.  And what we did to

22     accommodate borrowers who had a negative tax consequence is

23     setoff is a taxable transaction.  If they repaid their loan

24     and got their collateral back, that would not be a taxable

25     transaction.  So what we did in the plan was we allowed them

Page 58

1    to repay their loan if they wanted.  They would not get all

2    of the collateral back, because Your Honor ruled it didn't

3    belong.  But what we would do is they could buy a like

4    amount of their collateral back.  So if they had a million

5    dollar loan, they had three million dollars of collateral.

6    They could repay the million dollars.  We would give them

7    their collateral back in an equal amount.  A million dollars

8    of Bitcoin or Ethereum or whatever it was, and that will

9    help their tax treatment.  I mean, I'm not giving tax

10    advice, but we think that that should hopefully help their

11    tax treatment.  But it's at then-prevailing market prices.

12    It was going to be neutral to the estate.  And if they

13    preferred it, we were happy to facilitate it.  So there were

14    to options.  If you could -- if you didn't need to refinance

15    your loan because you could come up with a million dollars,

16    we had a process that before the effective date there was a

17    week-long period where you sent in a wire and we sent you

18    back your equivalent amount of Bitcoin or Ethereum.

19         So I'm using rough numbers.  But if you did that,

20    you bought Bitcoin at $43,000.  The plan also provided that

21    if you didn't have the cash and wanted to finance the cash

22    through a third-party lender -- not Celsius -- the Debtors

23    would work -- I think the plan says commercially-reasonable

24    efforts to work with the lenders after the effective date to

25    come up with a refinancing.  That process is complicated.

Page 59

1    The borrower has to negotiate with the lender, has to sign

2    documents, has to sign documents with us directing us to

3    give their distribution to the lender, who has a new loan.

4             So a borrower could take out a new million-dollar

5    loan with, you know, lender.  Lender sends us the money, we

6    send a million dollars of Bitcoin or Ethereum to lender as

7    well as the post-setoff amount to which the borrower is

8    entitled for the overage, the difference between the $3

9    million in collateral and the $1 million loan.  And then we

10   have no further relationship with the borrower.  The

11   borrower has a new relationship with the lender and has to

12   pay a million dollars to the lender to get that million

13   dollars in collateral plus the claim on the two million

14   dollar delta.

15            So what Mr. Funck is arguing is he wishes that he

16   could have bought Bitcoin at $43,000.  And it has taken time

17   for us to refinance because it is a complicated process.

18   And he wishes that he could have bought Bitcoin at $43,000

19   like everybody else.  And that is -- I mean, the plan has

20   provided that it is going to be at prevailing market prices

21   so that it is net-neutral to the estate and to other

22   creditors.  Allowing Mr. Funck to buy bitcoin now at $43,000

23   when the market price of Bitcoin is $65,000 I would argue is

24   inequitable, and anybody should make that choice.  But I

25   shouldn't advocate, but that is his argument.

Page 60

 1            THE COURT:  All right.  Here's what I would like

 2    you to do, Mr. Koenig.  We can order the transcript after

 3    this hearing.  Rather than have separate filings as to each

 4    of the questions you've gotten, you can do a single filing.

 5    I think you ought to try as best you can to address these

 6    issues.  I think I understand.

 7            MR. KOENIG:  Okay.

 8            THE COURT:  Thank you, Mr. Funck.

 9            Deanna, who is next?

10            CLERK:  We have Mark Casey Miller.

11            THE COURT:  All right, Mr. Miller, go ahead.

12            MR. MILLER:  Good morning, Your Honor, Mr. Koenig.

13    Thank you guys for your time this morning.

14            I am one of the individual creditors in the

15    Celsius distributions.  I was -- I am a U.S. resident here

16    out of Tennessee set to receive my crypto via PayPal/Venmo.

17    I am one of the ones -- I'm kind of representing a group of

18    about 60 of us that are in the same predicament that though

19    we have -- I've had a PayPal account for 21 years.  I've

20    been an excellent PayPal customer.  Verified KYC.  Attempted

21    to claim codes, got an error, some process error on the back

22    end.  PayPal said I'm a hundred percent perfectly fine, KYC.

23    Codes don't work.  But then I got the email a day later

24    saying important, your claim cannot be distributed by PayPal

25    or Venmo, please wait for further instructions.

Page 61

1          Well, it's been about 36 days now and we haven't

2     received any information since then other than we had a

3     docket update -- I believe Docket Number 4623 that was filed

4     on the March 14th.  Did notate it had a blurb in the bottom

5     that notated as a reminder if for any reason neither PayPal

6     nor Venmo can service your claim distribution, you will be

7     notified that your distribution cannot be serviced through

8     PayPal or Venmo and the post-effective date debtors will

9     attempt to make your distribution via Coinbase.

10          So we are at this stage now that we have not

11     received any official information outside of seeing this in

12     this docket five days ago.  So I've submitted multiple

13     tickets to Stretto along with the other ones in this

14     predicament.  We all have gotten the same copy and pasted

15     response, which doesn't give us any new information.  And

16     we've even tried to reach out to Celsius before they shut

17     down the 29th to verify, okay, do we have our stuff in place

18     to receive our Coinbase distributions.  And we've noticed

19     now that you -- now that the Debtors are starting to make

20     attempts to distribute Coinbase, the second attempts for the

21     Coinbase users with KYC issues, we're wondering are those of

22     us that are unable to be serviced by PayPal that are being

23     moved to Coinbase, when are we going to start seeing our

24     distribution attempts through Coinbase since we are being

25     moved to another distribution agent?

