March 31, 2024

<u>Group of Loan Creditors (Borrowers)</u>

Honorable Judge Glenn
Chief Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
Alexander Hamilton U.S. Custom House
One Bowling Green
New York, NY 10004-1408

Dear Judge Glenn,

We hope this letter finds you well. We write on behalf of retail creditors with loans in the Celsius bankruptcy proceedings and are writing to raise **significant concerns** regarding the refinancing and distribution process and treatment of these retail accounts / borrowers.

<u>We would like to request a hearing to discuss these specific issues, in particular with regard to the inequity of treatment of Creditors within the same Class of Borrowers and as part of the same Class Settlement, who were unfairly and unjustly treated with not only different pricing on like Assets, but were forced, under duress, to accept terms that were changed, by Debtor, due to unexplained delays and which disproportionately disadvantage certain members of the larger Class.</u>

<u>We feel that the Debtors should not get to pick and choose which members of the Class should be subject to different pricing based upon elections in the same Settlement and at the same time. Loan payoffs, regardless of whether those were via pay off, set off or Refinancing based upon Borrower Class elections in January, should have received equal</u> treatment with regard to pricing. Furthermore, it seems that all Loan Collateral should have been taken into account by Debtors, regardless of treatment, as all choices required Collateral Assets to be settled.  Additionally, the 5% of additional recovery that was due to those of us who voted for the Plan in September was omitted and not distributed with the Collateral Assets and should have been included.

<u>We urge the Court to assess and correct this inequitable situation promptly by ensuring that</u>
<u>distributions to all Borrowers, including those in the Refinance subgroup, are made at Effective Date prices. Furthermore, we urge the Court to access and correct the limited timelines in which Borrowers were given to Refinance their Loans and pray that the Court will allow for an extension of the March 31 deadline, in so far as those Creditors who are not able to complete their Irrevocable Direction Letter over the Easter Weekend are afforded sufficient time to work with third-party lenders to sort out the terms of their offers without the risk of set off against their wishes to Refinance.</u>

We would like to reserve any and all rights that we may have, as a group or individually, and to formally document our concerns over unfair and unequal treatment as Creditors, at the hand and the mercy of Debtors who have consistently demonstrated a lack of transparency, consistency and equity throughout a process where multiple classes of Creditors have been outright defrauded of their life savings and appreciating Assets.

We, the Borrowers group, believe that the Debtors have breached and failed to uphold a key and fundamental part of the Settlement. Debtors agreed they would Refinance our Loans with a third-party Lender and, if that Collateral was not available in existing Debtor Assets, they would purchase Collateral with our Principal amount at Effective Date pricing, in line with all other Celsius Borrower creditor groups. After the plan Effective Date, the Debtors changed the terms, without consulting the Borrowers group, to purchase Collateral with our Principal at Market Date pricing.

1

This is a material change that the Debtors made after significant and unexplained delays and that was not disclosed to Borrowers when they were offered an election to pay off, set off or to Refinance, that has dramatically reduced potential recoveries from effective date pricing for a meaningful subgroup of the Borrower class who are being disproportionately disadvantaged by direct action, or inaction, of the Debtors who failed to act on their Fiduciary Duties to protect the Assets and interests of the Refinance group of the Borrower Class - "The plan further provides that the Debtors will take commercially reasonable efforts to facilitate third-party refinancing or modification of Retail Borrowers' loans after the Effective Date (the "Refinancing Election")."

<u>We urge the Court to assess and correct this inequitable situation promptly by ensuring that distributions to all Borrowers, including those in the Refinance subgroup, are made at Effective Date prices.</u> Given that accounts that have already received refinance distributions with third-party lenders, we ask that they be made whole in a second distribution for the difference in price between the Effective Date and the prevailing Market Rate that was applied. We understand that the purpose of Kirkland & Ellis retaining funds of $165MM is for exactly issues such as this: <u>to ensure equal and fair treatment for all creditors</u>. The Debtors failed to use reasonable judgment to remedy this issue, in violation of their Fiduciary Duties, especially when they were given $70MM for the wind down process to ensure uneventful distribution to the creditors.

