Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**POST-EFFECTIVE DATE DEBTORS' RESPONSE TO DISTRIBUTION**
**ISSUES RAISED BY CORPORATE CREDITORS AND RETAIL BORROWERS**

At the hearing on Wednesday, March 20, 2024, counsel to the Post-Effective Date Debtors provided an update on Plan distributions to the Court.[2]   Many *pro se* creditors had an

---

[1]   The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]   Capitalized terms not immediately defined have the meaning ascribed to them in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "Plan"), the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337].

opportunity to speak and raise issues that they have encountered in the distribution process. The Court directed the Post-Effective Date Debtors to respond in writing to certain of the common concerns that were raised during the hearing and in letters filed on the docket.[3] A transcript of the March 20, 2024 hearing is attached hereto as **Exhibit A**.

Detailed responses to common concerns are discussed in the sections that follow. However, as a general matter, the Post-Effective Date Debtors believe that the arguments raised by creditors, including those who filed letters on the docket on behalf of dozens of corporate creditors and retail borrowers, illustrate an undeniable reality: it is not feasible for the Post-Effective Date Debtors to adjust the treatment of creditors based on fluctuating market prices. Each group of creditors has a different request, and what is beneficial to one group is often detrimental to another group. Where corporate creditors request that corporate creditors receiving Cash distributions tied to the January 16, 2024 price of Liquid Cryptocurrency receive additional Cash to account for the *current* market price of Liquid Cryptocurrency, retail borrowers who elected to refinance their loans request that they be allowed to refinance using the *January 16, 2024* price of Liquid Cryptocurrency. As detailed further in this response, the Plan provides clear answers to the requests from these creditors by setting a record date of January 16, 2024 to "draw a line" for the valuation of volatile assets. These creditors believe they are being harmed and treated "inequitably," but this is what the Plan provides. The perceived "inequity" is based not on what the Plan provides or how it is being administered, but rather on the rise in cryptocurrency prices in the weeks since January 16, 2024. The Debtors sized their reserves based on the January 16, 2024 record date and simply cannot afford to "top up" distributions whenever cryptocurrency prices happen to rise after the record date of January 16, 2024. Moreover, if the Post-Effective Date Debtors are required to make these adjustments, other creditors could also come forward and request adjustments for what they believe would be fair given shifts in market prices. Ultimately, adjustable treatment invites more complexity and inequity to the creditor body as a whole. While individual creditors and creditor groups are understandably concerned with maximizing their individual distributions, the Post-Effective Date Debtors are working to maximize the returns for *all* creditors and implementing the Plan as approved by the Bankruptcy Court.

## Response to the Corporate Creditor Group

On March 18, 2024, a group of 75 corporate creditors (the "Corporate Creditor Group") who have been notified that they will receive their distribution in Cash (US Dollars) rather than cryptocurrency filed a letter on the docket requesting that the Court order the Post-Effective Date Debtors to distribute Liquid Cryptocurrency to all corporate creditors [Docket No. 4719].[4] The

---

[3] The Post-Effective Date Debtors previously provided updates on the distribution process in the *Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions* [Docket No. 4298] (the "Effective Date Notice"), the *Post-Effective Date Debtors' First Update on Distributions* [Docket No. 4319] (the "First Distribution Notice") and the *Post-Effective Date Debtors' Second Update on Distributions* [Docket No. 4623] (the "Second Distribution Notice").

[4] Other corporate creditors also filed letters raising questions and concerns about the distribution process for corporate creditors. *See, e.g.*, Matthews Letter [Docket No. 4680], Andrus Letter [Docket No. 4550], Patel Letter [Docket No. 4515], Sarver Letter [Docket No. 4489].

group further requested that, where a distribution to a corporate creditor is not possible, corporate creditors should receive the Cash equivalent to the market price of BTC and ETH at the time of the distribution (and corporate creditors who have already received their Cash distributions should be made whole based on the market price of BTC and ETH at the time of those distributions). Three signatories of the letter, Laura McNeil, Wesley Chang, and Riece Keck spoke at the hearing and reiterated the group's requests.[5] As set forth in the letter and during the hearing, the Corporate Creditor Group further asserts that:

- it is discriminatory for the Post-Effective Date Debtors to provide Liquid Cryptocurrency distributions to 100 corporate creditors through Coinbase;

- it is unfair for the corporate creditors receiving Liquid Cryptocurrency to benefit from the recent price increase of BTC and ETH while corporate creditors receiving Cash are tied to the January 16, 2024 prices of BTC and ETH;

- it is unfair that individual creditors who may be transitioned from a Liquid Cryptocurrency distribution to a Cash distribution will receive the proceeds of a market price sale of their Liquid Cryptocurrency distribution while corporate creditors receiving Cash are tied to the January 16, 2024 price of BTC and ETH;

- the Post-Effective Date Debtors are accommodating Coinbase rather than corporate creditors;

- a lottery for the 100 corporate creditor slots with Coinbase would have been more equitable;

- the increased administrative burden of servicing additional corporate creditors with Liquid Cryptocurrency distributions does not justify the fact that only 100 corporate creditors will receive Liquid Cryptocurrency distributions; and

- the Post-Effective Date Debtors should not have sold Liquid Cryptocurrency for Cash in January "if they didn't have a viable banking partner to make distributions."

The Post-Effective Date Debtors' response to these issues is set forth below:

**Distributions to corporate creditors are being made in accordance with the terms of the Plan.** The Post-Effective Date Debtors acknowledge the frustrations felt by these 75 corporate creditors and other corporate creditors who are not among the 100 corporate creditors receiving Liquid Cryptocurrency and are therefore receiving Cash at January 16, 2024 prices. The Post-Effective Date Debtors acknowledge that this will mean that these corporate creditors will not benefit from the run-up in market prices of cryptocurrency that has occurred after the Effective Date, but that is what the Plan provides, as set forth below. However, as acknowledged by a corporate creditor at the hearing, creditors were "indifferent" to the distribution mechanics

---

[5] Ms. McNeil's, Mr. Chang's, and Mr. Keck's comments at the March 20, 2024 hearing can be found on pages 49-52 of the March 20, 2024 Hr'g. Tr.

up until the price of BTC and ETH started increasing after the Effective Date.[6]  Before addressing these specific concerns, the Post-Effective Date Debtors want to emphasize that this is an extraordinarily complex distribution process that is enabling the return of cryptocurrency to as many creditors as possible around the world in a regulatorily compliant manner.  As stated at the hearing, Celsius is making distributions to approximately 400,000 creditors in over 190 countries around the world.  Of these 400,000 creditors, approximately 1,800 are corporate creditors.

The Post-Effective Date Debtors entered into distribution agreements with PayPal and Coinbase after months of negotiations because they are both publicly listed, regulated in multiple markets, and have demonstrated expertise in delivering a range of financial services to hundreds of millions of users.  Accordingly, the Post-Effective Date Debtors believed that PayPal and Coinbase would allow the Post-Effective Date Debtors to distribute cryptocurrency to as many people as possible while fully complying with all regulatory requirements in different jurisdictions.  However, PayPal and Coinbase cannot provide distributions to every country where Celsius creditors are located or to every creditor:  PayPal provides distributions to creditors residing in the United States and Coinbase provides distributions to creditors residing in approximately 100 countries outside the United States.  While some creditors, both individual and corporate, have asserted that the Post-Effective Date Debtors could have entered into agreements with additional cryptocurrency distribution partners, the Post-Effective Date Debtors did explore potential agreements with other potential distribution partners but ultimately determined that they did not meet the regulatory, security, or financial standards required.  There are also unique reasons why a particular creditor cannot receive a distribution from PayPal or Coinbase, including that the creditor does not pass the distribution agent's compliance and onboarding process or that the creditor is banned from the platform for violation of the platform's terms of service.  Accordingly, the Plan—which more than 98% of creditors voted to approve—has *always* provided that if a distribution cannot be made in cryptocurrency for any reason, it will be made in Cash.  This applies to every creditor's distribution, whether the creditor is an individual creditor or a corporate creditor.

Specifically, the Plan provides that the Post-Effective Date Debtors shall make Plan distributions in Cash in cases where it is not possible to distribute Liquid Cryptocurrency, including for Anti-Money Laundering (AML) and Know-Your-Customer (KYC) compliance reasons and *because no Distribution Agent is available to make a particular creditor's distribution in Liquid Cryptocurrency.*[7]  While negotiating the distribution agreements with PayPal and Coinbase, the issue of cryptocurrency distributions to corporate creditors was discussed at length.  Only Coinbase was willing to make any cryptocurrency distributions to corporate creditors, and after extensive negotiations, Coinbase agreed to provide distributions to

---

[6]    March 20, 2024 Hr'g Tr. 50:12-14.

[7]    *See* Plan, Art. IV.K.1 ("The Debtors (and, following the Effective Date, the Plan Administrator) shall use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in this Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible. For the avoidance of doubt, if the Debtors or the Plan Administrator cannot make a distribution of Liquid Cryptocurrency to a particular creditor (including because no Distribution Agent is available to make such distribution), such creditor will receive a distribution of fiat.").

only 100 corporate creditors.  As explained at the hearing, this is because the onboarding, KYC, and AML compliance processes for corporate creditors are more complicated and take significantly longer to complete than those for individual creditors.  This is particularly true today in light of current sanctions regimes.[8]  Accordingly, the negotiated agreement with Coinbase provides for a Liquid Cryptocurrency distribution to 100 corporate creditors.  Therefore, no Distribution Agent has ever been available to service all 1,800 corporate creditors, and corporate creditors are being treated in accordance with the terms of the Plan, which provides that any creditor who cannot receive cryptocurrency for any reason will receive Cash.  As explained in the Effective Date Notice, distributions were calculated using BTC and ETH prices as of January 16, 2024, which were $42,972.9948 for BTC and $2,577.4752 for ETH.

The Corporate Creditor Group believes it is being treated differently from individual creditors who are originally scheduled to receive Liquid Cryptocurrency but who may be transitioned to a Cash distribution.  As explained in the Second Distribution Notice, the Plan provides that, to calculate the amount of Liquid Cryptocurrency each eligible creditor would receive, the Debtors were required to use applicable cryptocurrency prices as of the date that was approximately 15 days before the Effective Date.  Because the Effective Date was anticipated to be January 31, 2024, the Debtors were required to use cryptocurrency prices as of January 16, 2024 to calculate the amount of Liquid Cryptocurrency to allocate to creditors eligible to receive Liquid Cryptocurrency and the amount of Cash to allocate to those creditors who were initially scheduled to receive Cash rather than Liquid Cryptocurrency.  The Debtors set aside Liquid Cryptocurrency for each creditor initially scheduled to receive Liquid Cryptocurrency, and sold cryptocurrency on or around January 16, 2024 to set aside Cash for those creditors scheduled to receive Cash.  Therefore, the amount of Liquid Cryptocurrency and Cash to be distributed has been set since January 16, 2024.  The Plan provides that in those circumstances where a creditor initially set to receive Liquid Cryptocurrency cannot be serviced by a distribution partner, the Post-Effective Date Debtors could sell the Liquid Cryptocurrency at the prevailing market price as close to the expected date of the Cash distribution as possible and the creditor would receive the proceeds of the sale.[9]  Because only 100 corporate creditors are set to receive Liquid Cryptocurrency as of the Effective Date, this process and market price adjustment cannot be applied to the remaining 1,700 corporate creditors.

---

[8]  March 20, 2024 Hr'g Tr. 37:8-11 ("The Court:  The sanctions regime in effect with respect to Russia currently in effect restricts any distributions to a fairly broad [swath] of individuals or entities.").

[9]  *See* Plan, Art.IV.K.1 ("If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency at the time such Account Holder's Claim becomes an Allowed Claim or is otherwise made available for distribution and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder.  Additionally, if a creditor's AML/KYC Compliance Information results in a change in the form of consideration to be paid to such creditor (i.e., a creditor will receive fiat currency instead of Liquid Cryptocurrency, or vice versa, due to a change in the applicable Distribution Agent), then the Plan Administrator will convert the Liquid Cryptocurrency that would otherwise be distributed to the creditor to fiat currency (or vice versa) as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency or Liquid Cryptocurrency, as applicable, to the Account Holder.")

**The Corporate Creditor Group provides no feasible solutions.** The Corporate Creditor Group argues that, even though the agreement with Coinbase only provides for distributions to 100 corporate creditors, the Post-Effective Date Debtors should distribute cryptocurrency to all corporate creditors. The Corporate Creditor Group does not explain how this is to be done practically when no additional distribution partner is available to provide distributions to the remaining 1,700 corporate creditors. The Corporate Creditor Group further argues that there has been a delay in distributions and that this has caused corporate creditors to suffer further losses due to the increase in market price of BTC and ETH. Yet the Corporate Creditor Group does not acknowledge that attempting to identify additional distribution partners who can provide distributions to corporate creditors in dozens of countries around the world, negotiating multiple separate distribution agreements, and distributing cryptocurrency to additional corporate creditors at this stage of the process—at the same time as the distribution process to hundreds of thousands of individual creditors needs to continue—will only result in further delays. Moreover, the Post-Effective Date Debtors are not holding Liquid Cryptocurrency in reserve for corporate creditors who were scheduled to receive Cash, so even if a distribution agent was available to make cryptocurrency distributions to 1,700 corporate creditors, the Post-Effective Date Debtors would have to buy Liquid Cryptocurrency at today's market prices.

The Corporate Creditor Group would likely respond by reiterating its request that, if Liquid Cryptocurrency distributions cannot be made to all corporate creditors, corporate creditors should receive the Cash equivalent to the market price of BTC and ETH at the time of the distribution (and corporate creditors who have already received their Cash distributions should be made whole based on the market price of BTC and ETH at the time of those distributions). Such an adjustment would inevitably cost tens of millions of dollars. But more importantly, such an adjustment implicates the entire distribution process. Setting aside the fact that the market price of BTC and ETH continues to fluctuate and there is no guarantee that the price of BTC and ETH will always be higher in the future than it was on January 16, 2024, here, too, the problem of perceived unfairness is the same: if the Post-Effective Date Debtors distribute the Cash equivalent to the market price of BTC and ETH to all 1,700 corporate creditors set to receive Cash as of the Effective Date, all individual creditors who were originally scheduled to receive Cash rather than Liquid Cryptocurrency could demand the same. This is not feasible, operationally or financially. More to the point, as already noted, corporate creditors receiving Cash—and for that matter, individual creditors receiving Cash—are being treated in accordance with the terms of the Plan. There is no unfair treatment.

Corporate creditors originally scheduled to receive Cash cannot be treated the same way as individual creditors originally scheduled to receive Liquid Cryptocurrency who are switched to Cash. Such individual creditors are only receiving the proceeds of a distribution that was already set aside for them as of the Effective Date; they are not receiving an adjustment that comes out of the reserve funds of the estate. The mechanics were designed in this way because there was no alternative method to equitably account for constant market fluctuations. This Plan provision was also necessary to assuage the concerns of some creditors who have claimed that the Post-Effective Date Debtors are holding on to Liquid Cryptocurrency because they want to benefit from the recent increase in BTC and ETH prices by keeping the difference between the Effective Date value of the Liquid Cryptocurrency and the market price value of the Liquid Cryptocurrency. However, as should be clear from the above, the value of the Liquid

Cryptocurrency allocated to each creditor eligible to receive Liquid Cryptocurrency as of the Effective Date will be distributed to that creditor and no one except the creditor is benefiting from "the overage."[10]

**A lottery would not have allowed for the efficient distribution of cryptocurrency.** The Corporate Creditor Group also argues that instead of allocating cryptocurrency distribution slots to the 100 corporate creditors with the largest Claims who were eligible to receive a distribution as of the Effective Date (*i.e.*, they did not have Withdrawal Preference Exposure, did not opt out of the Class Claim Settlement, or were held back for any other reason), the Debtors should have held a lottery to determine which corporate creditors would receive one of the 100 slots. But the Post-Effective Date Debtors firmly believe that it was more efficient and equitable to distribute as much cryptocurrency as possible, which was only possible by distributing to the largest corporate creditors. Of the 1,800 corporate creditors, 571 hold Claims of less than $1,000, 321 hold Claims between $1,000 and $5,000, and 951 hold Claims greater than $5,000. In contrast, the top 100 corporate creditors eligible for distribution as of the Effective Date hold $112 million in Claims, representing more than 45% of the dollar value of all corporate creditor Claims.

**Distributions through the Celsius App were not feasible.** At the Hearing, Mr. Chang and another creditor acknowledged that KYC and AML compliance processes for corporate creditors are complex but asked why the Debtors had to involve third-party distribution agents at all when corporate creditors had already undergone that process with Celsius directly.[11] Corporate creditors also asked why distributions could not be made directly via the Celsius App.[12] As they explained previously and at the hearing, it is not regulatorily compliant for Celsius to enable withdrawals from the Celsius App to anyone other than Custody Account Holders, who the Court ruled owned the cryptocurrency that was transferred to their Custody Accounts. Celsius does not have the U.S. Money Transfer Licenses (or their equivalent in non-U.S. jurisdictions) required to comply with applicable regulations to enable those withdrawals to individuals or corporations. In addition, to distribute to corporate creditors located outside the United States, Celsius would have to engage local counsel in all countries where corporate creditors are located to review and determine that it would be able to complete cryptocurrency distributions. Identifying, engaging, and working with law firms in all jurisdictions where corporate creditors are located is not feasible or efficient. Similarly, maintaining the Celsius App for an extensive period of time is too expensive, and therefore not feasible.

---

[10] The Court requested that the Post-Effective Date Debtors confirm this in their written response. March 20, 2024 Hr'g Tr. 24:4-14, 21-22 ("Mr. Koenig:…The plan provides that we can sell that crypto and give them whatever the proceeds are, because I actually have the crypto. We have the crypto I should say. So if today we converted somebody that was banned at PayPal to Fiat and you were going to get one Bitcoin, you would get one Bitcoin—whatever today's prices are. I've seen a lot of letters and a lot of concerns saying Celsius is going to steal the overage. If we have it, we will give it to you. Nobody is stealing anything. Nobody is stealing anything…The Court: Is there a place where [creditors] can look and see essentially what you've just said?").

[11] March 20, 2024 Hr'g Tr. 47:17-25, 48:1-3.

[12] March 20, 2024 Hr'g Tr. 69:9-12.

**The distribution agreement with Coinbase only provides for 100 slots to corporate creditors.** Some corporate creditors also stated that they already have accounts that are fully onboarded with Coinbase Prime and therefore Coinbase should make distributions to them.[13] However, the distribution agreement with Coinbase only provides for 100 slots, and the Debtors reserved Liquid Cryptocurrency for those 100 corporate creditors and converted the cryptocurrency distribution for the remaining corporate creditors to Cash as of the record date of January 16, 2024. Even if the Post-Effective Date Debtors were able to renegotiate the distribution agreement with Coinbase to provide for distributions to additional corporate creditors, there are no Liquid Cryptocurrency distributions available for the corporate creditors outside of the 100 who have been chosen for a Coinbase slot. Further, there are significant costs associated with making cryptocurrency distributions to corporate creditors through Coinbase, and this cost was not included in the budget for distributions. The Post-Effective Date Debtors are not a company that can keep operating indefinitely but must complete distributions as soon as possible.

**The Debtors switched banking partners in response to real-time developments.** Finally, the Corporate Creditor Group asserts that the Debtors should not have sold Liquid Cryptocurrency for Cash in January "if they didn't have a viable banking partner to make distributions." For the avoidance of doubt, the Post-Effective Date Debtors want to confirm that it was not clear until after the Effective Date that their original banking partner's financial condition became uncertain. The Debtors sold Liquid Cryptocurrency in January with no expectation that their banking partner's financial condition would become precarious. Once they learned that this was the case, the Post-Effective Date Debtors pivoted quickly to a new banking partner. Further, as explained in the previous paragraph, the Plan required the Debtors to sell cryptocurrency to set aside Cash fifteen days before the anticipated Effective Date.

## Response to Retail Borrowers

On March 19, 2024, a group of 30 retail borrowers (the "Borrower Group") who have elected to refinance their loans filed a letter on the docket raising concerns about the refinancing process [Docket No. 4716].[14] Christian Funck, a signatory to the letter, spoke at the hearing.[15] As set forth in the letter and during the hearing, the Borrower Group asserts that borrowers who elected to refinance are being treated unfairly compared to borrowers who repaid their loans directly in January and Earn creditors who are receiving Liquid Cryptocurrency tied to January 16 prices, because the refinancing process is partly subject to the market price of BTC and ETH.

---

[13]   March 20, 2024 Hr'g Tr. 66:1-14.

[14]   Similar arguments have been raised in a recent filing by a group of borrowers. *See* [Docket No. 4766].

[15]   Mr. Funck's remarks at the March 20, 2024 hearing can be found on pages 55-56 of the March 20, 2024 Hr'g. Tr.

The Plan provides two treatment options to borrowers: the Repayment Election and the Set Off Treatment.[16]  The Repayment Election can be implemented through direct repayment by the borrower or through refinancing of the borrower's loan, and the Plan provides that the Debtors take commercially reasonable efforts to facilitate the refinancing process with third-party lenders.[17]  In January, the Debtors sent borrowers a notice providing them the opportunity to choose whether they wanted to repay their loan directly, refinance, or receive the Set Off Treatment.  The notice stated that borrowers electing to refinance would receive further instructions about the refinancing process on or after the Effective Date.

Under the direct Repayment Election, borrowers were able to repay their loans by making a US Dollar payment equal to the amount of their outstanding loans to the Debtors between January 21, 2024 and January 26, 2024.  In return, borrowers would receive an equivalent amount of BTC and ETH valued as of noon prevailing Eastern Time on the date of repayment (which would be paid to the borrower as part of the borrower's total distribution under the Plan).  If a borrower instead decided to refinance its loan, the third-party lender must repay the borrower's loan by making the payment to the Debtors, the Debtors would use those funds to purchase an equivalent amount of BTC and ETH on the market, and that BTC and ETH are then transferred to the third-party lender for use as collateral for the borrower's refinanced loan with the lender.  The refinancing process is now underway, but because it is an ongoing process occurring after the Effective Date, during which time the market price of BTC and ETH has increased substantially, borrowers who elected to refinance are effectively receiving less cryptocurrency than borrowers who repaid their loans directly to the Debtors during the repayment period in January—with respect to their excess collateral Claim.  Notably, the portion of a borrower's Claim that remains after application of a loan repayment amount, *i.e.*, the set-off amount, was calculated using January 16, 2024 cryptocurrency prices, and borrowers are being treated exactly the same as all Earn creditors with respect to that portion of their Claim.  However, with respect to a borrower's excess collateral claim, the Plan provides for a market price purchase of BTC and ETH in return for repayment of a borrower's loan.  Accordingly, borrowers who elected to refinance are being treated in accordance with the terms of the Plan.

The Borrower Group states in its letter that they expected the refinancing process to occur on the Effective Date.  The Post-Effective Date Debtors acknowledge that the refinancing process has taken time to complete.  However, nowhere in the Plan or otherwise did the Debtors state that the refinancing process would definitively occur on the Effective Date.  The Debtors' notice to borrowers in January stated that the refinancing process would begin on or after the Effective Date.  Finally, the refinancing process has taken time to set up because it is

---

[16]  *See* Plan, Art. III.B.2.  Under the Set Off Treatment, the principal amount of the loan owed to the Debtors is set off or recouped against the applicable "Retail Borrower Deposit Claim," or the Petition Date value of the cryptocurrency transferred as collateral for the borrower's loan.  The borrower retains the proceeds of its loan and has the associated Retail Borrower Deposit Claim reduced by the amount of the loan outstanding on the Petition Date.  The remaining amount of the Retail Borrower Deposit Claim (i.e., the "Retail Borrower Post-Set Off Claim") receives the Unsecured Claim Distribution Consideration (i.e., its pro rata portion of (1) Liquid Cryptocurrency, (2) MiningCo Common Stock, (3) Illiquid Recovery Rights, and (4) Litigation Proceeds) or Convenience Class Distribution, as applicable.

[17]  *See* Plan, Art. IV.B.7.

complicated and has required coordinating with many individual borrowers and several third-party lenders. The Post-Effective Date Debtors have worked to secure authorization from electing borrowers to share data with third-party lenders, provide that data to third-party lenders, wait for borrowers to enter into agreements with their chosen third-party lenders, secure direction letters from borrowers to release their distribution to their chosen lender, among other steps.

The Borrower Group requests that borrowers electing to refinance be allowed to purchase BTC and ETH according to Effective Date pricing (*i.e.*, January 16 pricing) or the average market price of BTC and ETH during the January 21-January 26 period when borrowers were able to repay their loans directly to the Debtors. In effect, the Borrower Group is requesting that the Post-Effective Date Debtors subsidize the cost of purchasing BTC and ETH for refinancing borrowers in the same way that corporate creditors want the Post-Effective Date Debtors to increase Cash distributions to make up for the increase in market prices of BTC and ETH. This would benefit these individual creditors at the expense of all others by giving these borrowers a new guaranteed option to buy cryptocurrency at below-market prices with the benefit of hindsight—and at a cost to the estate and all other creditors. As in the case of corporate creditors, the Post-Effective Date Debtors believe that it is neither feasible nor fair to other creditors to adjust distributions in real time in response to daily market fluctuations.

The Borrower Group also asserts that "[s]ome creditors have received their settlements, some only partially and some not at all with almost no communication options with the debtor;" "[s]ome are being forced to accept USD and not crypto as the plan laid out…;" "[t]he upside of increasing prices in crypto stays with the debtor despite the assets creating the upside belonging to the creditors;" and "[t]he 5% increase for us voting in favor of the plan and opting into the class claim was not added our total claim value." With respect to the first issue, the Post-Effective Date Debtors acknowledged in writing and at the March 20, 2024 hearing that communications with creditors need to be more frequent and more individualized, and they have been working to develop a more responsive communications plan. On the second point, and as previously noted in this response and prior filings, the Plan has always provided that creditors unable to receive Liquid Cryptocurrency would receive Cash. With respect to the issue regarding the Class Claim Settlement, the Second Distribution Notice explained that the 5% increase in scheduled Claims had been incorrectly calculated for borrowers so that borrowers did not receive the full extra amount due to them on account of the additional 5%, and that this would be corrected and that borrowers would receive the remaining amount in a subsequent distribution (*i.e.*, borrowers' distribution would not be held back just for that adjustment). Finally, as for who benefits from the upside of cryptocurrency prices, the Confirmation Order approving the Plan set forth that the collateral borrowers transferred to Celsius belongs to the bankruptcy estate (as is the case for the cryptocurrency transferred to Celsius by Earn account holders), and it is not apt for borrowers to think of the collateral transferred on account of loans as "their collateral." Ultimately, all remaining value of the estate will be returned to creditors in subsequent distributions. The Debtors do not benefit from increases in cryptocurrency prices; all creditors receive the benefit through the increase in value available for subsequent distributions.

### Phishing Attempts Reminder

Many phishing attempts are active now that Plan distributions have become available. Please proceed with caution and review the Phishing Notices.

As a reminder, neither the Post-Effective Date Debtors nor their advisors will ***ever*** contact you by telephone call, social media, or text message to request account information or other personal information absent an (a) order by the Court or (b) on-the-record instruction from the Court.

If you see any suspicious website domains or receive any uncorroborated email, text message, or telephone call purporting to be from the Post-Effective Date Debtors or their advisors claiming that withdrawals are available or requesting account information, personal information, or payment, we request that you please ***immediately*** contact the Post-Effective Date Debtors' counsel at CelsiusCreditorQuestions@kirkland.com or the Post-Effective Date Debtors' claims, noticing, and solicitation agent, Stretto, at CelsiusInquiries@stretto.com.

