Jason Voelker
145 Corte Madera Town Center, #146
Corte Madera, California, 94925

Telephone: 415–609–9967
Email: jason.voelker@ymail.com

THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>CELSIUS NETWORK LLC, et. al,<br>    Debtors.<br><br>JASON VOELKER, Derivative Shareholder<br>of iCAPITAL MANAGEMENT INC, and<br>Nominal Plaintiff,<br>    Plaintiff,<br>  v.<br>CELSIUS NETWORK LLC, CELSIUS<br>LENDING LLC, IONIC DIGITAL INC., and<br>FAHRENHEIT LLC, a Delaware Limited<br>Liability Company,<br><br>    Defendants. | Case No. _____<br>Case: 22-10964<br>Chapter 11<br><br>MOTION FOR LEAVE TO FILE<br>ADVERSARY PROCEEDING AND<br>REQUEST FOR PERMISSION TO<br>UTILIZE THE ELECTRONIC COURT<br>FILING SYSTEM (ECF);<br>DECLARATION OF JASON VOELKER<br>IN SUPPORT OF MOTION FOR LEAVE<br>TO FILE ADVERSARY PROCEEDING<br><br>Date:  May 7, 2024<br>Time:  2:00 p.m. EST<br>Place:  Room 523<br><br>Hon. Martin Glenn, Chief United States<br>Bankruptcy Judge |

**NOTICE IS HEREBY GIVEN THAT** Jason Voelker, the Derivative Shareholder of iCAPITAL MANAGEMENT INC, and, pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure, will respectfully move this Honorable Court to grant leave for the late filing of the above-referenced adversary proceeding that is being lodged contemporaneously herein and attached hereto as **Exhibit A** for the Court's ready reference. The time of the hearing

-1-

on May 7, 2024, will be at 2:00 p.m., and that the Notice of Omnibus Hearing Scheduled for MAY 8, 2024, which scheduled an omnibus hearing date and time for matters in the above-captioned chapter 11 cases and related adversary proceedings for MAY 8, 2024 (the "Omnibus Hearing"), is now also rescheduled to May 7, 2024.

PLEASE TAKE FURTHER NOTICE that the Omnibus Hearing will now begin at 2:00 p.m., prevailing Eastern Time, on Tuesday, May 7, 2024. The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

PLEASE TAKE FURTHER NOTICE that the Omnibus Hearing will be held in person before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. The Omnibus Hearing is not expected to involve the taking of testimony (a "Non-Testimonial Hearing"). With the permission of the Court, only parties in interest, their attorneys, and witnesses may attend hearings by Zoom. Any person or entity that is permitted to attend the Omnibus Hearing by Zoom must certify that they are appearing in a permitted capacity by registering their appearance in the Electronic Appearance portal located on the Court's website at: http://www.nysb.uscourts.gov/ecourt-appearances. Electronic appearances (eCourtAppearances) must be entered no later than 4:00 p.m., prevailing Eastern Time, the business day before the hearing (i.e., on Monday, May 6, 2024).

PLEASE TAKE FURTHER NOTICE that, with the permission of the Court, the public, including members of the media, may dial-in to Non-Testimonial Hearings remotely using the audio platform made available by the Court. Any person or entity that is permitted to dial-in to the Omnibus Hearing by using the audio platform must register their appearance in the Electronic Appearance portal located on the Court's website at: http://www.nysb.uscourts.gov/ecourt-

appearances. Appearances must be entered no later than 4:00 p.m., prevailing Eastern Time, the business day before the hearing (i.e., on Monday, May 6, 2024).

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Omnibus Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Omnibus Hearing remotely at 2:00 p.m., prevailing Eastern Time on May 7, 2024, must connect to the Omnibus Hearing beginning at 1:00 p.m., prevailing Eastern Time on May 7, 2024. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Omnibus Hearing. Parties that type in only their first name, a nickname, or initials will not be admitted into the Omnibus Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Omnibus Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Omnibus Hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius. You may also obtain copies of all pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
## FOR LEAVE TO FILE ADVERSARY COMPLAINT

Nominal plaintiff, Jason Voelker, a derivative shareholder of iCapital Management LLC ("iCapital"), respectfully moves this Court for leave to file a late adversary proceeding against Celsius Network LLC ("Celsius") and its affiliates (Attached as **Exhibit A**). Voelker seeks the return of specific cryptocurrency assets, valued at $1,101,780.50 as of April 17, 2024. These assets – 17.61163 Bitcoin (BTC), 0.08 Ethereum (ETH), 7,230.88 USD Coin (USDC), and 152.18 Zcash (ZEC) – rightfully belong to iCapital. Yet, Celsius has wrongfully seized and incorporated them into their bankruptcy estate, jeopardizing a critical portion of iCapital's investment portfolio and causing significant financial harm.

### A. Calculated Breach, Misrepresentations, and Reckless Behavior

iCapital, a Wyoming Corporation, entrusted Celsius with a significant cryptocurrency portfolio. Notably, the negotiations leading up to the Secured Loan Agreement (TILA-49877, "Agreement") (See **Exhibit B**) were conducted with a strong emphasis on iCapital's status as a Wyoming entity. This emphasis occurred repeatedly, both remotely and during in-person meetings with Celsius officials in Miami on June 3 and 4, 2021.

Throughout the negotiations, iCapital explicitly highlighted its reliance on Wyoming's stringent Cryptocurrency laws and the Special Purpose Depository Institution (SPDI) standards. Wyoming law (W.S. §13-12-101) provides superior protections for custodial assets, including strict segregation requirements and full reserve backing. Celsius' expressly represented that, although they were not a SPDI, they were nevertheless compliant with Wyoming law and through their acceptance of the Agreement implied compliance with these standards, further solidifying iCapital's trust.

However, Celsius shattered this trust through a pattern of deception and misrepresentation. They fabricated the existence of robust insurance coverage and painted a misleading picture of unassailable security during meetings. Additionally, Celsius' actions demonstrate a willful disregard for Wyoming's SPDI framework, a key factor in originally influencing iCapital's decision to bank with Celsius.

Evidence of Celsius' calculated breach and reckless endangerment of iCapital's assets includes, but is not limited to:

-4-

- Unauthorized withdrawals and significant discrepancies in iCapital's account, exceeding expected trading volume and market fluctuations.
- Suspicious timing of internal expenditures and investments by Celsius coinciding with missing assets, raising concerns about potential commingling and misuse of iCapital's holdings.
- Evidence of high-risk, speculative investments made by Celsius, contradicting their representations of conservative asset management and exposing iCapital's portfolio to undue risk.

Celsius' internal failures became so widespread and systemic that they cannibalized customers' deposits and destroyed their own company from within. Desperate to halt the decay, they sought bankruptcy protection as a last resort, hoping to prevent complete self-destruction. This blatant disregard for customer's deposits has caused demonstrable financial harm to iCapital, including:

- Lost Investment Opportunity: Due to Celsius' actions, iCapital was unable to fund a $750,000 early-stage investment in a promising technology startup. Expert analysis projected a potential 10x return on this investment, representing a significant loss for iCapital.
- Missed Real Estate Acquisition: Celsius' actions prevented iCapital from exercising a first right of refusal to acquire desirable commercial real property in San Francisco. This property has since been sold, resulting in a missed opportunity for iCapital to diversify its portfolio and secure valuable rental income.

**B. Derivative Standing, Procedural Constraints, and Inadvertent Delay**

As a derivative shareholder, my ability to act was initially constrained by corporate governance requirements. I diligently followed established procedures by formally requesting that iCapital's Board of Directors pursue immediate legal action. While respecting corporate autonomy, derivative lawsuits act as a safeguard when a corporation fails to protect its own interests. iCapital's formal declination, which occurred on March 28, 2024, was a prerequisite to securing my standing to sue (Federal Rule of Civil Procedure 23.1).

Unfortunately, this unavoidable sequence of events placed significant time constraints, culminating in an expired filing deadline. Inadvertent delay caused by the pursuit of necessary corporate remedies should not preclude my right to seek justice on iCapital's behalf.

### C. Equitable Tolling and Extraordinary Circumstances

The Court should grant leave to file the attached adversary complaint under the doctrine of equitable tolling. Equitable tolling applies when extraordinary circumstances prevent a party from filing within the statute of limitations, despite diligent efforts towards timely filing (see *Donely ex rel. Valdez v. United States*, 518 F.3d 173 (2d Cir. 2008)). Derivative shareholder actions present unique procedural hurdles that directly impact filing timelines. Strict adherence to corporate governance protocols in this case was a legal necessity and lay entirely outside of my control notwithstanding my diligence. The focus is on whether the applicable creditor has been prevented in some way from acting within the limitations period. *See Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010) ("The doctrine of equitable tolling allows courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'") (citation omitted).

My delay stems directly from these procedural requirements inherent in derivative actions. Before I could act, it was legally imperative that iCapital formally decline to pursue its own remedies. This process created an involuntary sequence of events that culminated in an expired adversary filing deadline. To deny relief based on this unavoidable delay would contradict the very purpose of equitable tolling and undermine the pursuit of intracorporate remedies.

