**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                                    FOR PUBLICATION

          CELSIUS NETWORK LLC, *et al.*,                                  Chapter 11

                                                                          Case No. 22-10964 (MG)
                              Post-Effective Date Debtors.
------------------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER DENYING JASON VOELKER'S MOTION FOR LEAVE TO FILE AN ADVERSARY PROCEEDING AND REQUEST FOR PERMISSION TO UTILIZE THE ELECTRONIC COURT FILING SYSTEM

*A P P E A R A N C E S :*

JASON VOELKER
*Pro Se Shareholder of iCapital Management LLC*

WHITE & CASE LLP
*Attorneys for Mohsin Y. Meghji as Litigation Administrator and Ionic Digital Inc.*
1221 Avenue of the Americas
New York, NY 10020
By:    David M. Turetsky, Esq.
       Samuel P. Hersey, Esq.
       Joshua D. Weedman, Esq.

111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
By:    Gregory F. Pesce, Esq.

Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
By:    Keith H. Wofford, Esq.

555 South Flower Street
Suite 2700
Los Angeles, California 90071
By:    Aaron E. Colodny, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

The order confirming Celsius's chapter 11 plan was entered on November 9, 2023 (the

"Confirmation Order," ECF Doc. # 3972).[1]  The Confirmation Order became final and non-

appealable on November 23, 2023.  The Plan became effective on January 31, 2024.  The Plan

and the Confirmation Order include customary provisions binding all creditors to the terms of the

Plan, and releasing, discharging, and enjoining creditors from pursuing any discharged claims

against Celsius Network LLC ("Celsius") and its affiliates (collectively, prior to the Effective

Date, the "Debtors" and, after the Effective Date, the "Post-Effective Date Debtors"), whether or

not the creditor voted for or against the Plan as long as the creditor had received the required

notices.  Now, months after the Plan became final and non-appealable, and distributions are

underway, a former creditor (actually, an individual purporting to act derivatively for a former

creditor) wants to commence litigation against the Debtors on claims that were released,

discharged, and enjoined.  Permitting such a maneuver would upset the underpinnings of a

successful chapter 11 reorganization and is not permitted.

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 4825) of

Jason Voelker ("Voelker"), a *pro se* "derivative shareholder" of creditor iCapital Management

LLC ("iCapital"), seeking entry of an order for (i) leave to file a late adversary proceeding

against the Post-Effective Date Debtors for the return of certain cryptocurrency assets allegedly

belonging to iCapital and (ii) permission to utilize the Court's Electronic Court Filing ("ECF")

system.  (*See Declaration of Jason Voelker in Support of Motion* (the "Voelker Declaration"),

Motion at 10–12.)  In the event the Court is disinclined to grant Voelker his requested leave,

---

[1]     Defined terms used but not otherwise defined herein shall have the meaning ascribed to them in the
*Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for
MiningCo Transaction* (the "Plan," ECF Doc. # 4289).

Voelker seeks entry of an order (i) preventing Celsius and its affiliates, including Ionic Digital, Inc. ("Ionic") and Fahrenheit LLC ("Fahrenheit"), from discharging the debt owed to iCapital and (ii) granting iCapital limited relief from discharge to pursue the immediate return of its "wrongfully seized assets." (*Id.* at 8–9.)

Annexed to the Motion is (i) the Voelker Declaration; (ii) a copy of Voelker's proposed adversary complaint (the "Proposed Adversary Complaint") as Exhibit A; and (iii) a copy of the Secured Loan Agreement (TILA-49877) between Celsius and iCapital (the "Agreement") as Exhibit B.

On April 29, 2024, Voelker filed a *Notice of Errata* (the "Notice of Errata," ECF Doc. # 4841) in connection with the Motion, addressing certain omissions and providing certain corrections to the Proposed Adversary Complaint. Annexed to the Notice of Errata as Exhibit A is a copy of the omitted response letter from iCapital to Voelker, dated March 28, 2024 (the "March 2024 iCapital Letter").

On April 30, 2024, Mohsin Y. Meghji (the "Litigation Administrator") and Ionic (together with the Litigation Administrator, the "Objectors") filed a joint objection (the "Joint Objection," ECF Doc. # 4843) to the Motion. Annexed to the Joint Objection is the declaration of Brian Karpuk—managing director at Stretto Inc. ("Stretto"), the Debtor's claims and noticing agent—in support of the Joint Objection (the "Karpuk Declaration," ECF Doc. # 4843-1). In response, on May 6, 2024, Voelker filed the *Nominal Plaintiff's Final Brief in Reply to Celsius' Objection to the Motion for Leave to File Verified Adversary Complaint* (the "Reply," ECF Doc. # 4865).

On May 7, 2024, the Court held a hearing on the Motion during which Voelker and the Objectors presented their arguments.

3

For the reasons set forth below, the Court **DENIES** the Motion.

## I.     BACKGROUND

### A.  Relevant Case History

#### 1.  Commencement of the Case and the General Bar Dates

On July 13, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of the U.S. Bankruptcy Code before this Court.  (*See* ECF Doc. # 1.)  The Court

established February 9, 2023 as the initial general claims bar date in the chapter 11 cases (the

"Initial Bar Date").  (*See Order (I) Extending the Bar Dates for Submitting Proofs of Claim, (II)*

*Approving Notice Thereof, and (III) Granting Related Relief*, ECF Doc. # 1846 (extending the

deadlines for submitting proofs of claim).)  Subsequently, the Court established August 2, 2023

(together with the Initial Bar Date, the "General Bar Dates") as an additional bar date for any

claim affected by the amendment of the Debtors' schedules and statements pursuant to its ruling

in *In re Celsius Network LLC,* 649 B.R. 87 (Bankr. S.D.N.Y. 2023).  (*See Joint Stipulation and*

*Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors*

*Establishing Account Holder Bar Date*, ECF Doc. # 3066 ¶ 1.)

