Page 1



1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK, LLC,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY   10004

14

15                    May 7, 2024

16                    2:04 p.m.

17

18

19

20

21  B E F O R E :

22  HON MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:   JONATHAN

1    HEARING re Hybrid Hearing RE:  Motion for Leave to File a

2    Late Adversary Proceeding against Celsius Network LLC

3    (Celsius) and its Affiliates Filed by Jason Voelker (Doc

4    #4825, 4841, 4843, 4855, 4865)

5

6    HEARING re Hybrid Hearing RE:  Motion Requesting Judicial

7    Review of a UCC Matter. (Doc #4464, 4701, 4764, 4797, 4806,

8    4850, 4855)

9

10   HEARING re Doc #4866 Motion to Allow/Motion for an Order

11   Requiring the Post-Effective Debtors to Provide Discovery to

12   Support Statements Made in Response to Issues Raised by

13   Corporate Creditors for Inequitable Distribution under the

14   Plan of Reorganization

15

16   HEARING re Hybrid Hearing RE:  Post-Effective Date Debtor's

17   Motion Seeing Entry of an Order (I) Approving for the

18   Distribution of Deceased Account Holder Assets to their

19   Respective Authorized Representatives, (II) Authorizing such

20   Distributions, and (III) Granting Related Relief (Doc #4815,

21   4826, 4855)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND ELLIS LLP

 4         Attorneys for the Debtors

 5         333 West Wolf Point Plaza

 6         Chicago, IL 606054

 7

 8   BY:  CHRISTOPHER KOENIG

 9

10   MCDONALD HOPKINS LLC

11         Attorneys for Stretto, Inc.

12         39533 Woodward Avenue, Suite 318

13         Bloomfield Hills, MI 48304

14

15   BY:  JOSEPH MCNELIS

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18         Attorneys for the U.S. Trustee

