Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY   10004

15

16                    May 14, 2024

17                    3:02 p.m.

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

Page 2

1    HEARING re Hybrid Conference RE:  Stretto Notice of Data

2    Security Incident. (Doc # 4834, 4858, 4880)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   UNITED STATES DEPARTMENT OF JUSTICE

4        Attorneys for the U.S. Trustee

5        Alexander Hamilton Custom House

6        One Bowling Green, Room 534

7        New York, NY 10004

8

9   BY:  MARK BRUH

10

11   KIRKLAND ELLIS LLP

12        Attorneys for the Debtor

13        333 W Wolf Point Plaza

14        Chicago, IL 60654

15

16   BY:  ROSS KWASTENIET

17

18   ALSO PRESENT:

19   JOSEPH MCNEILIS

20   DAVID J. ADLER

21   CHRIS BECIN

22   JEFFREY BERNSTEIN

23   JOHAN BRONGE

24   VITOR CUNHA

25   RICKIE CHANG

1    CHRISTINA CIANCARELLI

2    JON COLLARD

3    AARON COLODNY

4    SHARA CLAIRE CORNELL

5    CAMERON R. CREWS

6    DAVID DALHART

7    TRISTAN LUIS DIAZ

8    JAMES H. F. DIXON

9    SHARON DOW

10   JANELL ECKHARDT

11   REBECCA GALLAGHER

12   JASLEIGH GEARY

13   DARIUS GHEORGHE

14   SAMUEL P. HERSHEY

15   JOHN HITTI

16   DAVID KAHN

17   DAN KAPLAN

18   BRIAN P. KARPUK

19   CHRIS KOENIG

20   RIKI KOULY

21   JOSEPH LEHRFELD

22   MARK S. LEONARD

23   NICOLE A. LEONARD

24   SERBAN LUPU

25   CHASE MARSH

1   BRIAN S. MASUMOTO

2   JOHN MELLEIN

3   MICHAEL D. MORRIS

4   GREGORY F. PESCE

5   RICHARD PHILLIPS

6   JONATHAN RODRIGUEZ

7   SAURABH ROHATGI

8   DAVID SCHNEIDER

9   WILLIAM D. SCHROEDER

10   SAHRISH SOLEJA

11   COURTNEY BURKS STEADMAN

12   ELIZABETH B. VANDESTEEG

13   EZRA VAZQUEZ-D'AMICO

14   KEITH WOFFORD

15   GOLSHID ZAHIREMAMI

16   TANZILA ZOMO

17   RAKESH PATEL

18   HEIN VAN DER WIELEN

19   GABRIEL BRUNSWICK

20   DREW DUFFY

21   CLARA ELLEN GEOGHEGAN

22   UDAY GORREPATI

23   TAYLOR HARRISON

24   DIETRICH KNAUTH

25   MIKE LEGGE

Page 6

1    JONATHAN RANDLES

2    PETER J. SPROFERA

3    VINCE SULLIVAN

4    SHIRA WEINER

5    ALEX WITTENBERG

6    ZACHARY ZABIB

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              AUTOMATED VOICE:  Recording in progress.

4              THE COURT:  Please be seated.  All right, we're

5     here in Celsius, 22-10964.  This is the hybrid hearing

6     regarding Stretto's notice of data security incident.  We

7     have … this was on the agenda, first item on the agenda on

8     May 7th.  And I ordered that we also have the hearing today.

9     Please go ahead.

10             MR. McNELIS:  Joseph McNelis for Stretto.

11             THE COURT:  Okay.

12             MR. McNELIS:  Stretto cares about and prioritizes

13    the security of information that it maintains for the

14    bankruptcy courts, and for that reason has measures put in

15    place to tend to prevent incidents like this.  And if they

16    do happen, to mitigate the harm and the impact to creditors,

17    if incidents like this do happen.  In terms of attempting to

18    prevent incidents like this, all accounts that have access

19    to any Stretto system require a password and multifactor

20    authentication.  And the, all of the employees including the

21    employee who was impacted here, go through training on how

22    to recognize and avoid this precise kind of attack.

23             THE COURT:  Let me ask first -- I directed that

24    there be someone from, that an officer of Stretto be present

25    today.  Is there?

Page 8

1              MR. McNELIS:  Yes, Your Honor.

2              THE COURT:  Who is that?

3              MR. McNELIS:  Chris Updike, the general counsel.

4              THE COURT:  Come on up here, in front of the bar,

5     Mr. Updike.  What is Mr. Updike's position?  His position

6     is?

7              MR. McNELIS:  General counsel.

8              THE COURT:  Okay.  Good afternoon, Mr. Updike.  Go

9     ahead Mr. McNelis.

10             MR. McNELIS:  Sure.  So, unfortunately, this, this

11    employee did fall what's called a smishing attack.

12             THE COURT:  Stuff happens.  That I'm … you know,

13    obviously, the Stretto, has procedures to try to avoid that

14    and I appreciate reading the investigation summary.  I don't

15    doubt that.  So, that's not where stuff happens.  The

16    question is, what's done as soon as you find out that's

17    something's happened?  And I think -- let me be crystal

18    clear about this.  I asked at the hearing on May 7th,

19    whether the accountholders, the Celsius accountholders,

20    whose information had been compromised in one fashion or

21    another, had been contacted.  And I was told that the answer

22    to that was no, they had not been.

23             So, the report which you provided, the

24    confidential memorandum dated May 13th, on page five, under

25    Communications to Impacted Creditors, it starts out, the

Page 9

1    first paragraph starts, quote, "On May 7, 2024, Stretto

2    promptly began sending notifications to Celsius creditors

3    whose information may have been accessed and/or

4    exfiltrated," close quote.  So, that's the day of the

5    hearing.  Do I presume that sometime after the hearing,

6    which was at two o'clock in the afternoon, Stretto, I'd say,

7    finally began notifying the accountholders?

8              MR. McNELIS:  Yes, Your Honor.  There was

9    coordination that Stretto had --

10             THE COURT:  You might have put it in the memo.  It

11   wasn't coincidental that on May 7th, Stretto began notifying

12   the accountholders.  To put it mildly, I blew my stack at

13   the hearing when I found out that Stretto hadn't done what

14   seems to be among the most important things it could

15   possibly do.  It learned … it learned of the breach April

16   18th, or 17th?

