Dimitry Kirsanov
Pro Se Creditor
United States of America
dimitry.kirsanov@protonmail.com
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____ )

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, et al., [1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Post-Effective Date Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Case No. 22-10964 |
| | ) | |
| | ) | |

_____ )

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Dimitry Kirsanov, Creditor in Celsius Network LLC et al., hearby appeals to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C § 158 and the Federal Rules of Bankruptcy Procedure 8001-8005, from the United States Bankruptcy Court for the Southern District of New York's June 12th, 2024 *Memorandum Opinion and Order Denying Dimitry Kirsanov's Motion to Revoke Confirmation Order [Docket No. 4941]*, entered by the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

**PLEASE TAKE FURTHER NOTICE** attached as **Exhibit A** is a copy of the Opinion and Order.

_____

[1]     The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030

The name of all parties to the Order appealed from and the names, addresses, and telephone numbers of their respective counsel are as follows:

**Appellant:**

**Dimitry Kirsanov**

[contact information on file]

**Appellee:**

**KIRKLAND & ELLIS LLP**

Joshua A. Sussberg, P.C.

601 Lexington Avenue New York, NY 10022

Telephone: (212) 446-4800

**KIRKLAND & ELLIS LLP**

Patrick J. Nash, Jr., P.C.

Ross M. Kwasteniet, P.C.

Christopher S. Koenig

Dan Latona

333 West Wolf Point Plaza, Chicago, IL 60654

Telephone: (312) 862-2000

*Counsel to the Debtors*

Dated: June 26th, 2024.

I stay respectfully,

/s/ Dimitry Kirsanov

Dimitry Kirsanov

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | NOT FOR PUBLICATION |
| CELSIUS NETWORK LLC, *et al.*, | Chapter 11 |
| Post-Effective Date Debtors. | Case No. 22-10964 (MG) |

## MEMORANDUM OPINION AND ORDER DENYING DIMITRY KIRSANOV'S MOTION TO REVOKE CONFIRMATION ORDER

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Counsel to Defendants Celsius Network LLC, et al.*
601 Lexington Avenue
New York, New York 10022
By:    Joshua A. Sussberg, Esq.

333 West Wolf Point Plaza
Chicago, Illinois, 60654
By:    Patrick J. Nash Jr., Esq.
          Ross M. Kwasteniet, Esq.
          Christopher S. Koenig, Esq.
          Dan Latona, Esq.

*Pro se* Creditor Dimitry Kirsanov

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Dimitry Kirsanov's *Letter and 1144 Request* (the

"Revocation Request," ECF Doc. # 4869) seeking revocation, pursuant to 11 U.S.C § 1144, of

the confirmation order (the "Confirmation Order," ECF Doc. # 3972)[1] in the cases of Celsius

Network LLC, *et al.* ("Celsius" or the "Debtors").  Celsius filed a *Response to Dimitry*

*Kirsanov's May 6, 2024 Letter to the Bankruptcy Court* (the "Revocation Response," ECF Doc.

---

[1]        Terms not otherwise defined have the meaning set forth in the Confirmation Order.

# 4898), and Kirsanov subsequently filed the *Declaration of Dimitry Kirsanov, Creditor, in Support of a Revocation Proceeding under US 1144, Along with the Notification to the Bankruptcy Court of Non-Receipt of Custody Assets, with Relief Requested as Deemed Appropriate by the Bankruptcy Court* (the "Kirsanov Declaration," ECF Doc. # 4902).

The Revocation Request raises the same arguments and objections which the Court has repeatedly rejected and denied.  The Debtors have expended hours carefully responding on the docket to the myriad Kirsanov letter motions, and conferring independently with Kirsanov "via e-mail and telephone to facilitate Mr. Kirsanov's understanding of the Plan and Custody Settlement."  (Revocation Response at 3 n.4.)  These cases are replete with active *pro se* creditors, and the Court appreciates the valuable perspectives they often bring.  However, it is neither the Court nor the Debtors' duty to continue explaining, in painstaking detail, the answers to moot questions which a single creditor is unable or unwilling to understand.  However, to address them thoroughly and with finality, this Opinion undertakes that task.  For the reasons detailed below, the Revocation Request is **DENIED**.

## I.    BACKGROUND

The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on July 13, 2022 (the "Petition Date").  The Court confirmed its plan of reorganization (the "Plan," ECF Doc. # 4289, as amended) on November 9, 2023.  (*See* Confirmation Order.)  Celsius emerged from bankruptcy on January 31, 2024.  (*See* ECF Doc. # 4298.)  Familiarity with the facts and circumstances of the Celsius bankruptcy and disputes concerning the CEL Token is assumed and is discussed in more detail in the Court's confirmation opinion.  *See In re Celsius Network LLC*, 655 B.R. 301, 305–07 (Bankr. S.D.N.Y. 2023) (the "Confirmation Opinion").

### A. Kirsanov's Letter Motions

Kirsanov has filed numerous letter motions and objections, pre- and post-confirmation, each of which have been denied or overruled. The relevant post-confirmation filings are summarized below.

#### 1. Motion to Convert and Balloting Letter

On November 1, 2023, Kirsanov filed the *Motion of (sic) Conversion of Bankruptcy to Chapter 7 Pursuant to U.S. Code § 1112* (the "Conversion Motion," ECF Doc. # 3956). He subsequently filed a letter reiterating various concerns with balloting, which he had raised in the Conversion Motion (the "Balloting Letter," ECF Doc. # 3967). The Conversion Motion argued for relief on the grounds that (1) he was "a dissenting creditor [who] ha[d] voted to reject the plan" and there had been a "misrepresentation on (sic) how [he] ha[d] voted," an objection which he set forth in more detail in the Balloting Letter; (2) the Plan "propose[d] to devalue [his] petition day CEL Custody Claim by $419,552"; and (3) that "[p]etition day values ha[d] risen across most classes, which [he] believe[d] would increase overall creditor recovery under a Chapter 7." (Conversion Motion at 2.)

The Court rejected Kirsanov's arguments and denied the Conversion Motion in an order entered on November 9, 2023 (the "Conversion Denial," ECF Doc. # 3975).

#### 2. Motions for Clarification and Reconsideration

On November 10, 2023, Kirsanov filed *Kirsanov's Motion for Clarification* ("First Clarification Motion," ECF Doc. # 3998). The First Clarification Motion sought, among other things, clarification with respect to how his acceptance of the Custody Settlement (ECF Doc. # 2291-1) had affected his vote on the Plan, and how certain assets associated with Custody

3

Claims would be valued and distributed to creditors in Hawaii.  (*See generally* First Clarification Motion.)

