**WHITE & CASE LLP**
Samuel P. Hershey
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com
      lucas.curtis@whitecase.com
      nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
      devin.rivero@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: gregory.pesce@whitecase.com
      laura.baccash@whitecase.com

– and –

**ASK LLP**
Marianna Udem
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email: mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath
Kara E. Casteel (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email: bmcgrath@askllp.com
      kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CELSIUS NETWORK LLC, *et al.*, | § | Case No. 22-10964 (MG) |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |

---

[1] The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's

| | |
|---|---|
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br><br>Plaintiff,<br><br>v.<br><br>SEBASTIAN JOSEF MOSS,<br><br>Defendant. | § § § § § § § § § § § § |

Adv. Proc. No. **Refer to Summons**

## COMPLAINT

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("**Plaintiff**" or the "**Litigation Administrator**"), through his undersigned counsel, hereby submits this complaint (the "**Complaint**") to avoid and recover transfers made by the above-captioned debtors (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**") to or for the benefit of the above-captioned defendant (the "**Defendant**"), and alleges the following facts and claims based upon information and belief based on reasonable due diligence regarding the facts and circumstances of the Debtors' bankruptcy cases, Plaintiff's ongoing investigation, and the documents and information currently available to Plaintiff as to all other matters:

## PRELIMINARY STATEMENT

1.      Before it filed for chapter 11 protection on July 13, 2022, the Debtors worked hard to make its customers believe that it was a legitimate enterprise. It was not. Despite the Company's public messaging, on the inside, Celsius was a fraudulent mess, the extent of which has come to light through investigative fallout in the Debtors' bankruptcy. Far from being "safer

---

principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

than a bank," Celsius repeatedly failed to responsibly hold or invest the assets that its account holders transferred to its platform. Losing billions of dollars because of risky investments and grave mismanagement, Celsius managed to keep up appearances until the cryptocurrency crashes of 2022, insisting on its legitimacy as a business to the very end. As a result of Celsius's staggering and widespread fraud, many of the Company's customers lost their life savings and faced financial ruin. Customers who trusted the lies propagated by management and did not withdraw the assets they had transferred to Celsius found those assets trapped on Celsius's platform, and themselves embroiled in an 18-month bankruptcy.

2.      The Defendant in this action is one of the lucky few who were spared—either partly or entirely—the devastation and hardship caused by Celsius's collapse. Indeed, less than 2% of Celsius's customers withdrew more than $100,000 of assets in the 90 days before the Debtors' bankruptcy filing. Notably, of the customers whose preference exposure was not released under the Debtors' confirmed plan of reorganization, the vast majority removed more than 90% of their account balances before the June 12, 2022 pause on withdrawals.[2]

3.      The Bankruptcy Code provides a mechanism to correct this inequity. The Litigation Administrator, with his obligation to *all* creditors of the Estates, seeks to put as many Celsius customers as possible on equal footing. To do so, the Litigation Administrator brings this preference avoidance and recovery action against the Defendant as the initial transferee of the assets transferred away from the Debtors in the 90 days before the date of Celsius filing for Bankruptcy (the "**Petition Date**"). Through these targeted efforts, the Litigation Administrator will level the disproportionate impact of the Debtors' bankruptcy and increase the amount of resources available for distribution to creditors.

---

[2] Under the confirmed plan of reorganization, Celsius customers with less than $100,000 of withdrawal preference exposure were released from that exposure.

4. To that end, and through this Complaint, Plaintiff seeks to avoid and recover the preferential transfers that Defendant received as an initial transferee during the 90 days immediately preceding the Debtors' commencement of the Chapter 11 Cases.

## NATURE OF THE ACTION

5. Plaintiff brings this adversary proceeding (the "**Adversary Proceeding**") pursuant to sections 502, 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), seeking to avoid and recover from Defendant, or from any other person or entity for whose benefit the transfers were made, transfers of property of the Debtors during the 90-day period (the "**Preference Period**") before the commencement of the Chapter 11 Cases.

6. Plaintiff seeks entry of a judgment against Defendant: (i) avoiding, pursuant to section 547(b) of the Bankruptcy Code, preferential transfers to and/or for the benefit of Defendant; (ii) directing, pursuant to section 550(a) of the Bankruptcy Code, Defendant to pay to Plaintiff an amount to be determined at trial that is not less than the value of the Avoidable Transfers (defined below), plus interest and costs; and (iii) pending such payment, disallowing, pursuant to section 502 of the Bankruptcy Code, any claim of Defendant against the Debtors.

