**WHITE & CASE LLP**

Aaron Colodny (admitted *pro hac vice*)

555 South Flower Street, Suite 2700

Los Angeles, California 90071

Telephone: (213) 620-7700

Facsimile: (213) 452-2329

Email: aaron.colodny@whitecase.com

**WHITE & CASE LLP**

David M. Turetsky

Kathryn J. Gundersen

1221 Avenue of the Americas

New York, New York 10020

Telephone: (212) 819-8200

Facsimile: (212) 354-8113

Email:    david.turetsky@whitecase.com

kathryn.gundersen@whitecase.com

– and –

**WHITE & CASE LLP**

Jason Zakia (*pro hac vice* pending)

Gregory F. Pesce (admitted *pro hac vice*)

111 South Wacker Drive, Suite 5100

Chicago, Illinois 60606

Telephone: (312) 881-5400

Facsimile: (312) 881-5450

Email: jzakia@whitecase.com

gregory.pesce@whitecase.com

*Counsel to Mohsin Y. Meghji, as Representative for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CELSIUS NETWORK LLC, *et al.*, | § | Case No. 22-10964 (MG) |
| | § | |
| Post-Effective Date Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

---

[1] The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

| | |
|---|---|
| MOHSIN Y. MEGHJI, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS, §<br>§<br>§<br>§ | Adv. Proc. No. ___-_____ |
| Plaintiff, §<br>§ | |
| v. §<br>§ | |
| YARDEN NOY, §<br>§ | |
| Defendant. §<br>§ | |

## COMPLAINT

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("**Plaintiff**" or the "**Litigation Administrator**"), through his undersigned counsel, hereby submits this complaint (the "**Complaint**") to avoid and recover transfers made by the above-captioned debtors (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**") to or for the benefit of the above-captioned defendant (the "**Defendant**"), and alleges the following facts and claims based upon information and belief based on reasonable due diligence regarding the facts and circumstances of the Debtors' bankruptcy cases, Plaintiff's ongoing investigation, and the documents and information currently available to Plaintiff as to all other matters:

## NATURE OF THE ACTION

1.      Before it filed for chapter 11 protection on July 13, 2022, Celsius advertised that it was "safer than a bank." It was not. Celsius was a fraud and insolvent. One of Celsius's central frauds was the CEL token. Celsius and its former Chief Revenue Officer have admitted that Celsius manipulated the price of CEL token to make Celsius appear safer (and more solvent) than it really was.

2.      The CEL token was given to employees as part of their compensation and treated in most instances like restricted stock units. Employees also received bonuses when CEL token's market price reached $1.50 and $5.00. Both of these price targets were reached because of the manipulation of CEL token by Celsius.

3.      Celsius told the public that the amount of CEL token it purchased from the market was equal to the amount of interest it needed to pay its customers in CEL token. CEL token was advertised to be a self-reinforcing flywheel. The more people who elected to receive interest in CEL token, the more CEL token Celsius bought, and the higher the price would go.

4.      Starting in 2019, Celsius directors and officers began manipulating the price of CEL token by buying significantly more than was needed to pay interest to customers and strategically purchasing tokens to stop the price from dropping when larger sales occurred, including sales by Celsius executives on third party exchanges. Celsius became worried that executives and employees' sales to Celsius through third party exchanges was inappropriate. Celsius was also worried that the public would see its employees selling their CEL tokens and lose faith in the company. It created a policy limiting the amount of CEL token directors, officers, and employees could sell at any time. Those limits were regularly breached by Celsius's executives.

5.      The Company then decided that it was better to buy CEL tokens directly from its employees through its "over-the-counter" ("**OTC**") trading desk. The OTC trading desk was an email address through which Celsius would quote a price and buy or sell CEL tokens for other cryptocurrency or cash. It used the OTC trading desk to purchase CEL token from employees to hide those sales from the public and avoid the downward effect such sales would have on the price of the CEL token. Between winter 2020 and mid-2022, the Company repurchased over $48 million in CEL token from employees.

3

6.     At the beginning of 2021, Celsius realized that the Company had a hole in its balance sheet, caused in large part because it was using cryptocurrency to buy CEL token and was short the cryptocurrency it was obligated to pay to its account holders.  Celsius subsequently suffered more than a billion dollars of losses.  Celsius raised equity financing at the end of 2022, but that did not even bring the Company back to level.

7.     Far from being "safer than a bank," Celsius repeatedly failed to responsibly hold or invest the assets that its account holders transferred to its platform.  Losing billions of dollars because of risky investments and grave mismanagement, Celsius only managed to keep up appearances until the cryptocurrency crashes of 2022.  When the Company eventually collapsed in July 2022, many of its customers lost their life savings and faced financial ruin.

8.     Defendant Yarden Noy ("**Mr. Noy**" or "**Defendant**"), as then Head of Regulation at Celsius, was one of the employees who sold CEL token to Celsius through the OTC trading desk.  On June 30, 2021, Mr. Noy sold 40,511 CEL token back to Celsius through the OTC trading desk and received $245,091.55 in return.  This transfer is an avoidable actual and constructive fraudulent transfer under applicable provisions of the Bankruptcy Code and state law.

