Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                    Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br><br>                    Plaintiff,<br><br>        v.<br><br>COMPOUND LABS, INC.,<br><br>                    Defendant. | Adversary Proceeding<br>Case No. _____ (MG)<br><br>**ADVERSARY COMPLAINT** |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("Plaintiff" or "Litigation Administrator"), by and through his undersigned counsel, brings this action against Defendant and alleges as follows:

## NATURE OF THE ACTION[2]

1.      This is an action by Celsius against Compound Labs to recover for damages Celsius sustained as a result of Compound Labs's negligence, negligent misrepresentation, and professional malpractice.

2.      Compound Labs operated Compound, a decentralized finance borrowing and lending protocol, which allowed users to deploy assets on the DeFi ecosystem and to borrow against collateralized assets.

3.      Compound Labs required users borrowing assets to maintain a certain ratio of collateral.  If an account fell below this collateral ratio, Compound Labs would cause the user's borrowing position to be liquidated.

4.      On November 26, 2020, Compound mistakenly concluded that the price for one DAI token—a cryptocurrency "pegged" to the U.S. dollar on a one-to-one basis—had spiked to $1.30.  This "flash" price increase caused approximately $89 million worth of positions on Compound to be liquidated, including Celsius' position.

5.      In designing, operating, and maintaining Compound to operate automatically off of one source of pricing data—Coinbase Pro—Compound was negligent.  By designing its platform in this manner, Compound Labs rendered Compound and its users uniquely vulnerable to exploitation and the automatic liquidation of its customers' assets.

---

[2] Capitalized terms undefined in the Nature of the Action section have the meaning ascribed elsewhere in the Complaint.

6.    Further, a Compound Whitepaper represented that the price of assets on Compound was tied to ten sources, not one.  This was a misrepresentation relied upon by Celsius that caused damages once the Liquidation Transactions occurred.

7.    Celsius brings this suit against Compound Labs to recover damages incurred as a result of Compound Labs's negligence, negligent misrepresentations, and professional malpractice.

## **PARTIES**

8.    The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [- Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code.  Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates"). The Debtors relevant to this lawsuit are Celsius Network Limited and Celsius KeyFi LLC.

9.    Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

3

10.     Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

11.     Celsius KeyFi, LLC ("Celsius KeyFi" and together with CNL, "Celsius") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

12.     Defendant Compound Labs, Inc. ("Compound Labs") is a Delaware corporation that on information and belief has its principal place of business in California.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157.  Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan.  Further, this Court has jurisdiction over the matter pursuant to article XII of the Plan.

14.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A) and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and

judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

15.    Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under, arises in, and related to cases commenced under the Bankruptcy Code.

## BACKGROUND

### A.    CNL's Business, Staking, and DeFi

16.    CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

17.    CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral.  The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

18.    The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth.  Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

19.    Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward."

Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets. The principal staked coins are not exchanged for other forms of currency. While the staked coins may, in some cases, be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

20.     DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending, and market-making without an institutional intermediary, often utilizing so-called "smart contracts." Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

21.     Around August 2020, Celsius reached an agreement in principle with Jason Stone, the former CEO of Celsius KeyFi, LLC ("Celsius KeyFi"), and KeyFi Inc. ("KeyFi," and together with Stone, the "Stone Parties"), for Celsius to acquire the assets of KeyFi and for Stone, through Celsius KeyFi, to operate Celsius staking and DeFi activities. Stone's authorization to deploy Celsius' assets ended on or around March 26, 2021.

**B.    Compound and Compound Labs**

22.     Compound Labs is a technology company that builds infrastructure in the financial industry, including the Compound Protocol and its associated and affiliated technologies and product ("Compound").

23.     Compound is a DeFi borrowing and lending protocol built on Ethereum that functions as the blockchain version of a money market. The Compound token ("COMP") is an

Ethereum Request for Comment Number 20 ("ERC-20")[3] token that facilitates the community governance of Compound.

24.      According to Compound Labs, "Compound is a protocol on the Ethereum blockchain that establishes money markets, which are pools of tokens with algorithmically derived interest rates, based on the supply and demand for the token.  Suppliers (and borrowers) of an asset interact directly with the protocol, earning (and paying) a floating interest rate, without having to negotiate terms such as maturity, interest rate, or collateral with a peer or counterparty.  Each money market is unique to an ERC-20 token (such as tokenized Ether, a stablecoin such as Dai, or a utility token such as Golem), and contains a transparent and publicly inspectable balance sheet, with a record of all transactions and historical interest rates."

25.      Compound Labs claims in its Whitepaper (the "Compound Whitepaper") concerning Compound that "The ability to seamlessly hold new assets (without selling or rearranging a portfolio) gives new superpowers to dApp consumers, traders and developers."

26.      Compound Labs also claimed that Compound, "introduce[s] a decentralized system for the frictionless borrowing of Ethereum tokens without the flaws of existing approaches, enabling proper money markets to function, and creating a safe positive-yield approach to storing assets."  Ultimately, these statements were incorrect.

