Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>     Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br><br>     Plaintiff,<br><br>   v.<br><br>GUY BENARTZI, ELENE CHKEIDZE, LEVAN MKHEIDZE, JASON STONE, AND KEYFI INC.,<br><br>     Defendants. | Adversary Proceeding<br>Case No. _____ (MG)<br><br>**ADVERSARY COMPLAINT** |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("Plaintiff" or "Litigation Administrator"), in connection with the bankruptcy cases of Celsius Network LLC and its Debtor Affiliates ("Debtors" or "Celsius") by and through undersigned counsel, brings this action against Defendants and alleges as follows:

## NATURE OF THE ACTION

1.      This action relates to Celsius property that Executive and Vehicle (defined below) wrongfully caused Celsius to transfer from Celsius wallets to their own wallets or those of their associates and on to Benartzi. This action seeks to avoid fraudulent transfers to the Defendants, and recover valuable estate property from Benartzi (not the Executive Parties, as defined below), as well as to impose constructive trusts, and to require Benartzi to account for, and turn over that property which was taken from Celsius (and ultimately from the whole Celsius community).

## PARTIES

2.      The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], *the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code. Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates").

2

3.      Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

4.      Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

5.      Celsius KeyFi LLC ("Celsius KeyFi") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

6.      Defendant Jason Stone ("Executive") is a resident of New York.  Executive was the founder and principal of Vehicle, as well as CEO and chief fiduciary of Celsius KeyFi and directed the transfers of the assets at issue in this litigation.

7.      Defendant KeyFi, Inc. ("Vehicle," and together with Executive, the "Executive Parties") is a Delaware corporation that, upon information and belief, has a principal place of business located in New York.  Executive is the largest shareholder of Defendant Vehicle.

8.      Defendant Guy Benartzi, upon information and belief, is a citizen of Israel.

9.      Defendant Elene Chkeidze, upon information and belief, is a citizen of the nation Georgia.

10.     Defendant Levan Mkheidze, upon information and belief, is a citizen of the nation Georgia.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157.  Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan.

12.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (H); and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

13.     Certain Defendants named in this Complaint are domiciled in the United States or are entities organized with their principal place of business or place of organization or administration in the United States and, thus, are subject to the general personal jurisdiction of the Court.  This category includes but is not necessarily limited to the Executive Parties.

14.     Defendants Benartzi, Chkeidze, and Mhkeidze may reside primarily abroad or be organized abroad.  These Defendants also are subject to this Court's jurisdiction, as they have purposefully availed themselves of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

15.     In particular, each of the Defendants has transacted business within the United States from which the claims allegedly arise, including by receiving one or more of the fraudulent transfers at issue (collectively, the "<u>Fraudulent Transfers</u>"), or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the Fraudulent Transfers at issue.

16.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## **BACKGROUND**

### A.      **CNL's Business, Staking, and DeFi**

17.     CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

18.     CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral.  The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

19.     The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth.  Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius

began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

20.     Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets.  The principal staked coins are not exchanged for other forms of currency. While the staked coins may, in some cases, be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

21.     DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending, and market-making without an institutional intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met.  Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.     CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

22.     The Defendants are recipients of estate property that was transferred to or for their benefit during the course of the Executive Parties' management of Celsius' assets.

23.     In 2020, Executive represented himself as a pioneer and expert in coin staking and decentralized finance ("DeFi") investments in order to gain access to and control over the valuable coins of Celsius Network Limited ("CNL," and together with its successor Celsius Network LLC ("Celsius LLC") and Celsius KeyFi, "Celsius").  At one point, Executive oversaw and controlled more than one billion dollars' worth of CNL assets.  The Executive Parties transferred millions of dollars in coins and other property from Celsius "wallets"—blockchain addresses where coins and

other digital assets can be stored—to non-Celsius wallets, cryptocurrency exchange accounts or other destinations.

24.    In 2020, when CNL began to explore deploying CNL's coins in staking and DeFi strategies, based on, inter alia, Executive's representations, CNL engaged the Executive Parties to lead the effort.

25.    By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to acquire the assets of Vehicle and operate Celsius' staking and DeFi activities, with Executive as CEO of that subsidiary.  CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August.

