Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Reorganized Debtors. | Jointly Administered |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

| | |
|---|---|
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS, | Adversary Proceeding Case No. _____ (MG) |
| Plaintiff, | **ADVERSARY COMPLAINT** |
| v. | |
| WALLET OWNER 0X10F546A6F4D20D91E5A8506124384759C9F4BC79; WALLET OWNER 0XD387A6E4E84A6C86BD90C158C6028A58CC8AC459; WALLET OWNER 0X2C36D622F710D60C2D0B44DA56E88141969E2D58; WALLET OWNER 0X52FD8267BCAEAEEA684879CECFB7B0118A575788; WALLET OWNER 0X8B13C6C3CAEB4F7C467B8DA8F871C2D62CBDFC06; WALLET OWNER 0X9E8B401A1173539A92E640629C0E004A9803DFB1; WALLET OWNER 0XC0D64AE6E18826F14E7B9058EB68FA6ACFD454FF; WALLET OWNER 0X6A80D451135720C51AF81ECB4334A1A94B3A6055; WALLET OWNER 0XD8595AC2836B7A8040F046E751B42088436B6365; WALLET OWNER 0xf22f00d0b95b1b728078066e5f4410f6b2be8fae; WALLET OWNER 0XBD4CE8C1100E4644A3F9B93B3CB3BE926AEE7BBD; WALLET OWNER 0X7FBC25EEDFD1D7F9CE1EC1DB951D22F0A8B0691A; WALLET OWNER 0XF9172446F3B6F0D027EF8F0A7FAFA117FF5439C2; WALLET OWNER 0XE83C750B2708320BB134796C555B80DF39A3D97B; | |

WALLET OWNER
0X29B1B2D083456FD07B19649F8B85F9927A29B1A
B;
WALLET OWNER
0XC352B534E8B987E036A93539FD6897F53488E56A;
WALLET OWNER
0X055F86A0AAF702D7324076AE9C5B9AA203204CC
D; KEYFI INC.; AND JASON STONE,

Defendants.

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("Plaintiff" or "Litigation Administrator"), in connection with the bankruptcy cases of Celsius Network LLC and its Debtor Affiliates ("Debtors" or "Celsius") by and through undersigned counsel, brings this action against Defendants and alleges as follows:

## NATURE OF THE ACTION

1.      This action relates to Celsius property that Defendant Jason Stone, the former CEO of Celsius KeyFi LLC ("Executive"), and his majority owned vehicle, Defendant KeyFi Inc. ("Vehicle," and together with Executive, the "Executive Parties"), wrongfully caused Celsius to transfer from Celsius wallets to Defendants and to or for their own benefit.  This action seeks to avoid fraudulent transfers, and to recover valuable estate property from the Defendants (other than the Executive Parties), as well as to impose constructive trusts, and to require that such Defendants account for, and turn over that property which was taken from Celsius (and ultimately from the whole Celsius community) (the "Subject Property").

## PARTIES

2.      The Litigation Administrator brings this action pursuant to the Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates (the "Confirmation Order") [Docket No. 3972], the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction) [Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the Eleventh Notice of Filing of Plan Supplement [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code. Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate,

4

prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates").

3.      Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

4.      Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

5.      Celsius KeyFi is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

6.      Defendant Executive is a resident of New York.  Executive was the founder and principal of Vehicle, as well as CEO and chief fiduciary of Celsius KeyFi and directed the transfers of the assets at issue in this litigation.

7.      Defendant Vehicle is a Delaware corporation that, upon information and belief, has a principal place of business located at 99 John St., #1405, New York, NY 10038.   Executive is the largest shareholder of Defendant Vehicle.

8.      Defendant Wallet Owner 0x10f546a6f4d20d91e5a8506124384759c9f4bc79 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x10f546a6f4d20d91e5a8506124384759c9f4bc79 ("0x10f54").

9.      Defendant Wallet Owner 0xd387a6e4e84a6c86bd90c158c6028a58cc8ac459 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xd387a6e4e84a6c86bd90c158c6028a58cc8ac459 ("0xd387a").

10.     Defendant Wallet Owner 0x2c36d622f710d60c2d0b44da56e88141969e2d58 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x2c36d622f710d60c2d0b44da56e88141969e2d58 ("0x2c36d").

