Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Reorganized Debtors. | Jointly Administered |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

<table>
<tr><td>

MOHSIN Y. MEGHJI, LITIGATION
ADMINISTRATOR, AS REPRESENTATIVE FOR
THE POST-EFFECTIVE DATE DEBTORS,

                Plaintiff,

       v.

ANTOINE CASTEL; ARBEN KANE; BENJAMIN
THOR RAMEAU; CURATED; ELENE CHKEIDZE;
GLADYS EDITH GRITTI; IRAKLI
MATCHAVARIANI; JUAN CRUZ ARIAS; LEVAN
MKHEIDZE; LUXOR TECHNOLOGY
CORPORATION; WALLET OWNER
0XD3C8E3E8DCD89AE98FBA866DB20AE72DC2EE7
5A3; WALLET OWNER
0XEE49DCBD9BE47C0FA3DB852E5F13F909608FCC
72; WALLET OWNER
0x852C29C4bCD5E4297839380Ebb784cc48e4f81F7;
KEYFI INC.; and JASON STONE,

                Defendants.

</td><td>

Adversary Proceeding
Case No. _____ (MG)

**ADVERSARY COMPLAINT**

</td></tr>
</table>

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated

debtors ("Plaintiff" or "Litigation Administrator"), in connection with the bankruptcy cases of

Celsius Network LLC and its Debtor Affiliates ("Debtors" or "Celsius") by and through

undersigned counsel, brings this action against Defendants and alleges as follows:

**NATURE OF THE ACTION**

1.  This action relates to Celsius property that Executive and Vehicle (defined below)

wrongfully caused Celsius to transfer from Celsius wallets to Defendants and to or for their own

benefit.  This action seeks to avoid fraudulent transfers, and to recover valuable estate property

from the Defendants (other than the Executive Parties), as well as to impose constructive trusts,

and to require that such Defendants account for, and turn over that property which was taken from Celsius (and ultimately from the whole Celsius community) (the "Subject Property").

## PARTIES

2. The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "Plan"), the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code. Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates").

3. Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

4. Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030. All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

5. Celsius KeyFi is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030. Celsius KeyFi's

sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

6. Defendant Jason Stone ("Executive") is a resident of New York. Executive was the founder and principal of Vehicle, as well as CEO and chief fiduciary of Celsius KeyFi and directed the transfers of the assets at issue in this litigation.

7. Defendant KeyFi Inc. ("Vehicle") is a Delaware corporation that, upon information and belief, has a principal place of business located at 99 John St., #1405, New York, NY 10038. Executive is the largest shareholder of Defendant Vehicle.

8. Defendant Antoine Castel, upon information and belief, is a citizen of France.

9. Defendant Arben Kane, upon information and belief, is a citizen of Hawaii and was an affiliate of Executive's, involved with the return of Celsius assets when Executive resigned from his role as CEO of Celsius KeyFi and involved with other business enterprises led by Executive.

10. Defendant Benjamin Thor Rameau, upon information and belief, is a citizen of Hong Kong.

11. Defendant Curated, upon information and belief, is a self-described "cryptonative fund that collects exceptional crypto art and culture" that is owned and operated by Todd Goldberg and Andrew Jiang, and has a domain address of https://www.curated.xyz/. Upon information and belief, Andrew Jiang is a resident of Texas.

12. Defendant Elene Chkeidze, upon information and belief, is a citizen of the nation Georgia.

13. Defendant Gladys Edith Gritti, upon information and belief, is a citizen of Argentina.

14.    Defendant Irakli Matchavariani, upon information and belief, is a citizen of the nation Georgia.

15.    Defendant Juan Cruz Arias, upon information and belief, is a citizen of Argentina.

16.    Defendant Levan Mkheidze, upon information and belief, is a citizen of the nation Georgia.

17.    Defendant Luxor Technology Corporation is a crypto mining company registered in Delaware and, upon information and belief, operates its business from Seattle, Washington.

18.    Defendant Wallet Owner 0xd3c8e3e8dcd89ae98fba866db20ae72dc2ee75a3 is the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xd3c8e3e8dcd89ae98fba866db20ae72dc2ee75a3 ("0xd3c8e").

19.    Defendant Wallet Owner 0xee49dcbd9be47c0fa3db852e5f13f909608fcc72 the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0xee49dcbd9be47c0fa3db852e5f13f909608fcc72 ("0xee49").

20.    Defendant Wallet Owner 0x852C29C4bCD5E4297839380Ebb784cc48e4f81F7 the person(s), entity(ies), DAO(s) or other party that owns, has possession, or otherwise controls the wallet with address 0x852C29C4bCD5E4297839380Ebb784cc48e4f81F7 ("0x852C29").

## **JURISDICTION AND VENUE**

21.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States District Court for the Southern District of New York (the "Southern District of New York") dated February 1, 2012, referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157. Alternatively, subject matter jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action

and the confirmed plan in these chapter 11 cases such that this matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan.

22.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (H); and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

23.     Certain Defendants named in this Complaint are domiciled in the United States or are entities organized with their principal place of business or place of organization or administration in the United States and, thus, are subject to the general personal jurisdiction of the Court.  Upon information and belief, this category includes but is not necessarily limited to the Executive, Vehicle, Arben Kane, Curated, and Luxor Technology Corporation.

24.     Certain Defendants may reside primarily abroad or be organized abroad.  Those Defendants also are subject to this Court's jurisdiction, as each of the Defendants has, on information and belief, purposefully availed himself, herself or itself of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

25.     In particular, each of the Defendants has transacted business within the United States from which the alleged claims arise, including by receiving one or more of the fraudulent transfers at issue (collectively, the "Fraudulent Transfers"), or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the Fraudulent Transfers at issue.

26.     Defendants Elene Chkeidze, Gladys Edith Gritti, and Levan Mkheidze (collectively, the "<u>RICO Defendants</u>") additionally participated in a conspiracy with co-conspirators located in the United States, including Executive and Vehicle, who took overt acts in furtherance of the conspiracy within the United States, including effecting the fraudulent transfers at issue.

