Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Reorganized Debtors. | Jointly Administered |

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

MOHSIN Y. MEGHJI, LITIGATION
ADMINISTRATOR, AS REPRESENTATIVE FOR
THE POST-EFFECTIVE DATE DEBTORS,

                            Plaintiff,

                    v.

WALLET OWNER
0xdbc13e67f678cc00591920cece4dca6322a79ac7;
WALLET OWNER
13GgeP35HWrDTAWgFzDix8n7zu8g5oTohv;
WALLET OWNER
3KdwZrjTLCvfM9W7vZ4xpkMuXcadQhSvo6;
WALLET OWNER
17Eb7n5h3wJVpt9ZvYB2zgHwPRdKygsoZs;
WALLET OWNER
0x7d602b32acd5942a619f49e104b20c0553c93405;
WALLET OWNER
0x54b5e4b07e5ad50f1d14842963f7dee80ae60f34;
WALLET OWNER
0xee24b229e1132dfc932725aab9b0196e94af2d32;
WALLET OWNER
bc1q2psht4fm0z58j6e5e949gtxjyx674qfuh4j5kj;
WALLET OWNER
1BPS19krxwJ4DepTRv8WhmjRpGtw6Uduxr;
WALLET OWNER
3CLnTPYiXz6v4CNhCKx6mARN1hnbu8rm5p;
WALLET OWNER
bc1qxd0rwrakltuw7j9euqap2ffn9qrr86z3m2tl48;
WALLET OWNER
0x09d637F36959d2cBD05D74a1Db1e2Eb79e65D116;
WALLET OWNER
3J8G8P8qdGJd52FruNZbAgocSspivvMeXF;
WALLET OWNER
0xEf2A5fE526735d6D5Fe85763B0377ff772c25103;
WALLET OWNER
0xb4cb81906359d8e925abbd382d5ece069e1a0a02;
WALLET OWNER
0x19b3982933eeb6ddfa1d6318067e5aba7bcf4c50;
WALLET OWNER
0x5ad7ac81935963cb627854ad6903895c52c9fa73;
WALLET OWNER
0xbf7c232b80ad3131d69234cc820ccd26a3f6a823;
WALLET OWNER

Adversary Proceeding
Case No. _____ (MG)

**ADVERSARY COMPLAINT**

0x6c7Ce9f8aFA19976f8BFa233EEed5b0a72d4E16c,
WALLET OWNER
0xd3c8e3e8dcd89ae98fba866db20ae72dc2ee75a3;
WALLET OWNER
0x77D3C47876e45123C2837Ba68720378Af00a2C0A;
WALLET OWNER
0x8BC87154b3f9e7515324742F915796ECC38748b1;
JASON STONE, KEYFI, INC., LEVAN MKHEIDZE,
and IRAKLI MATCHAVARIANI,

                    Defendants.

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors ("Plaintiff" or "Litigation Administrator"), in connection with the bankruptcy cases Celsius Network LLC and its Debtor Affiliates ("Debtors" or "Celsius") by and through undersigned counsel, brings this action against Defendants and alleges as follows:

## NATURE OF THE ACTION

1.      This action relates to Celsius property that Executive and Vehicle (defined below) wrongfully caused Celsius to transfer from Celsius wallets to Defendants and to or for their own benefit.  This action seeks to avoid fraudulent transfers, and to recover valuable estate property from the Defendants (other than the Executive Parties), as well as to impose constructive trusts, and to require that such Defendants account for, and turn over that property which was taken from Celsius (and ultimately from the whole Celsius community) (the "Subject Property").

## PARTIES

2.      The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "Plan"),

the Litigation Administrator Agreement attached as Exhibit B to the *Eleventh Notice of Filing of Plan Supplement* [Docket No. 4297] (the "Litigation Administrator Agreement"), and section 1123 of the Bankruptcy Code. Pursuant to the Plan, Confirmation Order, and the Litigation Administrator Agreement, Plaintiff has the capacity, in his own right and name, to investigate, prosecute, compromise, and settle Recovery Causes of Action, including this Avoidance Action, on behalf of the Debtors and their estates (the "Estates").

3.    Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales with its principal place of business located at 167-169 Great Portland Street, 5th Floor, London W1W 5PF.

4.    Celsius Network LLC ("Celsius LLC") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  All customer relationships within the broader Celsius enterprise were transitioned from CNL to Celsius LLC.

5.    Celsius KeyFi LLC ("Celsius KeyFi") is a Delaware limited liability company with its principal place of business located at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

6.    Defendant Jason Stone ("Executive") is a resident of New York.  Executive was the founder and principal of Vehicle, as well as CEO and chief fiduciary of Celsius KeyFi and directed the transfers of the assets at issue in this litigation.

7.    Defendant KeyFi Inc. ("Vehicle") is a Delaware corporation that, upon information and belief, has a principal place of business located at 99 John St., #1405, New York, NY 10038. Executive is the largest shareholder of Defendant Vehicle.

4

8.      Defendant Levan Mkheidze, upon information and belief, is a citizen of the nation of Georgia.

9.      Defendant Irakli Matchavariani, upon information and belief, is a citizen of the nation of Georgia.

10.     Defendant Wallet Owner 0xdbc13e67f678cc00591920cece4dca6322a79ac7 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xdbc13e67f678cc00591920cece4dca6322a79ac7 ("0xdbc").

11.     Defendant Wallet Owner 13GgeP35HWrDTAWgFzDix8n7zu8g5oTohv is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 13GgeP35HWrDTAWgFzDix8n7zu8g5oTohv ("13GgeP").

12.     Defendant Wallet Owner 3KdwZrjTLCvfM9W7vZ4xpkMuXcadQhSvo6 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 3KdwZrjTLCvfM9W7vZ4xpkMuXcadQhSvo6 ("3KdwZr").

13.     Defendant Wallet Owner 17Eb7n5h3wJVpt9ZvYB2zgHwPRdKygsoZs is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 17Eb7n5h3wJVpt9ZvYB2zgHwPRdKygsoZs ("17Eb7n").

14.     Defendant Wallet Owner 0x7d602b32acd5942a619f49e104b20c0553c93405 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0x7d602b32acd5942a619f49e104b20c0553c93405 ("0x7d6").

15.     Defendant Wallet Owner 0x54b5e4b07e5ad50f1d14842963f7dee80ae60f34 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0x54b5e4b07e5ad50f1d14842963f7dee80ae60f34 ("0x54b5").

16.    Defendant Wallet Owner 0xee24b229e1132dfc932725aab9b0196e94af2d32 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xee24b229e1132dfc932725aab9b0196e94af2d32 ("0xee24").

17.    Defendant Wallet Owner bc1q2psht4fm0z58j6e5e949gtxjyx674qfuh4j5kj is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address bc1q2psht4fm0z58j6e5e949gtxjyx674qfuh4j5kj ("bc1q2p").

18.    Defendant Wallet Owner 1BPS19krxwJ4DepTRv8WhmjRpGtw6Uduxr is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 1BPS19krxwJ4DepTRv8WhmjRpGtw6Uduxr ("1BPS19").

