Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**POST-EFFECTIVE DATE DEBTORS'**
**(I) SUPPLEMENTAL OBJECTION TO THE FALLER CREDITORS' MOTION**
**SEEKING ENTRY OF AN ORDER APPROVING FURTHER DISTRIBUTION**
**UNDER THE PLAN OF REORGANIZATION FOR THE FALLER CREDITORS AND**
**(II) OBJECTION TO THE AD HOC GROUP OF AUSTRALIAN CORPORATE**
**CREDITORS' MOTION FOR A LIQUID CRYPTOCURRENCY DISTRIBUTION**

The above-captioned post-effective date debtors (collectively, the "Post-Effective Date

Debtors," and prior to the Effective Date, the "Debtors") hereby file this supplemental objection

(the "Supplemental Objection") to (i) supplement the *Post-Effective Date Debtors' Omnibus*

*Objection to the Faller Creditors' (I) Motion Seeking Entry of an Order Approving Further*

---

[1]   The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Post-Effective Date Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Distribution Under the Plan of Reorganization for the Faller Creditors and (II) Motion for Discovery to Support Claims Made by the Post-Effective Date Debtors in Regards to Equitable Treatment of Corporate Creditors* [Docket No. 4974] (the "Original Objection")[2] in response to the Faller Creditors' *Motion Seeking Entry of an Order (I) Approving Further Distribution Under Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* [Docket No. 4911] (together with all joinders thereto, the "Distribution Motion") and (ii) object to additional points raised by the ad hoc group of Australian corporate creditors in their motion seeking a distribution in Liquid Cryptocurrency (the "Australian Distribution Motion").[3] In further support of the Original and Supplemental Objections, the Debtors submit the *Declaration of Christopher Ferraro in Support of the Post-Effective Date Debtors' Objection to the Motion Seeking Entry of an Order (I) Approving Further Distribution Under the Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* (the "Ferraro Declaration") and the *Declaration of Robert Campagna in Support of the Post-Effective Date Debtors' Objection to the Motion Seeking Entry of an Order (I) Approving Further Distribution Under the Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* (the "Campagna Declaration"), filed contemporaneously herewith, and state as follows:[4]

---

[2]   The Original Objection is incorporated herein by reference.

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Distribution Motion, Original Objection, or the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be further modified, amended, or supplemented from time to time, the "Plan"), as applicable.

[4]   Contemporaneously herewith, Coinbase has filed the *Declaration of Roger Bartlett in Support of the Post-Effective Date Debtors' Objection to the Motion Seeking Entry of an Order (I) Approving Further Distribution Under the Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* (the "Bartlett Declaration").

**Preliminary Statement**

1.      Liquid Cryptocurrency distributions to corporate creditors are far more complex to effectuate than distributions to individual creditors, which made it difficult for the Debtors to find a Distribution Agent willing to make distributions to the Debtors' approximately 1,900 corporate creditors (who are approximately 0.5% of total creditors by number and represent approximately 4.6% of the distributable value under the Plan).  After months of negotiations, the Debtors were only able to find one suitable distribution partner to facilitate Liquid Cryptocurrency distributions to corporate creditors—Coinbase—and Coinbase made clear from the beginning that it would only agree to make distributions to approximately 100 corporate creditors due to Coinbase's intensive and multi-stage onboarding process for corporate creditors.  Ultimately, the Debtors and Coinbase agreed to a 100-creditor limit for corporate distributions, and the Post-Effective Date Debtors have not instructed Coinbase to make Liquid Cryptocurrency distributions to corporate creditors beyond that limitation.

2.      At the time of the Disclosure Statement Hearing, the Debtors did not have any actionable offers for corporate distributions and did not have a final agreement regarding international distributions for *any* creditors.  The 100-creditor offer from Coinbase materialized near-simultaneously with the approval of the Disclosure Statement, as set forth in the following table:

| Date | Event |
|---|---|
| August 1, 2023 | Initial Coinbase Distribution Proposal Received for Distributions to International (Non-Corporate) Creditors |
| August 5, 2023 | Debtors Inquire Regarding Corporate Distributions |
| August 9, 2023 | Revised Disclosure Statement Filed[5] |
| August 14, 2023 | Disclosure Statement Hearing |
| August 15, 2023 | Revised Disclosure Statement Filed |

