| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Christopher S. Koenig |
| 601 Lexington Avenue | Dan Latona (admitted *pro hac vice*) |
| New York, New York 10022 | **KIRKLAND & ELLIS LLP** |
| Telephone:    (212) 446-4800 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile:    (212) 446-4900 | 333 West Wolf Point Plaza |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Counsel to the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF
CHRISTOPHER FERRARO, PLAN ADMINISTRATOR,
IN SUPPORT OF THE POST-EFFECTIVE DATE DEBTORS'
(I) SUPPLEMENTAL OBJECTION TO THE FALLER CREDITORS'
MOTION SEEKING ENTRY OF AN ORDER APPROVING FURTHER
DISTRIBUTION UNDER THE PLAN OF REORGANIZATION FOR
THE FALLER CREDITORS AND (II) OBJECTION TO THE AD HOC
GROUP OF AUSTRALIAN CORPORATE CREDITORS' MOTION
FOR A LIQUID CRYPTOCURRENCY DISTRIBUTION**

Pursuant to 28 U.S.C. § 1746, I, Christopher Ferraro, hereby declare under penalty of perjury, as follows:

---

[1] The Post-Effective Date Debtors in these Chapter 11 Cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Background and Qualifications**

1. I am the Plan Administrator for the Plan and the Chief Financial Officer of Celsius Network LLC ("Celsius" and together with the above-captioned post-effective date debtors, the "Post-Effective Date Debtors," and prior to the Effective Date, the "Debtors") and was previously the interim Chief Executive Officer and Chief Restructuring Officer of Celsius. I joined Celsius on March 21, 2022. I was appointed as Chief Financial Officer on July 11, 2022, and I was appointed as interim Chief Executive Officer and Chief Restructuring Officer by the Special Committee of Debtor Celsius Network Limited on September 27, 2022, following the resignation of the Debtors' co-founder and former chief executive officer, Alex Mashinsky.

2. In my capacity as the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, I became generally familiar with the Debtors' day-to-day operations, business, financial affairs, and ongoing restructuring efforts, including, but not limited to, the transactions contemplated under the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC And Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] and related negotiations. As Plan Administrator, I am responsible for, among other things, administering the Post-Effective Date Debtors, maintaining the Disputed and Contingent Claims Reserve, and assisting in making any distributions contemplated under the Plan.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Motion Seeking Entry of an Order (I) Approving Further Distribution Under Plan of Reorganization for the Faller Creditors and (II) Granting Related Relief* [Docket No. 4911] (the "Distribution Motion"), the Plan, or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No 3332] (the "Disclosure Statement"), as applicable.

2

3.      Except as otherwise indicated herein, all facts in this declaration (this "Declaration") are based upon (a) my personal knowledge, (b) my discussions with members of my team and my advisors, and (c) my review of relevant documents and information concerning the distribution process and the relevant agreements.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## Distribution Overview

4.      Throughout the process of developing the Plan, the Debtors' guiding mission was to return as much Cryptocurrency to as many creditors as possible.  We began the process hoping to distribute Cryptocurrency to all creditors in-kind (*i.e.*, in the same Cryptocurrency the Account Holder originally transferred to the Debtors) to the greatest extent possible, and adjusted our goals as practical and legal hurdles arose.  Ultimately, the Plan provided for distributions of BTC and ETH (defined as "Liquid Cryptocurrency" in the Plan) where feasible and, where Liquid Cryptocurrency distributions were infeasible, distributions in fiat currency.

5.      The Post-Effective Date Debtors are in the process of making distributions to their approximately 375,000 creditors residing in more than 165 countries, approximately 1,900 (approximately 0.5%) of which are corporate creditors.  To date, the Post-Effective Date Debtors have returned approximately $2.43 billion[3] in value, or approximately 89.6% of the value currently eligible to be distributed under the Plan, to creditors.  Approximately $1.42 billion and $893 million worth of Liquid Cryptocurrency (based on January 16, 2024 cryptocurrency prices) have been distributed to creditors via PayPal and Coinbase, respectively.  An additional $125 million in Cash distributions have been made to creditors who either cannot receive Liquid

---

[3]    This figure is based on cryptocurrency prices as of January 16, 2024, the Initial Distribution Record Date.

