# EXHIBIT A

**Deed of Amendment**

This deed (this "**Deed**") is dated and effective on ___January 20___, 2022 (the "**Amendment Date**"):

between:  **Tether Limited** ("**TLTD**"),

a company incorporated pursuant to the laws of Hong Kong with incorporation number 2142570;

and  **Celsius Network Limited** (the "**Recipient**"),

a company incorporated pursuant to the laws of England and Wales with incorporation number 11198050;

(collectively, the "**Parties**"),

**WHEREAS** on February 1, 2020, each of the Parties entered into a token agreement, attached as Schedule 2 (*Original Agreement*) hereto (the "**Original Agreement**");

**WHEREAS** TLTD and the Recipient have agreed certain amendments to the Original Agreement, which the Parties wish to formalize pursuant to this Deed (the Original Agreement, as so amended pursuant to this Deed, the "**Amended Agreement**"). Capitalized terms used in this Deed but not otherwise defined shall have the meaning given to them in the Amended Agreement.

**1.  AMENDMENT.**

1.1  The Parties have agreed to amend the Original Agreement as follows, each amendment with effect from the Amendment Date:

(a)  By deletion of paragraph 1.1.6 (*Defined Terms*) in its entirety and by substituting the following paragraph in its place:

"1.1.6  "**Termination Date**" means January 13, 2023 (subject to any extension pursuant to clause 14 (*Termination*) and unless terminated earlier pursuant to the terms of this Agreement);"

(b)  By deletion of paragraphs 3 (*Collateral*) to and including 7 (*Interest*) in their entirety and by substituting the following paragraphs in their place:

"3.  **Collateral**: The collateral to be posted in consideration for making the Tokens available (the "**Collateral**") shall be equal to a percentage (the "**Initial Margin**") of the number of Tokens made available to the Recipient and payable in such digital tokens as may be agreed upon by TLTD and the Recipient, and the number of such digital tokens forming the Collateral shall be agreed upon by TLTD and the Recipient prior to TLTD making any Tokens available. The Initial Margin shall be as set out in Schedule 1 to this Agreement. In each instance of Tokens being made available, the Collateral shall be remitted to TLTD prior to the making available of any Tokens. The value of the Collateral shall be determined by reference to the average bid price of the relevant Collateral/USDT pair on the cryptocurrency exchanges set out in the row entitled 'Basket Exchanges' in Schedule 1 to this Agreement, where such Collateral/USDT pairs are available on such cryptocurrency exchanges (or such other cryptocurrency exchanges as the Parties may otherwise agree in writing from time to time), weighted equally amongst such exchanges.

TLTD shall hold the Collateral in a segregated account (the "**Collateral Account**") for the benefit of the Recipient. The Parties shall make good faith efforts to agree, prior to February 28, 2022, on a designated third party (the "**Third Party Signatory**") to be appointed as a signatory to the Collateral Account. Following such designation, the Collateral Account shall be subject to multi-signature controls, whereby: (a) private keys to the Collateral Account shall be held by: (i) the Third Party Signatory; (ii) a person designated by TLTD in writing

from time to time (which may be by email); and (iii) a person designated by the Recipient in writing from time to time (which may be by email); and (b) consent shall be required by two of three such signatories to take actions regarding such Collateral Account.

4. **Fall in Value of Collateral**: Should the value of the Collateral fall below a percentage (the "**Margin Call Point**") of the number of Tokens made available to the Recipient at any time, TLTD shall provide Recipient notice of such occurrence ("**Margin Call Notice**") and the Recipient shall, within ten (10) hours of such Margin Call Notice, provide additional amounts to TLTD's satisfaction to increase the Collateral to an amount equal to or greater than a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient. The Margin Call Point shall be as set out in Schedule 1 to this Agreement. If the Recipient has not posted sufficient additional Collateral in accordance with the foregoing, should the value of the Collateral fall below a percentage (the "**Liquidation Point**") of the number of Tokens made available to the Recipient at any time following the time that is ten (10) hours from the delivery of the applicable Margin Call Notice, TLTD shall have the right, in its sole and absolute discretion, and without further notice to the Recipient, to sell, dispose of, and liquidate the Collateral. The Liquidation Point shall be as set out in Schedule 1 to this Agreement.

