**Hearing Date and Time: August 27, 2024 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: August 13, 2024 at 4:00 p.m. (prevailing Eastern Time)**

| | |
|---|---|
| **BRESSLER, AMERY & ROSS, P.C.**<br>David H. Pikus<br>Christopher M. Vaughan (*pro hac vice* to be filed)<br>17 State Street, 34th Floor<br>New York, NY 10004<br>Telephone: (212) 425-9300<br>Email: dpikus@bressler.com<br>  cvaughan@bressler.com | **BRESSLER, AMERY & ROSS, P.C.**<br>Louis F. Mendez (*pro hac vice* to be filed)<br>2001 Park Place, Suite 1500<br>Birmingham, AL 35203<br>Telephone: (205) 719-0400<br>Facsimile: (205) 719-0500<br>Email: lmendez@bressler.com |

*Counsel for The Bressler Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |

**THE BRESSLER DEFENDANTS' OBJECTION TO THE LITIGATION ADMINISTRATOR'S MOTION FOR AN ORDER ESTABLISHING STREAMLINED PROCEDURES GOVERNING AVOIDANCE ACTIONS PURSUANT TO SECTIONS 502, 547, AND 550 OF THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE that Austin Michael Craig, Litao Liu, Allister Lam, Melvin Symes, Kenneth Kebbekus, Cang Ly, En Fan Ho, Alex Flocas, Daniel Case, Michael Merritt McCloy, Peter John Olson, Kirk Tsai, Jason Awad, Sean Pettis, Kyle Alexander Doohan, Abdelkader Benkreira, Wenifredo Suarez, and Jacob Matthew Setzer (collectively, the "Bressler Defendants"), by and through their undersigned counsel, Bressler, Amery & Ross, P.C., hereby object to the Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Section 502, 547 and 550 of the Bankruptcy Code as filed by Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors (the "Plaintiff" or the "Litigation Administrator").

1

I.      **Introduction**

The irony of Plaintiff's Motion for An Order Establishing Streamlined Procedures (Doc. No 7534, the "Motion") for the thousands of separate avoidance actions it decided to file is readily apparent. Streamlined procedures certainly do make good sense for these avoidance actions. But they have always made sense, even before Plaintiff filed almost 2,500 adversary proceedings against individual Celsius users. What does not make any sense, however, is for the Court to impose mandatory mediation fees of at least $2,500 on every individual Celsius user Plaintiff has opted to sue. By demanding that an excess of 2,400 individuals pay, at a minimum, $2,500 for mandatory mediation, Plaintiff appears to be using the specter of excessive mediation fees "as a cudgel to extort a settlement." *In re Gen. Aero. Corp.*, 594 B.R. 442, 478 (Bankr. D. Utah 2018). Indeed, the Litigation Administrator and Litigation Oversight Committee's (collectively, the "LOC's") request that these defendants must split the exorbitant costs they assign to the mediation process will do anything but encourage the expeditious resolution of claims: every retail customer facing a clawback is necessarily less motivated to settle in these mediations by a factor of the costs the LOC is demanding they carry into it.

Equity, justice, and the law demand that the LOC actually streamline this case in the way the Motion purports to do. Mediation will only be productive if the fees are affordable, and the LOC, as a show of good faith to the same Defendants on whom it seeks to impose mandatory mediation, covers those affordable costs. The Bressler Defendants therefore submit their limited objection to and oppose the portion of Plaintiff's proposed costs of mandatory mediation, and its proposal that the parties equally split those costs.

II. **Factual Background**

The following is a brief summary setting forth the LOC's settlement communications to potential and actual Celsius clawback defendants.

- July 28, 2022: Celsius suffers from a data breach shortly after its announcement of insolvency. The breach included their customers' email addresses, which leads to an onslaught of phishing and scam emails being sent to Celsius's prior users.

- January 10, 2024: Counsel for Celsius, Kirkland & Ellis, emails 5,711 Celsius users who executed withdrawal transactions to external wallets within 90 days of Celsius's declaration of insolvency (hereinafter referred to as "eligible users offering to settle the potential claims against them for 27.5%. *See* Jan. 10th Email from Celsius, attached hereto as **Exhibit A.** Due to the aforementioned data breach, many eligible users ignored this January 10 communication, believing it to be a phishing or scam email.

