Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## PLAN ADMINISTRATOR'S FIRST STATUS REPORT ON DISTRIBUTIONS

The Plan Administrator[2] for the above-captioned post-effective date debtors (collectively,

the "Post-Effective Date Debtors," and prior to the Effective Date, the "Debtors") hereby files

this distribution report (the "Report") and respectfully states as follows:

---

[1]    The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be further modified, amended, or supplemented from time to time, the "Plan").

**Introduction**

1.    The Effective Date of the Plan occurred on January 31, 2024.    In the approximately seven months since the Effective Date (the "Reporting Period"), the Plan Administrator—with the assistance of the employees of the Post-Effective Date Debtors and their advisors—has worked tirelessly to make distributions to creditors, to answer creditor questions, and to resolve issues experienced by creditors so that distributions can be successfully received by creditors.

2.    The distribution process contemplated by the Plan is likely the most complicated and ambitious distribution process ever attempted in a chapter 11 case.  This distribution process was the product of months of diligence, evaluation, and design by the Debtors and their advisors in close consultation with the Committee and their advisors, who supported the Plan and distribution process.  It involves the distribution of Liquid Cryptocurrency, Cash, and for those creditors outside of the Convenience Class, MiningCo Common Stock to approximately 375,000 creditors in over 165 different countries.  Celsius has creditors in so many different countries because its prepetition business model was focused on rapidly growing its platform and user base all over the world.  As has been disclosed throughout these Chapter 11 Cases, Celsius was not a fully regulatorily compliant business prepetition, and many regulators were pursuing enforcement actions against the Debtors.  These factors have increased the complexity of the distribution process.

3.    Since the Effective Date, the Post-Effective Date Debtors have successfully made initial distributions to approximately 251,000 creditors—roughly two-thirds of all eligible creditors by number and approximately 93% of the eligible value.  The distribution process has been steadily progressing over time as the Post-Effective Date Debtors work through issues being faced by creditors.  In the first two weeks of distributions, approximately 65% of all

then-eligible value (a total of approximately $1.7 billion) had successfully been distributed to creditors. One month later, almost 80% of all then-eligible value (a total of approximately $2 billion) had been distributed to creditors. In each subsequent month (other than the month in which distributions were paused for a data security incident), the Post-Effective Date Debtors have successfully distributed to creditors approximately 30% to 40% of the remaining amount then-eligible for distribution. That is, the distribution process is leading to steady distributions over time.

4.      The Post-Effective Date Debtors know that creditors that have not been able to successfully claim a distribution would like it to be completed immediately. But the process is complex, and there are items that creditors have to successfully complete in order to receive a distribution (such as opening an account at PayPal with a matching date of birth, opening an account at Coinbase with a matching e-mail address and date of birth, or providing the Post-Effective Date Debtors with accurate wire instructions and/or mailing address for a check). The remaining creditors overwhelmingly have small distributions—of the approximately 121,000 creditors who have not yet successfully claimed a distribution, approximately 64,000 have a distribution of less than $100, and approximately 41,000 more have a distribution of between $100 and $1,000. Given the small amounts at issue for many of these creditors, they may not be incentivized to take the steps needed to successfully claim a distribution.

5.      The Plan Administrator retries distributions through Coinbase typically every two weeks, and PayPal claim codes can be redeemed at any time once issued. Cash distributions are attempted approximately once per week. All in all, the Plan Administrator has attempted more than 2.7 million distributions in total for the approximately 372,000 currently eligible creditors,

including numerous reattempts for nearly all of the creditors who have not yet successfully received a distribution.

6.        If a distribution attempt is unsuccessful, the Post-Effective Date Debtors investigate the potential reasons for such failed distribution attempt and reattempt the distribution.  Creditors who were assigned to Coinbase as their Distribution Agent and were eligible for a distribution as of the Effective Date (which constitutes a supermajority of all creditors assigned to Coinbase) would have had their distribution attempted ten times by now (and received an email each time the attempt was unsuccessful reminding them to open a Coinbase account and complete necessary KYC).  For PayPal, issued claim codes are always active, and the Post-Effective Date Debtors have sent regular emails reminding creditors to redeem their distributions.  For wire transfers, there have been approximately twenty-six wire cohorts since the Effective Date, and creditors who resubmit wire information are typically attempted in the next wire transfer cohort after their information is submitted, and receive an email if a wire transfer is unsuccessful pointing out the portion of the wire transfer information that failed and asking for corrected information.

7.        Recognizing creditors may not be able to receive their distribution through their originally assigned Distribution Agent, the Post-Effective Date Debtors have developed processes for transitioning creditors to new Distribution Agents.  This has proved highly successful.  For example, of those creditors who have been transitioned from PayPal to Coinbase, approximately 88% by number and 94% by value have been able to successfully claim their distribution.  As the Post-Effective Date Debtors continue to resolve distribution-related issues and transition creditors to other Distribution Agents, they expect these distribution success rates to continue to increase.

8.      For those creditors who have yet to receive a distribution, the Post-Effective Date
Debtors are committed to assisting these creditors in claiming their distributions.  Creditors are
able to submit a Customer Care Ticket around the clock through the Post-Effective Date
Debtors'    ticketing    system    at    https://stretto-celsius.freshdesk.com/support/tickets/new.
In addition, letters submitted to the Bankruptcy Court are entered as Customer Care Tickets to be
addressed by the Post-Effective Date Debtors' support resources.  When a creditor submits a
Customer Care Ticket, the ticket is routed to the proper channel depending on the creditor's
assigned Distribution Agent and the nature of their inquiry.  U.S.-based support resources review
and address Customer Care Tickets Monday through Friday from 8 a.m. to 8 p.m. (prevailing
Eastern Time).  The Post-Effective Date Debtors continue to prioritize identifying and resolving
common issues.  To date, creditors have submitted more than 100,000 Customer Care Tickets
regarding distributions, approximately 65% of which are resolved in less than a day and
approximately 80% of which are resolved in four days or fewer.  86% of Customer Care Tickets
are resolved in a single message from the Post-Effective Date Debtors (other than the initial
confirmatory e-mail sent to creditors noting receipt of their ticket).

