Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 24-03667-mg

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   MEGHJI,

14                   Plaintiff,

15           v.

16   MASHINSKY, et al.,

17                   Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 2

1    Adv. Case No. 24-03738-mg

2    - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    MEGHJI,

4                        Plaintiff,

5               v.

6    ATAR,

7                        Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Adv. Case No. 24-03739-mg

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   MEGHJI,

12                       Plaintiff,

13              v.

14   O'BRIEN,

15                       Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - - - - x

17   Adv. Case No. 24-03740-mg

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   MEGHJI,

20                       Plaintiff,

21              v.

22   YARWOOD,

23                       Defendant.

24   - - - - - - - - - - - - - - - - - - - - - - - - - - x

25



Page 3

1    Adv. Case No. 24-04010-mg

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    BARBER LAKE DEVELOPMENT LLC

4                    Plaintiff,

5            v.

6    PRIORITY POWER MANAGEMENT, LLC,

7                    Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                   United States Bankruptcy Court

11                   One Bowling Green

12                   New York, NY  10004

13

14                   August 27, 2024

15                   10:00 a.m.

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 4

1    HEARING re Update on Avoidance Actions. (Doc ## 7458, 7618).

2

3    HEARING re Status Update on Corporate Creditor Matter (Doc

4    ## 7585, 7587, 7588, 7592).

5

6    HEARING re Status Update. (Doc #7612)

7

8    HEARING re Status Update on Ionic Digital, Inc. (Doc # 7590,

9    7616, 7631).

10

11   HEARING re Hearing Held Using Zoom for Government RE: Motion

12   for an Order Establishing Streamlined Procedures Governing

13   Avoidance Actions Pursuant to Sections 502, 547, and 550 of

14   the Bankruptcy Code. (Doc# Doc# 7534, 7559, 7595, 7602,

15   7603, 705, 7606, 7607, 7610, 7611, 7619, 7625)

16

17   HEARING re Adversary proceeding: 24-03667-mg MEGHJI v.

18   MACHINSKY et al Pre-Trial Conference Held Using Zoom for

19   Government. (Doc #1,2,3,5 to 7)

20

21   HEARING re Adversary proceeding: 24-03738-mg MEGHJI v. ATAR

22   Pre-Trial Conference Held Using Zoom for Government. (Doc

23   #1, 2, 4)

24

25   HEARING re Adversary proceeding: 24-03739-mg MEGHJI v.

Page 5

1   O'BRIEN Pre-Trial Conference Held Using Zoom for Government,

2   (Doc #1, 2, 4)

3

4   HEARING re Adversary proceeding: 24-03740-mg MEGHJI v.

5   YARWOOD Pre-Trial Conference Held Using Zoom for Government.

6   (Doc #1, 2, 4, 6, 7)

7

8   HEARING re Adversary proceeding: 24-03741-mg MEGHJI v. PETER

9   Pre-Trial Conference Held Using Zoom for Government. (Doc

10  #1, 2, 4)

11

12  HEARING re Adversary proceeding: 24-03976-mgz MEGHJI v. NOY

13  Pre-Trial Conference Held Using Zoom for Government. (Doc

14  #1, 2, 4)

15

16  HEARING re Adversary proceeding: 24-04010-mg Barber Lake

17  Development LLC v. Priority Power Management, LLC

18  Pre-Trial Conference Held Using Zoom for Government. (Doc

19  ##1, 2, 5, 6, 12, 18)

20

21  HEARING re Doc# 7640 Amended Notice of Agenda for Hearing to

22  be Held August 27, 2024, at 10:00 A.M. (Prevailing Eastern

23  Time)

24  Transcribed by:  Sonya Ledanski Hyde

25

Page 6

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for the Post-Effective Date Debtors

 5         and the Plan Administrator

 6         333 W Wolf Point Plaza

 7         Chicago, IL 60654

 8

 9    BY:  CHRIS KOENIG

10

11    KIRKLAND & ELLIS LLP

12         Attorneys for Debtors

13         601 Lexington Avenue

14         New York, NY 10022

15

16    UNITED STATES DEPARTMENT OF JUSTICE

17         Attorneys for the U.S. Trustee

18         Alexander Hamilton Custom House

19         One Bowling Green, Room 534

20         New York, NY 10004

21

22    BY:  SHARA CLAIRE CORNELL

23         MARK BRUH

24

25
```

Page 7

```
 1    WILKIE FARR & GALLAGHER LLP

 2         Attorneys for BRIC

 3         787 Seventh Avenue

 4         New York, NY 10019

 5

 6    BY:  BRIAN LENNON

 7

 8    WHITE & CASE LLP

 9         Attorneys for Litigation Oversight Committee; Mohsin Y.

10         Meghji

11         555 South Flower Street, Suite 2700

12         Los Angeles, CA 90071

13

14    BY:  AARON COLODNY

15

16    WHITE & CASE LLP

17         Attorneys for Litigation Oversight Committee; Ionic

18         Digital

19         111 South Wacker Drive, Suite 5100

20         Chicago, IL 60606-4302

21

22    BY:  GREGY F. PESCE

23

24

25
```

Page 8

1  WHITE & CASE LLP

2       Attorneys for Mohsin Y. Meghji as Litigation

3       Administrator

4       1221 Avenue of the Americas

5       New York, NY 10020

6

7  BRESSLER, AMERY & ROSS, P.C.

8       Attorneys for The Bressler Defendants

9       17 State Street, Suite 34th Floor

10      New York, NY 10025

11

12  BY:  CHRISTOPHER MATTHEW VAUGHAN

13

14  SEWARD & KISSEL LLP

15      Attorneys for Barber Lake Development LLC

16      One Batter Park Plaza

17      New York, NY 10004

18

19  BY:  THOMAS ROSS HOOPER

20  FALCON RAPPAPORT & BERKMAN LLP

21      Attorneys Thomas Edwin McCann and Will Thomas McCann

22      265 Sunrise Highway

23      Rockville Centre, NY 11570

24

25  BY:  MICHELE K. JASPAN

Page 9

1   PHILLIPS NIZER LLP

2        Attorneys for Darren Yarwood

3        485 Lexington Avenue

4        New York, NY 10017

5

6   BY:  JARED RILEY CLARK

7

8   LOWENSTEIN SANDLER

9        Attorneys for Celsius Adversary Proceeding Defendants

10       One Lowenstein Drive

11       Roseland, NJ 07068

12

13  BY:  MICHAEL PAPANDREA

14

15  THE SARACHEK LAW FIRM

16       Attorneys for Ad Hoc Committee

17       670 White Plains Road, Penthouse Suite

18       Scarsdale, NY 10583

19

20  BY:  JOSEPH SARACHEK

21

22

23

24

25

Page 10

 1   RUSKIN MOSCOU FALTISCHEK, P.C.

 2        Attorneys for Koala 1, LLC, AM Ventures Holdings Inc.

 3        And Alex M.

 4        1425 RXR Plaza, Suite 15th Floor

 5        Uniondale, NY 11445-1425

 6

 7   BY:  SHERYL P. GIUGLIANO

 8

 9   JACKSON WALKER

10        Attorneys for Mike Boudet

11        1401 McKinney, Suite 1900

12        Houston, TX 77010

13

14   BY:  THAD WILSON

15

16   KING & SPALDING

17        Attorneys for Kristine Meehan Mashinsky

18        1185 Avenue of the Americas

19        New York, NY 10036

20

21   BY:  LEIGH NATHANSON

22

23

24

25

Page 11

1  TROUTMAN PEPPER HAMILTON SANDERS LLP

2       Attorneys for a Member of Preference Defendants

3       (Identified at Docket 7601)

4       4000 Town Center, Suite 1800

5       Southfield, MI 48075

6

7  BY:  DEBORAH KOVSKY-APAP

8

9  JAMES MATTHEWS, Pro Se

10

11  JOHN ANKENEY, Pro Se

12

13  ALSO PRESENT:

14  ARTUR ABREU

15  DAVID J. ADLER

16  ELENI ALEMU

17  BROOKS ANTWEIL

18  JUAN ARCINIEGAS

19  MATTHEW P. AUSTRIA

20  JASON AWAD

21  RICHARD A. BARKASY

22  CHRIS BECIN

23  PHILIP BENTLEY

24  NISCHAY KISHAN BHAN

25  SCOTT RICHARD BOWLING

1    JOHAN BRONGE

2    ENRIC BULT

3    VITOR CUNHA

4    SANTOS CACEREST

5    ROBERT A. CAMPAGNE

6    KARA E. CASTEEL

7    RICKIE H. CHANG

8    THOMAS CHERNALK

9    ROBERT CHRISTIANSEN

10   CHRISTINA CIANCARELLI

11   CAMERON CREWS

12   OONA CRUSELL

13   DAVID J. DALHART

14   PAUL JAMES DERIEMAKER

15   ZARYN DENTZEL

16   JASON DIBATTISTA

17   TRISTAN DIAZ

18   DAVID DINOSO

19   SHARON M. DOW

20   SCOTT DUFFY

21   STEPANIE EBERHARDT

22   CONSTANTINE ECONOMIDES

23   EDUARD EDELER

24   GABRIEL EISENBERGER

25   RICHARD FERREE

1    ELI D. FRAME

2    LARUEN FRAME

3    ELISE S. FREJKA

4    REBECCA GALLAGHER

5    JASLEIGH GEARY

6    JOSEPH BERNELL GEORGE

7    DARIUS GHEORGHE

8    MAHA GHYAS

9    VICTORIA GIORGIO

10   EDUARDO J. GLAS

11   HARLEY J. GOLDSTEIN

12   TIMOTHY GRINSELL

13   KATHRYN GUNDERSEN

14   CAMERON GUTHRIE

15   THOMAS HARPOINTNER

16   JEFFREY HAVEMEIER

17   KIM HAVLIN

18   GABRIELA HENSLEY

19   JOHN HILL

20   STETSON HOGUE

21   JASON IOVINE

22   STIG JELLESTAD

23   MIKE JOHNSON

24   ROLAND GARY JONES

25   DAVID KAHN

Page 14

1   YARA KASS-GERGI

2   RIECE KECK

3   MARTIN E. KEDZIOR

4   TRAVIS KEENEY

5   THOMAS S. KESSLER

6   AHARON KING

7   DAVID T. KING

8   FRED KING

9   DARRYL KITSON

10  RIKI KOULY

11  IRINA KURDIANI

12  ROSS KWASTENIEL

13  SERBAN LUPU

14  DAN LALONA

15  LOUIS E. LAYRISSON

16  JOSEPH LEHRFELD

17  MARK S. LEONARD

18  XI LIN

19  FRAN LIN

20  JASON LU

21  JEFF MARKOWSKI

22  DAVID MALHOTRA

23  DANIEL J. MAREE

24  GREGORY MAUK

25  CAROL MAUNDER

Page 15

1    KEITH MCCORMACK

2    BRIAN T. MCGARRY

3    BRIGETTE MCGRATH

4    ZACHARY MCKAY

5    LAURA FALLER MCNEIL

6    JOHN MELLEIN

7    LOUIS FRANK MENDEZ

8    MEDX MER

9    TOM MERCURI

10   MIKE MIKE

11   LAYLA MILLIGAN

12   JUQUWON LATORENCE MORENS

13   JOSH J. MOREY

14   MICHAEL D. MORRIS

15   HAROLD B. MURPHY

16   SHANNON NELSON

17   RICHARD OSWALD

18   CRAIG PARKIN

19   DEEP PATEL

20   MILIN PATEL

21   ARIE PELED

22   KENNETH R. PUHALA

23   LALANA PUNDISTO

24   FAISAL QUADRI

25   VALENTIN RAAB

Page 16

1    GABRIELLE REARDON

2    DEVIN RIVERO

3    JONATHAN RODRIGUEZ

4    ERIC S. ROSEN

5    MICHAEL M. SARKISSIAN

6    SHELBY SAXON

7    DAVID SCHNEIDER

8    NOAH M. SCHOTTENSTEIN

9    SAMUEL SCHREIBER

10   WILLIAM D. SCHROEDER

11   MARK SCHWARZ

12   DAVID SENES

13   RAFFAELE SENESE

14   EZRA SERRUR

15   NIKOLAS SEVERSON

16   MATTHEW W. SILVERMAN

17   ERIC W. SLEEPER

18   RYAN T. SLOPER

19   DON SMITH

20   SAHRISH K. SOLEJA

21   COURTNEY BURKS STEADMAN

22   JASON M. STEIN

23   RETO STIFFLER

24   PAUL STORVICK

25   STEPHANIE R. SWEENEY

1   BRAIN TUNNING

2   ELVIN TURNER

3   MARIANNA UDEM

4   EZRA VAZQUEZ-D'AMICO

5   TONY VEJSELI

6   DEISREE VELLEUER

7   HAROLD VINES

8   BRIAN VIOLETTE

9   CRAIG VOLCHKO

10   SUSAN WARNOCK

11   STEVE WATTS

12   AVI WEITZMAN

13   RICHARD E. WELTMAN

14   STEPHANIE WICKOUSKI

15   REBECCA Y. WILSON

16   SEAN XUE

17   GOLSHID ZAHIREMAMI

18   TANZILA ZOMO

19   DAVID M. BARSE

20   COLIN FEULING

21   DEBORAH FRANKEL

22   KYLE MCEVILLY

23   CARLA MOORE

24   RAKESH PATEL

25   ROMUALD TENDILLE

Page 18

1    HEIN VAN DER WIELEN

2    MICHAEL S. AMATO

3    NICOLAS FLORIO

4    KATHRYN GUNDERSEN

5    PIETER VAN TOL

6    PAUL BENJAMIN KOEPP

7    ISHAN ANAND

8    TRAVIS ARBON

9    JOSH ALL

10   ISHAN ANAND

11   TRAVIS ARBON

12   RICH ARCHER

13   LAURA BARON

14   SOMA BISWAS

15   DREW DUFFY

16   MATTHEW EZERSKY

17   CLARA ELLEN GEOGHEGAN

18   UDAY GORREPATI

19   JAMES MATTHEW GROSS

20   TAYLOR HARRISON

21   DANIEL G. KUHN

22   MIKE LEGGE

23   MICHELLE LOTFALLA

24   DOROTHY MA

25   STEPHEN NGUYEN

1    JONATHAN RANDLES

2    TIMOTHY REILLY

3    MARK ROSOLINI

4    RYAN SAPP

5    PETER J. SPROFERA

6    DANELLE SUCHY

7    VINCE SULLIVAN

8    MICHAEL ABBATE

9    AUSTIN STRATTON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2               CLERK:  Good afternoon.  All right, starting the

3     hearing calendar for August 27th, 2024, at 10 a.m.  Calling

4     the following cases:  Case Number 22-10964, Celsius Network,

5     LLC;  Case Number 24-3667, Meghji v. Mashinsky et al;  Case

6     Number 24-3738, Meghji v. Atar; Case Number 24-3739, Meghji

7     v. O'Brien; Case Number 24-3740, Meghji v. Yarwood; Case

8     Number 24-3741, Meghji v. Peter; Case Number 24-33976,

9     Meghji v. Noy; Case Number 24-4010, Barber Lake Development

10    LLC v. Priority Power Management LLC et al.  If we can have

11    parties state their appearances for the record?

12              MR. KOENIG:  Good morning, Diana.  It's Chris

13    Koenig from Kirkland and Ellis for the post-effective date

14    Debtors and the Plan Administrator.  Can you hear me okay?

15              CLERK:  Yes, I can, Chris.

16              MR. KOENIG:  Thank you so much.  We have a

17    conference room that has a camera setup in this room.  It's

18    -- the name on the Zoom account is CH 50C.  I think it's

19    stuck in the -- oh, there we go, there we go, there we go.

20    Thank you.

21              CLERK:  Yeah.  All right, thank you.  Do we have

22    any additional Counsel for the Debtors that are stating

23    their appearance?

24              MR. FERRARO:  Hi Diana, not Counsel, but Plan

25    Administrator for the Debtors, Chris Ferraro.  And I

Page 21

1    apologize, I can't figure out how to spell out my last name

2    on Zoom.  For some reason, it changed, so it just says Chris

3    F.

4              CLERK:  Is that correct?

5              MR. FERRARO:  Oh, now it's correct.  Thank you.

6              CLERK:  You're welcome.  All right, do we have

7    Creditors Committee Counsel on the line?  Would you like to

8    state your appearances?  All right, how about the US

9    Trustee?

10             MS. CORNELL:  Good morning, Diana.  I am Shara

11   Cornell, here on behalf of the Office of the United States

12   Trustee.  I believe I'm going to be joined with my colleague

13   Mark Bruh.

14             CLERK:  Okay, thank you.

15             MS. CORNELL:  Thank you.

16             CLERK:  All right, I'm going to ask the parties

17   that are speaking on the record this morning to raise -- use

18   the raised hand function in Zoom.  Please do that.  I will

19   ask you to unmute and ask you to state your appearance for

20   the record.  Yes, Brian?

21             MR. LENNON:  Good morning, Brian Lennon of Willkie

22   Farr & Gallagher on behalf of the Litigation Oversight

23   Committee.

24             CLERK:  Okay, thank you.  James?

25             MR. MATTHEWS:  Yes, James Matthews,

Page 22

1     (indiscernible), pro se Creditor.

2                CLERK:  James.  Aaron?

3                MR. COLODNY:  Good morning, Aaron Colodny from

4     White & Case on behalf of the litigation administrator.

5                CLERK:  All right, thank you.  Christopher?

6                MR. VAUGHAN:  Good morning, Christopher Vaughan on

7     behalf of the group of 34 Defendants in the Adversary

8     Proceedings.

9                CLERK:  Okay, is that for the Meghji v. Mashinsky

10    matter?

11               MR. VAUGHAN:  It is not, no.

12               CLERK:  Okay, do you know the Case Number or the

13    matter?

14               MR. VAUGHAN:  I mean, there's 34 of them.  I can

15    run through them all if you want me to.

16               CLERK:  It's fine.  It's not necessary.  If you

17    happen to be appearing on a specific adversary, I was just

18    going to ask for the adversary number.  It's not --

19               MR. VAUGHAN:  No, it's just in relation to the

20    motion or (indiscernible) procedures.

21               CLERK:  Okay.  Perfect, thank you.  Ross?

22               MR. HOOPER:  Good morning, Ross Hooper from Seward

23    & Kissel or for Barbara Lake Development, LLC.

24               CLERK:  All right, thank you.  Michelle?

25               MS. JASPAN:  Good morning, Michele Jaspan of

1    Falcon Rappaport & Berkman, joined with my colleague Richard

2    Weltman for Creditors Will and Tom McCann.

3              CLERK:  All right, thank you.  Sam?

4              MR. HERSHEY:  Yes, good morning.  Apologies --

5              CLERK:  Sorry, you're echoing a little bit.

6              MR. HERSHEY:  Sorry, give me one minute and we'll

7    fix this.

8              CLERK:  Okay, thank you.  Are there any additional

9    parties that are speaking on the record?  Jared?

10             MR. CLARK:  Yes, hello.  Jared Clark for Darren

11   Yarwood.  Phillips Nizer LLC.

12             CLERK:  All right, thank you.

13             MR. PESCE:  Hi Diana, it's Gregory Pesce, White &

14   Case on behalf of two partis -- Ionic Digital and the

15   Celsius Litigation Oversight Committee from White & Case.

16   Thank you.

17             CLERK:  Thank you.  All right --

18             MR. PAPANDREA:  Yeah, good morning, it's Michael

19   Papandrea from Lowenstein Sandler.  We represent a number of

20   defendants in various adversary proceedings.  I think it's

21   like 132 adversary proceedings.  But similar to Mr. Vaughan,

22   we're -- we don't intend to speak as to any of them

23   specifically, just more in response to, you know, the

24   matters on for the hearing generally.

25             CLERK:  All right, thank you.  All right, so --

1          MR. SARACHEK:  Hi, good morning.

2          CLERK:  Yeah --

3          MR. SARACHEK:  Joe Sarachek for the Ad Hoc

4     Committee of Corporate Creditors.

5          CLERK:  All right, thank you.  Cheryl?

6          MS. GIUGLIANO:  Good morning.  This is Sheryl

7     Giugliano, Ruskin Moscou Faltischek, Counsel to Alexander

8     Mashinsky, Koala One LLC, AM Ventures Holdings in connection

9     with the Meghji v. Mashinsky Adversary Proceeding.  I don't

10    believe that I will need to speak on the record, but to the

11    extent that I do, I just wanted to make the appearance.

12    Thank you.

13         MAN:  Okay --

14         CLERK:  Yeah, Sam?

15         MR. HERSHEY:  Yeah, good morning.  Sam Hershey

16    from White & Case for Mo Meghji, the Litigation

17    Administrator.  I apologize for the issue before, but we

18    have apparently resolved it.

19         CLERK:  Yes, you have.  Thank you.  Do you have

20    any additional appearances?  If you're stating your

21    appearance on the record, please use the raise hand function

22    in Zoom.  I will ask you to unmute and take your appearance.

23    Yes, Thad?  Yeah, I can't hear you.

24         MR. WILSON:  There we go.  Thad Wilson from King

25    and Spalding on behalf of Jeremy (indiscernible) in the

Page 25

1    Meghji v. Mashinsky Adversary Proceeding.  I don't think I'm

2    going to need to speak today, but to the extent I need to,

3    just wanted to make an appearance.

4              CLERK:  All right, thank you.  Roland?

5              MR. JONES:  Good morning, I just wanted to note my

6    appearance.  I don't think I'll be speaking, either.  I

7    represent multiple Defendants.

8              CLERK:  All right, thank you.  All right, Mr.

9    Jones.  All right,

10             MS. NATHANSON:  Good morning, this is Leigh

11   Nathanson from King & Spalding.  I represent two Defendants

12   in the Meghji v. Mashinsky Adversary Proceeding -- Christine

13   Meehan and Koala 2 LLC.  Like some of my Co-Defendants'

14   Counsel, I don't intend to speak on the record, but if

15   necessary, I wanted to make my appearance.  Thank you.

16             CLERK:  You're welcome.  Thank you.  All right,

17   for the parties that have joined, if anyone is speaking on

18   the record, please use the raised hand function in Zoom.  I

19   will ask you to unmute and take your appearance.  All right,

20   Judge, would you like to test your microphone?

21             I think we lost him.  Can -- for the parties that

22   have joined, is anyone speaking on the record?  If you are,

23   please use the raised hand function in Zoom.  I will ask you

24   to unmute and take your appearance.  Yes, John?

25             MR. ANKENEY:  Hi, I'm speaking on the record.

Page 26

1              CLERK:  Okay, if we could just have your first and

2      last name.

3              MR. ANKENEY:  Sure.  The first name is John.  Last

4      name is Ankeney.  A-N-K-E-N-E-Y.

5              CLERK:  Okay, thank you.  You can mute the line

6      for now.  All right, for the parties that have joined, is --

7      if anyone is speaking on the record, please use the raised

8      hand function in Zoom.  I will ask you to unmute and take

9      your appearance.  Deb?

10             MS. KOVSKY-APAP:  Good morning, Diana.  Deb

11     Kovsky, Troutman and Pepper for a member of Preference

12     Defendants.

13             CLERK:  Okay, thank you.

14             THE COURT:  Can you hear me, Diana?

15             CLERK:  Yes, I can, Judge.  Thank you.

16             THE COURT:  Okay, thank you.

17             CLERK:  All right, for the parties that have

18     joined, if anyone is speaking on the record this morning,

19     please use the raised hand function in Zoom.  I will ask you

20     to unmute and take your appearance.

21             And for the parties that have joined, if anyone is

22     speaking on the record, please unmute your line and state

23     your appearance for the record.  The 958 Celsius hearing, is

24     that for one of the Debtor's lines?

25             THE COURT:  Yeah, I think that was our line that

Page 27

1    wasn't working.  We'll try to close that out.  I'm just

2    joining on my computer now.

3              CLERK:  Okay, all right.  Thank you.  Judge, it's

4    10 o'clock by my watch.  Would you like me to make a final

5    call for appearances?

6              THE COURT:  Yes, if you would, please, Diana.

7              CLERK:  Okay, this is the final call for

8    appearances.  If anyone is speaking on the record and has

9    not stated their appearance yet, please use the raised hand

10   function in Zoom.  I will ask you to unmute and take your

11   appearance.  All right, I do not see any hands.

12             MR. GOLDSTEIN:  Harley Goldstein for Jake Steele.

13             CLERK:  Okay, thank you.  Yes --

14             MAN:  Yeah, I believe that Louie Layrisson from

15   Baker Botts will be joining and speaking on behalf of

16   Priority Power Management LLC.  We're having some issues

17   with the Zoom.  But he is going to be joining, and I believe

18   he'll be making an appearance on the record as soon as he's

19   able to join.

20             CLERK:  Okay.  Thank --

21             MR. LAYRISSON:  Good morning, Louie Layrisson here

22   on behalf of Priority Power.  And thank you (indiscernible)

23   --

24             CLERK:  All right.  Again, any call for

25   appearances?  Thank you.  If you're making an appearance,

Page 28

1    please use the raised hand function in Zoom.  All right, I

2    don't see any hands.  Judge, would you like to start?

3              THE COURT:  I would.  Thank you very much and good

4    morning, everybody.  This is Judge Glenn.  We have a long

5    agenda for today.  I see on my screen that there are 152

6    Zoom connections.  I will call the matters in the order in

7    which they appear on the agenda that was circulated.  It's

8    ECF-7640.

9              It's important that anyone -- well, when we cover

10   specific items on the agenda, I will only hear people who

11   wish to address that agenda item.  It's very important that

12   anybody else who wishes to be heard at the appropriate time

13   uses the raise hand function at the bottom of the Zoom

14   screen, and I will try and recognize people in the order in

15   which their hands are raised as best I can.

16             Depending on what the item that we're discussing,

17   I may limit the amount of time that I will allow any one

18   speaker to address the Court.  I do try always to hear what

19   people's concerns are, what their arguments are, whether

20   they're pro se parties without an attorney, or whether

21   they're attorneys appearing.

22             So let's begin.  And the first item on the agenda

23   is the Status Update on Distributions.  Who's going to speak

24   for the Plan Administrator?  I guess the presentation

25   materials that were circulated, which are ECF-7638 were

Page 29

