Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | ) (Jointly Administered) |

**POST-EFFECTIVE DATE DEBTORS'
STATEMENT RELATING TO SELECTION OF
COINBASE AND DETERMINATION OF THE 100 CORPORATE
CREDITOR LIMIT FOR LIQUID CRYPTOCURRENCY DISTRIBUTIONS**

In response to the issues relating to the Corporate Creditor Motion [Docket No. 4911],[2] the Post-Effective Date Debtors submit this statement of facts setting forth their view of the pertinent

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Terms capitalized but not defined in this Motion have the meaning ascribed to them in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be amended, modified, and supplemented from time to time, the "Plan") and the *Motion Seeking Entry of an Order (I) Authorizing Supplemental Distribution to Eligible Corporate Creditors, (II) Approving Procedures for Supplemental Corporate Creditor Distributions, and (III) Granting Related Relief* (the "Supplemental Distribution Motion"), filed contemporaneously herewith, as applicable,.

facts relating to the selection of Coinbase, the negotiations regarding the limit on the number of corporate creditors receiving Liquid Cryptocurrency from Coinbase, the decisions made with respect to distributions to corporate creditors, and the discussions and coordination between the Post-Effective Date Debtors and the Committee, and respectfully state as follows:

**Statement of Facts**

**I.     Selection of Coinbase as Corporate Distribution Agent and Initial 100 Corporate Creditor Limit.**

1.      One of the principal goals of the Debtors in developing the Plan was to distribute as much Cryptocurrency to as many creditors as possible in a regulatorily compliant manner. Given that the Debtors had approximately 375,000 creditors, with many individualized circumstances, in over 165 countries with fast-changing regulatory landscapes, the Debtors knew that not everyone would be able to receive Cryptocurrency, and many would not be able to receive distributions of the same type or proportion of Cryptocurrency they had originally deposited, but they worked to maximize the amount of Cryptocurrency that could be distributed to creditors.

2.      In furtherance of this goal, the Debtors, the Committee, and their respective advisors spent a significant amount of time evaluating potential options for distributing Liquid Cryptocurrency under the Plan to try to determine which option would best allow for the safe, secure, and reliable distribution of Liquid Cryptocurrency to creditors all over the world while maintaining regulatory compliance. As part of this process, the Debtors, in close consultation with the Committee, considered making Liquid Cryptocurrency distributions using the Debtors' existing customer platform and also evaluated eight different potential Distribution Agent partners.

      **A.     Third-Party Distribution Agent Selection Process.**

3.      The Debtors considered many different factors in evaluating potential Distribution Agents, including the potential agent's (a) ability to safely and reliably make distributions to

2

Celsius creditors all over the world (Celsius creditors reside in over 165 countries), (b) regulatory compliance, (c) security and risk controls, and (d) financial resources. This evaluation framework was designed to ensure (as much as possible) that the potential Distribution Agent would be able to withstand regulatory scrutiny and that the Distribution Agent had sufficient financial wherewithal such that it was not likely to file its own bankruptcy proceedings in the event of a downturn in the cryptocurrency market.

4.      By July 2023, the Debtors had determined (and the Committee agreed) that PayPal was a highly qualified and respected institution that could serve as a Distribution Agent. PayPal satisfied the criteria of operational capacity, regulatory compliance, security protocols, and financial wherewithal. Additionally, based on a preliminary analysis, it appeared that many Celsius creditors already had PayPal accounts, which would make it easier for those creditors to receive their distributions because they would not have to open a new account with PayPal. Accordingly, the Debtors included in the Disclosure Statement that PayPal was expected to be a Distribution Agent (subject to final negotiation of the terms of the distribution agreement). *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* at 25 [Docket No. 3332].

5.      Unfortunately, PayPal only offers full cryptocurrency services within the United States (excluding Hawaii) and provides more limited cryptocurrency services within the United Kingdom and Luxembourg. Additionally, at that time, PayPal did not offer any distribution services for corporate creditors. Accordingly, another method of distribution would be needed to distribute Liquid Cryptocurrency to Celsius' international and corporate creditors, which (by number) constituted approximately 56.5% and 0.5% of Celsius' creditors, respectively, and were spread across more than 165 different countries.

