Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  One Bowling Green

13                  New York, NY 10004-1408

14

15                  September 12, 2024

16                  2:03 PM

17

18

19

20

21  B E F O R E :

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: UNKNOWN

1    HEARING re Status Update on Distributions and Preference

2    Settlements. (Doc ## 7676)

3

4    HEARING re Hearing Using Zoom for Government RE: Joint

5    Motion Seeking Entry of an Order (I) Authorizing

6    Supplemental Distribution to Eligible Corporate Creditors,

7    (II) Approving Procedures for Supplemental Corporate

8    Creditor Distributions, and (III) Granting Related Relief.

9    (Doc# 7661, 7665 to 7667, 7673, 7675, 7677)

10

11    HEARING re Hearing Using Zoom for Government RE: Post-

12    Effective Date Debtors Motion for Entry of an Order

13    Authorizing the Post-Effective Date Debtors to Redact and

14    File Under Seal Certain Confidential Terms of the

15    Supplemental Coinbase Agreement. (Doc## 7659, 7661)

16

17    HEARING re Hearing using Zoom for Government RE: Motion to

18    Compel Plan Treatment. (Doc# 4911 to 4914, 4916 to 4923,

19    4928, 4929, 4934, 4935, 4938 to 4940, 4944 to 4947, 4786,

20    4950, 4952 to 4954, 4956, 4958, 4959, 4961, 4963, 4964, 4966

21    to 4968, 4974, 4976, 4985, 4986, 4988, 5194 to 5197, 5594,

22    6569, 7535 to 7538, 7551, 7554, 7557, 7562, 7571, 7575,

23    7608, 7660)

24

25

Page 3

1    HEARING re Hearing Using Zoom for Government RE: Motion to

2    Direct Celsius to Issue Australian Corporate Creditors with

3    Bitcoin (BTC) and Ether (ETH), not USD Cash, for those who

4    Remain Unpaid their Distributions in the Amounts of

5    Cryptocurrency that they Would Have Received for their

6    Claims as at the 15 January 2024 Prices Fixed by Celsius, or

7    in the Alternative, Motion to Compel that Celsius be

8    Directed to Issue Bankruptcy Proceeds to Australian

9    Corporate Creditors Only in USD Wire Transfers Rather than

10   Checks, ect. [sic] [Docket Nos. 6892, 7528, 7530, 7535,

11   7562, 7569, 7571, 7608, 7676, 7680].

12

13   HEARING re Hearing using Zoom for Government RE: Application

14   for Final Professional Compensation for RSM US LLP, Auditor,

15   period: 8/1/2023 to 11/9/2023, fee: $1,247,374.45, expenses:

16   $32,003.70. (Doc no. 4264, 4276, 4835, 4957, 4960, 3715,

17   4970, 7523, 7524, 7555, 7591, 7620, 7663) STIPULATION AND

18   ORDER ENTERED; SEE DOC. NO. 7524. HEARING Set for 9/12/2024

19   at 2:00 pm

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for the Debtor

 5         333 West Wolf Point Plaza

 6         Chicago, IL 60654

 7

 8    BY:  CHRIS KOENIG

 9         GABRIELLE ABBE

10

11    WHITE & CASE LLP

12         Attorney for Mohsin Y. Meghji, Litigation Administrator

13         1221 Avenue of the Americas

14         New York, NY 10020

15

16    BY:  LUCAS G. CURTIS

17

18    THE SARACHEK LAW FIRM

19         Attorney for Ad Hoc Committee of Corporate Creditors

20         670 White Plains Road, Penthouse Suite

21         Scarsdale, NY 10583

22

23    BY:  JOSEPH E. SARACHEK

24

25
```

Page 5

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the United States Trustee

3         One Bowling Green, Suite 534

4         New York, NY 10004-1408

5

6    BY:  SHARA CORNELL

7

8    GODFREY & KAHN, S.C.

9         Attorney for the Fee Examiner

10        1 East Main Street, Suite 500

11        Madison, WI 53703

12

13   BY:  KATHERINE STADLER

14

15   FREJKA PLLC

16        Attorney for the Fee Examiner

17        415 East 52nd Street, Suite 3

18        New York, NY 10022

19

20   BY:  ELISE S. FREJKA

21

22   ALSO PRESENT:

23   CHRISTOPHER SONTCHI

24   SEAN XUE

25

1                    P R O C E E D I N G S

2              THE COURT:  Good afternoon, everybody.  This is

3    Judge Glenn.  We're going to move forward with the items as

4    listed on the amended agenda, and we'll start with the

5    status update on distributions.

6              MR. KOENIG:  Good afternoon, Your Honor.  It's

7    Chris Koenig, from Kirkland & Ellis, on behalf of Celsius.

8    Can you hear me okay?

9              THE COURT:  I can.

10             MR. KOENIG:  Wonderful.  So we're just going to go

11   through the distribution slides that we go through every

12   month.  We filed a presentation yesterday afternoon at

13   Docket Number 7676.  Deanna, could you make my colleague,

14   Ms. Gabrielle Abbe, co-host so that she can share the slide

15   and we can walk through quickly?

16             THE COURT:  And I have a copy in front of me, Mr.

17   Koenig.

18             MR. KOENIG:  Thank you, Your Honor.  So it's only

19   been about two and a half weeks since we updated these

20   figures.  I'm just going to wait for it to be on the screen

21   for a moment.

22             THE COURT:  Yeah.

23             CLERK:  Okay.  She's the co-host.

24             MR. KOENIG:  Thank you so much.  So it's only been

25   about two and a half weeks since we've updated these

Page 7

