Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  Adv. Case No. 24-03994-mg

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13  MEGHJI,

14               Plaintiff,

15           v.

16  WALLET OWNER 0X10F546A6F4D20D91E5A8506124384759C9F

17               Defendant.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 2

1   Adv. Case No. 24-04004-mg

2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3   MEGHJI,

4                    Plaintiff,

5           v.

6   CASTEL, et al.,

7                    Defendants.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   Adv. Case No. 24-04005-mg

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  MEGHJI,

12                   Plaintiff,

13          v.

14  WALLET OWNER 0xdbc13e67f678cc00591920cece4dca6322a

15                   Defendant.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17  Adv. Case No. 24-04024-mg

18  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19  CELSIUS CUSTOMER PREFERENCE ACTIONS, et al.,

20                   Plaintiffs,

21          v.

22  VALENZUELA, et al.,

23                   Defendants.

24  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

25

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY   10004

4

5                    October 8, 2024

6                    2:01 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

1    HEARING re Status Update on Distributions (Doc##7718, 7729,

2    7737)

3

4    HEARING re Status Update on Preference Settlements (Doc

5    7689).

6

7    HEARING re Hearing using Zoom for Government RE: The

8    Litigation Administrators First Omnibus Objection to Certain

9    Insufficient Document Claims. (Doc# 7639, 7722, 7732, 7733)

10

11   HEARING re Hearing Using Zoom for Government RE: The

12   Litigation Administrators Motion to Enforce Customer

13   Preference Claims Settlement Agreements Against Certain

14   Breaching Parties. (Doc# 7709, 7714, 7722, 7731, 7732)

15

16   HEARING re Hearing Using Zoom for Government RE: The

17   Litigation Administrator to Redact and File Under Seal

18   Certain Confidential Terms of Customer Preference Claims

19   Settlement Agreements Against Certain Breaching Parties

20   (related Doc## 7710, 7709, 7714, 7722)

21

22

23

24

25

Page 5

1    Adversary proceeding: 24-03994-mg MEGHJI v. WALLET OWNER

2    0X10F546A6F4D20D91E5A8506124384759C9F

3

4    HEARING re Hearing Using Zoom for Government RE: Motion for

5    Alternative Service. (Doc ## 11, 12, 15, 16, 17)

6

7

8    Adversary proceeding: 24-04004-mg MEGHJI V. CASTEL et al

9

10   HEARING re Hearing Using Zoom for Government RE: Motion for

11   Alternative Service. (Doc ## 16, 17, 22 to 24)

12

13

14   Adversary proceeding: 24-04005-mg MEGHJI v. WALLET OWNER

15   0xdbc13e67f678cc0091920cece4dca6322a

16

17   HEARING re Hearing Using Zoom for Government RE: Motion for

18   Alternative Service. (Doc ## 11, 12, 15, 16, 17)

19

20

21

22

23

24

25

Page 6

1    Adversary proceeding: 24-04024-mg Celsius Customer

2    Preference actions et al v. Valenzuela et al

3

4    HEARING re Hearing Using Zoom for Government RE: Revised

5    Motion for an Order Establishing Streamlined Procedures

6    Governing Avoidance Actions Pursuant to Sections 502, 547,

7    and 550 of the Bankruptcy Code. (Doc## 3, 5, 6, 9 to 16, 21,

8    22)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

**Page 7**

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Post-Effective Date Debtors

 5        and the Plan Administrator

 6        333 W. Wolf Point Plaza

 7        Chicago, IL 60654

 8

 9   BY:  ROSS KWASTENIET

10        GABRIELLE ABBE

11

12   LAW OFFICE OF EDUARDO GLAS PC

13        Attorney for Anthony Valenzuela

14        345 Seventh Avenue, 21st Floor

15        New York, NY 10001

16

17   BY:  ANTHONY GLAS

18

19   AKIN GUMP STRAUSS HAUER & FELD, LLP

20        Attorneys for Plaintiff Meghji

21        2300 North Field Street, Suite 1800

22        Dallas, TX 75201

23

24   BY:  ELIZABETH SCOTT

25
```

1    AKIN GUMP STRAUSS HAUER & FELD, LLP

2         Attorneys for Administrator

3         One Bryant Park

4         New York, NY 10036

5

6    BY:  MITCHELL HURLEY

7

8    WHITE & CASE LLP

9         Attorney for Litigation Administrator

10        555 South Flower Street, Suite 2700

11        Los Angeles, CA 90071

12

13   BY:  RONALD GORSICH

14

15   WHITE & CASE LLP

16        Attorney for Litigation Administrator

17        1221 Avenue of the Americas

18        New York, NY 10020

19

20   BY:  SAMUEL P. HERSHEY

21

22

23

24

25

Page 9

```
 1   BRESSLER, AMERY & ROSS, P.C.

 2        Attorney for Defendants in the Preference Actions

 3        372 Central Park West, Apartment 17A

 4        New York, NY 10025

 5

 6   BY:  CHRISTOPHER VAUGHAN

 7

 8   LAX & NEVILLE, LLP

 9        Attorneys for Defendants Jeffrey Lacerte, Justin

10        Ireland, and Weston Norris

11        2425 Post Road, Suite 200

12        Southport, CT 06890

13

14   BY:  AARON ROMNEY

15

16   HOPPIN GRINSELL LLP

17        Attorney for Defendant Seph Zdarko

18        11 Hanover Square, Suite 703

19        New York, NY 10020

20

21   BY:  TIMOTHY GRINSELL

22

23

24

25
```

Page 10

1   AUSTRIA LEGAL, LLC

2        Attorney for Multiple Adversary Proceeding Defendants

3        1007 North Orange Street, 4th Floor

4        Wilmington, DE 19801

5

6   BY:  MATTHEW P. AUSTRIA

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorneys for the U.S. Trustee

10       Alexander Hamilton Custom House

11       One Bowling Green, Room 534

12       New York, NY 10004

13

14  BY:  MARK BRUH

15

16  TROUTMAN PEPPER HAMILTON SANDERS LLP

17       Attorneys for Troutman Defendants

18       4000 Town Center, Suite 1800

19       Southfield, MI 48075

20

21  BY:  DEBORAH KOVSKY-APAP

22

23

24

25

Page 11

```
 1    LOWENSTEIN SANDLER LLP

 2         Attorney for Lowenstein Sandler Defendants

 3         1251 Avenue of the Americas, 17th Floor

 4         New York, NY 10020

 5

 6    BY:  DANIEL B. BESIKOF

 7

 8    BARTON LLP

 9         Attorney for Nicholas Capadona, Hsin Chun, Kevin White,

10         Zhongyu

11         711 Third Avenue, 14th Floor

12         New York, NY 10017

13

14    BY:  ERIC W. SLEEPER

15

16    FALCON RAPPAPORT & BERKMAN LLP

17         Attorney for Multiple Adversary Defendants

18         265 Sunrise Highway, Suite 50

19         Rockville Centre, NY 11570

20

21    BY:  RICHARD E. WELTMAN

22         MICHELE K. JASPAN

23

24

25
```

Page 12

1    WILMERHALE

2         Attorney for DOF Firm

3         7 World Trade Center

4         250 Greenwich Street

5         New York, NY 10007

6

7    BY:  THOMAS DAVIS

8

9    GOLDSTEIN & MCCLINTOCK LLLP

10        Attorney for Jacob Jon Steele

11        111 West Washington Street, suite 1221

12        Chicago, IL 60602

13

14   BY:  HARLEY J. GOLDSTEIN

15

16   IGOR KUPRIYAN, Pro Se

17

18   ALSO PRESENT:

19   ARTUR ABREU

20   DAVID J. ADLER

21   SUSAN ADLER

22   CONNOR ANDREEN

23   JOHN ANKENEY

24   JASON AWAD

25   RICHARD A. BARKASY

1   CHRIS BECIN

2   MICHAEL BEER

3   JEFFREY BERNSTEIN

4   JOHAN BRONGE

5   ENRIC BULT

6   VITOR CUNHA

7   SANTOS CACERES

8   JERRY CASAL

9   KARA E. CASTEEL

10   RICKIE H. CHANG

11   THOMAS CHERNAIK

12   ROBERT CHRISTIANSEN

13   CHRISTINA CIANCARELLI

14   JON COLLARD

15   AARON COLODNY

16   SHARA C. CORNELL

17   PAMELA CORRIE

18   CAMERON CREWS

19   OONA CRUSELL

20   MICHAEL DAL LAGO

21   DAVID J. DALHART

22   ANDREW R. DAWES

23   PAUL JAMES DARIEMAKER

24   ZARYN DENTZEL

25   JASON DIBATTISTA

1    TRISTAN DIAZ

2    DAVID DINOSO

3    SHARON M. DOW

4    GABRIEL EISENBERGER

5    JAMES ENGEL

6    BERNARD J. FALLER

7    RICARDO I. FELIZ

8    SEAN T. FLYNN

9    DEBORAH FRANKEL

10   CHARLES GAFVERT

11   JUAN C. GARCIA

12   JASLEIGH GEARY

13   JOSEPH BERNELL GEORGE

14   DARIUS GHEORGHE

15   MAHA GHYAS

16   JOHN GILLILAND

17   JORDAN GOLSON

18   CAMERON GUTHRIE

19   STETSON HOGUE

20   JASON IOVINE

21   CHRISTOPHER ISAAC

22   STIG JELLESTAD

23   VIK JINDAL

24   MIKE JOHNSON

25   ROLAND G. JONES

1   DAVID KAHN

2   YARA KASS-GERGI

3   JASON KAUFMAN

4   DAVID T. KING

5   FRED KING

6   CHRIS KOENIG

7   HAROLD L. VINES

8   SERBAN LUPU

9   JOSEPH LEHRFELD

10   BRIAN S. LENNON

11   MARK S. LEONARD

12   RICHARD LIN

13   XI LIN

14   FRAN LIN

15   SEAN LOCKLIN

16   JASON LU

17   SERBAN LUPU

18   JAMES A. G. MATTHEWS

19   CAROL MAUNDER

20   KYLE MCEVILLY

21   BRIAN T. MCGARRY

22   BRIGETTE MCGRATH

23   LAURA FALLER MCNEIL

24   GEORGIA MEADOW

25   RICHARD MEAMBER

Page 16

