Richard D. Grossman
**LAW OFFICES OF RICHARD D. GROSSMAN**
211 West Wacker Drive Ste 710
Chicago, IL  60606
(312) 750-9308
Fax (312) 750-9323
rgat135@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br><br>**CELSIUS NETWORKS LLC**, *et al.*,<br><br>        **Debtors.** | Chapter 11<br><br>**Case No. 22-10964 (MG)**<br><br>**MOTION FOR HEARING**<br>**AND OTHER RELIEF** |

PRELIMINARY STATEMENT

1.  Movants are claimants in the instant bankruptcy proceeding. They each are individuals who borrowed money from Debtor CELSIUS NETWORKS LLC using cryptocurrency as collateral for their loans and as a result they are Creditors in the Borrower class of this proceeding.

2.  Movants' claim is that through a combination of ambiguous, vague, misleading and/or confusing written directives, an utter lack of clear and timely communication at critical intervals during the unduly extended distribution period and implementation of policy mandates which significantly depart from, or which are nowhere authorized by the Plan confirmed by this Court on November 9, 2023 and it's supporting documents, Movants have lost the vast majority of the value of their respective claim values.

3. The multiple millions of dollars lost by the Movants and the Borrower class generally often represent the vast majority of their assets or their life savings.

4. Movants further submit that the conduct of the Plan Administrators of the instant Chapter 11 described above, constitutes significant and ongoing breaches of the fiduciary duties imposed upon them by the Plan. These breaches include failure of duties of loyalty, care, good faith, accounting and conflict of interest and, as a result, a failure to protect Creditor Assets and Stored Creditor Data, acted negligently in the management of assets, failure to keep adequate records, failure to account, failure and delay in the distribution of assets, failure to disclose relevant facts, failure to act responsibly and to properly implement the Plan in a timely manner as it was intended and confirmed.

5. More specifically, there has been, on the part of the Administrator, a lack of transparency and clear communication with regard to key distribution provisions within the Plan, the Notices, the Election Forms and supporting documents, particularly, with respect to the Refinance Option.

6. Movants further submit that the conduct of the Plan Administrators of the instant Chapter 11 described above, constitutes significant and ongoing breaches of the Plan and of the Class Claim Settlement Agreement as well as the Retail Borrower Settlement. These breaches include a failure and delay in the distribution, refinancing and allocation of assets, failure to provide full claim values or to provide distributions at the correct values, miscalculations and incorrect calculations of claims, unexplained delays in distributions and refinancings, failure to keep records and accountings of Creditor claims and distributions, failure to disclosure relevant facts, providing lacking and unclear disclosures, failure to manage assets in a tax efficient manner, failure to provide timely notice, and misrepresentation.

7. Additionally, Movants are very confused by conflicting statements and representations about the

treatment, sale, purchase and transfers of Creditor Asset cryptocurrency holdings and by the lack
of transparency as to how, when, where and with whom these transactions took place and the
manner in which these transactions were conducted (open exchanges, OTC trades, private sales,
etc).

8.  Movants believe that the Plan, Class Claim Settlement, Retail Borrower Settlement and
supporting documents were clear with respect to Treatment of Borrower claims and are deeply
concerned that the Post-Effective Date Debtor and the Plan Administrator continue to advance,
promote and adhere to interpretations of the Treatment provisions that are not supported or
substantiated in the language of the Plan and its supporting documents.

9.  Specifically, nowhere does the Plan, or the "refinance instructions" issued to Movants several
months after the confirmation of the Plan, explain, as the Administrator now contends, that the
Administrator would "go into the market" (especially as the crypto market experienced a widely
publicized and predicted enormous increase in value as expected by professionals and investors)
and purchase new cryptocurrency to serve as collateral for the financial entity acting as the
"refinancer".  The Administrator's creation and implementation of the formula for refinancing
offered in the post Effective Date instructions is an unwarranted, unsubstantiated and arbitrary
gloss on the language of the Plan in the same vein as the "100 Top Corporate Creditors"
"interpretation" of the Plan advanced by the Administrator, but essentially condemned by the
Court. Movants understand that the Plan gives the Plan Administrator discretion to implement
its terms, but that discretion must be bounded by reasonableness and the Fiduciary Duties to
Creditors. In short, the Plan Administrator appears to have simply "made up" a refinancing
process which the language of the Plan does not support, and which, if actually described within
either the Plan or the following "instructions" for the refinancing option, would not have been

something for which Movants would have opted.

10. The virtual tsunami of letters, complaints and objections filed on the Court Docket in this case Post-Effective Date attest to creditor confusion and shock upon learning of the Administrator's interpretation of the refinance option as described in the Plan and the instructions. (See Docket Nos. 4320-5000).

11. The above-referenced filings also attest to the maladministration of the Post-Effective Date Distribution process.

12. As described in much more detail below, the following occurred: Debtors were supposed to provide repayment notice to Creditors at least thirty days before the Effective Date. (See ¶ 212 of Modified Plan, Doc 3972-1). Instead, Creditors received Notice on the Court Docket on January 9, 2024, twenty-two days before the Effective Date and in emails on January 10th, 2024. This notice contained the very first mention of a "refinance" option that had little to no detail about how the refinance was to take place and indicated that additional information and instructions would be provided in the future. Movants were then given six days to make life-changing elections of what to do with hundreds of thousands of dollars of cryptocurrency often representing either the bulk of that individual's net worth or sometimes their life and retirement savings. Movants believe that the Plan Administrator was acting in his own interest, over the interests and needs of Creditors, in order to receive a significant incentive bonus for reaching the Effective Date before his incentive deadline.

13. Movants here note that the Plan Administrator received a substantial bonus EIP Award incentive within their $5+ Million multi-year pay package for reaching the "Effective Date" by January 31, 2024. (*See,* the Employee Incentive Program outlined on pages 60-63 in Court Docket Document number 3972-1 sets for the criteria for the Plan Administrator's financial incentives).

Those incentives for Chris Ferraro are outlined as follows:

Christopher Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

• Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

(a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

• Distribution Agreement Metric (20% of the EIP Award):

(a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

(b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

• Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

(a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

(b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

• Effective Date Metric (10% of the EIP Award):

(a) target performance requires the Effective Date occur by December 31, 2023;

(b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

(c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

• Mining Rig Metric (10% of EIP Award):3

(a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

(b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

14. Movant's believe that these incentives put the personal interests of the Plan Administrator, in violation of its Fiduciary Duties, and ahead of the interests of Creditors and the protection of their Assets. Proper Notice provisions, as outlined under the Settlement agreement were ignored, impossibly short timelines were imposed for loan refinance and repayment elections and liquid cryptocurrency distribution was miscalculated in the rush to finalize the Effective Date in time for the Plan Administrator to receive a short term incentive bonus, all to the significant detriment to Creditors and their claim value distributions.

15. The entire Post-Effective Date process was plagued by unexplained and inexplicable delays, which continue to the time of this writing. Movants, (and the "refinancing class" generally) received literally no communication from the Administrator between the January 9, 2024 notice containing the first mention of the refinance option, and March 10th, 2024, without any explanation of the radio silence. Then, during the delayed distribution process, the process was further delayed when the Plan Administrator and their claims administrator, Stretto, failed to protect Stored Customer Data.

16. Moreover, the Administrator was to send a thirty day notice of intent to sell any Liquid Cryptocurrency. Neither Movants, nor the "refinance class", nor the Court ever received such a notice, despite the Plan Administrator having apparently sold many millions of dollars of it, to the significant detriment of Creditors and in a highly inefficient tax manner.

