Richard D. Grossman
**LAW OFFICES OF RICHARD D. GROSSMAN**
211 West Wacker Drive Ste 710
Chicago, IL  60606
(312) 750-9308
Fax (312) 750-9323
rgat135@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **CELSIUS NETWORKS LLC**, *et al.*, | **Case No. 22-10964 (MG)** |
| **Debtors.** | |

**RESPONSE TO POST-EFFECTIVE DATE DEBTORS' OBJECTION TO CERTAIN RETAIL BORROWERS' MOTION FOR HEARING AND OTHER RELIEF (ECF Doc. #7789)**

## INTRODUCTION

In reply to the Post-Effective Debtor's Objection to the Motion for Hearing and Other Relief, Movants wish to clarify and contextualize their requests for relief and the importance and relevance of the Discovery that they have requested. Movants believe that there are substantive concerns about Debtor's pre-Effective date actions but, alternatively believe that, even if those actions are set aside for the moment, that there are sufficient issues remaining with regard to the Post-Effective Date Debtor's commercially reasonable efforts to effectuate the refinancing of Borrower loans to justify the relief that has been requested in the form of relevant discovery, hearing and other relief that this Court deems appropriate under the circumstances.

The Debtor and its Adminstrator(s) were charged with an explicit fiduciary duty to carefully and professionally manage the assets of the Debtor so as to give Creditors their cryptocurrency back to the greatest extent possible and as soon after the Effective Date as possible, and, Movants submit, using Effective Date pricing. These obligations are spelled out in the settlement agreement that was incorporated into The Plan, and ordered by the Court along with a Reservation of Rights during the Confirmation process. Throughout this Bankruptcy, Debtor and its Administrators have been very

1

well compensated and have had the support of teams of highly paid specialists and experts to prepare and implement the Plan, which is admittedly complex and unique.

The gravamen of Movants' Motion is that despite the forgoing, the Post-Effective Date distribution process has been plagued with errors, material changes, mandates found nowhere in the Plan, omissions, unexplained and unexplainable delays, and an utter indifference to the urgent pleas of thousands of Creditors (reflected in the letters clogging the docket in this case) for help and/or information as to ambiguities and inconsistencies in the instructions received by Movants regarding the required elections and other interim steps leading to distributions, all of which has resulted in financially catastrophic losses in the millions of dollars to the Creditors, particularly the Retail Borrower Creditors, as explained below.

Movants seek discovery to find out how, and by whom, the Assets of the Debtor were "managed", and an accounting of exactly what happened to the cryptocurrency and other assets in the Estate. Additionally, Movants seek the hearing they were entitled to under the Reservation of Rights found in Paragraph 323 of Plan. Finally, even if all the foregoing were not true, it seems painfully obvious that, after the Effective Date, Post-Effective Date Debtor and its Administrators failed to use, as they were required to, "commercially reasonable" efforts to see to it that distributions of liquid cryptocurrency occurred "to the greatest extent possible". Movants seek discovery to find out how, in the Post-Effective Date period, Debtor received, handled and timely responded to Creditor questions with regard to the delays, notices, instructions and communications related to the planning, implementing and troubleshooting of issues, delays and timelines of Creditor distributions and refinancings for Borrowers.

If there are any parties in this matter who have access to both information, data, receipts and resources that could clear up these concerns, it would be the Debtor and the Plan Administrator. If there was nothing to hide, there would be no concern over the requested transparency and accounting of Creditor Assets that were being managed on behalf of Creditors and the statements, accountings, processes and communications that Movants have requested in Discovery.

Debtor's counsel has not chosen to object to our detailed concerns on the merits. Counsel not responded with accurate or relevant responses to refute specific allegations. Instead, counsel, in an unduly dismissive Objection, has chosen to deflect, distract and categorically deny any wrongdoing.

Movants note that the concerns raised by the Retail Borrowers were supposed to be addressed in the July 2023 mediation. At that mediation, a settlement term sheet was agreed to and signed by the parties. As a direct result of those efforts, a refinancing option was to be added and incorporated into The Plan. The Settlement was used to incentivize Class 2 Retail Borrowers to vote in favor of the Plan's Confirmation and to settle the concerns raised by Retail Borrowers, who would in turn vote for confirmation and release their claims in exchange for the terms and treatment outlined in the Settlement Agreement in September 2023. The election form used to Confirm the Plan was supposed to include an election form for Retail Borrowers to choose a Retail Advance Obligation

2

Repayment Election, but Debtor failed to include that election option in the Class 2 Ballot. That was only the beginning of Debtor's failure to perform the terms of the Settlement Agreement. Movant's do not intend to relitigate or modify the Settlement Agreement, rather they simply seek the correct treatment that was intended by the Settlement.

In October of 2023, the Ad Hoc Borrower's Group filed a Response to the Confirmation of the Plan (Doc 3928), in a letter filed by David Adler, that clearly outlined significant issues and concerns with the manner in which the Debtor was omitting key provisions of the Settlement Agreement and failed to perform certain terms of the Settlement Agreement. In particular, as mentioned above, the Debtor was supposed to incorporate the Retail Advance Repayment Election into the Class 2 Ballot. They failed to do so and the Debtor addressed the issue by modifying the Plan and redefining the Retail Advance Obligation Election as "election of a Retail Borrower to repay its Retail Advance Obligations, *which will be in the Retail Advance Obligations Repayment Instructions.*" Borrowers further raised the issue that the Retail Advance Obligations Repayment Instructions were to be issued no less than 30 days before the anticipated Effective Date, indicated that the Borrowers were already in active discussions with the three third-party refinance lenders and that no instructions had been circulated to Borrowers.

The Ad Hoc Group raised concerns over the lack of cooperation, both before and after the Effective Date, on the part of the Debtor to work with the third-party refinancing lenders who were, at the time, unwilling to accept the timing issue of a repayment date 5 calendar days prior to the Effective Date and the Effective Date specifically stating that "No third-party lender is willing to repay a loan and then wait five days to receive the collateral", which is a clear and contemporaneous demonstration of the intent of the Retail Borrowers Settlement to provide Effective Date Treatment as Movants have contended now since July of 2023.

Ad Hoc Borrowers further demonstrated in this letter that there were already issues that needed to be resolved in order to effectuate the Effective Date Treatment that was specified under the Settlement Agreement and the Debtor raised these issues out of an abundance of caution in their letter. The Ad Hoc Group's letter requested that the Confirmation Order include a reservation of rights to address any issues that may arise after the Retail Advance Obligation Repayment Instructions were provided. That Reservation of Rights of Retail Borrower Ad Hoc Group was included in the Court's Plan Confirmation Order (Doc 3972) and specifically states:

> *323. **Reservation of Rights of Retail Borrower Ad Hoc Group**. The Debtors acknowledge that the Retail Advance Obligation Repayment Election has not been circulated to date. The Debtors shall make commercially reasonable efforts to facilitate such third-party financing with respect to the repayment of Retail Advance Obligations, including any issues related to the timing of the Retail Advance Obligation Repayment Deadline **<u>and the distributions to be made on the Effective Date</u>**.* (Emphasis added)

There can be no doubt, from the clear language of the Reservation of Rights above, as included in the Court's Confirmation of The Plan, that the intention of the Retail Borrowers Settlement

Agreement was to provide a timely (30 days) Notice. When it was finally sent late on January 9th, 2024 Movants first saw the election form that was supposed to be shared with Borrowers in August 2023 ahead of the Class 2 vote in September 2023. However, the Notice still did not include the instructions for refinancing that were requested by the Borrowers, under the terms of the Settlement. Quite apart from the notice being sent inexcusably late, Borrowers were given 4 working days to make their election and they still had not received any instructions. Instructions were not provided by the Effective Date, when the Treatment under the Plan was to be implemented, and were not received by Borrowers until February 15th. This was a significant violation of the Plan and of the Court Order (Doc 3928) compelling performance of the terms of the Settlement. This significant violation of the Plan, Settlement Agreement and Court Order (Doc 3288), combined with other factors related to Debtor's repeated failures, caused a delay in the refinancing process and prevented Effective Date Treatment from being applied to Retail Borrowers who refinanced their loans causing the loss of tens of millions of dollars for the Retail Borrowers Class.