Page 62

1              THE COURT:  Thank you, Mr. Miller.

2              MR. MILLER:  And we're kind of just -- yeah.

3              MR. KOENIG:  Mr. Miller, it's Chris Koenig.  I

4    understand the question entirely and I have what I hope is a

5    helpful response.

6              So we are in the process of migrating the people

7    that can't get distributions from PayPal to Coinbase,

8    Coinbase is going to be reattempting distributions I would

9    say every two weeks.  And our plan is to migrate people

10   PayPal to Coinbase on the off week.  So I would hope in the

11   next couple of weeks you're going to get your distribution

12   through Coinbase.  That would be my expectation.  I mean, I

13   haven't looked at your particular claim.  I don't know your

14   particular situation.  But that is our plan for banned users

15   from PayPal generally, is we're going to be moving them to

16   Coinbase promptly in the next couple of weeks.  And I hope

17   you get your distribution soon.

18             THE COURT:  Deanna, next.

19             CLERK:  Artur Abreu, A-r-t-u-r is the first name.

20             THE COURT:  All right.  Mr. Abreu, go ahead.

21             MR. ABREU:  Pro se creditor.  Can you hear me?

22             THE COURT:  Go ahead.

23             MR. ABREU:  Can you hear me?

24             THE COURT:  Yes, we can hear you fine.

25             MR. ABREU:  Okay.  So I just wanted to add my

Page 63

1    personal experience to the matters that Chris Koenig was

2    mentioning about distributions.  I have two other family

3    creditors who were successful and a third.  We are

4    international, so we are doing the KYC on the Coinbase side.

5           So this third family member was required to

6    provide a source of income.  And I -- we cannot provide this

7    because it's (indiscernible) retirement.  But I just wanted

8    to highlight that the claim here is still under $5,000.  So

9    I'm kind of frustrated because I'm trying to -- I already

10   sent back (indiscernible) even the mortgage, and we still

11   are having issues.  So I just want to highlight for the

12   Court that some issues with KYC is also -- is coming from

13   the Coinbase side because they are trying to have a source

14   of fund.  And in this particular case, there is no -- there

15   is no future -- and this family member doesn't intend to

16   keep on Coinbase.  Just wants to sell and rescue all the

17   funds here.  So I just want to highlight this.

18          I know the judge usually just have (indiscernible)

19   pro se creditors about the motion about the (indiscernible)

20   Earn creditors that were (indiscernible) and was not given

21   time.  Many creditors contacted me.  I think --

22          THE COURT:  Mr. Abreu, we have a separate motion

23   on the docket.

24          MR. ABREU:  Okay.

25          THE COURT:  That hope -- today, today that --

1                    MR. ABREU:  Yeah, yeah, yeah.

2                    THE COURT:  -- to deal with this issue about the

3        convenience class.  So we'll take that up when we finish

4        this portion of the hearing.

5                    MR. ABREU:  Okay.  Thank you, Judge.  I just

6        wanted to bring that issue (indiscernible).  Thank you.

7                    THE COURT:  Thank you.  All right, Deanna, next.

8                    CLERK:  Rebecca Gallagher.

9                    THE COURT:  Ms. Gallagher, go ahead.

10                   MS. GALLAGHER:  Yes, Your Honor.  I am in the

11       situation where I have received my Ethereum code and claimed

12       it on PayPal but still have not received a BTC code.  So I

13       would like someone to assure me today that the code is

14       coming and I will get those 2.069 BTC.  And then I can wait

15       patiently.  But the thought that I might not be getting the

16       code at all is really very, very distressing.

17                   THE COURT:  All right.  Let's see.  Mr. Koenig, go

18       ahead.

19                   MR. KOENIG:  Ms. Gallagher, it's Mr. Koenig.  I've

20       heard this from some people, that they received one code or

21       not the other for whatever reason.  There were a couple of

22       creditors that could elect to receive only Bitcoin or

23       Ethereum.  We offered that option to people with very large

24       claims.  Assuming you did not do that, the Bitcoin code is

25       coming.  We've heard this from a number of people that for

Page 65

1    whatever reason their email flagged one of them as spam or

2    whatever.  So we are resending all of the outstanding codes.

3    And I hope that you receive it soon.  It should happen in

4    the next week or so.  If you still haven't received it,

5    please feel free to contact me after a week or so and I'll

6    look into it more for you.  But we are aware of the issue.

7    We're trying to push out all of the claim codes.  It may

8    take another week or two, but we're working on it.  It is

9    coming, I assure you.  It is coming.  And again, assuming

10   that you didn't opt for a hundred percent ETH, your Bitcoin

11   code is out there and we'll track it down for you.

12            THE COURT:  All right.  Deanna, next.

13            MS. GALLAGHER:  I opted to 75 percent ETH and 25

14   percent Bitcoin.  So does that mean I'm definitely going to

15   get the 25 percent?