<u>Furthermore, we urge the Court to access and correct the limited timelines in which Borrowers were given to Refinance their Loans and pray that the Court will allow for an extension of the March 31 deadline, in so far as those Creditors who are not able to complete their Irrevocable Direction Letter over the Easter Weekend are afforded sufficient time to work with third-party lenders to sort out the terms of their offers without the risk of set off against their wishes to Refinance</u>.

This poses a few fundamental problems. Changing the purchase of Collateral with our Principal to Market Date significantly hurts the Loans Creditors because it subjects the Borrower group to fluctuating prices beyond that of the agreed upon Effective Date, in fact those prices are significantly higher than the Effective Date prices that were made available to those who opted to pay off or set off. The price of crypto assets have appreciated dramatically since the Effective Date and those gains are resulting in diminishing recoveries for the Borrower group, to a much greater degree than all the other significant Celsius creditor groups that were processed in the same Settlement under Effective Date prices.

Due to Debtor's failure to act on their Fiduciary Duties to Creditors, we believe that "commercially reasonable efforts" were not made by the Debtor and think that the Debtor, in charge of our recovery and its process, timing and terms, should not have the power to deviate from the agreed upon Settlement of Effective Date pricing, especially when the delay severely hurts a major creditor class in an up-trending market and certainly should not unfairly benefit the Debtors with this value appreciation to the detriment of Creditors.

Due to the significant delays of the Debtor in addressing Refinance claims and issues, we are in an impossible situation where we need to evaluate and decide on how to refinance our loans, without visibility into the terms at which we will be refinanced, or whether the prices at which our Collateral will be offered will even suffice to support refinancing at these terms. We have been given only two weeks to make decisions with significant consequences and many in the Class have not even been made aware of the new terms or of the deadlines to make their decisions. We feel that, as a direct result of the Debtors delays and material changes to the Refinance options, that we are being forced, under extreme duress, to accept refinance terms that are undefined and that we are putting our investments at increased risk and are severely reducing and limiting our potential recoveries. In addition, the three approved lenders have been struggling around the clock to get clear answers and timelines from the Debtors and, unfortunately, there is confusion and uncertainty all around.

Unfortunately, all of the members of the Borrower Class in the Refinance subgroup must decide whether to Refinance on unknown terms or to let our Loans set off within the next 36 hours, during a Holiday weekend. Both Creditors and the Lenders who are offering to Refinance our Loans are uncertain of many of the key terms and factors to the Loans that we are Irrevocably committing to. We do so under extreme duress and with numerous concerns about repeated and unexplained delays by the Debtors and general lack of communication or consideration on the part of the Debtors for all Creditors. In short, we must act on the offers that are put in front of us, but we are gravely concerned about the inequity of the treatment of Creditors across the same class, and the consequences of those inequities on our particular sub group.

It has been difficult for us to get any clear answers about our concerns and we have not been given sufficient time or information to make these decisions or to understand what options we may have to address our concerns. We also have limited visibility into other members of the sub group and we expect that there will be additional support for these concerns and our requests that are outlined in detail below, but we do not have time to circulate this letter for signatures in a reasonable timeframe to raise our concerns ahead of the Refinance deadline that is less than 36 hours away at the writing of this letter.

While we MUST act this weekend on our Refinancing, we wish to reserve rights to revisit these issues and we compel the Court and the Trustee to call for a complete accounting of the treatment of Assets and accountability for those who should have a Fiduciary Duty to Creditors to both explain how such inequities were created and resolve these inequities and omissions in future recoveries for those affected as outlined below.