Copies of the Phishing Notices, the Disclosure Statement, Plan, the Confirmation Order, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: April 4, 2024

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  patrick.nash@kirkland.com
 ross.kwasteniet@kirkland.com
 chris.koenig@kirkland.com
 dan.latona@kirkland.com

*Counsel to the Post-Effective Date Debtors*

**<u>Exhibit A</u>**

March 20, 2024 Hearing Transcript

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK, LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   One Bowling Green

13                   New York, NY  10004

14

15                   March 20, 2024

16                   11:04 AM

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KS

1    HEARING re Hybrid Hearing re:  Post-Effective Date Debtors

2    Motion Seeking Entry of an Order (I) Approving Automatic

3    Revocation of Presumed Mistaken Convenience Claim Elections,

4    (II) Approving Optional Revocation Procedure for Eligible

5    Convenience Claim Elections, and (III) Granting Related

6    Relief.  (Doc. ## 4372, 4417, 4530, 4336, 4433, 4434, 4485,

7    4713, 4732)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    ARTUR ABREU, Pro Se

4

5    WESLEY CHANG, Pro Se

6

7    CHRISTIAN FUNCK, Pro Se

8

9    LAURA MCNEIL, Pro Se

10

11   RIECE KECK, Pro Se

12

13   GEORGE STANBURY, Pro Se

14

15   KIRKLAND & ELLIS LLP

16        Attorneys for the Debtor

17        300 North LaSalle

18        Chicago, IL 60654

19

20   BY:  CHRIS KOENIG

21

22

23

24

25

```
1    UNITED STATES DEPARTMENT OF JUSTICE
2            Attorneys for the U.S. Trustee
3            Alexander Hamilton Custom House
4            One Bowling Green, Room 534
5            New York, NY 10004
6
7    BY:  SHARA CLAIRE CORNELL
8            MARK BRUH
9            BRIAN S. MASUMOTO
10
11   ALSO PRESENT:
12   JIN WU
13   ANDREA AMULIC
14   SAMUEL ARGIER
15   TONIAH BARNES
16   DAVID BARSE
17   THOMAS G. BAULDREE
18   CHRIS BECIN
19   JOSE I. BELTRAN
20   BLAINE G. BERNARD
21   JEFFREY BERNSTEIN
22   INGO BEUTLER
23   CHRISTOPHER BRADHAM
24   KYLE BRAY
25   PAUL BREUDER
```

1    DONALD ENEM BRINK

2    JOHAN BRONGE

3    RALPH MICHAEL BURTON II

4    CARL COTE

5    VITOR CUNHA

6    SHIRLEY CARROLL

7    RICKIE CHANGE

8    PAOLO CIAMARONE

9    CHRISTINA CIANCARELLI

10   JOSHUA CLARK

11   CHRISTOPHER COCO

12   SONDA CORI COHEN

13   AARON COLODNY

14   FREDDY COLON

15   LAFAYETTE A. COOK

16   CAM CREWS

17   OONA E. CRUSELL

18   JOSHUA CRUZ

19   DAVID J. DALHART

20   FLORENT DAVID

21   YVONNE M. DEHART

22   THOMAS DIFIORE

23   TRISTAN DIAZ

24   SIMON DIXON

25   SHARON DOW

| | |
|---|---|
| 1 | SCOTT DUFFY |
| 2 | JEROME DUFOURG |
| 3 | JOHN PETER DZARAN |
| 4 | SIMON ELIMELECH |
| 5 | JEFFREY D. EATON |
| 6 | JANELL ECKHARDT |
| 7 | JAMES ENGEL |
| 8 | DAVID AVERY FAHEY |
| 9 | AAMIR S. FAROOQ |
| 10 | BARRY FLOWETS |
| 11 | TYSON FOIANINI |
| 12 | DEBORAH FRANKEL |
| 13 | DARIOUS-VLADIMIR GHEORGHE |
| 14 | REBECCA GALLAGHER |
| 15 | MARJORIE N. GARCIA FRANCO |
| 16 | JALSIEGH GEARY |
| 17 | MIRA HAQQANI |
| 18 | MONIQUE D. HAYES |
| 19 | ROBERTO HERNANDEZ |
| 20 | SAMUEL P. HERSHEY |
| 21 | KAITLYN HITTELMAN |
| 22 | JOHN HITTI |
| 23 | PERRY D. HOLLOMAN |
| 24 | JOHANNA C. HOLLOMAN |
| 25 | JASON IOVINE |

1    THIBAULT ITART-LONGUEVILLE

2    FRANCES JONES

3    KRILL KHAN

4    DAVID KAHN

5    DAN KAPLAN

6    YARA KASS-GERGI

7    ROBERT KAUFMANN

8    TRAVIS KEENEY

9    SOPHIE KELLER

10   NATE KELLER

11   JOHN H. KNAB

12   RIKI KOULY

13   TOMMY KUSTERS

14   ROSS KWASTENIET

15   SERBAN LUPU

16   CHRISTOPHER LACKEY

17   LISA R. LANG

18   JENNIFER LARKIN

19   SOLEI K. LARKSON

20   DAN LATONA

21   CATHY LAU

22   JOSEPH LEHRFELD

23   MARK S. LEONARD

24   NICOLE A. LEONARD

25   PIETRO V. LICARI

1     XI LIN

2     MAARTEN MAAN

3     JAY MACELHENNEY

4     DAVE K. MALHOTRA

5     KEVIN M. MANUS

6     DANIEL J. MAREE

7     CHASE MARSH

8     CAROL MAUNDER

9     EOIN PAUL MCANESPY

10    KEVIN MCCARTHY

11    MARTIN RUDGE MCNEILL

12    JOHN MELLEIN

13    TOM MERCURI

14    MARK CASEY MILLER

15    LAYLA MILLIGAN

16    CARLA MOORE

17    KEITH NOYES

18    RICHARD OSWALD

19    SHAWN P. PARPART

20    MILIN PATEL

21    JEFF PATTON

22    ANDERS PEDERSON-BJERGAARD

23    GREGORY F. PESCE

24    RICHARD PHILIPS

25    WEI QIANG

1    JONATHAN RODRIGUES

2    CARL D. ROBINSON

3    MARK ROBINSON

4    JONATHAN RODRIGUEZ

5    LIZ ROVIRA

6    NAIDU SANDRANA

7    JOSEPH E. SARACHEK

8    MICHAEL SAKISSIAN

9    DAVID SCHNEIDER

10   NOAH M. SCHOTTENSTEIN

11   WILLIAM D. SCHROEDER

12   ELENA SELEZNEVA

13   DAVID SENES

14   EZRA SERRUR

15   MATTHEW W. SILVERMAN

16   LUKE SPANGLER

17   COURTNEY BURKS STEADMAN

18   PAUL D. STORVICK

19   ASHLEY LAUREN SWIM

20   LUCY L. THOMSON

21   DAVID TURESTKY

22   ELVIN TURNER

23   PIOTR MAREK UJMA

24   TIMOTHY JOHN VANN

25   EZRA VAZQUEZ-D'AMICO

1   TONY VEJSELI

2   LORENZ DIETER WAGENER

3   CAROLINE WARREN

4   KEITH WOFFORD

5   GUOHUA XU

6   RISHI YADAV

7   ANDREW YOON

8   GOLSHID ZAHIREMAMI

9   JARNO BERG

10  ED G. BIRCH

11  SANTOS CACERES

12  SIMON CONOR DEEHAN

13  VINCENT GUYADER

14  RAKESH PATEL

15  HEIN VAN DER WIELEN

16  RICK ARCHER

17  AARON BENNET

18  CLARA ELLEN GEOGHEGAN

19  UDAY GORREPATI

20  TAYLOR HARRISON

21  DIETRICH KNAUTH

22  MIKE LEGGE

23  JONATHAN RANDLES

24  TIMOTHY REILLY

25  VINCE SULLIVAN

1    CATHY TA

2    MAUDE TIPTON

3    ALEX WOLF

4    ZACHARY ZABIB

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning, Mr.

4    Koenig.

5              MR. KOENIG:  Good morning, Your Honor.

6              THE COURT:  Are you feeling lonely in the

7    courtroom?

8              MR. KOENIG:  Yeah.  Mr. McCarrick at the last

9    hearing said something like he'd lost all of his friends.

10   And I think that sums it up.

11             THE COURT:  All right.  I don't mean to make fun.

12   Just for those who are on Zoom, Mr. Koenig is the only one

13   in the courtroom, obviously besides the judge and staff.

14             Mr. Koenig, go ahead.

15             MR. KOENIG:  Thanks, Your Honor.  For the record,

16   Chris Koenig of Kirkland & Ellis for the post-effective-date

17   Debtors.

18             So, Your Honor, there's been a bit of

19   correspondence on the docket about the claims process.  It

20   feels like the early days of the case again.  We only have

21   one motion this morning that is I would describe almost

22   uncontested.  So with Your Honor's indulgence, I think it

23   makes sense to give you some context for the distribution

24   process, how things are going, common issues and things of

25   that nature, especially given the number of creditors that

1    we have on the phone.

2         So this is the most complicated claims

3    distribution process that I've ever been a part of.  We are

4    slated to make distributions to nearly 400,000 people in

5    almost every country in the world.  It's over 150 countries.

6    And we will be distributing to anyone who is eligible to

7    receive cryptocurrency, we will give them cryptocurrency,

8    Bitcoin and Ethereum.  And we will be distributing U.S.

9    Dollars to anyone who cannot receive cryptocurrency for any

10   reason.  And this distribution process is very complicated

11   because we worked to give creditors what they demanded from

12   us; a distribution in cryptocurrency to the extent they

13   could receive it.

14        Our creditors are people who are bought into the

15   power and benefits of crypto.  We held on to the crypto

16   through the bankruptcy.  We did not sell it.  Other debtors

17   have sold it.  That would have been the easy thing to do.

18   FTX sold their crypto and is making distributions in U.S.

19   Dollars.  But we know from our conversations with the

20   Committee, ad hoc groups, and individual creditors, our

21   creditors wanted crypto.  And to the extent we were able to

22   give it to them, we wanted to do that.

23        Now of course we have to be able to give it to

24   them in a way that is regulatorily compliant.  One of the

25   major issues in this entire case was what did the regulators

1    think about our distributions.  And we worked carefully with

2    them to make sure that we were making distributions that

3    they were okay with.  We worked with them to make

4    distributions of Bitcoin and Eth only, not of other alt

5    coins like Sushi Coin or Dogecoin or all of the other tokens

6    that Celsius offered prepetition.

7           So we've worked with regulators to do something

8    that they would support.  And Your Honor may remember we

9    actually had no objections from regulators to confirmation I

10   think as part of that process.

11          So we developed a very complex distribution plan

12   to give as many people crypto as possible while complying

13   with all regulations, which I will come back to in a moment.

14   We spent months preparing for this incredibly complicated

15   distribution.  We started negotiating with potential

16   distribution agents last summer and we selected Coinbase and

17   PayPal around the time of the disclosure statement.

18   Coinbase and PayPal are some of the largest and most trusted

19   cryptocurrency distribution partners in the world.  We

20   wanted to select partners that allowed us to make the most

21   distributions of cryptocurrency to the most possible people

22   while fully complying with all regulatory requirements in

23   all of the different jurisdictions.  That includes Know Your

24   Customer and Anti-Money Laundering requirements, KYC and

25   AML.

1          Those requirements are really important.  Because

2     I don't want to wake up and read the front page of the Wall

3     Street Journal and it turns out that we have distributed

4     currency to a Russian oligarch or a terrorist organization

5     or anything like that.  And that's important to the

6     regulators too of course.  So we found trusted distribution

7     partners who were fully regulatorily compliant in all of

8     these jurisdictions.

9          So let's go back to January where we were at the

10    peak of our preparation for the effective date.  We were

11    preparing to send billions of dollars to hundreds of

12    thousands of people all over the world.  And we thought at

13    the time that about 90 percent of those distributions could

14    be in cryptocurrency.  And about ten percent that for

15    various reasons, the most important of which is what

16    jurisdiction are you in.  PayPal is our distribution agent

17    in the United States.  Coinbase is our international

18    distribution agent.  Coinbase, we have about 150 countries

19    where we have customers to distribute to.  Coinbase services

20    about half of them.  And it's mostly the larger

21    jurisdictions; Western Europe, larger Asian countries and

22    the larger countries.

23          If you live in a smaller country in South America,

24    perhaps Coinbase doesn't have the license to distribute to

25    you.  And of course if I don't have a distribution partner

1    that is allowed to distribute to you, we have to give you

2    dollars.  That's the only thing we can do.

3             So what we did is we designed and we developed a

4    master claims management system that had every creditor in

5    the case.  And what we thought -- could give them the

6    crypto or give them cash based on where we thought they

7    lived at the time based on our record.

8             Now, that's not perfect.  If I thought that you

9    lived in California, Your Honor, but you had actually moved

10   to Botswana, a place that Coinbase doesn't support, there's

11   going to be a little bit of movement of course.  But we

12   believe that 90 percent of our creditors could get crypto.

13   We reserved enough Bitcoin and Ethereum to make

14   distributions to those people.  And the plan provides that

15   for anybody that can't get cryptocurrency, we will give them

16   an equivalent amount of cash.

17            Now, the most complicated thing about this

18   distribution is that bitcoin is -- the price fluctuates.  I

19   hesitate to call it a commodity because of the legal

20   implications.  But for simplicity's sake, I'll say it's a

21   commodity.

22            THE COURT:  Moved a little bit since the start of

23   this case, hasn't it?

24            MR. KOENIG:  It moved a little bit since the

25   effective date, in fact, which is what I'm getting to.

1          So the plan drew a line in the sand.  Here is the

2    distribution record date on which point we calculate all

3    distributions.  So it's the cryptocurrency distribution

4    record date.  And that date was set at 15 days before the

5    effective date, which turned out to be January 16th, 2024.

6    Now, that was important because we set aside an amount of

7    cash and crypto to make sure that we could comply with our

8    obligations under the plan.  We had to reserve enough

9    crypto, we had to reserve enough cash because we knew that

10   it was possible that bitcoin as a commodity could fluctuate

11   up or fluctuate down, and there has to be a date at which we

12   all look and say this is the price, all of those sorts of

13   things.

14          So, for example, if somebody was entitled to

15   receive one Bitcoin and ten Ethereum.  And we could reserve

16   crypto.  It's very easy.  Reserve one Bitcoin and ten

17   Ethereum.  If you lived in a place that we couldn't give you

18   crypto or we didn't believe we could give you crypto for

19   whatever reason, we reserved an equivalent amount of cash at

20   January 16th prices.  On January 16th, Bitcoin was about

21   $43,000 and Ethereum was about $2,600.  Now, those prices

22   are about double what they were on the petition date and

23   they've gone up significantly more since.

24          But what we did was the best that we could do tat

25   the time with the information we had.  And we were complying

1   with the plan, which set a date on which the calculations

2   would have been made.

3           Now, of course since January the price of crypto

4   has gone up.  And that is great news for most of our

5   creditors.  If you received crypto and you received Bitcoin,

6   that Bitcoin is now worth $63,000, $65,000 when it was worth

7   $43,000.  If you received a U.S. Dollar check for $43,000, I

8   understand perhaps your frustration that, oh, if only I

9   could have received crypto, I would have received 65 instead

10  of 43.  But se can't see into the future with a crystal

11  ball.  All we could do was the best that we could at the

12  time.  And as of January 16th, those are the prices.

13          And if the prices had gone the other way, those

14  creditors would have said, boy, Bitcoin was $43,000 on the

15  effective date.  You should have given me $43,000.

16          So it's very difficult with this commodity that is

17  so fluid in price.  And it's so expensive to hedge.  We

18  couldn't have bought hedges for this just to have it.  But

19  we understand the frustration of creditors that have

20  received cash instead of crypto.  But we sold the crypto

21  that would have otherwise gone to them on or around January

22  16th in accordance with the plan.  There's nothing else that

23  we can do.  I've read all the letters that they -- boy, they

24  should make me whole, they should account for the runup in

25  prices.  We can't do that.  We sold their crypto a month-

1   and-a-half ago.  We are doing our best.

2           And the whole point of the motion here today is to

3   try to do our best by as many people as humanly possible.

4   It's a very unusual motion.  I've never filed it before.  I

5   hope to never have to file it again.  But I hope that Your

6   Honor and the parties listening know that we are endeavoring

7   to do our very best by everybody in this process.  It's very

8   complicated and some things just can't be done.  And there

9   were steps that had to be taken in January to prepare for

10  this eventuality.  And yes, crypto went up.  And that is

11  such great news for so many of our creditors.  I think it

12  justifies the strategy we took in the case.  But I don't

13  think anybody has been inequitably treated.  It is what the

14  plan says.  It is what the plan says.

15          So with that, I want to quickly turn to the status

16  of distributions and how has it been going.  So my colleague

17  --

18          THE COURT:  Either now or when you finish that, I

19  also want to hear about the status of the first two -- the

20  rest of the shares of MiningCo.

21          MR. KOENIG:  Yes, no, wonderful.  And I've got a

22  couple of other quick topics.

23          THE COURT:  That's fine.  Go in your --

24          MR. KOENIG:  Thank you, Your Honor.  And I

25  appreciate the preview.

1          So my colleague, Ms. Golic, we filed some slides

2     last night, Your Honor, to sort of illustrate how it's

3     going.  And, Deanna, I believe that you made Ms. Golic a co-

4     presenter.  So if she could present some of the slides.  And

5     I'll start on this slide right here.

6          This sort of walks through our different

7     distribution channels and how it's been going.  And these

8     percentages on the right column are the percentages of

9     people that are eligible to receive a distribution.

10         THE COURT:  Let me ask you for a moment.

11         MR. KOENIG:  Yes.

12         THE COURT:  So for anyone who has access to ECF,

13    these slides were filed as ECF Docket 4732.

14         MR. KOENIG:  Thank you, Your Honor.

15         THE COURT:  Go ahead.

16         MR. KOENIG:  So this presentation lays out as of

17    yesterday the amount of people that have successfully

18    claimed distributions.  And there's percentages on the right

19    that say successfully distributed.  And there's a footnote

20    that's too small perhaps to read on the screen.  But what it

21    says is the percentages are of people that are eligible to

22    receive distributions.  They're people that opt out of the

23    class claim settlement and they're going to litigate their

24    claims before Your Honor at some point in time.  They're not

25    part of the denominator because they're just not eligible to

1    receive claims.  Those sorts of things.

2          So today is I believe the 47th day after the

3    effective date.  And we have successfully distributed --

4    that means somebody has actually claimed -- it is in their

5    account and it is in their hands, they can do whatever they

6    want with it.  86 percent if they were assigned to PayPal or

7    Venmo.  And again, those are U.S. creditors predominantly.

8          Of the remaining 14 percent that haven't claimed a

9    distribution, 11 percent of them have not done the necessary

10   KYC process to register for their distribution, or they just

11   haven't clicked on their code.  So with PayPal, eligible

12   creditors get two emails with individualized codes.  They go

13   onto PayPal's website, they type in the code.  And if

14   everything is correct, it will just be deposited in their

15   account.

16         THE COURT:  Just for creditors in the United

17   States who elected for crypto, where can they look to find

18   the instructions that you've just described as to what to do

19   in the case that they -- you say three percent that have

20   failed to onboard, et cetera.  Where can they look to get

21   the directions as to what to do?

22         MR. KOENIG:  Thank you, Your Honor.  So in the

23   email that everybody receives, there are links to FAQs and

24   other help services that are there.  We filed several claims

25   distribution updates.  The company has an FAQ as well.

1    Those are all in filings on the docket.  They are pretty

2    prominently titled.  You know, Debtor's first update on

3    distributions, Debtor's second update on distributions.  And

4    anybody listening, if you can't find it, feel free to reach

5    out to and we'll be happy to --

6                   THE COURT:  Let me suggest this.  After the

7    hearing today, put it on the docket again so somebody

8    doesn't have to search the entire docket looking for it.

9                   MR. KOENIG:  Wonderful.

10                  THE COURT:  There will be -- almost at the very

11   bottom of the ECF list will be the directions again for

12   anyone who hasn't done it so far.

13                  MR. KOENIG:  Yes.  And maybe what we'll do is like

14   a notice of, you know, important distribution filings and

15   we'll take the three or four of them and we'll just compile

16   them all in one.  That might make it even easier.

17                  So of the 11 percent, some of them just haven't

18   completed the KYC process, which is on them.  And they

19   should have received instructions on how to do that, or they

20   just haven't typed in their codes.  Or they've typed in

21   their codes and they're having some sort of problem.  I'm

22   sure you've read those letters, just as we have.  We've read

23   them.  We've investigated them.  I would say all of them

24   that we've reviewed, there appears to be some sort of issue

25   on their end.  Haven't actually completed the KYC, they're

1   not actually typing in the code right.  We're doing our best
2   to respond to those individual creditors and try to point
3   them in the right direction.  But it's challenging.
4             THE COURT:  Who do they contact if they haven't
5   been able to successful do this?
6             MR. KOENIG:  Right.  So there is a ticketing
7   system that is on all of these different FAQs and so on and
8   so forth that you can put in your problem and you can select
9   on a dropdown, I'm having trouble claiming at PayPal.  And
10  that will route you to the right people that will get you a
11  quick answer.
12            THE COURT:  Okay.
13            MR. KOENIG:  And I think that that's very
14  important.  And then three percent failed onboarding, which
15  means they've provided their information and they are -- the
16  shorthand is banned by PayPal for whatever reason.  They
17  violated their terms of service in the past, and so PayPal
18  doesn't want to service somebody that's scammed them out of
19  a prior distribution.  Which, you know, it is what it is.
20  We will migrate those users to Coinbase first if we can.
21  And if they are banned at Coinbase too, we will give them
22  Fiat.
23            Now, the interesting thing here is -- so I talked
24  about the January 16th issue and how we had to set it aside.
25  If we're holding Bitcoin and Ethereum for somebody and it

1    turns out they can't receive it because they fail onboarding

2    or they move to a country that -- we thought they were in

3    California but they're actually in some country that

4    Coinbase doesn't service.  The plan provides that we can

5    sell that crypto and give them whatever the proceeds are.

6    Because I actually have the crypto.  We have the crypto I

7    should say.  So if today we converted somebody that was

8    banned at PayPal to Fiat and you were going to get one

9    Bitcoin, you would get one Bitcoin -- whatever today's

10   prices are.  I've seen a lot of letters and a lot of

11   concerns saying Celsius is going to steal the overage.  If

12   we have it, we will give it to you.  Nobody is stealing

13   anything.  Nobody is stealing anything.  So that's the

14   PayPal --

15             THE COURT:  May I ask this?

16             MR. KOENIG:  Yeah.

17             THE COURT:  You just provided I think important

18   information.  It doesn't appear to affect a very large

19   number of creditors, but it does.

20             MR. KOENIG:  yes.

21             THE COURT:  Is there a place where they can look

22   and see essentially what you've just said?  In other words,

23   if people had elected crypto and you're not currently able

24   to provide it because PayPal or Coinbase won't do it but

25   you're holding the crypto, given the runup in the price

1   since January 16th, it's important.  Is there a place they

2   can look and see what you've just said?

3            MR. KOENIG:  Yes.  And in the notice that we

4   filed, which we will refile.  And it is in -- what we've

5   done is we've been trying to improve the process.  And I

6   think communications is the area that we worked very hard on

7   this process.  I think we were surprised by the overwhelming

8   number of inquiries.  In the days after the effective date,

9   we had thousands of inquiries a day and our queue got up to

10  20,000.

11           THE COURT:  I haven't received thousands, but as

12  you know, because my clerks have made sure when we've

13  receive inquiries, we've made sure that both the Debtor and

14  the Committee have received copies of it.  They may have

15  received it directly, but we've made sure of that.

16           MR. KOENIG:  Yes, right.  And we've done our best

17  to respond to people as promptly as possible.  But we have

18  taken steps to improve our communication strategy and sort

19  of continue to build the airplane out as we're flying it.  I

20  mean, we had a very good plan, but there's always ways you

21  can improve the process.

22           And so many letters complained about slow

23  responses of form responses.  We pointed people to FAQs and

24  form answers because that works for the vast majority of

25  people.  And there are people that have said, boy, why can't

1    you just push my individual distribution through?  Well, I

2    do have 15,000 people saying that.  And we have tried to

3    triage and focus on common issues and focus on issues that

4    will resolve issues for the most people at once rather than

5    sort of playing whack-a-mole and solving this person's

6    individual issue and then that person's individual issue.

7    So we focused on inquiries that were more time-sensitive and

8    would allow us to get to common answers.

9              THE COURT:  So the slide you have on the screen,

10   overall 80 percent of the distributions have successfully

11   occurred so far.

12             MR. KOENIG:  Yes.  And --

13             THE COURT:  Twenty percent still leaves a lot,

14   but...

15             MR. KOENIG:  Right.  And that includes the Fiat

16   distributions, too.  So if it's just the crypto

17   distributions, it's 85 percent total.  It's 86 percent at

18   PayPal, 83 percent at Coinbase, and a blended 85.  And I'll

19   go through Coinbase in a moment.  But just on the

20   communications before I lose the thread.

21             We've been listening to the requests for more

22   detailed and personalized responses.  And we've been working

23   to improve our communication strategy to make sure that

24   people get more frequent updates from us.  So our goal that

25   we set about a week-and-a-half ago was that every creditor

1    that has not received a distribution should get a new email

2    from us with the status, what do they need to do, what are

3    the next steps.  And for some of them it should be, you

4    know, you'll receive a reattempt next week, and for some of

5    them you have a little bit more of a complicated situation,

6    but here is the status.

7            We're almost done with those distributions.  We've

8    sent our more than 150,000 emails.  And I am pleased to

9    report that in the last week we've made a lot of progress on

10   these numbers.  They would have been lower last week.  We

11   made quite a bit of progress.

12           But we've developed solutions that will help us

13   respond to creditors quicker.  The process is complicated

14   because the company, Celsius, is directing the

15   distributions.  But we're not actually making the

16   distributions.  Coinbase, PayPal, and our Fiat partners are

17   making the distributions.  So we rely on data from them to

18   say, you know, this distribution failed to Chris Koenig for

19   whatever reason.  We have to get that data back.  And we've

20   been working with them to develop an improved system so that

21   the people making the distribution, Coinbase and PayPal, can

22   give us information in more real time that will allow the

23   people answering the flood of creditor questions more

24   promptly so that we have the latest and greatest technology.

25   But it is complicated.

1          But we've now largely caught up on communications.

2    The outstanding tickets are much lower than they've been in

3    the last few weeks.  And just anecdotally in the last three,

4    four, five days, we have seen that number go way down as our

5    new communication strategy rolled out.  And as these

6    distribution numbers go up, we have fewer questions because

7    people have fewer outstanding issues.  Which is very good.

8          So I talked about PayPal a little bit.  Let me

9    talk about Coinbase quickly.  And then I have a couple of

10   other quick topics because I know there's  a lot of people

11   on the line, and some of them raised some of these topics.

12         So Coinbase doesn't have codes.  If you have an

13   account -- if I have an account at Coinbase for Chris Koenig

14   and the KYC matches, because they need to make sure that I'm

15   the same Chris Koenig that is a customer of Celsius -- I

16   won't bore Your Honor with the details, but it is

17   complicated.  If I have a fully-KYC'd account with Coinbase

18   and they know that I'm the right Chris Koenig, when Coinbase

19   goes to attempt the distribution, if it worked, I get an

20   email that says congratulations, you just received crypto

21   from Celsius.  That's the happy path.  That's easy, no

22   problem.

23         If you -- but Coinbase is going to attempt

24   everyone regardless of -- they don't check first to see does

25   Chris Koenig have an account, their system just tries me.

1    And if it works, great.  And if not, it comes back with a

2    failure that says Chris Koenig doesn't have a KYC'd account.

3    And I get an email that says, Chris, we just tried you, it

4    didn't work.  You know, you need to complete KYC, you need

5    to open an account.  Here are links to what you need to do.

6           And so Coinbase first tried these distributions

7    around February 14th, about two weeks after the effective

8    date.  And a number of people it worked, and a number of

9    people hadn't set up accounts yet, which I totally

10   understand.  Those people initially got a communication

11   because we had understood in that moment that they would

12   never be able to get something from Coinbase.  It was more

13   akin to Coinbase has banned you, then you don't have a KYC

14   account.  We looked into it because those numbers seemed

15   high to us.  And it turned out that it was just a

16   misunderstanding.  Those people just didn't have an account.

17   So those people subsequently got an email from us that said

18   that earlier communication was in error, please go and open

19   an account, do the KYC.  We will try you again.  We will try

20   you on a periodic basis.

21          On Monday, Coinbase ran it again, and a full third

22   of the outstanding accounts had done what they needed to do

23   and had opened an account and had provided Coinbase and we

24   distributed a full third of the outstanding amounts from

25   Coinbase.  That number was a little bit over 70 percent

1   literally two days ago.  So we are making progress.  And

2   similarly here, you see sort of a same percentage.  You have

3   of the remaining 17 percent, 13 percent just haven't done

4   the KYC properly and need to do it or need to create an

5   account or something like that.  And about four percent, the

6   data that we have suggests that they may not ever be able to

7   meet the KYC because they are on some sort of banned list or

8   whatever the case may be.  Those people will be migrated to

9   Fiat.  And again, same explanation goes for PayPal.  If we

10  have their crypto, we will sell it and we will give them the

11  proceeds, whatever they are at the time.  So we've made a

12  lot of progress recently with Coinbase.

13           I had, again, just sort of anecdotally.  But as

14  you can imagine, I have a number of phone calls with lawyers

15  and pro se alike these days.  And in the last couple of

16  days, I would say half of those calls were cancelled because

17  people said I appreciate your time, but I just got my

18  distribution.  Again, it's anecdotal evidence, but I think

19  the data bears it out that the process is working.  And I

20  think that we're ahead of the curve.  In large retail

21  bankruptcies, it can take quite some time for distributions

22  to go out.  And in the other large crypto bankruptcies, it

23  took time, too.  In one of them, it took 30 days for them to

24  start the process.  14 days in, we distribute 75 percent of

25  the value and 50 days in we've distributed 85 percent of the

1    value.  And, frankly, three-quarters of the remaining value

2    to be distributed, we're waiting on somebody to open an

3    account or complete KYC, and there's only so much that we

4    can do there.  People are getting regular communications

5    from us, obviously, to remind them to do those sorts of

6    things.