### D. Equity, Click-Wrap Maneuvers, Jurisdiction, and the Broader Importance

Bankruptcy Code recognizes the court's equitable powers in extraordinary circumstances This case undoubtedly meets that threshold. Celsius' misrepresentations, fraudulent activity, and calculated disregard for iCapital's rights necessitate equitable remedies.

The parties expressly agreed that Wyoming law would govern the Agreement. Wyoming's robust cryptocurrency framework offered superior protections, including a legal mandate to segregate client assets and recognizes that cryptocurrency handed over creates a bailment. Celsius' actions demonstrate a willful disregard for these protections expressly chosen by the parties.

-6-

Wyoming law treats custodial cryptocurrency holdings as a bailment. As the bailor, iCapital retained rightful ownership of the assets, and they should never have been included in Celsius' bankruptcy estate. Celsius' actions in seizing iCapital's assets contravene the parties' agreement but also the very nature of a bailment under Wyoming law.

While this Court previously held that Celsius' modified Terms of Service (TOS) were generally applicable to all creditors in this matter, the Court did not have an opportunity to review the distinguishable circumstances involved between iCapital and Celsius. As will be shown, Celsius' reliance on a unilaterally modified TOS, introduced after the execution of the parties' Agreement, is a disingenuous attempt to circumvent their contractual and fiduciary obligations. Corporate governance, especially under both Wyoming and New Jersey law, dictates a more rigorous approach. Any modifications to existing contracts with a corporation who ratifies contracts through its board necessitate formal board approval, documented in a signed resolution, ensuring transparency and adherence to proper legal protocols. Celsius was fully aware of this requirement, having diligently engaged in the onboarding process with iCapital which required verification of its corporate structure. To now allow the TOS to supersede is a blatant disregard for legal precedent and erodes the integrity of formal agreements.

Jurisdictional analysis also supports iCapital's claims. Under either New Jersey (Celsius' home state) or New York law (the court's venue), a court would likely find the click-wrap TOS unenforceable in this context. Given the meticulous nature of the Secured Loan Agreement and the emphasis placed on Wyoming law as the governing jurisdiction, a mere click-wrap modification would not be sufficient to alter those terms. Furthermore, both jurisdictions recognize that escrowed assets are held in trust, and Celsius' breach of this trust through the seizure of assets falls outside the scope of permissible modifications via standard TOS updates.

This Court has the power to right this injustice. Granting leave to file reaffirms the Court's commitment to justice and deters future attempts to circumvent contractual safeguards through opportunistic maneuvers. This case is about more than recovering iCapital's assets. Upholding the sanctity of contracts is essential to a healthy and secure marketplace. Denying justice based on a procedural technicality, especially when caused by strict adherence to corporate governance procedures, would undermine the very foundations of equitable jurisprudence.

### E.    Lack of Prejudice

March 28, 2024, is the day this nominal plaintiff obtained standing to bring this action. Given the strict timelines imposed by bankruptcy proceedings and the time required to prepare the complaint after standing was obtained, the current application is not too far delayed resulting in any apparent prejudice at this time.

Granting leave to file puts justice firmly at the center of these proceedings. The procedural timing of this action does not hinder Celsius in any demonstrable way. The fundamental issues – the integrity of our Agreement, the rightful ownership of the assets – remain unchanged. Celsius has been consistently apprised of these claims since their inception. Our Creditor's Claim, filed on August 15, 2022, provided comprehensive notice, further reiterated through ongoing communications.

Allowing this Adversary Proceeding ensures a thorough examination of all evidence. Truth, not timelines, should dictate the outcome. Rather than prejudice Celsius, this action illuminates a path forward. Potential disruptions are minimal, as the core questions surrounding the assets are already intrinsic to the bankruptcy proceedings.

### F.    Nondischargeability, Rule 9024 Relief, and Protection Against Asset Shielding

In the event the Court hesitates to grant leave to file the attached adversary complaint, I respectfully request the following urgent alternative relief to mitigate the devastating consequences of Celsius' actions:

### 1.    Order of Nondischargeability and Broad Application to Affiliates

In the alternative to granting leave to file the attached complaint, the Court should enter an order preventing Celsius and its affiliated entities, including Ionic Digital and Fahrenheit, from discharging the debt owed to iCapital. Celsius' actions, as outlined in the complaint and briefly summarized herein, provide robust grounds for determining that the debt is nondischargeable under 11 U.S.C. § 523(a)(6). Celsius' pattern of calculated malfeasance (including intentional misrepresentations, unauthorized exploitation, conversion, and reckless breach of fiduciary duty) raises serious concerns about attempts to shield assets or evade debts through these newly established affiliates. To prevent such maneuvering, the order of nondischargeability must

explicitly encompass all entities created who can conceal iCapital's assets or hinder its claim.

## 2. Limited Relief from Discharge Order Under Rule 9024

In the alternative to granting leave to file the attached complaint, the Court could grant a limited order of relief from the Order of Discharge under Federal Rule of Bankruptcy Procedure 9024, allowing iCapital to pursue the immediate return of its wrongfully seized assets. These assets, valued at $1,101,780.50 as of April 17, 2024, are critical to iCapital's investment portfolio and financial well-being.

Celsius' actions represent a blatant case of unconscionable theft, inflicting a crippling blow on iCapital. It is imperative to prevent this injustice from being compounded through the bankruptcy process. Granting this limited relief is essential to allow iCapital to pursue the return of its assets and mitigate the severe financial consequences inflicted by Celsius' egregious misconduct.

## Conclusion

Granting leave to file an adversary complaint is the optimal course of action. However, even if the Court is hesitant to do so currently, preserving iCapital's claim and preventing debt discharge is an essential first step towards achieving justice. This approach safeguards iCapital's rights and sends a clear message that calculated attempts to exploit bankruptcy proceedings for personal gain will not be tolerated.

**WHEREFORE**, Jason Voelker respectfully requests that the Court: (1) Grant leave to file a late adversary proceeding against Celsius (as previously requested), and instruct the clerk to file the contemporaneously lodged Complaint; (2) In the alternative, enter an order preventing Celsius and its affiliated entities, including Ionic Digital Inc. and Fahrenheit LLC, from discharging the debt owed to iCapital LLC; and (3) Grant such other and further relief as the Court deems just and equitable.

Dated: April 17, 2024                          Respectfully Submitted,

_____

**DECLARATION OF JASON VOELKER IN SUPPORT OF MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING AND REQUEST FOR PERMISSION TO UTILIZE THE ELECTRONIC COURT FILING SYSTEM (ECF)**

I, Jason Voelker, do hereby declare as follows:

1. I am a derivative shareholder of iCapital LLC ("iCapital"), a Wyoming Corporation. I submit this declaration in support of the pending Motion for Leave to File a Late Adversary Proceeding against Celsius Network LLC ("Celsius").

2. iCapital entrusted Celsius with a significant cryptocurrency portfolio through a Secured Loan Agreement (TILA-49877, "Agreement"), expressly governed by the laws of Wyoming. This Agreement mandated specific safeguards, including the segregation of client assets and robust insurance coverage. The agreement was memorialized in our Board's Resolution which was provides to Celsius in conjunction with our tax EIN, a statement of our members, and photocopies of each board member's state issued identification.

3. Celsius touted their adherence to Wyoming's stringent SPDI standards – a key factor in iCapital's decision to entrust Celsius with its assets.

4. On June 3 and 4, 2021, our chief investment officer, Zameer Azam, attended meetings with Celsius executives in Miami, where the nature of the escrow account and insurance coverage were again discussed. Although I was not present at that meeting in person, there were several times I was called and placed on speaker so I could participate remotely.

5. As early as May 2022, when Celsius inexplicably shut down iCapital's account weeks before the national freeze, concerns were raised regarding continued access to our

cryptocurrency assets. This initiated a period of ongoing communications and emails between iCapital officials and Celsius representatives.

6.  Following iCapital's discovery of potential breaches of the Agreement, I formally requested on May 20, 2022, that iCapital's Board of Directors take immediate legal action against Celsius and sue Celsius. The Board was in accord with this request, but before we could take legal measure Celsius filed for voluntary bankruptcy. As I surveyed the legal landscape and spoke with various attorneys about proceeding, I soon found that we would likely need to file an adversary proceeding in this Court. Accordingly, I again requested that iCapital's Board of Directors take immediate legal action against Celsius and sue Celsius.

7.  Adhering to corporate governance protocols, I diligently awaited the Board's decision. Unfortunately, iCapital's formal declination, necessary for me to secure derivative standing, was only received on March 28, 2024.

8.  Upon securing standing, I moved expeditiously to prepare an adversary complaint but found my path to justice seemingly blocked by procedural time limits.

9.  This delay was caused solely by my adherence to mandatory corporate processes outside of my control. It does not reflect negligence on iCapital's part, as my understanding is that iCapital would have brought an action if the funds were available to retain counsel, but due to the theft that occurred by Celsius, no funds were available to act.