#### 2.  iCapital's Secured Proof of Claim and Solicitation

On August 15, 2022, iCapital timely filed proof of claim no. 9489 (the "iCapital Claim")

in an unliquidated amount against debtors Celsius and Celsius Lending LLC, secured by "Bitcoin

(BTC) and other crypto assets."  (iCapital Claim at 2.)  The articulated basis for the iCapital

Claim is the "assets held in Trust by Celsius for iCapital Management Inc."  (*Id*.)  Voelker

himself did not file a proof of claim in the chapter 11 cases.

The Debtors deemed iCapital as possessing an Account Holder Claim in these chapter 11

cases and solicited iCapital on this basis.  (*See* Joint Objection ¶¶ 8–9 (indicating that iCapital

was solicited as a holder of an Account Holder Claim).)  As a holder of an Account Holder

Claim, iCapital was served with copies of (i) the Solicitation and Voting Procedures; (ii) a ballot (the "Ballot") for voting to accept or reject the Plan; (iii) the Debtors' cover letter in support of the Plan; (iv) the order approving the Disclosure Statement (excluding exhibits) (the "Disclosure Statement Order," ECF Doc. # 3337); (v) the Disclosure Statement; (vi) the Committee's letter in support of the Plan (the "Committee Letter," Disclosure Statement Order, Ex. 5); (vii) the confirmation hearing notice; and (viii) the *Notice of Claims Settlement and Opportunity to Opt Out of Class Settlement* (the "Settlement and Opt Out Notice," Disclosure Statement Order, Ex. 10). (*See Affidavit of Service*, ECF Doc. # 3514 at 1–2 (detailing the solicitation materials provided); *id.*, Ex. A at 2490 (reflecting that iCapital was served with the solicitation materials).)

Notably, "Item 8" to the Ballot provided iCapital with an opportunity to opt out of the Class Claim Settlement incorporated in the Plan, which provides for the "full and final settlement and resolution of the Class Claim"—proof of claim no. 29046 filed by the Committee on behalf of all Account Holders, all proofs of claim filed by Class Claim Settlement Participants, and the Class Certification Motion. (Plan, Art. I.44 (describing the Class Claim Settlement).) A holder of an Account Holder Claim is deemed a "Class Claim Settlement Participant" under the Plan to the extent such holder, other than an Account Holder who only holds Custody Claims, does not opt out of the Class Claim Settlement on such holder's Ballot. (*Id.*, Art. I.47.) The Settlement and Opt Out Notice included with the solicitation materials informed iCapital of its ability to opt out as well as any attendant risks, benefits, and/or consequences for doing so (or failing to do so) by the September 22, 2023 deadline. (*See* Joint Objection ¶ 8 (noting that the Disclosure Statement Order established a deadline of September 22, 2023 at 4:00 p.m. for Account Holders to opt out).)

Ultimately, iCapital did not return a Ballot.  (Karpuk Declaration ¶ 2.)  The Debtors,

therefore, considered iCapital a participant in the Class Claim Settlement as it did not timely opt

out.  (*See* Joint Objection ¶ 9 ("iCapital became a Class Claim Settlement Participant under the

Plan").)

### 3.  The Debtors' Plan and the Confirmation Order

On November 9, 2023, the Court entered the Confirmation Order confirming the

*Modified Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtors Affiliates*

(the "Initial Plan," ECF Doc. # 3577).  After failing to receive approval from the Securities and

Exchange Commission for the originally contemplated NewCo Transaction, however, the

Debtors sought to pivot to the Orderly Wind Down and toggle to an alternative transaction that

would create a standalone bitcoin mining company (the "MiningCo Transaction").  (*See Joint*

*Motion of the Debtors and the Committee for Entry of an Order (I) Approving the*

*Implementation of the MiningCo Transaction and (II) Granting Related Relief* (ECF Doc. #

4050).)  The Court ultimately approved the Debtors' implementation of the MiningCo

Transaction on December 27, 2023, which the Debtors incorporated in the Plan.

The Plan, among other things, provides for the (i) distribution of Celsius's liquid

cryptocurrency assets to its users and other creditors; (ii) creation of Ionic, a new company that

would reorganize Celsius's Bitcoin mining business and distribute equity of that company to

Celsius's creditors; and (iii) pursuit and monetization of litigation claims, Causes of Action, and

certain illiquid assets, and distribution of related proceeds to creditors under the oversight of

litigation administrators and the Litigation Oversight Committee.  (Joint Objection ¶ 6.)

In connection with the Class Claim Settlement in particular, the Plan provided that the

claims of Class Claim Settlement Participants who did not opt out would be expunged from the

claims register.  The Plan, which effectuated the Class Claim Settlement, provides:

6

> Except as otherwise provided in the Order approving the Class Claim Settlement, under the Class Claim Settlement, if a Holder does not opt-out of the Class Claim Settlement, such Holder's Account Holder Claims, other than Custody Claims, shall receive, in lieu of any scheduled Claim or Filed Proof of Claim, an Allowed Claim in an amount that is 105% of the scheduled amount of such Claim, in each case of the same Class as the originally scheduled Claim.  *Proofs of Claim filed by Class Claim Settlement Participants (i.e., Holders of Account Holder Claims (other than Account Holders who only hold Custody Claims) that do not opt out of Class Claim Settlement) shall be expunged from the Claims Register and shall be of no further force and effect.*

(Plan, Art. IV.B.8 (emphasis added).)

The Plan also includes an injunction provision (the "Injunction Provision"), which states, in relevant part:

> Effective as of the Effective Date . . . *all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined*, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests . . . and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Further, to the maximum extent permitted under applicable law, *the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan*, including the Causes of Action released or exculpated in this Plan. . . .
>
> Except as otherwise set forth in the Confirmation Order, *each Holder of an Allowed Claim . . . by accepting, or being eligible to accept, distributions under . . . such Claim . . . pursuant to the Plan, shall be deemed to have consented to the injunction provisions* set forth in this Article VIII.F.

(Plan, Art. VIII.F (emphasis added).)