19         Alexander Hamilton Custom House

20         One Bowling Green, Room 534

21         New York, NY 10004

22

23   BY:  BRIAN MASUMOTO

24

25
```

1    RICHARD PILLIPS

2         Pro Se

3

4    JASON VOELKER

5         Pro Se

6

7    ALSO PRESENT:

8    KEITH NOYES

9    KIMBERLY ANNE HAVLIN

10   DAVID J. ADLER

11   CHRIS BECIN

12   MARLOWE P. BENNETT

13   JEFFREY BERNSTEIN

14   PAUL BREUDER

15   MARK BRUH

16   SANTOS CACERES

17   WESLEY CHANGE

18   RICKIE CHANG

19   RAUL CHAVEZ

20   THOMAS A. CHERNAIK

21   CHRISTINA CIANCARELLI

22   CAMERON CREWS

23   JOSHUA CRUZ

24   DAVID J. DALHART

25   TRISTAN DIAZ

Page 5

1   SHARON M. DOW

2   JANELL ECKHARDT

3   SIMON ELIMELECH

4   JAMES ENGEL

5   CHRIST FERRARO

6   DEBORAH FRANKE

7   REBECCA GALLAGHER

8   JASLEIGH GEARY

9   DARIUS GHEORGHE

10   GASTON GIANNELLI

11   JAMIE GILBERT

12   AMILA GOLIC

13   RICHARD D. GROSSMAN

14   KLAIDAS IVANAUSKIS

15   FRANCES JONES

16   KIRILL KHAN

17   BRIAN P. KARPUK

18   ROSS KWASTENIET

19   JOSEPH LALIA

20   DAN LATONA

21   JOSEPH LEHRFELD

22   MARK S. LEONARD

23   SERBAN LUPU

24   CHASE MARSH

25   LAURA MCNEIL

1   JOHN G. MELLEIN

2   LAYLA MILLIGAN

3   RICHARD E. OSWALD

4   RAKESH PATEL

5   JONATHAN RODRIGUEZ

6   JOSEPH E. SARACHEK

7   DAVID SCHNEIDER

8   NOAH M. SCHOTTENSTEIN

9   WILLIAM D. SCHROEDER

10  SAHRISH K. SOLEJA

11  CHUA SOON GUAN

12  LUKE SPANGLER

13  COURTNEY BURKS STEADMEN

14  CHRIS UPDIKE

15  ELIZABETH B. VANDESTEEG

16  EZRA VAZQUEZ-D'AMICO

17  SEAN XUE

18  GOLSHID ZAHIREMAMI

19  TANZILA ZOMO

20  HEIN VAN DER WIELEN

21  DREW DUFFY

22  BERNARD JACOB FALLER

23  UDAY GORREPATI

24  TAYLOR HARRISON

25  DIETRICH KNAUTH

1   MIKE LEGGE

2   XI LIN

3   TIMOTHY REILLY

4   VINCE SULLIVAN

5   ALEX WITTENBERG

6   SARAH WYNN

7   ZACHARY SABIB

8   DEAN CHAPMAN

9   MITCHELL HURLEY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2              CLERK:  All rise.

3              AUTOMATED VOICE:  Recording in progress.

4              THE COURT:  Please be seated.  Mr. Koenig, good

5    afternoon.

6              MR. KOENIG:  Good afternoon, Your Honor.  For the

7    record, Chris Koenig, Kirkland & Ellis, for Celsius.  Your

8    Honor, before getting into our formal agenda today, I wanted

9    to just give you a brief update on the status of plan

10   distributions, hopefully a little bit shorter than the last

11   time, and the a lawyer for Stretto intends to provide an

12   update on the data security incident that was detailed in

13   the notice that we posted on the docket about two weeks ago.

14              So first, getting started on plan distributions,

15   we filed a few slides last night.  Deanna, could you please

16   make Amila Golic, A-M-I-L-A, the co-presenter so that she

17   can put the slides up?

18              CLERK:  Yes.  Give me one moment.

19              MR. KOENIG:  Thank you.  So, what we did, Your

20   Honor, is we filed some slides that -- it's the same slides

21   we put up at the last hearing in March.  We just sort of

22   redlined them so you could see the progress that we've made.

23   We've refreshed them for the progress that we've made in the

24   last six weeks or so.  I'll just wait for the slides.

25              CLERK:  Yeah, she's a co-host.

1           MR. KOENIG:  Thank you.  Great.  So, this is a

2      redline version of the slides that we presented last

3      hearing.  So, as you can see, we've made quite a bit of

4      progress, especially on the PayPal side of things and the

5      fiat side of things.  So, for PayPal, Venmo, we distributed

6      approximately 86 percent of the value as of March.  We've

7      got hale the way between 86 and 100, got all the way to 93

8      percent.

9           We are confident that -- as a reminder, Your

10     Honor, there's claim codes that are sent out to people.

11     There were some people in the last hearing who had been

12     having problems with claim codes.  We've been working

13     through that process, canceling old codes, sending new

14     codes, and we're pretty confident that we've got it figured

15     out, as you can see in the table.

16          For the USD distributions at the bottom, the fiat

17     distributions using Stretto, that was the part at the last

18     hearing detail, we were maybe a little bit behind there

19     because we had a banking partner issue.  Now that we're up

20     and running, you see a lot of progress there, going all the

21     way from 18 percent to 46 percent.  That's a very manual

22     process, checks, wires, and the like.  And we have obviously

23     still a ways to go, but that process is well under way.

24          Two, with Coinbase, the flat percentage remains at

25     83 percent but that's a little bit misleading because we've

Page 10

1   distributed $70 million more.  It's just that the amount

2   that was eligible for Coinbase also increased by about $80

3   million, so due to luck, I guess, the number stayed exactly

4   the same, but we've actually distributed $80 million more.

5           So, we're now at 86 percent of total value under

6   the plan distributed and 89 percent of crypto, and again,

7   keeping in mind the number of eligible claims went up during

8   this period as well.  So, it's -- that probably understates

9   some of the progress.  So, unless Your Honor has more

10  specific questions for me on distributions, that was all I

11  had on that matter.

12          THE COURT:  I guess this really relates to the

13  breach and Stretto.  Have distributions resumed again?

14          MR. KOENIG:  They have not.  That was what I was

15  going to turn to.

16          THE COURT:  Okay, I'll wait.  Go ahead.

17          MR. KOENIG:  I expect that we're going to be able

18  to get there this week.  Your Honor, safety and security of

19  assets have been at the forefront.  I've stood here and

20  talked to you about this many times and phishing scams and

21  things of that nature.  The moment we heard about this from

22  Stretto, we immediately pause plan distributions because we

23  needed to understand whether the systems were safe and

24  secure to reopen distributions.

25          So far, somebody from Stretto will appear and

Page 11

1   provide a more detailed summary, but we have found no

2   evidence that any distributions were rerouted, stolen,

3   anything of that nature.  We're comfortable that that's --

4   that that has not affected the distributions at all.

5           We're simply kicking the tires.  We've been

6   speaking to Stretto and investigators every day to try to,

7   you know, make sure that we're doing our diligence and

8   making absolutely certain that the system is safe and secure

9   to resume distributions.  We expect -- I'm cautiously

10  optimistic that in the next week, we're going to have

11  completed our review of their investigation and then we can

12  reopen distributions and we'll be back -- we'll be back to

13  business, as it were.

14          THE COURT:  Okay.

15          MR. KOENIG:  But unless you have any further

16  questions for me, I'll cede the lectern.  Joe McNelis from

17  McDonald Hopkins represents Stretto and he wanted to briefly

18  address the Court.

19          THE COURT:  Thanks very much, Mr. Koenig.

20          MR. KOENIG:  Thank you.

21          CLERK:  I'm sorry, Judge, we never raised him on

22  Zoom.

23          THE COURT:  No, not yet.

24          CLERK:  Okay.

25          MR. McNELIS:  this is Joseph McNelis from McDonald

Page 12

1    Hopkins on behalf of Stretto.  Good afternoon, Your Honor.

2            THE COURT:  Good afternoon.

3            MR. McNELIS:  May I be heard?

4            THE COURT:  Yes, please.  Go ahead.

5            MR. McNELIS:  Thank you, Your Honor.  So, on the

6    morning of April 17th, Stretto discovered some suspicious

7    activity related to a single employee account.  They

8    immediately initiated an internal investigation which

9    determined that there had been unauthorized access to that

10   account.

11           In response to that discovery, Stretto disabled

12   all access to that account to its internal systems as well

13   as to any external or cloud-based software applications that

14   they use related to its claims management services.

15   Thereafter, Stretto retained external privacy counsel, our

16   firm, McDonald Hopkins, as well as a forensic investigation

17   firm to assist with the investigation, and that's been in

18   progress around the clock until today.

19           At this time, I can say that the forensic

20   investigation itself has concluded.  We are awaiting a final

21   executive summary from the forensic investigation firm, but

22   I am able to share some -- the findings of that

23   investigation as it relates to Celsius and these

24   proceedings.  The investigation found that there was a

25   single employee account that was accessed as a result of a

Page 13

1    smishing attack which is essentially a phishing attack which

2    is done via text message, as opposed to email.

3            The first known access was on April 16th.  It was

4    discovered by Stretto on April 17th and was terminated at

5    that time.  The investigation did confirm that there is no

6    additional unauthorized access from this account after April

7    17th.

8            THE COURT:  May I ask this question?  How many --

9            MR. McNELIS:  Sure.

10           THE COURT:  On how many occasions was the account

11   accessed before it was shut down?

12           MR. McNELIS:  So, in terms of the email account,

13   so the initial access, Your Honor, was via email.  And then

14   the threat actor was able to --

15           THE COURT:  I thought --

16           MR. McNELIS:  -- access --

17           THE COURT:  I though you said it was by text.

18           MR. McNELIS:  So, the initial communication came

19   in via text and then in response to the text, the employee

20   provided his credentials, thinking that it was a legitimate

21   request for his credentials, and then once the threat actor,