17             MR. McNELIS:  April 17th, Your Honor.

18             THE COURT:  April 17th.  And the notion that there

19   would be radio silence in terms of the accountholders whose

20   information had been compromised, between April 17th and May

21   7th is, frankly, mindboggling to me.  I understand that

22   Stretto jumped on this with an investigation, but I guess,

23   in my view, I'd like to know, why should accountholders have

24   to wait for an investigation to be complete, completed,

25   before they're advised that there's a problem?

Page 10

```
 1              MR. McNELIS:  Sure.  So, as I think was laid out

 2   in the report, as soon as discovery of this incident

 3   happened, the incident response team at McDonald Hopkins and

 4   Stretto were working, literally, around the clock on this

 5   issue.

 6              THE COURT:  I'll accept that as being true.  I

 7   have no reason to believe that isn't the case.  I think …

 8   I'm certainly glad to see that as soon as they received

 9   information from their own internal systems that there

10   appeared to have been systems compromised, and discovered

11   how that happened -- I appreciate that.  I don't have a

12   problem about that.  It's the several weeks until …

13              If I hadn't blown my stack at the hearing, it

14   clearly was the precipitating factor, because -- you know,

15   your client is shaking his head no, but you've acknowledged

16   that there had not been communication with the

17   accountholders as of the time of the hearing.  The hearing

18   was at two o'clock on May 7th, and your May 13th memo sort

19   of casually says, "Oh, on May 7, 2024, Stretto promptly

20   began sending notifications."

21              MR. McNELIS:  Sure.  I understand your point, Your

22   Honor.  But I can tell you that whether … however that

23   hearing that went on May 7th, those communications were

24   going to go out.

25              THE COURT:  You didn't tell me that.
```

1          MR. McNELIS:  So, how the hearing went on the 7th,

2     did not accelerate or change the timeline.

3          THE COURT:  Why the wait until May 7th?

4          MR. McNELIS:  Sure.  So, the forensic

5     investigation itself was not completed until May 6th.  That

6     is a very standard timeline for an investigation of this

7     type.  And as we're going through the investigation, the

8     victim, you know, the company, Stretto, is learning

9     information piecemeal and is working with the forensic

10    investigators to determine whether there are anymore areas

11    within their network, or within the forensic evidence, that

12    they need to look at.

13          It was not until May 6th that we determined

14    anyplace within the Stretto network that threat actor could

15    have touched has been reviewed, and we've determined this is

16    the full universe of information that could have been

17    accessed.  And the reason that we wait until that point is

18    that there are risks for all parties involved, to both under

19    notify a population, or over notify a population, in terms

20    of telling too many people that their information has been

21    impacted when, in truth, we don't know that it has been.  Or

22    in telling one group of creditors first, that your

23    information may have been impacted, and then later telling

24    another group, and later telling another group, is that we,

25    as Stretto, firstly, to coordinate with Celsius, the debtor.

Page 12

 1   Stretto does not have the ability or the authority to

 2   unilaterally notify creditors.

 3             THE COURT:  You're going to (indiscernible) that

 4   it was because Kirkland said don't tell anybody.  Is that

 5   why --?

 6             MR. McNELIS:  No, not at all.  All I'm saying is,

 7   we were working, as Stretto, with Celsius, starting on April

 8   25th, having daily calls, to discuss the findings that were

 9   happening, saying we reviewed this system and found X, we

10   reviewed this system and found Y.  And --

11             THE COURT:  How many accounts were, in one fashion

12   or another, compromised?

13             MR. McNELIS:  Just one.

14             THE COURT:  How many Celsius accountholder

15   (indiscernible)?

16             MR. McNELIS:  No Celsius accounts were impacted.

17   There was information that creditors --

18             THE COURT:  PII of Celsius creditors?

19             MR. McNELIS:  Thirty-three.  So, there was --

20             THE COURT:  And when did Stretto, or those

21   conducting the investigation determine that the number was

22   33?

23             MR. McNELIS:  On May 6th.  And so, there was, as I

24   think you saw in the report, 104,000 creditors who had their

25   name and certain contact information that was impacted by

Page 13

 1    the incident.

 2            THE COURT:  So, what you're telling me is 104,000

 3    had some information, some PII compromised, 33 more so than

 4    the rest?

 5            MR. McNELIS:  I would say PII is sort of a term of

 6    art in the cyber and privacy world, so --

 7            THE COURT:  It's defined in the Bankruptcy Code.

 8            MR. McNELIS:  So, PII, as I understand it, is not,

 9    is not necessarily just name and address; it would be

10    something more sensitive like a Social Security number, a

11    financial account number, something along those lines.

12            THE COURT:  So, Section 101.41(A) -- 101 is the

13    definitions, and 41(A):  The term Personally Identifiable

14    Information means, (A), if provided by an individual to the

15    debtor, in connection with obtaining a product or service

16    from the debtor, primarily for personal, family or household

17    purposes.  That's (i), the first name or initial and last

18    name of such individual, whether given at birth or time of

19    adoption, or resulting from lawful change of name; (ii), the

20    geographical address or the physical place of residence of

21    such individual; (iii) an electronic address, including an

22    email address, of such an individual.  So, how many Celsius

23    accountholders had personally identified -- it goes on.  Let

24    me give the full picture: (iv) is a telephone number

25    dedicated to contacting such individual; (v) Social Security

Page 14

```
 1    account number; (vi) the account number or the credit card

 2    issued to such individual.  So, my question to you is, how

 3    many of the Celsius accountholders that had accounts with

 4    Stretto, had personally information, personally-identifiable

 5    information obtained, as that term is defined in the

 6    Bankruptcy Code?

 7              MR. McNELIS:  That would be approximately 104,000,

 8    Your Honor.

 9              THE COURT:  And have you notified 104,000 people

10    that personally identifiable information, as defined in the

11    Bankruptcy Code, was improper, improperly obtained?  I'm not

12    -- I don't want to -- I'm not faulting Stretto.

13              MR. McNELIS:  Understood.

14              THE COURT:  Okay, it's a separation.  Accidents

15    happen, things happen.  But the Bankruptcy Code defines PII.

16    You've acknowledged roughly 104,000 Celsius creditors had

17    PII that was wrongfully obtained, surreptitiously obtained.

18    And you're drawing a distinction between -- I would

19    acknowledge, 33 more serious violations.  But the Bankruptcy

20    Code, Stretto's in the business of dealing with bankruptcy

21    claims.  The Bankruptcy Code has a much broader definition

22    of PII than the 33 accounts.  So, is it only 33 that were

23    notified, or 104,000 notified?

24              MR. McNELIS:  No, all 104,000 were notified.

25              THE COURT:  Over what period?
```