The Court ordered a response from the Debtors (*see* ECF Doc. # 4005), which they filed on November 20, 2023 ("Clarification Response," ECF Doc. # 4014).  The Debtors re-explained the mechanisms of the Custody Settlement, including how acceptance of the Custody Settlement resulted in a deemed acceptance of the Plan for any account holder's Custody Claim (Clarification Response ¶¶ 10–11).  Because Kirsanov had accepted the Custody Settlement, he was ineligible to vote "no," and his attempt to do so was deemed an acceptance.  (*Id.* ¶¶ 23–24, 27).

On November 23, 2023, Kirsanov filed *Kirsanov's Motion of (sic) Reconsideration* (the "Reconsideration Motion," ECF Doc. # 4031), seeking reconsideration of the Confirmation Order, Confirmation Opinion, and Conversion Denial.  The Reconsideration Motion (1) acknowledged that Kirsanov accepted the Custody Settlement (Reconsideration Motion ¶ 6); (2) averred that his CEL Tokens were "categorized as 6B due to his non-engagement with other debtor programs," but that "due to an outstanding loan," his claim was "reclassified" from 6B to 6A (*id.* ¶¶ 5, 7); (3) restated his belief that he was entitled to vote to reject the Plan (*id.* ¶ 8); (4) took issue with the "lowering" of "the 'Deactivation Day Price' from petition day prices to $0.25 per CEL [Token]" (*id.* ¶¶ 14–15); and (5) restated his belief that the Debtors had misrepresented his vote (*id.* ¶¶ 19–23).

The Reconsideration Motion did not "point to controlling decisions or data that the court overlooked" which may "reasonably be expected to alter the [Court's] conclusion," and thus failed to satisfy the relevant standard.  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.

4

1995).  The Court denied both the Clarification Motion and Reconsideration Motion in an order

entered on November 29, 2023 (the "Clarification/Reconsideration Denial," ECF Doc. # 4046).

3.  Second Clarification Motion

On December 4, 2023, Kirsanov filed the *Statement and Motion of (sic) Clarification* (the

"Second Clarification Motion," ECF Doc. # 4063).  The Second Clarification Motion requested

clarity on two questions: *first*, "[h]ow could [his] Pure CEL have been 6B if [his] name was not

listed in the revised withdrawal order pursuant to the balloting instructions on the Plan?" and

*second*, "would the debtor lacking funds in their Custody Wallets, subsequently transferring

500,000 CEL Tokens to their Custody wallets weeks later to fulfill my eligible withdrawal

request in full not be classified as a Shortfall event pursuant to the Custody Settlement?"

(Second Clarification Motion at 5.)

On December 5, 2023, the Court denied the Second Clarification Motion (the "Second

Clarification Denial," ECF Doc. # 4066), stating that "[n]o further motions by Kirsanov

concerning the confirmed Plan will be considered by the Court, and the Court will consider

imposing sanctions on Kirsanov if he files further motions addressed to the confirmed Plan."

(Second Clarification Denial at 1.)

**B.  Kirsanov's Revocation Request**

On May 6, 2024, Kirsanov filed the Revocation Request.  The Revocation Request

contends that the Confirmation Order was obtained by fraud, and requests that the Court

"proceed with . . . a Revocation Proceeding" based on alleged misrepresentations and materially

adverse post-balloting changes to the Plan.  (Revocation Request at 4.)  Namely, Kirsanov

contends that (1) his claim was reclassified from 6A to 6B (*id.* at 1; *id.* ¶¶ 1–2, 7); (2) argues that

a post-balloting amendment that assigned CEL Tokens a Deactivation Date price of $0.25

5

"adversely affected" him and similarly situated creditors (*id.* at 1; *id.* ¶¶ 3–6, 11); and (3) that he

had voted to reject the plan, and the Debtors had misrepresented his vote (*id.* at 1; *id.* ¶ 13).[2]

### C. The Debtors' Revocation Response

The Debtors filed the Revocation Response on May 22, 2024, pursuant to the Court's

order (ECF Doc. # 4875).  They argue that the Revocation Request should be dismissed (1) on

procedural grounds, (2) because it raises the same baseless arguments which have been

repeatedly rejected, and (3) because even if true, the allegations fall short of the high standard to

revoke a confirmation order under section 1144.

#### 1.  Procedural Deficiency

The Debtors argue that the Revocation Request fails on procedural grounds, because a

request to vacate a confirmation order must be brought as an adversary complaint.  (Revocation

Response ¶ 5 (citing FED. R. BANKR. P. 7001(5) and *In re BGI, Inc.*, No. 11-10614 (MG), 2012

WL 5392208, at *4 (Bankr. S.D.N.Y. Nov. 2, 2012)).)  Thus, they argue, the Court must dismiss

the Motion unless all parties consent to the procedural error, which they do not.  (*Id.* (citing *In re

CTLI, LLC*, 534 B.R. 895, 905 (Bankr. S.D. Tex. 2015)).)

#### 2.  Failure to Meet the Burden Under Section 1144

Second, the Debtors contend that Kirsanov has not met his burden of showing that the

Confirmation Order was obtained through fraud, because (1) his allegations are untrue, and

(2) even if they were, this would still not rise to the requisite showing of fraud, and (3) that the

balance of Kirsanov's arguments has already been addressed and specifically overruled.  (*Id.* ¶¶

7, 11, 14.)

---

[2]    Kirsanov also states that it "is [his] understanding that the Court intends to amend the confirmation order."
(Revocation Request at 2.)  It is unclear what gave Kirsanov this mistaken impression, but for the avoidance of
doubt, the Court does not have (and never had) any intention of amending the Confirmation Order.

*First*, the Debtors flatly deny that Kirsanov's claims were reclassified from 6A to 6B, an argument for which he does not explain any purported motive, nor propose what could be done to correct it.  (*Id.* ¶ 7.)  They explain the distinction between 6A and 6B claims: Class 6B Withdrawable Custody Claims were fully withdrawable and unimpaired either (1) because they had only ever been used in the Custody Program, (2) because they were below the $7,575 threshold required for a preference action, or (3) were otherwise eligible for withdrawal under the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* (the "Custody Withdrawal Order," ECF Doc. # 1767).  (*Id.* ¶ 8.)  Class 6A General Custody Claims were all remaining Custody Claims—including those which, under the Custody withdrawal Order, had *not* been eligible for withdrawal due to an outstanding loan.  (*Id.* ¶ 9.)  Based on this, "[b]ecause Mr. Kirsanov had an outstanding loan, he had a Class 6A General Custody Claim," which was never reclassified, but merely deemed to accept due to his acceptance of the Custody Settlement.  (*Id.*)

*Second*, the Debtors argue that *even if* Kirsanov's claim had somehow been reclassified, this would not amount to a procurement of the Confirmation Order by fraud, because Class 6A "voted overwhelmingly to accept the Plan."  (*Id.* ¶ 11.)  Even if Kirsanov and the other 88 similarly situated creditors were "somehow allowed to vote against the Plan (or were reclassified as 6B)," Class 6A still accepted by more than by two-thirds in dollar amount and one-half in number as required by section 1126(c) of the Bankruptcy Code.  (*Id.* ¶ 13.)