7. Through its ongoing investigation, Plaintiff has determined, based on currently available information, that the transfers set forth on **Exhibit A** (the "**Avoidable Transfers**") with a value totaling no less than approximately $252,177.75[3] were made by the Debtors to or for the benefit of Defendant and are avoidable under section 547 of the Bankruptcy Code and recoverable under section 550 of the Bankruptcy Code.

---

[3] To provide a sense of the dollar value for the preference actions and potential new value calculations (with the exception of CEL token, where the Plan (defined below) value was used to calculate value), the Litigation Administrator has provided the market value of the various assets as of June 14, 2024, in USD. In doing so, Plaintiff does not waive, and expressly reserves, any and all arguments with respect to the proper valuation date of the Avoidable Transfers and/or the form of recovery on any judgments.

8.      During the course of this Adversary Proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to Defendant during the Preference Period that are avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code.  Plaintiff intends to avoid and recover all such transfers made to or for the benefit of Defendant or any other transferee during the Preference Period.  Plaintiff reserves the right to amend this Complaint to include, without limitation: (i) further information regarding the Avoidable Transfers; (ii) additional transfers made during the Preference Period; (iii) additional plaintiffs; (iv) modifications of and/or revisions to Defendant's name and other information; (v) additional defendants; and (vi) additional causes of action, if applicable (collectively, the "**Amendments**"), that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise, and intend for any such Amendments to relate back to this Complaint.

9.      To the extent that any Defendant has filed a proof of claim in the Chapter 11 Cases, is listed on the Debtors' schedules, or has otherwise requested payment from the Debtors' Estates (collectively, the "**Claims**"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to such Claims for any reason including, but not limited to, section 502 of the Bankruptcy Code, and such rights are expressly reserved.

## **THE PARTIES**

10.      The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972],[4] the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network*

---

[4] "Docket No." refers to the docket of *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y., filed July 13, 2022).  Documents filed on this docket can be accessed free of charge at https://cases.stretto.com/celsius/ (the "**Claims Agent Website**").

*LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "**Plan**"), the *Litigation Administrator Agreement* attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "**Litigation Administrator Agreement**"), and section 1123 of the Bankruptcy Code.  Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action,[5] including this Avoidance Action, on behalf of the Debtors and their estates (the "**Estates**").  The Debtors are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC.

11.    Upon information and belief, Defendant was, at all relevant times, a Celsius customer utilizing the Celsius platform for the storage, transfer, purchase, and/or withdrawal of assets.

12.    Upon further information and belief, Defendant resides at an address within the United States of America, which address is known to Plaintiff but is not publicly disclosed pursuant to the *Memorandum Opinion and Order on the Debtors' Sealing Motion* (the "**Order to Seal**"), Docket No. 910.

## JURISDICTION AND VENUE

13.    The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over the Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, No. M-431, of the United States District Court for the Southern District of New York, dated January 31, 2012.

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Confirmation Order, and/or Litigation Administrator Agreement, as applicable.

14.     The Adversary Proceeding is commenced pursuant to sections 502, 547 and 550 of the Bankruptcy Code, and Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

15.     The Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157.  This Court has jurisdiction to hear and to determine this proceeding and to enter a final order and judgment.  In the event that this Court or any other court finds any part of the Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Chapter 11 Cases and will have a material impact on the administration of the Estates.

16.     Plaintiff consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.     This Court has jurisdiction over Defendant in as much as Defendant has maintained minimum contacts with the United States in connection with the claims asserted in this Complaint.  This Court also has jurisdiction over Defendant pursuant to Bankruptcy Rules 7004(d) and (f) and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Defendant purposefully availed itself of the laws of the United States and the State of New York by, among other things, doing or transacting business in the United States and in the State of New York which gives rise and/or relates to the claims at issue in this Adversary Proceeding.  Further, this Court also has jurisdiction over Defendant by virtue of Defendant having entered into agreements with the Debtors and/or Plaintiff that for various contracts and matters designated New York law as the governing law and New York as the forum state for dispute resolution with respect to the transactions at issue in this Adversary Proceeding.  To the extent Defendant has also filed a proof

of claim in these Chapter 11 Cases and is therefore subject to the Court's jurisdiction, Defendant's claim, if any, is hereby incorporated by reference.

18.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises under and is related to the Debtors' Chapter 11 Cases pending in this Court.