9.     Plaintiff brings this adversary proceeding (the "**Adversary Proceeding**") pursuant to sections 502, 544, 548 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), seeking to avoid and recover from Defendant (i) the fraudulent transfer resulting from Defendant's sale of the artificially inflated CEL token through the Company's OTC trading desk (the "**Avoidable OTC Transfer**"), and (ii) a declaratory judgment that the resulting claim under section 502(h) is a CEL Token Deposit Claim (as such term is defined in the Plan).

10.     Through its ongoing investigation, Plaintiff has determined, based on currently available information, that the Avoidable OTC Transfer with a value totaling no less than

approximately $245,091.55 was made by the Debtors to or for the benefit of Defendant and is avoidable under sections 544 and 548 of the Bankruptcy Code and recoverable under section 550 of the Bankruptcy Code.

## THE PARTIES

11.     The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972],[2] the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "**Plan**"), the Litigation Administrator Agreement [Docket No. 4297] (the "**Litigation Administrator Agreement**"), and section 1123 of the Bankruptcy Code.  Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action,[3] including this Avoidance Action, on behalf of the Debtors and their Estates. The Debtors are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC.

12.     Defendant held the role of Head of Regulation at Celsius.  In this role, Defendant conducted business in or directed at the United States and, specifically, New York for the time period relevant to this Complaint.  Upon information and belief, Defendant resides at an address

---

[2]     "Docket No." refers to the docket of *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. July 13, 2022).  Documents filed on this docket can be accessed free of charge at https://cases.stretto.com/celsius/.

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Confirmation Order, and/or Litigation Trust Agreement.

within Israel, which address is known to Plaintiff but is not publicly disclosed pursuant to the

*Memorandum Opinion and Order on the Debtors' Sealing Motion* [Dkt. No. 910].

## JURISDICTION AND VENUE

13.     The United States Bankruptcy Court for the Southern District of New York (the

"**Bankruptcy Court**" or the "**Court**") has jurisdiction over the Adversary Proceeding pursuant to

28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, No. M-431, of the

United States District Court for the Southern District of New York, dated January 31, 2012.

14.     The Adversary Proceeding is commenced pursuant to sections 502, 544, 548, and

550 of the Bankruptcy Code, and Rules 3007, 6009 and 7001 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

15.     The Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157.  This

Court has jurisdiction to hear and to determine this proceeding and to enter a final order and

judgment.

16.     Plaintiff consents to entry of final orders and judgments by this Court in this

Adversary Proceeding pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to entry of final

orders or judgments by this Court if it is determined that this Court, absent consent of the parties,

cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.     This Court has jurisdiction over Defendant in as much as Defendant has maintained

minimum contacts with the United States in connection with the claims asserted in this Complaint.

This Court also has jurisdiction over Defendant by virtue of Defendant having served as Celsius's

Head of Regulation, through which he directed the regulation of Celsius products sold and

developed in the United States and the State of New York.  Further, this Court also has jurisdiction

over Defendant pursuant to Bankruptcy Rules 7004(d) and (f) and New York Civil Practice Law

& Rules § 302 (McKinney 2008) because Defendant purposefully availed themselves of the laws

of the United States and the State of New York by, among other things, doing or transacting business in the United States and in the State of New York, and receiving compensation for his work as Head of Regulation in the form of CEL Token, which Defendant then used to sell back to Celsius through the OTC trading desk which, upon information and belief, was operated out of or whose operation was directed from the United States and New York, which gave rise and/or relates to the claims at issue in this Adversary Proceeding. Defendant has also entered into agreements with the Debtors and/or Plaintiff that for various contracts and matters designated New York law as the governing law and New York as the forum state for dispute resolution with respect to the transactions at issue in this Adversary Proceeding.

18.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises under and is related to the Debtors' bankruptcy case pending in this Court.

## FACTUAL BACKGROUND

### A.    The Celsius Business Model and its Programs

19.    Celsius was founded in 2017. Its business plan was described in a "Whitepaper," which Celsius used to solicit capital through the public initial coin offering of its own cryptocurrency, the CEL token. Celsius planned to offer two primary products. By depositing their cryptocurrency in the "Earn" investment program, customers could transfer their cryptocurrency assets to Celsius by depositing them on "Earn Accounts" in exchange for weekly interest. Celsius, initially, said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to generate yield. In addition, Celsius would allow its members to use the cryptocurrency assets they had deposited on the Celsius platform as collateral to secure low-interest loans in dollars – the "Borrow" program.

20.    Celsius also developed the CEL token. Celsius described the CEL token as the "backbone of Celsius" and often equated the market price of the CEL token with the strength of

Celsius's business.[4]  Celsius account holders could elect to receive weekly rewards payments (or interest) in CEL token.  Interest in CEL token was most often paid at a higher rate than if the account holder elected to receive interest in the deposited cryptocurrency.

21.    Celsius pitched the CEL token as a self-reinforcing flywheel based on its commitment to buy enough CEL token from the public market to pay the interest it owed to its customers who elected to "Earn" rewards in CEL token.  Celsius intended for customers to deposit digital assets onto the Celsius platform.  Celsius would then invest those coins to earn a reward.  Celsius told the public it would use the return from the Company's investments to buy CEL tokens on the market in the amount required to pay weekly rewards to its customers who elected to "Earn" rewards in CEL token.  Celsius would then pay interest in CEL token to electing holders using those purchased CEL tokens.  Those CEL Token balances would increase and Celsius would owe more CEL token rewards the next week.  Celsius would then earn yield on the increased balances, buy more CEL tokens, and pay its users more interest in CEL tokens.