27.      Compound also offers users the ability to borrow from the protocol by utilizing collateralized lines of credit to be used in the Ethereum ecosystem.  Compound Labs distinguishes Compound from other so-called peer-to-peer protocols, claiming, "Unlike peer-to-peer protocols, borrowing from Compound simply requires a user to specify a desired asset; there are no terms to negotiate, maturity dates, or funding periods; borrowing is instant and predictable.  Similar to

---

[3] ERC-20 is the implemented standard for fungible tokens created using the Ethereum blockchain.

supplying an asset, each money market has a floating interest rate, set by market forces, which determines the borrowing cost for each asset."

28.     The interest rate of these loans is not negotiated by its user, but rather it is set automatically by certain features of the protocol.

29.     To permit these loans, Compound has a "collateral ratio" as part of the platform. Compound Labs stated, "Accounts can take no action (e.g. borrow or withdraw) that would bring its value below our desired ratio; to increase (or reset) the collateral ratio."

30.     Compound has an additional feature in place to maintain an account's collateral ratio, an automatic liquidation feature.  Compound Labs states:

> If the value of a user's supplied assets divided by the value of their outstanding borrowing declines below the collateral ratio, the user's collateral becomes available to purchase (with the borrowed asset) at the current market price minus a *liquidation discount;* this incentivizes an ecosystem of arbitrageurs to quickly step in to reduce the borrower's exposure, and eliminate the protocol's risk.
>
> Any Ethereum address that possesses the borrowed asset may invoke the liquidation function, in whole or in part, exchanging their asset for the borrower's collateral. As both users, both assets, and prices are all contained within the Compound protocol, liquidation is frictionless and does not rely on any outside systems or order-books.

31.     Liquidators on Compound are typically users with large reserves of funds who can cover the borrowed positions in exchange for a percentage of proceeds from the liquidated collateral.

32.     Compound Labs had no feature, procedure, mechanism, or any other control feature to protect against exploits, hacks, or misuse of the protocol.  This presented significant risk, given the immediate and potential long-term, loss that a user could incur in the event of an unjustified liquidation.

33.     In fact, at all times relevant in this Complaint, Compound's "oracle" (the system used for pricing data) was tied solely to pricing data on Coinbase Pro, as opposed to a combination or average of multiple exchanges or sources.

34.     This is contrary to the Compound Whitepaper, which states:

> A *Price Oracle* maintains the current exchange rate of each supported asset; the Compound protocol delegates the ability to set the value of assets to a committee which pools prices from the top 10 exchanges.  These exchange rates are used to determine borrowing capacity and collateral requirements, and for all functions which require calculating the value equivalent of an account.

35.     The difference between the Compound Whitepaper and actual pricing data from one source for DAI was material, and ultimately caused significant financial loss to Celsius as explained herein.

36.     Compound envisions and works on a model of full partnership of all its users. Compound Labs describes this model of governance in the Compound Whitepaper:

> Compound will begin with centralized control of the protocol (such as choosing the interest rate model per asset), and over time, will transition to the community and stakeholder control. The following rights in the protocol are control by the admin or governance committee:
>
> - The ability to choose a new admin, such as a DAO;
> - The ability to set the interest rate model per market;
> - The ability to support, suspend or unsuspend a market;
> - The ability to delegate which entity may set oracle prices;
> - The ability to withdraw the equity (earned income) of the protocol.

**C.      The November 2020 Liquidation Event**

37.     Automatic protocols leading to an automatic liquidation with absolutely no protection, control, or other fail-safe to account for error was a ticking time bomb that would, and eventually did, lead to losses for many of Compound's users, including Celsius.

9

38.     As of November 26, 2020, Celsius had entered into several borrowing positions on Compound for DAI and USDT.  As collateral for these borrowing positions, Celsius stored Ether ("ETH") as collateral on Compound and received Compound Ether ("cETH") in return.  In other words, Celsius borrowed DAI and USDT using the Compound protocol and pledged its ETH as collateral for repayment of the loans.  Assuming that the account was otherwise appropriately collateralized to support his borrowing positions, cETH could be exchanged for ETH at any time. However, if the collateral ratio fell below the acceptable level, then the cETH was subject to automatic, immediate liquidation.

39.     On that day, the price of DAI on the Coinbase Pro exchange mistakenly and falsely indicated that the current price of DAI had skyrocketed approximately 30% to $1.30.  Although the price spike to $1.30 was only momentary, this caused nearly $90M of collateralized loan positions to be immediately liquidated on Compound.

40.     A co-founder of Chainlink commented on the event and explained, "DeFi protocols with centralized oracles that rely on a single exchange of any kind (Off-chain or DEX) . . . are exposing user funds to significant risks."  Compound Labs took an objectively unreasonable risk in tying the entirety of its pricing data to Coinbase Pro, and the immediate liquidation of approximately $89M in borrowed positions from a momentarily exploit resulted from that recklessness.

41.     Celsius was directly harmed as a result of this negligence.  As a direct result of the DAI price spike, Compound initiated a series of eight liquidation transactions (the "Liquidation Transactions") in a Celsius wallet, resulting in a total of 2,509,770.21 cETH being taken from the wallet and distributed to various liquidator wallets.  That 2,509,770.21 cETH would have been

redeemable for a total of 50,268.9529 ETH, all of which Celsius was forced to have to repurchase on the open market following the liquidation event.