26.    Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy CNL's coins on CNL's behalf while the parties sought to finalize the acquisition.

27.    CNL from time-to-time funded coins into certain wallets accessible to Executive. For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that the Executive Parties could deploy CNL's coins in DeFi and staking activities.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed.  Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

28.     On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("MOU") concerning deployment of CNL's coins and anticipating an asset purchase agreement by which CNL would acquire the Vehicle business (as later executed, the "APA").  The MOU also anticipated that CNL would incorporate a subsidiary that would receive all of Vehicle's intellectual property and employ Vehicle's employees.  The subsidiary anticipated by the MOU, Celsius KeyFi, LLC, was formed on or around October 5, 2020, and the APA ultimately closed several months later, around December 2020.  The MOU anticipated that Celsius KeyFi, referred to therein as NEWCO, would be authorized to deploy CNL coins in DeFi activities for the benefit of Celsius pursuant to a temporary "Service Agreement" according to certain service terms.

29.     On October 7, 2020, CNL and Vehicle entered into a service agreement (the "First Service Agreement") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services."  This First Service Agreement also incorporated the terms of the MOU by reference, including the service terms under which Vehicle could deploy CNL's coins.  The First Service Agreement expired on or around December 30, 2020.

30.     On or around December 31, 2020, CNL and Vehicle entered a new service agreement that superseded the First Service Agreement (the "Second Service Agreement").  The Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

31.     Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed the APA dated December 31, 2020.  Pursuant to the APA and Second Service Agreement, Executive was to continue deploying CNL's coins as CEO of Celsius KeyFi solely in authorized DeFi activities.

32.    As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control over both Vehicle and Celsius KeyFi and the Celsius Wallets.  Thus, at all times, Executive exercised significant control over the Celsius coins entrusted to his deployment.

## C. Executive Parties Open Binance Accounts in Foreign Citizens' Names to Circumvent U.S. Law

33.    From the outset of their affiliation with Celsius, Executive and Vehicle caused the transfer of substantial Celsius assets from Celsius wallets for unauthorized purposes.  To accomplish this misappropriation, Executive transferred large amounts of coins to his own wallets, Vehicle's wallets, and various third-party wallets, including those belonging to the Defendants. Executive did not move coins in a straightforward, linear fashion.  Instead, he moved coins among dozens of wallets with great frequency, as well as routed coins through accounts at more than a dozen different crypto exchanges and also through the now-banned "mixer" Tornado Cash. Certain of the crypto exchange accounts were in Executive's name, but many others were fraudulently opened in the names of third parties who sold their identifying information to the Executive Parties for purposes of evading the exchanges' "know your customer" money laundering requirements, including certain Defendants in this action.  Executive himself maintained control over at least some of these purported third-party accounts.

34.    For example, the Executive Parties used the name, passport, and other personal "Know-Your-Customer" information of Defendant Levan Mkheidze, a citizen of the nation of Georgia, to open a Binance account ("Binance 001") with the address 0x904912b9a2cf0185c06020fe90d51e08b2880d99.  However, upon information and belief, upon funding the Binance 001 account, the Executive Parties may have retained exclusive access to, and control of, the coins contained therein.  The Executive Parties transferred tens of millions of dollars' worth of Celsius assets from Celsius' 0xb1 wallet to the Binance 001 account.  Certain of

the Fraudulent Transfers identified herein were first transferred to the Binance 001 account and to

or for the benefit of the Executive Parties, and then transferred from the Binance 001 account to

certain Defendants and to or for the benefit of the Executive Parties, as described more specifically

herein.

35.     The Executive Parties similarly used the name, passport, and other personal

"Know-Your-Customer" information of Elene Ckheidze, a citizen of the nation of Georgia, to open

a Binance account to which they retained exclusive access and control.

**G.     Defendants Received Millions in Misappropriated Celsius Assets**

36.     Not long into his tenure at Celsius, and without any authorization, Executive began

to use Celsius assets to speculate wildly in the non-fungible tokens ("NFTs") market.  This case

arises out of that scheme.