11.     Defendant Wallet Owner 0x52fd8267bcaeaeea684879cecfb7b0118a575788 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x52fd8267bcaeaeea684879cecfb7b0118a575788 ("0x52fd82").

12.     Defendant Wallet Owner 0x8b13c6c3caeb4f7c467b8da8f871c2d62cbdfc06 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x8b13c6c3caeb4f7c467b8da8f871c2d62cbdfc06 ("0x8b13c").

13.     Defendant Wallet Owner 0x9e8b401a1173539a92e640629c0e004a9803dfb1 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x9e8b401a1173539a92e640629c0e004a9803dfb1 ("0x9e8b4").

14.     Defendant Wallet Owner 0xc0d64ae6e18826f14e7b9058eb68fa6acfd454ff is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xc0d64ae6e18826f14e7b9058eb68fa6acfd454ff ("0xc0d64a").

15.     Defendant Wallet Owner 0x6a80D451135720C51aF81EcB4334a1a94B3A6055 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x6a80D451135720C51aF81EcB4334a1a94B3A6055 ("0x6a80D").

16.     Defendant Wallet Owner 0xd8595ac2836b7a8040f046e751b42088436b6365 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xd8595ac2836b7a8040f046e751b42088436b6365 ("0xd8595").

17.     Defendant Wallet Owner 0xf22f00d0b95b1b728078066e5f4410f6b2be8fae is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xf22f00d0b95b1b728078066e5f4410f6b2be8fae ("0xf22f0").

18.     Defendant Wallet Owner 0xbd4ce8c1100e4644a3f9b93b3cb3be926aee7bbd is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xbd4ce8c1100e4644a3f9b93b3cb3be926aee7bbd ("0xbd4ce").

19.     Defendant Wallet Owner 0x7fbc25eedfd1d7f9ce1ec1db951d22f0a8b0691a is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x7fbc25eedfd1d7f9ce1ec1db951d22f0a8b0691a ("0x7fbc2").

20.     Defendant Wallet Owner 0xf9172446f3b6f0d027ef8f0a7fafa117ff5439c2 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xf9172446f3b6f0d027ef8f0a7fafa117ff5439c2 ("0xf9172").

21.     Defendant Wallet Owner 0xE83C750b2708320bb134796c555b80DF39A3D97B is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xE83C750b2708320bb134796c555b80DF39A3D97B ("0xE83C7").

22.     Defendant Wallet Owner 0x29B1B2d083456FD07b19649F8B85f9927A29B1Ab is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x29B1B2d083456FD07b19649F8B85f9927A29B1Ab ("0x29B1B").

23.     Defendant Wallet Owner 0xC352B534e8b987e036A93539Fd6897F53488e56a is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xC352B534e8b987e036A93539Fd6897F53488e56a ("0xC352B").

24.     Defendant Wallet Owner 0x055f86a0AAF702D7324076Ae9C5b9AA203204ccD is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or  otherwise controls the wallet with address 0x055f86a0AAF702D7324076Ae9C5b9AA203204ccD ("0x055f8").

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157.  Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan.

26.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (H); and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

27.     Certain Defendants named in this Complaint are domiciled in the United States or are entities organized with their principal place of business or place of organization or

administration in the United States and, thus, are subject to the general personal jurisdiction of the Court. This category includes but is not necessarily limited to the Executive Parties.

28.     Certain Defendants may reside primarily abroad or be organized abroad. Those Defendants also are subject to this Court's jurisdiction, as each of the Defendants has, on information and belief, purposefully availed himself, herself or itself of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

29.     In particular, each of the Defendants has transacted business within the United States from which the claims alleged arise, including by receiving one or more of the fraudulent transfers at issue (collectively, the "Fraudulent Transfers"), or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the Fraudulent Transfers at issue.

30.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## BACKGROUND

### A.     CNL's Business, Staking, and DeFi

31.     CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

32.     CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using

those transferred assets as collateral.  The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

33.    The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth.  Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

34.    Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another or otherwise speculating in cryptocurrency assets.  The principal staked coins are not exchanged for other forms of currency. While the staked coins may, in some cases, be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

35.    DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending, and market-making without an institutional intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met.  Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.**     **CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

36.     The Defendants are recipients of estate property that was transferred to or for their benefit during the course of the Executive Parties' mismanagement and misappropriation of Celsius' assets.