27.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## **BACKGROUND**

### A.     **CNL's Business, Staking, and DeFi**

28.     CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

29.     CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral.  The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

30.     The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth.  Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius

began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

31.     Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets.  The principal, staked coins are not exchanged for other forms of currency.  While the staked coins may in some cases be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

32.     De-centralized finance ("DeFi") generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending and market-making without an institutional intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.**     **CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

33.     The Defendants are recipients of estate property that was transferred to or for their benefit during the course of the Executive Parties' mismanagement and misappropriation of Celsius' assets.

34.     In 2020, Executive represented himself as a pioneer and expert in coin staking and DeFi investments in order to gain access to and control over the valuable coins of CNL.  Based on Executive's representations, he was engaged to lead Celsius' DeFi efforts.

35.     By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to operate Celsius' staking and DeFi activities, with Executive as CEO

of that subsidiary.  CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August.

36.    Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy Celsius' coins on CNL's behalf while the parties sought to finalize the acquisition.

37.    CNL from time-to-time funded Celsius' coins into certain wallets accessible to Executive.  For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that the Executive Parties could deploy CNL's coins in DeFi and staking activities.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed.  Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

38.    On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("MOU") concerning deployment of CNL's coins and anticipating an asset purchase agreement by which CNL would acquire the Vehicle business (as later executed, the "APA").  The MOU also anticipated that CNL would incorporate a subsidiary that would receive all of Vehicle's intellectual property and employ Vehicle's employees.  The subsidiary anticipated by the MOU, Celsius KeyFi, was formed on or around October 5, 2020, and the APA ultimately closed several months later, around December 2020.  The MOU anticipated that Celsius KeyFi, referred to therein as NEWCO, would be authorized to deploy CNL coins in DeFi activities for

the benefit of Celsius pursuant to a temporary "Service Agreement" according to certain service terms.

39.     On October 7, 2020, CNL and Vehicle entered into a service agreement (the "First Service Agreement") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services."  This First Service Agreement also incorporated the terms of the MOU by reference, including the service terms under which Vehicle could deploy CNL's coins.  The First Service Agreement expired on or around December 30, 2020.

40.     On or around December 31, 2020, CNL and Vehicle entered a new service agreement that superseded the First Service Agreement (the "Second Service Agreement").  The Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

41.     Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed the APA dated December 31, 2020.  Pursuant to the APA and Second Service Agreement, Executive was to continue deploying CNL's coins as CEO of Celsius KeyFi solely in authorized DeFi activities.

42.     As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control over both Vehicle and Celsius KeyFi and the Celsius Wallets.  Thus, at all times, Executive exercised significant control over the Celsius coins entrusted to his deployment.

## C.    CNL Demands Return of Its Coins, But Executive Parties Leave a Substantial Gap

43.     It did not take long before CNL lost confidence in Executive's leadership and decision-making as CEO of Celsius KeyFi and demanded the return of all of Celsius' coins. During the fall of 2020, Executive and Celsius personnel, including Alex Mashinsky, held meetings on an approximately weekly basis to discuss Executive's deployment of CNL's coins.

At these meetings Executive repeatedly and consistently stated that the Executive Parties' deployments of CNL's coins for staking and DeFi activities were profitable.

44.    Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Executive Parties' activities with Celsius assets without their complete and accurate cooperation. The Executive Parties claimed that they were working on a "wormhole" program that would allow Celsius to have visibility into their trading activities, including the purported profits thereof, but the Executive Parties consistently failed to deliver that program or any other reporting system to enable Celius to track and understand the Executive Parties' deployment of Celsius assets.

45.    In addition, the Executive Parties' deployments of Celsius ETH were liquidated on two separate occasions in November 2020 and February 2021.  These "liquidation events" both occurred at Compound Finance and resulted in the total loss of 18,836 ETH (around 29.5 million USD).

46.    In early 2021, troubled by the Executive Parties' reporting failures, the liquidation events, and other issues, Celsius instructed the Executive Parties to return the coins Celsius had made available for deployment, including to ensure the coins were accounted for and subject to improved security measures.

47.    The Executive Parties agreed, and Executive and his affiliates prepared a written plan for unwinding positions the Executive Parties had taken and swiftly returning Celsius' coins.

48.    But the Executive Parties did not execute on the plan, and by March 24, 2021, the Executive Parties had not returned the coins in their control as they had promised.

49.     Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal, written board resolutions commanding Executive, as CEO of Celsius KeyFi, to return all of CNL's coins to the 0xb1 wallet.  The board resolutions were unequivocal in directing Executive:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along with all un-deployed Crypto Assets, in each case together with all interest thereon, to the [0xb1 wallet and] . . . to provide the seed and password for the [0xb1 wallet to Celsius and] . . . disclose . . . all codes, keys and other information concerning access and control of any wallet in which Crypto Assets belonging to Celsius are, have been, or may be held, or that were opened or used for the purpose of or in connection with any Company affairs, including without limitation, holding or deploying any Crypto Assets.

50.     The board provided a copy of the resolutions and a direction letter to the Executive Parties on March 26, 2021.

51.     Celsius succeeded in recovering the majority of its coins from the Executive Parties voluntarily, over a period of weeks, but a substantial gap remained.

**D.      Executive Parties Misappropriated Thousands of CNL's Coins**

52.     Celsius ultimately determined that the Executive Parties returned far fewer coins than had been provided, including approximately 89,275 fewer ETH.  In some cases, the Executive Parties did not return coins because they had simply lost those coins in poor investments.  In others, the Executive Parties misappropriated assets, keeping many for themselves and sending others to third parties, including the Defendants.

53.     As to the investment losses, the Executive Parties turned out to be inept at the investment strategies they were undertaking.  For example, Executive apparently placed a significant sum of Celsius ETH deposits into DeFi investments like automatic market makers ("AMMs") that are likely to return a mix of coins different than the mix deposited.  For instance, if the price of ETH increases during the deployment, the AMM smart contract likely will return to the investor fewer ETH than the investor deployed.  The Executive Parties promised Celsius that

they would hedge against such risks and that their deployments would be "delta-neutral." Apparently, however, Executive and Vehicle failed to hedge against these and other risks created by their deployments, which were dramatic during the relevant period on account of substantial swings in coin prices and the tremendous increase in the value of ETH. The Executive Parties' improvidence resulted in a loss of tens of thousands of Celsius ETH. These losses are known as "impermanent loss." This impermanent loss was in addition to the tens of thousands of ETH lost by the Executive Parties in the liquidation events described *supra*.