19.    Defendant Wallet Owner 3CLnTPYiXz6v4CNhCKx6mARN1hnbu8rm5p is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 3CLnTPYiXz6v4CNhCKx6mARN1hnbu8rm5p ("3CLnTP").

20.    Defendant Wallet Owner bc1qxd0rwrakltuw7j9euqap2ffn9qrr86z3m2tl48 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address bc1qxd0rwrakltuw7j9euqap2ffn9qrr86z3m2tl48 ("bc1qxd").

21.    Defendant Wallet Owner 0x09d637F36959d2cBD05D74a1Db1e2Eb79e65D116is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0x09d637F36959d2cBD05D74a1Db1e2Eb79e65D116 ("0x09d6").

22.    Defendant Wallet Owner 3J8G8P8qdGJd52FruNZbAgocSspivvMeXF   is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 3J8G8P8qdGJd52FruNZbAgocSspivvMeXF ("3J8G8P").

23.     Defendant Wallet Owner 0xEf2A5fE526735d6D5Fe85763B0377ff772c25103 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xEf2A5fE526735d6D5Fe85763B0377ff772c25103 ("0xEf2A").

24.     Defendant Wallet Owner 0xb4cb81906359d8e925abbd382d5ece069e1a0a02 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xb4cb81906359d8e925abbd382d5ece069e1a0a02 ("0xb4cb").

25.     Defendant Wallet Owner 0x19b3982933eeb6ddfa1d6318067e5aba7bcf4c50 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0x19b3982933eeb6ddfa1d6318067e5aba7bcf4c50 ("0x19b").

26.     Defendant Wallet Owner 0x5ad7ac81935963cb627854ad6903895c52c9fa73 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0x5ad7ac81935963cb627854ad6903895c52c9fa73 ("0x5ad7").

27.     Defendant Wallet Owner 0xbf7c232b80ad3131d69234cc820ccd26a3f6a823 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xbf7c232b80ad3131d69234cc820ccd26a3f6a823 ("0xbf7c").

28.     Defendant Wallet Owner 0x6c7Ce9f8aFA19976f8BFa233EEed5b0a72d4E16c is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet address 0x6c7Ce9f8aFA19976f8BFa233EEed5b0a72d4E16c ("0x6c7C").

29.     Defendant Wallet Owner 0xd3c8e3e8dcd89ae98fba866db20ae72dc2ee75a3 is the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls the wallet with address 0xd3c8e3e8dcd89ae98fba866db20ae72dc2ee75a3 ("0xd3c").

30.     Defendant Wallet Owner 0x77D3C47876e45123C2837Ba68720378Af00a2C0A is
the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls
the wallet with address 0x77D3C47876e45123C2837Ba68720378Af00a2C0A ("0x77D").

31.     Defendant Wallet Owner 0x8BC87154b3f9e7515324742F915796ECC38748b1 is
the person(s), entity(ies), DAO(s) or other party that owns, has possession of, or otherwise controls
the wallet with address 0x8BC87154b3f9e7515324742F915796ECC38748b1 ("0x8BC8").

32.     The Defendants aside from the Executive Defendants are referred to herein as the
"Recovery Defendants."

## JURISDICTION AND VENUE

33.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§
1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10–468 of the United States
District Court for the Southern District of New York (the "Southern District of New York") dated
February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases
and proceedings arising under, arising in, or related to a case under title 11 of the United States
Code (the "Bankruptcy Code"), issued pursuant to 28 U.S.C. § 157.  Alternatively, subject matter
jurisdiction exists as there is a "close nexus" or "conceivable effect" between this action and the
confirmed plan in these Chapter 11 Cases such that this matter affects the interpretation,
implementation, consummation, execution, or administration of the confirmed plan.

34.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C.
§§ 157(b)(2)(A); (E); (H); and (O).  In the event that this or any other appropriate Court finds any
part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders
and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy
Procedure.

35.     Certain Defendants named in this Complaint are domiciled in the United States or are entities organized with their principal place of business or place of organization or administration in the United States and, thus, are subject to the general personal jurisdiction of the Court.  This category includes but is not necessarily limited to the Executive Parties.

36.     Certain Defendants may reside primarily abroad or be organized abroad.  Those Defendants also are subject to this Court's jurisdiction, as each of the Defendants has, on information and belief, purposefully availed himself, herself or itself of the privilege of conducting activities within the forum by engaging in conduct within or directed at the United States in connection with the claims and causes of action alleged herein.

37.     In particular, each of the Defendants has transacted business within the United States from which the claims alleged arise, including by receiving one or more of the Fraudulent Transfers at issue, or the benefit thereof, and, upon information and belief, engaging in communications with Executive and Vehicle within the United States relating to the claims and causes of action alleged, including communications relating to arranging the Fraudulent Transfers at issue.

38.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## **BACKGROUND**

**A.     CNL's Business, Staking, and DeFi**

39.     CNL and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

40.     CNL was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral. The rewards offered by CNL varied by the type and amount of crypto asset transferred to the CNL platform.

41.     The CNL business model was centered on deploying digital assets to generate income for CNL and its operations and growth. Among other things, CNL made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency in excess of the amount loaned. In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and de-centralized finance ("DeFi") activities.

42.     Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets. The principal, staked coins are not exchanged for other forms of currency. While the staked coins may in some cases be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

43.     DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending and market-making without an institutional intermediary, often utilizing so-called "smart contracts." Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

10

B.      **CNL and the Executive Parties Agree Executive Will Provide Staking and DeFi Services**

44.    The Defendants are recipients of estate property that was transferred to or for their benefit during the course of the Executive Parties' mismanagement and misappropriation of Celsius' assets.

45.    In 2020, when CNL began to explore deploying CNL's coins in staking and DeFi strategies, based on, inter alia, Executive's representations CNL engaged the Executive Parties to lead the effort.

46.    By August 2020, CNL and Executive agreed in principle that CNL would set up a wholly owned subsidiary to acquire the assets of Vehicle and operate Celsius' staking and DeFi activities, with Executive as CEO of that subsidiary.  CNL and Executive discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement, which they exchanged in August.

47.    Anticipating that closing on the transaction would take some time, the parties agreed that CNL would permit Executive to begin to deploy CNL's coins on CNL's behalf while the parties sought to finalize the acquisition.

48.    CNL from time-to-time funded coins into certain wallets accessible to Executive. For example, on or around August 19, 2020, CNL created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  CNL provided to the Executive Parties the private keys to the 0xb1 wallet and certain other CNL-created wallets (together with the 0xb1 wallet, the "Celsius Wallets") so that the Executive Parties could deploy CNL's coins in DeFi and staking activities.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can

11

never be changed.  Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

49.    On October 1, 2020, CNL and Vehicle signed a non-binding memorandum of understanding ("<u>MOU</u>") concerning deployment of CNL's coins and anticipating an asset purchase agreement by which CNL would acquire the Vehicle business (as later executed, the "<u>APA</u>").  The MOU also anticipated that CNL would incorporate a subsidiary that would receive all of Vehicle's intellectual property and employ Vehicle's employees.  The subsidiary anticipated by the MOU, Celsius KeyFi, LLC, was formed on or around October 5, 2020, and the APA ultimately closed several months later, around December 2020.  The MOU anticipated that Celsius KeyFi, referred to therein as NEWCO, would be authorized to deploy CNL coins in DeFi activities for the benefit of Celsius pursuant to a temporary "Service Agreement" according to certain service terms.