---

[5]    The Disclosure Statement was first filed on June 27, 2023.  In addition to the revisions summarized in this table, the Disclosure Statement was also amended on July 29, 2023.

| August 16, 2023 | Coinbase Conveyed 100-Creditor Offer |
|---|---|
| August 17, 2023 | Revised Disclosure Statement Filed [Solicitation Version] |
| August 17, 2023 | Disclosure Statement Order Entered |
| September 7, 2023 | Hearing Held—Presentation Contains References to 100-Corporate Creditor Limit<br>*Negotiations near-final but ongoing for international distributions.* |

3.    Because of this uncertainty, the Disclosure Statement disclosed that negotiations were ongoing regarding Distribution Agents for international and corporate creditors and stated that the Debtors would keep open the platform to facilitate distributions to international and corporate creditors if no Distribution Agent could be identified.   The Disclosure Statement expressed that this would not be a desirable outcome and separately cautioned that some creditors may need to receive fiat distributions for a variety of reasons, including legal considerations. *See* Disclosure Statement Art. II.B.1.a., Art. III.R.

4.    After the Debtors were able to come to an agreement with Coinbase to facilitate individual (non-corporate) international distributions and distributions to 100 corporate creditors, the calculus changed regarding the remaining distributions.  While 100 corporate creditors is far short of the total of approximately 1,900 by number, the 100 largest corporate creditors represent approximately 70% of the value distributable to corporate creditors under the Plan, and the Debtors did not have a suitable offer from any other potential Distribution Agent.  With only 30% of the value distributable to corporate creditors remaining, the Debtors determined it was not appropriate to take the steps necessary to conduct these distributions themselves given the regulatory hurdles and costs of making these distributions themselves.  At a minimum, the Debtors would have needed to retain local counsel in each state and country where the Debtors proposed to perform distributions to ensure such distributions were done in a regulatorily compliant manner—and there was no certainty that regulators (who were active in vetting potential distribution agents and their

licenses) would sign off on allowing the Debtors to make these distributions themselves, particularly when some of these regulators had been investigating the Debtors prepetition for these types of distributions. Setting aside cost and regulatory risk, self-facilitating these distributions would potentially cause significant delays to *all* distributions while the Debtors worked to identify the art of the possible and then prepared to implement.

5.      Subsequently, the Debtors and Coinbase had numerous discussions regarding the issue of how many corporate creditors Coinbase would agree to facilitate distributions for and potential alternatives for corporate creditors whose accounts were retirement accounts. Despite months of discussions, Coinbase only ever offered to facilitate distributions to ten to fifteen additional corporate creditors. The Debtors and Coinbase never agreed on a number beyond 100 distributions, and the Debtors never instructed Coinbase to make distributions beyond 100 corporate creditors. Though this limit does not explicitly appear in the final agreement with Coinbase (the "Coinbase Agreement"), it is embodied in the provision prohibiting the Debtors from engaging in activities "that impose an unreasonable or disproportionally large load on Coinbase's infrastructure." Coinbase Agreement ¶8.4.2.

6.      To avoid delaying the distribution for all creditors over 2.4% of distributable value, the Debtors—in accordance with the Plan—made the determination that no Distribution Agent was reasonably available to make distributions to the remaining corporate creditors in Liquid Cryptocurrency and scheduled such creditors to receive Cash. *See* Plan Art. IV.G ("[T]he Debtors or Post-Effective Date Debtors, as applicable, may elect in their reasonable discretion to make any distribution in [Cash] if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.").

5

7.      Though many corporate creditors argue that the Debtors should have identified a Distribution Agent other than Coinbase for Liquid Cryptocurrency distributions to corporate creditors, their arguments do not appreciate the extent of the vetting process for Distribution Agents and the interconnection of all distributions.  Each potential Distribution Agent required careful review regarding its ability to make distributions safely and reliably to large numbers of Celsius creditors and its financial resources, among other things.  The Debtors also had to ensure that any potential Distribution Agent would be able to withstand regulatory scrutiny.

8.      For these reasons, and as more fully set forth herein and in the Original Objection, the Debtors and the Post-Effective Date Debtors have complied with the Plan, the Faller Creditors and similarly situated creditors (including the Australian corporate creditors) are not entitled to an additional distribution, and the Bankruptcy Court should deny the Distribution Motion and the Australian Distribution Motion.