3

Cryptocurrency distributions or who requested a Cash distribution, including $33 million in Cash already distributed to corporate creditors.

### Selection of Distribution Agents

6. Prior to the August 14, 2023 Disclosure Statement Hearing, the Debtors considered various options for facilitating Liquid Cryptocurrency distributions to their creditors, including conducting the distributions themselves or contracting with third parties who would make the distributions. As part of this process, the Debtors solicited proposals from eight potential third-party Distribution Agents. We vetted the potential Distribution Agents extensively, and considered critical factors including their (a) ability to safely and reliably make distributions to large numbers of Celsius creditors in over 165 countries, (b) regulatory compliance, (c) security and risk controls, and (d) financial resources. We wanted to ensure that the potential Distribution Agent would be able to withstand regulatory scrutiny, and the Debtors and their advisors discussed potential Distribution Agents with regulators many times ahead of the confirmation hearing. We also wanted to ensure that the Distribution Agent had sufficient financial wherewithal such that it was not likely to file its own bankruptcy proceedings in the event of a downturn in the cryptocurrency market. At the conclusion of this process, Coinbase was the only potential Distribution Agent who was willing to make distributions to any corporate creditors in cryptocurrency and who also satisfied our evaluation criteria.

7. Coinbase submitted its initial proposal on August 1, 2023 (approximately two weeks before the Disclosure Statement Hearing). At the time, the Debtors were primarily focused on identifying a Distribution Agent to handle international Liquid Cryptocurrency distributions, as the Debtors were engaged in productive conversations with PayPal for PayPal to facilitate Liquid Cryptocurrency distributions to U.S.-based individual customers on favorable terms. The anticipated PayPal agreement would provide a Distribution Agent for the Debtors'

individual customers in the United States, who constitute approximately 65% of the Debtors' individual creditors. The Debtors' international customers constitute the remaining approximately 35% of their individual creditors. The Debtors also did not have a solution identified for their approximately 1,900 corporate (non-individual) creditors (0.5% of all Account Holders), representing $144 million worth of Claims valued as of the Petition Date, because PayPal would not make any Liquid Cryptocurrency distributions to corporate creditors.

8. Coinbase's initial proposal only contemplated facilitating distributions to the Debtors' individual international creditors. On August 5, 2023, the Debtors asked Coinbase if it would be able to facilitate distributions to the Debtors' approximately 1,900 corporate creditors, approximately half of whom are located in the United States.

### Disclosure Statement Hearing

9. As of the Disclosure Statement Hearing on August 14, 2023, the Debtors and PayPal had reached an agreement regarding the distribution of Liquid Cryptocurrency to individual (non-corporate) creditors in the United States (other than Hawaii). Though the Debtors were negotiating with Coinbase to facilitate Liquid Cryptocurrency distributions to international creditors and had asked Coinbase to include corporate creditors, negotiations remained ongoing and Coinbase had not yet responded regarding whether it would facilitate distributions to any of the Debtors' corporate creditors. The Debtors were also unsure if certain creditors would be able to receive Liquid Cryptocurrency distributions for any number of reasons, including that the creditor was banned by a Distribution Agent, the creditor was unable to complete the AML/KYC compliance process, or there was no Distribution Agent available to make a Liquid Cryptocurrency distribution to a particular creditor due to their location or identity.

### Post-Disclosure Statement Hearing Negotiations

10. After the Disclosure Statement Hearing—while solicitation was under way on the Bankruptcy Court-approved Disclosure Statement—the Debtors were able to finalize a business-level agreement with Coinbase regarding international distributions. Additionally, on or around August 16, 2023, Coinbase offered to facilitate Liquid Cryptocurrency distributions to 100 corporate creditors. In response, the Debtors asked Coinbase whether Coinbase could facilitate distributions to additional corporate creditors and offered additional compensation for such distributions.