5. **Rise in Value of Collateral**: Should the value of the Collateral increase to greater than a percentage (the "**Upper Limit**") of the number of Tokens made available to the Recipient at any time, TLTD shall, at Recipient's discretion (such election to be communicated to TLTD in writing, which may be by email or electronic messenger), either (i) on the next Monday or Thursday following such election being received by TLTD, return to the Recipient any such excess of the Collateral above a percentage, equal to the applicable Initial Margin, of the number of Tokens made available, or (ii) make available as soon as possible following such election being received by TLTD, additional Tokens to the Recipient such that the value of the Collateral is reduced to a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient. The Upper Limit shall be as set out in Schedule 1 to this Agreement.

6. **Return of Tokens**: At any time, provided the value of the Collateral has not fallen below a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient, the Recipient may return all or any portion of the Tokens and receive, in consideration, its Collateral, or a portion thereof, in respect of such returned Tokens. In the case of any partial return of Tokens, TLTD shall on or prior to the following Monday or Thursday, return to the Recipient any excess Collateral, if any, above a percentage equal to the Initial Margin of the number of Tokens outstanding following such partial return.

7. **Interest**: The Recipient shall pay TLTD simple, pro rata interest on all made available and unreturned Tokens equal to such interest rate per month as set out in Schedule 1 to this Agreement, in each case calculated on the basis of 30/360 per full calendar month. Any and all such interest shall be paid in a form and to a place or account as directed by TLTD."

(c) By insertion of the following new paragraph 10A as follows:

"10A. **Negative Pledge**. So long as any Tokens remain outstanding hereunder, the Recipient will not create or permit to exist any liens, claims, encumbrances or any nature or any kind on any of the Collateral, except in favour of TLTD pursuant to this Agreement."

(d) By insertion of the following new paragraph 10B as follows:

"10B. **Proceeds of Enforcement**. In the event that TLTD exercises its rights under this Agreement to sell, dispose of, and liquidate the Collateral (a "**Liquidation Event**"), any

proceeds of sale of Collateral shall be paid to, or at the direction of, TLTD and shall be applied in the following order (*provided that,* no proceeds will be applied in payment of any amounts specified in the paragraphs below until all amounts specified in such preceding paragraphs have been satisfied in full):

(a) FIRST in payment of all fees, costs, charges, expenses, liabilities and other amounts (including any interest thereon pursuant to the terms of this Agreement) incurred or payable by or on behalf of TLTD and any receiver, attorney or agent in connection with the Liquidation Event and TLTD exercising its powers and discretions hereunder;

(b) SECOND in payment to TLTD for application against all present and future monies, liabilities and obligations due, owing or incurred by the Recipient, whether actual or contingent, to TLTD under or in connection with the Agreement together with all interest (including, without limitation, default interest) accruing in respect of such monies or liabilities (including, without limitation, the obligation of the Recipient to return all Tokens and payment of all other amounts accrued and outstanding hereunder (including any interest accrued thereon)),

(the liabilities described in paragraphs (a) and (b) above, the "**Liabilities**"); and

(c) THIRD, the payment of the surplus (if any) to the Recipient.

The obligations (including the Liabilities) of the Recipient under this Agreement are full recourse obligations enforceable against the Recipient and its assets and shall survive any Liquidation Event. In the event that the proceeds of sale of the Collateral are not sufficient to satisfy the Liabilities in full or TLTD is otherwise prevented from the enforcement of its rights hereunder in respect of some or all of the Collateral, the Recipient shall retain full liability for the payment and performance of all outstanding Liabilities and such Liabilities shall be immediately due and payable. The provisions of this paragraph 10B shall survive, notwithstanding the termination of this Agreement."

(e) By deletion of paragraph 14 (*Term*) in its entirety and by substituting the following paragraph in its place:

"14. **Term**: Save as expressly set out herein, this Agreement shall terminate on the Termination Date. At the Termination Date, if any Tokens are still made available and outstanding pursuant to this Agreement, they shall be returned to TLTD (including any interest accrued thereon and subject to any earlier return requirement pursuant to this Agreement) by the Recipient and, thereupon, all Collateral shall be returned to the Recipient by TLTD. Either Party may terminate this Agreement on 30 days' notice the other Party. Subject to the foregoing, the Parties may mutually agree to extend the term of this Agreement by for one year. There is no limit to the number of successive one year renewals permitted under this Agreement. In the event that: (i) the Recipient fails to return any Tokens when due and/or fails to pay any interest payable hereunder (whether by scheduled maturity, demand or otherwise); (ii) the Recipient breaches any covenant or condition of this Agreement; or (iii) any representation or warranty made on behalf of the Recipient pursuant to, or in connection with, this Agreement, shall have been incorrect or misleading in any material respect when made or deemed repeated, then TLTD may: (a) demand return of all Tokens (and payment of all other amounts accrued and outstanding hereunder (including any interest accrued thereon) with immediate effect; (b) terminate this Agreement; and/or (c) sell, dispose of, and liquidate the Collateral. The provisions of paragraph 8 (*Confidentiality*) shall continue in force for a period of two years after the Termination Date. Termination of this Agreement shall not affect or prejudice any rights or obligations which have accrued or

arisen under this Agreement prior to the time of termination and such rights and obligations shall survive such termination.

(f)    By the insertion of Schedule 1 (*Percentage Points*) hereto as Schedule 1 to the Amended Agreement.

1.2    With effect from the Amendment Date, every reference in the Original Agreement to that agreement (including any reference to "this Agreement" or similar effect) will be construed as a reference to the Amended Agreement. The provisions of the Original Agreement shall, subject only to this Deed, continue in full force and effect.

## 2. PRE-EXISTING CLAIMS

2.1    Notwithstanding anything contained herein to the contrary, nothing in this Deed shall affect or prejudice any claim or demand whatsoever which either the Recipient or TLTD may have against the other under the Amended Agreement in relation to matters arising before the Amendment Date.

## 3. SECURITY CONFIRMATION

3.1    The Recipient confirms that, with effect from (and including) the Amendment Date, the security interest created by the Amended Agreement shall remain in full force and effect and continue to secure the obligations set out therein, and extend to all new obligations under the Amended Agreement.

## 4. REPRESENTATIONS

4.1    TLTD and the Recipient makes each of the representations and warranties in favour of TLTD under paragraph 9 (*Representations and Warranties of TLTD*) and paragraph 10 (*Representations and Warranties of the Recipient*), respectively, on: (i) the Amendment Date; (ii) any date upon which TLTD delivers Tokens to the Recipient; and (iii) any date upon which Collateral is provided to TLTD (each a "**Representation Date**"): (x) by reference to the facts and circumstances then existing; and (y) as if references to the "Agreement" include references to this Deed and the Amended Agreement.

4.2    The Recipient represents and warrants in favour of TLTD on each Representation Date by reference to the facts and circumstances then existing that the Recipient is: (i) able to pay its debts as they fall due, and: (ii) not otherwise insolvent under the terms of the laws of its jurisdiction of incorporation or continuation.

## 5. INCORPORATION OF TERMS

5.1    The provisions of paragraphs 8 (*Confidentiality*), 11 (*No Representation or Warranty*), 15 (*Counterparts and Transmission by Facsimile*), 16 (*Independent Legal Advice*), 17 (*Assignment*) and 18 (*Severability*) of the Amended Agreement shall be incorporated into this Deed as if set out in full herein and as if references in those paragraphs to "this Deed" are references to this Deed.

## 6. GOVERNING LAW

6.1    This Deed shall be governed by and is to be construed and interpreted in accordance with the laws of the British Virgin Islands. The Parties hereby irrevocably and unconditionally attorn to the non-exclusive jurisdiction and venue of the courts of the British Virgin Islands and all courts competent to hear appeals therefrom.

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

**Tether Limited**

_____

Name: JL van der Velde

Position: Director

*I have authority to bind the company.*

**Celsius Network Limited**

_____

Name:

Position:

*I have authority to bind the company.*


_____

Name: Giancarlo Devasini

Position: Director

*I have authority to bind the company.*

_____

Name:

Position:

*I have authority to bind the company.*

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

| **Tether Limited** | **Celsius Network Limited** |
|---|---|
| | |
| Name: JL van der Velde | Name: |
| Position: Director | Position: |
| *I have authority to bind the company.* | *I have authority to bind the company.* |
| | |
| Name: Giancarlo Devasini | Name: |
| Position: Director | Position: |
| *I have authority to bind the company.* | *I have authority to bind the company.* |