- January 31, 2024: the Bankruptcy Estate's Plan for Reorganization ("the Plan") went into effect. *See* Doc. No. 4289. The Plan called for the creation of the LOC, and the creation of the "Litigation Recovery Account" with an "Initial Litigation Funding Amount" of $55 million. *See id.* at 12-14.

- March 20, 2024: the LOC made its first attempt to contact eligible users, by sending a second email with a reduced settlement offer of 13.75%, to which eligible users must respond by a set date or the offer increases to 19.4% instead. *See* Mar. 20, 2024 Email from LOC, attached hereto as **Exhibit B.** The CelsiusLOC Twitter account ("the Twitter Account") and the CelsiusLOC Youtube Account ("the Youtube Account") also posted about the 13.75% for eligible users. Both of these social media posts stress that this 13.75% settlement figure is a "**limited time offer."**

- March 24, 2024: The Twitter Account represents that "hundreds of account holders representing over US$75 million of WPE have already settled or reached out regarding settlement."

- In reality, despite its goal to recover an excess of $2 Billion, by March 30, 2024, the LOC had recovered only $944,706.95 through settlement agreements. *See* Doc. No. 4847 Litigation Administrator's Quarterly Update from Apr. 30, 2024.

- April 2, 2024: the Twitter Account posted that "To date, over half of those who accepted the settlement offer are international users."

- April 5, 2024: the LOC circulated "Demand Letters" to eligible users, setting an initial deadline of April 15 to accept the 13.75% settlement offer. *See* April 15 Demand Letter, attached as **Exhibit C**. As with all prior communications, none of these so-called "Demand Letters" were circulated via U.S. Mail.

- April 11, 2024: the Twitter Account represents that a "growing number of users have settled their preference liability for the benefit of all eligible creditors as set forth in the Plan." The Youtube Account posted its second and final video, in which LOC member Cam Crews interviews Celsius creditor, Mark Finelli who had already settled his WPE for an undisclosed amount. Mr. Finelli called the settlement "fair and reasonable" while failing to mention that he is a former Celsius employee.

- April 17, 2024: Stretto suffered from a phishing attack. *See* Apr. 17, 2024 Notice of Data Security Incident, attached hereto as **Exhibit D**. This phishing attack led to the exposure of "creditor names, email addresses, mailing addresses, and Claim amounts" and, in some cases, tax identification numbers. *See* Ex. I at 2. Thereafter, eligible users were receiving spam emails not only as a result of the original Celsius data leak, but also phishing attempts from fraudsters who obtained their information from the LOC's own docket manager. Many email services, such as Gmail, automatically began sorting all emails from addresses with "Stretto" in the account name as spam, further increasing the difficulty for eligible users to become aware of the ongoing proceedings. Within hours of this phishing attack, the Twitter Account once again stresses the urgency of upcoming deadlines to accept the 13.75% settlement offer.

- April 23, 2024: Despite the supposed urgency of accepting the 13.75% settlement offer (which had been available since the LOC's initial communications on March 20), the Twitter Account issued *another* extension to accept the 13.75% settlement offer, allegedly "to accommodate the numerous requests to extend the deadline" and "**the surge of settlement requests** received over the past few days." This post claimed that "this **limited-time offer**" would increase to 19.4% on May 1, 2024.

- May 1, 2024: The "limited-time offer" for settlement was extended by yet another seven days via Twitter.

- May 15, 2024: The LOC circulates a second round of "Demand Letters," via email, which maintained the same 13.75% offer that was meant to expire the week prior. *See* May 15, 2024 Demand Letter, attached hereto as **Exhibit E.** Again, the LOC did not mail these letters to any potential settlors.

- From May 15 to June 30, the LOC made no attempts to contact any eligible users.

- June 30, 2024: By June 30, the LOC had settled approximately 1,600 cases for an estimated $88 million. This brought the sum of the Litigation Recovery Account to $188 million. *See* Doc. 7568, Quarterly Update**.** However, even this figure amounted to only 28% of the total pool of eligible users and represented a small fraction of the LOC's recovery goal (which was in excess of $2 Billion).