9.      To provide the Post-Effective Date Debtors with more control over
communications with creditors and data regarding these communications, the Post-Effective
Date Debtors have also integrated their own communication system into the distribution platform
and have already successfully sent approximately 233,000 e-mails through this system (which
was just launched in August 2024).  These enhancements to the communication system have
provided the Post-Effective Date Debtors with invaluable insight regarding whether
communications are reaching creditors and how creditors are interacting with such
communications.    The Post-Effective Date Debtors expect that the improvements to

communications should resolve many of the early communication and visibility concerns by creditors.

10.    Additionally, approximately 12,000 creditors are not currently able to receive a distribution for a variety of reasons, including because their Claim is being held back pursuant to the Plan or their account is missing essential compliance information necessary to make a distribution.  Pursuant to the Plan, the Post-Effective Date Debtors have withheld, pending resolution and Allowance by the Litigation Administrator, distributions to creditors who (a) have outstanding Withdrawal Preference Exposure, (b) opted out of the Class Claim or Custody Settlements, or (c) are Holders of Equitably Subordinated Claims.  As the Litigation Administrator resolves some of these contingencies (*e.g.*, by entering into a settlement resolving the Withdrawal Preference Exposure of a particular creditor), the Litigation Administrator periodically notifies the Plan Administrator that a Claim that was previously held back is now Allowed and can receive a distribution.  For each of these Claims that are currently held back pursuant to the Plan to receive a distribution, the Litigation Administrator will have to resolve the contingency and inform the Plan Administrator that the Claim is now eligible for a distribution.

11.    The Plan Administrator was focused on three key goals in making the initial distribution:  (a) distributing as much value to creditors as soon as possible; (b) distributing as much Cryptocurrency to creditors as possible, and (c) ensuring that all distributions are safe and fully regulatorily compliant.  The process has proven challenging due to many factors, including external factors such as having to transition banking partners due to the financial stress on the Post-Effective Date Debtors' prior bank and a data breach that required pausing distributions for approximately one month.  There have also been issues that have prevented successful

distributions to creditors, such as (w) creditors not reading emails or redeeming claim codes that were sent to them for distribution at PayPal, (x) creditors not successfully opening (and passing KYC/AML checks for) an account with PayPal or Coinbase, (y) many international creditors being unable to cash checks of $US Dollars, requiring an immediate overhaul to the Cash distribution system, and (z) creditors not providing correct wire instructions.

12.     Despite these challenges, the Plan Administrator has now overcome many of the most common hurdles faced by creditors and is pleased to report that the initial distribution to eligible creditors has been successful for a substantial majority of creditors (both by dollar amount and number), as outlined in more detail in the below table—over 251,000 creditors have received over $2.53 billion in value of Liquid Cryptocurrency and Cash (at prices set as of January 16, 2024—that Liquid Cryptocurrency is worth much more at today's market prices):

| Distribution Agent | Amount of Claims Currently Eligible for Distribution (in USD) | Amount Successfully Distributed (in USD as of January 16, 2024 prices) | Percent of Value Successfully Distributed | Percent of Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|
| PayPal/Venmo | $1.50 billion | $1.43 billion | 96% | 70% |
| Coinbase | $997 million | $917 million | 92% | 69% |
| Cash (Stretto / Wires / Hyperwallet) | $232 million | $178 million | 77% | 26% |
| **TOTAL:** | **$2.73 billion** | **$2.53 billion** | **93%** | **68%** |

13.     To be sure, significant work remains to fully complete this initial distribution. Approximately 121,000 eligible creditors, which have an average distribution of approximately $1,500 in Liquid Cryptocurrency or Cash at January 16 prices, have yet to successfully claim their distribution.  As noted above, approximately 64,000 of these remaining creditors have a distribution of less than $100, and approximately 41,000 more have a distribution of between

7

$100 and $1,000. But the Plan Administrator is confident that given recent steps that he is taking to address the most common outstanding issues (including streamlining Cash distributions through the addition of the new Hyperwallet service, and beginning to give creditors who were assigned to PayPal or Coinbase but have been unable to receive Liquid Cryptocurrency from those Distribution Agents the option to elect to have their Liquid Cryptocurrency sold and receive the Cash proceeds of the sale), distributions will continue to be steadily made to creditors who have not yet been successful in claiming a distribution. The most common issues (which apply to approximately 112,000 out of the 121,000 creditors who have yet to receive a distribution) include:

- approximately 50,000 creditors at PayPal who have an open claim code that they have not yet claimed;

- approximately 44,000 creditors at Coinbase who have not yet opened a matching Coinbase account;

- approximately 11,000 creditors who have an open Coinbase account but for which there is still some action pending from the creditor before a distribution can be attempted (these creditors likely have some type of open KYC issue to be resolved by the creditor to bring its account into good standing);

- approximately 5,000 checks that have not yet been cashed; and

- approximately 2,200 other creditors whose Cash distributions are still in progress (wires or Hyperwallet).

14.     It is important to note that the Plan Administrator does not expect that all creditors will claim a distribution—given that creditors need to take action to claim a distribution, there will certainly be some amount of creditors who never take any action, and those amounts will ultimately be redistributed to other creditors as contemplated by the Plan. For example, with the Custody distributions that were authorized by the Bankruptcy Court through the Deactivation Date of February 28, 2024, only 68% by number of creditors and 96.9% by dollar amount ever claimed their Custody distributions—and those distributions could be claimed just by going into

the Celsius app and withdrawing the Cryptocurrency.  For distributions under the Plan, creditors have to take more steps—signing up with a new service (PayPal or Coinbase) and passing KYC or, for certain Cash distributions, providing wire information.

15.    The Post-Effective Date Debtors have fielded over 100,000 creditor inquiries regarding a variety of distribution-related matters and have made monthly presentations to the Bankruptcy Court (and posted those to the docket) regarding the status of Plan distributions. This Report is intended to provide a robust update to the Court and all parties in interest regarding the status of distributions, and will continue to be filed quarterly.  This update is not intended to be a comprehensive update on every single distribution-related matter, rather this Report will describe the most common outstanding issues and provide updates regarding distributions under the Plan.