```
1    actually circulated by Kirkland.  So who on behalf of

2    Kirkland wants to address the issues that are in that

3    hearing presentation, which is ECF-7638?

4              MR. KOENIG:  Good morning, Your Honor.  It's Chris

5    Koenig.  Can you hear me now?

6              THE COURT:  I can, Mr. Koenig.

7              MR. KOENIG:  It's a little --

8              THE COURT:  You're echoing.  Let me first ask, can

9    everybody hear me okay?  Yes, okay.  I see heads shaking

10   yes.  Mr. Koenig, do you have more than one microphone in

11   the -- in your vicinity so that it's picking up your voice

12   in multiple locations?  Because that can cause the echo.

13             MR. KOENIG:  Understood, Your Honor.  I've dialed

14   in on another line, and somebody can let me in under my

15   name, Chris Koenig.

16             THE COURT:  You're still echoing.  There has to be

17   more than one microphone open.  Try again.

18             MR. KOENIG:  There we go.  Can you hear me now,

19   Your Honor?

20             THE COURT:  Yeah, but I hear echoes.

21             MR. KOENIG:  I think I figured it out.  Give me

22   one -- okay, Your Honor.  I think that the echo is gone now?

23             THE COURT:  It's about 90 percent gone.  Let's put

24   it that way.  But go ahead.  I want to see how you're doing.

25             MR. KOENIG:  All right, thanks, Your Honor.  I
```

Page 30

1   went out into the hallway with a cell phone, so hopefully

2   this works.  I think the problem is that the speaker was

3   generating it back and doing a feedback loop.  Can you hear

4   me okay?

5           THE COURT:  I can.  Go ahead.

6           MR. KOENIG:  Thank you, Your Honor.  I'm sorry for

7   the technical difficulties.  So as you mentioned, we have an

8   update on distribution.  So the Plan Administrator, I'm

9   joined on a Zoom by Mr. Ferraro, the Plan Administrator.  He

10  filed a robust report on the docket about distributions at

11  7637.

12          So rather than have me give the update, we thought

13  we'd have Mr. Ferraro give the update, and perhaps even

14  better, since he hopefully won't be having the same tech

15  issues that I have.  So I'll turn it over to Mr. Ferraro and

16  we'll sort of do a couple of questions and answers that we

17  did during the case.  So Mr. Ferraro, if you could unmute

18  and we can make sure that everybody can hear you?

19          MR. FERRARO:  Yeah, I think I should be unmuted.

20          THE COURT:  Yeah, you're fine.  Good morning, Mr.

21  Ferraro.

22          MR. FERRARO:  Good morning, Your Honor.

23          MR. KOENIG:  Thank you.  Mr. Ferraro, so the

24  effective date of the plan occurred on January 31.  What

25  have the highlights of the distribution process been in the

Page 31

1    seven months since the effective date occurred?

2            MR. FERRARO:  Yeah, we distributed cryptocurrency,

3    Fiat and Mining Co. common stock to over 250,000 Creditors.

4    This is roughly two thirds of all eligible Creditors by

5    number, for 2.5 billion in value, which is 93 percent of the

6    total eligible amount.

7            In the first two weeks after the effective date,

8    we distributed 65 percent of the eligible value for 1.7

9    billion.  And within six weeks, we distributed 80 percent of

10   the value for two billion.

11           THE COURT:  Let me just stop you for just a

12   moment, Mr. Ferraro.  I'm following what you're reporting

13   on, and I do want to hear it.  But for those of you who are

14   looking for the actual report, it's ECF-7638.  And I guess

15   it's a 7637, 7638.  And I'm following it on Page 1.  So if

16   anyone wants to actually see the document, I think that is

17   sort of the basis for Mr. Ferraro's presentation.  And

18   that's where you can find it on the docket.  Go ahead, Mr.

19   Ferraro, I'm sorry to interrupt you.

20           MR. FERRARO:  Thank you.  No, no, thank you, Your

21   Honor.  That's very helpful.  Subsequent to those first six

22   weeks, we have distributed 30 to 40 percent of the remaining

23   eligible value in every month.  Other than we paused, of

24   course, for the Stretto data security incident in late May

25   through June.

Page 32

1              In total, we've attempted more than 2.7 million

2    distributions for 372,000 eligible Creditors in 165

3    countries.  We are now in the part of the process, we're

4    dealing with Creditors that have bespoke individual type

5    issues.  And given time to resolve such distributions, it

6    might extend given this added complexity.

7              MR. KOENIG:  So Mr. Ferraro, how many Creditors

8    haven't successfully been in distribution and what are the

9    most common issues that you're seeing that they have?

10             MR. FERRARO:  Yeah, there are 120,000 Creditors

11   who have not been able to claim.  And we put those into the

12   following groups.  First, there's 50,000 Creditors of

13   PayPal, who have received a claim code, but have yet to

14   redeem.  Usually, the Creditor simply needs to open a PayPal

15   account with a matching date of birth and follow the

16   instructions to claim their distribution.

17             Next, 44,000 Creditors at Coinbase, who need to

18   open an account or add an email and date of birth that

19   matches the Celsius information.  These Creditors have been

20   getting an email typically every two weeks with every failed

21   attempt telling them how to proceed.

22             There are 11,000 Creditors who have a Coinbase

23   account, but typically, there has some sort of open KYC

24   issue.  These Creditors also get an email after every

25   attempt --

Page 33

1            THE COURT:  KYC is know your customer?

2            MR. FERRARO:  Know your customer.  Sorry, Your

3    Honor.  Yes.  Usually, they have some onboarding item

4    opened, but we're able to match an email back to the Celsius

5    information, so we know that they are in the process of

6    opening an account.  And we attempt every two weeks, and

7    they send -- we send an email if the attempt is successful

8    or unsuccessful.

9            In September, we will also offer Creditors who

10   have not been able to successfully claim their crypto

11   distribution.  The option to transition to Fiat.  This will

12   be done through an election process and will give Creditors

13   an offramp to get their distribution in Fiat.  As some of

14   these Creditors are likely stuck in onboarding at PayPal or

15   Coinbase.

16           Additionally, we have about 5,000 uncashed checks

17   that we sent to Creditors over the last few months.  After.

18   90 days, these checks will be voided, and these Creditors

19   will be transitioned to Hyperwallet.  And finally, there are

20   2,000 Creditors ready to claim their distribution with

21   Hyperwallet, who are still in the wire process.

22           Of the 120,000 Creditors, only eight percent have

23   an open ticket with our customer support team.  For all of

24   the issues, customers should contact us if they are having

25   problems claiming, and we will work with them.  The

1    quarterly report has details about the ticketing process and

2    how Creditors can get in contact with their support team.

3            MR. KOENIG:  So Mr. Ferraro, what do you do if a

4    distribution attempt is unsuccessful to any particular

5    Creditor?

6            MR. FERRARO:  Yeah, we continue attempting the

7    distribution and providing support.  Creditors assigned to

8    Coinbase and eligible at the effective date would've had

9    their distribution attempted 10 times already.  PayPal claim

10   codes are always active, and we send regular emails

11   reminding Creditors to take the necessary steps and redeem.

12           For wire transfers, there has been approximately

13   26 cohorts since the effective date.  And Creditors who

14   resubmit their wire information are typically attempted in

15   the next cohort, typically done weekly.  There is an email

16   sent to Creditors after every distribution attempt, whether

17   successful or unsuccessful.  And starting in September, we

18   will send weekly email reminders to all eligible Creditors

19   that have not received their distribution.

20           MR. KOENIG:  So Mr. Ferraro, you mentioned that

21   there are a number of Creditors that haven't claimed their

22   distribution.  Why might a Creditor not take the steps that

23   are necessary to claim their distribution?

24           MR. FERRARO:  Many of the remaining Creditors have

25   a small distribution value.  Similar to the custody

Page 35

1    distribution, a sizable amount of these Creditors might not

2    be incentivized to take the necessary steps to claim their

3    distribution.  Of the 128,000 Creditors that have not

4    claimed, 64,000, a little bit over a half, have a

5    distribution value of less than $100, and 41,000 have a

6    distribution value between $100 and $1,000.

7            The average value for Creditors who have not

8    claimed their distribution is about $1,500 at January 16th

9    prices.  With the custody distribution, which was processed

10   on the Celsius platform for 94 days until February 28th,

11   2024, only 68 percent by number of Creditors and 97 percent

12   by value have reclaimed their custody distribution.

13           We are approaching those levels.  The custody

14   distributions were easily claimed by going into the Celsius

15   app and withdrawing the crypto currency.  With distributions

16   under the plan, Creditors must take additional steps,

17   signing up with a new service -- PayPal or Coinbase --

18   passing KYC, know your customer, and for certain Fiat

19   distributions, providing wire information.

20           It's important to note any amounts that are

21   unclaimed will ultimately be redistributed to other

22   Creditors as contemplated under the plan.

23           THE COURT:  What is that --

24           MR. KOENIG:  So that --

25           MR. FERRARO:  Pardon me.

Page 36

1              THE COURT:  When does that come, Mr. Ferraro?

2              MR. FERRARO:  Well, there's a year kind of a

3    (indiscernible) period after the effective date.  Mr. Koenig

4    could probably go into additional details, if needed.

5              MR. KOENIG:  Thank you.  That's right.  It's -- so

6    the plan provides Your Honor, that a year after a Creditor

7    has their distribution made available to them, it holds for

8    the -- it's cheated back to the date to be redistributed to

9    other folks.  We're going to file a motion just to make it

10   ultra clear what exactly that date is, and we're going to

11   send very specific notices to Creditors with, you know,

12   bold, like, you know, you need to claim your distribution by

13   such and such a date or it will be forfeited.  But we'll

14   bring that matter before Your Honor before we take any

15   action there.

16             THE COURT:  Thank you, Mr. Koenig.

17             MR. KOENIG:  Thank you.  So Mr. Ferraro, we've

18   talked at previous hearings about some of the troubles that

19   we've had with the Fiat distribution process.  What have you

20   done to improve the Fiat distribution process?

21             MR. FERRARO:  Yeah, let me start with just

22   reminding everybody kind of where we were at at the

23   effective date.  We originally planned to send wires to

24   Creditors with the Fiat distribution over $250,000.  This

25   was about 50 Creditors in total.

Page 37

1          The remainder that were scheduled for Fiat would

2     receive checks.  Many international Creditors told us they

3     cannot cash a USD check, and we listened to that feedback.

4     We now send wires for any amount above $500, which is about

5     3,500 Creditors.

6          To improve the process, we have modified the wire

7     form to include additional instructions.  We also correct

8     obvious errors in the Creditor's submission.  These

9     modifications to the wire process doubled the success rate

10    from 30 to 60 percent.

11          MR. KOENIG:  And Mr. Ferraro, am I right in saying

12    that some of the folks that are currently stuck in the wire

13    process have transitioned to Hyperwallet?

14          MR. FERRARO:  That's correct, Mr. Koenig.

15          MR. KOENIG:  Great.  And then, just wrapping up,

16    can you talk -- you mentioned about transitioning Creditors

17    to different distribution partners, if they're sort of stuck

18    in one thought or another.  Can you just elaborate on that a

19    little bit more?

20          MR. FERRARO:  Yeah, we want to provide an off-ramp

21    for those Creditors that are stuck.  So we developed a

22    process for transitioning Creditors to a new distribution

23    agent.  This has been proven highly successful thus far.  94

24    percent of Creditors by value, who have transitioned from

25    PayPal to Coinbase have claimed their distribution.

1          With the addition of Hyperwallet, we can now

2     transition Creditors from crypto to Fiat at scale, which is

3     important given those issues we've had with both wires and

4     checks.  If a Creditor elects the option to have their

5     liquid cryptocurrency sold and transitioned to Fiat, the

6     sale will be done as close as possible to the date of

7     distribution.

8          MR. KOENIG:  I have nothing further for Mr.

9     Ferraro.

10          THE COURT:  All right.  I see Mr. Bronge's hand

11     raised.  I will call on you, Mr. Bronge.

12          MR. BRONGE:  Yes, hello.  This is Johan Bronge.

13     Can you hear me?

14          THE COURT:  Yes, I can.  Go ahead.

15          MR. BRONGE:  Yes, thank you.  I just would like to

16     comment on the distribution from the Creditor's side.  Now I

17     am an international Creditor, and I have tried to pass

18     Coinbase KYC since January.  I have sent numerous emails to

19     Celsius and to Coinbase.  The response is not appropriate.

20          It takes weeks or months to respond from both of

21     these entities, and I have provided all information, asked

22     for several times.  My account has been approved and then

23     back in manual review process.  And this is just ongoing.

24     And the way Mr. Ferraro describes this is not how it looks

25     from the Creditor's side.

1              The incompetence is rampant, and the ignorance of

2      issues is the same.  So I would be -- I really would hope

3      the Court would do something to make this work for

4      international Creditors.  And I'm not alone in this.

5              THE COURT:  Okay, Mr. Koenig --

6              MR. BRONGE:  I think you --

7              THE COURT:  -- Mr. Koenig, reach out to Mr. Bronge

8      specifically and let's see whether you can solve his issues.

9              MR. KOENIG:  Understood.  And anybody that's stuck

10     in KYC or having a problem, you should reach out to me.  My

11     email is on all of the pleadings.  If you reach out to me

12     with your Coinbase ticket, we can help escalate that with

13     the appropriate folks.  Please reach out.

14             MR. BRONGE:  Yeah, thank -- just so you know, I've

15     already done that several times.

16             MR. KOENIG:  I don't recall --

17             MR. BRONGE:  (indiscernible) --

18             THE COURT:  Mr. Bronge, stop, Mr. Bronge.  Mr.

19     Koenig's going to reach out to you, and let's see whether

20     you can get this issue resolved.  All right.

21             MR. BRONGE:  Thank you.

22             THE COURT:  Next I see Sean Xue.  X-U-E, with a

23     hand raised.  Go ahead, please.

24             MR. XUE:  Hi, Judge Glenn.  I'm Sean Xue, pro se

25     Creditor.  So I just wanted to raise the -- an issue with

Page 40

```
 1    the Court.  Basically, I'm part of a very small group of

 2    Creditors that have transfer claims.  And specifically,

 3    individual to individual transfer claims.