6. Identifying a qualified Distribution Agent for these creditors proved to be much more challenging than the selection of PayPal for U.S. distributions to retail creditors. First, although there were many potential Distribution Agents with licenses in some countries, finding one that had the requisite licenses in a majority of the more than 165 countries that Celsius creditors lived in was difficult. Additionally, the Debtors had concerns regarding the financial health and regulatory stature of several of the potential Distribution Agents. As for corporate creditors, distributions to corporate entities are much more challenging than distributions to individuals. This is due to the heightened know-your-customer, sanctions, and anti-money laundering requirements for non-individual creditors, which take significantly longer to complete than those for individual creditors. Distribution Agents typically have automated KYC services that allow for the verification of an individual retail customer to take place quickly and cost-effectively by validating a potential customer's government issued identification documents and other personal information (such as a date of birth) to ensure the retail customer is not on restricted or sanctions lists. Onboarding a corporate entity requires the same level of KYC and screening as retail customers for each of the beneficial owners of such corporate entity. This is to ensure that the individuals who own the corporate entity are not themselves on a restricted or sanctions list. In addition, the corporate entity itself must be validated and screened through review of its official formation documents and tax ID number(s), and additional documentary evidence may be required based on jurisdiction or other customer-specific criteria. In some cases, corporate entities have beneficial owners who are also corporate entities, and may require further validation and screening of that separate entity's beneficial owners (*i.e.*, several layers of review of beneficial owners). This heightened KYC obligation means that a lawyer or other compliance expert may have to analyze the legal documents of the entity to determine the beneficial owners (as opposed to the more

automated process for retail customers). Regulatory requirements also mandate that this KYC process must be repeated periodically (to ensure that beneficial owners did not change through an assignment or other transaction).

7. The Debtors, the Committee, and their advisors stayed in close contact regarding identifying one or more additional Distribution Agents, with the primary focus being to find a partner for international customers given the size of that constituency (more than half of all individual creditors). Each party worked their connections in the industry—if the Debtors had a relationship with one potential agent, they would take the lead on the outreach, and if a member of the Committee or its advisors had a relationship, that party would take the lead in introducing the relevant party to the Debtors.

8. For Coinbase, the outreach soliciting a distribution proposal came from one of the Committee's bankers, who reached out in July 2023 to request that Coinbase make a proposal to the Debtors to serve as a Distribution Agent for international creditors. On August 1, 2023, Coinbase made an initial proposal by e-mail, delivered jointly to the Committee and the Debtors, for Coinbase to make distributions to international "retail" creditors (*i.e.*, individual, non-corporate creditors). That proposal was clear in several places that it was only to distribute Liquid Cryptocurrency to "retail" creditors (*i.e.*, not corporate creditors).

9. Coinbase's proposal was intriguing to the Debtors for several reasons—Coinbase supported cryptocurrency distributions in over 100 countries, and it is one of the largest and most reputable cryptocurrency firms in the world. Coinbase is a publicly traded company on the NASDAQ, is well capitalized, holds all required licenses in its supported jurisdictions, and met the financial wherewithal requirements that certain other firms did not (as described further below).

5

10.     While Coinbase's initial proposal was clearly limited to retail customers, Coinbase has a "Coinbase Prime" service that is offered to corporate entities. That is, Coinbase does make cryptocurrency distributions to corporate entities (while, on the other hand, PayPal does not offer any cryptocurrency distributions to corporate entities). On August 4, 2023, a Celsius representative e-mailed Coinbase to ask if Coinbase would consider making any distributions to corporate creditors. The parties discussed the request, and Celsius provided aggregate data on its creditors (both retail and corporate) for Coinbase to review as they continued discussions on the proposal. After additional discussion, in an e-mail sent on August 15, 2023 (after the Disclosure Statement Hearing), Coinbase first suggested that it thought Coinbase could "get comfortable supporting 100 or so" corporate creditors, and on August 16, 2023, Coinbase confirmed via e-mail that it "could support 100" corporate creditors. Ordinarily, Coinbase charges corporate customers $1,000 to open an account because of the intensive KYC process described above, but Coinbase agreed to waive that fee and facilitate Liquid Cryptocurrency distributions to these 100 corporate creditors.