```
1    figures, so you wouldn't expect a lot of movement.  But
2    there has been improvement in the amounts of folks that have
3    successfully received cash transfers.  So if you look at the
4    column on the right, two weeks ago we were at 26 percent of
5    FIAT distributions by number and now we're at 31 percent.
6    That's due to the rollout of Hyperwallet, which we announced
7    a couple of weeks ago.  We're rolling it out on a rolling
8    basis to an increasing number of creditors every week.  So
9    we expect to see those numbers continue to climb in the near
10   future.
11          As we explained in the quarterly report that we
12   filed at the end of August, most of the creditors that
13   haven't received cash simply haven't cashed a check.
14   There's about 5,000 checks outstanding that were sent to
15   creditors that were owed $500 or less.  We recently voided
16   those checks.  They timed out after six months and we're
17   transitioning those folks over to Hyperwallet.  We're
18   hopeful that trying their distribution through a new method
19   will be successful.
20          That was all that I had.  It's only been two and a
21   half weeks since the last update we filed the report and Mr.
22   Ferraro spoke at the last hearing.  So unless Your Honor has
23   specific questions on the distribution process, we're happy
24   to continue to go through the agenda.
25          THE COURT:  I guess the only question I have is,
```

Page 8

1   and maybe because the amounts are still -- the additional

2   distributions are relatively small, looking at the last line

3   on the page, there's been no change in the value distributed

4   or percentage of creditors distributed.

5           MR. KOENIG:  Sure.  So there has been change in

6   the subset of the cash amount.  I would say for the PayPal,

7   Venmo and Coinbase folks, most of those folks have been

8   pending for upwards of six months.  And it's sort of -- it's

9   on them at this point to create a Coinbase account or to

10  click a link in their email.  We send folks emails every

11  time a distribution is attempted and isn't successful or

12  isn't claimed, reminding people, please go in and click the

13  link.  Please go in and make a Coinbase account.

14          As I think we explained at the last hearing, we're

15  in the process of transitioning people over.  If they've

16  been having trouble at Coinbase, they're sort of stuck in a

17  KYC process or something, we can transition them to

18  Hyperwallet.  Those folks that we've been transitioning,

19  it's been very successful.  So as we continue to scale that

20  up and roll that out, I expect that you're probably going to

21  see -- I expect you're probably going to see the most

22  movement in that third line, the Stretto Hyperwallet

23  because, frankly, we think it's the fastest, easiest way for

24  people to get their distributions.  And we're going to be

25  transitioning people that have been stuck in one

1   distribution method or the other to that Hyperwallet

2   distribution method.

3           But as we've talked about, we expect that you're

4   going to have people that just, for whatever reason, never

5   take action.  And as we explained in the quarterly report,

6   most of the creditors, by number, that haven't redeemed a

7   distribution have exceedingly small distribution amounts.

8   So it may just be that they don't want to take the steps

9   necessary to KYC to claim their distribution.  But as I

10  said, we continue to follow up with them, with

11  communications, reminding them of what they have to do,

12  offering tickets if they're having some sort of problem.

13  But we certainly -- we don't expect that that number is

14  going to reach 99 or 100 percent based on -- just based on

15  creditor activity in the case.  There are folks that, for

16  whatever reason, aren't going to cash a $50 check.

17          THE COURT:  All right.  Thank you, Mr. Koenig.  I

18  see Mr. Bronge's hand raised, but I'm not going to permit

19  anybody else to address this issue.  We've got a long

20  agenda, and I appreciate, Mr. Koenig, the presentation was

21  on the docket.  Let's move on to the next item, status

22  update on preference settlements.

23          MR. CURTIS:  Good afternoon, Your Honor.  Can you

24  hear me okay?

25          THE COURT:  Mr. Bronge, please put -- Mr. Bronge,

Page 10

1    please put your hand down.  Okay.  Who's going to --

2           MR. CURTIS:  Good afternoon, Your Honor.  Can you

3    hear me?

4           THE COURT:  Yes, I can.

5           MR. CURTIS:  Hi.  This is Lucas Curtis, from White

6    & Case, appearing on behalf of the litigation

7    administrators.  I'm going to give the court a brief update

8    on the status of the preference litigation settlements.

9           First, the settlement program passed a major

10   milestone last week.  We have surpassed over $100 million of

11   settlement commitments.  The litigation administrator has

12   settled with approximately 1,800 parties, and the litigation

13   administrator continues to engage parties to the customer

14   preference actions in an effort to reach settlement and

15   resolve their preference liability consensually without need

16   for further litigation.  To date, the litigation

17   administrator has received approximately 94 percent of

18   settlement payments owed, or more than $90 million.  The

19   litigation administrator thanks those parties who have

20   fulfilled their commitments under these agreements.

21          Nevertheless, there are approximately 100

22   counterparties who have failed to pay the amounts that they

23   owe.  The litigation administrator has tried for months to

24   address these parties' failure to pay, but to no avail.  We

25   have sent these parties multiple emails and letters

Page 11

1    reminding them of their contractual commitments and the

2    potential remedies if they do not comply.  Many of them have

3    not responded to these communications, despite the

4    litigation administrator's professionals using the same

5    contact information that was used through the course of

6    negotiating and executing settlements with these parties.

7    We are growing increasingly concerned that these parties

8    intend not to live up to their end of the deal.  We think at

9    this point we need the court's assistance.

10              We therefore wanted to preview with the court that

11   the litigation administrator intends to file next week a

12   motion to enforce these settlement agreements against

13   parties who, despite all of our efforts, still have not paid

14   the full amount owed under their settlement agreements.

15   While the motion itself will detail the specific relief that

16   the litigation administrator is seeking, in sum, we plan to

17   seek an order from the court directing identified settlement

18   counterparties to pay the amounts they owe within 30 days.

19   We hope that a court order will cause these parties to

20   reengage and perform the terms to which they agreed.  For

21   those parties who fail to follow the court's directive to

22   pay within the 30-day period, the litigation administrator

23   plans to file complaints against them, bringing causes of

24   action arising from the breach of the settlement agreement's

25   terms.

Page 12

1          In the meantime, we would like to reiterate to

2     those parties who have settled and have failed to pay the

3     settlement amount, please pay your full settlement amount or

4     reach out to the litigation administrator's professionals

5     with any issues that there may be.  If there are

6     circumstances that are affecting your ability to timely pay,

7     please contact litigation administrator's professionals so

8     we may address those concerns.  We thank the court for its

9     time and are happy to address any of the court's questions.

10          THE COURT:  I say just by looking at the docket in

11     the main case today, there were 11 adversary proceedings

12     that were closed.  Going back, and there have been others, I

13     just quickly looked at those.  Just briefly describe these

14     are what, settlements that have been effectuated where the

15     litigation administrator received the payments and the cases

16     are closed?

17          MR. CURTIS:  So in the case of these voluntary

18     dismissals, yes, they were executed and we received the

19     settlement amounts under those cases.  The ones that we are

20     referring to, that we would direct to enforce settlement

21     agreements, we executed the settlement agreements, but they

22     have not paid the full amount of what they owe by the time

23     allotted within the settlement agreement.

24          THE COURT:  All right.  Thank you very much.  All

25     right.

Page 13

1                    MR. CURTIS:  Thank you.

2                    THE COURT:  Let's move on.  Let's move on to the

3        next item of agenda.  It's the uncontested matters.  First

4        is a motion to seal, which is at ECF Docket 7659.  It's to

5        seal certain confidential terms of the supplemental Coinbase

6        agreement.  Who's going to argue that?

7                    MR. KOENIG:  I am, Your Honor.  Again, it's Chris

8        Koenig, Kirkland & Ellis, for Celsius.  As you mentioned, we

9        filed the motion at 7659.  This seeks to seal the economic

10       arrangements between Celsius and Coinbase in the

11       supplemental distribution addendum as commercial

12       confidential information pursuant to Section 107(b) of the

13       Bankruptcy Code.

14                    More specifically, if the pricing that Coinbase

15       was willing to offer Celsius in order to resolve this motion

16       was publicly available, Coinbase's competitors could use

17       that information to their competitive advantage.  Part of

18       the agreement with Coinbase was that we seek to seal this

19       information for exactly this reason.  Coinbase

20       understandably does not want their competitors to obtain

21       confidential pricing information that would give them an

22       advantage.  We sealed the economics of the first

23       distribution agreement with Coinbase as well.  As you

24       mentioned, no parties objected to the motion.  I'm happy to

25       answer any questions Your Honor has, but otherwise, we would

Page 14

1    respectfully request sealing of this information.

2              THE COURT:  The objection deadline on this motion

3    was 4:00 p.m., September 5.  No objections were filed.  The

4    motion is granted.

5              MR. KOENIG:  Thank you, Your Honor.  Next up is

6    the related joint motion to make a supplemental distribution

7    to corporate creditors.  That's a Docket Number 7661.  Your

8    Honor, we've had a number of hearings on this matter

9    already, so I won't go into too, too much detail on the

10   background.  I'll just hit the high points.

11             This corporate creditor issue has been one of the

12   most complex and contentious issues since we emerged from

13   bankruptcy.  Mr. Saracek, who represents the ad hoc group of