```
 1   SETH MEISEL
 2   JOHN MELLEIN
 3   MEHDI MERALI
 4   TOM MERCURI
 5   LOUIS FRANK MENDEZ
 6   LAYLA MILLIGAN
 7   MIKE MOLLOY
 8   JOSH J. MOREY
 9   RICHARD D. MORRIS
10   SHANNON O. C. NELSON
11   JEFFERSON NUNN
12   DEIRDRE O'CONNOR
13   RICHARD OSWALD
14   ROBERT PARRO III
15   MOIS E. PELTZ
16   GREGORY F. PESCE
17   REX PHAM
18   VALENTIN RAAB
19   ANDREW S. RICHMOND
20   DEVIN RIVERO
21   MARK ROBINSON
22   JONATHAN RODRIGUEZ
23   ERIC S. ROSEN
24   MICHAEL M. SARKISSIAN
25   DAVID SCHNEIDER
```

1    SAMUEL SCHREIBER

2    EZRA SERRUR

3    NIKOLAS SEVERSON

4    MATTHEW W. SILVERMAN

5    DON SMITH

6    SAHRISH K. SOLEJA

7    COURTNEY BURKS STEADMAN

8    JASON TRAGER

9    JOE TRUPIANO

10   MARIANNA UDEM

11   GERARD UZZI

12   ZRA VAZQUEZ-D'AMICO

13   TONY VEJSELI

14   SEAN XUE

15   GOLSHID ZAHIREMAMI

16   RICHAEL ZEMSER

17   TANZILA ZOMO

18   COLIN FEULING

19   RAKESH PATEL

20   ROMUALD TENDILLE

21   HEIN VAN DER WIELEN

22   DAVE MALHOTRA

23   ALAN BRODY

24   NATHAN IACOVINO

25   ZACHARY MCKAY

Page 18

1    HAROLD B. MURPHY

2    KENNETH R. PUHALA

3    MICHAEL SULLIVAN

4    SUSAN C. WARNOCK

5    TRAVIS ARBON

6    SOMA BISWAS

7    DREW DUFFY

8    EDUARD EDELER

9    MATTHEW EZERSKY

10   UDAY GORREPATI

11   TAYLOR HARRISON

12   ARTHUR LOMAS

13   EVAN OCHSNER

14   JONATHAN RANDLES

15   VINCE SULLIVAN

16   CATHY TA

17   MILES TREVELYAN

18   ALEX WITTENBERG

19   SARAH WYNN

20   THOMAS S. KESSLER

21

22

23

24

25

1                    P R O C E E D I N G S

2             THE COURT:  Good afternoon, everyone.  Obviously,

3    we are here at Celsius, 22-10964.  I have the agenda in

4    front of me.  Let's begin with the status update on

5    distributions.

6             MR. KWASTENIET:  Good afternoon, Your Honor.  It's

7    Ross Kwasteniet from Kirkland & Ellis on behalf of the post-

8    effective-date debtors.  Can you hear me okay?

9             THE COURT:  Yes, I can.

10            MR. KWASTENIET:  Okay, great.  And at the

11   beginning, Your Honor, as we've done with prior hearings, I

12   would like to just request that my colleague, Gabrielle

13   Abbe, be given co-hosting privileges so she can share the

14   slide presentation.

15            We filed it on the docket last night. It's at

16   Docket Number 7737.  It's a short PowerPoint presentation

17   that summarizes the progress that we've made with respect to

18   distributions.

19            THE COURT:  All right.  It's on the screen.  Go

20   ahead.

21            MR. KWASTENIET:  Okay, great.  Thank you, Your

22   Honor.

23            Your Honor, the headline for this month is that we

24   continue to make steady and incremental progress with

25   respect to distributions.  Out of a total amount of $2.73

Page 20

1     billion that's presently eligible to be distributed, we have

2     distributed successfully approximately $2.57 billion, or

3     about 94 percent of that total.

4              Your Honor, we are still chasing pockets of

5     creditors where we haven't gotten distributions

6     successfully.  The cash distributions have been a little

7     slower than we would have liked, but that in part is due to

8     the fact that we've got a large number of individuals who

9     all have to take some action.  They have to either send in

10    wire transfer instructions or they have to receive and then

11    cash a check.  And we're running into a little bit of the

12    law of large number, Your Honor, where the overwhelming

13    amount of the value has gone out.  And so what we're doing

14    now is chasing and trying to complete the distribution

15    process to a larger number of creditors who are owed a

16    smaller amount.

17             And so it's challenging by nature, but we are

18    encouraged by the fact that the distribution numbers,

19    percentages continue to tick up month over month.  And we

20    are also undertaking efforts, we're communicating with folks

21    on a weekly basis.  We are trying to migrate people.  If

22    they're unsuccessful with PayPal, we're trying to migrate

23    them to Coinbase.  If they're unsuccessful at Coinbase,

24    we're trying to get them a cash distribution.  We've been

25    working to build out the Hyperwallet and had been encouraged

Page 21

1    with the initial results on Hyperwallet.

2            So, Your Honor, we are doing everything we can to

3    continue to manage these numbers upward and we are pleased

4    with the progress that we've made over the last month.

5            So I'll pause there and see if Your Honor has any

6    questions about the distributions.

7            THE COURT:  Let me make a brief comment.  From

8    time to time the Court has received typically email

9    communications from creditors.  I've had my law clerks

10   forward them on.  Some of them have shown that either your

11   firm or White & Case has received copies, sometimes not.

12   We've forwarded them on.  They would be -- there's nothing

13   for the Court to decide with those.  They typically involve

14   creditors who at least assert that they have not received

15   their distributions and have not received communications.

16   We've usually forwarded them -- as I say, we've forwarded

17   them on.  And in many of the instances we've ever heard that

18   the problem has been resolved.

19           So could you just address that?  I'm sure you're

20   getting -- your firm and White & Case are both getting those

21   communications, some of them directly -- how you're dealing

22   with them when you do receive them.

23           MR. KWASTENIET:  Yes.  Absolutely, Your Honor.  So

24   we've got a subset of the team who worked on the Chapter 11

25   cases continue to be engaged and dealing with the

Page 22

1    distribution issues.  And so once we receive a

2    communication, we obviously read it carefully.  We then

3    reach out to the company to get background information on

4    who the creditor is, what type of claim they have, what

5    class they're in.  And then we'll reach out to the creditor

6    either electronically or we'll speak on the phone to try to

7    understand what steps they have gone through.  Once we

8    understand what class they're in and what they're supposed

9    to get and how that's supposed to work depending on which

10   distribution partner it is, we then will reach out to the

11   creditor to walk through what steps they've taken.  And

12   often it's a simple failure in communication or some bit of

13   information that had to be provided, wasn't yet provided,

14   and we're often able to get to the bottom of it pretty

15   quickly.

16            THE COURT:  So for the benefit of anyone who is

17   present at this hearing, who should they direct their

18   inquiries to with respect to problems with distributions?

19            MR. KWASTENIET:  People can send inquiries to me.

20   My last name is Kwasteniet, RossKwasteniet@Kirkland.com, or

21   to Mr. Koenig, Chris Koenig.  And Chris and I coordinate on

22   a daily basis with the company about distribution inquiries.

23   And both of our email addresses are in the Kirkland

24   signature block on all the pleadings and it's on the Stretto

25   website.

Page 23

1              THE COURT:  All right.  Thank you very much, Mr.

2    Kwasteniet.  Anything else you want to add?

3              MR. KWASTENIET:  No, that's it from us, Your

4    Honor.

5              THE COURT:  All right.  Let's move on to the

6    status update on preference settlements.  Who is going to

7    take that?

8              MR. HERSHEY: Yes, Your Honor.  Good afternoon.

9    Sam Hershey from White & Case for the Celsius litigation

10   administrator.

11             At the August hearing, Your Honor instructed us to

12   file a notice with a deadline for parties to accept the

13   settlement offer.  And we did so.  We filed that notice on

14   September 13th with a deadline one week from today of

15   October 15th.  We scheduled that deadline significantly far

16   out from when we filed the notice for two reasons.  One was

17   to give parties who may not have known about the settlement

18   offer sufficient time to consider it.  The other was to give

19   us the chance to raise the matter at this hearing so that

20   parties will hear about it here as well and will have the

21   opportunity to consider it before the offer lapses on the

22   15th.

23             I do want to note that just because the settlement

24   offer is lapsing does not mean that our settlement efforts

25   are ending.  We actually are entering what we hope will be a

Page 24

1    very productive period of voluntary mediations.  In our

2    proposed order we had suggested a 120-day moratorium on

3    litigation for those mediations to play out.  And I am

4    pleased to report that many defendants are reacting

5    positively to that suggestion.

6              We have a mediation scheduled for later this

7    month, on October 29th with a group of non U.S. defendants.

8    We've been in talks with Ms. Kovsky and Mr. Besikof

9    regarding mediations with their defendants, or their clients

10   I should perhaps say who, as Your Honor knows, number in the

11   hundreds.  And so we are using this time productively and we

12   intend to continue our settlement efforts even after the

13   settlement offer is no longer generally available.

14              THE COURT:  All right.  Thank you.  Anything else

15   you would like to add?

16              MR. HERSHEY:  No, Your Honor.  Thank you very

17   much.

18              THE COURT:  All right.  Thank you.

19              All right.  Let's move on on the agenda then.

20   Listed in uncontested matters is the first claim objection.

21              MR. GORSHICH:  Good afternoon, Your Honor.  Ron

22   Gorshich with White & Case on behalf of the litigation

23   administrator.  I'll be handling the first and second claim

24   objection.

25              THE COURT:  Okay.  Please go ahead.

1          MR. GORSHICH:  As you can see, Your Honor, we

2    filed a Certificate of No Objection.  We did not receive any

3    formal responses to either the first or second claim

4    objection.  We did indicate on the agenda that we have

5    withdrawn the motion as to certain proofs of claim.

6          Initially, as you saw in the CNO, we did that

7    because the proofs of claim did not have any address or

8    contact information at all listed.  And so we were going to

9    have to take them off and deal with that with alternative

10   service.  However, subsequently we determined that all of

11   those proofs of claim were late-filed and therefore already

12   expunged under the plan.  So the motion is actually moot as

13   to those.

14          So unless Your Honor has any questions or we have

15   any other changes, we'll provide an updated order with

16   schedules for the first and second omnibus objection

17   removing all of the claims indicated on the agenda.

18          THE COURT:  So there were -- as I understand it

19   there were a hundred claims that are identified -- that the

20   first omnibus objection applies to.

21          MR. GORSHICH:  Correct, Your Honor.

22          THE COURT:  As to 96 or 100, I don't have a

23   question.

24          MR. GORSHICH:  Okay.

25          THE COURT:  As to four of the hundred, it was less

Page 26

1    clear to me whether the claims -- because some of those

2    proofs of claim were filed prior to the bar date.

3           MR. GORSHICH:  Yes, Your Honor.

4           THE COURT:  Well, I guess they were all filed

5    before the bar date.  Some were filed before the bar date

6    order was entered.  And some of those claims did include

7    some documentation, some of which we are not able -- when I

8    say we, my chambers have not been able to open and see.  Let

9    me specifically identify which ones.

10          The claim of Maggie Berg, B-e-r-g.  The POC was

11   filed on February 11th, 2023 before any of the bar dates.

12   The Claimant provides a dollar amount of her claim, $250.

13   And the proof of claim seems to have been substantially

14   filled out.  It's unclear whether any supporting

15   documentation was filed as part of that claim.

16          And unless you are prepared to -- I'll identify

17   the four that I have questions about.  As to those, I will

18   give you a chance to address them.  What I am inclined to do

19   is enter an order as to 96 of the claims expunging the

20   claims, and as to four ask for some further information from

21   the Debtors.  There were no responses filed on any of these.

22          So the first is, as I said, the claim of Maggie

23   Berg.

24          The second is the claim of Lena Chishti, C-h-i-s-

25   h-t-i.  And the proof of claim was filed on January 21,

Page 27

1    2023.  Again, the Claimant provides a dollar amount, $250.

2    The claim form was substantially filled out.  One supporting

3    document was filed, but it's inaccessible to us.

4            The third one is the claim of Cruz Marlene

5    (indiscernible), I'll spell the last name, C-o-v-a-r-r-u-b-

6    i-a-s.  The proof of claim was filed on January 25th, 2023.

7    The Claimant also provides a dollar amount, the same $250.

8    The proof of claim was substantially filled out.  There was

9    some supporting documents uploaded.  I haven't been able to

10   access it.

11           The fourth of these hundred claims is the claim of

12   John Dehass, D-e-h-a-s-s.  The proof of claim was filed on

13   December 16th, 2022 against the $250 claim.  And I really

14   can't tell whether there was any supporting documents or

15   not.

16           So what I would like to do -- well, I'll give you

17   a chance if you want to address those four now.  Otherwise,

18   I'll give you a chance to do it after.  I'm not prepared,

19   unless I have a better understanding with respect to those

20   four, whether there really is sufficient documentation

21   claims or not.

22           And as to the other 96, yes, we are prepared to

23   enter an order sustaining the objection as to the other 96.

24   I don't know whether you want to address the four or not.

25           MR. GORSHICH:  The only comment I could make on

Page 28

1      those four is that in addition to being insufficient

2      documentation, the basis for these are also books and

3      records objections.  We reviewed each of these and reviewed

4      the Debtor's books and records and determined that these

5      claimants did not appear to have any amount owed to them in

6      the books and records.  If they had any kind of valid

7      account, they would have been included on a subsequent

8      omnibus objection that we were seeking to reduce and allow.

9      And you'll hear those at the next omnibus hearing.  But for

10     these, none of these Claimants appear in the Debtor's books

11     and records to have any valid claim in any amount.

12              If you would prefer, we are happy to pull --

13              THE COURT:  Well, let me interrupt.

14              MR. GORSHICH:  Sorry, go ahead.

15              THE COURT:  Because some of them seem to attach

16     something that we weren't -- my chambers was not able to

17     access.  So here's what I would like to do.  Yes, and I see

18     that you've also indicated that the books and records didn't

19     reflect anything on these claims.  But I don't know what

20     they attached.

21              So we'll go ahead and enter an order sustaining

22     the objection as to the other 96.  As to those four, I'm

23     going to deny -- overrule the objection without prejudice.

24     I don't think you have to do a lot more on it, but I just

25     want to be satisfied as to when it was.

```
1              I know you said that there was nothing in the

2      books and records, but I -- unless you can tell me what it

3      is they attached or that we have not been able to access.

4              MR. GORSHICH:  I could pull them --

5              THE COURT:  Why don't we do this?  Rather than do

6      it now, I'll sustain the objection as to the 96.  I will

7      overrule the objection without prejudice as to the four.

8      You can bring those back on and just provide a clear

9      explanation to me.  Okay?

10             MR. GORSHICH:  Explaining what they attached so

11     you can specifically --

12             THE COURT:  Yeah.  I would like to know what it is

13     that they attached.  You know, they attached something.

14     They completed proofs of claim.

15             MR. GORSHICH:  Okay.

16             THE COURT:  The fact that they're not -- you know,

17     if someone completes a proof of claim, the fact that you

18     don't reflect it in your books and records doesn't

19     automatically mean that the objection gets sustained.

20             MR. GORSHICH:  Sure.  Understood.  I mean, if they

21     have valid evidence of -- then they have to make a prima

22     facie case, right?

23             THE COURT:  Yes.  Yes.

24             MR. GORSHICH:  And they don't -- okay.  Sure.

25     Happy to explain what they attached.  Would you like them
```

Page 30

1    attached to a subsequent objection or lodged with the Court

2    if you're not able to see them on your end?

3              CLERK:  Judge?

4              MR. GORSHICH:  Did the Court freeze?

5              CLERK:  I think he might have frozen.  Let me

6    contact him.

7              CLERK:  The Judge is -- hi, Judge.

8              THE COURT:  You are able to see and hear me now,

9    Deanna?

10             CLERK:  Yes, Judge.

11             THE COURT:  Okay.  I apologize to everybody.  I

12   had some technical problems.  Zoom crashed, but I am back on

13   now.

14             I wanted to move on to the second claim objection.

15             MR. GORSHICH:  Your Honor, I am not sure if you

16   heard my last question.  I was asking if it would be

17   convenient for the Court, we would also be happy to send

18   complete copies of those four claims to chambers with the

19   next objection to make sure you saw the documents.

20             THE COURT:  Absolutely.  I would appreciate it

21   very much.

22             MR. GORSHICH:  Okay, will do.

23             THE COURT:  All right.  Let's move on to the

24   second claim objection.

25             MR. GORSHICH:  Your Honor, exactly the same

```
 1    process with the second claim objection.  We had informal

 2    responses, reached out, and they were not resolved.  And

 3    then we subsequently withdrew them on the agenda.  Did you

 4    have any questions on those or other claims that we should

 5    remove to discuss subsequently?

 6              THE COURT:  Let me -- give me a moment.

 7              Just briefly describe what the second claim

 8    objection covers.

 9              MR. GORSHICH:  Your Honor, it's exactly the same

10    as the first.  We split them up only because of the 250

11    limit.

12              THE COURT:  Right.

13              MR. GORSHICH:  And so these are also insufficient

14    documentation in books and records.  We went through each of

15    these, determined that the proofs of claim didn't represent

16    a valid claim, and the books and records didn't show any

17    amounts owed to any of these creditors.  And again, no

18    formal responses were filed.

19              THE COURT:  Does anybody else wish to be heard

20    with respect to the second omnibus objection claim?

21              Those objections are sustained.

22              MR. GORSHICH:  Thank you, Your Honor.

23              THE COURT:  Okay.  All right.  Let's go on to the

24    motion to enforce the settlement.