17. Administrator failed to provide proper distributions and have never provided Creditors with statements or accountings to verify that distributions were correctly calculated. The initial distributions that were made to Borrower creditors were to include the 5% that was offered as an incentive to vote in favor of the Plan and Class Claim Settlement Agreement. Administrator not only failed to include those amounts in the initial distributions but have failed to fully address this

omission, and have not communicated a clear plan or timelines to make additional distributions to incorporate these amounts. In the Post-Effective Date Debtor's Second Update on Distributions, filed with the Court on March 13, 2024 as document number 4623 Debtor acknowledged that they had miscalculated initial distributions and omitted the 5%. That second distribution update on March 13, 2024 further stated that, "the Post-Effective Date Debtors are finalizing revisions to the affected Claims to correct this error, and the affected borrowers will receive the additional distribution when the second 'wave' of distributions is made in the next several weeks". As of this writing it has been over 30 weeks since the publication of the second distribution update and there has been no further communication or clear resolution regarding this matter. The total value of this omission is approximately $38.275 Million in claim value for the Class overall.

18. Ultimately, Movants seek only what they were promised by the Plan – i.e., return of their cryptocurrency "to the greatest extent possible" using full claim values at "Effective Date" pricing and distributed as soon after the Effective Date as possible. As Debtor's Counsel Chris Koenig stated himself at the September 12th, 2024 hearing, "if the Plan requires it, we must pay it" and Creditors should be given "the amount that they should have received for their claims on January 16th".

19. Specifically, in Movants' case:

   a) Movants had each borrowed funds from the Debtor using significant and substantial quantities of Bitcoin, Ethereum or other cryptocurrencies as collateral for those loans.

   b) Movants had each made additional transfers of cryptocurrency to the Debtor as additional collateral before the Debtor filed for bankruptcy to protect their loans and to avoid liquidation of their collateral.

c)  Movants believed, based upon the statements and documents published to the Court during the bankruptcy proceedings that if they repaid or refinanced their loans, that they would get pro rata distributions of cryptocurrency based upon the full claim values of their cryptocurrency, at dollarized Petition Date prices. It was not.

d)  Movants further believed that the Retail Borrowers Settlement Agreement that was entered into by the Ad Hoc Committee of Borrowers in good faith with the Debtors would protect their interests and their asset claims as Creditors. They also believed that the Treatment, as outlined in the Retail Borrowers Settlement Agreement and that clearly stated that "On the Effective Date, a Retail Borrower shall receive:" and that then offered incentives (pricing on an agreed date, refinance option and Newco stock) would be honored for their full claim value upon the Confirmation and Effective Date of the Plan. It was not.

e)  Movants opted into the Class Claim Settlement Agreement and voted in favor of The Plan believing that they would be paid a 5% bonus on their total claim values if they did so. They were not.

f)  Movants opted into the Class Claim Settlement Agreement and voted in favor of The Plan and thereby provided the Debtor with releases and waivers of all their rights to pre-effective date actions by the Debtor. Debtor acted with impunity and made substantial material changes to The Plan that reduced, delayed and dramatically impacted both Creditor Assets and Claim Values.

g)   Movants were not notified of the determination that their Collateral held by the Debtor was determined to be an Asset of the Debtor until it was buried deep in the confirmation of the Plan and Findings of Fact notice in document 3972, filed with the Court on November 9th, 2023 – all of which was published after they voted for the Plan, accepted the settlement and waived all their rights to pre-effective date actions by the Debtor.

h)  Movants were not notified of the Effective Date or the Refinance Options at least 30 days prior to the Effective Date, as specified in and required under the Retail Borrowers Settlement Agreement.

i)  Movants were not notified of the Plan Administrators plan to sell cryptocurrency, converting it to cash only to then use cash to convert back into cryptocurrency at market prices for distribution.

j)  Movants were not provided with statements or accountings of how their claims were calculated, or how their distributions would be made. As a result, Movants have not been able to confirm whether distributions were properly accounted for.

k)  Movants were given seven days to elect for the Treatment of their loans, without any information about how, where and under what terms their refinance transactions would be offered by 3rd party lenders, or if they even qualified.

l)  Movants all elected for the Refinance Treatment.

m) Movants were not properly notified of the omission of the 5% bonus in their distributions, nor were they told how or when those additional distributions would be made. In their second update on distributions, the Post-Effective Date Debtors acknowledged that they miscalculated claim values and omitted the 5% bonus, further the Post-Effective Date Debtors indicated to the Court that they were working on a resolution that would be distributed in a second "wave" of distributions to Creditors. To date, more than 30 weeks later, no effort to address those omitted distributions have been made, no communications have been sent and there is no known timeline for these additional distributions.

n)  Movants were not given refinance instructions in a timely manner before or after the Effective Date. When instructions were sent on February 15th, 2024, the approved Lenders were not able to answer basic questions or process loans.

o) Movants' cryptocurrency distributions were significantly delayed by the Debtor, without explanation. Distribution issues with selected Distribution Agents were lengthy and communications were lacking, when questions or requests were even responded to.

p) Movants were given updated instructions on March 10th, 2024 and were given until March 31st to come to terms with Lenders over the Easter holiday weekend.

q) Movants expressed their concerns to the Court in multiple Pro Se letters and to the Debtors in countless communications and customer service tickets that went unaddressed and unanswered, outside of stock and uninformed auto-responses.

r) Distributions to the Movants did not include the 5% bonus provided for under the Class Claim Settlement Agreement and these Distributions were not made at Effective Date Prices as provided for under the Plan. Furthermore, these and other bonuses as provided for under the Class Claim and Retail Borrower Settlement Agreements were not accounted for, or included in, the initial Distribution.

s) Movants filed Motions with the Court to raise awareness of these issues.

t) Debtors and the Plan Administrator have alleged that the Plan clearly communicated material changes to the language that are not substantiated in the Plan and that do not represent the intent of the plan and that have resulted in the unequal treatment of Movants claims and those of the entire Borrower class.

u) Furthermore, Debtor and the Plan Administrator have failed, on multiple accounts, to uphold the fundamental terms of the Class Claim Settlement Agreement and the Retail Borrower Settlement Agreement that were used to induce Borrowers to vote for approval and confirmation of the Plan and to provide the Debtor with releases and waivers of all their rights to pre-effective date actions by the Debtor.

v) Movants have suffered significant losses due to the delays and misinterpretations of the Plan

and from the unexplained delays and failures of the distribution of Assets under the Plan. For many of the Creditors in this case, the Assets held by the Debtor represented all, or a significant portion of their entire life and retirement savings.

w) Movants have suffered additional losses in their refinancing efforts as the reduction of cryptocurrency distributed has resulted in much higher Loan to Value (LTV) Ratios which have led to both higher refinancing costs and the requirement that additional Collateral be transferred to avoid liquidation of the refinanced loans. For those Creditors who did not have access to additional funds to use as collateral, they have suffered additional losses from liquidations and stabilizations of their refinanced loans that would not have otherwise occurred at the LTV rates that would have been supported under the Plan, with pricing of their Collateral for refinanced loans at Effective Date prices, as called for under The Plan.

**x)** Movants are not requesting modification of the Plan but, rather, are seeking the correct implementation of the Plan as it was presented and Confirmed. Similarly, Movants are not requesting a new option, as has been alleged by the Debtor, but are seeking to correct the maladministration of the Plan by the Plan Administrator to request relief in the form of receiving the correct value for their Claims as provided for under the Plan and the Settlement Agreement.

**y)** Movants have suffered significant losses due to the delays and misinterpretations of the Plan and from the unexplained delays and failures of the distribution of Assets under the Plan. Movants believe that the above are a direct result of the misconduct of the Plan Administrator, are in fact breaches of Fiduciary Duties as well as of The Plan and Settlement Agreements. It is Movant's estimation that the Claim Value that has been mishandled in this manner could easily exceed $100M, that otherwise should have been distributed to Retail Borrowers at Effective Date Pricing under the correct terms and distribution calculations that were outlined

in The Plan and it's supporting documents and Settlements.

## Facts

20. On July 13, 2022 Celsius Network, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

21. As of the July 13, 2022 Petition Date, the Celsius Lending program had approximately 23,000 outstanding loans to retail borrowers in the aggregate amount of approximately $411 million backed by collateral with a market value of approximately $765.5 million in digital assets. (22-10964-mg Doc 23 Filed 07/14/22 Entered 07/14/22 14:27:45 Main Document Pg 18 of 61)

22. On November 9, 2023, this Court confirmed the Plan proposed and voted upon by all Creditors. The Plan appears on this Court's Docket as Document no. 3972-1.