Alternatively, even if all the concerns about pre-Effective Date actions, omissions and failures are not taken into account, it seems painfully obvious that, after the Effective Date beginning on February 1st and beyond, Debtor and its Administrators failed to perform the terms of the Settlement Agreement and failed to use, as they were required to, "commercially reasonable" efforts to see to it that distributions of liquid cryptocurrency occurred "to the greatest extent possible".

Movants were promised an opportunity to have their voices heard. In the following Movants explain why they are entitled to seek the relief that they have requested all along - proper accountings of Full Claim Value allocations and distributions, discovery into the planning, processes, implementation and management of refinancings and claims distributions (pre and/or post-Effective Date), and the Court's evaluation and interpretation of the Effective Date Treatment that Movants contend they should have received under the Plan and of the commercially reasonable efforts made to effectuate the refinancings and claim distributions pre and/or post Effective Date.

## DETAILED RESPONSES TO DEBTOR'S OBJECTIONS

1.    Paragraph 1 of the Debtor's objection is a gross oversimplification of the issues that have been raised. The Debtor and the Plan Administrator were paid enormous sums of money from the Estate to manage and distribute Creditor Assets on behalf of the creditors. Not only have they failed to provide accountings and statements to Creditors, but they have refused to acknowledge or be accountable for significant and well documented issues that have been raised for many months, have caused great concerns and significant harm to Creditors and that have been articulated in great detail in this Motion for relief and discovery.

    a.    The primary issue is one of pricing Movants full claim values using the Effective Date Treatment that was outlined in the Retail Borrower Settlement Agreement and

incorporated into the Plan. But the related issues go much deeper into the maladministration of the Plan.

b.    Due to the Debtor's failure to perform the terms of the Settlement Agreement, there were significant delays to the refinance process that resulted in a violation of the Plan and the Court Order that incorporated the Settlement into the Plan, and that resulted in significant losses to Creditors' value and amounted to an unauthorized material modification and breach of the Plan overall.

c.    Additional related issues that the Movants have raised and ask for relief on are 1) the 5% bonus and confirmation of the resolution of the omission of this bonus that the Plan Administrator acknowledged, promised to resolve and then went silent on; 2) the forced set-off treatment of borrower accounts that were repaid or refinanced; 3) the mishandling of the Corporate Creditor distributions that resulted in an approximately $82M loss of creditor value to cover for the Plan Administrator's errors, omissions and incompetence. In addition, Movants have raised, articulated and documented concerns over countless breaches of fiduciary duties and key responsibilities of the Plan Administrator that have harmed Movants, the Borrower Class, Earn Class and other Creditors and have caused significant reductions in claim recoveries.

d.    As with the issue concerning the corporate creditors and Movants prior efforts to raise awareness of these issues, Debtor's counsel is adamant that the treatment that was received is clear in the text of the plan, and remains highly dismissive of Movants' concerns. As Movants learned through the Corporate Creditors, those similar representations were patently untrue, and the plan interpretation that they vehemently defended and misrepresented was, in fact, not supported in the plan. Movants believe, and have documented, that the same is true here and that Debtor's counsel and the Plan Administrator are simply trying to distract from the issues and discovery requests that will offer visibility and transparency into their management of Creditor Assets and administration of the Plan on behalf of all Creditors.

e.    Movants are not asking, as Debtor's counsel alleges, to retroactively change the terms of the new loans. Those loans were refinanced through third-party refinance lenders. Movants entered into those loans, while expressing their concerns to the Debtor and the Court, to preserve as much of the Full Claim Value as possible and to avoid the devastating effects of the set-off treatment. What Movants are asking for is simply the treatment specified by the Plan as Ordered by the Court, in the form of proper explanations and accountings of the allocations that were used in determining the distributions of creditor assets. To this day, Movants are without any information or understanding as to how the distribution amounts were arrived at by the Debtor.

f.      Movants have consistently raised issues about the fairness of the treatment that they have received, and their concerns have consistently gone unanswered or outright ignored. Movant Thomas Chernaik specifically raised these issues in Court at the July 29, 2024 hearing, speaking directly to Judge Glenn. On behalf of the group of Movants, and the larger subgroup of the Class, Mr. Chernaik explained that the group has been desperately trying to get the attention of the Court and the Post-Effective Date Debtor to raise awareness of these issues and to have their voices heard. Judge Glenn promised that their voices would be heard and that is what is being requested, along with discovery that is vital to finally gaining an understanding into how the Debtor and Plan Administrator both managed and allocated Creditor Assets and made decisions about that treatment within their Fiduciary and Administrative Duties and whether Post-Effective Date Debtors used reasonable business efforts to resolve significant issues before and during the Post-Effective Date Period.

2.      Movants sustained huge losses due to the Debtor's repeated and continued failures to provide timely elections and instructions, to cooperate with third-party refinancing lenders to fulfill Effective Date Treatment, and the resulting delays that pushed refinancings out for months. This lack of cooperation extended well beyond the Effective Date. Not taking into account the full values of Borrower claims, or effectuating their refinancing on or even near the target Effective Date with delays lasting for weeks and months afterward, caused direct harm to not only the Borrower Class, but to all Creditors and the Estate.

a.      Movants do not, as Debtor's counsel alleges, seek to recover more than the value of their respective loan repayments. Movants have simply asked to receive the Effective Date Treatment that was provided for in the Retail Borrower Settlement Agreement. In September 2023, borrower creditors were incentivized to vote in support of the confirmation of the Plan after the Ad Hoc Retail Borrower Group negotiated a Settlement to their earlier Adversary Proceeding. Under that Agreement, Retail Borrowers were supposed to receive equal treatment, on the Effective Date. It was understood that while crypto would not be transferred to Creditors immediately on the Effective Date, there was nothing in the Plan language that indicated that the treatment for repayment and refinancing would be a forced set-off with an option to buy additional crypto at market prices after months of unexplained delays by the Debtor. Modification of the Treatment or of any of the terms of the Settlement would require a signed writing by the Parties, and by further order of the Court, if material.

b.      There was a provision for borrower creditors who repaid their loans to do so within a window of 5 days in January, 2024. Those creditors who repaid or refinanced were specifically not to be set-off and were to receive Full Claim Value under the Plan.

c.      In paragraph 38 of their objection, the Debtor's Counsel alleges that the Retail Borrower Settlement is somehow not, in fact, a settlement and that due to some

6

unexplained claimed failure of the Retail Borrower Ad Hoc Group the "Term Sheet" was not in fact a Settlement and that, as a result of that "certain aspects of the term sheet were not incorporated into The Plan". Movants address this misstatement below but suffice it to say that this allegation is easily refuted in multiple references to the Retail Borrower Settlement Agreement and its incorporation into the Plan has been clearly documented and referenced throughout this document.

d.    Other retail borrowers in the same class did receive significantly more value (40-60% more crypto) for claims that were repaid in the five-day window that was provided immediately preceding the Effective Date. According to the Plan and the language in the Retail Borrower Settlement Agreement, the refinancing option was to be available on the same date as the repayment that would provide Movants with Full Claim Value for their claims with Effective Date Treatment. By not honoring that, and by delaying the refinance process for many months throughout the distribution process, retail borrowers who refinanced were at a significant disadvantage and were subject to market pricing in a scenario that harmed the Borrower class, the Estate and all other classes.

e.    None of the above should come as a surprise to the Debtor. These very issues were raised by the Retail Borrower Ad Hoc group in 2023, leading to the negotiation and mediation of the Retail Borrower Settlement. That settlement was then used to incentivize Retail Borrowers to vote in favor of Confirmation of The Plan. During the Confirmation process, on October 27, 2023 Counsel to the Ad Hoc Group, David Adler, filed a Response to the Debtor's Confirmation Order (Doc 3928) that clearly outlines some of the concerns about timing, planning and coordinating repayments and refinancings in a manner that would be consistent with the Retail Borrower Settlement Agreement terms and with the inability or unwillingness of the Debtor to provide clear instructions or to effectively cooperate with third-party lenders (who were already identified and actively engaged in October 2023) to devise logistical solutions to effect refinancings on the Effective Date or within the 5 day window provided for repayment. Debtor failed to perform the terms of the Settlement Agreement, even after they were reminded of their obligations during the Confirmation Process.

3.    Movants agree, in part, with the objection's third paragraph, except that the default treatment of all Borrower accounts was not set-off under the Plan as alleged by the Debtor. The Borrower Settlement ("Term Sheet" as the Debtors have inaccurately alleged) made it clear that those who refinance or repay their loans are not to receive the set-off treatment and are to receive Effective Date Treatment, at Full Claim Value, for their claims.