16            MR. KOENIG:  You should.  I obviously need to look

17   at your particularized claim.  But yes, we'll look at it.

18            THE COURT:  Thank you.  Deanna?

19            MS. GALLAGHER:  Okay.  Thank you, Your Honor.

20            THE COURT:  Thank you, Ms. Gallagher.

21            CLERK:  We have Ezra Vazquez-D'Amico.

22            MR. VAZQUEZ-D'AMICO:  Thank you.  Can you hear me,

23   Your Honor?

24            THE COURT:  Yes, I can.  Go ahead, Mr. D'Amico.

25            MR. VAZQUEZ-D'AMICO:  Thank you.  I am here

Page 66

1    representing myself.  I'm owner of a single-member LLC that

2    manages my retirement.  I'm also a Loans creditor as well as

3    a regular Celsius creditor.  But I wanted to second

4    everything that's been said by the corporate creditor class

5    (indiscernible) and add in addition that I've talked to a

6    number of corporate creditors like myself who do have

7    Coinbase accounts, corporate accounts for their LLC.  But we

8    were never given the option to receive the funds in

9    cryptocurrency.  So I just wanted to add that fact, that

10   while Mr. Koenig said that Coinbase had pointed out that it

11   would be to difficult to onboard as many corporate creditors

12   as might have wanted to, some of us were already onboarded

13   and were not treated equitably that way.  Thank you, Your

14   Honor.

15            THE COURT: Thank you, Mr. D'Amico.

16            MR. KOENIG:  We will address that in our written

17   response.

18            THE COURT:  Okay.  Next, Deanna?

19            CLERK:  Jin Wu.

20            MS. WU:  Thank you, Your Honor, for your time.  I

21   am an individual creditor with suspended accounts due to the

22   fact that I have more than one account with Celsius.  I

23   appreciate the fact that the Debtors are working through the

24   suspended accounts to try (indiscernible) distributions.  My

25   questions are the following.

Page 67

1          First, is there an approximate timeline for

2   suspended users to receive our distribution?  The second is

3   are there foreseeable issues that would prevent suspended

4   users from receiving these distributions?  In other words,

5   what kinds of suspended users are likely not to receive

6   distributions and what kinds will receive distributions?

7   And thirdly, I just want to make sure that our distributions

8   won't be distributed in kind rather than in U.S. Dollars.

9   Thank you.

10          MR. KOENIG:  Thank you.  It's Chris Koenig.  So

11   I'll take you in turn.

12          So just for Your Honor's edification, we had a

13   number of users that were suspended on the Celsius platform

14   for whatever reason.  Many of them had multiple accounts,

15   which was a technical breach of the terms of service.

16          As we were starting distributions, we realized

17   that we had suspended these accounts and that it wasn't

18   proper to keep them suspended for what amounts to a

19   technical violation of the terms of service.  So we decided

20   to unsuspend those users and process them for distributions.

21          That is a manual process.  I can't just flip a

22   switch and send all of those people.  We need to go through

23   and manually enable those users for distributions.  We are

24   in the process of doing it.  I can't give you a particular

25   day.  I hope that in the next couple of weeks almost all of

1   them are enabled for distributions.  I don't expect any

2   issues particularized to the formerly-suspended users.  They

3   will be routed for distribution just like everybody else.

4          Now, if you are a corporate creditor and you were

5   suspended, you may get Fiat for the same reason that all the

6   other corporate creditors are going to get Fiat.  So I can't

7   guarantee you that you will receive cryptocurrency.  But if

8   you are otherwise able to receive cryptocurrency, you will

9   receive it.

10          THE COURT:  Ms. Wu had described herself as an

11   individual account.

12          MR. KOENIG:  Then it sounds to me if she lives in

13   the United States and she is an individual, I would expect

14   that she would get cryptocurrency unless she's banned on

15   PayPal and Coinbase or something for that example.  But I

16   would expect that you would receive crypto.  And we are

17   unsuspending your accounts in the next few weeks.  We will,

18   once unsuspended, you know, send them to Coinbase and PayPal

19   for distribution.  You know, that may take a little bit of

20   time to work its way through their process.  But, you know,

21   I am hopeful that in the next month, month-and-a-half

22   hopefully it's in your account.

23          THE COURT:  Deanna, next.  Thank you, Mr. Koenig.

24   Deanna, next.

25          CLERK:  Janell Eckhardt.

Page 69

1        MS. ECKHARDT:  Hi.  I am Janell Eckhardt.  I am a

2   U.S. Earn Creditor and I have a few questions or comments,

3   actually.

4        So I wanted to see if Kirkland could disclose who

5   else they considered for the corporate and international

6   distribution partner.  PayPal is actually bigger

7   internationally than Coinbase.  Did they consider anybody

8   else?

9        Another one is why was the app shut down early, 20

10  days versus the 90 days they originally talked about.  Why

11  couldn't corporate use the app?  They were already KYC

12  already.  So why couldn't they use that instead?