A group of Borrowers expressed concerns in an earlier Pro Se letter to the court before your hearing on March 20th, but many of us were unaware of the letter before it was sent, and we wish to not only support the initial letter's intent, but to further clarify our concerns. Furthermore, in the past two weeks since the Debtors, in the final hour of the original deadlines for refinancing, revealed their proposed plans for refinancing with an impossibly tight deadline and, seemingly, little preparation for the highly complex and unusual nature of the refinancing process, numerous issues have come to light with increasing clarity around details that were not previously disclosed which significantly disadvantage the recoveries for this subgroup of Borrowers.

We wanted to address some of the specific concerns of a subset of Creditors as Borrowers, in particular Borrowers who opted to Refinance their existing loans. It seems that there are about 650 Borrowers who are in this particular subset of the larger class. There has been little transparency and no reporting of details with regard to the Loans, but it appears that the total value of the loans overall was around $400M, and those that opted for refinancing total around $85M.

In short, through delays of the debtor, this group had to elect for the refinance option in mid-January 2024 based upon representations that were either false or outright misrepresentations only to find, in mid-March 2024 when our offer details were released, that our terms and the treatment of our collateral, would be materially different that was represented to us in January and from the treatment that Borrowers in the same class received when they opted for either pay off or set off options. Specifically, those in the class who opted for pay off or set off options were locked into the Effective Date price of $42,973, while those with the refinance option are now being told that they are not locked into the Effective Date price, but rather will be subject to market prices at the time of the Refinance, which could still be weeks away. Crypto markets are extremely volatile and, in just the past week, Bitcoin values rose faster than ever before in history and hit a new all-time high value exceeding $73K, with projections that it will continue to climb in the coming weeks. At current values, Bitcoin is 65-70% higher and Ethereum is 35-40% higher than at the Effective Date, with a likelihood that market values will increase more, and recoveries will decrease before the loans that are submitted for refinancing will be processed.

This dramatic shift in value is not only a concern over differing treatment within the class (which is of great concern), or of diminished value (which is significant), but also of outsized impact as the refinance process is dramatically riskier the

higher the LTV (loan-to-value) percentage is of the refinanced loans. Under a recovery based upon Effective date values a loan with a 50% LTV becomes a loan with a 72% LTV at current prices that cannot be funded by many of the few loan products that are available for refinancing. Even if they are financed at these LTVs, these loans are at much higher risk of liquidation as the market values fluctuate, of particular risk for loans that have higher LTVs at origination. As a result, this particular subset of the Borrower class is put at increased risk, directly as a result of the delays of the Debtor to complete the refinance plans in a timely manner and based upon misrepresentations and reasonable expectations that Borrowers would be treated equally within the class.

Of additional concern with the shift in treatment from Effective Date to Market pricing, is that the Debtor was supposed to have enough Bitcoin and Ethereum on hand to settle these claims at the estimated values. Even before the call for Borrowers to elect for pay off, set off or Refinancing, the amount of the total Collateral needed for the Effective Date Settlements was known. If market price is being used to buy additional Bitcoin and Ethereum to provide collateral for the re-financings, that would be due to mismanagement or miscalculation on the part of the debtor, as there were sufficient assets for the plan, or as a result of misrepresentation that those assets would be allocated to these claims. Why would the refinance assets be treated any differently than the assets used to pay off or set off claims at the Effective Date prices? If the refinancing offers were to be settled at or around the same time as the pay off or set off claims, why wouldn't the Post-Effective Date Debtors have purchased all of the necessary Collateral for these loans at the same time as other Effective Date settlements? Did the Post-Effective Date Debtors and other parties to this settlement not have had a Fiduciary Duty to us as Creditors to manage settlement assets fairly, equally and equitably? With known market conditions and a BTC ETF already announced on January 10, 2024, it was clear before the Effective Date that market demand and prices were going up on the Effective Date and beyond.