7              But what I will say to Your Honor is, you know, I

8    want this number to be as high as possible as quick as

9    possible.  But it's sort o f the 80/20 rule of 80 percent of

10   the time -- 20 percent of the time is spent on solving the

11   first 80 percent of the problem, but the last problems are

12   the more difficult ones to solve.  We've gotten emails from

13   people who are like, I understand, you thought I lived in

14   California.  I now live in Botswana.  We can help that

15   person, but that's a very manual process and it's going to

16   take a little bit of time.

17             So we are endeavoring to get distributions out to

18   people as quickly as possible, but I don't expect this

19   number to hit 95 percent in a month.  It's going to be a

20   little bit slower going.  Now that we've solved all the

21   common problems, we're going down to the brass tacks of the

22   difficult, individualized problems.

23             Okay, just a couple of other updates.  And I

24   apologize for being long-winded, but I think it's important.

25             So Fiat.  Fiat is the third row on this chart.

1    It's U.S. Dollars.  So unfortunately, we had to change our

2    bank in February.  We were with Flagstar, who had bought

3    Signature Bank.  And they unfortunately were running into

4    their own distress.  And the irony is not lost on me that in

5    a crypto bankruptcy we are worried more about the security

6    of the U.S. Dollars than of the crypto.  I have to say that

7    out loud.

8            So we moved banks because it would be a disaster

9    if our banking partner went under and took our money with

10   it.  So we transferred to a new bank successfully, but it

11   took a few weeks to migrate and to get a new corporate

12   account set up and all of the bells and whistles that you

13   need to get the services online that allows us to send

14   checks and wires all over the world.  And Fiat is one of the

15   other I would say success stories where we overhauled the

16   process based on initial feedback.

17           So our plan had been to send checks to everybody

18   eligible to receive Fiat, which is very inexpensive, it's

19   very simple, and it works.  But 45 percent of our creditors

20   live outside the United States.  And when we sent

21   communications right after the effective date saying we're

22   going to send you a check, please update your address if

23   you've moved recently, people said, whoa, whoa, whoa, I live

24   in a country where the post doesn't get delivered regularly,

25   the post is corrupt, people steal checks, my bank won't

1   deposit a U.S. Dollar check.  You need another solution.

2           So we used the timing delay to our advantage from

3   moving banks and we overhauled the system.  Anybody with a

4   claim of at least a thousand dollars can get a wire transfer

5   for this, which should solve the problem for the

6   international people.  Eligible creditors should receive a

7   communication by the end of the week asking for wire

8   transfer instructions.  We've asked for quite a few of them

9   already.  We just keep going out to more and more people as

10  we hear of this issue.

11          THE COURT:  How are you dealing with potential

12  security issues regarding wire transfers to ensure that

13  these are the proper accounts?

14          MR. KOENIG:  For sure.  I mean, there is as you

15  can imagine a validation and security process that I am not

16  equipped to go through in detail.  But rest assured that our

17  banking partner does this for a living and the company does

18  this for a living.

19          THE COURT:  And your banking partner is who now?

20          MR. KOENIG:  Pardon?

21          THE COURT:  Who is the current banking partner?

22          MR. KOENIG:  Oh my god.  It's totally blanking on

23  me.  I'll get it when I sit back down.  But it's a

24  significant bank.  I'm just totally blanking on it.  But we

25  are confident in the process.  Frankly, the biggest problem

1    we've had is getting people to send us the right

2    information.  Because we can only complete a wire transfer

3    if they fill out the form correctly.

4              THE COURT:  You need a routing number.

5              MR. KOENIG:  And some of these creditors don't

6    speak English as a principal language, which is totally

7    understandable. But we'll get back a wire transfer form that

8    has their name and their address, and we need the name of

9    the bank.

10             THE COURT:  Have you prepared wire transfer

11   instructions --

12             MR. KOENIG:  Yes.

13             THE COURT:  And has that been distributed to all

14   of these people?

15             MR. KOENIG:  Yes.  And we've continued to update

16   the form to make it even more clear over time as the first

17   round of it.  You know, we would say bank's address, and

18   people would put their own address.  And so the second time

19   we go through and we say, no, we really need the bank

20   address, not your address and make it as crystal clear as

21   possible for people.

22             So as I said, by the end of the week, anybody over

23   a thousand dollars will be contacted us and have the

24   opportunity to receive a wire.  And even for those under a

25   thousand dollars.  If you tell us you can't receive a check,

1    we'll work to get you a wire.  And those people are going to

2    get a communication from us by the end of the week saying we

3    will send you a check, here's where you can update your

4    address.  And if you tell us affirmatively that you can't

5    receive a check, we will give you a wire, too.  And so by

6    the end of next week, we will have attempted all wires where

7    creditors gave us correct and complete wire instructions as

8    of yesterday and we'll just ramp up from there.  Okay.  That

9    is the update on Fiat.

10            So again, Fiat is a little bit behind the

11   eightball as you can see from the numbers just because the

12   banking delay, number one.  And we overhauled the system to

13   make sure that people that were receiving Fiat could

14   actually deposit it.  Because I don't want to send a check

15   to somebody and they can't deposit it, we have to cancel the

16   check and it's a whole thing.  All right.

17            One of the other areas of concern has been from

18   corporate creditors, as Your Honor may have read in some of

19   the letters.  Unfortunately, our agreement with Coinbase

20   only allows us to distribute to 100 corporate creditors.

21   Those are corporations, LLCs, trusts, and other non-

22   individual entities.  So if there was an LLC and the account

23   was in the name of the LLC rather than the individual

24   person.  They are I'll call them a corporate creditor.

25            The universe here is small but significant.  Just

1    for Your Honor's edification, there's about 1,800 corporate

2    creditors.  They have a total of $78 million in claims.

3    Those are --

4            THE COURT:  Give me that number again.  How many?

5            MR. KOENIG:  1,800 corporate creditors with a

6    total of $78 million in claims.  Now, those are big numbers.

7    But in the scope of Celsius, remember that we have about

8    400,000 creditors with claims big enough to receive a

9    distribution, and they have about $5 billion in claims.  So

10   it's about a half a percent by number and a little bit more

11   than one percent by dollar amount.

12           Corporate creditors are a challenge to KYC and to

13   distribute to.  For you and me, Your Honor, individuals, if

14   I want to sign up with Coinbase, I give them my driver's

15   license, I give them my Social Security number.  Coinbase

16   has a vendor that they run through and they go, yeah, this

17   person is who he says he is.  He's not on the banned list,

18   he's not a Russian oligarch, good to go.

19           If the corporate creditor is I Love Crypto, LLC,

20   how do you figure out who that person is?  A lawyer has to

21   read the LLC agreement.  Right?  And that structure may be

22   several levels up and you need to make sure that the

23   ultimate beneficiary is not a Russian oligarch.  And so we

24   negotiated this point --

25           THE COURT:  Just so the record is clear, you've

1    reference several times Russia.  There is a regime in place

2    that prevents distributions to certain categories of

3    creditors.

4          MR. KOENIG:  Thank you, Your Honor.  Federal rules

5    and regulations that prevent us from sending money to

6    certain recipients who are affiliated with terrorist

7    organizations or regimes that the U.S. Government --

8          THE COURT:  The sanctions regime in effect with

9    respect to Russia currently in effect restricts any

10   distributions to a fairly broad swatch of individuals or

11   entities.

12         MR. KOENIG:  And that is one of the points  of the

13   KYC AML process.

14         THE COURT:  Okay.  Just so that everybody

15   understands why in part such care has to be taken.  Indeed,

16   I have another case where about $8 million is frozen in New

17   York because it can't be returned to Russia because the

18   creditors include sanctioned parties.

19         MR. KOENIG:  Interesting.

20         THE COURT:  This is not a Celsius-specific

21   problem, it's a more general problem because of the

22   sanctions regime in effect.  Go ahead.

23         MR. KOENIG:  So again, if the creditor is an LLC,

24   a lawyer has to read the LLC agreement and then you have to

25   figure out who the ultimate beneficiaries are.  And that's a

1    complicated and expensive process.  It was one of the

2    harder-fought negotiations that we had with distribution

3    agents because we have 1,800 creditors and we want to

4    distribute crypto to as many of them as possible.  We landed

5    on 100 corporate creditors.  For better or for worse, that

6    was the best that we could do.  And there was a point in

7    time where we thought we were going to get zero.  And there

8    are 1,800 people.  And --

9            THE COURT:  How are you going to deal with the

10    other 1,700?

11            MR. KOENIG:  They are getting Fiat.  And that is

12    the only thing that we can do.

13            So the plan and the disclosure statement said if

14    you cannot get cryptocurrency for any reason, including

15    because there is not a distribution agent that can send to

16    you in a fully regulatory compliant way, you will get U.S.

17    Dollars.  And so we're sort of back to the conversation that

18    I had at the beginning of my presentation where if you were

19    outside of the top 100, we reserved for you Fiat because we

20    did not have a slot for you as of the effective date.  And

21    I've read the letters of people that, you know, they wish

22    that we had done some other process to select.  What we did

23    was we wanted to make the most out of those 100 slots.  And

24    there's any number of ways you could have done it.  We

25    looked at the data, and of the 1,800 creditors, half of

1    them, 900 have less than $5,000 in claims.  Those are

2    relatively small in this case.  Those 900 people

3    collectively have about $1 million of claims.  That's -- and

4    again, $78 million in claims total.

5          So I've seen the question, oh, the Debtors should

6    have run a lottery.  Well, if we had run a lottery and we

7    had used one of the 100 slots on somebody who was entitled

8    to receive $25, that doesn't seem like a very good use of

9    limited resources.

10         So what we did is we went out to the top 250

11   creditors by size and said do you want cryptocurrency or do

12   you not care.  This was in January.  And we said if you were

13   indifferent, please let us use the slot on somebody who

14   really cares.  And there were creditors that said I don't

15   care, send cash.  Those creditors may be kicking themselves

16   now with the run-up in prices, but it is what it is.

17         But it shows that as of January 16th, nobody

18   should have cared.  It was --

19         THE COURT:  They may have gotten their money and

20   reinvested it in Bitcoin.

21         MR. KOENIG:  Yeah, exactly.  They could have done

22   that.  But, you know, I understand -- same as I understand

23   the frustration of the people that live in countries all

24   over the world that we can't distribute crypto to.  They see

25   people that are getting more in their mind.  But we are

1    giving them what the plan requires.  And I'll stand behind

2    our process as the process that we believed was going to get

3    the most use out of limited resources and to get the most

4    amount of crypto to the most amount of creditors.  And it's

5    complicated and it's frustrating I'm sure, but that is what

6    it is.  And so there's corporate creditors that are saying,

7    well, you should make me whole for the runup in crypto

8    prices.  I sold their crypto on January 16th, and the price

9    has gone up.  We can give them the Fiat, but it is what it

10   is.  Okay.

11              CLERK:  Sorry, Judge.  We have a raised hand.

12              THE COURT:  Not yet, Deanna.

13              MR. KOENIG:  I'm almost done, Your Honor.

14              The convenience class, that is the subject of this

15   morning's motion, so I'll table that.  And then on the

16   loans, Your Honor may recall that we had an option for

17   borrowers to sort of refinance the principal balance of

18   their loans.  The main reason was tax treatment for those

19   individuals.  We had about 350 individuals that elected that

20   treatment.  We've been working with the lenders to refinance

21   them.  We closed our first cohort, a small cohort, but it

22   was a large dollar amount actually with about six or seven

23   creditors last week.  And we are doing about another hundred

24   this week.  And again, there's like 350 that initially

25   elected it, and some of those people have fallen away and

1    have decided that they don't want to do that after all.  So

2    we'll give them their normal distributions.

3            Your Honor, I have been speaking for quite a

4    while.  There have been quite a few letters.  Is there

5    anything that -- oh, you wanted me to address the MiningCo

6    stock.  Those discussions remain ongoing.  It's difficult

7    for me to speak to it because that process is confidential

8    with the SEC.  But Your Honor and the other parties should

9    rest assured that I do not represent the MiningCo, I

10   represent Celsius.  But for my understanding, those

11   conversations are ongoing and I am hesitant to characterize

12   them for fear of breaching confidentiality.  But there has

13   not been a development that is -- you know, the SEC has not

14   denied the application, nor has it granted it.  Those

15   conversations remain ongoing, which, frankly, is what we

16   have expected.

17           I've been speaking for a while.  Is there anything

18   Your Honor was hoping I would address before I get to the

19   motion?

20           THE COURT:  No.

21           MR. KOENIG:  Thank you, Your Honor.

22           THE COURT:  Well, let me -- before you get to the

23   motion, I am going to allow creditors who wish to be heard

24   to speak.  Just so we are clear about this process, my

25   courtroom deputy, who is not in the courtroom, she is able

1    to see raised hands on her computer.  And she will try and

2    do this in the order in which  hands are raised to identify

3    people.  I ask you to keep your comments brief if possible.

4    But I do want to hear what you have to say.

5            Deanna, can you indicate the first person to be

6    heard?

7            CLERK:  Yes.  We have Laura McNeil.

8            THE COURT:  All right.  Ms. McNeil?

9            MS. MCNEIL:  Hi, Your Honor.  Thank you for

10   allowing me to speak today.  My name is Laura McNeil, and

11   this is the first court hearing I've attended, participated

12   in.

13           I've been following the bankruptcy court updates

14   all along wherein I've waited patiently throughout this

15   process.  But I now feel like it's time to speak up.

16           I am here with two other creditors today, Wesley

17   Chang and Riece Keck.  And we are representing a group of

18   over 80 corporate creditors found and connected with in a

19   very short amount of time over various social media

20   channels.  Together, we wrote a letter with all of our names

21   and we submitted this to the Court on Monday.  We encourage

22   you to read Docket Number 4719, as it outlines the great

23   inequity we are all experiencing in regards to receiving USD

24   distributions.

25           The majority of the corporate creditors we

1    represent have retirement accounts, family trusts, wills,

2    and non-conventional corporate accounts aimed at

3    safeguarding our financial futures.

4         I personally manage nine accounts.  Seven of these

5    are corporate accounts that are all self-directed IRAs which

6    are sole-operator LLCs with retirement funds.  Four of these

7    accounts are for my parents' IRAs and contain their entire

8    life savings, which they have not had access to for well

9    over a year-and-a-half, largely affecting their retirement

10   and their livelihood.  This has severely affected all of our

11   mental health, not knowing when, if, or how much of our

12   funds we get back.  My parents worked hard for decades and

13   they put their entire net worth into these tax-sheltered

14   accounts with Celsius under the false pretenses their funds

15   would be safe.

16        The reason I am speaking to you today is to bring

17   to your attention how corporate creditors are not getting

18   equitable treatment with their distributions.  The Debtor

19   selected only a hundred corporate accounts, as you heard

20   earlier, to receive their distribution through

21   cryptocurrency with Coinbase.  And the other accounts were

22   told they were to receive U.S. Dollar distributions based on

23   January 16th crypto prices.  However, it's been over two

24   months and most of us are still waiting to receive any

25   distribution.

1        In Chris Koenig's opening statement, he said we

2   could do what we wanted with these funds.  But most of us

3   have still not even received these funds.

4        Since then, Bitcoin has gone up about 60 percent

5   and Ethereum has gone up about 40 percent in price.  This is

6   a huge discrepancy from the January 16th prices.  Selecting

7   100 accounts mean that those accounts got preferential

8   treatment.  The debtor had a fiduciary responsibility to be

9   equitable and they breached this duty.  We feel the Debtors

10  were negligent in not trying to find a distribution partner

11  to service all corporate accounts equally.

12       In Kirkland & Ellis's recent docket, filing number

13  4623, (indiscernible) that accounts are unable to receive

14  cryptocurrency distributions, and all of selected that

15  option.  The Debtors could sell the liquid cryptocurrency

16  and the creditor will receive liquid cryptocurrency at

17  prevailing market price as close to the expected date of the

18  cash distribution as possible.  If we as corporate creditors

19  are to be compensated with U.S. Dollars, we should also be

20  able to receive these distributions at prevailing market

21  prices as close as possible to our distribution.  To pay us

22  at significantly lower January 16th crypto prices and have

23  us wait over two months is another example of how this

24  process has been inequitable.  Our crypto should have never

25  been sold.  However, if the Debtors were going to liquidate

1   assets, they should have had a viable banking partner able

2   to distribute these funds as close as possible to when they

3   were sold as they specify they are doing for other

4   creditors.  This is yet another example of how these

5   distributions have not been equitable across creditors.  Why

6   should corporate creditors, including my parents, be treated

7   differently than any other creditor?  As the U.S. justice

8   system (indiscernible), people are to be treated

9   impartially, fairly, equally, and reasonably by the law.

10          Your Honor, on behalf of myself, my parents, and a

11  growing list of over 80 corporate creditors we have

12  connected with, we are asking that you rule that was not an

13  equitable solution for corporate creditors.

14          In Chris Koenig's opening statement, he said if we

15  have it, we will give it to you.  Well, we understand that

16  Kirkland & Ellis has retained $165 million to use to remedy

17  (indiscernible) such as this.  And we kindly request you

18  order these distributions to be made equitably so all

19  creditors are treated fair and equal as required by law.

20          Specifically we are requesting the Court to order

21  distributions be made in cryptocurrency.  And where this is

22  not possible, corporate accountholders should receive U.S.

23  Dollars at current prevailing market cryptocurrency prices

24  as close as possible to when they are sold to match

25  treatment of other creditors receiving U.S. Dollars.

1          For the few corporate accounts that have already

2    received U.S. Dollar distributions, we ask that they be made

3    whole based on the prevailing market rate when they received

4    their distributions just as Kirkland & Ellis have stated

5    other creditors will receive.  These requests will ensure

6    all creditors are treated fair and equal.

7          Your Honor, thank you for your time and your

8    consideration.

9          THE COURT:  All right, thank you.  I haven't read

10   your filing, ECF 4719.  I would ask that the Debtors respond

11   in writing to it on ECF and I'll determine how to take it

12   up.

13          MR. KOENIG:  Understand.  We will do so.

14          THE COURT:  All right.  Thank you, Mr. McNeil.

15          All right, Deanna, who is next?

16          CLERK:  We have Wesley Chang, I believe.  Wesley,

17   can you unmute?

18          MR. CHANG:  Yes, hello.  Thank you, Your Honor,

19   for giving us the opportunity to speak.  I don't know if

20   you're able to see me on the screen.

21          THE COURT:  I can't see you on the screen.  I can

22   see your name on the screen.  Go ahead, Mr. Chang.

23          MR. CHANG:  Okay, all right.  Yes, again, my name

24   is Wesley Chang.  I am a (indiscernible) creditor who owns

25   (indiscernible) Earn, Loan, and corporate accounts with

1    Celsius.

2              Mr. Koenig earlier spoke about doing their best to

3    ensure equitable distribution.  And I am here to

4    resoundingly dispute that claim as well as other claims that

5    he has made this morning.

6              The Debtors could not secure a distribution

7    partner.  Financial issues with their banking partners,

8    logistics, complexities, miscalculation of distribution.

9    This is all documented through the dockets that were

10   submitted by all the creditors.  So I just don't feel that

11   Debtors have much credibility.

12             As you heard from Ms. McNeil and as you'll hear

13   from Mr. Keck, we are here to represent all corporate

14   creditors who have been informed that we will not be getting

15   distribution in the form of cryptocurrency as we have all

16   requested.

17             According to the Docket 4623 by Kirkland & Ellis

18   on March 13th, the reason for the Debtor's inability to

19   distribute currently co corporate creditors was due to an

20   onboarding process and compliance requirement being

21   significantly more demanding for corporate creditors.  And

22   we spoke about that earlier.  I understand.  But as Mr.

23   Koenig spoke about the AML and KYC compliance, we were all

24   subject to KYC process through Celsius even after the

25   bankruptcy effective date.  But the Debtors still took it

1    upon themselves to involve a third party distributor, which

2    obviously added more complexity to the distribution process,

3    which is where we are now a month later.  We still haven't

4    gotten anything.  And as a result, they were allowed to

5    enter into an agreement that limited equitable distribution

6    for those outside of top 100 accounts.

7            Docket 4220, again, filed by Kirkland & Ellis back

8    on January 11th stipulated that if you are not eligible to

9    receive a distribution in cryptocurrency due to your

10   particular circumstances, we will receive -- you will

11   receive distribution in U.S. Dollars.

12           (indiscernible) this was a huge miscalculation on

13   the Debtor's part and there should be no practical reason

14   for those corporate creditors who selected cryptocurrency as

15   the form of payment to receive cash distribution.  We feel

16   that this is a clear failing on the Debtor's commitment to

17   ensure equitable distribution.

18           The topic of equitable distribution naturally took

19   the front stage due to the spike in Bitcoin and Ethereum

20   prices as of recent.  But such headline could have been

21   avoided had the Debtors at their own discretion, again,

22   could have exercised fair and equitable judgement by

23   committing (indiscernible) deficiency.

24           And Docket 4319, filed on February 15th, the

25   Debtor state U.S. Dollar distribution will be distributed as

1    soon as reasonably possible after the effective date of the

2    plan.  Due to what Debtors classified as a logistical

3    complexity, as soon as reasonably possible didn't

4    materialize.  So even if for some reason distribution must

5    be made in cash, we ask the Court to establish a rule that

6    cash wire transfer distributions be made within five

7    business days from the new effective date that should be

8    established, or cash value at the time of distribution be

9    within five percent of the Bitcoin and Ethereum value.  We

10   have to have that type of rule to be (indiscernible).

11   Otherwise, we'll be back in the court arguing this point.

12         So in closing, I want to reiterate Ms. McNeil

13   briefly -- what she touched on earlier.  The corporate

14   accounts are mostly owned by single-member LLCs with IRA and

15   retirement funds of her parents and her relatives.  And that

16   is -- and that goes for most of the corporate creditors,

17   including mine.

18         So we ask Your Honor to be fair in your

19   (indiscernible) and consideration of those who really need a

20   fair treatment.  Your Honor, please have mercy on all of us

21   and grant us the equitable distribution we all deserve.

22   Thank you for your time.

23         THE COURT:  Thank you, Mr. Chang.

24         Let me hear next -- Deanna, who is next?

25         CLERK:  We have Riece Keck.

1          THE COURT:  All right.

2          CLERK:  Apologies if I got the wrong name.

3          THE COURT:  Thank you.  Mr. Keck, go ahead.

4          MR. KECK:  Hello, Your Honor.  My name is Riece

5   Keck and I am a corporate creditor based here in the United

6   States.  For context, I have a claim with Celsius of

7   approximately $305,000.

8               I am here today to raise concerns about the

9   inequitable treatment of corporate creditors in the Celsius

10  bankruptcy case.  I am for context one of those who is

11  scheduled to receive distributions in U.S. Dollars.

12  Although I did originally request cryptocurrency, I was

13  initially somewhat indifferent due to the similar Bitcoin

14  prices on January 16th and the effective date.

15              However, the significant delay in receiving funds

16  and the recent appreciation of Bitcoin and Ethereum have

17  materially impacted my distribution.  If paid in

18  cryptocurrency, my claim would currently be worth

19  approximately $82,000 more than the U.S. distribution at

20  current prices.

21              There are three primary issues that I want to

22  raise with treatment of corporate creditors.  First, as

23  we've discussed, is that only 100 corporate creditors could

24  receive cryptocurrency while the rest receive U.S. Dollars.

25              Now, I fully understand the reasoning for picking

1    U.S. Dollars, as Mr. Koenig mentioned, in the instance of

2    regulatory or compliance issues.  However, increased

3    administrative burden is not a valid reason for unequal

4    treatment.  Debtors should have found an additional

5    distribution partner capable of handling the (indiscernible)

6    corporate creditors.

7            Secondly, as Mr. Koenig mentioned, the funds were

8    liquidated on January 16th.  However, this was done without

9    a proper banking partner in place, which has caused delays

10   and prevented creditors from benefiting from recent

11   cryptocurrency appreciation.  And as Mr. Koenig mentioned,

12   only 18 percent of wires have gone out.

13           Your Honor briefly mentioned earlier that those

14   corporate creditors could have reinvested, which I actually

15   did intend to do, as I anticipated a wire shortly after the

16   effective date.  However, as of today, I still have yet to

17   receive anything.  So had things gone out on time, I could

18   have done that.  But the Debtors failed to accommodate that.

19           And then third, individual creditors who are

20   unable to receive cryptocurrency through Coinbase and PayPal

21   are assured that their crypto will be sold at current prices

22   while corporate creditors are not afforded the same

23   treatment.

24           So, Your Honor, I believe these issues violate

25   fundamental principles of bankruptcy law.  First, in unfair

1    discrimination, and I believe the Debtors have unfairly

2    discriminated against similarly-situated creditors by

3    treating corporate creditors differently.

4             Secondly, breach of fiduciary duty.  The Debtors

5    breached their fiduciary duties by failing to secure a

6    distribution partner capable of servicing all corporate

7    accounts equitably.

8             Third, inconsistent treatment.  The Debtor's own

9    statements indicate that creditors unable to receive

10   cryptocurrency, individual creditors, will receive proceeds

11   at prevailing market prices, but corporate creditors are

12   forced to accept outdated prices.

13            And fourth, unnecessary liquidation.  The Debtors

14   should not have liquidated cryptocurrency assets prematurely

15   without a viable banking partner, which has caused harm to

16   corporate creditors.

17            Now, I understand that those distributions -- or

18   those assets were sold on January 16th.  However, as a

19   previous creditor mentioned, Kirkland & Ellis has withheld

20   back $165 million to ensure equal and fair treatment of all

21   creditors.  And I ask that you rule fairly to those of us

22   who have been unable to receive cryptocurrency.  Thank you

23   for your time.

24            THE COURT:  Thank you.  Deanna, next?

25            CLERK:  Next is George Stanbury.

1              THE COURT:  All right.  Mr. Stanbury?

2              MR. STANBURY:  Good morning, Your Honor.  Thank

3      you very much for all of your patience and effort in this

4      (indiscernible).  I have simply two questions to ask.  The

5      first, how did you value (indiscernible) value our U.S.

6      Dollar (indiscernible) for purposes of the distribution.

7              And my second question is since any distribution

8      (indiscernible) upon receiving a distribution

9      (indiscernible), why didn't I and others ever receive the

10     distribution letter?

11             THE COURT:  I'm sorry, Mr. Stanbury, I'm not sure

12     I understood your point.

13             MR. KOENIG:  Your Honor, I think I heard the

14     second point, which was --

15             THE COURT:  You have to identify yourself.

16             MR. KOENIG:  I'm sorry.  Chris Koenig from

17     Kirkland for Celsius.

18             I think what Mr. Stanbury said was he has not

19     received a PayPal code yet.  And he was asking why.

20             Mr. Stanbury, if you -- we'll refile on the docket

21     tonight the FAQ with all of the different emails and

22     ticketing systems.  But if you email me, my email is on all

23     of Celsius' filings, Chris.Koenig@Kirkland.com.  If you

24     email me your question, we will come back to you promptly.

25     And of course you are free to address the judge.  But if

1    your question is why haven't I received my code y et, I
2    standing here don't know that, and I would have to check my
3    records.
4           THE COURT:  Go ahead, Mr. Stanbury, if you want to
5    say anything else.
6           MR. STANBURY:  The first question was how did you
7    value the price or the value of an alt coin such as
8    (indiscernible) for purposes of distribution.
9           MR. KOENIG:  Right.  So what happened, Mr.
10   Stanbury, is there was a table --
11          THE COURT:  And it's Mr. Koenig who is speaking.
12   Go ahead.
13          MR. KOENIG:  I'm sorry.  Mr. Koenig speaking to
14   Mr. Stanbury.
15          Mr. Stanbury, the plan provided for a table that
16   would be set for a conversion of different types of
17   cryptocurrency into each other.  But if you had a claim for
18   ADA, that claim was set on the petition date pursuant to the
19   Bankruptcy Code.  And so whatever the price of ADA was on
20   that date is the claim that you have.  And then we
21   distributed to you Bitcoin and Ethereum at prices that were
22   as of January 16th.  So if your question is what was the
23   price of ADA, the price of ADA was the price that you had in
24   your account.  That's your claim against Celsius.  That was
25   set on the petition date of July 13th, 2022.  And then you

1    got Bitcoin and Ethereum that -- let's just say that the

2    value of your account as of July 13th, 2022 was $10,000.

3    The plan provided that you would get Bitcoin and Ethereum

4    valued as of January 16th, 2024.  And it's about 57, 58

5    percent as the initial distribution.  So if you have a

6    $10,000 claim, you've got Bitcoin and Ethereum that as of

7    January 16 was worth $57,000 or $58,000.  And then what the

8    Bitcoin and Ethereum was worth sort of goes up and down with

9    the market.

10          Does that help answer your question?

11          MR. STANBURY:  Yes, thank you.

12          MR. KOENIG:  You're very welcome.  If you have

13    anything else, as I said, please email me.

14          THE COURT:  All right.  Deanna, next?

15          CLERK:  Christian Funck.

16          THE COURT:  I'm sorry, say it again, Deanna?

17          CLERK:  The name is Christian Funck, F-u-n-c-k.

18          MR. FUNCK:  Yes, hello.  Can you hear me?

19          THE COURT:  Yes, I can.  Go ahead, Mr. Funck.

20          MR. FUNCK:  Your Honor, thank you for your time.

21    I'm calling out of Europe.  I am calling from one of the

22    creditor class, the Borrow class.  And we sent a letter

23    yesterday, and it's about the unfair discrimination between

24    the actual creditor class, but also within the actual credit

25    class itself.