10. Celsius has long been aware of the nature of iCapital's claims. These claims were first raised in May 2022, further amplified when Celsius shut down iCapital's account, and subsequently formalized in the Creditor's Claim filed on August 15, 2022. These early communications, along with ongoing discussions, ensure Celsius is fully apprised of the issues at hand. Granting leave to file will not introduce new issues or cause undue prejudice to Celsius.

11. Further, I request this Honorable Court to direct the clerk to enable my access to the Electronic Court Filing (ECF) system to expedite my prompt participation. I affirm my willingness to comply with all electronic filing requirements and to waive my right to receive documents via first-class mail to utilize electronic delivery service. I am familiar with and will adhere to the rules and procedures of the Court, such as the Federal

Bankruptcy Rules, Local Rules, and the Administrative Procedures for Electronic Case Filing.

12. For the reasons stated above and in the attached Complaint, I respectfully request that this Honorable Court grant the requested relief and instruct the clerk to file the contemporaneously lodged Complaint, which is also attached as **Exhibit A** for the clerk's ready reference. I maintain that I will act swiftly and diligently and will act responsibly without delay.

13. I swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this application and declaration was executed on April 17, 2024, in San Francisco, California.

_____

Jason Voelker

Exhibit A

1  Jason Voelker
2  145 Corte Madera Town Center, #146
   Corte Madera, California, 94925
3
   Telephone: 415–609–9967
4  Email: jason.voelker@ymail.com

5

6

7

8                    THE UNITED STATES BANKRUPTCY COURT
9
                   FOR THE SOUTHERN DISTRICT OF NEW YORK
10

| | |
|---|---|
| In re: | Case No. _____ |
| CELSIUS NETWORK LLC, et. al, | Case: 22-10964 |
|     Debtors. | Chapter 11 |
| | |
| JASON VOELKER, Derivative Shareholder of iCAPITAL MANAGEMENT INC, a Wyoming Limited Liability Company, | VERIFIED DERIVATIVE SHAREHOLDER ADVERSARY COMPLAINT |
|     Plaintiff, | |
| v. | |
| | Hon. Martin Glenn, Chief United States Bankruptcy Judge |
| CELSIUS NETWORK LLC, CELSIUS LENDING LLC, IONIC DIGITAL INC., and FAHRENHEIT LLC, a Delaware Limited Liability Company, | |
|     Defendants. | |

**Introduction**

1.  Nominal Plaintiff, Jason Voelker, a minority shareholder with an ownership stake in iCapital Management Inc. ("iCapital"), a Wyoming company, comes before this Court to unravel a calculated scheme of deception orchestrated by the Defendants.

-1-

2. The Defendants are a network of entities connected to the now-bankrupt Celsius Network LLC. Celsius Network, a New Jersey company, has become synonymous with unethical business practices. Celsius Lending LLC, a subsidiary, stands accused of complicity. Ionic Digital Inc., a recent spinoff, appears to be a cynical attempt to evade accountability. Fahrenheit LLC, a Delaware limited liability company that recently acquired the bulk of Celsius, is also implicated. Finally, Alex Mashinsky, the former CEO of Celsius Network, faces criminal prosecution for his alleged role in the fraudulent conduct.

3. Prior to its descent into bankruptcy, Celsius lured iCapital into a meticulously crafted line of credit agreement, TILA-49877. This Agreement was established after multiple meetings between December 2020 and June 2021 and was expressly governed by Wyoming law. Celsius representatives engaged in a calculated scheme of fraudulent misrepresentation, painting a rosy picture of Celsius' financial health while masking its reckless operations.

4. Deceived by false assurances, iCapital entered the Agreement, establishing a line of credit with a 50% loan-to-value (LTV) ratio. This allowed iCapital to access funds while depositing valuable digital assets as collateral. These assets included, but were not limited to:

   - 17.61163 Bitcoin (BTC)
   - 0.08 Ethereum (ETH)
   - 7,230.88 USD Coin (USDC)
   - 152.18 Zcash (ZEC)

5. The current market value of these assets, as of April 17, 2024, is approximately $1,101,780.50.

6. Through error, these cryptocurrency assets were mistakenly transferred to the Celsius Bankruptcy Estate. iCapital promptly rectified its error and demanded the return of these rightfully owned assets. However, Celsius, in a blatant act of defiance, has chosen to wrongly retain these assets.

7. The cryptocurrency assets identified in paragraph 4 above constitute the exclusive property of iCapital. Under Wyoming law, which governs the Agreement, custodial cryptocurrency holdings are to be treated as a bailment, with the bailor (iCapital) retaining

-2-

ownership. Celsius' possession of iCapital's assets is a textbook case of conversion and unjust enrichment. Celsius has offered no compensation and seeks to enrich itself through dishonest means, inflicting financial hardship on iCapital.

### Derivative Standing

8. Under Federal Rule of Civil Procedure 23.1, and incorporated into bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7001, shareholders have the right to bring derivative actions on behalf of the corporation when management fails to pursue meritorious litigation. In this instance, iCapital's management's refusal to pursue legal action against Celsius constitutes the prerequisite for derivative standing. Therefore, I bring this derivative action to protect the interests of both iCapital and its shareholders, me included.

### Jurisdiction and Venue

9. This lawsuit is brought before the United States Bankruptcy Court for the Southern District of New York pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 1451. This Court has jurisdiction to hear all claims asserted in this Complaint because they arise under the Bankruptcy Code and relate to the bankruptcy estate of Celsius Network LLC. Additionally, venue is proper in this District due to the ongoing bankruptcy case for Celsius Network LLC, filed as case no. 22-10964. Therefore, venue for this derivative shareholder lawsuit is also proper in the Southern District of New York.

### Statement of the Facts

10. Prior to its collapse, Celsius engaged in a deceptive scheme to attract unsuspecting consumers and businesses like iCapital. Driven by a desire for innovation and growth, iCapital unfortunately became ensnared in this meticulously crafted web of deceit. Through a series of seemingly beneficial financial agreements, Celsius lured iCapital into a false sense of security. However, these agreements ultimately constituted a blatant disregard for the established financial agreement between the two companies.

11. In the deceptive twilight that preceded its collapse, Celsius cast a wide net, seeking to lure unsuspecting businesses into its grasp. iCapital, driven by a desire to innovate and grow, fell victim to this meticulously crafted charade. Through a series of calculated

-3-

misrepresentations, agents of Celsius Network LLC, Celsius Lending LLC, and potentially its nascent spinoff, Ionic Digital Inc., painted a deceptive picture of financial health and stability. This elaborate ruse masked the reckless gamble Celsius played with other people's money, a clear violation of the trust established within the agreement.

### Core Claim for Recovery of Erroneously Deposited Cryptocurrency

12. The cryptocurrency assets identified in paragraph 4 unequivocally belong to iCapital and have no rightful place within the Celsius Bankruptcy Estate. Celsius, Fahrenheit, and Ionic Digital's possession of these assets, held within a designated escrow account as stipulated by Wyoming law, constitutes both conversion and unjust enrichment. Celsius has offered no compensation and seeks to profit through dishonest means at iCapital's expense. These actions violate the very foundation of our original agreement – the principles of fair dealing and transparency.

13. Celsius' refusal to return the cryptocurrency assets is a brazen violation of 11 U.S.C. § 542(a), a cornerstone of bankruptcy law mandating the return of property erroneously held within the bankruptcy estate. Celsius' defiance disregards not only the law but the very principles of fairness and equity. Moreover, as will be established, their actions constitute a clear and calculated breach of the parties' original agreement, which was explicitly governed by Wyoming law.

### The Formation of the Parties' Agreement

14. In December 2020, iCapital, a Wyoming corporation, sought to responsibly expand by leveraging cryptocurrency. After careful consideration, iCapital partnered with Celsius, a company boasting unparalleled security and top-tier custodial services. Entranced by their promises, iCapital entrusted a significant amount of cryptocurrency into what Celsius officials described as a "secure," "neutral" "escrow account," established in explicit accordance with Wyoming's legal framework. The terms were crystal clear: iCapital would retain access to 50% of its cryptocurrency at any time and could withdraw all assets upon fulfilling the loan terms.

15. In hindsight, Celsius' promises of top-tier security, bank-grade services, and a $750,000,000.00 insurance policy covering our individual escrow account raise profound

-4-

concerns about their intent. The agreement itself misrepresented the true insurance coverage applicable, a fact discovered to iCapital's horror much later. This revelation exposed the shocking reality that there were zero insurance covering iCapital's cryptocurrency assets within the escrow account.

16. In early 2022, concerns over Celsius' financial health prompted iCapital to repay the remaining $17,000 loan balance and withdraw its cryptocurrency from the secure escrow account. What followed was shocking:

- **Unexplained Blockade:** Despite fulfilling all loan obligations and the requirements established under the agreement, Celsius inexplicably blocked all access to iCapital's assets, preventing withdrawal from the escrow account. This blatant disregard for our agreement shattered the trust upon which our partnership was built.