In entering the Confirmation Order, the Court approved the Class Claim Settlement as being binding on all parties in interest and the Injunction Provision, both effective as of the Effective Date.  (Confirmation Order ¶ 267 (stating that the Class Claim Settlement would be

"immediately effective and binding on all parties in interest on the Effective Date to the extent not already effective pursuant to separate order of the Bankruptcy Court"); *id.* ¶ 288 (approving the Injunction and deeming it "immediately effective on the Effective Date without further order or action on the part of this Court or any other party").)

The Court found that the Class Claim Settlement, along with other settlements incorporated in the Plan, was "substantively fair" and constituted a "good-faith compromise[]," was in the "best interests of the Debtors, the Estates and all Holders of Claims and Interests," and was "fair, equitable, and reasonable." (Confirmation Order ¶ 23; *see also id.* ¶ 77 (finding that the Debtors proposed the Plan in good faith, including with respect to the Class Claim Settlement).) Relatedly, the Court also deemed the process used to serve the applicable Ballot or notice with the opportunity to opt out of the Class Claim Settlement to be "reasonably calculated to ensure that each Holder of a Claim or Interest was informed of its ability to opt out of . . . the Class Claim Settlement as well as the risks, benefits, and/or consequences of doing so or for failing to timely do so." (*Id.* ¶ 18.) Finally, the Confirmation Order made clear that:

> [F]or the avoidance of doubt, *any party that did not affirmatively opt out of the Class Claim Settlement* by (i) the deadline to submit a Ballot or (ii) the supplemental deadline of October 9, 2023 established solely for Holders of Class 4 Convenience Claims to submit Class Claim Settlement Opt-Out Forms, *shall be bound by the terms of the Class Claim Settlement* and communicated to each Holder of a Class 4 Convenience Claim by email.

(*Id.* ¶ 20 (emphasis added).)

As for the Injunction Provision, the Court concluded that the provision was "necessary to implement, preserve, and enforce the Debtors' discharge," among other things, and was "narrowly tailored to achieve these purposes." (*Id.* ¶ 31; *see also id.* ¶¶ 144–45 (indicating that the injunction provisions under the Plan were necessary to effectuate the Plan's release and exculpation provisions).)

8

Neither iCapital nor Voelker objected to entry of the Confirmation Order, and neither

sought to appeal it.  (Joint Objection ¶ 12.)  On November 23, 2023, the Confirmation Order

became final and non-appealable.[2]  On January 31, 2024, the Debtors filed the *Notice of

Occurrence of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of

Distributions* (ECF Doc. # 4298), indicating that the Effective Date of the Plan, as modified,

occurred on January 31, 2024.  The Confirmation Order provides, in relevant part, that:

> Upon the occurrence of the Effective Date, the terms of the Plan are
> immediately effective and enforceable and deemed binding on . . . any and
> all Holders of Claims or Interests (regardless of whether such Holders of
> Claims or Interests have, or are deemed to have, accepted the Plan), all
> Persons and Entities that are parties to or are subject to the settlements,
> compromises, releases, and injunctions described in the Plan . . . .  All
> Claims and debts shall be as fixed, adjusted, or compromised, as applicable,
> pursuant to the Plan regardless of whether any Holder of a Claim or debt
> has voted on the Plan.

(Confirmation Order ¶ 293.)

### 4.  Post-Effective Date Status of iCapital's Proof of Claim

Pursuant to the terms of the Plan and Confirmation Order, the Post-Effective Date

Debtors have expunged the iCapital Claim "in exchange for release full and final satisfaction of

its claims against the Debtors, including the 5% premium to its scheduled claim as part of the

Class Claim Settlement."  (Joint Objection ¶ 9.)  Accordingly, Stretto, the claims and noticing

agent, is in the process updating the claims register to reflect the expungement of the iCapital

Claim along with other claims held by Class Claim Settlement Participants.  (*Id.* at 5 n.7.)

The Debtors, in planning for distributions under the Plan, reserved an amount for iCapital

in accordance with the fact that it did not opt out of the Class Claim Settlement.  (Joint Objection

---

[2]    The Confirmation Order is a "final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the
period in which an appeal must be filed shall commence upon entry hereof."  (Confirmation Order ¶ 378.)
Generally, Rule 8002 of the Federal Rules of Bankruptcy Procedure provides that "a notice of appeal must be filed
with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."  FED. R.
BANKR. P. 8002(a)(1).

¶ 25.)  On March 19, 2024, iCapital received a portion of that amount as an initial distribution under the Plan.  (Karpuk Declaration ¶ 3 ("Stretto sent iCapital . . . an initial distribution under the Plan.").)  iCapital is slated to receive 105% of the scheduled amount of its claim.  (Joint Objection ¶ 18.)

### B.  Events Underlying the Relief Sought in the Proposed Adversary Complaint

#### 1.  Celsius's Alleged Mishandling of iCapital's Digital Assets

iCapital, a Wyoming corporation, entered into the Agreement with Celsius pursuant to which Celsius loaned $17,000.00 to iCapital, secured by iCapital's "[p]ledged digital assets." (Motion at 4 and Ex. B.)  Voelker submits that the Agreement was expressly governed by the laws of Wyoming and mandated certain safeguards, including the segregation of client assets and robust insurance coverage.[3]  (Voelker Declaration ¶ 2.)  Voelker indicates that these terms were memorialized in iCapital's board resolutions, which authorized iCapital to enter into the Agreement.  (*Id.*; *see also* Motion, Ex. B (stating in the recitals to the board resolutions that Celsius "presented a proposed agreement that outlines terms for an escrow account and a credit line . . . and agreeance to adhere Wyoming's Special Purpose Cryptocurrency Laws and Standards").)

As set forth in the Proposed Adversary Complaint, the Agreement "establish[ed] a line of credit with a 50% loan-to-value (LTV) ratio" that enabled iCapital to access funds while depositing digital assets as collateral.  (Proposed Adversary Complaint ¶ 4.)  These assets— comprised of 17.61163 in Bitcoin (BTC), 0.08 Ethereum (ETH), 7,230.88 USD Coin (USDC), and 152.18 Zcash (ZEC)—are collectively valued in the amount of $1,101,780.50 as of April 17,

---

[3]        The copy of the Agreement annexed to the Motion does not reflect these terms.