22   I'll call them, once the threat actor had credentials, they

23   first accessed the employee's email account.

24           THE COURT:  Were you able to track the access, the

25   extent of the access that occurred once the access was

Page 14

1    gained?

2            MR. McNELIS:  Yes.  So, I guess to your first

3    question, we do know that it was only this one email account

4    that was accessed.  The investigation did include a review

5    of the entire email environment and did not find

6    unauthorized logins or any activity connected to the same IP

7    addresses that were used.  So, we can say with confidence

8    that it was just the single employee email account.

9            In addition to the email account, there was

10   evidence that the threat actor was able to access what's

11   called the Stretto CORE software application.  And just to

12   be clear, this is not CORE as in the adjective core as in

13   critical or kind of the main software.  This is just -- CORE

14   is the name of a software program that Stretto uses for

15   certain claims management functions.

16           THE COURT:  Does it leave a trail once someone

17   gains access to it?

18           MR. McNELIS:  Yes, Your Honor.  So, that -- yeah,

19   part of the investigation was once the forensic investigator

20   was engaged, they worked with the Stretto IT team to pull

21   what we call logs and other forensic evidence that was left,

22   sort of a trail that would have been left by the threat

23   actor showing where they went within each part of, you know

24   -- within each of these applications and then what files or

25   folders they may have touched when they were -- in the when

Page 15

1    they were in those systems.  I can say that there was no --

2    there is no evidence that outside of the email access, there

3    was no evidence to access to internal Stretto systems.  So

4    it was just to the email account.

5            There was a brief period where the threat actor

6    was able to access the Amazon Web Services console which

7    does have some cloud-based applications used by Stretto, but

8    the investigation also found that essentially the threat

9    actor was doing reconnaissance and there was no access to

10   any data stored there.  The access to data really occurred

11   in that CORE software application and in terms of what data

12   was accessed, there -- as I think was laid out briefly in

13   the notice that was filed by Celsius, there was evidence of

14   access to certain information from claims forms.

15           With regard to 99.9 percent of those individuals,

16   the information that was accessed was really limited to just

17   name and contact information.  There was no evidence that

18   any claim codes were accessed or even could have been

19   accessed by this account, just because of where they were

20   stored and the permissions granted to this account would not

21   have allowed him to access those claim codes.

22           THE COURT:  So, with respect -- stop.  With

23   respect --

24           MR. McNELIS:  Sure.

25           THE COURT:  -- the account holders and any email

1  addresses for them, were those account holders contacted by

2  Stretto to advise that their specific -- that some of their

3  specific information had been accessed?

4          MR. McNELIS:  So, we are in the process of

5  preparing those communications.  I expect --

6          THE COURT:  What are you waiting for?  What are --

7          MR. McNELIS:  We --

8          THE COURT:  -- you waiting for?

9          MR. McNELIS:  We are just dealing with some

10  logistics in terms of getting email addresses and mailing

11  addresses for those individuals.

12          THE COURT:  How long ago did this occur?  I don't

13  understand why it's taking so long.  The notice was filed on

14  April 26th.  It should have been the highest priority to

15  notify each and every account holder.  You've identified the

16  account holders, correct?

17          MR. McNELIS:  Yes.  At this point, we have.

18          THE COURT:  And I don't understand, then, why you

19  haven't contacted the account holders to advise each account

20  holder that their account was accessed improperly.  Here we

21  are at May 7th, and the notice was filed on April 26th.

22  What are you waiting for?

23          MR. McNELIS:  So, the notice that was filed by

24  Celsius on the docket was, you know, at least one way to try

25  to alert creditors that this had occurred.  Typically,

Page 17

 1    investigations like this can, you know, sometimes take

 2    months to try to determine exactly whose information may

 3    have been accessed.

 4            THE COURT:  When did you identify whose

 5    information had been accessed?

 6            MR. McNELIS:  Probably May 1st or 2nd, Your Honor.

 7            THE COURT:  Have you communicated with the Office

 8    of the United States Trustee about the details of what

 9    transpired and what's been done since?

10            MR. McNELIS:  No, Your Honor.  At this time, the

11    communications, at least as it relates to these proceedings,

12    have been directly with Celsius.

13            THE COURT:  All right.  Mister --

14            MR. McNELIS:  -- and then there's --

15            THE COURT:  Mr. Masumoto, from the U.S. Trustee's

16    office?

17            MR. MASUMOTO:  Brian Masumoto for the Office of

18    the United States Trustee.  I did want to advise the Court

19    that our office became aware of the Stretto incident and

20    conveyed that information to the U.S. Attorney's Office.

21            THE COURT:  Okay.  But I -- here's my concern.

22    Okay?  The notice was filed -- of the security incident was

23    filed on April 26th.  You know that specific account

24    holders' accounts were accessed.  You know, unless somebody

25    reads the docket on a regular basis, they probably have no

Page 18

1    clue what's happened.  I consider this to be absolutely the

2    highest priority and inexcusable that the account holders

3    haven't been contacted.

4            MR. McNELIS:  I understand and if I could --

5            THE COURT:  Stop.

6            MR. McNELIS:  -- raise --

7            THE COURT:  Stop.

8            MR. McNELIS:  Sorry.  Sure.

9            THE COURT:  I don't want to go into this further

10   on the record now.  Mr. Masumoto, you or your colleagues

11   should be in touch with Stretto's counsel and I just -- it's

12   unacceptable to me that they haven't been -- that account

13   holders haven't been contacted.

14           MR. MASUMOTO:  We will follow up, Your Honor.

15           THE COURT:  It's absolutely invisible to them

16   unless -- you know, most creditors don't read the docket.

17   When is the report going to be available?  I want to see the

18   report.  The U.S. Trustee should see the report.  I'm sure

19   the Debtor and the Creditors Committee counsel should see

20   the report as well.  I want it as soon as possible.

21           MR. McNELIS:  Understood.  And can I just be heard

22   on one point of clarification, Your Honor?

23           THE COURT:  Go ahead.

24           MR. McNELIS:  I don't want the Court to come away

25   with the thought that accounts of creditors have been

Page 19

1    accessed in any way.  They were simply claim -- I mean, not

2    to downplay it, because it's obviously important and

3    sensitive information, but there was no account information,

4    no credentials, no evidence of any claim codes or wire

5    information.  There were records within a Stretto software

6    application --

7              THE COURT:  Are you suggesting to me that the

8    account holders don't have a right to know that their

9    account was accessed?

10             MR. McNELIS:  No.  I'm suggesting that their --

11   their account was not accessed.  It was their personal

12   information.  So --

13             THE COURT:  You don't think they have a right to

14   know that their personal information was accessed through a

15   phishing attack?

16             MR. McNELIS:  Of course, I do, Your Honor.

17             THE COURT:  Okay.  Where are you located?

18             CLERK:  (indiscernible).

19             MR. McNELIS:  I am (indiscernible) South Carolina,

20   but I live outside of Philadelphia and that's where I

21   practice.

22             THE COURT:  Tell me when the reports are going to

23   be -- when the report is going to be completed.

24             MR. McNELIS:  By Thursday, Your Honor.

25             THE COURT:  I'm scheduling another hearing just to

Page 20

1    deal with the Stretto security incident, to use the title

2    that's on your notice, for next Tuesday, May 14th at three

3    o'clock.  You need to be in courtroom.  I expect to have the

4    report by Monday at noon and the U.S. Trustee, the Debtor,

5    and the Committee will have it as well.

6           It's unacceptable to me.  It's unacceptable to me

7    that this wasn't absolutely the highest priority to get this

8    done to have distributions resumed.  Distributions have been

9    frozen while this has been going on.  The Court is contacted

10   regularly by creditors wanting to know what's happened to

11   their distributions.  So, you be in the courtroom along with

12   somebody, a responsible executive from Stretto.

13           MR. McNELIS:  Yes, Your Honor.  And I do want to

14   assure you that this has been a priority for Stretto and for

15   the members of our team that are working on this.

16           THE COURT:  I want to make sure I get an

17   explanation on Tuesday when you show up why it's taken this

18   long.

19           MR. McNELIS:  Yes, Your Honor.  And --

20           THE COURT:  Okay.  Let's go on to the next --

21           MR. McNELIS:  Okay.  Understood.

22           THE COURT:  -- item on the agenda.

23           MR. KOENIG:  Thank you, Your Honor.  The next item

24   on the agenda, I believe, is Mr. Voelker's motion that he

25   filed.  Unfortunately, Your Honor, I have a day hearing --

Page 21