Page 15

1           MR. McNELIS:  On May 7th, the 33 individuals who

2      had their Social Security number or tax payer identification

3      number in the, in the data, were notified electronically.

4      And in that notification, they were also provided with 12

5      months of a credit monitoring product.

6           THE COURT:  I saw that, and I've seen that as sort

7      of the … what appears to be -- I don't want to validate it,

8      but that appears to be sort of the standard that's being

9      used for providing protection.

10          MR. McNELIS:  Yes, exactly.  It's not required by

11     law, but it is standard to include it in those types of

12     notifications, particularly when a Social Security number,

13     or something like that, is included.  So, because those 33

14     had more sensitive information, Stretto and Celsius wanted

15     to prioritize getting those out.  They were done

16     electronically on the 7th.

17          As just an update, Stretto has been tracking the

18     receipt of those notifications.  Out of the 33, there were

19     two emails that bounced back as undeliverable.  And

20     yesterday, Stretto found the mailing address for those

21     individuals and sent a similar letter in the mail.  So,

22     that's not in the report, but that's just an update.

23          Then, on … as to the larger population that just

24     had name and address and other contact information, there

25     was a subset of those people that Stretto had emails for, or

Page 16

```
 1    email addresses for, and then another set where there was

 2    not an email but we had a mailing address.  And so, emails

 3    to those, to that population started going out on May 8th,

 4    and I think they went out between May 8th and May 10th.

 5             Again, Stretto is also tracking the receipt of

 6    those to try to determine, you know, the highest possible

 7    delivery to that population.  Then, on May 10th is when the

 8    letters went out in the mail, to the, I'll call it the non-

 9    SSN population, on May 10th.  And all of those letters have

10    gone out in the mail at this point, and did as of Friday.

11             THE COURT:  On page 3 of the report, it's labeled

12    confidential memorandum, it's addressed to me.  I guess

13    you're one of the people who sent it; there are three names.

14    They're all in your firm?

15             MR. McNELIS:  Yes, Your Honor.

16             THE COURT:  But on page three, the fourth bullet

17    point on the page reads, quote, "There is evidence that the

18    threat actor was able to access Stretto's Amazon Web

19    Services, AWS, console, which hosts certain cloud-based

20    applications.  However, there is no evidence that the threat

21    actor was able to access any date related to the Celsius

22    bankruptcy matter stored in Stretto's AWS portal.  The

23    forensic evidence indicates that the threat actor had access

24    to the console for approximately three minutes, and

25    conducted initial reconnaissance activities.  There is no
```

Page 17

1    evidence of access, access to or exfiltration of data from

2    the AWS console," close quote.

3              So, one question I have is, was data for any other

4    debtor other than Celsius, accessed?

5              MR. McNELIS:  As to that specific … as to the AWS

6    console?

7              THE COURT:  Yes.

8              MR. McNELIS:  Or overall?

9              THE COURT:  Well, let's answer both.

10             MR. McNELIS:  So, I'll say this.  To that

11   question, there's no evidence from the forensic

12   investigation that any, any data stored within that AWS

13   console was accessed at all.  So, you know, regardless of

14   what was in that console --

15             THE COURT:  Celsius or any other …

16             MR. McNELIS:  Yes, or any other debtor, there was

17   no information in that portion of the network that was

18   accessed.

19             THE COURT:  The next bullet point, on page three,

20   the final one reads, quote, "The forensic evidence indicates

21   that the threat actor was able to access the impacted

22   employees' account in the CORE," -- that's in quotes, it

23   says corporate restructuring software application --

24   "(indiscernible) software program used by Stretto for

25   certain claim management activities.  During instances of

Page 18

1    unauthorized access to this claim administration software,

2    the threat actor accessed and exfiltrated certain data held

3    by Stretto in connection with the Celsius bankruptcy matter.

4    Stetto's (indiscernible) provided Stretto with a list of

5    activities conducted by the threat actor, within the CORE

6    application, for review by Stretto, in conjunction with

7    counsel."

8           So, question one:  Did the threat actor access and

9    exfiltrate data held by Stretto in connection with any

10   bankruptcy cases other than Celsius

11          MR. McNELIS:  From the CORE software or …?

12          THE COURT:  Look, I'm reading, I read a quote from

13   your report.  It refers to CORE.

14          MR. McNELIS:  Yes.

15          THE COURT:  Okay.  And it acknowledges --

16          MR. McNELIS:  There were three other … apologies.

17          THE COURT:  Let me finish.  I'm a little slow

18   sometimes, but let me finish.  "It acknowledges that the

19   Threat Actor," -- and that's a capitalized term == "…

20   accessed and exfiltrated …" -- exfiltrated means they took

21   it, right?

22          MR. McNELIS:  Yes.  Yes, Your Honor.

23          THE COURT:  -- "… certain data held by Stretto in

24   connection with the Celsius bankruptcy matter."  And my

25   question now is, did you find any indication that any

Page 19

1    information in the CORE software application was accessed

2    and exfiltrated in connection with any bankruptcy matters

3    other than Celsius?

4              MR. McNELIS:  Yes, there were three, Your Honor.

5              THE COURT:  And what, if anything, has been -- are

6    any of those cases pending in this Court?