### D.  The Kirsanov Declaration

In response to Debtors' Revocation Response, Kirsanov filed the Kirsanov Declaration. In it, he (1) argues that the Debtors "never received permission" to move certain CEL tokens to

7

his wallet to "satisfy the shortfall prior to confirmation" (Kirsanov Declaration ¶¶ 1–5); (2) again

raises the 6B classification issue (*id.* ¶¶ 6, 8); and (3) again raises the CEL token deactivation

date valuation (*id.* ¶ 9).  He also argues that the Confirmation Order was procured by fraud,

noting that the standard is "fraud on the court," and that a consideration for evaluating such fraud

is whether at least some creditors would have voted differently absent the alleged fraud, which

he argues they would have.  (*Id.* ¶¶ 13–17.)

## II.   <u>LEGAL STANDARD</u>

### A.  Revocation of an Order of Confirmation Under Section 1144

Section 1144 of the Bankruptcy Code is the sole basis for revoking confirmation of a

chapter 11 plan.  8 COLLIER ON BANKR. ¶ 1144.02[1] (16th ed. 2024).  Section 1144 provides

that, "[o]n request of a party in interest at any time before 180 days after the date of the entry of

the order of confirmation, and after notice and a hearing, the court *may* revoke such order if and

only if such order was procured by fraud."  11 U.S.C. § 1144 (emphasis added).  If the court does

order revocation, the revocation order "shall . . . contain such provisions as are necessary to

protect any entity acquiring rights in good faith reliance on the order of confirmation."  11

U.S.C. § 1144(1).

The decision to revoke is left largely to the sound discretion of the court, which "may

decline to revoke the order of confirmation *even if* it finds that the order *was* procured by fraud."

*Varde Inv. Partners, L.P. v. Comair, Inc. (In re Delta Air Lines, Inc.)*, 386 B.R. 518, 532 (Bankr.

S.D.N.Y. 2008) (emphasis in original).  However, the mandate of section 1144(1) limits a court's

ability to grant revocation: "[a]ll orders revoking orders of confirmation *must* protect innocent

parties . . .  [I]f a court cannot fashion a revocation order that protects innocent parties who

acquired rights in reliance on the confirmation order, the court is *barred* from revoking the
confirmation order—even if the order was procured by fraud." *Id.* (emphasis in original).

       1.  <u>Procedure to Seek Revocation</u>

"Bankruptcy disputes take two distinct forms: (1) contested matters, which are initiated
by a motion filed in the main bankruptcy case; and (2) adversary proceedings, which are initiated
by a formal complaint that creates a separate lawsuit treated similarly to a civil suit outside of
bankruptcy." *CTLI*, 534 B.R. at 905.

A proceeding to revoke an order of confirmation of a chapter 11 plan is an adversary
proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure. FED. R. BANKR. P.
7001(5). When a Rule 7001 category is at issue, a movant may proceed "only through an
adversary proceeding." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 762 (5th Cir. 1995)
(citation omitted). As such, "[a] proceeding to revoke an order of confirmation . . . must be
commenced by complaint." *In re V&M Mgmt., Inc.*, 215 B.R. 895, 897 (Bankr. D. Mass. 1997).
Absent consent from a non-moving party, the court must deny a motion seeking revocation that
is not properly brought as an adversary proceeding. *CTLI*, 534 B.R. at 905; *see also Wing on
Bank, Ltd. v. Interstate Airlines, Inc. (In re Air One, Inc.)*, 75 B.R. 1003, 1005 (Bankr. E.D. Mo.
1987).

       2.  <u>Procurement by Fraud</u>

A movant seeking revocation under section 1144 must demonstrate that there has been
fraud on the court. 8 COLLIER ON BANKR. ¶ 1144.03[2][a] (16th ed. 2024). *See also, e.g.*,
*Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 507
(Bankr. S.D.N.Y. 2012) ("[T]he fraud [alleged in a revocation proceeding] must be on the *Court*,

and not directed at anyone else or floating in the air.") (emphasis in original).  A movant alleging

that a confirmation order was obtained by fraud on the court must show that:

> (1) the debtor made a representation regarding compliance with section 1129 of the Bankruptcy Code that was materially false;
> (2) the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;
> (3) the representation was made to induce the court to rely upon it;
> (4) the court did rely upon it; and
> (5) as a consequence of such reliance, the court entered the confirmation order.

*See In re Virgin Orbit, LLC*, 659 B.R. 36, 42 (Bankr. D. Del. 2024); *see also Port of Corpus*

*Christi Auth. V. Sherwin Alumina Co. (In re Sherwin Alumina Co.)*, 952 F.3d 229, 235 (5th Cir.

2020) (listing the same factors).

Because "fraud upon the court" is a variation of fraud, a plaintiff must allege it with the

level of particularity required by Federal Rule of Civil Procedure 9(b).  *See* FED. R. CIV. P. 9(b)

("In alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud or mistake.").  *See also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.

1994) ("[T]o serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to

a strong inference of fraudulent intent.").  The requisite "strong inference" of fraud may be

established by alleging either (a) facts to show that defendants had both motive and opportunity

to commit fraud, or (b) facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness.  *Motors Liquidation*, 462 B.R. at 506.  Accordingly, to "secure

relief under section 1144 of the Code, a movant must point to specific acts of the debtor

evidencing actual fraudulent intent." *Id.* at 505.

### 3.  Section 1144(1) and Equitable Mootness

Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a

reorganization plan once implemented.  *Deutsche Bank AG v. Metromedia Fiber Network, Inc.*

*(In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005).  It is "grounded in the

10

notion that, with the passage of time after a judgment in equity and implementation of that

judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable."

*Id.* (citation omitted).  The primary factor in evaluating mootness is whether the plan has been

substantially consummated, as defined in section 1101 the Bankruptcy Code.  *Delta*, 386 B.R. at

537.  A failure to seek a stay of execution of the plan weighs heavily towards a finding of

equitable mootness.  *Metromedia Fiber*, 416 F.3d at 145.