## FACTUAL BACKGROUND

### A.    The Celsius Business Model and its Programs

19.    Celsius was founded in 2017. The business idea was described in a whitepaper, which Celsius used to solicit capital through the public initial coin offering of its CEL token. Celsius planned to offer two primary products. Of relevance for the purposes of this Complaint, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest. Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to generate yield.  Celsius account holders could elect to receive weekly rewards payments (or interest) in the transferred cryptocurrency (*i.e.*, in-kind) or in CEL token, which had higher return interest rates. In short, customers would transfer digital assets to the Celsius platform. Celsius would lend the coins to third parties to earn yield.

20.    "Earn" was an investment program offered to Celsius account holders who held their assets on Celsius's cryptocurrency platform (the "**Earn Program**").   Under the Earn Program, participants ("**Earn Users**") could place digital assets in accounts with Celsius ("**Earn Accounts**") in return for rewards.  The relationship between Earn Users and Celsius was governed by Celsius's "**Terms of Use**," which versions relevant to this action were attached to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms*

*of Use Dating Back to February 18, 2018*, Docket No. 393 as Exhibits A-6 through A-8,[6] and are incorporated herein by reference.

21.    The Terms of Use provided that when account holders transferred assets to Celsius, they transferred ownership of those assets to the Debtors. The Terms of Use provided that customers who transferred assets to the Company as part of the Earn Program "grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service."[7]  The Company was thus, among other things, granted the right "to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership," and "to use or invest such Digital Assets in [its] full discretion."[8]  In other words, as recognized by this Court,[9] the Terms of Use unambiguously transferred title and ownership of cryptocurrency assets transferred to Earn Accounts from users to the Company.

22.    Originally, customers who agreed to the Terms of Use entered into a contractual arrangement with Celsius Network Ltd ("**CNL**"), a United Kingdom entity.  However, in July 2021, the Terms of Use were updated such that the counterparty for ***all*** customers became Celsius Network LLC ("**LLC**"), a Delaware entity.[10]  Moreover, the governing law of the Terms of Use

---

[6] The Terms of Use as of July 2021 are found at Exhibit A-6, with technical corrections made in August 2021 as Exhibit A-7.  The Terms of Use in effect as of April 14, 2022, can be found at Exhibit A-8.  These documents can be accessed free of charge on the Claims Agent Website.

[7] Terms of Use Version 8 § 4(D).

[8] *Id.* § 13.

[9] During the Chapter 11 Cases, this Court addressed whether transfers to Earn Accounts constituted assets of the Estates.  On January 4, 2023, following a multi-day hearing and extensive briefing from the parties in interest, this Court issued a ruling (the "**Earn Ruling**") determining that when assets were transferred to Earn Accounts, "the cryptocurrency assets became Celsius's property."  *In re Celsius Network LLC*, 647 B.R. 631, 637 (Bankr. S.D.N.Y. 2023).  The Earn Ruling is available on the Claims Agent Website at Docket No. 1822.

[10] Terms of Use Version 6 § 1. Typographical errors were corrected in Version 7 released in August 2021.

was changed to New York law, and any disputes "arising out of, or related to, your Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY and the US District Court located in the Borough of Manhattan."[11]  All customers were required to accept these updates to the Terms of Use through a "push" notification to continue to access Celsius's platform.  This was done, in part, to reflect the change in legal entity with which customers would conduct business moving from CNL in the United Kingdom to LLC in the United States.  Previously, CNL received all transfers from retail and institutional customers for the Earn Program.  After these changes were made, LLC remained the counterparty on the Terms of Use and a holder of assets.  Further, all "user-facing" activities, including all withdrawal requests related to the Earn Program, were housed in the workspace hosted by LLC for customer accounts.  Accordingly, as of the Petition Date and during the 90 days before the Petition Date, all Celsius customers who participated in the Earn Program were knowingly and willingly contracting with a U.S. entity in connection with the assets that they transferred to and withdrew from Celsius's platform.

23.    The Terms of Use provided that customers could withdraw assets corresponding to the balances in their Earn Accounts or Custody Accounts (defined below) at will or transfer them between accounts at Celsius as needed.[12]  However, that was not how Celsius actually operated. In March 2022, Celsius acknowledged internally that it was not producing enough revenue to cover liabilities or additional operating expenses. Celsius was insolvent by nearly $800 million by its own account.  Accordingly, Celsius was unable to fulfill the promises set forth in the Terms of Use and return assets to customers when requested.  Rather, the assets that customers withdrew depleted a pool of assets that was insufficient for Celsius to honor customers' withdrawal requests.

---

[11] *Id.* § 33.

[12] *See* Terms of Use Version 8 § 11.