### B.    Celsius Artificially Inflates the CEL Token Price

22.    From January 2019 through June 2022, Celsius used BTC, ETH, and stablecoins to purchase CEL tokens on public markets through third-party exchanges (such as FTX and Liquid Exchange) or its OTC trading desk.

23.    Celsius advertised that it would purchase the amount of CEL token it owed customers who elected to "Earn in CEL," rather than using the CEL tokens in its treasury.[5]

---

[4]    Celsius Network, Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon – Friday, July 17, 2020, YouTube (July 17, 2020), at [5:27], https://www.youtube.com/watch?v=csFrn4XtwL0; Celsius Network, Celsius Network Team AMA – Thursday, July 2, 2020, YouTube (July 2, 2020), at [38:35], https://youtube.com/watch?v=Ym1EjbThjVk; Ozi_Crypto, Celsius Network Twitter Spaces AMA 1-12-2021, YouTube (Jan. 12, 2021), at [1:43:33], https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=28.

[5]    Celsius Network, Celsius Network Team AMA – Friday, December 31, 2021, YouTube (Dec. 31, 2021), at [3:70], https://www.youtube.com/watch?v=miXgxNqwFag.

Beginning in the summer of 2020, Alex Mashinsky, Celsius's CEO, committed that Celsius would "stop using the treasury to pay interest to our community" and would start "buying almost everything . . . almost 100 percent from the markets."[6]

24.    The amount of CEL tokens purchased, however, was determined in an ad hoc manner by Mr. Mashinsky and other Celsius executives, who provided specific price targets (including resting buy orders at set prices) and amounts to be purchased.  Celsius often would purchase CEL tokens in amounts significantly greater than needed to meet reward obligations with the goal of increasing the market price of CEL token.   For example, on November 10, 2020, Celsius executive Johannes Treutler proposed and directed the purchase of 100,000 CEL per day for that week, even though Celsius only needed 65,000 CEL per day to satisfy its reward obligations.  However, on November 26, 2020, Mr. Mashinsky assured the public that Celsius's purchases were transparent and calculated based on those who elected to Earn in CEL: "[Celsius] just published our total assets, do the math how much $CEL we will need to buy next week all-time record users, deposits and Celsius earning in CEL."  Similarly, in late December 2020, Celsius's trading desk bought a total of $3.8 million in CEL despite needing only $1.5 million to cover its reward obligations.  From July 2020 to the end of 2020, Celsius purchased more than 17 million CEL tokens more than it paid its customers.  Those purchases artificially increased the price of CEL token from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.

25.    On certain occasions, Celsius executives directed CEL tokens to be purchased during Mr. Mashinsky's live broadcasts, such that the value of the CEL token would visibly increase during the broadcasts, thus encouraging retail investors to purchase CEL tokens.

---

[6]    Celsius Network, Ask Mashinsky Anything – Friday, June 19, 2020, YouTube (June 19, 2020), at [00:11:41], https://www.youtube.com/watch?v=YrGcsAID3cM.

26.    Celsius also bought CEL to improve its position in business deals.  In one case, Mr. Treutler noted that "[w]e bought a lot [of CEL] . . . to support price for this deal" and that the purchases resulted in Celsius securing a better deal in the transaction than it otherwise would have secured.

27.    Celsius gave its employees bonuses when the CEL token's artificially inflated market price hit $1.50 to $5.00.  Those bonuses were paid in CEL tokens that vested over a period of time.  Celsius paid a portion of the bonus amount to certain employees in cash when each of the price thresholds were met.  Through the $5.00 bonus alone, Celsius paid approximately $13 million to employees in cash.  More than that amount was paid to employees in CEL token.

28.    At the beginning of 2021, the price of CEL had increased to over $6.00 per token. The rising price required Celsius to spend more dollars each week if it were to do as it promised and purchase the amount of CEL token required to pay the rewards it owed its customers.  To avoid that cash burn, Mr. Mashinsky instructed Mr. Treutler to stop purchasing CEL token in the market until the price dropped.  In March 2021, Mr. Mashinsky and his officers found a "hole" in Celsius's balance sheet, which was created in part through its purchase of CEL tokens using BTC and ETH that had been transferred by customers.   On March 21, 2021, Mr. Mashinsky directed his officers to change course and only purchase half of the CEL tokens required to pay interest to account holders who elected to receive interest in CEL token on the public market and take half from treasury.

29.    In April 2021, Celsius resumed purchasing more CEL token than it needed to pay rewards in CEL token in order to artificially inflate the price of the token.  In total for 2021, Celsius purchased approximately $243 million more CEL tokens than it paid to its customers as rewards.