42.    But for the failures by Compound Labs in the design, operation, and maintenance of Compound, Celsius would not have been harmed.

### FIRST CAUSE OF ACTION
**(Negligence)**

43.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

44.    Compound Labs had a special relationship with Celsius by virtue of its special duty to Celsius to prevent harm to users of Compound.  This duty arose in light of Compound Labs being the only entity that could prevent harm to users of Compound, and this duty was breached by Compound Labs's conduct.

45.    As alleged herein, Compound Labs negligently designed, operated, or maintained Compound by exposing its users to the volatility of one, and only one, source for its pricing data. Compound Labs also failed to protect against any of the risks that were eminently foreseeable by virtue of using only source for pricing data.

46.    This failure in the design, operation, or maintenance of Compound caused the Liquidation Transactions.

47.    Celsius suffered harm from the Liquidation Transactions in an amount to be proved at trial.

### SECOND CAUSE OF ACTION
**(Negligent Misrepresentation)**

48.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

49. Celsius and Compound Labs were in a special or else privity-like relationship by virtue of Celsius' use of Compound.

50. Compound Labs, in the Compound Whitepaper, stated:

> A *Price Oracle* maintains the current exchange rate of each supported asset; the Compound protocol delegates the ability to set the value of assets to a committee which pools prices from the top 10 exchanges. These exchange rates are used to determine borrowing capacity and collateral requirements, and for all functions which require calculating the value equivalent of an account.

51. This statement was false because at the time of the November 2020 Liquidation Event, DAI was priced to only one source, Coinbase Pro, not a "pool" of "prices from the top 10 exchange."

52. The statement that Compound drew pricing data from ten different sources rather than solely Coinbase Pro was a misrepresentation or material omission of fact that was false and known to be false by Compound Labs.

53. Compound Labs knew that Celsius and other users of Compound would rely on this statement when deciding whether to deploy assets on Compound.

54. Celsius relied on this statement in deploying assets on Compound.

55. Celsius suffered damages in an amount to be proved at trial as a result of the falsity of this statement, because the Liquidation Transaction would not have occurred had the price of DAI actually been linked to the "top 10 exchanges" instead of solely to Coinbase Pro.

### THIRD CAUSE OF ACTION
**(Professional Malpractice)**

56. Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

57. Compound Labs is a professional in the financial technology industry.

58.    As a professional in the financial technology industry, Compound Labs had a duty to design, operate, and maintain Compound in a commercially reasonable manner.

59.    Encompassed by this duty was the obligation to design, operate, and maintain its pricing data.  This was particularly important because the pricing data impacted all aspects of Compound, much of which was programmed to run automatically.

60.    Compound breached the duty to maintain reliable pricing data in a commercially reasonable manner by using only one source, Coinbase Pro, to determine the price of DAI. Compound further breached this duty by not taking reasonable measures to prevent and protect against the damage that could result from the use of only source to determine pricing data.

61.    The fixing of Compound's oracle's price data to only one source falls below the standard of care by a professional in the financial technology industry.

62.    This breach led to Compound believing that the price of DAI had risen to approximately $1.30 on November 26, 2020, which was erroneous because the fair market value of DAI was not $1.30.

63.    As a result of this breach, Compound caused the Liquidation Transactions to occur.

64.    The Liquidation Transactions caused Celsius damages in an amount to be proved at trial.

65.    Compound Labs's conduct constituted professional malpractice and it is liable for the damages this malpractice caused.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)    Judgment in favor of Plaintiff and against Defendant on all causes of action;

(b)    Judgment in favor of Plaintiff and against Defendant for negligence;

(c)     Judgment in favor of Plaintiff and against Defendant for negligent misrepresentation;

(d)     Judgment in favor of Plaintiff and against Defendant for professional malpractice;

(e)     Awarding Plaintiff actual damages in an amount to be determined at trial;

(f)     Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law;

(g)     Awarding Plaintiff attorneys' fees in an amount to be proved at trial; and

(h)     Awarding all relief to which Plaintiff is entitled in law and in equity as this Court deems just and proper.


Dated:      July 12, 2024
            New York, New York
                                    AKIN GUMP STRAUSS HAUER & FELD LLP

                                    By:   */s/ Mitchell P. Hurley*
                                          Mitchell P. Hurley
                                          Dean L. Chapman Jr.
                                          One Bryant Park
                                          New York, New York 10036
                                          Telephone: (212) 872-1000
                                          Facsimile: (212) 872-1002
                                          mhurley@akingump.com
                                          dchapman@akingump.com

                                          Elizabeth D. Scott (admitted *pro hac vice*)
                                          Nicholas R. Lombardi (admitted *pro hac vice*)
                                          2300 N. Field Street, Suite 1800
                                          Dallas, TX 75201
                                          Telephone: (214) 969-2800
                                          Facsimile: (214) 969-4343
                                          edscott@akingump.com
                                          nlombardi@akingump.com

                                          *Counsel for Plaintiff*