37.      During and after Executive's tenure as CEO of Celsius KeyFi, the Executive

Parties wrongfully caused Celsius Wallets to transfer Celsius assets to wallets and cryptocurrency

exchange accounts owned or controlled by Defendants ("Defendant Wallets") and to or for the

benefit of the Executive Parties for the purpose of acquiring NFTs.

38.     The Fraudulent Transfers at issue in this litigation fall into the two general

categories set forth below, the third of which includes some transfers that are a subset of the

second.

39.     First, are transfers of coins from Celsius to Defendant Benartzi that passed through

one or more non-Celsius wallets (the "Celsius Indirect Transfers").  The Executive Parties caused

each of the Celsius Indirect Transfers, all of which were made for the Executive Parties' benefit.

The initial transfers of assets subject to the Celsius Indirect Transfers are the following:

a.   Levan Mkheidze's Binance 001 account (opened and at all times controlled by

the Executive Parties) received 8,000,000 MATIC, 50,000 LINK, 3,025,315.61

10

USDT, 2,239,909.04 USDT, 6,000 LINK, 219,823.44 MATIC, 575,000 ALPHA, 7,500,000 USDT, 6,500,000 USDT, 10 YFI, 10 YFI, 137,734 LINK, 10,000 BADGER, 50,000 USDC, 1,773,240.84 USDT, 29.97 BTC and 7,000,000 USDC from Celsius wallets between January 31, 2021 and April 21, 2021, as reflected in the following table.

| Transaction Hash | Date | Currency | Amount |
|---|---|---|---|
| e7d023a82dc45f8cbe2032e8a261aeaa37dd88cab840326c8d2be437333b7a64 | 1/31/2021 15:38 | BTC | 29.97 |
| 0xee00e12f8b0a3e31b2297a3081bd48f68dc44e585753ced040aaf7335d2ff136 | 3/17/2021 19:30 | MATIC | 8,000,000.00 |
| 0x7f8a4d0e8295c3ae4020d750db5ef26558dd5d04f20e3051a72708802acc9b43 | 3/23/2021 1 1:36 | LINK | 50,000 |
| 0x13f74a9e9c04bafabc039f148c25dc728b28bc1ac38104f53157396980db4942 | 4/6/2021 1:28 | USDT | 3,025,315.61 |
| 0x264c930559738df7bc94bc953f2627ee5c3fb6a1567e29d0c87ffd53dd3e4265 | 4/6/2021 15:54 | USDT | 2,239,909.04 |
| 0xfb27f950cd3726bc4e7604ce6febabb82b66921b8af70353bf83c92eca189105 | 4/7/2021 15:04 | LINK | 6,000.00 |
| 0xf3434d40fa2f9ca8e59dfdade9b405086ef5fa98544baa984c7fcc401424fd74 | 4/7/2021 15:08 | MATIC | 219,823.44 |
| 0x698ee7dcdb5c6e386931d5522a08d7537e0d7f7ce28794a8c048347783 13ca27 | 4/13/2021 15:04 | ALPHA | 575,000.00 |
| 0x5fd98736b650028e4c9883ca2442e5ac963077db5e620a46ccac4b5f1393a8c6 | 4/14/2021 21:12 | USDT | 7,500,000.00 |
| 0x89fde8cfa1f433c2cb1bbe34ea1d0c6d81622092b0a3f65c9600f6a643bbb181 | 4/14/2021 21:14 | USDT | 6,500,000.00 |
| 0x3ff0af7f533ce68b2a768b3205a10d96566f41ded6a9c340fb8468853d8af8f9 | 4/14/2021 21:30 | YFI | 10 |
| 0xb175b96d5b4a20939c297c4cfa2fa2f233bf349256df770c2ba6fd5d8bb04ce0 | 4/15/2021 8:26 | YFI | 10 |
| 0x624cd3c95522fbd9d8acb92026128a36f87afc816aa5671ebc7ee436f949a06e | 4/15/2021 8:28 | LINK | 137,734.00 |
| 0x43c1ce48fbf64887c0a44706cf65388899d6485a5b100951527f9b4a527be268 | 4/15/2021 19:58 | BADGER | 10,000.00 |
| 0x8264b7307f5f597341ae6ef195aa080c65e30a87fbf373c8428760dbb30f33bc | 4/19/2021 22:46 | USDC | 50,000 |
| 0x8b1929cfcd41a26bdcc0b9d2c908173b30fe7c2039e3c777f83d1a5779b3b31f | 4/20/2021 11:38 | USDT | 1,773,240.84 |
| 0x7a646921346d43705f5c1c4e01b4be6dda43ac95fb53e001e0dc738b466efc89 | 4/21/2021 12:44 | USDC | 7,000,000.00 |