37.     In 2020, Executive represented himself as a pioneer and expert in coin staking and de-centralized finance ("DeFi") investments in order to gain access to and control over the valuable coins of CNL.  Based on Executive's representations, he was engaged to lead Celsius' DeFi efforts.

38.     By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to operate Celsius' staking and DeFi activities, with Executive as CEO of that subsidiary.  CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August.

39.     Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy Celsius' coins on CNL's behalf while the parties sought to finalize the acquisition.

40.     CNL from time-to-time funded Celsius' coins into certain wallets accessible to Executive.  For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that the Executive Parties could deploy CNL's coins in DeFi and staking activities.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed.  Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

11

41.     On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("MOU") concerning deployment of CNL's coins and anticipating an asset purchase agreement by which CNL would acquire the Vehicle business (as later executed, the "APA").  The MOU also anticipated that CNL would incorporate a subsidiary that would receive all of Vehicle's intellectual property and employ Vehicle's employees.  The subsidiary anticipated by the MOU, Celsius KeyFi, LLC, was formed on or around October 5, 2020, and the APA ultimately closed several months later, around December 2020.  The MOU anticipated that Celsius KeyFi, referred to therein as NEWCO, would be authorized to deploy CNL coins in DeFi activities for the benefit of Celsius pursuant to a temporary "Service Agreement" according to certain service terms.

42.     On October 7, 2020, CNL and KeyFi entered into a service agreement (the "First Service Agreement") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services."  This First Service Agreement also incorporated the terms of the MOU by reference, including the service terms under which Vehicle could deploy CNL's coins.  The First Service Agreement expired on or around December 30, 2020.

43.     On or around December 31, 2020, CNL and Vehicle entered a new service agreement that superseded the First Service Agreement (the "Second Service Agreement").  The Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

44.     Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed the APA dated December 31, 2020.  Pursuant to the APA and Second Service Agreement, Executive was to continue deploying CNL's coins as CEO of Celsius KeyFi solely in authorized DeFi activities.

45.    As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control over both Vehicle and Celsius KeyFi and the Celsius Wallets.  Thus, at all times, Executive exercised significant control over the Celsius coins entrusted to his deployment.

**C.    CNL Demands Return of Its Coins, But Executive Parties Leave a Substantial Gap**

46.    It did not take long before CNL lost confidence in Executive's leadership and decision-making as CEO of Celsius KeyFi and demanded the return of all of Celsius' coins. During the fall of 2020, Executive and Celsius personnel, including Alex Mashinsky, held meetings on an approximately weekly basis to discuss Executive's deployment of CNL's coins. At these meetings Executive repeatedly and consistently stated that the Executive Parties' deployments of CNL's coins for staking and DeFi activities were profitable.

47.    Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Executive Parties' activities with Celsius assets without their complete and accurate cooperation. The Executive Parties claimed that they were working on a "wormhole" program that would allow Celsius to have visibility into their trading activities, including the purported profits thereof, but the Executive Parties consistently failed to deliver that program or any other reporting system to enable Celius to track and understand the Executive Parties' deployment of Celsius assets.

48.    In addition, the Executive Parties' deployments of Celsius ETH were liquidated on two separate occasions in November 2020 and February 2021.  These "liquidation events" both occurred at Compound Finance and resulted in the total loss of 18,836 ETH (around 29.5 million USD).

49.    In early 2021, troubled by the Executive Parties' reporting failures, the liquidation events, and other issues, Celsius instructed the Executive Parties to return the coins Celsius had

made available for deployment, including to ensure the coins were accounted for and subject to improved security measures.

50.    The Executive Parties agreed, and Executive and his affiliates prepared a written plan for unwinding positions the Executive Parties had taken and swiftly returning Celsius' coins.

51.    But the Executive Parties did not execute on the plan, and by March 24, 2021, the Executive Parties had not returned the coins in their control as they had promised.