54.    As to the misappropriation, it is clear that Executive and Vehicle also caused the transfer of substantial Celsius assets from Celsius wallets for unauthorized purposes, some of which were made to the Defendants, and to or for the benefit of the Executive Parties. Celsius received no value for any of the Fraudulent Transfers.

55.    The Executive Parties effected these fraudulent transfers through their control of Celsius wallets, and with the intent (which is imputed to Celsius) to hinder, delay or defraud the legitimate creditors of Celsius, which was insolvent at the time of the transfers and received no consideration in exchange for the purloined assets.

56.    On August 23, 2022, Celsius commenced an adversary proceeding against the Executive Parties with respect to their wrongful conduct. Complaint, *Celsius Network Ltd. v. Executive,* ECF #1 (S.D.N.Y. Bankr. Filed Aug. 23, 2022). At the outset of the case, following a two-day trial, the Court found that Celsius had "shown a substantial likelihood of prevailing on the merits and [was] entitled to a temporary restraining order restraining the defendants from transferring any other assets away." The Court issued a Temporary Restraining Order accordingly, which was kept in place throughout the remainder of the case. Celsius' action against the Executive

Parties resulted in a settlement on June 28, 2024 by which the Executive Parties agreed to return substantial assets to Celsius (the "Executive Settlement Agreement").

### E. Executive Parties Open Binance Accounts in Foreign Citizens' Names

57.    Executive transferred large amounts of coins to his own wallets, Vehicle's wallets, and various third-party wallets, including those belonging to the Defendants. Executive did not move coins in a straightforward, linear fashion.  Instead, he moved coins among dozens of wallets with great frequency, as well as routed coins through accounts at more than a dozen different crypto exchanges and also through the now-banned "mixer" Tornado Cash.  Certain of the crypto exchange accounts were in Executive's name, but many others were fraudulently opened in the names of third parties who sold their identifying information to the Executive Parties for purposes of evading the exchanges' "Know-Your-Customer" money laundering requirements, including certain Defendants in this action.  Executive himself maintained control over at least some of these purported third-party accounts.

58.    For example, the Executive Parties used the name, passport, and other personal "Know-Your-Customer" information of Defendant Levan Mkheidze, a citizen of the nation of Georgia, to open a Binance account ("Binance 001") with the address 0x904912b9a2cf0185c06020fe90d51e08b2880d99.  However, upon information and belief, upon funding the Binance 001 account, the Executive Parties may have retained exclusive access to and control of the coins contained therein.  The Executive Parties transferred tens of millions of dollars' worth of Celsius assets from Celsius' 0xb1 wallet to the Binance 001 account.  Certain of the fraudulent transfers identified herein were first transferred to the Binance 001 account and to or for the benefit of the Executive Parties, and then transferred from the Binance 001 account to certain Defendants and to or for the benefit of the Executive Parties as described more specifically herein.

59.     The Executive Parties similarly paid Defendant Elene Ckheidze, a citizen of the nation of Georgia, approximately $1,000 to use her name, passport, and other personal "Know-Your-Customer" information to open a Binance account to which they retained exclusive access and control.  In the case of Defendant Gladys Gritti, the Executive Parties paid a third party known by the Telegram name "CoinKing" approximately $1,000 in exchange for her "Know-Your-Customer" information, which they used to open an FTX account.

## G.     Executive Uses a Money Laundering App to Mask Destinations of Transfers

60.     During his tenure as CEO of Celsius KeyFi and continuing afterwards until such time as OFAC banned its use, Executive also regularly employed a notorious money laundering application called Tornado Cash to obfuscate the origin, destination and counterparties to his transfers.  Tornado Cash is a privacy protocol "mixer" that masks the path of ETH that is transferred from a sender to a receiver on the blockchain.  Among other things, a user can deposit ETH to Tornado Cash and then withdraw the ETH through a wallet with a different public key, or address, thus obscuring the final destination of the transaction on the blockchain.  On August 8, 2022, the U.S. Department of Treasury announced that OFAC had placed Tornado Cash on its SDN List, and that "all transactions by U.S. persons or within (or transiting) the United States" with Tornado Cash were prohibited.  According to OFAC, this severe sanction was warranted because Tornado Cash is "commonly used by illicit actors to launder funds, especially those stolen during significant heists."

## H.     Defendants Received Millions in Misappropriated Celsius Assets from the Executive Parties

61.     During and after Executive's tenure as CEO of Celsius KeyFi, the Executive Parties wrongfully caused Celsius Wallets to transfer Celsius assets to wallets and cryptocurrency

exchange accounts owned or controlled by the Defendants ("Defendant Wallets") and to or for the benefit of the Executive Parties.

62.     The Fraudulent Transfers at issue in this litigation fall into the two general categories set forth below, the second of which includes some transfers that are a subset of the first.

63.     First are transfers of coins from Celsius to the Defendants that passed through one or more non-Celsius wallets (the "Celsius Indirect Transfers").  The Executive Parties caused each of the Celsius Indirect Transfers, all of which were made to or for the Executive Parties' benefit.