50.    On October 7, 2020, CNL and Vehicle entered into a service agreement (the "<u>First Service Agreement</u>") pursuant to which Vehicle agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services."  This First Service Agreement also incorporated the terms of the MOU by reference, including the service terms under which Vehicle could deploy CNL's coins.  The First Service Agreement expired on or around December 30, 2020.

51.    On or around December 31, 2020, CNL and Vehicle entered a new service agreement that superseded the First Service Agreement (the "<u>Second Service Agreement</u>").  The Second Service Agreement replaced Vehicle with the newly formed CNL subsidiary, Celsius KeyFi, and laid out the service terms for Celsius KeyFi's staking of CNL's coins.

52.    Finally, on or around December 31, 2020, Vehicle, Celsius KeyFi, and CNL signed the APA dated December 31, 2020.  Pursuant to the APA and Second Service Agreement,

12

Executive was to continue deploying CNL's coins as CEO of Celsius KeyFi solely in authorized DeFi activities.

53.     As CEO of Vehicle and Celsius KeyFi, Executive maintained significant control over both Vehicle and Celsius KeyFi and the Celsius Wallets.  Thus, at all times, Executive exercised significant control over the Celsius coins entrusted to his deployment.

**C.      CNL Demands Return of Its Coins, But Executive Parties Leave a Substantial Gap**

54.     It did not take long before CNL lost confidence in Executive's leadership and decision-making as CEO of Celsius KeyFi and demanded the return of all of CNL's coins.  During the fall of 2020, Executive and Celsius personnel, including Alex Mashinsky, held meetings on an approximately weekly basis to discuss Executive's deployment of CNL's coins.  At these meetings Executive repeatedly and consistently stated that the Executive Parties' deployments of CNL's coins for staking and DeFi activities were profitable.

55.     Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Executive Parties' activities with Celsius assets without their complete and accurate cooperation. The Executive Parties claimed that they were working on a "wormhole" program that would allow Celsius to have visibility into their trading activities, including the purported profits thereof, but the Executive Parties consistently failed to deliver that program or any other reporting system to enable Celius to track and understand the Executive Parties' deployment of CNL assets.

56.     In addition, the Executive Parties' deployments of Celsius ETH were liquidated on two separate occasions in November 2020 and February 2021.  These "liquidation events" both occurred at Compound Finance and resulted in the total loss of 18,836 ETH (around 29.5 million USD).

57.    In early 2021, troubled by the Executive Parties' reporting failures, the liquidation events, and other issues, Celsius instructed the Executive Parties to return the coins Celsius had made available for deployment, including to ensure the coins were accounted for and subject to improved security measures.

58.    The Executive Parties agreed, and Executive and his affiliates prepared a written plan for unwinding positions the Executive Parties had taken and swiftly returning CNL's coins.

59.    But the Executive Parties did not execute on the plan, and by March 24, 2021, the Executive Parties had not returned the coins in their control as they had promised.

60.    Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal, written board resolutions commanding Executive, as CEO of Celsius KeyFi, to return all of CNL's coins to the 0xb1 wallet.  The board resolutions were unequivocal in directing Executive:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along with all un-deployed Crypto Assets, in each case together with all interest thereon, to the [0xb1 wallet and] . . . to provide the seed and password for the [0xb1 wallet to Celsius and] . . . disclose . . . all codes, keys and other information concerning access and control of any wallet in which Crypto Assets belonging to Celsius are, have been, or may be held, or that were opened or used for the purpose of or in connection with any Company affairs, including without limitation, holding or deploying any Crypto Assets.

61.    The board provided a copy of the resolutions and a direction letter to the Executive Parties on March 26, 2021.

62.    The Executive Parties effected these wrongful transfers through their control of Celsius wallets, and with the intent (which is imputed to Celsius) to hinder, delay or defraud the legitimate creditors of Celsius, which was insolvent at the time of the transfers and received no consideration in exchange for the purloined assets.

63.    Celsius succeeded in recovering the majority of its coins from the Executive Parties voluntarily, over a period of weeks, but a substantial gap remained.

64.    On August 23, 2022, Celsius commenced an adversary proceeding against the Executive Parties with respect to their wrongful conduct.  Complaint, *Celsius Network Ltd. v. Stone,* ECF #1 (S.D.N.Y. Bankr. Filed Aug. 23, 2022).  At the outset of the case, following a two-day trial, the Court found that Celsius had "shown a substantial likelihood of prevailing on the merits and [was] entitled to a temporary restraining order restraining the defendants from transferring any other assets away."  The Court issued a Temporary Restraining Order accordingly, which was kept in place throughout the remainder of the case.  Celsius' action against the Executive Parties resulted in a settlement on June 28, 2024 by which the Executive Parties agreed to return substantial assets to Celsius (the "Executive Settlement Agreement").

**D.    Executive Parties Steal Thousands of CNL's Coins**

65.    Celsius ultimately determined that the Executive Parties returned far fewer coins than had been provided, including approximately 89,275 fewer ETH.  In some cases, the Executive Parties did not return coins because they had simply lost those coins in poor investments.  In others, the Executive Parties misappropriated assets, keeping many for themselves and sending others to third parties, including the Defendants.

66.    As to the investment losses, the Executive Parties turned out to be inept at the investment strategies they were undertaking.  For example, Executive apparently placed a significant sum of Celsius ETH deposits into DeFi investments like automatic market makers ("AMMs") that are likely to return a mix of coins different than the mix deposited.  For instance, if the price of ETH increases during the deployment, the AMM smart contract likely will return to the investor fewer ETH than the investor deployed.  The Executive Parties promised Celsius that they would hedge against such risks and that their deployments would be "delta-neutral." Apparently, however, Executive and Vehicle failed to hedge against these and other risks created by their deployments, which were dramatic during the relevant period on account of substantial

15

swings in coin prices and the tremendous increase in the value of ETH. The Executive Parties' improvidence resulted in a loss of tens of thousands of Celsius ETH. These losses are known as "impermanent loss." This impermanent loss was in addition to the tens of thousands of ETH lost by the Executive Parties in the liquidation events described *supra*.

67.     As to the misappropriation, it is clear that Executive and Vehicle also caused the transfer of substantial Celsius assets from Celsius wallets for unauthorized purposes, some of which were made directly or indirectly to the Defendants, and to or for the benefit of the Executive Parties. Celsius received no value for any of the Fraudulent Transfers.