## **Argument**

### I.     **The Corporate Distributions Comply with the Plan.**

9.      The Plan permits the Debtors or Post-Effective Date Debtors "to make any distribution in [Cash] if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor."  Plan Art. IV.G; *see also* Plan Art. IV.K.1 ("For the avoidance of doubt, if the Debtors or the Plan Administrator cannot make a distribution of Liquid Cryptocurrency to a particular creditor (including because no Distribution Agent is available to make such distribution), such creditor will receive a distribution of fiat.").  Because there was no Distribution Agent "reasonably available" to make a Liquid Cryptocurrency distribution to all of the Debtors' corporate creditors, including those corporate creditors located in Australia, the Debtors properly scheduled such creditors to receive a Cash distribution.

6

A. **The Plan and Disclosure Statement Provide Flexibility Regarding the Form of Distribution.**

10.     When developing the Plan, the Debtors' guiding mission was to return as much Cryptocurrency to as many creditors as possible.  Ferraro Dec. ¶ 4.  At the same time, the Debtors understood that regulatory restrictions and practical realities could limit their ability to distribute Cryptocurrency—even Liquid Cryptocurrency—to creditors.  *See id.* ¶ 10.  As such, the Plan permits Cash distributions or distributions in a specific Cryptocurrency if required to remain compliant with applicable laws and regulatory requirements.  *See* Plan Art. VI.G ("Notwithstanding anything to the contrary herein, the Distribution Agent may, in its sole and absolute discretion, make any distributions provided for herein in a specific Cryptocurrency or fiat as required in its business and legal judgment to remain compliant with applicable laws and regulatory requirements.").

11.     Prior to the August 14, 2023 Disclosure Statement Hearing, the Debtors considered various options for facilitating Liquid Cryptocurrency distributions to their creditors, including conducting the distributions themselves or contracting with third parties to facilitate the distributions.  Ferraro Dec. ¶ 6.  At the time of the Disclosure Statement Hearing, the Debtors had reached an agreement with PayPal to facilitate Liquid Cryptocurrency distributions to non-corporate creditors located in the United States (other than Hawaii).  *Id.* ¶ 9.  Though the Debtors were negotiating with Coinbase to facilitate Liquid Cryptocurrency distributions to international creditors and had asked Coinbase to include corporate creditors, negotiations remained ongoing and Coinbase had not yet responded as to whether it would facilitate distributions to any of the Debtors' corporate creditors.  *Id.*  As such, the Disclosure Statement, as approved, informed international and corporate creditors that:

> [f]or all distributions of Cryptocurrency that are not or will not be made by PayPal (including distributions to international creditors, corporate creditors, and Custody

7

and Withhold creditors), the Debtors continue to explore potential Distribution Agents.    If another Distribution Agent cannot be located to make those distributions, the Debtors will keep the Celsius platform open for ninety days after the Effective Date to make distributions to these creditors through the Celsius App (similar to how the Debtors have processed Court-approved withdrawals for certain Custody and Withhold users).  The Debtors would prefer to identify a Distribution Agent who can make these distributions to international and corporate creditors because it is expensive to keep the Debtors' platform open to process withdrawals.

Disclosure Statement Art. II.B.1.a.

12.    The Disclosure Statement further provided that:

[t]he Distribution Agent may be unable to make distributions to certain parties for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions, as further explained in Article VIII of this Disclosure Statement, entitled "Risk Factors." In certain circumstances, these legal or other reasons may prevent the Distribution Agent from making any distributions, and in other circumstances, the Distribution Agent may only be able to make such distributions in Cash.

Disclosure Statement Art. III.R.

**B.    No Distribution Agent Was Reasonably Available to Provide Liquid Cryptocurrency Distributions to the Moving Creditors.**

13.    The Debtors solicited proposals from eight potential third-party Distribution Agents.  Ferraro Dec. ¶ 6.  In evaluating the proposals submitted by potential Distribution Agents, one of the Debtors' central focuses was avoiding a situation where a Distribution Agent filed its own insolvency proceeding or became subject to regulatory actions which could put creditors' distributions at risk.   Therefore, the Debtors considered, among other things, each potential Distribution Agent's reputation, size, financial stability, regulatory licenses, and AML/KYC compliance process.  Additionally, with an aim to provide Liquid Cryptocurrency distributions to as many creditors as possible while minimizing the cost and complexity of the distribution process, the Debtors also considered what population of creditors a Distribution Agent could facilitate distributions to and whether such population was already covered by an existing Distribution Agent.