11. The Debtors and Coinbase subsequently had numerous discussions regarding the issue of how many corporate creditors Coinbase could facilitate distributions for and potential alternatives for corporate creditors whose accounts were retirement accounts. Negotiations continued for months—only ending in January 2024 when the Debtors needed to finalize data files to prepare for distributions or risk delaying distributions to *all* of the Debtors' approximately 375,000 creditors. Coinbase made clear that they viewed distributions to corporate creditors as part of a larger deal centered around providing distributions to international creditors and that the number of corporate creditors Coinbase would serve would not materially change from 100. Despite months of discussions, the Debtors were only ever able to get Coinbase to offer to facilitate distributions to ten to fifteen additional corporate creditors, and the Debtors and Coinbase never reached a final agreement for distributions to such creditors.

12. From the very beginning of negotiations with Coinbase regarding corporate creditors, Coinbase was clear that it was not going to be able to make distributions to more than approximately 100 corporate creditors due to the practicalities of the onboarding process and Coinbase's commitment to maintaining a high level of service when making distributions to corporate creditors, as well as fulfilling their AML and sanctions obligations for these accounts.

Based on my discussions with Coinbase, it is my understanding that while Coinbase and the Debtors can leverage Coinbase's existing infrastructure to make Liquid Cryptocurrency to individual (non-corporate) international creditors, the same is not true for distributions to corporate creditors. The process for making corporate distributions is entirely manual, requiring the Post-Effective Date Debtors, Coinbase, and the applicable creditor to take additional steps prior to a distribution being made.

13. Accordingly, we designed a distribution process that included Liquid Cryptocurrency distributions to 100 corporate creditors based on the agreement with Coinbase. While 100 corporate creditors is far less than the total of approximately 1,900 corporate creditors by number, the largest 100 corporate creditors represented approximately 70% of the value to be distributed to corporate creditors under Plan, and the Debtors (who closely consulted with the Committee regarding the distribution process) determined that making distributions of Liquid Cryptocurrency to 100 corporate creditors (given that Coinbase was available for Liquid Cryptocurrency distributions to 100 corporate creditors) was far preferable to making none.

14. The Debtors still have $83.4 million (at January 16, 2024 cryptocurrency prices) in additional distributions slated for routing through Coinbase that have not yet been completed, and the Coinbase contract has a one year term that will expire in January 2025.

### Regulatory Considerations

15. Throughout the Plan formulation process, the Debtors were in active conversations with the SEC and other regulators regarding the identities of potential Distribution Agents. For each potential Distribution Agent, these regulators were interested not only in the licenses they had but how they fit into the distribution process, including what creditors such Distribution Agent would facilitate distributions to and what form of currency would be distributed. The Debtors' corporate creditors are associated with 63 different countries,

7

including approximately 1,000 creditors in the United States (across 49 states). We determined that in order for the Debtors to make Liquid Cryptocurrency distributions to corporate creditors themselves, it would likely be necessary to retain local counsel in nearly each of the 49 states and 63 countries where the Debtors proposed to perform distributions to ensure such distributions were done in a regulatorily compliant manner. We anticipated that obtaining the necessary regulatory approvals might be challenging given the prepetition opposition of many state regulators due to the fact that Celsius did not have money transmitter licenses in each jurisdiction it previously operated in.

16. While the Debtors initially intended to keep the Debtors' platform open to process distributions for international and corporate creditors if another Distribution Agent could not be identified, the agreement with Coinbase significantly changed the calculus. As described below, distributions to the largest 100 corporate creditors accounted for approximately 70% of the total value to be distributed to all corporate creditors. As such, any additional costs and delays—from keeping the platform open and for ensuring regulatory compliance—would now be on account of a much smaller universe of claims (approximately 0.5% of creditors and 2.4% of distributable value).

17. As a consequence, the Debtors determined that facilitating corporate distributions ourselves—if ultimately legally permitted—would cause material delays to the process, including delaying distributions for all creditors, and increase the overall cost of the distribution process. Accordingly, the Debtors did not further explore a self-supported distribution to corporate creditors.