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

**Tether Limited**

_____

Name: JL van der Velde

Position: Director

*I have authority to bind the company.*

**Celsius Network Limited**

_____

Name: Alexander Mashinsky

Position: Director

*I have authority to bind the company.*

_____

Name: Giancarlo Devasini

Position: Director

*I have authority to bind the company.*

_____

Name: Shlomi "Daniel" Leon

Position: Director

*I have authority to bind the company.*

**Schedule 1**

**Percentage Points**

|  | **Where Collateral is provided in XAUt** | **Where Collateral is provided in BTC** | **Where Collateral is provided in ETH** |
|---|---|---|---|
| **Initial Margin** | 110% | 130% | 150% |
| **Margin Call Point** | 105% | 120% | 130% |
| **Liquidation Point** | 100% | 110% | 120% |
| **Upper Limit** | 120% | 150% | 170% |
| **Interest Rate** | 0.33% (recurring) per month | 6% per year applicable to all BTC collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are less than 2 Billion Tokens; 5.5% per year applicable to all BTC collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are equal to or greater than 2 Billion Tokens | 6% per year applicable to all ETH collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are less than 2 Billion Tokens; 5.5% per year applicable to all ETH collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are equal to or greater than 2 Billion Tokens |
| **Basket Exchanges** | Bitfinex, FTX | Coinbase Pro, Kraken, Bitfinex, Binance, FTX | Coinbase Pro, Kraken, Bitfinex, Binance, FTX |

**Schedule 2**

**Original Agreement**

[*To be attached*]

Token Agreement

This token agreement (this "**Agreement**") is effective as of February 1, 2020 (the "**Effective Date**")

between:    Tether Limited ("**TLTD**"),
a company incorporated pursuant to the laws of Hong Kong, incorporation number 2142570; and,

and    Celsius Network Limited (the "**Recipient**"),
a company incorporated pursuant to the laws of England and Wales, incorporation number 11198050

(collectively, the "**Parties**")

whereas TLTD is engaged in the business of making digital tokens available to willing parties;

and whereas the Recipient wishes to borrow digital tokens from TLTD, all on and subject to the terms and conditions set out in this Agreement;

now, therefore, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. Interpretation:
    1.1. Defined Terms:
        In this Agreement, the following capitalized terms have the following meanings unless the context indicates otherwise:
        1.1.1. "**Agreement**" means this token agreement between TLTD and the Recipient, effective February 1, 2020;
        1.1.2. "**Collateral**" has the meaning set out in paragraph 3 of this Agreement;
        1.1.3. "**Effective Date**" means February 1, 2020;
        1.1.4. "**Parties**" means TLTD and the Recipient;
        1.1.5. "**Recipient**" means Celsius Network Limited, a company incorporated pursuant to the laws of England and Wales, incorporation number 11198050;
        1.1.6. "**Termination Date**" means February 1, 2021;
        1.1.7. "**TLTD**" means Tether Limited, a company incorporated pursuant to the laws of Hong Kong, incorporation number 2142570; and,
        1.1.8. "**Tokens**" means Tether tokens made available by TLTD or by TLTD's affiliates from time to time.
    1.2. Headings: The headings and sub-headings in this Agreement are for ease of reference only and are not to be taken into account in the construction or interpretation of any provision or provisions to which they refer.
    1.3. Extended Meanings: Unless specified in this Agreement, words importing the singular include the plural and vice versa and words importing gender include all genders.
    1.4. Amendments: No change or modification of this Agreement is valid unless it is in writing and signed by the Parties.

1.5. Governing Law: This Agreement shall be governed by and is to be construed and interpreted in accordance with the laws of the British Virgin Islands. The Parties hereby irrevocably and unconditionally attorn to the non-exclusive jurisdiction and venue of the courts of the British Virgin Islands, and all courts competent to hear appeals therefrom.

2. Provision of Tokens: TLTD agrees to make available tether tokens (the "**Tokens**") to the Recipient from time to time. Each instance of TLTD making the Tokens available shall be subject to the written request of the Recipient and to TLTD's written agreement to making the Tokens available. All instances of making Tokens available shall be contingent on the Recipient's adherence to TLTD's terms of service, available on and at https://tether.to/legal/, or in such other place as may be designated by TLTD to the Recipient in writing, and as may be amended or changed from time to time in TLTD's sole and absolute discretion. TLTD reserves the right to make Tokens available to the Recipient on and subject to any protocol in TLTD's sole and absolute discretion. The availability of any Tokens at any time shall be subject to TLTD's standard fees in effect and as may be amended or changed from time to time.