- July 1 to July 15: The LOC began filing the instant lawsuits against non-settling eligible users (hereafter referred to as the "WPE Defendants"). However, the suits filed by the LOC drastically altered the WPE values that, up until this point, had been advertised in every settlement agreement. While the original WPE value was based on the USD withdrawals of the crypto at the time it was withdrawn from Celsius, the WPEs

4

presented in the Complaints (hereafter "Complaint WPEs") based the value of the cryptocurrencies as of June 14, 2024. To provide perspective as to this change, on July 13, 2022 (the final day of the preference period), the value of one Bitcoin was $20,981. On June 14, 2024, one Bitcoin was worth $66,747—a multiple of 318%.

Following these numerous ineffective efforts at pre-litigation resolution, the LOC filed the instant Motion seeking to impose mandatory mediation and mediation fee structure on the WPE Defendants.

### III. Argument

To be clear, the Bressler Defendants do not oppose mediation as a general proposal for the swift resolution of a large number of the claims against the WPE Defendants. It is indisputable that "[m]ediation plays a critical role in the resolution of lawsuits by fostering settlement and preserving personal and judicial resources." *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 417 B.R. 197, 205 (Bankr. S.D.N.Y. 2009). However, the current proposed fee schedule will do anything but foster settlement nor will it preserve the resources of the Bressler Defendants or the Estate.

#### A.  The Proposed Fees Are Exorbitant and a Waste of Administrative Funds

The mediation fees themselves are exorbitant. Plaintiff has proposed 17 mediators to preside over 2,468 nearly identical claims. While the parties may be able to mediate a portion of those claims in group settings, many of them will not. Assuming an equal distribution of claims to mediators, each mediator will be responsible for presiding over negotiations for at least 140 cases that, again, contain essentially the same legal issues. Recognizing that fact, Plaintiff still insists that these mediators must be paid, at minimum, $5,000 per mediation. On a conservative average, then, Plaintiff is requesting that each mediator be paid $700,000.

In support of this monumental request, Plaintiff references the mediation fee structures from five other S.D.N.Y. Bankruptcy cases. *See* Doc. 7534 at 13. Plaintiff assures this Court that

5

the procedures it proposes in the Motion "are similar to procedures adopted in other cases with large numbers of adversary proceedings where uniform procedures were beneficial to the administration of those cases," without highlighting that the mediation fees it requests both parties share equally here are *substantially* higher than those ordered in the cases it lists. Only four of the five orders for streamlined procedure cited by Plaintiff on this point contained a fee schedule for mediation.[1] In addition, each case involved less than 400 adversary proceedings and all but *Quebecor World (USA)* involved only corporate entity defendants, not individuals.

- *In re Sizmek, et al.*, Case No. 19-10971 (SMB), Doc. No. 846 (Bankr. S.D.N.Y. July 24, 2020): For 82 adversary proceedings, in which all of the defendants were corporate entities, the Court ordered the following fee schedule based on amount claimed in complaint:
    - less than $100,000 – $3,000.00 per case;
    - $100,000 to $249,999 – $4,000 per case;
    - $250,000 to $999,999 – $5,000 per case; and
    - $1,000,000 or greater – $6,000.00 per case.

- *In re Advance Watch Co. Ltd.*, Case No. 15-12690 (MG), Docket No. 415 (Bankr. S.D.N.Y. Nov. 16, 2017): For 35 adversary proceedings, in which all of the defendants were corporate entities, the Court ordered the following fee schedule based on amount claimed in complaint:
    - less than $250,000 – $2,000 per party, per case;
    - $250,000 to $999,999 – $2,500 per party, per case; and
    - $1,000,000 or greater – $3,000 per party, per case.

- *In re Sears Holding Corp., et al.*, Case No. 18-23538: For 397 adversary proceedings, in which all of the defendants were corporate entities, the Court ordered the following fee schedule based on amount claimed in complaint:
    - less than $100,000 – $3,000.00 per case;
    - $100,000 to $249,999 – $4,000 per case; and
    - $250,000 to $999,999 – $5,000 per case.
    - $1,000,000 to $4,999,999 – $6,000.00 per case; and
    - $5,000,000 or greater – $7,000 per case.