### Liquid Cryptocurrency Distributions

16.    Consistent with the Plan, the Post-Effective Date Debtors commenced Liquid Cryptocurrency distributions to eligible creditors through their Liquid Cryptocurrency Distribution Agents: PayPal/Venmo and Coinbase.  The below table summarizes the current status of Liquid Cryptocurrency distributions:

| Distribution Agent | Amount of Claims Currently Eligible for Distribution (in USD) | Amount Successfully Distributed (in USD as of January 16, 2024 prices) | Percent of Value Successfully Distributed | Percent of Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|
| PayPal/Venmo | $1.50 billion | $1.43 billion | 96% | 70% |
| Coinbase | $997 million | $917 million | 92% | 69% |
| **TOTAL:** | **$2.50 billion** | **$2.35 billion** | **94%** | **69%** |

(a)    PayPal Distributions

17.    In December 2023, the Debtors e-mailed creditors expected to receive their distribution through PayPal with important details on the upcoming distribution and claims process.  As of the Effective Date, the majority of Claims were deemed Allowed and the Post-Effective Date Debtors sent eligible creditors their claim codes via e-mail in February. As additional creditors became eligible to receive a distribution, the Post-Effective Date Debtors have issued new claim codes via e-mail to such creditors, typically every two weeks.  Creditors currently eligible to receive their distribution through PayPal and Venmo should have received claim codes via e-mail that can be used to claim their distribution on PayPal or Venmo.

18.    Following a data incident with Stretto in late May, all unclaimed claim codes were invalidated and reissued, with affected creditors receiving new claim codes via e-mail.  The Post-Effective Date Debtors also directed Stretto to resend claim codes to those who did not receive them initially due to e-mail issues (*e.g.*, bounce-backs, spam filtering, etc.).  The Post-Effective Date Debtors have regularly sent reminder e-mails to creditors with open claim codes at PayPal, and now that the Post-Effective Date Debtors have migrated to their new e-mail system, creditors will receive weekly e-mail reminders about their claim codes.

19.    During this Reporting Period, there were several main issues that creditors had with successfully redeeming from PayPal, almost all of which have now been resolved.  Key issues included creditors' dates of birth not matching on PayPal and Celsius (affected creditors updated their date of birth with PayPal, Celsius, or both), individual claim codes not working (Celsius re-sent the claim codes), and a creditor trying to redeem claim codes for multiple Celsius accounts (a security issue—these creditors with multiple accounts are transitioned to another Distribution Agent).  The Post-Effective Date Debtors have also sent new claim codes to

creditors who have not yet claimed a distribution in case there was an issue redeeming the initial claim code.

20.    Some creditors also reported that they had not received their claim codes despite multiple attempts by the Post-Effective Date Debtors to send such creditors their claim codes. After investigation, it appeared that there was a deliverability issue for some of the e-mails containing claim codes caused by certain creditors' e-mail service providers flagging these e-mails as spam.  Many of these issues have been resolved following the integration of the Post-Effective Date Debtors' communication system into the distribution platform.    The Post-Effective Date Debtors have also contacted all creditors slated to receive a distribution above $100 who have yet to redeem their distribution on PayPal to determine if they are experiencing an issue redeeming their claim codes.  Though this outreach has resulted in some creditors claiming distributions successfully, creditors with smaller Claims have been less responsive to such efforts.

21.    If any creditor is still having trouble redeeming its claim code, please create a Customer Care Ticket at https://stretto-celsius.freshdesk.com/support/tickets/new, select the most relevant items from each drop-down menu (shown below), and we will work with you to help you resolve your issue.



22.    If for any reason neither PayPal nor Venmo can service a creditor's Claim distribution, such creditor will be notified that their distribution cannot be serviced through PayPal or Venmo and the Post-Effective Date Debtors will attempt to make such creditor's distribution via Coinbase.

23.    The below table details the number of distributions currently pending but not completed at PayPal as of August 22, 2024:

| Size of Creditor Distribution | Creditors with Active PayPal Claims | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) |
|---|---|---|
| Less than $100 | 24,717 | $0.83 million |
| $100 - $1,000 | 17,926 | $6.15 million |
| $1,000 - $10,000 | 6,236 | $18.48 million |
| Greater than $10,000 | 1,030 | $41.08 million |
| **TOTAL:** | **49,909** | **$66.54 million** |

(b)   Coinbase Distributions

24.    In December 2023, the Debtors e-mailed creditors expected to receive their distribution through Coinbase with important details on the upcoming distribution and claims process.  As of the Effective Date, the majority of Claims were deemed Allowed and the Post-Effective Date Debtors made initial distribution attempts to creditors via Coinbase in February.  As additional creditors became eligible to receive a distribution, the Post-Effective Date Debtors added newly eligible creditors to their distribution attempts (which are typically made every two weeks) through Coinbase.  Since the Effective Date, the Post-Effective Date Debtors have made ten attempts to distribute Liquid Cryptocurrency through Coinbase to creditors eligible to receive a distribution through Coinbase as of the Effective Date, and up to nine attempts to creditors who became eligible to receive a distribution after the Effective Date. Creditors receive e-mail communications after each attempt.  In August, the Post-Effective Date Debtors contacted all creditors who had still yet to successfully receive a distribution through Coinbase.  The Post-Effective Date Debtors will continue to attempt distributions via Coinbase to eligible creditors who have completed Coinbase's KYC requirements approximately every two weeks and will continue to do so throughout the remainder of the one-year term of Coinbase's agreement with the Post-Effective Date Debtors to ensure all creditors have the opportunity to receive their distributions.  The Post-Effective Date Debtors and Coinbase are also working to identify creditors who are unable to receive their distribution through Coinbase and transition these creditors to other available distribution methods.

25.    During this Reporting Period, there were several main issues that creditors had with successfully receiving their distribution from Coinbase.  The most significant issue is creditors who do not have an account with Coinbase that matches their information with Celsius. Creditors scheduled to receive a distribution from Coinbase receive e-mails generally every other

week informing them that Coinbase was unable to find an account with details that matched the creditor's information, and that they need to open an account with Coinbase, complete KYC, and ensure that information that Coinbase has for that creditor—such as date of birth—match Celsius's records. Certain other creditors have a Coinbase account that is currently ineligible to receive a distribution pending certain action by the creditor, including completing KYC.