 4              So me and the -- I transferred it actually to my

 5    wife.  And we've been like, having a lot of issues just

 6    trying to get attention in terms of the distribution.  So

 7    according to the plan, like we're in like, a location that

 8    should be eligible for crypto distribution.

 9              So both the transfer and transferee should be

10    eligible.  And according to the plan, we should be receiving

11    that crypto distribution.  However, so far, we have not seen

12    anything.  I've been in contact with Kirkland, and they've

13    been like, generally responsive.  But we have not gotten

14    anywhere.

15              I think like everyone's in agreement in terms of

16    what we should be getting, but just not in terms of when.

17    So I just wanted to kind of raise this issue with the Court,

18    just so that it's kind of out in the open and everyone's

19    aware of this.

20              THE COURT:  All right --

21              MR. XUE:  Because I don't see this group in part

22    of the discussion so far.

23              THE COURT:  What jurisdiction are you located in?

24              MR. XUE:  So I'm located in Hong Kong, but I

25    KYC'd.  I'm both in Hong Kong and in the United States.  I
```

Page 41

1    KYC'd in both areas.

2              THE COURT:  All right.  Mr. Koenig, would you

3    reach out to Mr. Xue and let's see whether we can get his

4    problems solved?

5              MR. KOENIG:  Yeah, of course.

6              THE COURT:  All right.  Mr. Xue --

7              MR. XUE:  Thank you.

8              THE COURT:  -- hopefully this will help.  All

9    right, is there anybody else who wishes to be heard in

10   response to Mr. Ferraro's presentation?  All right, let's go

11   onto the next agenda item, which is the update on the

12   corporate Creditor matter.  Who's going to address this on

13   behalf of the Plan Administrator or the Debtor?

14             MR. KOENIG:  Your Honor, it's still me, Chris

15   Koenig.  So just really briefly, I wanted to give an update

16   here.  After last month's hearing, the parties agreed to go

17   with mediation.  We had a two-day in-person mediation led by

18   Judge Bentley, who of course is the United States Bankruptcy

19   Judge in the Southern District of New York.

20             That mediation session was successful.  There was

21   a term sheet that was signed by the (indiscernible) the

22   Debtors, the Ad Hoc Committee of Corporate Creditors, by Mr.

23   Sarachek, who's on the line, and Coinbase to resolve the

24   matters that are set forth in the Corporate Creditor motion.

25             So what we're doing right now is, we're working

Page 42

1    hard to finalize a motion and associated documentation that

2    would implement the agreement that would reach to mediation.

3    We're expecting to file that motion later this week to be

4    heard at the next hearing on September 12th.

5            Importantly, this resolution is not limited to

6    just those Corporate Creditors, who were at the mediation or

7    filed joinders.  But it would affect all similarly situated

8    Corporate Creditors who live in jurisdictions serviced by

9    Coinbase.

10           That agreement will be set forth in more detail in

11   the motion.  But just at a very high level, the high points

12   are that every eligible Corporate Creditor would receive the

13   option to receive cryptocurrency in the amount that they

14   would have received beginning on the effective date, if they

15   were scheduled for cryptocurrency distribution by the

16   Debtor.

17           That means that they would receive January 16th

18   pricing for cryptocurrency, so they'll receive the upside of

19   the cryptocurrency market since then.  Or alternatively, the

20   Creditor can elect to receive an equivalent amount of cash

21   at today's market pricing.

22           We will sell that cryptocurrency in the market as

23   close in time of the distribution date as possible and give

24   people the proceeds, again, so that people get the economic

25   equivalent as close in time as possible, if they elect to

Page 43

1    receive cash.

2           Now, we expect that cash option is going to be

3    much faster than the crypto option.  As we've talked about

4    in prior hearings, the KYC know your customer process for

5    Corporate Creditors is very manual and time intensive.

6    We've made specific commitments to the term sheet to improve

7    the cash process, which we think will make that a much

8    faster option for those Creditors.

9           But if anybody really wants the cryptocurrency for

10   any reason, they're free to do so, but it will likely take

11   much longer for them.  We will lay all of this out in the

12   motion and the notice that is sent to eligible Creditors,

13   assuming it is approved at the hearing in September.

14          There's plenty of other details in the terms

15   sheet.  They'll be laid out in the motion that we'll file

16   later this week.  I just wanted to give the high points to

17   Your Honor, and of course, will be prepared to address any

18   questions in September.

19          THE COURT:  All right, thank you, Mr. Koenig.  My

20   communications with Judge Bentley have been limiting --

21   limited exclusively to me sending an email to him thanking

22   him for undertaking the mediation.  I've had no

23   communications whatsoever about the substance of the dispute

24   or the resolution.

25          I'm certainly pleased that it appears that a

Page 44

1    resolution has been reached.  Ms. Cornell, I -- you had

2    objected to the mediation.  I overruled the objection

3    without prejudice.  I don't know whether you've been able to

4    be part of the -- participate in the process or be educated

5    in the process.

6              Obviously, the US Trustee will take whatever

7    position it's going to take.  I'm not seeking to affect that

8    one way or the other.  My only inquiry is, as to whether

9    you've been kept apprised of the result of the mediation and

10   you know, I mean, you still have the right to object.  I'm

11   not trying to affect that at all.

12             If it's possible to satisfy the US Trustee on

13   substance or procedure, that would certainly be beneficial,

14   but I -- anything you'd like to say at this point?

15             MS. CORNELL:  Absolutely, Your Honor.  Thank you,

16   again.  Shara Cornell with the Office of the United States

17   Trustee.  And I have reviewed the preliminary settlement

18   terms, and that is actually -- that's all I've seen.  As

19   Your Honor knows, the United States Trustee believed and

20   still believes that mediation was premature.

21             The questions that Your Honor asked at the last

22   few hearings, and the questions that the United States

23   Trustee has posed to the Debtors, both during the hearing

24   and outside the hearing have not been answered.  We haven't

25   seen a status report outlining those questions that you

Page 45

1    specifically asked to be answered.

2            And many of those answers, we believe, would

3    inform any mediation settlement.  Moreover, what we've seen

4    again, it's a preliminary mediation settlement.  I haven't

5    read the motion.  And I haven't seen the actual settlement

6    itself, so obviously, I'm speaking from only my information.

7            But what I've seen so far appears to be a material

8    and substantive plan modification.  And as Your Honor is

9    aware, the United States Trustee does take those issues very

10   seriously, for both noticing and voting purposes.  And I

11   know you haven't seen the information yet, but as it stands,

12   what we've seen, we do have some serious problems with.

13           And I can leave it at that, and if Your Honor has

14   any questions for me, I'd be happy to answer them.  But

15   that's where we stand right now.

16           THE COURT:  I think the only thing is that I would

17   encourage Mr. Koenig and the other parties to the mediation

18   to communicate fully with the US Trustee to see whether its

19   concerns can be resolved.  Obviously, at the hearing, when

20   this issue sort of crystallized, it's correct that I ask a

21   series of questions.

22           It seems to me the answers to those questions may

23   be totally separate and apart from whether or not the

24   mediated result is appropriate and should be approved by the

25   Court.  I don't have that before me.  I don't know what the

1    terms are.  And I'm not commenting one way or the other on

2    it.

3           I think that there are -- when this came before

4    the Court before, I was certainly concerned about how we got

5    to the point we were at at this -- at that.  I think that to

6    the extent that sophisticated parties, many represented by

7    Counsel have been able to reach an agreement through the

8    mediation, it may well Counsel approving the settlement

9    result, even if the US Trustee has legitimate questions that

10   it wishes to pursue.  We'll leave it at that for now.  It's

11   all premature.  Is there anybody else who --

12           MS. CORNELL:  (indiscernible) -- thank you --

13           THE COURT:  -- wants to be heard with respect to

14   the Corporate Creditor issue.

15           MR. KOENIG:  Just really quickly, Your Honor.  Mr.

16   Cornell reminded me.  I was remiss in not mentioning that we

17   -- simultaneously with the motion, we intend to file a

18   separate statement answering Your Honor's questions.  Your

19   Honor had some pointed questions.

20           We of course intend to answer them fully and as

21   Your Honor suggested, we of course, do things separate from

22   the actual motion, but they will be submitted simultaneously

23   so that you, the other parties and the United States Trustee

24   will see the answers to those questions, and we're happy to

25   discuss them at the appropriate time.

Page 47

1              THE COURT:  Thank you very much, Mr. Koenig.

2              MR. KOENIG:  Thank you.

3              THE COURT:  All right.  Let's move on on the

4      agenda.  Item 3 is the update on the Ionic Digital Inc.

5      Who's going to take that?

6              MR. PESCE:  Good morning, Your Honor.  It's

7      Gregory Pesce, White & Case.  I'm here on behalf of Ionic

8      Digital, which is the mining co. under the plan of

9      reorganization.  Can the Court hear me all right?

10             THE COURT:  Yes, I can.  Go ahead, Mr. Pesce.

11             MR. PESCE:  This is -- just in the way of a status

12     update today, and as the Court probably saw numerous letters

13     from Ionic Digital shareholders have been filed on the

14     Court's docket.  Ionic Digital filed a press release as well

15     recently to give an update on its listing process.

16             And in the several months since the effective

17     date, Ionic Digital, the mining new co. is not in --

18     squarely in front of the Court while all these other

19     litigations and distribution matters have been there.  But I

20     wanted to flag this for the Court, for the shareholders.

21             And I can also give just a very brief couple of

22     minute update on where Ionic is in its listing process, and

23     then give you and the shareholders, the former Celsius

24     Creditors, some updates on what will be coming next from

25     Ionic, if that would be useful for the Court?

Page 48

1                THE COURT:  Please, go ahead.

2                MR. PESCE:  All right.  So just by way of a recap,

3       the Celsius plan of reorganization provided for the

4       establishment of Ionic Digital as a standalone Bitcoin

5       mining business, with the expectation that Ionic was going

6       to be publicly listed NASDAQ in the middle of this year.

7                But Ionic Digital came into effect on January

8       31st, when the plan was consummated.  And Celsius' assets

9       were transferred to Ionic.  As I'll explain here briefly,

10      regrettably, Ionic has not yet become a publicly listed

11      company on NASDAQ as it expected.  There's been a series of

12      setbacks I can brief the Court and the parties on.

13               But we are continuing at Ionic to pursue the

14      public listing and will have more updates for our

15      shareholders on that in near future.  When Ionic came into

16      existence as a standalone company, making it a publicly

17      listed company on NASDAQ was quite complex.

18               It needed to identify and engage an independent

19      management team.  When the company was effectively pulled

20      out of Celsius while at the same time pursuing what was

21      effectively an IPO.  We needed to carve the actual assets

22      for Ionic Digital out of Celsius mining, which had run it

23      effectively as a corporate division.

24               There needed to be corporate controls and systems

25      established, given the history that had led to this time.

1   Ionic Digital needed its auditor, RSM, which had been

2   engaged by Celsius during the bankruptcy to complete an

3   audit of Ionic Digital's Bitcoin assets.

4          We needed to then also manage the active Bitcoin

5   site, which is in Midland, Texas.  While at the same time,

6   completing construction of the Cedarvale site, which you

7   probably heard some about during the course of the

8   bankruptcy, and which was under construction by Hut 8, the

9   future plan sponsor during the bankruptcy case itself.

10          So in the context of the Chapter 11 plan, to

11   address these matters, Hut 8, which is a digital asset

12   company and the plan sponsor under the Chapter 11 plan,

13   entered into a management services agreement through the

14   plan of reorganization.

15          And that management services agreement or MSA

16   became effective when the plan was consummated.  Hut 8, as

17   the service provider, provided services necessary to manage

18   the Bitcoin mining site that was in operation.  It was going

19   to act as the general contractor for the under-construction

20   site at Cedarvale.

21          And finally, Hut 8 was providing corporate

22   services, including some personnel relevant to the listing

23   process.  It was paid a fee for those services as we worked

24   through during the -- or had approved, rather, during the

25   Chapter 11 process.

Page 50

1           The real focal point of Ionic's efforts, though,

2    and its independent board since the effective date has been

3    to get Ionic publicly listed on NASDAQ as contemplated by

4    the plan, so that the shareholders whose securities today

5    are locked up and restricted could have a liquidity for

6    those securities.

7           The efforts to become publicly listed on NASDAQ

8    have been beset by numerous challenges.  As it has been sort

9    of summarized in some of these recent disclosures, the

10   original CFO did not ultimately take his position.  An

11   independent firm, FTI, was brought in to provide interim

12   transition -- or management services in the CFO office.

13          As disclosed in our recent press release, RSM,

14   which was Celsius' mining auditor, and then Ionic Digital's

15   auditor notified the company a couple of months ago that it

16   would resign as auditor.  But for not -- not due, to be

17   clear, due to any disagreement with the company.

18          That in turn, you know, created a -- numerous

19   issues for Ionic.  The audit, which RSM had begun, was not

20   yet complete for the final month of the bankruptcy.  There

21   was post emergence audit work that had to be done.  And any

22   securities filings of which we've several of the SEC on this

23   process could not be updated with our auditor not in place.

24          So in turn though, hiring an auditor is not like

25   hiring any other professional.  It's a very long, rigorous

1    process.  There is independent standards, accountability

2    standards, etc., that have to be met.  So it's not like you

3    can just hire an auditor in a couple of weeks.  It's a

4    process that takes many, many months.

5            At the same time, management has been running the

6    business as well.  You know, specifically running the

7    Midland site and working to get the Cedarvale site completed

8    for its construction project.  So while these setbacks have

9    been regrettable, you know, Ionic has been working around

10   the clock, and its Board has been working around the clock

11   to address them.

12           And in creating Ionic Digital, the UCC and the

13   Debtors created some safeguards in anticipation that the

14   Ionic Digital Group faced challenges after the effective

15   date and during its listing process.  Among other things,

16   during the confirmation hearing and then in the recent

17   letters, you've heard reference to a so-called liquidity

18   deadline, effectively under the plan of reorganization, the

19   UCC negotiated for Ionic Digital to have a light to

20   (indiscernible) agreement by June 1st.

21           If -- they missed it in accordance with the MSA,

22   as we disclosed in our recent press releases, the Board of

23   Directors of Ionic, prior to June 1 actually did provide

24   notice to terminate the managed services agreement.  Hut 8,

25   the service provider, disputed that notice to provide the

Page 52

1    parties with the opportunity to negotiate a resolution and

2    consider an amendment to the MSA.

3            Ionic Digital agreed to delay the effectiveness of

4    the termination notice, which otherwise was going to take

5    effect June 1st.  Engaged -- Hut 8 and the company engaged

6    in discussions regarding the MSA.  And the MSA that was

7    entered into on the effective date that was contemplated by

8    the plan was amended by its terms as was permitted, as of

9    June 19th, so 18 days after the liquidity deadline.

10           That amendment in turn, and we've put more details

11   about this in the press release, but just for those who are

12   listening, the management fee was reduced by roughly 25

13   percent.  The liquidity deadline's a termination penalty, so

14   a variety of future penalties that might have to be paid, if

15   a listing ultimately happened were removed.  Those are right

16   to terminate for convenience for an agreed upon termination

17   payment, and there's clarity on other terms in the original

18   contract.

19           Following the entry of that amendment that's been

20   focused on pursuing its registration with the SEC and the

21   NASDAQ listing, our top priority today remains identifying

22   and engaging -- or engaging a new audit firm.  The company's

23   management team received proposals from several audit

24   candidates.

25           We are now zeroing in and working to finalize our

Page 53

1    engagement of a replacement auditor, which we expect to

2    happen in the next couple of weeks, subject to that firm

3    finishing any kind of KYC were on boarding independence

4    requirements.

5         Once that auditor is engaged, the company plans on

6    restarting the public filings with the SEC that it had begun

7    to make prior to the resignation.  And that is, as I

8    mentioned earlier, because the federal law requires the

9    auditor to sign off effectively on disclosures.

10        With this in mind, Ionic Digital clearly was

11   expecting to be a publicly listed company making regular

12   reports to the SEC being publicly listed and traded on

13   NASDAQ.  That has not happened.  It's something that is

14   being addressed 24 hours a day at Ionic.

15        And for that reason, you know, we are not in the

16   type of communication, regular cadence of communication that

17   a public company would be.  While we work through this

18   process, though, management is redoubling and refocusing its

19   efforts to make sure that Celsius' Creditors, who are now

20   our shareholders, are informed about the process.

21        Earlier today, we released a new press release,

22   which will be filed on the docket after the hearing.  We'll

23   file future press releases.  We're also preparing to have a

24   webcast from our interim CEO, John Penver, who's our CFO as

25   well.  And we've updated our website to make a variety of

Page 54

1    information available.

2            Again, Ionic Digital is working hard to get -- to

3    become a listed company so that Creditors have liquidity.

4    Given all of the recent you know, questions on the docket,

5    or letters on the docket, we wanted to take this opportunity

6    to reintroduce Ionic to the Court and to the constituency

7    here, as we work through these issues.

8            If it would be helpful for the Court in future

9    hearings to hear from Counsel or the CEO or management of

10   the company, we can make that possible.  And that was all I

11   had for today in terms of my update, Your Honor, so I

12   appreciate your time.  Thank you.

13           THE COURT:  Let me ask you a few questions.

14           MR. PESCE:  Sure.

15           THE COURT:  Can you provide any estimate of the

16   time to complete the selection and hiring of the independent

17   auditors?  Once the auditor is selected for what time

18   periods are audited financial statements required?  Is there

19   an estimate of how long it will take a new auditor to

20   complete the necessary audit reports in order to move

21   forward with the listing process?

22           MR. PESCE:  Sure.  I can answer most of those

23   questions, Your Honor, and if I need to come back or provide

24   that at the next hearing or otherwise, I'm happy to do it.

25   We expect to sign an engagement letter with the new auditor

Page 55

1    in roughly the next two weeks.  And we expect that the

2    auditor, assuming its independence work is done, would then

3    be on the job, ready to start doing work.

4          We're hopeful that later this fall, updated

5    securities filings with the latest financials, including

6    audited financials could be filed with the SEC and shared

7    with NASDAQ.  We anticipate at this time that the public

8    listing would happen sometime, it looks like early --

9    sometime in 2025.  So not this calendar year.  The

10   management team on which financials need to be formally

11   audited or reviewed to finalize that process following --

12         THE COURT:  What's the -- I did ask the question

13   about what time periods are -- will audited financials be

14   required for?  I mean, how far back will be the new auditor

15   have to go?  And for what time period will he be delivering

16   an audit report?

17         MR. PESCE:  My understanding that a formal audit

18   was completed for -- through the end of 2023, that the final

19   month of 2024 was not formally completed.  The new auditor

20   would need to work with the outgoing auditor to transition

21   those work files and essentially sign off on the proceeding

22   work.

23         And then, it's my understanding, due some audited

24   work for the beginning of -- or for the post-emergence

25   period, to do the listing.  I'll speak to the management

Page 56

1    team to get a more specific answer for you on which months

2    have been completed or not.

3              THE COURT:  All right, thank you.  We have at

4    least one hand raised.  Tony Vejseli.  I'm sorry if I've

5    mispronounced your name.  Go ahead, please.

6              MR. VEJSELI:  Tony Vejseli.  I'm a Creditor and

7    shareholder of Ionic.  I have a lot of issues with Ionic,

8    obviously, and you've seen from the letters that were

9    written, the biggest one obviously being around Hut 8.  This

10   is a material change to the plan.

11             The liquidity provision was nothing close to the

12   tech shareholders Creditors.  I don't think a lot of people

13   believe that they can list on NASDAQ.  I, being one of them,

14   didn't believe they could.  They made a lot of promises.

15   They didn't deliver on any of them so far.

16             They've had eight months since we emerged out of

17   bankruptcy, and they haven't done anything.  We have a

18   revolving door of Board Members.  The latest ones they

19   approved have a terrible track record, the stocks that they

20   are on the Board of are not doing well, you know, to be

21   generous on those stocks.

22             They have no mining experience.  They have nothing

23   of relevant -- the CEO quit.  The new CEO, the interim CEO

24   has been on the job for like a week.  He doesn't know what's

25   going on.  He's never been in mining before.  He's a CFO.

Page 57

1    He doesn't have any experience in data centers.  This

2    company is kind of going backwards, it seems like.  And I

3    think we're on pace to basically lose our investment.

4              I would like, and we're in the process of filing a

5    shareholder vote.  We plan to remove the Board, essentially.

6    We're about -- I think we're 60, 65 percent of the way

7    there, requiring all the shares needed to call the vote.

8    But that's basically what shareholders are about to do at

9    this point.

10             THE COURT:  Right.  Mr. Sarachek, do you want to

11   be heard?

12             MR. SARACHEK:  Sure.  Thank you, Your Honor.  Joe

13   Sarachek with the Sarachek Law Firm.  I'd just like the

14   Court to know, we've been contacted by numerous shareholders

15   about forcing a liquidation of these assets.  I know this

16   issue was before you.  I know it's not formally before you

17   now.  But numerous shareholders in recent weeks have

18   contacted us.  And we're reviewing the documents and will

19   take appropriate action.  Thank you.

20             THE COURT:  All right.  I should've -- Mr. Pesce,

21   I should've asked this, and that is, the actual performance

22   of the mining site, because at least one is operating, am I

23   correct?  One is still being built out?

24             MR. PESCE:  That's correct.  Our Midland site is

25   operating as it was during the bankruptcy.  Now, you know,

Page 58

1    with the new management arrangement.  Our second site that

2    is contemplated right now is called the Cedarvale site.

3    It's located near Odessa, Texas.  Hut 8 is the general

4    contractor.

5         The project has effectively four identical

6    buildings.  The first building became operational roughly

7    two weeks ago.  The final three buildings are in the midst

8    of construction.  Those are -- I think you put this in the

9    press release.  There's a requirement that they have to be

10   completed by December the 17th.  And the expectation and