11.     Celsius evaluated its own data and estimated at the time (in August 2023) that if distributions in Liquid Cryptocurrency were made to the 100 largest corporate creditors (to fill the 100 slots offered by Coinbase), those distributions would cover approximately 80% of the value to be distributed to all corporate creditors (estimated to cover about 6% of the corporate creditors by number, which was at the time estimated to be about 1,700 entities).

12.     After the Debtors completed the vetting process for the eight potential Distribution Agents under evaluation, Coinbase was the only potential Distribution Agent who was willing to make distributions to any corporate creditors in Liquid Cryptocurrency and who also satisfied the Debtors' criteria (described in greater detail in paragraph 3, above). There were two other potential

6

Distribution Agents who the Debtors seriously considered, but the Debtors had serious concerns about their ability to serve as a Distribution Agent. For one of those Distribution Agents, the Debtors had concerns about the party's regulatory fitness and believed that the party could likely end up embroiled in litigation with regulators without sufficient financial wherewithal to survive this protracted litigation. The Debtors were concerned about the other potential Distribution Agent's financial wherewithal and operational abilities; after an initial round of diligence and questions, it appeared that the party did not have the operational capacity necessary to make the distributions in a regulatorily compliant way. The Debtors communicated these concerns to the Committee as part of their close consultation on the selection of another Distribution Agent, and those concerns were discussed at length as the parties evaluated the selection of the second Distribution Agent.

### B. Self-Facilitated Distribution Considerations.

13. As part of evaluating potential Distribution Agents under the Plan, the Debtors and the Committee also evaluated whether the Debtors could make some or all distributions through Celsius' existing technological infrastructure. The main concern was one of cost and risk—operating the Debtors' existing platform was extremely labor-intensive (with large teams required for distributions, IT, regulatory compliance, and customer care), which came with a steep price tag. Additionally, the Committee expressed concerns about the risk of the Debtors' employees leaving on or after the Effective Date, and the high cost to replace those employees with temporary employees or outside advisors.

14. After the Disclosure Statement was approved, the Debtors and their advisors continued to evaluate the potential regulatory hurdles to self-facilitating Liquid Cryptocurrency distributions. The Debtors had previously determined to use their platform to make Custody

distributions by allowing creditors to withdraw their Custody Assets from their accounts. This raised no regulatory issues because the Debtors were not making a payment or distribution to Custody Holders. They were simply allowing Custody Holders to pick up their property. Also, the Custody withdrawal process began and was substantially completed during the Chapter 11 Cases, when the Debtors' platform was still intact and the Debtors still employed the personnel necessary to maintain the platform. By contrast, the Debtors determined that they could not use their platform for Liquid Cryptocurrency distributions to non-Custody creditors (retail or corporate) for multiple reasons. First, and most critically, the regulatory analysis was more complex for non-Custody distributions.[3] The Debtors (with the assistance of counsel) determined that in order to proceed with distributions to non-Custody creditors in a regulatorily compliant way, the Debtors would need to retain local counsel in every state and over 165 foreign jurisdictions to provide an opinion that distributions to creditors were permitted under applicable law and regulations. Moreover, there was a risk that (even if the requisite opinions were obtained) regulators would not permit Celsius to make these distributions itself—the Debtors and their advisors had regular conversations with state and federal regulators regarding distributions under the Plan, and the regulators continually asked about the licenses that the Debtors' Distribution Agents held. The Debtors did not hold any money-transmission licenses, which was the subject of scrutiny by regulators prepetition, so there was a real risk that regulators would not allow the Debtors to make these distributions. Second, keeping the Celsius platform open to make distributions to all creditors would have been extremely costly due to the personnel needs to keep the platform open. Third, regulators had expressed concerns about the Debtors distributing

---

[3] The Debtors had a Court order that provided that Cryptocurrency in the Custody program legally did not belong to the Debtors. As a result, a Custody "distribution" was just the return of the Account Holder's property, which did not raise the same regulatory considerations as other Plan distributions.

8

Cryptocurrency other than bitcoin and ether (versus the more than 50 Cryptocurrencies to be distributed through Custody distributions) to non-Custody creditors, making it was much more cost-effective to outsource Liquid Cryptocurrency distributions to non-Custody creditors than to keep the Debtors' platform open to make such distributions.