14   corporate creditors, filed a motion on behalf of the Faller

15   creditors back in early June at Docket 4911.  We had an

16   initial hearing on this motion in July.  And at that

17   hearing, Your Honor, although you did not rule, Your Honor,

18   suggested that we fix this issue with the corporate

19   creditors.  So we have done just that.

20             We went to a two-day mediation with the ad hoc

21   group of corporate creditors, Coinbase, the litigation

22   administrator and the litigation oversight committee, and

23   certain other creditors who joined us at that mediation.

24   And that mediation was open to anyone who wanted to

25   participate.  Guided by Judge Bentley, the debtors were able

1     to reach a term sheet that was signed by Celsius, the ad hoc

2     group of corporate creditors and Coinbase that resolves the

3     motion that was brought by Mr. Sarachek's group.

4          In short, the supplemental motion that we filed

5     two weeks ago provides for a streamlined process for

6     corporate creditors to receive the liquid cryptocurrency

7     that they would have received under the plan if they were

8     initially scheduled for a liquid cryptocurrency distribution

9     back in January of this year.  That is, these corporate

10    creditors will receive an amount of crypto that would give

11    them approximately 58 percent of their claim at the January

12    16th prices that we use to calculate distributions under the

13    plan.

14         Now, we've talked at several hearings and

15    explained in all of our court papers how complicated and

16    time consuming the KYC process is for corporate creditors,

17    because applicable regulations requires that these

18    corporations provide significant corporate organizational

19    documents and beneficiary information, and then for the

20    distribution agent, here, Coinbase, to have senior

21    compliance agents, often lawyers, review all of these

22    corporate organizational documents and other KYC

23    information.  And that's to make sure that the beneficial

24    owners of the corporation are not on some sort of a banned

25    list, restricted list.  They aren't a Russian oligarch or on

1    a terrorist watch list or something like that.  The

2    difficulties in the KYC process remain.  They don't

3    magically go away simply because we have a resolution on the

4    motion.

5              So although there is an option for every corporate

6    creditor to receive cryptocurrency from Coinbase under this

7    supplemental motion, we do expect that an equivalent amount

8    of cash will be much faster for these creditors.  So what

9    we've done is we've given people the option to receive cash

10   instead at today's market prices, or the market prices at

11   the time that we sell their crypto, and that'll allow them

12   to get their distributions faster and they can do whatever

13   they want with it.  If they want to buy back into the

14   cryptocurrency market and continue to ride the market, they

15   can absolutely do that.  And if they want to spend the cash,

16   obviously they can do that as well.

17             But from talking to Mr. Saracek and other

18   corporate creditors, we believe that most corporate

19   creditors would prefer to receive the market value of that

20   crypto now quickly in cash, so that they can use it to buy

21   back into the market, rather than wait what may be an

22   extended period of time to go through the extensive

23   onboarding and KYC process with Coinbase to receive a

24   cryptocurrency distribution.  But of course, if there are

25   folks that feel strongly and they want to receive a crypto

Page 17

1    distribution from Coinbase, they can go through the

2    onboarding process, and if they are successful, they will

3    receive a cryptocurrency distribution from Coinbase.

4           But again, what we're trying to do here is giving

5    corporate creditors the same treatment under the plan that

6    individual creditors have.  They have liquid cryptocurrency

7    at January 16th prices, or its equivalent in market prices

8    in cash if they want to get their distribution faster; that

9    is, implementing the plan and complying with the terms of

10   the plan.

11          There were two objections to the motion, one from

12   the U.S. trustee and one from an individual creditor.  The

13   main point of the U.S. trustee in its objection was that

14   this is somehow a plan modification that shouldn't be

15   allowed.  I'm somewhat perplexed by that argument.  What

16   we're doing here is giving corporate creditors the amount of

17   liquid crypto that they would have been entitled to on

18   January 16th, or because we all understand it's going to

19   take a bit of time if all corporate creditors elect that

20   option, we'll convert that liquid crypto to cash at market

21   prices and give it to them faster.  The plan provides for

22   conversion of crypto to cash at market prices, or vice versa

23   if a distribution agent changes for any particular creditor.

24   So again, this is not plan modification.  This is plan

25   implementation.

1          Your Honor indicated at the last hearing that you

2     thought that providing liquid crypto to all corporate

3     creditors is what the plan requires.  That is what we are

4     doing with some procedures for creditors to choose to get

5     cash if they want to receive a distribution faster.

6          The objections also talked about why the

7     distribution are coming from the disputed claims reserve.

8     But if the plan requires us to make these distributions to

9     corporate creditors, then the debtors have to use their

10    assets and make these distributions under the plan.  And the

11    reserve is for disputes about claims, just like the

12    corporate creditor motion.  And notably, we used this

13    reserve before when we filed the motion earlier this year to

14    fix the convenience claim issue, where we had a number of

15    creditors that complained that they had erroneously checked

16    the wrong box, and we filed a motion seeking authority to

17    allow them to rescind that election and receive a greater

18    distribution.  We used that reserve for that issue as well,

19    because that's what it's for.  It's for disputes about

20    claims and distributions under the plan.  We used

21    approximately $20 million in liquid cryptocurrency from the

22    reserve for that motion.

23         So again, here we are giving corporate creditors

24    what they are entitled to under the plan.  We are treating

25    them the same as individual creditors.  If that is what the

Page 19

1    plan requires, then individual creditors are not harmed

2    unfairly.  We are just giving fair treatment to corporate

3    creditors.

4            Notably, we have a supplemental agreement with

5    Coinbase to help implement this distribution to corporate

6    creditors.  Most importantly, the term of the existing

7    distribution agreement with Coinbase expires in early

8    November of this year.  So even if it is true that under the

9    existing agreement, we could compel Coinbase to make

10   distributions to corporate creditors, that agreement would

11   run out in November.  My assumption is that not too many

12   corporate creditors would be successful in receiving

13   distributions over the next two months.  So we needed to

14   solve that problem, and that would require Coinbase's

15   agreement.  And so Coinbase agreed, after arm's length

16   negotiations, that for any creditor that submits, any

17   corporate creditor that submits the onboarding package, the

18   KYC package, Coinbase will work through the onboarding

19   process with that creditor, even if it happens after the

20   agreement expires in November.  If that creditor is

21   ultimately successfully onboarded, whenever it is, whether

22   it's before November or after November, they will get a

23   distribution from Celsius through Coinbase.

24           We've been sort of calling this the standing in

25   line when the polls close provision.  If you're in line and

Page 20

1    the polls close, you still get to vote.  Here, if you've

2    submitted your onboarding package to Coinbase, they will

3    work through the onboarding process even after their

4    contract ends, no matter how long it takes.  I think that's

5    a pretty significant concession.

6         The objections took issue with Coinbase not

7    contributing monetarily to the settlement, but they're

8    absolutely contributing in a very material way through this

9    supplemental agreement.  We could not make these

10   distributions to corporate creditors without them.  The

11   objections seem to suggest that we should be suing Coinbase,

12   but litigation with Coinbase would be expensive, complex,

13   and frankly, an uphill battle.  There are limitations of

14   liability in their contract, and Celsius did not issue

15   formal instructions to Coinbase for more than 100 corporate

16   creditors.  So we're pleased to be able to reach this

17   supplemental agreement with Coinbase that will give an

18   option for the corporate creditors who really want to

19   receive crypto to receive their distribution in crypto.

20        The last thing that I wanted to say in my opening

21   remarks is that we filed a separate statement that sets

22   forth our perspective, Celsius's perspective of the relevant

23   facts that gave rise to the corporate creditor motion in the

24   first place.  At the hearing in July, Your Honor had some

25   important and pointed questions and we wanted to make sure

1    that Your Honor had answers.  That's filed at Docket Number

2    7660.  And White & Case, as counsel to the former committee,

3    filed its own statement of relevant facts at Docket Number

4    7662.

5            With that, I know that there are two objections.

6    I'm sure Your Honor may have questions for me, so I'm happy

7    to take whatever initial questions Your Honor has.  And if

8    not, I'm happy to hear from the objectors and come back

9    after we hear what they have to say.

10           THE COURT:  Before we do that, this was filed as a

11   joint motion.  Let me hear from anyone else who wishes to

12   speak in support of the motion and then I'll turn to the

13   objectors.

14           MR. SARACHEK:  Thank you, Your Honor.  Joe

15   Sarachek.  We support the comments made by Mr. Koenig.

16   We've been working on this matter since March when we were

17   first engaged by the Faller creditors.  Subsequently, since

18   July 29th, we have been representing a committee of

19   corporate creditors advocating on a much larger class of

20   1,800 corporate entities around the world.  We've spoken to

21   the largest creditors and to some very small ones.  We have

22   also had extensive communications with the group that filed

23   the Australian creditors' motion.  This settlement was

24   derived after two full days of mediation with Judge Bentley,

25   numerous emails, conversation, analysis between members of

Page 22