25              MR. HERSHEY:  Yes, Your Honor.  Sam Hershey again
```

1      from White & Case for the litigation administrator.

2              Your Honor, at the last hearing my colleague,

3      Lucas Curtis, explained that we would be filing this motion.

4      We did so.  We did not receive any objections to the motion.

5      I will note that the motion, as we hoped it would, spurred

6      some parties to action.  Originally there were 97

7      individuals against whom we were seeking to enforce the

8      settlement agreements.  Ten have engaged with us and have

9      resolved their breach.  And so we submitted a revised list

10     of parties subject to the proposed order, which is now 87

11     parties instead of 97 parties.

12             I will note as well that we filed the motion under

13     seal and we have a motion to seal on the agenda.  We sealed

14     personal identifying information as well as details of

15     parties' specific settlements as we are concerned that if

16     those details become public, it could impair our ability to

17     settle going forward.

18             THE COURT:  Give me a moment, Mr. Hershey.

19             MR. HERSHEY:  Of course, Your Honor.

20             THE COURT:  Let's back up a minute.  I want to ask

21     a more fundamental question.  What is it in the plan or in

22     any order entered by the Court that authorizes the plan

23     administrator to settle claims without approval of the Court

24     --

25             MR. HERSHEY:  Your Honor, I --

 1          THE COURT:  Hold on.

 2          MR. HERSHEY:  Sure.  Of course, Your Honor.

 3          THE COURT:  And in some cases, many larger cases,

 4   I've entered orders that provide authority for I'll call it

 5   the plaintiff to settle claims without court approval within

 6   certain dollar parameters.  But there's usually been

 7   something in the plan or the order confirming the plan or in

 8   some other document that provides the authority.  And I'm

 9   just not sure what if anything there is at this point.

10          You're asking -- so you've made a motion to

11   enforce settlements.  You say it's now 87.  They're

12   contracts.

13          MR. HERSHEY:  That's right, Your Honor.

14          THE COURT:  They were entered into by the plan

15   administrator.  And was I ever asked to approve those

16   settlements?

17          MR. HERSHEY:  No, Your Honor.  And let me -- just

18   a clarity for the record.  It's the litigation administrator

19   who is entering into the settlement agreements.  And Your

20   Honor is correct, we -- under the authority in the plan, we

21   have not asked Your Honor for approval.  I am trying to get

22   the exact cite from the plan that gives us that authority.

23   And I might need to come back to Your Honor with that exact

24   cite.  But is my understanding the plan provides that

25   authority.

Page 34

1          THE COURT:  So I've had my law clerks on the hunt

2     for the provision.  And Article 7, Section C, ECF 4289 at

3     Page 76 provides the litigation administrator with the sole

4     authority to -- this is Romanette (b), settle or compromise

5     any disputed claim without any further notice to or action

6     order or approval by the bankruptcy court.  But that's

7     claims against the estate, not claims asserted against

8     anyone.

9          MR. HERSHEY:  So, Your Honor --

10          THE COURT:  Let me go on.  Okay?

11          MR. HERSHEY:  Of course, Your Honor.

12          THE COURT:  Just bear with me, okay?

13          MR. HERSHEY:  I will, Your Honor.  Of course.

14          THE COURT:  So what also potentially bears on this

15     issue is Article 8, viii(C).  And it breaks down withdrawal

16     preference exposure less than $100,000 and over $100,000.

17     And it basically released claims for anybody who voted in

18     favor of the plan with preference exposure, withdrawal

19     preference exposure less than $100,000.  And for those above

20     -- with preference exposure above $100,000, if they voted in

21     favor of the plan, doesn't opt out under the releases under

22     the plan, and provides the Debtor or litigation

23     administrator as applicable with cash equal to 27.5 percent

24     of such accountholder's withdrawal preference exposure no

25     later than 14 days prior to the effective date, that's the

Page 35

1     proof as well.

2            But I haven't found -- but that doesn't fit what I

3     -- well, I don't know.  Does that fit any of the settlements

4     which I am being asked to enforce now?

5            MR. HERSHEY:  Your Honor, I think the provision

6     that covers these settlements is Article 4, Section L.  And

7     I can -- the docket cite, it's the notice of the revised

8     proof of -- excuse me, the notice of revised plan that was

9     filed on January 29th of this year.  It's Docket Number 4289

10    and Page 57, PDF 57 is what I'm looking at.  And I can just

11    -- I will read it to Your Honor --

12           THE COURT:  Go ahead.  Read it to me.

13           MR. HERSHEY:  So Section L, the header is

14    Litigation Administrators, Litigation Oversight Committee,

15    and Contributing Claims.  And it says, "On the effective

16    date, one or more litigation administrators will be

17    appointed to prosecute, settle, or otherwise resolve any

18    remaining disputed claim."  Which is what Your Honor spoke

19    about.  And then "(Including any related causses of action

20    that are not released, waived, settled, or compromised

21    pursuant to this plan.) the recovery causes of action and

22    the contributing claims," and it goes from there.

23           So I think -- I believe -- I have to look at the

24    defined terms.  I think the recovery causes of action

25    relates to our avoidance action seeking to recover these

Page 36

1    preference liabilities.

2              THE COURT:  But the language you just read to me,

3    Mr. Hershey, didn't authorize -- yes, it authorized the

4    administrator to settle it, but does it authorize them to

5    settle it without approval of the Court?

6              MR. HERSHEY:  Your Honor, perhaps it would make

7    sense -- I would request the opportunity to look into this

8    issue further.  Because my assumption is there are other

9    provisions to the plan that would -- or the litigation

10   administrator agreement that might -- that the Court

11   approved that might provide that authority to do these

12   things without court approval.

13             So perhaps we can carry forward the motion and

14   we'll brief this issue.

15             THE COURT:  We can.  Let me -- I've got pages of

16   notes here that I'm going through.

17             It's not my intention to create problems for any

18   party here.  But I've got to follow what the law is.  And it

19   may be that you'll provide me with authority that says post-

20   confirmation a plan administrator can go ahead and settle

21   the claims, estate claims without approval of the Court and

22   that 9019 doesn't apply, et cetera.  Okay?  I'll be

23   interested in hearing that.

24             MR. HERSHEY:  Okay, Your Honor.  Absolutely.

25             THE COURT:  I'm still reading some notes.  Okay?

1           MR. HERSHEY:  Sure.  Of course, Your Honor.

2           THE COURT:  Certainly -- I read you a couple of

3    the provisions from the plan that dealt with -- you know,

4    that said yeah, you could settle it for 27.5 percent.  I

5    don't know if the settlements fir that or not.

6           For me to be able to enforce the agreements, I

7    need to understand that, yes, the plan administrator had the

8    authority to enter into these contracts.  That's what they

9    are, they're contracts.  And enforce the terms.  Okay.  Let

10   me raise another issue.  Give me a second.

11          So when I wrote notes to myself, Mr. Hershey, I

12   said do I have to conduct a 9019 analysis with respect to

13   each settlement.  The settlements, the concluded agreements,

14   was the Court required to approve each settlement?

15   Sometimes Plaintiff was permitted to settle claims within

16   certain parameters without obtaining court approval.  And I

17   looked at things like the plan or confirmation order or

18   something else.

19          So on the sealing, I understand what it is that

20   the -- the reasons that have been articulated for sealing

21   these settlements.  But there are at least two cases, one by

22   me, one by Judge Lynch when he was sitting as a district

23   judge, that bear on this issue.

24          So my opinion in In re In re Oldco M Corp., 466

25   B.R. 234, 237-238 (Bankr. S.D.N.Y. 2012).  That's my

Page 38

1    opinion.

2              And I followed -- and in that decision I followed

3    the opinion by Judge Lynch when he was a district judge in

4    Geltzer v. Anderson Worldwide S.C., 2007 WL 273526 *4

5    (S.D.N.Y. Jan. 30, 2007).

6              Both involve settlements.  Judge Lynch -- you can

7    read what he had to say.  Essentially my takeaway is that

8    preserving a position of leverage and negotiation with

9    third-party claimants does not justify sealing court

10   records.

11             And in Oldco M which I wrote, there's a very

12   strong policy of public access to all court records.  And an

13   important function of the court when it has to rule on 9019

14   motions, which I haven't been asked to do here, is do it in

15   a transparent way that the public and parties in interest

16   can review what the court did and see whether they agree,

17   disagree, whatever.  Parties in interest may have a right to

18   appeal.

19             One of the things I said in Oldco was there's no

20   discernible public interest or interest of the bankruptcy

21   estates in -- and I'm quoting Judge Lynch, "Preserving

22   leverage as against other parties."  Okay.

23             So, look, I am sensitive to this issue.  I

24   understand you could potentially alter the settlement

25   dynamics.  And it may be that there are other cases that I'm

1    not aware of, Mr. Hershey, with respect to the sealing

2    issue.

3              When I wrote Oldco, I had found Judge Lynch's

4    decision in Anderson Worldwide.  And I can't say I explored

5    -- I'm sure I looked further and didn't find anything.  But

6    let me say, whether this would be determinative or not, if

7    the litigation administrator had authority to settle claims

8    without approval of the bankruptcy court, if I didn't have

9    to rule on a 9019 motion, I could see the arguments why in

10   that circumstance if there was confidentiality provisions

11   regarding the settlement, that they be kept under seal under

12   Rule 1007, or Code Section 1007(b).  I don't know.  Again,

13   I'm not looking to create undue problems.  I understand

14   we've got a situation here, we've got close to 2,500

15   preference actions.

16             Just bear with me a second.

17             And I certainly understand as a practical matter

18   that disclosing the terms of settlement in a handful of

19   settlements already been achieved could have an impact on

20   the dynamics, but I need some more set on that.

21             Ms. Kovsky, you 've got your hand raised.  Let me

22   call on you.

23             MS. KOVSKY-APAP:  Thank you, Your Honor.  I just

24   wanted to raise an issue with respect to sealing.  And to be

25   clear, I don't believe any of my clients are involved in

Page 40

1    this particular motion.  However, as Your Honor is aware,

2    Troutman represented hundreds of clients, many of whom have

3    already settled.  And leaving aside whether or not the

4    Plaintiff was required to seek court authority, our

5    understanding and the representation made to us is that that

6    wasn't necessary, and my clients certainly did not want to

7    have their name or the terms of the settlement agreement

8    that they agreed to in the public record.

9              And this case has really shown us in a lot of ways

10   how the world has changed.  And while, yes, transparency and

11   public information is critical to court cases to bankruptcy,

12   at the same time, my clients have been the victims of

13   phishing attacks, they have been the victims of scams.

14   They've had emails hacked.  I mean, the list goes on and on.

15   And putting individuals' information out there, we run into

16   all of the same arguments that we were making sure on or

17   during the bankruptcy case, that there are legitimate, real-

18   world, practical reasons to protect this information that

19   have nothing to do with the Plaintiff desire to be able to

20   leverage higher settlements, or lower settlements for that

21   matter, from other Defendants.  This is really a matter of

22   privacy and protection for folks who have already decided to

23   settle and don't want to be further harassed by phishing

24   attacks and so forth.

25              I think Your Honor might be frozen again.

1              CLERK:  Judge?  Let me get hold of him.

2              MS. KOVSKY-APAP:  Your Honor, I think you're on

3    mute.

4              THE COURT:  Yeah.  I unmuted.  I don't know what

5    the problem is today.  I usually don't have this problem.

6              Ms. Kovsky, I mean, very early on -- I'm maybe

7    repeating some of what people heard.  Early on I wrote an

8    opinion about sealing.  And thereafter there were many

9    phishing attempts, there were threats, there were all sorts

10   of things.  I am very sensitive to this issue.

11             Judge Lane in Gemini wrote an opinion going the

12   other way.  And I have a lot of respect for Judge Lane and

13   his opinion.  I think the world -- you know, a lot of things

14   happened by the time of that.

15             Judge Dorsey in FTX sealed information -- this

16   wasn't the settlement information.

17             I am not opposed -- you know, I would -- I am open

18   to considering whether it all should be sealed.  I am open

19   to considering whether PII, including the names of the

20   settling parties, should be sealed.  I am not ruling, okay?

21   I think these are difficult issues.  Okay?  I am very

22   sensitive to this issue of the strong public policy of

23   public access to court records in bankruptcy cases.  And

24   courts should be able -- the public and parties should be

25   able to see if-- again, it's a question -- I don't know --

Page 42

1    I'm not saying that the plan administrator didn't have

2    authority to settle it without coming to the bankruptcy

3    court to seek approval.  I am not suggesting that if a 9019

4    motion were presented that I wouldn't approve it.  I am not

5    saying whether or not I would be persuaded in the facts in

6    light of everything that's transpired in these cases to

7    seal, including names.  But that wouldn't necessarily mean

8    it ought to seal information about the preference claim with

9    X dollars and something about what it was settled for and

10   maybe what the -- I just don't know.

11          So I think the first thing that strikes me, if the

12   plan administrator has the authority to settle without the

13   authority of the bankruptcy court, I could certainly see --

14   look, private settlements don't have to be disclosed.  And I

15   think -- I can go back and read Judge Lynch's opinion

16   recently, but I think he recognized the distinction between

17   settlements that private parties reach, which frequently are

18   confidential and under seal, and those that require court

19   approval.  And in bankruptcy court, many of the settlements

20   that I am presented with I do have to decide whether to

21   approve.  And here judicial action is required to approve,

22   then it raises issues about what facts of circumstances

23   about it should be disclosed.  Okay?

24          Let me just -- I've said this before.  I have --

25   you know, in some large cases, I have approved a trustee or

Page 43

1    a plan administrator's authority to settle up to a

2    particular dollar amount without court approval.  But I've

3    never seen blanket authority and I've never -- I've looked -

4    - you know, again, whether the argument is that post-

5    confirmation the bankruptcy court doesn't have to approve

6    the settlements.  You know, if that's the showing you make,

7    fine.  Okay.

8           Ms. Kovsky, I sort of cut you off.  Is there

9    anything else you wanted to add?

10          MS. KOVSKY-APAP:  No, Your Honor.  I just wanted

11   to flag the PII issue.

12          THE COURT:  I'm very sensitive to the PII issue.

13          Mr. Hershey, go ahead.

14          MR. HERSHEY:  Yes, Your Honor.  Thank you very

15   much for these comments.  We will certainly address them.

16   And I was wondering if Your Honor had a briefing structure

17   or schedule in mind for addressing these issues or how we

18   should approach them.

19          THE COURT:  Well, this was an uncontested motion.

20   That's the other thing.

21          MR. HERSHEY:  Right, Your Honor.

22          THE COURT:  I don't rubber stamp uncontested

23   motions.  I at least want to be satisfied that I have a good

24   faith basis to granting the relief that I am asked to grant.

25          MR. HERSHEY:  Understood.  Would Your Honor permit

Page 44

1      us two weeks let's say to submit?

2              THE COURT:  Yes, I would.

3              MR. HERSHEY:  Okay.  That would be great.  Thank

4      you.  We will do that.  And we'll address your questions,

5      Your Honor.  Thank you very much.

6              THE COURT:  Okay, all right.  Thanks very much.

7      All right.  Let's move on on the agenda.

8              All right.  We get to the adversary proceedings.

9      And at least by my reckoning, the next matter is the motion

10     to approve alternative service on a wallet.  And I guess,

11     Mr. Hurley, this is yours.

12             MR. HURLEY:  Yes.  Good afternoon, Your Honor.

13     You are right.  It's not just a wallet, it's a number of

14     wallets.

15             THE COURT:  It's a number of wallets.

16             MR. HURLEY:  Mitch Hurley on behalf of the

17     litigation administrator.

18             So we filed on September 24th our motion for

19     alternative service, Your Honor.  It's in connection with

20     three cases at Index 24-04005, 24-03994, and 24-04004.  And

21     each of those cases involve some defendants where the only

22     identifying information available is the wallet address

23     where a transfer that we believe our client is entitled to

24     recover was made.

25             So we filed that motion on September 24th.  We are

Page 45

```
 1   seeking approval of a kind of service that is certainly new-

 2   ish.  They weren't doing it 15 years ago.  But --

 3            THE COURT:  It seems to happen a lot in the

 4   Southern District of Florida.

 5            MR. HURLEY:  Yes.

 6            THE COURT:  I think all the cases you've cited are

 7   Southern District of Florida District Court opinions.  I've

 8   read each of them.