23. The Plan provided in pertinent part, *inter alia*, as follows:

Each Holder of a Retail Borrower Deposit Claim shall receive:

**Repayment Election**: If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

*Or*

**Set Off Treatment**: If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

*Plus*

On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro

Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(Modified Joint Chapter 11 Plan, pg. 35, ¶ 2).

The Debtors (and, following the Effective Date, the Plan Administrator) shall use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in this Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible.

The Plan Administrator, as a fiduciary for parties entitled to receive distributions under the Plan, shall exercise his business judgment regarding whether to continue to hold such Liquid Cryptocurrency or convert to other Liquid Cryptocurrency or fiat, including, without limitation, market forces and whether there is a Distribution Agent capable of making distributions to creditors at a particular time.

If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency at a time such Account Holder's Claim becomes an Allowed Claim and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder.

If the Debtors, Post-Effective Date Debtors or Plan Administrator determine, in the exercise of their fiduciary duties and in their business judgment, that it is no longer commercially reasonable to continue to hold Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall provide notice Filed on the docket, of the intent to sell the Liquid Cryptocurrency.

(22-10964-mg Doc 3972-1 Filed 11/09/23 Entered 11/09/23 11:53:00 Exhibit A Pg 54 of 92)

*A. Distributions on Account of Claims or Interests Allowed as of the Effective Date.*
"Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Post-Effective Date Debtors, as the case may be, and the Holder of the applicable Claim or Interest, the Distribution Agent shall made initial distributions under the Plan on account of Claims or Interests Allowed on the Effective Date or as soon as reasonably practical thereafter"

(22-10964-mg Doc 3972-1 Filed 11/09/23 Entered 11/09/23 11:53:00 Exhibit A Pg 69 of 92)

24. Prior to the Confirmation of the Plan, an Ad hoc Committee of Borrowers raised numerous concerns regarding the manner and extent of the repayment and distribution of the cryptocurrency pledged as collateral for loans. The parties reached a Settlement Agreement which was offered as an incentive to Retail Borrowers to vote to approve the Plan and to avoid prolonged and expensive litigation over concerns that had been raised by the Ad Hoc Committee of Borrowers. That Settlement Agreement (Document 3064), was "incorporated" into the Plan.

25. Broadly speaking, the Retail Borrower Settlement Agreement provided for a refinance provision to be included in The Plan along with a 5% bonus on total claim value for all Borrower Creditors who voted in favor of the Class Claim Settlement Agreement, in exchange for releases of all Pre-Effective Date Claims against the Debtor. The Retail Borrower Settlement Agreement further provided for Notice at least 30 days in advance of the Effective Date and for the parties to use commercially reasonable efforts to structure the transaction in a tax efficient manner for Earn and Borrow creditors.

26. Specifically, the Class Claim Settlement Agreement provided as follows:

*Plan Treatment of Non-Contract Claims Associated with the Earn and Borrow Accounts*

The Debtors and the Committee shall enter into a settlement agreement resolving the Committee Class Claim and Class Certification Motion (the "Class Claim Settlement"), which shall Allow a Claim for each Account Holder who does not opt out of the Class Claim Settlement against each Debtor entity on account of their contract claims and non-contract claims as follows:

All holders of Account Holder Claims other than Custody Claims shall receive, in lieu of any scheduled claim or a proof of claim, 105% of the scheduled amount of such Claim as the same type of Account Holder Claim (e.g., a General Earn Claim for $10,000 shall receive a General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500) (the "Settlement Claim").

Page 40 (Page 2 of the Term Sheet) outlines the *Treatment of Retail Deposit Claim*
*Treatment of Retail Deposit Claim*

<u>The Plan will be amended to provide Holders of Retail Borrower Deposit Claims the following treatment in full and final satisfaction of such Retail Borrower Deposit Claims</u>, including, without limitation, dismissal with prejudice of the adversary proceeding brought by the Ad Hoc Group of Borrowers and participating pro se account holders:

> o Optional Repayment of Retail Advance Obligation:
> A Retail Borrower must elect on its ballot whether it intends to repay its Retail Advance Obligation. To the extent a Retail Borrower makes such election and repays its Retail Advance Obligation on the terms set forth below, <u>the Debtors shall pay an amount of BTC or ETH (at the Retail Borrower's election) equivalent to the Retail Advance Obligation repaid with such amount of BTC or ETH valued as of Noon ET on such date based on prices on a cryptocurrency exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers</u>.
>
> The Debtors shall email a notice of the projected Effective Date to all Retail Borrowers at least thirty (30) calendar days prior to such Effective Date and provide each such Retail Borrower with instructions on how to repay the applicable Retail Advance Obligation.

Page 41 (Page 3 of the Term Sheet)

> o Treatment: <u>On the Effective Date</u>, a Retail Borrower shall receive:
>
> A. Either:
>
> 1. If the Retail Borrower repays its Retail Advance Obligation, an amount of BTC or ETH (at the Retail Borrower's election) equal to the Repayment Amount; or
>
> 2. If the Retail Borrower elects to not repay or fails to repay its Retail Advance Obligation, such Retail Advance Obligation shall be set off against the Retail Borrower Deposit Claim (i.e. the Retail Borrower Deposit Claim shall be reduced by the amount of the Retail Advance Obligation); plus
>
> B. On account of the Retail Borrower Excess Claim, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, in an amount such that the Retail Borrower receives its pro rata amount of the Unsecured Claim Distribution Consideration (i.e. (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of NewCo Common Stock (subject to dilution by the Management Equity Compensation); provided, that any election to Liquid Cryptocurrency Weighed Distribution Election shall be given priority over all other such elections.

Page 42 (page 4 of the Term Sheet) – Tax Matters

Tax Matters

The <u>parties agree to use commercially reasonable efforts to structure the transaction in a tax efficient manner for Earn and Borrow creditors</u>.

(22-10964-mg Doc 3064 Filed 07/20/23 Entered 07/20/23 23:49:57 Main Document)

27. Movants believe that Plan Administrator violated its fiduciary duty when the key provisions of

the Settlement Agreement outlined above were not taken into account in Effective Date planning and in the execution of The Plan.

Specifically:

a)   On the Effective Date Retail Borrowers did not receive the Treatment outlined in the Retail Borrower Settlement or in the Plan; Instead, the Administrator appears to have misrepresented and arbitrarily "improvised" a refinance regime, the provisions of which were nowhere provided for in the terms of the Plan, that resulted in the substantial diminishment of the value of Borrowers' claims.

b)   The Plan Administrator appears to have miscalculated the withholding of sufficient liquid cryptocurrency to be available for substantially all Holders of Allowed Claims to withdraw their initial distribution by 30 days after the Effective Date, as required under the Plan and under the EIP Award structure; and

c)   The Plan Administrator appears to have miscalculated Retail Borrower Deposit Claim Values under the Class Claim Settlement Agreement, representing an underpayment of Distribution claims where Borrowers were not given their additional 5% of total claim value allocation with initial distributions, as called for under the Plan and as agreed upon in the Class Claim Settlement Agreement, representing a total value of approximately $38.275 Million that was withheld from initial distributions without any explanation; and

d)   Retail Advance Obligations were not honored based on the Effective Date prices, as called for under the Plan and as agreed upon by the Debtors and the Ad Hoc Group of Borrowers; and

e)      Notice was not sent at least 30 days prior to the Effective Date; and

f)      Notice was not sent 30 days before selling cryptocurrency Assets; and

g)      The Administrator did not use commercially reasonable efforts to structure the transaction in a tax efficient manner; and

h)      The Administrator did not choose to follow the Plan or the Orderly Wind Down, instead concocting a hybrid Plan that siphoned off Creditor Assets to fund a NewCo mining company that was not in the Plan and those Assets should have been distributed to Creditors under the Orderly Wind Down.