4.    Movants agree that the set-off treatment was, in part, intended to avoid potential taxable events as described in paragraph 4 of the objection, but the obligation of the Debtor was to allocate and reserve crypto from creditor assets sufficient to cover the Debtor's liabilities for the Full Claim Value, not just the post set-off excess. If the loan was set off, that additional

allocation would be returned to the estate as repayment of the loan from the collateral. If the loan was repaid or refinanced, the reserved crypto would be used to exchange for the repayment or refinance and the cash received in return for the loan obligation would be credited to the Estate as repayment for the collateral obligation. By not allocating the correct reserves, the Debtor and the Plan Administrator not only shifted the burden of the value of the principal Retail Advance Obligation to the Borrow Creditor, who was not given an allotment of crypto assets for an amount of collateral that was a significant portion of their Full Claim Value, but also waived the Estate's ability to recover the value of the loan portfolio that they instead seem to have willingly written off, to the detriment of the Estate and of all of the Creditors. Furthermore, Debtor's counsel indicates that they had not yet identified a source of third-party refinancing and that therefore the Debtor could not have possibly included the detailed terms of the refinancing process in the Plan. This is absolutely untrue. By October 2023, the three lenders (SALT, LEDN and Figure) were identified and many Borrowers already had accounts and preliminary terms defined by December and early January (including at least two of the Movants). Many Borrowers were in regular contact with the three refinancing lenders (SALT, LEDN and Figure) and were ready to refinance in January. It was the Debtor who failed to communicate clearly, if at all, with the Creditors and the refinancing partners well into March, as detailed in the letters submitted to the Court in March. It is impossible to believe that the Plan Administrator and Debtor's Counsel were unaware of the concerns that were clearly raised and articulated in David Adler's October 27, 2023 Response (Doc 3928), specifically with regard to the Plan Administrator's neglect to perform the terms of the Agreement, to include the Retail Advance Obligation Election in the September 2023 election, to provide timely refinancing instructions and lack of collaboration and coordination with the already identified third-party refinancing lenders who were willing and ready to refinance ahead of the Effective Date.

5.      Movants strongly disagree with the Debtor's characterization in paragraph 5 of the objection. This was not an issue of a free option. Movant Borrowers are not seeking more than 100% back on a claim. Movant Borrowers are seeking fair and equitable treatment that accounts for the Effective Date Treatment and Full Claim Values of their claims, as provided in the Retail Borrowers Settlement Agreement incorporated into The Plan; and are seeking to correctly address fundamental miscalculations of their claims that were imposed due to incompetence or maladministration of the Plan; and are not seeking to reduce the claim recoveries of other Creditors.

     a.      The Plan was not clear, as the Debtor's counsel alleges, that any repayment would be valued at contemporaneous market prices and not as of the Effective Date. While this was true of the repayment option, that was limited to a 5 day window immediately preceding the Effective Date, David Adler's letter on behalf of the Ad Hoc Borrowers Group (Doc 3928) makes it clear that Effective Date Treatment was what was intended in the Retail Borrower Settlement Agreement. That letter also raises concerns that as of October 27th, 2023 the Debtor had not provided instructions for refinancing and that those instructions would need to be prepared and would need to be shared with all

Borrower Creditors no less than 30 days prior to the anticipated Effective Date. The contemporaneous Reservation of Rights of Borrow Ad Hoc Group also confirms that the express intention of the Retail Borrowers Settlement Agreement was to provide refinancing at Effective Date Treatment. The refinancing option first appeared in the January 9th Notice and was listed as a third alternative. These alternatives, repayment, refinancing and set-off were separate and specifically separated by OR modifiers.

b. The Plan Administrator had full control of the creation of the Plan documents and could have easily added clear provisions or qualifications to the refinance option, but they did not. The Plan Administrator knew, or should have known at the time, that the Retail Borrower Settlement Agreement provided for Effective Date Treatment.

6.    Movants were aware of certain terms of the refinancings that were being offered, as stated in paragraph 6 of the Debtor's objection. However, those terms were materially different from the terms of the Plan, and Movants actively wrote letters explaining the imminent predicament that they faced when they were compelled to sign the Irrevocable Direction Letter with refinancing partners. Movants and refinancing partners were unable to get any answers from the Debtor and were forced to make life changing decisions over a holiday weekend. Movants disagreed with the market price and other material changes, but due to the significant and extended delays in the process Movants' only other alternative to refinancing at that point was to receive the default set-off treatment that would have wiped out most of the Full Claim Value that Movants were entitled to receive under the plan. Movants closed on the loans when they were able to in an attempt to recover as much of the Full Claim Values as possible.

7.    Debtors previously acknowledged their error in omitting the 5%. Debtor's counsel provided limited view summaries of Movants' specific claims in individual excel spreadsheets concurrently with the filing of their objection. Those limited view summaries do not show their sources nor do they clearly show the addition of the 5%. Without clear account statements, it is impossible for individual creditors to confirm that their distribution calculations were correctly tabulated. Account statements should have been, and still should be, provided to all Creditors for their accounts for verification of distributions and for tax preparation. This omission, and the resulting delays, did cause direct harm to creditors. The Plan Administrator simply failed to report and follow up on the conclusion or resolution of this issue and it remains unclear whether this issue was fully addressed, how it was addressed, on what timeline, and where the additional creditor assets were allocated from.

8.    These discovery requests are anything but a fishing expedition. As outlined above, the issues addressed here are not just the primary issue of pricing of the repayment of Borrower Loans, but the underlying and directly related issues of opaque and misleading statements and claims that cannot be verified due to an utter lack of accounting and transparency about the determinations that were used to manage and distribute Creditor assets on behalf of the Creditors. Moreover, the

issues addressed in Movant's discovery requests are relevant to the Debtor and Plan Administrator's failure to perform the terms of the Retail Borrowers Settlement Agreement. 9.

9.    Movants were promised an opportunity to have their voices heard and this objection by the Debtor is merely an attempt to deflect and distract from fundamental maladministration of the plan and to further silence voices that have appealed to the Court for the better part of a year to bring these issues to light and to seek the relief that they have requested all along - the Effective Date Treatment that should have been received under the Retail Borrowers Settlement Agreement as it was incorporated into The Plan. Movants believe that the Post-Effective Date Debtor failed to perform the terms of the Settlement Agreement and failed to use reasonable commercial efforts to effectuate treatment of refinancings and distributions and are entitled to the relief that has been requested.

10.    Despite the Debtor's repeated assertions in paragraph 10 of the Objection, and in multiple prior statements, that the Plan language is clear and that the refinancing option is one and the same with the repayment option, is not an accurate statement. The refinancing option first appeared in the January 9th Notice and was listed as a third alternative. These alternatives (repayment, refinancing and set-off) were separate and specifically separated by **_OR_** modifiers. The default treatment of all Borrower accounts was not set-off under the Plan as alleged by the Debtor. The Borrower Settlement ("Term Sheet" as the Debtors have referred to it) made it clear that those who refinance or repay their loans are not to receive the set-off treatment and are to receive Full Claim Value for their claims. Furthermore, the Retail Borrowers Settlement Agreement, as incorporated into the Plan, requires the outlined Effective Date Treatment to take effect on the Effective Date, like the repayment process, as the refinancing is an alternative to repayment. Clearly no one would have voted for a Plan that would delay refinancing for months with an open-ended transaction window. The Plan Administrator had full control of the creation of the Plan documents and could have easily added clear provisions or qualifications to the refinance option, but did not. The Debtor was clearly aware of the concerns of the Ad Hoc Group as they were outlined in David Adler's letter (Doc 3928). Any ambiguity in the plan language during the planning, confirmation and modification to incorporate the third option for refinancing would have been the result of the Plan Administrator's work and oversight, or lack thereof.

11.    In paragraph 11 of the Debtor's objection, the Debtor states that they were required to take commercially reasonable efforts to facilitate a creditor's request to refinance obligation, and that it did so. In January, 2024, the Debtors solicited all eligible Retail Borrowers to determine who was interested in potentially refinancing their loans and indicated that additional details would be provided to interested borrowers after the Effective Date. The October, 2023, Adler letter (Doc 3928) made it clear that in August, 2023, the Debtor had omitted the election form that was finally sent on January 9, 2024. Had this election form been timely sent to Class 2 Borrowers for vote in September, 2023, Debtors would have been able to determine who was interested in potentially refinancing their loans before the confirmation of The Plan.