13       Kirkland liquidated on January 16th, but they

14  didn't notify corporate accounts until January 19th

15  (indiscernible) January 23rd deadline.  And if distribution

16  is U.S. Dollars, do those creditors still get back stock?  I

17  don't think that's been addressed yet.  And then finally

18  (indiscernible) should get -- they really should get a paper

19  notification.  Some don't get emails and it goes into their

20  spam.  So (indiscernible) notifications going to creditors,

21  but they're only getting email.  So I would request that

22  they also get paper notifications.  Thank you, Your Honor.

23       THE COURT:  Thank you, Ms. Eckhardt.

24       MR. KOENIG:  Thank you.  Again, it's Chris Koenig.

25  So I wrote down I think many of your questions.  It was why

Page 70

1    Coinbase and PayPal and not another distribution agent.  I'm

2    not going to disclose our discussions with other

3    distribution agents, but we did go through the process.  I

4    mean, Coinbase was to my knowledge the only one who was

5    willing to service corporate accounts at all.

6           You asked why we shut down the app early, 30 days

7    versus 90 days.  It was 90 days after the confirmation

8    order, not 90 days after the effective date.  So what we did

9    is the confirmation order enabled custody withdrawals

10   immediately and enabled them on the app and the confirmation

11   order said that we has -- that people had 90 days from that

12   date to claim a distribution.  And that was because all of

13   those distributions were through the app and were fairly

14   simple.  And the Court had ruled that custody was their

15   property.  So we were comfortable from a regulatory

16   perspective that we were not distributing securities in

17   violation of the securities laws.  And we had talked to the

18   regulators about that.  If we were to make a distribution

19   for something other than custody, I think the regulators

20   would have had something to say.  So that's the question of

21   why not just let the corporate creditors take something off

22   the platform.  I don't represent the SEC, but I suspect that

23   they would have had something to say if I argued that.

24          We got them comfortable that we were just -- if we

25   were returning somebody's actual property to them, that

Page 71

1    might be different than making a distribution on a claim in

2    a bankruptcy.

3            But you said that we shut it down early.  It was

4    90 days from the confirmation order, which I think was

5    November 9th.  We actually extended that out until the end

6    of February because we wanted to give people even more time.

7    It wasn't 30 days from the effective date, it was 90 days

8    from the confirmation date.

9            And then I think you said something about paper

10   notifications.  We're certainly evaluating that.  And it's

11   obviously expensive to send paper notices as well.  As we go

12   through the process, if it seems that people aren't getting

13   our emails, we will send them paper notices.  But paper

14   notices can be lost and discarded just like emails can be

15   lost or discarded.  But we're going through the process.

16           THE COURT:  Deanna, next?

17           CLERK:  WE have Tyson Foianini.  Do you want me to

18   spell the last name?

19           THE COURT:  Yes, please.

20           CLERK:  F-o-i-a-n-i-n-i.

21           THE COURT:  All right.  Please go ahead.

22           MR. FOIANINI:  Hi, Your Honor.  thank you for

23   allowing me to speak today.  My name is Tyson Foianini and I

24   fall under Class 6A, General Custody Claims.  I'm on the

25   call today because of Document Number 4372 that I received

Page 72

1    via email on March 2nd, 2024.  In this document, it is my

2    understanding that the creditors may elect to reverse their

3    convenience claim elections if they mistakenly voted to opt

4    in the convenience claim election.

5           For the record, I rejected the plan in August

6    2023, not fully understanding the consequences of my vote

7    and now fall under Class 6A, General Custody Claims,

8    Treatment B.

9           From my understanding, my crypto will be

10   transferred to a segregated walled held by the post-

11   effective date Debtors and shall be subject to an all

12   avoidance and (indiscernible) claims with respect to such

13   allowed general custody claim.

14          So my question is as follows.  I would like to

15   know if I can reverse my vote and fall under Class 6A,

16   General Custody Claim, Treatment A, where I would receive

17   72.5 percent of my cryptocurrency.

18          THE COURT:  Mr. Koenig?

19          MR. KOENIG:  Yes.  Again, Chris Koenig.  So we

20   represent Celsius and the post-effective date debtors.

21   There was a litigation administrator who was appointed to

22   pursue the preference issues.  If you email me, Mr. Foianini

23   -- and again, my email is on all of the Celsius filings -- I

24   will put you in touch with that person who can address that

25   question.  But I understand -- your question is can I make

Page 73

1    the election that was offered to me before.  I can't speak

2    to that.  But if you contact -- I will give you their

3    contact and I hope that you get a response very soon.  I

4    understand your question.  We'll put you in touch.

5              MR. FOIANINI:  And where did you say I could get

6    your email from?

7              MR. KOENIG:  It's on any of the Celsius filings on

8    the court docket.  The Kirkland signature block has my name.

9    It's Chris.Koenig@Kirkland.com.  But it's on any of the

10   Celsius filings.

11             MR. FOIANINI:  Thank you, Mr. Koenig.

12             THE COURT:  Thank you.  All right.  Deanna, next?

13             CLERK:  The next person that has not spoken is Don

14   Smith.

15             THE COURT:  I'm only going to hear people once.

16             Mr. Smith?

17             MR. SMITH:  yes.  Your Honor, thank you for

18   allowing me to speak.  My name is Don Smith.  I am a Loan

19   creditor.  And on February 23rd, I emailed Mr. Koenig, Ms.