Furthermore, it appears that we were not given credit for the additional 5% recovery that was promised as an incentive to vote for the plan and, for many of us, our Earn claims and Mining Company Stock calculations have been miscalculated and claim codes have been blocked for redemption, without explanation. For those Borrowers, throughout this process there has been an utter lack of transparency and clear communication to Creditors and we have needed to rely on outside resources and independent Good Samaritans to keep us updated about key dates, options and deadlines that were critical to our recoveries.

The bankruptcy process, that was triggered by a perfect storm of documented mismanagement of funds at Celsius, the collapse of FTX and a resulting crash of the crypto markets left many of us at risk of losing our investments, which for many of us were significant. As customers, we were led to believe that Alex Mashinsky had created Celsius as the "Unbank" that he represented as "better than a bank" and a modern day banking institution where we could safely deposit crypto assets. As Borrowers, we were led to believe that our crypto would be held as collateral against our loan amounts and that ownership of that crypto was not given up to Celsius from both a legal and a tax perspective.

As Borrowers, we were able to borrow against cryptocurrency collateral that far exceeded the value of our crypto holdings at the time that we entered our loan agreements. We did so largely on the belief that the long-term value of our crypto holdings would increase and that, in borrowing against those values, we could get some utility from that value in the interim. Many of us used these loans to finance expenses, purchases or other investments.

While loan and deposit amounts were sometimes small, for many their crypto holdings had not only significant dollar values, but also represented investments and life savings for future large life purchases and obligations including home purchases, college tuition, retirement expenses, end of life care and more. I revisit this to highlight the impact that this bankruptcy and the recoveries that we see from this process will have upon countless individuals and their families, an impact that I do not think should be overlooked or underestimated.

For many of the Celsius Creditors who transferred Cryptocurrency to Celsius, there are significant tax consequences to the treatment of those Cryptocurrencies. Many of these assets were purchased at lower values and a taxable event, in particular a taxable event where assets are exchanged but profits are not realized, can have very complicated and burdensome consequences. In the Earn Settlements, for example, Earn Creditors were given distributions in 50% BTC and 50% ETH, regardless of the original assets that were deposited. It is unclear how recovery of assets that are not like kind will be treated for taxes. Furthermore, for Borrower Creditors, if in fact the underlying Collateral assets were sold by the Debtor and new assets must be purchased at Market Prices this could mean that Borrower Creditors would be taxed on the sale of their full collateral, while their recovery of approximately 25% of their original Collateral is held as Collateral for their new Refinance Loans. This could mean that Borrowers could be taxed for gains of the Collateral that they were never able to recover and potentially unable to cover the liabilities of the prior sale or conversion of their Collateral Assets.

The lack of transparency with regard to the treatment of Collateral Assets and the dates and specifics of the transactions and transfers of those assets will create incalculable complexity and confusion for Creditors and their CPAs in accounting for these transactions. Clear explanations must be provided for why certain assets were sold or transferred for Collateral requirements and obligations, as opposed to assets that have been retained as BTC or ETH for other purposes, if those assets were in fact sold. Again, the implications to Borrowers, in particular for Borrowers who are in the Refinance subgroup of the class, are much more significant than for the remainder of the class that set off or paid off their loans at the Petition Price.

It seems that Borrowers fell into a few subgroups: A) Some Borrowers were liquidated as crypto prices fell in 2022. For these borrowers, their collateral was partially liquidated to pay off their loans at the valuation at the time of the liquidation. B) Some borrowers made attempts to repay their loan obligations pre-bankruptcy in an effort to reclaim their collateral. Those that succeeded were able to move those coins to either Earn or Custody accounts where they were treated accordingly. Those that failed were left in a perilous spot where their funds were received by Celsius, but where the loan collateral was stuck in Limbo. C) Most Borrowers were left holding loans at the time of the bankruptcy and were not clear on the future of their loans or their collateral.

Throughout the bankruptcy process, much of the focus was on Custody, Earn and Corporate accounts. Borrowers holding loans were often unsure whether they would have an option to refinance, if they would be forced to liquidate or sell off their collateral, or if they would need to raise the capital to pay off their loans. Arguably, the situation that Borrowers were in was more complex than that of an Earn or Custody account holder, but the answers and options were far murkier.