1            In our case, in the Borrow class, it was mentioned

2      by Mr. Koenig that refinancing is only for tax reasons.

3      That is not correct.  Many people are refinancing because

4      they actually cannot pay back the loan themselves but they

5      don't want to lose their crypto.  But the situation is as

6      follows.  Some within the credit class or the Borrow class,

7      they have been able to pay off the loan or settle the loan

8      (indiscernible) prices whilst we that want to refinance, our

9      loans cannot (indiscernible) prices (indiscernible) have to

10     do it at market prices.  And at the moment that would give

11     us around, you know, almost half of the amount of coins back

12     than other people in our same class that's been able to

13     receive.

14            Therefore, we think that it's unfair

15     discrimination and we would like to (indiscernible) funds

16     set aside to remedy that or to at least (indiscernible)

17     refinance (indiscernible) excess effective date pricing just

18     like all the others.

19            And finally, if you allow me to comment, also what

20     we try to understand is that our assets have in the meantime

21     since the petition date (indiscernible) almost risen by 370

22     percent.  The question is where does that upside get to or

23     go to.

24            Thank you for your time.

25            THE COURT:  Thank you.

1          MR. KOENIG:  Your Honor, I'm happy to address --

2    Chris Koenig, Kirkland.

3          So what Mr. Funck is talking about is under the

4    plan, borrowers had three options.  The default option was

5    setoff.  That means that they no longer owe the loan to

6    Celsius.  It is forgiven.  And in exchange, we will reduce

7    the collateral that we were holding for them in an equal

8    amount.  So they get a hundred percent recovery because they

9    owed us -- if they had a million dollar loan, they owed us a

10   million dollars, and we are forgiving that loan.  And in

11   exchange, we will reduce their account effectively by a

12   million dollars.

13         That is the default treatment, and that is the

14   treatment that overwhelming borrowers selected because that

15   was the simple treatment and that's what made the most

16   sense.

17         Your Honor ruled as part of confirmation the

18   collateral belongs to Celsius.  It does not belong to the

19   borrowers.  And the borrowers had a claim, an unsecured

20   claim for the difference.  They had a setoff right, and then

21   they had a claim for the difference.  And what we did to

22   accommodate borrowers who had a negative tax consequence is

23   setoff is a taxable transaction.  If they repaid their loan

24   and got their collateral back, that would not be a taxable

25   transaction.  So what we did in the plan was we allowed them

1　to repay their loan if they wanted.  They would not get all

2　of the collateral back, because Your Honor ruled it didn't

3　belong.  But what we would do is they could buy a like

4　amount of their collateral back.  So if they had a million

5　dollar loan, they had three million dollars of collateral.

6　They could repay the million dollars.  We would give them

7　their collateral back in an equal amount.  A million dollars

8　of Bitcoin or Ethereum or whatever it was, and that will

9　help their tax treatment.  I mean, I'm not giving tax

10　advice, but we think that that should hopefully help their

11　tax treatment.  But it's at then-prevailing market prices.

12　It was going to be neutral to the estate.  And if they

13　preferred it, we were happy to facilitate it.  So there were

14　to options.  If you could -- if you didn't need to refinance

15　your loan because you could come up with a million dollars,

16　we had a process that before the effective date there was a

17　week-long period where you sent in a wire and we sent you

18　back your equivalent amount of Bitcoin or Ethereum.

19　　　　　　So I'm using rough numbers.  But if you did that,

20　you bought Bitcoin at $43,000.  The plan also provided that

21　if you didn't have the cash and wanted to finance the cash

22　through a third-party lender -- not Celsius -- the Debtors

23　would work -- I think the plan says commercially-reasonable

24　efforts to work with the lenders after the effective date to

25　come up with a refinancing.  That process is complicated.

1    The borrower has to negotiate with the lender, has to sign

2    documents, has to sign documents with us directing us to

3    give their distribution to the lender, who has a new loan.

4         So a borrower could take out a new million-dollar

5    loan with, you know, lender.  Lender sends us the money, we

6    send a million dollars of Bitcoin or Ethereum to lender as

7    well as the post-setoff amount to which the borrower is

8    entitled for the overage, the difference between the $3

9    million in collateral and the $1 million loan.  And then we

10   have no further relationship with the borrower.  The

11   borrower has a new relationship with the lender and has to

12   pay a million dollars to the lender to get that million

13   dollars in collateral plus the claim on the two million

14   dollar delta.

15        So what Mr. Funck is arguing is he wishes that he

16   could have bought Bitcoin at $43,000.  And it has taken time

17   for us to refinance because it is a complicated process.

18   And he wishes that he could have bought Bitcoin at $43,000

19   like everybody else.  And that is -- I mean, the plan has

20   provided that it is going to be at prevailing market prices

21   so that it is net-neutral to the estate and to other

22   creditors.  Allowing Mr. Funck to buy bitcoin now at $43,000

23   when the market price of Bitcoin is $65,000 I would argue is

24   inequitable, and anybody should make that choice.  But I

25   shouldn't advocate, but that is his argument.

1          THE COURT:  All right.  Here's what I would like

2     you to do, Mr. Koenig.  We can order the transcript after

3     this hearing.  Rather than have separate filings as to each

4     of the questions you've gotten, you can do a single filing.

5     I think you ought to try as best you can to address these

6     issues.  I think I understand.

7          MR. KOENIG:  Okay.

8          THE COURT:  Thank you, Mr. Funck.

9          Deanna, who is next?

10         CLERK:  We have Mark Casey Miller.

11         THE COURT:  All right, Mr. Miller, go ahead.

12         MR. MILLER:  Good morning, Your Honor, Mr. Koenig.

13    Thank you guys for your time this morning.

14         I am one of the individual creditors in the

15    Celsius distributions.  I was -- I am a U.S. resident here

16    out of Tennessee set to receive my crypto via PayPal/Venmo.

17    I am one of the ones -- I'm kind of representing a group of

18    about 60 of us that are in the same predicament that though

19    we have -- I've had a PayPal account for 21 years.  I've

20    been an excellent PayPal customer.  Verified KYC.  Attempted

21    to claim codes, got an error, some process error on the back

22    end.  PayPal said I'm a hundred percent perfectly fine, KYC.

23    Codes don't work.  But then I got the email a day later

24    saying important, your claim cannot be distributed by PayPal

25    or Venmo, please wait for further instructions.

1          Well, it's been about 36 days now and we haven't

2     received any information since then other than we had a

3     docket update -- I believe Docket Number 4623 that was filed

4     on the March 14th.  Did notate it had a blurb in the bottom

5     that notated as a reminder if for any reason neither PayPal

6     nor Venmo can service your claim distribution, you will be

7     notified that your distribution cannot be serviced through

8     PayPal or Venmo and the post-effective date debtors will

9     attempt to make your distribution via Coinbase.

10          So we are at this stage now that we have not

11    received any official information outside of seeing this in

12    this docket five days ago.  So I've submitted multiple

13    tickets to Stretto along with the other ones in this

14    predicament.  We all have gotten the same copy and pasted

15    response, which doesn't give us any new information.  And

16    we've even tried to reach out to Celsius before they shut

17    down the 29th to verify, okay, do we have our stuff in place

18    to receive our Coinbase distributions.  And we've noticed

19    now that you -- now that the Debtors are starting to make

20    attempts to distribute Coinbase, the second attempts for the

21    Coinbase users with KYC issues, we're wondering are those of

22    us that are unable to be serviced by PayPal that are being

23    moved to Coinbase, when are we going to start seeing our

24    distribution attempts through Coinbase since we are being

25    moved to another distribution agent?

1                    THE COURT:  Thank you, Mr. Miller.

2                    MR. MILLER:  And we're kind of just -- yeah.

3                    MR. KOENIG:  Mr. Miller, it's Chris Koenig.  I

4     understand the question entirely and I have what I hope is a

5     helpful response.

6                    So we are in the process of migrating the people

7     that can't get distributions from PayPal to Coinbase,

8     Coinbase is going to be reattempting distributions I would

9     say every two weeks.  And our plan is to migrate people

10    PayPal to Coinbase on the off week.  So I would hope in the

11    next couple of weeks you're going to get your distribution

12    through Coinbase.  That would be my expectation.  I mean, I

13    haven't looked at your particular claim.  I don't know your

14    particular situation.  But that is our plan for banned users

15    from PayPal generally, is we're going to be moving them to

16    Coinbase promptly in the next couple of weeks.  And I hope

17    you get your distribution soon.

18                    THE COURT:  Deanna, next.

19                    CLERK:  Artur Abreu, A-r-t-u-r is the first name.

20                    THE COURT:  All right.  Mr. Abreu, go ahead.

21                    MR. ABREU:  Pro se creditor.  Can you hear me?

22                    THE COURT:  Go ahead.

23                    MR. ABREU:  Can you hear me?

24                    THE COURT:  Yes, we can hear you fine.

25                    MR. ABREU:  Okay.  So I just wanted to add my

1    personal experience to the matters that Chris Koenig was

2    mentioning about distributions.  I have two other family

3    creditors who were successful and a third.  We are

4    international, so we are doing the KYC on the Coinbase side.

5           So this third family member was required to

6    provide a source of income.  And I -- we cannot provide this

7    because it's (indiscernible) retirement.  But I just wanted

8    to highlight that the claim here is still under $5,000.  So

9    I'm kind of frustrated because I'm trying to -- I already

10    sent back (indiscernible) even the mortgage, and we still

11    are having issues.  So I just want to highlight for the

12    Court that some issues with KYC is also -- is coming from

13    the Coinbase side because they are trying to have a source

14    of fund.  And in this particular case, there is no -- there

15    is no future -- and this family member doesn't intend to

16    keep on Coinbase.  Just wants to sell and rescue all the

17    funds here.  So I just want to highlight this.

18           I know the judge usually just have (indiscernible)

19    pro se creditors about the motion about the (indiscernible)

20    Earn creditors that were (indiscernible) and was not given

21    time.  Many creditors contacted me.  I think --

22           THE COURT:  Mr. Abreu, we have a separate motion

23    on the docket.

24           MR. ABREU:  Okay.

25           THE COURT:  That hope -- today, today that --

1          MR. ABREU:  Yeah, yeah, yeah.

2          THE COURT:  -- to deal with this issue about the

3    convenience class.  So we'll take that up when we finish

4    this portion of the hearing.

5          MR. ABREU:  Okay.  Thank you, Judge.  I just

6    wanted to bring that issue (indiscernible).  Thank you.

7          THE COURT:  Thank you.  All right, Deanna, next.

8          CLERK:  Rebecca Gallagher.

9          THE COURT:  Ms. Gallagher, go ahead.

10          MS. GALLAGHER:  Yes, Your Honor.  I am in the

11    situation where I have received my Ethereum code and claimed

12    it on PayPal but still have not received a BTC code.  So I

13    would like someone to assure me today that the code is

14    coming and I will get those 2.069 BTC.  And then I can wait

15    patiently.  But the thought that I might not be getting the

16    code at all is really very, very distressing.

17          THE COURT:  All right.  Let's see.  Mr. Koenig, go

18    ahead.

19          MR. KOENIG:  Ms. Gallagher, it's Mr. Koenig.  I've

20    heard this from some people, that they received one code or

21    not the other for whatever reason.  There were a couple of

22    creditors that could elect to receive only Bitcoin or

23    Ethereum.  We offered that option to people with very large

24    claims.  Assuming you did not do that, the Bitcoin code is

25    coming.  We've heard this from a number of people that for

1    whatever reason their email flagged one of them as spam or

2    whatever.  So we are resending all of the outstanding codes.

3    And I hope that you receive it soon.  It should happen in

4    the next week or so.  If you still haven't received it,

5    please feel free to contact me after a week or so and I'll

6    look into it more for you.  But we are aware of the issue.

7    We're trying to push out all of the claim codes.  It may

8    take another week or two, but we're working on it.  It is

9    coming, I assure you.  It is coming.  And again, assuming

10   that you didn't opt for a hundred percent ETH, your Bitcoin

11   code is out there and we'll track it down for you.

12              THE COURT:  All right.  Deanna, next.

13              MS. GALLAGHER:  I opted to 75 percent ETH and 25

14   percent Bitcoin.  So does that mean I'm definitely going to

15   get the 25 percent?

16              MR. KOENIG:  You should.  I obviously need to look

17   at your particularized claim.  But yes, we'll look at it.

18              THE COURT:  Thank you.  Deanna?

19              MS. GALLAGHER:  Okay.  Thank you, Your Honor.

20              THE COURT:  Thank you, Ms. Gallagher.

21              CLERK:  We have Ezra Vazquez-D'Amico.

22              MR. VAZQUEZ-D'AMICO:  Thank you.  Can you hear me,

23   Your Honor?

24              THE COURT:  Yes, I can.  Go ahead, Mr. D'Amico.

25              MR. VAZQUEZ-D'AMICO:  Thank you.  I am here

1    representing myself.  I'm owner of a single-member LLC that

2    manages my retirement.  I'm also a Loans creditor as well as

3    a regular Celsius creditor.  But I wanted to second

4    everything that's been said by the corporate creditor class

5    (indiscernible) and add in addition that I've talked to a

6    number of corporate creditors like myself who do have

7    Coinbase accounts, corporate accounts for their LLC.  But we

8    were never given the option to receive the funds in

9    cryptocurrency.  So I just wanted to add that fact, that

10   while Mr. Koenig said that Coinbase had pointed out that it

11   would be to difficult to onboard as many corporate creditors

12   as might have wanted to, some of us were already onboarded

13   and were not treated equitably that way.  Thank you, Your

14   Honor.

15            THE COURT: Thank you, Mr. D'Amico.

16            MR. KOENIG:  We will address that in our written

17   response.

18            THE COURT:  Okay.  Next, Deanna?

19            CLERK:  Jin Wu.

20            MS. WU:  Thank you, Your Honor, for your time.  I

21   am an individual creditor with suspended accounts due to the

22   fact that I have more than one account with Celsius.  I

23   appreciate the fact that the Debtors are working through the

24   suspended accounts to try (indiscernible) distributions.  My

25   questions are the following.

1           First, is there an approximate timeline for

2    suspended users to receive our distribution?  The second is

3    are there foreseeable issues that would prevent suspended

4    users from receiving these distributions?  In other words,

5    what kinds of suspended users are likely not to receive

6    distributions and what kinds will receive distributions?

7    And thirdly, I just want to make sure that our distributions

8    won't be distributed in kind rather than in U.S. Dollars.

9    Thank you.

10          MR. KOENIG:  Thank you.  It's Chris Koenig.  So

11   I'll take you in turn.

12          So just for Your Honor's edification, we had a

13   number of users that were suspended on the Celsius platform

14   for whatever reason.  Many of them had multiple accounts,

15   which was a technical breach of the terms of service.

16          As we were starting distributions, we realized

17   that we had suspended these accounts and that it wasn't

18   proper to keep them suspended for what amounts to a

19   technical violation of the terms of service.  So we decided

20   to unsuspend those users and process them for distributions.

21          That is a manual process.  I can't just flip a

22   switch and send all of those people.  We need to go through

23   and manually enable those users for distributions.  We are

24   in the process of doing it.  I can't give you a particular

25   day.  I hope that in the next couple of weeks almost all of

1     them are enabled for distributions.  I don't expect any

2     issues particularized to the formerly-suspended users.  They

3     will be routed for distribution just like everybody else.

4           Now, if you are a corporate creditor and you were

5     suspended, you may get Fiat for the same reason that all the

6     other corporate creditors are going to get Fiat.  So I can't

7     guarantee you that you will receive cryptocurrency.  But if

8     you are otherwise able to receive cryptocurrency, you will

9     receive it.

10          THE COURT:  Ms. Wu had described herself as an

11    individual account.

12          MR. KOENIG:  Then it sounds to me if she lives in

13    the United States and she is an individual, I would expect

14    that she would get cryptocurrency unless she's banned on

15    PayPal and Coinbase or something for that example.  But I

16    would expect that you would receive crypto.  And we are

17    unsuspending your accounts in the next few weeks.  We will,

18    once unsuspended, you know, send them to Coinbase and PayPal

19    for distribution.  You know, that may take a little bit of

20    time to work its way through their process.  But, you know,

21    I am hopeful that in the next month, month-and-a-half

22    hopefully it's in your account.

23          THE COURT:  Deanna, next.  Thank you, Mr. Koenig.

24    Deanna, next.

25          CLERK:  Janell Eckhardt.

1           MS. ECKHARDT:  Hi.  I am Janell Eckhardt.  I am a

2    U.S. Earn Creditor and I have a few questions or comments,

3    actually.

4           So I wanted to see if Kirkland could disclose who

5    else they considered for the corporate and international

6    distribution partner.  PayPal is actually bigger

7    internationally than Coinbase.  Did they consider anybody

8    else?

9           Another one is why was the app shut down early, 20

10   days versus the 90 days they originally talked about.  Why

11   couldn't corporate use the app?  They were already KYC

12   already.  So why couldn't they use that instead?

13          Kirkland liquidated on January 16th, but they

14   didn't notify corporate accounts until January 19th

15   (indiscernible) January 23rd deadline.  And if distribution

16   is U.S. Dollars, do those creditors still get back stock?  I

17   don't think that's been addressed yet.  And then finally

18   (indiscernible) should get -- they really should get a paper

19   notification.  Some don't get emails and it goes into their

20   spam.  So (indiscernible) notifications going to creditors,

21   but they're only getting email.  So I would request that

22   they also get paper notifications.  Thank you, Your Honor.

23          THE COURT:  Thank you, Ms. Eckhardt.

24          MR. KOENIG:  Thank you.  Again, it's Chris Koenig.

25   So I wrote down I think many of your questions.  It was why

1    Coinbase and PayPal and not another distribution agent.  I'm

2    not going to disclose our discussions with other

3    distribution agents, but we did go through the process.  I

4    mean, Coinbase was to my knowledge the only one who was

5    willing to service corporate accounts at all.

6             You asked why we shut down the app early, 30 days

7    versus 90 days.  It was 90 days after the confirmation

8    order, not 90 days after the effective date.  So what we did

9    is the confirmation order enabled custody withdrawals

10   immediately and enabled them on the app and the confirmation

11   order said that we has -- that people had 90 days from that

12   date to claim a distribution.  And that was because all of

13   those distributions were through the app and were fairly

14   simple.  And the Court had ruled that custody was their

15   property.  So we were comfortable from a regulatory

16   perspective that we were not distributing securities in

17   violation of the securities laws.  And we had talked to the

18   regulators about that.  If we were to make a distribution

19   for something other than custody, I think the regulators

20   would have had something to say.  So that's the question of

21   why not just let the corporate creditors take something off

22   the platform.  I don't represent the SEC, but I suspect that

23   they would have had something to say if I argued that.

24            We got them comfortable that we were just -- if we

25   were returning somebody's actual property to them, that

1  might be different than making a distribution on a claim in

2  a bankruptcy.

3          But you said that we shut it down early.  It was

4  90 days from the confirmation order, which I think was

5  November 9th.  We actually extended that out until the end

6  of February because we wanted to give people even more time.

7  It wasn't 30 days from the effective date, it was 90 days

8  from the confirmation date.

9          And then I think you said something about paper

10  notifications.  We're certainly evaluating that.  And it's

11  obviously expensive to send paper notices as well.  As we go

12  through the process, if it seems that people aren't getting

13  our emails, we will send them paper notices.  But paper

14  notices can be lost and discarded just like emails can be

15  lost or discarded.  But we're going through the process.

16          THE COURT:  Deanna, next?

17          CLERK:  WE have Tyson Foianini.  Do you want me to

18  spell the last name?

19          THE COURT:  Yes, please.

20          CLERK:  F-o-i-a-n-i-n-i.

21          THE COURT:  All right.  Please go ahead.

22          MR. FOIANINI:  Hi, Your Honor.  thank you for

23  allowing me to speak today.  My name is Tyson Foianini and I

24  fall under Class 6A, General Custody Claims.  I'm on the

25  call today because of Document Number 4372 that I received

1  via email on March 2nd, 2024.  In this document, it is my

2  understanding that the creditors may elect to reverse their

3  convenience claim elections if they mistakenly voted to opt

4  in the convenience claim election.

5          For the record, I rejected the plan in August

6  2023, not fully understanding the consequences of my vote

7  and now fall under Class 6A, General Custody Claims,

8  Treatment B.

9          From my understanding, my crypto will be

10  transferred to a segregated walled held by the post-

11  effective date Debtors and shall be subject to an all

12  avoidance and (indiscernible) claims with respect to such

13  allowed general custody claim.

14          So my question is as follows.  I would like to

15  know if I can reverse my vote and fall under Class 6A,

16  General Custody Claim, Treatment A, where I would receive

17  72.5 percent of my cryptocurrency.

18          THE COURT:  Mr. Koenig?

19          MR. KOENIG:  Yes.  Again, Chris Koenig.  So we

20  represent Celsius and the post-effective date debtors.

21  There was a litigation administrator who was appointed to

22  pursue the preference issues.  If you email me, Mr. Foianini

23  -- and again, my email is on all of the Celsius filings -- I

24  will put you in touch with that person who can address that

25  question.  But I understand -- your question is can I make

1    the election that was offered to me before.  I can't speak

2    to that.  But if you contact -- I will give you their

3    contact and I hope that you get a response very soon.  I

4    understand your question.  We'll put you in touch.

5             MR. FOIANINI:  And where did you say I could get

6    your email from?

7             MR. KOENIG:  It's on any of the Celsius filings on

8    the court docket.  The Kirkland signature block has my name.

9    It's Chris.Koenig@Kirkland.com.  But it's on any of the

10   Celsius filings.

11            MR. FOIANINI:  Thank you, Mr. Koenig.

12            THE COURT:  Thank you.  All right.  Deanna, next?

13            CLERK:  The next person that has not spoken is Don

14   Smith.

15            THE COURT:  I'm only going to hear people once.

16            Mr. Smith?

17            MR. SMITH:  yes.  Your Honor, thank you for

18   allowing me to speak.  My name is Don Smith.  I am a Loan

19   creditor.  And on February 23rd, I emailed Mr. Koenig, Ms.

20   Golic, and the Celsius Creditor Answers Email address

21   established by Kirkland & Ellis advising them I decided to

22   change to the BTC ETH setoff treatment at effective date

23   prices.  Mr. Koenig promptly confirmed my setoff selection

24   that day.

25            Nearly a month has passed, and I have not received

1    a crypto distribution.  My PayPal account is operational

2    because I received and retrieved a small Earn claim a few

3    months ago.  Can Mr. Koenig please address when loan setoff

4    creditors will receive their BTC ETH PayPal claim codes?

5    Thank you.

6              MR. KOENIG:  Thanks, Mr. Smith.  It's Mr. Koenig.

7    Look, when you reversed your election, you went back to the

8    setoff.  WE processed you for distribution.  I haven't

9    looked at your particular claim.  We're sending claims to

10   PayPal and Coinbase on a regular basis.

11             You've already been in touch with me it sounds

12   like via email.  If you just bump up that thread, I'll check

13   into it for you and see what the status is.  My guess is you

14   are somewhere in the process.  But this process is not

15   instantaneous.

16             But also for anybody on the line, if you have

17   reached out to us and you have individualized questions, you

18   should just feel free to email me or the other contacts that

19   are on the FAQs at any point.  We do our best to get back to

20   people as promptly as we can.  It's not always

21   instantaneous.

22             THE COURT:  Thank you.

23             MR. SMITH:   Okay.  I will send that email right

24   after the hearing.  Thank you.

25             MR. KOENIG:  Thanks.  We'll check into it for you.

1          THE COURT:  Thank you, Mr. Smith.  Thank you, Mr.

2     Koenig.

3          Next, Deanna?

4          CLERK:  Ralph Burton.

5          THE COURT:  All right.  Mr. Burton?  Mr. Burton,

6     do you wish to be heard?

7          CLERK:  Mr. Burton, I see you are unmuted.  Can

8     you speak?  Try speaking.  Maybe it's a problem with your

9     microphone.

10          MR. KOENIG:  Perhaps your microphone is muted

11     actually on your end with a button or something.

12          CLERK:  Yeah.  It's unmuted on Zoom.

13          MR. KOENIG:  Right.  Sometimes there is the double

14     mute.  I'm guilty of that myself sometimes.

15          THE COURT:  Deanna, call the next one.  If Mr.

16     Burton comes through, we will listen to him after.  But

17     let's go on to the next person.

18          CLERK:  The next person already spoke.  It's

19     Christian Funck.

20          THE COURT:  No.  Only speaking to people once.

21     Are there any others who haven't been heard, Deanna?

22          CLERK:  No.

23          THE COURT:  All right.  Ralph Burton, if you want

24     to be heard, unmute your line and we'll be happy to listen

25     to you.  All right.

1          Everyone who wanted to be heard has been heard by

2     the Court.  Do you want to move on to the remaining item on

3     the agenda?

4          MR. KOENIG:  I do.  Just really quickly, Mr.

5     Hershey from White & Case represents the litigation

6     administrator.  And I understand from him that he just had a

7     brief update he wanted to provide to the Court on their

8     process working through the preference issues.  So with your

9     indulgence, we can turn it over to Mr. Hershey.

10          THE COURT:  Mr. Hershey?

11          MR. HERSHEY:  Thank you, Your Honor.  Just so Your

12     Honor is aware, my video apparently has been stopped and I

13     can't turn it on.  I don't need to turn it on unless Your

14     Honor wants me to.

15          THE COURT:  Just go ahead.

16          MR. HERSHEY:  Oh, there we go.

17          THE COURT:  There you go.  Go ahead.

18          MR. HERSHEY:  Thank you, y h.  It's been turned on

19     now.  Thank you very much, Your Honor.

20          Good morning, Your Honor.  Sam Hershey from White

21     & Case for the Litigation Oversight Committee or LOC for

22     short.

23          Listening to Mr. Koenig's presentation, I have to

24     admit that some relief that the LOC is now responsible for

25     handling distributions, though the LOC is certainly working

1    to stay updated on the distribution process and we

2    appreciate very much Mr. Koenig's update today.

3              Your Honor, I believe this is the first time the

4    LOC has appeared before you.  So with Your Honor's

5    permission, I would like to take just a few minutes to

6    update the Court regarding the LOC's work so far including

7    (indiscernible) regarding the preference litigation that the

8    LOC has been charged with overseeing.

9              As Your Honor is aware, the LOC was formed about

10   six weeks ago on the effective date of the Debtor's planned

11   reorganization.  The purpose of the LOC, a lot of the

12   litigation administrators working under supervision, is to

13   increase account holders' recoveries by investigating and

14   pursuing claims and causes of action belonging to Celsius.

15             The LOC and its professionals have begun that work

16   in earnest and will continue to keep Your Honor informed as

17   that work progresses.

18             One category of claims that the LOC has been

19   charged with overseeing is the approximately $2.5 billion

20   preference claims against accountholders who withdrew assets

21   from Celsius during the 90 days leading up to the petition

22   date.  This is a very small set of individuals.  About two

23   percent of active users.

24             Notably, this group does not include

25   accountholders with preference exposure under $100,000 who

1     were released under the plan or preference exposure resolved

2     through the custody settlement.

3         I am pleased to announce that this morning the LOC

4     released a settlement offer to all customers with unresolved

5     preference exposure, specifically the LOC is giving

6     customers the opportunity to settle their preference

7     exposure at 13.75 percent of the value of the asset at the

8     time they were withdrawn during the preference period.

9         Additionally, this offer allows customers to

10    settle their preference exposure in cash rather than by

11    returning the assets that were withdrawn, including many

12    assets which have significantly grown in value.

13        I want to note that this offer has been designed

14    as a limited-time opportunity to encourage parties to settle

15    before the LOC incurs the time and expense of litigation.

16    The LOC would encourage everyone to settle the preference

17    exposure quickly.

18        Accountholders who are eligible for this offer

19    will be receiving an email with further details including

20    how to accept the offer and get payment.  Indeed, many

21    accountholders likely already have received such emails.

22        If accountholders have questions regarding the

23    settlement offer, they can visit the Stretto website where

24    they will find a new tab at the top of the page that will

25    route them to information regarding the settlement offer, or

1    they can visit the following URL;

2    Cases.Stretto.com/CelsiusLOC.

3              Additionally, I will note that the LOC has posted

4    an open letter to accountholders regarding the settlement

5    process on its X or Twitter account and will continue to

6    post further updates throughout this process.

7              That is an update for today.  The LOC looks

8    forward to providing further updates to Your Honor as its

9    work progresses.  Thank you very much.

10              THE COURT:  Mr. Hershey, what is the -- you said

11   it is an offer for a limited time.  When is the deadline?

12              MR. HERSHEY:  April 15th, Your Honor.

13              THE COURT:  April 15th, 2024 is the deadline for

14   accepting --

15              MR. HERSHEY:  Yes, Your Honor.  Exactly right.

16   April 15th, 2024.  Yes.

17              THE COURT:  And with respect to anyone who does

18   not accept the offer and who has a potential exposure of

19   over the $100,000, has the Committee made the decision to go

20   forward with litigation as to those claims?