- **Unauthorized Activity and Vanished Assets:** iCapital discovered unauthorized withdrawals totaling $7,200.00 worth of cryptocurrency. Furthermore, a substantial discrepancy arose, with 17.61163 bitcoins (representing a significant value today) mysteriously vanishing from the escrow account.

17. Celsius' actions represent far more than a mere breach of contract. Their deceptive tactics, unauthorized withdrawals, and misappropriation of iCapital's holdings, which were to be protected within a designated escrow account, suggest a calculated pattern of misconduct and a blatant breach of fiduciary duty. The timing of these activities, coinciding with Celsius' purchase of crypto mining equipment and distribution of employee bonuses, is highly suspicious.

18. It is crucial to emphasize that the misconduct outlined herein predates Celsius' bankruptcy filing. Significantly, iCapital's accounts were frozen and assets misappropriated in May 2022 – well before the general account freeze of June 14, 2022, and the bankruptcy filing on July 13, 2022. iCapital would have pursued legal action sooner if not for the Court's automatic stay.

19. We stand before this Court not to worsen Celsius' burdens but to recover stolen assets and safeguard the future jeopardized by their actions. Celsius may attempt to shield themselves behind standard bankruptcy procedures, but that defense is inapplicable to

iCapital's situation. This lawsuit targets Celsius' pre-bankruptcy misconduct, violating both our agreement and the escrow protections mandated by our agreement and Celsius' promise to act in accord with Wyoming law. Specifically, we focus on the May 2022 freezing of our account, the obstruction of loan repayment, and the misappropriation of our electronic assets. These acts of conversion occurred well before Celsius was legally obligated to surrender assets to the bankruptcy estate.

20. iCapital respectfully requests the Court's intervention to uphold justice and the legal protections afforded to Wyoming companies.

21. As a shareholder of iCapital, I have a direct and substantial financial interest in the company's success. The misconduct by Celsius caused significant financial harm to iCapital, directly impacting the value of our holdings and investments. As shown throughout the underlying bankruptcy case, and detailed throughout this Adversary Complaint, Celsius' actions were not only a betrayal of public trust, but also a violation of its duties and its contractual obligations to customers, including iCapital.

22. After discovering iCapital's management declined to pursue legal action against Celsius, I took decisive steps to protect the company's interests. During the latter portion of 2023, I formally demanded that iCapital file a lawsuit to recover the misappropriated assets. Unfortunately, iCapital did not fulfill this obligation not because it didn't want to, but because it simply lacked the capital reserves needed to retain counsel and pursue these matters to the end.

23. Prior to the agreement's execution, Celsius representatives, including CEO Alex Mashinsky, engaged in a series of deceptive meetings including a face-to-face meeting in Miami with iCapital. During these meetings, Celsius portrayed itself as a financial institution akin to a traditional bank, boasting of unparalleled security measures and a robust $750 million insurance policy safeguarding client assets. Most importantly, Celsius emphatically assured iCapital that any cryptocurrency assets deposited with them would be held in a segregated, secure escrow account, reflecting a fiduciary relationship with iCapital. These assurances, later exposed as a meticulously crafted web of deceit, induced iCapital to enter into the Agreement.

24. Since at least 2019, Celsius has been promoted as a cryptocurrency-based alternative to banks—a safer place to store assets than a bank, and which supposedly always acted in its "depositors'" "best interests." Mr. Mashinsky made many of these representations independently. Defendants, and each of them, have used slogans like "Banks are not your friends" and "Unbank Yourself" to position Celsius favorably relative to banks. Defendants repeatedly asserted that banks could not be trusted with consumers' hard-earned money, while Celsius was "telling you the truth" and "being transparent all the time." (Mr. Mashinsky personally made these statements in a 2021 AMA, accompanied by Mr. Goldstein.) Defendants also claimed that Celsius was a better place for consumers to store their assets because "we have less risk, we have much less risk" than banks. Mr. Mashinsky even told consumers that "a run on the bank"—referring to a scenario in which mass consumer withdrawals deplete a bank's available capital and cause it to collapse— "cannot happen at Celsius."

25. Defendants relied on digital advertising and social media to market Celsius' products and services and persuade consumers to deposit their cryptocurrency onto the Celsius platform. One of Celsius' most prominent advertising channels was its collection of "Ask Mashinsky Anything" ("AMA") videos, in which Mr. Mashinsky (and other Celsius employees, including Mr. Leon and Mr. Goldstein) advertised Celsius' products, responded to viewer questions, discussed the crypto market, and touted Celsius' purported superiority over other financial institutions and crypto companies. As of June 2022, Mr. Mashinsky had recorded 179 AMA episodes, many of which were an hour or more long and each of which was seen by thousands of viewers. Including iCapital and its shareholders. Many of the AMAs were posted on Celsius' website and on its YouTube channel, where they remain accessible for public viewing today. Mr. Mashinsky, Mr. Goldstein, and Mr. Leon also used their own personal social media accounts to promote and market Celsius' products and services.

**Defendants have misrepresented Celsius' products and services.**

26. Defendants have made several misrepresentations about the benefits of using Celsius services and the safety of consumer funds. Specifically, Defendants have claimed that: (1) Celsius did not make unsecured loans; (2) Celsius maintained sufficient liquid crypto

assets to satisfy its consumer obligations; (3) consumers could withdraw the cryptocurrency they deposited at any time; (4) Celsius maintained a $750 million insurance policy for consumer deposits; (5) consumers could earn "up to 17% APY" and "up to 18.63% APY;" (6) Celsius assured consumers that it could borrow against its cryptocurrency by placing its cryptocurrency safely in an "escrow account;" as collateral; and (7) consumers would always have access to its cryptocurrency while held in escrow. All these claims were false or unsubstantiated at the time they were made.

**A. Defendants claimed that Celsius did not make unsecured loans.**

27. According to Defendants, one reason Celsius was safer than a traditional bank was because Celsius could supposedly earn yield "without taking any risk . . . or taking minimal risk." Defendants claimed Celsius earned this no-risk revenue by lending out deposited cryptocurrency via secured loans to highly vetted counterparties at favorable interest rates. According to Defendants, the loans to third parties were low- or no-risk because they were secured by cryptocurrency or other assets held by Celsius, which Celsius could liquidate if the borrower were to default. Defendants promised consumers that their deposits would be lent out only via "100% collateral" and denied engaging in "unsecured" lending to generate revenue.

28. In a 2020 AMA, Mr. Mashinsky, accompanied by Mr. Leon, claimed that Celsius did not "do non-collateralized loans . . . because that would be taking too much risk on your behalf." In fact, in July 2020, Celsius had approximately $160,000,000 in unsecured loans.

29. In a 2021 AMA, Mr. Mashinsky told viewers that "we only do asset back[ed] lending meaning you have to give us an asset like crypto or things that we accept." Yet as of August 2021, nearly half of Celsius' institutional lending portfolio (over $700 million) was unsecured.

30. In another 2021 AMA, Mr. Mashinsky falsely claimed that "we don't treat businesses or individuals differently" in issuing loans, meaning that both businesses and individuals were required to post collateral. Internally, Celsius employees complained that "we absolutely do" treat institutional counterparties differently from individuals, because Celsius made unsecured institutional loans. Yet only two weeks later, Mr. Mashinsky and

-8-

another AMA guest both claimed, again, that Celsius made all its institutional
counterparties post collateral.

31. In a 2021 AMA, a Celsius employee claimed that "the majority of our loans, almost 100%
of them are fully collateralized, with other assets." And in April 2022, Mr. Mashinsky told
a CNBC reporter that "we do not offer any non-collateralized loans." In fact, Celsius had
over $1.2 billion uncollateralized loans outstanding.

32. iCapital believed Celsius.

33. Contrary to its representations to iCapital, Celsius routinely made unsecured loans that
gave Celsius no ability to seize collateral should the counterparty default.

34. By June 2022, Celsius had lost over $60 million due to unsecured and under secured
lending.

35. Internally, Celsius employees acknowledged that the promises that Celsius made only
collateralized loans were false, and that Mr. Mashinsky was a "liar" for claiming that "we
do not unsecured lending." Yet Defendants continued to misrepresent how Celsius earned
revenue and concealed its actual practices from the public.

**B.  Defendants assured iCapital that Celsius maintained sufficient reserves to
meet all customer obligations.**

36. Defendants promised iCapital that Celsius would always have sufficient liquid crypto
reserves to meet customer obligations.

37. Defendants told iCapital and other consumers that the assets on its balance sheet
guaranteed the safety of the cryptocurrency deposits and availability of withdrawals. For
example, in 2021, Mr. Mashinsky claimed that because "Celsius has over two billion
dollars on its balance sheet . . . there is no safer place to give your coins to loan."
Goldstein, who also appeared in the video, nodded in agreement. Mr. Mashinsky also told
consumers that Celsius always had "enough liquidity on the sidelines . . . enough liquidity
on hand" to satisfy consumer obligations. In 2022, Mr. Leon helped craft a blog post
falsely stating that Celsius had more than enough reserves to meet its obligations.