2024 (collectively, the "Pledged Digital Assets").  (Motion at 4; Proposed Adversary Complaint ¶¶ 4, 5.)

In the negotiations leading up to the parties' entry into the Agreement, iCapital indicated its "reliance on Wyoming's stringent Cryptocurrency laws"—which provide "superior" protections for custodial assets, including strict segregation requirements and full reserve backing—and its Special Purpose Depository Institution ("SPDI") standards.  (Motion at 4.) While Celsius was not an SPDI, Voelker indicates that Celsius nonetheless assured iCapital that it was compliant with Wyoming law and "touted [its] adherence to Wyoming's stringent SPDI standards." (*Id.*; Voelker Declaration ¶ 3.)

Voelker asserts that iCapital's trust in Celsius was misplaced as Celsius engaged in "calculated breach and reckless endangerment of iCapital's assets." (*Id.* 4–5 (alleging that Celsius engaged in unauthorized withdrawals from iCapital's account, suspicious expenditures and investments suggesting possible commingling and misuse of assets, and high risk, speculative investments).)  Indeed, Voelker argues that Celsius's actions reflect a "willful disregard" for Wyoming's SPDI framework, which served as a key factor in iCapital's decision to bank with Celsius.  (*Id.* at 4; *see also* Voelker Declaration ¶ 3 (stating that Celsius's alleged adherence to Wyoming's SPDI standards was a key factor in its decision).)  As a result of Celsius's actions, Voelker argues that iCapital suffered "demonstrable financial harm," including lost investment opportunities in a promising technology startup and a missed real estate acquisition.  (Motion at 5.)  Accordingly, Voelker seeks leave to commence an adversary proceeding for the return of iCapital's Pledged Digital Assets, which he alleges were "mistakenly transferred to the Celsius Bankruptcy Estate."  (Proposed Adversary Complaint ¶ 6.)

2.  <u>Jason Voelker's Derivative Standing to Bring Suit</u>

Following iCapital's discovery of possible breaches of the Agreement, on May 20, 2022,

Voelker formally requested that iCapital's board of directors take "immediate legal action

against Celsius." (Voelker Declaration ¶ 6.)  However, Celsius sought bankruptcy protection in

July before iCapital could take any action. (*Id.*)  Voelker subsequently requested that the board

of directors file an adversary proceeding with the Court. (*Id.*)  iCapital's board of directors,

however, did not provide Voelker with a "formal declination" until March 28, 2024, which

Voelker asserts granted him derivative standing to bring suit. (*Id.* ¶ 7; Motion at 5.)

Voelker indicates that he otherwise moved "expeditiously" to prepare an adversary

complaint after receiving this declination, and the delay in him seeking relief was "caused solely

by [his] adherence to mandatory corporate processes outside of [his] control." (Voelker

Declaration ¶ 9.)  His understanding is that iCapital would have brought an action if it possessed

sufficient funds to retain counsel, but "due to the theft that occurred by Celsius, no funds were

available to act." (*Id.*; *see also* Notice of Errata, Ex. A (indicating that the "fees for retaining a

specialist . . . and navigating the intricacies of the case have proven to be prohibitive . . . and

iCapital Management currently lacks the resources to cover the necessary fees and expenses

associated with such litigation").)

**C. The Proposed Adversary Complaint**

The contemplated adversary proceeding will seek the return of the Pledged Digital

Assets, which Voelker believes "rightfully belong" to iCapital. (Motion at 4.)  Voelker, in his

capacity as a derivative shareholder, seeks to assert eight claims against defendants Celsius

Network LLC, Celsius Lending LLC, Ionic Digital Inc., and Fahrenheit LLC. (*See generally*

Proposed Adversary Complaint.)  These claims include claims for breach of contract; willful

misconduct, bad faith, and conversion; breach of contract by estoppel; breach of fiduciary duty

and ostensible fiduciary duty; fraudulent misrepresentation; conversion; constructive trust; and certain declaratory relief. (*Id.* ¶¶ 71–88.) Such claims are predicated on the notion that the Pledged Digital Assets comprise the "exclusive property of iCapital," and Celsius's custodial holdings of the Pledged Digital Assets constitute a bailment under Wyoming law. (*Id.* ¶ 7.)

### D. The Motion

The Motion seeks entry of an order (i) granting Voelker leave to file a late adversary proceeding or (ii) in the alternative, establishing the nondischargeability of debt Celsius owes to iCapital and granting iCapital limited relief from discharge to pursue the immediate return of the Pledged Digital Assets. (Motion at 4, 8–9.) Additionally, Voelker also seeks access to the Court's ECF system to "expedite" his "prompt participation." (Voelker Declaration ¶ 11.)

In support, Voelker asserts that leave is warranted pursuant to the doctrine of equitable tolling. (Motion at 6.) He indicates that derivative shareholder lawsuits generally require "[s]trict adherence to corporate governance protocols," which present "unique procedural hurdles" that can result in delays. (*Id.*) In this instance, Voelker asserts that his delay in filing stemmed directly from the procedural requirements inherent in such derivative actions. (*Id.*) Specifically, it was "legally imperative" that iCapital formally decline to pursue its own remedies, which resulted in an "involuntary" sequence of events that culminated into an "expired adversary filing deadline." (*Id.*) Voelker argues that, to deny relief based on these "unavoidable delay[s]," would counter the very purpose of equitable tolling and otherwise "undermine the pursuit of intracorporate remedies." (*Id.*)

Additionally, Voelker argues that Celsius's actions in "seizing iCapital's assets" contravene both the terms of the parties' agreement and the nature of bailment under Wyoming law. (*Id.* at 7.) He also states that the modified Terms of Service, which predated the parties'

13

Agreement, cannot modify the terms of the Agreement.  (*Id.* ("Given the meticulous nature of the [Agreement] and the emphasis placed on Wyoming law as the governing jurisdiction, a mere click-wrap modification would not be sufficient to alter those terms."); *see also id.* ("To now allow the [Terms of Service] to supersede is a blatant disregard for legal precedent and erodes the integrity of formal agreements.").)