```
 1              THE COURT:  Go ahead.  Go ahead.  That's fine.  Go
 2    ahead.
 3              CLERK:  Sorry, Judge.  We have a raised hand.  I
 4    don't know if you want to address anything.
 5              THE COURT:  I want to address the next motion.
 6    All right.  The next matter on the agenda is the motion for
 7    leave to file an adversary proceeding by Jason Voelker.  Mr.
 8    Voelker --
 9              MR. VOELKER:  Good morning, Your Honor.
10              THE COURT:  -- are you in the court -- you're on
11    the screen.  Go ahead, Mr. Voelker.
12              MR. VOELKER:  I'm on -- I am on Zoom.  Good
13    morning.  Sorry about that.  It's afternoon there.  I'm in
14    California, so --
15              THE COURT:  Okay.  Go ahead.
16              MR. VOELKER:  So, the motion that I filed, I think
17    it pretty much speaks for itself.  I was hoping for a
18    response from Celsius and their counsel to where we could
19    kind of, you know, flesh out the facts and, you know, kind
20    of narrow the scope of the issues here, but it's kind of
21    wide open.  With regards to their particular argument that
22    iCapital and myself are barred from proceeding because of
23    the injunction and the class settlement, I think that that
24    would be -- I believe that's true with regards to Earn
25    account, but with regards to the money that we had in a
```

Page 22

1    separate escrow account that's outside the bankruptcy

2    estate, I think that's a separate matter that would have to

3    be brought through an adversary proceeding.

4            And I see the injunction as being one that would

5    bar us if those monies were actually in the bankruptcy

6    estate, but they never made it there.  They collaterally

7    outside of the estate, but they're included within this

8    bankruptcy.  And that was kind of this conversation I

9    thought we were going to be having, but counsel basically

10   didn't address anything.  They didn't address the Wyoming

11   law with regards to cryptocurrency assets.

12           They didn't address jurisdiction.  They didn't

13   address the difference between having their escrow account

14   out of Wyoming and the regular Earn account.  Counsel didn't

15   mention the word Wyoming at all, so I'm kind of at a loss of

16   how the Court wants to proceed, but I do want to answer any

17   questions or if anything came up.

18           THE COURT:  Well, I read your papers and I'll give

19   you a chance to make any other argument you want to do now.

20           MR. VOELKER:  Well, the only other argument I

21   would have -- well, I really don't have any other argument.

22   There's nothing really new to add to this, Your Honor.  I

23   think that it's pretty straightforward that what we have is

24   we have a classic bailment under Wyoming law.  I understand

25   that the Court in the past has ruled that the cryptocurrency

Page 23