7              MR. McNELIS:  I believe one is.  And we, we have

8    notified -- on April 22nd, is when Stretto first notified

9    any debtors who had a bankruptcy case that Stretto was

10   working on.  That was the first time that Celsius and the

11   three other debtors were informed of the incident.  So, yes,

12   we --

13             THE COURT:  I don't want to put the names of those

14   on the record in this case.  But have you conferred with the

15   US Trustee's Office and advised them of each case in which

16   any information in any Stretto system, whether it's CORE or

17   another system, was improperly accessed and exfiltrated?

18             MR. McNELIS:  Yes, Your Honor.  So, last night, we

19   -- or yesterday afternoon, we had a call, Stretto --

20             THE COURT:  You waited until the night before this

21   hearing?

22             MR. McNELIS:  Stretto and the US Trustee had a

23   call about this matter, in which it was -- the three other

24   cases were also discussed.  The US Trustee indicated that

25   they, they would like to have the appropriate representative

Page 20

1    from the Trustee in those other cases informed.  Stretto has

2    since reached back out to the three other parties in those

3    cases to say we would recommend reaching out to the US

4    Trustee.  Let's coordinate that because, again, similar to

5    this case, Stretto doesn't feel that they can unilaterally

6    inform the US Trustee without first conferring with the

7    actual party in the bankruptcy case.  So, the plan is to do

8    that along with each of the parties in the case.

9            THE COURT:  Has Stretto notified -- and I don't

10   want to put it on the record what cases those were; you've

11   indicated that that's been disclosed to the US Trustee's

12   Office, and you've also disclosed it to the counsel,

13   debtors' counsel, in those case?

14           MR. McNELIS:  Yes, Your Honor.

15           THE COURT:  Okay.  Has Stretto notified each and

16   every accountholder who had PII, as defined in the

17   Bankruptcy Code, and you notified them that their

18   information was improperly accessed?  Yes or no.

19           MR. McNELIS:  No.  As to the other --

20           THE COURT:  And why is that?

21           MR. McNELIS:  Sure.  So, that --

22           THE COURT:  If it's a case in this Court, as Chief

23   Judge, I consider it my responsibility to make sure -- and I

24   don't know whether your firm was involved or not.  I mean,

25   we've been through a go-round with all of the claims agents

Page 21

1    in connection with the ex-claim matter, as to which I opened

2    a miscellaneous proceeding; which was ultimately resolved

3    satisfactorily.  I don't like finding out that information

4    in any case pending in this Court -- have you notified the

5    judges who are providing those other two cases, that there

6    had been improper access to the information?

7              MR. McNELIS:  No.  At this time we have not.

8              THE COURT:  Why not?  Come on.

9              MR. McNELIS:  So, at the end of the forensic

10   investigation, the forensic firm provided Stretto with the

11   information that was accessed.  Then there is a period where

12   Stretto has to do an internal review of that data, to try to

13   sort out which cases were impacted, and then which

14   individuals within those cases were impacted.

15             THE COURT:  I expect to receive a letter, by

16   tomorrow at noon, with a copy to the US Trustee -- and you

17   can copy debtors' counsel in those cases -- identifying the

18   cases, and what information, what PII as defined in the

19   Bankruptcy Code, was improperly accessed in each of those

20   cases.  I don't , what I don't like are these surprises.

21   The letter, a copy of the letter should be addressed to me,

22   but sent to the judges who are presiding over each of those

23   cases.  And also, copy our Chief Deputy Clerk, Mike Paek,

24   sitting in the back of the room listening to this.

25             Okay.  The last thing I want to find out is a bad

1    surprise, that PII, which is supposed to be protected, has

2    been compromised.  I don't blame Stretto for being

3    compromised.  But I don't like finding out that you didn't

4    bother telling the judges.  So, I'm ordering that by noon

5    tomorrow, that letter go to the judges presiding in those

6    matters; the US Trustee, to Mike Paek, the Chief Deputy

7    Clerk.

8              MR. McNELIS:  Understood, Your Honor.  We will do

9    that.

10             THE COURT:  And has there been a complete forensic

11   investigation in each of those cases to determine what

12   information was accessed?  You use the term exfiltrated.  I

13   assume that means it was downloaded by whoever the threat

14   actor was.

15             MR. McNELIS:  Yes.  So, from a forensic

16   standpoint, essentially, what the forensic firm can show is

17   what systems and what information was touched.  They don't

18   know what's, what that information means.  So, at the end of

19   the investigation, the forensic firm sends that information

20   to Stretto, at which point Stretto can say, okay, we know

21   that these particular documents were in the places that were

22   touched.  Then we can go into those documents and figure out

23   what cases were impacted and which individuals within those

24   cases were impacted.  And as to the three cases outside of

25   this one, that process is ongoing but --

Page 23

```
 1              THE COURT:  Three besides this one, so a total of
 2   four in this Court?
 3              MR. McNELIS:  A total of four, yes.
 4              THE COURT:  Who were the judges presiding in those
 5   matters?
 6              MR. McNELIS:  I don't … I think Judge Wiles is one
 7   that's pending here, but I don't know about the other two
 8   cases, Your Honor.
 9              THE COURT:  You'll know that by tomorrow at noon.
10              MR. McNELIS:  Of course, yes.
11              THE COURT:  This is really, look, it's really
12   troubling to me, it's really troubling to me.
13              MR. McNELIS:  Yeah.  And I do want to reiterate,
14   we had been working on this.  The priority has been, let's
15   determine the full universe of information that was
16   impacted, so that we can be right the first time we send out
17   this, this notification.
18              THE COURT:  You say, on page four of the report,
19   it's under the heading Stretto's Internal Review of Impacted
20   Data, a little further down the page there's bullet points,
21   and the second bullet point:  For over 99 percent of this
22   population, the impacted information was limited to contact
23   information such as name, mailing address, email address,
24   and/or phone number.  That's a big deal to me, okay.  You
25   suggest that that's sort of unimportant information.  That's
```