As stated above, even if a court determines a confirmation order has been procured by

fraud, the court's ability to revoke the order is circumscribed by section 1144(1)'s requirement

that any revocation order "protect any entity acquiring rights in good faith reliance" on the

confirmation order.  11 U.S.C. § 1144(1).  There is thus "substantial overlap" between this

condition and the doctrine of equitable mootness, because if no such order could be fashioned,

both section 1144(1) and equitable mootness would usually preclude revocation.  8 COLLIER ON

BANKR. ¶ 1144.06[1][a].

For example, in *Delta*, the court denied revocation for the "separate and independent

(although obviously related) reasons" of the section 1144(1) requirement and equitable

mootness.  *Delta*, 386 B.R. at 534.  The post-effective debtors had negotiated and executed

"transactions involving billions of dollars," including the issuance of stock which had begun

trading.  *Id.* at 535.  The panoply of post-effective transactions rendered it both "impossible" for

the court to protect innocent parties, barring revocation under section 1144(1), *and* demonstrated

that the plan had been substantially consummated, rendering the revocation proceeding equitably

moot.  *Id.*

11

### III.    DISCUSSION

The Revocation Request attempts to resurrect settled issues by garnishing them with the word "fraud" and presenting them under section 1144.  These efforts are unpersuasive.  While the Revocation Request could be denied purely on procedural grounds or for mootness, for the avoidance of doubt, it also fails on the merits.  For the reasons below, the Revocation Request is **DENIED**.

### A.  The Revocation Request is Procedurally Improper and Moot

A request to revoke a confirmation order is an adversary proceeding under Bankruptcy Rule 7001, which requires initiation via a complaint.  *See* FED. R. BANKR. P. 7001(5); *V&M Mgmt., Inc.*, 215 B.R. at 897.  Kirsanov made the Revocation Request through a letter motion filed on the docket.  The Debtors "do not consent to allowing Mr. Kirsanov's procedural error." (Revocation Response ¶ 5.)  Thus, the Revocation Request could be denied purely on procedural grounds alone.

Equitable mootness is also grounds to deny the Revocation Request.  The Debtors emerged from bankruptcy several months ago, and have distributed billions of dollars' worth of cryptocurrency and cash.  Kirsanov notes that "the egg can not [sic] be completely unscrambled." (Revocation Request at 2.)  At this point, the eggs have not merely been scrambled: they have been seasoned, cooked, and served.  The Revocation Request could be denied on grounds of equitable mootness.

### B.  The Revocation Request Does Not Allege Fraud on the Court

While each issue Kirsanov raises has been repeatedly addressed, the Revocation Request and Kirsanov Declaration raise the following issues which, he believes, have not been

12

satisfactorily explained: the 6A/6B classification and voting issue, the CEL Token Deactivation

Date valuation, and the Shortfall Issue.

None of Kirsanov's allegations plead with particularity either (1) motive and opportunity

to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior. *Motors*

*Liquidation*, 462 B.R. at 506. He has not pointed to any knowingly and materially false

representations the Debtors made regarding compliance with section 1129 of the Bankruptcy

Code, made to induce reliance by the Court, which the Court did in fact rely on in entering the

Confirmation Order. *Virgin Orbit*, 659 B.R. at 42. Accordingly, Kirsanov has not alleged—

much less demonstrated—that the Debtors committed fraud on the Court.

    1. <u>Classification and Voting Issue</u>

Kirsanov's claim was not misclassified. His claim was properly deemed as an

acceptance. And even if his claim had been misclassified or miscounted, that would not amount

to fraud on the Court in procuring confirmation, as the Custody Class voted overwhelmingly to

accept the Plan. There was neither motive to commit fraud, nor any evidence (circumstantial or

otherwise) of conscious misbehavior.

    *a. Kirsanov had a Class 6A General Custody Claim*

Kirsanov had Custody Claims, a Class 2 Retail Borrower Deposit Claim, and a Class 5

General Earn Claim. (Clarification Response ¶ 21). Kirsanov's Custody Claim was a "pure"

Custody Claim, *i.e.*, his tokens had been exclusively maintained in the Custody Program, and

never "interacted with" any other program the Debtors had offered. (First Clarification Motion

at 3.)

One of Kirsanov's principal contentions is that his Custody Claim was misclassified,

misrepresented, or improperly counted. Part of the confusion stems from a lack of clarity in

13

what class he was apparently switched to, or from.  Over his myriad letters, Kirsanov has

asserted that:

- "[H]is impaired 6B funds were reflected on the 6A balloting" (Balloting Letter ¶ 6);
- "He . . . exercised his rights to reject with his impaired 6B funds" (*id.* ¶ 9);
- "[His] 6B, however, was impaired and visible on his 6A voting results" (First Clarification Motion at 2);
- "[His] CEL Tokens were categorized as 6B" (Reconsideration Motion ¶ 5);
- "[A]n outstanding loan . . . result[ed] in the reclassification of his 6B to 6A" (*id.* ¶ 7);
- "[He does] not dispute that 6B without a loan is unimpaired, however, [his] name was not listed under the Revised Withdrawal Notice, and thus, [his] claim was converted into 6A" (Second Clarification Motion at 2);
- "[H]is vote . . . was indeed for [his] impaired 6A funds" (*id.*);
- "[T]he debtors reclassified [similarly situated] creditors from 6A to 6B after balloting" (Revocation Request at 1);
- "[T]he balloting instructions . . . determine[d] that [similarly situated creditors], including [him]self, were 6A, instead of 6B" (*id.* ¶ 2);
- "After balloting, the debtors changed the balloting along with voting classes, reassigning [similarly situated creditors] from 6A to 6B" (*id.* ¶ 7);
- "The Debtors in response to the original clarification, indicate that I had a 6B Claim . . . . . However, in the 6B order, my name was unlisted for any assets" (Kirsanov Declaration ¶ 6);
- "If such claims were not reclassified, the plan amendment, post balloting, would not list such similar-situated claims under 6B, contrary to my personal claims showing 6A" (*id.* ¶ 8).