24.    Celsius's model was therefore always a fraud, with the Company promising it could, and would, pay its customers back when it knew it could not.

**B.    Celsius Faces Heavy Losses and Public Regulatory Scrutiny, Leading to the Pause**

25.    Beginning in 2021 through July 13, 2022 (the Petition Date), Celsius faced increasing regulatory pressure from the United Kingdom and United States' governments.  Among other things, on September 17, 2021, the New Jersey Bureau of Securities ordered Celsius to cease and desist from offering Earn Accounts to certain investors in the United States (the "**New Jersey Order**").[13]  Around the same time, several other state regulatory agencies, including those in Vermont, California, and New York, took action against Celsius.

26.    In mid-2021, Celsius was forced by regulators in the U.K. to "migrate" its retail business from CNL (a U.K. entity) to LLC (a Delaware entity).  More specifically, Celsius "migrated" all customer balances and obligations arising from transactions on the Celsius platform from CNL to LLC.  In response to adverse regulatory action in the U.K., Celsius announced on June 23, 2021, that it was migrating its main business activity and headquarters from the United Kingdom to the United States and where applicable, to several other jurisdictions.

27.    As much as Celsius tried to keep these issues secret, on April 15, 2022, the New Jersey Order became effective, forcing Celsius to publicly admit to the regulatory issues that had been plaguing it for over a year.  In a dramatic and public move, Celsius was forced to close its Earn Program to unaccredited investors.  In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states (the "**Custody Program**").  The Custody Program provided accounts ("**Custody Accounts**") that were unlike the Earn

---

[13] State of New Jersey Bureau of Securities, *Summary Cease and Desist Order in the Matter of Celsius Network, LLC* (Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.

Accounts in that the Terms of Use provided that customers retained title to the assets but could not generate rewards.[14] Funds that were already held in Celsius's Earn Accounts were allowed to remain in those Earn Accounts regardless of accreditation status; however, on and after April 15, 2022, only international-based users and U.S. accredited users could transfer funds to Earn Accounts. The Custody Program was created—and the attendant regulatory problems revealed—89 days before the Petition Date. Any transfers of assets from Earn Accounts to Custody Accounts, and the accompanying transfer of title from Celsius to customers ("**Earn to Custody Title Transfers**"), therefore also occurred during the Preference Period. Following the New Jersey Order, the Company began to experience significant outflows of assets from its platform. The amount of digital assets transferred off the Celsius platform increased by 67%,[15] and the corresponding transaction volume increased by 137%, from the period of April 15, 2022 to May 15, 2022, as compared to the period of March 15, 2022 to April 15, 2022.

28.    While Celsius was already insolvent at least as of March 2022, the situation at the Company was about to become even more untenable. On May 7, 2022, what started as a spike in migration of assets off Celsius's platform turned into an explosion. The cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market. The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called "Luna." The UST coin value "de-pegged" and plummeted (the **"Terra Luna Collapse"**).[16] Celsius had approximately $940 million

---

[14]  Celsius, *Custody FAQ*, https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ (last visited June 3, 2024).

[15]  The amount of digital assets transferred off the Celsius platform during these periods was calculated using the approximate value of the transferred assets in USD as of the date of the transfer and not as of June 14, 2024.

[16]  The Terra Luna Collapse and other events discussed herein are described in further detail in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "**Disclosure Statement**"). *See, e.g.*, Disclosure Statement at 587.

deployed on the Terra blockchain. It was able to escape the crash with an approximately $30 million loss. Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of the Terra Luna Collapse.

29.    In the face of the Terra Luna Collapse, rumors swirled around Celsius and its stability. Customers withdrew billions of dollars' worth of cryptocurrency assets from the Celsius platform the week after the Terra Luna Collapse. Seventy-five percent of all withdrawals during the Preference Period occurred after the Terra Luna Collapse.

30.    Internally, Celsius faced a liquidity crisis. It had billions of dollars invested in illiquid investments but insufficient assets to address customer withdrawal requests. Celsius also had more than one billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to survive margin calls. By May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH.

31.    Over the course of May and June 2022, crypto prices widely and continuously plummeted, and the instability in the crypto markets led to a run on the bank. In May, BTC was down 15.7% month-over-month.[17]  June was even worse, as BTC was down 37.9%.[18]  Many customers began rapidly withdrawing all or some of their assets, demanding crypto assets that Celsius lacked liquidity to provide. Many other players in the crypto markets were also collapsing under the same pressures, with crypto hedge fund Three Arrows Capital, Ltd. and crypto brokerage

---

[17] Statmuse, *what is the average price of bitcoin in May 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-may-2022 (last visited June 3, 2024).