30.    Celsius has accepted and acknowledged as true that its executives manipulated the price of the CEL token, stating in its stipulation with the Department of Justice that:

> Mashinsky touted the CEL token and the rise in CEL token's price as an indicator of Celsius' own financial health, and encouraged the public to purchase and hold CEL token. These claims were false and misleading. The rise in the value of the CEL token was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL. For example, although Mashinsky publicly disclosed that Celsius was purchasing CEL as part of a weekly "buyback" program to pay customer rewards, Celsius did not disclose that, in many weeks, Celsius was secretly purchasing far more CEL token than was necessary to pay those rewards. Those excess CEL purchases were not made for the purpose of paying customer rewards or for carrying out any legitimate business activity. Rather, their acknowledged purpose was to artificially support the price of CEL token.

31.    Likewise, on September 13, 2023, Roni Cohen-Pavon, Celsius's former Chief Revenue Officer, pled guilty to four counts of (1) engaging in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and by making false and misleading statements about Mr. Mashinksy's own sales of CEL token, (2) conspiring to manipulate the price of CEL token, (3) market manipulation of the CEL token, and (4) wire fraud in connection with the manipulation of the CEL token.  As part of that plea, Mr. Cohen-Pavon testified under oath that:

> Beginning in 2019, [Celsius] told [CEL token] market participants that . . . the company was purchasing [the] amount of [CEL tokens] in the market to fund the interest payments that is owed to [Celsius] clients.  From October 2021 through December 31, 2021, I oversaw and at time directly ordered a pattern of [CEL token] purchases in excess of what the company needed to buy to meet its interest obligation.  I knew and understood that the purpose of these excess purchases was at least in part to increase the price of [CEL token], prevent the price of [CEL token] from dropping and all to create [an] appearance of a more liquid market in [CEL token] trading all of which were intended to at least in part to induce additional [CEL

token] purchases by the public, at prices that likely did not reflect
the true market price.

32.     From its inception to the Petition Date, Celsius spent hundreds of millions of dollars

to purchase CEL tokens on the open market to inflate the price of the token.  The total amount of

CEL tokens Celsius purchased from 2019 to 2022 exceeds $500 million.

33.     Celsius took assets from its general omnibus wallets (where all customer funds

were accepted and commingled) to fund its purchases of CEL tokens.  Celsius operated at a

multiple hundred-million-dollar loss in each of 2020, 2021, and 2022.  Even if Celsius's intent was

to use its profits to purchase CEL tokens, it simply did not have the profits to do so.

34.     Celsius's directors and officers caused the Company to manipulate the price of the

CEL token by causing Celsius to purchase significantly more CEL token than was owed to account

holders.  They intended to portray Celsius as more successful and solvent than it actually was to

defraud their customers.  Celsius insider and employees profited significantly through sales of

CEL token, including through Celsius's OTC trading desk.

### C.     **The OTC Trading Desk and Defendant's OTC Sales**

35.     The Company bought and sold CEL tokens through its OTC trading desk.  The

OTC trading desk was an email address through which the Company would provide a quote to

people that wanted to buy or sell CEL token.

36.     The OTC trading desk was part of the CEL token fraud.  Internal Celsius notes

described the purpose of the OTC trading desk as follows: "The more CEL we sell OTC; the more

CEL we can repurchase; the more attractive CEL markets look like; the more CEL buy orders we

receive; In the end: The more our Treasury is worth; The less # of CEL we need to sell for the

same $ value we want to raise with these OTC sales."  As Mr. Mashinsky said in an email

conversation about the OTC Flywheel on May 16, 2020, "It's a win win scenario, the only way we

loose [*sic*] if CEL price drops a lot and people get nervous and keep selling. We can protect against this scenario."

37.    At times, Celsius was concerned that its officers, directors and employees were selling into its buybacks on third party exchanges.  The Company established a trading policy which limited the amount of CEL tokens its employees could sell on third party exchanges and employees' ability to sell CEL token when they had material non-public information about the Company.  Celsius's executives regularly breached that policy.

38.    To counter this, the Company offered to purchase CEL tokens from its officers and employees directly through the OTC trading desk.  Some employees have said Celsius required them to sell through the OTC trading desk, rather than on third party exchanges, so that the public would not find out that employees were selling, and so that their large sales would not depress the market price of the CEL token.

39.    Celsius also regularly granted employees CEL tokens as part of their compensation. Celsius then allowed certain employees to sell these CEL tokens back to the Company via the OTC trading desk to avoid both applicable securities regulations and the Company's CEL token trading policy.  In an attempt to comply with Rule 144 of the Securities Act, Celsius subjected its grants of CEL tokens to employees to a one-year "lock up" period, during which time employees would not be able to sell or otherwise transfer those CEL tokens on the open market.  While Celsius employees stated repeatedly that they "do not advertise this," Celsius permitted certain employees to circumvent the lock up by selling their CEL token directly back to the Company via the OTC trading desk prior to the lock up period's expiry.  Additionally, Celsius allowed employees to sell back their CEL token in larger amounts than were permitted by the Company's internal CEL token trading policy.

40.    Employees' sales of CEL token via the OTC trading desk primarily occurred during the period in which CEL token's market value was at an all-time high.  While Celsius sometimes bought back employees' CEL token at a discount from the token's market price, the CEL token's market price was at all times artificially inflated as a result of the Company's manipulation.  Thus, even these discounted prices were heavily inflated and not representative of the CEL token's true value.