40.     Thereafter, the Binance 001 wallet transferred 1,291,872.47 USDC, 6.11 BTC and 3.11 ETH in (3) transfers on or around May 20, 2021 to Elene Chkeidze's Binance account (opened and at all times controlled by the Executive Parties). Additionally, the Binance 001 wallet

transferred 69.99 ETH on or around May 19, 2021 to an address associated with the Executive Parties (0x40c839b831c90173dc7fbce49a25274a4688ddd9) which address in turn transferred 100 ETH, 23,797 OMG, and 505.1 ETH on or around October 14, 2021, November 12, 2021, and December 28, 2021, respectively, to Elene Chkeidze's Binance account (opened and at all times controlled by the Executive Parties).

41.    Thereafter, Elene Chkeidze's Binance account transferred 500 ETH on or about December 28, 2021 to a wallet owned and controlled by Guy Benartzi (0xb4AF0A1ba9E4a0f1457c3009a8F9345CD9EC407B) (the "Subject Property").

42.    The assets fraudulently transferred to Benartzi were used by Benartzi and the Executive Parties to mint a NFT referred to as the Mega Trippy Mutant #30005 NFT (the "Mega Trippy NFT").  On or around August 5, 2021, Executive Parties used 40 ETH traceable to Celsius that was misappropriated to Executive Parties' 0x50dd57f50a17d57304e7a4f262da30beb31c2e87 (see Exhibit 1 attached hereto) to purchase Bored Ape NFT #5235 (the "Bored Ape NFT"). Executive Parties subsequently caused the Bored Ape NFT to "drink" an "M3 Serum," and upon drinking the M3 Serum, the Bored Ape NFT turned into (or minted) an entirely new NFT—the Mega Trippy NFT.  The M3 Serum used to create the Mega Trippy NFT was acquired with 999 ETH from Benartzi's 0xb4af0a1ba9e4a0f1457c3009a8f9345cd9ec407b address, including the 500 ETH from the Fraudulent Transfers described above.  Upon information and belief, the Mega Trippy NFT was jointly owned by the Executive Parties and Benartzi until the NFT was sold to a third party in August 2022.

43.    Celsius did not receive any value in exchange for the Celsius property transfers used to acquire the Serum, the Bored Ape NFT, or the Mega Trippy NFT.

**H.    CNL, Celsius KeyFi, and the Executive Parties Were Each Insolvent at the Time of the Transfers to the Defendants**

44.    Each of CNL, Celsius KeyFi, Vehicle, and Executive were insolvent at the time of the transfers to the Defendants set forth above.

45.    CNL (along with its successor, Celsius LLC) was insolvent at the time of each transfer made to Defendants because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

46.    As the *Final Report of Shoba Pillay*, *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Aug. 23, 2022) [Docket No. 1956] (the "Examiner Report") stated: "Celsius's problems did not start in 2022. Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards. To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin. And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market. But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile customer assets and liabilities on a coin-by-coin basis. Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks)."

47.    Celsius' consolidated balance sheet as of September 30, 2020 showed negative equity of $306 million. On December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity of $1.47 billion, but $1.49 billion of the "assets" on Celsius' balance sheet consisted of CEL tokens. But CEL tokens were essentially worthless, including because they depended solely on CNL's market-making techniques and were completely correlated to the value of, and totally dependent on the continued operations of, Celsius—just as an airline rewards program is completely dependent on the underlying airline continuing to operate.