52.    Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal, written board resolutions commanding Executive, as CEO of Celsius KeyFi, to return all of CNL's coins to the 0xb1 wallet.  The board resolutions were unequivocal in directing Executive:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along with all un-deployed Crypto Assets, in each case together with all interest thereon, to the [0xb1 wallet and] . . . to provide the seed and password for the [0xb1 wallet to Celsius and] . . . disclose . . . all codes, keys and other information concerning access and control of any wallet in which Crypto Assets belonging to Celsius are, have been, or may be held, or that were opened or used for the purpose of or in connection with any Company affairs, including without limitation, holding or deploying any Crypto Assets.

53.    The board provided a copy of the resolutions and a direction letter to the Executive Parties on March 26, 2021.

54.    The Executive Parties caused these wrongful transfers through their control of Celsius wallets, and with the intent (which is imputed to Celsius) to hinder, delay or defraud the legitimate creditors of Celsius, which was insolvent at the time of the transfers and received no consideration in exchange for the purloined assets.

55.    Celsius succeeded in recovering the majority of its coins from the Executive Parties voluntarily, over a period of weeks, but a substantial gap remained.

56.    On August 23, 2022, Celsius commenced an adversary proceeding against the Executive Parties with respect to their wrongful conduct.  Complaint, *Celsius Network Ltd. v.*

*Stone,* ECF #1 (S.D.N.Y. Bankr. Filed Aug. 23, 2022). At the outset of the case, following a two-day trial, the Court found that Celsius had "shown a substantial likelihood of prevailing on the merits and [was] entitled to a temporary restraining order restraining the defendants from transferring any other assets away." The Court issued a Temporary Restraining Order accordingly, which was kept in place throughout the remainder of the case. Celsius' action against the Executive Parties resulted in a settlement on June 28, 2024, by which the Executive Parties agreed to return substantial assets to Celsius (the "Executive Settlement Agreement").

**D.    Executive Parties Misappropriated Thousands of CNL's Coins**

57.    Celsius ultimately determined that the Executive Parties returned far fewer coins than had been provided, including approximately 89,275 fewer ETH. In some cases, the Executive Parties did not return coins because they had simply lost those coins in poor investments. In others, the Executive Parties misappropriated assets, keeping many for themselves and sending others to third parties, including the Defendants.

58.    As to the investment losses, the Executive Parties turned out to be inept at the investment strategies they were undertaking. For example, Executive apparently placed a significant sum of Celsius ETH deposits into DeFi investments like automatic market makers ("AMMs") that are likely to return a mix of coins different than the mix deposited. For instance, if the price of ETH increases during the deployment, the AMM smart contract likely will return to the investor fewer ETH than the investor deployed. The Executive Parties promised Celsius that they would hedge against such risks and that their deployments would be "delta-neutral." Apparently, however, Executive and Vehicle failed to hedge against these and other risks created by their deployments, which were dramatic during the relevant period on account of substantial swings in coin prices and the tremendous increase in the value of ETH. The Executive Parties' improvidence resulted in a loss of tens of thousands of Celsius ETH. These losses are known as

"impermanent loss." This impermanent loss was in addition to the tens of thousands of ETH lost by the Executive Parties in the liquidation events described *supra*.

59.    As to the misappropriation, it is clear that Executive and Vehicle also caused the transfer of substantial Celsius assets from Celsius wallets for unauthorized purposes, which were made directly or indirectly to the Defendants, and to or for the benefit of the Executive Parties. Celsius received no value for any of the Fraudulent Transfers.

60.    As Executive began failing at the investment strategies for which he had been authorized, not long into his tenure at Celsius, he began to speculate wildly in the non-fungible tokens ("NFTs") market. At the time, the third-party blockchain application Celsius used to view Celsius Wallets was able to show only fungible coins native to the relevant blockchain (e.g., BTC and ETH) and so-called ERC-20, fungible tokens issued on the Ethereum blockchain, and not NFTs. Aware that transfers of NFTs in and out of the Celsius Wallets would not be visible to Celsius through the operative dashboards, and despite his agreement to engage only in staking and DeFi investments, Executive began to buy hundreds of NFTs with Celsius' coins, which he later secreted to Executive Parties' wallets or to certain of the Defendants.