64.     The initial steps in the transfers of assets subject to the Celsius Indirect Transfers include the following:

   a.   Levan Mkheidze's Binance account (opened and at all times controlled by the Executive Parties) received 8,000,000 MATIC, 50,000 LINK, 3,025,315.61 USDT, 2,239,909.04 USDT, 6,000 LINK, 219,823.44 MATIC, 575,000 ALPHA, 7,500,000 USDT, 6,500,000 USDT, 10 YFI, 10 YFI, 137,734 LINK, 10,000 BADGER, 50,000 USDC, 1,773,240.84 USDT, 29.97 BTC and 7,000,000 USDC from Celsius wallets between January 31, 2021 and April 21, 2021;

| Transaction Hash | Date | Currency | Amount |
|---|---|---|---|
| e7d023a82dc45f8cbe2032e8a261aeaa37dd88cab840326c8d2be437333b7a64 | 1/31/2021 15:38 | BTC | 29.97 |
| 0xee00e12f8b0a3e31b2297a3081bd48f68dc44e585753ced040aaf7335d2ff136 | 3/17/2021 19:30 | MATIC | 8,000,000.00 |
| 0x7f8a4d0e8295c3ae4020d750db5ef26558dd5d04f20e3051a72708802acc9b43 | 3/23/2021 1:36 | LINK | 50,000 |
| 0x13f74a9e9c04bafabc039f148c25dc728b28bc1ac38104f53157396980db4942 | 4/6/2021 1:28 | USDT | 3,025,315.61 |
| 0x264c930559738df7bc94bc953f2627ee5c3fb6a1567e29d0c87ffd53dd3e4265 | 4/6/2021 15:54 | USDT | 2,239,909.04 |
| 0xfb27f950cd3726bc4e7604ce6febabb82b66921b8af70353bf83c92eca189105 | 4/7/2021 15:04 | LINK | 6,000.00 |
| 0xf3434d40fa2f9ca8e59dfdade9b405086ef5fa98544baa984c7fcc401424fd74 | 4/7/2021 15:08 | MATIC | 219,823.44 |
| 0x698ee7dcdb5c6e386931d5522a08d7537e0d7f7ce28794a8c04834778313ca27 | 4/13/2021 15:04 | ALPHA | 575,000.00 |
| 0x5fd98736b650028e4c9883ca2442e5ac963077db5e620a46ccac4b5f1393a8c6 | 4/14/2021 21:12 | USDT | 7,500,000.00 |
| 0x89fde8cfa1f433c2cb1bbe34ea1d0c6d81622092b0a3f65c9600f6a643bbb181 | 4/14/2021 21:14 | USDT | 6,500,000.00 |

| | | | |
|---|---|---|---|
| 0x3ff0af7f533ce68b2a768b3205a10d96566f41ded6a9c340fb8468853d8af8f9 | 4/14/2021 21:30 | YFI | 10 |
| 0xb175b96d5b4a20939c297c4cfa2fa2f233bf349256df770c2ba6fd5d8bb04ce0 | 4/15/2021 8:26 | YFI | 10 |
| 0x624cd3c95522fbd9d8acb92026128a36f87afc816aa5671ebc7ee436f949a06e | 4/15/2021 8:28 | LINK | 137,734.00 |
| 0x43c1ce48fbf64887c0a44706cf65388899d6485a5b100951527f9b4a527be268 | 4/15/2021 19:58 | BADGER | 10,000.00 |
| 0x8264b7307f5f597341ae6ef195aa080c65e30a87fbf373c8428760dbb30f33bc | 4/19/2021 22:46 | USDC | 50,000 |
| 0x8b1929cfcd41a26bdcc0b9d2c908173b30fe7c2039e3c777f83d1a5779b3b31f | 4/20/2021 11:38 | USDT | 1,773,240.84 |
| 0x7a646921346d43705f5c1c4e01b4be6dda43ac95fb53e001e0dc738b466efc89 | 4/21/2021 12:44 | USDC | 7,000,000.00 |

    b.   The Executive Parties' 0x50dd57f50a17d57304e7a4f262da30beb31c2e87 wallet (the "0x50dd" wallet) received approximately 210 transfers of various crypto assets from Celsius' 0xb1 wallet between March 6, 2021 and May 3, 2021, as set forth in Exhibit 1 attached hereto; and

    c.   Defendant Wallet Owner 0xd3c8e was funded by Celsius' 0xb1 wallet, receiving 225 ETH from Celsius' 0xb1 wallet on April 10, 2021 in transaction 0xe4f9f8f8c1049ab2dfae9d464e2854a1490b412994d2604947ef9a6287eb77d0; such transfer was to or for the benefit of the Executive Parties.

65.    The ultimate recipients of the Celsius Indirect Transfers include the following:

    a.   Antoine Castel received 60,000 DAI on or around May 3, 2021 from Defendant Wallet Owner 0xd3c8e in transaction 0x09b33da73b0f17c2ca602c28f28f787dfba6115dd4fb3b9f065e510a5fc9fd5f;

    b.   Curated received the NFT Zombie CryptoPunk #3489 on or around June 26, 2022 in transaction 0x9c3dd32766bbe9969854cbea37bfd28458f6f8251e29bc1053e05c60e95b98d6; the Executive Parties had previously caused Celsius to purchase the NFT for 130 ETH from Defendant Wallet Owner 0xE83C750b2708320bb134796c555b80DF39A3D97B on or around February

11,                    2021                    in                    transaction
0xa28c464f931c9fba7ef090f27ca0dddb6bf0137b0400745f51c0aaf3d4e82dd3;

c.  Luxor Technology received 62,500 USDC on or around May 3, 2021 from

Defendant         Wallet         Owner         0xd3c8e         in         transaction

0x02626ea7c87c2eb2a94fab77a413dff7d9d57d0ff4f3a154a2ae5ecb51b6d7ac;

d.  Arben Kane received 90,819.30 DAI on or around May 4, 2021 from Defendant

Wallet            Owner            0xd3c8e                  in            transaction

0x05bed9f5afc54a40dcf2ae1ab6bb1510ab52266293b567cf40defe82a3dff76a;

e.  Benjamin Thor Rameau received 129,605.26 USDT on or around May 13, 2021

from         Defendant         Wallet         Owner         0xee49         in         transaction