**E. Executive Parties Open Binance Accounts in Foreign Citizens' Names**

68.     Executive also transferred large amounts of coins to his own wallets, Vehicle's wallets, and various third-party wallets, including those belonging to the Defendants. Executive did not move coins in a straightforward, linear fashion. Instead, he moved coins among dozens of wallets with great frequency, as well as routed coins through accounts at more than a dozen different crypto exchanges and also through the now-banned "mixer" Tornado Cash. Certain of the crypto exchange accounts were in Executive's name, but many others were fraudulently opened in the names of third parties who sold their identifying information to the Executive Parties for purposes of evading the exchanges' "know your customer" money laundering requirements, including certain Defendants in this action. Executive himself maintained control over at least some of these purported third-party accounts.

69.     For example, the Executive Parties used the name, passport, and other personal "Know-Your-Customer" information of Defendant Levan Mkheidze, a citizen of the nation of Georgia, to open a Binance account ("Binance 001") with the address 0x904912b9a2cf0185c06020fe90d51e08b2880d99. However, upon information and belief, upon

funding the Binance 001 account, the Executive Parties may have retained exclusive access to and control of the coins contained therein. The Executive Parties transferred tens of millions of dollars' worth of Celsius assets from Celsius' 0xb1 wallet to the Binance 001 account. Certain of the Fraudulent Transfers identified herein were first transferred to the Binance 001 account and to or for the benefit of the Executive Parties, and then transferred from the Binance 001 account to certain Defendants and to or for the benefit of the Executive Parties as described more specifically herein.

**G.    Defendants Received Millions in Stolen Celsius Assets from the Executive Parties**

70.    During and after Executive's tenure as CEO of Celsius KeyFi, the Executive Parties wrongfully caused Celsius Wallets to transfer Celsius assets to wallets and cryptocurrency exchange accounts owned or controlled by the Defendants ("Defendant Wallets") and to or for the benefit of the Executive Parties.

71.    The transfers at issue in this litigation fall into three general categories. First are transfers of coins directly from Celsius to certain Defendants and to or for the benefit of the Executive Parties (the "Celsius Direct Transfers"). The Celsius Direct Transfers include the following Fraudulent Transfers:

   a.    On or around November 6, 2020, Celsius Wallets transferred 50 ETH to Defendant 0xdbc1 to or for the benefit of the Executive Defendants in transaction 0x38dfa46473b70358cf790fb6c094185dd23570c7a53ea11ef36239e5df641ac5;

   b.    On or around January 12, 2021, Celsius Wallets transferred 4 BTC to Defendant 13GgeP to or for the benefit of the Executive Defendants in transaction bd3456b00a82c6c5fdcab8d2cb610dc441e5f69bea499a7738fb0ee6abca9aa8;

c.  On or around February 1, 2021, Celsius Wallets transferred 8 renBTC to Defendant 0xee24 to or for the benefit of the Executive Defendants in transaction 0x85435cb5d3b9d6666dfc73e0588fcb31afdaf79ef945fb24e93e6e924735f9d0 .

d.  On or around February 6, 2021, Celsius Wallets transferred 5.67 BTC to Defendant 3KdwZr to or for the benefit of the Executive Defendants in transaction e7e85b174f9ac97537f59321d2fa61d5e5d8ba858580e25ad103fc0b1f11ae06;

e.  On or around February 6, 2021, Celsius Wallets transferred 5.10 BTC to Defendant 17Eb7n to or for the benefit of the Executive Defendants in transaction 65c2110ee054aaafe69f56de12ba272563c37b20f47c052b6c558d4df9176b6e;

f.  Celsius Wallets transferred various amounts to Defendant 0x54b5 to or for the benefit of the Executive Defendants over two days:

   1.  10 ETH, then 8 ETH, on or around February 11, 2021 in transactions 0x3f4a7e7025c8aba7f4e4cb5108d545770e7e8a4d62839d11d029b599 db01deaa                                                    and 0x18bbe3d1d3a1fdae78479f070c3a78741a76cbaabc8c253d720f08216 2efd2c3;

   2.  46 ETH, then 30 ETH, on or around February 12, 2021 in transactions 0x863f79b893b9fdfaa9a69ed62075069ac93a8850ec167853f96443288 7befefe                                                    and 0xa3f7d51b5e0781930f6e6eb5d299fc081b6a94d844e44274e8ec1f1bd ca1da4d.

18

g. On or around March 12, 2021, Celsius Wallets transferred 200 WETH to Defendant 0x7d6 to or for the benefit of the Executive Defendants in transaction 0xbb8b1429df052e73cb95af6cdce532012532bd5d910381e998cb8907d20af50f;

72. The second category of fraudulent transfers are transfers of coins from Celsius to the Defendants and to or for the benefit of the Executive Parties through one or more accounts such as the Binance 001 account, each of which was funded directly or indirectly through transfers from Celsius (the "Celsius Indirect Transfers"). The Executive Parties caused each of the Celsius Indirect Transfers, all of which were made to or for the Executive Parties' benefit.

73. The first steps in the transfers of assets subject to the Celsius Indirect Transfers include the following:

a. As set forth below, Binance 001 was funded by Celsius wallets, receiving 29.97 BTC, 8,000,000 MATIC, 50,000 LINK, 3,025,315.61 USDT, 2,239,909.04 USDT, 6,000 LINK, 219,823.44 MATIC, 575,000 ALPHA, 7,500,000 USDT, 6,500,000 USDT, 10 YFI, 10 YFI, 137,734 LINK, 10,000 BADGER, 50,000 USDC, 1,773,240.84 USDT, and 7,000,000 USDC from Celsius wallets between January 31, 2021 and April 21, 2021;

| Transaction Hash | Date | Currency | Amount |
|---|---|---|---|
| e7d023a82dc45f8cbe2032e8a261aeaa37dd88cab840326c8d2be437333b7a64 | 1/31/2021 15:38 | BTC | 29.97 |
| 0xee00e12f8b0a3e31b2297a3081bd48f68dc44e585753ced040aaf7335d2ff136 | 3/17/2021 19:30 | MATIC | 8,000,000.00 |
| 0x7f8a4d0e8295c3ae4020d750db5ef26558dd5d04f20e3051a72708802acc9b43 | 3/23/2021 1:36 | LINK | 50,000 |
| 0x13f74a9e9c04bafabc039f148c25dc728b28bc1ac38104f53157396980db4942 | 4/6/2021 1:28 | USDT | 3,025,315.61 |
| 0x264c930559738df7bc94bc953f2627ee5c3fb6a1567e29d0c87ffd53dd3e4265 | 4/6/2021 15:54 | USDT | 2,239,909.04 |
| 0xfb27f950cd3726bc4e7604ce6febabb82b66921b8af70353bf83c92eca189105 | 4/7/2021 15:04 | LINK | 6,000.00 |
| 0xf3434d40fa2f9ca8e59dfdade9b405086ef5fa98544baa984c7fcc401424fd74 | 4/7/2021 15:08 | MATIC | 219,823.44 |