14.     After review, Coinbase was the only suitable Distribution Agent who agreed to facilitate Liquid Cryptocurrency distributions to *any* corporate creditors, and the parties mutually agreed that Coinbase would make Liquid Cryptocurrency distributions to 100 of the Debtors' approximately 1,900 corporate creditors in order to maintain Coinbase's high level of service and in consideration of the practicalities of Coinbase's onboarding process.   Ferraro Dec. ¶¶ 6, 12. While 100 corporate creditors is approximately 5% of corporate creditors by number, the largest 100 corporate creditors represent approximately 70% of the value to be distributed to corporate creditors under the Plan, and the Debtors (who closely consulted with the Committee regarding the distribution process) determined that making distributions of Liquid Cryptocurrency to 100 corporate creditors (given that Coinbase was available for Liquid Cryptocurrency distributions to 100 corporate creditors) was preferable to making none.   Ferraro Dec. ¶ 13.

15.     Against this backdrop, the Debtors filed a presentation ahead of the September 7, 2023 omnibus hearing which noted that the Debtors were close to entering into an agreement with a then unnamed Distribution Agent (Coinbase) to facilitate Liquid Cryptocurrency distributions to the top 100 corporate creditors and that all other corporate creditors would receive Cash distributions. *See Notice of Filing of September 7, 2023, Hearing Presentation* [Docket No. 3428] at 7.  In parallel, the Debtors continued negotiating with Coinbase regarding the issue of how many corporate creditors Coinbase would facilitate distributions for and potential alternatives for corporate creditors whose accounts were retirement accounts.   Ferraro Dec. ¶ 12.   These negotiations continued for months—only ending in January 2024 when their continuation threatened to delay the Effective Date.  *Id.*  During the course of these negotiations, Coinbase only offered to facilitate distributions to ten to fifteen additional corporate creditors, but the Debtors and Coinbase never reached a final agreement for distributions to such creditors.  *Id.*

16.     The Debtors made several additional disclosures regarding the 100-creditor limit for Liquid Cryptocurrency distributions to corporate creditors, including on the distribution FAQ (which went live on January 11, 2024) and in the notice of the Effective Date.  Additionally, on January 19, 2024, the Debtors contacted the top 250 corporate creditors, explained the limitation on the number of Liquid Cryptocurrency distributions that could be made, and requested that such creditors notify the Debtors if they would prefer a Cash or Liquid Cryptocurrency distribution. Ferraro Dec. ¶ 19.  Despite these disclosures, the first objections to this allocation were not filed until late February, after the trading price of bitcoin rapidly increased.  In fact, twenty-seven corporate creditors—***including the Faller Creditors***—specifically elected to receive a Cash distribution when given the choice.  Campagna Dec. ¶ 8.

17.     As described in the Original Objection, the Debtors set aside sufficient Cash to make Cash distributions to these electing creditors based on their responses, and the Debtors also set aside sufficient Cash to make Cash distributions to all other corporate creditors (other than the 100 largest corporate creditors who expressed a preference for a Liquid Cryptocurrency distribution) on the basis that there was "no Distribution Agent [] reasonably available to make a Liquid Cryptocurrency distribution to [such] creditor[s]."  Plan Art. IV.G.

**C.     The Debtors Cannot Require Coinbase to Complete Additional Distributions to Corporate Creditors.**

18.     The Debtors and Coinbase entered into the Coinbase Agreement in October 2023, and a copy of the Coinbase Agreement was included in the Plan Supplement which was approved by the Bankruptcy Court as part of the Confirmation Order.[6]  Pursuant to the Coinbase Agreement, the Debtors or Post-Effective Date Debtors, as applicable, provide Coinbase with written

---

[6]     The Coinbase Agreement was part of the approved Plan Supplement.  *Seventh Notice of Filing Plan Supplement* [Docket No. 3869], Ex. G.

instructions regarding distributions, including who to make distributions to and what amount to distribute to a certain creditor. *See* Coinbase Agreement § 4.2; Coinbase Agreement, <u>Sch. 1</u> ("The Celsius Estate will provide documentation detailing each creditor's email address, and quantity of assets (as well as other mutually agreed information, which will be hashed if such information is Personally Identifiable Information) to be distributed with legal authorization for Coinbase to have access to the relevant exchange account at Coinbase and to perform these functions on their behalf."). The Coinbase Agreement does not explicitly state that Coinbase will only make distributions to 100 corporate creditors. Rather, the Coinbase Agreement includes a provision that prohibits the Debtors from engaging in activities "that impose an unreasonable or disproportionately large load on Coinbase's infrastructure." Coinbase Agreement ¶ 8.4.2.