**Corporate Creditor Distributions**

18.     The Debtors have approximately 1,900 corporate creditors eligible for distribution.  Understanding that the Debtors would only be able to make Liquid Cryptocurrency to 100 corporate creditors, the Debtors evaluated different methods of allocating these 100 spots, ultimately deciding to offer them to the corporate creditors with the largest Claims first in furtherance of the goal of distributing as much Liquid Cryptocurrency as possible.  The 100 largest corporate creditors constitute approximately 5% of the Debtors' total corporate creditors and approximately 70% of the total value to be distributed to all corporate creditors.

19.     After evaluating available options for allocating the 100 Coinbase distributions, the Debtors determined to email each of the 250 largest corporate creditors on January 19, 2024, notifying them that they were one of the corporate creditors with the largest Claims against the Debtors and, as such, may have the opportunity to receive a Liquid Cryptocurrency distribution through Coinbase.  The email further explained that the purpose of asking corporate creditors for their preference was to ensure that each corporate creditor who was selected to receive a Liquid Cryptocurrency distribution actually wanted to receive Liquid Cryptocurrency in light of the limited spots available.  The Debtors' correspondence stated that in order to be eligible to receive Liquid Cryptocurrency, a corporate creditor must both:  (i) affirmatively request to receive a distribution in Liquid Cryptocurrency by the stated deadline by email; and (ii) if the creditor had any Withdrawal Preference Exposure, elect to settle any Withdrawal Preference Exposure by January 25, 2024, and actually make the required payment to settle their Withdrawal Preference Exposure by no later than January 31, 2024.  The email further informed corporate creditors that if they failed to affirmatively indicate their preference for a Liquid Cryptocurrency distribution, they would receive Cash even if they were one of the 100 largest corporate creditors.

9

20. Corporate creditors were selected for the 100 corporate creditor distribution spots on January 31, 2024. To date, it is my understanding that 81 corporate creditors have received their distribution through Coinbase, 8 corporate creditors have completed Coinbase's AML/KYC compliance requirements but have not yet confirmed they have received the test transaction or their deposit address, 5 corporate creditors have been rejected by Coinbase, and 6 have not initiated or completed Coinbase's onboarding process. In sum, it is my understanding that over the course of a six month period, nineteen of the 100 corporate creditors allocated a Liquid Cryptocurrency distribution have not yet received such distribution due to the complexity of the process.

### Australian Corporate Creditor Distributions

21. It is my understanding that, while the Post-Effective Date Debtors have been facilitating Cash distributions to both individual and corporate creditors around the world, Cash distributions to creditors located in Australia have been particularly complex. Based on my discussions with the Post-Effective Date Debtors' bank, some Australian banks do not accept USD checks and use different intermediary banks to process international wire transfers than banks located in other countries, which has introduced additional complexities when troubleshooting wire transfer issues. In addition, many creditors, whether corporate, Australian, or otherwise, have had issues completing the wire transfer form. For example, some creditors have entered the name of their bank, or have entered their individual name rather than the name of their company, as the beneficiary of the wire transfer.

22. The Post-Effective Date Debtors have communicated with creditors whose wire transfers have been unsuccessful, including explaining the issues with their previously submitted wire transfer information and asking creditors to submit corrected wire transfer information.

10

Despite this, many creditors continue to either submit the exact same wire transfer information, or have submitted new but also incorrect wire information. The Post-Effective Date Debtors have discussed whether they should review the wire transfer information provided and try to unilaterally correct common mistakes, but doing so comes with the risk that the Post-Effective Date Debtors will make a distribution to someone other than the correct creditor.

23. Despite these difficulties, the Post-Effective Date Debtors have made distributions totaling approximately $2.7 million to Australian corporate creditors, representing approximately 28.7% of the total value currently eligible for distribution to Australian corporate creditors under the Plan. The Post-Effective Date Debtors are committed to working through distributions related issues and have been exploring other options, including PayPal Hyperwallet, for making Cash distributions to creditors in Australia and elsewhere.

[*Remainder of page left intentionally blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 23, 2024  
Quito, Ecuador

*/s/ Christopher Ferraro*
Name: Christopher Ferraro
Title: Plan Administrator