3. Collateral: The collateral to be posted in consideration for making the Tokens available (the "**Collateral**") shall be equal to a percentage of the number of Tokens made available to the Recipient (the "**Initial Margin**") and payable in digital tokens as may be agreed upon by TLTD and the Recipient, and the number of such digital tokens forming the Collateral shall be agreed upon by TLTD and the Recipient prior to TLTD making any Tokens available. Where the Collateral is provided in: (1) Ether (ETH) tokens, the Initial Margin shall be equal to 170% of the Tokens made available to the Recipient, (2) Tether Gold (XAUt) tokens, the Initial Margin shall be equal to 110% of the Tokens made available to the Recipient, and (3) Bitcoin BTC tokens, the Initial Margin shall be equal to 140% of the Tokens made available to the Recipient. In each instance of Tokens being made available, the Collateral shall be remitted to TLTD prior to the making available of any Tokens. The value of the Collateral will be determined by using the spot price on Coinbase Pro.

4. Fall in Value of Collateral: Should the value of the Collateral fall below a percentage of the number of Tokens made available to the Recipient (the "**Margin Call Point**") at any time, the Recipient shall immediately provide additional amounts to TLTD's satisfaction in order to increase the Collateral to an amount equal to or greater than a certain percentage (the "**Margin Recovery Point**") of the number of Tokens made available to the Recipient. Notwithstanding the foregoing provisions of this paragraph, should the value of the Collateral fall below a percentage of the number of Tokens made available to the Recipient (the "**Liquidation Point**") at any time, TLTD shall have the right, in its sole and absolute discretion, and without further notice to the Recipient, to sell, dispose of, and liquidate the Collateral, and shall have all right, title, and interest to the Collateral and all proceeds therefrom. Where the Collateral is provided in : (1) Ether (ETH) tokens: (a) the Margin Call Point will be 150%; (b) the Margin Recovery Point will be 170%; and (c) the Liquidation Point will be 120%; (2) Tether Gold (XAUt) tokens: (a) the Margin Call Point will be 105%; (b) the Margin Recovery Point will be 110%; and (c) the Liquidation Point will be 100% and (3) BTC tokens: (a) the Margin Call Point will be 125%; (b) the Margin Recovery Point will be 140%; and (c) the Liquidation Point will be 115%;

5. Rise in Value of Collateral: Should the value of the Collateral increase to greater than a percentage of the number of Tokens made available to the Recipient (the "**Upper Limit**") at any time, TLTD shall immediately either (i) return to the Recipient any such excess of the Collateral above 180% of the number of Tokens made available, or (ii) make available additional Tokens to the Recipient such that the value of the Collateral is reduced to the Initial Margin, (i) or (ii) to be decided by TLTD in its sole and absolute discretion. Where the Collateral is provided in: (1) Ether (ETH) tokens the Upper Limit will be 200%; (2) Tether Gold (XAUt) tokens the Upper Limit will be 115% and (3) BTC tokens, the Upper Limit will be 180%.
6. Return of Tokens: At any time, provided the value of the Collateral has not fallen below a percentage of the number of Tokens made available to the Recipient (the "**Collateral Return Point**"), the Recipient may return all of the Tokens and receive, in consideration, its Collateral in respect of such Tokens. Where the Collateral is provided in: (1) ETH tokens: the Collateral Return Point will be 120%; (2) XAUt tokens: the Collateral Return Point will be 100% and (3) BTC tokens: the Collateral Return Point will be 115%. No partial return of Tokens is or shall be permitted pursuant to this Agreement.
7. Interest: The Recipient shall pay TLTD simple, *pro rata* interest on all made available and unreturned Tokens equal to a certain percentage per month, calculated on the basis of 30/360 per full calendar month; provided that, where the Collateral is provided in: (1) ETH tokens: the interest rate will be 0.55% in respect of Tokens issued pursuant to the deposit of such Collateral (2) XAUt tokens: the interest rate will be 0.333% in respect of Tokens issued pursuant to the deposit of such Collateral and (3) BTC tokens, the interest rate will be 0.55% in respect of Tokens issued pursuant to the deposit of such Collateral. Any and all such interest shall be paid in a form and to a place or account as directed by TLTD.
8. Confidentiality: The provisions of this Agreement shall be kept strictly confidential by the Parties. However, it shall not be a violation of this paragraph to disclose the terms of this Agreement: to duly retained and qualified lawyers and accountants acting as advisors to the Parties; pursuant to an order to comply issued by a properly-constituted court or administrative tribunal of competent jurisdiction; or, if necessary, to prosecute litigation among the Parties should any of the obligations of this Agreement be breached.
9. Representations and Warranties of TLTD: TLTD represents and warrants as follows:
    9.1. Valid Organization & Good Standing: That it is duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation or continuation; and,
    9.2. Authority: That it has all requisite corporate power and authority to enter into this Agreement; to perform its obligations hereunder; to consummate the transactions herein; and that its corporate signatory herein is vested with the requisite authority to bind itself to this Agreement.
10. Representations and Warranties of the Recipient: The Recipient represents and warrants as follows:
    10.1. Unencumbered Collateral: That all Collateral given over to TLTD in consideration for the Tokens is free and clear of any and all liens, claims, or encumbrances of any nature or of any kind, and that the Recipient has the full rights and authority to deploy such Collateral pursuant to this Agreement, without restrictions;