---

[1] Plaintiff cites *In re BGI, Inc., f/k/a Borders Grp., Inc.*, Case No. 11-10614 (MG), Docket No. 2922 (Bankr. S.D.N.Y. Oct. 23, 2012) in its Motion. *See* Exhibit A at p. 8. In *BGI, Inc.*, the Court did not order mediation fees according to a fixed schedule, but instead ordered that the "Mediator's fees and reasonable and actual expenses shall be split equally by the parties, and payment arrangements reasonably satisfactory to the Mediator must be completed on or prior to the commencement of the mediation."

6

- *In re Quebecor World (USA) Inc., et al.*, Case No. 08-10152-JMP, Docket No. 3935 (Bank. S.D.N.Y, March 10, 2016): For 350 Adversary Proceedings, the Court ordered the following fee schedule based on amount claimed in complaint:
    - less than $250,000 – $1,250 per party, per case;
    - $250,000 to $999,999 – $2,000 per party, per case; and
    - $1,000,000 or greater – $3,000 per party, per case.

A side-by-side comparison of the fees ordered in the cases cited by Plaintiff, against the fees proposed here, is illustrative of the unprecedented proposal before the Court. While *none* of the cases cited by Plaintiff involved retail customer defendants, Plaintiff would nevertheless expect the individuals in this matter to pay *more* in mediation fees relative to their potential liability than the corporate entities were ordered to pay in those cases.

This disparity is compounded by the fact that there are *substantially* more adversary proceedings to be resolved in this case than in those cited by Plaintiff. Plaintiff recognizes in its motion that there are "nearly 2,500 preference complaints against certain of the of the Debtors' customers who withdrew more than $100,000 of assets in the 90 days before the Debtors' bankruptcy filing," without even attempting to assign proportionate fees to the mediation of those claims. By way of comparison, even if *all* of the 2,468 claims to be mediated were assigned the *lowest* fee schedule offered by Plaintiff ($5,000), the total spend on mediation fees would be $12.34 million. If all of the claims in the cases cited by Plaintiff were all assigned the *highest* fixed fee in their respective orders, the total spend on mediation *for all four matters combined* would be $5.58 million. While the volume of claims in this case will necessarily require a higher spend on mediation than any of those cases individually or collectively, economics of scale should allow each individual claim to bear less of a financial burden in its resolution.

The fees which Plaintiff asks this court to approve are not only prohibitive for lower-end WPE creditors, which is explained further below, they are a waste of the Estate's administrative funds. Even if the Estate's position is that these are the most qualified mediators for resolving these

7

matters efficiently, there is no justifiable reason to repeatedly pay them the same rate for attempting to resolve nearly identical claims. *See In re Burgoyne, Inc.*, No. 01-35687DWS, 2002 Bankr. LEXIS 1381, at *16 (Bankr. E.D. Pa. Nov. 4, 2002) ("[T]he wasteful use of highly skilled and highly priced talent. . .will not be tolerated"). In the context of the Estate's administrative costs for mediation, these fees should be treated similarly as attorneys' fees, and thus "should be closely scrutinized with a view toward eliminating excessive charges or wasteful services and expenditures of professional time." *In re Liberal Mkt., Inc.*, 24 B.R. 653, 658 (Bankr. S.D. Ohio 1982). Close scrutiny of these proposed fees demonstrates that they are excessively wasteful and should be drastically reduced to reflect the actual services to be provided.

Plaintiff notes in its motion that "[i]n *Quebecor World (USA) Inc.*, the mediators were able to resolve 94% of the 350 adversary proceedings remaining at the mediation phase in less than 12 months." *See* Ex. A at 8. The Bressler Defendants agree this Court should find *Quebecor World* instructive in its structuring of the amount of fees to be paid for mediation. *Quebecor World*, as noted above, involved 350 adversary claims, with fees between $2,500 (for claims under $250,000) to $6,000 (for claims equal to or greater than $1 million) per claim. If the same ratio of number of claims to fees per claim were ordered in this case, mediation fees in the instant matter would be $714 to $1,142 per claim. The Bressler Defendants, therefore, request the mediation fees follow this schedule based on Complaint WPE in order to reduce the financial burden of mediation on the individuals:

- $100,000 to $249,9999 – $800 per case;
- $250,000 to $500,000 – $1,000 per case;
- $500,000 to $1,000,000 – $1,200 per case; and
-  $1,000,000 or greater – to be determined by the Plaintiff, the Bressler Defendants, and Mediator on a case-by-case basis, but at no point higher than $1,500 per case.