26.     The other main issue is that in some jurisdictions, creditors have faced long queue times to open accounts. More specifically, there are certain "throttled" jurisdictions where Coinbase has not been able to keep up with creditors opening accounts. These jurisdictions include Thailand, Serbia, Taiwan, and Sri Lanka. Although, through the efforts of the Post-Effective Date Debtors and Coinbase, 63% of the value currently eligible for distribution to creditors in these jurisdictions has been distributed, many creditors have been unable to open accounts and receive their Liquid Cryptocurrency distributions, as the queue for opening accounts is still very long. Creditors who have not yet received their distribution are still entitled to the upside of the increase in cryptocurrency prices because they were assigned Liquid Cryptocurrency even though they are in a "throttled" jurisdiction. Because of the delays these creditors are experiencing in opening Coinbase accounts, the Plan Administrator has decided to reach out to creditors in these throttled jurisdictions and give them the option to opt to receive Cash instead (creditors who take this option will have their Liquid Cryptocurrency distribution sold at prevailing market prices and will receive the Cash proceeds of the sale, as contemplated by the Plan). The Plan Administrator expects to begin offering this transition option in September.

27.     The Plan Administrator also plans to conduct additional outreach to creditors who have not received their distributions from Coinbase to identify and help resolve issues that are

blocking the distribution.  Please note that neither Celsius nor Coinbase will ever request an account password or cryptocurrency wallet keys.  Further, please verify that any email that you respond to is either from Celsius or Coinbase (please see the phishing notice attached as **Exhibit B**).

28.    If any creditor is still having trouble receiving its distribution from Coinbase, please create a Customer Care Ticket at https://stretto-celsius.freshdesk.com/support/tickets/new, select the most relevant items from each drop-down menu (shown below), and we will work with you to help you resolve your issue.  Creditors should include their Coinbase Support Case ID in their inquiry to assist the Post-Effective Date Debtors in identifying and escalating such creditor's ticket.  We will work with you to help you resolve your issue.



29.    The below table details the number of distributions currently pending but not completed at Coinbase as of August 22, 2024:

| Size of Creditor Distribution | Creditors In Process at Coinbase | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) |
|---|---|---|
| Less than $100 | 30,787 | $0.98 million |
| $100 - $1,000 | 18,904 | $6.05 million |
| $1,000 - $10,000 | 4,946 | $14.22 million |
| Greater than $10,000 | 970 | $59.61 million |
| **TOTAL:** | **55,607** | **$80.86 million** |

30.     As a reminder, if a creditor originally scheduled to receive a Liquid Cryptocurrency distribution is ultimately unable to receive such distribution, they will receive a Cash distribution from an alternative Distribution Agent.  The Liquid Cryptocurrency that was allocated to such creditors will be sold as close as possible to the expected date of the Cash distribution, and such creditors will receive the proceeds of the sale.[3]  Creditors who are affected will receive further communications once that determination is made, including requests for any additional information or authorizations the Post-Effective Date Debtors require to process a Cash distribution.

**Cash Distributions**

31.     Since the Effective Date, the Post-Effective Date Debtors commenced Cash distributions to creditors.  Initially, these distributions were processed via check or wire transfer.  To ensure distributions are made in a safe and reliable manner, the Post-Effective Date Debtors group creditors who are eligible to receive a Cash distribution into cohorts.  If a distribution attempt to a creditor is unsuccessful, the Post-Effective Date Debtors review the reason the

---

[3]     If a creditor notifies the Post-Effective Date Debtors that they would like to receive Cash rather than Liquid Cryptocurrency, this same process will apply to such creditor's distribution.

distribution was unsuccessful and either include the creditor in the next cohort (if the error is easily resolvable) or reach out to the creditor to submit corrected information.  Over the past seven months, the Post-Effective Date Debtors have attempted Cash distributions to creditors in 26 cohorts.

32.    As described by counsel to the Post-Effective Date Debtors at various court hearings, the Cash distribution process has been extremely complex and has lagged a bit behind the Liquid Cryptocurrency distributions, and many factors have contributed to delays in this process.

33.    Most importantly, the Plan Administrator had initially planned on sending checks to almost every creditor entitled to receive Cash and processing wire transfers only to those creditors expected to receive a Cash distribution of $250,000 or more, but an overwhelming number of foreign creditors informed the Plan Administrator that they cannot cash checks from U.S. banks (or, alternatively, in U.S. Dollars), but they can receive wire transfers of U.S. dollars. For example, numerous Australian creditors indicated that banks in Australia cannot cash checks from U.S. Banks or in U.S. Dollars.  Accordingly, the Plan Administrator completely overhauled the Cash distribution process shortly after the Effective Date, offering wire transfers to approximately 3,500 creditors in an attempt to solve for this issue.

34.    Unfortunately, the wire transfer process relies on creditors who may not be familiar with the wire transfer process submitting accurate wire transfer instructions.  Less than half of creditors contacted to provide wire instructions responded to the Post-Effective Date Debtors' initial outreach, and more than half of those who did respond sent incomplete or obviously incorrect wire information.  Without accurate wire instructions from creditors, the Post-Effective Date Debtors cannot successfully complete a wire transfer, and the wire transfer

process to date has encountered difficulties based on inaccurate or incomplete wire instructions from creditors. International wire distributions are particularly complex because the international banking network has requirements across the SWIFT routing networks, which adds complexities to sending wire transfers globally to the more than 158 countries where the Post-Effective Date Debtors are making fiat distributions. Wire transactions go through a data validation process where additional data is collected, reviewed and, when applicable, adjusted to try to fix simple errors, before submitting to the Post-Effective Date Debtors' bank to initiate transactions. This manual review process is performed by the Post-Effective Date Debtors with the assistance of their advisors including Stretto, Inc. and Alvarez & Marsal.

35.    The Cash distribution process was also complicated by the Post-Effective Date Debtors' transition to a new banking partner. In early February—mere weeks after the occurrence of the Effective Date, the prior banking partner had its bonds downgraded to "junk" status. As a result, and in an effort to safeguard the Post-Effective Date Debtors' cash assets (totaling approximately $500 million), the Plan Administrator transitioned to a new banking partner, which required, among other things, locating a new banking partner whose internal policies did not bar cryptocurrency companies from being customers and taking necessary steps to enable sending checks and wire transfers en masse from this new bank account. Specifically, within a single month, the Post-Effective Date Debtors had opened an account with a new banking partner that was able to offer them a full suite of cash management operations. This transition delayed Cash distributions by approximately one month, but was necessary in order to safeguard the cash assets of the Post-Effective Date Debtors.