11   hope is that they're completed sooner than that subject to,

12   you know, me running a safe, orderly process for that.

13        Finally, under the Hut agreement, it's anticipated

14   that Hut might provide -- they might identify other sites

15   that Ionic would consider develop -- or developing, funding

16   and having generate returns for shareholders.  I'll rely on

17   the press release at some of the more recent performance

18   information there in terms of that, but that's the -- that's

19   where we are in terms of operations.

20        And as Mr., of course, you know, I'll, you know,

21   butchered his last name, as Tony V. said, we do have a new -

22   - we have a new CFO.  And that individual is acting as our

23   interim CEO.  And he and our Board are overseeing a search

24   for a new full-time CEO to take us through the listing and

25   as a standalone company.

Page 59

 1              There's other parts of that commentary that I'm

 2    happy to also address other than the operational point that

 3    you raised, Your Honor.

 4              THE COURT:  No, I am interested in the operational

 5    point.  Is the operation cash flow positive or negative at

 6    this point?  What can you tell everyone about that?

 7              MR. PESCE:  Sure, yes.  The company is cash flow

 8    positive.  The company has a significant balance of cash and

 9    of Bitcoin.  In the press release, we put the figures for

10    what our Bitcoin holdings are.  They were roughly, you know,

11    $100 million in Fiat value.  So we have significant cash on

12    Bitcoin that we have not yet begun to liquidate to fund

13    operations or construction.

14              We want to hold -- you know, we want to consider

15    that carefully, but we have a significant liquidity to see

16    through the construction and do what the company needs to

17    do.

18              THE COURT:  Thank you.  Mr. Dixon?

19              MR. DIXON:  Hi, Simon Dixon, pro se Creditor.

20    Yeah, we were very disappointed that such a significant

21    decision was made without really any communication with our

22    shareholders.  We were hoping that the liquidity provision

23    would protect us.

24              Personally, I introduced a mining team with over a

25    decade of experience.  They're working half an hour away

Page 60

1    from the location.  They're a more experienced mining team

2    than anybody that's currently on the Board that has no

3    experience in mining.  And for whatever reason, none of

4    those opportunities were pursued.

5            And then, it turns out that the liquidity

6    provision with Hut 8 was you know, terminated, which was

7    meant to protect us, so that we could be more profitable.  I

8    just had a quick question as well, because we seeded the

9    company with $225 million cash, and the recent press release

10   said there's $200 million cash.  And yet, we're meant to be

11   profitable.

12           And does that include the -- I think another press

13   release said we had 1,900 Bitcoin.  Does the $200 million

14   cash, is that on top of the Bitcoin?  Because that would

15   make us profitable?  Or is the $200 million cash included in

16   the Bitcoin, which would not make us profitable?

17           THE COURT:  Mr. Pesce, are you able to respond to

18   that?

19           MR. PESCE:  Yeah, yeah, just a couple of quick

20   points here.  And full disclosure, you know, Mr. Dixon was

21   identified as an observer to the new Board.  We were unable

22   to reach terms with Mr. Dixon on the trading policy, given

23   his other activities.  So he's not formally joined the Board

24   as an observer, but you know, we hear regularly from Mr.

25   Dixon.

Page 61

1         Let me just make two quick points here.  I think

2    there's a fundamental disconnect about this liquidity

3    provision.  The liquidity deadline was there to protect

4    shareholders so that it would -- we could effectively break

5    glass in case of emergency of going into June 1st.

6         We knew there was a radical problem that would

7    prevent a listing from occurring as expected.  Before that

8    date, the company's Board did determine that it was

9    necessary to protect shareholders by providing the

10   termination notice.

11        The Board was ready to separate from Hut.  And

12   again, Hut 8 will contest this, but the Board was fully

13   ready to separate from Hut and move to other arrangements if

14   necessary.  Ultimately, the delivery of that notice and the

15   liquidity deadline itself, as expected, did serve its

16   purpose.  It provided a very powerful tool for Ionic's Board

17   to ensure that Hut was -- we got the best deal possible from

18   Hut, and that is why we re-negotiated the deal.

19        So the suggestion this isn't really for the

20   benefit of shareholders is not correct.  We negotiated

21   numerous provisions that we weren't able to secure during

22   the bankruptcy to improve the contract.

23        In terms of you know, other shareholder

24   engagement, I'm just happy to say, you know, look, the

25   company is a fiduciary for shareholders, if shareholders

Page 62

1    want to engage in (indiscernible) Counsel and advisors,

2    they're ready, willing and able to address that.

3            There's been a lot of commentary on social media.

4    There's been indirect communications with some of our Board

5    Members.  For parties that have contacted the company, we

6    told them to direct their communications to the Chief Legal

7    Officer, if they have any kind of demand or interest in some

8    type of transaction.

9            I will note that at the time being, you know, we

10   generally don't comment on market rumors or any potential

11   merger acquisition or takeover activities.  You know,

12   significant asset sale or liquidation, as one the speakers

13   mentioned, would require an evaluation process by the Board.

14           There's no individual shareholder or group of

15   shareholders that we're aware of that has close to the

16   voting power necessary to force any kind of sale or change

17   at the Board.  And all that being said, but we're not

18   engaging in any kind of M&A activity.

19           And as I mentioned, though, we do have an

20   independent board and advisors who are prepared to evaluate

21   any legitimate proposal from a party that's willing to abide

22   by the typical rules of the road for a public company, which

23   we are about to become.  So hopefully that's responsive to

24   the various comments there.

25           MR. DIXON:  Sorry, would you be able to answer

Page 63

1    about the 200 --

2              THE COURT:  No, stop, stop.  Mr. Dixon, quiet.

3    You had your chance.  We'll take one last comment.  The hand

4    of Mr. Sarkissian, Mike Sarkissian, is raised.  Go ahead.

5    I'll recognize you.

6              CLERK:  I am (indiscernible).

7              THE COURT:  Go ahead.

8              MR. SARKISSIAN:  I apologize.  I did not mean to

9    raise my hand, Your Honor.

10             THE COURT:  Okay.

11             MR. SARKISSIAN:  But I am also interested in the

12   question that Mr. Dixon asked, in terms of how that

13   accounting works with the Bitcoin and cash, if it's additive

14   or if it's inclusive of each other.  So I would like to -- I

15   mean, I could use this mistake on my part to reiterate his

16   question.

17             THE COURT:  Mr. Pesce, is there any further light

18   you can shed on that question?

19             MR. PESCE:  My understanding is the cash balance

20   is roughly 200 -- or the liquidity available to the company

21   of cash and Bitcoin is roughly $200 million.  I don't

22   believe that they are at -- there's an additional $200

23   million of cash.  So it's a total BTC and cash of roughly

24   $200 million.

25             THE COURT:  All right, thank you very much.  Let's

Page 64

1    move onto the next item on the agenda, which is the update

2    on avoidance actions.  Who's going to address that?

3              MR. PESCE:  I'll pass the mic here.

4              MR. HERSHEY:  Yeah, good morning, Your Honor.  Sam

5    Hershey from White & Case for the Litigation Administrator.

6    So two of the next items on the agenda are the status report

7    and the procedures motion.

8              They raise separate issues, and so I plan to

9    address them separately.  But I do want to note that they

10   will likely affect each other, and that we'll have to

11   probably amend the procedures order, depending on what the

12   Court determines regarding common issues and how we should

13   schedule litigation of those common issues.

14             But I'll start with the status report.  Your Honor

15   asked some questions about service at the last hearing.  I

16   believe we've addressed those.  If Your Honor has any

17   further questions, I'm happy to address them now, but

18   otherwise, I won't repeat our answers, and I'll move onto

19   Your Honor's --

20             THE COURT:  Mr. Hershey, just -- there's a lot of

21   people -- there's like 180 people on Zoom today.  And so,

22   just very briefly address, even though it may be repetitive,

23   just address the service issue, if you will.

24             MR. HERSHEY:  Of course, Your Honor.  I'm happy

25   to.  So we have -- as of August 1st, we served all US

Page 65

1    Defendants.  The Defendants split almost 50/50 US and non-

2    US.  And all US Defendants have been served.  We are in the

3    process of serving the foreign Defendants.  There are a

4    number who have accepted service, and some who have been

5    served.

6           But we still have a ways to go, just given the

7    requirements of complying with the Hague Convention and you

8    know, other issues involved in serving non-US Defendants.

9    But that process is underway.  We expect that within, I'm

10   going to say four to six months, we should have, you know,

11   the -- I'd say the majority of foreign Defendants served.

12           THE COURT:  All right, thank you.

13           MR. HERSHEY:  On the common issues.  So Your Honor

14   asked us to consider common issues that could apply across

15   all Defendants or large numbers of Defendants.  We gave it a

16   lot of thought, and in our status report, we identified

17   certain common issues, as well as an order in which to

18   address them.

19           And the order is important, because some of these

20   issues, we believe can be dealt with very quickly as a

21   matter of law.  And so, the estate and Defendants should

22   have the benefit of having those issues decided quickly, see

23   how it affects their litigation position, and then we can

24   move onto what we've called phase two, which are issues that

25   are difficult, complex, in some cases, likely matters of

Page 66

1    first impression.

2            So here's what we propose.  And I'll note that Ms.

3    Kovsky, on behalf of her group filed a response yesterday.

4    Mr. Besikof, on behalf of his group, joined that response

5    this morning.  And we have broad agreement with them, and

6    we've actually, as I'll discuss right now, we've made a few

7    modifications to our proposal to try to expand that

8    agreement.

9            But there are still a few points of disagreement,

10   which I'll highlight after I set forth what we would

11   propose.  So we would propose that it -- first, there be a

12   phase one of litigation for the following issues.

13           First, extraterritoriality.  And per Ms. Kovsky's

14   suggestion, we would include in that specific personal

15   jurisdiction over non-US Defendants.  And by specific

16   personal jurisdiction, I mean whether we have personal

17   jurisdiction as a result of those parties' agreement to the

18   terms of use.

19           Second, whether the litigation administrator is

20   entitled under Section 550(a) to recover the assets that

21   were transferred off the platform or those assets' current

22   value.  And third, in phase one would be the proper method

23   for calculating new value under Section 547.

24           So that's what we would propose litigating in the

25   first round.  We would then propose a phase two of

1    litigation to follow after those first round issues are

2    litigated and decided by the Court.  And that phase two

3    would be first, the objective prong of the ordinary course

4    of business defense.

5            In other words, not any individual Creditor's

6    personal course of business with Celsius, but an examination

7    of the cryptocurrency industry in which Celsius operated,

8    and the terms of use under which it operated.  Second would

9    be the 546(e) Safe Harbor Defense.

10            THE COURT:  That's the horizontal test that you

11   proposed to deal with?

12            MR. HERSHEY:  Exactly, Your Honor.  Yes.

13            THE COURT:  Okay.

14            MR. HERSHEY:  Second would be the 546(e) Safe

15   Harbor Defense.  And third, per Ms. Kovsky's suggestion we

16   will agree to move what we had put as a phase one issue, but

17   we're happy to treat as a phase two issue, which is whether

18   the Litigation Administrator stated a prima facie claim for

19   preference avoidance, particularly as to the Debtor's

20   insolvency, which we recognize could potentially raise fact

21   issues.

22            Now, as I said, there is broad agreement among us

23   and Ms. Kovsky and Mr. Besikof.  And the -- you know, based

24   on their response, I think there are only a few areas of

25   disagreement in terms of how we should sequence these issues

Page 68

1        that I'll highlight now.

2               Mr. Kovsky and Mr. Besikof argue that we should

3        save all issues regarding damages until a new final phase,

4        which they've dubbed phase three, which they say should come

5        only after the Court has determined whether Defendants

6        actually have liability.  And in particular, I think that

7        they're focused on whether we're properly calculating new

8        value, and whether we can recover the assets themselves that

9        are equivalent value.

10              Their argument is that damages are normally

11       litigated after liability is determined, and it would

12       prejudice Defendants to make them litigate damages first.

13       And look, it is correct that damages are normally litigated

14       after liability is determined.  But this is not a normal

15       case.

16              Here, we have 2,500 cases, all of which will

17       participate in mandatory mediation.  And I can tell, Your

18       Honor, we've started those mediation discussions.  We have a

19       long track record now of settlement discussions.  And in

20       many cases, we aren't even in the same universe as the

21       Defendants regarding the amount of damages to which we

22       believe we are entitled that form the basis for a mediation.

23              And that is because many Defendants believe, as a

24       matter of law, that we are not entitled to pursue the

25       withdrawn assets or their current value, that we're

Page 69

1    calculating new value wrong, that the plan prohibits us from

2    pursuing the damages we're asserting, all these issues that

3    we would like to litigate in phase one.

4              And keep in mind, we had a very robust pre-

5    litigation settlement process that resulted in thousands of

6    Defendants settling.  These are the Defendants who have

7    chosen not to settle.  And in large part, that is because of

8    their beliefs regarding what we have put into the phase one

9    issues.

10             So if we're going to have effective mediations, we

11   need to resolve those issues now.  Otherwise, we'll be

12   launching into a mandatory mediation process without these

13   issues decided, and the mediation will in large part for

14   many people be doomed from the start, simply because we

15   can't agree on what the realm of possibility is in terms of

16   damages, if we prevail in the litigation.

17             THE COURT:  I take it then, Mr. Hershey, you agree

18   with Ms. Kovsky and Mr. Besikof that prior to mandatory

19   mediation taking effect, the Court should resolve certainly

20   what you've identified as the phase one issues.  There may

21   be some disagreement between you and the two of them as to

22   where issues fall, which are phase one, which are phase two,

23   etc.  Do I understand correctly so far?

24             MR. HERSHEY:  Yes, Your Honor.  I think that makes

25   a lot of sense.  And you know, we think these issues can be

Page 70

1    briefed very quickly.  I mean, Mr. Besikof and Ms. Kovsky

2    will argue that it's prejudicial to Defendants to litigate

3    these issues, when they may not have liability.

4              But these are all issues that are -- they're

5    matters of law.  There's -- it's just what the plan says,

6    what the Bankruptcy Code says, what the case law says.  And

7    we think there's no discovery needed.  We can brief them

8    quickly, get a decision from Your Honor.

9              And then, yes, I think mandatory mediation makes

10   sense at that point.  Obviously, if parties wanted to

11   mediate before phase one starts, they certainly can.  We're

12   absolutely open to that.  But yes, these issues are really

13   threshold issues for having productive mediations.

14             THE COURT:  All right.  Anything else you want to

15   say at this point?  I'll give you further chance to respond.

16             MR. HERSHEY:  Thank you, Your Honor.  No, not at

17   this time.  I'm happy to hear from other parties.

18             THE COURT:  Ms. Kovsky?

19             MS. KOVSKY-APAP:  Good morning, Your Honor, Deb

20   Kovsky on behalf of the Defendants and the Adversaries

21   listed at Docket Number 7601 in our notice of appearance.

22             THE COURT:  How many clients are you up to at this

23   point?

24             MS. KOVSKY-APAP:  So I think the ones that have --

25   and just to be clear, we filed a notice of appearance for

1    those for who we have authority to accept some risk, or

2    those who confirm that they have been served and authorized

3    us to disclose that they're represented parties.

4           I believe it's 360 and change.  We have

5    approximately 100 or 115 additional clients in our group who

6    are non-US, who have not been served yet, and for whom we do

7    not have authority to accept service.

8           THE COURT:  Okay, go ahead.

9           MS. KOVSKY-APAP:  So I wanted to point out first

10   that it was Mr. Hershey's client that was demanding that

11   mediation take place before the Plaintiff has to respond

12   substantively to any of these issues.

13          I'm really not sure how exactly under the proposed

14   procedures, Mr. Hershey imagines that these issues would be

15   brought before the Court in light of the mediation

16   procedures, which by the way, we spent a great deal of time

17   and energy negotiating with the White & Case and ASK teams.

18          And I do want to thank them for their flexibility

19   and responsiveness so we could get to an agreed mediation

20   order.  But that order clearly contemplates that we can have

21   pre-response mediation.  So that's the path that most

22   likely, my entire group, and I don't want to speak for Mr.

23   Besikof.  I believe his colleague, Mr. Papandrea is

24   attending the hearing on behalf of his group.

25          But we're likely to mediate before responding to

Page 72

1    any of these issues.  So saying, well, we need to have

2    damages go forward in phase one really doesn't make any

3    sense.  I also want to point out that I think Mr. Hershey is

4    mistaken on a number of points.

5              I don't think it's that many Defendants believe as

6    a matter of law that their damages are kept, so much as many

7    Defendants believe as a matter of law that they have

8    absolute defenses to liability, and that there's not going

9    to be a more productive mediation if damages are litigated

10   first.

11             What's going to happen is, the price to sell may

12   change, but the number of parties willing to settle won't

13   because the issue is that liability is still hotly

14   contested.  And in fact --

15             THE COURT:  But I understand -- Ms. Kovsky, I

16   understood Mr. Hershey not as putting damages as a phase one

17   issue.

18             MS. KOVSKY-APAP:  He's absolutely putting damages

19   as a phase one issue.  That is our primary point of

20   disagreement.  The point that he wants to determine first,

21   the measure of damages that are available to the Plaintiff

22   under 550(a) and in terms of how the value is calculated, so

23   that it -- he wants to get a ruling from the Court saying,

24   you can throw the definition of withdrawal preference

25   exposure under the plan out the window.

1          We can go after you for something completely

2     different that was never disclosed that you didn't vote on.

3     And if he gets that ruling, that -- that's the damages issue

4     that we've been debating back and forth, Mr. Hershey and I,

5     and Mr. Besikof.

6          That's what he wants to have heard first.  That's

7     what Mr. Besikof and I, and again, I don't mean to speak for

8     him, but in the Troutman Defendants' response to this

9     statement regarding potential litigation procedures, we

10    don't believe it's appropriate or efficient to force the

11    parties to litigate how much the Plaintiff can recover

12    before it's determined whether the Plaintiff can recover

13    anything at all.

14         And we do understand that reverse bifurcation has

15    been used in some cases, typically in the asbestos context,

16    but the case law is really clear, that when issues of fault

17    and liability are hotly contested, reverse bifurcation does

18    not advance judicial efficiency.  It'll prejudice our

19    clients.

20         They'll have to spend time and money litigating

21    how much they owe before they have an opportunity to contest

22    whether they owe it at all.  Mr. Hershey's client is sitting

23    on a massive war chest.  They can litigate till the cows

24    come home.  My clients are individuals who withdrew their

25    retirement savings, their college tuition, their mortgage

Page 74

1    payments.

2           They don't have unlimited funds to be able to

3    litigate.  And if they have the opportunity first to contest

4    liability before getting to damages, that's the more

5    efficient path, forcing them to do it in reverse prejudices

6    them, and it shouldn't be contemplated.

7           THE COURT:  All right, Mr. Besikof?

8           MR. PAPANDREA:  Hi, good morning, Your Honor.

9           THE COURT:  You're the one who's speaking on –

10   Just say on line with Ms. Besikof.

11          MR. PAPANDREA:  I am, yes.  Michael Papandrea from

12   Lowenstein Sandler, same firm as Mr. Besikof, on behalf of -

13   - well, let me take a step back.  I filed a motion for Pro

14   Hoc Vice admission this morning at Docket Number 7643.  And

15   we also filed a, as Counsel noted, a joinder for the

16   statement of response that the Troutman firm filed at 7 --

17   Docket Number 7642.

18          And we're appearing today on behalf of the

19   approximately 130 or so Defendants in the adversary

20   proceedings listed on the exhibit to the joinder that we

21   filed.  There might be a few others out there that are not

22   out -- on that list for the same reason that Counsel had

23   mentioned with respect to her clients, that we weren't

24   authorized to accept service or what have you.  But as of

25   right now, the number is at somewhere around that 130 range.

1          I'm not going to belabor the point.  Counsel for

2     the other Defendants out there articulated it quite -- very

3     eloquently.  The real bottom line is, it puts the cart

4     before the horse, to put measure of damage type issues and

5     calculation of new value at the forefront in phase one.

6          It strips the Defendants of the ability to

7     actually assert their defenses to liability.  And we

8     question, just like our, you know, our colleague on the same

9     side of the V, I should say.  We question whether it would

10    even facilitate productive mediation because it, you know,

11    ultimately, depending on the outcome of how that, you know,

12    it -- that issue goes, it just pushes the number to settle

13    perhaps further out, despite the fact that liability, right,

14    hasn't even been made an issue as of yet.

15         So and to the extent it does potentially

16    facilitate settlements, it's probably purely in a

17    prejudicial way to our clients, the Defendants, who get to

18    see the potential ceiling on their damages go up before

19    they've had any chance to actually spend time and resources

20    defending liability in the first instance.  And so, for that

21    reason, we join in the response to the statement regarding

22    the preference actions.

23         THE COURT:  Thank you, Mr. Papandrea.

24         Mr. Goldstein?

25         MR. GOLDSTEIN:  Thank you, Your Honor.  Harley

1    Goldstein on behalf of Mr. Steele.  What Ms. Kovsky and Mr.

2    Papandrea said has a lot of merit, but I would like to take

3    a step back here since this goes into the avoidance action

4    procedures.  I want to address all of the smaller issues

5    that I had erased, but I do want to address this issue.

6            I am quite frankly a little confused and a little

7    offended by this whole discussion.

8            THE COURT:  Keep your -- keep that out of this

9    discussion.  If you've got substantive things you want to

10   talk about...

11           MR. GOLDSTEIN:  The substantive things I'd like to

12   talk about, Your Honor, if I may, are that --

13           THE COURT:  Well, I will let you speak if you

14   don't attack others about what approach they're taking.

15   Just make your point or I'm going to pass on to the next

16   speaker.

17           MR. GOLDSTEIN:  My point is that most of the

18   defendants that aren't represented by the two larger groups

19   of defendants have had no communication offered whatsoever

20   with the plaintiff.  I think it's fundamentally unfair that

21   the plaintiff should hand-pick two groups of attorneys

22   representing a number of defendants but not include any of

23   the other defendants in any of these discussions.

24           THE COURT:  Any other points you want to make?

25           MR. GOLDSTEIN:  Not until we get to the

Page 77