15.     Ultimately, in late August 2023, the Debtors determined, and the Committee agreed, that Coinbase was the best, most reliable option for distributions to international and corporate creditors. In particular, as discussed in paragraph 12 above, the Debtors did not believe that the two other Distribution Agent options both had the operational capacity and financial wherewithal to make the distributions contemplated by the Plan in a regulatorily compliant way without the risk of their own financial distress. The Committee did not express a different view to the Debtors, and agreed with the Debtors' determination that Coinbase should be the second Distribution Agent.

## II.     Further Discussions Regarding 100 Corporate Creditor Limit and Finalization of Coinbase Distribution Agreement

16.     The Debtors and Coinbase continued to negotiate the terms of the distribution agreement for several months; a draft was filed with the Plan Supplement on October 20, 2023, but the final agreement was not signed until on or around October 25, 2023 (after the Debtors' case in chief in support of confirmation of the Plan was completed). Discussions between the Debtors and Coinbase continued even after the agreement was signed in connection with the preparations for distributions. Those negotiations were at times challenging. That said, those negotiations were very successful—the Debtors managed to negotiate to significantly reduce Coinbase's fees for distributions to retail creditors from their initial proposal and to get Coinbase to agree to support Liquid Cryptocurrency distributions for 100 corporate creditors.

9

17. One of the more contentious aspects of the negotiations was the number of corporate creditors to which Coinbase would agree to distribute Liquid Cryptocurrency. When Coinbase initially indicated it would support up to 100 corporate accounts, the Debtors pushed for Coinbase to make distributions to even more creditors, a position the Committee strongly agreed with. Over the following months, the Debtors' principals repeatedly asked Coinbase to agree to facilitate distributions to more than 100 corporate creditors. In particular, at one point after the distribution agreement with Coinbase was signed, the Debtors offered to re-open the terms of the arrangement with Coinbase to offer to pay more to Coinbase if it would agree to facilitate distributions to more than 100 corporate creditors—but Coinbase declined, explaining that it was a service point, not an economic one.

18. The last time that the Debtors pushed Coinbase for additional corporate creditor slots was in mid-January 2024, when the distribution plan was being finalized.[4] Although Coinbase indicated it might be able to make distributions to as many as 10 to 15 additional corporate creditors, that was the extent of their flexibility. The Debtors' view was that adding an additional 10 or 15 slots just before the distribution plan was finalized would add unnecessary complexity given the limited benefit to just a handful of additional creditors. Accordingly, the Debtors did not move to formalize an agreement for a total of 110 to 115 corporate creditors, and instead treated the distribution plan (as it relates to Coinbase) as for only 100 corporate creditors.

19. The Debtors at all times understood that Coinbase was only able to make distributions to 100 corporate creditors. The Debtors did not specifically consider trying to force Coinbase to make distributions to all (approximately 1,900) corporate creditors. The Debtors were

---

[4] To be clear, the Post-Effective Date Debtors did not instruct Coinbase to make distributions to more than the initial 100 corporate creditors.

10

focused on finalizing the distribution plan with the assistance of the Distribution Agents and launching distributions successfully upon the anticipated Effective Date of January 31, 2024.

20.  Accordingly, the Debtors proceeded with their distribution plan assuming that Coinbase would only make distributions to up to 100 corporate creditors, consistent with the various discussions and agreements between the parties. The Debtors viewed this as consistent with the terms of the Plan, because the Debtors did not believe that there was a Distribution Agent reasonably available to make distributions to more than 100 corporate creditors.

**III.  Selection Process for 100 Corporate Creditors, Approval and Implementation**

21.  After PayPal and Coinbase were selected as the Distribution Agents, the Debtors and their advisors began to design the specific distribution plan and process to ensure distributions to approximately 375,000 creditors who were expected to be entitled to receive distributions under the Plan. This was an incredibly complicated process given that the Debtors' creditors live in over 165 countries all over the world and have individual circumstances (including their geography or whether they were banned by PayPal and/or Coinbase, among other factors). In January 2024, the Debtors and their advisors created a master distribution plan which included the Debtors' view (as of January 2024) of whether or not each creditor would be able to receive Liquid Cryptocurrency or Cash. Key factors considered in creating this distribution plan included (a) whether the creditor lived (according to the Debtors' records) in a jurisdiction where a Distribution Agent could make a distribution in Liquid Cryptocurrency,[5] (b) whether the creditor was banned by that Distribution

---

[5]  Additionally, in the period from November 2023 through January 2024, the Debtors received approximately 11,000 requests from creditors to change their address, and many of these requests affected the creditor's eligibility to receive Liquid Cryptocurrency from a Distribution Agent. For example, a creditor may have moved from a jurisdiction that was supported by PayPal or Coinbase to one that was not—or vice versa.