```
 1    our team, the committee, the committees involved in the

 2    case, and also parties who filed joinders who were privy to

 3    the mediation and gave us their input.  Simply put, this

 4    joint motion restores creditors to where they should be

 5    under the plan and the settlement is authorized under the

 6    plan and is being effectuated post-confirmation.  We urge

 7    the court to approve the settlement.  Thank you.

 8              THE COURT:  Let me ask either you or Mr. Koenig,

 9    how, if at all, does this settlement, if approved, apply to

10    those who have not specifically joined in the motion?

11              MR. KOENIG:  I'm happy to address that, Your

12    Honor.  So any eligible corporate creditor has the option.

13    They do not have to file a joinder.  They did not have to

14    appear in the mediation.  They do not have to -- everybody

15    will get a form.  Now eligible corporate creditor is defined

16    in the motion.  The most important limitation is they have

17    to be organized in a jurisdiction that Coinbase can make a

18    distribution to because if Coinbase couldn't have made a

19    distribution --

20              THE COURT:  I mean, so the plan was always -- and

21    the plan related documents were always quite clear that

22    Celsius was only obligated to distribute to corporate

23    creditors in a jurisdiction in which there was a

24    distribution agent who was licensed to do that.

25              MR. KOENIG:  You took the words right out of my
```

Page 23

1    mouth, Your Honor.  The other restriction is convenience

2    class creditors will only get the cash option.  That's

3    simply because the convenience class was always designed to

4    be convenient.  And these folks have claims of less than

5    $5,000.  And frankly, we all expected that, given the

6    lengthy KYC process with Coinbase, that people with small

7    dollar amounts would probably prefer to get their

8    distribution quickly instead.  Those are the two

9    restrictions on eligible corporate creditors.  So everybody

10   else will get some sort of a notice.

11          I guess the other thing I should say is there may

12   be a creditor whose claim is not allowed.  They have

13   preference exposure.  They're an equitably subordinated

14   creditor.  So their time will come at the appropriate time,

15   whenever their claim is either allowed, or, I guess if it's

16   not allowed, they won't ever get a distribution.  So

17   anybody, they don't have to file a joinder.  This applies to

18   everybody in the class, everybody similarly situated, that

19   is an eligible corporate creditor as defined in the motion.

20          THE COURT:  All right.  Thank you.  So there are

21   two objections.  The amended objection of Sean Xue, which is

22   ECF 7661.  Mr. Xue, do you want to be heard?

23          MR. XUE:  Yes, Your Honor.  So I think to start,

24   right, have you read my objection?  Do you want me to read

25   it?  And then also my response?

Page 24

1              THE COURT:  I've read it.  I've read all the

2     papers relating to this.  I'll give you a chance to make

3     your argument, but you shouldn't just read what you filed.

4     Okay.

5              MR. XUE:  Oh, I mean, I have more than that.  But

6     I figure if you haven't read it, I read it to you.  But

7     okay, so firstly, Your Honor, I want to thank you for all

8     the work you've done in this case.  My intent from this

9     objection is to raise questions, questions that believe is

10    not being answered to a neutral party.

11             Most creditors have stopped following this case

12    now that most of the crypto in the first distribution has

13    been distributed, and hence are not aware of the potential

14    impact of this on their second distribution.  I probably

15    would not have known about this either if I wasn't following

16    the docket while waiting for my first distribution.

17             So, in my objection, so, firstly, with the UCC no

18    longer in existence, there was no party that represented all

19    creditors in the mediation.  The debtor counsel led the

20    mediation with expressed interest to arrive at a solution

21    that (indiscernible) their own culpability for an error they

22    and their client are responsible for.  In a court hearing on

23    July 29th, Your Honor stated to a debtor counsel that,

24    "There will have to be discovery that you're going to pay

25    for, and that's what's going to happen, and you're going to

Page 25

1    pay for it.  When I say you, your firm, your law firm is

2    going to pay for it."  Hence, there's a clear motivation for

3    the debtor counsel to have this problem go away by having

4    one group of creditors pay off another group of creditors at

5    no cost to a debtor counsel themselves.

6         Furthermore, in the same hearing, Your Honor

7    stated about Coinbase that, "There's a very strong argument

8    that Coinbase breached its contract.  It is Coinbase's

9    refusal to distribute to more than 100 corporate creditors

10   that created this problem in the first place.  Yet the

11   consequences of this potential breach of contract are only

12   borne by creditors.  In a proposed settlement, Coinbase is

13   only offering to perform the services that they should have

14   done according to the contract.  This then begs the

15   question, if there's liability, why is Coinbase not being

16   pursued?  And if there's no liability, why is the settlement

17   agreed to by the debtor counsel?  And the debtor's counsel's

18   response does not answer the question of conflict of

19   interest at all.  In their response, the assumption is that

20   all the litigation costs are borne by the estate.  The

21   debtor counsel made no mention of the specific quote that I

22   referenced.  I believe this is a key point that requires

23   clarification for Your Honor.

24        Secondly, the settlement will allow many creditors

25   to receive more than the number of Bitcoin Ethereum than

Page 26

1     they would have been distributed as of the effective date.

2     The choice to use average value for those that have already

3     received distribution FIAT when the current market prices

4     are significantly lower gives those that already received

5     distribution if you had more Bitcoin and Ethereum than they

6     would have received at effective date.

7             Here's my objection.  I have a distribution

8     breakdown for creditors who have already received FIAT 96

9     million USD already distributed, as well as the cost to the

10    estate which the debtor, the counsel never mentioned in any

11    of their filings.  Just to show -- I will get back to that

12    later, but just to show the absurdity of this formula,

13    current Ethereum prices is lower than the effective day

14    price, yet additional payment of Ethereum is still due to

15    those that already received distribution.

16            Furthermore, there's no distinction made between

17    corporate creditors who elected to receive FIAT distribution

18    versus who elected to receive crypto but were refused.  The

19    creditors who opted to receive or have already received FIAT

20    are effectively given downside protection to the price of

21    Bitcoin Ethereum.  This downside protection is not free, and

22    the cost is borne by creditors not party to the corporate

23    creditor ad hoc.

24            In a response, the debtor counsel claims that the

25    dollar value of supplemental distribution is $14 million.

Page 27

1    That's on Docket 7677, Page 10.  This number is incorrect.

2    In my detailed illustration of the cost to the estate as of

3    September 3rd, which is fairly close to what it's looking

4    like now, focusing on the impact of true-up on $96 million

5    that was already distributed in USD, the net cost of that

6    alone is $32 million, highlighted in the QB distributed

7    average value in my illustration.  Even looking at the

8    debtor counsel's example in Docket 7661, Page 13 --

9              THE COURT:  Slow down.  I appreciate it.  I'm

10   listening, but just slow down so we can follow you.  Go

11   ahead.  Go ahead.

12             MR. XUE:  Sorry, sorry.  So where was I?  The net