 9            MR. HURLEY:  There is at least one case from New

10   York State.  But the federal court cases, you may be right

11   that they're all -- hold on, I'm looking at the list now.

12            THE COURT:  I found the links to the briefs, but

13   not -- and I think one of them a very short order.  But none

14   of them were reasoned opinion -- I'm not, you know, I am

15   intrigued.

16            Let me ask you this.

17            MR. HURLEY:  Sure.

18            THE COURT:  And I thought that the -- give me a

19   second.  The Trager declaration that you submitted in

20   support, ECF 12, was very good.  He's obviously very

21   experienced.  It laid out a lot -- look, I am  not -- I

22   certainly was not familiar with service by creating a

23   website, dropping something into a wallet.  And it was

24   pretty well descried.  The opinions that I read from -- they

25   were short, but the opinions from the Southern District of
```

Page 46

1    Florida, they were uniform in their outcome.  They permitted

2    it.

3            Do you have any information that these wallets

4    have been accessed any time recently?

5            MR. HURLEY:  So let me say first of all, Your

6    Honor, on behalf of Mr. Trager, thank you for the compliment

7    on his declaration.  Mr. Trager is present today if Your

8    Honor has any questions for him.

9            I don't know the answer to your question sitting

10   here right now.  We can get you that information.  It's

11   possible Mr. Trager has the answer with respect to how

12   recently some of these wallets have been active.  But just

13   to be clear, there are a pretty large number of wallets.

14   It's a dozen-plus.  So I'm not sure he's going to have that

15   at his fingertips.  We can absolutely get you that

16   information, but I don't have it now.

17           THE COURT:  So let me ask you, if I authorize this

18   service, I gather that Mr. Trager will be able to ascertain

19   whether the links dropped into the wallet, the links to the

20   website that have the service papers, whether -- those have

21   been accessed through the wallet, am I correct in that?

22           MR. HURLEY:  So I believe the answer to that is

23   yes.  As I said, Mr. Trager is on.  With Your Honor's

24   permission, maybe we can just ask him directly?

25           THE COURT:  I would like that.

 1              MR. HURLEY:  Okay.  Jason?

 2              MR. TRAGER:  Can everyone hear me?

 3              THE COURT:  I can hear you.  Just identify your

 4      full name if you would.

 5              MR. TRAGER:  Good afternoon, Your Honor.  I am

 6      Jason Trager.  I am the senior director of the Blockchain

 7      and Digital Assets Practice with FTI Consulting.  Good

 8      afternoon everyone as well.

 9              THE COURT:  So let's assume I authorize this

10      service.  As I understand, you set up a website.  The

11      services papers go in there.  You drop a link into the

12      wallet.  I may be very inexact in what I am describing.  I

13      don't have your declaration open in front of me.

14              And are you able to tell if someone has accessed

15      the website with the service papers?

16              MR. TRAGER:  Yes, Your Honor.  So what we'll be

17      able to do is, one, confirm the moment that the token is in

18      the wallet that we are airdropping it to so that it's one

19      metric for service.

20              THE COURT:  How do you do that?

21              MR. TRAGER:  We can use open explorers and

22      proprietary explorers that will -- for the Ethereum network,

23      the Bitcoin network, which are the only two networks we're

24      going to be using, they are public networks.

25              THE COURT:  Okay.

Page 48

1          MR. TRAGER:  So we'll be able to see the exact

2    moment that they are officially transacted and now in the

3    possession of the wallet holder.

4          THE COURT:  Okay.  And can you see when the link

5    is connected and they get -- and ostensibly get access to

6    the service papers?

7          MR. TRAGER:  Yes.  And that we'll be able to do on

8    the back end through the website.  When the link is typed,

9    we'll be able to track what time and date the visitor

10   arrives.

11         THE COURT:  THE COURT:  Okay.

12         MR. TRAGER:  And in regards to your earlier

13   question, Your Honor, I do not have those exact dates that

14   they were last accessed, but that is something that we can

15   do as well, figure out when each of these wallets was last

16   transacted with or used.

17         THE COURT:  And you have the information when Mr.

18   Stone transferred assets into those wallets?

19         MR. TRAGER:  Yes, Your Honor.

20         THE COURT:  So you would be able to ascertain --

21   you could provide a declaration about when Stone transferred

22   crypto into the wallets and when after that the wallets were

23   accessed?

24         MR. TRAGER:  So we will be able to tell you the

25   last time that assets were transacted utilizing those

Page 49

1   wallets.  We wouldn't be able to tell you exactly if

2   somebody viewed the contents of the wallets and didn't

3   transact.

4          THE COURT:  Okay.

5          MR. TRAGER:  But could certainly tell you the last

6   time that a transaction occurred.

7          THE COURT:  All right.

8          MR. HURLEY:  And I should say, Your Honor, in some

9   cases the wallets are subsequent transferees.

10         THE COURT:  Mr. Hurley, you just need to identify

11  yourself as a speaker when you...

12         MR. HURLEY:  Apologies.  Mitch Hurley with Akin

13  Gump on behalf of the litigation administrator.  In some

14  cases, Your Honor, the transfers are subsequent transfers.

15         THE COURT:  Okay.  Have any judges in the Southern

16  District of New York approved service by this method?

17         MR. HURLEY:  So, Your Honor, we identified the

18  cases that we found --

19         THE COURT:  I think you cited one case that Judge

20  Cote had written.

21         MR. HURLEY:  That sounds right, Your Honor.  I

22  don't have it in front of me right now.  But the cases that

23  we put into our submissions are the cases that we found.

24         We do think that it's a hundred percent consistent

25  with the rules, including the state court rules that we

1   would be relying on if they were domestic and Rule 4 to the

2   extent they are foreign.  So under the --

3            THE COURT:  So your position with respect to

4   foreign and any of the -- because we don't know where these

5   wallets are.

6            MR. HURLEY:  Correct.

7            THE COURT:  And your position is there's nothing

8   in the Hague Convention that rules out service by this

9   method?

10           MR. HURLEY:  That's exactly right.  We are not

11  aware of anything that would suggest that there's

12  international law prohibiting service (indiscernible).  And

13  of course we cited the cases that have allowed it in the

14  past.  So that's right, Your Honor.

15           THE COURT:  Okay.  So what happens if you do this

16  and you get no response?  What do you do next?

17           MR. HURLEY:  That's a question we've certainly

18  been grappling with, Your Honor.  And I think that part of

19  it may involve coming back to you, looking for discovery in

20  various forms.  We are hoping that we will get some

21  responses in connection with the service that we engage in.

22  But all we can do today is act with the information that we

23  have.  We're certainly not going to stop looking for

24  additional information that would allow us to take further

25  steps even if they are -- we don't get responses on at least

Page 51

1   some of these.  And I would be shocked if we got responses

2   on all of them.

3          So we are going to just take it one step at a time

4   really, Your Honor.

5          THE COURT:  Okay.  There are several hands raised.

6   Mr. Weltman?  You need to unmute.

7          MR. WELTMAN:  Thank you.  I just want to be guided

8   by Your Honor.  Mr. Hershey made a comment about the October

9   15th deadline.  At some point I would like to address that,

10  when you believe is the correct --

11         THE COURT:  We're well past that.  I mean, why

12  didn't you speak up before?  We're on -- much further on in

13  the agenda.

14         MR. WELTMAN:  No, I appreciate that.

15         THE COURT:  Right now we're on the issue of

16  alternate service by tokens --

17         MR. WELTMAN:  No, I understand that.  I understand

18  that.

19         THE COURT:  Are you speaking to service by

20  dropping tokens into wallets?

21         MR. WELTMAN:  No, I'm not speaking to that issue,

22  Your Honor.

23         THE COURT:  Then don't speak.  I'll -- maybe I'll

24  come back to you.  But you should have raised your hand

25  before.

Page 52

1          MR. WELTMAN:  Please (indiscernible) I would

2     appreciate it.

3          THE COURT:  Okay.  Mr. Vaughan.

4          MR. VAUGHAN:  Yes.  And I find this entire concept

5     extremely concerning.  Essentially for the very reasons that

6     Mr. Trager and Mr. Hurley are referring to, the blockchain

7     on which these tokens are being distributed.  There simply

8     is no way to know who views those tokens and who would be

9     clicking the links therein.  Because as they said, it's a

10    public blockchain.  You or I could go see that token the

11    second it goes into that wallet, click on that link, and

12    then all of the sudden it will trace back to your or I's

13    URL.  There is no --

14         THE COURT:  How do you distinguish the consistent

15    line of cases from the Southern District of Florida that

16    have authorized service in exactly this manner?

17         MR. VAUGHAN:  Well, Your Honor, frankly I think

18    (indiscernible) to Florida because this is a new technology

19    and hasn't fully considered the ramifications of allowing

20    service by dropping in a wallet address.

21         THE COURT:  You didn't file a brief in this.  You

22    didn't -- I am listening to you, but nobody filed anything.

23         MR. VAUGHAN:  You are correct, Your Honor.  It

24    wasn't an issue that I briefed on.

25         THE COURT:  Go on.  I'll let you finish.  Go

Page 53

1    ahead.

2            MR. VAUGHAN:  Yeah, no.  Because it's a public

3    blockchain, Your Honor, anyone can view this link and click

4    on it.  And the very idea that just because it was dropped

5    into a wallet and that someone clicked on it after it was

6    dropped in the wallet is not at all instructive as to

7    whether someone was actually served by receiving it there.

8    Because anyone can view it since it's on a public

9    blockchain.  So it simply is not effective service because

10   it just says to the world this was dropped into this wallet

11   and this link is available to be clicked.

12           THE COURT:  Mr. Hurley, do you want to respond?

13           MR. HURLEY:  Your Honor, may I respond?

14           THE COURT:  Yeah, please.

15           MR. HURLEY:  Yeah. I mean, the fact that other

16   people besides the defendant can review it doesn't mean that

17   the defendant can't also review it.  And the point with

18   service is to get that document in front of the defendant.

19   It seems to me that the fact that others also can see it is

20   just immaterial.

21           MR. VAUGHAN:  Your Honor, may I respond?

22           MR. HURLEY:  Your Honor, I actually don't know who

23   Mr. Vaughan represents.

24           THE COURT:  I don't, either.  Who do you

25   represent, Mr. Vaughan?

Page 54

1                MR. VAUGHAN:  Your Honor, I represent 42

2    defendants in the adversary proceedings.

3                THE COURT:  Do any of them own the wallet that's

4    identified in the caption?

5                MR. VAUGHAN:  No, Your Honor.  But as the group

6    grows and expands, I would be fearful that this would be

7    deemed as --

8                THE COURT:  Well, unless you're telling me you

9    represent a party in interest with respect to this motion, I

10   mean, I hear what you are saying.  But do you have standing

11   to object?  Let me ask you quite clearly; do you represent

12   any party in interest in any of the cases that are included

13   in this motion about service by token on a wallet?

14               MR. VAUGHAN:  Well, frankly, Your Honor --

15               THE COURT:  Yes or no?

16               MR. VAUGHAN:  It's hard to say at this point

17   because we --

18               THE COURT:  No, it isn't hard to say.  You've got

19   clients.  Are you representing to the Court that you

20   represent a client that has an ownership interest in one of

21   the wallets that's identified in these adversary

22   proceedings, yes or no?

23               MR. VAUGHAN:  Not to my knowledge, Your Honor.

24               THE COURT:  Okay.

25               MR. VAUGHAN:  But that's not to say that --

Page 55

1           THE COURT:  All right.  Thank you very much.

2           MR. VAUGHAN:  Yes, Your Honor.

3           THE COURT:  Go ahead, Mr. Hurley.

4           MR. HURLEY:  So, Your Honor, I don't have much

5    more to add beyond what's in the papers.  We do believe that

6    this method of service is authorized by the rules and

7    consistent with approaches to alternative service that have

8    been laid out in lots of cases.  And then there are a number

9    of specific instances that are all cited in a brief, you've

10   already referenced them, where this exact kind of approach

11   to service has been endorsed in the past.

12           It's the method that's available for us to proceed

13   against these defendants.  It's the only method.  And so we

14   respectfully ask that Your Honor approve the approach.

15           THE COURT:  What I would like is file a

16   supplemental declaration from Mr. Trager showing that

17   subsequent to the transfers or subsequent transfers, that

18   the wallets were accessed.  I might have a different view.

19   I don't know for sure, Mr. Hurley.  But what if these

20   wallets have not been accessed since whenever the transfers

21   were made, would you still say that service in this matter

22   is appropriate?  I mean, it has to be serviced reasonably

23   practicable in the circumstances to give actual notice.  And

24   if there were wallets that just are there and haven't been

25   accessed, that's a concern to me.

1           MR. HURLEY:  Understood.  I don't think the other

2      cases that we have seen have made that a condition of

3      granting or approving this method of service.  I understand

4      the concern you're raising.  I mean, I suppose it's similar

5      to a last-known mailing address.  I mean, you provide -- you

6      mail papers to that address.  I don't think typically you

7      would even be able to prove that somebody has received mail

8      at that address lately.  What you can demonstrate is that at

9      one time the person you're trying to get documents to lived

10     there and received information there.  And I think the same

11     thing would be true with a wallet.  We certainly don't have

12     any evidence that the ownership of the wallet has changed

13     since the transfer that we're seeking to recover on.  So I

14     would think it's similar to that, Your Honor.

15          THE COURT:  How do you know?  I mean, I don't know

16     one way or the other whether the ownership of the wallets

17     have changed since the transfers were made.

18          MR. HURLEY:  It's a fair point, although I think

19     probably that would not be an inquiry with respect to let's

20     say allowing mail service.  You would probably have to

21     establish that the house that you want to mail to hasn't

22     been sold since the last time there's evidence that the

23     person you're trying to contact lives there.

24          But let us work with Mr. Trager.  We'll come back

25     to you with the information that we have.  I honestly don't

Page 57

1    know the answer to the question about which of these

2    defendants will have post-transfer activity, but we can

3    certainly get that to you.

4              THE COURT:  Okay. You know, let me make clear; I

5    haven't decided that that's a determinative fact.  Okay?

6    The opinions from the judges, the district judges in the

7    Southern District of Florida, they have been at least -- I