28. Notice was submitted to the Court Docket on January 9th, 2024 (22 days prior to Effective Date of January 31st, 2024) and emailed to Creditors on January 10th, 2024 (21 days prior to Effective Date). Claimants were given until January 17th to file their elections. The Notice appears on this Court's Docket as Document No. 4206. Not only was this Notice not timely filed and shared with Creditors, as provided for under the Plan, but those Creditors were only given 7 calendar days / 4 business days (given the Martin Luther King Holiday weekend observed on Monday January 15th, 2024) in which to make life changing decisions that have dramatic effects on significant investments often representing their life savings or retirement savings and requiring commitments to transfer large sums of funds to an entity in an extended bankruptcy proceeding without enough information to make informed decisions or to plan accordingly.

29. In the January 9th, 2024 Notice, the Plan Administrator further limited the repayment options set forth under the Plan by modifying the language used to describe the repayment options, specifically for partial payments, stating that: "I elect to repay only a portion of the entire principal amount of my loan, such portion not to be less than $25,000. I understand that if I make a partial

repayment of my loan and such repayment is less than $25,000, my repayment will not be honored

and I will receive the Set Off Treatment by default". This language was not used to qualify partial

repayments in earlier repayment descriptions in the Settlement, the Plan or in the Disclosures. In

fact, in the Settlement, an example was specifically used demonstrating the partial repayment

process using figures that were below this threshold as follows:

> "If you make the Retail Advance Obligation Repayment Election and repay all or a portion of the
> proceeds of the loan you took out under the Debtors' Borrow Program by the Retail Advance
> Obligation Repayment Deadline and in accordance with the Retail Advance Obligation
> Repayment Instructions, you will receive an amount of BTC or ETH equal to the amount that you
> paid back (you can choose whether to receive BTC or ETH). <u>For example, if you took out a loan
> for $15,000 (this would be your Retail Advance Obligation), and you repaid $10,000 of that loan
> in Cash, you would receive $10,000 worth of BTC or ETH (depending on which you elect),</u> valued
> as of noon prevailing Eastern Time on the date of repayment based on prices on a Cryptocurrency
> exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers.

30. The limitation of partial repayments and the modification of this language was a material and

undisclosed modification to the Plan that presented a significant and unexpected hurdle to

Borrowers who wished to repay a portion of their Retail Advance Obligation, or who were not

able to pay their Retail Advance Obligation in full on short notice and without receiving timely

Notice of the repayment election and its shortened timelines.

31. The language that was included in the Plan in the Disclosures, on page 30 in Court Docket

Document 3320, which was the most current disclosure when Borrowers voted to approve the

Plan and the Settlement made it clear that:

> "If you make the Retail Advance Obligation Repayment Election, you must repay all or a portion
> of the proceeds of the loan you took out under the Debtors' Borrow Program (defined in the Plan
> as the "Retail Advance Obligation"). If you repay all or a portion of your Retail Advance
> Obligation in accordance with the instructions provided by the Debtors,[7] and you make this
> repayment on or prior to five calendar days prior to the Effective Date of the Plan,[8] then you will
> receive an amount of BTC or ETH <u>equal to the amount that you paid back</u>. You can make an
> election as to whether to receive BTC or ETH.

> The footnotes referenced above read as follows:

> [7] The "Retail Advance Obligation Repayment Instructions" will be provided by the Debtors via

email to all Retail Borrowers <u>at least thirty calendar days prior to the anticipated Effective Date</u>.

<sub>8</sub> This is defined in the Plan as the "Retail Advance Obligation Repayment Deadline."

32. Election Forms were shared together with the Notice provided to the Court and to Creditors on the above dates. Movants had to rely on representations and language contained within the Plan, the Confirmation Order, the Notice of Effective Date and the Election Forms as well as supporting documents that were available to them by January 17th, 2024 in order to elect for the treatment of Claims distributions. The Election Form appears on this Court's Docket together with the Notice as Document no. 4206.

33. The Notice provided on January 9th, 2024 was the first detailed mention of the refinance process, and that detail was minimal. The notice provided that:

> NOTICE TO HOLDERS OF RETAIL BORROWER DEPOSIT CLAIMS REGARDING FORTHCOMING NOTICE AND ELECTION FORM FOR REPAYMENT OR REFINANCING OF RETAIL BORROWER DEPOSIT CLAIMS
>
> **The Refinancing Election and the Refinancing Election Instructions:**
>
> **PLEASE TAKE FURTHER NOTICE** that, as an alternative to repaying the Debtors directly, Holders of Retail Borrower Deposit Claims may refinance their Retail Advance Obligation(s) with a third-party lender. The Debtors do not specifically endorse any lender or lending program for this purpose. While the Debtors do not attest to the creditworthiness or reliability of any specific lender, the following three lenders have provided the Debtors with indicative lending terms designed specifically to help Retail Borrowers refinance their Retail Advance Obligation(s): (1) Figure Lending, (2) Ledn, and (3) SALT Lending. Further information about these lenders will be provided after your submission of the Election Form indicating your interest in the Refinancing Election.
>
> **PLEASE TAKE FURTHER NOTICE** that if you choose to refinance all or a portion of your Retail Advance Obligation(s), you will not receive any distribution of Liquid Cryptocurrency on the Effective Date. Instead, the Plan Administrator will take commercially reasonable efforts to work with you and the third-party lender of your choice to refinance your Retail Advance Obligation on or after the Effective Date. You will be required to assign, or transfer, the Liquid Cryptocurrency to be distributed on account of your Retail Borrower Deposit Claim to the third-party lender, that third-party lender will be required to repay the amount of your Retail Advance Obligation to the Debtors, and you will be required to enter into a new loan agreement with that third-party lender on the terms you agree to with the third-party lender. If the Debtors and/or the Plan Administrator do not ultimately reach an acceptable agreement with you and your chosen lender, you will receive the Set Off Treatment by default.
>
> **PLEASE TAKE FURTHER NOTICE** that Account Holders with Withdrawal Preference Exposure above $100,000 who make the Refinancing Election must resolve their Withdrawal

Preference Exposure by making a settlement payment or otherwise resolving their Withdrawal Preference Exposure with the Litigation Administrator before the refinancing process can be completed. Because the refinancing process will begin after the Effective Date, Account Holders with Withdrawal Preference Exposure greater than $100,000 can make their settlement payments after the Effective Date. The Plan Administrator and Litigation Administrator will have the discretion to set a deadline by which Withdrawal Preference Exposure must be settled to participate in any refinancing with a third-party lender and such settlement payments must be made. The Plan Administrator will communicate any such deadline to applicable Account Holders with at least two weeks' notice of such deadline. Any Account Holder with Withdrawal Preference Exposure greater than $100,000 who does not resolve its Withdrawal Preference Exposure by this deadline but made the Refinancing Election will receive the Set Off Treatment.

**PLEASE TAKE FURTHER NOTICE** that Retail Borrowers who elect to refinance their Retail Advance Obligation(s) will still receive their pro rata portion of MiningCo Common Stock, Litigation Proceeds, and Illiquid Recovery Rights under the Plan.

**PLEASE TAKE FURTHER NOTICE** that if you would like to make the Refinancing Election, you must make your election and submit the Election Form by 11:59 p.m., prevailing Eastern Time, on January 17, 2024, via the online portal of the Debtors' claims, noticing, and solicitation agent, Stretto. If you do not timely complete and submit the Election Form, you will receive the Set Off Treatment. Once you have submitted the Election Form with your Refinancing Election, you will receive instructions about the next steps of the refinancing process after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that refinancing your loan with a third-party lender entails risk that could include loss of the cryptocurrency supporting your loan due to the financial conditions or internal operations/security protocols of the lender that you select. Retail Borrowers interested in working with a third-party lender to refinance their outstanding loan obligations are encouraged to thoroughly explore the offerings of the lenders listed above (as well as any other offerings that may be available via other lenders) to make an informed decision that accounts for all risks associated with transferring your cryptocurrency to a new lender. The Debtors and the Committee are not endorsing, sponsoring, or recommending that any Retail Borrower enter into an agreement with any specific lender or refinance their Retail Advance Obligation. Other than the transactions described in the Plan, neither the Debtors nor the Committee have any agreement with any of the lenders mentioned in this Notice. Other than the repayment of the Retail Advance Obligation to the Debtors under the Plan, neither the Debtors nor the Committee will receive any consideration from these lenders or any other party on account of any agreement between a Retail Borrower and any refinancing lender.