Furthermore, had the Debtors provided timely election forms, it is likely that many more Borrowers would have availed themselves of the refinance option. The Debtors were aware of this omission at the time, promised to add it to a Notice to be provided to Borrowers no less than 30 days prior to the anticipated Effective Date, and then failed to timely deliver that Notice. Then, the Debtors promptly blamed the Borrowers for delays to the refinancing process and explained that they would provide the Refinancing Instructions after the Effective Date, rendering timely implementation of the Effective Day Treatment impossible, in direct violation of the terms of the Settlement Agreement and of the Court's Order. Furthermore, the Adler letter noted the attempt to address the Debtor's omission of the election form and called for timely and comprehensive instructions to be provided no less than 30 days in advance of the anticipated Effective Date to ensure that the Effective Date Treatment could be honored. Despite the three refinancing lenders already being identified in October, 2023, the Debtor failed to act in a commercially reasonable manner to cooperate with those lenders to finalize agreements or to provide any timely or meaningful detail about refinancings ahead of the anticipated Effective Date, when distributions were intended to be effectuated. Those failures continued after the Effective Date, when the Post-Effective Date Debtors failed to use commercially reasonable efforts to effectuate refinancings on, or after, the Effective Date in a timely manner. On February 15, 2024, the Debtor finally provided some additional information to Borrowers, but they still were not communicating with the refinancing lenders, so the original March 15, 2024, deadline had to be extended to March 31, 2024, because refinancing lenders were unable to get answers from the Debtor in a timely fashion, if at all. Again, many of the borrowers and refinancing lenders were ready with their paperwork in December, 2023, and it was the delays and unresponsiveness of the Debtor that pushed refinancings out to February, then March, then May, with a final deadline in August. Movants do not believe that this is consonant, in any way, of commercially reasonable behavior on the part of the Debtor or the Plan Administrator. Rather, it is an example of the haphazard and opaque manner in which the Plan Administrator has planned and implemented distributions under The Plan.

12.    In paragraph 12 of the Objection the Debtor states *"The Plan provides two treatment options for Holders of Retail Borrower Deposit Claims: (i) make the Retail Advance Obligation Repayment Election; or (ii) receive the Set Off Treatment."* While this was true in the Plan document, this was modified in the January 9th Notice to incorporate a distinct third option for repayment as outlined in detail above in paragraph 10. Not only were there three options, as provided for in the Retail Borrower Settlement Agreement, there was also a provision that those who repaid or refinanced were not to receive the set-off treatment. It should be noted that election forms and clarification of the three treatment options were supposed to be provided in an election form in August, 2023 that the Debtor omitted from the Class 2 Borrower election packet for voting in September, 2023. Debtors not only failed to include the election form in a timely manner, but they did not correct that omission until January 9, 2024 in a required additional notice that was not timely filed either. This delay, and the failure to include all three required options in the election form packet for Class 2 Borrowers in August, 2023 significantly

impacted the number of Borrowers who elected for refinancing and likely contributed to significantly higher numbers of Creditors who ended up receiving the default set-off treatment.

In footnote 11, the Debtors addressed concerns about the limiting of partial repayments: *"The Debtors informed creditors that partial repayments of less than $25,000 would not be accepted "due to administrative reasons" but that "[t]he Debtors will accept all repayments of the entire principal amount of the Retail Advance Obligation." Retail Borrower Notice at 8. The Retail Borrower Movants argue this modified the Plan but have made no indication that they would have made such repayment if the threshold had been lower."* Debtor's counsel is always quick to dismiss the material changes that were forced on Creditors in this process, by saying that Movants did not indicate that they planned to act in a particular way. The fact is that the change was a material change, as it was limiting the repayment options in a manner which was wholly inconsistent with the very example that was used in the plan. Such a material change is a violation of The Plan and Court Orders and would have required a writing signed by both parties and, if material, by the Court as well. These changes were frequent, unannounced, and harmful to Creditors. They were indicative of the dismissive and callous nature of the Plan Administrator's post-confirmation material changes and of the chaotic shifting of terms that made it nearly impossible for individual creditors to navigate and make decisions on the short timelines that were required. A material modification to the Plan requires disclosure and signed agreement from all parties. Debtor's dismissal of the issue of Limitation of Partial Repayment does not provide an explanation or rationalization of the material change that was made without prior disclosure, is misleading at best.

13.    Movants agree with the contents of paragraph 13.

14.    Movants agree with the contents of paragraph 14, with the exception that Movants do not believe that the Debtors worked in good faith to take commercially reasonable efforts to facilitate such third-party refinancing, in particular with regard to the delays and lack of communication with regard to the refinancing election forms (delayed from August, 2023 to January, 2024); cooperation with the identified lenders to prepare for planned Effective Date Treatment; Notice of Effective Date; and failure to provide refinancing instructions until after the Effective Date, when the Settlement was intended to be effectuated on the Effective Date, as described in detail throughout the document. At least two of the Movants had their initial accounts and agreements with refinancing lenders signed and ready to go in early January, 2024 and many other Borrowers had contracts with the third-party lenders beginning in December, 2023. Furthermore, even after February 1st, the Post-Effective Date Debtors did not act in good faith to try to finalize agreements with third-party refinancing lenders and accommodate refinancings on the Effective Date with the Retail Borrowers Settlement Agreement Effective Date Treatment.

15.    In paragraph 15, Debtor states: *"Because the refinancing process was a Retail Borrower making the Retail Advance Obligation Repayment Election through a third-party, the Plan*

*provided that those Retail Borrowers who elected to refinance their Retail Advance Obligations*
*would be treated similarly to those Retail Borrowers who repaid their Retail Advance*
*Obligations."* Movants believe, therefore, the refinancing process was supposed to happen in the
same period of time as the repayments and not be delayed for months. This has been confirmed
as the intent of the Retail Borrower Settlement Agreement by the contemporaneous letter of
response submitted by David Adler on behalf of the Ad Hoc Borrowers in October 2023, by the
Court Order confirming the Retail Borrower Agreement as well as incorporating the Reservation
of Rights of Retail Borrower Ad Hoc Group. Due to the inaction and delays by the Debtor, those
refinancing were not treated similarly and received unequal treatment in the same class of
creditors. The treatment was not the same because Movants were delayed for months.
Furthermore, Borrowers who repaid or refinanced were specifically not to receive the set-off
treatment and were to receive Full Claim Value, which was not accounted for in the Plan
Administrator's implementation of the Plan.

16.     Movants agree with the contents of paragraph 16.

17.     Debtors continue to allege that the Plan offered two options for addressing Retail Advance
        Obligations. As Movants have outlined in detail above, this was not the case. The refinancing
        option first appeared in the January 9th Notice and was listed as a third alternative but was
        originally supposed to be included in the August 2023 election form for Class 2 Borrowers, but
        was omitted in error by the Debtor. These alternatives, repayment, refinancing and set-off were
        separate and specifically separated by OR modifiers. The default treatment of all Borrower
        accounts was not set-off under the Plan as alleged by the Debtor. The Borrower Settlement made
        it clear that those who refinance or repay their loans are not to receive the set-off treatment and
        are to receive Effective Date Treatment, at Full Claim Value for their claims. Furthermore, the
        Retail Borrowers Settlement Agreement, requires the outlined treatment to take effect on the
        Effective Date, like the repayment process, as the refinancing is an alternative to repayment, and
        not be delayed for months with an open-ended transaction window.

18.     In paragraph 18, The Post-Effective Debtor again mischaracterizes the relief that the Movants
        seek and wrongly claims that Movants are seeking a "free option" or an additional windfall.
        Again, it appears that the Plan Administrator failed to properly account for and allocate
        sufficient assets for Borrowers who repaid or refinanced and were due Full Claim Value in
        exchange for their repayment or refinance. The refinancing process was supposed to start at the
        Effective Date, similar to repayment. Movants were supposed to be able to refinance in the same
        period as the repayment. The "free option" was the Post-Effective Date Debtor and the Plan
        Administrator's failure to account for the Full Claim Values that they were responsible for, and
        to effectuate those refinancings in a timely manner even after the Effective Date target date had
        passed.