20   Golic, and the Celsius Creditor Answers Email address

21   established by Kirkland & Ellis advising them I decided to

22   change to the BTC ETH setoff treatment at effective date

23   prices.  Mr. Koenig promptly confirmed my setoff selection

24   that day.

25             Nearly a month has passed, and I have not received

Page 74

1    a crypto distribution.  My PayPal account is operational

2    because I received and retrieved a small Earn claim a few

3    months ago.  Can Mr. Koenig please address when loan setoff

4    creditors will receive their BTC ETH PayPal claim codes?

5    Thank you.

6               MR. KOENIG:  Thanks, Mr. Smith.  It's Mr. Koenig.

7    Look, when you reversed your election, you went back to the

8    setoff.  WE processed you for distribution.  I haven't

9    looked at your particular claim.  We're sending claims to

10   PayPal and Coinbase on a regular basis.

11              You've already been in touch with me it sounds

12   like via email.  If you just bump up that thread, I'll check

13   into it for you and see what the status is.  My guess is you

14   are somewhere in the process.  But this process is not

15   instantaneous.

16              But also for anybody on the line, if you have

17   reached out to us and you have individualized questions, you

18   should just feel free to email me or the other contacts that

19   are on the FAQs at any point.  We do our best to get back to

20   people as promptly as we can.  It's not always

21   instantaneous.

22              THE COURT:  Thank you.

23              MR. SMITH:   Okay.  I will send that email right

24   after the hearing.  Thank you.

25              MR. KOENIG:  Thanks.  We'll check into it for you.

Page 75

```
 1                 THE COURT:  Thank you, Mr. Smith.  Thank you, Mr.
 2      Koenig.
 3                 Next, Deanna?
 4                 CLERK:  Ralph Burton.
 5                 THE COURT:  All right.  Mr. Burton?  Mr. Burton,
 6      do you wish to be heard?
 7                 CLERK:  Mr. Burton, I see you are unmuted.  Can
 8      you speak?  Try speaking.  Maybe it's a problem with your
 9      microphone.
10                 MR. KOENIG:  Perhaps your microphone is muted
11      actually on your end with a button or something.
12                 CLERK:  Yeah.  It's unmuted on Zoom.
13                 MR. KOENIG:  Right.  Sometimes there is the double
14      mute.  I'm guilty of that myself sometimes.
15                 THE COURT:  Deanna, call the next one.  If Mr.
16      Burton comes through, we will listen to him after.  But
17      let's go on to the next person.
18                 CLERK:  The next person already spoke.  It's
19      Christian Funck.
20                 THE COURT:  No.  Only speaking to people once.
21      Are there any others who haven't been heard, Deanna?
22                 CLERK:  No.
23                 THE COURT:  All right.  Ralph Burton, if you want
24      to be heard, unmute your line and we'll be happy to listen
25      to you.  All right.
```

1          Everyone who wanted to be heard has been heard by

2    the Court.  Do you want to move on to the remaining item on

3    the agenda?

4          MR. KOENIG:  I do.  Just really quickly, Mr.

5    Hershey from White & Case represents the litigation

6    administrator.  And I understand from him that he just had a

7    brief update he wanted to provide to the Court on their

8    process working through the preference issues.  So with your

9    indulgence, we can turn it over to Mr. Hershey.

10          THE COURT:  Mr. Hershey?

11          MR. HERSHEY:  Thank you, Your Honor.  Just so Your

12    Honor is aware, my video apparently has been stopped and I

13    can't turn it on.  I don't need to turn it on unless Your

14    Honor wants me to.

15          THE COURT:  Just go ahead.

16          MR. HERSHEY:  Oh, there we go.

17          THE COURT:  There you go.  Go ahead.

18          MR. HERSHEY:  Thank you, y h.  It's been turned on

19    now.  Thank you very much, Your Honor.

20          Good morning, Your Honor.  Sam Hershey from White

21    & Case for the Litigation Oversight Committee or LOC for

22    short.

23          Listening to Mr. Koenig's presentation, I have to

24    admit that some relief that the LOC is now responsible for

25    handling distributions, though the LOC is certainly working

Page 77

1      to stay updated on the distribution process and we

2      appreciate very much Mr. Koenig's update today.

3              Your Honor, I believe this is the first time the

4      LOC has appeared before you.  So with Your Honor's

5      permission, I would like to take just a few minutes to

6      update the Court regarding the LOC's work so far including

7      (indiscernible) regarding the preference litigation that the

8      LOC has been charged with overseeing.

9              As Your Honor is aware, the LOC was formed about

10     six weeks ago on the effective date of the Debtor's planned

11     reorganization.  The purpose of the LOC, a lot of the

12     litigation administrators working under supervision, is to

13     increase account holders' recoveries by investigating and

14     pursuing claims and causes of action belonging to Celsius.

15             The LOC and its professionals have begun that work

16     in earnest and will continue to keep Your Honor informed as

17     that work progresses.

18             One category of claims that the LOC has been

19     charged with overseeing is the approximately $2.5 billion

20     preference claims against accountholders who withdrew assets

21     from Celsius during the 90 days leading up to the petition

22     date.  This is a very small set of individuals.  About two

23     percent of active users.