When, in September 2023, we were asked to vote on the Fahrenheit plan we were presented with options that A) incentivized us with an extra 5% return and B) offered a path out of bankruptcy with a return of a portion of our investments. In particular for the Borrowers, there were still a number of open questions but we had to cast our votes without seeing the full picture.

When the Fahrenheit plan fell apart, the decision was made to proceed with an Orderly Wind Down. Loans and the concerns of borrowers were not fully addressed before we were told on March 15, 2024 (the date of the original deadline to refinance) that the deadline to refinance was extended to March 31 and that our offers would be ready for review. We were suddenly faced with new offers, on substantially different terms, and a very short window of two weeks to negotiate with a new lender and irrevocably assign our claim, or else our claims will be liquidated at highly unfavorable terms that are significantly worse than if we had not opted for a refinance option in January and that would leave us with pennies on the dollar from our original claims.

The result is that we are forced to refinance, at unfavorable terms that are significantly worse than others in our class, under duress and without having an understanding of whether our new Refinance LTVs will even qualify for refinancing at the market prices at the time of refinancing.

In a refinance scenario, a borrower's excess collateral claim (i.e. amount of collateral, based upon the fixed Petition price, that exceeds the principal amount at the Petition price) is given the same haircut as Earn and then locked in at Effective Date pricing. The Borrowers are however subject to market volatility because of the additional financial aspects behind a refinanced claim.

The second portion of the Refinance (the Principal value) is dynamic in nature and based on the market price of BTC or ETH at the time of the Refinance. The assumption made by selecting market price for this calculation is that when a third-party lender pays Celsius the principal portion on behalf of the borrower that then Celsius exchanges the agreed collateral for that Refinance out on the open market to acquire the BTC or ETH. However, this is a false assumption as the BTC and ETH that was supposed to be used for this exchange should have been paid from the BTC and ETH that the debtor had reserved for resolving these claims, as they did for the pay off and set off Borrowers.

Like the corporate accounts, these delays, and the subsequent run up in asset price is a further haircut to refinancing borrowers. The principal portion **currently returns close to HALF the amount of BTC or ETH that it would have returned at the effective date pricing**.

An example:

- 100.000 USD principal
- 10 BTC as collateral
- Refinancing at effective date prices of 42.973 USD/BTC equals to 2,559 BTC to be returned to the lender for the principal
- Refinancing at market price e.g. 73.734 USD/BTC (last week) equals to 1,491 BTC to be returned to the lender for the principal.
- **That is 41,7% less** equaling to 1,068 BTC or 78.747 USD at last week's high.

Not to mention the fact that our BTC assets at last week's high are an astounding 370.87% more valuable than at the petition date prices we are being held to. Who gets to keep this upside? Why did the Pre-Petition and Post-Petition Debtors not have fiduciary obligations to Creditors to manage these assets and mitigate the dilution of values for our Claims and Collateral?

The main expectation was that the refinance process would take place at the Effective Date, as was the case for the other members of the Borrower Class. The debtors stated that "The Plan further provides that the Debtors will take commercially reasonable efforts to facilitate third-party refinancing or modification of Retail Borrowers' loans (the "Refinancing Election")".

By ways of summary the Borrower group is witnessing a major disparity in the criteria for Refinancing, distribution, and settlement being applied across this Creditor Class, also compared to other classes. A breakdown of the disparities:

1. We are requesting equal treatment in same class of creditors, the Borrowers class. The Borrowers that elected to pay their loans, were able to do it the period of January 21st to January 26th when the average price of BTC was $43,000. Over 7 weeks later, directly due to delays and possibly negligence (or worse) on the part of the Debtors, the Borrowers that elected to Refinance, were suddenly informed that they are being treated differently and are

6

still left in the dark as to what their Refinance price will be or if their Refinance will even be possible, given the market price at the time of Refinancing.