21              MR. HERSHEY:  So yes, Your Honor.  And the LOC

22   intends to --

23              THE COURT:  People are entitled to know that

24   here's the offer, but what happens if they don't accept it?

25              MR. HERSHEY:  Yes, Your Honor.  I appreciate you

1    raising that.  We addressed that in the communication to

2    creditors this morning.  And Your Honor is absolutely right,

3    preference exposure over $100,000 is not settled through the

4    settlement process, the Litigation Oversight Committee does

5    intend to pursue litigation to reclaim that value for

6    unsecured creditors.

7              THE COURT:  And what is the number of creditors

8    who faced the preference exposure of over $100,000 as of

9    now?

10             MR. HERSHEY:  It's about 5,000 or 6,000, Your

11   Honor.

12             THE COURT:  All right.  Thank you very much, Mr.

13   Hershey.  Anything else you want to add before we go on?

14             MR. HERSHEY:  No, Your Honor.  thank you for your

15   time.

16             THE COURT:  Thank you, Mr. Hershey.  Go ahead, Mr.

17   Koenig.

18             MR. KOENIG:  Thanks, Your Honor.  That was the

19   longest introduction I think I've ever given to a motion.

20             So as I think I previewed some time ago, one of

21   the most common issues that was reported in the early days

22   after the effective date was inadvertent or accidental

23   convenience claim elections.  The convenience claim election

24   was an election on everybody's ballot that if somebody

25   elected would reduce the electing creditors' claim to

1   $5,000, but they would get a guaranteed distribution of

2   liquid cryptocurrency equal to 70 percent of the reduced

3   claim.  That is they would get $3,500 of liquid

4   cryptocurrency.

5           Now, at the time the disclosure statement

6   projected Earn recoveries would have a liquid crypto

7   recovery of about half that, something like 33 percent.  So

8   if you had a claim that was just above $5,000, you could

9   elect to reduce your claim if you had $5,050.  You could --

10  if you didn't elect, you might have received 33 percent of

11  $5,050, which lawyer math is challenging, as I've said a

12  couple of times.  But that's closer to $1,500 or $2,000.  Or

13  you could elect to just take a little bit of a haircut and

14  instead get 70 percent of $5,000.

15          So that was the purpose of the election, was

16  people that are close to the $5,000 mark, if they wanted to

17  forego the MiningCo equity, if they wanted to -- if they

18  just wanted the liquid crypto distribution and be done and

19  be out of the case, they could do that.  And many people did

20  that.

21          Unfortunately, before the effective date we took a

22  look at the data and we realized that a number of people had

23  made that election that was clearly erroneous.  I remember -

24  - I forget whether it was December or January.  I stood in

25  front of Your Honor and the first thing I said was we had an

1    update on this issue.  And I said, Your Honor, there are

2    seven people of over a million dollars that checked that

3    box.  Those people must have been wrong.

4              So we emailed everybody over $25,000 and said, hi,

5    we think you made a bad decision.  Would you like to rescind

6    your election?  And about 70 to 75 percent of them did.

7              After the effective date, a lot of people got

8    distributions and they were surprised to learn that they

9    were in the convenience class.  They asserted that they

10   didn't understand the ballot, that they never actually

11   checked the box.  We checked our records.  In every

12   instance, our records reflect that they did check the box.

13             But it was obviously -- it seems to have been a

14   mistake.  And so I'll be honest that my initial reaction was

15   there was a ballot, there was a process.  I went back and I

16   read the ballot.  I think the ballot is pretty clear.  I

17   will say we have creditors -- 45 percent of our creditors

18   are international.  Many of them do not speak English as a

19   first language, and it seems very inequitable to me for a

20   creditor of a million dollars that checked a box erroneously

21   to receive a $3,500 distribution instead of a $500,000

22   distribution.

23             So as the communications both to us and to

24   chambers ramped up, we realized that this was a significant

25   problem and that these pro se creditors didn't know how to

1    use the court system to ask for the relief that they wanted.

2    And so we took it upon ourselves to file a motion on behalf

3    of those creditors.  It's a motion to rescind their mistaken

4    election.  It's a little bit weird to file a motion for

5    another party's mistake.  But we think that that's the right

6    thing to do.  It's a little bit of a complicated motion.

7    Because anybody -- we ran the math.  Anybody above $9,333

8    would have never had an economic basis to make the election.

9    Even if they valued the equity at zero, they must have made

10   a mistake.  For those people, we are proposing an automatic

11   revocation.  They don't have to do anything at all because

12   they obviously made a mistake.

13            If you are between $6,050 and $9,333, you may have

14   had a reason.  Maybe you prefer liquid cryptocurrency over

15   the equity.  You don't value the equity and you would prefer

16   to have 70 percent of $5,000 rather than take some equity

17   and some liquid crypto.  So what we were proposing by the

18   motion is those people in that band would get an email from

19   us and they would have 30 days to affirmatively rescind

20   their election.  If they do, great.  We'll move them back

21   into the Earn class.  And if they don't, we'll treat their

22   election as valid and, importantly, final.

23            For people between $5,000 and $6,050, they've

24   already received more than they would receive if they

25   rescinded their election.  So it doesn't make any sense.  If

1    they rescinded their election, I would have to ask them to

2    give us something back.  We're not going to do that.  That

3    makes no sense.

4              The motion received three responses.  One from --

5    there was a letter from a creditor -- and I apologize, I

6    have it somewhere.  There was a letter from a creditor,

7    Docket Number 4385, that disagreed with the requested relief

8    because his view was that the ballot was explicit and that

9    many people made this choice and this is America and people

10   should be bound to their choices.  That was the only thing

11   that I would say is an objection.  There was another

12   creditor that filed an objection to preserve their election.

13   That is they did not want to opt out, they wanted to keep

14   their election.  We checked, and that person was actually

15   not in the convenience class, which is very confusing to me.

16             THE COURT:  On the agenda it says objection to

17   claim being rescinded by Patrice (indiscernible).

18             MR. KOENIG:  I think that's -- what is the docket

19   number on that?

20             THE COURT:  4594.

21             MR. KOENIG:  That was the one I just spoke about.

22   That person said I do not wish to rescind my election.  That

23   person actually did not make the election.  But it is what

24   it is.

25             Another creditor filed a letter, 4678, complaining

1     that they couldn't rescind the election if they were below

2     the sixty-fifty mark.  But again, they actually do better

3     where they are.  So that doesn't make sense.

4          And then somebody else at 4718 said that he was

5     not informed that selecting the convenience claim election

6     would reduce his recovery.  I think he's supporting the

7     motion.  But again, he actually is not a convenience class

8     member and I think is confused.

9          THE COURT:  Address the issue, because I think in

10    your motion you addressed the issue about the reserves that

11    are available and sort of the impact.  I think one of the

12    things I'm focused on is if I grant the motion, what if any

13    impact does it have on other creditors in the case.

14         MR. KOENIG:  Yes.  That's important, Your Honor,

15    for sure.  And that was one of the things that we focused

16    on.

17         So it's in the motion.  But we have reserves in

18    this case because there are people that opted out of the

19    settlement and are going to litigate.  And they could win or

20    they could lose.  And so we set aside some funds in case

21    they are right and we are wrong.  We have reserves for $500

22    million of claims above and beyond the dollar values on the

23    schedules.  Now, some of those are other cryptocurrency

24    firms that have sued us for, you know, their equivalent of

25    preference under foreign law.  And so it's not all

1  individuals.  But we have ample reserves.  That said, we of

2  course can't just release everything from the reserves.  I'm

3  sure that some of the corporate creditors are writing down

4  everything I'm saying and saying, well, why don't you

5  release the reserves for me.  Those numbers are much larger

6  I would say.

7           So to Your Honor's question, if we revoke all of

8  the elections above $9,333, we will release approximately

9  $18.3 million worth of liquid cryptocurrency at the January

10 16th prices from the reserves, which is significant.  But we

11 are comfortable that we have enough reserves to meet our

12 obligations under the plan.  It's another $6 million of

13 MiningCo stock.  That's less of a problem because, you know,

14 MiningCo can issue more stock.  And then more creditors will

15 receive future recovery rights under the plan.  Again, that

16 is the -- those are the people that made a big mistake.

17           Assuming the revocation of the people in the

18 narrow band in the middle, the $6,050 to $9,333, that would

19 be $1.1 million worth of additional liquid cryptocurrency.

20 It's a lot of people, but it's a small band.  And if you had

21 $8,000 and you were reduced to $5,000 and we're putting you

22 back to $8,000, it's a small dollar amount.  The biggest

23 issues are the large creditors that made a big mistake.

24           So in total, Your Honor, it's $19.4 million of

25 liquid cryptocurrency would come out of the reserves for

1  which we are comfortable we have sufficient cushion to fix

2  this mistake.

3  THE COURT:  Does anybody from the U.S. Trustee

4  wish to be heard?  There were no objections.  I know on the

5  agenda you've listed letters that were received.

6  MR. KOENIG:  I was trying to make sure that people

7  had their voices heard.

8  THE COURT:  Yeah.  So Ms. Cornell?

9  MS. CORNELL:  Good morning, Your Honor.  Shara

10 Cornell with the Office of the United States Trustee.

11 The United States Trustee is aware of many of the

12 ongoing distribution issues.  We are in receipt, just as

13 Your Honor is, of many emails on a daily basis from

14 creditors and constituents in these cases, some of which

15 have been reiterated on the docket via letters and also some

16 independent comments.

17 Prior to this hearing, we had reached out to

18 Debtors with a request for a status update, which the

19 Debtors have provided to the Court today.  And I think it is

20 helpful for putting many of the stated concerns into context

21 for all of the creditors.

22 Our office are continuing to monitor the issues

23 and will provide assistance to the parties where

24 appropriate.

25 THE COURT:  My question right now, I'm happy to

1    hear you on all of the matters, Ms. Cornell.  But

2    specifically with respect to the motion which is -- the

3    motion to revoke mistaken convenience class elections, it

4    was ECF 4372.  And you didn't file an objection on that.

5         MS. CORNELL:  No, I did not, Your Honor.

6         THE COURT:  (indiscernible) ask whether -- your

7    position with respect to it.

8         MS. CORNELL:  We took no position with respect to

9    the pending motion, Your Honor.

10        THE COURT:  All right.  Thank you.  Does anybody

11   else wish to be heard with respect to this pending motion?

12        CLERK:  Judge, Artur Abreu has his hand up.

13        THE COURT:  All right.  Mr. Abreu?

14        MR. ABREU:  Hello, Judge.  Just wanted to

15   highlight the support that we have.  I think I have a group

16   with 130 people all in support.  And I just want to

17   highlight that at no point on the ballot were people aware

18   of were they notified that they will be in some cases

19   rescinding 90 percent of their recoveries.

20        THE COURT:  I understand our position, Mr. Abreu.

21   Thank you very much.

22        MR. ABREU:  Thank you.

23        Does anybody else wish to be heard?

24        CLERK:  I do not see any additional hands.

25        THE COURT:  All right.  This potentially is a

1    complicated issue.  Because the issue actually arose before

2    the effective date of the plan, I consider it different than

3    for example in the Boy Scouts case where it was much, much

4    later.

5              MR. KOENIG:  It was more than a year after.

6              THE COURT:  Correct.  So this issue -- and at some

7    point before the hearing date the issue was highlighted to

8    me about this potential issue about mistaken election of

9    convenience class treatment.  And I think because this issue

10   arose before the effective date but only comes up actually

11   today with the motion, I consider this materially different

12   than the situation in Boy Scouts, for example.  And really

13   in the absence of any objection in light of when it was

14   first raised with the Court, the motion is granted.

15             MR. KOENIG:  Thank you, Your Honor.  We will work

16   to send the emails.

17             THE COURT:  All right.  I think that concludes our

18   agenda for today.  Just let me come back to I think -- I'm

19   not sure you need to address every one of the issues that

20   arose today, but I think you should do a filing that

21   addresses it.  I don't have any motions pending before me.

22   I think we've raised issues that -- they are of concern to

23   me.

24             MR. KOENIG:  Right.  We sill address the common

25   issues including corporate creditors and loan creditors.

1    And we will review the transcript, but those are the two

2    that really stuck out to me.

3            The other thing is I mentioned -- I had forgotten

4    about the bank.  It's Citizens Bank, Your Honor, which is a

5    bank that I am sure you are familiar with.  Okay.

6            Anything else for me, Judge?

7            THE COURT:  No.  Thank you very much.

8            CLERK:  Sorry, Judge.  Simon Dixon has his hand

9    up.

10           THE COURT:  We have finished the agenda for the

11   day.  The hearing is adjourned.  Thank you.

12           (Whereupon these proceedings were concluded at

13   12:42 PM)

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5      Motion, GRANTED                          89          14

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    _Sonya M. Ledanski Hyde_

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 21, 2024

| & |
|---|
| **&** 3:15 12:16 44:12 45:16 46:4 47:17 48:7 52:19 73:21 76:5,21 |

| 1 |
|---|
| **1** 39:3 59:9 |
| **1,500** 81:12 |
| **1,700** 38:10 |
| **1,800** 36:1,5 38:3,8,25 |
| **1.1** 86:19 |
| **10,000** 55:2,6 |
| **100** 35:20 38:5 38:19,23 39:7 44:7 48:6 50:23 |
| **100,000** 77:25 79:19 80:3,8 |
| **10004** 1:13 4:5 |
| **11** 21:9 22:17 |
| **11501** 92:23 |
| **11:04** 1:16 |
| **11th** 48:8 |
| **12151** 92:6 |
| **12:42** 90:13 |
| **13** 30:3 |
| **13.75** 78:7 |
| **130** 88:16 |
| **13th** 47:18 54:25 55:2 |
| **14** 21:8 30:24 91:5 |
| **14th** 29:7 61:4 |

| 15 |
|---|
| **15** 17:4 |
| **15,000** 26:2 |
| **150** 13:5 15:18 |
| **150,000** 27:8 |
| **15th** 48:24 79:12,13,16 |
| **16** 55:7 |
| **165** 45:16 52:20 |
| **16th** 17:5,20,20 18:12,22 23:24 25:1 39:17 40:8 43:23 44:6,22 50:14 51:8 52:18 54:22 55:4 69:13 86:10 |
| **17** 30:3 |
| **18** 51:12 |
| **18.3** 86:9 |
| **19.4** 86:24 |
| **19th** 69:14 |

| 2 |
|---|
| **2,000** 81:12 |
| **2,600** 17:21 |
| **2.069** 64:14 |
| **2.5** 77:19 |
| **20** 1:15 31:10 69:9 |
| **20,000** 25:10 |
| **2022** 54:25 55:2 |
| **2023** 72:6 |
| **2024** 1:15 17:5 55:4 72:1 79:13,16 92:25 |

| 21 |
|---|
| **21** 60:19 92:25 |
| **22-10964** 1:3 |
| **23rd** 69:15 73:19 |
| **25** 39:8 65:13 65:15 |
| **25,000** 82:4 |
| **250** 39:10 |
| **29th** 61:17 |
| **2nd** 72:1 |

| 3 |
|---|
| **3** 59:8 |
| **3,500** 81:3 82:21 |
| **30** 30:23 70:6 71:7 83:19 |
| **300** 3:17 92:22 |
| **305,000** 50:7 |
| **33** 81:7,10 |
| **330** 92:21 |
| **350** 40:19,24 |
| **36** 61:1 |
| **370** 56:21 |

| 4 |
|---|
| **40** 44:5 |
| **400,000** 13:4 36:8 |
| **4220** 48:7 |
| **43** 18:10 |
| **43,000** 17:21 18:7,7,14,15 58:20 59:16,18 59:22 |
| **4319** 48:24 |
| **4336** 2:6 |

| 4372 |
|---|
| **4372** 2:6 71:25 88:4 |
| **4385** 84:7 |
| **4417** 2:6 |
| **4433** 2:6 |
| **4434** 2:6 |
| **4485** 2:6 |
| **45** 32:19 82:17 |
| **4530** 2:6 |
| **4594** 84:20 |
| **4623** 44:13 47:17 61:3 |
| **4678** 84:25 |
| **4713** 2:7 |
| **4718** 85:4 |
| **4719** 42:22 46:10 |
| **4732** 2:7 20:13 |
| **47th** 21:2 |

| 5 |
|---|
| **5** 36:9 |
| **5,000** 39:1 63:8 80:10 81:1,8 81:14,16 83:16 83:23 86:21 |
| **5,050** 81:9,11 |
| **50** 30:25 |
| **500** 85:21 |
| **500,000** 82:21 |
| **534** 4:4 |
| **57** 55:4 |
| **57,000** 55:7 |
| **58** 55:4 |
| **58,000** 55:7 |

| 6 | 9 | | |
|---|---|---|---|
| **6** 86:12 | **9,333** 83:7,13 | **accidental** | **actually** 14:9 |
| **6,000** 80:10 | 86:8,18 | 80:22 | 16:9 21:4 |
| **6,050** 83:13,23 | **90** 15:13 16:12 | **accommodate** | 22:25 23:1 |
| 86:18 | 69:10 70:7,7,8 | 51:18 57:22 | 24:3,6 27:15 |
| **60** 44:4 60:18 | 70:11 71:4,7 | **accordance** | 35:14 40:22 |
| **60654** 3:18 | 77:21 88:19 | 18:22 | 51:14 56:4 |
| **63,000** 18:6 | **900** 39:1,2 | **account** 18:24 | 69:3,6 71:5 |
| **65** 18:9 | **95** 31:19 | 21:5,15 28:13 | 75:11 82:10 |
| **65,000** 18:6 | **9th** 71:5 | 28:13,17,25 | 84:14,23 85:2 |
| 59:23 | | 29:2,5,14,16 | 85:7 89:1,10 |
| **6a** 71:24 72:7 | **a** | 29:19,23 30:5 | **ad** 13:20 |
| 72:15 | **aamir** 6:9 | 31:3 32:12 | **ada** 54:18,19 |
| | **aaron** 5:13 | 35:22 54:24 | 54:23,23 |
| **7** | 10:17 | 55:2 57:11 | **add** 62:25 66:5 |
| **70** 29:25 81:2 | **able** 13:21,23 | 60:19 66:22 | 66:9 80:13 |
| 81:14 82:6 | 23:5 24:23 | 68:11,22 74:1 | **added** 48:2 |
| 83:16 | 29:12 30:6 | 77:13 79:5 | **addition** 66:5 |
| **72.5** 72:17 | 41:25 44:20 | **accountholders** | **additional** 51:4 |
| **75** 30:24 65:13 | 45:1 46:20 | 45:22 77:20,25 | 86:19 88:24 |
| 82:6 | 56:7,12 68:8 | 78:18,21,22 | **additionally** |
| **78** 36:2,6 39:4 | **above** 81:8 | 79:4 | 78:9 79:3 |
| | 83:7 85:22 | **accounts** 29:9 | **address** 32:22 |
| **8** | 86:8 | 29:22 33:13 | 34:8,17,18,20 |
| **8** 37:16 | **abreu** 3:3 | 43:1,2,4,5,7,14 | 34:20 35:4 |
| **8,000** 86:21,22 | 62:19,20,21,23 | 43:19,21 44:7 | 41:5,18 53:25 |
| **80** 26:10 31:9 | 62:25 63:22,24 | 44:7,11,13 | 57:1 60:5 |
| 31:11 42:18 | 64:1,5 88:12 | 46:1,25 48:6 | 66:16 72:24 |
| 45:11 | 88:13,14,20,22 | 49:14 52:7 | 73:20 74:3 |
| **80/20** 31:9 | **absence** 89:13 | 66:7,7,21,24 | 85:9 89:19,24 |
| **82,000** 50:19 | **absolutely** 80:2 | 67:14,17 68:17 | **addressed** |
| **83** 26:18 | **accept** 52:12 | 69:14 70:5 | 69:17 80:1 |
| **85** 26:17,18 | 78:20 79:18,24 | **accurate** 92:4 | 85:10 |
| 30:25 | **accepting** | **action** 77:14 | **addresses** |
| **86** 21:6 26:17 | 79:14 | **active** 77:23 | 89:21 |
| **89** 91:5 | **access** 20:12 | **actual** 55:24,24 | **adjourned** |
| | 43:8 | 70:25 | 90:11 |

administrative 51:3

administrator 72:21 76:6

administrators 77:12

admit 76:24

advantage 33:2

advice 58:10

advising 73:21

advocate 59:25

affect 24:18

affected 43:10

affecting 43:9

affiliated 37:6

affirmatively 35:4 83:19

afforded 51:22

agenda 76:3 84:16 87:5 89:18 90:10

agent 15:16,18 38:15 61:25 70:1

agents 14:16 38:3 70:3

ago 19:1 26:25 30:1 61:12 74:3 77:10 80:20

agreement 35:19 36:21 37:24 48:5

ahead 12:14 20:15 30:20 37:22 46:22 50:3 54:4,12

55:19 60:11 62:20,22 64:9 64:18 65:24 71:21 76:15,17 80:16

aimed 43:2

airplane 25:19

akin 29:13

alex 11:3

alexander 4:3

alike 30:15

allow 26:8 27:22 41:23 56:19

allowed 14:20 16:1 48:4 57:25 72:13

allowing 42:10 59:22 71:23 73:18

allows 32:13 35:20 78:9

alt 14:4 54:7

america 15:23 84:9

aml 14:25 37:13 47:23

amount 16:16 17:6,19 20:17 36:11 40:4,4 40:22 42:19 56:11 57:8 58:4,7,18 59:7 86:22

amounts 29:24 67:18

ample 86:1

amulic 4:13

anders 8:22

andrea 4:13

andrew 10:7

anecdotal 30:18

anecdotally 28:3 30:13

announce 78:3

answer 23:11 55:10

answering 27:23

answers 25:24 26:8 73:20

anti 14:24

anticipated 51:15

anybody 16:15 19:13 22:4 33:3 34:22 59:24 69:7 74:16 83:7,7 87:3 88:10,23

apologies 50:2

apologize 31:24 84:5

app 69:9,11 70:6,10,13

apparently 76:12

appear 24:18

appeared 77:4

appears 22:24

application 41:14

appointed 72:21

appreciate 19:25 30:17 66:23 77:2 79:25

appreciation 50:16 51:11

appropriate 87:24

approving 2:2 2:4

approximate 67:1

approximately 50:7,19 77:19 86:8

april 79:12,13 79:16

archer 10:16

area 25:6

areas 35:17

argier 4:14

argue 59:23

argued 70:23

arguing 49:11 59:15

argument 59:25

arose 89:1,10 89:20

artur 3:3 62:19 88:12

ashley 9:19

asian 15:21

aside 17:6 23:24 56:16

85:20
**asked** 33:8
70:6
**asking** 33:7
45:12 53:19
**asserted** 82:9
**asset** 78:7
**assets** 45:1
52:14,18 56:20
77:20 78:11,12
**assigned** 21:6
**assistance**
87:23
**assuming**
64:24 65:9
86:17
**assure** 64:13
65:9
**assured** 33:16
41:9 51:21
**attempt** 28:19
28:23 61:9
**attempted** 35:6
60:20
**attempts** 61:20
61:20,24
**attended** 42:11
**attention** 43:17
**attorneys** 3:16
4:2
**august** 72:5
**automatic** 2:2
83:10
**available** 85:11
**avery** 6:8
**avoidance**
72:12

**avoided** 48:21
**aware** 65:6
76:12 77:9
87:11 88:17

**b**

**b** 1:21 72:8
**back** 14:13
15:9 27:19
29:1 33:23
34:7 38:17
43:12 48:7
49:11 52:20
53:24 56:4,11
57:24 58:2,4,7
58:18 60:21
63:10 69:16
74:7,19 82:15
83:20 84:2
86:22 89:18
**bad** 82:5
**balance** 40:17
**ball** 18:11
**ballot** 80:24
82:10,15,16,16
84:8 88:17
**band** 83:18
86:18,20
**bank** 32:2,3,10
32:25 33:24
34:9,19 90:4,4
90:5
**bank's** 34:17
**banking** 32:9
33:17,19,21
35:12 45:1
47:7 51:9
52:15

**bankruptcies**
30:21,22
**bankruptcy**
1:1,11,23
13:16 32:5
42:13 47:25
50:10 51:25
54:19 71:2
**banks** 32:8
33:3
**banned** 23:16
23:21 24:8
29:13 30:7
36:17 62:14
68:14
**barnes** 4:15
**barry** 6:10
**barse** 4:16
**based** 16:6,7
32:16 43:22
46:3 50:5
**basis** 29:20
74:10 83:8
87:13
**bauldree** 4:17
**bears** 30:19
**becin** 4:18
**beginning**
38:18
**begun** 77:15
**behalf** 45:10
83:2
**believe** 16:12
17:18 20:3
21:2 46:16
51:24 52:1
61:3 77:3

**believed** 40:2
**bells** 32:12
**belong** 57:18
58:3
**belonging**
77:14
**belongs** 57:18
**beltran** 4:19
**beneficiaries**
37:25
**beneficiary**
36:23
**benefiting**
51:10
**benefits** 13:15
**bennet** 10:17
**berg** 10:9
**bernard** 4:20
**bernstein** 4:21
**best** 17:24
18:11 19:1,3,7
23:1 25:16
38:6 47:2 60:5
74:19
**better** 38:5
85:2
**beutler** 4:22
**beyond** 85:22
**big** 36:6,8
86:16,23
**bigger** 69:6
**biggest** 33:25
86:22
**billion** 36:9
77:19
**billions** 15:11

**birch** 10:10
**bit** 12:18 16:11
  16:22,24 27:5
  27:11 28:8
  29:25 31:16,20
  35:10 36:10
  68:19 81:13
  83:4,6
**bitcoin** 13:8
  14:4 16:13,18
  17:10,15,16,20
  18:5,6,14
  23:25 24:9,9
  39:20 44:4
  48:19 49:9
  50:13,16 54:21
  55:1,3,6,8 58:8
  58:18,20 59:6
  59:16,18,22,23
  64:22,24 65:10
  65:14
**bjergaard** 8:22
**blaine** 4:20
**blanking** 33:22
  33:24
**blended** 26:18
**block** 73:8
**blurb** 61:4
**bore** 28:16
**borrow** 55:22
  56:1,6
**borrower** 59:1
  59:4,7,10,11
**borrowers**
  40:17 57:4,14
  57:19,19,22

**botswana**
  16:10 31:14
**bottom** 22:11
  61:4
**bought** 13:14
  18:18 32:2
  58:20 59:16,18
**bound** 84:10
**bowling** 1:12
  4:4
**box** 82:3,11,12
  82:20
**boy** 18:14,23
  25:25 89:3,12
**bradham** 4:23
**brass** 31:21
**bray** 4:24
**breach** 52:4
  67:15
**breached** 44:9
  52:5
**breaching**
  41:12
**breuder** 4:25
**brian** 4:9
**brief** 42:3 76:7
**briefly** 49:13
  51:13
**bring** 43:16
  64:6
**brink** 5:1
**broad** 37:10
**bronge** 5:2
**bruh** 4:8
**btc** 64:12,14
  73:22 74:4

**build** 25:19
**bump** 74:12
**burden** 51:3
**burks** 9:17
**burton** 5:3
  75:4,5,5,7,16
  75:23
**business** 49:7
**button** 75:11
**buy** 58:3 59:22

**c**

**c** 3:1 6:24 12:1
  55:17 92:1,1
**caceres** 10:11
**calculate** 17:2
**calculations**
  18:1
**california** 16:9
  24:3 31:14
**call** 16:19
  35:24 71:25
  75:15
**calling** 55:21
  55:21
**calls** 30:14,16
**cam** 5:16
**cancel** 35:15
**cancelled**
  30:16
**capable** 51:5
  52:6
**care** 37:15
  39:12,15
**cared** 39:18
**carefully** 14:1
**cares** 39:14

**carl** 5:4 9:2
**carla** 8:16
**carol** 8:8
**caroline** 10:3
**carroll** 5:6
**case** 1:3 12:20
  13:25 16:5,23
  19:12 21:19
  30:8 37:16
  39:2 50:10
  56:1 63:14
  76:5,21 81:19
  85:13,18,20
  89:3
**cases** 87:14
  88:18
**cases.stretto....**
  79:2
**casey** 8:14
  60:10
**cash** 16:6,16
  17:7,9,19
  18:20 39:15
  44:18 48:15
  49:5,6,8 58:21
  58:21 78:10
**categories** 37:2
**category** 77:18
**cathy** 7:21 11:1
**caught** 28:1
**caused** 51:9
  52:15
**causes** 77:14
**celsius** 1:7 14:6
  24:11 27:14
  28:15,21 36:7
  37:20 41:10

43:14 47:1,24
50:6,9 53:17
53:23 54:24
57:6,18 58:22
60:15 61:16
66:3,22 67:13
72:20,23 73:7
73:10,20 77:14
77:21
**celsiusloc** 79:2
**certain** 37:2,6
**certainly** 71:10
76:25
**certified** 92:3
**cetera** 21:20
**challenge**
36:12
**challenging**
23:3 81:11
**chambers**
82:24
**chang** 3:5
42:17 46:16,18
46:22,23,24
49:23
**change** 5:7
32:1 73:22
**channels** 20:7
42:20
**characterize**
41:11
**charged** 77:8
77:19
**chart** 31:25
**chase** 8:7
**check** 18:7
28:24 32:22