38. iCapital believed Celsius. Dozens of other consumers have stated that Celsius'
representations about its crypto reserves were an important factor in their decision to
deposit crypto with Celsius. As one consumer put it, "[Mr. Mashinsky] reiterated time and

time again on Twitter and on these AMAs that the company was over collateralized and that should anything go wrong they have more than enough money to make all depositors whole." Another consumer spent "100+ hours listening to Mr. Mashinsky and the communication of the company . . . every week for over a year: The worst thing that can happen is that everyone gets their coins back,' 'we have 2 billion dollars on our balance sheet so there is zero risk in depositing your crypto on Celsius . . .."

39. In fact, Celsius did not maintain sufficient liquid cryptocurrency reserves to satisfy consumer obligations. Rather than maintaining "enough liquidity on hand" to ensure that all consumers could withdraw their crypto deposits if needed, Defendants maintained only a small capital reserve that would have allowed a fraction of its customers to withdraw their crypto within one week.

40. Defendants promised iCapital that they could withdraw "at any time."

41. Between at least 2019 and June 2022, Defendants claimed that customers, including iCapital, could withdraw their deposited cryptocurrency "at any time." Defendants claimed that customers would "always" have access to their cryptocurrency deposits and could withdraw them "whenever."

42. Celsius' website and blog promised consumers, including iCapital, that they could "Access your coins whenever, keep them safe forever" and "withdraw your crypto at any time":

43. Defendants' marketing emails also promised that consumers could withdraw at will, promising in one: "Deposit any amount of crypto and feel good knowing you can withdraw at any time without fees or penalties!"

44. Defendants amplified these promises of on-demand withdrawals in Mr. Mashinsky's weekly AMA videos. Over and over, Mr. Mashinsky promised that anyone who deposited cryptocurrency with Celsius could "always" retrieve those deposits. According to Mr. Mashinsky, the "big benefit" of Celsius was that "you can withdraw at any time." He promised viewers that, "With Celsius, you can withdraw as much as you want as often as you want. No limits." Mr. Mashinsky even encouraged consumers to test Celsius by "pull[ing] out any assets you want five minutes after you put them in because you change

-10-

your mind." In a 2021 tweet, he promised that "All coins are returned to their owners even in the case of bankruptcy."

45. These promises were echoed at the face-to-face meeting with iCapital in Miami.

46. In fact, contrary to its promises, iCapital could not "withdraw at any time" because Celsius did not maintain sufficient liquidity to allow everyone to withdraw on demand.

47. Much of Defendants' assets, like Bitcoin mining equipment and stock in Bitcoin mining companies, could not quickly be converted into cryptocurrency for withdrawals. Other assets, like Celsius' proprietary CEL token, were highly volatile and illiquid, without a guaranteed market for sale. In addition, many of Celsius' deployment strategies required digital assets to be posted as collateral, "staked" (i.e., posted on the Ethereum blockchain to validate transactions, meaning that it could not be accessed for lengthy periods), or otherwise locked up and inaccessible to Celsius for significant periods of time. This meant that, even where Celsius owned assets equivalent to the assets consumers sought to withdraw, those assets might not be available for withdrawals. To access these illiquid cryptocurrency assets, Celsius was required to "unwind" transactions with institutional counterparties—a process that could take several days.

48. Until 2021, Celsius did not use any system for monitoring movement of cryptocurrency assets to and from its platform. Nor did Celsius have any policy or procedure for ensuring that Celsius had assets available to satisfy consumer demands. In mid-2021, Celsius began using spreadsheets to track its assets and liabilities (most of which were consumer deposits). Celsius employees updated the spreadsheets manually. There was no standard process for updating the spreadsheets at regular intervals and no system for ensuring their accuracy. As a result, the spreadsheets were often inaccurate and frequently overstated Celsius' assets.

49. Internally, Celsius employees acknowledged that its own internal financial statements were inadequate and could not be trusted, yet Defendants continued to assert that Celsius could satisfy consumer withdrawals. (See Case 1:23-cv-06009 Document 1 Filed 07/13/23 Page 18 of 33.)

50. In Miami Maschinki and Celsius officials also asserted that it had $750 million of insurance on consumer deposits. When they learned that iCapital was based out of

-11-

Wyoming and were entitled to a set of protective regulatory rules, they informed iCapital that they followed Wyoming law, and they had been thinking of opening a crypto bank in Wyoming.

51. In or around June 2022, Defendants updated Celsius' website to advertise "$750M in insurance."

52. iCapital believed Celsius.

53. However, neither Celsius nor its former subsidiary GK8 purchased or maintained a $750 million insurance policy.

**A Deceptive Bait and Switch: The Factual Underpinnings of the Agreement**

54. Relying on Celsius' egregious misrepresentations, iCapital initially deposited cryptocurrency assets with Celsius in December of 2020. These assets were intended to serve as collateral for a credit line established for iCapital, with a maximum borrowing limit of 50% of the loan-to-value (LTV) ratio of the deposited assets. The very foundation of this credit line, however, was built on a bed of sand – Celsius' fraudulent assurances regarding the safety and security of the underlying assets.

55. As a custodian entrusted with iCapital's cryptocurrency assets, Celsius held a position of immense trust. However, Defendant's actions constituted a blatant breach of that trust, as evidenced by:

- Misrepresenting the Strength of Security Measures
- Failing to Segregate Assets as Promised
- Denying Access to Assets Upon Request
- Impeding Loan Repayment Efforts
- Misappropriating funds from the custodial account
- Misappropriating cryptocurrency from the escrow account
- Refusing to provide an accounting.
- Pledging fidelity and fiduciary duty while providing anything but.

**A Facade Crumbles: Celsius' Descent into Disarray**

56. iCapital continued depositing cryptocurrency with Celsius and by June of 2021, they entered into a. formal agreement to gain a line of credit with an opportunity to borrow up

to 50% of the LTV of the account balance. However, when iCapital attempted to repay two small loans in full in April and May of 2022, Celsius inexplicably denied the request. This unexpected roadblock forced iCapital to incur additional, unforeseen debt to fulfill their loan obligations. This incident marked the beginning of a series of disturbing events, ultimately culminating in Celsius filing for bankruptcy just two months later.

57. Compounding the previous breaches, starting on May 8, 2022, iCapital's attempts to access or retrieve their cryptocurrency assets were met with constant roadblocks from Celsius. This denial of access constituted a clear act of conversion of assets.

58. Further compounding the web of deceit, Celsius attempted to modify the terms of the Agreement after receiving iCapital's assets. The specific details and timing of this alleged modification remain highly suspect. However, any such attempt would be considered a nullity, given the unilateral modification that lacked consideration.

59. Celsius attempted to modify the Agreement after receiving iCapital's funds. These modifications lacked essential elements for enforceability. As established in Hampe v. Concordia Mutual Life Ins. Co. (1903), simply demanding adherence to existing obligations (e.g., loan repayment) without offering new consideration cannot constitute a valid contract modification. The alleged modifications offered no new value or concessions to iCapital, rendering them a one-sided attempt to alter the Agreement in Celsius' favor.

60. Additionally, the potential existence of these modifications, heavily weighted in favor of Celsius, raises concerns about unconscionability. Such terms are excessively unfair and therefore unenforceable.

61. Moreover, iCapital lacked Board Approval to enter a novation or modification of the original contract. iCapital adheres to a strict policy requiring board approval for any contract modifications that would give away assets, as is required pursuant to Wyoming Statutes Section 17-16-1202. Celsius' disregard for this essential procedure raises serious questions about their commitment to ethical business practices.

62. Additionally, no consideration was offered much less considered:

- The alleged modification offered no new value or concessions to iCapital.

- This lack of consideration renders the attempt a one-sided effort to alter the existing Agreement in Celsius' favor.

63. The new Terms of Service (TOS) violated public policy. Indeed, the unilateral contract modification raises serious concerns about Celsius' business practices, particularly if such modifications were intended to support an illegal Ponzi scheme or theft of iCapital's assets.

64. Moreover, such modification is contradicted by the underlying agreement and contradicted by the very nature of all consideration previously given to iCapital during the initial agreement. The promised security and transparency quickly vanished in favor of the new TOS. Celsius bombarded iCapital with misleading statements about its financial health and the robust security measures in place. These deceptive tactics were designed to mask a troubling reality – Celsius' reckless business practices and questionable financial stability caused it to steal from its client's accounts.

**The Disappearance: Crypto Vanishes Amidst Account Restrictions**

65. As early warning signs emerged, iCapital attempted to gain oversight of its investment. Alarmingly, Celsius inexplicably delayed and obstructed access to account information. Then, in a move that shattered trust, iCapital discovered the unthinkable: the Crypto Assets were gone. Celsius offered no explanation, only further restrictions on accessing even basic account information.