Finally, Voelker indicates that this granting of leave would not prejudice the Debtors as the Motion was filed soon after he was granted standing to bring suit on March 28, 2024, and Celsius has been apprised of these claims since "their inception."  (*Id.* at 8.)  Voelker believes that the iCapital Claim, filed on August 15, 2022, has provided the Debtors with more than sufficient notice.  (*Id.*)

The Notice of Errata, subsequently filed on April 29, 2024, seeks to modify the caption for the Proposed Adversary Complaint to reflect that Voelker is plaintiff seeking relief (i) derivatively on behalf of iCapital and (ii) as a direct party.  (Notice of Errata at 2.)  Additionally, the Notice of Errata includes a copy of the March 2024 iCapital Letter to be attached to the Proposed Adversary Complaint as Exhibit A.  (*Id.*)  The letter indicates that, after "careful consideration and consultations with legal experts," iCapital declined Voelker's request to pursue a lawsuit for the return of investors' cryptocurrency in the Debtors' bankruptcy proceedings.  (*Id.*, Ex. A at 1.)  The basis for iCapital's determination was, as noted, the substantial costs to pursue the matter and iCapital's lack of resources to cover the necessary fees and expenses.  (*Id.*)

### E.  The Joint Objection

The Litigation Administrator and Ionic oppose the Motion several grounds.  Each is summarized in turn.

1.  The Plan Enjoins iCapital and Voelker and iCapital's Claim Has Been
    Expunged

At the outset, the Litigation Administrator and Ionic assert that iCapital and Voelker are

barred from initiating the contemplated adversary proceeding, which is predicated on prepetition

conduct, by virtue of the Injunction Provision set forth under the Plan.  (Joint Objection ¶ 15.)

As iCapital did not opt out of the Class Claim Settlement, in accordance with the terms of the

Plan and Confirmation Order, iCapital and any derivative shareholders are (i) bound by the terms

of the settlement and (ii) permanently enjoined from commencing any action or proceeding

relating to prepetition claims that were otherwise released or settled under the Plan.  (*Id.* ¶ 16.)

The Objectors suggest that iCapital's decision to not opt out of the Class Claim Settlement was

not "irrational" considering the alternative.  (*See id.* at 8 n.10 (noting that parties who opt out

would have forfeited the additional 5% recovery above their scheduled amount and quicker

turnaround on distributions).)

Aside from the foregoing, Voelker also lacks a basis to pursue his Motion since the

iCapital Claim has been settled, released, and expunged pursuant to the terms of the Plan and

Confirmation Order, a consequence iCapital was notified of on multiple occasions.  (*Id.* ¶¶ 17,

19.)  Therefore, the Motion should be denied as an attempt to take a "second bite out of the

estates."  (*Id.* ¶ 18.)

2.  Equitable Tolling is Inapplicable

The Objectors further argue that equitable tolling, an "extraordinary remedy" applied

"sparingly," is inapplicable as Voelker's claims simply do not exist by virtue of iCapital's

participation in the Class Claim Settlement.  (*Id.* ¶¶ 20–21.)  Even if it were to apply, the

Objectors assert that Voelker fails to meet the requirements to justify equitable tolling, which

generally requires (i) a diligent pursuit of rights and (ii) extraordinary circumstances beyond the

litigant's control that prevent timely filing.  (*Id.* ¶ 21 (quoting *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 256–57 (2016)).)  The Objectors submit that Voelker has not offered any support for his "conclusory" statements that he acted with diligence.  (*Id.* ¶ 23.)  Moreover, they argue, Voelker has neither alleged nor established that extraordinary circumstances prevented him from obtaining standing.  (*Id.* ¶ 22.)  Thus, according to the Objectors, there is no support for the assertion that delay caused by corporate procedure amounts to an "extraordinary" circumstance that warrants the application of equitable tolling.  (*Id.*)

### 3.  Granting the Motion Would be Prejudicial

The Objectors reject Voelker's proposition that the Motion would not be prejudicial to Debtors.  Rather, they assert that allowing the adversary proceeding to proceed at this juncture, while distributions are currently being made, would "significantly disrupt the administration of the Plan and invite costly litigation that the Plan has already foreclosed."  (*Id.* ¶ 25.)  Indeed, iCapital has already received a portion of the distribution the Debtors have allotted to it, and Voelker should be denied his request to effectively "assert late claims" that have already been released and expunged.  (*Id.* ¶ 26.)

### 4.  Alternative Relief for Nondischargeability Should be Denied

Lastly, the Objectors assert that Voelker's alternative request for an order of nondischargeability is effectively moot as the Court has confirmed the Plan, which includes provisions relating to discharge.  (*Id.* ¶ 27.)  The Confirmation Order, which neither iCapital nor Voelker objected to or appealed, is a final and non-appealable order.  (*Id.*)

Moreover, to the extent Voelker is seeking a reconsideration or modification to the Confirmation Order, he has not articulated a basis for such and the window to do so has already passed.  (*Id.* ¶¶ 28–29 (citing to Rules 7052 and 9023 of the Federal Rules of Bankruptcy

Procedure and Rules 52 and 59 of the Federal Rules of Civil Procedure, which require that such

motions be filed 14 days after entry of judgment).)