```
 1    itself, that there's no security interest in it, but that's

 2    not with regard to the State of Wyoming.  The State of

 3    Wyoming makes it very clear that there is a security

 4    interest and you can perfect that security interest simply

 5    by transacting.  There's no need to go and follow UCC1 or

 6    any other type of security statement.  Just transacting

 7    alone is enough to create a security interest.

 8              THE COURT:  Okay.  Anything else you want to add?

 9              MR. VOELKER:  No, Your Honor.

10              THE COURT:  Okay.  So, an -- objections were filed

11    by the litigation administrator.  Who wants to argue -- go

12    ahead.

13              MS. YOO:  Good afternoon, Your Honor.  Jade Yoo

14    from White & Case on behalf of the litigation administrator

15    and Ionic Digital.

16              THE COURT:  Okay.

17              MS. YOO:  I'll be addressing Mr. Voelker's motion

18    today.

19              THE COURT:  Go ahead.

20              MS. YOO:  Before I begin, we have the declaration

21    of Mr. Brian Karpuk from Stretto, which is attached to our

22    objection.  I'd like to submit that into evidence.  Mr.

23    Karpuk is also available by Zoom today for any questions

24    related to his declaration.

25              THE COURT:  What's the ECF number of the
```

Page 24

```
 1   declaration?

 2              MS. YOO:  The -- that would be 4843.

 3              THE COURT:  4843-1.

 4              MS. YOO:  Actually, I believe it's attached

 5   directly to the objection, so no dash one.

 6              THE COURT:  I think it had a dash one.

 7              MS. YOO:  Oh, my apologies, Your Honor.  You're

 8   correct.  4843-1.

 9              THE COURT:  All right.  Any objection?  All right,

10   the Karpuk declaration is admitted into evidence.

11              (ECF 4843-1 entered into evidence)

12              MS. YOO:  Thank you, Your Honor.  Turning now

13   (indiscernible) substance of Mr. Voelker's motion, as argued

14   in our objection, the issue before the Court today is more

15   of a gating issue, that is whether the Court should grant

16   Mr. Voelker, a nominal plaintiff, leave to file a derivative

17   complaint seeking return of cryptocurrency assets that

18   iCapital deposited with Celsius as part of Celsius' Earn

19   program and Borrow program.  And the answer, Your Honor, is

20   no for two reasons.