Page 24

```
 1    all really important information.

 2            You know, just taking the Celsius case, there have

 3    been multiple instances of phishing attempts directed at

 4    creditors, obtaining … when … the start of this case, there

 5    as a sealing motion, the debtor made a sealing motion; which

 6    I granted in part and denied in part.  The part I granted

 7    was for addresses, email addresses, phone numbers.  Are you

 8    aware of this?

 9            MR. McNELIS:  Yes, Your Honor.

10            THE COURT:  Okay.  And yet, you make it sound in

11    that bullet point that's not a big deal, for 99 percent of

12    the people the only thing that was impacted were names,

13    mailing addresses, email addresses, and/or phone numbers.

14    That's a big deal to me.  That is something that I ordered

15    not be disclosed.

16            MR. McNELIS:  Understood, yes.  And it was not

17    meant to minimize the first group.  It's really just

18    differentiating what, you know, what, at least from my firm,

19    would categorize as more sensitive versus less sensitive

20    information.  And I can say that it is rare to get --

21            THE COURT:  What I've seen in this case already,

22    when people improperly get hold of people's email addresses,

23    and home addresses -- there have been threats against

24    people, there have been attempts to, you know, gain access

25    to their accounts and distributions and things like that.
```

1    So, I consider identifying information about a addresses,

2    phone numbers and email addresses very serious.  It may be

3    hat Social Security numbers are an order of magnitude more

4    than that.  But I consider the kinds of personally

5    identifiable information that we're saying, oh, only 99

6    percent of the accounts, really, all we're talking about is

7    things like names, addresses, phone numbers, email

8    addresses.

9            MR. McNELIS:  Right.  And I think another point of

10   why making that distinction was relevant here, is because

11   one of the biggest concerns was, did the incident impact

12   financial account information of creditors, or information

13   like claim codes, which could have allowed a threat actor

14   to, you know, either commit some kind of financial fraud or

15   make claims on behalf of creditors.  That was really the

16   main distinction.

17           THE COURT:  You don't know whether the threat

18   actor who gained Social Security numbers, for example, has

19   improperly gained access to a Celsius creditor's checking

20   account in a financial institution.

21           MR. McNELIS:  It's possible that in some other

22   attack, they have.  But we can say for certain that in this

23   case, it did not happen, at least based on the forensic

24   evidence.  And one of the reasons is, the way that Celsius

25   kept this information was that … so, the information in the

Page 26

1    CORE system, that was accessed, that mostly came from claim

2    forms that were submitted by creditors.  That was in one

3    system called CORE.  There was a separate system that was

4    walled off from this account -- he did not have access to it

5    -- that had the claim codes or wire information, depending

6    on how the creditor was going to access their thoughts in

7    this case.  So, we know from the forensic investigation that

8    there is no evidence that that system that had the claim

9    codes and wire information, that was not touched.  And based

10   on Stretto's internal review, this account did not even have

11   access to that system.  So, I think that was one of the

12   reasons why that distinction was made, because it was

13   critical, you know, from the very beginning; certainly from

14   the Celsius side, as well as Stretto, is we need to make

15   sure that claim codes and wire information is not impacted

16   here.  And that's why that is highlighted, Your Honor.

17            THE COURT:  Does Stretto have a written policy

18   with respect to disclosure of improper access to PII

19   disclosure to accountholders, of PII?  Is there a written

20   policy?

21            MR. McNELIS:  About --?

22            THE COURT:  Stretto's steps to disclose to

23   accountholders that their PII has been accessed, improperly

24   accessed?

25            MR. McNELIS:  I don't know if there's a written

1  policy, Your Honor, but I know that as soon as this incident

2  happened, there was an incident response policy that was

3  initiated.

4  THE COURT:  I understand that, and I appreciate

5  that, except they jumped on it internally, except the part

6  about notifying the people whose accounts were affected by

7  it.  And my question is -- because I think this is a broader

8  question, not only for Stretto but for other claims agents

9  as well -- whether they have procedures in place for, one,

10  identifying improper (indiscernible), or did, promptly

11  didn't do; investigating it, which they did, how they went

12  about it; notifying affected individuals or business

13  entities that their account information has been improperly

14  accessed?  And under what circumstances will then --

15  Stretto, does it have a policy with respect to what's

16  required before it will provide, this year, of the program

17  that it has  in effect?  That seems to be pretty standard.

18  MR. McNELIS:  Right.  I don't know the answer to

19  that, Your Honor.  I know that there is, that there are some

20  agreements between Stretto and Celsius, where there are

21  specific steps that Stretto has to take to notify Celsius of

22  an incident like this, and that was done in this case.  And

23  I think that's, that's because, I think as I noted, I mean

24  Stretto is really working as -- not as a party in this case,

25  so it can't unilaterally reach out to creditors.  So, the

Page 28

1    plan --

2              THE COURT:  You've got to be approved by this

3    Court before you can even be hired as a (indiscernible).

4              MR. McNELIS:  Of course.  Yes.  So, the plan, in

5    any of these cases, would be we, once we find out that an

6    incident happens, we initiate our response.  If it, as soon

7    as it's determined that there's some bankruptcy information,

8    we have a duty to reach out to that, that debtor, so that we

9    can figure out what was impacted, how we respond --

10             THE COURT:  What happens if the Debtor says, "Oh,

11   don't worry about it," what do you do then?  Do yo have an

12   obligation to the Court?  I'm concerned about, you know,

13   maybe you don't … you can't reach the appropriate contact

14   person at the debtor's law firm for a week because he or she

15   is away on vacation?  Or … I guess what I'm asking now, and

16   I don't know whether Mr. Masumoto or Mr. Bruh can answer

17   this, as to whether the US Trustee, in vetting claims

18   agents, has looked to determine whether they have

19   appropriate policies and procedures in place to deal with

20   circumstances like occurred here.  I would just -- I mean,

21   I'm not determining anything from the Court's standpoint, at

22   this point, but I'm certainly concerned, and might well ask

23   in the context of whether or not to approve the retention of

24   Stretto or another claims agent, whether they have policies

25   and procedures in place, in the event of improper access to

Page 29

1   information; what are the steps that are taken?  When is the

2   Court notified?  When is the US Trustee notified?  That

3   seems important to me.  I'm not adopting the policy but, you

4   know …

5          MR. McNELIS:  I think one other point I would note

6   --

7          THE COURT:  I don't want to do things, just, you

8   know, kneejerk reaction.  But these are all things that come

9   to mind about --

10         MR. McNELIS:  Yeah, I do know that Stretto does

11  have a, they have policies for compliance with the CCPA and

12  GDPR.  And on their website those policies are published,

13  that give claimants, or you know, whoever is on that site,

14  at least notice of their rights under those statutes.