He alternately references "his" 6B funds[3] and "his" 6A funds,[4] and alternately references

the conversion or recategorization of 6B to 6A,[5] but also 6A to 6B.[6]

Although far from a model of clarity, it appears that Kirsanov's believes he had a 6B

claim because it was a "pure custody claim," but, *pre-balloting*, was "recategorized" to 6A

---

[3]    *See* Balloting Letter ¶¶ 6, 9; First Clarification Motion at 2 (referencing his 6B Claim).  In reliance of Kirsanov's assertion of a 6B Claim, and the Clarification Response which further referenced "his" 6B Claim (*see* Clarification Response ¶ 26), the Clarification/Reconsideration Denial assumed that Kirsanov had a 6B Claim.  For the avoidance of doubt, this Opinion, which clarifies that Kirsanov had only a 6A Claim, supersedes any inconsistencies in any prior order.

[4]    *See* Second Clarification Motion at 2; Kirsanov Declaration ¶ 8 (referencing his 6A claim).

[5]    *See* First Clarification Motion at 2; Reconsideration Motion ¶ 7; Second Clarification Motion at 2 (referencing a 6B to 6A recategorization or conversion).

[6]    *See* Reconsideration Motion ¶ 5; Revocation Request ¶¶ 2, 7; Kirsanov Declaration ¶ 8 (referencing a 6A to 6B recategorization or conversion).

because, due to his loan, the Custody Claim was not eligible for withdrawal under the Custody

Withdrawal Order.  (*See, e.g.*, Reconsideration Motion ¶ 7 ("[A]n outstanding loan . . . result[ed]

in the reclassification of his 6B to 6A.").)  Then, he believes *post-balloting*, the Debtors

improperly "reclassified" the votes of creditors like him from 6A back to 6B, such that they were

shown to accept.  (*See, e.g.*, (Revocation Request at 1 ("[T]he debtors reclassified [similarly

situated] creditors from 6A to 6B after balloting.").)

　　　　Kirsanov only ever had a 6A claim.  He apparently conflates "pure custody" with "Class

6B," and thus referenced "his" 6B claim, which created much of the initial confusion.  However,

his claim was not "recategorized" from Class 6B; he was never *in* Class 6B, which carved him

out by virtue of his outstanding loan.  Class 6B Claims were only those which were

withdrawable under the Custody Withdrawal Order.  While most pure Custody Claims were

withdrawable and thus in Class 6B, Kirsanov's pure Custody Claim was *not* withdrawable under

the Custody Withdrawal Order because he had an outstanding loan.  Any claim which was not

Class 6B claim was a Class 6A General Custody Claim.  Thus, Kirsanov had a Class 6A General

Custody Claim.

### b.  *Kirsanov's Claim was Properly Deemed to Accept the Plan*

　　　　Class 6A General Custody claims were eligible to participate in the Custody Settlement,

whereby they would settle their Withdrawal Preference Exposure in exchange for being allowed

to withdraw 72.5% of their cryptocurrency.  (*See generally* Custody Settlement.)  Participation in

the Custody Settlement meant that any votes cast on account of such participating Custody

Claims were *deemed to accept* the Plan, regardless of how any individual creditor attempted to

vote on their ballot.  (Revocation Response ¶ 9 (citing Plan Art. III.B.6A).)

Kirsanov accepted the Custody Settlement.  (*See* Reconsideration Motion ¶ 6.)  He also attempted to vote his Class 6A Custody Claim to reject the Plan.  (Balloting Letter ¶ 7.) However, "[b]ecause he had previously accepted the Custody Settlement, his Class 6A Claim was deemed a vote to accept the Plan, regardless of whether it was shown as an accept or reject" on the balloting tabulations.  (Clarification Response ¶ 24.)

Kirsanov argued that his right to reject the plan was preserved by virtue of the following language in the Custody Settlement:

> For the avoidance of any doubt, *any Holder of an Allowed Custody Claim that abstains from voting or votes to reject the Plan* and has only Pure Custody Assets or Transferred Custody Assets, but was prevented from receiving his or her Custody Assets under the [Custody] Withdrawal Order as a result of an outstanding obligation owed to the Debtors through the Debtors' Borrow Program, shall receive his or her Custody Assets in accordance with the treatment of allowed Deposit Claims under the Plan and otherwise consistent with the Court's findings in the [Custody] Withdrawal Order.

(Custody Settlement § 5 (emphasis added).)

The Debtors responded that this provision "was merely clarifying how Holders of an Allowed Custody Claim would be treated under the Plan if the ***only*** reason they could not withdraw their [assets] under the Custody Withdrawal Order was because of a [Retail Borrower Deposit] Claim," and "was not referring to ***Settling Custody Account Holders*** (*i.e.*, those that accepted the Custody Settlement) and was not preserving any such Settling Custody Account Holder's right to vote to reject the Plan."  (Clarification Response ¶ 25 (emphasis in original).)

The provision at issue could have been drafted more clearly.  Since it was not referring to Settling Custody Account Holders, it could have used the other relevant defined term: "Non-Settling Custody Account Holders," which was defined as "each Holder of an Allowed Custody Claim that does not 'opt-in' to the Settlement Agreement within 30 days after entry of the Settlement Approval Order and that abstains from voting or votes to reject the Plan."  (Custody

Settlement at 5.)  Or, it could have specified that this did not preserve any voting rights for any

Account Holder who accepted the Custody Settlement.

Kirsanov *was* a holder of an Allowed Custody Claim, whose Class 2 Retail Borrower

Claim *was* the only reason he could not withdraw his pure custody assets.  Read in isolation, the

provision appears to contemplate that *any* such holder might reject the Plan.  However, this

ignores the myriad other places where the Debtors specified that once such a holder accepted the

Custody Settlement, they were no longer eligible to vote to reject.  Kirsanov argues that the

deemed acceptance mechanism was only introduced *after* the balloting had concluded, and he

thus did not have adequate information.  (Revocation Request ¶ 12 ("[D]ebtor's counsel

indicated they made it clear in the Custody Settlement. . . [and] disclosure statement.  However,

the change in the disclosure statement where it was added after balloting, contradicts this.").)

The Custody Settlement does not, in fact, explicitly state that rejection votes will be

"deemed" as acceptances.  It does, however, provide that any Settling Account Holder—which

would include Kirsanov—"*must vote* all of his or her Allowed Custody Claims to accept the

Plan." (Custody Settlement § 5 (emphasis added).)  Further, the language of "deemed" or

"automatic" acceptance was introduced in the very *first* disclosure statement.  (*See* "First

Disclosure Statement," ECF Doc. # 2902, at 26 ("[A]ny votes cast by [a Custody Settlement

Participant] on account of [their] General Custody Claim, whether to accept or reject the Plan,

*shall be deemed* votes to accept the Plan." (emphasis added)); *id.* at 64 (informing account

holders that, if they had "elected to participate in the Custody Settlement," their claim would

"*automatically be counted* as a vote to accept the Plan." (emphasis added); *id.* at 65 ("If you are a

Settling Custody Account Holder, you are *deemed to accept* the Plan." (emphasis added).)  Each

subsequent version of the Disclosure Statement contained identical language.  (*See* "Second

17

Disclosure Statement," ECF Doc. # 3117 at 31, 70–71; "Third Disclosure Statement," ECF Doc.