[18] Statmuse, *what is the average price of bitcoin in June 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-june-2022 (last visited June 3, 2024).

company Voyager Digital Holdings, Inc. filing for chapter 11 bankruptcy shortly before the Debtors, on July 1, 2022, and July 5, 2022, respectively.[19]

32.    On June 12, 2022, in response to customer withdrawal demands and increasing volatility in the cryptocurrency markets, Celsius paused all withdrawals from its platform to prevent further erosion of value (the "**Pause**").  Hundreds of thousands of customers who still had assets on Celsius's platform were left without recourse, unable to withdraw or sell their coins. A matter of minutes, in some cases, made the difference between being a customer who was able to escape with assets and a customer who would have assets frozen indefinitely while the value continued to plummet.

**C.    The Chapter 11 Cases**

33.    On the Petition Date, the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under chapter 11 of the Bankruptcy Code.  All of these Chapter 11 Cases were consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).[20]

34.    On July 27, 2022, the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.[21]  On September 29, 2022, the Court entered an order directing the appointment of an

---

[19] *See In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y, filed July 1, 2022); *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y, filed July 5, 2022).

[20] *See Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 53]; *Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 1648].

[21] *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 241].

examiner.[22]  Following the examiner's issuance of a final report of her examination, on April 4, 2023, the Court entered an order discharging the examiner.[23]

35.    On March 21, 2023, the Court entered the *Order (I) Approving (A) the Settlement by and among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2291] approving the Settlement Agreement attached as Exhibit 1 [Docket No. 2291-1] (the "**Custody Settlement**").  Under the Custody Settlement, the parties to the Custody Settlement released each other from any and all claims and causes of action related to the Allowed Custody Claims of Settling Custody Account Holders (as defined in the Custody Settlement), including avoidance actions.[24]  Notwithstanding anything to the contrary set forth in the Custody Settlement, parties to the Custody Settlement did not release any rights or causes of action with respect to any assets other than Custody Assets (as defined in the Custody Settlement) or claims other than Allowed Custody Claims (as defined in the Custody Settlement).[25]  To the extent the Defendant is a party to the Custody Settlement, this Complaint asserts causes of action and claims that were not released under the Custody Settlement.

36.    On April 20, 2023, the Court entered the *Order (I) Approving the Settlement by and among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2509] approving the Settlement Agreement attached as Exhibit 1 (the "**Withhold Settlement**").  Under the Withhold Settlement, the Estates released any avoidance claims against the Settling Withhold Account Holders (as defined in the Withhold Settlement).[26]

---

[22] *See Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923].

[23] *See Order Discharging Examiner* [Docket No. 2364].

[24] *See* Custody Settlement ¶ 6.

[25] *Id.* Examples of non-released rights or causes of action with respect to assets other than Custody Assets (as defined in the Custody Settlement) include assets held in an Earn Account by an account holder and certain assets transferred off Celsius's platform by an account holder.  *See id.*

[26] *See* Withhold Settlement ¶ 7.

Notwithstanding anything to the contrary set forth in the Withhold Settlement, parties to the Withhold Settlement did not release any rights or causes of action with respect to any assets other than Withhold Assets (as defined in the Withhold Settlement) or claims other than Withhold Claims (as defined in the Withhold Settlement).[27]   To the extent the Defendant is a party to the Withhold Settlement, this Complaint asserts causes of action and claims that were not released under the Withhold Settlement.

37.    On November 9, 2023, the Court entered the Confirmation Order, pursuant to which the Court approved and confirmed the Plan (as amended, supplemented, or modified from time to time) for all of the Debtors.  The Confirmation Order provides that Cryptocurrency held by Debtors as of the Petition Date as collateral with respect to Account Holders' loan obligations under the Borrow Program constitutes property of the Estates under section 541 of the Bankruptcy Code.[28]

38.    Pursuant to the Confirmation Order and Plan, Debtors Celsius Network Limited, Celsius Network LLC, Celsius Lending LLC, and Celsius Networks Lending LLC (the "**Consolidated Debtors**") were substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions.  Among other aspects of the substantive consolidation, (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Consolidated Debtors on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; and (iii) each Claim filed or scheduled

---

[27] *Id.* Examples of non-released rights or causes of action with respect to assets other than Withhold Assets (as defined in the Withhold Settlement) include assets held in an Earn Account by an account holder and certain assets transferred off Celsius's platform by an account holder.  *See id.*

[28] *See* Confirmation Order ¶¶ 33-36, 269.

in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the estates of the Consolidated Debtors.[29]

39.     As described in articles III.A.1 and III.B.9 of the Plan and article III.E of the Disclosure Statement, General Unsecured Claims constitute an impaired class of creditors that has not been, and is not expected to be, paid in full.