41.    On June 30, 2021, Mr. Noy sold 40,511 CEL tokens through the Celsius OTC trading desk back to Celsius, and in return received approximately $245,091.55.

**D.    Celsius's Solvency**

42.    Between 2019 and 2021, Celsius experienced rapid growth in both its registered users and assets under management.  Sometime around the end of 2020, Celsius realized that the Company was not accurately tracking its positions and that Celsius had significantly more BTC obligations than BTC assets, and thus had a short position on the rapidly appreciating asset.  A substantial factor contributing to Celsius's short position was the Defendants' use of BTC transferred by account holders to purchase CEL tokens to inflate the price of the token.  When Celsius finally realized it was short BTC, it was too late.  While others in the cryptocurrency industry were making money hand-over-fist as BTC rose from approximately $10,000 to $60,000, *Celsius lost approximately $250 million.*

43.    By December 2021, Celsius claimed that it had over one million registered users. Only a portion of those users had transferred assets to the Celsius platform.

44.    At all times relevant to this Complaint, Celsius operated at a loss and was insolvent. Celsius's executives were aware its was insolvent.  But they continued to pay out astronomical rewards rates and pursue a "growth at all costs" strategy.  Celsius's officers and directors made

riskier and riskier decisions in their attempts to support their unsustainable business strategy, including those described below.

### a.    *The Self-Interested and Reckless KeyFi Transaction*

45.    In the summer of 2020, Celsius's executives wanted Celsius to begin investing in staking and decentralized finance ("**DeFi**") protocols.  Mr. Mashinsky, Mr. Goldstein (co-founder and Chief Technology Officer), and Mr. Cohen-Pavon chose to work with KeyFi, who would deploy Celsius's assets.  Mr. Mashinsky and Mr. Goldstein were partial owners of KeyFi.

46.    On August 19, 2020, Mr. Mashinsky and Mr. Cohen-Pavon reached an "agreement in principal" with KeyFi and its principal, Jason Stone, whereby KeyFi would deploy assets transferred by Celsius account holders.  Upon information and belief, before a written agreement was signed, and over the objection of other Celsius employees, Mr. Mashinsky and Mr. Cohen-Pavon directed the transfer of cryptocurrency from Celsius to KeyFi.  KeyFi lost and absconded with more than $315 million.

### b.    *Mr. Mashinsky Dictated Unsustainable Interest Rates to Attract More Customers*

47.    Until July 2021, Celsius did not have a formal method or policy to determine the interest rates it offered and paid to its customers.  Rates were chosen on an ad hoc basis, largely based on Mr. Mashinsky's and other executives' fears that Celsius would lose customers if its rates were lower than those of Celsius's competitors.  Celsius employees expressed that "[t]here is no evidence that has ever supported the rates we pay."  Mr. Mashinsky consistently resisted efforts to reduce the rewards rates that Celsius offered on BTC.  For instance, in January 2022, Celsius's Assets and Liabilities Committee was informed that even if Celsius was able to maximize BTC deployment across every available investment strategy, the Company would still lose money at its

current rewards rates. Nevertheless, Mr. Mashinsky vetoed any suggestion to lower interest rates on BTC at that time.

48.     In February 2022, Celsius's Treasury department prepared an analysis for the Company's new CFO showing $100 million in potential cost savings to Celsius by reducing interest rates paid out on BTC and ETH deposits. The presentation also pointed out that at that time, Celsius's liabilities exceeded its assets by $1 billion and that Celsius was incurring financing costs of approximately $100 million per year. The presentation recommended that Celsius "should begin to shift its strategic direction to profitability rather than being a 'loss leader' for the sake of customer acquisition." Those suggestions were again refused by Mr. Mashinsky and Celsius's other executives.

### c.    *Celsius Incurs Staggering (and Unsustainable) Losses*

49.     In a presentation that was given to the Board of Directors in May 2022, Celsius reported an $811 million pre-tax loss on its management profit and loss statement for the year ending 2021. Following the Petition Date, the Debtors informed the Official Committee of Unsecured Creditors that the figure was much higher and identified approximately $1.2 billion of losses in 2021. Mr. Mashinsky has admitted that Celsius's staggering losses were the result of "poor asset deployment decisions."[7] Those large losses, which were never disclosed to Celsius's account holders until the Company's Chapter 11 cases, include:

50.     **Equities First Holdings ($308 million and 3,765 BTC defaulted unsecured obligation (current market value of approximately $230 million))**:  In 2019, Mr. Mashinsky decided to enter into the first of a series of loan agreements with EFH under which EFH would loan Celsius U.S. dollars collateralized by BTC and ETH, which would be held by EFH. Celsius

---

[7] *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] ¶ 10.

did not require (and EFH did not provide Celsius with) financial statements in connection with entering into any of the loans.[8]  Upon information and belief, Celsius did not conduct a public records search before it executed the first loan agreement.  If it had, it would have known that at that time, EFH had been sued at least four times in the United States for failing to return borrowers' collateral.[9]  Celsius's risk officer was not told about the loan until months after it had been executed.  That risk officer immediately identified that Celsius was over-exposed to EFH.