13

48.    Additionally, there was never a real market in which to deploy CEL.  Instead, CNL, as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying sprees of CEL tokens.  While this caused the value of CEL prices to appreciate at first, CNL eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL buybacks, and in 2020, CNL began using customer-deposited Bitcoin (BTC) and Ether (ETH) to fund its CEL purchases.

49.    When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased CNL's liabilities.

50.    Additionally, Celsius suffered other losses of over $800 million that further decreased the asset side of its balance sheet, including based on activities of the Executive Parties, keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound, collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin Trust.

51.    Celsius was also insolvent based on other mismatches between its liabilities and assets.  At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any moment if its customers started to withdraw their assets, which Celsius was relying on to fund its own CEL buybacks to artificially pump up its CEL assets.  Indeed, this scenario finally occurred in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

52.    Throughout the time period during which Executive effected the Fraudulent Transfers, Celsius KeyFi, Vehicle, and Executive were likewise insolvent due to—among other

things—staggering liabilities owed to CNL related to the loss, mismanagement, and theft of its coins.

53.    Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue.  While in theory, under the Service Agreement, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses.  What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or theft of hundreds of millions of dollars' worth of CNL's coins.  As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

54.    Executive and Vehicle were likewise insolvent due (at least) to the massive liabilities they owed to Celsius.  During the time during which Vehicle was temporarily authorized to deploy CNL's coins between on or around October 1, 2020 and December 31, 2020, it had no material assets.  By contrast, Vehicle accrued millions in liabilities to Celsius during that same time period related to the Executive Parties' misappropriation of Celsius' property, including certain of the Fraudulent Transfers at issue here, as well as their gross mismanagement of Celsius' property.  Upon information and belief, Vehicle's financial condition only deteriorated from there as it continued to incur massive liabilities related to the Executive Parties' theft and mismanagement of Celsius' assets with no corresponding increase in its assets.  So too for Executive, whose liability related to his misappropriation of tens of millions of dollars' worth of Celsius' coins and gross mismanagement undoubtedly dwarfed his assets at all relevant times.

**FIRST CAUSE OF ACTION**
**(Turnover Under Section 542 of the Bankruptcy Code)**

55.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

56.     At all times, Celsius had legal ownership and right to possession over the Subject Property and all of the proceeds, rents or profits thereof.

57.     Upon information and belief, Defendants Benartzi, Chkeidze, and Mkheidze had possession, custody or control of the Subject Property or its proceeds at the time Celsius filed its chapter 11 petition on July 13, 2022, and/or had possession, custody and control of the Subject Property or its proceeds during the pendency of Celsius' chapter 11 cases.

58.     The Subject Property or its proceeds is or was property that the trustee may use, sell, or lease under section 363 of the Bankruptcy Code.

59.     The Subject Property or its proceeds is not of inconsequential value or benefit to the Debtors' estates.

60.     Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to a judgment ordering the Defendants Benartzi, Chkeidze, and Mkheidze to turn over the Subject Property, and all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate.

**SECOND CAUSE OF ACTION**
**(11 U.S.C. § 542(e):  Turnover and Accounting of Documents)**

61.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

62.     Defendants Benartzi, Chkeidze, and Mkheidze are in possession of and hold recorded information including books, documents, records or papers relating to Celsius' property or financial affairs.  Among other things, Defendants Benartzi, Chkeidze, and Mkheidze are in the

possession of information concerning the amount and location of the Subject Property, including any wallet addresses containing Celsius property and proceeds thereof.

63.     Celsius is entitled to turnover from Defendants Benartzi, Chkeidze, and Mkheidze of such recorded information including books, documents, records and papers.

64.     Celsius is entitled to an award of damages, costs and attorneys' fees arising from a Defendant's refusal to immediately turnover such information.

## THIRD CAUSE OF ACTION
### (Fraudulent Transfer – Celsius Indirect Transfers)

65.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

66.     As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets to be made from wallets owned by Celsius through other wallets, persons or entities (including wallets owned or controlled by the Executive Parties, including the wallets under the names of Defendants Levan Mkheidze and Elene Chkeidze) en route to the Benartzi (i.e., the Celsius Indirect Transfers).