**G.    Defendants Received Millions in Misappropriated Celsius Assets in Exchange for Celsius Receiving NFTs Worth Less Than the Reasonably Equivalent Value Transferred**

61.    During and after Executive's tenure as CEO of Celsius KeyFi, the Executive Parties wrongfully caused Celsius Wallets to transfer Celsius assets to wallets and cryptocurrency exchange accounts owned or controlled by the Defendants ("Defendant Wallets") and to or for the benefit of the Executive Parties.

62.    Relevant here are transfers caused by the Executive Parties of coins directly from Celsius to certain Defendants and to or for the benefit of the Executive Parties (the "Celsius Direct Transfers"), which were transfers made for the purchase of NFTs – purchases that the Executive

Parties were not authorized to make, and that the Executive Parties in fact made for their own benefit.  The Celsius Direct Transfers include the following Fraudulent Transfers:

a.  On February 6, 2021, 333.66 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x10f54 and to or for the benefit of the Executive Parties in connection with their acquisition of (3) Beeples NFTs with the NFT IDs 100010006, 100020002 and 100030005;

b.  On February 19, 2021, 180 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xd387a and to or for the benefit of the Executive Parties in connection with their acquisition of (3) Beeples NFTs with the NFT IDs 100010013, 100020022 and 100030029;

c.  On February 16, 2021, 125 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x2c36d and to or for the benefit of the Executive Parties in connection with their acquisition of (3) Beeples NFTs with the NFT IDs 100010091, 100020083 and100030179;

d.  On February 17, 2021, 100 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x52fd82 and to or for the benefit of the Executive Parties in connection with their acquisition of (2) Beeples NFTs with the NFT IDs 100010044 and 100030018;

e.  On February 6, 2021, 88.8 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x8b13c and to or for the benefit of the Executive Parties in connection with their acquisition of one ERC-1155 token with the NFT ID 101;

f.   On February 11, 2021, 66 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x9e8b4 and to or for the benefit of the Executive Parties in connection with their acquisition of (2) Beeples NFTs with the NFT IDs 100020004 and 100020007;

g.   On February 1, 2011, 88 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xc0d64a and to or for the benefit of the Executive Parties in connection with their acquisition of (2) Hashmasks NFTs with the NFT IDs 1240 and 1241;

h.   On March 18, 2021, 50 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x6a80D and to or for the benefit of the Executive Parties in connection with their acquisition of one Ether Cards Founder NFT with the NFT ID 96;

i.   On February 19, 2021, 43.875 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xd8595 and to or for the benefit of the Executive Parties in connection with their acquisition of one BullrunBabes NFT with the NFT ID 3068;

j.   On February 18, 2021, 39 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x9e8b4 and to or for the benefit of the Executive Parties in connection with their acquisition of one Beeples NFT with the NFT ID 100020044;

k.   On February 19, 2021, 39 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xd8595 and to or for the benefit of

the Executive Parties in connection with their acquisition of one BullrunBabes NFT with the NFT ID 3395;

l.   On February 19, 2021, 40 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xf22f0 and to or for the benefit of the Executive Parties in connection with their acquisition of one Beeples NFT with the NFT ID 100010258;

m.   On February 17, 2021, 43.05 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x9e8b4 and to or for the benefit of the Executive Parties in connection with their acquisition of one Beeples NFT with the NFT ID 100020061;

n.   On February 19, 2021, 32.49675 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xbd4ce and to or for the benefit of the Executive Parties in connection with their acquisition of one Love Strike NFT with the NFT ID 131930;

o.   On February 8, 2021, 33.33 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x7fbc2 and to or for the benefit of the Executive Parties in connection with their acquisition of (3) Beeples NFTs with the NFT IDs 100010106, 100020095, 100030169;

p.   On February 11, 2021, 30 WETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xf9172 and to or for the benefit of the Executive Parties in connection with their acquisition of one Rarible NFT with the NFT ID 124196;

q.  On February 11, 2021, (3) transfers of 130 ETH (for a total of 390 ETH) belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xE83C7 and to or for the benefit of the Executive Parties in connection with their acquisition of (3) CryptoPunks NFTs with the NFT IDs 3489, 6784 and 8472;

r.  On February 22, 2021, 55 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x29B1B and to or for the benefit of the Executive Parties in connection with their acquisition of one CryptoPunks NFT with the NFT ID 9934;

s.  On February 21, 2021, 45 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0xC352B and to or for the benefit of the Executive Parties in connection with their acquisition of one CryptoPunks NFT with the NFT ID 4347; and

t.  On March 12, 2021, 199.9 ETH belonging to Celsius were transferred from Celsius Wallets to Defendant Wallet Owner 0x055f8 and to or for the benefit of the Executive Parties in connection with their acquisition of one Beeples NFT with NFT ID 100010009.