0x57a63ec4b5896106af44498daddd196f1ad9c6fc990fd3d4ecc7cb3086981cb

0, and Defendant Wallet Owner 0xee49 received funds from Defendant Levan

Mkheidze's  Binance  account  (opened  and  at  all  times  controlled  by  the

Executive               Parties)               in               transaction

0xb80813cafdf4c5a5521bfc01ff2e1f87ce5886d1739e53b46eacfd4382de567c;

f.  Elene Chkeidze's Binance account (opened and at all times controlled by the

Executive Parties) received 1,291,872.47 USDC, 6.11 BTC and 3.11 ETH in

three (3) transfers on or around May 20, 2021 in three internal Binance to

Binance transactions with IDs 62739431650, 62739279771, and 62739015520

from Defendant Levan Mkheidze's Binance account (opened and at all times

controlled by the Executive Parties);

g.  Juan         Cruz         Arias         received         8         ETH         in         transaction

0xa19a3317cda2f99a7e46af669cdf969b114367f63f8d612aa6e96e4046a28d2b

and          300,089.11          USDT          in          transaction

0x123b32cd1f43324b7ea60434b8cb0c69b361ad0a2f6bae37409cf0059d58536

6 on or around March 14, 2022, and 50,100 USDC on around April 1, 2022 in

transaction

0x33930bd719cabca50f6743c4d2580f72f370a904e0f9df05dd2a2d4c98dc207

5,    with    each    transfer    coming    from    the    Executive    Parties'

0x872c67dd383db7b7e9bc1800546f1ae715a0bc0c    wallet,    which    received

assets from Defendant Elene Chkeidze's Binance account (opened and at all

times    controlled    by    the    Executive    Parties)    in    transactions

0x3744091bc2123402be0d0d7572debd2d080c33aa9d400458929cb0a45a7a2d

be,                                                                        and

0x9d491402c348d3aeadadf33fef47b17e9b19314d17117fbab85b673d5488614

5, and Defendant Elene Chkeidze's Binance account received assets from

Defendant Levan Mkheidze's Binance account (opened and at all times

controlled by the Executive Parties) in three internal Binance to Binance

transactions with IDs 62739431650, 62739279771, and  62739015520; and

h.   Gladys Edith Gritti received 250,000 USDC and 480,954.58 USDT across three

(3)                                                              transfers

(0x6fa433f645015f1b227769491be001f395cf5ec29ff2d345a960f2a43214e05

7,

0x0301cdb933f66dc29c44dfec5d619805c00f84cd16aab7cf85185343b87d388

4,                                                              and

0x64a9b6ce2f73e066f83f8076ec1169ee454849500bebc869a4d9c56dab03a4b

9) on or around May 10, 2022 from the Executive Parties'
0x50dd57f50a17d57304e7a4f262da30beb31c2e87 wallet, which was funded
with assets from Celsius' 0xb1 wallet.

66.    Second, in some cases, the Celsius Indirect Transfers were routed through wallets

owned or controlled by the Executive Parties, including the wallets opened in the names of

Defendants Levan Mkheidze and Elene Ckheidze (the "<u>Executive Wallets</u>") such that the

Defendant in question received the transferred assets from an Executive Party (the "<u>Executive</u>

<u>Transfers</u>").   The Executive Transfers – many of which are a subset of the Celsius Indirect

Transfers but give rise to a secondary theory of fraudulent transfer liability – include the following:

a.  Benjamin Thor Rameau received 129,605.26 USDT on or around May 13, 2021
from Defendant Wallet Owner 0xee49 in transaction
0x57a63ec4b5896106af44498daddd196f1ad9c6fc990fd3d4ecc7cb3086981cb0,
and Defendant Wallet Owner 0xee49 received funds from Defendant Levan
Mkheidze's Binance account (opened and at all times controlled by the Executive
Parties) in transaction
0xb80813cafdf4c5a5521bfc01ff2e1f87ce5886d1739e53b46eacfd4382de567c,
which was made to or for the benefit of the Executive Parties;

b.  Curated received the NFT Zombie CryptoPunk #3489 on or around June 26, 2022
in transaction
0x9c3dd32766bbe9969854cbea37bfd28458f6f8251e29bc1053e05c60e95b98d6;
the Executive Parties had previously caused Celsius to purchase the NFT for 130
ETH from Defendant Wallet Owner
0xE83C750b2708320bb134796c555b80DF39A3D97B on or around February 11,

2021                          in                          transaction
0xa28c464f931c9fba7ef090f27ca0dddb6bf0137b0400745f51c0aaf3d4e82dd3; the
Executive Parties caused the 0xb1 wallet to transfer the NFT to Executive Parties'
0x50dd   wallet   on   or   around   May   3,   2021   in   transaction
0xc9043f6fbbe1b55d02dc26f8da3b50023ac67d26be2c22c70bb93d276772fffb;
Executives Parties transferred the NFT from their 0x50dd wallet to Defendant
Wallet Owner 0x852C29 on or around December 8, 2021 in transaction
0x14687144c3b5e804dc74862c0c8ca7fa83a74e562c34b4757cf660c702e61bc5,
which was made to or for the benefit of the Executive Parties;

c.   Gladys Edith Gritti received 250,000 USDC and 480,954.58 USDT across three (3)
transfers
(0x6fa433f645015f1b227769491be001f395cf5ec29ff2d345a960f2a43214e057,
0x0301cdb933f66dc29c44dfec5d619805c00f84cd16aab7cf85185343b87d3884,
and
0x64a9b6ce2f73e066f83f8076ec1169ee454849500bebc869a4d9c56dab03a4b9)
on or around May 10, 2022 from wallets owned or controlled by the Executive
Parties; and

d.   Juan   Cruz   Arias   received   8   ETH   in   transaction
0xa19a3317cda2f99a7e46af669cdf969b114367f63f8d612aa6e96e4046a28d2b
and        300,089.11        USDT        in        transaction
0x123b32cd1f43324b7ea60434b8cb0c69b361ad0a2f6bae37409cf0059d585366
across two (2) transfers on or around March 14, 2022, and 50,100 USDC on around
April        1,        2022        in        transaction

0x33930bd719cabca50f6743c4d2580f72f370a904e0f9df05dd2a2d4c98dc2075 from wallets owned or controlled by the Executive Parties.