| | | | |
|---|---|---|---|
| 0x698ee7dcdb5c6e386931d5522a08d7537e0d7f7ce28794a8c04834778313ca27 | 4/13/2021 15:04 | ALPHA | 575,000.00 |
| 0x5fd98736b650028e4c9883ca2442e5ac963077db5e620a46ccac4b5f1393a8c6 | 4/14/2021 21:12 | USDT | 7,500,000.00 |
| 0x89fde8cfa1f433c2cb1bbe34ea1d0c6d81622092b0a3f65c9600f6a643bbb181 | 4/14/2021 21:14 | USDT | 6,500,000.00 |
| 0x3ff0af7f533ce68b2a768b3205a10d96566f41ded6a9c340fb8468853d8af8f9 | 4/14/2021 21:30 | YFI | 10 |
| 0xb175b96d5b4a20939c297c4cfa2fa2f233bf349256df770c2ba6fd5d8bb04ce0 | 4/15/2021 8:26 | YFI | 10 |
| 0x624cd3c95522fbd9d8acb92026128a36f87afc816aa5671ebc7ee436f949a06e | 4/15/2021 8:28 | LINK | 137,734.00 |
| 0x43c1ce48fbf64887c0a44706cf65388899d6485a5b100951527f9b4a527be268 | 4/15/2021 19:58 | BADGER | 10,000.00 |
| 0x8264b7307f5f597341ae6ef195aa080c65e30a87bf373c8428760dbb30f33bc | 4/19/2021 22:46 | USDC | 50,000 |
| 0x8b1929cfcd41a26bdcc0b9d2c908173b30fe7c2039e3c777f83d1a5779b3b31f | 4/20/2021 11:38 | USDT | 1,773,240.84 |
| 0x7a646921346d43705f5c1c4e01b4be6dda43ac95fb53e001e0dc738b466efc89 | 4/21/2021 12:44 | USDC | 7,000,000.00 |

b.  Defendant 0xd3c was funded by Celsius' 0xb1 wallet, receiving 225 ETH from Celsius' 0xb1 wallet on April 10, 2021 in transaction 0xe4f9f8f8c1049ab2dfae9d464e2854a1490b412994d2604947ef9a6287eb77d0 ;

c.  Executive Parties' wallet 0xfc2a616d48a8681250aaaf590404e20812e96cfa was funded by Celsius' 0xb1 wallet on or around February 19, 2021, receiving 200 ETH;

d.  As set forth in **Exhibit 1**, the Executive Parties' 0x50dd57f50a17d57304e7a4f262da30beb31c2e87 wallet was funded by Celsius' 0xb1 wallet, receiving approximately 210 transfers of various crypto assets between March 6, 2021 and May 3, 2021, including the Cryptopunk Zombie #6784 discussed *infra*;

e. Executive Parties' wallet 0xE63c8C198BC07973D1D6AA70928C9db95724c720 was funded by Celsius' 0xfb86C5E6E3Fdb2890D54c5f84B96d2b45c416B5D wallet on or around February 8, 2021, receiving 509,459 Curve.fi yDAI/yUSDC/yUSDT/yTUSD.

74.    The ultimate recipients of the Celsius Indirect Transfers include the following:

a. Defendant bc1q2p received 3 BTC from the Binance 001 account (opened and at all times controlled by the Executive Parties) on or around February 6, 2021 in transaction 203a379aa6bbaa627e5b3b9de35fb1faae3b8da6ca9900ab8b52cea9dd6644a0;

b. Defendant 1BPS19 received 2.5 BTC from the Binance 001 account (opened and at all times controlled by the Executive Parties) on or around February 7, 2021 in transaction 0990ea427b7ffab1ea7170ab22b86e43157935aa51830a79639a6a23e4587fb8;

c. Defendant 3CLnTP received 2.0 BTC from the Binance 001 (opened and at all times controlled by the Executive Parties) account on or around February 10, 2021 in transaction f2cb934df75e7e66b8ad8571f7aea038b91056612d51b6f856db1884ed09695f;

d. Defendant bc1qxd received 1.70 BTC from the Binance 001 account (opened and at all times controlled by the Executive Parties) on or around March 2, 2021 in transaction 4feb1e57e9649f01f3ba281210a5812c12e21e61a1b999903e648702cbe40be2;

e.  Defendant 0x09d6 received 100,000 USDT from the Binance 001 account
(opened and at all times controlled by the Executive Parties) on or around April
20,        2021      in        transaction      in        transaction
0x52cfdd063d7c1e68081de5cc81bb8ed226eafa2cd2ef1d435630bbf6b59ba93
5;

f.  Defendant 3J8G8P received 5 BTC from the Binance 001 account (opened and
at all times controlled by the Executive Parties) on or around April 12, 2021 in
transaction                        in                        transaction
f8691e3aa291b6893263849604ea367f2a469e8ad79604af654fdaac415c8357;

g.  Defendant 0xEf2A received 200,000 USDC from the Binance 001 account
(opened and at all times controlled by the Executive Parties) on or around May
8,        2021        in        transaction
0x99676ba53b681f74cff3ab7011105f1a5076dbd82bb87a71aae149ff5a8ed5e2
;

h.  Defendant 0x54b5 received 193 ETH from the Executive Parties' 0xfc2a wallet
in the six transactions set forth below.  The Executive Parties' 0xfc2a wallet
had itself been funded with 200 ETH from Celsius Wallet 0xb1 on or around
February 19, 2021:

1.  20 ETH on or around February 20, 2021 in transaction
0xf037d8bf5338b0b33d619616562d6ec7438c0303cc0da4a8b380c4
141e3cdb0c;

2.  30 ETH on or around February 27, 2021 in transaction 0x7ce8a3984bf767e4852d5d2db14c55633cd67f0bd236ed3c4f4e77 b10b82c703;

3.  25 ETH on or around February 28, 2021 in transaction 0x9dd5acfc1c237dfef1a4889bc614bf14fbb44ea4fd3a21c2d302473 9007cd343;

4.  100 ETH on or around March 9, 2021 in transaction 0x3674d86df64e73e3c112a309d4bdcb5fbaf84437daef69db0a15bae 3bc8c4889;

5.  10 ETH, then 8 ETH, on or around April 12, 2021 in transactions 0xf21263b5bf2104c89def0a3f305ef65da8b6c71424d461a3bcf2760 c8dfec3af                                                         and 0x810a975f533ba552d18b799223894f8b4715e77e5ddbf103047c99 781db3626e;

i.  Defendant 0xb4cb received 1,169,506 USDC from Wallet 0x88319f48A7DBf52E69ffE5e42b3c008050CFE391 on or around February 14, 2023, 509,459 USDC of which is traceable back to Celsius Wallets, in transaction 0x14541b12ed6ff36b2b3063c5fe9a10a69c51e8103c68e1a82c74545a42ba73b f; before arriving at Defendant 0xb4cb, the funds were transferred among many cyrpto addresses; the original sources of the funds was a Celsius Wallet that transferred them to the Executive Parties' 0xe63 wallet in transaction 0x5365922dc2f4aa232a9b1f4698b622ecd57b44f9c9dd57fd3aabdc86606bd16

6 which in turn sent the assets to Defendant 0x77D in transaction 0x9fb40767cef9ed656958a705858551a4191e992fde2996b9752cec6344e8e86 3.