19.    For Coinbase, making distributions to corporate creditors is an intensive, multi-stage process that is necessary to ensure compliance with applicable laws across many jurisdictions. First, a corporate creditor is required to submit various documentation related to the customer's identity, business dealings, location, tax status, and principles. Bartlett Dec. ¶ 11. Coinbase's operations and compliance team reviews the data provided to ensure they are dealing with the correct entity and that the relationship between Coinbase and the applicable corporate creditor does not violate any applicable sanctions regimes or laws. *Id.* In addition, each corporate creditor must enter into a Prime services agreement with Coinbase, which may require the negotiation of a bespoke agreement. *Id.* ¶ 12.

20.    Once a corporate creditor has completed these steps, the Post-Effective Date Debtors must provide Coinbase with instructions to facilitate a distribution, which includes specific account information for such corporate creditor, to ensure the distribution is made to the proper creditor. *Id.* ¶ 13. Once this information has been verified, the Post-Effective Date Debtors

instruct Coinbase to send a test transaction to the applicable corporate creditor's wallet address. *Id.* Each corporate creditor must confirm that they received the test transaction prior to the Post-Effective Date Debtors instructing Coinbase to make the remainder of the applicable corporate creditor's distribution.

21.      The results to date demonstrate the challenges of the process.  Of the 100 corporate creditors allocated Liquid Cryptocurrency distributions, 81 corporate creditors have received their distribution through Coinbase, 8 corporate creditors have completed Coinbase's AML/KYC compliance requirements but have not yet confirmed they have received the test transaction or their deposit address, 5 corporate creditors have been rejected by Coinbase, and 6 have not initiated or completed Coinbase's onboarding process.   Ferraro Dec. ¶ 20.  The Post-Effective Date Debtors' current contract with Coinbase expires in January 2025, and the Post-Effective Date Debtors anticipate sending instructions for Coinbase to facilitate $83.4 million (at January 16, 2024 cryptocurrency prices) in additional distributions to international and corporate creditors before the term is up.

## II.      Corporate Creditors Were Not Damaged by Receiving Cash.

22.      Assuming, *arguendo*, that the Faller Creditors and the joining movants are correct and all corporate creditors should have received a Liquid Cryptocurrency distribution, they still have not suffered any damages.  As explained in the Original Objection, the Plan required the Debtors to value all initial distributions as of the Distribution Record Date (*i.e.*, January 16, 2024). A concept like the Distribution Record Date is present in nearly every chapter 11 plan, because the value of many assets, including Cryptocurrency, fluctuates.  To control for these movements, the Debtors set aside sufficient Cash and Liquid Cryptocurrency (at January 16, 2024 prices) to make distributions to all creditors entitled to a distribution under the Plan.  This concept is

especially important in the Debtors' case because the value of Cryptocurrency fluctuated even in advance of the Effective Date.  Campagna Dec. ¶ 6.

23.    Whether a creditor was scheduled to receive Cash or Liquid Cryptocurrency, all creditors received the same value as of the Distribution Record Date.  For example, if a creditor had a Class 5 General Earn Claim for $100,000, such creditor received either Cash worth $58,000 or Liquid Cryptocurrency worth $58,000 as of the Distribution Record Date.  The difference is that where a creditor was scheduled to receive their distribution in Cash, either because no Distribution Agent was reasonably available to make a distribution in Liquid Cryptocurrency to such creditor or because such creditor requested a distribution in Cash, the Debtors set aside sufficient Cash to make such distribution, not Liquid Cryptocurrency.  The fact that twenty-seven creditors, including the Faller Creditors, elected to receive a Cash distribution when presented with the opportunity for a Liquid Cryptocurrency distribution underscores the fact that creditors presented with the choice saw a Cash distribution as equivalent to, if not more valuable than, a Liquid Cryptocurrency distribution. *See id.* ¶ 8.