10.2. Valid Organization & Good Standing: That it is duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation or continuation; and,

10.3. Authority: That it has all requisite power, capacity, and authority to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions herein.

11. No Representation or Warranty: TLTD makes no other representation or warranty of any kind, and without limiting the generality of the foregoing, TLTD makes no representation or warranty of any kind about the Tokens, including with respect to their merchantability or fitness for any particular purpose. The Tokens are provided on an as-is, where-is basis only.

12. Perfection: The Recipient shall, at the request of TLTD, agree to all steps and shall sign such other and further documents as may be required to lodge and perfect TLTD's security interest in the Collateral.

13. Notice: Any notice, demand, or other communication required or permitted to be given to any Party to this Agreement shall be in writing and sent by electronic mail, receipt confirmed:

    13.1. in the case of the Issuer, to silvano@tether.to; and,

    13.2. in the case of the recipient, to legal@celsius.network and trading@celsius.network.

14. Term: This Agreement shall terminate on the Termination Date. At the Termination Date, if any Tokens are still made available and outstanding pursuant to this Agreement, they shall be returned to TLTD by the Recipient and, thereupon, all Collateral shall be returned to the Recipient by TLTD. Either Party may terminate this Agreement on 30 days' notice the other Party. The Parties may mutually agree to extend the term of this Agreement by for one year. There is no limit to the number of successive one year renewals permitted under this Agreement.

15. Counterparts and Transmission by Facsimile: This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which, when taken together, shall constitute but one and the same instrument. Signatures transmitted by electronic means (including electronic mail) shall be deemed to be originals.

16. Independent Legal Advice: The Parties each acknowledge having obtained their own independent legal advice with respect to the terms of this Agreement prior to its execution. No ambiguity or omission in this Agreement shall be construed or resolved against any Party on the ground that this Agreement or any of its provisions was drafted or proposed by that Party.

17. Assignment: Subject to all of the other provisions contained herein, this Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns. TLTD may assign, delegate, or otherwise transfer, in whole or in part, any or all of its rights or obligations under this Agreement without the consent of the Recipient. The Recipient may not assign, delegate, or otherwise transfer, in whole or in part, any or all of its rights or obligations under this Agreement without the express written consent of TLTD.

18. Severability: If any provision of this Agreement is held to be unenforceable or invalid in whole or in part by a court of competent jurisdiction, such unenforceability or invalidity attaches only to such provision and everything else in this Agreement continues in full force and effect.

**[The rest of this Page is blank.]**

IN WITNESS WHEREOF, this Agreement is executed by the Parties as of February 1, 2020.

| **Tether Limited** | **Celsius Network Limited** |
|---|---|
| Per: _[signature]_ | Per: _[signature]_ |
| Name: JL van der Velde | Name: Harumi Urata-Thompson |
| Position: Director | Position: CFO |
| Date: June 9, 2020 | Date: June 9, 2020 |
| I have authority to bind the company. | I have authority to bind the company. |