8

The mediators in this case will remain well-compensated under this structure. Assuming an equal distribution of claims among the proposed mediator list, if all of the claims heard by the neutrals took place under the lowest possible fee, each mediator would still be compensated $93,600 for their participation in this case. Particularly given the fact that nearly all of the claims to be resolved are a mirror image of each other, this level of compensation is more than reasonable and appropriate given the scope of the overall engagement.

B.      **The Estate Should Cover the Full Costs of Mediation for All Creditors**

After this court orders the reduction of the proposed mediation fees to a more reasonable value, this Court should further order that the Estate cover the costs of the mediation it seeks to mandate. In considering motions which may directly impact the efficiency with which a bankruptcy claim can be resolved, this Court routinely favors a motion when it "will permit efficient resolution of critical issues. . . avoid needless complexity of proceedings. . .serve judicial efficiency, and. . .benefit all parties—even the Estate—by promoting a cost-effective and timely resolution" to the claims at hand. *See In re Kossoff PLLC,* No. 21-10699 (DSJ), 2023 Bankr. LEXIS 1237, at *26 (Bankr. S.D.N.Y. May 10, 2023). However, the Estate, in demanding that the defendant-creditors cover half of the costs of overpriced mediation services, are unnecessarily complicating a proposal designed to streamline these claims.

The LOC is sufficiently capitalized to handle the costs of mediation without contribution from the defendant-creditors. The closest reference point currently available reflecting the status of the LOC's recoveries is in the Litigation Administration's Quarterly Report filed on July 31, 2024**.** This report reflects that, in addition to the $55 million raised in pre-funding, the Litigation Recovery Account had, as of June 30th, executed "approximately 1,600 settlement agreements with individuals totaling approximately $88 million of settlement commitments." *See* Ex. B at 7. This

9

figure notably omits any settlements into which the LOC entered with creditors after the WPE Defendants in this case were mailed their summons or received notice of the Complaint filed against them by virtue of the solicitation-by-mail.

Moreover, the LOC, at any time, could have easily remedied its shortcomings in making potential WPE Defendants aware of their opportunities for settlement. As stated above, the Litigation Recovery Account was pre-funded with $55 million. If the LOC had elected to use even 2% of that prefunding to send each and every settlement agreement out via U.S. Mail to all eligible users, there would be no doubt that the number of settlements from the months of March to the end of June would have increased dramatically. Alternatively, the LOC could *have* spent a small portion of their funding to set up a form of a "Help Line," where eligible users could call into a center and have their questions and concerns answered by a real person. Instead, the LOC limited its communications to email and social media posts.

As the LOC "should not needlessly protract the litigation" by imposing unreasonable legal costs and pressure on the Bressler Defendants, the LOC should cover the costs and fees of mediation for all WPE Defendants. *Brown v. Federation of State Medical Bds.*, 830 F.2d 1429, 1439 (7th Cir. 1987); *see also In re Pierce*, 165 B.R. 252, 254 (Bankr. N.D. Ind. 1994) (noting that debtors are only entitled to reasonable professional fees because "the injured party has a duty to mitigate costs.").

If the Court is not inclined to require the LOC to cover the costs for all mediations, it should at a minimum be required to cover the cost for any mediation involving a WPE of $300,000 or less. Based on our analysis of the WPE data made publicly available in Docket No. 973, which includes an assumption that settlement offers already reached has been evenly distributed amongst the "Tranches" of creditors, we approximate that over half of the remaining WPE Defendants in

10

this matter, roughly 1,300 people, have a WPE ranging between $100,000 to $200,000 ("Tranche One"). Additionally, the next largest tranche of WPE Defendants (476 individuals) are facing liabilities between $200,000 and $300,000 ("Tranche Two"). Together, over 70% of the individual litigants in these proceedings are facing Clawbacks of between $100,000 to $300,000. The LOC, being fully aware of this distribution of WPE Defendants, nonetheless requests that these individuals, collectively, spend over $4.4 million on mediation fees.