36.    In an effort to resolve some of these issues, the Post-Effective Date Debtors have (a) entered into an addendum to their distribution agreement with PayPal to use PayPal's

Hyperwallet service ("Hyperwallet") to make Cash distributions to creditors, (b) modified the wire transfer information form to include additional instructions on the information needed from creditors, and (c) identified and corrected obvious errors in the wire transfer information previously submitted by creditors. The Post-Effective Date Debtors expect that distributions via Hyperwallet will be quicker and more reliable, enabling them to make Cash distributions more efficiently to creditors. In addition, the modifications to the wire transfer process have increased the wire transfer success rate from approximately 30% to approximately 60%.

37.    Hyperwallet's distribution services include a self-service portal where— depending on the creditor's jurisdiction—the creditor can select their preferred payment method (*i.e.*, PayPal or Venmo) and input their payment details directly. The Post-Effective Date Debtors expect that this will significantly increase the chance of success and reduce the complexities and delays related to collecting correct bank wire information as well as paper check delivery and cashing issues. That is, the Post-Effective Date Debtors believe that for most creditors, the Hyperwallet service will be quicker and more effective in making Cash distributions under the Plan.

38.    Accordingly, creditors who have been unable to receive their distribution via wire or check or who affirmatively opt-in to receiving a Cash distribution will be transitioned to Hyperwallet. For the avoidance of doubt, if a check has been issued and uncashed for more than 90 days, the check will be voided and the creditor will be transitioned to Hyperwallet, if eligible, or the Post-Effective Date Debtors will contact such creditor regarding such creditor's distribution.

39.    During this transition, and for those creditors who are unable to be transitioned to Hyperwallet, the Post-Effective Date Debtors will continue to try to complete wire transfers to

creditors. The Post-Effective Date Debtors have continued to work to improve their wire transfer instructions and collection process, including by (a) introducing a new wire transfer information form with additional instructions regarding the information required for each field, (b) implementing a new automated communication to creditors when a wire it attempted, and (c) including MT103 information in communications sent to creditors following an unsuccessful wire transfer attempt (when requested).

40.    To date, approximately $232 million in Cash is currently eligible to be distributed under the Plan, approximately $178 million (or 77%) of which has been successfully distributed to creditors. The below table summarizes the current status of Cash distributions (the Plan Administrator expects to continue to transition creditors to Hyperwallet in the coming weeks):

| Distribution Method | Amount Currently Eligible for Distribution | Amount Successfully Distributed via Distribution Method | Percent of Value Successfully Distributed | Number of Creditors Who Successfully Received a Distribution | Percent of Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|---|
| Check | $7.03 million | $5.25 million | 75% | 1,745 | 21% |
| Wire Transfer | $207 million | $159 million | 77% | 2,451 | 46% |
| Hyperwallet[4] | $18.4 million | $361 thousand | 2% | 504 | 15% |
| **TOTAL:** | **$232 million** | **$178 million[5]** | **77%** | **4,700** | **26%** |

---

[4]    The Post-Effective Date Debtors launched distributions through Hyperwallet in early August 2024, and expect the amount of successful distributions through Hyperwallet to increase as more distributions (and reminders to claim distributions) are sent to creditors.

[5]    The number also includes the approximately $13 million distributed to creditors via Withdrawal Preference Exposure setoffs and the loan refinancing process.

41.     Additionally, approximately 5,000 checks have been issued that have not yet been cashed.  The below table details the number of Cash distributions currently pending but not completed as of August 22, 2024:

| Size of Creditor Distribution | Creditors with Fiat Distributions in Process | Total Dollar Value of Outstanding Distributions |
|---|---|---|
| Less than $100 | 4,751 | $0.15 million |
| $100 - $1,000 | 3,228 | $1.05 million |
| $1,000 - $10,000 | 378 | $1.35 million |
| Greater than $10,000 | 217 | $15.33 million |
| **TOTAL:** | **8,574** | **$17.88 million** |

### Jurisdiction Changes

42.     Since the Effective Date, through the KYC process, the Post-Effective Date Debtors have determined that a number of creditors originally scheduled to receive Cash have moved to jurisdictions where they could receive a Liquid Cryptocurrency distribution (or vice versa).  The Post-Effective Date Debtors are working to process these jurisdictional changes and convert the Cash or Liquid Cryptocurrency, as applicable, originally set aside for such creditor's distribution so that they can make distributions to such creditors.  Creditors who have submitted an address change should continue to monitor their e-mail for any additional communications from the Post-Effective Date Debtors regarding their distribution.

### Deceased Creditor Distributions

43.     On May 8, 2024, the Bankruptcy Court entered an order approving the Post-Effective Date Debtors proposed procedures for making distributions to the authorized representatives of deceased creditors.  [Docket No. 4874].  As part of this process, authorized representatives of deceased creditors are required to open a Customer Support Ticket and submit

certain information to confirm the creditor is deceased and that the individual submitting the Customer Care Ticket has authority from the deceased creditor's estate to receive the deceased creditor's distribution.  Once an authorized representative of a deceased creditor submits the required documentation, it is reviewed by the Post-Effective Date Debtors.  If no further documentation is needed, the Post-Effective Date Debtors send an e-mail to the deceased creditor's e-mail address on file.  If no response is received within fourteen days of sending this e-mail, the Post-Effective Date Debtors or Distribution Agent are authorized to distribute the assets to the authorized representative of the deceased creditor.

44.    In total, 167 authorized representatives have submitted tickets to retrieve the distributions of deceased creditors.  The Post-Effective Date Debtors have released for distributions those amounts held on account of 91 deceased creditors, and are expecting to release the distributions of an additional 27 deceased creditors in the coming weeks.  The Post-Effective Date Debtors are continuing to reach out to 49 authorized representatives who have not responded to the Post-Effective Date Debtors' outreach regarding their Customer Care Tickets.

## MiningCo Common Stock Distributions

45.    Certain creditors, depending on the types of Claims a creditor held, are eligible for MiningCo Common Stock under the Plan.  These distributions are being handled by the Stock Transfer Agent, Odyssey Transfer and Trust Company ("Odyssey").  To date, Odyssey has distributed approximately 32.6 million shares of MiningCo Common Stock to eligible creditors, and the Plan Administrator periodically directs that more MiningCo Common Stock be issued to creditors when they become eligible (e.g., when a creditor resolves Withdrawal Preference Exposure and the Litigation Administrator directs the Plan Administrator that such creditor's distribution may be released).  The frequently asked questions related to the MiningCo Common

Stock distribution are available at the following link: ionicdigital.odysseytrust.com
(the "MiningCo Common Stock FAQ").    Odyssey will continue to update the MiningCo
Common Stock FAQ with the latest information.