```
 1    substantive issues, Your Honor.  That's my big picture point

 2    with regard to this.

 3              THE COURT:  Go ahead and make whatever other

 4    points you want to make now.

 5              MR. GOLDSTEIN:  I think it's the movant's burden

 6    to address those first, Your Honor.  They were contained in

 7    our pleading.

 8              THE COURT:  Mr. Goldstein, if you want to address

 9    them, address them now.

10              MR. GOLDSTEIN:  Okay, Your Honor.  I certainly

11    will.  Thank you.

12              With regard to the amounts at issue, a lot of the

13    procedures put us in categories based on those amounts.  And

14    as you heard from the last two groups of defendant counsels,

15    those are in dispute.  A lot of things that hinge on those

16    are based on the Plaintiff's calculation of where they fall.

17    And I think as you know, everybody knows, the price of

18    cryptocurrency goes up and down.  It's completely

19    speculative and there's been no ruling that that's the

20    appropriate measure.  So I think splitting up what specific

21    procedure are based on which of those you fall into when

22    they weren't fiat currency I think is inherently problematic

23    without a ruling on that issue exactly.

24              THE COURT:  I don't understand the point you're

25    just making.
```

1    MR. GOLDSTEIN:  In the medication procedures,

2    certain liability for fees and certain other procedures --

3    for example whether they should be in-person or whether they

4    should be via video conference, because my client is very

5    far from New York, hinge on the amount that the plaintiff

6    asserts, the defendant is liable for.  If that's a threshold

7    issue because they're trying to tie it to cryptocurrency as

8    opposed to fiat currency, then it's not really a fair

9    barometer to fit them in one category or another based on an

10   issue that hasn't been decided by the court yet.

11        THE COURT:  Well, you raised the issue, which I

12   decided in January -- I'm now blanking on whether it was

13   2023 or 2024 -- I established and held that the Earn

14   accounts were property of the estate.  You seem to disagree

15   with that.  That was the Court's ruling.  It's at 647 B.R.

16   631.  That's not being revisited.

17        MR. GOLDSTEIN:  Your Honor, my client was not a

18   party to that, to be fair.

19        THE COURT:  Mr. Goldstein, I am not revisiting --

20   that was a very broad ruling.  It was lots of people had an

21   opportunity to participate in it.  That is the law of the

22   case.

23        MR. GOLDSTEIN:  I understand that, Your Honor.

24   But should we decide to appeal that issue, we have the right

25   to with regard to our case.

1            THE COURT:  Well, did you appeal from the

2    confirmation?

3            MR. GOLDSTEIN:  We were not a party to that.  We

4    had not subjected ourselves to the bankruptcy court's

5    jurisdiction.  There was no proof of claim filed.  We

6    haven't been served yet.

7            THE COURT:  The 1141(d) applies whether or not you

8    have filed a proof of claim.  The Court made a determination

9    in a published opinion that the Earn accounts were property

10   of the estate.  I'm not -- you know, if you think you have

11   appellate rights when the time comes and you think you can

12   pursue them, go ahead and pursue them.

13           You argued in your objections that -- you

14   complained because the defendants are prohibited from filing

15   any motions under Rules 12(c) or 56 until after the

16   mediators file reports.  I think that Mr. Hershey and Ms.

17   Kovsky more or less have agreed that there are common issues

18   of law that should be resolved before mandatory mediation,

19   not voluntary mediation, but mandatory mediation kicks in.

20   Mr. Hershey, am I correct in that?

21           MR. HERSHEY:  You are absolutely correct, Your

22   Honor, yes.

23           THE COURT:  All right.

24           MR. GOLDSTEIN:  Your Honor, I think my issue with

25   that is that they didn't have to file a substantive response

Page 80

1   to that.  So we were filing pleadings, but they weren't.  We

2   weren't allowed to take discovery on it, either.

3          THE COURT:  You complained in your objection that

4   it was unfair that you had to choose from a list of

5   plaintiff-selected mediators.  I have a couple of comments

6   on that for the benefit of all of you.  I think there were

7   17 names on the list you submitted, Mr. Hershey.

8          My own view -- I'm not ruling on this now -- I

9   think it's too many.  There were also names on the list of

10  very able lawyers who represented parties in interest in

11  different phases of the Celsius case, in adversary

12  proceedings or otherwise.  I would exclude any lawyers who

13  have prior representation of clients during this case in

14  contested matters or adversary proceedings.  I don't want

15  later conflicts issues arising.  They are very able lawyers.

16  I'm not questioning their ability to serve.  Just as a

17  matter of course I'm not going to permit names from -- of

18  others who represented clients in the case.

19          Third, particularly if we move forward with

20  hearings on substantive issues initially before a mandatory

21  mediation kicks in -- I keep saying mandatory because I

22  think you were very successful with voluntary mediations

23  before the adversary proceedings were filed.  And whether it

24  was Ms. Kovsky or anyone else, to the extent they wish to

25  engage in voluntary mediation, the better frankly.  But

Page 81

1      that's not mandatory mediation.

2              I would -- I think that these procedures need to

3      be revised to give defendants a period of time to suggest

4      other possible names of anyone appearing on the district's

5      register of mediators.  Okay.

6              I am going to reserve the right to cut names from

7      the list.  The reason being my experience, as indicated in

8      large cases, there's a real benefit to having a group of

9      mediators who develop working knowledge of the case and the

10     issues in it.  I feel strongly about that.  I think that the

11     defendants deserve an opportunity to suggest alternative

12     names, particularly if we're moving forward with litigation.

13     On briefing and decision on certain common issues of law in

14     particular, I don't think it will slow down -- if people

15     want to engage in voluntary mediation, they can work with

16     you and see whether you can agree there are people on the

17     list.  There's no prohibition on agreeing with someone else

18     in voluntary mediation.  Okay.

19             So I may well pare down the list at some point,

20     not at this point.  I think that one of the things that I've

21     always observed is many defendants have concern that a

22     plaintiff has sort of cherry-picked the list of row

23     plaintiff people to serve as mediators.  They want an

24     opportunity to have a say in who the mediators are.  I agree

25     with that.  Okay.  The only thing I'm saying is I think 17

                                                    Page 82

1     is too many.  What the right number is, I don't know.  I'm

2     not saying for now.

3             So I think you ought -- what you ought to do is --

4     what I hope to come out of today with Mr. Hershey is an

5     agreement of at least some of the common issues for

6     briefing.  I want to hear -- it may be that I want to hear

7     some more from counsel as to which issues they think should

8     be in phase one of litigation, which should be phase two, et

9     cetera.

10            I think there is -- at least my reading of the

11    papers, there's large agreement on a group of issues that

12    should be phase one litigation issues.  Let's get them

13    clearly defined, try and get an agreed briefing schedule for

14    them to the extent -- and, you know, I think my experience

15    in the Celsius case was these kinds of issues got worked out

16    with -- you know, yeah, they're disagreements, but you --

17    you know, there was some give and take.  And when we had the

18    -- the issue of who do the Earn accounts to, there was large

19    agreement on the schedule.  There really -- that didn't

20    become an issue.  So I want you and other counsel to try and

21    agree on the framing of the precise issues, a briefing

22    schedule for them.  I will permit one further filing of --

23    if you think that some additional issue defined as you wish

24    ought to be in phase one, if Ms. Kovsky or other counsel

25    believe no, they shouldn't, I will consider those before

Page 83

1   finalizing the list.  But I think we don't have to hold off.

2   It seemed to me there was largely agreement on phase one

3   issues.  Now we'll work on the briefing schedule for them.

4   Okay.

5           The other thing, I don't want to cut off

6   opportunity for counsel to participate, but I don't plan to

7   have 30 briefs from defendants on the same issue.  You need

8   to get defendants, whether Ms. Kovsky or others, need to try

9   and coordinate it.  So to the extent possible, have common

10  briefings so the Court isn't reading 30 briefs on the same

11  issue.  It will -- you know, a simple statement that you

12  join the brief filed on behalf of the group will suffice.

13  Okay.

14          MR. GOLDSTEIN:  Do you want me to continue with my

15  issues, Your Honor?

16          THE COURT:  Go ahead.

17          MR. GOLDSTEIN:  Your Honor, if the plaintiff has

18  represented that they view the expenses of mediation as

19  minimal, then they should pay it, as is fairly typically

20  with  preference cases.

21          THE COURT:  It's not fairly typical.  It's not

22  fairly typical.  I have --

23          MR. GOLDSTEIN:  In many districts it's --

24          THE COURT:  Stop.  I have some difficulty with

25  some of the breakpoints and some of the specific amounts.

Page 84

1    Don't think that starving a mediator from doing everything

2    needed to be done to bring a settlement is going to work to

3    the disadvantage -- it's going to work to the advantage of

4    the defendants.  It doesn't.

5            I agree that the costs need to be manageable.

6    I'll just tell you it's a nonstarter.  I am not going to

7    order that all of the fees be paid by the plan

8    administrator.

9            MR. GOLDSTEIN:  Your Honor, there's an awful lot

10   of briefing by the defendants too on top of that.  We're not

11   getting paid from the kitty, we're getting paid from our

12   clients.

13           THE COURT:  I am not going to order the plan

14   administrator to pay the entire costs of the mediation.

15           MR. GOLDSTEIN:  Understood, Your Honor.

16           THE COURT:  You want to be able to litigate issues

17   in advance, and I'm saying there is going to be litigation

18   of issues in advance.

19           MR. GOLDSTEIN:  Okay.

20           THE COURT:  If you hit a home run, well, it may

21   end at that.  Okay?

22           MR. GOLDSTEIN:  Okay.

23           THE COURT:  But mediation costs -- I'm not saying

24   -- I'm not ruling how what exactly the split should be or

25   what the breakpoints are, but it's not going to be a free

Page 85

1   ride for the defendants in mediation.

2           There is going to be -- after the Court resolves

3   certainly phase one litigated issues, there is going to be

4   mandatory mediation.  I believe I have the authority to

5   order it.  I believe I have the authority to order a split

6   in the mediator's fees.  The law in this district and this

7   circuit supports those conclusions.  If at an appropriate

8   time -- I don't think it has to be now because I'm going to

9   permit litigation of phase one issues before mandatory

10  mediation kicks in -- I will put my reasoning down on paper.

11  And if you don't like it, you can do what you want with it.

12          MR. GOLDSTEIN:  I hear you loud and clear, Your

13  Honor.  I would hope that when making that determination of

14  how much is attributable or what the appropriate amounts

15  are, I would like to point out that the plaintiff in their

16  pleadings liken this to participating in bidding procedures

17  and the leeway that the court has in setting those.  WE are

18  not affirmatively coming and bidding here.  We've been

19  dragged into the court and sued.  It's a very different

20  situation.  But I hear you loud and clear.  Moving on to the

21  next issue --

22          THE COURT:  Those mediation fees will pale in

23  comparison with the costs of litigating each claim to

24  judgement.  I am very concerned about the cost of mediation

25  and I will be mindful of that when I rule.  But it's not

Page 86

1    going to be now.  It is not going to shift the entire cost

2    of mediation to the plan administrator.

3              MR. GOLDSTEIN:  All right.

4              THE COURT:  Any additional issues?

5              MR. GOLDSTEIN:  Yes, Your Honor.  The -- the issue

6    with regard to the in-person versus the video conference and

7    the arbitrary thresholds in their -- if there is ordered

8    mediation and if we are talking about costs of paying, I

9    certainly don't think it would be appropriate to -- to drag

10   my client from far away into mediation.

11             THE COURT:  Where is your client?

12             MR. GOLDSTEIN:  My client is in Colorado.

13             THE COURT:  Mr. Hershey, if you would address this

14   issue of Zoom versus in-person.

15             MR. HERSHEY:  Of course, Your Honor.  So I think

16   Mr. Goldstein may misunderstand the proposed procedures.  We

17   were trying to protect defendants with low value.  We said

18   those mediations have to -- I assume -- if it's under

19   $500,000 that we're seeking, has to assume.  That does not

20   mean that everyone else has to be in-person.  We're

21   absolutely willing to work with defendants to see what works

22   best for them.

23             I do happen to believe personally that in-person

24   can be more effective.  And so for very large -- defendants

25   with very large exposure, we probably will press to do those

Page 87

1    in-person.  But it's not the case that if someone has

2    exposure of $500,001 they are required to appear in-person.

3    That's not going to be our approach.  And we're absolutely

4    going to work with parties to do what makes sense.

5                THE COURT:  All right.

6                MR. GOLDSTEIN:  This goes back to what amount is

7    at issue.  Is it fiat currency or is it the fluctuating

8    value of cryptocurrency?

9                THE COURT:  Well, your client got crypto back,

10   right?

11               MR. GOLDSTEIN:  Well, certainly, Your Honor.  But

12   it was at another time.  And it fluctuates up and down.  Are

13   you asking --

14               THE COURT:  All right.  We're not going to get

15   into -- all right.  Now is not the time to argue this issue.

16   I understand that you and others are raising the issue.

17   There will come a time when it needs to be resolved.

18               Any other last points you want to raise?  There

19   are other hands raised.

20               MR. GOLDSTEIN:  The only other -- this is much

21   less minor, but I'm going to raise it just to raise it.

22               So we were never served a motion despite reaching

23   out to plaintiff's counsel and stating that we represented

24   defendant.  This is why I take on (indiscernible) the main

25   case.  So since we filed our limited objection to the

Page 88

1    procedures, on a daily basis we've been flooded with let's

2    just say a whole lot of -- certainly not as many as I'm sure

3    Your Honor has read, but certainly a whole lot of pleadings.

4    It's -- it runs up a lot of attorney's fees with things that

5    have nothing to do with clients.  So we would ask for --

6            THE COURT:  Let me see if I can address this for a

7    second, Mr. Goldstein.

8            Mr. Hershey, I've done this in other cases, and

9    what I'd think seriously about doing here would be to create

10   a docket labeled Celsius preference actions docket.  I would

11   require all pleadings related to preference actions to be

12   filed in that docket.  And to the extent that pleadings

13   relate to specific cases within the docket, the pleadings

14   should also be filed in the Celsius preference action docket

15   and into the specific docket.

16           So any lawyers representing clients in preference

17   actions can limit their review to the preference action

18   docket.  If pleadings are specific as to individual cases --

19   so it would start with the caption this preference action

20   docket, and then there would be -- if a pleading was limited

21   solely to a specific action within it, it would have that

22   caption with it and the filing would go there as well.

23           I don't believe that this will be increasing the

24   cost for any of the defendants to be able to serve papers.

25   You'll be able to file on the docket electronically.  Any

1    lawyer who has registered to appear in the preference action

2    docket can get it.  If they're not interested, they don't

3    have to look at it.  I've done that successfully in other

4    cases.  The Celsius main docket is too long already and I

5    think it may well be that -- and we'll talk about some of

6    the other -- the employee preference actions.  I'm open to

7    creating specific dockets for those categories of cases as

8    well.  If a pleading is specific as to one of the cases

9    within it, you just file it in both.

10            But that's what I have in mind.  I would like you

11   to try and work out the details of this with other counsel.

12   I don't want all of these going in the main docket and then

13   people have to hunt through and try and find things.  Even

14   this preference action docket will turn out to be very long.

15            MR. HERSHEY:  I'm sure you're right, Your Honor.

16   And thank you very much for that guidance.  We will discuss

17   it internally and with counsel to defendants.  Thank you.

18            MR. GOLDSTEIN:  Thank you, Your Honor.  I think

19   that's a helpful solution.

20            THE COURT:  Okay.  Mr. Vaughan?

21            MR. VAUGHAN:  Yes, Your Honor.  It's Christopher

22   Vaughan on behalf of the 34 defendants in ECF 7622.

23            First, Your Honor, we would just like to express

24   our agreement with Ms. Kovsky --

25            THE COURT:  The one thing, I don't know by docket

Page 90

1    numbers.  Okay?

2              MR. VAUGHAN:  I'm sorry.  Yes.  It's a group of

3    35.  It's a group of 35 defendants, Your Honor.  And I'll

4    have the ECF number refrained from (indiscernible).  I

5    apologize.

6              But first, Your Honor, just we would like to

7    express our agreement with Ms. Kovsky and Mr. Besikof's

8    group that damages should be handled as a final issue.

9              In addition to the points raised by Ms. Kovsky and

10   Mr. Papandrea, counsel for plaintiff misconstrues the

11   reasoning for why many of these defendants did not

12   (indiscernible) other claims ahead of time.

13             As recognized by the plan administrator in their

14   filing last night, because of the original Celsius data

15   breach in 2022 and in the second data breach that happened

16   in these cases in relation to stretto, most of the emails

17   sent out in relation to this case and the opportunity to

18   settle them were auto-flagged as spam and were not received

19   by potential defendants in these cases.

20             Accordingly, Your Honor, the vast majority of the

21   defendants in these cases were not even aware of any of

22   these ongoings until they received their paper sums in the

23   mail.  And this staff report also communicates that the --

24   that they didn't upgrade their system for communication

25   until August, which was after all of these cases were filed.

1     So the idea that all of these individuals did not settle

2     their cases prior to plaintiff filing these exponentially

3     higher WPE claims because they had no interest in settlement

4     at all is a fallacy and it is contrary to the position taken

5     by the plan administrator.

6          As a second point, Your Honor, as this Court

7     recognized originally in Tribune and again in Sun Edison,

8     the application of 546(e) presents a straightforward

9     question of statutory interpretation, the type of which is

10    appropriately resolved on the pleadings.

11         And while we recognize that the application of

12    546(e) in the context of cryptocurrency is likely a matter

13    of first impression such that some aspect of the analysis

14    may require discovery and expert reporting before it can be

15    resolved, there are other aspects that may be resolved by

16    motion or that may be resolved in relating ongoing

17    proceedings happening simultaneously to those being heard in

18    this Court.

19         And we understand that this Court in the interest

20    of only hearing certain arguments at one stage to the other

21    may want to withhold its final decision in 546(e) until the

22    larger defendant groups have fully fleshed out their

23    arguments.  And if those groups want to await their

24    opportunity to make their 546(e) arguments in court, that's

25    fine.  But that should not foreclose other defendant groups

Page 92

1    or pro se defendants from advancing their arguments via

2    motion as the Court can take all of these arguments into

3    consideration at the time that it deems most appropriate.

4            But overall, Your Honor, the litigation strategies

5    of defense groups, of larger defense groups should not be

6    determinative of timing for all the defendants in these

7    cases if they want to file a motion in relation to 546(e).

8            THE COURT:  I'm going to withhold (indiscernible)

9    for now.  But it seems to me that the 546(e) issues are

10   going to be fact-intensive.  You yourself recognize the need

11   for expert reports.  I don't plan -- I am disinclined -- I

12   am going to reserve ruling for now.  I am disinclined to

13   permit motions under 546(e) which will be much more time-

14   consuming and factually intensive.  I don't view those -- I

15   don't view the 546(e) issue as appropriate for early

16   decision by the Court.

17           Certainly those who wish to reserve on that issue

18   -- maybe the issue is going to be reserved, I'm not deciding

19   it.  But this is not the first case in which I have faced

20   546(e) issues.  Yes, it's the first crypto case.  I think

21   these are uncharted waters.  So I will -- you know, I've

22   considered the arguments.  I'm not ready to rule on it now.

23   I'll just say I am disinclined to do that.

24           This is really a phase -- phasing of the case

25   issue.  I agree that there are pure legal issues that will

Page 93