11

Agent, and (c) for corporate creditors, whether such creditor was expected to be able to receive a Liquid Cryptocurrency distribution through Coinbase (as described further below).

22. The distribution plan was built around a record date of January 16, 2024 (the "Initial Distribution Record Date"). The Initial Distribution Record Date was critical because it "froze" the daily volatility of cryptocurrency prices—calculating initial distributions as of this date and setting aside the applicable amount of Liquid Cryptocurrency or Cash (as applicable) for distribution purposes prevented creditors' entitlements from being a continually moving target. The Debtors calculated creditor entitlements based upon the Initial Distribution Record Date and the cryptocurrency prices set forth in the Distribution Cryptocurrency Conversion Table filed pursuant to the Plan (with pricing as of January 16, 2024). Based on these calculations, the Debtors set aside Liquid Cryptocurrency and Cash to facilitate distributions to creditors and finalized and transmitted distribution instruction files to the Distribution Agents. To the extent necessary to ensure they had sufficient Cash for distributions, the Debtors converted Liquid Cryptocurrency to Cash, and the Debtors completed these conversions prior to the Effective Date and as close as possible to the Initial Distribution Record Date so creditors would receive their appropriate proportionate value of the Debtors' estates with cryptocurrency pricing as of that date, regardless of the form of distribution notwithstanding subsequent fluctuations in cryptocurrency prices. In other words, creditors who received Cash or Liquid Cryptocurrency as part of this initial distribution would receive the same value (as of the Initial Distribution Record Date) under the Plan.

23. For the corporate creditors, given that the Debtors understood that Coinbase was only able to make distributions to 100 corporate creditors, the Debtors had to allocate those 100 slots before finalizing the distribution plan. Throughout January 2024, the Debtors' advisors

consulted extensively with the Committee's advisors in determining how to best allocate the 100 corporate slots at Coinbase. The overarching goal was simple: distribute as much Liquid Cryptocurrency as possible to as many corporate creditors as possible. The advisors to the Debtors and the Committee analyzed the list of corporate creditors and confirmed that the vast majority of the value to be distributed was stratified in the very largest corporate creditors—the 100 largest corporate creditors were owed about 80% of the total value of all corporate creditors. The Debtors and the Committee considered two main alternatives: allowing the largest creditors the option to receive Liquid Cryptocurrency, or a lottery where 100 creditors would be randomly selected. The random lottery idea was quickly rejected—the Debtors and the Committee were focused on maximizing distributions of Liquid Cryptocurrency to creditors that wanted that form of consideration. Accordingly, the Debtors and the Committee agreed to move forward with an election form whereby the largest creditors would be solicited to determine whether they wanted Liquid Cryptocurrency or Cash (to ensure that the limited 100 slots were used on corporate creditors that preferred Liquid Cryptocurrency).

24. On January 19, 2024, the Debtors sent the election form to the largest 250 corporate creditors. That number was chosen because the Debtors wanted to solicit enough feedback that at least 100 corporate creditors would likely respond, without over-soliciting or under-soliciting. As it turns out, approximately 150 corporate creditors responded by the deadline of January 23, 2024—27 of which elected a Cash distribution and 118 of which elected a Liquid Cryptocurrency distribution through Coinbase. In addition, 8 corporate creditors contacted the Debtors regarding the election form but failed to make an election by the deadline for various reasons, 94 corporate creditors were sent the election form but failed to respond to the election form or otherwise contact

the Debtors, and 3 corporate creditors did not have an e-mail address on file with Celsius and were not sent the election form.

25. Once the Debtors received the responses from corporate creditors, they allocated the slots to the 100 largest creditors who had opted for Liquid Cryptocurrency, excluding those who had unresolved Withdrawal Preference Exposure as had been explained in the notice. Specifically, those with Withdrawal Preference Exposure were not entitled to receive distributions until their Withdrawal Preference Exposure was resolved, and so the Debtors determined (and the Committee agreed) that the slots should not be used on a party who might not be eligible for a distribution during the one-year term of the Coinbase distribution contract. This allowed the Debtors and their advisors to finalize the distribution plan, including the distribution amount and Distribution Agent for each creditor, on or around January 25, 2024.