13   cost of that alone is $32 million, highlighted in QB

14   distributed average value in my illustration.  Even looking

15   at the debtor counsel's example in Docket 7661, Page 13, it

16   is clear that the cost is not just $14 million.  In this

17   example, on initial USD distribution of around $68,000 and

18   an additional distribution of 0.665 bitcoins and 7.71

19   ethereum is projected, which is worth around $24,000 at

20   current prices, or roughly 36 percent of the initial

21   distribution.  Now, 36 percent of $96 million is obviously

22   not $14 million, and this isn't including the 15 percent

23   that has not been distributed.

24             The debtor counsel appears to be just looking at

25   the crypto appreciation, assuming that the net cost to this,

Page 28

1    assuming that is the net cost to the estate, which I also

2    show in my illustration as to be distributed using current

3    value.  This is certainly the more sensible formula, but

4    it's not a formula that they're proposing to use.

5           The debtor counsel claims that the formula is due

6    to, "Liquid cryptocurrency would have been sold as close as

7    reasonably practicable to the anticipated cash

8    distribution."  However, to my knowledge, no liquid crypto

9    due to creditors having sold yet in the bankruptcy.  All

10   this further highlights my concern that a cost to the estate

11   is of no importance to the debtor counsel, as long as

12   they're off the hook for any costs that they may have to

13   incur themselves.

14          Lastly, the requested $1.5 million professional

15   fees are excessive.  This far exceeds the fees granted to

16   all other ad hocs involved in the case combined, which adds

17   to $361,000.  And these were ad hocs who spent many months

18   longer working towards a consensus to have the plan passed.

19   The settlement parties may argue that this also pays for the

20   services of having a dedicated point of contact.  However,

21   why is this service not performed by the plan administrator?

22   And why does it only cover a small group of creditors, many

23   of whom have already received distribution, when there are

24   multiple times more creditors outside of the corporate

25   creditors group who have yet to receive any distribution?

1    By the debtors' own count, 32 percent of the creditors have

2    yet to receive a distribution which was shown on the slide

3    earlier.

4          The debtor counsel's response to this is

5    essentially that they can do as they please.  I don't think

6    there's any argument that this fund is not coming from

7    future creditor.  It's not coming from future creditor

8    distribution.  Why is there no accountability required?  Is

9    three times the cost of all other ad hocs combined

10   reasonable?  Or is it just a means to make the problem go

11   away for the debtor counsel?

12         And finally, I also want to address the

13   convenience class.  So finally, the debtor counsel mentioned

14   in the response that there were no objections to the

15   previous distribution from the reserve to the convenience

16   class creditors.  I personally did not file an objection due

17   to the fact that many people with large claims were severely

18   impacted and getting pennies on their dollars on their life

19   savings.  Furthermore, there was no question of conflict

20   interest, and the numbers were reasonable.

21         THE COURT:  Mr. Xue, the issue about the

22   convenience class is just not before me.  We're not

23   revisiting what was --

24         MR. XUE:  Okay.  I'm not arguing that.  I'm just

25   saying like that was brought up and hence like that was the

1    question.  Right?  And that's my response to -- my response

2    to that.  I'm not looking to revisit that issue.

3            So I conclude with creditors outside the corporate

4    creditor ad hoc have no issues with any compensations that

5    is awarded if it's coming from debtor counsel and Coinbase.

6    However, the reality here is that non-corporate creditors

7    are being used to pay off corporate creditors so the debtor

8    counsel and Coinbase can avoid all potential liability.  The

9    moral hazard of bankruptcy professionals cutting corners to

10   meet their incentive deadlines and receive the incentive

11   award should not be ignored.  Thank you.

12           THE COURT:  Thank you very much.  All right.  The

13   other written objection is by the U.S. trustee, which is ECF

14   7667.  Ms. Cornell?

15           MS. CORNELL:  Good afternoon, Your Honor.  Shara

16   Cornell, with the Office of the United States Trustee.  I

17   know Your Honor has read all the papers, so I'm going to

18   keep it very brief today.  The facts are the facts.  What

19   the debtors are proposing modifies the confirmed and

20   substantively consummated plan.  I understand the desire for

21   a quick fix, but the Bankruptcy Code and the bankruptcy

22   rules exist for a reason.  Whatever relief the debtors seek,

23   it must be done properly and pursuant to the statutes.

24   Until the following questions are answered, the relief

25   sought by the debtors should not be approved.  First, how do

Page 31

1    you have a 9019 settlement for a class of creditors when

2    only nine creditors agree to it?  Counsel to an ad hoc

3    committee is just not a fiduciary to a class of creditors or

4    to anyone else.

5              THE COURT:  Well, at this point, Ms. Cornell, I

6    mean, it's clear it's available to all corporate creditors

7    who wish to join the settlement, whether they were part of

8    the ad hoc group or not.  I mean, I take that point, but

9    that was -- I think I asked Mr. Sarachek about.  I think Mr.

10   Koenig is the one who answered.  But I wanted to be clear

11   that this proposed settlement doesn't sort of cherry pick a

12   small, relatively small group of corporate creditors.  This

13   issue, that I was the one who raised -- well, I did not

14   raise it in the first instance.  There were many corporate

15   creditors who had filings with the court that raised this

16   issue.  It went forward.  Anyone who wanted to participate

17   in the mediation could.  But this is not a settlement that

18   is limited to just those corporate creditors who

19   participated in the mediation.

20             MS. CORNELL:  No, and your point is well taken,

21   Your Honor.  However, the parties in which Mr. Sarachek was

22   negotiating on behalf were just nine creditors.  He's not a

23   fiduciary to the estate.  But again, I understand what Your

24   Honor is saying.  Second, how is this --

25             THE COURT:  It would have been impractical to have

Page 32

1    a hearing with every potential corporate creditor, no matter

2    their size.  If this issue is not settled and it's

3    litigated, it potentially involves many, many corporate

4    creditors, large and small, and it would be a very expensive

5    and time consuming litigation.  So I'm not -- yes, I have to

6    fairly judge this settlement, whether it's fair and

7    reasonable and in the best interests of the estate.  But the

8    fact that Mr. Sarachek only represented nine creditors,

9    there are many who can take advantage of this settlement.

10        And I guess one of the things that I'm not

11   persuaded about, Ms. Cornell, is when I raised this issue,

12   it seemed to me that the result essentially was reached.

13   There were issues that had to be settled as part of it was

14   this implements what I understood the plan to originally

15   contemplate and provide for.  This is not a change in the

16   plan.  That's what bothered me about it when I raised the

17   issue.  There was no hundred creditor limit for Coinbase in

18   dealing with corporate creditors.  That's why I raised this

19   issue.  There were many disgruntled corporate creditors who

20   wanted crypto distributions who weren't within the top

21   hundred.  And it seemed to me, I don't have to resolve this

22   issue if I approve the settlement, is that on the face of

23   the documents it appeared this is exactly -- the result here

24   is exactly the way I, without resolving the issue, initially

25   read the documents, the plan supplement, and the various

Page 33