8    don't know -- did you find any contrary authority?

9              MR. HURLEY:  My colleague, who did more of this

10   than I did, is shaking her head.  I believe the answer is

11   no, Your Honor.  We will confirm that when we come back to

12   you with the additional Trager declaration.

13             THE COURT:  Is that Ms. Scott?

14             MR. HURLEY:  Yes.

15             THE COURT:  Let me ask her, did you find anything

16   contrary, any contrary authority?

17             MS. SCOTT:  No, Your Honor.  I don't believe we

18   saw any contrary authority.

19             THE COURT:  Okay.  I'm intrigued by it.  And where

20   we go from here, I don't know.  I'm not sure the ball is

21   going to get advanced very far if radio silence is in

22   response to dropping tokens into these wallets, even if

23   they're accessed.  But we'll deal with it one step at a

24   time.

25             I am interested in knowing whether -- see, I do

Page 58

1    have trouble, Mr. Hurley, if there was evidence that

2    ownership of the wallets was transferred that the allegedly

3    improper -- that the avoidable transfer is no longer there

4    when the wallet -- you know, there were other assets in

5    there, but not the avoidable transfers.  You know, I have

6    questions in my mind.  So let's take it one step at -- I

7    won't say one step at a time, but we'll try and answer this.

8    And I don't think I'm going to -- I don't think it will be

9    that long before I provide an answer to you, okay?

10              MR. HURLEY:  Understood, Your Honor.  We'll get

11   you the additional submission right away.

12              THE COURT:  All right.  Let's move on on the

13   agenda.  The next item is customer -- Celsius customer

14   preference actions, the revised motion establishing

15   procedures.  Who is going to handle that?

16              MR. HERSHEY:  Yes, Your Honor.  That's me again.

17   Sam Hershey from White & Case for the litigation

18   administrator.

19              Before I do that, Your Honor, I do just want to

20   flag that, as I thought might happen, with the benefit of

21   time we have identified the provision of the plan that

22   allows us to settle claims without court approval.

23              THE COURT:  Okay.

24              MR. HERSHEY:  Do you mind if I read that into the

25   record?

Page 59

1          THE COURT:  No, I don't.

2          MR. HERSHEY:  Okay.  So it's again Docket Number

3     4289.  It's PDF Page 66, which is Section IV(S).  And the

4     last sentence of that section reads, "The post effective

5     date debtors, the plan administrator, and the litigation

6     administrators as applicable shall have the exclusive right,

7     authority, and discretion to determine and to initiate,

8     file, prosecute, enforce, abandon, settle, compromise

9     release, withdraw, or litigate to judgement any such causes

10    of action --" a defined term that I'll come back to, "-- and

11    to decline to do any of the foregoing without the consent or

12    approval of any third party or further notice to or action

13    order or approval of the bankruptcy court.

14          And the defined term causes of action, it's the

15    31st defined term in the plan.  It includes among other

16    things Chapter 5 claims and avoidance actions, another

17    defined term.  So that's the authority under the plan, Your

18    Honor.

19          If Your Honor would like further briefing on the

20    legal issues that are involved that Your Honor mentioned, we

21    are of course -- we will do whatever Your Honor would like.

22    But that's where the authority in the plan is.

23          THE COURT:  Obviously I'll go and read it.  I

24    appreciate your finding it and calling it to the Court's

25    attention.  My clerks and I have done obviously a fair

Page 60

1        amount of work.  We missed that one provision.

2                MR. HERSHEY:  It's a long plan, Your Honor.

3                THE COURT:  No, that's okay.  As I said earlier,

4        assuming that it's correct that the plan administrator had

5        the authority to settle the claims without seeking approval

6        of the bankruptcy court, it could well affect my 107(b)

7        sealing analysis.  Perhaps you and/or Mr. Kovsky could just

8        file something really short.  Okay?  And with regard to the

9        confidentiality of terms of a settlement that plan

10       administrators authorized to enter into without the approval

11       of the bankruptcy court.

12                As I say, as my recollection about Judge Lynch's

13       decision and my own decision, if I'm being asked to approve

14       a settlement, the parties and the public at large are

15       entitled to know what I took into account, why did I decide.

16                If the plan administrator had the authority to do

17       this on his own without approval of the bankruptcy court, I

18       think it would affect whether or not -- I mean, private

19       parties ordinarily can enter into settlement agreements that

20       are confidential.

21                I guess I would ask that if you want, file just a

22       short memorandum addressing this.

23                Ms. Kovsky, I know you are interested in this

24       point as well.  And I'm not looking for lengthy briefs on

25       the point.  Judge Lynch's decision in the Geltzer case and

Page 61

1      mine in Oldco, the only ones that -- I haven't gone back to

2      look to see whether there have been more since.  Those are

3      the only two that I am familiar with.

4                  MR. HERSHEY:  We will do so, Your Honor.  Thank

5      you very much.

6                  THE COURT:  Okay.  Thanks very much.  And I doubt

7      that you will need to have another hearing about it.  I

8      mean, you've reduced the number to 87 parties.

9                  MR. HERSHEY:  Yeah.  It's actually, Your Honor, I

10     was correct.  It's 87 agreements, but there were apparently

11     parties who were for whatever reason represented twice in

12     some of the agreements.  So it's 84 agreements among 87

13     parties.

14                 THE COURT:  Okay, 84 agreements.

15                 MR. HERSHEY:  But yes, it's reduced, Your Honor.

16                 THE COURT:  Okay, got the point.

17                 MR. HERSHEY:  Okay.

18                 THE COURT:  How much time do you want to -- do you

19     want to file anything else on sealing?

20                 MR. HERSHEY:  No, Your Honor.

21                 THE COURT:  Okay.  Ms. Kovsky, do you want to file

22     anything on sealing?

23                 MS. KOVSKY-APAP:  Your Honor, these particular

24     settlement agreements don't affect my clients.  This was --

25     I raised the point more generically should it happen in the

Page 62

1    future.

2            THE COURT:  Okay, all right.  The Court will take

3    it under submission.  It won't take me very long to decide

4    that.  Okay?

5            MR. HERSHEY:  Thank you, Your Honor.

6            THE COURT:  All right.  I think we've completed

7    the agenda.

8            MR. HERSHEY:  Oh wait.  No, Your Honor.  I was

9    about to address the motion for streamlined procedures.

10           THE COURT:  Oh right, right.  Sorry.

11           MR. HERSHEY:  I'm sorry, I got us off track.

12           THE COURT:  How could I forget?

13           MR. HERSHEY:  Yeah.  All right.  So if I may, Your

14   Honor, I'll give my argument --

15           THE COURT:  Let me get my notes.  Just a second.

16           MR. HERSHEY:  Of course, Your Honor.

17           THE COURT:  I've got a lot of notes on this.

18           I have them.  Go ahead, Mr. Hershey.

19           MR. HERSHEY:  Thank you, Your Honor.  So, Your

20   Honor, three months ago, in an effort to manage the 2,500

21   customer preference cases, the litigation administrator

22   filed a motion for streamlined procedures.  Shortly

23   thereafter, the Court requested that the parties identify

24   common issues to be litigated as to all defendants.  What

25   followed has been many conversations both internally among

Page 63

1    the litigation administrator's advisors and externally with

2    numerous defense counsel to try to come up with a set of

3    common issues and agreed procedures to govern these

4    litigations.

5         It is a testament to the success of that process

6    that of the 2,500 defendants, only 7 limited objections to

7    the litigation administrator's proposed procedures have been

8    filed, raising only a handful of discrete issues.

9         THE COURT:  But Ms. Kovsky filed something on a

10   limited objection.  She's got a lot of clients.

11        MR. HERSHEY:  That's true, Your Honor.  It's true

12   that she has a lot of clients.  But I will --

13        THE COURT:  It's not the number of clients, it's

14   the number of objections, limited objections you've

15   received.

16        MR. HERSHEY:  I will note, as Ms. Kovsky notes as

17   well, that we've had -- perhaps of all the counsel we've

18   dealt with, a very productive experience with Ms. Kovsky

19   where we've really narrowed the issues.  She did raise a few

20   issues though that I will address.

21        THE COURT:  Okay, go ahead.

22        MR. HERSHEY:  Before I do that, I will note that

23   certain of the objections have already been ruled on by the

24   Court.  So, for example, the Court ruled at the August

25   hearing that there will be mandatory mediation.  That's a

Page 64

1    decided issue.  I don't plan on addressing that again.  The

2    Court also ruled that fees for mediations will not be solely

3    borne by the litigation administrator.  I don't plan on

4    addressing that again.

5           What I will do is run through the remaining

6    disputes, particularly the large disputes that really

7    require this Court's attention.  And I just want to note

8    that if parties raise other issues than those I address

9    here, I would request the opportunity to address those

10   issues on reply.

11          I will start with what I think is the most

12   significant dispute and what in our brief we call the Phase

13   One damages issues.  So that is the question of whether the

14   litigation administrator can recover the assets that were

15   transferred by Celsius or the current value and whether the

16   litigation administrator has correctly calculated new value.

17          All parties agree that these are issues that will

18   need to be decided at some point.  We think they should be

19   decided in Phase One.  The Troutman and Lowenstein groups

20   think they should be decided in a new Phase Three.

21          Now, I get that these are issues that relate to

22   damages.  We call them the Phase One damages issues.  But to

23   be clear, there is absolutely no reason why this Court could

24   not order these issues to be decided in Phase One.  The

25   authority underlying this exercise, which I don't think

1   anyone has explicitly cited, but we all know is Rule 7042

2   which allows this Court to manage the cases however the

3   Court determines to be most efficient.

4          So when Your Honor asked us to consider common

5   issues, we weren't focused on issues that we think would

6   normally be resolved in the beginning of the case or the

7   middle of the case or the end of the case.  We were focused

8   on what we believed were the key gating items common to all

9   defendants that needed to be resolved for these cases to

10  proceed efficiently.

11         And when we considered that question, it was

12  crystal clear to us that some of the most important

13  threshold issues are the Phase One damages issues.  Again

14  and again when trying to resolve disputes with various

15  parties, we've run into these issues.  And you don't have to

16  take my word for it; you can look at what defendants

17  themselves have filed.

18         We cited in our brief just a small sample of the

19  answers and motions to dismiss that have been filed in

20  various customer preference cases, arguing that the

21  litigation administrator cannot recover the transferred

22  assets or that the litigation administrator has

23  miscalculated new value.  In fact, in one of the objections

24  to our procedures motion, which is the Falcon Rappaport

25  objection at Docket Number 14.  They argue that our proposed

Page 66

1    mediation fees were miscalculated because we based them on

2    the transaction date -- we based them on the current value

3    of the assets rather than the transaction date value of the

4    assets.  And that sort of crystallizes things.

5           As I said at the last hearing, and I'll say it

6    again now, if these issues are not decided before mandatory

7    mediation starts, which we propose would be in line with

8    Phase Two, they will be a major if not insurmountable

9    impediment to the success of those mediations.  The parties

10   will simply start too far apart to reach a resolution.

11          Now, the Troutman and Lowenstein groups argue they

12   will be prejudiced if these issues are decided in Phase One.

13   And I have to say I just don't see it.  These are purely

14   legal issues that can be resolved on the briefing.  There is

15   no experts needed, no discovery needed.  And it's not like

16   these are issues the parties have not thought about.  These

17   parties are certainly going to raise these issues in the

18   mediations.  So where is the prejudice from having the

19   parties address these issues with the Court?

20          The real prejudice would be for the litigation

21   administrator undertaking the time and expense of

22   potentially hundreds of mediations which may well be doomed

23   to failure because these important legal issues have not

24   been resolved.

25          Now, the Troutman and Lowenstein groups also argue

Page 67

1    that the litigation administrator is improperly seeking

2    reverse bifurcation.  I am sure Your Honor is familiar

3    enough with the asbestos cases that defendants cite to know

4    that this is not reverse bifurcation that we are seeking.

5    We are not seeking a trial on the amount of any defendant's

6    liability.  We're not even seeking a judicial determination

7    regarding whether any particular defendant is liable at all.

8    All we are seeking are determinations regarding questions of

9    law that have repeatedly been raised by defendants as

10   threshold issues requiring resolution for the parties to

11   reach agreement.  That is something that can be done quickly

12   and cost efficiently.  There is no reason to --

13          THE COURT:  Mr. Hershey, hold on.  I'm having all

14   sorts of problems today.  And I apologize.  You had cut out.

15   My connection disconnected.  It's reconnected now.

16          I hate to ask you to repeat, but go back.  You

17   were talking about the Phase One damage issue.

18          MR. HERSHEY:  Yes, Your Honor.  And it's no

19   problem at all, Your Honor.  I just don't know where Your

20   Honor cut out.  So I can do it all again or I can start --

21   if you remember what you last heard, Your Honor, I could try

22   to start from there.

23          THE COURT:  Why don't you quickly start again and

24   I'll slow you down when I want you to.  Okay?

25          MR. HERSHEY:  Sure, Your Honor.  Absolutely, Your

Page 68

1    Honor.

2           So we recognize that the Phase One damages issues

3    are damages issues.  You know, to be clear, Your Honor has

4    authority under Rule 7042 to --

5           THE COURT:  Oh, I don't doubt that I have the

6    authority to do it.  Okay?

7           MR. HERSHEY:  Okay, thank you, Your Honor.  And

8    the overarching point that I was making is again and again

9    these are issues raised by defendants that we are

10   encountering, particularly when trying to settle these

11   cases.  And we know this because the defendants themselves

12   in the answers and motions to dismiss that they filed in

13   their preference cases raise these issues again and again.

14   And we cited a few examples in our brief.

15          And in fact one of the objections to our proposed

16   procedures argued that our mediation fees, proposed

17   mediation fees were miscalculated because they were based on

18   the current value of the assets rather than transaction date

19   values.  So these issues are arising again and again.  And

20   as I said at the last hearing, if these issues are not