22-10964-mg Doc 4206 Filed 01/09/24 Entered 01/09/24 00:27:18 Main Document

34. Furthermore, in the January 9th, 2024 Notice, the Debtors effectively modified the Settlement

Agreement with the following notice:

"**PLEASE TAKE FURTHER NOTICE** that if you choose to refinance all or a portion of your Retail Advance Obligation(s), you will not receive any distribution of Liquid Cryptocurrency on the Effective Date. Instead, the Plan Administrator will take commercially reasonable efforts to work

with you and the third-party lender of your choice to refinance your Retail Advance Obligation on or after the Effective Date. You will be required to assign, or transfer, the Liquid Cryptocurrency to be distributed on account of your Retail Borrower Deposit Claim to the third-party lender, that third-party lender will be required to repay the amount of your Retail Advance Obligation to the Debtors, and you will be required to enter into a new loan agreement with that third-party lender on the terms you agree to with the third-party lender. If the Debtors and/or the Plan Administrator do not ultimately reach an acceptable agreement with you and your chosen lender, you will receive the Set Off Treatment by default".

Simply shifting the distribution date of a cryptocurrency distribution is an explainable modification to the Agreement Terms, given the complexity of this distribution. However, although the notice clearly states that the actual distribution of the Retail Borrower Claim cryptocurrency would be delayed, there is no mention whatsoever that pricing would not be at Effective Date pricing. In other examples where alternate pricing was specified (i.e. the repayment option) that was limited to pricing within a 5 day window, immediately preceding the Effective Date. There is no indication that the intention was to leave a window open for months in which to apply Market Rate Pricing and the Plan documents in no way support such an interpretation, as presented by Debtor's counsel.

35. Filed along with the January 9th, 2024 Notice was an Election Form to be used by Creditors to vote for the treatment of their Class 2 Retail Borrower Deposit Claims. When voting for refinancing, the Election Form stated the following:

Refinancing Election: The election of a Retail Borrower to refinance the Retail Borrower's existing loan made by the Debtors to the Retail Borrower as part of the Borrow Program with a third-party lender. Any and all third-party lenders are unaffiliated with the Debtors and the Debtors and the Committee do not specifically endorse any lender or lending program for this purpose. Making this election is only an indication of interest in refinancing; the process to refinance will commence after the Effective Date and will be led by the Plan Administrator. The Retail Borrower will be required to assign, or transfer, the Liquid Cryptocurrency distributed on account of its Retail Borrower Deposit Claim to the third-party lender, the third-party lender will be required to repay the Debtors the principal amount of the applicable loan, and the Retail Borrower will be required to repay the third-party lender on the terms the Retail Borrower agrees to with the third-party lender. Under this treatment, the Retail Borrower will not receive a distribution of Liquid Cryptocurrency from the Debtors on the Effective Date because that cryptocurrency will be transferred to the third-party lender as part of the refinancing transaction. The Plan Administrator will take commercially reasonable efforts following the Effective Date to complete the refinancing of the Retail Borrower's loan. If the Debtors and/or the Plan Administrator do not ultimately reach an acceptable agreement with you and your chosen lender,

you will receive the Set Off Treatment by default.

Item 2 on the Election Form provides the three distinct selections to choose from, which clearly separates the Retail Advance Obligation Repayment Election from the Refinancing Election.

> **Item 2. Optional Election for Holders of Class 2 Retail Borrower Deposit Claims Regarding the Treatment of Their Claim.**
>
> Holders of Class 2 Retail Borrower Deposit Claims should check the applicable box below. Please note that if you prefer to receive the Set Off Treatment, you do not need to check any box in this **Item 2** and you do not need to submit this form. If you submit this form and do not check any box in this **Item 2**, you will receive the Set Off Treatment. If you do not submit this form, you will receive the Set Off Treatment.
> The undersigned, a Holder of a Class 2 Retail Borrower Deposit Claim against the Debtors as set forth in the chart in **Item 1**, elects as follows:
>
> ☐   **The Retail Advance Obligation Repayment Election - Full repayment of loan.** I elect to repay the entire principal amount of my loan.
>
> - **OR** –
>
> ☐   **The Retail Advance Obligation Repayment Election - Partial repayment of loan.** I elect to repay only a portion of the entire principal amount of my loan, such portion not to be less than $25,000. I understand that if I make a partial repayment of my loan and such repayment is less than $25,000, my repayment will not be honored and I will receive the Set Off Treatment by default.
>
> - **OR** –
>
> ☐   **The Refinancing Election.** I would like to refinance my loan. I understand that the refinancing process will begin on or after the anticipated Effective Date of the Plan and by making this election, if the refinance transaction is consummated, I will not receive the Liquid Cryptocurrency distribution I otherwise would be entitled to receive under the Plan.

36. Movants believed, and still believe, that the most reasonable interpretation of this language is that those choosing, not to repay, but to refinance their loans, would have their cryptocurrency valued as of the "Effective Date" (January 16, 2024), as defined and agreed in the Retail Borrower Settlement Agreement, and that the loan amount would be repaid by an advance from participating lender, in exchange for the cryptocurrency representing the full claim value in liquid cryptocurrency at Effective Date pricing, as specified in the Plan and supporting documents when they elected for refinancing by January 17th, 2024.

37. Movants believed, and still believe, that the Plan Administrators fiduciary duty was to withhold
and account for cryptocurrency reserves sufficient to satisfy Distributions for full claim values
and that any attempt to omit principal amounts from the reserved Assets or to sell cryptocurrency
ahead of the Effective Date with respect to the Assets to effect these distributions is an egregious
breach of the Administrator's fiduciary duties to protect Creditor Assets and to avoid tax issues
wherever possible.

38. Since all of the Movants had over-collateralized their loans with pledged cryptocurrency valued
well in excess of the loan amount, the language of the Plan led Movants to expect that their pro
rata share of their full claim values were set at Petition Date Prices , including the 5% bonus on
total claim value promised in the Settlement Agreement, would be returned to them in "Liquid
Cryptocurrency"  at Effective Date pricing and with additional distributions of their Pro Rata share
of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c)
Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim
Distribution Mix Elections, and not just on the portion of their claims that account for the set off value.
That is because, in the case of a repayment, through direct repayment or indirect repayment
through a refinancing, the Debtor received payment in full of a debt obligation by the Borrower
to address a loan that was secured by an overcollateralized deposit of cryptocurrency.
Accordingly, Borrowers' full claim value should have been applied to the benefits of the
Settlement Agreement and the exclusion of those benefits amounts to unequal Treatment of the
Borrower Class.

39. The experience of Movant David Heiliger is illustrative of the problems encountered by the
Borrowers in negotiating the post-Effective Date terrain under the Administrator's ad hoc
interpretation of the Plan and its supporting documents. Movant David Heiliger filed a Motion on
behalf of his individual and corporate claims. Mr. Heiliger had tried to contact the Debtor, the

Plan Administrator and Stretto to inquire about his Election Form questions ahead of the filing deadline, but could not get answers to his questions. On his Election Forms, Mr. Heiliger selected both the options for Repayment and Refinance, as the terms of each were still unclear and his questions were unanswered. Apparently, the Plan Administrator determined that the form was improperly filled out and, despite both options selected that indicated that Mr. Heiliger wanted to repay or refinance and the box for set-off left blank, they arbitrarily determined that these claims should be set-off instead. The January 9th, 2024 Notice and Election Form included specific language with regard to defective forms that provided as follows:

Item 4

9. the undersigned acknowledges that if the undersigned submits this Election Form but makes no election and the Election Form is blank, the undersigned will receive the Set Off Treatment on account of the undersigned's Retail Borrower Deposit Claim.