19.     In paragraph 19, the Debtors state that *"The Movants' misinterpretation ignores that the Plan*
        *does not provide any material terms of the refinancing process and the plain language of the*

*Plan providing for the pricing of the Retail Advance Obligation Repayment Election as contemporaneous market prices."* This statement ignores the failure of the Plan Administrator to perform the terms of the Retail Borrower Settlement, to add the refinance option to the plan, that was required under the Settlement Agreement, and to clearly define the material terms of the third distinct option. The intent of the Retail Borrower Settlement Agreement was made clear in the contemporaneous letter of response submitted by David Adler on behalf of the Ad Hoc Borrowers in October 2023. That letter raised concerns about the inaction of the Debtor to provide timely refinancing instructions, to coordinate with the identified third-party refinancing lenders, or to make any efforts - let alone commercially reasonable efforts - to prepare for refinancings to take place as called for under Effective Date Treatments. Again, any omission or ambiguity in the Plan and its supporting documents, would be the result of the Plan Administrator's work, oversight or failure thereof. The inaction of Post-Effective Date Debtor caused the refinancings to be further delayed, well beyond the Effective Date target.

20.    Movants do not agree that the Debtors have taken commercially reasonable efforts to facilitate the Retail Borrower's requests with respect to refinancing our loans. Debtors were clearly aware of the concerns of the Borrower Ad Hoc Group in October 2023, and they seem to have chosen not to address them. In fact, not only were refinancing details and instructions not ready in time to provide timely Notice ahead of the anticipated Effective Date, they were not ready in time for the late Notice, or the voting deadline for refinancing, or even for the actual Effective Date. Even after February 1st. the abject failure of the Post-Effective Date debtor to timely provide final treatment of Retail Borrower Deposit Claims or to adequately address concerns that have been raised about lack of transparency, delays, unfair treatment and requesting plan and distribution clarification and statements went wholly unaddressed until Movants' most recent motion was filed.

21.    Movants agree with most of the contents of paragraph 21, except that the election form that was included in the January 9, 2024 Notice was originally supposed to be included in the election form packet provided to Class 2 Borrowers in August, 2023 for the vote scheduled for September 22, 2023. The omission of this election form was a key concern of the Ad Hoc Borrower Group, who raised concerns that the omission could cause delays in the planned Effective Date Treatment for refinancings. This omission, and the failure to timely provide refinancing elections, mechanisms and details was a failure to perform the terms of the Retail Borrowers Settlement Agreement, as ordered by the Court.

22.    In paragraph 22, the Debtors allege that the January 9th Notice was not sent less than 30 days of the anticipated Effective Date. Debtors stated that "The Debtors were able to go effective earlier on January 31, 2024, which was not certain as of the date the Notice was sent." This statement is patently untrue and is easily refuted through multiple references contained directly in the Notice in question and other concurrent filings on the Court Docket. In the Notice itself, there is a reference to January 31, 2024 as the anticipated Effective Date on page 5 of the Notice, seen on page 9 of document #4206 on the Court Docket and there are five separate

14

references to January 31, 2024 as the anticipated Effective Date on pages 2, 9, 10, 11 and 16 of the NOTICE REGARDING PROCEDURES FOR SETTLING WITHDRAWAL PREFERENCE EXPOSURE (Doc #4207) that was contemporaneously filed on the same date. Clearly, the Plan Administrator and Debtor's Counsel knew well ahead of the Notice date that the anticipated Effective Date was January 31, 2024. Debtor further alleges that because the Notice only provided eight days less than the anticipated thirty-day notice was not a violation of the Plan. The Court should reject this "argument". The Notice was not meant to be a casual courtesy to Creditors.  As noted above, the election form provided in this Notice was supposed to be provided to Class 2 Borrowers in August, 2023 and the remainder of this Notice was to prepare creditors for an anticipated Effective Date for the refinance and repayment options and to provide meaningful refinancing details and instructions. Thirty days are not 22 days, and obligations are obligations. Debtors had been reminded of their obligation to provide timely notice and refinancing instructions in October, 2023 in David Adler's letter (Doc 3928), and they should have been well aware of their obligations under the Borrower Settlement Agreement as it was incorporated into The Plan. Not only was the Notice not sent to Borrower Creditors more than thirty days prior to the anticipated Effective Date, but that notice failed to provide detailed instructions, or any meaningful instructions, for the newly added refinancing option. However, the late Notice sent on January 9, 2024, required a response within a week - by January 17, 2024 - at risk of Set-Off if no election was filed by January 17th, in a week that fell on a holiday weekend, leaving thousands of Creditors located around the globe to make life changing decisions, within a few days, based upon a notice that was delivered late and lacked appropriate detail to understand new and material changes that were added at the last minute. Of course, as a result of Debtor's failure to provide proper Notice, it was impossible to complete the refinancings on the anticipated schedule for the Effective Date. With four business days to decide, Movants and other Borrowers were left with no time to make decisions and no definitive information to make those decisions. Movants were left with the following choice: either make an uninformed election and hope for the best, or receive the default set-off treatment and lose the bulk of the Full Claim Value. Again, it is impossible to believe that the Plan Administrator and Debtor's Counsel were unaware of the concerns that were clearly raised and articulated in David Adler's October 27, 2023 Response (Doc 3928), specifically with regard to the Plan Administrator's neglect to provide timely refinancing instructions, lack of collaboration and coordination with the already identified third-party refinancing lenders and the requirement for Notice to be provided at least 30 days prior to the anticipated Effective Date.

23.    In paragraph 23, Debtor states that "The Retail Borrower Notice further informed creditors that the refinancing process would be completed on or after the Effective Date." The Debtor knew the terms that were negotiated in good faith and agreed to in the Retail Borrower Settlement Agreement. During the confirmation process, in the letter from David Adler on behalf of the Ad Hoc Borrowers Group, the Debtor was reminded of their obligations under the Settlement and that the intention of that Settlement Agreement was to be prepared to effectuate Effective Day Treatment for Borrowers who wished to repay or refinance their loans. Debtors failed to provide the election form in a timely manner, so they did not know how many of the

Borrowers intended to repay or refinance. Then when they filed their late notice, they added the much delayed election form and inserted language that indicated that the refinancings would take place on or after the Effective Date, knowing full well that they had not yet even provided instructions for the refinancing and those instructions weren't sent to Borrowers until more than two weeks after the Effective Date. These unexplained delays and failures to perform the terms of the Settlement were violations of the Plan and the Court Order. The insertion of this language in the Notice was an unauthorized material modification of the plan that would have required a writing signed by both parties and, as it is a material change to the terms of the Settlement, would need the approval of the Court as well.

24. Movants agree that the Post-Effective Date Debtors did send further instructions for refinancing on February 15, 2024. However, as clearly stated above, Movants have demonstrated that the refinancing instructions had to be shared with Borrowers ahead of the Effective Date under the terms of the Settlement Agreement. It was impossible for Borrowers to complete their loan applications without instructions and the unexplained delays and failure of the Debtors to perform the terms of the Agreement are at the core of the issues with Effective Date Treatment. It is clear from the Plan and the contemporaneous letter from the Ad Hoc Group in October 2023, that an assertion that the debtor had always planned for refinancings to take place AFTER the Effective Date is a complete departure from the intention of the Parties when they signed the Agreement and that the delivery of instructions, being a lynchpin in the refinancing of a loan, after the Effective Date is a blatant violation of the terms of the Settlement Agreement and a material modification of The Plan.

25.     In paragraph 25, the Post-Effective Date Debtor addressed Irrevocable Direction Letters that were required to finalize the refinancing of a Retail Advance Obligation.

26.     In paragraph 26, the Post-Effective Date Debtors reference the Irrevocable Direction Letters that were signed by the Movants and allege that, by signing the IDL they waived claims related to the refinancing of their Retail Advance Obligations. This is a mischaracterization of the release that was included in the IDL. The Borrower provided a release for the Released Assets, but that release would only cover the amount of cryptocurrency in the transfer under the IDL. That release would prevent a Borrower from interfering with the transfer of collateral for the repayment to protect the refinancing lender and Celsius from a claim that would attempt to unwind their transaction. In the case of a miscalculation or where a Settlement term is not performed and there are amounts due from Celsius above and beyond the initial transfer, there would be no release for amounts that exceed the Released Assets.