24             Notably, this group does not include

25     accountholders with preference exposure under $100,000 who

1    were released under the plan or preference exposure resolved

2    through the custody settlement.

3            I am pleased to announce that this morning the LOC

4    released a settlement offer to all customers with unresolved

5    preference exposure, specifically the LOC is giving

6    customers the opportunity to settle their preference

7    exposure at 13.75 percent of the value of the asset at the

8    time they were withdrawn during the preference period.

9            Additionally, this offer allows customers to

10   settle their preference exposure in cash rather than by

11   returning the assets that were withdrawn, including many

12   assets which have significantly grown in value.

13           I want to note that this offer has been designed

14   as a limited-time opportunity to encourage parties to settle

15   before the LOC incurs the time and expense of litigation.

16   The LOC would encourage everyone to settle the preference

17   exposure quickly.

18           Accountholders who are eligible for this offer

19   will be receiving an email with further details including

20   how to accept the offer and get payment.  Indeed, many

21   accountholders likely already have received such emails.

22           If accountholders have questions regarding the

23   settlement offer, they can visit the Stretto website where

24   they will find a new tab at the top of the page that will

25   route them to information regarding the settlement offer, or

Page 79

1    they can visit the following URL;

2    Cases.Stretto.com/CelsiusLOC.

3            Additionally, I will note that the LOC has posted

4    an open letter to accountholders regarding the settlement

5    process on its X or Twitter account and will continue to

6    post further updates throughout this process.

7            That is an update for today.  The LOC looks

8    forward to providing further updates to Your Honor as its

9    work progresses.  Thank you very much.

10           THE COURT:  Mr. Hershey, what is the -- you said

11   it is an offer for a limited time.  When is the deadline?

12           MR. HERSHEY:  April 15th, Your Honor.

13           THE COURT:  April 15th, 2024 is the deadline for

14   accepting --

15           MR. HERSHEY:  Yes, Your Honor.  Exactly right.

16   April 15th, 2024.  Yes.

17           THE COURT:  And with respect to anyone who does

18   not accept the offer and who has a potential exposure of

19   over the $100,000, has the Committee made the decision to go

20   forward with litigation as to those claims?

21           MR. HERSHEY:  So yes, Your Honor.  And the LOC

22   intends to --

23           THE COURT:  People are entitled to know that

24   here's the offer, but what happens if they don't accept it?

25           MR. HERSHEY:  Yes, Your Honor.  I appreciate you

Page 80

1    raising that.  We addressed that in the communication to

2    creditors this morning.  And Your Honor is absolutely right,

3    preference exposure over $100,000 is not settled through the

4    settlement process, the Litigation Oversight Committee does

5    intend to pursue litigation to reclaim that value for

6    unsecured creditors.

7             THE COURT:  And what is the number of creditors

8    who faced the preference exposure of over $100,000 as of

9    now?

10            MR. HERSHEY:  It's about 5,000 or 6,000, Your

11   Honor.

12            THE COURT:  All right.  Thank you very much, Mr.

13   Hershey.  Anything else you want to add before we go on?

14            MR. HERSHEY:  No, Your Honor.  thank you for your

15   time.

16            THE COURT:  Thank you, Mr. Hershey.  Go ahead, Mr.

17   Koenig.

18            MR. KOENIG:  Thanks, Your Honor.  That was the

19   longest introduction I think I've ever given to a motion.

20            So as I think I previewed some time ago, one of

21   the most common issues that was reported in the early days

22   after the effective date was inadvertent or accidental

23   convenience claim elections.  The convenience claim election

24   was an election on everybody's ballot that if somebody

25   elected would reduce the electing creditors' claim to

Page 81

1    $5,000, but they would get a guaranteed distribution of

2    liquid cryptocurrency equal to 70 percent of the reduced

3    claim.  That is they would get $3,500 of liquid

4    cryptocurrency.

5            Now, at the time the disclosure statement

6    projected Earn recoveries would have a liquid crypto

7    recovery of about half that, something like 33 percent.  So

8    if you had a claim that was just above $5,000, you could

9    elect to reduce your claim if you had $5,050.  You could --

10   if you didn't elect, you might have received 33 percent of

11   $5,050, which lawyer math is challenging, as I've said a

12   couple of times.  But that's closer to $1,500 or $2,000.  Or

13   you could elect to just take a little bit of a haircut and

14   instead get 70 percent of $5,000.

15           So that was the purpose of the election, was

16   people that are close to the $5,000 mark, if they wanted to

17   forego the MiningCo equity, if they wanted to -- if they

18   just wanted the liquid crypto distribution and be done and

19   be out of the case, they could do that.  And many people did

20   that.

21           Unfortunately, before the effective date we took a

22   look at the data and we realized that a number of people had

23   made that election that was clearly erroneous.  I remember -

24   - I forget whether it was December or January.  I stood in

25   front of Your Honor and the first thing I said was we had an

1    update on this issue.  And I said, Your Honor, there are

2    seven people of over a million dollars that checked that

3    box.  Those people must have been wrong.