2. Creditors who opted for Refinance were not given sufficient disclosure of the terms, timelines or requirements of Refinance options and it seems that, due to delays and lack of transparency of the Debtors, the Lenders who were authorized to issue Refinancing were also not fully informed of the terms with which they could make offers to refinance. As I write this on March 29, 2024 – with two days remaining to initiate our Irrevocable letter to lock in our Refinancing - the three Lenders are still struggling to work through the process to issue offers and respond to questions and issues. In the meantime, only the first few Refinancings have taken place to date.

3. On behalf of all Creditors, there has been an utter lack of transparency and communication on behalf of the Debtors (pre and post-Effective Debtors) with respect to accountings of Assets, transfers, conversions, confirmations, calculations or timelines of the recoveries that have been planned, scheduled, received, delayed or otherwise directed, misdirected or stalled.

4. Some creditors have received their settlements, some only partially, and some not at all with almost no communication and with no options for communication with the Debtor. This included Earn claims that have been tied up for more than two months with PayPal, Venmo and Coinbase issues and those who opted for set off and pay offs of claims that have received no communication or confirmation of how and where their funds and assets will be received. Additionally, a number of Creditors who received payments in USD Checks have reported that those checks have been bouncing at their financial instututions.

5. Many are facing uncertainty and complexity with respect to tax consequences and are extremely concerned that, based upon the lack of transparency and communication to date that vital records, accountings and statements will be lost forever due to the negligence and lack of due care by the Debtors.

6. Some are being forced to accept USD and not crypto as the plan laid out, which for some can have severe tax consequences.

7. Some Borrower Creditors are being processed at Effective Date prices whilst other Borrower Creditors will be processed at Market Prices. Effective date prices were locked on January 16th. Borrowers that elected to pay their loan in the period of January 21st to January 26th at 12PM were locked into Effective Date pricing, despite increases to Market prices in the interim.
    a. Debtor, post plan approval, changed refinancing from Effective Date to Market Prices, without explanation, under a timeline that they control and subject to significant unexplained delays on behalf of the Debtor. That decision alone has cost Refinance loan creditors another almost 50% haircut on their principal.
    b. Assuming that the total of Loans at stake in the Refinance subgroup is $85M, the cost to adjust the recovery to Effective Date prices would be less than $100M to the Debtor which, in context of other expenses that are being expended on other costs of this process, are not significant.

8. The supposed Refinancing deadline was pushed back to March 31, without communication about the reasons for the delays and with no proposal on how to remedy the consequences. We are now up against these deadlines and Lenders are still scrambling to provide Borrowers with clear offers and terms that can be agreed to.

9. The upside of increasing prices in crypto remains with the Debtor despite significant holdings of these cryptocurrencies in accounts by the Debtor and the assets creating that upside representing the Collateral that is

7

due to the creditors upon repayment obligations.

10. The 5% increase for us voting in favor of the plan and opting into the class claim was not added our total claim value. This should be fixed in the future and it should not affect in any way the refinance process timeline.

In essence above means that Borrowers with Refinance have gotten a significantly lower recovery than Earn and Borrowers that paid off their loans in January exacerbated by more than 7 weeks delay that is 100% the debtor's fault. With each passing day, Celsius is having to give up less and less crypto for the dollarized principal purchase. This refinance process was planned and discussed months in advance since last year during the mediation. There was no reason to be delayed for so long into this process.

A recovery for same Creditor class should not be different, subject to whether choosing a third party or paying back yourselves, in particular when extended and unexplained delays are the debtor's fault. This is why Effective Date prices should be applied retroactively in future distributions to Creditors in the Refinance subgroup of the Borrower Class. Treatment of Effective Date pricing should be the same on the Excess Principal buyback portion as well as the Collateral.

Furthermore, are we hearing that the UCC committee has been stalling the process because they are not content with the refinancing terms. This has not been substantiated and we are not kept in the loop by the Debtor.