33:1 34:25
35:3,5,14,16
54:2 74:12,25
82:12
**checked** 82:2
82:11,11,20
84:14
**checks** 32:14
32:17,25
**chicago** 3:18
**choice** 59:24
84:9
**choices** 84:10
**chris** 3:20 4:18
12:16 27:18
28:13,15,18,25
29:2,3 44:1
45:14 53:16
57:2 62:3 63:1
67:10 69:24
72:19
**chris.koenig**
53:23 73:9
**christian** 3:7
55:15,17 75:19
**christina** 5:9
**christopher**
4:23 5:11 7:16
**ciamarone** 5:8
**ciancarelli** 5:9
**circumstances**
48:10
**citizens** 90:4
**claim** 2:3,5
20:23 33:4
47:4 50:6,18
54:17,18,20,24

55:6 57:19,20
57:21 59:13
60:21,24 61:6
62:13 63:8
65:7,17 70:12
71:1 72:3,4,13
72:16 74:2,4,9
80:23,23,25
81:3,8,9 84:17
85:5
**claimed** 20:18
21:4,8 64:11
**claiming** 23:9
**claims** 12:19
13:2 16:4
20:24 21:1,24
36:2,6,8,9 39:1
39:3,4 47:4
64:24 71:24
72:7,12 74:9
77:14,18,20
79:20 85:22
**claire** 4:7
**clara** 10:18
**clark** 5:10
**class** 20:23
40:14 55:22,22
55:24,25 56:1
56:6,6,12 64:3
66:4 71:24
72:7,15 82:9
83:21 84:15
85:7 88:3 89:9
**classified** 49:2
**clear** 34:16,20
36:25 41:24
48:16 82:16

**clearly** 81:23
**clerk** 12:2
40:11 42:7
46:16 49:25
50:2 52:25
55:15,17 60:10
62:19 64:8
65:21 66:19
68:25 71:17,20
73:13 75:4,7
75:12,18,22
88:12,24 90:2
**clerks** 25:12
**clicked** 21:11
**close** 44:17,21
45:2,24 81:16
**closed** 40:21
**closer** 81:12
**closing** 49:12
**coco** 5:11
**code** 21:11,13
23:1 53:19
54:1,19 64:11
64:12,13,16,20
64:24 65:11
**codes** 21:12
22:20,21 28:12
60:21,23 65:2
65:7 74:4
**cohen** 5:12
**cohort** 40:21
40:21
**coin** 14:5 54:7
**coinbase** 14:16
14:18 15:17,18
15:19,24 16:10
23:20,21 24:4

24:24 26:18,19
27:16,21 28:9
28:12,13,17,18
28:23 29:6,12
29:13,21,23,25
30:12 35:19
36:14,15 43:21
51:20 61:9,18
61:20,21,23,24
62:7,8,10,12
62:16 63:4,13
63:16 66:7,10
68:15,18 69:7
70:1,4 74:10
**coins** 14:5
56:11
**collateral** 57:7
57:18,24 58:2
58:4,5,7 59:9
59:13
**colleague**
19:16 20:1
**collectively**
39:3
**colodny** 5:13
**colon** 5:14
**column** 20:8
**come** 14:13
53:24 58:15,25
86:25 89:18
**comes** 29:1
75:16 89:10
**comfortable**
70:15,24 86:11
87:1
**coming** 63:12
64:14,25 65:9

65:9
**comment**
56:19
**comments** 42:3
69:2 87:16
**commercially**
58:23
**commitment**
48:16
**committee**
13:20 25:14
76:21 79:19
80:4
**committing**
48:23
**commodity**
16:19,21 17:10
18:16
**common** 12:24
26:3,8 31:21
80:21 89:24
**communicati...**
25:18 26:23
28:5 29:10,18
33:7 35:2 80:1
**communicati...**
25:6 26:20
28:1 31:4
32:21 82:23
**company** 21:25
27:14 33:17
**compensated**
44:19
**compile** 22:15
**complained**
25:22

**complaining**
84:25
**complete** 29:4
31:3 34:2 35:7
**completed**
22:18,25
**complex** 14:11
**complexities**
47:8
**complexity**
48:2 49:3
**compliance**
47:20,23 51:2
**compliant**
13:24 15:7
38:16
**complicated**
13:2,10 14:14
16:17 19:8
27:5,13,25
28:17 38:1
40:5 58:25
59:17 83:6
89:1
**comply** 17:7
**complying**
14:12,22 17:25
**computer** 42:1
**concern** 35:17
89:22
**concerns** 24:11
50:8 87:20
**concluded**
90:12
**concludes**
89:17

**confident**
33:25
**confidential**
41:7
**confidentiality**
41:12
**confirmation**
14:9 57:17
70:7,9,10 71:4
71:8
**confirmed**
73:23
**confused** 85:8
**confusing**
84:15
**congratulatio...**
28:20
**connected**
42:18 45:12
**conor** 10:12
**consequence**
57:22
**consequences**
72:6
**consider** 69:7
89:2,11
**consideration**
46:8 49:19
**considered**
69:5
**constituents**
87:14
**contact** 23:4
65:5 73:2,3
**contacted**
34:23 63:21

contacts 74:18
contain 43:7
context 12:23
  50:6,10 87:20
continue 25:19
  77:16 79:5
continued
  34:15
continuing
  87:22
convenience
  2:3,5 40:14
  64:3 72:3,4
  80:23,23 82:9
  84:15 85:5,7
  88:3 89:9
conventional
  43:2
conversation
  38:17
conversations
  13:19 41:11,15
conversion
  54:16
converted 24:7
cook 5:15
copies 25:14
copy 61:14
cori 5:12
cornell 4:7
  87:8,9,10 88:1
  88:5,8
corporate
  32:11 35:18,20
  35:24 36:1,5
  36:12,19 38:5
  40:6 42:18,25

43:2,5,17,19
44:11,18 45:6
45:11,13,22
46:1,25 47:13
47:19,21 48:14
49:13,16 50:5
50:9,22,23
51:6,14,22
52:3,6,11,16
66:4,6,7,11
68:4,6 69:5,11
69:14 70:5,21
86:3 89:25
corporations
  35:21
correct 21:14
  35:7 56:3 89:6
correctly 34:3
corresponde...
  12:19
corrupt 32:25
cote 5:4
countries 13:5
  15:18,21,22
  39:23
country 13:5
  15:23 24:2,3
  32:24 92:21
couple 19:22
  28:9 30:15
  31:23 62:11,16
  64:21 67:25
  81:12
course 13:23
  15:6,25 16:11
  18:3 53:25
  86:2

court 1:1,11
  12:3,6,11
  16:22 19:18,23
  20:10,12,15
  21:16 22:6,10
  23:4,12 24:15
  24:17,21 25:11
  26:9,13 33:11
  33:19,21 34:4
  34:10,13 36:4
  36:25 37:8,14
  37:20 38:9
  39:19 40:12
  41:20,22 42:8
  42:11,13,21
  45:20 46:9,14
  46:21 49:5,11
  49:23 50:1,3
  52:24 53:1,11
  53:15 54:4,11
  55:14,16,19
  56:25 60:1,8
  60:11 62:1,18
  62:20,22,24
  63:12,22,25
  64:2,7,9,17
  65:12,18,20,24
  66:15,18 68:10
  68:23 69:23
  70:14 71:16,19
  71:21 72:18
  73:8,12,15
  74:22 75:1,5
  75:15,20,23
  76:2,7,10,15
  76:17 77:6
  79:10,13,17,23

80:7,12,16
83:1 84:16,20
85:9 87:3,8,19
87:25 88:6,10
88:13,20,25
89:6,14,17
90:7,10
courtney 9:17
courtroom
  12:7,13 41:25
  41:25
create 30:4
credibility
  47:11
credit 55:24
  56:6
creditor 16:4
  26:25 27:23
  35:24 36:19
  37:23 44:16
  45:7 46:24
  50:5 52:19
  55:22,24 62:21
  66:2,3,4,21
  68:4 69:2
  73:19,20 82:20
  84:5,6,12,25
creditors 12:25
  13:11,14,20,21
  16:12 18:5,14
  18:19 19:11
  21:7,12,16
  23:2 24:19
  27:13 32:19
  33:6 34:5 35:7
  35:18,20 36:2
  36:5,8,12 37:3

37:18 38:3,5
38:25 39:11,14
39:15 40:4,6
40:23 41:23
42:16,18,25
43:17 44:18
45:4,5,6,11,13
45:19,25 46:5
46:6 47:10,14
47:19,21 48:14
49:16 50:9,22
50:23 51:6,10
51:14,19,22
52:2,3,9,10,11
52:16,21 59:22
60:14 63:3,19
63:20,21 64:22
66:6,11 68:6
69:16,20 70:21
72:2 74:4 80:2
80:6,7,25
82:17,17,25
83:3 85:13
86:3,14,23
87:14,21 89:25
89:25
**crews** 5:16
**crusell** 5:17
**cruz** 5:18
**crypto** 13:15
13:15,18,21
14:12 16:6,12
17:7,9,16,18
17:18 18:3,5,9
18:20,20,25
19:10 21:17
24:5,6,6,23,25

26:16 28:20
30:10,22 32:5
32:6 36:19
38:4 39:24
40:4,7,8 43:23
44:22,24 51:21
56:5 60:16
68:16 72:9
74:1 81:6,18
83:17
**cryptocurrency**
13:7,7,9,12
14:19,21 15:14
16:15 17:3
38:14 39:11
43:21 44:14,15
44:16 45:21,23
47:15 48:9,14
50:12,18,24
51:11,20 52:10
52:14,22 54:17
66:9 68:7,8,14
72:17 81:2,4
83:14 85:23
86:9,19,25
**crystal** 18:10
34:20
**cunha** 5:5
**currency** 15:4
**current** 33:21
45:23 50:20
51:21
**currently**
24:23 37:9
47:19 50:18
**curve** 30:20

**cushion** 87:1
**custody** 70:9
70:14,19 71:24
72:7,13,16
78:2
**custom** 4:3
**customer**
14:24 28:15
60:20
**customers**
15:19 78:4,6,9

**d**

**d** 6:5,18,23 9:2
9:11,18 12:1
91:1
**d'amico** 9:25
65:21,22,24,25
66:15
**daily** 87:13
**dalhart** 5:19
**dan** 7:5,20
**daniel** 8:6
**darious** 6:13
**data** 27:17,19
30:6,19 38:25
81:22
**date** 2:1 12:16
15:10 16:25
17:2,4,4,5,11
17:22 18:1,15
21:3 25:8 29:8
32:21 38:20
44:17 47:25
49:1,7 50:14
51:16 54:18,20
54:25 56:17,21
58:16,24 61:8

70:8,12 71:7,8
72:11,20 73:22
77:10,22 80:22
81:21 82:7
89:2,7,10
92:25
**dave** 8:4
**david** 4:16
5:19,20 6:8 7:4
9:9,13,21
**day** 21:2 25:9
60:23 67:25
73:24 90:11
**days** 12:20
17:4 25:8 28:4
30:1,15,16,23
30:24,25 49:7
61:1,12 69:10
69:10 70:6,7,7
70:8,11 71:4,7
71:7 77:21
80:21 83:19
**deadline** 69:15
79:11,13
**deal** 38:9 64:2
**dealing** 33:11
**deanna** 20:3
40:12 42:5
46:15 49:24
52:24 55:14,16
60:9 62:18
64:7 65:12,18
66:18 68:23,24
71:16 73:12
75:3,15,21
**deborah** 6:12

**debtor** 1:9 3:16
25:13 43:18
44:8 48:25
**debtor's** 22:2,3
47:18 48:13,16
52:8 77:10
**debtors** 2:1
12:17 13:16
39:5 44:9,15
44:25 46:10
47:6,11,25
48:21 49:2
51:4,18 52:1,4
52:13 58:22
61:8,19 66:23
72:11,20 87:18
87:19
**decades** 43:12
**december**
81:24
**decided** 41:1
67:19 73:21
**decision** 79:19
82:5
**deehan** 10:12
**default** 57:4,13
**deficiency**
48:23
**definitely**
65:14
**dehart** 5:21
**delay** 33:2
35:12 50:15
**delays** 51:9
**delivered**
32:24

**delta** 59:14
**demanded**
13:11
**demanding**
47:21
**denied** 41:14
**denominator**
20:25
**department**
4:1
**deposit** 33:1
35:14,15
**deposited**
21:14
**deputy** 41:25
**der** 10:15
**describe** 12:21
**described**
21:18 68:10
**deserve** 49:21
**designed** 16:3
78:13
**detail** 33:16
**detailed** 26:22
**details** 28:16
78:19
**determine**
46:11
**develop** 27:20
**developed**
14:11 16:3
27:12
**development**
41:13
**diaz** 5:23
**dieter** 10:2

**dietrich** 10:21
**difference**
57:20,21 59:8
**different** 14:23
20:6 23:7
53:21 54:16
71:1 89:2,11
**differently**
45:7 52:3
**difficult** 18:16
31:12,22 41:6
66:11
**difiore** 5:22
**directed** 43:5
**directing** 27:14
59:2
**direction** 23:3
**directions**
21:21 22:11
**directly** 25:15
**disagreed** 84:7
**disaster** 32:8
**discarded**
71:14,15
**disclose** 69:4
70:2
**disclosure**
14:17 38:13
81:5
**discrepancy**
44:6
**discretion**
48:21
**discriminated**
52:2
**discrimination**
52:1 55:23

56:15
**discussed**
50:23
**discussions**
41:6 70:2
**dispute** 47:4
**distress** 32:4
**distressing**
64:16
**distribute**
15:19,24 16:1
30:24 35:20
36:13 38:4
39:24 45:2
47:19 61:20
**distributed**
15:3 20:19
21:3 29:24
30:25 31:2
34:13 48:25
54:21 60:24
67:8
**distributing**
13:6,8 70:16
**distribution**
12:23 13:3,10
13:12 14:11,15
14:16,19 15:6
15:16,18,25
16:18 17:2,3
20:7,9 21:9,10
21:25 22:14
23:19 26:1
27:1,18,21
28:6,19 30:18
36:9 38:2,15
43:20,25 44:10

44:18,21 47:3
47:6,8,15 48:2
48:5,9,11,15
48:17,18,25
49:4,8,21
50:17,19 51:5
52:6 53:6,7,8
53:10 54:8
55:5 59:3 61:6
61:7,9,24,25
62:11,17 67:2
68:3,19 69:6
69:15 70:1,3
70:12,18 71:1
74:1,8 77:1
81:1,18 82:21
82:22 87:12
**distributions**
13:4,18 14:1,2
14:4,21 15:13
16:14 17:3
19:16 20:18,22
22:3,3 26:10
26:16,17 27:7
27:15,16,17
29:6 30:21
31:17 37:2,10
41:2 42:24
43:18,22 44:14
44:20 45:5,18
45:21 46:2,4
49:6 50:11
52:17 60:15
61:18 62:7,8
63:2 66:24
67:4,6,6,7,16
67:20,23 68:1

70:13 76:25
82:8
**distributor**
48:1
**district** 1:2
**dixon** 5:24
90:8
**doc** 2:6
**docket** 12:19
20:13 22:1,7,8
42:22 44:12
47:17 48:7,24
53:20 61:3,3
61:12 63:23
73:8 84:7,18
87:15
**dockets** 47:9
**document**
71:25 72:1
**documented**
47:9
**documents**
59:2,2
**dogecoin** 14:5
**doing** 19:1
23:1 40:23
45:3 47:2 63:4
67:24
**dollar** 18:7
33:1 36:11
40:22 43:22
46:2 48:25
53:6 57:9 58:5
59:4,14 85:22
86:22
**dollars** 13:9,19
15:11 16:2

32:1,6 33:4
34:23,25 38:17
44:19 45:23,25
48:11 50:11,24
51:1 57:10,12
58:5,6,7,15
59:6,12,13
67:8 69:16
82:2,20
**don** 73:13,18
**donald** 5:1
**double** 17:22
75:13
**dow** 5:25
**drew** 17:1
**driver's** 36:14
**dropdown** 23:9
**due** 47:19 48:9
48:19 49:2
50:13 66:21
**duffy** 6:1
**dufourg** 6:2
**duties** 52:5
**duty** 44:9 52:4
**dzaran** 6:3

**e**

**e** 1:21,21 3:1,1
5:17 9:7 12:1,1
91:1 92:1
**earlier** 29:18
43:20 47:2,22
49:13 51:13
**early** 12:20
69:9 70:6 71:3
80:21
**earn** 46:25
63:20 69:2

74:2 81:6
83:21
**earnest** 77:16
**easier** 22:16
**easy** 13:17
17:16 28:21
**eaton** 6:5
**ecf** 20:12,13
22:11 46:10,11
88:4
**eckhardt** 6:6
68:25 69:1,1
69:23
**economic** 83:8
**ecro** 1:25
**ed** 10:10
**edification**
36:1 67:12
**effect** 37:8,9,22
**effective** 2:1
12:16 15:10
16:25 17:5
18:15 21:3
25:8 29:7
32:21 38:20
47:25 49:1,7
50:14 51:16
56:17 58:16,24
61:8 70:8 71:7
72:11,20 73:22
77:10 80:22
81:21 82:7
89:2,10
**effectively**
57:11
**effort** 53:3

efforts 58:24
eightball 35:11
either 19:18
elect 64:22
  72:2 81:9,10
  81:13
elected 21:17
  24:23 40:19,25
  80:25
electing 80:25
election 72:4
  73:1 74:7
  80:23,24 81:15
  81:23 82:6
  83:4,8,20,22
  83:25 84:1,12
  84:14,22,23
  85:1,5 89:8
elections 2:3,5
  72:3 80:23
  86:8 88:3
elena 9:12
eligible 2:4
  13:6 20:9,21
  20:25 21:11
  32:18 33:6
  48:8 78:18
elimelech 6:4
ellen 10:18
ellis 3:15 12:16
  45:16 46:4
  47:17 48:7
  52:19 73:21
ellis's 44:12
elvin 9:22
email 21:23
  27:1 28:20

29:3,17 53:22
53:22,24 55:13
60:23 65:1
69:21 72:1,22
72:23 73:6,20
74:12,18,23
78:19 83:18
emailed 73:19
  82:4
emails 21:12
  27:8 31:12
  53:21 69:19
  71:13,14 78:21
  87:13 89:16
enable 67:23
enabled 68:1
  70:9,10
encourage
  42:21 78:14,16
endeavoring
  19:6 31:17
enem 5:1
engel 6:7
english 34:6
  82:18
ensure 33:12
  46:5 47:3
  48:17 52:20
enter 48:5
entire 13:25
  22:8 43:7,13
entirely 62:4
entities 35:22
  37:11
entitled 17:14
  39:7 59:8
  79:23

entry 2:2
eoin 8:9
equal 45:19
  46:6 52:20
  57:7 58:7 81:2
equally 44:11
  45:9
equipped
  33:16
equitable
  43:18 44:9
  45:5,13 47:3
  48:5,17,18,22
  49:21
equitably
  45:18 52:7
  66:13
equity 81:17
  83:9,15,15,16
equivalent
  16:16 17:19
  58:18 85:24
erroneous
  81:23
erroneously
  82:20
error 29:18
  60:21,21
especially
  12:25
essentially
  24:22
establish 49:5
established
  49:8 73:21
estate 58:12
  59:21

et 21:20 54:1
eth 14:4 65:10
  65:13 73:22
  74:4
ethereum 13:8
  16:13 17:15,17
  17:21 23:25
  44:5 48:19
  49:9 50:16
  54:21 55:1,3,6
  55:8 58:8,18
  59:6 64:11,23
europe 15:21
  55:21
evaluating
  71:10
eventuality
  19:10
everybody
  19:7 21:23
  32:17 37:14
  59:19 68:3
  82:4
everybody's
  80:24
evidence 30:18
exactly 39:21
  79:15
example 17:14
  44:23 45:4
  68:15 89:3,12
excellent 60:20
excess 56:17
exchange 57:6
  57:11
exercised
  48:22

**expect** 31:18
68:1,13,16
**expectation**
62:12
**expected** 41:16
44:17
**expense** 78:15
**expensive**
18:17 38:1
71:11
**experience**
63:1
**experiencing**
42:23
**explanation**
30:9
**explicit** 84:8
**exposure** 77:25
78:1,5,7,10,17
79:18 80:3,8
**extended** 71:5
**extent** 13:12,21
**ezra** 9:14,25
65:21

**f**

**f** 1:21 8:23 31:9
55:17 71:20
92:1
**faced** 80:8
**facilitate** 58:13
**fact** 16:25 66:9
66:22,23
**fahey** 6:8
**fail** 24:1
**failed** 21:20
23:14 27:18
51:18

**failing** 48:16
52:5
**failure** 29:2
**fair** 45:19 46:6
48:22 49:18,20
52:20
**fairly** 37:10
45:9 52:21
70:13
**fall** 71:24 72:7
72:15
**fallen** 40:25
**false** 43:14
**familiar** 90:5
**family** 43:1
63:2,5,15
**faq** 21:25
53:21
**faqs** 21:23 23:7
25:23 74:19
**far** 22:12 26:11
77:6
**farooq** 6:9
**fear** 41:12
**february** 29:7
32:2 48:24
71:6 73:19
**federal** 37:4
**feedback** 32:16
**feel** 22:4 42:15
44:9 47:10
48:15 65:5
74:18
**feeling** 12:6
**feels** 12:20
**fewer** 28:6,7

**fiat** 23:22 24:8
26:15 27:16
30:9 31:25,25
32:14,18 35:9
35:10,13 38:11
38:19 40:9
68:5,6
**fiduciary** 44:8
52:4,5
**fifty** 85:2
**figure** 36:20
37:25
**file** 19:5 83:2,4
88:4
**filed** 19:4 20:1
20:13 21:24
25:4 48:7,24
61:3 84:12,25
**filing** 44:12
46:10 60:4
89:20
**filings** 22:1,14
53:23 60:3
72:23 73:7,10
**fill** 34:3
**final** 83:22
**finally** 56:19
69:17
**finance** 58:21
**financial** 43:3
47:7
**find** 21:17 22:4
44:10 78:24
**fine** 19:23
60:22 62:24
**finish** 19:18
64:3

**finished** 90:10
**firms** 85:24
**first** 19:19 22:2
23:20 28:24
29:6 31:11
34:16 40:21
42:5,11 50:22
51:25 53:5
54:6 62:19
67:1 77:3
81:25 82:19
89:14
**five** 28:4 49:6,9
61:12
**fix** 87:1
**flagged** 65:1
**flagstar** 32:2
**flip** 67:21
**flood** 27:23
**florent** 5:20
**flowets** 6:10
**fluctuate** 17:10
17:11
**fluctuates**
16:18
**fluid** 18:17
**flying** 25:19
**focus** 26:3,3
**focused** 26:7
85:12,15
**foianini** 6:11
71:17,22,23
72:22 73:5,11
**following**
42:13 66:25
79:1

| | | | |
|---|---|---|---|
| **follows** 56:6 | **friends** 12:9 | **g** | 73:2 84:2 |
| 72:14 | **front** 15:2 | **g** 4:17,20 10:10 | **given** 12:25 |
| **footnote** 20:19 | 48:19 81:25 | 12:1 | 18:15 24:25 |
| **forced** 52:12 | **frozen** 37:16 | **gallagher** 6:14 | 63:20 66:8 |
| **forego** 81:17 | **frustrated** 63:9 | 64:8,9,10,19 | 80:19 |
| **foregoing** 92:3 | **frustrating** | 65:13,19,20 | **giving** 40:1 |
| **foreign** 85:25 | 40:5 | **garcia** 6:15 | 46:19 58:9 |
| **foreseeable** | **frustration** | **geary** 6:16 | 78:5 |
| 67:3 | 18:8,19 39:23 | **general** 37:21 | **glenn** 1:22 |
| **forget** 81:24 | **ftx** 13:18 | 71:24 72:7,13 | **go** 12:14 15:9 |
| **forgiven** 57:6 | **full** 29:21,24 | 72:16 | 19:23 20:15 |
| **forgiving** 57:10 | **fully** 14:22 | **generally** | 21:12 26:19 |
| **forgotten** 90:3 | 15:7 28:17 | 62:15 | 28:4,6 29:18 |
| **form** 25:23,24 | 38:16 50:25 | **geoghegan** | 30:22 33:16 |
| 34:3,7,16 | 72:6 | 10:18 | 34:19 36:16,18 |
| 47:15 48:15 | **fun** 12:11 | **george** 3:13 | 37:22 46:22 |
| **formed** 77:9 | **funck** 3:7 | 52:25 | 50:3 54:4,12 |
| **formerly** 68:2 | 55:15,17,18,19 | **gergi** 7:6 | 55:19 56:23 |
| **forth** 23:8 | 55:20 57:3 | **getting** 16:25 | 60:11 62:20,22 |
| **forward** 79:8 | 59:15,22 60:8 | 31:4 34:1 | 64:9,17 65:24 |
| 79:20 | 75:19 | 38:11 39:25 | 67:22 70:3 |
| **fought** 38:2 | **fund** 63:14 | 43:17 47:14 | 71:11,21 75:17 |
| **found** 15:6 | **fundamental** | 64:15 69:21 | 76:15,16,17,17 |
| 42:18 51:4 | 51:25 | 71:12 | 79:19 80:13,16 |
| **four** 22:15 28:4 | **funds** 43:6,12 | **gheorghe** 6:13 | **goal** 26:24 |
| 30:5 43:6 | 43:14 44:2,3 | **give** 12:23 13:7 | **god** 33:22 |
| **fourth** 52:13 | 45:2 49:15 | 13:11,22,23 | **goes** 28:19 30:9 |
| **frances** 7:2 | 50:15 51:7 | 14:12 16:1,5,6 | 49:16 55:8 |
| **franco** 6:15 | 56:15 63:17 | 16:15 17:17,18 | 69:19 |
| **frankel** 6:12 | 66:8 85:20 | 23:21 24:5,12 | **going** 12:24 |
| **frankly** 31:1 | **further** 59:10 | 27:22 30:10 | 16:11 19:16 |
| 33:25 41:15 | 60:25 78:19 | 35:5 36:4,14 | 20:3,7,23 24:8 |
| **freddy** 5:14 | 79:6,8 | 36:15 40:9 | 24:11 28:23 |
| **free** 22:4 53:25 | **future** 18:10 | 41:2 45:15 | 31:15,19,20,21 |
| 65:5 74:18 | 63:15 86:15 | 56:10 58:6 | 32:22 33:9 |
| **frequent** 26:24 | **futures** 43:3 | 59:3 61:15 | 35:1 38:7,9 |
| | | 67:24 71:6 | 40:2 41:23 |

| | | | |
|---|---|---|---|
| 44:25 58:12 | **groups** 13:20 | **harder** 38:2 | **helpful** 62:5 |
| 59:20 61:23 | **growing** 45:11 | **harm** 52:15 | 87:20 |
| 62:8,11,15 | **grown** 78:12 | **harrison** 10:20 | **hernandez** |
| 65:14 68:6 | **guarantee** 68:7 | **hayes** 6:18 | 6:19 |
| 69:20 70:2 | **guaranteed** | **headline** 48:20 | **hershey** 6:20 |
| 71:15 73:15 | 81:1 | **health** 43:11 | 76:5,9,10,11 |
| 84:2 85:19 | **guess** 74:13 | **hear** 19:19 | 76:16,18,20 |
| **golic** 20:1,3 | **guilty** 75:14 | 33:10 42:4 | 79:10,12,15,21 |
| 73:20 | **guohua** 10:5 | 47:12 49:24 | 79:25 80:10,13 |
| **golshid** 10:8 | **guyader** 10:13 | 55:18 62:21,23 | 80:14,16 |
| **good** 12:3,5 | **guys** 60:13 | 62:24 65:22 | **hesitant** 41:11 |
| 25:20 28:7 | **h** | 73:15 88:1 | **hesitate** 16:19 |
| 36:18 39:8 | | **heard** 41:23 | **hi** 42:9 69:1 |
| 53:2 60:12 | **h** 7:11 76:18 | 42:6 43:19 | 71:22 82:4 |
| 76:20 87:9 | **haircut** 81:13 | 47:12 53:13 | **high** 29:15 |
| **gorrepati** | **half** 15:20 19:1 | 64:20,25 75:6 | 31:8 |
| 10:19 | 26:25 30:16 | 75:21,24 76:1 | **highlight** 63:8 |
| **gotten** 31:12 | 36:10 38:25 | 76:1 87:4,7 | 63:11,17 88:15 |
| 39:19 48:4 | 43:9 56:11 | 88:11,23 | 88:17 |
| 60:4 61:14 | 68:21 81:7 | **hearing** 2:1,1 | **highlighted** |
| **government** | **hamilton** 4:3 | 12:9 22:7 | 89:7 |
| 37:7 | **hand** 40:11 | 42:11 60:3 | **hit** 31:19 |
| **grant** 49:21 | 88:12 90:8 | 64:4 74:24 | **hittelman** 6:21 |
| 85:12 | **handling** 51:5 | 87:17 89:7 | **hitti** 6:22 |
| **granted** 41:14 | 76:25 | 90:11 | **hoc** 13:20 |
| 89:14 91:5 | **hands** 21:5 | **hedge** 18:17 | **holders** 77:13 |
| **granting** 2:5 | 42:1,2 88:24 | **hedges** 18:18 | **holding** 23:25 |
| **great** 18:4 | **happen** 65:3 | **hein** 10:15 | 24:25 57:7 |
| 19:11 29:1 | **happened** 54:9 | **held** 13:15 | **holloman** 6:23 |
| 42:22 83:20 | **happens** 79:24 | 72:10 | 6:24 |
| **greatest** 27:24 | **happy** 22:5 | **hello** 46:18 | **hon** 1:22 |
| **green** 1:12 4:4 | 28:21 57:1 | 50:4 55:18 | **honest** 82:14 |
| **gregory** 8:23 | 58:13 75:24 | 88:14 | **honor** 12:5,15 |
| **group** 42:17 | 87:25 | **help** 21:24 | 12:18 14:8 |
| 60:17 77:24 | **haqqani** 6:17 | 27:12 31:14 | 16:9 19:6,24 |
| 88:15 | **hard** 25:6 | 55:10 58:9,10 | 20:2,14,24 |
| | 43:12 | | 21:22 28:16 |