**Unearthing the Truth: Diverted Funds and Shady Transfers**

66. Further investigation revealed a disturbing pattern. During a period of financial hardship, Celsius inexplicably purchased cryptocurrency mining equipment. This suspicious purchase suggests a deliberate attempt to divert funds away from legitimate business purposes, potentially to shield assets from creditors like iCapital. Furthermore, plans to transfer the mining equipment to Ionic Digital Inc., a spinoff company, raise even more red flags.

67. Plaintiff seeks redress for the significant financial losses incurred as a direct result of Celsius' fraudulent misrepresentations and breach of duty. Plaintiff seeks available legal options to recoup the misappropriated assets and to reverse this fraudulent conveyance.

68. Throughout the negotiations, iCapital explicitly highlighted its reliance on Wyoming's stringent Special Purpose Depository Institution (SPDI) standards. Wyoming law (W.S. §13-12101) provides superior protections for custodial assets, including strict segregation requirements and full reserve backing. Celsius' acceptance of the Agreement implied compliance with these standards, further solidifying the conversion that occurred.

69. Celsius' actions demonstrate a willful disregard for Wyoming's SPDI framework, a key factor influencing iCapital's decision.

70. Plaintiff discovered a pattern of concerning behavior by Celsius. While experiencing financial hardship, they engaged in questionable purchases of cryptocurrency mining equipment. This suggests improper asset diversion. Their plans to transfer this equipment to Ionic Digital Inc., a spin-off company, raise suspicion of potential fraudulent conveyance. Plaintiff seeks redress for these actions and those outlined in the following Counts.

### Derivative Shareholder Claims

**Count 1:** Breach of Contract and Bad Faith

71. iCapital's Board Resolution of April 20, 2021, combined with the final executed agreement, establishes a clear bailment relationship governed by Wyoming law. This resolution emphasizes secure asset custody and adherence to Wyoming's Special Purpose Depository Institution (SPDI) Framework. Celsius, by accepting these assets and agreeing to Wyoming's regulations, assumed the duties and responsibilities of a bailee.

### Key Elements of Bailment and Breach

- **Transfer of Possession with Intent to Return:** iCapital delivered specific cryptocurrency assets to Celsius, expecting their safekeeping and return upon fulfilling agreed-upon conditions. The escrow account and 50% Loan-to-Value ratio reinforce iCapital's ownership rights.

- **Bailee's Duty of Care:** Wyoming law mandates responsible custodianship from bailees. This includes adherence to safekeeping protocols, asset segregation, and protection from loss or unauthorized use. Celsius demonstrably breached these duties through:

- o **Denial of Asset Access:** Despite iCapital's attempts to repay the loan, Celsius denied access to their assets within the escrow account, violating the bailment agreement and Wyoming law.
- o **Obstruction of Loan Repayment:** Celsius obstructed iCapital's good-faith efforts to repay the loan in full. This, coupled with asset misappropriation and account lockout, suggests a deliberate pattern of misconduct.

### Willful Misconduct, Bad Faith, and Conversion

72. Celsius's actions transcended a mere breach of contract and demonstrated willful misconduct and bad faith:

- **Deliberate Denial and Timing:** Denying asset access and obstructing loan repayment, particularly a month before freezing all accounts and two months before bankruptcy, suggests a calculated scheme and disregard for iCapital's rights.
- **Reckless Disregard for Fair Dealing:** Celsius' actions demonstrate a reckless indifference to the implied covenant of good faith and fair dealing inherent in the agreement.

73. These actions constitute willful conversion of iCapital's property.

74. iCapital seeks remedies available under Wyoming law:

- **Return of Property or its Traceable Equivalent:** Celsius and Ionic Digital must immediately return the specific cryptocurrency assets wrongfully withheld, or their traceable equivalent.
- **Restitution for Damages:** iCapital seeks full compensation for all actual and consequential damages suffered due to Celsius' misconduct.
- **Constructive Trust (If Applicable):** Given the potential commingling of funds, a constructive trust should be imposed to secure the return of iCapital's rightful property.
- **Punitive Damages (If Applicable):** The Court may consider imposing punitive damages due to Celsius' willful misconduct and bad faith, which caused severe harm to iCapital.

75. Even if Wyoming law is deemed inapplicable, the agreement between iCapital and Celsius remains binding under New York and New Jersey law. Both states uphold the principles of contract sanctity and good faith in commercial transactions. Celsius' actions constitute a material breach of this agreement, regardless of the specific jurisdiction.

### Count 2: Breach of Contract by Estoppel

76. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Celsius repeatedly assured iCapital of asset security, promising compliance with Wyoming law. Their subsequent actions directly contradict these promises, constituting a clear breach of contract by estoppel.

### Count 3: Breach of Fiduciary Duty

77. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Celsius assumed a fiduciary duty to act in iCapital's best interests. This duty was demonstrably breached through failings including, but not limited to, the concealment of the CEL Price Manipulation Scheme and the denial of asset access. Plaintiff believes their assets would have been much more secure had Celsius not falsely represented that they owned, operated, and held these assets in a custodial capacity and in such a way as to conform to the strict requirements of WY law.

### Count 4: Breach of Ostensible Fiduciary Duty

78. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Even absent a formal fiduciary relationship, Celsius' actions and representations created a reasonable expectation of trust. They fostered trust through repeated promises about an escrow account, industry-leading security, and insurance coverage. These promises were central to iCapital's investment decision.

### Count 5: Fraudulent Misrepresentation

79. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Celsius engaged in a pattern of fraudulent misrepresentations regarding asset security, the

stability of their CEL token, misleading statements about insurance coverage, and their operating practices. A reasonable investor would rely on these assurances. Plaintiff has determined that Celsius either knew these statements were false or made them with reckless disregard for their truthfulness. These misrepresentations directly influenced iCapital's decision to entrust Celsius with their assets.

### Count 6: Conversion

80. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Plaintiff deposited multiple units of cryptocurrency with Celsius. In [Date], without iCapital's knowledge or consent, Defendant transferred these assets from Plaintiff's account. Defendant's refusal to return the assets upon iCapital's demand constitutes conversion. Plaintiff seeks restitution for the damages incurred.

### Count 7: Constructive Trust

81. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Due to Celsius' wrongful actions and the potential commingling of iCapital's assets, a constructive trust should be imposed. This would ensure the return of iCapital's rightful property or its traceable equivalent.

### Count 8: Declaratory Relief

82. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

83. Plaintiff entrusted Celsius Network Limited and its affiliates (hereinafter collectively "Celsius") with the safekeeping and management of specific cryptocurrency assets through a formal agreement. This agreement established a clear bailment relationship under Wyoming law, with Celsius assuming the duties and responsibilities of a bailee.

84. Celsius demonstrably breached these duties, subsequently engaging in actions suggesting willful misconduct and the potential conversion of Plaintiff's property. This includes:

- **Denial of Asset Access:** Celsius inexplicably denied iCapital access to their cryptocurrency assets held within the established escrow account, despite iCapital's attempts to fulfill all loan obligations.
- **Obstruction of Loan Repayment:** Celsius actively obstructed Plaintiff's good-faith efforts to repay the loan in full.
- **Misappropriation:** Celsius' subsequent actions, including potential asset commingling and ultimate bankruptcy filing, raise grave concerns about the misappropriation of Plaintiff's entrusted cryptocurrency.

85. The original agreement mandated that any modifications required formal approval by a two-thirds vote of iCapital's Board of Directors. Plaintiff never granted such approval for any subsequent modifications or alterations.

86. Moreover, under Wisconsin law, iCapital could not unilaterally modify the agreement in a manner that could result in relinquishing ownership rights to their deposited cryptocurrency.

87. Therefore, Celsius cannot rely on any new or revised terms of service to justify their actions or supersede the original, Board-approved agreement.

88. Plaintiff respectfully requests the following declaratory relief from this Court:

- **Confirmation of Bailment:** A declaration affirming the existence of a bailment relationship between Plaintiff and Celsius, governed by Wyoming law.
- **Asset Ownership:** A clear and unequivocal declaration establishing Plaintiff's true ownership of the deposited cryptocurrency assets.
- **Breach of Duty:** A declaration acknowledging Celsius' breach of their fiduciary duties as a bailee under the established bailment relationship.
- **Inapplicability of New Terms:** A declaration stating that any new or revised terms of service unilaterally imposed by Celsius are inapplicable in this case.
- **Asset Recovery:** An order directing Celsius and its affiliates to immediately return Plaintiff's cryptocurrency assets, or their traceable equivalent.

-19-

- **Denial of Debt Discharge:** An order precluding Celsius and its affiliates from receiving any discharge of debts owed to Plaintiff in subsequent bankruptcy proceedings.