### F. The Reply

In the Reply, Voelker asserts that the Objectors disregard Wyoming law, which governs

the Agreement and establishes a bailment relationship between the Debtors and iCapital. (Reply

at 2–3.) In his view, Wyoming law "unambiguously vest[s] ownership of the escrowed digital

assets with iCapital," which establishes a bailment, and property held in bailment is not property

of the Debtors' estates. (*Id.*) Voelker contends that the Debtors' alleged disregard of contractual

obligations under Wyoming law reflects their lack of "good faith participation" in the legal

process. (*Id.* at 2.) Additionally, he argues that their disregard for Wyoming's established legal

framework violates the U.S. Constitution's Full Faith and Credit Clause, which generally

mandates that states honor the laws and legal decisions of other states. (*Id.* at 3.) In Voelker's

view, permitting the Debtors to do so would "erode confidence in interstate transactions and

undermine the rule of law itself." (*Id.*)

Moreover, granting relief pursuant to the doctrine of equitable tolling is "essential" here,

he argues, and denying the Motion would establish "dangerous precedent, undermin[e] investor

confidence, discourag[e] the use of Wyoming's progressive digital asset framework, and signal[]

that contractual sanctity can be disregarded within the bankruptcy process." (*Id.*)

Finally, Voelker argues that Objectors' reliance on the Class Claim Settlement is

"flawed." (*Id.*) In support, he contends that the iCapital Claim does not fall within the ambit of

the Class Claim Settlement as it "addresses assets held outside of the bankruptcy estate" while

the Class Claim Settlement addresses "general holdings." (*Id.* at 4.) Voelker invokes section

105 of the Bankruptcy Code as granting the Court power to "fashion alternative forms of

equitable relief," including the segregation of escrowed assets and the appointment of an

independent custodian.  (*Id.* at 5.)

## II.   <u>LEGAL STANDARD</u>

### A.  Legal Effect of a Confirmation Order

Generally, a bankruptcy court's "order of confirmation is treated as a final judgment with

*res judicata* effect."  *In re Arcapita Bank B.S.C.(c)*, 520 B.R. 15, 21 (Bankr. S.D.N.Y. 2014)

(quoting *In re Indesco Int'l Inc.*, 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006)); *see also Silverman*

*v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.)*, 255 F.3d 87, 92 (2d Cir. 2001) ("The

confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of final

judgment in an ordinary civil litigation.").  "The doctrine of *res judicata* precludes the same

parties from litigating claims in a subsequent suit based on the same cause of action if there has

been a final judgment on those claims."  *In re Residential Cap., LLC*, 522 B.R. 458, 461 (Bankr.

S.D.N.Y. 2014) (citations omitted).  Indeed, *res judicata* will preclude "later litigation if [an]

earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction,

(3) in a case involving the same parties or their privies, and (4) involving the same cause of

action."  *Id.* (quoting *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir.

2007)).  "In the bankruptcy context, [courts] ask as well whether an independent judgment in a

separate proceeding would impair, destroy, challenge, or invalidate the enforceability or

effectiveness of the reorganization plan."  *Id.* (quoting *Corbett v. MacDonald Moving Servs.,*

*Inc.*, 124 F.3d 82, 88 (2d Cir.1997)).

As provided for in section 1141(a) of the Bankruptcy Code, "[a]n order of confirmation

binds the debtor and its creditors whether or not they have accepted the confirmed plan."

*Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.)*,

18

262 B.R. 604, 612 (Bankr. S.D.N.Y. 2001); *see also Indesco*, 354 B.R. at 664 ("Pursuant to 11

U.S.C. § 1141(a), a confirmed plan of reorganization is binding on all parties."). The "finality

interests of *res judicata* are particularly important in the bankruptcy context, where numerous

claims and interests are gathered, jostled, and are determined and released." *Ionosphere*, 262

B.R. at 612. Nonetheless, the scope of a confirmation order's preclusive impact is limited to the

"content of the reorganization plan and the confirmation order." *Arcapita*, 520 B.R. at 21

(quoting *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d

1036, 1044–45 (2d Cir. 1996)). *Res judicata* will not apply "when a cause of action has been

expressly reserved for later adjudication." *Ionosphere*, 262 B.R. at 612 (citation omitted).

### B.  Standing in a Bankruptcy Case

Generally, to have standing in bankruptcy court, a party must possess: (i) prudential

standing; (ii) constitutional standing; and (iii) standing under section 1109 of the Bankruptcy

Code. *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018); *see In re Old

Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (indicating that a party invoking federal

jurisdiction bears the burden to establish that it meets "(1) Article III's constitutional

requirements, (2) federal court prudential standing requirements, and (3) the 'party in interest'

requirements under Bankruptcy Code 1109(b)."). "All three standing requirements must be met

to have standing." *Motors Liquidation*, 580 B.R. at 340.

Section 1109(b) of the Bankruptcy Code states, in relevant part, that "[a] party in interest,

including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a

creditor, an equity security holder, or any indenture trustee may raise and may appear and be

heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The phrase, "any issue in

a case," generally "grants a right to raise, appear and be heard on *any issue* regardless [of]

whether it arises in a contested matter or an adversary proceeding." *Term Loan Holder Comm. v. Ozer Grp. LLC (In re Caldor Corp.)*, 303 F.3d 161, 169 (2d Cir. 2002) (emphasis in original).

"[P]arty in interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding." *Krys v. Official Comm. of Unsecured Creditors of Refco, Inc. (In re Refco Inc.)*, 505 F.3d 109, 117 n.10 (2d Cir. 2007). Any rights of a party in interest that are asserted "must be asserted by the party in interest, not someone else." *Id.* at 117. The term "party in interest," however, is not defined in the Bankruptcy Code. *See Old Carco*, 500 B.R. at 691 (stating that Bankruptcy Code does not define "party in interest" as used in section 1109(b)). Generally, courts have held that "a party in interest is one that has a sufficient interest in the outcome of the case that would require representation, or a pecuniary interest that will be directly affected by the case." *In re Innkeepers USA Trust*, 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011). While giving section 1109(b) a broad reading, courts have "limited 'party in interest' standing where a party's interest in the proceeding is not a direct one." *Id.* (citing various examples). Whether "someone is a 'party in interest' must be read against the purposes of Chapter 11, which are to 'preserv[e] going concerns and maximiz[e] property available to satisfy creditors.'" *In re Teligent, Inc.*, 640 F.3d 53, 61 (2d Cir. 2011) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). "Generally, a party in interest must have a financial or legal stake in the outcome of the particular matter." *Old Carco*, 500 B.R. at 691 (citation omitted).

### III.   **DISCUSSION**

As will be discussed in greater detail below, relief is not warranted as iCapital (and therefore, Voelker) are enjoined from initiating the proposed adversary proceeding. Additionally, for the same reasons, the alternative relief that Voelker seeks—an order of

nondischargeability and limited relief from discharge for iCapital to pursue the immediate return

of the Pledged Digital Assets—also cannot be granted.  Finally, the Court cannot grant Voelker

access to use ECF as it would be contrary to the Court's policies.