21              First, the plan says what the plan says.  No

22   matter how Mr. Voelker tries to slice and dice iCapital's

23   reported claims, they were settled, they were released,

24   expunged, and are now permanently enjoined pursuant to the

25   terms of the plan and Your Honor's confirmation order.
```

1              Second, Mr. Voelker's request just simply comes

2      too late and he cannot seek refuge under the doctrine of

3      equitable tolling to save his untimely request.  On the

4      first point, Your Honor, the plan says what the plan says

5      and what the plan says is that iCapital which did not

6      affirmatively opt out of the class claim settlement, settled

7      and released all prepetition claims and causes of action

8      underlying its proof of claim, and that proof of claim is

9      now expunged.

10             The following facts are uncontested.  During the

11     solicitation process for the plan, iCapital was served the

12     solicitation materials which included a ballot and a notice

13     regarding the class claim settlement.  iCapital did not

14     return a ballot.  It did not opt out of the class claim

15     settlement, and it is now bound by the terms of that

16     settlement.

17             And in exchange, as Your Honor is aware, iCapital

18     became entitled to a 5 percent premium on the scheduled

19     amount of its scheduled claim and will receive distributions

20     under the plan consistent with that entitlement.  In fact,

21     iCapital has already received an initial distribution and

22     the injunction provision of the plan which is now effective

23     permanently enjoins both iCapital and Mr. Voelker from

24     commencing actions based on such settled, released, and

25     expunged claims.

Page 26

1          Mr. Voelker does not contest that iCapital is a

2    class claim settlement participant or that the injunction

3    provision is inappropriate.  Indeed, as you see in his reply

4    in support of his motion which he filed yesterday and as he

5    stated today on the record, Mr. Voelker seems to concede

6    that conjunction provisions of the plan do bar general Earn

7    claims.

8          Instead, what he seems to argue is that iCap --

9    that the assets iCapital deposited as a retail borrower in

10   connection with the Borrow program are somehow distinct and

11   are not property of the estates.  The distinction Mr.

12   Voelker tries to draw is completely contrary to the terms of

13   the class claims settlement which encompasses both general

14   Earn claims and retail Borrower deposit claims.

15         And critically, Your Honor, the Court has already

16   found that the cryptocurrency transferred by users to

17   participate in the Borrow program with respect to those

18   users who did not vote to accept the plan is property of the

19   Debtor's estate under Section 541 of the Bankruptcy Code.

20   And this is in Your Honor's confirmation order, Paragraph

21   269.

22         As mentioned earlier, iCapital received a ballot

23   but did not return it, and thus it never voted to accept the

24   plan.  Your Honor's confirmation order therefore applies

25   with full force.  The cryptocurrency iCapital pledged as

Page 27

1    collateral is properly considered part of the Debtors'

2    estates and Mr. Voelker cannot seek their return.  Simply --

3           THE COURT:  What about his argument that state law

4    made it into a secured creditor?

5           MS. YOO:  Well, the time to have made that

6    argument, Your Honor, is simply passed and that's the second

7    point that I'd like to raise.  To be clear, Your Honor, we

8    do not believe that the application of equitable tolling is

9    apt here and even if it is, the circumstances do not warrant

10   the application of equitable tolling.  Mr. Voelker admits in

11   his -- in both his motion and his reply that the relief that

12   he seeks is untimely, and what he does is appeal to the

13   doctrine of equitable tolling.

14          As an initial matter, Your Honor, application of

15   equitable tolling would be prejudicial to the Debtors at

16   this point in time.  The confirmation order became final and

17   non-appealable on November 23rd of 2023.  The Debtors have

18   since emerged from Chapter 11 and commenced distributions to

19   creditors pursuant to the plan, as Your Honor has heard this

20   morning, and iCapital has already received an initial

21   distribution based on its entitlement under the plan.

22          Granting Mr. Voelker's motion at this point would

23   open the door to costly litigation that the plan already

24   operates to foreclose and would disrupt the orderly

25   administration of the effective plan.  And in any event,

Page 28

1    Your Honor, finally, Mr. Voelker's equitable argument fails.

2    Mr. Voelker bears the burden of satisfying two elements for

3    the application of equitable tolling.  One is that he

4    diligently pursued his rights; and two, that there were

5    extraordinary circumstances beyond his control that

6    prevented timely filing.  He has not met his burden on

7    either element.

8             This Court can quickly dispose of the notion that

9    Mr. Voelker or iCapital have been prevented from asserting

10   their rights in these Chapter 11 cases whether that's an

11   extraordinary way or even an ordinary way.  Nowhere in his

12   reply brief or his opening brief does Mr. Voelker make any

13   such allegations.

14            As for his personal diligence, all Mr. Voelker

15   said he's done is to encourage iCapital's board of directors

16   to pursue legal action.  According to his papers, this

17   request was made as early as May of 2022 which is now almost

18   two years ago.  He provides simply no other detail or

19   explanation for what caused the delay on his part to obtain

20   consent for derivatives -- excuse me, derivative standing.

21            More importantly, Your Honor, iCapital has had

22   multiple opportunities to exercise its rights or otherwise

23   preserve its claims against Celsius.  As Your Honor noted,

24   they could have brought up the Wyoming law issue at any

25   point during the Chapter 11 cases and they did not.

Page 29

1    iCapital could have opted out of the class claim settlement.

2    It did not.  iCapital could have objected to the plan or

3    appealed your confirmation order.  It did not.

4           Under these facts, there is simply no basis to

5    apply equitable tolling, and for these reasons, Your Honor,

6    we ask that you deny the motion.

7           THE COURT:  Thank you very much.  All right.  Mr.

8    Voelker, do you wish --

9           MR. VOELKER:  Yes, that's -- yes.  Thank you, Your

10   Honor.  (indiscernible) it sounded a lot like the

11   opposition, I didn't really hear anything new to that and

12   the reply addressed much of that.  As far as why did

13   iCapital not bring anything previously and somehow that

14   precludes relief, I mean, that's kind of the point.  Counsel

15   makes the point, is that it wasn't able to proceed.  It

16   didn't have counsel.  It didn't have representation.  It

17   wasn't able to proceed.

18          That's why I came in as a shareholder derivative

19   and -- but I couldn't come a day earlier.  Under 23.1 of the

20   Federal Rules of Civil Procedure, it's very clear that had I

21   come any earlier with these claims, I would been barred.

22   Unfortunately, when I had standing, it was already too late,

23   and that's precisely what equitable tolling is for, other

24   equitable relief.  Because if the day I'm able to come to

25   Court, I'm already barred and I come to Court with clean

Page 30

1  hands, there's something wrong.  I should be able to come to

2  Court with clean hands and have my day in Court.  And if

3  that is something that's barred, that's what exactly

4  equitable tolling is for.

5           As far as the claim that, you know, that this was

6  just part of the regular Earn account or part of the Borrow

7  account, that that's not the case.  If you can look

8  distinctively at the documents that we prepared out of

9  Wyoming, it says it would be an escrow account.  We

10 submitted our board resolution.  We submitted our bylaws.

11 The (indiscernible) finance agreement said it was out of

12 Wyoming and it's very clear that this is an agreement and it

13 was put together for the purposes of trying to maintain a

14 security interest in this cryptocurrency.

15          And as far as I can see, I don't see anywhere

16 where that cryptocurrency has been deposited into the actual

17 estate.  I don't know if it's outside of the estate, if it

18 was transferred in there separately under a different

19 heading.  When I look at iCapital's information in the

20 schedules, I'm not seeing it.  So, when counsel says, well,

21 there's already disbursements coming, I'm not seeing it.  I

22 saw a $3,000 disbursement check from part of the Earn

23 account, but that's not what we're talking about.  We're

24 talking about the money held in this distinct escrow that is

25 part of a bailment under Wyoming law and I think the Court

Page 31

1    has to take that into consideration.

2              And when counsel says, oh, this is going contrary

3    to the Court's rules, I don't believe so.  I think that the

4    Court has not taken a look at it from this angle, and when

5    it sees that Wyoming law incorporated it into the

6    (indiscernible) changes things.

7              THE COURT:  All right.  Thank you very much, Mr.

8    Voelker.  I'm going to take it under submission and I'll

9    enter an order appropriately.

10             MR. PHILLIPS:  Your Honor, may I be heard on this

11   matter?

12             THE COURT:  No, you may not.  You have not filed

13   anything, Mr. Phillips.  You're not a party to this dispute.

14   You cannot be heard.  All right.  Next item on the agenda is

15   request for judicial review of UCC matter by Mr. Noyes.  Mr.

16   Noyes, do you want to be heard?

17             MR. NOYES:  Yes.  Yes, please, Your Honor.

18             THE COURT:  Go ahead.

19             MR. NOYES:  Okay, with your permission, I would

20   like to briefly lay out how I came to be part of the UCC,

21   the events that led to the United States Trustee to

22   (indiscernible) manner and why I think those allegations

23   were spurious.

24             So, I first became involved with Celsius

25   bankruptcy case in July 2022, while I was employed as Chief

Page 32

1    Risk and Compliance Officer for Covario AG, a Swiss crypto

2    brokerage firm.  I should add here that I worked in

3    financial markets for approximately 30 years.  I'm not a

4    lawyer and have never studied law.

5            Covario AG had several clients who had deposited

6    crypto assets with Celsius through the Earn (audio glitch)

7    program.  Because the assets were deposited through Covario

8    account with Celsius, Covario ended up being a very large

9    institutional creditor.  (audio glitch) I completed the

10   application form for Covario to join Unsecured Creditors

11   Committee and I also disclosed that I was personally at

12   creditor of Celsius in the August 2, 2022 disclosure

13   statement for Covario.

14           After Covario was selected by the U.S. Trustee to

15   join the UCC, I was tasked with being the Covario

16   representative on UCC, a role I fulfilled form the end of

17   July 2022 until September 29, 2023 when Covario was removed

18   from the UCC, and by extension myself.  Let me be clear up

19   front that I do challenge the authority of the U.S. Trustee

20   to select, substitute, and remove members of the UCC.  What

21   I do challenge is spurious allegation by the U.S. Trustee

22   that I acted in an ultra vires manner at the time Covario

23   (indiscernible).

24           Despite no evidence backing the accusation, the

25   U.S. Trustee also insisted that my name be removed from the

Page 33

1    litigation oversight committee to which I had been selected

2    in my personal capacity by the whole UCC.  The first

3    allegation by the UCC that I acted in an ultra vires manner

4    have had tremendous personal economic and professional

5    impact on my life.  I explain now why the accusation is

6    false and how the U.S. Trustee acted negligently in making

7    these accusations.

8            As the Covario representative on UCC, I was from

9    the outset extremely engaged in all UCC matters.  Due to

10   time zone differences, this frequently involved working well

11   into the night as well as on weekends and European holidays.

12   In terms of participation time and effort, I estimate that

13   only the committee co-chairs dedicated more time and effort

14   to the UCC than I did.

15           On November 25, 2022, Covario failed to make

16   payroll and it became clear that bankruptcy was near.  Not

17   being familiar with U.S. bankruptcy law regarding whether or

18   not a bankrupt company could continue to be a UCC committee

19   member, I sought the advice of Greg Pesce of White & Case,

20   the UCC counsel.  As the evidence provided by the U.S.

21   Trustee's March 13th and May 1, 2023 filings, the latter of

22   which is in Docket 4850, Mr. Pesce first flagged Covario's

23   potential bankruptcy to the U.S. Trustee in late November,

24   early December 2022.

25           This was the first of three instances where I

1    expressed concern that Covario bankruptcy could make it

2    impossible for me to represent Covario on USS and asked

3    whether I should resign if that were the case.  To be clear,

4    what I mean by that is whether I should resign from my

5    position on the UCC, not to resign (indiscernible) Covario's

6    position on the UCC.  As the evidence shows, U.S. Trustee

7    did not (audio glitch) conclusions until an actual

8    bankruptcy occurred and this is understandable.

9              On December 20, 2022, Covario filed for bankruptcy

10   in Zug, Switzerland.  The filing was for a winddown akin to

11   a U.S. Chapter 11 rather than a restructuring.  On that same

12   day, Covario's CEO Mark Banner circulated two emails to

13   Covario staff (audio glitch) Exhibits 2 and 3 (audio glitch)

14   in Docket (audio glitch) requesting review.  In the first

15   email, staff were advised to collect personal belongings on

16   that day and that access to Covario email would be shut off

17   imminently.

18             The second advised (indiscernible) employment

19   would be up to the Swiss bankruptcy administrator.  To this

20   day -- meaning today -- the Swiss bankruptcy administrator

21   has never instructed me to discontinue representing Covario

22   AG on the UCC.  (indiscernible), Mr. Pesce again reached out

23   to the U.S. Trustee on December 21, 2022 to inform the U.S.

24   Trustee that Covario had indeed gone bankrupt, and I again

25   asked for guidance on whether I could continue to represent

Page 35

1    Covario in the UCC.

2            At the same time, Mr. Pesce submitted on my behalf

3    an application to join the UCC in my own capacity.  The

4    purpose of this application was to give U.S. Trustee option

5    should it choose to remove Covario from the UCC that it

6    could substitute me instead in order to preserve maximum

7    continuity and institutional memory.  I fully understood

8    that I could not join the UCC in my personal capacity until

9    or unless the U.S. Trustee chose to review -- remove Covario

10   and select me.

11           With Covario email being shut off, Mr. Pesce and I

12   agreed that from that day forward, UCC committee

13   (indiscernible) would be sent to a personal email address

14   that I created for this purpose so that I could continue to

15   represent Covario on the UCC to perform my fiduciary duties.

16           When I returned (indiscernible) in early January,

17   I found in my letterbox official notice of the Covario

18   bankruptcy which I officially -- which I immediately

19   forwarded to Mr. Pesce.  Again, I inquired if the U.S.

20   Trustee had reached any decision (indiscernible) for me to

21   resign from UCC.  Mr. Pesce responded that he had spoken

22   with the U.S. Trustee the previous day, January 4th, '23,

23   and that the U.S. Trustees were taking matters under

24   consideration and Mr. Pesce advised that I should continue

25   performing my UCC duties as before.

1          For the next nine months, I continued to do just

2     that, representing Covario on the UCC and assisting

3     Covario's end clients with Celsius exposure questions where

4     I could.  Though my demonstrated efforts and abilities, the

5     UCC found it (indiscernible) select me around the end of

6     August or beginning of September 2023 to serve on the

7     Litigation Oversight Committee.

8          In approximately mid-September 2023, I was alerted

9     for the first time by Mr. Pesce that the U.S. Trustee was

10    raising questions about my capacity to serve on UCC.

11    (indiscernible) I find the accusation made by the U.S.

12    Trustee absurd and believe that they have been negligent

13    (audio glitch) spurious allegation that I acted in

14    (indiscernible) manner.

15         In the U.S. Trustee filing of March 13, 2023 --

16    and I apologize.  This was circulated through chambers, so I

17    don't know the docket number -- the U.S. Trustee, and I

18    quote, "Mr. Noyes (indiscernible) in the Noyes letter that

19    as of December 20, 2022 he was no longer employed by the

20    (indiscernible) on behalf of Covario, the committee member

21    had been authorized -- he had been authorized in the

22    committee."

23         Nothing could be further from (audio glitch).  I

24    continued to represent Covario because the Swiss bankruptcy

25    administrator never instructed me not to continue

Page 37

1    representing Covario.  According to the U.S. Trustee filing

2    of (indiscernible) Page 6, the U.S. Trustee (indiscernible)

3    Mr. Pesce and expressly asked if there had been formal

4    resignation and if so, what was the resignation date.

5          The (indiscernible) email sent (indiscernible) to

6    Mr. Pesce on Thursday, September 14th, 2023 read, "Thank you

7    for your email.  Has there been a formal resignation yet?

8    We cannot make any designation -- any decision of any action

9    without a formal resignation.  Additionally, as of what date

10   will the resignation relate to?  Can you provide the date

11   for the insolvency proceedings abroad?  Lastly, we were not

12   aware of Keith's personal application for the committee.

13   Thank you, Shara."

14         So, therefore the U.S. Trustee also proposed that

15   there had never been an official resignation by Covario and

16   this (indiscernible).  I also find it incredibly interesting

17   that (indiscernible) stated that she was not aware of

18   Keith's personal application for (audio glitch), despite the

19   U.S. Trustee's May 1, 2024 filing stating specifically at

20   the bottom of Page 5 and the start of Page 6, also including

21   the December 21 email was for the first time a copy of an

22   individual application to join the committee from Mr. Noyes.

23         Based upon the scant evidence provided in the

24   discovery by the U.S. Trustee, it appears that the first

25   time that the U.S. Trustee attempted to contact Covario

Page 38