15         THE COURT:  Does it say how quickly those

16  policies, any of those policies, how quickly Stretto will

17  notify them that your PII, as defined in the Bankruptcy

18  Code, is improperly accessed.

19         MR. McNELIS:  I don't know the answer to that.  I

20  can tell you that those laws would require that, and Stretto

21  would certainly comply with that.

22         THE COURT:  Well, those laws are in the EU and I'm

23  sitting here in New York. …

24         MR. McNELIS:  Sure.  Yeah, they just tend to be

25  the most stringent.  The California law is one of the most

1    stringent in the country, and GDPR is much more stringent

2    than a lot of the state laws.  So, yes, so I know there are

3    published policies from Stretto on those two, those two

4    items.  But to your specific question, I don't know the

5    answer to that.

6              THE COURT:  Within a week, could you notify me

7    what, and provide me with copies of whatever policies

8    Stretto might have?

9              MR. McNELIS:  Yes, Your Honor.

10             THE COURT:  And again, once they -- give it to me,

11   but give it to the US Trustee as well, and the US Trustee --

12   I don't have to deal with this, okay.  I shouldn't have to

13   deal with this.  Stretto doesn't want to have to --

14             MR. McNELIS:  Right.

15             THE COURT:  Look, they want to protect the data.

16   Accidents happen, things happen.

17             MR. McNELIS:  Right.

18             THE COURT:  And what happens then?  What do they

19   do then?  Do they notify the Court?  Obviously, they didn't

20   notify two judges in this Court that PII In their cases was

21   compromised.

22             MR. McNELIS:  Right.  And I know, just from

23   dealing with this matter, these are issues that Stretto

24   cares about and is thinking about.  And they know that

25   they're in a unique position working with the Court and

Page 31

1    working with all of this data, and it is a top priority for

2    the company.

3              THE COURT:  So, on page two of this confidential

4    memorandum -- did you provide a copy of this to the US

5    Trustee?

6              MR. McNELIS:  Excuse me?

7              THE COURT:  Yeah, he did, okay.  I asked whether

8    you provided a copy to the US Trustee.  Mr. Bruh has

9    indicated yes.

10             MR. McNELIS:  Yes.

11             THE COURT:  So, on page two, the first paragraph

12   says, quote, "On April 17, 2024, Stretto Information

13   Technologies staff were alerted to suspicious activity

14   occurring in one employee account.  Stretto immediately

15   initiated an internal investigation …," and it goes on from

16   there.  When did Stretto learn of improper access to

17   information in two other cases in this Court?  Or three

18   other cases in this Court?

19             MR. McNELIS:  That was either April 21st or April

20   22nd, was when it was confirmed that that there was

21   information related to bankruptcy cases, that could have

22   been accessed.  And that April 22nd was the date that all of

23   those debtors were notified.

24             THE COURT:  And did Stretto, has Stretto learned

25   that there was improper access to information in any

Page 32

1    bankruptcy cases in any other courts?

2         MR. McNELIS:  In any other courts?

3         THE COURT:  Courts.

4         MR. McNELIS:  Yes.  I, candidly, I don't know.  I

5    know two, this case and one other, are in the Southern

6    District of New York.  I don't know what court the other two

7    are in, but I know they're in courts other than this one.

8         THE COURT:  Mr. Bruh?

9         MR. BRUH:  Your Honor, Mark Bruh, United States

10   Trustee.  I know the case names and districts.

11        THE COURT:  We don't need to spread the names on

12   here.  Have the judges been in those cases been notified?

13        MR. BRUH:  Not to the best of my knowledge.

14   (indiscernible) has been notified as well.

15        THE COURT:  I would say it's a broader problem

16   than the Southern District of New York.  I don't … you know

17   … I hope Mr. Bruh or Mr. Masumoto, if the cases have been

18   identified to you, you will notify the US Trustee Offices in

19   those, that deal with those courts.  Are they in the Second

20   Circuit or …?

21        MR. BRUH:  Your Honor, I am the attorney handling

22   the other matter.

23        THE COURT:  I want to be sure that there are

24   polices and procedures in place, including notifying the

25   judge who's got the case.

1          MR. McNELIS:  Yes, understood.  And obviously, a

2     key focus of this investigation was let's make sure we know

3     what information was impacted here that relates to a

4     bankruptcy case.  As soon as that was determined, even

5     beyond knowing for sure the universe, April 22nd, you know,

6     three days after the incident, or four days after the

7     incident, all the debtors at least knew that there was an

8     incident implicating that information.

9          THE COURT:  The debtors but not the Courts?

10          MR. McNELIS:  Right.  An it just takes time to --

11          THE COURT:  It doesn't take very long, pick up the

12     phone, send an email.  It's a nanosecond.

13          MR. McNELIS:  Sure.  What I meant was, it takes

14     tie to determine the universe --

15          THE COURT:  You need the (indiscernible).  Stretto

16     needs my signature on an order authorizing the retention.