# 3320 at 32, 84–85; "Fourth Disclosure Statement," ECF Doc. # 3332 at 32, 84–85.)  This

deemed acceptance language was carried through into the Plan.  (*See* Plan Art. III.B.6A(b)(ii).)

   Kirsanov's allegation that the Disclosure Statement did not disclose or explain this

mechanism pre-balloting is thus without merit.  Further, even if true, it would not amount to

fraud on the Court.  As in *Nyack Autopartstores*:

> The creditor alleges that the debtor's disclosure statements are grossly
> inaccurate and inconsistent and that they require explanation.  The creditor
> does not, however, offer any evidence of the debtor's intent to defraud the
> court.  Without a specific showing of the requisite fraudulent intent, the
> bankruptcy court had no authority under section 1144 to revoke its
> confirmation order.

*Parts, Inc. v. Nyack Autopartstores Holding Co. (In re Nyack Autopartstores Holding Co.)*, 98

B.R. 659, 661–62 (Bankr. S.D.N.Y. 1989).

   Under the clear terms of the Disclosure Statement and Plan, Kirsanov's vote on account

of his Class 6A General Custody Claim was properly deemed as an acceptance, and his

contentions to the contrary do not amount to an allegation of fraud.  *See In re Melinta

Therapeutics, Inc.*, 623 B.R. 257, 265, 267–68 (Bankr. D. Del. 2020) (declining to revoke

confirmation order based on *pro se* creditor's arguments that the Debtors improperly tabulated

votes, which were "built upon multiple faulty assumptions," and finding no evidence that the

debtors had made materially false representations in presenting the vote count).  There was no

nefarious switching or reclassification: the Debtors classified Kirsanov's claim, tabulated his

ballot, and counted his final vote exactly the way they had disclosed clearly and repeatedly that

they would.

2.  <u>CEL Token Deactivation Value</u>

Kirsanov then argues that the Debtors, by modifying the Plan post-solicitation to specify that the Deactivation Date price of CEL would be $0.25, materially and adversely affected him and other CEL Token holders.  (Revocation Request at 1.)  The basis of his objection is that this change deviates from the "plan [he] voted on," in which (1) "Custody Claims [we]re exempt from the CEL Token Settlement" and (2) "deactivation Cryptocurrency prices . . . would meet [his] best interests."  (*Id.*)  Neither argument has merit, nor would either constitute fraud on the Court, as the Court was keenly aware of these objections during confirmation and explicitly overruled them.

The allegedly adverse change appears in the version of the Plan filed post-solicitation on September 27, 2023 (the "Modified Plan," ECF Doc. # 3577).  The modification is shown below, in the blackline against the solicitation version of the Plan (the "Solicitation Plan," ECF Doc. # 3319) (attached to the Modified Plan as Exhibit B).

19

2. **CEL Token Settlement.**

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in this Article IV.B.2 and in Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.17, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17, as applicable.

- ~~The Debtors will evaluate the votes cast by Holders of CEL Token Deposit Claims (not including CEL Token Deposit Claims held by Equitably Subordinated Parties) and the number of Holders of CEL Token Deposit Claims that opt out of the Class Claim Settlement. Such votes will be disclosed on the voting report to be filed by the Solicitation Agent. To the extent the majority of eligible Holders of CEL Token Deposit Claims vote to accept the Plan or not opt out of the Class Claim Settlement and/or the Debtors and the Committee reach an agreement with an ad-hoc group of Holders of CEL Token Deposit Claims, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation. To the extent a majority of Holders of CEL Token Deposit Claims vote to reject the Plan, the Debtors will seek a determination from the Court of the relative rank and value of CEL Token on the Petition Date at Confirmation~~

- Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25.

(Modified Plan at 142; *see also id.* at 109 (showing corresponding changes in the definitions of "Deactivation Date" and "Deactivation Date Cryptocurrency Conversion Table").)

Kirsanov argues that he voted on a "plan where Custody Claims [we]re exempt from the CEL Token Settlement," and this modification runs contrary to that exemption. (Revocation Request at 1.) The "exemption" to the CEL Token Settlement is that Custody Claims could be withdrawn in-kind, rather than valued at $0.25. However, the "exemption" was honored under both the Solicitation Plan *and* Modified Plan. (Solicitation Plan Art. IV.B.2; Modified Plan Art. IV.B.2.) Under both versions of the Plan, CEL Tokens could be withdrawn in-kind until the Deactivation Date. (Solicitation Plan Art. IV.D.4; Modified Plan Art. IV.D.4.) Upon the Deactivation Date (roughly 90 days post-confirmation), the Celsius platform would shut down and any further distributions would be made by a third-party distribution agent in BTC, ETH, or fiat currency. (*See* "Confirmation Memo," ECF Doc. # 3864 ¶ 5.) In-kind distribution of any

20

token, including CEL, would thus be impossible.  As such (under both the Solicitation Plan and

Modified Plan), all tokens would be converted to either BTC, ETH, or fiat, using prices

approximately 15 days prior to the Deactivation Date.  (Solicitation Plan Art. I.A.84; Modified

Plan Art. I.A.84.)

Thus, upon the Deactivation Date, the "exemption" from the CEL Token Settlement—

which allowed for in-kind distribution of CEL Tokens—would be meaningless, as in-kind

distribution would no longer be possible.  However, the Debtors still needed a value at which to

convert CEL Tokens:

> Under the plan, we have 90 days to make those distributions.  If somebody
> doesn't show up and withdraw their coins in those 90 days, we have to do
> something.  We have to give the equivalent of those coins the best that we
> can . . . .  [F]or CEL token we're proposing to provide a 25 cent valuation,
> which is exactly the same as we're doing under the [P]lan.  So we think that
> that's appropriate.

(Oct. 30, 2023 Hr'g Tr. at 147:11–18 (Koenig).)

Kirsanov, unsurprisingly, argues that the $0.25 number does not "meet [his] best

interests," an argument which rests on the (incorrect) assumption that the liquidation value of

CEL Token is $0.81 and that he must receive 100% of that value to satisfy the "best interests"

test.  (Revocation Request at 1; Oct. 30, 2023 Hr'g Tr. at 115:17–19 (Kirsanov) ("[M]y

liquidation value for my pure custody CEL is 100 percent, which is 81 cents on the dollar.").)