40.     On January 31, 2024, the Plan became effective.[30]   As part of the Plan, the Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims belonging to the Estates and to serve as the Estates' representative in certain litigation, including causes of action under chapter 5 of the Bankruptcy Code.[31]   The Litigation Administrator is charged to maximize distributions to the stakeholders, including victims of Celsius's collapse.

### D.    The Avoidable Transfers

41.     The market turmoil that Celsius faced during the Preference Period led to unprecedented withdrawals from its platform, amounting to a classic "run on the bank."   Celsius's records show that Defendant contributed to this "run on the bank" by making significant withdrawals during this time, *i.e.*, the Avoidable Transfers.   Unlike other customers, Defendant was able to withdraw net assets valued greater than $100,000 USD, even when accounting for any new value, before Celsius paused withdrawals and locked all assets on its platform, advantaging Defendant over other creditors.

42.     During the Preference Period, Celsius Network LLC and/or one or more of the Debtors transferred to Defendant, by virtue of Defendant: receiving an Earn to Custody Title

---

[29] *See* Plan, Art. IV.A.

[30] *See Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions* [Docket No. 4298].

[31] *See* Plan, Art. IV.L.

Transfer; and/or withdrawing funds held in their Earn Account/s; and/or receiving any transfer of property of the Debtors constituting an Avoidable Transfer,[32] Avoidable Transfer(s) in an aggregate gross amount valued at no less than approximately $252,177.75.[33]  Details of each such Avoidable Transfer are set forth on **Exhibit A**.  These details include:

- A transaction description, which contains: i) the type of asset (*e.g.*, BTC, ETH, USDC), ii) a description of whether the transfer was internal (*i.e.*, from one account on the Celsius platform to another account) or a withdrawal (*i.e.*, off the Celsius platform), and iii) the type of account the asset was transferred to and from (*e.g.*, from Yield to Custody);[34]

- The transaction date; and

- The transaction amount, which is the approximate value of the transferred asset in USD as of June 14, 2024.

### E.      The Litigation Administrator's Demand and Due Diligence

43.     On or about April 9, 2024, Plaintiff, via email and through his professionals, sent a demand letter (the "**April Letter**") to Defendant, seeking a return of the Avoidable Transfer(s).

---

[32] All types of withdrawals or transactions which Plaintiff alleges qualify as Avoidable Transfers are described in the Disclosure Statement. As noted in section III.PP of the Disclosure Statement, transfers which are listed as increasing an Account Holder's Withdrawal Preference Exposure are ones involving transfers of the Debtors' property under the Terms of Use and any other governing documents and would be considered Avoidable Transfers under this Complaint.

[33] As noted *supra*, the Litigation Administrator has provided the market value of the various assets as of June 14, 2024 in USD.  In doing so, Plaintiff does not waive, and expressly reserves, any and all arguments with respect to the proper valuation date of the Avoidable Transfers and/or the form of recovery on any judgments.

[34] The Litigation Administrator received the underlying data used in **Exhibit A** from the Debtors. The accounts within the data are coded with the following names: (1) "Yield"; (2) "Custody"; (3) "Off-Platform"; and (4) "Celsius." "Yield" means Earn Accounts as defined in this Complaint. "Custody" means Custody Accounts as defined in this Complaint.  "Off-Platform" means a digital asset account, wallet, or other mechanism for receiving digital assets that is not on the Celsius platform. "Celsius" means a digital asset account, wallet, or other mechanism enabling the transfer of digital assets under the control of Celsius with respect to the transfer of collateral.

The April Letter also provided the Defendant an option to settle at a discount to the net withdrawal preference exposure prior to Plaintiff initiating this preference action.[35]  Prior to sending the April Letter, Plaintiff reviewed the Debtors' records and identified certain transfers or other qualifying transactions[36] that could potentially provide new value under section 547(c) of the Bankruptcy Code, decreasing the net amount owed by Defendant to Plaintiff.  On or about May 15, 2024, Plaintiff, via email and through his professionals, sent a second demand letter (the "**May Letter**") to Defendant, again seeking a return of the Avoidable Transfer(s).  In the May Letter, the Litigation Administrator informed the Defendant that he had conducted due diligence with respect to potential defenses to liability under 11 U.S.C. § 547(c).