51.    During the course of the EFH loan, Celsius's collateral appreciated significantly in value.  But because Celsius had not negotiated for a reverse margin feature common in similar loans, Celsius had no recourse to recoup its collateral.  When certain of Celsius's loans with EFH came due in July 2021, EFH informed Celsius that it would be unable to return Celsius's BTC and ETH collateral which was then valued to be worth approximately $509 million.  It was only after EFH refused to return Celsius's collateral that the Risk Committee did background checks on EFH and its principles.  Prior to the Petition Date, Celsius agreed to a long dated unsecured payment plan with EFH.  EFH defaulted and stopped making any payments to Celsius on or around June 13, 2023.  EFH currently owes Celsius approximately $308 million and 3,765 BTC which have a market value of approximately $230 million.

52.    **Grayscale BTC Trust (~$120 million loss)**:  In 2021, Celsius contributed BTC to the Grayscale BTC Trust in exchange for shares in the Trust, which were trading at a premium to the Trust's Net Asset Value at the time.  Celsius was required to hold the shares for six months before they could be sold.  Once the lock-up period expired, the shares were trading at a discount

---

[8] EFH has never provided Celsius with financial statements.

[9] *See HNA Sweden Hospitality Management AB et al v. Equities First Holdings, LLC et al.*, No. 1:19-cv-02452-JRS-MPB (S.D. Ind. June 17, 2019); *Roossien et al v. Equities First Holdings LLC*, No. 3:12-cv-02649 (N.D. Tex. July 10, 2012); *Morris et al v. Equities First Holdings LLC et al.*, No. 3:08-cv-05126 (W.D. Wash. Mar. 3, 2008); *Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008).

to the BTC that Celsius had contributed.  Mr. Mashinsky elected to hold the shares over the advice of other Celsius employees, betting that the share price would rebound and trade at a premium again.  Instead, the discount increased, resulting in an approximately $120 million loss when the shares were sold.

53.    **Stakehound Loss (~$110 million loss)**: Stakehound is an ETH staking service provider that was utilized by Celsius.  In 2021, Stakehound announced that both it and its custody provider had deleted the private key for the wallet that held 35,000 ETH that had been transferred by Celsius.  Celsius did not disclose that loss to its customers until June 2022 and only after various news outlets published stories on the loss.

54.    **BadgerDAO Hack (~$49 million loss)**:  On December 2, 2021, a phishing incident occurred on BadgerDAO, a DeFi protocol where Celsius had stored 906 BTC.  BadgerDAO issued a recovery token, remBadger, which guaranteed a full pay-out over two years if the tokens remained deposited at BadgerDAO.  BadgerDAO made clear that the condition for receiving the restitution pay-out was keeping the remBadger token deposited and that the holder of the remBadger token could not re-deposit the token after its withdrawal.  A Celsius employee withdrew the token, forfeiting the payment.  The mistake could have easily been avoided had Celsius implemented proper corporate controls, including a multi-signature approval protocol.

55.    **Defaults on Under-Collateralized and Uncollateralized Loans (~$35 million loss)**:  Between 2020 to the end of 2021, Celsius began to increase its exposure to under-collateralized and wholly uncollateralized loans which provided a higher interest rate, but also significantly more risk.  By June 2021, it was routine for one-third or more of Celsius's institutional

loan portfolio to consist of unsecured loans.  In 2021, two counterparties defaulted on significant uncollateralized and under-collateralized loans resulting in approximately $35 million losses.[10]

56.     **Acquisition of GK8 and Subsequent Sale (~$71 million loss)**:  In October 2021, Celsius Network Limited purchased the GK8 Debtors, a digital asset custody business, for $115 million.  After the acquisition of GK8, Celsius made limited effort, and was never able, to integrate the GK8 Debtors' technology in the broader Celsius business.  On top of that, Mr. Mashinsky repeatedly promised consumers that GK8 had a "$750 million insurance policy" which would offer "$750 million insurance per client."  Neither Celsius nor GK8 had ever owned such an insurance policy.  On December 13, 2022, the Bankruptcy Court approved the Debtors' sale of the GK8 Debtors for approximately $44 million—a realized loss of approximately $71 million.

57.     *In all, Celsius suffered realized losses that exceeded $1.2 billion due to the reckless conduct and actions taken in 2021 by the D&O Defendants.  The Company also spent over $388 million buying back CEL token in 2021.*

> ### E.     Celsius Faces Heavy Losses and Public Regulatory Scrutiny, Leading to the Pause

58.     Beginning in 2021 through the Petition Date, Celsius faced increasing regulatory pressure from the United Kingdom and United States governments.

59.     While Celsius was already insolvent, the situation at the Company was about to become even more untenable.  On May 7, 2022, the cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market.  The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called Luna.  The UST coin value "de-pegged" and plummeted.

---

[10] The Reliz LTD loan was under-collateralized.  The Iterative OTC LLC loan was uncollateralized.

60.     Celsius had approximately $940 million deployed on the Terra Chain.  It realized an approximately $30 million loss on its assets deployed on the Terra Chain.  Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of the collapse of Terraform Labs.

61.     Rumors swirled around Celsius and its stability.  Users withdrew over $1.4 billion worth of digital assets from the Celsius platform the week after the collapse of Terraform Labs.  Internally, Celsius faced a liquidity crisis.  It had billions of dollars invested in illiquid investments but insufficient assets to address customer withdrawal requests.  Celsius also had more than one billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to survive margin calls.  By May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH.