67.     The Executive Parties effected the Celsius Indirect Transfers through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

68.     Upon information and belief, the Executive Parties effected each of the Celsius Indirect Transfers with the intent to hinder, delay, or defraud the creditors of CNL and Celsius KeyFi.

69.     The fraudulent transfer scheme was designed in a manner to conceal many of the transfers and to mask the ultimate destination of much of the Subject Property.  The Executive Parties masked their actions through a complex web of transactions, including routing transactions through anonymous Binance accounts opened in the name of foreign nationals whose "Know-Your-Customer" information had been purchased by Executive and through the anonymity of the recipient wallets.

70.     Numerous other badges of fraud likewise marked the Executive Parties' actions: (1) CNL and Celsius KeyFi received no value for the transferred Subject Property; (2) the Executive Parties were closely associated with the Defendants; (3) the transfers were made while CNL and Celsius KeyFi were insolvent or else the transfers caused CNL or Celsius KeyFi to become insolvent; and (4) the transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of Celsius assets.

71.     The Celsius Indirect Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Indirect Transfers was made for less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL and Celsius KeyFi were insolvent, or else because each of CNL and Celsius KeyFi became insolvent as a result of such transfer.

72.     At the time of each of the Celsius Indirect Transfers, each of CNL and Celsius KeyFi was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

73.     At the time of each of the Celsius Indirect Transfers, each of CNL and Celsius KeyFi intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

74.    Celsius is therefore entitled to a judgment avoiding each of the initial transfers comprising the Celsius Indirect Transfers and recovering the fraudulently transferred assets or their value from Defendants Benartzi, Chkeidze, and Mkheidze.

### FOURTH CAUSE OF ACTION
**(Fraudulent Transfer – Executive Transfers)**

75.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

76.    As stated above, the Executive Parties repeatedly effected fraudulent transfers of property out of wallets over which they exercised control (including the wallets in the names of Defendants Levan Mkheidze and Elene Ckheidze), and transferred such property to Benartzi (, the "Executive Transfers").

77.    The Executive Transfers were made at a time when the Executive Parties had substantial and overwhelming liability to Celsius as a result of their poor investment strategies leading to massive investment losses and their active misappropriation of assets from Celsius, and were made long after Celsius had demanded the Executive parties return all such assets.  The Executive Parties had accrued tens of millions of dollars of liability to Celsius as a result of such mismanagement and misappropriation.  Thus, the Executive Transfers were made with the actual intent to hinder, delay or defraud Celsius – upon information and belief, the Executive Parties' single largest creditor, as it held substantial litigation claims against the Executive Parties.

78.    Numerous other badges of fraud mark the Executive Transfers:  (1) the transfers were made to Executive Parties' insiders and associates; (2) the Executive Parties received less than reasonably equivalent value (if any value at all) for the transferred Subject Property; (3) the Executive Parties and the Defendants were closely associated; (4) the transfers were made while the Executive Parties were insolvent or else the transfers caused the Executive Parties to become

insolvent; (5) the transfers were concealed from Celsius; (6) the transfers were made to remove or conceal the Executive Parties' assets and the Celsius assets that Executive purloined; (7) the transfers were made while the Executive Parties were aware of a significant risk of litigation with Celsius at the time of the transfers; and (8) the transfers were made at a time when the Executive Parties faced substantial financial liabilities to Celsius.

79.     The Executive Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Executive Transfers was made for less than reasonably equivalent value (or, more often, for no value) at a time when the Executive Parties were insolvent.

80.     At the time of each of the Executive Transfers, the Executive Parties were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Executive Parties was unreasonably small capital.

81.     At the time of each of the Executive Transfers, the Executive Parties intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

82.     Celsius is therefore entitled to a judgment avoiding the Executive Transfers and recovering the fraudulently transferred assets or their value from Defendants Benartzi, Chkeidze, and Mkheidze.

### FIFTH CAUSE OF ACTION
**(Unjust Enrichment)**

83.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

84.     Defendant Benartzi did not have a contract with Celsius.

85.     Defendant Benartzi was enriched by receiving the Subject Property.

86.    Defendant Benartzi's enrichment was gained at Celsius' expense.

87.    This enrichment was unjust because Defendant Benartzi provided nothing of value to Celsius, and his enrichment has come at the expense of Celsius' legitimate creditors and customers.