63.  Celsius did not receive reasonably equivalent value in exchange for the Celsius Direct Transfers.

64.  For each of the Celsius Direct Transfers, the Celsius wallet from which assets were used to acquire the NFTs received NFTs valued at nothing or far less than the reasonably equivalent value of the assets transferred from Celsius Wallets to Defendants.  The Executive Parties consistently paid far more than these NFTs could ever have been worth based on an entirely unjustified and unsupportable view that they would appreciate in the future.  The Executive

Parties' valuation of the NFTs were largely not based on historical precedent (especially since NFTs were new and presented a nascent market), but instead the Executive Parties' subjective enthusiasm for NFTs.  In fact, many of the NFTs are worthless.  As such, the Defendants were unjustly enriched due to the Executive Parties causing Celsius to grossly overpay for the NFTs purchased from Defendants.

65.     At all times, the Executive Parties used *Celsius* assets to acquire the NFTs for their *personal* ownership, based on their totally unsupported and false belief that they had been "authorized" to acquire the NFTs as an "advance" on a non-existent profit share that they were supposedly owed.  Indeed, they subsequently moved *all* of the NFTs into their own wallets.  As such, the transfers were to or for the benefit of the Executive Parties, not Celsius.

### H.     CNL, Celsius KeyFi, and the Executive Parties Were Each Insolvent at the Time of the Transfers to the Defendants

66.     Each of CNL, Celsius KeyFi, Vehicle, and Executive were insolvent at the time of the transfers to the Defendants set forth above.

67.     CNL (along with its successor, Celsius LLC) was insolvent at the time of each transfer made to Defendants because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

68.     As the *Final Report of Shoba Pillay*, *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Aug. 23, 2022) [ECF No. 1956] (the "Examiner Report") stated, "Celsius's problems did not start in 2022. Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards.  To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin.  And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market.  But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile

customer assets and liabilities on a coin-by-coin basis.   Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks)."

69.    Celsius' consolidated balance sheet as of September 30, 2020, showed negative equity of $306 million.  On December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity of $1.47 billion, but $1.49 billion of the "assets" on Celsius' balance sheet consisted of CEL tokens.  But CEL tokens were essentially worthless, including because they depended solely on CNL's market-making techniques and were completely correlated to the value of, and totally dependent on the continued operations of, Celsius—just as an airline rewards program is completely dependent on the underlying airline continuing to operate.

70.    Additionally, there was never a real market in which to deploy CEL.  Instead, CNL, as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying sprees of CEL tokens.  While this caused the value of CEL prices to appreciate at first, CNL eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL buybacks, and in 2020, CNL began using customer-deposited Bitcoin (BTC) and Ether (ETH) to fund its CEL purchases.

71.    When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased CNL's liabilities.

72.    Additionally, Celsius suffered other losses of over $800 million that further decreased the asset side of its balance sheet, including based on activities of the Executive Parties, keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound,

collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin Trust.

73.    Celsius was also insolvent based on other mismatches between its liabilities and assets.  At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any moment if its customers started to withdraw their assets, which Celsius was relying on to fund its own CEL buybacks to artificially pump up its CEL assets.  Indeed, this scenario finally occurred in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

74.    Throughout the time period during which Executive effected the Fraudulent Transfers, Celsius KeyFi, Vehicle, and Executive were likewise insolvent due to—among other things—staggering liabilities owed to CNL related to the loss, mismanagement, and theft of its coins.