67.     In certain cases, assets were sent from Executive Wallets to Defendants that Celsius has not yet traced to Celsius Wallets.  Those transfers also constitute Executive Transfers and are as follows:

a.  Irakli Matchavariani received 55 ETH on or around May 3, 2021 and about 290 ETH on or around May 10, 2021 from wallets owned or controlled by the Executive Parties in transactions 0x2f9f6e6406dfb029fe1359ce238f8714b76d8f633f684a5d3b879da93ff9aaf9 and 0x325c75da298931ed21fca0915e9441af5cc5f398c2822e052d0962b11d67a9ba; and

b.  Elene Chkeidze's Binance account (opened and at all times controlled by the Executive Parties) received 100 ETH on or around October 14, 2021 from Executive Parties' 0x40c839b831c90173dc7fbce49a25274a4688ddd9 address (the "0x40c839" wallet) in transaction 0xa359cc1e942671c65f1fabea4ff2232d034e80258b5b29c036b2375ca6313e9d; 23796.68 OMG on or around November 12, 2021 from the Executive Parties' 0x40c839 wallet in transaction 0xe5141b62ecf638ea816e71bb2895acfcc82e2c962d7bf74bc20695fa92ab64ba; and 505.10 ETH on or around December 28, 2021 from the Executive Parties' 0x40c839 wallet in transaction 0x4cdaad24876d08f302ae56ba2a215d93b4954b4a11263bd37bbdd3c315777cc0.

I.    **CNL, Celsius KeyFi, and the Executive Parties Were Each Insolvent at the Time of the Transfers to the Defendants**

68.    Each of CNL, Celsius KeyFi, Vehicle, and Executive were insolvent at the time of the transfers to the Defendants set forth above.

69.    CNL (along with its successor, Celsius LLC) was insolvent at the time of each transfer made to Defendants because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

70.    As the *Final Report of Shoba Pillay, Examiner*, *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. Jan. 31, 2023), Docket No. 1956 (the "Examiner Report") stated:

> Celsius's problems did not start in 2022. Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards. To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin. And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market. But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile customer assets and liabilities on a coin-by-coin basis. Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks).

71.    Celsius' consolidated balance sheet as of September 30, 2020 showed negative equity. On December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity, but the value of CEL tokens on the asset side of Celsius' balance sheet exceeded the amount of positive equity. But CEL tokens were essentially worthless, including because they depended solely on CNL's market-making techniques and were completely correlated to the value of, and totally dependent on the continued operations of, Celsius—just as an airline rewards program is completely dependent on the underlying airline continuing to operate.

72.    Additionally, there was never a real market in which to deploy CEL. Instead, CNL, as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying

sprees of CEL tokens.  While this caused the value of CEL prices to appreciate at first, CNL eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL buybacks, and in 2020, CNL began using customer-deposited Bitcoin (BTC) and Ether (ETH) to fund its CEL purchases.

73.   When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased CNL's liabilities.

74.   Additionally, Celsius suffered other losses of over $800 million that further decreased the asset side of its balance sheet, including based on activities of the Executive Parties, keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound, collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin Trust.

75.   Celsius was also insolvent based on other mismatches between its liabilities and assets.  At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any moment if its customers started to withdraw their assets, which Celsius was relying on to fund its own CEL buybacks to artificially pump up its CEL assets.  Indeed, this scenario finally occurred in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

76.   Throughout the time period during which Executive effected the Fraudulent Transfers, Celsius KeyFi, Vehicle, and Executive were likewise insolvent due to – among other things – staggering liabilities owed to CNL related to the loss, mismanagement, and misappropriation of its coins.

77.    Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue.  While in theory, under the Service Agreement, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses.  What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or misappropriation of hundreds of millions of dollars' worth of CNL's coins.  As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

78.    Executive and Vehicle were likewise insolvent due (at least) to the massive liabilities they owed to Celsius.  During the time during which Vehicle was temporarily authorized to deploy CNL's coins between on or around October 1, 2020 and December 31, 2020, it had no material assets.  By contrast, Vehicle accrued millions in liabilities to Celsius during that same time period related to the Executive Parties' misappropriation of Celsius' property, including certain of the Fraudulent Transfers at issue here, as well as their gross mismanagement of Celsius' property.  Upon information and belief, Vehicle's financial condition only deteriorated from there as it continued to incur massive liabilities related to the Executive Parties' unauthorized use and transfers and mismanagement of Celsius' assets with no corresponding increase in its assets.  So too for Executive, whose liability related to his misappropriation of tens of millions of dollars' worth of Celsius' coins and gross mismanagement undoubtedly dwarfed his assets at all relevant times.

## FIRST CAUSE OF ACTION
### (Turnover Under Section 542 of the Bankruptcy Code)

79.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

80.    At all times, Celsius had legal ownership and right to possession over the Subject Property and all of the proceeds, rents or profits thereof.

81.    Upon information and belief, Defendants had possession, custody or control of the Subject Property or its proceeds at the time Celsius filed its chapter 11 petition on July 13, 2022, and/or had possession, custody and control of the Subject Property or its proceeds during the pendency of Celsius' chapter 11 cases.

82.    The Subject Property is or was property that the trustee may use, sell, or lease under section 363 of the Bankruptcy Code.

83.    The Subject Property is not of inconsequential value or benefit to the Debtors' estates.

84.    Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to a judgment ordering the Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) to turn over the Subject Property, and all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate.

85.    It is possible that certain Subject Property may come into the Defendants' possession, custody or control in the future, including, without limitation, as the result of automated smart contract transfers associated with deployments of Subject Property.  Celsius therefore requests that the turnover judgment be continuing in nature, requiring the turnover (or satisfaction of judgment) of any such Subject Property that may come into the Defendants' possession, custody or control in the future.

## SECOND CAUSE OF ACTION
### (11 U.S.C. § 542(e):  Turnover and Accounting of Documents)

86.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

87.     Defendants are in possession of and hold recorded information including books, documents, records or papers relating to Celsius' property or financial affairs.  Among other things, Defendants are in the possession of information concerning the amount and location of the Subject Property, including any wallet addresses containing Celsius property and proceeds thereof.

88.     Celsius is entitled to turnover from Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) of such recorded information including books, documents, records and papers.