j.  Defendant 0xbf7c received 1,123,828 USDC from Defendant 0xd3c on or around May 18, 2021, 476,291 USDC of which is traceable back to Celsius Wallets in transaction 0x9d63301d5d9285a3e8c42011447c81c0ec65eb9fcaa346ca703978719f95f16 b; the funds were originally transferred from Celsius' 0xb1 wallet to Defendant 0xd3c.

k.  Defendant 0x6c7C received 8.06 WBTC from Defendant 0xd3c on or around April 10, 2021 in transaction 0x09a1aed3e44fc78423bea017373b5f5ac6e57ad0a48e4d6e5d18b63e60fc957 7; the funds were originally transferred from Celsius' 0xb1 wallet to Defendant 0xd3c.

l.  Defendant 0x5ad7 received Cryptopunk Zombie NFT # 6784 from Wallet 0xdbA0198f9693486Ef88fDC78aEf40e975aAd9fCb on or around June 26, 2022; the NFT was originally purchased by Celsius' 0xb1 wallet for 130 ETH and transferred to the Executive Parties' 0x50dd wallet; it was transferred on several more occasions before being sent for no consideration to Defendant 0x5ad7.

75.  Third, assets were sent from Executive Wallets to the Defendants (the "Executive Transfers"). There are two types of such Executive Transfers. First, as discussed above, the Celsius Indirect Transfers set forth above were routed through wallets owned or controlled by the

Executive Parties, including the wallets opened in the names of Defendant Levan Mkheidze and Elene Chkeidze (the "Executive Wallets"), such that each Defendant received the transferred assets either directly or indirectly from an Executive Party. Second, in certain cases, assets were sent from Executive Wallets to Defendants that Celsius has not yet traced to Celsius Wallets. Those transfers also constitute Executive Transfers and are as follows:

a.  Executive Parties' Wallet 0x40 sent 55 ETH to a Binance wallet in the name of Irakli Matchavariani on or around May 3, 2011 in transaction 0x2f9f6e6406dfb029fe1359ce238f8714b76d8f633f684a5d3b879da93ff9aaf9 (i.e., the initial transfer for purposes of avoidance), which after a few transfers, transferred 299.99 ETH to Defendant Wallet 0x19b3 on or around May 31, 2021 (of which 55 ETH is traceable to the Executive Parties) in transaction 0xa6776e562741e6cc3cb1cf163971b92dc6524c89ca91a104239e937951779bd7.

b.  Executive Parties' Wallet 0x8659044eA27aD1B91502BfE360075267148928cA sent 1 NFT, Cryptopunk Zombie NFT # 6784, to Defendant Wallet 0x8BC8 on or around January 26, 2022 in transaction 0x50678d7e299a5cd2a8b90b14bc03d51264a084ebf9828b450e2d46105561adc2; this transfer was to or for the benefit of the Executive Parties.

## H.    CNL, Celsius KeyFi, and the Executive Parties Were Each Insolvent at the Time of the Transfers to the Defendants

76.    Each of CNL, Celsius KeyFi, Vehicle, and Executive were insolvent at the time of the transfers to the Defendants set forth above.

77.    CNL (along with its successor, Celsius LLC) was insolvent at the time of each transfer made to Defendants because the value of CNL/Celsius LLC's liabilities exceeded the value of its assets at all relevant times.

78.    As the *Final Report of Shoba Pillay, Examiner, In re Celsius Network LLC,* No. 22 10964 (Bankr. S.D.N.Y. Jan. 31, 2023), Docket No. 1956 (the "Examiner Report") stated: "Celsius's problems did not start in 2022. Rather, serious problems dated back to at least 2020, after Celsius started using customer assets to fund operational expenses and rewards.  To fund operations, Celsius posted customer deposits as collateral to take out loans in stablecoin.  And to fund CEL buybacks for rewards, Celsius exchanged BTC and ETH for CEL on the secondary market.  But prior to the creation of the Freeze Report, Celsius did not adequately track or reconcile customer assets and liabilities on a coin-by-coin basis.  Celsius was therefore caught off guard when it recognized a shortfall in BTC and ETH (which it had been using to fund those CEL buybacks)."

79.    Celsius' consolidated balance sheet as of September 30, 2020 showed significant negative equity.  On December 31, 2020, Celsius' consolidated balance sheet purported to show positive equity, but the value of CEL tokens on the asset side of Celsius' balance exceeded the amount of positive equity.  But CLE tokens were essentially worthless, including because they depended solely on CNL's market-making techniques and were completely correlated to the value of, and totally dependent on the continued operations of, Celsius—just as an airline rewards program is completely dependent on the underlying airline continuing to operate.

80.    Additionally, there was never a real market in which to deploy CEL.  Instead, CNL, as the only purchaser of CEL tokens, propped up CEL's value by engaging in calculated buying sprees of CEL tokens.  While this caused the value of CEL prices to appreciate at first, CNL

eventually ran out of the funds from its crypto asset deployments necessary to fund its own CEL buybacks, and in 2020, CNL began using customer-deposited Bitcoin (BTC) and Ether (ETH) to fund its CEL purchases.

81.    When BTC and ETH rapidly appreciated in value in early 2021, the shortfall in BTC and ETH, which CNL had been using to fund those CEL buybacks, significantly increased CNL's liabilities.

82.    Additionally, Celsius suffered other losses of over $800 million that further decreased the asset side of its balance sheet, including based on activities of the Executive Parties, keys lost by Fireblocks for tens of thousands of ETH tokens that Celsius provided to StakeHound, collateral posted with Equities First Holdings that was not returned, and losses in Grayscale Bitcoin Trust.

83.    Celsius was also insolvent based on other mismatches between its liabilities and assets.  At any given time between 2020 and 2022, Celsius was susceptible to collapsing at any moment if its customers started to withdraw their assets, which Celsius was relying on to fund its own CEL buybacks to artificially pump up its CEL assets.  Indeed, this scenario finally occurred in 2022, when CNL could no longer bridge its deficits and its customers began to withdraw their assets from CNL *en masse*.

84.    Throughout the time period during which Executive effected the Fraudulent Transfers, Celsius KeyFi, Vehicle, and Executive were likewise insolvent due to – among other things – staggering liabilities owed to CNL related to the loss, mismanagement, and theft of its coins.

85.    Celsius KeyFi was formed for the singular purpose of deploying CNL coins in DeFi and staking investments and had no other business or sources of revenue.  While in theory, under

the Service Agreement, Celsius KeyFi could have earned a "profit share" based on profits it was able to generate through its investment of CNL's assets, its trading activities never generated any profits, only massive losses. What Celsius KeyFi did have in abundance was liabilities, including not only liabilities related to operating expenses like payments to contractors, but also liabilities to CNL related to the gross mismanagement and/or theft of hundreds of millions of dollars' worth of CNL's coins. As such, Celsius KeyFi was insolvent pursuant to any relevant standard.