24.    As a consequence, the only potential damages derive from any delay.  The Plan, however, specifically forecloses this possibility because it provides that creditors shall not "be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date."  Plan Art. VI.B; Disclosure Statement Art. III.O.  The Debtors notified creditors that they could not "guarantee the timing or amount of any recovery on an Allowed Claim," which could be "affected by many factors that cannot be predicted."  Disclosure Statement Art. VIII.B.3.

25.    From identifying and negotiating with potential Distribution Agents to addressing and resolving distribution hurdles (as further described in the Original Objection), distributions in

these Chapter 11 Cases have been especially difficult.  Nearly all distributions have experienced delays of some form or fashion, but none rise to the level of a violation of the Plan.  While the Debtors understand and empathize with the frustrations of creditors who have not yet received their distributions, the Post-Effective Date Debtors cannot open Pandora's Box by granting creditors "true up" payments due to changes in cryptocurrency prices following the Initial Distribution Record Date under the present circumstances.  Therefore, the Distribution Motion should be denied.

### III.    The Australian Distribution Motion Should Similarly Be Denied.

26.    The Australian Distribution Motion largely mirrors the Distribution Motion. Through the Australian Distribution Motion, corporate creditors located in Australia who have yet to receive their Cash distributions seek an order requiring the Post-Effective Date Debtors to make Liquid Cryptocurrency distributions to them rather than Cash distributions.  For the reasons set forth above and in the supporting declarations, this simply is not feasible.  The Debtors already solicited proposals from various potential Distribution Agents, analyzed such proposals, and determined that Coinbase presented the only suitable proposal for distributions to corporate creditors.  Further, the Celsius platform is no longer operational for the Post-Effective Date Debtors to utilize to facilitate such distributions themselves.  That certain corporate creditors in Australia have yet to receive their Cash distributions (and may face additional challenges to receiving them) does not change these facts.

27.    The Post-Effective Date Debtors acknowledge that processing wire transfers for Australian-based creditors has proven particularly complex.  This is because some Australian banks do not accept USD checks and use different intermediary banks to process international wire transfers than banks located in other countries, which has introduced additional complexities when troubleshooting wire transfer issues.  Ferraro Dec. ¶ 21.  In addition, many creditors, whether

14

corporate, Australian, or otherwise, have had issues completing the wire transfer form, including inputting the name of their bank, or their individual name rather than the name of their corporate entity, as the beneficiary of the wire transfer. *Id.* Following unsuccessful wire attempts, the Post-Effective Date Debtors have communicated with creditors regarding why a particular attempt was unsuccessful, including explaining the issues with their previously submitted wire transfer information and asking the creditor to submit corrected wire transfer information. *Id.* ¶ 22. Despite this, many creditors continue to either submit the exact same wire information or have submitted new but also incorrect wire information. *Id.* Though the Post-Effective Date Debtors could endeavor to unilaterally fix common errors in submitted wire information, doing so comes with the risk that the Post-Effective Date Debtors will make a distribution to someone other than the correct creditor. *Id.*

28.    Despite these difficulties, the assertion in the Australian Distribution Motion that no distributions have been made to Australian corporate creditors is not true. To date, the Post-Effective Date Debtors have made distributions totaling approximately $2.7 million to Australian corporate creditors, representing approximately 28.7% of the total value currently eligible for distribution to Australian corporate creditors under the Plan. *Id.* While these numbers are lower than the Post-Effective Date Debtors would like them to be, the Post-Effective Date Debtors are committed to working through distribution-related issues and have been exploring other options, including PayPal Hyperwallet, for making Cash distributions to creditors in Australia and elsewhere. *Id.* PayPal Hyperwallet, which the Post-Effective Date Debtors announced as a new fiat Distribution Agent at the June 27, 2024 omnibus hearing, is expected to be functional in the coming week and should provide an avenue for most creditors to receive Cash

distributions.[7]  Modifying the Post-Effective Date Debtors' already complex distribution process or requiring the Post-Effective Date Debtors to re-solicit proposals from entities that have already expressed no desire in making Liquid Cryptocurrency distributions to corporate creditors, however, is not the answer.  As a result, the Australian Distribution Motion should be denied.

*[Remainder of page intentionally left blank.]*

---

[7]    Due to PayPal Hyperwallet's requirements, corporate creditors are expected to have to complete an onboarding process which includes submitting AML/KYC compliance information whereas individual creditors are not expected to be required to complete such process.

New York, New York
Dated:  July 23, 2024

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Post-Effective Date Debtors*