To demonstrate the absurdity of this request, a simple analysis of the Estate's relative costs of handling the full balance of mediation for these ~1776 individuals may be illustrative. Even granting a generously low-average WPE amongst all individuals in Tranches One and Two of $160,000, the average settlement under the LOCs current standing offer of 13.75% would be $22,000. Under the Bressler Defendants' proposed schedule of mediation fees, the LOC would only need to settle, at most, 50 cases (~2%) to cover these costs. Even if this Court was unconvinced by our position that the fees paid should remain proportionate based on precedent in light of the volume of claims to be heard, if this Court directly adopted *any* of the fee schedules cited by Plaintiff in their motion, *none* of those schedules would require more than 300 cases (12%) to be settled, under the current proposed settlement rate, in order for the LOC to pay the costs of mediation and still come out profitable.

Moreover, mandating that the LOC bear the costs of mediation for Tranche One and Two individuals will serve the interests of judicial efficiency in a myriad of ways. First, the fact that these creditors will not be forced to pay an extra 1-2.5% of their WPE before they even sit down at the negotiation table will make them inherently more amenable to reaching a solution to the claim against them. *See Fields-D'Arpino v. Rest. Assocs., Inc.*, 39 F. Supp. 2d 412, 417 (S.D.N.Y. 1999) ("[s]uccessful mediation. . .depends upon the perception and existence of mutual fairness

11

throughout the mediation process.") Second, the fact that pro se litigants are saving funds on the actual costs of mediation may enable them to retain counsel, who can assist the litigants in avoiding the logistical pitfalls of the court system and introduce them to group mediation scenarios, where the time, funds, and negotiation within mediation can be narrowed. *See Cont'l Cas. Co. v. Pfizer, Inc. (In re Quigley Co.)*, 361 B.R. 723, 733 (Bankr. S.D.N.Y. 2007) (granting a stay in the interest of group arbitration because centralizing a bankruptcy "involving multiple litigants deciding the issues among the numerous parties raised by the Complaint in one forum will promote judicial efficiency.") Because they would be particularly and acute affected by being mandated to contribute to the costs of mediation, this Court should, at minimum, order that WPE Defendants with under $300,000 in exposure be relieved of any form of fee sharing, with the costs of those proceedings falling on the LOC.

### C. If the Court Orders Mediation Fees Be Shared Among the Parties, the LOC Should Pay the Vast Majority of the Fees in the Interest of Fairness and Judicial Efficiency

While the Bressler Defendants fully oppose the assignment of any mediation costs to WPE Defendants, if this Court were to order a fee sharing format, the LOC must be ordered to pay a far larger percentage of those fees. Put simply, as these mediation fees are only potentially present due to the LOC, this court should adopt the "rule of fairness" endorsed by the Southern District, which holds that when "fees are to be charged to the opposing party" to remedy the missteps of the charging party, "services should be charged at the rate of the available person who can most cheaply qualify to complete the task." *A.I. Trade Fin. v. Centro Internationale Handelsbank AG*, 89 Civ 7664 (PKL), 1994 U.S. Dist. LEXIS 5661, at *5 (S.D.N.Y. Apr. 29, 1994). There is no justifiable reason for these costs, if they are to be split at all, to be split evenly between the parties. The LOC is well-capitalized, is asking for these mediations to be mandatory, and created the situation which mandated these claims be mediated in the first place. Thus, if this Court does, over

objection, order that these fees be shared, the WPE Defendants should be charged minimal rates for the mediators who will preside over their claims.

## IV.     Conclusion

WHEREFORE, based on the foregoing, the Bressler Defendants respectfully request the Court reject the Motion's proposed mediation fees and requirement that the WPE Defendants evenly split the cost of mandatory mediation with the LOC.

Dated: August 13, 2024
       New York, New York

By:     /s/ David H. Pikus

**BRESSLER, AMERY & ROSS, P.C.**
David H. Pikus
Christopher M. Vaughan (*pro hac vice* to be filed)
17 State Street, 34th Floor
New York, NY 10004
Telephone: (212) 425-9300
Email: dpikus@bressler.com
       cvaughan@bressler.com

and

**BRESSLER, AMERY & ROSS, P.C.**
Louis F. Mendez (*pro hac vice* to be filed)
2001 Park Place, Suite 1500
Birmingham, AL 35203
Telephone: (205) 719-0400
Facsimile: (205) 719-0500
Email: lmendez@bressler.com

*Counsel for The Bressler Defendants*