### Creditors Not Currently Eligible to Receive a Distribution

46.    The majority of this Report deals with creditors whose claims are currently
eligible for distributions under the Plan.  But there are various creditors who, for one reason or
another, are not yet eligible for distributions—the most common reason is that there is litigation
that one of the Litigation Administrators has or could bring against the eligible claimant (such as
Withdrawal Preference Exposure, equitable subordination, or other litigation).    The Plan
Administrator cannot make these distributions until such time as (a) the Litigation Administrator
resolves the contingency and (b) the Litigation Administrator directs the Plan Administrator that
distributions may be made to this creditor.

47.    Once the applicable outstanding litigation is resolved or the Litigation
Administrator otherwise notifies the Plan Administrator that certain Claims are Allowed and
eligible for distribution, the Post-Effective Date Debtors expect to attempt these distributions.
Because the Post-Effective Date Debtors are processing distributions in batches, there may be
some delay between when a Claim is Allowed and when a distribution is attempted.

48.    During this Reporting Period, there were approximately 1,500 claims that were
ineligible as of the Effective Date that became eligible after the Effective Date (*e.g.*, after the
Effective Date, the Litigation Administrator entered into a settlement with a creditor to resolve
its Withdrawal Preference Exposure and directed the Plan Administrator to make a distribution
to such creditor), with a distribution value of approximately $205 million.

49.    This section highlights the most common reasons why creditors are not currently
eligible for distributions:

| Ineligibility Reason | Number of Creditors | Total Amount of Distributions Withheld (in USD as of January 16) |
|---|---|---|
| Creditors Who Did Not Accept the Custody Settlement | 2,472 | $3.1 million |
| Creditors Who Opted Out of the Class Claim Settlement and Filed a Proof of Claim | 320 | $8.3 million |
| Creditors with Withdrawal Preference Exposure | 2,778 | $45.4 million |
| Equitably Subordinated Claims | 15 | $14.7 million |

(a)    Creditors Who Did Not Accept the Custody Settlement

50.    On March 21, 2023, the Bankruptcy Court approved the Custody Settlement, pursuant to which participating creditors were eligible to withdraw certain Custody Assets from the Celsius platform.  Creditors were able to opt into the Custody Settlement either through an election form or as part of voting on the Plan.  Holders of Class 6A General Custody Claims who did not opt-in to the Custody Settlement and did not vote to accept the Plan ("Non-Settling Custody Creditors") remain subject to all Avoidance Actions and other claims with respect to their Custody Assets and their distributions have been withheld pending resolution or release by the Litigation Administrator.  On July 26, 2024, the Bankruptcy Court extended the time for the Litigation Administrator to bring any actions with respect to these claims until January 25, 2025. [Docket No. 7550].  As such, Non-Settling Custody Creditors are not currently eligible for a distribution on account of their Class 6A General Custody Claims.

(b)    Creditors Who Opted Out of the Class Claim Settlement and Filed a Proof of Claim

51.    On August 14, 2023, the Bankruptcy Court approved the Class Claim Settlement, pursuant to which participating creditors received a Claim against each Debtor equal to 105% of the scheduled amount of such Claim.  Creditors were provided the opportunity to opt-out of the

Class Claim Settlement through their ballots when voting on the Plan. If a creditor elected to opt-out of the Class Claim Settlement and filed a Proof of Claim, their Claim was treated as a Disputed Claim under the Plan. According, such creditors' distributions have been held back to be resolved through the claims reconciliation process by the Litigation Administrator.

(c)    Creditors with Withdrawal Preference Exposure

52.    Creditors with Withdrawal Preference Exposure above $100,000 who were otherwise eligible to participate in the Account Holder Avoidance Action Settlement received offers both pre-emergency and post-emergence from the Debtors and the Litigation Administrator, respectively, to resolve their outstanding Withdrawal Preference Exposure. While many creditors participated in these settlement offers, many others did not. By July 15, 2024, the Litigation Administrator commenced approximately 2,400 Avoidance Actions against creditors. Pursuant to the Plan, Distribution Agents are not required to make distributions to creditors with unresolved Withdrawal Preference Exposure above $100,000 until such Withdrawal Preference Exposure is resolved. *See* Plan Art. IV.B.3.

(d)    Equitably Subordinated Claims

53.    The Plan contemplated the equitable subordination of those Claims included on the Schedule of Equitable Subordinated Claims, which includes Claims against certain Insiders. Litigation regarding the Equitably Subordinated Claims was stayed pursuant to the Equitable Subordination Stay Order entered on September 12, 2023. [Docket No. 3450]. The Equitable Subordination Stay Order provides that litigation regarding the Equitably Subordinated Claims is stayed until the earlier of (a) September 12, 2024, and (b) the final disposition of the criminal case pending against Alexander Mashinsky in the Southern District of New York, docketed as 23 CR 347, and may be extended by the Litigation Administrator in consultation with the United States Attorney's Office for the Southern District of New York.

54.     Additionally, there are two categories of distributions that, while technically legally eligible to receive a distribution, are not able to be made at this time:

| Reason for Non-Distribution | Number of Creditors | Total Amount of Distributions Withheld (in USD as of January 16) |
|---|---|---|
| Missing Compliance Information | 8,968 | $12.8 million |
| Custody Assets Remaining on the Platform as of the Deactivation Date | 14,720 | $7.0 million |

(a)    Missing Compliance Information

55.     The Post-Effective Date Debtors have been unable to make distributions to certain creditors because their account is missing essential information necessary to make a distribution. This is most common where a creditor created an account through a third party, such as Nuri/Bitwalla or Bitfinex.  Because these creditors were routed to Celsius through a third party, in many instances the Post-Effective Date Debtors are missing crucial information necessary to make a distribution.  The Post-Effective Date Debtors have sent e-mails to such creditors asking them to provide any missing information.  Some creditors, however, have either not received or not responded to such e-mails.  In case a creditor no longer has access to the last e-mail associated with their Celsius account, the Post-Effective Date Debtors sent a physical letter to creditors with missing compliance information with instructions on how to provide any missing information.

56.     If any creditor signed up through a third party or utilized iCloud Private Relay to login to the Celsius app and has not received e-mails or other communications from the Debtors, their account may be missing necessary information.  If you have not received communications from the Post-Effective Date Debtors and created a Celsius account through a third party, please create a Customer Care Ticket at https://stretto-celsius.freshdesk.com/support/tickets/new, select

the most relevant items from each drop-down menu (shown below), and we will work with you to help you resolve your issue.