```
1      help determine the direction of mandatory mediation.  It

2      doesn't prevent the voluntary mediation now.  I don't put

3      546(e) into that category.  I don't plan to wait six, nine,

4      or 12 months to kick mandatory mediation in place while the

5      546(e) issue gets resolved by the Court.  So those are my

6      inclinations.  I am not ready to rule at the moment on it.

7               Any last points you want to make, Mr. Vaughan?

8               MR. VAUGHAN:  Not on that point, Your Honor.  If

9      you would like me to raise issues about the fees --

10              THE COURT:  Let me raise one issue.  And I want to

11     ask Mr. Hershey about this.  I am concerned, Mr. Hershey,

12     that because of communications issues -- let me just leave

13     it for that -- there are some number of defendants -- and

14     I've read the objections -- that they never even knew that

15     there was a deadline.  My inclination is, particularly since

16     we are deferring a start date for mandatory mediation, is to

17     see if you can get agreement on a date by which people will

18     have an opportunity to respond on voluntary settlement.

19              MR. HERSHEY:  Absolutely, Your Honor.  And I'll

20     just note that we've heard the same thing from defendants,

21     that they weren't even aware that we were settling at

22     transaction date values.  And we've had many settlements

23     since we filed the complaints.  Because once people got

24     sued, they realized that this was real and -- you know, and

25     the communication reached them.
```

Page 94

```
 1              I think, you know, we're still doing those

 2      settlements.  For anyone listening, we're happy to

 3      communicate regarding settlement always.  I think people

 4      know that.  And we've been having a lot of those

 5      discussions.  But yes, Your Honor.  Absolutely we will keep

 6      --

 7              THE COURT:  Mr. Hershey, what I would like though

 8      is -- so there isn't any ambiguity about it, it doesn't

 9      depend on the whim of any party or not, is an order on the

10      docket that has a date certain that gives -- give people a

11      reasonable time if they can reach out to you.  I mean, you

12      can voluntarily agree to extend it, but there is a date

13      certain.  You know, I am sufficiently concerned.  There were

14      enough people who didn't get notice of it, and they are

15      entitled to an opportunity to consider.  And if possible I

16      think it's to your advantage as well to see if any

17      settlements can be reached.

18              MR. HERSHEY:  Absolutely, Your Honor.  We will do

19      that.

20              THE COURT:  All right.  So confer with counsel.

21      See if you can agree on a date.  If you can't, submit an

22      order and I'll -- anybody else can submit a proposed order

23      and I'll just resolve it without another hearing.  I just --

24      I want a sufficient amount of time that people will have to

25      respond to it.  Okay?
```

Page 95

1           Before I call on people who have spoken already, I

2     see Mr. Ankeney.  I am probably mispronouncing your name.

3     Go ahead.

4           MR. ANKENEY:  Thank you, Your Honor.  My name is

5     John Ankeney.  I am a pro se creditor and now a pro se

6     defendant.  I have filed three petitions with the Court pro

7     se.  I am obviously not a professional.  But I am here for

8     two reasons.

9           Quickly to just respond to two things that Mr.

10    Hershey mentioned.  I'm also on the agenda today to speak.

11    If the Court would prefer that I continue speaking for

12    another couple of minutes briefly now, I certainly can.  The

13    two things that I would like to respond to after Mr. Hershey

14    spoke are kind of an oblique reference to -- we only have a

15    few areas of disagreement.  I couldn't disagree with that

16    any more fundamentally.  There is a complete fork in the

17    road with how Mr. Hershey et al would like to proceed and

18    how others represented here by Ms. Kovsky and Mr. Besikof

19    and myself as a pro se defendant would like to proceed.  And

20    we are petitioning the court overall writ large and asking

21    you politely and with respect to say, hey, we realize that

22    there is heavy lifting that has to be done.  We realize that

23    there are large issues that may take some time.  But it's

24    out of order and incorrect to put the cart before the horse

25    as we've used this phrase multiple times.  I think it's

Page 96

1    correct.

2            At its face, there are issues that need to be

3    solved.  And we haven't solved them.  And secondly, this

4    blends quickly into the second point.  For Mr. Hershey et al

5    to mention that many have settled, this is not a badge of

6    honor.  We should not be proud about this.  So I would like

7    to take this moment to say who we are.  We are people that

8    took our own money, our own retirement money and put it into

9    Celsius.  I used referral codes from my parents who are in

10   their seventies.  Friends and coworkers.  I told them about

11   Celsius and I believed in this.  It wasn't a get-rich-quick

12   scheme for me; it was somewhere to hold my cash and to feel

13   like maybe I could take all of this money and have it

14   appreciate over time and maybe catch up with inflation for a

15   small amount each year.

16           And so when we take this dollar that I had with

17   Celsius and start off by saying, Mr. Ankeney, you're only

18   going to get 33 cents back and you should be grateful for

19   the 33 cents.  And then you take the next 33 cents and you

20   say, but we're going to give it to you in ionic shares.  And

21   we just heard earlier that the ionic shares will probably

22   not pay off.  I think that's polite and an understatement.

23   I would say that from a business perspective it's been

24   nothing short of a total failure.

25           And so to begin this whole process with 33 cents

Page 97

1    on the dollar for my entire net worth -- I can tell you

2    where I was when I got the phone call about Celsius.  I can

3    tell you that every night since then and every morning since

4    -- that's not hyperbole.  Every night and every morning

5    since then I think about Celsius and the mistake that I

6    made.

7            Now I have on top of this 33 cents left the

8    plaintiff coming after me for transactions that were made

9    under ordinary courses of business.  And so my belief is

10   fundamental that there is 0.00 dollars in repayments that

11   should be given back.  And so when we say in paper and here

12   in speech that however many of the 2,500 have settled, you

13   shouldn't get a gold star for that.  These are people who

14   settled because they were intimidated and they were afraid.

15   And because Mr. Hershey had all used tactics and still use

16   tactics that are intimidating and fearmongering and so

17   people say, oh my gosh, I'd better do this.  And that's not

18   okay.  And so I'm asking you -- I am petitioning to the

19   court to say, hey, now is the time to do the heavy lifting

20   and decide these prima facie issues that must be decided

21   before we go on to say how much does every person owe and

22   how quickly can we get them to pay back.  Thank you, Your

23   Honor.

24           THE COURT:  Thank you, Mr. Ankeney.

25           No one is forcing anyone to settle.  Let me make

Page 98

1    that clear.  People make their own decisions whether to

2    settle or litigate.  I decide the legal issues that are

3    presented to me.  I think what's been recognized today is

4    there are common legal issues that arise in many or most of

5    the adversary proceedings, the avoidance adversary

6    proceedings.  And I think most of the people on the screen

7    are largely in agreement on many of those issues.  There are

8    obviously disagreements about whether something is a phase

9    one, phase two, or wherever.  And the Court will have to

10   resolve that.

11          Ms. Kovsky, go ahead.

12          MS. KOVSKY:  Thank you, Your Honor.  I just wanted

13   to respond to a couple of things and to clarify the record.

14   I had tried to jump in but was not quick enough off the draw

15   when you asked Mr. Hershey since it sounds like you and Ms.

16   Kovsky are largely in agreement that there are common issues

17   that need to be decided before mandatory mediation.  I just

18   wanted to clarify that we had not taken a position on that

19   issue, nor were we pushing to have common issues litigated

20   prior to mandatory mediation.  And the fact is my group is

21   most likely going to participate in voluntary mediation, as

22   Your Honor suggested, sooner the better, and see if we can

23   get some of the underbrush cleared out.  Those that want an

24   offramp, let's get them the offramp when they want it.

25          So I just wanted to clarify, we had not taken a

1   position on that.  And it was not something that to my

2   knowledge had really been contemplated.  We had the

3   mediation procedures order, which as I mentioned we

4   negotiated, we -- the Plaintiff's counsel was very

5   cooperative with us.  And we have an agreed order that was

6   submitted as a redline to their reply.  Which doesn't

7   contemplate having the common issues determined in the

8   middle.  I am not saying one way or the other whether we

9   would be in favor of that.  It's just not something that we

10  had discussed or that we took a position on.

11          THE COURT:  I think the only point I would make

12  here is that there are lots of defendants who want those

13  common issues resolved before they have to get to mandatory

14  mediation.  And it's perfectly rational for you and your

15  clients to decide let's sit down, let's get a mediation

16  going sooner rather than later before everybody runs up a

17  lot of costs, let's see whether we can get a resolution.

18          MS. KOVSKY:  Absolutely.

19          THE COURT:  You know from your experience most

20  cases settle.  Not all of them.

21          MS. KOVSKY:  I do know that from experience.

22          THE COURT:  Most cases.

23          MS. KOVSKY:  Your Honor also indicated that the

24  parties agree on phase one.  I am not sure exactly what Your

25  Honor was referring to with respect to what would go into

1  phase one.  I think there's large agreement at least between

2  my clients and the plaintiff as to what the common issues

3  are that should get decided before we get into the minutiae

4  of individual defendant facts and circumstances.  But there

5  is vehement disagreement as I indicated earlier as to what

6  should go into that phase one issue.  Your Honor also

7  indicated that there are some issues that can be decided

8  purely as a matter of law.  Even those issues that the

9  plaintiff indicated in their statement could be decided as a

10  matter of law.  We believe that there could potentially --

11  actually most likely there would be discovery, possibly

12  experts.  Under 550(a) one of the arguments that we would be

13  raising if we get to a damages phase -- and hopefully we

14  never get there.  But if we do get to a damages phase,

15  550(a) talks about benefit to the estate.  And there's

16  plenty of caselaw out there as to whether in a liquidating

17  debtor scenario the debtor can collect from preference

18  defendants more than is necessary to pay creditors in full.

19  What creditors have actually received and the value of what

20  they have received is not entirely straightforward when

21  distributions have been made over a broad period of time in

22  liquid crypto that has fluctuated in value.  A portion of

23  the distributions made in ionic stock, which I think as Your

24  Honor heard today, the value of that stock is very much in

25  question.  So those issues would require discovery and most

1    likely experts.

2         What the plan provides for may hinge in part on

3    what disclosures were made, who they were made to, what

4    people relied on, what they voted on, perhaps parole

5    evidence.

6         If Your Honor does determine that this is

7    something that should be heard perhaps alongside the

8    liability issues, we want to -- we absolutely do not want to

9    be foreclosed from taking discovery to the extent that it's

10   necessary.  And I just wanted to put that on the record.  I

11   know there's not a motion in front of Your Honor right now

12   for a -- this is not our 26(f) conference or 16(a)

13   conference.  But I just wanted to make sure that the record

14   was clear that these are not things that we are in agreement

15   on yet.

16        Then there were just some logistical issues I

17   wanted to flag.  One of them was actually the creation of a

18   consolidated docket, which Your Honor already covered, which

19   we are very much in favor of.  And we had proposed that to

20   Mr. Hershey.  And you'll see in the revised mediation

21   procedures order there are references to a consolidated

22   docket.  So we believe that is absolutely necessary.

23        We've also suggested to plaintiff's counsel that

24   it might make sense and that we would certainly be willing

25   to agree to the consolidation of all of the Troutman

Page 102

1    defendants and perhaps even the Troutman defendants and the

2    Lowenstein defendants together for pretrial purposes so that

3    we don't have to file the same motions in 500 adversary

4    proceedings plus the consolidated docket, and plaintiff

5    doesn't have to, either.  I think it saves a lot of time and

6    energy and effort.

7            But there are also some questions that would need

8    to be ironed out in terms of how do we get these issues

9    before the Court.  Who is bringing them, in what format, are

10   we talking -- you know, are there going to be test cases,

11   will there be consolidation?  We think that it's very

12   important to have the rules of the road ironed out in a

13   formal manner before we get going on this so that we're not

14   trying to build the airplane while we're flying it.

15           We've had some early productive discussions with

16   Mr. Hershey and with the ASK team.  But we believe that

17   there needs to be something much more granular put in place

18   so that this can be successful and efficient moving forward.

19           THE COURT:  Thank you.  Ms. Jaspan, I haven't

20   heard from you so far.  Go ahead if you wish to speak.

21           MS. JASPAN:  Good morning, Your Honor.  Thank you.

22   Michele Jaspan of Falcon Rappaport & Berkman for creditors

23   Tom and Will McCann.

24           I'm only bringing up these issues, Your Honor,

25   because it seems that we've somewhat gone into the area of

Page 103

```
1    the motion for the streamlined procedures, and I just wanted

2    to address a couple of things that had already been brought

3    up.

4            To Your Honor's point about the mediation costs,

5    we recognize and respect Your Honor's position on sharing

6    costs.  We're just going to ask that the parties consider

7    and Your Honor consider perhaps what we had put in our

8    opposition, a suggested perhaps sliding scale for defendants

9    who simply cannot afford the cost of mediation, nor at this

10   point every perhaps even the ability to settle.  You know,

11   as many of the individual pro se defendants have stated

12   today, they've taken their retirement funds and college

13   tuition funds or down payments that they expected to use

14   from homes and parked it in Celsius.  And now they don't

15   have that money available.  Or just funds that they had took

16   out of Celsius and put back into their retirement accounts.