26. The Debtors and their advisors sought approval from their Special Committee of the Board of Directors of Celsius Network Limited, which was empowered to approve all actions relating to the Chapter 11 Cases on behalf of the Debtors. Specifically, during numerous meetings of the Special Committee in January 2024, the Debtors and their legal and financial advisors presented the distribution plan and answered the questions of the directors. Those presentations included the fact that distributions of Liquid Cryptocurrency would only be to 100 corporate creditors and a description of the election process for the 250 largest corporate creditors. Final approval of the distribution plan by the Special Committee was received at the meeting held on January 29, 2024.

27. Below is a high-level timeline detailing the Distribution Agent selection process and the process for allocating the 100 slots to Corporate Creditors:

| Event | Date |
|---|---|
| PayPal selected as US distribution agent for retail creditors | **July 2023** |
| Coinbase proposal solicited for international creditors | **July 2023** |
| Initial proposal received from Coinbase for retail creditors only | **August 1, 2023** |
| Celsius asks if Coinbase can service corporate creditors | **August 4, 2023** |
| Disclosure Statement Hearing; Disclosure Statement approved | **August 14, 2023** |
| Coinbase indicates it can make distributions to 100 corporate creditors | **August 15-16, 2023** |
| Debtors and Committee select Coinbase as second Distribution Agent, Debtors and Coinbase begin negotiating documentation | **Late August 2023** |
| Presentation to Court on distribution process under the Plan, including that Liquid Cryptocurrency distributions would only be made to 100 corporate creditors [Docket No. 3428] | **September 7, 2023** |
| Confirmation hearing dates | **October 2 – 4, 2023**<br>**October 16 – 17, 2023**<br>**October 24, 2023**<br>**October 30, 2023** |
| Coinbase distribution agreement signed | **October 25, 2023** |
| Confirmation Order entered | **November 9, 2023** |
| SEC notified Celsius that it would not approve the pre-clearance letter for the NewCo Transaction | **November 9, 2023** |
| MiningCo motion filed | **November 30, 2023** |
| MiningCo motion approved | **December 27, 2023** |
| Distribution FAQ filed | **January 11, 2024** |
| Distribution Record Date of January 16, 2024 (price of BTC is $42,975 and the price of ETH is $2,577); Prices as of this date are used for the Debtors' calculation of distribution allocations and to set aside Liquid Cryptocurrency and Cash to make distributions to creditors | **January 16, 2024** |

15

| Event | Date |
|---|---|
| Debtors send notice to top 250 corporate creditors asking them to make an election to receive cryptocurrency or cash | **January 19, 2024** |
| Deadline for corporate creditors to respond to notice | **January 23, 2024** |
| Effective Date of the Plan | **January 31, 2024** |
| First letter filed on corporate distributions | **February 15, 2024** |
| Omnibus Hearing where corporate creditor issue is discussed in Court; Court directs Post-Effective Date Debtors to file a response | **March 20, 2024** |
| Post-Effective Date Debtors file a response on distribution issues, including corporate creditor issue | **April 4, 2024** |
| Corporate Creditor Motion filed | **June 3, 2024** |
| Post-Effective Date Debtors file Omnibus Objection to Corporate Creditor Motion | **June 20, 2024** |
| Initial hearing on Corporate Creditor Motion | **June 28, 2024** |
| Post-Effective Date Debtors file supplemental objection to Corporate Creditor Motion | **July 23, 2024** |
| Movants file a reply in support of Corporate Creditor Motion | **July 26, 2024** |
| July hearing on Corporate Creditor Motion; motion adjourned to August 27 hearing | **July 29, 2024** |

[*Remainder of page intentionally left blank.*]

| | |
|---|---|
| New York, New York<br>Dated:  August 29, 2024 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900<br>Email:             joshua.sussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:      (312) 862-2200<br>Email:             patrick.nash@kirkland.com<br>                       ross.kwasteniet@kirkland.com<br>                       chris.koenig@kirkland.com<br>                       dan.latona@kirkland.com<br><br>*Counsel to the Post-Effective Date Debtors* |