```
1    other agreements.  So I don't see -- I mean, what is it that
2    you think requires a modification of the plan?  I mean, this
3    is exactly contrary to what I was -- what I raised the
4    issue.
5             MS. CORNELL:  Well, Your Honor, that brings me to
6    my next point.  You are removing money from an escrow under
7    the plan that was dedicated --
8             THE COURT:  You'd like to just unwind the whole
9    case rather than -- look, there are -- in many cases I've
10   had over the years, there are settlements and disputes.
11   They get resolved.  They have to get paid for in some way.
12   Okay.  I'm not sure what it is you want.  You just want to
13   unwind the whole case when this -- it seems to me this
14   resolution is consistent with what I understood the plan to
15   provide for?  So what is it you want?
16            MS. CORNELL:  Your Honor, I understand your
17   comments.  However it is --
18            THE COURT:  No.  Tell me what you want.  What's
19   the result you're asking for?
20            MS. CORNELL:  Your Honor, it's not my
21   responsibility to fix this.
22            THE COURT:  It is -- it is your responsibility to
23   answer my question.  What's the result that the U.S. trustee
24   is asking for, given that this dispute has arisen?
25            MS. CORNELL:  Your Honor, I can't answer that.
```

Page 34

1    The debtors need to satisfy the statute and the rules --

2            THE COURT:  They need to satisfy me that 9019 is

3    satisfied.  But if you don't want to answer the question --

4    you've objected.  I've read it.  I don't understand your

5    objection.  It seems to me that the result that this

6    settlement would implement is consistent with the plan.  It

7    doesn't need a modification of the plan to achieve it.  You

8    argue otherwise.  I don't know what it is you want to

9    accomplish and you won't tell me.

10            MS. CORNELL:  Your Honor, with all due respect --

11            THE COURT:  Do you want the plan -- do you want

12    the plan vacated?  Go to the appellate court.  Okay.  What

13    is it you want?  You've not told me what you want.  You've

14    told me you objected.  I'm not saying -- I tried to make

15    this clear at the last hearing.  Okay.  There may be issues

16    that come up on final fee applications and things like that,

17    but they don't have to do with today's issue of whether or

18    not this settlement gets approved.  So what is it you want?

19    You tell me.  I'm asking, giving you one last chance to tell

20    me what is the U.S. trustee's position about how this

21    problem should be solved.  What's the plan modification you

22    think is required that you're arguing for?

23            MS. CORNELL:  Well, for starters, Your Honor, I'm

24    extremely concerned about the payment of fees to the ad hoc

25    committee counsel out of this pot that was not previously

Page 35

1    contemplated under the plan.  That is a plan modification.

2    That's $1.5 million out of a pot that was not previously

3    contemplated.

4              THE COURT:  What else?

5              MS. CORNELL:  The reserves itself.  Those were not

6    funds that were going to be used for corporate

7    distributions.  The debtor has yet to identify what pot they

8    were going to use for corporate distributions and how it is

9    in fact the same pot, as Mr. Koenig keeps saying, that this

10   is not a modification.  If it's not a modification, then the

11   funds that they're using to pay out corporate creditors

12   would be the exact same funds that they were planning on

13   using under the plan, which they're not.  It's a new pot.

14             THE COURT:  What else?

15             MS. CORNELL:  That's the crux of it, Your Honor.

16             THE COURT:  Okay.  You didn't object when the

17   problem with the convenience class was fixed and that

18   resulted in payment of funds as well.  You didn't object at

19   that time.  What's the difference?

20             MS. CORNELL:  Your Honor, the difference is that

21   we're dealing with this now, with this issue, as you just

22   told Mr. Xue, that we're not looking to unwind that.  And

23   we're also dealing with attorney's fees that are in excess

24   of millions of dollars.  It is a difference, and it is an

25   important difference.  And it's material.  The pot has

Page 36

1    changed.

2              THE COURT:  All right.  Anything else?

3              MS. CORNELL:  No, Your Honor.

4              THE COURT:  Anything else?

5              MS. CORNELL:  No, Your Honor.

6              THE COURT:  Mr. Koenig, do you wish to respond?

7              MR. KOENIG:  I do, Your Honor.  Can you hear me

8    okay?

9              THE COURT:  Yes, I can.

10             MR. KOENIG:  Thanks.  I'll start with Ms. Cornell

11   and I'll be brief.  She complained about it being with nine

12   creditors.  The mediation was open to all creditors.  We

13   specifically served notice of the mediation on all 1,900

14   corporate creditors.  And in fact, many of them, in addition

15   to Mr. Sarachek's group, joined the mediation.  I don't want

16   to say anything more than that because of the mediation

17   privilege, but it's not like it was just nine creditors.

18             The reserve is not dedicated to anyone in

19   particular.  Both objectors raised this point.  If you look

20   at the definitions in the plan, the reserve is for disputes

21   about claims.  If the plan requires that the debtors make a

22   distribution to a particular creditor, we have to use our

23   assets to make that distribution.  The reserve is the spot

24   that it should be made from.  But if the plan requires me to

25   make a distribution, I think I have to use my assets on hand

Page 37

```
1    to make that distribution.  I think it's important to note

2    that the other creditors don't have any interest in that

3    reserve right now.  They have what I would describe as a

4    contingent or remainder interest that once all other claims

5    get their distribution under the plan or not, if disputed

6    claims are disallowed, whatever remains at the end of that

7    process will be distributed to other creditors.  But it's

8    not as though they have some sort of current interest in the

9    reserve.  The reserve is there to make sure that creditors

10   get what they are entitled to under the plan.  And that is

11   exactly what we --

12            THE COURT:  What's the amount of the reserve?

13   What's the amount of the reserve, Mr. Koenig?

14            MR. KOENIG:  What is the amount of the reserve?

15   So it was sized initially for $500 million of disputed

16   claims in case they all became allowed.  And the current

17   size of the reserve is -- I think it's about $300 million

18   today.  It's in our papers.  I just don't have the number in

19   front of me.