21   decided before mandatory mediation, they will be a major

22   impediment if not an insurmountable impediment to the

23   success of those mediations.  We will simply be too far

24   apart from the defendants to reach a resolution.  And so we

25   need clarity on this issue from Your Honor.

1           THE COURT:  And you think it's just purely a legal

2     issue as opposed to a factual issue?

3           MR. HERSHEY:  I do, Your Honor.  At least on the

4     issue that we are presenting, which is do we have authority

5     under 550(a) to seek return of the assets.  We think based

6     on the plain language of the statute, we do.  And are we

7     calculating new value correctly based on 547(c), which says

8     that new value is to be calculated based on a transfer to

9     the Debtor after the first preferential transfer from the

10    Debtor.  And so on that basis, we think we are -- these are

11    purely legal issues.

12          I will note, and I'm sure Ms. Kovsky will make

13    this point, that some of the arguments as to why we are

14    wrong on these issues are based on the plan of

15    reorganization.  That is again a legal document, a contract

16    that Your Honor can interpret as a matter of law.  So we

17    don't think that defense to these issues takes us out of the

18    realm of legal issues that Your Honor can quickly decide

19    just on the briefs without the need for experts or fact

20    discovery.

21          So, Your Honor, I guess the last thing I'll note

22    is the Troutman and Lowenstein groups argue that we are

23    seeking reverse bifurcation.  To be clear, that's not what

24    we're doing.  I am sure Your Honor is familiar with the

25    asbestos cases that defendants rely on to know that's not

1    what we're doing.  We're not seeking a trial on the amount

2    of any defendant's liability.  We're not even seeking a

3    decision from Your Honor regarding whether any defendant is

4    liable at all.  We are just seeking a determination on

5    threshold legal issues that have been repeatedly raised by

6    defendants and that we have seen as an impediment to

7    reaching resolution.  And we believe a resolution is

8    necessary for the mandatory mediation to be effective.

9              I will move on to the second issue, Your Honor, if

10   I may.

11             THE COURT:  Go ahead.

12             MR. HERSHEY:  Which is the contention by a small

13   number of defendants that the 546(e) safe harbor defense

14   should be litigated in Phase One.  I'll note --

15             THE COURT:  Let me stop you.  We're not litigating

16   546(e) is part of Phase One.  I've already decided that.

17             MR. HERSHEY:  Thank you, Your Honor.  Then I will

18   move on.

19             And there were only a few disputes left that I

20   wanted to address with Your Honor.  They relate to how we

21   will structure the mediations.  And I'll start with the list

22   of mediators.

23             We submitted a revised list of mediators to Your

24   Honor.  We understand Your Honor intends to call that list

25   and we will of course take guidance from Your Honor.

1          THE COURT:  Well, Mr. Hershey, I want you to call

2     the list.  Okay?  There's too many mediators.  I don't want

3     -- I have already made clear I don't want anybody who

4     represented a party in interest at any point in the case to

5     be a mediator.  There are too many mediators.  There needs

6     to be enough -- look, I'll make two points.  I will permit

7     you to propose a smaller number of mediators.  I will permit

8     defendants to suggest -- I don't want to give the number

9     right now -- some additional number of mediators.  Okay?  I

10    would like you to meet and confer and see if you can agree

11    on those that they've identified.

12         But, look, from my standpoint, Mr. Hershey, based

13    on my experience, there needs to be enough mediators given

14    the number of cases we have that there isn't going to be an

15    enormous backlog in getting the cases mediated.  There needs

16    to be enough people that people are comfortable choosing

17    from them.  But there's just too many.  What the right

18    number is -- my own view, if we add three for example, the

19    three or four that have been suggested by the defendants and

20    we wind up with an entire pool of ten, that in my view is

21    sort of the outside limit.  It's more than I've ever

22    approved in any other case, but I also haven't had one where

23    there were close to 2,500 adversary proceedings.

24         The real advantage for all of you is the learning

25    curve that the mediators gain so you can have more expedited

Page 72

1      mediations.  Okay?  But there's just too many.  I think if

2      we wind up -- I am prepared to approve a total list of ten.

3      That includes some suggested by the defendants as well.

4           MR. HERSHEY:  Absolutely, Your Honor.  And I'll

5      just note two quick things, Your Honor.

6           The first is that our revised proposed list does

7      include some suggestions from defendants.  But we will

8      certainly continue to meet and confer with them and make

9      sure that they have three or four that are represented.

10          I did want to ask.  Your Honor had said before

11     that you don't want parties who are involved in the

12     bankruptcy case.  I didn't know if that included Judge

13     Sontchi, who was on our list.  I don't know as a

14     representative of the estate if you felt he should be --

15          THE COURT:  No, I wouldn't include -- put it this

16     way.  I wouldn't include him on the list that I'm thinking

17     about.

18          MR. HERSHEY:  Okay.  Understood, Your Honor.

19          THE COURT:  You had a couple of people who had

20     represented defendants in adversary proceedings, for

21     example, that were resolved.

22          MR. HERSHEY:  Yes.

23          THE COURT:  It shouldn't include any of those.

24     Judge Sontchi, he obviously was the fee examiner in the

25     case, has a lot of familiarity with the case, but did not

1    represent any party in interest in the case.  You know, I

2    personally have a lot of confidence in Judge Sontchi.  I

3    think he is excellent.  But whether he would wind up being

4    selected or not.  I also think he is eminently fair, but

5    people will -- you know, hopefully you will be able to agree

6    on a mediator.

7             There's a real advantage of getting people who

8    know about this case, who have lived through a lot of it but

9    didn't represent a party in interest.

10            MR. HERSHEY:  Right.  Understood, Your Honor.

11   Absolutely understood.  Only a few more quick issues, Your

12   Honor.

13            THE COURT:  Okay.

14            MR. HERSHEY:  Some parties took issue with our

15   proposed mediation fees.  We tried to track them based on

16   precedent.  We believe they are fair and reasonable.  Again

17   though we will of course take guidance from Your Honor.  But

18   it's our position that our fees are appropriate.

19            THE COURT:  I will tell you that one of the things

20   that I am considering is changing the split to 60 percent

21   plan administrator, 40 percent defendant.  You proposed

22   50/50.  I think in many cases I would agree with that.  I

23   think that I also would -- and I think this was a suggestion

24   by some of the defendants.  I don't remember precisely which

25   ones at this point.  I would be happy to have a procedure

Page 74

1      that would provide applications for waiver or reduced fees

2      demonstrated on financial hardship.  I guess that's in the

3      Falcon Rappaport group suggests that the Court consider

4      alternate fee arrangements including reducing mediator

5      compensation, the fee range, have it based on the 2022

6      transfer values.  I'm not prepared to say what date value it

7      should be based on.  Providing a sliding scale of mediation

8      fees depending on the defendant's circumstances, ability to

9      pay.  I'm not prepared -- I'm not going to go through 2,500

10     applications.  I'm willing to consider a provision that

11     provides for waiver or reduced fees based on demonstrated

12     financial hardship.  But these are all -- you know,

13     preference claims of $100,000 or more doesn't automatically

14     translate into the absence of financial hardship.  But

15     there's greater financial hardship if a defendant has to go

16     through and litigate this whole case, frankly.

17             MR. HERSHEY:  Right.

18             THE COURT:  But I do want a provision built in

19     that does have a mechanism for -- I do want to shift to

20     60/40.  I do want to put in a provision that allows

21     applications for waiver or reduction of fees based on

22     financial hardship.

23             MR. HERSHEY:  Understood, Your Honor.  I guess my

24     one question would be if there is a waiver or a reduction of

25     fees, do those fees then shift to the litigation

Page 75

1    administrator?  Because my concern with that would be that

2    then we are being ordered to mediate with a party who can

3    effectively not engage with impunity because they bear no

4    cost from the mediation.

5              THE COURT:  Well, have a little confidence in my

6    ability to look at whatever showing is made of financial

7    hardship.

8              MR. HERSHEY:  I certainly have confidence, Your

9    Honor.

10             THE COURT:  Just let me finish.

11             MR. HERSHEY:  Sure.

12             THE COURT:  You may have the strongest claims

13   going, but with a total inability to collect.

14             MR. HERSHEY:  Right, Your Honor.  Absolutely.

15             THE COURT:  Sophisticated counsel always look at

16   is the settlement going to be collectible.  And if someone

17   is able to show financial hardship, the least of which you

18   have to worry about is that you're going to bear a larger

19   share of the mediation cost.  You'll have to put in a

20   calculus of how strong is my claim against them if this is

21   really -- I'll give you a chance if you want to rebut the

22   financial hardship, yes.  I don't want extensive -- we're

23   not going to have a mini trial on financial hardship.  But

24   if you want to dispute the -- I'm not going to simply accept

25   a declaration that says, you know, this is -- Celsius has

1   left me financially strained.  If somebody is going to show

2   financial hardship, they are going to have to show some

3   financial hardship.  I will permit affidavits or

4   declarations of financial hardship to be filed under seal

5   with a copy to counsel for the plan administrator.

6           MR. HERSHEY:  Completely understood, Your Honor.

7   And I have complete confidence in Your Honor to determine

8   who has financial hardship and who doesn't.  I guess my only

9   point would be if these parties do have financial hardship,

10   there may not be a point in mediating.  Because if they

11   can't pay $2,000 to mediate, to your point, Your Honor, I

12   don't know what we would collect in a judgement.

13           So I just want to make sure that we're not sent to

14   a mandatory mediation where we're carrying the cost.  And to

15   Your Honor's point, we're carrying them based on the fact

16   that they can't pay anything.

17           THE COURT:  Look, you may decide if they file a

18   declaration showing financial hardship, you may conclude

19   that it's not worth pursuing them.

20           MR. HERSHEY:  Right.  Agreed, Your Honor.  Agreed.

21           THE COURT:  The ball is in your court on that.  I

22   mean, the plan administrator will decide I've got a strong

23   claim, but I'll never collect a penny.  Why am I going to do

24   this?

25           MR. HERSHEY:  Understood, Your Honor.  Okay.

Page 77

 1                THE COURT:  All right.

 2                MR. HERSHEY:  The very last point, Your Honor, is

 3       there was some discussion in the briefing about how Phase

 4       Two briefings should be structured and when expert reports

 5       should come in.  I spoke to Mr. Besikof and Ms. Kovsky, who

 6       had made that objection.  And we agree -- and they can speak

 7       for themselves -- but it probably makes sense to punt on

 8       that issue and have Phase Two briefing determined when we

 9       get there.  We don't know what Phase Two will look like at

10       this point.  It's possible some issues, if they are found to

11       require discovery, will carry forward to Phase Two and that

12       will have an impact on how we want to stage the briefing.

13       So we will present a revised form of order that just kind of

14       reserves on the right of the parties to determine Phase Two

15       briefing when we get there if that's acceptable to Your

16       Honor.

17                THE COURT:  Okay.  Give me one second.

18                All right.  I'm going to give the preference

19       defendants until noon October 29th to suggest possible

20       mediators to be put on the list.  And the reason I'm setting

21       it out that far, I don't know how many people observe the

22       Jewish holidays.  It's a jam-packed time of the year and

23       there's Yom Kippur is next weekend, there's Sukkot, there's

24       other holidays.  So I'm picking the 29th for anybody who is

25       observant, gives them enough time to be able to suggest --

Page 78

1    what I want you to do, Mr. Hershey, is engage.  And I really

2    want ten names.

3              MR. HERSHEY:  Absolutely, Your Honor.

4              THE COURT:  And it may be that you'll have a

5    disagreement and you'll submit eight and they'll submit ten

6    and I'll cut the list.  But there is a real advantage to

7    having a narrower list.  It cuts the learning curve for each

8    of them.  There's enough cases that they'll each have

9    enough.  Okay.

10             MR. HERSHEY:  Yeah.  Thank you, Your Honor.

11             THE COURT:  Let me hear from -- I'll hear from Ms.

12   Kovsky first, who raised her hand immediately.  This is

13   really on the issue what ought to be Phase One, Phase Two,

14   et cetera.

15             MS. KOVSKY-APAP:  Yes.  Thank you, Your Honor.

16   And I also wanted to thank Mr. Hershey and his team for

17   working with me and Mr. Besikof to narrow the issues so that

18   at this point there's really only one point in contention

19   that's before Your Honor today, and that's really should

20   defendants be forced to expend significant legal fees

21   litigating the non-dispositive issue of how much liability

22   they may have before Your Honor determines whether or not

23   they actually have liability.

24             Mr. Hershey started out by saying everybody agrees

25   that this issue of damages is going to need to be decided at

Page 79

1    some point.  And while I applaud his optimism and belief in

2    the strength of his case, I would submit respectfully, Your

3    Honor, that there is a good chance that this will never need

4    to be litigated, that the gating issues -- and we talked

5    about gating issues, Your Honor.  We were talking about

6    dispositive issues that might actually just be case-

7    determinative.  And those are the common issues we were

8    looking for.  If those dispositive issues are determined in

9    our favor, we never get to the question of how should

10   damages be calculated, because there are no damages.

11          Even if these are purely legal issues -- and by

12   the way, we strongly dispute that.  Mr. Hershey sort of

13   cavalierly says, oh, it doesn't take much to brief them.  It

14   actually does, Your Honor.  It takes legal research, it

15   takes writing, it takes showing up at hearings.  It takes

16   internal conferences, conferences with clients.  And while

17   Mr. Hershey's client is sitting on a war chest of tens of

18   millions of dollars, my clients are not.

19          And Your Honor indicated just because somebody

20   withdrew $100,000 or more does not mean that they are

21   wealthy individuals.  You have to remember that these

22   customers of Celsius withdrew crypto at a time when the

23   markets were in absolute turmoil in the crypto space.  Many

24   of them lost everything after they subsequently withdrew,

25   whether on DeFi projects, on other entities that went

Page 80