40. Post-Effective Date Debtors' Counsel seems to also indicate that there was a large sale of cryptocurrency holdings immediately preceding the Effective Date (Court Docket Document 4786, page 8). No substantiation, documentation, receipts or other confirmation of such a sale has been shared with the Court or with Creditors to date, despite the Plan's clear directive that Creditors would receive advance notice of any sales of cryptocurrency.

41. Any sale of cryptocurrency Creditor Assets that were supposedly held in cryptocurrency throughout the Chapter 11 process would potentially present significant tax consequences to Creditors and for tax reasons and otherwise, and, quite apart from the failure to notice Creditors as required by the Plan, would be an undesirable and unexpected deviation from the Plan and its expressed goal to distribute liquid cryptocurrency Any sale of the cryptocurrency that was held as a Creditor Asset should have been a last resort, reserved only for Claims where no Distribution Agent was capable of making a distribution to the Account Holder.

42. While the Plan provided that the Administrator could reasonably exercise business judgment regarding whether to hold their cryptocurrency Assets on behalf of Creditors, the Administrator's discretion was tempered by clear fiduciary duties to protect the Creditors' assets. The Plan Administrator's fiduciary duties under the Plan were defined as: "The Plan Administrator, as a fiduciary for parties entitled to receive distributions under the Plan, shall exercise his business judgment regarding whether to continue to hold such Liquid Cryptocurrency or convert to other Liquid Cryptocurrency or fiat, including, without limitation, market forces and whether there is a Distribution Agent capable of making distributions to creditors at a particular time.

43. At the time the purported sale of cryptocurrency took place in January 2024, announcements had been widely reported that Bitcoin ETFs were pending and receiving approvals, with Bitcoin ETFs beginning trading on January 11th, 2024. At that time, there was wide consensus among financial reports and headlines that cryptocurrencies, in particular Bitcoin, would see rapid appreciation in short order. These market forces were widely reported across the internet, radio, newspapers and television in January of 2024 and led to Bitcoin surging and reaching new all time high values within a few short weeks. This was not an anomaly or an unpredictable market force.

44. Refinance instructions were not sent to Creditors until February 14th, 2024, one month after their election for refinance in January.

Refinance instructions email read as follows:

From: <no-reply@cases-cr.stretto-services.com>
Date:         Wed,        Feb        14,        2024        at        9:28 PM
Subject: Action Required: Further Instructions for Refinancing of Retail Borrower Loans
To: REDACTED

Dear REDACTED,

You are receiving this Notice because you timely and properly submitted an Election Form indicating your interest in the Refinancing Election. In order to refinance your loan (also known as the "Retail Advance Obligation" under the Plan) and complete the Refinancing Election, you must complete the following steps.

**Action Required**

1.  Submit a signed Data Sharing Authorization and select lender(s) to whom information can be provided.

- To make your selection electronically, please visit https://balloting.stretto.com/.

- Your electronic password is REDACTED

2.  Reach a final agreement with your chosen lender and email a signed Irrevocable Direction Letter to Stretto at CelsiusRefinancing@stretto.com.

3.  If applicable, resolve Withdrawal Preference Exposure by making a settlement payment or otherwise resolving Withdrawal Preference Exposure with the Litigation Administrator.

**You must reach a final agreement with your chosen lender and email a signed Irrevocable Direction Letter to Stretto at CelsiusRefinancing@stretto.com by 11:59 p.m., prevailing Eastern Time, on March 15, 2024. Please return the signed Irrevocable Direction Letter using the email address to which this Notice was sent. This will help to confirm your identity with Stretto and ensure your transaction is processed safely and efficiently.**

**If you have questions or need further support**

We *strongly suggest* you refer to the Distributions FAQ if you have questions or need assistance with this process before contacting support. We are currently receiving a large number of inquiries, and we appreciate your patience while we work through each creditor support inquiry.

The latest updates on these Chapter 11 cases are available on cases.stretto.com/celsius or through the Celsius X account (formerly Twitter) @CelsiusNetwork.

**Stay Alert**

Remain vigilant for phishing attempts. Celsius, the Official Committee of Unsecured Creditors, or their respective advisors will never contact you directly by phone, text message, or social media to request account or personal information absent an order or on-the-record instruction by the Court.

Stretto

45. A second email was sent to Refinance Creditors on March 12th, 2024. At that point, refinancings

had not begun and the approved Lenders were still waiting for information from the Post-Effective

Debtor. Creditors were told that if they did not sign an Irrevocable Direction Letter with a Lender by March 31st, 2024 that their loans would be set-off. Up until the deadline, it was not clear what to do if a Creditor was not able to work our terms with a particular Lender and it was not clear whether multiple Irrevocable Direction Letters could be submitted. Messages to the Post-Effective Date Debtors, Stretto and the addresses provided were responded to with form responses and no meaningful information was shared around the many open questions in a complex process that was not properly defined or explained to Creditors or Lenders who were trying to engage in transactions under the Plan.

46. Furthermore, instructions were emailed to Creditors on February 15th with a due date of March 15th and on March 12th a second set of instructions were emailed out extending the deadline to March 31st. At that point, no refinancing had been completed and in the 18 days between March 13th and March 31st, both Creditors and Lenders could not get answers to basic questions. Movants and others in the class were confused and had nowhere to turn. Some, out of utter frustration and confusion, selected multiple choices in the hope of avoiding set-off of their clams, but found themselves set-off after all because the Plan Administrator determined that their elections were invalid.

47. On March 19, 2024 Movants, (together with 30 additional signers) filed a Pro Se Letter with the Court that appears on the Court Docket as Document 4716, highlighting growing concerns about issues with delays and miscommunications about refinancing of loans.

48. On March 31st, 2024 Movants, (together with 40 additional signers) filed a Pro Se letter with the Court that appears on the Court Docket as Document 4766, highlighting the issues resulting from the lack of communication, an imminent deadline over the Easter Holiday weekend to make life altering decisions with no responses to key and basic questions about the refinance process and

issues that were arising with refinancing, without understanding or knowing which terms the approved Lenders would refinance and the chaos that ensued as a result.

49. On April 4th, 2024, The Post-Effective Date Debtors filed a response to the distribution issues raised by Corporate Creditors and Retail Borrowers. That response appears in the Court Docket as Document 4786.  On page 8 of that response, the Debtors indicate that they sold cryptocurrency Assets of the Estate in January. The Plan Administrator seems to have made a determination to sell Cryptocurrency ahead of the Effective Date, to the significant detriment of Creditors, and has not provided any substantiation, explanation or documentation of such a sale or its terms, or of the reasoning to sell the cryptocurrency for fiat instead of distributing the cryptocurrency that was preserved (at great appreciation in value) through the Chapter 11 process.

50. Under the Plan, the Plan Administrator was explicitly directed to use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in the Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible. Such a sale would have required that no Distribution Agent could distribute the liquid cryptocurrency, with appropriate Notice of the sale. The conversion of the Liquid Cryptocurrency to fiat currency would have had to have taken place as close to the anticipated date of distribution as reasonably practical under the circumstances, and be distributed, in fiat currency, to the Account Holder in a timely fashion. Just days earlier, at the Hearing on March 20th, 2024, Debtor's counsel stated to the Court that Debtor made valiant efforts to do what other financially troubled entities dealing in cryptocurrency did not – keep their cryptocurrency, to wit: "We held onto the crypto through the bankruptcy. We did not sell it. Other Debtors have sold it. That would have been the easy thing to do." (Transcript, March 20, 2024, p. 13, ll. 15-17). If that were the case, and if Creditors had a strong preference for receiving their Distributions in cryptocurrency, why would it be the prudent

decision to sell the cryptocurrency after holding it on behalf of Creditors for all that time. Specifically, despite Debtor's professed desire (as explained to the Court by Mr. Chris Koenig on March 20, 2024) to "give creditors what they demanded from us: a distribution in cryptocurrency to the extent they could receive it", Movants are getting less than a third of the "crypto" they would otherwise be entitled to if not for the arbitrary formula devised by the Plan administrators. (March 20, 2024 Transcript, p. 13, ll. 10-13). Movants believe that this is a significant breach of the Plan Administrator's clear fiduciary duties.