27.     Movants agree with the contents of paragraph 27. However, considering that there were approximately 12,000 loans in total, Movants strongly believe that if not for the failure of the Debtor to provide timely election forms to Class 2 Borrowers in August, 2023, and the chaos and confusion that stemmed from the Debtor's failure to perform the terms of the Settlement Agreement, that the response rate of refinancing Borrowers would have been significantly

16

higher. The loss of creditor value due to set-off of loans would easily total hundreds of millions of dollars, considering that loan liabilities that were due to the Debtor were $411M at petition date prices.

28.     In paragraph 28, the Post-Effective Date Debtor addresses the specific claims of Movant David Heiliger. Movants submit that the specifics of his claim should be discussed directly, but that his confusion, the lack of reporting and the callousness with which his documented requests, both before and after the Effective Date, were received is emblematic of the ways that Creditor concerns were addressed and handled by the Plan Administrator and that they are emblematic of how, and why, many Borrowers were unwillingly forced to accept default set-off treatment, whether or not, and even when, their express desires to refinance were clear.

29.    In paragraph 29, the Post-Effective Date Debtor states that *"The Refinancing Movants submitted letters to the Bankruptcy Court where they admit that they were aware of the terms of the refinancing transactions and requested the Bankruptcy Court to intervene".* Movants were aware of the terms but Movants filed contemporaneous letters complaining about these very issues and made it clear that they did not want to face default set-off treatment and lose the vast majority of their Full Claim Values. Set-off treatments, in the view of Movants and other Borrowers, as articulated in these letters, would present devastating losses of value in claims that represented substantial portions of their life and retirement savings. Furthermore, these letters pointed out the consistent delays on behalf of the Plan Administrator before and after the Effective Date, the understanding that the refinancings were intended to receive Effective Date Treatment and the loss of value due to the price increases and the Debtor's interpretation of the refinancing process that was forced upon Movants at the last minute with the only alternative being the default set-off treatment if Movants did not move forward with refinancings and did not have liquid funds available for repayment. Instead of attempting to resolve the open issues at that time, (October, 2023), Debtor ignored them and refused to have any discussion on the merits about the legitimate concerns of Borrowers with respect to implementation of the Plan in their distributions. The confusion that existed in the period between Plan Confirmation, Effective Date and again in the Post-Effective Date period through the refinancing IDL deadline in late March and beyond was due to the failure of the Debtor to provide timely elections and instructions, in direct conflict with the language and intention of the Retail Borrowers Settlement Agreement as incorporated into the Plan upon Confirmation and as Ordered by the Court. These delays and the failure to perform the terms of the Settlement were a material and unauthorized modification of the Settlement Agreement.

30.     In paragraph 30, the Debtors state: "*In an admission that what they are currently requesting is a modification of the Plan, the March 19 Letter requests that the Bankruptcy Court implement a solution by requiring the Post-Effective Date Debtors to use Effective Date pricing for the refinancing transactions. See id. at 4*" Movants requested to receive the Effective Date Treatment that was clearly outlined in the Retail Borrowers Settlement Agreement as incorporated into the Plan upon Confirmation and as Ordered by the Court. Post-Effective Date

Debtors have tried to mischaracterize the requests for fair and equal treatment, under the terms and conditions of the Retail Borrower Settlement Agreement and the Plan as a "free option" and as an overreaching of the Movants but, in fact, Movants have only requested the correct distributions that they were entitled to under The Plan and as has been documented as the intention of the Settlement Agreement to provide refinancing of Borrower loans with Effective Date Treatment at Full Claim Values.

31.    In paragraph 31, the Post-Effective Date Debtor's state: *" In response to Mr. Funck's argument, counsel for the Post-Effective Date Debtors stated that "[a]llowing Mr. Funck to buy bitcoin now at $43,000 when the market price of Bitcoin is $65,000 I would argue is inequitable, and anybody should make that choice."* While Movants agree that this exchange happened at the Hearing in question, we believe that this is a perfect example of how the Debtors simply tried to change the subject when these issues were raised and blame Movants and other Creditors who attempted to request the treatment that they understood the Plan to provide for them. Forcing the Borrowers to receive Bitcoin at $65,000 (or much more, in the examples of all of the Movants who successfully refinanced) when the Plan clearly provided for Effective Date Treatment is equally inequitable, and no one should be forced to make that choice. Movants and refinancing borrowers were, in fact, forced to accept market price treatment at the time, at risk of losing the majority of their Full Claim Values through the default set-off treatment if they did not accept those terms, at the time.

32.    In paragraph 32, The Post-Effective Date Debtors discuss Movant's March 31, 2024 letter, and they allege that it demonstrates that the Movants had an understanding of how the refinance process worked. Movants agree in part that they understood how the refinance process was being implemented but emphatically deny that an understanding of the treatment described in the March 31, 2024 letter is somehow an approval of it. Movants believed at the time that their interpretation of the Retail Borrowers Settlement Agreement and the Effective Date Treatment applied to their claims, and they further believe that the support for that belief is overwhelmingly confirmed by contemporaneous and binding references that have been highlighted throughout this response.

33.    In paragraph 33, The Post-Effective Date Debtors state: *"Further, prior to refinancing transaction closing, the Refinancing Movants would have received specific terms from their selected third-party lender, presumably including information on the valuation of their Retail Advance Obligation repayment."* Although the Debtor was not a party to the third-party refinancing agreements between lenders and Borrowers, it is astounding that they do not seem to understand how the process worked. Under the scheme that the Plan Administrator and Debtor's Counsel used to incorrectly implement treatment at market pricing under The Plan, there was no way for Movants to know the specific terms required by the third-party lender until after the refinancing transaction closing. Borrowers made their elections before even receiving instructions (due to delays and non-performance of the Debtor), selected a lender and signed an Irrevocable Direction Letter before even seeing an agreement from the lender, and were not informed of an anticipated refinancing transaction closing until after the transaction closed.

Borrowers had no visibility and no say into how to refinance throughout this process, but went ahead with refinancings anyway, as they had no alternative but to accept default set-off treatment and, as a result, almost total loss of their Total Claim Values.

34.   In paragraph 34, Post-Effective Date Debtor alleges that Movants have failed to meet their burden of establishing "good cause" for such discovery. Movants disagree that we have failed to meet that burden as detailed throughout this reply and as addressed below in 35.

21.   Movants have requested discovery to address significant and documented concerns that have caused direct harm and injustice to the Borrower Class. Movants further believe that the rights of Creditors to understand and confirm the manner in which Creditor Assets were managed, how claim values were determined, how the treatment process was implemented and the details of administration of the Plan does not present any undue burden on the Estate, but rather provides the Creditors (for whom the estate is being managed) with information that should have been reported to them to begin with and have demonstrated that:

   a.  Debtors have been unclear about the use of cryptocurrency that was held on behalf of creditors in terms of management, use and allocations.
   b.  Debtor has not been transparent with respect to the process by which distribution allocations were determined or the process involving any sale of any cryptocurrency to fulfill claim distributions or in the refinancing or repayment of their loans. It is not clear whether cryptocurrencies were truly bought and sold on the open market, or if there were private sales where prices and parties to those agreements should be made clear.
   c.  Debtor has not been transparent about sales, transfers or purchases of cryptocurrency were made to fulfill distributions to Creditors.
   d.  Debtor has not been transparent about the management of repayment and refinancing repayments of Retail Borrower Advances and the sources and methods of the market price purchases of cryptocurrencies to fulfill those transactions
   e.  Post-Effective Date Debtor has not been transparent about the decisions, determinations, calculations and processes to incorporate the refinance treatment for Class 2 Borrowers nor has the Debtor been transparent or forthcoming about the errors, omissions, delays and efforts that were put into resolving the issues that have been raised around the omission of the election form, the concerns raised in David Adler's letter, the incorporation of the Retail Borrower's Settlement Agreement into The Plan, the delay of the Notice and election form sent on January 9th, the delay of refinancings beyond Effective Date and many more issues that have been raised about the specific treatment of refinancing under The Plan. Furthermore, Post-Effective Date Debtor has not been transparent about the preparation or processes for refinancing and communications with Creditors around delays, errors, omissions and timelines for refinancings and distributions in the Post-Effective Period where Creditors were significantly harmed by the inaction, lack of response and inability of Post-Effective Debtors to effectuate refinancings and distributions in this critical period.

f.  Post-Effective Date Debtor has not been transparent about the process by which Borrower Election Forms were reviewed and approved. There has been no reporting on the number of forms that were denied and set-off as a result.

g.  Debtor has not been transparent about their communications around Class 2 Borrower election forms, and have not shared their communications around the omission, delay, and modifications as a result of their failures.