4            So we emailed everybody over $25,000 and said, hi,

5    we think you made a bad decision.  Would you like to rescind

6    your election?  And about 70 to 75 percent of them did.

7            After the effective date, a lot of people got

8    distributions and they were surprised to learn that they

9    were in the convenience class.  They asserted that they

10   didn't understand the ballot, that they never actually

11   checked the box.  We checked our records.  In every

12   instance, our records reflect that they did check the box.

13           But it was obviously -- it seems to have been a

14   mistake.  And so I'll be honest that my initial reaction was

15   there was a ballot, there was a process.  I went back and I

16   read the ballot.  I think the ballot is pretty clear.  I

17   will say we have creditors -- 45 percent of our creditors

18   are international.  Many of them do not speak English as a

19   first language, and it seems very inequitable to me for a

20   creditor of a million dollars that checked a box erroneously

21   to receive a $3,500 distribution instead of a $500,000

22   distribution.

23           So as the communications both to us and to

24   chambers ramped up, we realized that this was a significant

25   problem and that these pro se creditors didn't know how to

Page 83

1    use the court system to ask for the relief that they wanted.

2    And so we took it upon ourselves to file a motion on behalf

3    of those creditors.  It's a motion to rescind their mistaken

4    election.  It's a little bit weird to file a motion for

5    another party's mistake.  But we think that that's the right

6    thing to do.  It's a little bit of a complicated motion.

7    Because anybody -- we ran the math.  Anybody above $9,333

8    would have never had an economic basis to make the election.

9    Even if they valued the equity at zero, they must have made

10   a mistake.  For those people, we are proposing an automatic

11   revocation.  They don't have to do anything at all because

12   they obviously made a mistake.

13        If you are between $6,050 and $9,333, you may have

14   had a reason.  Maybe you prefer liquid cryptocurrency over

15   the equity.  You don't value the equity and you would prefer

16   to have 70 percent of $5,000 rather than take some equity

17   and some liquid crypto.  So what we were proposing by the

18   motion is those people in that band would get an email from

19   us and they would have 30 days to affirmatively rescind

20   their election.  If they do, great.  We'll move them back

21   into the Earn class.  And if they don't, we'll treat their

22   election as valid and, importantly, final.

23        For people between $5,000 and $6,050, they've

24   already received more than they would receive if they

25   rescinded their election.  So it doesn't make any sense.  If

1    they rescinded their election, I would have to ask them to

2    give us something back.  We're not going to do that.  That

3    makes no sense.

4              The motion received three responses.  One from --

5    there was a letter from a creditor -- and I apologize, I

6    have it somewhere.  There was a letter from a creditor,

7    Docket Number 4385, that disagreed with the requested relief

8    because his view was that the ballot was explicit and that

9    many people made this choice and this is America and people

10   should be bound to their choices.  That was the only thing

11   that I would say is an objection.  There was another

12   creditor that filed an objection to preserve their election.

13   That is they did not want to opt out, they wanted to keep

14   their election.  We checked, and that person was actually

15   not in the convenience class, which is very confusing to me.

16             THE COURT:  On the agenda it says objection to

17   claim being rescinded by Patrice (indiscernible).

18             MR. KOENIG:  I think that's -- what is the docket

19   number on that?

20             THE COURT:  4594.

21             MR. KOENIG:  That was the one I just spoke about.

22   That person said I do not wish to rescind my election.  That

23   person actually did not make the election.  But it is what

24   it is.

25             Another creditor filed a letter, 4678, complaining

1    that they couldn't rescind the election if they were below

2    the sixty-fifty mark.  But again, they actually do better

3    where they are.  So that doesn't make sense.

4            And then somebody else at 4718 said that he was

5    not informed that selecting the convenience claim election

6    would reduce his recovery.  I think he's supporting the

7    motion.  But again, he actually is not a convenience class

8    member and I think is confused.

9            THE COURT:  Address the issue, because I think in

10   your motion you addressed the issue about the reserves that

11   are available and sort of the impact.  I think one of the

12   things I'm focused on is if I grant the motion, what if any

13   impact does it have on other creditors in the case.

14           MR. KOENIG:  Yes.  That's important, Your Honor,

15   for sure.  And that was one of the things that we focused

16   on.

17           So it's in the motion.  But we have reserves in

18   this case because there are people that opted out of the

19   settlement and are going to litigate.  And they could win or

20   they could lose.  And so we set aside some funds in case

21   they are right and we are wrong.  We have reserves for $500

22   million of claims above and beyond the dollar values on the

23   schedules.  Now, some of those are other cryptocurrency

24   firms that have sued us for, you know, their equivalent of

25   preference under foreign law.  And so it's not all

1    individuals.  But we have ample reserves.  That said, we of

2    course can't just release everything from the reserves.  I'm

3    sure that some of the corporate creditors are writing down

4    everything I'm saying and saying, well, why don't you

5    release the reserves for me.  Those numbers are much larger

6    I would say.

7            So to Your Honor's question, if we revoke all of

8    the elections above $9,333, we will release approximately

9    $18.3 million worth of liquid cryptocurrency at the January

10   16th prices from the reserves, which is significant.  But we

11   are comfortable that we have enough reserves to meet our

12   obligations under the plan.  It's another $6 million of

13   MiningCo stock.  That's less of a problem because, you know,

14   MiningCo can issue more stock.  And then more creditors will

15   receive future recovery rights under the plan.  Again, that

16   is the -- those are the people that made a big mistake.