This discrepancy in treatment based on effective or market date has created an unfair disparity among Creditors, where some have the option to benefit from cryptocurrency appreciation while others are told we will receive US Dollar checks and wires and, if crypto, substantially less.
Furthermore, are many of us being left over two months past the Effective date without access to our funds. During this time, the value of Bitcoin (BTC) and Ethereum (ETH) have nearly doubled, resulting in tremendous additional losses for the creditors. Especially concerning is Kirkland & Ellis' assurance that those with individual accounts who were unable to receive distributions in-kind would be compensated with USD based on the market value of BTC and ETH, but now ending up receiving effective date value (which is significantly lower). Also worth noting, Kirkland & Ellis changed distribution to USD and said they sold our cryptocurrency, but the recent docket filing states they have to change banking partners, so they currently have no way to make these distributions.

An additional remark. Individual accounts were established with the same intentions as corporate accounts, reflecting our belief in fair treatment and equal opportunity. Just like corporate account holders, we trusted our assets with Celsius. Many of the individual accounts we represent are accounts with retirement funds, aimed at safeguarding our financial futures. It is important to note that these types of individual accounts do not have any type of insurance, meaning losses cannot be claimed via insurance. Hence, we assert that all creditors, regardless of account type, have the right to be treated the same. The current disparity in distribution methods undermines the principles of fairness and equality.

We urge the court to assess and correct this situation promptly. One **easy to implement solution** is to deal with all borrowers at Effective Date prices or at least the average market prices during the period of January 21st to January 26th at 12PM in the day of the payment applied to the borrowers that elected to pay their loan was in the period and when Refinance was supposed to take place.

This gives about the same equal treatment / collateral recovery of all Borrowers (same creditor group) and means there is no longer a punishment for those that picked Refinance instead of paying back themselves. It also means we do not lose coins due to a delay that is Celsius fault.

With the Refinance deadline looming this weekend, this cannot and will not be changed for this round of distribution / Refinancing, but these issues outlined above need to be fully addressed and evaluated and there is an opportunity to

8

correct these inequities in the second round of distribution together with the additional 5%. We compel the Court and the Trustee to ensure that these issues are addressed and that equitable resolution across the entire Borrower Class is not ignored.

We further understand the purpose of Kirkland & Ellis having retained substantial funds for issues exactly such as this: **to ensure equal and fair treatment for all creditors**. The Debtors failed to use reasonable judgment to remedy this issue, especially when they were given $70M for the wind down process to ensure uneventful distribution to the creditors.

On behalf of all of us, we trust you will rule in favor of transparency, equitable distribution and fairness for Borrower Creditors who have been disproportionately disadvantaged, and for accountability and clear communication to all Creditors with respect to all Creditors in this case.

Thank you for your attention to this matter.

Tom Chernaik on behalf of:

A.S.T.
Andrew Luke Joiner
Andrew Oh
Aswath Suresh
Brian Barnes
Brian Green
Christian Funck
Concepcion Lara
Daken Coleman
Daniel Lomax
Darius Gheorghe
Faisal Quadri
Fernando Javier Andres Rutia
Hayden Smith
Hongguang Wu
Housam Jarrar
JC van Niekerk
Jean Goldi Horta Shvarzblat
Julius Hudec Jonathan Cantor
Jordan Siff

Joshua Clark
Keri David Taiaroa
Marek Vesely
Maria Teresa González (Ibertrade Representaciones SL, ES)
Mario D Marin
Mathieu Boko
Oliver Pausch
Paul Daniel Storvick
Robert Sieg
Roman Julian Feola
Rory Breen (Bree IT Solutions LTD, UK)
Roy Berg
Ryan Runchey
Simon Dixon
Tan Chye Teck
Tiago Viegas
Timo Latvala
Tom Chernaik
Tony Vejseli
Uri Eran

… _and many more we could not get hold of before deadline.