31:7 35:18
36:13 37:4
40:13,16 41:3
41:8,18,21
42:9 45:10
46:7,18 49:18
49:20 50:4
51:13,24 53:2
53:13 55:20
57:1,17 58:2
60:12 64:10
65:19,23 66:14
66:20 69:22
71:22 73:17
76:11,12,14,19
76:20 77:3,9
77:16 79:8,12
79:15,21,25
80:2,11,14,18
81:25 82:1
85:14 86:24
87:9,13 88:5,9
89:15 90:4
**honor's** 12:22
36:1 67:12
77:4 86:7
**hope** 19:5,5
62:4,10,16
63:25 65:3
67:25 73:3
**hopeful** 68:21
**hopefully**
58:10 68:22
**hoping** 41:18
**house** 4:3
**huge** 44:6
48:12

**humanly** 19:3
**hundred** 40:23
43:19 57:8
60:22 65:10
**hundreds**
15:11
**hybrid** 2:1
**hyde** 2:25 92:3
92:8

**i**

**identify** 42:2
53:15
**ii** 2:4 5:3
**iii** 2:5
**il** 3:18
**illustrate** 20:2
**imagine** 30:14
33:15
**immediately**
70:10
**impact** 85:11
85:13
**impacted**
50:17
**impartially**
45:9
**implications**
16:20
**important** 15:1
15:5,15 17:6
22:14 23:14
24:17 25:1
31:24 60:24
85:14
**importantly**
83:22

**improve** 25:5
25:18,21 26:23
**improved**
27:20
**inability** 47:18
**inadvertent**
80:22
**include** 37:18
77:24
**includes** 14:23
26:15
**including**
38:14 45:6
49:17 77:6
78:11,19 89:25
**income** 63:6
**inconsistent**
52:8
**increase** 77:13
**increased** 51:2
**incredibly**
14:14
**incurs** 78:15
**independent**
87:16
**indicate** 42:5
52:9
**indifferent**
39:13 50:13
**indiscernible**
44:13 45:8,17
46:24,25 48:12
48:23 49:10,19
51:5 53:4,5,6,8
53:9 54:8 56:8
56:9,9,15,16
56:17,21 63:7

63:10,18,19,20
64:6 66:5,24
69:15,18,20
72:12 77:7
84:17 88:6
**individual**
13:20 23:2
26:1,6,6 35:22
35:23 51:19
52:10 60:14
66:21 68:11,13
**individualized**
21:12 31:22
74:17
**individuals**
36:13 37:10
40:19,19 77:22
86:1
**indulgence**
12:22 76:9
**inequitable**
44:24 50:9
59:24 82:19
**inequitably**
19:13
**inequity** 42:23
**inexpensive**
32:18
**information**
17:25 23:15
24:18 27:22
34:2 61:2,11
61:15 78:25
**informed**
47:14 77:16
85:5

| | | | |
|---|---|---|---|
| **ingo** 4:22 | **irony** 32:4 | 86:9 | **k** |
| **initial** 32:16 | **issue** 22:24 | **jarno** 10:9 | |
| 55:5 82:14 | 23:24 26:6,6 | **jason** 6:25 | **k** 7:19 8:4 |
| **initially** 29:10 | 33:10 64:2,6 | **jay** 8:3 | 55:17 |
| 40:24 50:13 | 65:6 82:1 85:9 | **jeff** 8:21 | **kahn** 7:4 |
| **inquiries** 25:8 | 85:10 86:14 | **jeffrey** 4:21 6:5 | **kaitlyn** 6:21 |
| 25:9,13 26:7 | 89:1,1,6,7,8,9 | **jennifer** 7:18 | **kaplan** 7:5 |
| **instance** 51:1 | **issues** 12:24 | **jerome** 6:2 | **kass** 7:6 |
| 82:12 | 13:25 26:3,3,4 | **jin** 4:12 66:19 | **kaufmann** 7:7 |
| **instantaneous** | 28:7 33:12 | **johan** 5:2 | **keck** 3:11 |
| 74:15,21 | 47:7 50:21 | **johanna** 6:24 | 42:17 47:13 |
| **instructions** | 51:2,24 60:6 | **john** 6:3,22 | 49:25 50:3,4,5 |
| 21:18 22:19 | 61:21 63:11,12 | 7:11 8:12 9:24 | **keeney** 7:8 |
| 33:8 34:11 | 67:3 68:2 | **jonathan** 9:1,4 | **keep** 33:9 42:3 |
| 35:7 60:25 | 72:22 76:8 | 10:23 | 63:16 67:18 |
| **intend** 51:15 | 80:21 86:23 | **jones** 7:2 | 77:16 84:13 |
| 63:15 80:5 | 87:12,22 89:19 | **jose** 4:19 | **keith** 8:17 10:4 |
| **intends** 79:22 | 89:22,25 | **joseph** 7:22 9:7 | **keller** 7:9,10 |
| **interesting** | **itart** 7:1 | **joshua** 5:10,18 | **kevin** 8:5,10 |
| 23:23 37:19 | **item** 76:2 | **journal** 15:3 | **khan** 7:3 |
| **international** | **j** | **judge** 1:23 | **kicking** 39:15 |
| 15:17 33:6 | | 12:13 40:11 | **kind** 60:17 |
| 63:4 69:5 | **j** 5:19 8:6 | 53:25 63:18 | 62:2 63:9 67:8 |
| 82:18 | **jalsiegh** 6:16 | 64:5 88:12,14 | **kindly** 45:17 |
| **internationally** | **james** 6:7 | 90:6,8 | **kinds** 67:5,6 |
| 69:7 | **janell** 6:6 | **judgement** | **kirkland** 3:15 |
| **introduction** | 68:25 69:1 | 48:22 | 12:16 44:12 |
| 80:19 | **january** 15:9 | **july** 54:25 55:2 | 45:16 46:4 |
| **investigated** | 17:5,20,20 | **jurisdiction** | 47:17 48:7 |
| 22:23 | 18:3,12,21 | 15:16 | 52:19 53:17 |
| **investigating** | 19:9 23:24 | **jurisdictions** | 57:2 69:4,13 |
| 77:13 | 25:1 39:12,17 | 14:23 15:8,21 | 73:8,21 |
| **involve** 48:1 | 40:8 43:23 | **justice** 4:1 45:7 | **kirkland.com.** |
| **iovine** 6:25 | 44:6,22 48:8 | **justifies** 19:12 | 53:23 73:9 |
| **ira** 49:14 | 50:14 51:8 | | **knab** 7:11 |
| **iras** 43:5,7 | 52:18 54:22 | | **knauth** 10:21 |
| | 55:4,7 69:13 | | **knew** 17:9 |
| | 69:14,15 81:24 | | |

**know** 13:19
14:23 19:6
22:2,14 23:19
25:12 27:4,18
28:10,18 29:4
31:7 34:17
38:21 39:22
41:13 46:19
54:2 56:11
59:5 62:13
63:18 68:18,19
68:20 72:15
79:23 82:25
85:24 86:13
87:4
**knowing** 43:11
**knowledge**
70:4
**koenig** 3:20
12:4,5,8,12,14
12:15,16 16:24
19:21,24 20:11
20:14,16 21:22
22:9,13 23:6
23:13 24:16,20
25:3,16 26:12
26:15 27:18
28:13,15,18,25
29:2 33:14,20
33:22 34:5,12
34:15 36:5
37:4,12,19,23
38:11 39:21
40:13 41:21
46:13 47:2,23
51:1,7,11
53:13,16,16

54:9,11,13,13
55:12 56:2
57:1,2 60:2,7
60:12 62:3,3
63:1 64:17,19
64:19 65:16
66:10,16 67:10
67:10 68:12,23
69:24,24 72:18
72:19,19 73:7
73:11,19,23
74:3,6,6,25
75:2,10,13
76:4 80:17,18
84:18,21 85:14
87:6 89:5,15
89:24
**koenig's** 44:1
45:14 76:23
77:2
**kouly** 7:12
**krill** 7:3
**ks** 1:25
**kusters** 7:13
**kwasteniet**
7:14
**kyc** 14:24
21:10 22:18,25
28:14 29:4,13
29:19 30:4,7
31:3 36:12
37:13 47:23,24
60:20,22 61:21
63:4,12 69:11
**kyc'd** 28:17
29:2

**kyle** 4:24

**l**

**l** 9:20
**lackey** 7:16
**lafayette** 5:15
**landed** 38:4
**lang** 7:17
**language** 34:6
82:19
**large** 24:18
30:20,22 40:22
64:23 86:23
**largely** 28:1
43:9
**larger** 15:20,21
15:22 86:5
**largest** 14:18
**larkin** 7:18
**larkson** 7:19
**lasalle** 3:17
**latest** 27:24
**latona** 7:20
**lau** 7:21
**laundering**
14:24
**laura** 3:9 42:7
42:10
**lauren** 9:19
**law** 45:9,19
51:25 85:25
**laws** 70:17
**lawyer** 36:20
37:24 81:11
**lawyers** 30:14
**layla** 8:15
**lays** 20:16

**leading** 77:21
**learn** 82:8
**leaves** 26:13
**ledanski** 2:25
92:3,8
**legal** 16:19
92:20
**legge** 10:22
**lehrfeld** 7:22
**lender** 58:22
59:1,3,5,5,6,11
59:12
**lenders** 40:20
58:24
**leonard** 7:23
7:24
**letter** 42:20
53:10 55:22
79:4 84:5,6,25
**letters** 18:23
22:22 24:10
25:22 35:19
38:21 41:4
87:5,15
**levels** 36:22
**licari** 7:25
**license** 15:24
36:15
**life** 43:8
**light** 89:13
**likely** 67:5
78:21
**limited** 39:9
40:3 48:5
78:14 79:11
**lin** 8:1

line 17:1 28:11
74:16 75:24
91:4
links 21:23
29:5
liquid 44:15,16
81:2,3,6,18
83:14,17 86:9
86:19,25
liquidate 44:25
liquidated 51:8
52:14 69:13
liquidation
52:13
lisa 7:17
list 22:11 30:7
36:17 45:11
listed 87:5
listen 75:16,24
listening 19:6
22:4 26:21
76:23
literally 30:1
litigate 20:23
85:19
litigation 72:21
76:5,21 77:7
77:12 78:15
79:20 80:4,5
little 16:11,22
16:24 27:5
28:8 29:25
31:16,20 35:10
36:10 68:19
81:13 83:4,6
live 15:23
31:14 32:20,23

39:23
lived 16:7,9
17:17 31:13
livelihood
43:10
lives 68:12
living 33:17,18
liz 9:5
llc 1:7 35:22,23
36:19,21 37:23
37:24 66:1,7
llcs 35:21 43:6
49:14
llp 3:15
loan 46:25 56:4
56:7,7 57:5,9
57:10,23 58:1
58:5,15 59:3,5
59:9 73:18
74:3 89:25
loans 40:16,18
56:9 66:2
loc 76:21,24,25
77:4,8,9,11,15
77:18 78:3,5
78:15,16 79:3
79:7,21
loc's 77:6
logistical 49:2
logistics 47:8
lonely 12:6
long 31:24
58:17
longer 57:5
longest 80:19
longueville 7:1

look 17:12
21:17,20 24:21
25:2 65:6,16
65:17 74:7
81:22
looked 29:14
38:25 62:13
74:9
looking 22:8
looks 79:7
lorenz 10:2
lose 26:20 56:5
85:20
lost 12:9 32:4
71:14,15
lot 24:10,10
26:13 27:9
28:10 30:12
77:11 82:7
86:20
lottery 39:6,6
loud 32:7
love 36:19
lower 27:10
28:2 44:22
lucy 9:20
luke 9:16
lupu 7:15

## m

m 5:21 8:5 9:10
maan 8:2
maarten 8:2
macelhenney
8:3
made 18:2 20:3
25:12,13,15
27:9,11 30:11

45:18,21 46:2
47:5 49:5,6
57:15 79:19
81:23 82:5
83:9,12 84:9
86:16,23
main 40:18
major 13:25
majority 25:24
42:25
make 12:11
13:4 14:2,3,20
16:13 17:7
18:24 22:16
26:23 28:14
34:16,20 35:13
36:22 38:23
40:7 59:24
61:9,19 67:7
70:18 72:25
83:8,25 84:23
85:3 87:6
makes 12:23
84:3
making 13:18
14:2 27:15,17
27:21 30:1
71:1
malhotra 8:4
manage 43:4
management
16:4
manages 66:2
manual 31:15
67:21
manually
67:23

| | | | |
|---|---|---|---|
| **manus** 8:5 | **mccarthy** 8:10 | **migrated** 30:8 | **mole** 26:5 |
| **march** 1:15 | **mcneil** 3:9 42:7 | **migrating** 62:6 | **moment** 14:13 |
| 47:18 61:4 | 42:8,9,10 | **mike** 10:22 | 20:10 26:19 |
| 72:1 92:25 | 46:14 47:12 | **milin** 8:20 | 29:11 56:10 |
| **maree** 8:6 | 49:12 | **miller** 8:14 | **monday** 29:21 |
| **marek** 9:23 | **mcneill** 8:11 | 60:10,11,12 | 42:21 |
| **marjorie** 6:15 | **mean** 12:11 | 62:1,2,3 | **money** 14:24 |
| **mark** 4:8 7:23 | 25:20 33:14 | **milligan** 8:15 | 32:9 37:5 |
| 8:14 9:3 60:10 | 44:7 58:9 | **million** 36:2,6 | 39:19 59:5 |
| 81:16 85:2 | 59:19 62:12 | 37:16 39:3,4 | **monique** 6:18 |
| **market** 44:17 | 65:14 70:4 | 45:16 52:20 | **monitor** 87:22 |
| 44:20 45:23 | **means** 21:4 | 57:9,10,12 | **month** 18:25 |
| 46:3 52:11 | 23:15 57:5 | 58:4,5,6,7,15 | 31:19 48:3 |
| 55:9 56:10 | **media** 42:19 | 59:4,6,9,9,12 | 68:21,21 73:25 |
| 58:11 59:20,23 | **meet** 30:7 | 59:12,13 82:2 | **months** 14:14 |
| **marsh** 8:7 | 86:11 | 82:20 85:22 | 43:24 44:23 |
| **martin** 1:22 | **mellein** 8:12 | 86:9,12,19,24 | 74:3 |
| 8:11 | **member** 49:14 | **mind** 39:25 | **moore** 8:16 |
| **master** 16:4 | 63:5,15 66:1 | **mine** 49:17 | **morning** 12:3 |
| **masumoto** 4:9 | 85:8 | **mineola** 92:23 | 12:5,21 47:5 |
| **match** 45:24 | **mental** 43:11 | **miningco** | 53:2 60:12,13 |
| **matches** 28:14 | **mentioned** | 19:20 41:5,9 | 76:20 78:3 |
| **materialize** | 51:1,7,11,13 | 81:17 86:13,14 | 80:2 87:9 |
| 49:4 | 52:19 56:1 | **minutes** 77:5 | **morning's** |
| **materially** | 90:3 | **mira** 6:17 | 40:15 |
| 50:17 89:11 | **mentioning** | **miscalculation** | **mortgage** |
| **math** 81:11 | 63:2 | 47:8 48:12 | 63:10 |
| 83:7 | **mercuri** 8:13 | **mistake** 82:14 | **motion** 2:2 |
| **matter** 1:5 | **mercy** 49:20 | 83:5,10,12 | 12:21 19:2,4 |
| **matters** 63:1 | **mg** 1:3 | 86:16,23 87:2 | 40:15 41:19,23 |
| 88:1 | **michael** 5:3 9:8 | **mistaken** 2:3 | 63:19,22 80:19 |
| **matthew** 9:15 | **microphone** | 83:3 88:3 89:8 | 83:2,3,4,6,18 |
| **maude** 11:2 | 75:9,10 | **mistakenly** | 84:4 85:7,10 |
| **maunder** 8:8 | **middle** 86:18 | 72:3 | 85:12,17 88:2 |
| **mcanespy** 8:9 | **migrate** 23:20 | **misundersta...** | 88:3,9,11 |
| **mccarrick** 12:8 | 32:11 62:9 | 29:16 | 89:11,14 91:5 |

| | | | |
|---|---|---|---|
| motions 89:21 | 33:1 34:4,8,19 | normal 41:2 | ny 1:13 4:5 |
| move 24:2 76:2 | 36:22 49:19 | north 3:17 | 92:23 |
| 83:20 | 58:14 65:16 | notably 77:24 | o |
| moved 16:9,22 | 67:22 76:13 | notate 61:4 | |
| 16:24 32:8,23 | 89:19 | notated 61:5 | o 1:21 12:1 |
| 61:23,25 | needed 29:22 | note 78:13 79:3 | 31:9 71:20 |
| movement | negative 57:22 | notice 22:14 | 92:1 |
| 16:11 | negligent 44:10 | 25:3 | objection |
| moving 33:3 | negotiate 59:1 | noticed 61:18 | 84:11,12,16 |
| 62:15 | negotiated | notices 71:11 | 88:4 89:13 |
| multiple 61:12 | 36:24 | 71:13,14 | objections 14:9 |
| 67:14 | negotiating | notification | 87:4 |
| mute 75:14 | 14:15 | 69:19 | obligations |
| muted 75:10 | negotiations | notifications | 17:8 86:12 |
| n | 38:2 | 69:20,22 71:10 | obviously |
| | neither 61:5 | notified 61:7 | 12:13 31:5 |
| n 3:1 6:15 12:1 | net 43:13 59:21 | 88:18 | 48:2 65:16 |
| 55:17 71:20,20 | network 1:7 | notify 69:14 | 71:11 82:13 |
| 91:1 92:1 | neutral 58:12 | november 71:5 | 83:12 |
| naidu 9:6 | 59:21 | noyes 8:17 | occurred 26:11 |
| name 34:8,8 | never 19:4,5 | number 12:25 | offer 78:4,9,13 |
| 35:23 42:10 | 29:12 44:24 | 24:19 25:8 | 78:18,20,23,25 |
| 46:22,23 50:2 | 66:8 82:10 | 28:4 29:8,8,25 | 79:11,18,24 |
| 50:4 55:17 | 83:8 | 30:14 31:8,19 | offered 14:6 |
| 62:19 71:18,23 | new 1:2,13 4:5 | 34:4 35:12 | 64:23 73:1 |
| 73:8,18 | 27:1 28:5 | 36:4,10,15 | office 87:10,22 |
| names 42:20 | 32:10,11 37:16 | 38:24 42:22 | official 61:11 |
| narrow 86:18 | 49:7 59:3,4,11 | 44:12 61:3 | oh 18:8 33:22 |
| nate 7:10 | 61:15 78:24 | 64:25 66:6 | 39:5 41:5 |
| naturally | news 18:4 | 67:13 71:25 | 76:16 |
| 48:18 | 19:11 | 80:7 81:22 | okay 14:3 |
| nature 12:25 | nicole 7:24 | 84:7,19 | 23:12 31:23 |
| nearly 13:4 | night 20:2 | numbers 27:10 | 35:8 37:14 |
| 73:25 | nine 43:4 | 28:6 29:14 | 40:10 46:23 |
| necessary 21:9 | noah 9:10 | 35:11 36:6 | 60:7 61:17 |
| need 27:2 | non 35:21 43:2 | 58:19 86:5 | 62:25 63:24 |
| 28:14 29:4,4,5 | | | 64:5 65:19 |
| 30:4,4 32:13 | | | 66:18 74:23 |

90:5
old 92:21
oligarch 15:4
36:18,23
onboard 21:20
66:11
onboarded
66:12
onboarding
23:14 24:1
47:20
once 26:4
68:18 73:15
75:20
ones 31:12
60:17 61:13
ongoing 41:6
41:11,15 87:12
online 32:13
oona 5:17
open 29:5,18
31:2 79:4
opened 29:23
opening 44:1
45:14
operational
74:1
operator 43:6
opportunity
34:24 46:19
78:6,14
opt 20:22
65:10 72:3
84:13
opted 65:13
85:18

option 40:16
44:15 57:4
64:23 66:8
optional 2:4
options 57:4
58:14
order 2:2 42:2
45:18,20 60:2
70:8,9,11 71:4
organization
15:4
organizations
37:7
originally
50:12 69:10
oswald 8:18
ought 60:5
outdated 52:12
outlines 42:22
outside 32:20
38:19 48:6
61:11
outstanding
28:2,7 29:22
29:24 65:2
overage 24:11
59:8
overall 26:10
overhauled
32:15 33:3
35:12
overseeing
77:8,19
oversight
76:21 80:4
overwhelming
25:7 57:14

owe 57:5
owed 57:9,9
own 32:4 34:18
48:21 52:8
owned 49:14
owner 66:1
owns 46:24

**p**

p 3:1,1 6:20
8:19 12:1
page 15:2
78:24 91:4
paid 50:17
paolo 5:8
paper 69:18,22
71:9,11,13,13
pardon 33:20
parents 43:7
43:12 45:6,10
49:15
parpart 8:19
part 13:3 14:10
20:25 37:15
48:13 57:17
participated
42:11
particular
48:10 62:13,14
63:14 67:24
74:9
particularized
65:17 68:2
parties 19:6
37:18 41:8
78:14 87:23
partner 15:25
32:9 33:17,19

33:21 44:10
45:1 47:7 51:5
51:9 52:6,15
69:6
partners 14:19
14:20 15:7
27:16 47:7
party 48:1
58:22
party's 83:5
passed 73:25
past 23:17
pasted 61:14
patel 8:20
10:14
path 28:21
patience 53:3
patiently 42:14
64:15
patrice 84:17
patton 8:21
paul 4:25 8:9
9:18
pay 44:21 56:4
56:7 59:12
payment 48:15
78:20
paypal 14:17
14:18 15:16
21:6,11 23:9
23:16,17 24:8
24:14,24 26:18
27:16,21 28:8
30:9 51:20
53:19 60:16,19
60:20,22,24
61:5,8,22 62:7

62:10,15 64:12
68:15,18 69:6
70:1 74:1,4,10
**paypal's** 21:13
**peak** 15:10
**pederson** 8:22
**pending** 88:9
88:11 89:21
**people** 13:4,14
14:12,21 15:12
16:14 19:3
20:9,17,21,22
23:10 24:23
25:17,23,25,25
26:2,4,24
27:21,23 28:7
28:10 29:8,9
29:10,16,17
30:8,17 31:4
31:13,18 32:23
32:25 33:6,9
34:1,14,18,21
35:1,13 38:8
38:21 39:2,23
39:25 40:25
42:3 45:8 56:3
56:12 62:6,9
64:20,23,25
67:22 70:11
71:6,12 73:15
74:20 75:20
79:23 81:16,19
81:22 82:2,3,7
83:10,18,23
84:9,9 85:18
86:16,17,20
87:6 88:16,17

**percent** 15:13
15:14 16:12
21:6,8,9,19
22:17 23:14
26:10,13,17,17
26:18 29:25
30:3,3,5,24,25
31:9,10,11,19
32:19 36:10,11
44:4,5 49:9
51:12 55:5
56:22 57:8
60:22 65:10,13
65:14,15 72:17
77:23 78:7
81:2,7,10,14
82:6,17 83:16
88:19
**percentage** 30:2
**percentages** 20:8,8,18,21
**perfect** 16:8
**perfectly** 60:22
**period** 58:17
78:8
**periodic** 29:20
**permission** 77:5
**perry** 6:23
**person** 31:15
35:24 36:17,20
42:5 72:24
73:13 75:17,18
84:14,22,23
**person's** 26:5,6

**personal** 63:1
**personalized** 26:22
**personally** 43:4
**perspective** 70:16
**pesce** 8:23
**peter** 6:3
**petition** 17:22
54:18,25 56:21
77:21
**philips** 8:24
**phone** 13:1
30:14
**picking** 50:25
**pietro** 7:25
**piotr** 9:23
**place** 16:10
17:17 24:21
25:1 37:1 51:9
61:17
**plan** 14:11
16:14 17:1,8
18:1,22 19:14
19:14 24:4
25:20 32:17
38:13 40:1
49:2 54:15
55:3 57:4,25
58:20,23 59:19
62:9,14 72:5
78:1 86:12,15
89:2
**planned** 77:10
**platform** 67:13
70:22

**playing** 26:5
**please** 12:3
29:18 32:22
39:13 49:20
55:13 60:25
65:5 71:19,21
74:3
**pleased** 27:8
78:3
**plus** 59:13
**pm** 90:13
**point** 17:2 19:2
20:24 23:2
36:24 38:6
49:11 53:12,14
74:19 88:17
89:7
**pointed** 25:23
66:10
**points** 37:12
**portion** 64:4
**position** 88:7,8
88:20
**possible** 14:12
14:21 17:10
19:3 25:17
31:8,9,18
34:21 38:4
42:3 44:18,21
45:2,22,24
49:1,3
**post** 2:1 12:16
32:24,25 59:7
61:8 72:10,20
79:6
**posted** 79:3

| | | | |
|---|---|---|---|
| **potential** 14:15 33:11 79:18 89:8 | **presentation** 20:16 38:18 76:23 | 56:8,9,10 58:11 59:20 73:23 86:10 | 44:24 47:20,24 48:2 58:16,25 59:17 60:21 |
| **potentially** 88:25 | **presenter** 20:4 | **pricing** 56:17 | 62:6 67:20,21 |
| **power** 13:15 | **preserve** 84:12 | **primary** 50:21 | 67:24 68:20 |
| **practical** 48:13 | **presumed** 2:3 | **principal** 34:6 | 70:3 71:12,15 |
| **predicament** 60:18 61:14 | **pretenses** 43:14 | 40:17 | 74:14,14 76:8 77:1 79:5,6 |
| **predominantly** 21:7 | **pretty** 22:1 82:16 | **principles** 51:25 | 80:4 82:15 |
| **prefer** 83:14 83:15 | **prevailing** 44:17,20 45:23 | **prior** 23:19 87:17 | **processed** 74:8 |
| **preference** 72:22 76:8 77:7,20,25 78:1,5,6,8,10 78:16 80:3,8 85:25 | 46:3 52:11 58:11 59:20 | **pro** 3:3,5,7,9 3:11,13 30:15 62:21 63:19 82:25 | **professionals** 77:15 **progress** 27:9 27:11 30:1,12 **progresses** 77:17 79:9 |
| | **prevent** 37:5 67:3 | **problem** 22:21 23:8 28:22 | **projected** 81:6 **prominently** |
| | **prevented** 51:10 | 31:11 33:5,25 37:21,21 75:8 | 22:2 **promptly** |
| **preferential** 44:7 | **prevents** 37:2 **preview** 19:25 | 82:25 86:13 | 25:17 27:24 53:24 62:16 |
| **preferred** 58:13 | **previewed** 80:20 | **problems** 31:11,21,22 | 73:23 74:20 |
| **prematurely** 52:14 | **previous** 52:19 | **procedure** 2:4 **proceedings** | **proper** 33:13 51:9 67:18 |
| **preparation** 15:10 | **price** 16:18 17:12 18:3,17 | 90:12 92:4 **proceeds** 24:5 | **properly** 30:4 **property** 70:15 |
| **prepare** 19:9 | 24:25 40:8 | 30:11 52:10 | 70:25 |
| **prepared** 34:10 | 44:5,17 54:7 54:19,23,23,23 | **process** 12:19 12:24 13:3,10 | **proposing** 83:10,17 |
| **preparing** 14:14 15:11 | 59:23 **prices** 17:20,21 | 14:10 19:7 21:10 22:18 | **provide** 24:24 63:6,6 76:7 |
| **prepetition** 14:6 | 18:12,13,25 24:10 39:16 | 25:5,7,21 27:13 30:19,24 | 87:23 **provided** 23:15 |
| **present** 4:11 20:4 | 40:8 43:23 44:6,21,22 45:23 48:20 50:14,20 51:21 52:11,12 54:21 | 31:15 32:16 33:15,25 37:13 38:1,22 40:2,2 41:7,24 42:15 | 24:17 29:23 54:15 55:3 58:20 59:20 |