### Arguments Against Standard Bankruptcy Defenses

89. Plaintiff hereby incorporates by reference all the preceding paragraphs of the complaint. Celsius' actions predate the bankruptcy filing. The blocking of iCapital's account and the misappropriation of assets occurred in May 2022. Furthermore, the escrow account provision under Wyoming law, and Celsius' willful misconduct establish exceptions to standard bankruptcy discharge and the bailment entitles iCapital to the immediate return of its cryptocurrency.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

1. **Declare** that Celsius and Ionic Digital are in unlawful possession of iCapital's cryptocurrency assets.
2. **Order** the immediate return of all cryptocurrency assets wrongfully withheld, or their traceable equivalent.
3. **Award** iCapital all actual and consequential damages arising from Defendants' misconduct as outlined in previous counts.
4. **Impose** a constructive trust, ensuring the return of iCapital's rightful property.
5. **Award** Plaintiff reasonable attorneys' fees, costs, prejudgment and post-judgment interest, as allowed by law.
6. **Deny** Celsius, Ionic Digital, and Fahrenheit the ability to discharge any debts owed to iCapital.
7. **Grant** such other and further relief as the Court deems just and equitable.

-20-

**Verification**

    I, Jason Voelker being derivative shareholder of iCapital, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 17th day of April 2024 in San Francisco, CA.

                                         _____

                                       Jason Voelker

Exhibit B

Done                    **tila-49877**

**Loan Number: 49877**

**Lender**
Celsius Networks Lending LLC
221 River Street, 9th Floor
Hoboken, NJ 07030, USA

**Borrower**
iCapital Management Inc.
1309 Coffeen Avenue, Sheridan,
82801, Apt Number: Suite 1982
Wyoming, United States

**TRUTH IN LENDING DISCLOSURE STATEMENT**

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 8.95% | $2,284.38 | $17,000.00 | $19,284.33 |

Your payment schedule will be:

| Number of payments | Amount | When payments are due |
|---|---|---|
| 18 | $126.91 | First payment is due on _____07/04/2021_____ and each subsequent payment is due monthly thereafter on the same day of each month |
| 1 | $17,000.00 | Last payment is due on _____12/04/2022_____ |

**Security:** You are giving a security interest in the following collateral:

Pledged digital assets.

**Late Charge:** If a payment is late, you will be charged a late fee of eighteen percent (18%) per annum (calculated daily) (i.e., 0.049%) of the scheduled payment for each day the payment is past due, when permitted by applicable law.

**Prepayment:** If you pay off early, you

[x] may          [ ] will not          have to pay a penalty.
[x] may          [ ] will not          be entitled to a refund of part of the finance charge.

The annual percentage rate does not take into account your required deposits.

This obligation has a demand feature.

See your contract documents for any additional information about nonpayment, default, margin calls, the right to accelerate the maturity of the obligation, prepayment penalties, collateral, and loan termination.

---

**Loan Number: 49877**

**ITEMIZATION OF AMOUNT FINANCED**

Itemization of Amount Financed of $17,000.00

Amount given to you directly: $17,000.00

Amount paid on your account: $ N/A

Amount paid to others on your behalf: $ N/A

Prepaid finance charge: $ N/A




**BOARD RESOLUTION OF iCAPITAL MANAGEMENT LLC**

**WHEREAS**, iCapital Management LLC ("iCapital") is a Wyoming corporation engaged in the business of investment management; and

**WHEREAS**, iCapital seeks to enter into a secured loan agreement for the management of its cryptocurrency assets, including the establishment of an escrow account and a secured credit line; and

**WHEREAS**, Celsius Network has presented a proposed agreement that outlines terms for an escrow account and a credit line with a loan-to-value (LTV) ratio of 50%, and agreeance to adhere Wyoming's Special Purpose Cryptocurrency Laws and Standards; and

**WHEREAS**, the Board of Directors of iCapital has carefully gone over the terms and deems it to be in the best interests of iCapital; and

**WHEREAS**, Celsius has requested iCapital's corporate articles, employer identification number, and a copy of a formal resolution are required to upload iCapital into its customer base.

**NOW, THEREFORE, BE IT RESOLVED THAT**:

1. Zameer Azam, Chief Investment Officer of iCapital, is hereby authorized to travel to Miami, Florida, on June 3 and 4, 2021, for the purpose of meeting with Celsius officials to:

   - Confirm and enter the Agreement to ensure maximum protection of iCapital's assets held in escrow in strict accordance with Wyoming's SPDI framework, specifically including asset segregation requirements and full reserve backing.
   - Finalize the terms and conditions of the credit line, ensuring that the maximum loan-to-value (LTV) ratio does not exceed 50%.

2. Zameer Azam is granted authority to execute the contract on behalf of iCapital, provided that the final terms of the Agreement uphold the principles and protections outlined in this Resolution and Wyoming's digital SPDI laws, et al.; the established escrow account adheres to the strictest asset segregation and

protection standards; and the credit line terms clearly stipulate the 50% LTV line of credit.

3. Any modifications to the Agreement shall require approval by a vote of at least two-thirds (2/3) of the Board of Directors.

**DULY ADOPTED** and approved by the Board of Directors of iCapital LLC on this April 20, 2021

## BYLAWS OF iCapital Management Inc.

### ARTICLE I
### (Offices)

**Section 1.1.  Principal Office.**  The principal office of the corporation shall be located at such place as the board shall designate.  The corporation may have such other offices and places of business, either within or outside of Wyoming, as the board may designate or as the affairs of the corporation may require.

**Section 1.2.  Registered Office.**  The registered office required by the Wyoming Corporation Code may, but need not, be identical with the principal office if in Wyoming, and the address of the registered office may be changed from time to time by the board.  The board shall also appoint and maintain a registered agent, or agents if necessary.

### ARTICLE II
### (Shareholders)

**Section 2.1.    Annual Meeting.**  This is a close corporation; therefore, no annual meeting of shareholders is necessary.  If the board determines the necessity of any annual meeting, an annual meeting of shareholders shall be held during the month of August, at a time and date fixed by the board, or at such other time as may be determined by the board, for the purpose of electing directors and for the transaction of such other business as may lawfully and properly come before the meeting.  If the election of directors shall not be held at the annual meeting, or at any adjournment thereof, the board shall cause the election to be held at a special meeting as soon thereafter as convenient.

**Section 2.2.  Special Meetings.**  Special meetings may be called as set forth in the Wyoming Corporation Code.

**Section 2.3.  Place of Meeting.**  The board may designate any place, either in or outside of Wyoming, as the place for any annual meeting or any special meeting called by the board. If no designation is made, or if a special meeting shall be called otherwise than by the board, the place of the meeting shall be the registered office.

**Section 2.4.  Notice of Meeting; Waiver.**  Written notice or waiver thereof shall be made in accordance with the Wyoming Corporation Code.

**Section 2.5.  Conduct of Meeting.**  The president shall call meetings to order and act as chairman.  In the absence of the president, any shareholder entitled to vote at that meeting, or any proxy of such shareholder, may call the meeting to order and a chairman shall be elected by a majority of the shareholders entitled to vote at that meeting.  Any person appointed by the chairman shall act as secretary of such meeting.

**Section 2.6.  Closing of Transfer Books or Fixing of Record Date.**  The Wyoming Corporation Code shall govern the closing of transfer books or the fixing of a record date for purposes of shareholders' meetings or for the purpose of determining shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose.

**Section 2.7.  Quorum.**  Unless otherwise provided by the articles of incorporation, 100% of the outstanding shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting.  If a quorum is not represented at a meeting, a majority of the shares present may adjourn the meeting without further notice for a period not to exceed 60 days at any one adjournment.  At any adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.  The shareholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of shareholders so that less than a quorum remains.  If a quorum is present, the affirmative vote of a majority of the shares represented and entitled to vote on the subject matter shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by law or the articles of incorporation.

**Section 2.8.  Proxies.**  At all meetings, a shareholder may vote by proxy executed in writing by the shareholder or his duly authorized attorney-in-fact.  Such proxy shall be filed with the secretary of the meeting before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.

**Section 2.9.  Informal Action by Shareholders.**  Any action required or allowed to be taken at a meeting may be taken without a meeting; provided, however, that a consent in writing setting forth the action so taken shall be signed by those shareholders entitled to vote who are sufficient to result in the passage of the matter under Wyoming law.  This consent shall have the same force and effect as a vote of the shareholders, and may be stated as such in

any articles or document filed with the Secretary of State for the State of Wyoming under the Wyoming Corporation Code.

### ARTICLE III
### (Board of Directors)

**Section 3.1.  General Powers.**  The property, business and affairs of the corporation shall be managed by the board, except as otherwise provided in the Wyoming Corporation Code or the articles of incorporation.  The board shall have all powers to act as set forth in the laws of Wyoming.

**Section 3.2.  Performance of Duties.**  A director shall perform his duties in good faith, including his duties as a member of any committee upon which he may serve, and in a manner reasonably believed to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  Each directors' actions shall be subject to the business judgment rule and each director shall be free from liability to the full extent provided by the Wyoming Corporation Code.