### A. iCapital and Voelker Are Enjoined from Initiating the Proposed Adversary Proceeding

#### 1. The Basis for Both the Proposed Adversary Proceeding and the iCapital Claim is iCapital's Status as an Account Holder

Both the Proposed Adversary Complaint and iCapital Claim are predicated on iCapital's

status as an Account Holder in the Debtors' chapter 11 proceedings.  As set forth in the Motion,

Voelker seeks authorization to commence an adversary proceeding for the return of the Pledged

Digital Assets, which he believes "rightfully belong" to iCapital and were "wrongfully seized

and incorporated . . . into [the Debtors'] bankruptcy estate."  (Motion at 4.)  This, as noted in the

Proposed Adversary Complaint, is Voelker's "core claim."  (Proposed Adversary Complaint at 4;

*see also* March 2024 iCapital Letter (declining Voelker's "request and acknowledgment that a

lawsuit be pursued for the return of investors' cryptocurrency that was converted by Celsius as

part of the bankruptcy proceedings").)

Voelker makes clear that this "core claim," which underlies the Proposed Adversary

Complaint, arose prepetition and was captured in the iCapital Claim filed in these bankruptcy

proceedings.  As explained in the Voelker Declaration, iCapital's claims against the Debtors

were "first raised in May 2022, further amplified when Celsius shut down iCapital's account, and

subsequently formalized in the [iCapital] Claim filed on August 15, 2022."  (Voelker Declaration

¶ 10; *see also* Motion at 8 (stating that the "fundamental issues—the integrity of . . . [the]

Agreement, the rightful ownership of the assets—remain unchanged.  Celsius has been

consistently apprised of these claims . . . [and] [o]ur Creditor's Claim, filed on August 15, 2022,

provided comprehensive notice").)  As discussed, the iCapital Claim is based on "assets held in

trust by Celsius for iCapital Management," comprised of "Bitcoin (BTC) and other crypto

assets." (iCapital Claim at 2.) It is for this reason that Voelker states that granting leave for him

to file the Proposed Adversary Complaint "will not introduce new issues." (Voelker Declaration

¶ 10.)

### 2. The iCapital Claim Was Fully Addressed and Resolved Under the Plan

However, the iCapital Claim was fully addressed and resolved in the Debtors' confirmed

Plan. During the solicitation process, iCapital was on notice that the Plan would effectuate the

Class Claim Settlement and, in multiple instances, was made aware of the opportunity to opt out

as well as any attendant consequences for electing to do so (or failing to timely do so) by the

September 22, 2023 deadline. (*See Affidavit of Service*, ECF Doc. # 3514, Ex. A at 2490

(reflecting that iCapital was served with the solicitation materials, including the Plan and

Settlement and Opt Out Notice); *see, e.g.*, Settlement and Opt Out Notice at 3 (notifying holders

of Account Claims that they are "a party to the Class Claim Settlement unless [they]

affirmatively opt out of the Class Claim Settlement on . . . [the] Account Holder Ballot"); *id.*

(making clear in bold that the "Class Claim Settlement opt-out is located in Item 8 of the

Account Holder Ballot" as well as the opt out deadline); *id.* (stating that holders who elect to opt

out "shall have their Account Holder Claims . . . treated as Disputed Claims . . . and shall not

receive a distribution on the Effective Date"); Committee Letter at 4 ("Any account holder who

does not timely opt out of the settlement will not have any right to pursue any filed Proof of

Claim against the Debtors, which will be expunged by the settlement.").)

Despite this, iCapital did not return a Ballot and failed to affirmatively opt out of the

Class Claim Settlement. (*See* Karpuk Declaration ¶ 2 (stating that iCapital did not return a

Ballot, which contained the opportunity to opt out in Item 8).) As a result, the Debtors

appropriately deemed and treated iCapital as a Class Claim Settlement Participant, expunging the

iCapital Claim and providing iCapital with an initial distribution in accordance with the

treatment outlined under the Plan. (*Id.* ¶ 3 (stating that Stretto issued iCapital a distribution on

March 19, 2024); Joint Objection ¶ 9 (indicating that the iCapital Claim has been expunged).)

The Class Claim Settlement, which the Plan effectuated, represents a "full and final

settlement and resolution" of, among other things, all proofs of claim filed by Class Claim

Settlement Participants, including the iCapital Claim, effective as of the Effective Date. (Plan,

Art. I.44 (describing the Class Claim Settlement); Confirmation Order ¶ 267 (indicating that the

Class Claim Settlement is "effective and binding on all parties in interest on the Effective Date to

the extent not already effective pursuant to separate order of the Bankruptcy Court").)

Accordingly, the iCapital Claim has been fully resolved and addressed under the Plan. As the

Proposed Adversary Complaint seeks relief predicated on the same cause of action, which

Voelker suggests is the case, it cannot be brought. (*See, e.g.*, Voelker Declaration ¶ 10 (stating

that iCapital Claim "formalized" iCapital's prepetition claims and put the Debtors on notice of

the claims underlying the Proposed Adversary Complaint).)

### 3. iCapital and Voelker are Enjoined and Bound by the Confirmation Order

iCapital and Voelker are enjoined from commencing the proposed adversary proceeding

as they are bound by the Confirmation Order irrespective of whether there is validity to

Voelker's contentions. Generally, "[a]n order of confirmation binds the debtor and its creditors

whether or not they have accepted the confirmed plan and thus, it has a preclusive effect."

*Ionosphere*, 262 B.R. at 612. Here, the Confirmation Order became a final and non-appealable

order on November 23, 2023. Therefore, iCapital and Voelker are bound by the terms of the

Confirmation Order, which approved the Class Claim Settlement effectuated under the Plan,

which iCapital was a participant to, as well as the Injunction Provision. *See* 11 U.S.C. § 1141(a)

("[T]he provisions of a confirmed plan bind the debtor . . . and any creditor . . . whether or not

the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan.").