```
 1    following being made aware that Covario had declared

 2    bankruptcy on December 2022 was on September 19, 2023.

 3          I apologize for the late delivery of discovery

 4    documents by -- made by the U.S. Trustee has made it

 5    impossible for me to submit these in the docket on a timely

 6    manner.  Please allow me read from the email from which

 7    (indiscernible) which is addressed exclusively to several

 8    Covario email addresses, including the CEO and the former

 9    head of corporate communications who left Covario during

10    summer of 2022, and I note that had been flagged that the

11    email for Covario was shut off on December 21, 2022.

12          "To whom it may concern, my name is Shara Cornell

13    and I am a trial attorney with the United States Trustee's

14    program, a branch of the United States Department of

15    Justice.  Covario AG appointed to the Official Committee of

16    the Unsecured Creditors Committee in bankruptcy case,

17    Celsius Network LLC, 22-10964 pending in the Southern

18    District of New York, United States of America, in August

19    2022.  At the time of appointment, Covario AG was

20    (indiscernible) Keith Noyes as its representative committee.

21    It has come to our attention that Keith Noyes is no longer

22    affiliated with Covario AG.  Can you please state Covario

23    AG's intention with respect to the Committee and Celsius?

24    If Covario AG no longer wishes to serve on the Committee,

25    please let me know as soon as possible (indiscernible) at
```

Page 39

1    your convenience to discuss further.  Regards, Shara

2    Cornell."

3              So again, I do not dispute the power of the U.S.

4    Trustee to select, remove, or replace UCC members; however,

5    I do challenge their right to case spurious allegations.  I

6    was clearly still the Covario representative on the UCC

7    until September 29th, 2023 when the U.S. Trustee removed

8    Covario and by extension myself.  The allegations that I

9    acted in an ultra vires manner has cause me significant

10   injury.

11             Covario's insolvency has already cause me

12   financial (audio glitch) and as a nearly 60 father trying to

13   support a family consisting of a wife and two teenage

14   daughters living in Switzerland, one of the most expensive

15   places on earth, the U.S. Trustee, the allegation of acting

16   in an ultra vires manner, having me removed from the

17   litigation -- the people selected to serve on the Litigation

18   Oversight Committee denying me a source -- a potential

19   source of future income (indiscernible) answer questions

20   about this ultra vires allegation in job interviews and this

21   puts me at a competitive disadvantage when competing for

22   jobs and puts (indiscernible) my resume the 13 months during

23   which I served on the UCC.

24             For these reasons, I seek judicial finding that I

25   did not act in an ultra vires manner as I hope has been duly

Page 40

1     demonstrated here.  I also seek a formal apology from the

2     U.S. Trustee for the damage that they have done to my good

3     name and (indiscernible) and I seek reinstatement in the

4     Litigation Oversight Committee as originally (indiscernible)

5     in the September 2022 confirmation plan, which is an Exhibit

6     6 in my original filing.  Thank you very much, Your Honor.

7              THE COURT:  Thank you, Mr. Noyes.  Who from the

8     U.S. Trustee's Office is going to respond?

9              MS. HAVLIN:  Your Honor, this is Kim Havlin for

10    the Committee.  We'd also like to be heard.

11             THE COURT:  All right, let me hear from the

12    Committee first, Mr. Masumoto, and then we'll hear from you,

13    okay?

14             MS. HAVLIN:  Of course, Your Honor.  Thank you.

15             THE COURT:  No, go ahead.  I'll hear from the

16    Committee first.  Go ahead.

17             MS. HAVLIN:  Thank you very much, Your Honor.

18    Good afternoon.  This is Kim Havlin of White & Case here on

19    behalf of the Committee.  I will be brief, but we do stand

20    here first to defend the integrity of the Committee and its

21    process, and we do agree with Mr. Noyes that he did not act

22    in an ultra vires manner.  And if I may pause on that, Your

23    Honor, that is the narrow question that is before the Court

24    today and a judicial determination --

25             THE COURT:  It actually is not.  That's the U.S.

Page 41

```
 1   Trustee position in their objection is that the matter is

 2   moot.  And I don't reach advisory opinions.  The matters

 3   before me now does not require -- my concern is, it does not

 4   require a finding one way or the other, whether anything

 5   done by Mr. Noyes was ultra vires.

 6           MS. HAVLIN:  We understand that concern, Your

 7   Honor, and with respect to that the Committee is in Your

 8   Honor's hands as to whether it wishes to hear the

 9   application.

10           THE COURT:  Well, go ahead.  (indiscernible).

11           MS. HAVLIN:  Sure.  Should the application

12   proceed, I'm sure the United States Trustee and Mr. Noyes

13   will address this issue, but just to go to the merits, we do

14   agree that Mr. Noyes did not act in an ultra vires manner at

15   any time and at least next to mootness question, that is

16   narrow and legal, frankly, Your Honor, question here before

17   the Court, a narrow question about legal authority to act

18   that to be frank is a bit apart from a lot of the back and

19   forth that you see in the emails and so forth, so there is -

20   - there is no dispute that Covario was appointed to the

21   Unsecured Creditors Committee and that Mr. Noyes was

22   appointed as its representative.