17     If Stretto thinks it doesn't have to tell a judge in his

18     Court who authorized their retention, debtors' counsel may

19     say, "Oh, this may go away."  I don't care whether debtor's,

20     what debtor -- I think, you know, Kirkland certainly

21     notified the Court promptly, it certainly appears.  I don't

22     want to have to rely on debtors' counsel, creditors

23     committee counsel, or any other counsel.  Each claims agent

24     has to have its retention approved by a judge.  And there's

25     an obligation to the Court … the last … almost too hard to

Page 34

```
 1    believe that a lawyer would say, "No, don't, let's just see

 2    how this works out. Nobody reports anything, don't go

 3    ahead."  I hope no lawyer will ever do that; that didn't

 4    happen here.  But if it turned out in another case that

 5    months had gone by because the debtors' lawyer wouldn't

 6    permit the claims agent to notify the Court, the claims

 7    agent isn't going to work in this Court again, I'll tell you

 8    that, is not going to work in this Court again if it ever

 9    turned out that it learned of improper access and didn't

10    timely notify the Court.

11              MR. McNELIS:  Understood.  And given that

12    distributions were ongoing in this case, that was a key

13    consideration in this case.  And that's why we --

14              THE COURT:  You know, on May 7th, distributions

15    hadn't resumed.  Have they resumed?  The distributions in

16    Celsius?  I get, every day, I get letters and emails from

17    creditors complaining they hadn't received their

18    distributions.  You know, I … today, actually, May 12th, it

19    was filed on the documents, ECF 4886, request for assistance

20    regarding bitcoin retrieval.  "Dear Judge Glenn, I hope this

21    finds you well …"  It has the person's name -- it's on the

22    docket, it's public.  "Recently, I received my bitcoin code

23    from Celsius, but I have encountered difficulties in

24    claiming it.  It has come to my attention that PayPal has

25    removed the option to claim such codes, adding to the
```

Page 35

1    complexity of the situation.  Despite my repeated attempts

2    to contact Stretto, I have yet to receive any response or

3    assistance."  It goes on from there.  Okay, this is ECF

4    4886.

5          This does … you know, I understand there are a

6    lot tickets and … but every day I get communications from

7    creditors who want to vacate the confirmation order, because

8    you know, a confirmation order entered last year, a plan

9    that's gone effective in January, people are having a hard

10   time getting.  I know there's a lot of creditors but …

11          MR. KWASTENIET:  Your Honor, Ross Kwasteniet from

12   Kirkland & Ellis, on behalf of the Celsius estate, for the

13   record.  Your Honor, it was our decision, Celsius's

14   decision, to pause withdrawals, and we did it.  We had to

15   make sure that crypto was not going to be stolen and that

16   wires weren't going to be misrouted and …

17          THE COURT:  I'm not faulting you for stopping

18   distributions.

19          MR. KWASTENIET:  Understood, Your Honor.  I wanted

20   to give the Court and update.  And we understand, you know,

21   creditors are frustrated.  They were frustrated before the

22   pause because there's technical difficulties in, you know,

23   entering the codes correctly, whatever, all things that

24   we've been working through and, frankly, making a lot of

25   progress.  Most people have been able to claim

Page 36

1    distributions.  For the last few weeks, though,

2    distributions have been on pause.  Fortunately, I haven't

3    had a lot of personal experience with data breaches, but I'm

4    learning.  Like these, you know, investigations are very

5    time consuming, painstaking, complicated.

6            The Celsius estate maintains a full suite of

7    security personnel, and will at all times while we're

8    holding customer assets.  We've been working very closely

9    with the Stretto team.  It's been a very collaborative, you

10   know, process.  I believe that we are at a point now where

11   in the next, you know, hopefully by tomorrow, we're able to

12   open up distributions.  We've got a few last datapoints that

13   we're asking for final confirmation on.  The Stretto team

14   has answered 97 out of our 100 questions.  You know,

15   directionally, there's a few last things that we're waiting

16   for final confirmation on, and then we're going to be poised

17   to reopen the distribution process.  So …

18           THE COURT:  And when is that?

19           MR. KWASTENIET:  What's that?

20           THE COURT:  When?

21           MR. KWASTENIET:  I think, I expect it will happen

22   certainly by the end of this week.  It could happen as early

23   as like this evening or tomorrow.  We're very close, Your

24   Honor.  It may have, there may been emails that came across

25   confirming we're good during this hearing, that I just

Page 37

1     haven't seen.  But we're very, very close.

2               THE COURT:  Have you told creditors why

3     distributions were paused?

4               MR. KWASTENIET:  Yes, Your Honor.  In the notice

5     that we filed on, I believe it was May 7 --

6               MR. McNELIS:  The initial notice was filed on

7     April 26th --

8               MR. KWASTENIET:  We filed a notice on April 26th,

9     Your Honor, informing everybody that there was a data

10    security incident, we were looking into it, and you know,

11    that we had paused distributions and would provide a further

12    update as soon as possible.  So …

13              THE COURT:  Have you provided an update yet?

14              MR. KWASTENIET:  Other than the update provided to

15    the Court last week, we haven't -- well, customers were

16    provided individualized notices by Stretto, so everybody

17    affected, but no, we would … once we resume …

18              THE COURT:  But everybody's distributions were --

19              MR. KWASTENIET:  Understood.  So, once we

20    recommence distributions, we plan to file a notice that

21    distributions are available again.  And then we're also

22    working with Stretto on email notifications to people who

23    have gotten claim codes recently had to let them know

24    specifically that they can try again, that we've reopened

25    things.

1           THE COURT:  Would somebody please deal with ECF

2    4886 -- I don't want to put his name on the record -- and,

3    you know … he ends by saying, "I am truly grateful for any

4    assistance you can offer facilitating the resolution of this

5    issue."  It's in your court now.

6           MR. KWASTENIET:  Understood Your Honor.  And there

7    are others like that creditor and we will handle every one

8    of those.

9           THE COURT:  Mr. Masomoto or Mr. Bruh?

10          MR. BRUH:  Your Honor, Mark Bruh for the United

11   States Trustee.  I'll be brief.  You've covered a lot of

12   issues here.

13          THE COURT:  What have I missed?  Because I'm sure

14   I've missed something.

15          MR. BRUH:  We think the report should be public.

16   I don't know why it was submitted as a confidential letter

17   to Your Honor.  We think it should be filed on the docket

18   for everyone to see.  I don't think there's anything there

19   that would be giving away the house's information, so to

20   speak, on Stretto's side.  That's the first point.

21          The second point, Your Honor hesitated for me to

22   name the cases.  If you want to know them, I'll be happy to

23   tell them to you, otherwise --

24          THE COURT:  Not on the record.

25          MR. BRUH:  Very well, Your Honor.  I will note,

1    for the one in this Court, I am the attorney, I have been in

2    contact with the plan administrator in the other case, and I

3    spoke to him as recently as earlier today, regarding what's

4    taken place there.  And they hope Stretto will have a dialog

5    with them to resolve any issues in that case.  And I think

6    they heard Your Honor's words of wisdom today to get that

7    moving.  So, I appreciate that.