Not so.  The issue of liquidation value and best interests has already been thoroughly addressed

in the Confirmation Opinion.  *See Celsius Network*, 655 B.R. at 310–12.  The key takeaway is

that *value* is not always the same as *price*, and creditors are only entitled to the liquidation *value*.

*Id.* at 312.  While CEL's petition day *price* was $0.81, the *value* was unascertainable, but

unquestionably much lower than $0.81, and $0.25 was a generous estimation of the value.  *Id.*

Accordingly, the modification at issue did not materially or adversely affect the Custody

Settlement's "exemption" from the CEL Token Settlement, as Account Holders could still

withdraw CEL Tokens in-kind until the Deactivation Date.  Nor did it violate the best interests

test, as it allowed Custody Account Holders who had not withdrawn their CEL Tokens to receive

the same fair liquidation value as non-Custody Account Holders.

> 3.  The "Shortfall Issue"

The "Shortfall Issue" referred to the 6% "shortfall" between the Debtors' aggregate assets

and liabilities in the Custody Program.  (Custody Settlement § G.)  As a result of this shortfall,

the eligible Custody Account Holders were initially permitted to withdraw only up to 94% of

their claim.  (*See* "Custody Withdrawal Notice," ECF Doc. # 1958 at 3.)  However, the Custody

Settlement solved this issue and authorized the Debtors "to distribute . . . the additional 6%

originally held back as a result of the Shortfall Issue."  (Custody Settlement § 3.)  The Custody

Settlement caveated this statement in a footnote (the "Shortfall Provision"), stating that:

> In the event that the Debtors have an insufficient amount of certain types of
> cryptocurrency to make all distributions in-kind to satisfy the Shortfall
> Issue, the Debtors shall make distributions in alternative cryptocurrencies,
> which conversion rate shall be determined using the value of the original
> digital asset as of the Petition Date in U.S. dollars that will be converted
> into alternative available cryptocurrency based on the value of such digital
> asset as of the date of entry of the Settlement Approval Order.

(*Id.* at 7 n.7.)

> a.  Alleged CEL Token Settlement "Shortfall"

Kirsanov argues first that "[D]ebtor's counsel indicated there was no 81 cents in the

Custody Settlement.  However, the shortfall provision, afforded such valuation, where it was

ruled upon dated 3/21/23, the provision would provide value as of that date, contradicting

counsel."  (Revocation Request ¶ 9 (internal citation omitted).)  The portion of the closing

argument he is referencing provides that: "Just for the clarification, there was no 81 cents in a

custody settlement.  Under the [C]ustody [S]ettlement, holders got the right to receive the tokens themselves, whatever they turned out to be."  (Oct. 30, 2023 Hr'g Tr. at 147:8–11 (Koenig).)  Debtors' counsel then proceeded to explain the reasoning for the $0.25 Deactivation Date value, discussed *supra*.

Kirsanov's argument is apparently that the Shortfall Provision—which allowed Debtors to convert cryptocurrencies of which they had an *insufficient amount* to satisfy 100% of the Custody Withdrawals—would allow for an $0.81 valuation of CEL.  The Shortfall Provision is inapplicable.  The Debtors had "an abundance of CEL Token in treasury," and did not need to convert any CEL Tokens to satisfy any shortfalls.  (Confirmation Memo ¶ 12.)  For the avoidance of doubt: no CEL Token, anywhere in the Plan, any settlement, or any distribution mechanism receives an $0.81 valuation.[7]  This treatment is not fraud, but a result of the Court's rulings.

For the avoidance of doubt, one of Kirsanov's prior letters—the Second Clarification Motion—requested clarity on why the Debtors' transfer of CEL tokens "weeks later to fulfill my eligible withdrawal request in full not be classified as a Shortfall event pursuant to the Custody Settlement?"  (Second Clarification Motion at 5.)  In light of the foregoing, the question answers itself: the Debtors fulfilled his "eligible withdrawal request *in full*."  (*Id.* (emphasis added).)  The Shortfall Provision would have only applied if the Debtors had had *insufficient* CEL Tokens to fulfill 100% of request, which was not the case.

---

[7]    "It is difficult to get a man to understand something, when his salary depends on his not understanding it." UPTON SINCLAIR, I, CANDIDATE FOR GOVERNOR: AND HOW I GOT LICKED (1935).  The sentiment appears equally applicable to CEL Token claims.

### b. Other Alleged "Admitted Shortfalls"

Lastly, Kirsanov cites two "admitted shortfalls" of the Debtors, which he draws from

(1) the *Debtors' Brief in Support of the CEL Token Settlement* ("CEL Token Settlement Brief,"

ECF Doc. # 3431), and (2) from the Debtors' *Notice of Conversion of LUNC and UST to

Alternative Cryptocurrency* ("LUNC/UST Conversion Notice," ECF Doc. # 2666).

- "CEL Token: Approximately 477,639 (Admitted Shortfall, as of Effective Date, ECF 3431). 'As a result, the Debtors cannot return CEL Token in kind and must assign it some (or no) value, even if they ultimately burn all CEL Tokens in their possession on the Effective Date as they intend.'" (Kirsanov Declaration ¶ 7 (quoting CEL Token Settlement Brief ¶ 2).)
- "(Admitted Shortfall, converted pursuant to the Custody Settlement. ECF 2666). 'For the avoidance of doubt, the value of such digital asset as of the date of entry of the Custody Settlement Order shall be determined using the same methodology set forth in the Notice of Filing of Cryptocurrency Conversion Rates [Docket No. 1420], annexed hereto for reference.'" (*Id.* (quoting LUNC/UST Conversion Notice at 3 n.2).)

Neither citation is relevant or related to the Shortfall Provision.

The first citation, to the CEL Token Settlement Brief, is the Debtors' explanation of why

they needed to place a value on CEL Tokens via the CEL Token Settlement rather than

distributing them all in-kind: namely, that several governmental entities had taken the position

that the CEL Token was an unregistered security, so distributing it to non-Custody Account

Holders carried significant regulatory risk. (CEL Token Settlement Brief ¶ 2). Thus, the

Debtors could not sidestep the valuation issue by distributing all their CEL Tokens in-kind

(despite having "an abundance" of them), and needed to "assign it some (or no) value, even if

they ultimately burn[ed] all CEL Tokens in their possession on the Effective Date." (*Id.*) There

is no connective tissue between this explanation and the Shortfall Provision, which applied only

if and when the Debtors had *insufficient* tokens to distribute *Custody Claims* in-kind; the Debtors

have repeatedly stated that they had a surplus of CEL Tokens to satisfy all in-kind Custody

distributions.