44.    As part of this due diligence evaluation, Plaintiff reviewed the Debtors' books and records and identified that Defendant potentially has $  0.00 in transfers or other transactions that would qualify as new value under section 547(c)(4) of the Bankruptcy Code.  However, the subsequent new value defense is an affirmative defense, for which Defendant bears the burden of proof under section 547(g) of the Bankruptcy Code.  Factors such as the appropriate valuation date of such new value may affect the ultimate net of new value amount, if any.  Accordingly, Defendant bears the burden of proof to establish it is entitled to this new value.

45.    Plaintiff also reviewed the ordinary course of business defense, and asserts it is not applicable to the Avoidable Transfers.  As described above, Celsius did not operate in the manner that the Terms of Use set forth, and the vast majority of the withdrawals during the Preference Period were essentially a run on the bank, occurring after Celsius's regulatory problems became notorious and the Terra Luna Collapse.  Additionally, transfers of assets from Earn Accounts to

---

[35] The settlement offer was calculated using the approximate value of the transferred assets in USD as of the date of the transfer and not as of June 14, 2024.

[36] *See* Disclosure Statement, section III.PP for a list of transactions that would qualify for new value credit under section 547(c) of the Bankruptcy Code.

Custody Accounts, if any, were the result of the creation of the new Custody Program in response to regulatory scrutiny. To the extent that Defendant asserts that any Avoidable Transfers were withdrawals that were ordinary as compared to prior withdrawals of Defendant, Plaintiff puts Defendant to its burden of proof to establish it is entitled to this defense.

46.     In accordance with section 547(b) of the Bankruptcy Code, Plaintiff has analyzed available information and asserts that the Avoidable Transfers are avoidable and recoverable pursuant to sections 547 and 550(a) of the Bankruptcy Code as set forth in **Exhibit A**.  Plaintiff reasonably believes all of the Avoidable Transfers are avoidable, subject to Defendant's known or reasonably knowable affirmative defenses under section 547(c) of the Bankruptcy Code, and Defendant's successful establishment of these defense(s) pursuant to section 547(g) of the Bankruptcy Code.  Based in part on the Earn Ruling, which held that assets in Earn Accounts were the property of the Debtors, Defendant's transfers from Earn Account(s) either (a) off the Celsius platform or (b) to Custody Account(s), if any, during the Preference Period qualify as avoidable transfers for which Defendant was the initial transferee.

47.     Plaintiff seeks to avoid all of the transfers of an interest of the Debtors in any property made by the Debtors to Defendant during the Preference Period.

## CAUSES OF ACTION

## COUNT ONE

### (Avoidance of Avoidable Transfers — 11 U.S.C § 547(b) — Defendant)

48.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

49.     During the Preference Period, the Debtors made the Avoidable Transfers to, and/or for the benefit of, Defendant in the asset type, approximate value, and transfer types set forth on **Exhibit A**, which is incorporated by reference herein.

50.    Defendant was a creditor of the Debtors within the meaning of section 547(b)(1) of the Bankruptcy Code at the time of each Avoidable Transfer by virtue of the Terms of Use, under which the Debtors were obligated to transfer the Avoidable Transfer(s) to Defendant.

51.    According to the books and records of the Debtors, the Avoidable Transfers were made to, and/or for the benefit of, Defendant because each Avoidable Transfer either reduced or fully satisfied a debt or debts then owed by the Debtors to Defendant.

52.    The Avoidable Transfers were made for, or on account of, antecedent debts owed by the Debtors to Defendant with respect to which each such Avoidable Transfer relates. Defendant had withdrawal rights to the assets reflected in the balances in its accounts, having transferred the assets to the Debtors under the Terms of Use.  Under the Terms of Use, the Debtors were obligated to transfer assets corresponding to the balances in Defendant's account upon request.

53.    The Avoidable Transfers were made while the Debtors were insolvent.  As discussed, *supra*, upon information and belief each Avoidable Transfer during the Preference Period was made while Debtors were insolvent within the meaning of sections 101(32) and 547(b)(3) of the Bankruptcy Code.  Notwithstanding the foregoing, Plaintiff is also entitled to the presumption of insolvency for each Avoidable Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

54.    The Avoidable Transfers enabled Defendant to receive more than it would have received if (a) the Debtors' Chapter 11 Cases were a case under chapter 7 of the Bankruptcy Code, (b) the Avoidable Transfers had not been made, and (c) Defendant received payment of such debt(s) to the extent provided by the provisions of the Bankruptcy Code.