62.     Over the course of May and June, crypto prices widely and continuously plummeted, and the instability in the crypto markets led to a run on the bank.  In May, BTC was down 15.7% month-over-month.  June was even worse, as BTC was down 37.9%.  Many customers began rapidly withdrawing all or some of their assets, demanding crypto assets that Celsius lacked liquidity to provide.  Many other players in the crypto markets were also collapsing under the same pressures, with crypto brokerage company Voyager Digital and crypto hedge fund Three Arrows Capital filing for chapter 11 bankruptcy shortly before Celsius, on July 6, 2022, and July 1, 2022, respectively.

63.     On June 12, 2022, in response to customer withdrawal demands and increasing volatility in the cryptocurrency markets, Celsius paused all withdrawals from its platform to

prevent further erosion of value (the "**Pause**").  Hundreds of thousands of customers who still had assets on the platform were left without recourse, unable to withdraw or sell their coins.

### F.    The Chapter 11 Cases

64.    On the Petition Date, the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under chapter 11 of the Bankruptcy Code.  All of these Chapter 11 Cases were consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).[11]

65.    On November 9, 2023, the Court entered the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972].  The Confirmation Order also approved the settlement that valued CEL Token Deposit Claims[12] at $0.25 per CEL token (*i.e.*, 1 CEL token equals a $0.25 CEL Token Deposit Claim) (the "**CEL Token Settlement**").  Docket No. 3972 at ¶ 267; Plan, Art. IV.B.2.

66.    On January 31, 2024, the Plan became effective.[13]  As part of the Plan, the Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims belonging to the Estates and to serve as the Estates' representative in certain litigation, including

---

[11]    *See Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 53]; *Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 1648].

[12]    "CEL Token Deposit Claim" is defined in the Plan to mean "any Claim against the Debtors on account of the Debtors' obligation to return or distribute CEL Token to any Entity."  Plan, Art. I.A.35.

[13]    *See Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions* [Docket No. 4298].

causes of action under chapter 5 of the Bankruptcy Code.[14]   The Litigation Administrator is

charged to maximize distributions to the stakeholders, including victims of Celsius's collapse.

### CAUSES OF ACTION

### COUNT ONE

**(Avoidance and Recovery of Actual Fraudulent Transfer — OTC Sale — 11 U.S.C. §§
544(b); 548(a)(1)(A); 550; and Applicable Law, including, but not limited, to the Uniform
Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)**

67.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs,

which are incorporated by reference as if set forth fully herein.

68.     Plaintiff brings this claim under section 544(b) of the Bankruptcy Code, section

548(a)(1)(A) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law

including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New

York, New Jersey, and Delaware.

69.     On June 30, 2021, Defendant sold 40,511 CEL tokens through the Celsius OTC

trading desk back to Celsius, and in return received approximately $245,091.55.

70.     This transfer (the "**Avoidable OTC Transfer**") constitutes a transfer of interest in

the Debtors' property and was made within two years prior to the Petition Date.

71.     The Avoidable OTC Transfer was made by the Debtors.

72.     Celsius used its OTC trading desk as part of its scheme to artificially inflate the

price of CEL token through the OTC flywheel, obscuring transactions from the public and ensuring

demand for the coin stayed high.  This artificially inflated price benefitted insiders and employees,

who held the vast majority of CEL token in circulation.  Celsius intentionally inflated the price of

CEL token to make Celsius appear to be more solvent and a more successful company than it

---

[14]   *See* Plan, Art. IV.L.

actually was to attract additional individuals and entities to transfer more assets to the Celsius and, thus, become creditors of Celsius.  Celsius allowed its insiders and employees, like Defendant, to profit off the inflated market price by selling their CEL tokens back to the Company via the OTC trading desk in exchange for cash, stablecoins, or more valuable cryptocurrency.  By doing so, Celsius drove itself further into insolvency and depleted the pool of assets available to satisfy obligations to creditors.  Celsius intended to defraud its customers and hide the Avoidable OTC Transfer from the public, including its customers, to encourage them to buy more CEL token, driving the price up further for the benefit of Celsius's insiders and employees.

73.    Celsius's actual intent to hinder, delay, or defraud its creditors is established by, among other things, the following badges of fraud:

    a.    The Avoidable OTC Transfer occurred when the Company was insolvent;

    b.    The Avoidable OTC Transfer benefitted insiders and employees, like Defendant Noy;

    c.    The Avoidable OTC Transfer was concealed from the public;

    d.    The Avoidable OTC Transfer was outside the ordinary course of business;

    e.    The Avoidable OTC Transfer was part of a coordinated scheme by Celsius to artificially inflate the price of CEL token; and

    f.    The Debtors received less than equivalent value in exchange for the Avoidable OTC Transfer.