88.    It would be inequitable for Defendant Benartzi to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

89.    Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for Benartzi's unjust enrichment.

90.    Plaintiff is entitled to a money judgment in the amount of value by which Benartzi was unjustly enriched in an amount to be proved at trial.

91.    Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

92.    Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

93.    Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

## <u>SIXTH CAUSE OF ACTION</u>
### (Accounting)

94.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

95.    The transfer of assets from Celsius and into the hands of Defendants is of a complicated character.  The assets at issues were transferred through many wallets and cryptocurrency exchanges.

96.     Celsius has only limited visibility into these transfers given the often opaque and anonymous nature of the crypto industry.  And Celsius has no visibility into any further use or proceeds of the assets transferred to Defendants following their transfer.

97.     Celsius requires an accounting to enable it to properly trace its property into the hands of Defendants, and perhaps others, as well as to support the claims and causes of action asserted herein and enable a complete recovery to Celsius.

98.     Absent enforcement of this accounting right, the Plaintiff has no adequate remedy at law.

99.     Accordingly, the Defendants Benartzi, Chkeidze, and Mkheidze are obligated to provide a complete accounting of all assets they have received directly or indirectly from Celsius, including any interest earned or accrued thereupon, the proceeds of any and all such transfers, any assets purchased by profits they received, the locations of the various assets, and all activities in which the Defendants Benartzi, Chkeidze, and Mkheidze engaged in connection with their possession, custody, and control of the Subject Property.

### SEVENTH CAUSE OF ACTION
**(Racketeer Influenced and Corrupt Organizations ("RICO") Act Violations)**

100.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

101.     Defendants Benartzi, Chkeidze, and Mkheidze are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

102.     Defendants Benartzi, Chkeidze, and Mkheidze each violated 18 U.S.C. § 1962(c) by their respective acts described in this Complaint.

103.    Defendants Benartzi, Chkeidze, and Mkheidze each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged herein.

104.    Defendants Benartzi, Chkeidze, and Mkheidze each committed at least two predicate acts of racketeering as alleged herein.

105.    The acts of racketeering were not isolated but were related in that they had the same or similar purpose and result, participants, victims, or method of commission.  Further, the acts of racketeering have been continuous spanning from at least 2020–2023.

### The RICO Enterprise

106.    There existed one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "RICO Enterprise") that was or is engaged in, and its activities affected, interstate or foreign commerce.

107.    Vehicle is an "enterprise" within the meaning of 18 U.S.C. § 1961(4)

108.    Alternatively, Defendants Benartzi, Chkeidze, and Mkheidze and their known and unknown agents and co-conspirators, including the Executive Parties, are an association in fact such that they are an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

109.    The enterprise had a common and continuing purpose of formulating and implementing a common scheme to defraud Celsius and its creditors through a pattern of theft, unlawful turnover, and fraudulent transfers aimed at defrauding Celsius and its creditors through this pattern of activities.  This common purpose came into existence no later than 2020 when Executive represented to Alex Mashinsky that he wanted to deploy and invest assets of the Debtors.

110.    The repeated and continuous violations of federal law alleged in this Complaint constitute a pattern of racketeering activity in violation of RICO, 18 U.S.C § 1961, *et seq*.

### The Pattern of Racketeering Activity

111.    Defendants Benartzi, Chkeidze, and Mkheidze conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetuated for the same or similar purposes by the same persons (the "RICO Pattern").

112.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

113.    Defendants Benartzi, Chkeidze, and Mkheidze voluntarily and intentionally devised and participated in one or more criminal schemes to perpetuate unlawful transfers of Celsius' assets during the relevant period, including without limitation, the Fraudulent Transfers.

114.    In furtherance of the scheme, the Executive Parties and Defendants Benartzi, Chkeidze, and Mkheidze willfully and knowingly transmitted or caused to be transmitted by means of causing matters and things to be sent or delivered by (1) a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

115.    The use of interstate or international mail or wires to perpetuate these transfers and to connect this racketeering conspiracy was foreseeable.