75.    Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue.  While in theory, under the Service Agreement, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses.  What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or theft of hundreds of millions of dollars' worth of CNL's coins.  As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

76.    Executive and Vehicle were likewise insolvent due (at least) to the massive liabilities they owed to Celsius.  During the time during which Vehicle was temporarily authorized to deploy CNL's coins —between on or around October 1, 2020, and December 31, 2020, it had

no material assets. By contrast, Vehicle accrued millions in liabilities to Celsius during that same time period related to the Executive Parties' misappropriation of Celsius' property, including certain of the Fraudulent Transfers at issue here, as well as their gross mismanagement of Celsius' property. Upon information and belief, Vehicle's financial condition only deteriorated from there as it continued to incur massive liabilities related to the Executive Parties' unauthorized use and transfers and mismanagement of Celsius' assets with no corresponding increase in its assets. So too for Executive, whose liability related to his misappropriation of tens of millions of dollars' worth of Celsius' coins and gross mismanagement undoubtedly dwarfed his assets at all relevant times.

**FIRST CAUSE OF ACTION**
**(Fraudulent Transfer – Celsius Direct Transfers)**

77.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

78.    As stated above, the Executive Parties caused certain fraudulent transfers of Celsius' assets from wallets owned by Celsius directly into wallets over which the Defendants had possession, custody or control (i.e., the Celsius Direct Transfers) and for the benefit of the Executive Parties.

79.    The Executive Parties caused the Celsius Direct Transfers through their dominion and control over the Celsius Wallets and the valuable Celsius assets in those wallets by virtue of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

80.    Upon information and belief, the Executive Parties caused each of the Celsius Direct Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi, and Vehicle.

81.    The Celsius Direct Transfers are marked by numerous badges of fraud:  (1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the transferred Subject Property; (2) upon information and belief, the Executive Parties were closely associated with the Defendants in the relatively close-knit NFT community; (3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; and (4) the transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of Celsius assets.

82.    The Celsius Direct Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Direct Transfers was made for less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL, Celsius KeyFi, and Vehicle were insolvent, or else because CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

83.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle were each engaged in business or a transaction, or were about to engage in business or a transaction for which any property remaining with them was unreasonably small capital.

84.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

85.     Celsius is therefore entitled to a judgment avoiding the Celsius Direct Transfers and recovering the fraudulently transferred assets or their value from the Defendants (other than the Executive Parties).

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

86.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

87.     No Defendants other than the Executive Parties, who are not defendants on this cause of action, had a contract with Celsius.

88.     The Defendants were enriched by receiving the Subject Property.

89.     The Defendants' enrichments were gained at Celsius' expense.

90.     This enrichment was unjust because the Defendants provided nothing of value or less than the reasonably equivalent value to Celsius, and their enrichment has come at the expense of Celsius' legitimate creditors and customers.

91.     It would be inequitable for the Defendants to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

92.     Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for the Defendants' unjust enrichment.

93.     Plaintiff is entitled to a money judgment in the amount of value by which Defendants were unjustly enriched in an amount to be proved at trial.

94.     Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

95.     Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

96.    Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)    Judgment in favor of Plaintiff and against Defendants on all causes of action;

(b)    Avoiding the Celsius Direct Transfers and awarding recovery of the avoided property or its money equivalent from the Defendants (other than the Executive Parties);

(c)    Imposing a constructive trust upon all Subject Property or its proceeds in favor of Plaintiff to remedy Defendants' otherwise wrongful conduct, resulting in their unjust enrichment;

(d)    Requiring Defendants (other than the Executive Parties) to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(e)    Awarding Plaintiff actual damages in an amount to be determined at trial;

(f)    Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law; and

(g)    Awarding such other and further relief as this Court deems just and proper.

Dated:      July 12, 2024
            New York, New York

                              AKIN GUMP STRAUSS HAUER & FELD LLP

                              By:   */s/ Mitchell P. Hurley*
                                    Mitchell P. Hurley
                                    Dean L. Chapman Jr.
                                    One Bryant Park
                                    New York, New York 10036
                                    Telephone: (212) 872-1000
                                    Facsimile: (212) 872-1002
                                    mhurley@akingump.com
                                    dchapman@akingump.com

                                    Elizabeth D. Scott (admitted *pro hac vice*)
                                    Nicholas R. Lombardi (admitted *pro hac vice*)
                                    2300 N. Field Street, Suite 1800
                                    Dallas, TX 75201
                                    Telephone: (214) 969-2800
                                    Facsimile: (214) 969-4343
                                    edscott@akingump.com
                                    nlombardi@akingump.com

                                    *Counsel for Plaintiff*