89.     Celsius is entitled to an award of damages, costs and attorneys' fees arising from a Defendant's refusal to immediately turnover such information.

## THIRD CAUSE OF ACTION
### (Fraudulent Transfer – Celsius Indirect Transfers)

90.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

91.     As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets from wallets owned by Celsius through other wallets, persons or entities (including wallets owned or controlled by the Executive Parties, including the wallets under the names of Defendants Levan Mkheidze and Elene Chkeidze) en route to the Defendants (i.e., the Celsius Indirect Transfers).

92.     The Executive Parties effected the Celsius Indirect Transfers through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue

of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius

KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius

KeyFi.

93.    Upon information and belief, the Executive Parties effected each of the Celsius

Indirect Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi,

and Vehicle.

94.    The fraudulent transfer scheme was designed in a manner to conceal many of the

transfers and to mask the ultimate destination of much of the Subject Property.  The Executive

Parties masked their actions through a complex web of transactions, including routing transactions

through anonymous exchange accounts and through the anonymity of the recipient wallets.  The

Executive Parties also relied on now-banned cryptocurrency mixers like Tornado Cash to cover

their tracks and hide the ultimate destination of Celsius assets.

95.    Numerous other badges of fraud likewise marked the Executive Parties' actions:

(1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the

transferred Subject Property; (2) the Executive Parties were closely associated with the

Defendants; (3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent

or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; (4) the transfers

were of assets essential for the functioning of CNL, Celsius KeyFi, and Vehicle; and (5) the

transfers were part of a broader scheme in which the Executive Parties improperly misappropriated

tens of millions of dollars' worth of CNL, Celsius KeyFi, and Vehicle's assets.

96.    The Celsius Indirect Transfers, in addition to being intentional fraudulent transfers,

are constructive fraudulent transfers because each of the Celsius Indirect Transfers was made for

less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL,

Celsius KeyFi, and Vehicle were insolvent, or else because CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

97.     At the time of each of the Celsius Indirect Transfers, CNL, Celsius KeyFi, and Vehicle was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

98.     At the time of each of the Celsius Indirect Transfers, CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

99.     Celsius is therefore entitled to a judgment avoiding the Celsius Indirect Transfers and recovering the fraudulently transferred assets or their value from the Defendants (other than the Executive Parties).

### FOURTH CAUSE OF ACTION
**(Fraudulent Transfer – Executive Transfers)**

100.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

101.     As stated above, the Executive Parties repeatedly effected fraudulent transfers of property out of wallets over which they exercised control (including the wallets in the names of Defendants Levan Mkheidze and Elene Ckheidze), and transferred such property to the Defendants (i.e., the Executive Transfers).  Any Executive Transfers that may be deemed to originate from the Executive Parties are subject to this Count.

102.     The Executive Transfers were made at a time when the Executive Parties had substantial and overwhelming liability to Celsius as a result of their poor investment strategies leading to massive investment losses and their active misappropriation of assets from Celsius, and were made long after Celsius had demanded the Executive parties return all such assets.  The

Executive Parties had accrued tens of millions of dollars of liability to Celsius as a result of such mismanagement and misappropriation. Thus, the Executive Transfers were made with the actual intent to hinder, delay or defraud Celsius – upon information and belief, the Executive Parties' single largest creditor, as it held substantial litigation claims against the Executive Parties.

103.    Numerous other badges of fraud mark the Executive Transfers:  (1) the transfers were made to Executive Parties' insiders and associates; (2) the Executive Parties received less than reasonably equivalent value (if any value at all) for the transferred Subject Property; (3) the Executive Parties and the Defendants were closely associated; (4) the transfers were made while the Executive Parties were insolvent or else the transfers caused the Executive Parties to become insolvent; (5) the transfers were concealed from Celsius; (6) the transfers were made to remove or conceal the Executive Parties' assets and the Celsius assets that Executive purloined; (7) the transfers were made while the Executive Parties were aware of a significant risk of litigation with Celsius at the time of the transfers; and (8) the transfers were made at a time when the Executive Parties faced substantial financial liabilities to Celsius.

104.    The Executive Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Executive Transfers was made for less than reasonably equivalent value (or, more often, for no value) at a time when the Executive Parties were insolvent.

105.    At the time of each of the Executive Transfers, the Executive Parties were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Executive Parties was unreasonably small capital.

106.    At the time of each of the Executive Transfers, the Executive Parties intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

107.    Celsius is therefore entitled to a judgment avoiding the Executive Transfers and recovering the fraudulently transferred assets or their value from the Defendants (other than the Executive Parties).

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

108.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

109.    No Defendants other than the Executive Parties, who are not defendants on this cause of action, had a contract with Celsius.

110.    The Celsius property conveyed to the Defendants was not conveyed pursuant to or in connection with any contract, but instead constituted the extra-contractual misappropriation of assets, including the receipt of assets misappropriated from Celsius.

111.    The Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) were enriched by receiving the Subject Property.

112.    The Defendants' enrichments were gained at Celsius' expense.

113.    This enrichment was unjust because the Defendants provided nothing of value to Celsius, and their enrichment has come at the expense of Celsius' legitimate creditors and customers.

114.    It would be inequitable for the Defendants to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

115.    Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for the Defendants' unjust enrichment.

116.    Plaintiff is entitled to a money judgment in the amount of value by which Defendants were unjustly enriched in an amount to be proved at trial.

117.    Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

118.    Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

119.    Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

## SIXTH CAUSE OF ACTION
### (Accounting)

120.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

121.    The transfer of assets from Celsius and into the hands of Defendants is of a complicated character.   The assets at issues were transferred through many wallets and cryptocurrency exchanges.

122.    Celsius has only limited visibility into these transfers given the often opaque and anonymous nature of the crypto industry.   And Celsius has no visibility into any further use or proceeds of the assets transferred to Defendants following their transfer.

123.    Celsius requires an accounting to enable it to properly trace its property into the hands of Defendants, and perhaps others, as well as to support the claims and causes of action asserted herein and enable a complete recovery to Celsius.