86.    Executive and Vehicle were likewise insolvent due (at least) to the massive liabilities they owed to Celsius. During the time during which Vehicle was temporarily authorized to deploy CNL's coins between on or around October 1, 2020 and December 31, 2020, it had no material assets. By contrast, Vehicle accrued millions in liabilities to Celsius during that same time period related to the Executive Parties' misappropriation of Celsius' property, including certain of the Fraudulent Transfers at issue here, as well as their gross mismanagement of Celsius' property. Upon information and belief, Vehicle's financial condition only deteriorated from there as it continued to incur massive liabilities related to the Executive Parties' theft and mismanagement of Celsius' assets with no corresponding increase in its assets. So too for Executive, whose liability related to his misappropriation of tens of millions of dollars' worth of Celsius' coins and gross mismanagement undoubtedly dwarfed his assets at all relevant times.

## **FIRST CAUSE OF ACTION**
### **(Turnover Under Section 542 of the Bankruptcy Code)**

87.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

88.    At all times, Celsius had legal ownership and right to possession over the Subject Property and all of the proceeds, rents or profits thereof.

89.     Upon information and belief, the Recovery Defendants had possession, custody or control of the Subject Property or its proceeds at the time Celsius filed its chapter 11 petition on July 13, 2022, and/or had possession, custody and control of the Subject Property or its proceeds during the pendency of Celsius' chapter 11 cases.

90.     The Subject Property is or was property that the trustee may use, sell, or lease under section 363 of the Bankruptcy Code.

91.     The Subject Property is not of inconsequential value or benefit to the Debtors' estates.

92.     Pursuant to section 542 of the Bankruptcy Code, Plaintiff is entitled to a judgment ordering the Recovery Defendants to turn over the Subject Property, and all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate.

93.     It is possible that certain Subject Property may come into the Recovery Defendants' possession, custody or control in the future, including, without limitation, as the result of automated smart contract transfers associated with deployments of Subject Property.  Celsius therefore requests that the turnover judgment be continuing in nature, requiring the turnover (or satisfaction of judgment) of any such Subject Property that may come into the Recovery Defendants' possession, custody or control in the future.

## SECOND CAUSE OF ACTION
### (11 U.S.C. § 542(e):  Turnover and Accounting of Documents)

94.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

95.     Recovery Defendants are in possession of and hold recorded information including books, documents, records or papers relating to Celsius' property or financial affairs.  Among other things, Recovery Defendants are in the possession of information concerning the amount and

location of the Subject Property, including any wallet addresses containing Celsius property and proceeds thereof.

96.    Celsius is entitled to turnover from Recovery Defendants of such recorded information including books, documents, records and papers.

97.    Celsius is entitled to an award of damages, costs and attorneys' fees arising from a Recovery Defendant's refusal to immediately turnover such information.

## THIRD CAUSE OF ACTION
### (Fraudulent Transfer – Celsius Direct Transfers)

98.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

99.    As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets to be made from Celsius wallets directly into wallets over which the Recovery Defendants had possession, custody or control (i.e., the Celsius Direct Transfers) and for the benefit of the Executive Parties.

100.    The Executive Parties effected the Celsius Direct Transfers through their dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius KeyFi.

101.    Upon information and belief, the Executive Parties effected each of the Celsius Direct Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi, and Vehicle.

102.    The Celsius Direct Transfers are marked by numerous badges of fraud:  (1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the transferred Subject Property; (2) the Executive Parties were closely associated with the Recovery Defendants;

(3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; and (4) the transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of Celsius assets.

103.    The Celsius Direct Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Direct Transfers was made for less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL, Celsius KeyFi, and Vehicle were insolvent, or else because CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

104.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle were each engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

105.    At the time of each of the Celsius Direct Transfers, CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

106.    Celsius is therefore entitled to a judgment avoiding the Celsius Direct Transfers and recovering the fraudulently transferred assets or their value from the Recovery Defendants.

### FOURTH CAUSE OF ACTION
**(Fraudulent Transfer – Celsius Indirect Transfers)**

107.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

108.    As stated above, the Executive Parties caused certain fraudulent transfers of Celsius assets to be made from wallets owned by Celsius through other mediate wallets, persons or entities (including wallets owned or controlled by the Executive Parties, including the wallets under the

names of Defendants Levan Mkheidze and Elene Chkeidze) for the benefit of Executive Parties

en route to the Recovery Defendants (i.e., the Celsius Indirect Transfers).

109.    The Executive Parties effected the Celsius Indirect Transfers through their

dominion and control over the Celsius Wallets and the Subject Property in those wallets by virtue

of their access to the Celsius Wallets' private keys and their direction of the activities of Celsius

KeyFi and Vehicle, including through Executive's position as CEO of Vehicle and then Celsius

KeyFi.

110.    Upon information and belief, the Executive Parties effected each of the Celsius

Indirect Transfers with the intent to hinder, delay, or defraud the creditors of CNL, Celsius KeyFi,

and Vehicle.

111.    The fraudulent transfer scheme was designed in a manner to conceal many of the

transfers and to mask the ultimate destination of much of the Subject Property.  The Executive

Parties masked their actions through a complex web of transactions, including routing transactions

through anonymous exchange accounts and through the anonymity of the recipient wallets.  The

Executive Parties also relied on now-banned cryptocurrency mixers like Tornado Cash to cover

their tracks and hide the ultimate destination of Celsius assets.

112.    Numerous other badges of fraud likewise marked the Executive Parties' actions:

(1) CNL, Celsius KeyFi, and Vehicle each received less than reasonably equivalent value for the

transferred Subject Property; (2) the Executive Parties were closely associated with the Recovery

Defendants; (3) the transfers were made while CNL, Celsius KeyFi, and Vehicle were insolvent

or else the transfers caused CNL, Celsius KeyFi, and Vehicle to become insolvent; (5) the transfers

were of assets essential for the functioning of CNL, Celsius KeyFi, and Vehicle; and (6) the

transfers were part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of CNL, Celsius KeyFi, and Vehicle's assets.

113.    The Celsius Indirect Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Celsius Indirect Transfers was made for less than reasonably equivalent value (and, in many cases, for no value) at a time when CNL, Celsius KeyFi, and Vehicle were insolvent, or else because each of CNL, Celsius KeyFi, and Vehicle became insolvent as a result of such transfer.

114.    At the time of each of the Celsius Indirect Transfers, each of CNL, Celsius KeyFi, and Vehicle was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with them was unreasonably small capital.

115.    At the time of each of the Celsius Indirect Transfers, each of CNL, Celsius KeyFi, and Vehicle intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

116.    Celsius is therefore entitled to a judgment avoiding each of the initial transfers comprising the Celsius Indirect Transfers and recovering the fraudulently transferred assets or their value from the Recovery Defendants.

## FIFTH CAUSE OF ACTION
### (Fraudulent Transfer – Executive Transfers)

117.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

118.    As stated above, the Executive Parties repeatedly effected fraudulent transfers of property out of wallets over which they exercised control (including the wallets in the names of Defendant Levan Mkheidze and Elene Ckheidze), and transferred such property to the Recovery Defendants (i.e., the Executive Transfers), in some cases directly and in other by way of an initial

transferee.  Any Executive Transfers that may be deemed to originate from the Executive Parties are subject to this Count.