   (b) <u>Custody Claims Not Withdrawn by the Deactivation Date</u>

  57. Beginning on or around November 29, 2023, creditors who were Holders of Class 6A General Custody Claims and/or Class 6B Withdrawable Custody Claims were eligible to withdraw their Custody Assets directly from the Celsius platform. Creditors had ninety-two days to withdraw their Custody Assets from the Celsius platform before the platform was deactivated on February 29, 2024 (the "<u>Deactivation Date</u>"). In total, approximately 68% of eligible creditors withdrew approximately 96.9% of the eligible Custody Assets on the Celsius platform. Following the Deactivation Date, the Post-Effective Date Debtors converted the Custody Assets remaining on the Celsius platform to Liquid Cryptocurrency. Creditors who still had Custody Assets on the Celsius platform as of the Deactivation Date are expected to receive a distribution on account of such assets in Liquid Cryptocurrency, if such creditor is eligible to receive Liquid Cryptocurrency, or Cash based on the Deactivation Date Cryptocurrency Conversion Table. The Litigation Administrator has advised the Plan Administrator that these distributions should not take place until such time as the Litigation Administrator approves them. The Plan Administrator is awaiting further conversations with the Litigation Administrator on this topic.

**Customer Care Response Efforts**

58.     During this Reporting Period, the Plan Administrator also resolved a number of distribution-related issues raised by creditors through the Post-Effective Date Debtors' customer support system.  In total, creditors have submitted more than 100,000 Customer Care Tickets through the customer support system.  Recently, the overwhelming majority of Customer Care Tickets submitted have been about distribution-related issues.  Of these tickets, approximately 25% relate to distribution issues at PayPal, 25% relate to distribution issues at Coinbase, and 20% relate to wire transfer issues.  When received, these tickets are segmented based on the assigned Distribution Agent and nature of the inquiry.  U.S.-based support resources review and address Customer Care Tickets from Monday through Friday from 8 a.m. to 8 p.m. (prevailing Eastern Time), and also log and respond to letters submitted to the Bankruptcy Court by creditors.  The Post Effective Date Debtors have, and will continue to, prioritize identifying and resolving common issues creditors are facing.  Doing so has resolved many common issues, including mistaken Convenience Class elections, inability to cash checks of $US Dollars (especially Australian creditors), and email deliverability issues.  In addition, the Post Effective Date Debtors have been able to assist individual creditors in resolving creditor-specific issues (*e.g.*, wire transfer information issues, Coinbase account issues, PayPal claim code issues, etc.), ultimately resulting in such creditor successfully receiving its distribution.

59.     Most Customer Care Tickets are resolved in a single e-mail (other than the initial confirmatory e-mail sent to creditors when they initially submit their ticket), and more than half of all Customer Care Tickets being resolved in less than a day.  For more complex and creditor-specific distribution issues, however, resolution times are longer.  This is because the Post-Effective Date Debtors must work with the creditor to identify and resolve the cause of the

issue. Sometimes resolving these issues requires the Post-Effective Date Debtors to develop new processes or solutions, which must be tested before they are implemented to ensure that distributions are still being made in a safe and fully regulatorily compliant manner.

60. Kirkland & Ellis LLP ("Kirkland"), one of the Post-Effective Date Debtors' advisors, also responds to creditor inquiries sent to CelsiusCreditorQuestions@kirkland.com ("CelsiusCreditorQuestions"). Questions received through CelsiusCreditorQuestions are either resolved based on information then available to Kirkland or routed to the appropriate team for further investigation. If a creditor has not received a response to a previously submitted Customer Care Ticket within several weeks of submitting such ticket, creditors are encouraged to reach out to CelsiusCreditorQuestions, noting that they previously submitted a Customer Care Ticket and describing their issue. Kirkland will endeavor to investigate the creditor's issue and provide a response. To the extent Kirkland needs additional information from the Post-Effective Date Debtors or their other advisors regarding a creditor's specific issue, it may still take some time to fully resolve such creditor's inquiry.

61. In the first few months after the Effective Date, creditors communicated that they were not receiving e-mails from the Post-Effective Date Debtors and Stretto. The Post-Effective Date Debtors, in consultation with Stretto, investigated these deliverability issues—it appeared that some e-mail services were flagging these communications as spam or not delivering this to the recipient at all. In response, the Post-Effective Date Debtors have overhauled their e-mail communication system, including integrating their communication system—MailJet—into the distribution platform, which has provided the Post-Effective Date Debtors with more control over communications with creditors and resolved many e-mail deliverability and communication issues. Since integrating this system in August, the Post-Effective Date Debtors have

successfully sent approximately 233,000 e-mails to creditors, only 4% of which have been flagged as undeliverable. Due to the Post-Effective Date Debtors' outreach efforts regarding outstanding distributions, the number of Customer Care Tickets have risen, further showing that communications sent by the Post-Effective Date Debtors are reaching customers.

### Receipts and Distributions

62. **Exhibit A** to this Report contains the receipts received and the expenditures made by the Post-Effective Date Debtors during the Reporting Period. The costs of administering the Plan during the Reporting Period have been higher than expected. That is for two main reasons: First, the Post-Effective Date Debtors compensate Coinbase for its role as a Distribution Agent through a percentage fee on distributions successfully made to creditors. That fee is on the cash value of the Liquid Cryptocurrency—and that value has been significantly elevated from the price of the Liquid Cryptocurrency on the Effective Date. As a result, fees to Coinbase have been 40% higher—totaling $7 million for the first four months of distributions—than had been previously budgeted. The second reason is that the high engagement by creditors in the post-Effective Date period has forced higher professional fees by the advisors to the Plan Administrator—including counsel, financial advisors, and customer outreach.

63. The Plan Administrator continues to evaluate the costs of administering the wind-down estate, and will seek to save costs wherever possible. In particular, the Plan Administrator intends to move more of the customer care function in-house, which should save costs by replacing outside advisors with hourly rates with in-house employees with salaries. The Plan Administrator has also been evaluating employee headcount and has been reducing headcount and transitioning to contractors as appropriate. The Plan Administrator will provide additional detail in future reports.