17           So we would just ask that that be considered for

18   people who cannot afford it if they can prove this, that

19   they be permitted to share on a sliding scale basis rather

20   than this set fee basis.

21           And then the other point I wanted to bring up was

22   about the issue of Your Honor saying that they should

23   provide a date certain by when people who didn't receive the

24   letters or did receive the letters but thought they were

25   spam and didn't open them, which I've heard from many of our
```

1    clients, is not that it's a date certain, perhaps --

2    everybody has got to respond by November 1st -- but that it

3    be a date for a specific time after Your Honor makes his

4    rulings on the issues that will come up --

5            THE COURT:  It isn't going to work that way.

6    Okay?  It isn't going to work that way.  You're not going to

7    sit back and wait six months for me to issue a ruling on

8    whatever those issues are.  I understood the complaint to be

9    because of spam issues or otherwise there were many

10   defendants who didn't receive notices and I want to solve

11   that problem.  I'm not giving people a free ride to wait for

12   six or nine months to decide they do or -- you know, what

13   their position is going to be.  That's not going to happen.

14           I'm sensitive to the issue of costs.  The only

15   thing I can say is the costs of the mediation pale in

16   comparison to what the costs of going ahead and litigating

17   these cases will be.  That's just the reality of it.

18           Mr. Vaughan, I've heard from you once, but your

19   hand is still raised.  Do you have some other point you want

20   to raise?

21           MR. VAUGHAN:  Yes, Your Honor.  Do you want us

22   just to address the issue of fees for mediation now since

23   it's come up a few times?

24           THE COURT:  Sure, go ahead.

25           MR. VAUGHAN:  Okay.  So yes, as Your Honor has

Page 105

1    recognized, the proposed mediation fee schedule -- and

2    actually I'll pause here and give Plaintiff's counsel an

3    opportunity to clarify.  In their reply to our objections,

4    they listed out that the minimum -- or that the mediation

5    fee for individuals under $500,000 starts at $1,000 per

6    party.  That's inconsistent with what they have filed in

7    their motion, which was a minimum of $2,500 per party.  I

8    guess we would just like to start before I get into the rest

9    of my arguments as to which is accurate.

10              THE COURT:  No, go ahead and put everything --

11   let's get everything you have to say on the record.

12              MR. VAUGHAN:  Okay.  Yes, Your Honor.

13              THE COURT:  And then I'll ask (indiscernible) to

14   respond.

15              MR. VAUGHAN:  Well, assuming that it does follow

16   their original mediation fee schedule, then the minimum fee

17   for defendants under $500,000 would be at least $2,500 and

18   up to $3,250.  And based on the 17 mediators that are

19   currently scheduled, that would mean that each mediator

20   would hear the same case 140 times, taking into

21   consideration groups and everything, probably a few times

22   less than that.  But roughly 140 times, which is a payment

23   of $700,000 for each mediator to hear that case

24   repetitively.  And that number will be reduced by a factor

25   of whatever number of mediators Your Honor decides which

Page 106

1    should remain on the list after they pare it down.

2          So they are astronomically too high, substantially

3    higher than any of the cases listed by Plaintiff in their

4    motion for streamlined procedures.  And it's also asking

5    individuals on the lower end of the WPE scale, which

6    plaintiff recognizes constitutes the vast majority of

7    claimants -- or defendants in this matter to pay between 1

8    to 2.5 percent of their original WPE value and which will

9    simply not (indiscernible) at the figures that plaintiff has

10   been seeking unsuccessfully for roughly 70 percent of

11   individuals in this case.

12          And on the same point, Your Honor, in their reply

13   to our objections, Plaintiff's counsel noted that the

14   mediation fee schedule is based on the complaint WPE value

15   rather than the original WPE value that began being

16   circulated in March -- I'm sorry, in January and then March

17   and then into April, which is simply illogical, Your Honor.

18   The individuals with -- one individual has given me

19   permission to share a story on this point, and it may put

20   this into context for why it doesn't make any sense.

21          His name is Michael Wakefield.  Mr. Wakefield was

22   one of the few individuals who was actually speaking with

23   agents of the plaintiff to attempt to settle his claims

24   prior to the filing, but they were unable to reach a

25   resolution.  And at that point in time, Mr. Wakefield's

Page 107

1    settlement value for WPE was $102,000.  When this suit was

2    filed against him, Plaintiff alleged that his WPE was over

3    $1.9 million.

4           And now Mr. Wakefield and individuals like him who

5    participated in the loan program under the plaintiff's

6    current proposal are expected to pay mediation fees

7    commensurate with that new figure of liability when they're

8    not even able to reach an agreement or fail to even become

9    aware of an agreement with regard to the original measure of

10   his WPE.

11          And, Your Honor, the reason we are going this

12   process is to encourage individuals to mediate.  There is

13   simply no reason to judge the mediation fee schedule based

14   on people's complaint WPE when all that does is serve to

15   raise the mediation fees and reduce the chances of

16   settlement.

17          THE COURT:  Thank you, Mr. Vaughan.  All right.

18   Has anybody who has not been heard so far wish to be heard

19   by the Court?

20          Mr. Hershey?

21          MR. HERSHEY:  Thank you, Your Honor.  I will be

22   brief because it sounds like we will submit a further round

23   of briefing to Your Honor on these issues, and I don't want

24   to repeat what Your Honor will read shortly.

25          I do want to clear something up real quick, which

Page 108

1   is that I think there have been some references during this

2   discussion to the plan administrator.  That's a different

3   entity from the litigation administrator, which is my

4   client, which is handling litigation.  I just want to make

5   that clear to all parties.

6           I also want to briefly address the cost of

7   mediation that Mr. Vaughan just addressed.  I have two

8   points.  The first is that Mr. Vaughan on behalf of the

9   Bressler group in his objection listed out on Page 6 a few

10  examples of previous cases where there was mandatory

11  mediation and parties were required to split the fees.

12          And what we have suggested is completely in line

13  with that precedent.  So, for example, in Advance Watch,

14  which is one of Your Honor's cases, parties where there was

15  less than $250,000 at stake were required to pay $2,000 for

16  mediation.  Our number is $2,500.  So we're just $500 above

17  what happened in Advance Watch.  And Advance Wath was seven

18  years ago.  So I think there's a reason that we've gone up

19  slightly.

20          And by the way, just for the record, Mr. Vaughan

21  is correct, there was an error in our reply.  We regret

22  that.  The numbers that are accurate are the ones in the

23  motion -- the procedures motion that we filed.

24          In Sears it's the same thing.  Sears.  Again, this

25  is now I believe -- yeah, it's six years ago.  And parties

Page 109

1    between $100,000 and $250,000 were, again, 2,000 per side.

2    We are at 2,500.

3            So particularly with regard to the smaller

4    defendants who have more of an ability or right to claim

5    difficulty in paying these fees, we are completely in line

6    with precedent.

7            I also think that Mr. Vaughan's comments really go

8    the point of why the issues that we believe should be phase

9    one issues, which are the amount of damages that Plaintiffs

10   potentially could be required to pay is relevant.  Because

11   as Mr. Vaughan says, these parties dispute the damages that

12   we're asserting.  They think that they should be in lower

13   brackets with regard to mediation fees.  Let's figure that

14   out.

15           And to be clear, we're not looking to get a final

16   order on the amount of damages.  But there are certain

17   issues that go to what that amount of damages can be.

18   Whether we can request return of the assets themselves under

19   Section 550, how to calculate new value under Section 547.

20           Just to be clear, you know, everyone who mediates

21   does so before liability is determined.  That's the

22   definition of mediation, right?  This is all going to happen

23   before liability is determined.  And everyone who mediates

24   does so with an eye on the amount of damages.  I guarantee

25   you every defendant in whatever submission they make to the

Page 110

1  mediator before mediation begins is going to say it's

2  ridiculous the amount the litigation administrator is

3  seeking here.  They have no right to this under the law.

4  And they're going to make these arguments, and we're going

5  to do the opposite.

6          And just to be clear, I want the mediation to

7  succeed.  If I'm wrong, I don't want to be wrong one minute

8  longer than I absolutely need to be.  So if Your Honor tells

9  me that we are not entitled to return of the assets,

10  obviously that's not the result that we want.  But it will

11  help us have a more effective mediation.  Because we'll go

12  in there knowing what our damages actually can be, not with

13  some unrealistic notion of what they can be.  And there will

14  be more settlements.

15          And Ms. Kovsky said -- I believe it was Ms.

16  Kovsky, and if I am misattributing this, I apologize.  But

17  one of -- there were many counsel who spoke.  And one of

18  them said that they don't believe that ligating these issues

19  in phase one will result in more settlements.  That just

20  can't be the case.  I know personally it can't be the case.

21  Because parties reach out to me and they say we will settle

22  for this amount.  And I say I'm sorry, our client simply

23  can't accept that.  And we can bridge that divide if some of

24  these threshold legal issues can be decided in phase one.

25          So again, I don't want to overdo it because we'll

Page 111

1   brief these issues for Your Honor in the final round that

2   Your Honor mentioned.  But that is our position.  And we

3   believe it would be beneficial to defendants and us.  It's

4   not just a one-way benefit as defendants argued.  I think if

5   we end up being wrong, of course then that's to their

6   benefit.  I think a settlement at a lower number is of

7   course more likely at that point.

8            THE COURT:  Let me raise one issue.

9            MR. HERSHY:  Of course, Your Honor.

10           THE COURT:  You've provided information on so-

11  called precedent cases.  None of them involve 2,463

12  preference avoidance actions.  Advance Watch was my case.

13  It was 35 cases that were being mediated.

14           One of the reasons I frankly think there's an

15  advantage not to have 17 prospective mediators on the list -

16  - but I'm not going to use a number because I don't want to

17  -- I'm not ready to say what the number should be.  But

18  whether it's 10 or 15 or five, it just -- the -- that person

19  who is the mediator has gone through the learning curve.  So

20  it seems to me that the mediation price for each case should

21  be less because the mediator is not going to have to tread

22  new ground with respect to each of these.  And it's one of

23  the reasons that I'm -- I think, yes, I appreciate the fact

24  that you pulled together a group of precedent cases, as

25  you've referred to them as.  But I think Sears, which was --

Page 112

1   or Quebecor, which was 350 cases, it's not 2,463 cases.

2          Yes, the people who are on the mediator list need

3   to be broadly respected so that both the plaintiff and the

4   defendants trust the person to be fair about it.  But I

5   think that there is -- there are clear cost savings to be

6   encountered when the list of mediators, of broadly respected

7   people is kept much shorter because they are assured of a

8   much larger number of mediations that they're going to do.

9   So that's one observation I would make.

10          With respect to this issue of what would the

11   Plaintiff be entitled to recover, to the extent you want to

12   hone in on your last round of briefs on why that's an issue

13   of law to be determined, I'm open to considering that.  I'm

14   not trying to exclude issues.  I don't want to include

15   issues that ultimately are going to be factually intensive

16   that people are going to say, oh, we can't -- you know,

17   unless we've had full discovery, we can't go ahead and

18   resolve those.  All right.

19          Anything else you want to say at this point, Mr.

20   Hershey?

21          MR. HERSHEY:  Yes, Your Honor.  The only last

22   thing is -- and we can do this after other parties speak.

23   But I just wanted to discuss what the date for the

24   submission would be.  I have a suggestion, but of course --

25          THE COURT:  Go ahead and give it to me.

Page 113

1              MR. HERSHEY:  Sure.  So the next hearing, Your

2     Honor, is September 12th.  I would -- and I think these are

3     issues that have been discussed extensively, including

4     today.  I think parties know what they want to say.  So I

5     would suggest that by September 5th, which is nine days from

6     today and a week before the hearing, we file our subsequent

7     submission regarding any areas of disagreement that remain.

8     And I would propose to file with that -- Ms. Kovsky has

9     observed several times the procedures order doesn't make

10    sense in light of these common issues.  We have to make them

11    fit together.  And we recognize that.

12             We would -- the litigation administrator file a

13    revised procedures order that takes into account how we are

14    proposing to handle these common issues.  And parties who

15    disagree I would suggest could express their disagreement

16    with our proposed procedures as well.

17             THE COURT:  What's the -- is there a hearing after

18    September 12th?  What's the next hearing after that?

19             My only concern is getting anything done before

20    Labor Day.  People are on vacations and I don't want to be

21    unreasonable about when people have to file their responses.

22             MR. HERSHEY:  Fair point, Your Honor.  October 8th

23    is the next one, which is not too far away.

24             THE COURT:  I would be more comfortable working

25    with that as the hearing date and backing into a date.

Page 114

1              MR. HERSHEY:  That works for us, Your Honor.  And

2       again we'll do the briefing however Your Honor would like.

3       I don't anticipate this being an opening brief response

4       reply sort of thing.  I think it would just be a submission

5       which we could make on October 1st along with other parties

6       who may not agree with our position.  But of course I defer

7       to what Your Honor thinks is best.

8              MS. KOVSKY:  Your Honor, could I be heard on that?

9              THE COURT:  Go ahead.  Go ahead, Ms. Kovsky?

10             MS. KOVSKY:  Thank you.  It's a procedural issue.

11      This has come up in a very informal manner.  At the July

12      29th status conference, Your Honor indicated to me and to

13      Mr. Hershey and to Mr. Besikof that you wanted us to work

14      together to try to identify common issues and suggest an

15      efficient path forward.

16             We're now talking about what seems almost like a

17      broad and generally applicable pretrial conference and

18      scheduling order for litigation that will affect everybody.

19      But this hasn't been put out on notice to anyone yet.  It's

20      really been very informal.  And I am just concerned that we

21      could agree -- I mean, Mr. Hershey and I can certainly sit

22      down in a room and figure out what we think makes sense and

23      come up with something.  But hearing some of the comments

24      from counsel for other groups and pro se defendants, I am

25      concerned that without notice, that they will object to

Page 115

1    being bound by something that they didn't even know was

2    going to be happening.

3              THE COURT:  Well, they're going to know very soon

4    what they're going to be bound by.

5              MR. HERSHEY:  And let me just say we of course

6    will be happy to put out a notice to all creditors of these

7    deadlines.

8              MS. KOVSKY:  We would also appreciate some

9    guidance from the Court as to what kind of format -- since

10   there is no motion pending here, what would the Court like

11   from the parties in terms of responsive pleadings?

12             THE COURT:  I'm looking at dates.  Hold on.

13             Mr. Hershey, file a motion with the specific

14   relief you're requesting by 5:00 p.m. September 7th.

15             MR. HERSHEY:  Absolutely, Your Honor.

16             THE COURT:  Oppositions to the motion by 5 p.m.,

17   September 21st, reply by 5:00 p.m., October 1st.  Hearing --

18   what time is our hearing on October 8th, 10:00 a.m.?

19             MR. HERSHEY:  10:00 a.m., yes, Your Honor.

20             THE COURT:  Schedule the hearing for 10:00 a.m. on

21   October 8th, so there'll be no question.  There'll be a

22   motion pending before me.  To the extent you can include

23   within your motion those areas as to which those agreements

24   so indicate as to where there -- where you're seeking other

25   relief as to which there is no agreement, so indicate

Page 116

1    clearly, but this way, there will be a motion.  There will

2    be an objection deadline, a reply deadline, and a hearing.

3            I think one -- the few things I think there's

4    agreement on today is to create something called -- I'm

5    using this name.  If you've got a better name, use it,

6    Celsius preference action docket.  I've done this before.

7    It's just too hard to find things on the main docket, even

8    for me.  This will -- may be tough enough as it is.

9            Reach out to my law clerks, and we'll get that

10   open.  All the motion and any opposition in reply will only

11   need to be filed in this newly created docket, because

12   everybody will know exactly where to look, where to file

13   your opposition.  It's not specific -- it's not case

14   specific or within all of the cases within the docket.

15   Okay?

16           MR. HERSHEY:  Thank you, Your Honor.  We'll do

17   that absolutely.

18           THE COURT:  And if you have questions -- issues

19   for fine tuning, reach out to my law clerks to deal with

20   that.  Okay?

21           Ms. Kass, your hand I still raised.  Before I call

22   on Mr. Stein, is -- any last points you wish to raise?

23           MS. KASS-GERGI:  Just a very last point.  As I had

24   indicated before, Your Honor, there are a number of clients

25   that have reached out to Troutman for representation, non-

Page 117

1      US.  They have not been served yet, so they are not actually

2      -- they've not been brought into the litigation yet, and I

3      just wanted to make sure that that's on the Court's radar,

4      as well as on Mr. Hershey's radar, that the timing and the

5      procedures and whatever we are going to be hopefully

6      negotiating consensually, we'll have to take into account

7      that there's going to be a whole tranche of defendants, half

8      the defendants, that are going to be on an entirely

9      different timetable.

10             THE COURT:  Possible, okay.

11             Mr. Stein?

12             MR. STEIN:  Thank you, Your Honor.  I'm appearing

13     as a pro se defendant.  I appreciate the opportunity to

14     address the Court today.  Like many others, I did not

15     receive a settlement email, and likely went into spam --

16             THE COURT:  We're fixing that problem.

17             MR. STEIN:  I understand, yes.

18             THE COURT:  There may be things we can't fix, but

19     that problem, I think, we're fixing.

20             MR. STEIN:  Fair enough.  I guess I'll just jump

21     to the point in the spirit of efficiency.  While I disagree

22     with the tactics in terms of intimidation and strongarm to

23     approach a settlement on behalf of Mr. Hershey's firm, there

24     is something to be said for price for peace, and there's a

25     legal component to this.  My clarification question is, is

Page 118

1    there terms by which settlements are negotiable?  I'm not

2    sure if that's a question for you --

3                THE COURT:  That isn't a question for me.  I can't

4    answer that question.  I think -- reach out to Mr. Hershey.

5    Get a dialogue going.  You'll -- you ought to be able to

6    figure it out.  For 34 years I've practiced law, probably

7    more often representing defendants than plaintiffs, but

8    representing both.  And they're often -- no matter how

9    strongly you feel about your position as a plaintiff or

10   defendant, there usually is a price for peace and the

11   certainty of getting something behind you.  That's just the

12   nature of it.  I can't (indiscernible) --

13               MR. STEIN:  Understood.

14               THE COURT:  Okay.

15               MR. STEIN:  Thank you.

16               THE COURT:  All right, anybody who hasn't been

17   heard from so far wish to be heard?

18               All right, just one last time, just to make sure

19   that you're all on the same page on this, motion to be filed

20   by 5 p.m., September 7th.  Opposition 5 p.m. September 21st,

21   reply 5 p.m. October 1st.

22               MR. STEIN:  Thanks, Your Honor.  And Your Honor,

23   if I may ask one more thing before we move on.  Given that

24   there's no procedures order in place yet, there have been a

25   number of litigations filed.  Could your Honor just confirm

```
 1    on the record that all litigation is stayed until these

 2    issues are decided?

 3              THE COURT:  All litigation is stayed until there

 4    issues are resolved.  I know there have been some specific

 5    requests for extensions of time.  Everything is on hold.

 6    Okay?  No one has to be concerned that, I got served, my

 7    answer is due by such and such date, if I don't, I risk

 8    having a default taken.  On the record, I'm so ordering the

 9    transcript, that all response dates are stayed until the

10    procedure's order is put in place.

11              MR. STEIN:  Thank you, Your Honor.

12              THE COURT:  Okay, all right, what do we still have

13    to do?