20            THE COURT:  Go ahead.

21            MR. KOENIG:  And so the reserve is built for

22   contingencies like this one.  We used it for the convenience

23   class issue before.  And if Your Honor finds that the plan

24   is required -- that the debtors are required to make a

25   distribution to corporate creditors under the plan, we have
```

Page 38

1    to use our assets to do so.  And of course it comes from the

2    reserves, because that is what the reserves are for.  It is

3    not as though earned creditors are going -- I should say, is

4    not as though individual creditors will receive less.  All

5    we are doing is giving corporate creditors that to which

6    they were entitled under the plan.  It's not knocking down

7    individual creditors.  It's bringing up corporate creditors.

8           On the fees issue, the plan provides that we can

9    settle issues post-emergence and make payments, including

10   payments to professionals, without further court order.  We

11   of course, wanted disclosure and we wanted to seek court

12   approval of of those fees.  But Ms. Cornell conceded in her

13   objection that the substantial contribution standard no

14   longer applied because we're now post substantial

15   consummation.  And that's the difference between the ad hoc

16   groups that sought fee payments from Your Honor.  They

17   performed services during the case when substantial

18   contribution applied.  We think that this is different.  We

19   think that this occurred -- we think that this occurred

20   after.

21          As for Mr. Xue's objection, many of my comments

22   remain the same.  He took some issue with the calculation.

23   It doesn't really make sense to get into the nuts and bolts

24   of the calculation.  I think it's beside the point.  If the

25   plan requires it, we have to pay it.  And frankly, our $14

Page 39

1    million is an estimate.  If crypto prices go up, then the

2    amount of that liquid crypto will be higher.  If prices go

3    down, it will be lower.  It's just an estimate.  But I don't

4    think that if it's $15 million or $20 million or $40

5    million, I don't actually think it changes the analysis for

6    Your Honor.  If the plan requires it, we have to pay it.  We

7    have to pay.

8            Mr. Xue seems to be arguing that his distribution

9    will be lower because of this.  But we have to pay all

10   creditors their distributions under the plan before we can

11   make any distributions from reserves to the other creditors.

12   As I said earlier, if the plan requires me to pay a

13   creditor, we have to pay that creditor first before we can

14   take the amount that was allocated in reserve and give it

15   out to everybody else.  Corporate creditors are simply

16   getting what individual creditors already received under the

17   plan, and that is the crux of the settlement.

18           Mr. Xue also talked about the average value for

19   people that already received cash distributions.  The reason

20   we did it like that was we had to do something for people

21   that already got a distribution.  And it wasn't fair -- if

22   you received cash, it wasn't fair to make a creditor give

23   the money back to us just so we could round trip it back to

24   them, either in liquid cryptocurrency or cash.  We thought

25   that that would impose an unfair burden on a creditor who

Page 40

1    may have used that money to pay down a debt or make an

2    investment or whatever they decided to do with it.  It

3    wouldn't be fair to make them give the money back to us.  So

4    we had to come up with some sort of a crediting mechanism,

5    an offset mechanism.  And that was frankly the most

6    complicated and contentious part of the negotiation that we

7    had in the mediation.  The global settlement is complicated,

8    but it was -- you know, it was what we reached in mediation

9    over two days with Mr. Sarachek's group, and we think it's

10   fair and reasonable and should be approved.

11          I think that that was everything that I had.  I

12   think that that was everything that I had in my notes.  But

13   if Your Honor has any questions for me, I'm happy to address

14   them.

15          THE COURT:  Mr. Sarachek, briefly, anything else

16   you want to add?

17          MR. SARACHEK:  No, Your Honor.  Well, I will say,

18   and I think you brought this up, if we don't settle this

19   now, and I do believe this is an appropriate settlement, the

20   litigation that we're looking at, let's say, class action

21   type litigation, the expenses associated with that, and we

22   did talk to Judge Bentley about this, will be absurd, you

23   know, and it will go on for a long, long time, and it will

24   be a true injustice.

25          THE COURT:  I've heard enough.  I'm going to take

Page 41

1    the matter under submission and the matter will be resolved

2    in an opinion or order in due course.  All right.  Let's

3    move on, on the agenda.  I'm not going to hear anyone else,

4    only those who filed papers on it.  So if you raise your

5    hand, but you didn't file papers, I'm not listening to you.

6            MR. KOENIG:  Thank you, Your Honor.  I believe

7    that that takes us to the RSM fee application, because the

8    next two items on the agenda were the corporate creditor

9    motion and the Australian creditor motion, which are

10   resolved by the settlement motion.  I realize Your Honor

11   hasn't ruled on the settlement motion yet, but maybe we

12   continue these motions to the next hearing date pending Your

13   Honor's ruling.

14           THE COURT:  Okay.

15           MR. KOENIG:  So I'll turn it over to whoever wants

16   to speak on the RSM fee application.

17           MR. SONTCHI:  Good afternoon, Your Honor.

18   Christopher Sontchi, the fee examiner in connection -- the

19   court-appointed fee examiner.  I'll let Ms. Frejka go

20   forward with her fee application, but I just want to tell

21   you the current status of it, if I may.

22           THE COURT:  Go ahead.

23           MR. SONTCHI:  Okay.  So this is our last fee

24   application for our responsibility, and I want to start by

25   thanking Ms. Stadler and her team at Godfrey & Kahn for all

Page 42

1   the hard work they've done in this case.  This was a bit of

2   a tricky one for us, and we were having a hard time really

3   communicating our concerns in a way that we could get RSM to

4   understand the issues.  Ms. Frejka was hired very recently

5   as counsel, and I just want to say she was tremendously

6   helpful in becoming a go-between and communicating with her

7   client very effectively.  We did have -- we issued a couple

8   reports.  Ms. Frejka helped her client do an amended fee

9   application.  We reviewed that, we did a report on that, and

10  we engaged in a negotiation.

11          I'm very happy to say that we reached a resolution

12  of all our issues and have agreed to the amount that is

13  being set forth in the proposed order, which is a

14  substantial reduction from the amount originally sought.

15  But look, there's no question that RSM did the work.

16  There's no question that they should be compensated.  We

17  just wanted to make sure that the compensation was

18  appropriate under the applicable law and rules, which we

19  believe we've satisfied ourselves to that.  So simply want

20  to let you know that this was a process, that we've agreed

21  to a reduction, and that we support the application and

22  then, unless Your Honor has any questions for me, I would

23  turn it back to you or to Ms. Frejka to make any further

24  comments.

25          THE COURT:  All right.  I will turn it over to Ms.

Page 43

1   Frejka.  But before I do, I just -- this is, I think, a

2   chance to thank you, Mr. Sontchi and Ms. Stadler, for all

3   the work that was done in connection with the fee

4   applications in this case.  It immeasurably reduced the work

5   that would be required by -- certainly by my chambers and I

6   believe also reduced the work required by the U.S. trustee's

7   office.  So this has been an expensive case, which is not

8   surprising given the magnitude of the case.  I'm very

9   appreciative of all that you've done in this case, Mr.

10  Sontchi, and you, Ms. Stadler, and your colleagues have

11  done.  Ms. Frejka, let me call on you.

12          MS. FREJKA:  Good afternoon, Your Honor.  As

13  always, it is a pleasure to appear before you.  This is a

14  difficult matter.  This is the last fee application.  I

15  think there have been lessons learned on all sides here,

16  including when to engage counsel, when to get counsel

17  involved in an area that may not be your area of expertise.

18  But I think we've come to a reasonable outcome.

19          RSM U.S. LLP filed an amended and restated fee

20  application on July 26th at Docket Number 7555.  We believe

21  that it more substantially complied with the guidelines and

22  that, with the reduction that has been agreed to, should

23  resolve this issue.  To the extent that you have any

24  questions about the work performed or any aspect of the fee

25  application, I do have a client representative, Howard

Page 44

1     Siegal, is on the line and should be visible to Your Honor

2     as well.

3              THE COURT:  So just so that the record is

4     sufficiently clear, so the amended and restated fee

5     application is filed as ECF Docket 7555.  Maybe you would

6     just, in summary fashion, indicate what the original

7     application was --

8              MS. FREJKA:  Yes.

9              THE COURT:  -- what the amended application, I

10    gather, was largely the product of your numerous

11    conversations with Mr. Sontchi and Ms. Stadler to try and

12    resolve this issue.  But let's just get the amounts.

13             MS. FREJKA:  Certainly, certainly.  The RSM fee

14    application was originally filed at Docket Number 4265 on

15    January 8, 2024.  It covered the period August 1, 2023

16    through November 9, 2023, and it sought feeds in the amount

17    of $1,247,374.45 and expenses of $32,003.70.  After the fee

18    examiner and his counsel provided a preliminary report and

19    their lack of ability to resolve it, I got involved,

20    reviewed the fee application, renegotiated with the examiner

21    and his counsel, an opportunity to amend and restate and

22    address hopefully most of the issues that were raised as far

23    as guideline compliance.

24             On July 26, 2024, an amended and restated fee

25    application was filed at Docket Number 7555 requesting a

Page 45

1    reduced amount of fees in the amount of $1,141,934.75,

2    reflecting approximately $106,000 in fees that were removed

3    and expenses in the amount of $26,387.69 or reduced fees of

4    approximately $5,500.  That work was done, with my

5    involvement, to eliminate some of the transitory

6    timekeepers, less clear time entries, some expenses that

7    would not be guideline compliant and the like.  And that is

8    the fee application that we negotiated a resolution of.

9            THE COURT:  All right.  Ms. Cornell, do you want

10   to be heard?

11           MS. CORNELL:  No, Your Honor.  Thank you.

12           THE COURT:  All right.  You know, the record

13   consists of the fee examiner's summary report of March 7,

14   2024, which is ECF 4835.  The fee examiner's report of June

15   27, 2024, ECF 4970.  There's a stipulation and proposed

16   order regarding final fee application, ECF 7523.  There is

17   the stipulation and order regarding final fee application of

18   RSM.  It's ECF 7524.  And then finally, what Ms. Frejka has

19   just described, the amended and restated application of RSM

20   for the period August 1, 2023 through November 9, 2023.

21   That's ECF 7555.  And the last thing that's on the docket is

22   the fee examiner's report and recommendation regarding the

23   final fee application of RSM, which is at ECF 7663.

24           The court has reviewed all of it.  As is always

25   the case with all fee applications, the approach of the

Page 46

1    court is not to try and sort of double ding an applicant

2    where they've negotiated in good faith in this case, because

3    there's a fee examiner who's taken his task very seriously.

4    And of course, the U.S. trustee also has an oversight role

5    as well.  So I'm pleased to be able to approve the final fee

6    application in the amounts that Ms. Frejka has indicated,

7    fees of $1,141,934.75 and expenses of $26,387.59.  Do I have

8    those amounts correct?

9             MS. FREJKA:  No.  No, Your Honor, you need to --

10   you need to deduct the amount that we've agreed with the fee

11   examiner from that, which is $250,000.

12            THE COURT:  Okay.

13            MS. FREJKA:  The expenses number is accurate,

14   though.

15            THE COURT:  All right.  The fee number is the

16   $1,141,934.75 minus $250,000.  Is that -- do I have that

17   right now?

18            MS. FREJKA:  That is correct.  That is the one

19   calculation I actually did not do before the hearing, and I

20   apologize.

21            THE COURT:  I'm going to count on you all to get

22   that (indiscernible).

23            MS. FREJKA:  Yeah.

24            THE COURT:  I'm not going to embarrass myself by

25   doing it wrong now.  Okay.  All right.  Thank you very much.