```
1    bankrupt, or they used the money in the ordinary course to

2    buy a house, pay college tuition, whatever it is.

3            But the point is these are not big corporations

4    with bottomless funds to be able to litigate.  And to force

5    them to spend tens or hundreds of thousands of dollars

6    litigating an issue that Mr. Hershey speculates might help

7    him reach settlements in mediation is just completely unfair

8    and prejudicial.

9            I also want to point out we were talking earlier

10   about settlements.  Mr. Hershey and his team and the

11   litigation administrator have managed to settle over 1,600

12   by my count preference actions.  And having this issue In a

13   gray area without clear guidance from Your Honor as to

14   whether claw backs can be in kind versus the transfer date

15   value, that didn't seem to impede any of those settlements.

16   The parties were not too far apart to reach settlement.

17           THE COURT:  You'd better hurry up and settle

18   before we get to this.

19           MS. KOVSKY-APAP:  Well, Your Honor, I would also

20   point out we've gotten some phenomenal mediators on the

21   list.  We've got Judge Sontchi.  We've got Judge Hale.  I am

22   very confident that we get in front of them, they're going

23   to help us narrow that gap even further.  And our clients

24   will listen to them when they say, you know, we think you're

25   got real risk here.  And I would hope that Mr. Hershey's
```

1    client would listen to them when they say you've got real

2    risk here.

3         There is a way to get these issues resolved in

4    mediation without having to incur the expense of litigating

5    them upfront, particularly when there is a good chance

6    they'll never need to be litigated at all.

7         I also want to address Mr. Hershey's contention

8    that this is completely different from reverse bifurcation.

9    It's really not.  It's putting the cart before the horse.

10   And the sole reason is really because the Plaintiff thinks

11   that somehow this will give him an advantage in mediation.

12   But the truth is -- and this is in the cases we've cited and

13   in the scholarly articles -- litigating the measure of

14   damages does not facilitate early settlement when the real

15   issue is whether defendants have liability at all.  And my

16   clients have not been raising the issue, oh, we don't want

17   to settle because we think you can only claw back the amount

18   that we actually took out at the time we took it out.  To

19   the extent that my clients haven't settled, it's because

20   they don't believe they have liability.  They believe they

21   have complete defenses.

22         So I'm not sure if we lost the Court.  Okay.

23         THE COURT:  Ms. Kovsky, right at the point where

24   you told me how confident you were, my screen went dark

25   again.  I don't know what the problem today is.

1          MS. KOVSKY-APOP:  Well, my point is -- the point I

2     was trying to make, Your Honor, I am not sure how much you

3     heard.  But there is a good chance that the issue of damages

4     may never need to be litigated at all.  And it is

5     prejudicial and unfair to ordinary customers to force them

6     to incur tens or hundreds of thousands of dollars in legal

7     costs litigating an issue that may never even become

8     relevant.  And the caselaw is clear, the scholarly articles

9     are clear that litigation the measure of damages does not

10    facilitate early settlements when the real issue is whether

11    parties actually have liability.  And that's the hill my

12    clients are standing on right now, not saying we don't want

13    to settle because we think that you can only claw back

14    dollarized values as of the transfer date.  No, they're

15    saying we believe that we have complete defenses to

16    liability.

17          THE COURT:  You know, there's enough people --

18    look, there's enough people on the defense side that I think

19    if you organize a session among defense counsel and allocate

20    who takes the lead on which arguments and brief, you'll

21    still have an opportunity to review and you won't have to do

22    all the work on it.

23          So I hear your argument.  I haven't decided yet.

24    But do you have any additional points for me?

25          MS. KOVSKY-APAP:  I do, Your Honor.

Page 83

1          THE COURT:  Go ahead.

2          MS. KOVSKY-APAP:  And you're absolutely right; we

3     are trying to be as efficient as possible.  You've seen that

4     Mr. Besikof and I have sought to consolidate all of our

5     cases together and are working very cooperatively both for

6     our efficiency and the Court's.

7          The other point I wanted to make is that we

8     shouldn't be required to litigate these issues without the

9     benefit of discovery.  These are not purely legal issues.

10    The disclosures that the Debtors made to customers, what

11    they put in the ballots regarding withdrawal preference

12    exposure, when they were asking customers to vote on the

13    plan and to grant releases and to contribute claims, these

14    are all things that factor into whether or not the

15    litigation administrator should be bound by the terms of the

16    plan that was confirmed by this Court.

17          With respect to 550(a) --

18          THE COURT:  Well, if you have an argument that the

19    terms of the plan bind the litigation administrator and

20    preclude damages, that's a legal argument.  You can go ahead

21    and make that.

22          MS. KOVSKY-APAP:  Well, to the extent that the

23    plan may be ambiguous, we're talking parole evidence.  And

24    if we're going to have to litigate it later anyway, why not

25    push it all off instead of doing it twice, which is just --

1          THE COURT:  We're not.  We're not going to push it

2     all off.  Okay.  Any other points, Ms. Kovsky?

3          MS. KOVSKY-APAP:  Two issues that were raised in

4     our limited objection that the litigation administrator does

5     not have an issue with.  We wanted to clarify that this is

6     without prejudice to our ability to file a motion to

7     withdraw the reference to the extent we believe it's

8     appropriate.

9          THE COURT:  I think Mr. Hershey agreed with that,

10    didn't he?

11         MS. KOVSKY-APAP:  He did.  And so we're just

12    looking to have something memorizing that in the amended

13    order.

14         THE COURT:  No, I understand that.  My

15    understanding was you raised it, he agreed that you would

16    reserve rights to withdraw the reference.

17         MS. KOVSKY-APAP:  And the substance of

18    consolidation -- and this is really more for Your Honor

19    because it's a case management issue.  But Mr. Beskiof from

20    Lowenstein and I had sought to have all of our cases

21    consolidated for pretrial purposes just so we don't have to

22    file the same motions or pleadings over and over again on

23    the consolidated docket.

24         THE COURT:  Mr. Hershey, do you have a problem

25    with that?

1            MR. HERSHEY:  No problem at all, Your Honor.

2            THE COURT:  Okay.  I agree.

3            MS. KOVSKY-APAP:  Thank you, Your Honor.  That's

4    it from me.

5            THE COURT:  Okay.  Mr. Besikof?

6            MR. BESIKOF:  Thank you, Your Honor.  For the

7    record, Dan Besikof of Lowenstein Sandler for certain

8    defendants.  I will be very, very brief because Ms. Kovsky

9    covered really everything I was planning to say.

10            But I really want to focus on the point that

11   having a decision on the issue of damages will bring parties

12   together.  My sense -- and I've spoken to hundreds of

13   defendants, both who are my clients and who were consulting

14   with me in advance of potentially hiring me or whatever, is

15   that this is not the impediment to settling.

16            And what I fear and what I think is going to be

17   the case is that whichever party wins this issue, it's just

18   going to harden the position of that party entering the

19   settlement negotiations.  I don't think it's going to be

20   this situation where the parties come together and say hey,

21   you know what, you were right.  What I think is going to

22   happen -- and again, it's based on discussions I've had with

23   dozens or hundreds of defendants -- is that the position is

24   going to harden.  If the litigation administrator wins on

25   this issue, I think we can expect the number to go up

Page 86

1    dramatically.  I don't think that raising the number

2    dramatically is likely to bring more people to the

3    settlement table, even if there's some indication that that

4    may be indicative of a final result after rounds of appeal

5    or whatever else.

6            What I think it's going to do is drive people away

7    from settling.  And that's the concern that my group has,

8    and frankly that I have personally.  I would like to see

9    these cases resolve as effectively as possible.  And I

10   really do fear that a decision up front on an issue that is

11   not even ripe yet for determination before there's been any

12   opportunity for the defendants to put forth their defenses

13   is just not going to help the cause.

14           THE COURT:  Okay.  Mr. Romney?

15           MR. BESIKOF:  Thank you, Your Honor.

16           THE COURT:  Thank you, Mr. Besikof.  Mr. Romney?

17           MR. ROMNEY:  Good afternoon, Your Honor.  Aaron

18   Romney with Lax and Neville.  I represent several preference

19   defendants.

20           I'm going to tread very lightly, Your Honor.

21   Because what I came to say here relates strictly to the

22   546(e) issue, and I heard Your Honor --

23           THE COURT:  We're not going to deal with 546 at

24   this point, I'm telling you right now.

25           MR. ROMNEY:  Your Honor, may I briefly have the

Page 87

1    Court's indulgence for 90 seconds to raise just a few

2    discrete points?

3            THE COURT:  Go ahead.

4            MR. ROMNEY:  My clients do not wish to seek any

5    discovery.  They don't seek any expert reports or anything

6    beyond the four corners of the complaint.  What they seek is

7    permission to file an ordinary 12(b)(6) motion based on the

8    four corners based on particular allegations that the

9    trustee has made that we believe bring this within the line

10   of cases where 546(e) has been --

11           THE COURT:  We're not going to do it because I'm

12   not going to have 2,500 12(b)(6) motions.  Okay.  That's why

13   we're doing what we're doing, identifying common issues,

14   having them identified.  You're not waiving your right to

15   make a 12(b)(6) motion, you're just not doing it now.  I am

16   not going to have 2,500 12(b)(6) motions.  I'm not going to

17   have a thousand 12(b)(6) motions.  Okay.  So next point.

18           MR. ROMNEY:  Understood, Your Honor.  Nothing

19   further.

20           THE COURT:  All right.  Mr. Vaughan?

21           MR. VAUGHAN:  Yes, Your Honor.  Christopher

22   Vaughan on behalf of certain defendants.  Just a brief

23   comment, Your Honor, on the fees issue once again.

24           THE COURT:  Yes.

25           MR. VAUGHAN:  Mr. Hershey once again repeated the

Page 88

1    argument from the previous hearing that the cases that they

2    cited were consistent with the fee schedule which they

3    proposed.  As Your Honor recognized at the last hearing,

4    that simply is not true.  All of the cases cited by Mr.

5    Hershey in his -- in the litigation administrator's motion

6    for streamlined procedures --

7              THE COURT:  I didn't -- if you're saying that I

8    recognize it wasn't true, that's not correct.

9              MR. VAUGHAN:  Oh, I'm sorry, Your Honor --

10             THE COURT:  You could make the point, the

11   argument, but don't say that I recognized that the fees that

12   he proposed were not the current going rate in effect.

13             MR. VAUGHAN:  Okay.  Yes, Your Honor.  I was

14   referring to an exchange at the last hearing.  But my

15   apologies.

16             The fees cited by Mr. Hershey or the litigation

17   administrator in their motion for streamlined procedures all

18   included cases with less than 400 claims, two of them less

19   than 100 claims.  So the fact that we maintain the same fee

20   schedule given the sheer number of mediations to occur here

21   is simply not consistent with precedent.

22             THE COURT:  Okay.  Mr. Weltman?

23             MR. WELTMAN:  Yes, Your Honor.  Thank you for

24   hearing me.

25             I raised the issue before and I want to raise it

1   again, the issue of the October 15th deadline.  The reason

2   why I believe that it dovetails into the procedures motion

3   is that working with both clients and prospective clients

4   and co-counsel including Shannon Nelson, who has settled

5   (indiscernible) in probably more than a hundred cases and

6   has many clients and is very much into the settlement

7   process, has become aware of a situation shared with me

8   where we understand that the WPE valuation is a moving

9   target.  We understand that the plan administrator has the

10  right to change the WPE calculation from the plan that was

11  filed and the disclosure statement that was filed.  But we

12  understand further that there was some recent -- described

13  as miscalculations and recalculations of the settlement

14  amount very recently (indiscernible) question whether the

15  October 15th date is really the right date.  If there are

16  issues with the WPE and the calculation of the WPE, and it

17  apparently is affecting more than one or two defendants, I

18  think it's incumbent upon Mr. Hershe -- and I appreciate his

19  efforts and I appreciate his cooperation and we've worked

20  very well with him and his team.  But I think that the

21  October 15th deadline is certainly a target.  It's not cast

22  in stone.  And I think it should be extended to give the --

23  I think we should have a notice to the defendants in the

24  case where there is recalculation of the WPE as part of the

25  pre-October 15th settlement calculation, settlement

Page 90

```
 1    logarithm, to give them an opportunity to really understand

 2    the calculations and have an opportunity to make an informed

 3    decision.  I think it's unreasonable to do that with the

 4    deadline being one week.

 5              THE COURT:  Let me stop you for a second.  Let me

 6    stop you.

 7              Mr. Hershey, the Jewish holiday calendar may not

 8    affect very many people.  It does affect me.  This is a

 9    chock-full month of holidays.  It's the reason why I

10    extended the time to try and iron out the mediators until

11    Tuesday, October 29th.  Are you willing -- I mean, I could

12    order it, but are you willing to extend this date, the

13    deadline until then?  I don't know.  Just give me time to

14    figure out what they're doing.  Okay?

15              MR. HERSHEY:  Absolutely, Your Honor.  We'll file

16    a revised notice extending the deadline.  We'll do the same

17    time, noon on the 29th.

18              THE COURT:  Yes.  Okay.

19              MR. HERSHEY:  Thank you, Your Honor.

20              MR. WELTMAN:  Your Honor, to start, I don't think

21    that the 29th gives us enough time.  But I do appreciate

22    Your Honor's flexibility --

23              THE COURT:  It is what you're getting.  It's what

24    you're getting.

25              MR. WELTMAN:  Thank you, Judge.
```

Page 91

```
 1              THE COURT:  Okay.

 2              MR. WELTMAN:  I hear you.

 3              THE COURT:  All right.

 4              MR. WELTMAN:  For the other comments we will rest

 5   on our papers.  And we appreciate your recognizing that the

 6   split should be reviewed.  And the 60/40 split while it's

 7   not --

 8              THE COURT:  I've already decided that one.  So

 9   let's just move on.  Okay?

10              MR. WELTMAN:  No, I understand.  We were looking

11   for 75/25.  But I --

12              THE COURT:  Well, I know you were.  And I gave you

13   60/40.  Okay?

14              MR. WELTMAN:  Thank you.

15              THE COURT:  I'm very aware of the 75/25

16   suggestion.

17              MR. WELTMAN:  Thank you, Judge.

18              THE COURT:  Don't reargue a point -- maybe you'd

19   like to go back to 50/50.

20              MR. WELTMAN:  Thank you, Judge.

21              THE COURT:  Thank you.  All right.  Mr. Grinsell?

22              MR. GRINSELL:  Thank you, Your Honor.  Tim

23   Grinsell for defendant, Seth Dargo.  My point relates to the

24   one you just spoke about.  Our understanding was the August

25   27th discussion on the record involved you asking the
```

Page 92

1    litigation administrator to reopen the settlement period

2    only to those who were not able to view the original

3    settlement offer.  The litigation administrator filed a

4    notice reopening that period on the docket.  We contacted

5    the litigation administrator in order to take advantage of

6    this reopened period and we received a settlement offer that

7    was 47 percent higher than the March 20th settlement offer

8    that was originally provided.

9            Our understanding is this is not consistent with

10   the Court's request and we wanted to bring this to the

11   Court's attention to --

12           THE COURT:  Mr. Grinsell, I would never -- first

13   off, I don't inject myself into settlement discussions,

14   okay?  Negotiate, settle, don't settle.  But don't raise

15   with me that you're upset because the litigation

16   administrator raised a settlement demand.  Okay?  It usually

17   makes it hard to settle cases where that happens, but I'm

18   not getting involved in the settlement.  There's going to be

19   a lot of good mediators and going to be a lot of issues that

20   may get briefed.  My reaction is settle sooner rather than

21   later if you can before you have to bear any cost of

22   mediators.  But I'm not -- your complaint that the

23   litigation administrator has upped the settlement demand is

24   made to the wrong person.  Okay?

25           Mr. Davis?

1          MR. DAVIS:  Thank you.  Good afternoon, Your

2     Honor.  For the record, Tommy Davis, WilmerHale, on behalf

3     of the DOF firm.

4          As Your Honor may have seen, the DOF Group is

5     designated as one of the briefing groups in the procedures

6     motion.  As this is our first appearance, by way of

7     introduction, we're working with the DOF Firm, an Australian

8     firm that we understand has a large number of clients and is

9     gathering more, those clients are primarily though not

10    exclusively outside the United States.

11          Phil Anker will be lead counsel for Wilmer in this

12    case.  He sends his regrets that he couldn't attend today,

13    as he is tied up in mediation.

14          Briefly turning back to the procedures motion,

15    you'll note that we did not file an objection to today's

16    motion.  We have no problem with the revisions requested by

17    the Troutman and Lowenstein groups and we have no major

18    concerns with the proposal outlined in the motion and today.

19    We look forward to the mediation and briefing process.  And

20    I have nothing further.  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Davis.  Anybody else

22    wish to be heard?

23          Mr. Jaspan?  Ms. Jaspan, sorry.  Didn't see your

24    first name.  You're muted.

25          MS. JASPAN:  I clicked.  I guess it didn't work

Page 94

1          the first time.  Thank you, Your Honor.

2                    Michele Jaspan of Falcon Rappaport & Berkman for

3          various objecting defendants.  I just wanted to add one

4          issue related to the briefing.  We respectfully request that

5          Your Honor -- and we're only suggesting.  We haven't had a

6          chance to discuss it with Beskiof and Lowenstein group --

7          that there be some sort of directive if Your Honor is

8          inclined not to permit other firms to submit briefs on the

9          Phase One  issues or Phase Two depending on how Your Honor

10         rules today on what is going to be briefed at the

11         (indiscernible) be kept informed in real time because we may

12         have additional suggestions or comments that we would like

13         to insert into the briefing that would not come before Your

14         Honor if we are not permitted to make submissions.

15                   So whether there is some sort of agreement for

16         joint defense where we are included in real time with the

17         drafts or that we submit to the proposed briefing parties

18         our suggested insertions, whether they incorporate them into

19         their brief or whether they add them in as a -- and this has

20         been submitted by other counsel, but we would just like to

21         be able to have some mechanism to have our voices heard.

22                   THE COURT:  So, look, I've practiced law for 34

23         years.  I had lots of cases.  I was on the defense side more

24         then the plaintiff's side, but also on the Plaintiff's side.

25         In the large cases, we usually worked out understandings who

Page 95

1    would take the lead at briefing, who would submit -- you

2    know, some understanding about a deadline after you see the

3    skeleton for a brief, if there are arguments that you think

4    also should be addressed, how you do it.  I'm not going to

5    get into the nitty gritty of -- look, there's a lot of

6    cases, there's a lot of parties.  It worked to your

7    advantage as well as -- and of your client.  So you need --

8    I would urge that -- I'm not -- you know, there have been

9    several lawyers who have been most active so far, Ms.

10   Kovsky, Mr. Besikof.  But there are others as well.  Reach

11   out, arrange your call.  Work out some understanding about

12   who is going to take the lead on which issues, when are

13   people going to submit  either proposed additional arguments

14   to make or sections of a brief, et cetera.

15           I've got to rely on people on defendant's side to

16   work this stuff out.  I agree that you should have an

17   opportunity to have your input.  I don't want to find myself

18   with 200 separate briefs.  That's not to anybody's

19   advantage.  Okay.  All right.

20           Mr. Hershey?

21           MR. HERSHEY:  Thank you, Your Honor.  I will be

22   extremely brief.  It seems like there's really only one

23   issue in dispute, which is the Phase One damages issues.  I

24   just want to make a few quick responses.

25           The first is, look, we have to be practical.