51. Furthermore, in the April 4th, 2024 response on page 9, the Debtors allege that the Plan provides two treatment options to Borrowers: The Repayment Election and the Set Off Treatment. While this is true of the Plan as it was originally confirmed, at that time there were no provisions whatsoever for the Refinance Option. The Refinance Option wasn't included at all in the language until the January 9th, 2024 Notice that was sent, and then only with an indication that details about a Refinance Option would be shared with those who elected for it. In the Election Form that was included with that Notice, Item 2 provides three distinct selections to choose from, which clearly separates the Retail Advance Obligation Repayment Election (Full or Partial) from the Refinancing Election, as follows:

**Item 2. Optional Election for Holders of Class 2 Retail Borrower Deposit Claims Regarding the Treatment of Their Claim.**

Holders of Class 2 Retail Borrower Deposit Claims should check the applicable box below.

Please note that if you prefer to receive the Set Off Treatment, you do not need to check any box in this **Item 2** and you do not need to submit this form. If you submit this form and do not check any box in this **Item 2**, you will receive the Set Off Treatment. If you do not submit this form, you will receive the Set Off Treatment.

The undersigned, a Holder of a Class 2 Retail Borrower Deposit Claim against the Debtors as set forth in the chart in **Item 1**, elects as follows:

¨ **The Retail Advance Obligation Repayment Election - Full repayment of loan.** I elect to repay the entire principal amount of my loan.

**- OR –**

¨ **The Retail Advance Obligation Repayment Election - Partial repayment of loan.** I elect to repay only a portion of the entire principal amount of my loan, such portion not to be less than $25,000. I understand that if I make a partial repayment of my loan and such repayment is less than $25,000, my repayment will not be honored and I will receive the Set Off Treatment by default.

- **OR** –

¨ **The Refinancing Election.** I would like to refinance my loan. I understand that the refinancing process will begin on or after the anticipated Effective Date of the Plan and by making this election, if the refinance transaction is consummated, I will not receive the Liquid Cryptocurrency distribution I otherwise would be entitled to receive under the Plan.

52. Also, in the April 4th, 2024 response on page 9, the Debtors state that "If a borrower instead decided to refinance its loan, the third-party lender must repay the borrower's loan by making the payment to the Debtors, the Debtors would use those funds to purchase an equivalent amount of BTC and ETH on the market, and that BTC and ETH are then transferred to the third-party lender for use as collateral for the borrower's refinanced loan with the lender". The Debtors further argue that "Notably, the portion of a borrower's Claim that remains after application of a loan repayment amount, i.e., the set-off amount, was calculated using January 16, 2024 cryptocurrency prices, and borrowers are being treated exactly the same as all Earn creditors with respect to that portion of their Claim. However, with respect to a borrower's excess collateral claim, the Plan provides for a market price purchase of BTC and ETH in return for repayment of a borrower's loan. Accordingly, borrowers who elected to refinance are being treated in accordance with the terms of the Plan". Despite the Debtor's repeated assertions that this is the Treatment outlined by the Plan, there is simply no language contained in the Plan, the Notice, the Election Form or the supporting documents that supports this position. Refinance instructions and elections were added into the January 9th, 2024 Notice and Election Form and were included as distinct options from the Repayment (Full), Repayment (Partial) and the Set Off Treatment. As explained above in detail, Movants believed, and still believe, that the most reasonable interpretation of this language

is that those choosing, not to repay, but to refinance their loans, would have their cryptocurrency valued as of the "Effective Date" (January 16, 2024), and that the loan amount would be repaid by an advance from a participating lender, in exchange for the cryptocurrency representing the full claim value in liquid cryptocurrency at Effective Date pricing, as specified in the Plan and supporting documents when they elected for refinancing by January 17th, 2024. If the Plan had called for the Treatment as now advocated by the Administrator and a purchase at "market price", that language would have been explicitly included in the Refinance Option. That language was not included, and the Debtor's assertions that this was always incorporated into the Plan, as a post-hoc rationale for the Administrator's conduct, are unsupported in the Plan documents with respect to the Refinance Option.

53. In the April 4th, 2024 response on page 9, the Debtors allege that "In effect, the Borrower Group is requesting that the Post-Effective Date Debtors subsidize the cost of purchasing BTC and ETH for refinancing borrowers in the same way that corporate creditors want the Post-Effective Date Debtors to increase Cash distributions to make up for the increase in market prices of BTC and ETH. This would benefit these individual creditors at the expense of all others by giving these borrowers a new guaranteed option to buy cryptocurrency at below-market prices with the benefit of hindsight—and at a cost to the estate and all other creditors. As in the case of corporate creditors, the Post-Effective Date Debtors believe that it is neither feasible nor fair to other creditors to adjust distributions in real time in response to daily market fluctuations". On the contrary, this was not a new option at all but, rather, was exactly what was called for in the Plan and the supporting documents. Similar to the Corporate Creditors, Movants have been trying to raise awareness of the inequities of distributions under the Plan and the unsupported and repeated assertions by the Debtor that this was clear and included in the Plan all along. It was the Plan Administrators responsibility to assess and account for the management of Creditor Assets and

account for sufficient reserves to cover the distribution obligations of the Debtor. The Borrower group is simply requesting the Treatment called for under the Plan. If the Plan Administrator was incompetent in miscalculating the needs for distribution, the management of Assets to protect Creditors or to maintain sufficient reserves to account for their miscalculations, the responsibility and burden of those errors should not be on the shoulders of Creditors. Discovery into the decisions that were made with respect to allocations of Assets for Distributions, and the management of those assets would help shed light on how these miscalculations may have occurred and where the responsibility stems from. Regardless of the source of the deficiency of Assets for Distribution as provided for in the Plan, Movants and other Creditors in a similar situation such as Corporate Creditors, are simply asking for correct accountings and distributions as provided under the Plan.

54. On May 3rd, 2024, Movants filed a Motion for hearing and other relief. That Motion appears in the Court Docket as Document 4860.

55. On May 3rd, 2024 Movants filed a Notice and Order. That Notice appears in the Court Docket as Document 4861.

56. On May 6th, 2024, Post-Effective Date Debtors filed a response to the Movant's Motion. That motion appears in the Court Docket as document 4862. This response contained categorical rejections of the Movant's concerns as expressed in the Motion. These responses referred to and relied heavily upon references to the Debtor's response in their earlier April 4th, 2024 response that is available on the Court Docket as Document 4786. Movants have addressed many of their responses to Debtor's assertions in Document 4786 above and believe that these apply to Document 4862 as well.

57. On August 29, 2024 the Post-Effective Date Debtors filed a Motion. That motion is available on

the Court Docket as document 7661. This Motion included a Settlement Agreement Term Sheet that was the result of a Mediation held on behalf of the Ad Hoc Committee of Corporate Creditors and in response to the concerns that the Ad Hoc Committee of Corporate Creditors had raised with respect to the Treatment that their Group received under the Plan and under the belief that their Treatment was unfair and the result of multiple breaches of the Plan.

58. Movants, like the Ad Hoc Committee of Corporate Creditors, are not seeking to modify the Plan but, rather, to resolve the significant issues that have been raised with the manner in which the Plan has been implemented that has prevented them from receiving the full value of their claims as outlined in the Plan. In many cases, these Creditors have yet to receive any of the value of their claims.

59. Furthermore, the proposed Settlement Agreement is an attempt to address significant and material issues that have been raised with important questions about how the Plan has been administered in a manner that has caused delays and significant harm to Creditors. Settlement of these Claims under the proposed terms is likely to be significantly more efficient, less time consuming and far less costly than extended litigation on these matters. However, answers to the questions raised and transparency into the Claims Distribution process are critical to gaining an understanding of whether the Plan is, in fact, being administered according to the Plan.