h.  Post-Effective Date Debtor has not been transparent about their process to address concerns raised around the preparation and treatment of Borrower Claims and distributions with respect to refinancing and distributions after the Effective Date. Their communications with regard to those issues, how they would be resolved and how quickly would be critical to gaining an understanding of their contemporaneous understandings, intentions and actions.

i.  Post-Effective Date Debtor has not been transparent about treatment of Borrower Claims, specifically with respect to calculations and formulas used to determine full claim values and to determine composition and calculation of initial distributions. Their communications with regard to those issues, errors and recalculations would be critical to gaining an understanding of their contemporaneous understandings, intentions and actions.

j.  Post-Effective Date Debtor has partially addressed the 5% omission with opaque statements for four of 12,000 Borrowers. Debtor has not been transparent about issues and omissions that they have admitted to, nor have they been transparent about their efforts to resolve these issues or the timelines of those resolutions.

k.  Post-Effective Date Debtor has not been transparent about Plan Administrator's unexplained delays and lack of provision for sufficient reserves for the full value of claims and elections by the class of Retail Borrowers to settle all claims at Effective Date pricing, in line with Borrowers who elected to refinance their loan principal. Their communications with regard to those issues would be critical to gaining an understanding of their contemporaneous understandings, intentions and actions.

Movants further believe that they have adequately demonstrated that the undue harm and injustice of the Post-Effective Date Debtor's refusal to adequately or directly respond to prior requests for information or to perform the terms of the Settlement Agreement well beyond the Effective Date require that certain information and communications about those matters are warranted and are not, as the Debtor alleges, a fishing expedition. It seems clear that the implementation of the Plan was rife with errors, omissions, delays and that Debtor and the Plan Administrator have not provided transparency to Creditors or to the Court with respect to these issues or their impacts on the Estate. Discovery of relevant facts, information and communications is the only manner in which these issues can be resolved.

35.  Movants further believe that they have adequately demonstrated that the undue harm and injustice of the Post-Effective Date Debtor's refusal to adequately or directly respond to prior requests for information, since the Effective Date, or to perform the terms of the Settlement

Agreement require that certain information and communications about those matters are warranted and are not, as the Debtor alleges, a fishing expedition. It seems clear that the implementation of the Plan was rife with errors, omissions, delays and that Debtor and the Plan Administrator have not provided transparency to Creditors or to the Court with respect to these issues or their impacts on the Estate. Discovery of relevant facts, information and communications is the only manner in which these issues can be resolved.

36.    The Debtors further allege that the Movants seek relief beyond discovery and that their discovery requests would be improper under the "pending proceeding rule" and instead should seek discovery under Bankruptcy Rules 7026 through 7037. Movants do not seek to circumvent the safeguards of the Federal Rules of Civil Procedure and are merely seeking relevant and legitimate discovery in light of significant issues that have caused significant and ongoing harm to them directly.

37.    Debtors allege that the limited documents provided by the Debtors would sufficiently address the Retail Borrower Movant's legitimate discovery requests. Movants appreciate the efforts of the Debtor to finally attempt to address the requests, but deny that these limited documents, in any way, address the discovery requests that are legitimate and necessary for the Movants and the Court to understand what has actually happened in this opaque process.

38. In paragraph 38, the Debtors in a series of allegations about the Movant's Motion write that:

- **Retail Borrowers Settlement Agreement** -
  *Debtors state:*
  > *"The Movants make multiple references to a 'Retail Borrowers Settlement Agreement,' alleging the Debtors and Post-Effective Date Debtors violated such agreement by not valuing refinancings as of the Effective Date. See generally Retail Borrower Motion" Furthermore, they state that "The Debtors and the Retail Borrower Ad Hoc Group entered into a term sheet— not a settlement agreement— which required certain modifications to the Plan.  Because the Retail Borrower Ad Hoc Group failed to uphold its obligations under that settlement, certain aspects of the term sheet were not incorporated into the Plan".*

  Debtor's counsel attempts to distract the Court over a technicality of the citation of the same signed Agreement that is referenced multiple times in the Court Docket. They kindly remind Movants that they failed to properly confirm the Settlement Agreement at the same time as the Class Claim Settlement over a dispute over legitimate concerns raised by the Ad Hoc Group that caused Debtor's counsel to throw their toys out of the pram and that seems to have harbored ongoing resentment between the groups. Regardless of the source of their displeasure on this issue, the Retail Borrower's Settlement Agreement (Doc 3064), "term sheet" or otherwise, was a signed agreement between the parties as the result of a mediation process, used to settle an adverse proceeding, that compelled specific Treatment language

and modifications, that was not only incorporated into The Plan (Doc 3319) where it is a Defined Term (#211), but ordered by the Court (Doc 3288) and extensively referenced throughout the Plan and its confirmation process. Debtor's Counsel concludes that "*In any event, the Movants' citations to the term sheets do not support the relief they seek.*" In fact, Movants are specifically requesting the Effective Date Treatment that is clearly outlined in this Borrower Settlement Agreement. Of deeper concern, is the statement from Debtor's Counsel that "certain aspects of the term sheet were not incorporated into The Plan". It is not clear to Movants which "certain aspects" Debtor's Counsel is referring to, but it is clear that the signed Retail Borrowers Agreement was incorporated into the Plan. That incorporation into The Plan was ordered by the Court in Document 3288 which provided the following relevant key points:

*HEREBY ORDERED THAT:*
1. *The Motion is granted on a final basis as set forth herein.  The Settlement was negotiated in good faith and the Settlement Agreement attached hereto as Exhibit 1 is approved in its entirety.*
2. *In the event of any inconsistency between the Motion or this Order and the Settlement Agreement, the Order shall control.*
3. *All objections, including without limitation, made by any party to the Settlement, that have not been withdrawn, waived, settled, or specifically addressed in this Order and all reservations of rights included in any such objections, are hereby overruled on the merits.  Accordingly, the entry into the Settlement by the Parties is authorized and ratified, and the Parties are directed to perform all of the terms of the Settlement.*
...
6. *In furtherance of this Order, the Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties thereto in a writing signed by such Parties, and in accordance with the terms thereof, without further order of the Court, provided such modification, amendment, or supplement is not material.*
7. *The failure to mention any provision of the Settlement in this Order shall not impair its efficacy, it being the intent and effect of this Order that the Settlement and the compromises and agreements contained therein are approved in all respects and all relief contemplated by the Settlement is hereby granted.*

As the Order incorporates the Retail Borrower Settlement Agreement into The Plan and provides that any related agreements, documents or other instruments may be modified, amended in a writing signed by such parties, it would seem that such a modification may not only be a violation of The Plan, as originally alleged by the Movants, but a violation of the Court's Order as well. Furthermore, simply failing to mention any provision of the Settlement shall not impair its efficacy and failing to provide and implement the relief contemplated by the Settlement may also not only be a violation of The Plan, as originally alleged by the Movants, but a violation of the Court's Order as well.