17           Assuming the revocation of the people in the

18   narrow band in the middle, the $6,050 to $9,333, that would

19   be $1.1 million worth of additional liquid cryptocurrency.

20   It's a lot of people, but it's a small band.  And if you had

21   $8,000 and you were reduced to $5,000 and we're putting you

22   back to $8,000, it's a small dollar amount.  The biggest

23   issues are the large creditors that made a big mistake.

24           So in total, Your Honor, it's $19.4 million of

25   liquid cryptocurrency would come out of the reserves for

Page 87

1    which we are comfortable we have sufficient cushion to fix

2    this mistake.

3              THE COURT:  Does anybody from the U.S. Trustee

4    wish to be heard?  There were no objections.  I know on the

5    agenda you've listed letters that were received.

6              MR. KOENIG:  I was trying to make sure that people

7    had their voices heard.

8              THE COURT:  Yeah.  So Ms. Cornell?

9              MS. CORNELL:  Good morning, Your Honor.  Shara

10   Cornell with the Office of the United States Trustee.

11             The United States Trustee is aware of many of the

12   ongoing distribution issues.  We are in receipt, just as

13   Your Honor is, of many emails on a daily basis from

14   creditors and constituents in these cases, some of which

15   have been reiterated on the docket via letters and also some

16   independent comments.

17             Prior to this hearing, we had reached out to

18   Debtors with a request for a status update, which the

19   Debtors have provided to the Court today.  And I think it is

20   helpful for putting many of the stated concerns into context

21   for all of the creditors.

22             Our office are continuing to monitor the issues

23   and will provide assistance to the parties where

24   appropriate.

25             THE COURT:  My question right now, I'm happy to

Page 88

```
 1    hear you on all of the matters, Ms. Cornell.  But

 2    specifically with respect to the motion which is -- the

 3    motion to revoke mistaken convenience class elections, it

 4    was ECF 4372.  And you didn't file an objection on that.

 5             MS. CORNELL:  No, I did not, Your Honor.

 6             THE COURT:  (indiscernible) ask whether -- your

 7    position with respect to it.

 8             MS. CORNELL:  We took no position with respect to

 9    the pending motion, Your Honor.

10             THE COURT:  All right.  Thank you.  Does anybody

11    else wish to be heard with respect to this pending motion?

12             CLERK:  Judge, Artur Abreu has his hand up.

13             THE COURT:  All right.  Mr. Abreu?

14             MR. ABREU:  Hello, Judge.  Just wanted to

15    highlight the support that we have.  I think I have a group

16    with 130 people all in support.  And I just want to

17    highlight that at no point on the ballot were people aware

18    of were they notified that they will be in some cases

19    rescinding 90 percent of their recoveries.

20             THE COURT:  I understand our position, Mr. Abreu.

21    Thank you very much.

22             MR. ABREU:  Thank you.

23             Does anybody else wish to be heard?

24             CLERK:  I do not see any additional hands.

25             THE COURT:  All right.  This potentially is a
```

Page 89

```
 1    complicated issue.  Because the issue actually arose before

 2    the effective date of the plan, I consider it different than

 3    for example in the Boy Scouts case where it was much, much

 4    later.

 5              MR. KOENIG:  It was more than a year after.

 6              THE COURT:  Correct.  So this issue -- and at some

 7    point before the hearing date the issue was highlighted to

 8    me about this potential issue about mistaken election of

 9    convenience class treatment.  And I think because this issue

10    arose before the effective date but only comes up actually

11    today with the motion, I consider this materially different

12    than the situation in Boy Scouts, for example.  And really

13    in the absence of any objection in light of when it was

14    first raised with the Court, the motion is granted.

15              MR. KOENIG:  Thank you, Your Honor.  We will work

16    to send the emails.

17              THE COURT:  All right.  I think that concludes our

18    agenda for today.  Just let me come back to I think -- I'm

19    not sure you need to address every one of the issues that

20    arose today, but I think you should do a filing that

21    addresses it.  I don't have any motions pending before me.

22    I think we've raised issues that -- they are of concern to

23    me.

24              MR. KOENIG:  Right.  We sill address the common

25    issues including corporate creditors and loan creditors.
```

Page 90

1    And we will review the transcript, but those are the two

2    that really stuck out to me.

3              The other thing is I mentioned -- I had forgotten

4    about the bank.  It's Citizens Bank, Your Honor, which is a

5    bank that I am sure you are familiar with.  Okay.

6              Anything else for me, Judge?

7              THE COURT:  No.  Thank you very much.

8              CLERK:  Sorry, Judge.  Simon Dixon has his hand

9    up.

10             THE COURT:  We have finished the agenda for the

11   day.  The hearing is adjourned.  Thank you.

12             (Whereupon these proceedings were concluded at

13   12:42 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 91

1                                    **I N D E X**

2

3                                  RULINGS

4                                                      Page        Line

5        Motion, GRANTED                                89          14

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 21, 2024