87:19
**provides** 16:14
24:4
**providing** 79:8
**purpose** 77:11
81:15
**purposes** 53:6
54:8
**pursuant** 54:18
**pursue** 72:22
80:5
**pursuing** 77:14
**push** 26:1 65:7
**put** 22:7 23:8
34:18 43:13
72:24 73:4
**putting** 86:21
87:20

**q**

**qiang** 8:25
**quarters** 31:1
**question** 39:5
53:7,24 54:1,6
54:22 55:10
56:22 62:4
70:20 72:14,25
72:25 73:4
86:7 87:25
**questions**
27:23 28:6
53:4 60:4
66:25 69:2,25
74:17 78:22
**queue** 25:9
**quick** 19:22
23:11 28:10
31:8

**quicker** 27:13
**quickly** 19:15
28:9 31:18
76:4 78:17
**quite** 27:11
30:21 33:8
41:3,4

**r**

**r** 1:21 3:1 7:17
12:1 62:19,19
92:1
**raise** 50:8,22
**raised** 28:11
40:11 42:1,2
89:14,22
**raising** 80:1
**rakesh** 10:14
**ralph** 5:3 75:4
75:23
**ramp** 35:8
**ramped** 82:24
**ran** 29:21 83:7
**randles** 10:23
**rate** 46:3
**rather** 26:4
35:23 60:3
67:8 78:10
83:16
**reach** 22:4
61:16
**reached** 74:17
87:17
**reaction** 82:14
**read** 15:2
18:23 20:20
22:22,22 35:18
36:21 37:24

38:21 42:22
46:9 82:16
**real** 27:22
**realized** 67:16
81:22 82:24
**really** 15:1
34:19 39:14
49:19 64:16
69:18 76:4
89:12 90:2
**reason** 13:10
17:19 23:16
27:19 38:14
40:18 43:16
47:18 48:13
49:4 51:3 61:5
64:21 65:1
67:14 68:5
83:14
**reasonable**
58:23
**reasonably**
45:9 49:1,3
**reasoning**
50:25
**reasons** 15:15
56:2
**reattempt** 27:4
**reattempting**
62:8
**rebecca** 6:14
64:8
**recall** 40:16
**receipt** 87:12
**receive** 13:7,9
13:13 17:15
20:9,22 21:1

24:1 25:13
27:4 32:18
33:6 34:24,25
35:5 36:8 39:8
43:20,22,24
44:13,16,20
45:22 46:5
48:9,10,11,15
50:11,24,24
51:17,20 52:9
52:10,22 53:9
56:13 60:16
61:18 64:22
65:3 66:8 67:2
67:5,6 68:7,8,9
68:16 72:16
74:4 82:21
83:24 86:15
**received** 18:5,5
18:7,9,9,20
22:19 25:11,14
25:15 27:1
28:20 44:3
46:2,3 53:19
54:1 61:2,11
64:11,12,20
65:4 71:25
73:25 74:2
78:21 81:10
83:24 84:4
87:5
**receives** 21:23
**receiving** 35:13
42:23 45:25
50:15 53:8
67:4 78:19

**recent** 44:12
48:20 50:16
51:10
**recently** 30:12
32:23
**recipients** 37:6
**reclaim** 80:5
**record** 12:15
16:7 17:2,4
36:25 72:5
92:4
**records** 54:3
82:11,12
**recoveries**
77:13 81:6
88:19
**recovery** 57:8
81:7 85:6
86:15
**reduce** 57:6,11
80:25 81:9
85:6
**reduced** 81:2
86:21
**reference** 37:1
**refile** 25:4
53:20
**refinance**
40:17,20 56:8
56:17 58:14
59:17
**refinancing**
56:2,3 58:25
**reflect** 82:12
**regarding**
33:12 77:6,7
78:22,25 79:4

**regardless**
28:24
**regards** 42:23
**regime** 37:1,8
37:22
**regimes** 37:7
**register** 21:10
**regular** 31:4
66:3 74:10
**regularly**
32:24
**regulations**
14:13 37:5
**regulatorily**
13:24 15:7
**regulators**
13:25 14:7,9
15:6 70:18,19
**regulatory**
14:22 38:16
51:2 70:15
**reilly** 10:24
**reinvested**
39:20 51:14
**reiterate** 49:12
**reiterated**
87:15
**rejected** 72:5
**related** 2:5
**relationship**
59:10,11
**relatively** 39:2
**relatives** 49:15
**release** 86:2,5
86:8
**released** 78:1,4

**relief** 2:6 76:24
83:1 84:7
**rely** 27:17
**remain** 41:6,15
**remaining** 21:8
30:3 31:1 76:2
**remedy** 45:16
56:16
**remember**
14:8 36:7
81:23
**remind** 31:5
**reminder** 61:5
**reorganization**
77:11
**repaid** 57:23
**repay** 58:1,6
**report** 27:9
**reported** 80:21
**represent** 41:9
41:10 43:1
47:13 70:22
72:20
**representing**
42:17 60:17
66:1
**represents**
76:5
**request** 45:17
50:12 69:21
87:18
**requested**
47:16 84:7
**requesting**
45:20
**requests** 26:21
46:5

**required** 45:19
63:5
**requirement**
47:20
**requirements**
14:22,24 15:1
**requires** 40:1
**rescind** 82:5
83:3,19 84:22
85:1
**rescinded**
83:25 84:1,17
**rescinding**
88:19
**rescue** 63:16
**resending** 65:2
**reserve** 17:8,9
17:15,16
**reserved** 16:13
17:19 38:19
**reserves** 85:10
85:17,21 86:1
86:2,5,10,11
86:25
**resident** 60:15
**resolve** 26:4
**resolved** 78:1
**resoundingly**
47:4
**resources** 39:9
40:3
**respect** 37:9
72:12 79:17
88:2,7,8,11
**respond** 23:2
25:17 27:13
46:10

**response** 61:15
62:5 66:17
73:3
**responses**
25:23,23 26:22
84:4
**responsibility**
44:8
**responsible**
76:24
**rest** 19:20
33:16 41:9
50:24
**restricts** 37:9
**result** 48:4
**retail** 30:20
**retained** 45:16
**retirement**
43:1,6,9 49:15
63:7 66:2
**retrieved** 74:2
**returned** 37:17
**returning**
70:25 78:11
**reverse** 72:2,15
**reversed** 74:7
**review** 90:1
**reviewed** 22:24
**revocation** 2:3
2:4 83:11
86:17
**revoke** 86:7
88:3
**richard** 8:18
8:24
**rick** 10:16

**rickie** 5:7
**riece** 3:11
42:17 49:25
50:4
**right** 12:11
20:5,8,18 23:1
23:3,6,10
25:16 26:15
28:18 32:21
34:1 35:16
36:21 42:8
46:9,14,15,23
50:1 53:1 54:9
55:14 57:20
60:1,11 62:20
64:7,17 65:12
71:21 73:12
74:23 75:5,13
75:23,25 79:15
80:2,12 83:5
85:21 87:25
88:10,13,25
89:17,24
**rights** 86:15
**riki** 7:12
**rise** 12:2
**risen** 56:21
**rishi** 10:6
**road** 92:21
**robert** 7:7
**roberto** 6:19
**robinson** 9:2,3
**rodrigues** 9:1
**rodriguez** 9:4
**rolled** 28:5
**room** 4:4

**ross** 7:14
**rough** 58:19
**round** 34:17
**route** 23:10
78:25
**routed** 68:3
**routing** 34:4
**rovira** 9:5
**row** 31:25
**rudge** 8:11
**rule** 31:9 45:12
49:5,10 52:21
**ruled** 57:17
58:2 70:14
**rules** 37:4
**rulings** 91:3
**run** 36:16 39:6
39:6,16
**running** 32:3
**runup** 18:24
24:25 40:7
**russia** 37:1,9
37:17
**russian** 15:4
36:18,23

**s**

**s** 3:1 4:9 6:9
7:23 12:1
**safe** 43:15
**safeguarding**
43:3
**sake** 16:20
**sakissian** 9:8
**sam** 76:20
**samuel** 4:14
6:20

**sanctioned**
37:18
**sanctions** 37:8
37:22
**sand** 17:1
**sandrana** 9:6
**santos** 10:11
**sarachek** 9:7
**savings** 43:8
**saying** 24:11
26:2 32:21
35:2 40:6
60:24 86:4,4
**says** 19:14,14
20:21 28:20
29:2,3 36:17
58:23 84:16
**scammed**
23:18
**scheduled**
50:11
**schedules**
85:23
**schneider** 9:9
**schottenstein**
9:10
**schroeder** 9:11
**scope** 36:7
**scott** 6:1
**scouts** 89:3,12
**screen** 20:20
26:9 46:20,21
46:22
**se** 3:3,5,7,9,11
3:13 18:10
30:15 62:21
63:19 82:25

| | | | |
|---|---|---|---|
| **search** 22:8 | **selected** 14:16 | **serviced** 61:7 | **shortly** 51:15 |
| **seated** 12:3 | 43:19 44:14 | 61:22 | **shows** 39:17 |
| **sec** 41:8,13 | 48:14 57:14 | **services** 15:19 | **shut** 61:16 69:9 |
| 70:22 | **selecting** 44:6 | 21:24 32:13 | 70:6 71:3 |
| **second** 22:3 | 85:5 | **servicing** 52:6 | **side** 63:4,13 |
| 34:18 53:7,14 | **selection** 73:23 | **set** 17:4,6 18:1 | **sign** 36:14 59:1 |
| 61:20 66:3 | **selezneva** 9:12 | 23:24 26:25 | 59:2 |
| 67:2 | **self** 43:5 | 29:9 32:12 | **signature** 32:3 |
| **secondly** 51:7 | **sell** 13:16 24:5 | 54:16,18,25 | 73:8 92:6 |
| 52:4 | 30:10 44:15 | 56:16 60:16 | **significant** |
| **secure** 47:6 | 63:16 | 77:22 85:20 | 33:24 35:25 |
| 52:5 | **send** 15:11 | **setoff** 57:5,20 | 50:15 82:24 |
| **securities** | 32:13,17,22 | 57:23 59:7 | 86:10 |
| 70:16,17 | 34:1 35:3,14 | 73:22,23 74:3 | **significantly** |
| **security** 32:5 | 38:15 39:15 | 74:8 | 17:23 44:22 |
| 33:12,15 36:15 | 59:6 67:22 | **settle** 56:7 78:6 | 47:21 78:12 |
| **see** 18:10 24:22 | 68:18 71:11,13 | 78:10,14,16 | **sill** 89:24 |
| 25:2 28:24 | 74:23 89:16 | **settled** 80:3 | **silverman** 9:15 |
| 30:2 35:11 | **sending** 37:5 | **settlement** | **similar** 50:13 |
| 39:24 42:1 | 74:9 | 20:23 78:2,4 | **similarly** 30:2 |
| 46:20,21,22 | **sends** 59:5 | 78:23,25 79:4 | 52:2 |
| 64:17 69:4 | **senes** 9:13 | 80:4 85:19 | **simon** 5:24 6:4 |
| 74:13 75:7 | **sense** 12:23 | **seven** 40:22 | 10:12 90:8 |
| 88:24 | 57:16 83:25 | 43:4 82:2 | **simple** 32:19 |
| **seeing** 61:11,23 | 84:3 85:3 | **several** 21:24 | 57:15 70:14 |
| **seeking** 2:2 | **sensitive** 26:7 | 36:22 37:1 | **simplicity's** |
| **seem** 39:8 | **sent** 27:8 32:20 | **severely** 43:10 | 16:20 |
| **seemed** 29:14 | 55:22 58:17,17 | **shara** 4:7 87:9 | **simply** 53:4 |
| **seems** 71:12 | 63:10 | **shares** 19:20 | **single** 49:14 |
| 82:13,19 | **separate** 60:3 | **sharon** 5:25 | 60:4 66:1 |
| **seen** 24:10 28:4 | 63:22 | **shawn** 8:19 | **sit** 33:23 |
| 39:5 | **serban** 7:15 | **sheltered** 43:13 | **situated** 52:2 |
| **segregated** | **serrur** 9:14 | **shirley** 5:6 | **situation** 27:5 |
| 72:10 | **service** 23:17 | **short** 42:19 | 56:5 62:14 |
| **select** 14:20 | 23:18 24:4 | 76:22 | 64:11 89:12 |
| 23:8 38:22 | 44:11 61:6 | **shorthand** | **six** 40:22 77:10 |
| | 67:15,19 70:5 | 23:16 | |

**sixty** 85:2
**size** 39:11
**slated** 13:4
**slide** 20:5 26:9
**slides** 20:1,4,13
**slot** 38:20
  39:13
**slots** 38:23
  39:7
**slow** 25:22
**slower** 31:20
**small** 20:20
  35:25 39:2
  40:21 74:2
  77:22 86:20,22
**smaller** 15:23
**smith** 73:14,16
  73:17,18 74:6
  74:23 75:1
**social** 36:15
  42:19
**sold** 13:17,18
  18:20,25 40:8
  44:25 45:3,24
  51:21 52:18
**sole** 43:6
**solei** 7:19
**solution** 33:1
  45:13
**solutions** 27:12
  92:20
**solve** 31:12
  33:5
**solved** 31:20
**solving** 26:5
  31:10

**somebody**
  17:14 21:4
  22:7 23:18,25
  24:7 31:2
  35:15 39:7,13
  80:24 85:4
**somebody's**
  70:25
**somewhat**
  50:13
**sonda** 5:12
**sonya** 2:25
  92:3,8
**soon** 49:1,3
  62:17 65:3
  73:3
**sophie** 7:9
**sorry** 40:11
  53:11,16 54:13
  55:16 90:8
**sort** 20:2,6
  22:21,24 25:18
  26:5 30:2,7,13
  31:9 38:17
  40:17 55:8
  85:11
**sorts** 17:12
  21:1 31:5
**sounds** 68:12
  74:11
**source** 63:6,13
**south** 15:23
**southern** 1:2
**spam** 65:1
  69:20
**spangler** 9:16

**speak** 34:6
  41:7,24 42:10
  42:15 46:19
  71:23 73:1,18
  75:8 82:18
**speaking** 41:3
  41:17 43:16
  54:11,13 75:8
  75:20
**specific** 37:20
**specifically**
  45:20 78:5
  88:2
**specify** 45:3
**spell** 71:18
**spent** 14:14
  31:10
**spike** 48:19
**spoke** 47:2,22
  47:23 75:18
  84:21
**spoken** 73:13
**staff** 12:13
**stage** 48:19
  61:10
**stanbury** 3:13
  52:25 53:1,2
  53:11,18,20
  54:4,6,10,14
  54:15 55:11
**stand** 40:1
**standing** 54:2
**start** 16:22
  20:5 30:24
  61:23
**started** 14:15

**starting** 61:19
  67:16
**state** 48:25
**stated** 46:4
  87:20
**statement**
  14:17 38:13
  44:1 45:14
  81:5
**statements**
  52:9
**states** 1:1,11
  4:1 15:17
  21:17 32:20
  50:6 68:13
  87:10,11
**status** 19:15,19
  27:2,6 74:13
  87:18
**stay** 77:1
**steadman** 9:17
**steal** 24:11
  32:25
**stealing** 24:12
  24:13
**steps** 19:9
  25:18 27:3
**stipulated** 48:8
**stock** 41:6
  69:16 86:13,14
**stood** 81:24
**stopped** 76:12
**stories** 32:15
**storvick** 9:18
**strategy** 19:12
  25:18 26:23
  28:5

**street** 15:3
**stretto** 61:13
  78:23
**structure**
  36:21
**stuck** 90:2
**stuff** 61:17
**subject** 40:14
  47:24 72:11
**submitted**
  42:21 47:10
  61:12
**subsequently**
  29:17
**success** 32:15
**successful** 23:5
  63:3
**successfully**
  20:17,19 21:3
  26:10 32:10
**sued** 85:24
**sufficient** 87:1
**suggest** 22:6
**suggests** 30:6
**suite** 92:22
**sullivan** 10:25
**summer** 14:16
**sums** 12:10
**supervision**
  77:12
**support** 14:8
  16:10 88:15,16
**supporting**
  85:6
**sure** 14:2 17:7
  22:22 25:12,13
  25:15 26:23

28:14 33:14
  35:13 36:22
  40:5 53:11
  67:7 85:15
  86:3 87:6
  89:19 90:5
**surprised** 25:7
  82:8
**sushi** 14:5
**suspect** 70:22
**suspended**
  66:21,24 67:2
  67:3,5,13,17
  67:18 68:2,5
**swatch** 37:10
**swim** 9:19
**switch** 67:22
**system** 16:4
  23:7 27:20
  28:25 33:3
  35:12 45:8
  83:1
**systems** 53:22

**t**

**t** 62:19 92:1,1
**ta** 11:1
**tab** 78:24
**table** 40:15
  54:10,15
**tacks** 31:21
**take** 22:15
  30:21 31:16
  46:11 59:4
  64:3 65:8
  67:11 68:19
  70:21 77:5
  81:13 83:16

**taken** 19:9
  25:18 37:15
  59:16
**talk** 28:9
**talked** 23:23
  28:8 66:5
  69:10 70:17
**talking** 57:3
**tat** 17:24
**tax** 40:18 43:13
  56:2 57:22
  58:9,9,11
**taxable** 57:23
  57:24
**taylor** 10:20
**technical** 67:15
  67:19
**technology**
  27:24
**tell** 34:25 35:4
**ten** 15:14 17:15
  17:16
**tennessee**
  60:16
**terms** 23:17
  67:15,19
**terrorist** 15:4
  37:6
**thank** 19:24
  20:14 21:22
  37:4 41:21
  42:9 46:7,9,14
  46:18 49:22,23
  50:3 52:22,24
  53:2 55:11,20
  56:24,25 60:8
  60:13 62:1

64:5,6,7 65:18
  65:19,20,22,25
  66:13,15,20
  67:9,10 68:23
  69:22,23,24
  71:22 73:11,12
  73:17 74:5,22
  74:24 75:1,1
  76:11,18,19
  79:9 80:12,14
  80:16 88:10,21
  88:22 89:15
  90:7,11
**thanks** 12:15
  74:6,25 80:18
**thibault** 7:1
**thing** 13:17
  16:2,17 23:23
  35:16 38:12
  81:25 83:6
  84:10 90:3
**things** 12:24,24
  17:13 19:2
  21:1 31:6
  51:17 85:12,15
**think** 12:10,22
  14:1,10 19:11
  19:13 23:13
  24:17 25:6,7
  30:18,20 31:24
  53:13,18 56:14
  58:10,23 60:5
  60:6 63:21
  69:17,25 70:19
  71:4,9 80:19
  80:20 82:5,16
  83:5 84:18

85:6,8,9,11
87:19 88:15
89:9,17,18,20
89:22
**third** 29:21,24
31:25 48:1
51:19 52:8
58:22 63:3,5
**thirdly** 67:7
**thomas** 4:17
5:22
**thomson** 9:20
**thought** 15:12
16:5,6,8 24:2
31:13 38:7
64:15
**thousand** 33:4
34:23,25
**thousands**
15:12 25:9,11
**thread** 26:20
74:12
**three** 21:19
22:15 23:14
28:3 31:1
50:21 57:4
58:5 84:4
**ticketing** 23:6
53:22
**tickets** 28:2
61:13
**time** 14:17
15:13 16:7
17:25 18:12
20:24 26:7
27:22 30:11,17
30:21,23 31:10

31:10,16 34:16
34:18 38:7
42:15,19 46:7
49:8,22 51:17
52:23 55:20
56:24 59:16
60:13 63:21
66:20 68:20
71:6 77:3 78:8
78:14,15 79:11
80:15,20 81:5
**timeline** 67:1
**times** 37:1
81:12
**timing** 33:2
**timothy** 9:24
10:24
**tipton** 11:2
**titled** 22:2
**today** 19:2
21:2 22:7 24:7
42:10,16 43:16
50:8 51:16
63:25,25 64:13
71:23,25 77:2
79:7 87:19
89:11,18,20
**today's** 24:9
**together** 42:20
**tokens** 14:5
**told** 43:22
**tom** 8:13
**tommy** 7:13
**toniah** 4:15
**tonight** 53:21
**tony** 10:1

**took** 19:12
30:23,23 32:9
32:11 47:25
48:18 81:21
83:2 88:8
**top** 38:19
39:10 48:6
78:24
**topic** 48:18
**topics** 19:22
28:10,11
**total** 26:17
36:2,6 39:4
86:24
**totally** 29:9
33:22,24 34:6
**touch** 72:24
73:4 74:11
**touched** 49:13
**track** 65:11
**transaction**
57:23,25
**transcribed**
2:25
**transcript** 60:2
90:1 92:4
**transfer** 33:4,8
34:2,7,10 49:6
**transferred**
32:10 72:10
**transfers** 33:12
**travis** 7:8
**treat** 83:21
**treated** 19:13
45:6,8,19 46:6
66:13

**treating** 52:3
**treatment**
40:18,20 43:18
44:8 45:25
49:20 50:9,22
51:4,23 52:8
52:20 57:13,14
57:15 58:9,11
72:8,16 73:22
89:9
**triage** 26:3
**tried** 26:2 29:3
29:6 61:16
**tries** 28:25
**tristan** 5:23
**trouble** 23:9
**true** 92:4
**trusted** 14:18
15:6
**trustee** 4:2
87:3,10,11
**trusts** 35:21
43:1
**try** 19:3 23:2
29:19,19 42:1
56:20 60:5
66:24 75:8
**trying** 25:5
44:10 63:9,13
65:7 87:6
**turestky** 9:21
**turn** 19:15
67:11 76:9,13
76:13
**turned** 17:5
29:15 76:18

turner 9:22
turns 15:3 24:1
twenty 26:13
twitter 79:5
two 19:19
  21:12 29:7
  30:1 42:16
  43:23 44:23
  53:4 59:13
  62:9 63:2 65:8
  77:22 90:1
type 21:13
  49:10
typed 22:20,20
types 54:16
typing 23:1
tyson 6:11
  71:17,23

**u**

u 55:17 62:19
u.s. 1:23 4:2
  13:8,18 18:7
  21:7 32:1,6
  33:1 37:7
  38:16 43:22
  44:19 45:7,22
  45:25 46:2
  48:11,25 50:11
  50:19,24 51:1
  53:5 60:15
  67:8 69:2,16
  87:3
uday 10:19
ujma 9:23
ultimate 36:23
  37:25

unable 44:13
  51:20 52:9,22
  61:22
uncontested
  12:22
under 17:8
  32:9 34:24
  43:14 57:3
  63:8 71:24
  72:7,15 77:12
  77:25 78:1
  85:25 86:12,15
understand
  18:8,19 29:10
  31:13 39:22,22
  45:15 46:13
  47:22 50:25
  52:17 56:20
  60:6 62:4
  72:25 73:4
  76:6 82:10
  88:20
understandable
  34:7
understanding
  41:10 72:2,6,9
understands
  37:15
understood
  29:11 53:12
unequal 51:3
unfair 51:25
  55:23 56:14
unfairly 52:1
unfortunately
  32:1,3 35:19
  81:21

united 1:1,11
  4:1 15:17
  21:16 32:20
  50:5 68:13
  87:10,11
universe 35:25
unmute 46:17
  75:24
unmuted 75:7
  75:12
unnecessary
  52:13
unresolved
  78:4
unsecured
  57:19 80:6
unsuspend
  67:20
unsuspended
  68:18
unsuspending
  68:17
unusual 19:4
update 22:2,3
  32:22 34:15
  35:3,9 61:3
  76:7 77:2,6
  79:7 82:1
  87:18
updated 77:1
updates 21:25
  26:24 31:23
  42:13 79:6,8
upside 56:22
url 79:1
usd 42:23

use 39:8,13
  40:3 45:16
  69:11,12 83:1
used 33:2 39:7
users 23:20
  61:21 62:14
  67:2,4,5,13,20
  67:23 68:2
  77:23
using 58:19
usually 63:18

**v**

v 7:25
valid 51:3
  83:22
validation
  33:15
value 30:25
  31:1,1 49:8,9
  53:5,5 54:7,7
  55:2 78:7,12
  80:5 83:15
valued 55:4
  83:9
values 85:22
van 10:15
vann 9:24
various 15:15
  42:19
vast 25:24
vazquez 9:25
  65:21,22,25
vejseli 10:1
vendor 36:16
venmo 21:7
  60:16,25 61:6
  61:8

| | | | |
|---|---|---|---|
| **verified** 60:20 | 38:3 39:11 | 50:23 61:16,18 | **wire** 33:4,7,12 |
| **verify** 61:17 | 41:1 42:4 | 64:25 89:22 | 34:2,7,10,24 |
| **veritext** 92:20 | 49:12 50:21 | **website** 21:13 | 35:1,5,7 49:6 |
| **versus** 69:10 | 54:4 56:5,8 | 78:23 | 51:15 58:17 |
| 70:7 | 63:11,17 67:7 | **week** 26:25 | **wires** 32:14 |
| **viable** 45:1 | 71:17 75:23 | 27:4,9,10 33:7 | 35:6 51:12 |
| 52:15 | 76:2 78:13 | 34:22 35:2,6 | **wish** 38:21 |
| **video** 76:12 | 80:13 84:13 | 40:23,24 58:17 | 41:23 75:6 |
| **view** 84:8 | 88:16 | 62:10 65:4,5,8 | 84:22 87:4 |
| **vince** 10:25 | **wanted** 13:21 | **weeks** 28:3 | 88:11,23 |
| **vincent** 10:13 | 13:22 14:20 | 29:7 32:11 | **wishes** 59:15 |
| **violate** 51:24 | 38:23 41:5 | 62:9,11,16 | 59:18 |
| **violated** 23:17 | 44:2 58:1,21 | 67:25 68:17 | **withdrawals** |
| **violation** 67:19 | 62:25 63:7 | 77:10 | 70:9 |
| 70:17 | 64:6 66:3,9,12 | **wei** 8:25 | **withdrawn** |
| **visit** 78:23 79:1 | 69:4 71:6 76:1 | **weird** 83:4 | 78:8,11 |
| **vitor** 5:5 | 76:7 81:16,17 | **welcome** 55:12 | **withdrew** |
| **vladimir** 6:13 | 81:18 83:1 | **went** 19:10 | 77:20 |
| **voices** 87:7 | 84:13 88:14 | 32:9 39:10 | **withheld** 52:19 |
| **vote** 72:6,15 | **wants** 63:16 | 74:7 82:15 | **wofford** 10:4 |
| **voted** 72:3 | 76:14 | **wesley** 3:5 | **wolf** 11:3 |
| **w** | **warren** 10:3 | 42:16 46:16,16 | **wonderful** |
| **w** 9:15 | **way** 13:24 | 46:24 | 19:21 22:9 |
| **wagener** 10:2 | 18:13 28:4 | **western** 15:21 | **wondering** |
| **wait** 44:23 | 38:16 66:13 | **whack** 26:5 | 61:21 |
| 60:25 64:14 | 68:20 | **whilst** 56:8 | **words** 24:22 |
| **waited** 42:14 | **ways** 25:20 | **whistles** 32:12 | 67:4 |
| **waiting** 31:2 | 38:24 | **white** 76:5,20 | **work** 29:4 35:1 |
| 43:24 | **we've** 14:7 | **whoa** 32:23,23 | 58:23,24 60:23 |
| **wake** 15:2 | 22:22,23,24 | 32:23 | 68:20 77:6,15 |
| **walks** 20:6 | 25:4,5,12,13 | **wielen** 10:15 | 77:17 79:9 |
| **wall** 15:2 | 25:15,16 26:21 | **william** 9:11 | 89:15 |
| **walled** 72:10 | 26:22 27:7,9 | **willing** 70:5 | **worked** 13:11 |
| **want** 15:2 | 27:12,19 28:1 | **wills** 43:1 | 14:1,3,7 25:6 |
| 19:15,19 21:6 | 30:11,25 31:12 | **win** 85:19 | 28:19 29:8 |
| 23:18 31:8 | 31:20 33:8 | **winded** 31:24 | 43:12 |
| 35:14 36:14 | 34:1,15 40:20 | | |

**working**   26:22
27:20 30:19
40:20 65:8
66:23 76:8,25
77:12
**works**   25:24
29:1 32:19
**world**   13:5
14:19 15:12
32:14 39:24
**worried**   32:5
**worse**   38:5
**worth**   18:6,6
43:13 50:18
55:7,8 86:9,19
**writing**   46:11
86:3
**written**   66:16
**wrong**   50:2
82:3 85:21
**wrote**   42:20
69:25
**wu**   4:12 66:19
66:20 68:10

**x**

**x**   1:4,10 79:5
91:1
**xi**   8:1
**xu**   10:5

**y**

**y**   54:1 76:18
**yadav**   10:6
**yara**   7:6
**yeah**   12:8
24:16 36:16
39:21 62:2

64:1,1,1 75:12
87:8
**year**   43:9 89:5
**years**   60:19
**yesterday**
20:17 35:8
55:23
**yoon**   10:7
**york**   1:2,13 4:5
37:17
**yvonne**   5:21

**z**

**zabib**   11:4
**zachary**   11:4
**zahiremami**
10:8
**zero**   38:7 83:9
**zoom**   12:12
75:12