**Section 3.3.    Number, Tenure and Qualifications.**    The number of directors shall initially be set at the organizational meeting therefore, or unanimous consent in lieu thereof.  The number of directors shall not exceed seven (7), nor be less than three (3), unless there are fewer then three (3) shareholders in number, in which event the number of directors may equal the number of shareholders.  The directors shall be elected at each annual meeting of shareholders.  Each director shall hold office until the next annual meeting of shareholders and thereafter until his successor shall have been elected and qualified.  Directors shall be 18 years of age or older, but need not be residents of Wyoming or shareholders.  Directors shall be removable in the manner provided by the Wyoming Corporation Code.

**Section 3.4.  Resignation.**  Any director may resign at any time by giving notice (either oral or written)  of his resignation to the board, the president or the secretary.  The resignation shall take effect at the date of receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 3.5.  Removal.**  Except as otherwise provided in the articles of incorporation or in these bylaws, any director may be removed, either with or without cause, at any time by the affirmative vote of the holders of a majority of the issued and outstanding shares of stock entitled to vote for the election of directors at a special meeting of the shareholders called and held for such purpose.

**Section 3.6.  Vacancies.**  Any vacancy occurring in the board may be filled by the affirmative vote of a majority of the remaining directors though less than a quorum.

**Section 3.7.  Regular Meetings.**  A regular meeting of the board shall be held without other notice than this bylaw immediately after and at the same place as the annual meeting of shareholders.  The board may provide by resolution the time and place, either within or outside of Wyoming, for the holding of additional regular meetings without other notice than such resolution.

**Section 3.8.  Notice.**  Notice of any special meeting shall be given at least 3  days previous thereto by written notice delivered personally or mailed to each director at his business address.  Such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid.

**Section 3.9.  Quorum.**  A majority of the number of directors in office  at the time of the meeting shall constitute a quorum for the transaction of business, but if less than such a majority is present, a majority of the directors present may adjourn the meeting from time to time without further notice.

**Section 3.10.  Manner of Acting.**  If a quorum is present, the affirmative vote of a majority present and entitled to vote on that particular matter shall be the act of the board, unless the vote of a greater number is required by law or the articles of incorporation.

**Section 3.11.  Compensation.**  By resolution of the board, any director may be reimbursed for all reasonable expenses incurred in attending any meeting and may be paid a fixed sum for attendance at such meeting, or receive a stated salary as director.  No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

**Section 3.12.  Committees.**  The board, by resolution adopted by a majority elected and qualified at the time of the resolution, may designate two or more directors to constitute an executive or any other committee, which shall have and may exercise all of the authority of the board or such lesser authority as may be set forth in said resolution.  No

*Wyoming Close Corporation Bylaws*
*Page 2*

such delegation of authority shall operate to relieve the board or any director from any responsibility imposed by law. The board shall at any time have the power to fill vacancies in, to change the size or constituent membership of and to discharge any committee in whole or in part. Each committee shall keep a written record of its acts and proceedings and shall submit this record to the board at each regular meeting thereof and at such other times as may be requested by the board. Failure to submit this record or of the board to approve any action set forth therein shall not invalidate any action taken by the committee to the extent the action was carried out prior to the time it was or should have been submitted to the board.

**Section 3.13.   Informal Action by Directors.**   Any action required or permitted to be taken at a meeting of directors, or at any meeting of any committee of directors, may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all directors entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote of the directors, and may be stated as such in any articles or documents filed with the Secretary of State for the State of Wyoming under the Wyoming Corporation Code.

**Section 3.14.   Meetings by Telephone.**   Members of the board or any committee may participate in a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other at the same time. Such participation shall constitute presence in person.

## ARTICLE IV
### (Officers and Agents)

**Section 4.1.   General.**   The officers shall initially be a president, a secretary and a treasurer, each of whom shall be elected by the board. The board may also appoint one or more vice presidents and such other officers, assistant treasurers, and assistant secretaries as may be necessary, each of whom shall be chosen in such manner and hold office for such terms and have such authority and duties as from time to time be determined by the board, or which may otherwise be commensurate with their position. The salaries of all the officers shall be fixed by the board. One person may hold any two offices, except that no person may simultaneously hold the offices of president and secretary. The officers shall be 18 years of age or older. In all cases where the duties of any officer, agent or employee are not prescribed by the bylaws or by the board, such officer, agent or employee shall follow the orders and instructions of (a) the president, or if a chairman of the board has been elected, then (b) the chairman.

**Section 4.2.   Election and Term in Office.**   The officers shall be elected by the board annually at the first meeting held after each annual meeting of the shareholders. If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as may be convenient. Each officer shall hold office until the first of the following occurs: until his successor shall have been duly elected and shall have qualified; until his death; until he shall resign; or until he shall have been removed in the manner hereinafter provided.

**Section 4.3.   Removal.**   Any officer, agent or employee may be removed by the board or by an executive committee, if any, whenever in its judgement the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contracts rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

**Section 4.4.   Vacancies.**   A vacancy in any office, however occurring, may be filled by the board for the unexpired portion of the term.

**Section 4.5.   Bonds.**   If the board by resolution shall so require, any officer or agent of the corporation shall give bond to the corporation in such amount and with such surety as the board, may deem sufficient, conditioned upon the faithful performance of that officer's or agent's duties and offices.

## ARTICLE V
### (Stock)

**Section 5.1.   Certificates.**   The shares of stock shall be represented by consecutively numbered certificates signed in the name of the corporation by its president or a vice president and by the secretary or an assistant secretary, and shall be sealed with the seal of the corporation, if any. Certificates of stock shall be in such form consistent with law as shall be prescribed by the board. No certificate shall be issued until the shares represented thereby are fully paid. Once issued, shares shall be nonassessable.

**Section 5.2.   Record.**   A record shall be kept of the name of each person or other entity holding the stock represented by each certificate for shares of the corporation issued, the number of shares represented by each such certificate, the date of issuance and, in the case of cancellation, the date of cancellation. The person or other entity

in whose name shares of stock stand on the books of the corporation shall be deemed the owner thereof, and thus the holder of record of such shares of stock for all purposes.

### ARTICLE VI
### (Indemnification of Officers and Directors)

The corporation has the power to indemnify current or former directors, officers, employees, and agents to the fullest extent provided in its Articles of Incorporation and by the Wyoming Corporation Code as amended and in effect on the date of the adoption of this article.

### ARTICLE VII
### (Instruments; Loans, Checks, Deposits; Proxies)

**Section 7.1.  Execution of Instruments.**  The president shall have the power to execute and deliver on behalf of and in the name of the corporation any instrument requiring the signature of an officer of the corporation, except as otherwise provided in the articles of incorporation or these bylaws or where the execution and delivery thereof shall be expressly delegated by the board to some other officer or agent of the corporation.  Unless authorized to do so by these bylaws or by the board, no officer, agent or employee shall have any power or authority to bind the corporation in any way, to pledge its credit or to render it liable pecuniarily for any purpose or in any amount.

**Section 7.2.  Loans.**  The corporation may lend money to, guarantee the obligations of and otherwise assist directors, officers and employees of the corporation, or directors of another corporation of which the corporation owns a majority of the voting stock, only upon compliance with the requirements of the Wyoming Corporation Code.  No loans shall be contracted for on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of the board.  Such authority may be general or confined to specific instances.

### ARTICLE VIII
### (Miscellaneous)

**Section 8.1.  Amendments.**  The board shall have the power to alter, amend or repeal the bylaws or adopt new bylaws of the corporation at any regular meeting of the board or at any special meeting called for that purpose, subject to repeal or change by action of the shareholders.

**Section 8.2.  Emergency Bylaws.**  Subject to repeal or change by action of the shareholders, the board may adopt emergency bylaws in accordance with and pursuant to the provisions of the Wyoming Corporation Code.

The above and foregoing constitute the true, correct and complete bylaws of iCapital Management Inc., a Wyoming corporation, as adopted by its directors on  August 26, 2020.

V. Venkatesh
Secretary

*Wyoming Close Corporation Bylaws*
*Page* 4

Entity: iCapital Management Inc.

Thank you for your interest in an account with Celsius. We have additional questions p
approving your corporate profile.
Please provide elaboration or documentation for the following:

- Proof of Address of iCapital Management Inc. (either a proof of rent deposit to Landlord OR a utility bill/bank statement dated within the last 90 days)

- Proof of Address (utility bill or bank statement) - dated within the last 90 days

- Driver's License back side for Jason Paul, Zameer Azam and Zamil Azam

- W9 Form (find attached)

- Proof of Tax Verification (EIN) of iCapital Management Inc.

- Proof of Source of funds -  Bank Statement of iCapital Management Inc./scree any crypto holdings held in other platforms and exchanges that you wish to tra Celsius AND/OR recent Financial Statement of iCapital Management Inc.

- Intended use for Celsius Account

Please provide documents to the secured link:

link: https://celsius.sendsafely.com/dropzone/app/464710
\* The files are automatically encrypted before upload and are deleted after 30 days.
Kind Regards,



**Compliance Operations** | Celsius
email: complianceteam@celsius.network
Celsius Network - www.celsius.network

END