As noted, the Injunction Provision permanently enjoins "all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation" from commencing a proceeding in connection with such claims or interests, including those released or settled pursuant to the Plan.  (Plan, Art. VIII.F.)  Moreover, the permanent injunction encompasses "the commencement or prosecution by any Person or Entity whether *directly, derivatively, or otherwise*, of any Causes of Action released pursuant to [the] Plan."  (*Id.* (emphasis added).)  As a participant in the Class Claim Settlement, iCapital settled and released its claims against the Debtors in exchange for a distribution equal to 105% of its scheduled claim.  As a result of its eligibility to accept distributions under the Plan (a portion of which it has already received), iCapital is deemed to have consented to the Injunction Provision.  (*Id.* ("Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim . . . by accepting, or being eligible to accept, distributions under . . . such Claim . . . pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.").)  Therefore, iCapital—and Voelker by virtue of his asserted "derivative" status—are enjoined from commencing the proposed adversary proceeding.

Allowing the adversary proceeding at this late stage would be prejudicial to the Post-Effective Date Debtors, particularly as the iCapital Claim has been expunged and distributions have already commenced.  *See Ionosphere*, 262 B.R. at 612 (noting that the "finality interests of *res judicata* are particularly important in the bankruptcy context, where numerous claims and interests are gathered, jostled, and are determined and released").  Indeed, iCapital received an initial distribution on March 19, 2024.  (Karpuk Declaration ¶ 3.)

### 4. Voelker Cannot Be a Party-In-Interest to Pursue the Adversary[4]

As the cause of action underlying the Proposed Adversary Complaint has been resolved through iCapital's participation in the Class Claim Settlement, Voelker likely lacks standing under section 1109(b) of the Bankruptcy Code to commence the lawsuit. Assuming *arguendo* that Voelker possesses derivative standing to commence the adversary proceeding on iCapital's behalf, to qualify as a party in interest, he must still have a "sufficient interest in the outcome . . . or a pecuniary interest that [would] be directly affected." *Innkeepers*, 448 B.R. at 141. In other words, "a party in interest must have a financial or legal stake in the outcome of the particular matter." *Old Carco*, 500 B.R. at 691 (citation omitted). As no relief can be provided, Voelker has no standing to bring the adversary. Therefore, his arguments with respect to equitable tolling are also irrelevant.

### B. Other Relief is Also Unwarranted

For the same reasons, the alternative relief that Voelker seeks cannot be granted. As noted, Voelker seeks entry of an order of nondischargeability and limited relief from discharge to allow iCapital to pursue the immediate return of the Pledged Digital Assets. (Motion at 8–9.)

---

[4] This decision does not address whether Voelker possesses derivative standing to commence the proposed adversary proceeding on behalf of iCapital as the issue does not need to be reached. Generally, however, to establish derivative standing under Rule 23.1 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings via Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, a "shareholder's derivative complaint must allege that the 'plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law.'" *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 922 F. Supp. 2d 445, 458–59 (S.D.N.Y. 2013) (quoting FED. R. CIV. P. 23.1); *see* FED. R. BANKR. P. 7023.1 ("Rule 23.1 F.R. Civ. P. applies in adversary proceedings."). In addition to standing, Rule 23.1 also imposes additional requirements for a complaint in a derivative suit. *See Facebook*, 922 F. Supp. 2d at 459 (discussing these additional requirements).

Even if standing can be established, a plaintiff must also satisfy the demand requirement. *Id.* at 467. "It is well established that demand requirements for a derivative suit are determined by the law of the state of incorporation." *Id.* As Voelker represents that iCapital is incorporated in the state of Wyoming, the sufficiency of Voelker's demand futility allegations would likely need to be examined under Wyoming law. However, as discussed, iCapital itself is enjoined from proceeding with the proposed adversary proceeding. Therefore, the issue of whether Voelker can proceed on a derivative basis on behalf of iCapital need not be reached.

Neither can be granted as iCapital and Voelker are enjoined and the iCapital Claim has already been fully addressed and resolved under the Plan.

### C. Voelker's Request for ECF Access is Denied

As a separate matter, Voelker's request for access to ECF to file documents electronically is denied. Under this Court's policy, ECF access is limited solely to attorneys practicing in this Court, including those who are admitted *pro hac vice*, and "limited users." (*See* S.D.N.Y. L.B.R. 5005-2 (providing that "[u]nless the Court directs otherwise, all attorneys practicing in the Court . . . are required to file all pleadings, motions, or other documents . . . by electronic means"); *see Gaining ECF Filing Privileges*, U.S. BANKR. CT. S. DIST. OF NEW YORK, https://www.nysb.uscourts.gov/gaining-ecf-filing-privileges (outlining the ECF registration process for attorneys and "limited users" only).) "Limited users" are defined to comprise of "[e]mployees of institutional creditors" who may obtain "limited-access" accounts to file electronically on ECF. (*Limited-Access E-Filing*, U.S. BANKR. CT. S. DIST. OF NEW YORK, https://www.nysb.uscourts.gov/limited-access-e-filing.) Such accounts are "intended for use by those who are not attorneys for *filing specific claims-related filings*" and limits the account to file those selected documents only. (*Id.* (emphasis added).) These "claims-related filings" may include, among other things, proofs of claim, withdrawals of claims, certificate of mailing of claims agent, monthly fee statements, and affidavits of service. (*Limited Users – Glossary of Events*, U.S. BANKR. CT. S. DIST. OF NEW YORK, https://www.nysb.uscourts.gov/limited-users-glossary-events.)

As Voelker has neither represented that he is an attorney admitted to practice before this Court nor an employee of an institutional creditor, he is not permitted to use the Court's ECF system.

26

## IV.    <u>CONCLUSION</u>

Accordingly, for the reasons discussed herein, the Motion is **DENIED.**

**IT IS SO ORDERED.**

Dated:    May 8, 2024
          New York, New York

                              *Martin Glenn*
                              MARTIN GLENN
                    Chief United States Bankruptcy Judge