23           I have two documents from the docket that I'd like

24   to refer to, Your Honor, (indiscernible) enter into evidence

25   just for --
```

Page 42

1            THE COURT:  So, just -- if it's on the docket, why

2     don't you just give me the docket numbers.

3            MS. HAVLIN:  Even better.  So, the first document,

4     Your Honor, is Docket No. 241. It was filed July 27, 2022.

5     It is the notice of appointment of Official Committee of

6     Unsecured Creditors.  And it lists at number seven Keith

7     Noyes for Covario AG.

8            The second document, Your Honor, is an amended

9     notice of appointment of Official Committee of Unsecured

10    Creditors that appears at Docket 3631.  It was filed

11    September 29, 2023.  I have copies if anyone needs them.

12    The amended notice no longer contains Covario or Mr. Noyes.

13            I raise these two document, Your Honor, because

14    there really, as we see it, is only one question which is

15    whether in this time period between the day that Covario and

16    Mr. Noyes were appointed and the day that they were formally

17    removed by the United States Trustee, was there any moment

18    at which authority to conduct itself in accordance with this

19    Court filed notice of appointment was revoked, destroyed, or

20    otherwise changed.  It's our submission that there is no

21    evidence in the record whatsoever before you that Mr. Noyes'

22    authority to act on behalf of Covario ever changed.

23            And I'll say, it's true that as Mr. Noyes

24    described -- and you'll see this, Your Honor, in the papers

25    -- that in November or December 2022, my partner Greg Pesce

Page 43

1    advised the United States trustee of Covario's financial

2    issues.  It did so as he -- as I think it clear from the

3    record if you take a look, in order to, you know, kind of

4    plan ahead in case because who knew at that time, perhaps

5    Covario decided to resign from the Committee, Covario

6    decided to appoint someone to the Committee, the United

7    States Trustee decided that Covario was no longer an

8    appropriate Committee member, some combination of the above,

9    or something different.

10            And as such, Mr. Pesce submitted the completed

11   questionnaire of Mr. Noyes which was always there to serve

12   as a backup option, should some removal or change occur.

13   But our point to come back to is that none of these ever

14   happened, Your Honor.  Mr. Noyes was never removed and

15   continued to serve as he had been authorized to do.

16            I do have two other documents which are emails

17   from discovery that I'd like to offer in, Your Honor, if I

18   may.

19            THE COURT:  Just -- why don't you tell me what

20   they are and see --

21            MS. HAVLIN:  For sure.  They've been circulated,

22   Your Honor, to the --

23            THE COURT:  Okay.

24            MS. HAVLIN:  -- United States Trustee and to Mr.

25   Noyes.  They're documents from discovery.  One of them, Your

Page 44

1    Honor, is the email that Mr. Noyes referred to.  It is an

2    email from Ms. Shara Cornell of the United States Trustee's

3    Office to the bankruptcy administrator for Covario's estate.

4    It is dated September 19 of 2023.  The other is an email

5    exchange dated September 30th, 2023 between my partner Greg

6    Pesce and the Covario bankruptcy administrator.

7              We're happy to put those on the docket, yes, Your

8    Honor.  My point is going to be more what those documents

9    don't contain.  There was an outreach from the United States

10   Trustee to the bankruptcy administrator of Covario.  There

11   was an outreach from the Unsecured Creditors Committee to

12   the bankruptcy administrators of Covario's estate.  Neither

13   one said, who is this Keith Noyes gentleman, he's not

14   authorized to act, please correct this error, please resign.

15   Please remove us.

16             So, even if you do engage in the discovery record,

17   I submit, Your Honor, it strongly supports Mr. Noyes'

18   contention and that he continued to have authority to serve.

19   Your Honor, I'm happy to answer any other questions on the

20   record.  I don't intend to address the merits any further,

21   other than, if I may, Mr. Noyes filed a reply just a few

22   hours before.  The last paragraph of Mr. Noyes' reply

23   submission -- forgive me -- which appears at Docket 4870,

24   the last paragraph of Mr. Noyes' reply requests that in the

25   event that Your Honor makes a finding against Mr. Noyes,

Page 45

1    that it doesn't just decline to --

2              THE COURT:  I don't even think that's an issue for

3    today.  The issue is whether this is moot.  I don't

4    (indiscernible).  I don't render advisory opinions.

5              MS. HAVLIN:  Then I --

6              THE COURT:  I don't see where -- I don't expect to

7    be making any finding that Mr. Noyes acted in an ultra vires

8    manner.

9              MS. HAVLIN:  Thank you, Your Honor.  I would just

10   ask, should you consider that if we could brief the issue

11   and address the request for modification of the order.

12             THE COURT:  Thank you.  Thank you very much.

13             MS. HAVLIN:  Thank you.

14             THE COURT:  Mr. Masumoto.

15             MR. MASUMOTO:  Thank you, Your Honor.  Brian

16   Masumoto for the Office of the United States Trustee.  Your

17   Honor, give your statements, I'm not sure whether I should

18   attempt to --

19             THE COURT:  Let me ask you this.  Do you agree

20   with me that in order to rule on the pending motion, I do

21   not need to make any finding that Mr. Noyes acted in an

22   ultra vires manner?

23             MR. MASUMOTO:  Our position is that, as indicated

24   in our papers, that the matter is moot and that the issue of

25   his ultra vires conduct or not, is not at issue.

Page 46

1          THE COURT:  All right.

2          MR. MASUMOTO:  Your Honor, to -- given Your

3    Honor's position and -- which seems to be consistent with

4    ours, that the matter is moot, I would prefer not to

5    necessarily go into details contradicting Mr. Noyes and/or

6    Ms. Havlin.  To the extent Your Honor has questions, I'm

7    happy to address them.  I would specifically address Your

8    Honor to the application filed by Mr. Noyes himself

9    regarding statements as to his representation on the

10   Committee.

11         THE COURT:  I don't have any questions.

12         MR. MASUMOTO:  Thank you, Your Honor.

13         THE COURT:  All right.  I'm going to take it under

14   submission.

15         MR. NOYES:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17         MS. HAVLIN:  Thank you, Your Honor.

18         THE COURT:  Thank you very much.  All right.

19   Let's move on on the agenda.  On the uncontested matters,

20   the motion to distribute deceased account holders' assets.

21   It's ECF 4815.

22         MR. LATONA: Good afternoon, Your Honor.  For the

23   record, Dan Latona of Kirkland & Ellis for the post-

24   effective date Debtors.  You're correct, Your Honor.  This

25   is an uncontested motion, but briefly for some background,

Page 47

1    prior to the pause back in June when the Debtors were

2    releasing cryptocurrency assets to individuals purporting to

3    be beneficiaries or representatives on account of deceased

4    account holders, they had in place a process pursuant to

5    which they would verify the individual's information.

6         Once the company paused distributions, the need

7    for that ceased.  But now that we recommenced distributions,

8    this issue has arisen in a handful of number of

9    circumstances and rather than seeking out local counsel in

10   the relevant jurisdiction and verifying that information, we

11   thought it made sense both from an administration

12   perspective and from a cost perspective to have one central

13   form where we have the implementer of a Court order.

14        And so, that's the background for the motion

15   that's being presented today.  So, very briefly, Your Honor,

16   the motion seeks a set of procedures whereby an individual

17   purporting to act as a beneficiary or representative on

18   behalf of a deceased account holder would submit to KYC in

19   their individual capacities.  We would ensure that the

20   deceased account holders' KYC is current and up to date.

21        We would need to see evidence that the individual

22   was authorized to act on behalf of the deceased account

23   holder, and lastly that the account holder was in fact

24   deceased.  That would be accompanied with a form that would

25   include all this information and which documents to provide.

Page 48

1              The Debtors would then send an email that's

2      attached to the order as Exhibit B to the account email

3      address on file and implement a 14-day waiting period.  If

4      no adverse response is received, then the distribution

5      agents or the Debtors would be authorized to distribute the

6      cryptocurrency assets as they see fit, pursuant to the plan.

7              And so again, Your Honor, there were no

8      objections, no individual or the United States Trustee

9      reached out, and so we would request entry of the order.

10             THE COURT:  Thank you.  Mr. Masumoto or Mr. Bruh,

11     do you have any comments on this?

12             MR. MASUMOTO:  No objection, Your Honor.

13             THE COURT:  All right, it's granted.

14             MR. LATONA:  Thank you, Your Honor.

15             THE COURT:  Submit the order (indiscernible).  The

16     last matter on the calendar is the motion for

17     reconsideration of substantial contribution by Ad Hoc Group

18     of Earn Account Holders.  I don't understand why this is

19     listed as an adjourned matter.  The matter was resolved in a

20     memorandum opinion and order denying motion of the Ad Hoc

21     Group of Earn Account Holder for reconsideration of the

22     Court's substantial contribution opinion.  It's filed as ECF

23     Docket No. 4819.  It was filed on April 19th, 2024.  So, I

24     believe it was erroneously listed as an adjourned matter.

25     All right, that concludes the calendar for today.  We're

Page 49

1    adjourned.

2              MR. LATONA:   Thank you, Your Honor.

3              MR. MASUMOTO:   Thank you, Your Honor.

4              MS. HAVLIN:   Thank you, Your Honor.

5              (Whereupon these proceedings were concluded at

6    3:01 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 50

1                           I N D E X

2

3                          RULINGS

4                                          Page        Line

5   Procedures for distributions for deceased

6   account holders, granted              48          13

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8    Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 8, 2024
```