8              One of the concerns we have, Your Honor, is that

9    there's been … what we see is a copying of the Stretto logo.

10   Now, that doesn't make this limited to this case or to

11   crypto cases.  But it's these bad actors could be every case

12   that Stretto is involved in.  So, we're concerned how

13   widespread this problem is or can become.  And we wanted to

14   put that on the record and try to find a way to resolve

15   this, because we just don't know.  And there are other cases

16   that have -- you know, it's not just money that's involved.

17   There's person -- the dioceses cases, for example, and I

18   know Stretto is involved in the diocese case; maybe not the

19   one before Your Honor, I'm not sure.  But we see that that

20   could be an issue.

21             Also, Your Honor, when we spoke to Stretto's

22   counsel yesterday, and we were talking about the 33 people

23   who had their Social Security numbers and they said it was

24   because they sent it to them, and then they had the

25   information, whereas the hundreds of thousands didn't send

Page 40

1    them the Social --

2              THE COURT:  104,000.

3              MR. BRUH:  Well, it could be even more creditors

4    that just weren't compromised by the hack.  And then our

5    concern was, albeit the information is not made public, what

6    does Stretto do?  And this is along Your Honor's thought

7    process -- to scrub that information in case of a future

8    hack.  That information should never be there.  If Stretto

9    steps into the role as a clerk of the court, the clerk

10   scrubs that information when it's submitted to the Court.

11   We think, if they're looking at their policies, or Your

12   Honor is, or we are, that that should be something going

13   forward, perhaps, and further ordered.  But that information

14   should never be around for anyone ever to have that

15   information.

16              I would just say, Your Honor, we did speak to

17   Stretto, we did speak to Kirkland yesterday.  We hope to

18   continue to have an open dialog and we would, you know,

19   happy to answer any questions Your Honor has at this time.

20              THE COURT:  When the ex-claim matter arose, I

21   really appreciated your office stepping up to that.  It's

22   not my goal to have the Court have an adversary relationship

23   with every claim agent, or even a subset of claim agents.  I

24   do feel a responsibility to make sure that, to the fullest

25   extent possible, appropriate procedures are in place,

Page 41

1    hopefully to avoid things that happen; they haven't, okay.

2    But what do you do when it does?  And I've already

3    expressed, I had … sort of blew my stack at the last hearing

4    when I found out they haven't told any of the

5    accountholders.  And they're saying, "Oh, but it was only

6    their names, addresses and email addresses.  It wasn't their

7    Social Security number."  Well, you know, names, addresses,

8    home addresses, email addresses, they're all PII under the

9    Bankruptcy Code; not as bad as the Social Security numbers.

10           I would … I think you and your colleagues ought to

11   have a discussion about whether it's time to review not only

12   Stretto, but each of the claims agents who gets approved in

13   this district, to make sure that if something untoward

14   happens, A, they have procedures to try -- it looks like

15   Stretto -- I'm accepting for now, that they identified the

16   problem right away.  It's telling the Court, telling, don't

17   rely solely … their obligation is more than just a debtor's

18   counsel.  They're standing in place of the Clerk's Office in

19   this function.  They're not, you know … fine, you can … you

20   know, maybe Kirkland isn't going to want to hire you in the

21   next case if you tip them off.  But you tick this Court off,

22   and you're not going to work in this Court.

23           CLERK:  Sorry, Judge?

24           THE COURT:  Yes.

25           CLERK:  We have parties with raised hands.  I

Page 42

1   don't know if you want to allow them to …

2            THE COURT:  Sure.  It's, I always am happy to hear

3   from -- I can't see them on the screen so you'll have to

4   identify the names.

5            CLERK:  Sure, Janell Eckhardt, please unmute.

6            MS. ECKHARDT:  Thank you, Your Honor.  My name is

7   Janell Eckhardt, and I'm a Celsius Earn Creditor and

8   appreciate that you're acknowledging the seriousness of this

9   matter.  I wondered if perhaps you had considered how, back

10  in October of '22, 2022, that we had engaged with a consumer

11  privacy ombudsman when we were releasing the schedules.

12  That was something that you and the US Trustee had set up.

13  And that was something that she had set up a report that was

14  something that maybe could be considered a resource.  Seems

15  like Stretto is kind of minimizing the situation.  And you

16  can connect the addresses to, you know, what was in the

17  schedules we're doing, while it addresses transaction

18  histories, crypto holdings, and recent transactions that

19  were done in those schedules.  And people can look at it,

20  it's a very large amount, you know, there's issues that

21  happen to people that had crypto holdings, that had criminal

22  things that happened to them.  So, it's a very serious

23  matter.  So, I didn't know if you considered that.  Thank

24  you.

25            THE COURT:  Thank you very much, Ms. Eckhardt.

Page 43

1    Anybody else?  Diana, anybody else have their hand raised?

2            CLERK:  Mr. (indiscernible) had his hand up but I

3    think he put it down.

4            THE COURT:  Okay, anybody else?  Any other?

5            CLERK:  That's all, Judge.

6            THE COURT:  Okay, all right.  Any of the counsel

7    in Court want to be heard further?  Mr. Bruh?

8            MR. BRUH:  Your Honor, Mark Bruh, United States

9    Trustee.  Just briefly on that comment, we had discussed it

10   with counsel, the privacy ombudsman.  She was discharged

11   when she filed her final report in the case, so we didn't

12   think, at this time, to bring her back in, in this role.

13   But …

14           THE COURT:  Thank you very much, Mr. Bruh.  All

15   right.  We're going to adjourn but the Chief Deputy Clerk is

16   sitting in the back of the room, and he may want to talk to

17   you off the record and see whether there's anything else.  I

18   take this very seriously, I've said that multiple times.

19   But … all right, we're adj

20

21           (Whereupon these proceedings were concluded at

22   4:01 PM)

23

24

25

Page 44

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 16, 2024