The second "admitted shortfall" in the LUNC/UST Conversion Notice, again, is not a shortfall contemplated or covered by the Shortfall Provision (though the corresponding provision contains the same conversion mechanism).  The Debtors filed the LUNC/UST Conversion Notice not because they had *insufficient* LUNC and UST tokens, but because the software on which the Debtors stored cryptocurrency would soon cease supporting LUNC and UST tokens. (LUNC/UST Conversion Notice at 1.)  The LUNC/UST Conversion Notice gave a deadline of May 31, 2023 for in-kind withdrawals, and provided that on or after June 1, 2023, distributions would be made in alternative cryptocurrency "converted using the value of the original digital asset as of the Petition Date in U.S. dollars, which will then be converted into alternative cryptocurrency using the value of such digital asset as of the date of entry of the Custody Settlement Order," as permitted by *section 8* of the Custody Settlement.  (*Id.* at 1–2.)

Section 8 of the Custody Settlement, captioned "Distribution Procedures," provided for the same conversion mechanism as the Shortfall Provision, which is found in footnote 7 of section 3 of the Custody Settlement (captioned "Approval").  (*See* Custody Settlement §§ 3, 8.) It is unclear exactly what Kirsanov is arguing here: this notice applied only to LUNC and UST tokens, which were permitted to be withdrawn in-kind until they were no longer supported, and then converted pursuant to an identical mechanism in the Shortfall Provision.  The only point to reiterate is that there was no "shortfall" of either token; Account Holders could withdraw 100% of any LUNC or UST Custody Claims in-kind up until the May 31, 2023 deadline.

Thus, neither of Kirsanov's final two allegations contain any indicia of fraud; they are merely his own misunderstandings or misinterpretations.

### C. Kirsanov's Caselaw Supports the Court's Conclusion

The Kirsanov Declaration cites a variety of cases to support his argument that the Confirmation Order was procured by fraud. Rather than supporting a finding of fraud, they are consistent with—and indeed, compel—the Court's findings and conclusions in this Opinion.

#### a. Actual Fraudulent Intent

His first argument that, while "fraud" is not defined in the Bankruptcy Code, a party seeking revocation under section 1144 must demonstrate actual fraudulent intent in connection with the procurement of the confirmation order. (Kirsanov Declaration ¶ 13 (citing *Tenn-Fla Partners v. First Union Nat'l Bank of Fla. (In re Tenn-Fla Partners)*, 226 F.3d 746, 750 (6th Cir. 2000); *In re Longardner & Assocs., Inc.*, 855 F.2d 455 (7th Cir. 1988); *Motors Liquidation*, 462 B.R. at 505; *Ogden v. Ogden Modulars, Inc. (In re Ogden Modulars, Inc.)*, 180 B.R. 544, 547 (Bankr. E.D. Mo. 1995); *In re Braten Apparel Corp.*, 21 B.R. 239, 256 (Bankr. S.D.N.Y. 1982), *aff'd*, 742 F.2d 1435 (2d Cir. 1983)).) The Court agrees with this proposition. However, Kirsanov has failed to allege, much less demonstrate, any actual fraudulent intent.

#### b. Fraud on the Court

He then submits that the fraud must be fraud on the Court, not on the party requesting revocation. (*Id.* ¶ 14 (citing *Tenn-Fla Partners*, 226 F.3d at 751; *V&M Mgmt.*, 215 B.R. at 904; *Ogden Modulars*, 180 B.R. at 547; *United States v. Kostoglou (In re Kostoglou)*, 73 B.R. 596, 599 (Bankr. N.D. Ohio 1987)).) Again, the Court agrees; and again, Kirsanov has neither alleged nor demonstrated fraud on the Court, which has been aware of each argument and objection Kirsanov sets forth and overruled them time and again.

### c. *Voting Considerations*

Lastly, Kirsanov argues that a relevant factor in considering whether confirmation was procured by fraud is whether at least some creditors would have voted differently absent the alleged fraud.  (*Id.* ¶ 16 (citing *Motors Liquidation*, 462 B.R. at 507; *Delta*, 386 B.R. at 533–34).)  He argues that he, and other creditors, would have voted differently had they known the plan would "shift" the price of CEL Token from one that "[met their] best interests . . . to 0.25 cents."  (*Id.* ¶ 17.)  As an initial matter, the Court has already explained why there was no fraud alleged with respect to this Plan amendment, much less perpetrated.

Assuming *arguendo* that the Deactivation Date price clarification amounted to fraud, neither *Delta* nor *Motors Liquidation* can salvage Kirsanov's case.  First, *Delta* specifically notes that, in considering which votes may have been different absent the alleged fraud, "it is instructive to consider which parties have seen fit to join the suit for plan revocation," and in cases where "none of the voting creditors who were allegedly defrauded into voting for confirmation have joined in or supported the suit to revoke the plan, the court should be cautious in exercising its discretion to revoke the confirmation order."  *Delta*, 386 B.R. at 534.  The *Motors Liquidation* court, citing *Delta*, noted that the plan had been overwhelmingly approved by allegedly defrauded creditors, none of whom had joined in the revocation action order or "otherwise indicated that they considered the confirmation order to have been procured by fraud," a fact which supported the court's decision to dismiss the complaint.  *Motors Liquidation*, 462 B.R. at 507 n.65.

While Kirsanov makes the bare assertion that "some of the creditors would of [sic] certainly voted differently," to the Court's knowledge, no other creditor has joined Kirsanov's revocation efforts.  (Kirsanov Declaration ¶ 17.)  Furthermore, even if some creditors had voted

27

differently, the Plan was still overwhelmingly accepted: Kirsanov does not even attempt to argue

that the alleged "fraud" would have caused a requisite majority of creditors and claims to alter

their votes and reject the Plan.

## IV.    CONCLUSION

The Revocation Request could be denied on procedural grounds alone, but also fails on

the merits, as none of Kirsanov's arguments amount to allegations of fraud on the Court.  His

arguments are Plan objections that have been clarified, explained, and overruled multiple times.

Further, even if Kirsanov had alleged fraud, it is too late: the Court would be barred from

revoking the confirmation order by section 1144(1), and would decline to revoke it on the

grounds of equitable mootness.  The Revocation Request is **DENIED**.[8]

**IT IS SO ORDERED.**

Dated:    June 12, 2024
          New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge

---

[8]      Any further filings in this Court by Kirsanov of motions, requests for reconsideration or clarification, or adversary proceedings WILL result in this imposition of sanctions.