55.     Under the Plan and current projected distributions pursuant to the Plan, general unsecured creditors of the Debtors will receive less than full value on account of their allowed claims against the Estates.

56.     By reason of the foregoing, each Avoidable Transfer should be avoided and set aside as a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.

## COUNT TWO

### (Recovery of Avoidable Transfers — 11 U.S.C § 550 — Defendant)

57.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

58.     Plaintiff is entitled to avoid the Avoidable Transfers pursuant to section 547(b) of the Bankruptcy Code.

59.     Defendant was the initial transferee of the Avoidable Transfers, the immediate or mediate transferees of such initial transferee, or the person(s) for whose benefit the Avoidable Transfers were made.

60.     As of the date hereof, the Defendant has not repaid all or a part of the value of the Avoidable Transfers or returned the Avoidable Transfers.

61.     Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from Defendant, for the benefit of the Estates, the property transferred in the Avoidable Transfers, or the value of such transferred property, plus interest thereon to the date of payment and the costs of this action.

## COUNT THREE

### (Disallowance of Defendant's Claims — 11 U.S.C. § 502(d) — Defendant)

62.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

63.     As alleged above, Defendant is the initial, immediate and/or mediate transferees of transfers avoidable under section 547 of the Bankruptcy Code and the persons from whom property is recoverable under section 550 of the Bankruptcy Code.

64.     As of the date hereof, the Defendant has not repaid all or a part of the value of the Avoidable Transfers or returned the Avoidable Transfers.

65.     By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, any Claims of Defendant that have been or may in the future be asserted in the Chapter 11 Cases should be disallowed unless and until Defendant relinquishes to Plaintiff the property transferred or pays to Plaintiff the value of such transferred property, for which and to the extent that the Court has determined Defendant is liable pursuant to section 550 of the Bankruptcy Code.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendant as follows:

(a)     Pursuant to section 547(b) of the Bankruptcy Code, avoiding each of the Avoidable Transfers;

(a)     Pursuant to section 550(a) of the Bankruptcy Code, directing Defendant to relinquish to Plaintiff the property transferred in the Avoidable Transfers, or pay to Plaintiff an amount to be determined at trial that is not less than the full amount of the Avoidable Transfers;

(b)     Disallowing any Claim of Defendant pursuant to section 502(d) of the Bankruptcy Code;

(c)     Awarding pre-judgment interest at the maximum legal rate running from the date of Plaintiff's first demand to Defendant to return all Avoidable Transfers to the date of judgment with respect to this Complaint (the "**Judgment**") herein;

(d)     Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full;

(e)     Awarding Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action, to the fullest extent allowed by applicable law;

(f)  Requiring Defendant to pay forthwith the amount of the Judgment; and

(g)  Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated: 7/3/2024
    New York, New York

By: /s/ *Joshua D. Weedman*

**WHITE & CASE LLP**
Samuel P. Hershey
Joshua D. Weedman
Lucas Curtis
Nikita Ash
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  sam.hershey@whitecase.com
       jweedman@whitecase.com.
       lucas.curtis@whitecase.com
       nikita.ash@whitecase.com

– and –

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  gregory.pesce@whitecase.com
       laura.baccash@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Devin Rivero (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email:  kwofford@whitecase.com
       devin.rivero@whitecase.com

– and –

**ASK LLP**
Marianna Udem, Esq.
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 267-7342
Facsimile: (212) 918-3427
Email:   mudem@askllp.com

– and –

**ASK LLP**
Brigette McGrath, Esq.
Kara E. Casteel, Esq. (admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, Minnesota 55121
Telephone: (651) 406-9665
Facsimile: (651) 406-9676
Email:   bmcgrath@askllp.com
              kcasteel@askllp.com

*Co-Counsel to Mohsin Y. Meghji,*
*Litigation Administrator, as*
*Representative for the Post-Effective*
*Date Debtors*

| | |
|---|---|
| Defendant: | **SEBASTIAN JOSEF MOSS** |
| Bankruptcy Case: | **Celsius Network LLC, et al.** |
| Preference Period: | **Apr 14, 2022 - Jul 13, 2022** |

### Transfers During Preference Period

| Debtor Entity | Transaction Description | Transaction Amount | Transaction Date |
|---|---|---|---|
| Celsius Network LLC, et al. | Internal Account Transfer: Yield to Custody (16656.5226277 LINK) | $252,177.75 | 5/13/2022 |

| | | |
|---|---|---|
| **Totals:** | **1 transfer(s),** | **$252,177.75** |