74.    The Avoidable OTC Transfer was a fraudulent transfer avoidable under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code, as well as applicable state law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

75.    Plaintiff is entitled to avoid the Avoidable OTC Transfer.

76.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under sections 544 or 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

77.    Defendant Noy is the initial transferee for whose benefit the Avoidable OTC Transfer was made.  Upon information and belief, Mr. Noy may have transferred the funds comprising the Avoidable OTC Transfer to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

78.    Therefore, the Avoidable OTC Transfer, or the value of the property transferred in the Avoidable OTC Transfer, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT TWO

**(Avoidance and Recovery of Constructive Fraudulent Transfer — OTC Sale — 11 U.S.C. §§ 544(b)(1); 548(a)(1)(B); 550; and Applicable Law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware)**

79.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

80.    Plaintiff brings this claim under sections 544(b)(1), 548(a)(1)(B) and 550 of the Bankruptcy Code.

81.    As noted in Count One, the Avoidable OTC Transfer was made by the Debtors between on June 30, 2021.

82.    The Debtors received less than reasonably equivalent value or did not receive fair consideration as part of this transaction.

83.     As a result of the manipulation of the CEL token, the total amount of CEL token Defendant sold to the Company through the OTC trading desk, 40,511.00, was worth significantly less than the $245,091.55 Defendant received in exchange for the Avoidable OTC Transfer.

84.     The Debtors were insolvent at all times relevant to this Complaint, and when the Avoidable OTC Transfer was completed.  The Debtors also had unreasonably small capital on the date of the Avoidable OTC Transfer, or intended to incur or believed they would incur debts beyond their ability to pay as such debts matured (or when the account holder requested to withdraw their digital assets from Celsius).

85.     The Debtors conducted the Avoidable OTC Transfer or incurred such obligation to, or for the benefit, of an insider like Defendant, and not in the ordinary course of business.

86.     By virtue of the foregoing, the Avoidable OTC Transfer was a constructive fraudulent transfer avoidable under sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code, and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

87.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 or 548 of the Bankruptcy Code, the Litigation Administrator may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfer was made, or any immediate or mediate transferee of the initial transferee.

88.     Defendant Mr. Noy is the initial transferee for whose benefit the Avoidable OTC Transfer was made.  Upon information and belief, Mr. Noy may have transferred the funds comprising the Avoidable OTC Transfer to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.

89.     Therefore, the Avoidable OTC Transfer, or the value of the property transferred in the Avoidable OTC Transfer, is recoverable by the Litigation Administrator under section 550 of the Bankruptcy Code.

## COUNT THREE

### (Declaratory Judgment — 28 U.S.C. §§ 2201 and 2202)

90.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

91.     For the reasons set forth herein, the Avoidable OTC Transfer is avoided and Plaintiff is entitled to recovery of the property, or the value thereof.  Thereafter, Defendant will be entitled to bring a claim against the Estates under section 502(h) of the Bankruptcy Code.  The value of any claim brought by Defendant under section 502(h) of the Bankruptcy Code should be denominated in CEL token, representing the consideration paid by Defendant to the Debtor for the Avoidable OTC Transfer.

92.     These CEL token claims should be treated as a CEL Token Deposit Claim in accordance with the CEL Token Settlement and valued at $0.25 per CEL token.

93.     An actual controversy exists between the parties concerning the calculation, value, and basis of any claim brought by Defendant under section 502(h) of the Bankruptcy Code.

94.     Plaintiff disputes any calculation, valuation, or basis of any claim brought by Defendant under section 502(h) of the Bankruptcy Code to the extent inconsistent with the allegations herein.

95.     There exists a substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgement under 28 U.S.C. § 2201 that: any claim under section 502(h) of the Bankruptcy Code brought by Defendant must be denominated in CEL token and treated in accordance with the CEL Token Settlement.  A prompt judicial

determination of the respective rights and duties of the parties in these respects is necessary and appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendant as follows:

(a)    Pursuant to sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, avoiding the Avoidable OTC Transfer;

(b)    Pursuant to section 550(a) of the Bankruptcy Code, directing Defendant to relinquish to Plaintiff the property transferred in the Avoidable OTC Transfer, or pay to Plaintiff an amount to be determined at trial that is not less than the full amount of the Avoidable OTC Transfer: $245,091.55;

(c)    Pursuant to section 502(h) of the Bankruptcy Code, reinstating a claim for Defendant against the estate in CEL token to be treated according to the CEL Token Settlement;

(d)    Awarding pre-judgment interest at the maximum legal rate running from the date of Plaintiff's first demand to Defendant to return the Avoidable OTC Transfer to the date of judgment with respect to this Complaint (the "**Judgment**") herein;

(e)    Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full;

(f)    Awarding Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action, to the fullest extent allowed by applicable law;

(g)    Requiring Defendant to pay forthwith the amount of the Judgment; and

(h)    Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated: July 12, 2024
         New York, New York

/s/ Aaron Colodny
_____

**WHITE & CASE LLP**
Aaron E. Colodny (admitted pro hac vice)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email:  aaron.colodny@whitecase.com

– and –

**WHITE & CASE LLP**
David M. Turetsky
Kathryn J. Gundersen
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  david.turetsky@whitecase.com
         kathryn.gundersen@whitecase.com

– and –

**WHITE & CASE LLP**
Jason Zakia (*pro hac vice* pending)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:   jzakia@whitecase.com
         gregory.pesce@whitecase.com

*Counsel to Mohsin Y. Meghji,*
*Litigation Administrator, as*
*Representative for the Post-Effective*
*Date Debtors*