116.    Accordingly, the Defendants Benartzi, Chkeidze, and Mkheidze committed numerous violations of mail or wire fraud in violation of 18 U.S.C. §§ 1341 & 1343.

117.    Defendants' violations of 18 U.S.C. §§ 1341 & 1343 directly and proximately caused injury to Celsius by unjustifiably and irrevocably depleting their assets or their value in the amount of such transfers.

**Continuity of Conduct**

118.    Defendants Benartzi, Chkeidze, and Mkheidze's violations of law as set forth herein, each of which directly and proximately injured Celsius, constituted a continuous course of conduct in the United States beginning in no later than 2020 and continuing at least through 2023, which was intended to obtain economic gain through fraud, deceit and other improper and unlawful means.  Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) & (5).

**The RICO Pattern Caused Injury to Celsius**

119.    Celsius has been injured in their business or property as a direct and proximate result of the Defendants Benartzi, Chkeidze, and Mkheidze's above-described violations of 18 U.S.C. § 1962(c) including any injury by reason of the predicate acts constituting the RICO Pattern.

120.    Defendants Benartzi, Chkeidze, and Mkheidze's violations of law in furtherance of their scheme to use the Debtors' assets through a series of unlawful transfers resulted in Celsius' assets being unjustifiably and irrevocably depleted in the amount of the value of the assets.

**Plaintiff Is Entitled to Treble Damages**

121.    As a result of the Defendants Benartzi, Chkeidze, and Mkheidze's violations of 18 U.S.C. § 1962(c), Celsius has suffered substantial damages in an amount to be proved at trial.

122.    Plaintiff has standing to bring all claims alleged in this Complaint.

123.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to judgment and to recover treble its general and special damages plus interests, costs and attorneys' fees caused by reason of Defendants Benartzi, Chkeidze, and Mkheidze's violations of 18 U.S.C. § 1962(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)      Judgment in favor of Plaintiff and against Defendants Benartzi, Chkeidze, and Mkheidze on all causes of action;

(b)      Directing Defendants Benartzi, Chkeidze, and Mkheidze to turn over the Subject Property and any and all proceeds thereof to Celsius, together with any other Subject Property and any and all proceeds thereof that may come into Defendants Benartzi, Chkeidze, and Mkheidze's possession, custody or control in the future;

(c)      Avoiding the Celsius Indirect and Executive Transfers and awarding recovery of the avoided property or its money equivalent against Defendants Benartzi, Chkeidze, and Mkheidze;

(d)      Imposing a constructive trust upon all Subject Property or its proceeds in favor of Plaintiff to remedy Defendants Benartzi, Chkeidze, and Mkheidze's otherwise wrongful conduct, resulting in their unjust enrichment;

(e)      Requiring Defendants Benartzi, Chkeidze, and Mkheidze to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(f)      Requiring Defendants Benartzi, Chkeidze, and Mkheidze to provide an accounting of the Subject Property and any and all proceeds and profits thereof in their control;

(g)      Requiring Defendants Benartzi, Chkeidze, and Mkheidze to turn over any recorded information, including books, documents, records, and papers, relating to the Subject Property;

(h)      Awarding Plaintiff actual damages in an amount to be determined at trial;

(i)      Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law; and

(j)      Awarding such other and further relief as this Court deems just and proper.

Dated:      July 12, 2024
            New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By:   */s/ Mitchell P. Hurley*
      Mitchell P. Hurley
      Dean L. Chapman Jr.
      One Bryant Park
      New York, New York 10036
      Telephone: (212) 872-1000
      Facsimile: (212) 872-1002
      mhurley@akingump.com
      dchapman@akingump.com

      Elizabeth D. Scott (admitted *pro hac vice*)
      Nicholas R. Lombardi (admitted *pro hac vice*)
      2300 N. Field Street, Suite 1800
      Dallas, TX 75201
      Telephone: (214) 969-2800
      Facsimile: (214) 969-4343
      edscott@akingump.com
      nlombardi@akingump.com

      *Counsel for Plaintiff*