124.    Absent enforcement of this accounting right, the Plaintiff has no adequate remedy at law.

125.    Accordingly, the Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) are obligated to provide a complete accounting of all assets they have received directly or indirectly from Celsius, including any interest earned or accrued thereupon, the proceeds of any and all such transfers, any assets purchased by profits they received, the locations of the various assets, and all activities in which the Defendants engaged in connection with their possession, custody, and control of the Subject Property.

### SEVENTH CAUSE OF ACTION
**(Racketeer Influenced and Corrupt Organizations ("RICO") Act Violations)**

126.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

127.    RICO Defendants are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

128.    RICO Defendants each violated 18 U.S.C. § 1962(c) by their respective acts described in this Complaint.

129.    RICO Defendants each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged herein.

130.    RICO Defendants each committed at least two predicate acts of racketeering as alleged herein.

131.    The acts of racketeering were not isolated but were related in that they had the same or similar purpose and result, participants, victims, or method of commission.  Further, the acts of racketeering have been continuous spanning from at least 2020–2023.

**The RICO Enterprise**

132.    There existed one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "RICO Enterprise") that was or is engaged in, and its activities affected, interstate or foreign commerce.

133.    Vehicle is an "enterprise" within the meaning of 18 U.S.C. § 1961(4)

134.    Alternatively, RICO Defendants and their known and unknown agents and co-conspirators, including the Executive Parties, are an association in fact such that they are an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

135.    The enterprise had a common and continuing purpose of formulating and implementing a common scheme to defraud Celsius and its creditors through a pattern of theft, unlawful turnover, and fraudulent transfers aimed at defrauding Celsius and its creditors through this pattern of activities.  This common purpose came into existence no later than 2020 when Executive represented to Alex Mashinsky that he wanted to deploy and invest assets of the Debtors.

136.    The repeated and continuous violations of federal law alleged in this Complaint constitute a pattern of racketeering activity in violation of RICO, 18 U.S.C § 1961, *et seq.*

**The Pattern of Racketeering Activity**

137.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetuated for the same or similar purposes by the same persons (the "RICO Pattern").

138.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

139.    The RICO Defendants voluntarily and intentionally devised and participated in one or more criminal schemes to perpetuate unlawful transfers of Celsius' assets during the relevant period, including without limitation, the Fraudulent Transfers.

140.    In furtherance of the scheme, the Executive Parties and the RICO Defendants willfully and knowingly transmitted or caused to be transmitted by means of causing matters and things to be sent or delivered by (1) a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

141.    The use of interstate or international mail or wires to perpetuate these transfers and to connect this racketeering conspiracy was foreseeable.

142.    Accordingly, the RICO Defendants committed numerous violations of mail or wire fraud in violation of 18 U.S.C. §§ 1341 & 1343.

143.    The RICO Defendants' violations of 18 U.S.C. §§ 1341 & 1343 directly and proximately caused injury to Celsius by unjustifiably and irrevocably depleting their assets or their value in the amount of such transfers.

## Continuity of Conduct

144.    The RICO Defendants' violations of law as set forth herein, each of which directly and proximately injured Celsius, constituted a continuous course of conduct in the United States beginning in no later than 2020 and continuing at least through 2023, which was intended to obtain economic gain through fraud, deceit and other improper and unlawful means.  Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) & (5).

**The RICO Pattern Caused Injury to Celsius**

145.    Celsius has been injured in their business or property as a direct and proximate result of the RICO Defendants' above-described violations of 18 U.S.C. § 1962(c) including any injury by reason of the predicate acts constituting the RICO Pattern.

146.    The RICO Defendants' violations of law in furtherance of their scheme to use the Debtors' assets through a series of unlawful transfers resulted in Celsius' assets being unjustifiably and irrevocably depleted in the amount of the value of the assets.

**Plaintiff Is Entitled to Treble Damages**

147.    As a result of the RICO Defendants' violations of 18 U.S.C. § 1962(c), Celsius has suffered substantial damages in an amount to be proved at trial.

148.    Plaintiff has standing to bring all claims alleged in this Complaint.

149.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to judgment and to recover treble its general and special damages plus interests, costs and attorneys' fees caused by reason of RICO Defendants' violations of 18 U.S.C. § 1962(c).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)    Judgment in favor of Plaintiff and against Defendants on all causes of action;

(b)    Directing Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) to turn over the Subject Property and any and all proceeds thereof to Celsius, together with any other Subject Property and any and all proceeds thereof that may come into the Defendants' possession, custody or control in the future;

(c)    Avoiding the Celsius Indirect and Executive Transfers and awarding recovery of the avoided property or its money equivalent from Defendants (other than the Executive Parties);

(d)      Imposing a constructive trust upon all Subject Property or its proceeds in favor of Plaintiff to remedy Defendants' otherwise wrongful conduct, resulting in their unjust enrichment;

(e)      Requiring Defendants (other than the Executive Parties) to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(f)      Requiring the Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) to provide an accounting of the Subject Property and any and all proceeds and profits thereof in their control;

(g)      Requiring the Defendants (other than Defendants Executive, Vehicle, and Irakli Matchavariani) to turnover any recorded information, including books, documents, records, and papers, relating to the Subject Property;

(h)      Awarding Plaintiff actual damages in an amount to be determined at trial;

(i)      Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law; and

(j)      Awarding such other and further relief as this Court deems just and proper.

Dated:       July 13, 2024
             New York, New York

                              AKIN GUMP STRAUSS HAUER & FELD LLP

                         By:  */s/ Mitchell P. Hurley*
                              Mitchell P. Hurley
                              Dean L. Chapman Jr.
                              One Bryant Park
                              New York, New York 10036
                              Telephone: (212) 872-1000
                              Facsimile: (212) 872-1002
                              mhurley@akingump.com
                              dchapman@akingump.com

                              Elizabeth D. Scott (admitted *pro hac vice*)
                              Nicholas R. Lombardi (admitted *pro hac vice*)
                              2300 N. Field Street, Suite 1800
                              Dallas, TX 75201
                              Telephone: (214) 969-2800
                              Facsimile: (214) 969-4343
                              edscott@akingump.com
                              nlombardi@akingump.com

                              *Counsel for Plaintiff*