119.    The Executive Transfers were made at a time when the Executive Parties had substantial and overwhelming liability to Celsius as a result of their poor investment strategies leading to massive investment losses and their active misappropriation of assets from Celsius, and were made long after Celsius had demanded the Executive parties return all such assets.  The Executive Parties had accrued tens of millions of dollars of liability to Celsius as a result of such mismanagement and misappropriation.  Thus, the Executive Transfers were made with the actual intent to hinder, delay or defraud Celsius – upon information and belief, the Executive Parties' single largest creditor, as it held substantial litigation claims against the Executive Parties.

120.    Numerous other badges of fraud mark the Executive Transfers:  (1) the transfers were made to Executive Parties' insiders and associates; (2) the Executive Parties received less than reasonably equivalent value (if any value at all) for the transferred Subject Property; (3) the Executive Parties and the Recovery Defendants were closely associated; (4) the transfers were made while the Executive Parties were insolvent or else the transfers caused the Executive Parties to become insolvent; (5) the transfers were concealed from Celsius; (6) the transfers were made to remove or conceal the Executive Parties' assets and the Celsius assets that Executive purloined; (7) the transfers were made while the Executive Parties were aware of a significant risk of litigation with Celsius at the time of the transfers; and (8) the transfers were made at a time when the Executive Parties faced substantial financial liabilities to Celsius.

121.    The Executive Transfers, in addition to being intentional fraudulent transfers, are constructive fraudulent transfers because each of the Executive Transfers was made for less than

reasonably equivalent value (or, more often, for no value) at a time when the Executive Parties were insolvent.

122.    At the time of each of the Executive Transfers, the Executive Parties were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Executive Parties was unreasonably small capital.

123.    At the time of each of the Executive Transfers, the Executive Parties intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as those debts matured.

124.    Celsius is therefore entitled to a judgment avoiding the Executive Transfers (including, as appropriate, the initial transfer component of the Executive Transfer) and recovering the fraudulently transferred assets or their value from the Recovery Defendants.

**SIXTH CAUSE OF ACTION**
**(Unjust Enrichment)**

125.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

126.    No Recovery Defendant had a contract with Celsius.

127.    The Recovery Defendants were enriched by receiving the Subject Property.

128.    The Recovery Defendants' enrichments were gained at Celsius' expense.

129.    This enrichment was unjust because the Recovery Defendants provided nothing of value to Celsius, and their enrichment has come at the expense of Celsius' legitimate creditors and customers.

130.    It would be inequitable for the Recovery Defendants to retain the benefit of Celsius' property, including any proceeds of such property, without payment for its value.

131.    Because no contractual remedy exists, the Plaintiff has no adequate remedy at law for the Recovery Defendants' unjust enrichment.

132.    Plaintiff is entitled to a money judgment in the amount of value by which Recovery Defendants were unjustly enriched in an amount to be proved at trial.

133.    Plaintiff is entitled to recovery of the Subject Property and any and all proceeds thereof.

134.    Plaintiff is entitled to the remedy of a constructive trust upon the Subject Property and any and all proceeds thereof.

135.    Plaintiff is entitled to an equitable lien upon the Subject Property and any and all proceeds thereof.

## SEVENTH CAUSE OF ACTION
### (Accounting)

136.    Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

137.    The transfer of assets from Celsius and into the hands of Recovery Defendants is of a complicated character.   The assets at issue were transferred through many wallets and cryptocurrency exchanges.

138.    Celsius has only limited visibility into these transfers given the often opaque and anonymous nature of the crypto industry.   And Celsius has no visibility into any further use or proceeds of the assets transferred to Defendants following their transfer.

139.    Celsius requires an accounting to enable it to properly trace its property into the hands of Recovery Defendants, and perhaps others, as well as to support the claims and causes of action asserted herein and enable a complete recovery to Celsius.

140.     Absent enforcement of this accounting right, the Plaintiff has no adequate remedy at law.

141.     Accordingly, the Recovery Defendants are obligated to provide a complete accounting of all assets they have received directly or indirectly from Celsius, including any interest earned or accrued thereupon, the proceeds of any and all such transfers, any assets purchased by profits they received, the locations of the various assets, and all activities in which the Recovery Defendants engaged in connection with their possession, custody, and control of the Subject Property.

## EIGHTH CAUSE OF ACTION
### (Conversion)

142.     Plaintiff repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

143.     At all times relevant herein, Celsius had the right to possession, custody or control of the Subject Property.

144.     The Recovery Defendants that received Celsius Direct Transfers, acting in concert with Executive, assumed control over the Subject Property, thereby interfering with Celsius' rights in that property in a manner inconsistent with those rights.

145.     This interference with Celsius' rights in the Subject Property is tortious conversion.

146.     Recovery Defendants' conversion of Celsius property has resulted in damages to Celsius in an amount to be proven at trial.

147.     Plaintiff is also entitled to the remedy of replevin and the proceeds thereof in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests as follows:

(a)    Judgment in favor of Plaintiff and against Defendants on all causes of action;

(b)    Directing Recovery Defendants to turn over the Subject Property and any and all proceeds thereof to Celsius, together with any other Subject Property and any and all proceeds thereof that may come into the Recovery Defendants' possession, custody or control in the future;

(c)    Avoiding the Celsius Direct, Celsius Indirect, and Executive Transfers and awarding recovery of the avoided property or its money equivalent;

(d)    Imposing a constructive trust upon all Subject Property or its proceeds in favor of Plaintiff to remedy Recovery Defendants' otherwise wrongful conduct, resulting in their unjust enrichment;

(e)    Requiring Recovery Defendants to disgorge the Subject Property and any and all proceeds and profits generated from the Subject Property to Celsius;

(f)    Requiring the Recovery Defendants to provide an accounting of the Subject Property and any and all proceeds and profits thereof in their control;

(g)    Requiring the Recovery Defendants to turnover any recorded information, including books, documents, records, and papers, relating to the Subject Property;

(h)    Awarding Plaintiff actual damages in an amount to be determined at trial;

(i)    Awarding Plaintiff pre-and post-judgment interest at the maximum amount permitted by law; and

(j)    Awarding such other and further relief as this Court deems just and proper.

Dated:          July 13, 2024
                New York, New York

                                    AKIN GUMP STRAUSS HAUER & FELD LLP

                                    By:    */s/ Mitchell P. Hurley*
                                           Mitchell P. Hurley
                                           Dean L. Chapman Jr.
                                           One Bryant Park
                                           New York, New York 10036
                                           Telephone: (212) 872-1000
                                           Facsimile: (212) 872-1002
                                           mhurley@akingump.com
                                           dchapman@akingump.com

                                           Elizabeth D. Scott (admitted *pro hac vice*)
                                           Nicholas R. Lombardi (admitted *pro hac vice*)
                                           2300 N. Field Street, Suite 1800
                                           Dallas, TX 75201
                                           Telephone: (214) 969-2800
                                           Facsimile: (214) 969-4343
                                           edscott@akingump.com
                                           nlombardi@akingump.com

                                           *Counsel for Plaintiff*