New York, New York
Dated: August 26, 2024

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
333 Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Plan Administrator*

## Exhibit A

**Receipts and Expenditures During Current Reporting Period**

# Post-Effective Date Debtors' Assets

|  | Crypto | Fiat | Lit Admin Assets [1] | Total |
|---|---|---|---|---|
| Debtors' Assets | $511 M | $304 M | $407 M | $ 1.2 B |
| Remaining Amount Owed in Initial Distribution | $465 M | $ 91 M | $ 0 M | $555 M |
| Net Assets | $46 M | $213 M | $407 M | $665 M |

**Net Assets** will be fully distributed to the creditors once the initial planned distribution is completed

1. Lit Admin Assets include $198 million in proceeds from asset sales and litigation recoveries managed by the Litigation Administrators and approximately $209 million of remaining illiquid assets.

# Plan Administrator's Expenses and Cash Balances

| 000s | Q1 2024 | Q2 2024 | Inception to Date |
|---|---|---|---|
| Opening Cash Balances | 70,000 | 57,106 | 70,000 |
| **Receipts** | | | |
| Interest Income | 488 | 587 | 1,076 |
| Rebates | 0 | 798 | 798 |
| **Total Receipts** | **488** | **1,385** | **1,874** |
| **Disbursements** | | | |
| Plan Administration Fees | (648) | (300) | (948) |
| Distribution Costs and Expenses | (4,706) | (3,625) | (8,331) |
| Professional Fees | (1,779) | (1,831) | (3,610) |
| Employee Payroll [1] | (3,971) | (6,135) | (10,105) |
| Other Operating Expenses | (2,279) | (1,389) | (3,668) |
| **Total Disbursements** | **(13,383)** | **(13,280)** | **(26,663)** |
| **Net Change in Cash** | **(12,894)** | **(11,895)** | **(24,789)** |
| **Ending Cash Balance** | **57,106** | **45,211** | **45,211** |

1.Reported on a cash basis and includes payout of post emergence bonuses and employee separation costs

**<u>Exhibit B</u>**

**Post-Effective Date Debtors' Recommendations for Phishing Emails**

<u>**Post-Effective Date Debtors' Recommendations for Phishing Emails**</u>

**Be aware of the sender's email address and URLs contained in their messages.**  Phishing emails will exploit your trust, expectations, and complacency with interacting with seemingly trusted sources.  The first step is always to verify the Email Sender's Identity, and without clicking on the links in the email, confirm where they are directed to.

We recommend users proactively "whitelist" official emails by creating email filters/tags or automation that will only tag Stretto or Celsius emails from legitimate sources.

**Review the below list of official websites and email addresses.**  You should disregard anything not coming from these email addresses or proceed with extreme caution.

Legitimate URLs contained in messages, and links contained:

- celsius.network
- stretto.com
- hello@celsius.network
- app@celsius.network
- claims@distributions.celsius.network
- complianceteam@celsius.network
- <u>do-not-reply@updates.celsius.network</u>
- no-reply@cases-cr.stretto-services.com
- celsiusdistribution@stretto.com
- cases.stretto.com
- https://celsiusnetwork.medium.com/
- https://cases.stretto.com/Celsius
- ionicdigital@odysseytrust.com
- do.not.reply@hyperwallet.com
- CelsiusCreditorAnswers@kirkland.com
- CelsiusCreditorQuestions@kirkland.com
- CelsiusLitigationAdmin@m3-partners.com

Note the specific punctuations, and don't be tricked by similar but differently worded or punctuated URLs using dashes instead of periods.  Remember some URL and website addresses may seem similar to the above, but you must ensure they are any of the ones shown above.

**Check the sender's email address and where the email links will take you.**  Examine the sender's email address carefully.  Phishers often use similar-looking addresses to mimic legitimate ones.  Look for misspellings, extra characters, or unusual domain names.  Verify email content and formatting.

**Be skeptical of emails with poor grammar, spelling errors, or unusual formatting.**  Legitimate organizations usually maintain a professional standard in their communication.

**Hover over links.**  If on your computer, hover your mouse over any links in the email to preview the destination URL.  Ensure it matches the expected website and is not a disguised link pointing to a phishing site.

**Check for generic greetings.**  Phishing emails often use generic greetings like "Dear Customer" instead of addressing you by name.  Legitimate organizations typically use your name in their communications.

**Beware of urgent or threatening language.**  Phishing emails often create a sense of urgency or use threatening language to manipulate recipients into taking immediate action.  Be cautious if an email demands urgent attention.

**Verify unexpected attachments.**  Avoid opening unexpected attachments, especially if they come from unknown or unexpected sources.  Malicious attachments may contain malware or phishing links.

Do not open these links for the first time on a mobile phone, as a mobile phone does not allow you to hover over links and ensure the stated link and the hyperlink match.

**Examine the email signature.**  Legitimate emails from companies usually include a consistent and professional email signature.  Lack of contact information or inconsistencies can be red flags.

**Enable two-factor authentication (2FA) everywhere possible.**  Implementing 2FA adds an extra layer of security, making it more challenging for attackers to gain unauthorized access even if they obtain your credentials through phishing.

**Use email security features.**  Many email providers offer built-in security features.  Enable features like spam filters and phishing detection to enhance your email security.

**Educate yourself and stay informed.**  Stay informed about the latest phishing techniques and trends.  Regularly update yourself on common phishing tactics to recognize new and sophisticated attempts.  Review the Celsius Knowledge Base site, as well as the official docket on Stretto to keep yourself up to date.

**https://celsiusdistribution.stretto.com/support/solutions**
**https://cases.stretto.com/Celsius**
**https://twitter.com/celsiusnetwork**
**https://x.com/celsiusnetwork**

**Verify unexpected requests.**  If an email requests sensitive information or actions that seem unusual, independently verify the request by contacting the organization through official channels before providing any personal information.

**Check for HTTPS.**  Verify that the website you are directed to uses HTTPS.  While this alone does not guarantee legitimacy, it adds an additional layer of security.  When in doubt, verify the SSL certificate used.

**Stay cautious with pop-ups and forms.**  Be cautious if an email or website opens unexpected pop-ups or prompts you to enter sensitive information in forms.  Legitimate organizations typically handle such interactions securely, not over a single-click email.

**Never connect your Crypto Wallet anywhere, even if it looks like a Celsius or Stretto Website.** If you follow the above tips, proceed with caution, and stay up to date with official site updates, you will be more secure in these trying times.