14              MR. COLODNY:  Your Honor, Aaron Colodny on behalf

15    of the litigation administrator and White & Case.  Next, we

16    have the status conferences or pretrial conferences in the

17    adversary proceedings against the former executives,

18    employees, and then, I believe there's one with respect to

19    Priority Power Management.

20              THE COURT:  Right.  Let's deal with Priority Power

21    Management next, okay?

22              MR. COLODNY:  Great, that will be my co-counsel

23    (indiscernible) Koepp.

24              THE COURT:  Go ahead.

25              I'm sorry, who's taking the lead on that, Mr.
```

Page 120

```
 1    Colodny?

 2              MR. COLODNY:  I believe it's Ross Hooper,

 3    (indiscernible).

 4              MR. HOOPER:  Good morning, Your Honor.  It's Ross

 5    Hooper from Seward & Kissel.

 6              THE COURT:  Go ahead, Mr. Hooper.

 7              MR. HOOPER:  My colleagues, Mr. Ashmead and Paul

 8    Koepp, are also on the line.  We represent Barber Lake

 9    Development, LLC.  Counsel for Priority Power Management,

10    Baker Botts, is also on the line, Mr. Layrisson, and, I

11    believe, one of his associates as well.

12              MR. LAYRISSON:  Good morning, Your Honor.  Louis

13    Layrisson, joined by my colleagues, Scott Bowling and Nisch

14    Bhan, on behalf of Defendant Priority Power.

15              THE COURT:  Okay.

16              MR. HOOPER:  So good morning, Your Honor.  This is

17    the first time we have been before you on this case.  I

18    don't know if you would like kind of a quick summary of what

19    this case is and how the parties think this will play out,

20    if that will be helpful for the Court.

21              THE COURT:  It would be.  Go ahead.

22              MR. HOOPER:  Okay, thank you, Your Honor.  So the

23    plaintiff, Barber Lake Development, LLC, is an entity that

24    received the letter of intent that was signed between

25    Celsius Mining, LLC and Priority Power Management, pursuant
```

1    to one of the master conveyance agreements back in January,

2    which I believe was approved by this Court.

3              The case itself involves three separate categories

4    of claims.  The first is with respect to the letter of

5    credit itself.  It was a mix of binding and non-binding

6    terms pursuant to which Priority Power Management had agreed

7    to develop a site in Mitchell County, Texas, referred to as

8    the Barber Lake site for Celsius Mining.  That was signed

9    back in February of 2022.

10             Unlike many of the agreements between Priority

11   Power Management and Celsius Mining, this particular

12   contract provided that certain amounts paid by Celsius

13   Mining were refundable until the later of the expiration of

14   an exclusivity period or the date on which certain

15   deliverables were provided by Priority Power Management to

16   Celsius Mining.

17             What happened in this case is that those

18   deliverables were never delivered, and it is Celsius

19   Mining's position that the fees that were paid are

20   refundable in accordance with the terms of the contract.

21   There were certain fees under the terms of the contract that

22   PPM could deduct from the $17 million that was paid, but we

23   believe it's a pretty straightforward case in which those

24   deliverables clearly were never delivered.  And PPM has

25   refused to give the money back.

Page 122

1          PPM in response has said that among other things

2     that the then-CEO of Celsius Mining back in -- on March

3     31st, 2022 -- wait, it's April 1st, took -- effectively

4     released any claims for the return of those monies.  We

5     disagree with that position.  We believe the contract itself

6     is clear.  The communication from the CEO did not constitute

7     a release, but if it did constitute a release of a $17

8     million claim 100 days before this bankruptcy was filed, it

9     was done at a time that Celsius Mining was insolvent, so

10     there is a claim to avoid that purported release.

11          The last category of claims is there -- we have

12     pled that there were amounts paid by Celsius Mining outside

13     of the contracts, so separate from this letter of intent,

14     which we all agree was the only contract with respect to

15     this particular property.  Celsius Mining made payments.

16     Those payments were used by PPM to develop the property, and

17     Celsius Mining is -- for the purpose of selling the

18     property, and that Celsius Mining is entitled to the benefit

19     of those extra contractual payments to the extent that there

20     was an equitable interest in the property that was created

21     by those.

22          So those are the three categories of claims.

23     Priority Power Management has moved to dismiss that third

24     category.  That motion is already on file.  Our opposition

25     and Barber Lake will be filing that opposition on September

Page 123

1    11th.  That will be for a -- teed up for a hearing before

2    Your Honor on September 18th at two o'clock.

3            We have been in discussions with Priority Power

4    Management.  We all agree that this case should move

5    forward, notwithstanding that partial motion to dismiss, and

6    we came together and did propose a joint schedule to Your

7    Honor, which we sent to chambers on Friday.  That in sum

8    would be a five-month period for fact discovery.  It would

9    take us to the end of January, 2025 with two months for

10   expert discovery, but there would be no stay pending any

11   decision on the motion to dismiss.  The only thing that we

12   would tie to the motion to dismiss would be the time in

13   which any amended pleading could be filed by Barber Lake.

14           THE COURT:  I mean, I -- and I did have -- I do

15   have the schedule, and I did review the complaint.  The --

16   while you largely followed the template that I used for case

17   management and scheduling orders, you would not have seen,

18   because I -- what I used, the template that I used for what

19   I consider to be more complicated cases, and essentially,

20   what it adds are a couple of paragraphs that really follow

21   requirements of the federal rules of civil procedure that do

22   apply in bankruptcy, but for most garden variety adversary

23   proceedings, I don't impose.

24           So to give you an example, and I haven't put the

25   date in for this, but on or before a date that would be

Page 124

1    inserted, "Counsel for the parties shall file a written

2    report outlining their discovery plan as required by Federal

3    Rule of Civil Procedure 26(f)(2) and (3).  Counsel Shall

4    cooperate and endeavor to reach agreement on a single

5    comprehensive discovery plan.  If they are unable to agree

6    on a single discovery plan, each counsel may submit its

7    proposed plan by blank date."

8            And then, the next paragraph, which is also added,

9    is "The discovery plan shall include proposed deadlines for

10   serving and responding to document requests, serving and

11   responding to interrogatories and requests for admissions,

12   identifying proposed fact witnesses, and providing the

13   timeframes and deadlines for beginning and then completing

14   deposition of fact witnesses, and for identifying expert

15   witnesses, exchanging expert witness reports, and taking

16   expert witness depositions.  Unless otherwise ordered by the

17   Court, all fact discovery shall complete it within" -- and

18   you would pick the 210 days, I believe, and I'm -- that's

19   fine -- "after the date of this order, and all expert

20   discovery shall be completed within 60 days after the

21   deadline for completion of fact discovery."

22           So it seemed to me that, just based on review of

23   what I've read, this is not the garden variety preference

24   avoidance action that I just heard so much about, and I

25   think it's -- I have found in the past it's helpful to

Page 125

```
1    require the parties to sit and confer and try and agree on a

2    discovery plan.  That's already included in the federal

3    rules.  I just don't, for a garden variety adversary

4    proceeding, I just haven't found it profitable to require

5    it, but it does seem to me it's appropriate to include that

6    requirement here.

7              But I don't know, Mr. Hooper, if you want to

8    respond to that, I know there's other counsel with hand

9    raised.

10             MR. HOOPER:  Yes, Your Honor, thank you, Your

11   Honor.  I have -- I think that that probably does make sense

12   here.  This is in some ways more akin to a commercial

13   dispute, kind of a standard contractual dispute.  I will say

14   there -- a lot of the witnesses here for Barber Lake are

15   going to be former employees, so there may -- there may be

16   some complications that we will want to work out with

17   Priority Power Management.  Our relationship has, thus far,

18   has been good, and we were able to consensually work to a

19   schedule, and I'm confident we can do that with a just

20   discovery plan.

21             THE COURT:  Yeah, it helps to get -- so you say

22   they're former employees.  It helps to get the names on the

23   table so you're all understand -- here are the issues we've

24   got to deal with.  I, look, I litigated for 34 years before

25   I became a judge, and those are the issues that come up in
```

Page 126

1   every complicated civil case.  And counsel working in good

2   faith get the issues resolved, but it helps to get the

3   issues on the table sooner rather than later.

4            MR. LAYRISSON:  On behalf of Priority, Your Honor,

5   completely agree and happy to work (indiscernible) --

6            THE COURT:  You have to identify yourself for the

7   record.

8            MR. LAYRISSON:  Apologies, Your Honor.  Louis

9   Layrisson for Priority Power, and agree with everything

10  that's been said and will be happy to work with Mr. Hooper

11  on a discovery plan as ordered by the Court.

12           THE COURT:  What I will do is I will have one of

13  my law clerks -- I made changes on a draft.  As I said, I

14  left some dates out of it, how much time do you want to

15  submit the discovery plan.  I will have -- I'm not going to

16  file it on -- when you get it filed on the docket, I will

17  have one of my law clerks email you the draft, and you can

18  fill in, you can talk about the details, and hopefully, it

19  won't be necessary to have another hearing before I enter in

20  a (indiscernible).

21           Okay, somebody has to mute their line.

22           Go ahead, Mr. Layrisson.  I cut you off.

23           MR. LAYRISSON:  No problem, Your Honor.  That all

24  sounds great to us, and just Mr. Hooper's summary was

25  helpful, and I don't intend to go into much detail today.  I

1    do want to clarify one thing about what Priority Power's

2    position may be, that there was a release by executives.

3          We do disagree with that characterization.  We

4    think that Priority Power's position is that it did do the

5    work to earn the fees that are in dispute, and that the

6    Celsius executives simply acknowledged rights that the

7    parties had under the contract, not that anything was

8    released, that those fees that were voluntarily paid were in

9    fact earned, too.

10         And Mr. Hooper did correctly point out we have a

11   motion to dismiss on file that goes in much more detail

12   about our vantage point of the case, Your Honor, but from

13   our perspective, hearing that in September will hopefully

14   allow us to trim this case to the core contract dispute, and

15   we'll work with counsel, obviously, work through all of the

16   discovery issues on that.  Thank you.

17         THE COURT:  I'm fine with the plans to do the

18   motion to dismiss.  I'm going to reserve, after I have the

19   briefing, whether we go forward with the hearing on the date

20   you selected or not.  I don't let things linger, so if the

21   date gets moved, it's just because my calendar just doesn't

22   permit me to do it, to spend the time preparing for it.  So

23   you'll get -- it isn't going to get delayed for a long time.

24   I just reserve perhaps changing that date.  Okay?

25         MR. LAYRISSON:  Understood, thank you, Your Honor.

1            THE COURT:  Okay, I will get one of my law clerks

2     to send you -- it's clearly a draft, and you can tinker with

3     it to a limited extent.  It's a format that I've used often

4     for more complicated adversary procedures.  Okay, it just

5     picks up from the Federal Rules of Civil Procedure, which

6     don't always make sense for the simple garden variety

7     adversary proceeding.  Okay?

8            MR. LAYRISSON:  Thank you, Your Honor.

9            MR. HOOPER:  Thank you, Your Honor.

10           THE COURT:  Thanks very much.  And I appreciate

11    the two of your cooperating and working out the details on

12    the schedule.  Okay?

13           MR. HOOPER:  Of course, thank you.

14           MR. COLODNY:  Judge --

15           THE COURT:  So I guess, am I correct, the next

16    thing on the agenda is the employee-related APs?

17           MR. COLODNY:  That's correct, Your Honor.  Aaron

18    Colodny on behalf of Mo Meghji as the litigation

19    administrator.

20           THE COURT:  Go ahead.

21           MR. COLODNY:  So we filed six actions against

22    former executives and employees between July 10th and 12th.

23    The litigation administrator has also entered into tolling

24    agreements with other former executives and employees and is

25    attempting to resolve other claims consensually prior to

Page 129

1    bringing more litigation.  At the request of the Court, we

2    filed a status report, which was filed in the main case at

3    Docket Number 7632.  And it was also filed in the Meghji v.

4    Mashinsky et al adversary proceeding, which is adversary

5    proceeding Number 24-03667, and the adversary proceeding

6    concerning Mr. Yarwood, 24.03740.  I'm happy to go through

7    that status report with Your Honor now for the record.

8              THE COURT:  Go ahead.

9              MR. COLODNY:  So just to summarize, Your Honor, I

10   think two big issues, the first is service.  As you asked

11   Mr. Hershey to summarize the service before, we served all

12   US defendants in the Meghji v. Mashinsky et al adversary

13   proceeding on July 25th through mail.  We have, we believe,

14   three defendants that are located in Israel, and we have

15   sent the service packages to the Israeli central authority

16   for service on those defendants.

17             We understand that because of the war in Israel

18   that that may be delayed some time, but the process will

19   work there.  We also hand-delivered a package to the German

20   central authority on August 5th with respect to one

21   defendant who's believed to be in Germany, and that's Mr.

22   Johannes Treutler.  And so we believe that service has been

23   completed or is in process with respect to all of the

24   defendants in the Meghji v. Mashinsky adversary proceeding.

25             With respect to the requested stay, the Debtors,

Page 130

1    the Committee at the time, and the US Attorney's Office for

2    the Southern District of New York entered into a stipulation

3    that stayed equitable subordination claims against the

4    defendants, certain the defendants in the Mashinsky -- or

5    Meghji v. Mashinsky adversary proceeding in connection with

6    confirmation of the plan.  That stipulation was entered by

7    the Court at Docket Number 3450.

8             Since then, the criminal case with respect to Mr.

9    Mashinsky has been delayed from, I believe, it was

10   originally September 17th, and now it's January 25th, 2025.

11   And after we filed our complaint, the United States

12   Attorney's Office reached out to us and inquired about

13   extending that stay until the end of Mr. Mashinsky's

14   criminal trial.  The litigation administrator did not object

15   to that request.

16            We reached out to counsel for all of defendants

17   via email that we were aware of from the original Chapter 11

18   docket, and those located in the United States, as listed in

19   the status report, indicated they did not object.  However,

20   certain of those defendants did not wish to execute the

21   stipulation.

22            We did not receive a response from counsel to Roni

23   Cohen-Pavon, Daniel Leon, Aliza Landes, or Johannes Treutler

24   or the entities associated with Daniel Leon.  We filed a

25   stipulation last night, which is executed by the litigation

Page 131

1    administrator and the office for the US Attorney, which

2    would extend the stay of the proceedings until the earlier

3    of the end of Mr. Mashinsky's criminal trial for March 31st,

4    2024.  And we would ask that the Court enter that stay.

5                THE COURT:  I assume you mean March '25.

6                MR. COLODNY:  '25, that's correct, Your Honor.

7    Sorry for misspeaking.

8                THE COURT:  Does anybody else wish to be heard?

9                I've had other cases in which defendants in civil

10   actions were defendants in criminal cases, and the US

11   Attorney has, as always, requested a stay.  And I'm fine

12   with it, so let me just ask you, Mr. Colodny, since not

13   everybody has responded or appeared.  I'll approve the

14   stipulation.  Do you want to file just a short-form motion,

15   asking for the same relief as to any of the defendants

16   who've not been served or accepted service?

17               I just want to be sure that there's no issue about

18   -- it could extend their time to -- I don't know, however

19   you want to deal with -- they just haven't responded, so I

20   assume you're not going to move for default judgments within

21   the period that you're agreed to a stay with the US

22   Attorney.

23               MR. COLODNY:  No, we don't intend to, Your Honor.

24   And I can file a short-form motion for all defendants, and

25   so we're all covered on all bases, (indiscernible) --

Page 132

```
 1              THE COURT:  Yeah, just file a short form with a

 2    very simple order, and I will grant it and do that.

 3              MR. COLODNY:  Okay, will do, Your Honor.

 4              The next matter is Meghji v. Yarwood, which is

 5    Adversary Proceeding 24-03740.  This matter and the other, I

 6    believe, it's four adversary proceedings that are currently

 7    before Your Honor with respect to former employees, are

 8    based off of transfers on accounts of fail to sell token

 9    through the company's OTC desk, bonuses that were awarded

10    when sell token reached certain price threshold, and

11    preferential transfers.  With respect --

12              THE COURT:  Just so that the record is clear, give

13    me the lead defendant name in those cases, and maybe the

14    case number, just so we're clear which ones that we're

15    talking about.  Okay?

16              MR. COLODNY:  Absolutely.  The first one is, the

17    lead defendant is Darren Yarwood, and that is adversary

18    proceeding 24-03740.

19              THE COURT:  Okay.

20              MR. COLODNY:  The next case is, lead defendant

21    Niratar, N-I-R-A-T-A-R, and that's adversary proceeding 24-

22    03738.  Next is Ashley O'Brien as the lead defendant.

23    That's Adversary Proceeding 24-03739.  The next is Shahar

24    Peter.  Shahar is spelled S-H-A-R-A-R, Peter as in P-E-T-E-

25    R.  And that's adversary proceeding --
```

Page 133

1              THE COURT:  On the agenda you have Shahar as S-H-

2      A-H-A-R.  I'm looking -- I'm just looking at the agenda.

3              MR. COLODNY:  That's correct, Your Honor.  That is

4      how it's listed on the agenda.  I can confirm spelling.

5      That might have been my mistake in my notes.

6              THE COURT:  Go ahead.

7              MR. COLODNY:  And that's adversary proceeding 24-

8      03741.  And then, the last is lead defendant Yarden Noy.

9      Yarden is Y-A-R-D-E-N.  Noy is N-O-Y.  And that's Adversary

10     Proceeding 24-03976.  Each of those seeks the avoidance of

11     transfers based off of OTC sales, bonuses that were awarded

12     when the sell token reached a certain price for preferential

13     transaction.

14             Mr. Yarwood is located in the United States, and

15     service was completed on Mr. Yarwood by mail on July 25th.

16     The litigation administrator initially agreed to extend the

17     deadline for Mr. Yarwood's answer and then negotiate a

18     stipulation that was filed last night, which is

19     substantially similar to the stay that we just discussed

20     with respect to the Mashinsky et al adversary proceeding.

21     Mr. Yarwood has agreed to that stay and executed the

22     stipulation, which was filed in that adversary proceeding

23     last night.  And we would request that the Court enter that

24     stipulation, which is executed by both the US Attorney and

25     the defendant in that action.

1                THE COURT:  All right, it's approved.

2                MR. COLODNY:  Thank you.

3                THE COURT:  Just make sure I have the stipulation

4    in Word format so it can be entered on the docket.

5                MR. COLODNY:  We emailed that to Your Honor's

6    chambers last night.

7                And then, the last four, we believe each of those

8    defendants are in Israel.  Service was commenced, I believe,

9    on August 2nd, and that is still in process pursuant to the

10   Hague Convention.  Those defendants have not been served at

11   this time.

12               THE COURT:  Okay, anything else to report?

13               MR. COLODNY:  I don't believe so, Your Honor.

14   That's all I had for you today.

15               THE COURT:  All right, is there anything else on

16   the agenda that we need to cover today?

17               MR. COLODNY:  I don't believe so, Your Honor.  I

18   believe those were the last matters.

19               THE COURT:  All right, all right, does anybody

20   else have any last comments they want to make before we

21   adjourn?

22               All right, thank you very much, everyone, for your

23   participation today.  We are adjourned.

24               MR. HERSHEY:  Thank you, Your Honor.

25               MR. COLODNY:  Thank you very much for your time.

Page 135

1          (Whereupon these proceedings were concluded at

2   12:36 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                       **I N D E X**

2

3                       RULINGS

4                                              Page      Line

5    Litigation stayed                         119        3

6

7    Plans for motion to dismiss               127       17

8

9    Stipulation approved                      131       13

10

11   Order to file form                        132        2

12

13   Stipulation approved                      134        1

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

1                       C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 28, 2024