```
 1                MS. FREJKA:  Thank you.

 2                MS. STADLER:  Judge, this is Katie Stadler, on

 3       behalf of the fee examiner.  I just wanted just to complete

 4       the record on that.  Docket 7663 has an Exhibit A, which --

 5       or, sorry, Schedule A, which shows the adjusted amount in

 6       Column 5, which is indeed the math you just outlined.  The

 7       result is $891,934.75.  And that is the amount that would be

 8       reflected in the proposed order that is attached to this

 9       report and that we'll submit in Word format right after the

10       hearing.

11                THE COURT:  All right, and let me take this

12       opportunity to thank you, Ms. Stadler, for all the work that

13       you and your colleagues at your firm have done in this case

14       as well.  As I've said, it's immeasurably assisted the court

15       in what I've always said is the least enjoyable part of my

16       job, which is reviewing fee applications, which I do do.

17       And again, thanks to Mr. Sontchi and to you and your

18       colleagues for doing it, Ms. Frejka, for getting this to a

19       final result.  So --

20                MS. STADLER:  Thank you, Judge.

21                MR. SONTCHI:  Thank you, Your Honor, very, very

22       much.

23                MS. FREJKA:  Thank you.

24                THE COURT:  That is the last thing on the agenda

25       for today in this case.  I do have other hearings coming up.
```

1    So we are adjourned in Celsius.

2              (Whereupon, at 2:59 PM, these proceedings were

3    concluded)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **I N D E X**

2

3                                    RULINGS

4                                                          Page        Line

5      Debtors' Motion for Entry of an Order          14          4

6      Authorizing the Post-Effective Date Debtors

7      to Redact and File Under Seal Certain

8      Confidential Terms of the Supplemental

9      Coinbase Agreement Conference

10

11     Application for Final Professional            46          5

12     Compensation for RSM US LLP, Auditor

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 50

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 16, 2024