```
 1              I am worried, Your Honor, that you may have frozen

 2      again.  You seem frozen on my screen.

 3              CLERK:  Judge?  Right.  I'll contact him.

 4              MR. HERSHEY:  Okay.

 5              CLERK:  Everyone, the Judge is attempting to

 6      reconnect.  Here he is.

 7              THE COURT:  All right.  I apologize.  I don't know

 8      what's happening with my connection.

 9              Mr. Hershey, do you want to pick up again?

10              MR. HERSHEY:  Yes, thank you, Your Honor.  No

11      worries at all.  I'll be very brief.

12              So, look, we have to be practical.  We are

13      entering soon enough a phase of mandatory mediation where

14      the litigation administrator is going to bear 60 percent of

15      the cost.  I want those mediations to be productive and

16      successful.  It is true that we settled 1,600 claims, not

17      preference actions.  They were pre-litigation claims that we

18      settled.  And that sort of speaks to the whole point here.

19      The reason we haven't settled with everyone else, and we

20      have 2,500 cases that are still before Your Honor, is there

21      are impediments to settlements being reached there that

22      didn't exist for the other people with whom we settled.

23              I will just speak for myself.  It would be

24      incredibly helpful to me if Your Honor ruled on these issues

25      before mediation.  I can guarantee Your Honor that my
```

Page 97

1    approach to the mediations, my position in the mediations

2    will change based on how Your Honor rules.  And if I lose,

3    my number will come down.  I guarantee you it's true for

4    everyone else as well.

5             THE COURT:  Okay.  Mr. Hershey, we'll get to it,

6    but I've sort of decided what's going to be part of this

7    Phase One and we're going to get briefed.  Okay?

8             MR. HERSHEY:  Okay, Your Honor.

9             THE COURT:  All right.  So let me go ahead and

10   make some rulings.

11            First, Lax & Neville Group, Garcia, Falcon

12   Rappaport Group asked for permission to move to dismiss

13   before mediation.  Denied.

14            The mediation fees I have already ruled changing

15   it to a 60/40 split.

16            There were -- I am looking at a chart I have.  You

17   know, there were lots of objections filed.  I have

18   considered every one (indiscernible) Lax & Neville Group,

19   Bressler, Garcia, Falcon Rappaport, all addressed the fees.

20   I am satisfied with the fees per case.  It leaves -- for the

21   large group of cases there will be negotiation about it.

22            I would encourage you all to try and settle before

23   you get to any of this.  It's going to obviate the issue of

24   paying for a mediator.  But you will or you won't.

25            Garcia objected to mandatory mediation. Overruled.

Page 98

1      There's mandatory mediation.

2              I have already ruled Valenzuela, Lax & Neville

3      Group, Troutman, Lowenstein Group, Falcon Rappaport, all

4      raised the issue about 546(e).  I have already ruled on

5      that.  We're not dealing with it, at least in Phase One.

6              The safe harbor defense remains a Phase Two issue

7      given the fact-intensive nature of the inquiry.  And it's

8      really a question of first impression in crypto cases.

9              With respect to the 550 (a) issue, the litigation

10     administrator has made clear this really goes to the purely

11     legal question of whether it can request the return of

12     assets themselves.  So long as it is limited to such, I do

13     not see why it shouldn't remain part of Phase One issue for

14     resolution before a mandatory mediation.  While relief under

15     550(a) is contingent upon a finding of liability under 547,

16     it also requires the defendants be either "the initial

17     transferee of such transfer or the entity for whose benefits

18     those transfers were made" or "any immediate or mediate

19     transferee of such initial transferee", see Section 550(a).

20             With respect to the new value issue, the

21     litigation administrator has made clear it goes to how that

22     should be computed.  The Bankruptcy Code defines new value

23     under 547(c)(4) as being "Money or money's worth in goods,

24     services, or new credit or released by a transferee of

25     property previously transferred to such transferee in a

Page 99

1    transaction that is neither void nor voidable by the Debtor

2    or the trustee under any applicable law, including proceeds

3    of such property, but does not include an obligation

4    substituted for an existing obligation."  Se Section

5    547(a)(2).  Again, this is purely to determine how to

6    properly compute and would facilitate consistency as well as

7    mediation discussions.  All right.

8            With respect to the issue of expert discovery,

9    Troutman & Lowenstein Group object that expert discovery

10   should have been completed before briefing for Phase Two

11   issues.  The Troutman and Lowenstein groups have proposed an

12   alternative Phase Two schedule that allows parties to file

13   dispositive motions after the close of all discovery.

14           Then the litigation administrator response is that

15   the litigation schedule in Phase Two follows the discovery

16   schedule previously entered in this case requiring the

17   litigation administrator to file his expert report before

18   the defendants file their opening briefs deprives the expert

19   of the chance to review the defendant's opening briefs

20   before that expert issue his or her rebuttal report and

21   gives the defendant two bites at the apple by letting them

22   address the litigation and the administrator's rebuttal

23   expert report in both their opening brief and their reply

24   brief.

25           The objection is overruled for the reasons the

Page 100

1    litigation administrator has articulated.

2           All right, with respect to defense briefs, the

3    limitation on quantity.  The Falcon Rappaport Group has

4    argued that the provision of the motion which requires

5    parties to seek permission before filing briefs during

6    Phases One and Two is unfair and burdensome to parties who

7    were not members of larger groups of defendants.  Defendants

8    not already permitted to file briefs should be allowed a

9    reasonable period to consider the (indiscernible)

10   submissions and decide whether to file joinders.

11          The litigation administrator's response was the

12   litigation administrator shares the Court's concern, which I

13   do have this concern, that allowing duplicative briefing

14   from defendants would make litigating these issues difficult

15   and inefficient.

16          The litigation administrator, in light of the

17   Court's advice during the August 27th omnibus hearing

18   proposes three groups of defendants that will submit three

19   opening briefs and three response briefs.  All other

20   defendants may request permission to file briefs under the

21   same limits, which request shall be determined by the Court.

22          So the Court sustains in part and grants in part.

23   Sustains the objection part and grants in part and overrules

24   in part.  The limitation on quantity of briefing would

25   assist in judicial economy and efficiency.

Page 101

```
 1              As this Court noted at the August 27th hearing,

 2    common briefing is preferable and the Court therefore

 3    overrules the objection as to the requirement to request

 4    permission.  However, the Court -- I do -- it's what I've

 5    already said.  With respect to the defense briefing, this

 6    really requires coordination.  And I'm going to leave it to

 7    -- I am not going to pick who is going to lead the defense

 8    group at this point.  There have been certain counsel that

 9    have sort of taken the lead in discussions, but I am not

10    precluding others from voicing it.

11              My suggestion is that you all arrange a conference

12    call in the next week and you hammer out some understanding

13    about how this is going to be done, who is going to be

14    taking the lead on various arguments, that they will be

15    circulated, people will have a chance to comment on it.

16    Again, I'm not -- you know, the Troutman (indiscernible)

17    group and the Lowenstein Group and the DOF Group

18    (indiscernible) and the (indiscernible) Group have been very

19    active so far, but I'm not -- I am not picking winners and

20    losers here.  You all ought to be able -- every case --

21    every big case that I was involved in as a litigator on the

22    defense side with lots of defendants, lots of firms, within

23    two calls -- you know, now you can do it by Zoom.  Back when

24    I was practicing, it was all conference calls.  We worked

25    out understandings about who would take the lead on which
```

Page 102

1    arguments and the opportunity for people to put in comments.

2    And I'm willing to take this into account in terms of

3    setting a final briefing schedule.  Okay.

4           Your Honor, there was the Valenzuela defendants

5    have objected saying the Court should direct defendants to

6    present a single joint defense brief and any unique

7    arguments should be raised separately.  Have your call

8    within the next week or so and try and work out how you're

9    going to do this.  Okay?  I would urge you -- I'm not

10   insisting.  If you can agree, put it in writing among

11   yourselves.  This is not something that the Court ought to

12   be resolving.  You ought to be able to resolve as a group of

13   defendants.  Some of you have a lot of clients, some of you

14   have fewer clients.  You all ought to have an opportunity to

15   submit comments.  They may or may not wind up in the final

16   brief.  Okay.

17          Next, the issue about withdrawal of the reference.

18   I think that issue has been worked out.  The litigation

19   administrator makes clear that nothing in the proposed

20   procedures inhibits the defendants' right to bring a motion

21   to withdraw the reference.

22          I think the Troutman and Lowenstein groups want to

23   consolidate for all pretrial purposes.  Mr. Hershey says he

24   has no objection to doing -- work out the details how you're

25   going to do it.

1            The cases aren't consolidated on the merits,

2    they're consolidated for pretrial purposes.  The better you

3    can coordinate, the better it will be for all of you.  Okay.

4    I'm fully in favor of Ms. Kovsky, you and Mr. Besikof

5    working this out.  Talk to Mr. Hershey to the extent you

6    need to do this.

7            The mediator list I've already said I want to get

8    the list down to ten.  I want to give the defendants an

9    opportunity to get some names on that list.

10           Mr. Hershey, take the lead and see if you can work

11   this out.  I gave until the 29th at noon to get this worked

12   out.  If you can't, put your list and I'll ultimately decide

13   it.  Okay.

14           MR. HERSHEY:  Okay.

15           THE COURT:  All right.  Is there anything else I

16   need to deal with today?

17           Ms. Kovsky, your hand is raised.

18           MS. KOVSKY-APAP:  Thank you, Your Honor.  Just a

19   quick comment about the schedule for Phase Two briefing.

20           As Mr. Hershey had indicated earlier, that was an

21   objection that Mr. Besikof and I had raised.  We spoke

22   before the hearing and we had come to agreement amongst the

23   three of us to actually push that issue because we don't

24   really know what Phase Two is necessarily going to look like

25   at this point.  And I believe Mr. Hershey's proposal was

Page 104

1    within 14 days after the conclusion of Phase One, we would

2    present a proposed schedule to Your Honor.  And if we can't

3    work it out consensually, then ask the Court to rule on it.

4            THE COURT:  I'm confident you're going to work out

5    the schedule.

6            MS. KOVSKY-APAP:  Understood, Your Honor.  One of

7    your rulings was specifically with respect to the schedule

8    and was an issue that we did not argue today because of the

9    agreement to kick the issue.  So I wanted to make sure that

10   it was --

11           THE COURT:  I'm fine with it.  Okay.

12           MS. KOVSKY-APAP:  Thank you.

13           THE COURT:  Within 14 days after Phase One is

14   decided, you'll work out a schedule.  I'm confident you

15   will.  If you can't, I'll resolve it.  Okay?

16           MS. KOVSKY-APAP:  Thank you, Your Honor.

17           THE COURT:  Mr. Hershey, anything else for today?

18           MR. HERSHEY:  Nothing further, Your Honor.  Thank

19   you very much.

20           THE COURT:  Okay.  Ms. Kovsky, Mr. Besikof, I'll

21   give anybody else a chance who wants.  But anything else you

22   want to raise?

23           MS. KOVSKY-APAP:  Nothing here, Your Honor.

24           THE COURT:  Mr. Besikof?

25           MR. BESIKOF:  Nothing from me, Your Honor.  Thank

Page 105

1    you.

2              THE COURT:  Okay.  Anybody else?  I don't mean to

3    -- by calling on them specifically, I don't mean to exclude

4    the opportunity for anybody else to say something if they

5    wish.

6              Okay.  I really would like -- I see Ms. Jaspan's

7    hand going up.  But let me just say this.  I really want to

8    get this all ironed out certainly by the 29th of October.

9    Okay?  Go ahead, Ms. Jaspan.

10             MS. JASPAN:  Your Honor, thank you.  I just wanted

11   clarification on the ruling that Your Honor had said the

12   motion -- request for motions to dismiss denied.  Was that

13   all motions to dismiss, Your Honor, whether it's lack of

14   personal jurisdiction, you know, there's a defense of

15   contemporaneous exchange of new value that I don't believe -

16   -

17             THE COURT:  It is.  I am excluding all motions to

18   dismiss.  We're going to deal with the common issues that

19   have been agreed.  I'm not going to find myself in the

20   position with thousands of 12(b)(6) motions.  Okay?  It's

21   just not going to happen.  In my view, and that's the view

22   that counts, the most efficient way of handling this large

23   number of cases that raise common issues in the way we're

24   proceeding.  You'll have your opportunity if you wish to

25   raise those issues.

Page 106

1          MS. JASPAN:  Thank you, Judge.

2          THE COURT:  Anybody else want to be heard?  Okay.

3   We are adjourned.

4              (Whereupon these proceedings were concluded at

5   4:17 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6        *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 10, 2024