60. Furthermore, due to the Plan Administrator's maladministration of the plan and mishandling of creditor assets, this Corporate Creditors Settlement has resulted in an approximately $75 Million redistribution to Corporate Creditors from the contingency fund to address both Plan Administrator's errors in omitting the 1,700 Corporate Creditors who were not in the Top 100 and to address the difference in value between the Effective Date pricing of cryptocurrency that Plan Administrator wrongfully chose to sell the Creditor cryptocurrency assets at and the amounts that needed to be provided to Corporate Creditors under their Settlement, which ultimately further

reduces the potential claim recoveries for all Borrow and Earn Creditors in future distributions, all due to a breach of Fiduciary Duties resulting from Plan Administrators miscalulations and unreasonable sale of cryptocurrency assets in a rapidly appreciating market ahead of the Effective Date.

61. Finally, the Post-Effective Date Debtors and the Plan Administrator breached their duties to **"protect against unauthorized access or disclosure of the Stored Customer Data from any access or use other than as authorized in this Order for so long as such Stored Customer Data is within the possession, custody, or control of any Representative"**. And the Plan administrator failed in his duties as "data controller" in the data breach in early 2024. This caused both direct harm to Creditors from the data breach and exposure of highly sensitive Stored Customer Data, but also caused harm specifically to Refinance Creditors and those whose Distributions were significantly delayed as a direct result of the utter failure of the Plan Administrator and the Post-Effective Date Debtors to prevent the data breach and to address the breach in a timely manner to the Court or to the Creditors, further delaying and pausing Distributions and Refinancings at a critical point where Crypto prices were rapidly rising.

62. The Administrator's reticence was compounded by the well-documented inability of thousands of creditors (including Movants) to negotiate the computer systems set up by the Administrator, which was beset by technical snafus or the Distribution Agents who could not answer any questions about why the provided redemption codes would not work, or what the status was with Claims and their respective Claim Codes. (See Docket Nos. 4300-5000 relating to difficulties encountered by those attempting to assert their claims in accordance with the "directions" sent by the Administrator, while creditors could not reach anyone at Stretto or the Administrator's office to help them solve any of the technical problems).

63. The Plan Administrator also failed to ensure that the Debtor's banking partner was viable and capable of managing the distribution process. While news apparently came to light in early February that the Post-Effective Date Debtor's banking partner had its bonds downgraded to "junk" and significant questions arose about the management and protection of cash assets of the Debtor (that were largely Creditor Assets) totaling approximately $500 Million Dollars at that time, Debtor relied upon lesser known and smaller sized banks to manage these funds. Aside from the concerns over safeguarding these Assets, these banks were also less equipped to handle the volume and complexity of the Distribution of Assets, but also were less equipped to handle the volume and complexity of international wire transfers and ACH payments with the need to rely on intermediary banks that caused so much of the delay and confusion in distributing funds to Creditors under the Plan.

64. The result of the foregoing was to convert what was a rapidly appreciating asset in the Administrator's hands (the cryptocurrency was experiencing the doubling and tripling of its value on the market) into a rapidly ***depreciating*** asset if processed according to the interpretation of the Plan advanced by the Administrator. The practical effect of all this was that while Movants and the other creditors struggled to cope with the technical problems of the claims system, and the Administrator dithered, and either negligently or intentionally failed to communicate with them at this critical juncture, millions of dollars of value of Creditors' Assets simply evaporated into thin air. Movants do not see how this state of affairs is justified under the Plan, or of any benefit to them at all. Indeed, Movants do not understand why the Administrator's Post-Effective Date conduct is not a breach of his fiduciary duty to, as the Plan provides, "…use commercially reasonable efforts to make distributions of Liquid Cryptocurrency…to the greatest extent possible…" and to "…make initial distributions under the Plan…on the Effective Date or as soon as reasonably practical thereafter".

65. To date, no statements have been provided to Creditors with details of their claims. Creditors are left to try to figure out what formulas were used to determine their Claim Distributions and whether those Claim Distributions were correct or complete.

66. To date, if there are disputes or questions about the formulas and calculations that were used to determine the Claim Distributions of individual or corporate Creditors, there is no mechanism or provision for Creditors to verify their Distributions or to determine their potential tax consequences from the treatment of their Assets in recovery and Distribution, or to appeal for corrections or verifications of Claim Distributions.

67. It seems that decisions that the Plan Administrator about which Creditor Claims would receive cryptocurrency distributions and which Creditor Claims would be liquidated ahead of the Effective Date was arbitrary, with certain groups and sub-groups receiving cryptocurrency distributions at Effective Date pricing, other groups being held to buy in to crypto at market prices and yet others getting the benefit of cryptocurrency appreciation in their distributions. This does not reflect what was outlined in the Plan and does not represent equal treatment of Creditors within the same Class.

68. Movants are not requesting modification of the Plan but, rather, are seeking the correct implementation of the Plan as it was presented and Confirmed.

69. Similarly, Movants are not requesting a new option, as has been alleged by the Debtor, but are seeking to correct the maladministration of the Plan by the Plan Administrator to request relief in the form of receiving the correct value for their Claims as provided for under the Plan and the Settlement Agreement.

70. As Debtor's Counsel Chris Koenig stated himself at the September 12th, 2024 hearing, "if the

Plan requires it, we must pay it" and Creditors should be given "the amount that they should have received for their claims on January 16th".

WHEREFORE, given the egregious circumstances described above, Movants request the following relief:

a) The entry of an order allowing Movants to pursue discovery of Debtor's use, *vel non*, of the cryptocurrency that was held by Debtor as a Creditor Asset through the Chapter 11 process;

b) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator management of the cryptocurrency that was held by Debtor on behalf of Creditors or bought and/or sold on Creditor's behalf and the process by which distribution allocations were determined and implemented to fulfill Claim Distributions to various classes, but in particular with respect to the Borrower Class and the Refinance sub-Group;

c) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator sales, transfers and purchases of cryptocurrency and the process by which distribution allocations from those sales were determined and implemented to fulfill Claim Distributions to various classes, but in particular with respect to the Borrower Class and the Refinance sub-Group;

d) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator management of the Repayment and Refinancing repayments of Retail Borrower Advances and the source(s) and transaction receipts for the conversions of those repayments into cryptocurrency for distribution to Lenders;

e) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator communications with respect to refinance treatment under the Plan;

f) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's review and approval process for Borrower Election Forms and reporting of exactly how many Election Forms were denied and set-off as a result;

g) The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's communications with respect to Borrower Election Forms;

h)  The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's communications with respect to treatment of Borrower Claims;

i)  The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's communications with respect to treatment of Borrower Claims, specifically with respect to calculations and formulas used to determine full claim values and to determine composition and calculation of initial distributions;

j)  The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's communications with respect to treatment of Borrower Claims, specifically with respect to the 5% incentive that was offered as an incentive and provisions for resolving the amounts that were omitted from initial distributions;

k)  The entry of an order allowing Movants to pursue discovery of Debtor, Post-Effective Debtor and Plan Administrator's unexplained delays and lack of provision for sufficient reserves for the full value of claims and elections by the class of Retail Borrowers to settle all claims at Effective Date pricing, in line with Borrowers who elected to refinance their loan principal;

l)  The scheduling of a hearing regarding the formula described in ¶ 4 above used to deal with the claims of Retail Borrowers; and

m) Other relief this Court deems appropriate under the circumstances.

Respectfully submitted,


 /s/ Richard D. Grossman
Richard D. Grossman
*Attorney for Thomas Chernaik,*
*Darius Gheorghe Christian Funck*
*and David Heliger*

Richard D. Grossman
**LAW OFFICES OF RICHARD D. GROSSMAN**
211 West Wacker Drive Suite 710
Chicago, IL  60606
(312) 750-9308
Fax (312) 750-9323
rgat135@gmail.com