- **Delay of Effective Date - Effective Date Treatment**

Debtor's Counsel then addresses that "*The Movants argue that the Post-Effective Date Debtors were not ready to initiate the refinancing process and should have delayed the Effective Date.*" They argue that "The Debtors were not going to hold up consummation of the Plan… so that a handful of Retail Borrowers could complete deals with third-party lenders". The fact is that the Post-Effective Date Debtors were not ready to initiate the refinancing process on the Effective Date, or even in a reasonable and timely manner thereafter. The Ad Hoc Borrowers Group had worked with the Debtors, in good faith, in July 2023 to negotiate and structure a Settlement to address specific concerns that were raised in an Adverse Proceeding. That Settlement and Term Sheet was filed with the Court on July 20th, 2023 (Doc 3064) and provided for Effective Date Treatment of Borrower Claims, including Effective Date Treatment at Full Claim Values that would have been equal and in parity with Borrowers who repaid their Retail Advance Obligations and those Retail Advance Obligations that were repaid or refinanced were not supposed to receive set-off treatment. The Ad Hoc Group raised these issues and concerns in October 2023 in David Adler's Response letter (Doc 3928), reminding Debtor of their obligations to prepare for Effective Date Treatment ahead of the anticipated Effective Date, but Debtor again failed to take action or to demonstrate reasonable business practices to ensure that those obligations were met. In fact, it was the Debtor who omitted the election form from the Class 2 Borrowers election packet and who then failed to cure that omission for months, until it was sent at the last minute, in an untimely filing that not only violated the plan, but that left no opportunity to implement the Effective Date Treatment provided under the Retail Borrowers Settlement that was incorporated into The Plan. Debtor's Counsel is attempting to paint a picture that Movants, and the Borrower Creditors overall, were attempting to somehow delay and extend the pre-effective date window, and this is simply untrue. Movants and Borrowers overall have repeatedly asked Debtors and the Court to ensure that they receive equal treatment, as provided under The Plan and as Ordered by the Court (Doc 3288) as noted above.  In fact, Movants, and many other Borrower Creditors were ready to refinance their loans in December, 2023 and January, 2024. Two of the movants had paperwork ready and awaiting detailed instructions that the Debtor failed to provide to either Creditors or the third-party refinancing lenders in a timely fashion, or at all, ahead of the Effective Date. Under the Retail Borrower's Settlement Agreement, Effective Date Treatment required that timely notice and detailed refinancing instructions were in place to implement Effective Date Treatment ahead of the anticipated Effective Date. Movant's did not seek to delay the Effective Date but, rather, seek to receive the Effective Date Treatment at Full Claim Value that is clearly outlined in the Retail Borrowers Settlement Agreement. However, if the Debtor was not ready to settle all claims, with Effective Date Treatment at Full Claim Values, it was clearly not adequately prepared to exit bankruptcy and effectuate the Effective Date. Movants and the Borrower Creditors were not seeking to delay the Effective Date process, as the Debtor alleges. Quite to the contrary, Borrower Creditors, the Ad Hoc Group and Movants were all focused on receiving the instructions for both repayment and refinance options and Effective Date Treatment that they were promised under the Retail Borrower Settlement as it was incorporated into the Plan, and as Ordered by the Court (Doc 3288) as

noted above, on the earliest possible date. This material change and failure to perform all of
the terms of the Settlement was a violation of the Settlement Agreement, The Plan and of
multiple Court Orders. The chaos caused by the actions, and inaction of, the Debtor and the
Plan Administrator in the months following the Effective Date with significant delays,
undeliverable claim codes, delayed and botched instructions, data breaches, miscalculations,
omission of the 5% bonuses and many other examples seems to clearly demonstrate their
lack of preparation, planning and ability to implement the Plan as it was outlined.

- **Sales of Cryptocurrency - Reporting of Management and Sales of Creditor Assets**
  Debtor's Counsel then alleges that Movants erroneously misinterpreted the Post-Effective
  Date Debtor's response to concerns raised by Corporate Creditors with regard to selling
  cryptocurrency and that Movants misunderstood the sold crypto to be related to our Retail
  Borrower Deposits. Movants did not conflate these issues, but they raise and reiterate
  questions about how, when and why Creditor Assets were handled, or mishandled, in
  particular when these omissions cost the Estate an estimated $82M. Movant's have
  requested discovery, accountings and reportings of sales of Creditor Assets, in particular for
  crypto assets. Debtor's statements are remarkably ambiguous with regard to any sales of
  crypto assets that were being managed on behalf of Creditors. In some instances, they pride
  themselves on having held Creditor Assets in crypto throughout the Chapter 11 process. In
  other instances, they offer up that they sold crypto (with no receipts) or that they haven't
  sold any crypto. These were creditor assets and not an Estate piggy bank. As Creditors,
  Movnats deserve to know how and why Estate Assets were being disposed of. This lack of
  clarity and transparency is unacceptable for a Plan Administrator who has responsibility for
  managing Creditor Assets and Fiduciary Duties to protect and account for those Assets.
  Furthermore, the Plan requires that Creditors receive notice at least 30 days prior to the sale
  of cryptocurrency assets, which was never provided. The planning and timing of sales of
  crypto were significant to all Creditors, as crypto was only to be sold as a last resort, in the
  event that no other method of distributing in crypto was available and was required to be as
  close to the date of distribution as possible. In the example of Corporate Creditors, the
  crypto was sold in January, 2024 and many of the Corporate Creditors waited for months on
  end for the Plan Administrator to fumble through improvised plans and failed attempts to
  distribute their claims, all the while their deposits languished in cash accounts and crypto
  values increased exponentially.

- **Lack of Communication**
  Debtors allege that their lines of communication were always open. This is simply untrue, in
  particular for Post-Effective Date Debtor communications after February 1st. The Post
  Effective Date Debtors and the Plan Administrator are on record admitting their failures in
  this regard and their many broken promises to address them, which should not be
  understated. Debtor's Counsel has since taken the lead in responding to Creditor questions in
  more recent communications. This cannot be the most efficient customer response
  mechanism, as we are sure Kirkland & Ellis bill at higher rates than a call center, and there

have been examples of requests that have been denied to Creditors on the basis of Debtor's counsel claiming that those Creditors were represented by counsel, when they were not. Communication has been a dumpster fire and, in particular in the critical weeks in January, February and March when the Borrowers, Corporate Creditors, Earn Creditors and Australian Creditors were desperately trying to get answers and clarifications on their claim distributions, the Debtors, Post-Effective Debtors and their vendors were impossible to reach. Movants believe that discovery will be highly beneficial to gaining an understanding of the true state of affairs in the Post-Effective Debtor's effectiveness and commercially reasonable efforts to resolve Creditor, refinance and distribution issues in this Post-Effective Date period.

- **Banking - Insufficient Resources and Partners**
  Debtors try to rationalize their failures to secure banking partners with sufficient stability and support to manage their complex banking needs. While Movants appreciate that banking and crypto have certain challenges, the responsibility to manage over $500M in cash on behalf of Creditors is significant. Furthermore, the selection of partners with the ability to wire funds internationally in large quantities was a key requirement of the responsible administration of the Plan. It seems that the Plan Administrator failed to properly take these considerations into account, as evidenced by the failure of the initial bank to maintain a sufficient credit rating, and by the failures of all of the Debtor's banking partners until the implementation of Hyperwallet, to effectively send funds, by wire or by check, to the Creditors who are located in jurisdictions around the world. This failure is not only emblematic of the Debtor and Plan Administrator's callous and careless approach to the responsibility of managing Creditor Assets, but also led to countless delays and extra costs for the Estate as well as contributing and compounding the loss of additional Creditor value as the whole distribution process needed to be paused, yet again, to recalibrate.

- **Insufficient Communications**
  Post-Effective Date Debtor attempts to rationalize their communications failures and somehow turn the blame to Creditors for their own confusion during the refinancing process. Suffice it to say that Debtor's Counsel knows many of the Movants, and many of the Creditors across many of the classes, by name. This is not a coincidence. Movants have been active and vocal, and Movants have been asking for clear answers to the treatment that the Plan Administrator seems to have erroneously concocted for Borrowers. Many of these requests in the early Post-Effective Date period were sent before the ticketing systems and were met with canned and unhelpful messages, or more often, with silence. In addition to trying to reach Celsius, Stretto, and others, Movants (and many other Creditors with legitimate concerns about this process) have filed letters with the court, have sat through countless hearings, have raised their voices and have routinely been dismissed and neglected by the Plan Administrator and Debtor's Counsel. Any attempt to blame Creditors for the failures to understand and implement the Plan, after more than a year of concerns that have now been documented and demonstrated to have been correct all along, is yet another

attempt to gaslight a group of Creditors who have received undue harm and injustice through the Debtor's failure to perform the terms of the Settlement and who have been silenced and dismissed through the entire process. Again, Movants believe that discovery will be highly beneficial to gaining an understanding of the true state of affairs in the Post-Effective Debtor's effectiveness and commercially reasonable efforts to resolve Creditor, refinance and distribution issues in this Post-Effective Date period.

39.    In paragraph 39, the Post-Effective Date Debtors have asked that the Court deny Movant's Retail Borrower Motion. Movants ask the Court to review the Motion and the responses above carefully, before considering whether to deny the motion, or to move forward, as scheduled, with requests for discovery and an initial hearing on November 13th.

Respectfully submitted,

 */s/ Richard D. Grossman*
Richard D. Grossman
*Attorney for Thomas Chernaik,*
*Darius Gheorghe, Christian Funck*
*and David Heliger*

Richard D. Grossman
**LAW OFFICES OF RICHARD D. GROSSMAN**
211 West Wacker Drive Suite 710
Chicago, IL  60606
(312) 750-9308
Fax (312) 750-9323
rgat135@gmail.com