Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Post-Effective Date Debtors. | ) | (Jointly Administered) |
| | ) | |

**PLAN ADMINISTRATOR'S SECOND STATUS REPORT ON DISTRIBUTIONS**

The Plan Administrator[2] for the above-captioned post-effective date debtors (collectively,

the "Post-Effective Date Debtors," and prior to the Effective Date, the "Debtors") hereby files

this distribution report (the "Report") and respectfully states as follows:

---

[1]    The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Post-Effective Date Debtor Celsius Network LLC's principal place of business and the Post-Effective Date Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (as may be further modified, amended, or supplemented from time to time, the "Plan") or the *Joint Order (I) Authorizing Supplemental Distribution to Eligible Corporate Creditors, (II) Approving Procedures for Supplemental Corporate Creditor Distributions, and (III) Granting Related Relief* [Docket No. 7747], as applicable.

**Introduction**

1.      On August 26, 2024, the Plan Administrator filed his first status report on distributions (the "Plan Administrator's First Report"), which covers the period from the Effective Date through August 22, 2024.  From August 23, 2024 through October 31, 2024 (the "Reporting Period"), the Plan Administrator—with the assistance of the employees of the Post-Effective Date Debtors and their advisors—has continued to work tirelessly to make distributions to creditors, to answer creditor questions, and to resolve issues experienced by creditors so that distributions can be successfully received by creditors.

2.      The distribution process has been steadily progressing over time as the Post-Effective Date Debtors work through issues being faced by creditors.  As reported in the Plan Administrator's First Report, between the Effective Date and August 22, 2024, the Post-Effective Date Debtors successfully made initial distributions to approximately 251,000 creditors (or roughly two-thirds of all then-eligible creditors by number and approximately 93% of then-eligible value).  During this Reporting Period, the Post-Effective Date Debtors successfully made initial distribution to approximately 22,000 additional creditors. Such distributions consisted of approximately $48 million in Liquid Cryptocurrency (based on January 16, 2024 prices) and approximately $32 million in Cash.  As such, from the Effective Date through October 31, 2024, the Post-Effective Date Debtors have successfully made initial distributions to, in total, approximately 273,000 creditors—roughly three-fourths of all eligible creditors by number and approximately 95% of the eligible value.

3.      Improvements to the Cash distribution process have enabled the Post-Effective Date Debtors to make distributions more efficiently to creditors.  In late July 2024, the Post-Effective Date Debtors introduced Hyperwallet as another Cash Distribution Agent and began to transition creditors to Hyperwallet where able.  Approximately 4,500 creditors,

representing approximately $5.6 million in value, have successfully received a distribution through Hyperwallet since Hyperwallet was introduced. The Post-Effective Date Debtors have been rolling out Hyperwallet to more and more creditors over time and expect to continue to transition additional creditors to Hyperwallet in the future. In addition, the Post-Effective Date Debtors updated the form used to collect wire transfer information to reduce the incomplete and inaccurate wire transfer information submissions by creditors. Such improvements have resulted in the success rate for wire transfers increasing from 29% in July 2024 to 82% in October 2024. As a result of these and other improvements to the Cash distribution process, the percentage of creditors scheduled to receive a Cash distribution who have successfully received a distribution increased from 26% as of August 26, 2024, to 51% as of October 31, 2024.

4.      As before, the majority of those creditors who have yet to receive a distribution overwhelmingly have small distributions—of the approximately 100,000 creditors who have not yet successfully claimed a distribution, approximately 57,000 have a distribution of less than $100, and approximately 33,000 more have a distribution of between $100 and $1,000. Given the small amounts at issue for many of these creditors, they may not be incentivized to take the steps needed to successfully claim a distribution. These small value creditors make up 90% of the creditors who have not successfully claimed a distribution. All in all, the Plan Administrator has attempted more than 2.5 million distributions in total for the approximately 372,000 currently eligible creditors, including numerous reattempts for nearly all of the creditors who have not yet successfully received a distribution.

5.      Recognizing that creditors may not be able to successfully receive their distribution through their originally assigned Distribution Agent, the Post-Effective Date Debtors have developed processes for transitioning creditors to new Distribution Agents. For example, in

September 2024, those creditors who were scheduled to receive a distribution through Coinbase and had yet to receive such distribution were provided the option to receive a Cash distribution instead.  Approximately 2,800 creditors elected to receive a Cash distribution and provided sufficient information to attempt such distribution, approximately 72% of which have now successfully received a Cash distribution.  As the Post-Effective Date Debtors continue to resolve distribution-related issues and transition creditors to other Distribution Agents, they expect these distribution success rates to continue to increase.

6.    Despite the challenges set forth in the Plan Administrator's First Report and this Report, the Plan Administrator has now overcome many of the most common hurdles faced by creditors and is pleased to report that the initial distribution to eligible creditors has been successful for an overwhelming majority of creditors (both by dollar amount and number), as outlined in more detail in the below table—as of October 31, 2024, approximately 273,000 creditors have received over $2.6 billion in value of Liquid Cryptocurrency and Cash (at prices set as of January 16, 2024):[3]

| Distribution Agent | Amount (in USD) Currently Eligible for Distribution on Account of Allowed Claims | Amount Successfully Distributed (in USD as of January 16, 2024 prices) | Percent of Value Successfully Distributed | Percent of Eligible Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|
| PayPal/Venmo | $1.51 billion | $1.46 billion | 97% | 76% |
| Coinbase | $993 million | $935 million | 94% | 73% |

---

[3]    The below table does not include Custody assets that were remaining on the Celsius platform as of February 29, 2024 (the "Deactivation Date") and which the Litigation Administrator recently authorized for distribution, as discussed further herein.

| Cash (Stretto / Wires / Hyperwallet) | $248 million | $210 million | 85% | 51% |
|---|---|---|---|---|
| **TOTAL:** | **$2.75 billion** | **$2.61 billion** | **95%** | **73%** |

7.      Despite the significant developments during this Reporting Period, additional work remains to fully complete this initial distribution.  Approximately 100,000 eligible creditors, which have an average distribution of approximately $1,200 in Liquid Cryptocurrency or Cash at January 16, 2024 prices, have yet to successfully claim their distribution.  As noted herein, approximately 57,000 of these remaining creditors have a distribution of less than $100, and approximately 33,000 more have a distribution of between $100 and $1,000.  As previously explained in the Plan Administrator's First Report, it is important to note that the Plan Administrator does not expect that all creditors will claim a distribution—given that creditors need to take action to claim a distribution, there will certainly be some amount of creditors who never take any action, and those amounts will ultimately be redistributed to other creditors as contemplated by the Plan.  The Post-Effective Date Debtors plan to file a motion to implement the provisions of the Plan regarding Unclaimed Distributions to be heard at the omnibus hearing on January 14, 2025.  For the avoidance of doubt, the Post-Effective Date Debtors do not intend to treat as Unclaimed Distributions those distributions that creditors are actively working with the Post-Effective Date Debtors to receive.

8.      In addition to continuing to make distributions to creditors, during this Reporting Period the Post-Effective Date Debtors, among other things, completed the Retail Advance Obligation refinancing process, resolved issues related to distributions to corporate creditors, and resolved issues preventing creditors from receiving a distribution through Coinbase prior to the

November 9, 2024 expiration of the Debtors' agreement with Coinbase (such agreement, the "Coinbase Agreement").

9.     As explained in the notice sent to Retail Borrowers in January 2024, Retail Borrowers could either repay, refinance, or setoff their Retail Advance Obligation.  Under the refinance option, a Retail Borrower entered into an agreement with a third-party who repaid such creditor's Retail Advance Obligation.  Retail Borrowers were required to negotiate the terms of the refinancing with their third-party lender of choice.  Constantly changing cryptocurrency prices increased the complexity of these transactions.  As such, while the Post-Effective Date Debtors originally expected to close all such transactions in March, they repeatedly extended such deadline until August 2024.  In total, approximately 475 Retail Borrowers elected to refinance their Retail Advance Obligation, of which approximately 355, or approximately $70.7 million in value, successfully refinanced.  All Retail Borrowers who initially elected to refinance their Retail Advance Obligation but failed to complete a transaction with a third-party lender by the deadline in August 2024 received the Set Off Treatment under the Plan.

10.     In August, the Post-Effective Date Debtors, Coinbase, and an ad hoc group of corporate creditors (the "Ad Hoc Committee of Corporate Creditors") participated in a mediation before the Honorable Philip Bentley, United States Bankruptcy Judge for the Southern District of New York regarding whether corporate creditors should have received distributions in Liquid Cryptocurrency under the Plan.  As a result of such mediation, the Post-Effective Date Debtors, Coinbase, and the Ad Hoc Committee of Corporate Creditors negotiated both the terms and process by which the Post-Effective Date Debtors would make supplemental distributions to Eligible Corporate Creditors and provide such creditors with the opportunity to receive either a Liquid Cryptocurrency or Cash distribution (the "Corporate Creditor Settlement").

On October 4, 2024, the Bankruptcy Court approved the Corporate Creditor Settlement [Docket No. 7728] and the Post-Effective Date Debtors sent Eligible Corporate Creditors with Allowed Claims an election form to determine which Eligible Corporate Creditors wanted to receive a Liquid Cryptocurrency or Cash distribution.   Distributions under the Corporate Creditor Settlement commenced on November 14, 2024, and are continuing.   Coinbase sent the initial onboarding email to Eligible Corporate Creditors who elected to receive a Liquid Cryptocurrency distribution during the week of December 2, 2024.   Additional details will be included in the next quarterly report.

11.     Finally, prior to the November 9, 2024 expiration of the Coinbase Agreement, the Post-Effective Date Debtors worked diligently to address potential issues preventing creditors from receiving a distribution through Coinbase, including by assisting creditors to update their KYC information with Celsius or Coinbase, which was preventing a successful distribution. During this Reporting Period, approximately 4,300 creditors originally assigned to Coinbase who had not yet received a distribution because of inconsistent KYC information (or 39% of such creditors) ultimately received a Liquid Cryptocurrency distribution through Coinbase because the Post-Effective Date Debtors were now able to successfully "match" the creditor to Coinbase's system.   The Post-Effective Date Debtors are working to transition to alternative Distribution Agents those creditors who were assigned to Coinbase and have not yet successfully received a distribution.   The Post-Effective Date Debtors sent emails regarding their distribution to many of these creditors on December 4.

12.     Additionally, approximately 5,400 creditors are not currently able to receive a distribution for a variety of reasons, including because their Claim is being held back pursuant to the Plan or their account is missing essential compliance information necessary to make a

distribution.    Pursuant  to  the  Plan,  the  Post-Effective  Date  Debtors  have  withheld,  pending

resolution and Allowance by the Litigation Administrator, distributions to creditors who (a) have

outstanding  Withdrawal  Preference  Exposure,  (b) opted  out  of  the  Class  Claim  or  Custody

Settlements,  or  (c) are  Holders  of  Equitably  Subordinated  Claims.    As  the  Litigation

Administrator resolves some of these contingencies (*e.g.*, by entering into a settlement resolving

the  Withdrawal  Preference  Exposure  of  a  particular  creditor),  the  Litigation  Administrator

periodically  notifies  the  Plan  Administrator  that  a  Claim  that  was  previously  held  back  is  now

Allowed  and  can  receive  a  distribution.    For  each  of  these  Claims  that  are  currently  held  back

pursuant  to  the  Plan  to  receive  a  distribution,  the  Litigation  Administrator  will  have  to  resolve

the  contingency  and  inform  the  Plan  Administrator  that  the  Claim  is  now  eligible  for  a

distribution.

13.    The  Post-Effective  Date  Debtors  have  fielded  over  130,000  creditor  inquiries

regarding a variety of distribution-related matters and have made monthly presentations to the

Bankruptcy Court (and posted those to the docket) regarding the status of Plan distributions.

This  Report  is  intended  to  provide  a  robust  update  to  the  Court  and  all  parties  in  interest

regarding  the  status  of  distributions,  and  will  continue  to  be  filed  quarterly.    This  update  is  not

intended  to  be  a  comprehensive  update  on  every  single  distribution-related  matter,  rather  this

Report  will  describe  the  most  common  outstanding  issues  and  provide  updates  regarding

distributions under the Plan.

### Liquid Cryptocurrency Distributions

14.    Consistent  with  the  Plan,  the  Post-Effective  Date  Debtors  commenced  Liquid

Cryptocurrency  distributions  to  eligible  creditors  through  their  Liquid  Cryptocurrency

Distribution Agents:  PayPal/Venmo and Coinbase.  The below table summarizes the status of

Liquid Cryptocurrency distributions as of October 31, 2024:

| Distribution Agent | Amount (in USD) Currently Eligible for Distribution on Account of Allowed Claims | Amount Successfully Distributed (in USD as of January 16, 2024 prices) | Percent of Value Successfully Distributed | Number of Eligible Creditors Who Successfully Received a Distribution | Percent of Eligible Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|---|
| PayPal/ Venmo | $1.51 billion | $1.46 billion | 97% | 121,000 | 77% |
| Coinbase | $993 million | $935 million | 94% | 142,000 | 73% |
| **TOTAL:** | **$2.50 billion** | **$2.4 billion** | **96%** | **262,000** | **75%** |

15. The Plan Administrator remains committed to facilitating distributions in Liquid Cryptocurrency to as many creditors as possible. However, as demonstrated by the expiration of the Coinbase Agreement, the reality is that Liquid Cryptocurrency distributions may not always be possible. Currently, the Plan Administrator intends to continue attempting Liquid Cryptocurrency distributions through PayPal and Coinbase, as applicable, through approximately November 2025. Thereafter, the Plan Administrator intends to make all distributions in Cash. After the conclusion of Liquid Cryptocurrency distributions in approximately November 2025, the Post-Effective Date Debtors will continue to hold Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve and convert it to Cash at market prices once such Claims are Allowed, as contemplated by the Plan. Pursuant to the Plan, the Plan Administrator may sell the Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve if, in the exercise of its fiduciary duties and its business judgment, holding such assets in Liquid Cryptocurrency is no longer commercially reasonable. *See* Plan Art. IV.K.1. The Plan Administrator does not currently expect to convert the Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve to Cash now or in the future except as may be necessary to make distributions to

creditors, in which case the Liquid Cryptocurrency would be converted to Cash at market rates as close as reasonably practicable to the expected Cash distribution date. If the Plan Administrator decides to convert such Liquid Cryptocurrency to Cash, it shall file a notice in these Chapter 11 Cases of its intent to sell the Liquid Cryptocurrency and shall include in such notice further information regarding the effect of such sale on creditors' distributions.

(a)    PayPal Distributions

16.    The Post-Effective Date Debtors have continued to send weekly email reminders to creditors with open claim codes at PayPal. These weekly reminders also inform creditors how to open a ticket if they are experiencing issues in claiming their distribution through PayPal. Since September 13, 2024, after implementing these weekly reminders, the Post-Effective Date Debtors have received inquiries from approximately 5,560 creditors regarding their claim codes and have been working with both PayPal and individual creditors to resolve issues preventing certain creditors from claiming their distributions. In total, approximately 119,000 creditors have successfully redeemed a distribution through PayPal, 20,000[4] of which successfully redeemed a distribution during this Reporting Period.

17.    As additional creditors become eligible to receive a distribution, the Post-Effective Date Debtors will issue new claim codes via email to such creditors, typically one a month. Creditors currently eligible to receive their distribution through PayPal and Venmo should have received claim codes via email that can be used to claim their distribution on PayPal or Venmo.

---

[4]    Approximately 10,000 of these creditors successfully redeemed a distribution in the previous reporting period but had either only partially redeemed their amounts eligible for distribution or were issued an incremental amount to redeem during this Reporting Period.

18.     During this Reporting Period, there were several main issues that creditors had with successfully redeeming from PayPal, almost all of which have now been resolved.   Key issues included creditors' dates of birth not matching on PayPal and Celsius (affected creditors updated their date of birth with PayPal, Celsius, or both), creditors not receiving claim code emails (Celsius re-sent the claim codes), and individual creditors trying to redeem claim codes for multiple Celsius accounts (a security issue—these creditors with multiple accounts are transitioned to another Distribution Agent).   As noted above, creditors slated to receive a distribution of $100 or less have continued to be less responsive to the Post-Effective Date Debtors' outreach efforts regarding their unclaimed distributions.

19.     Prior to the expiration of the Coinbase Agreement, the Post-Effective Date Debtors transitioned 7,000 creditors who were having issues redeeming claim codes via PayPal to Coinbase.   Of those creditors transitioned to Coinbase, 74% successfully redeemed their distributions.   The Post-Effective Date Debtors are in the process of transitioning those 1,800 creditors who were unable to receive a distribution through either PayPal or Coinbase to a Cash distribution method.

20.     If any creditor is still having trouble redeeming its claim code, please create a Customer Care Ticket at https://stretto-celsius.freshdesk.com/support/tickets/new, select the most relevant items from each drop-down menu (shown below), and we will work with you to help you resolve your issue.



21.    If for any reason neither PayPal nor Venmo can service a creditor's Claim distribution, such creditor will be notified that their distribution cannot be serviced through PayPal or Venmo and will be transitioned to a Cash distribution method.

22.    The below table details the number of distributions currently pending but not completed at PayPal as of October 31, 2024:

| Size of Creditor Distribution | Creditors with Active PayPal Claims as of August 22, 2024 | Creditors with Active PayPal Claims as of October 31, 2024 | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) as of August 22, 2024 | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) as of October 31, 2024 |
|---|---|---|---|---|
| Less than $100 | 24,717 | 20,407 | $0.83 million | $0.65 million |
| $100 - $1,000 | 17,926 | 13,038 | $6.15 million | $4.25 million |
| $1,000 - $10,000 | 6,236 | 4,273 | $18.48 million | $12.08 million |

| | | | | |
|---|---|---|---|---|
| Greater than $10,000 | 1,030 | 786 | $41.08 million | $27.52 million |
| **TOTAL:** | 49,909 | 38,504[5] | $66.54 million | $44.51 million |

(b)    Coinbase Distributions

23.    If a creditor was assigned to receive a Liquid Cryptocurrency distribution through Coinbase, such creditor's distribution was attempted approximately every two weeks from the date such creditor's Claims became Allowed.  As additional creditors became eligible to receive a distribution, the Post-Effective Date Debtors added newly eligible creditors to their distribution attempts through Coinbase.  In total, a creditor whose Claims were Allowed on the Effective Date had their distribution attempted approximately 14 times.  Creditors received email communications after each attempt.

24.    Following the Plan Administrator's First Report, approximately 8,700 creditors opened Customer Care Tickets regarding issues either onboarding at or receiving their distribution through Coinbase.  The Post-Effective Date Debtors worked with Coinbase to resolve potential issues preventing such creditors from receiving their distributions, resulting in approximately 3,760 such creditors ultimately successfully receiving a distribution through Coinbase this Reporting Period.

25.    Certain creditors assigned to Coinbase informed the Post-Effective Date Debtors that they resolved issues preventing them from receiving a distribution on November 9, 2024, the same day the Coinbase Agreement expired.  Coinbase agreed to make one final distribution

---

[5]    For the avoidance of doubt, this number includes additional creditors whose Claims became Allowed during this Reporting Period or who partially redeemed their eligible distributions (and may still have outstanding amounts eligible for distribution).  As a result, the difference between this number and the number of creditors with outstanding distributions as of August 22, 2024, may be different than the number of distributions successfully made through PayPal this Reporting Period.

attempt to creditors assigned to Coinbase on or around November 25, 2024. Pursuant to the Coinbase Agreement, Coinbase will continue to make distributions to creditors who successfully received an initial distribution through Coinbase for a period of 365 days after the initial distribution was successfully made. If a creditor was unable to successfully receive a Liquid Cryptocurrency distribution through Coinbase by November 25, 2024, such creditor will be transitioned to another Distribution Agent and will likely receive a Cash distribution. On December 4, 2024, the Post-Effective Date Debtors notified creditors who were unable to successfully receive a distribution through Coinbase prior to November 25, 2024 of their new Distribution Agent.

26.    During this Reporting Period, there were several main issues that creditors had with successfully receiving their distribution from Coinbase. The most significant issue was creditors who did not have an account with Coinbase that matched their information with Celsius. These creditors who were scheduled to receive a distribution from Coinbase received emails generally every other week informing them that Coinbase was unable to find an account with details that matched the creditor's information, and that they needed to open an account with Coinbase, complete KYC, and ensure that information that Coinbase has for that creditor—such as date of birth—matched Celsius's records. Certain other creditors had a Coinbase account that was currently ineligible to receive a distribution pending certain action by the creditor, including completing KYC.

27.     The below table details the number of distributions currently pending but not completed at Coinbase as of October 31, 2024:

| Size of Creditor Distribution | Creditors in Process at Coinbase as of August 22, 2024 | Creditors in Process at Coinbase as of October 31, 2024 | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) as of August 22, 2024 | Total Dollar Value of Outstanding Distributions (in USD as of January 16, 2024 Prices) as of October 31, 2024 |
|---|---|---|---|---|
| Less than $100 | 30,787 | 31,592[6] | $0.98 million | $0.98 million |
| $100 - $1,000 | 18,904 | 17,087 | $6.05 million | $5.28 million |
| $1,000 - $10,000 | 4,946 | 3,562 | $14.22 million | $9.74 million |
| Greater than $10,000 | 970 | 556 | $59.61 million | $41.25 million |
| TOTAL: | 55,607 | 52,797[7] | $80.86 million | $57.26 million |

**Cash Distributions**

28.     Since the Effective Date, the Post-Effective Date Debtors commenced Cash distributions to creditors.  Initially, these distributions were processed via check or wire transfer with Hyperwallet being introduced in July 2024.  To ensure distributions are made in a safe and reliable manner, the Post-Effective Date Debtors group creditors who are eligible to receive a Cash distribution into cohorts.  If a distribution attempt to a creditor is unsuccessful, the

---

[6]    After August 22, 2024, the Post-Effective Date Debtors transitioned certain creditors to Coinbase who had previously been assigned to PayPal and had been unable to successfully receive a distribution through PayPal in hopes such creditors would be able to successfully receive a Liquid Cryptocurrency distribution through Coinbase.  As a result of such transitions, more creditors were in process at Coinbase as of October 31, 2024 than as of August 22, 2024.

[7]    For the avoidance of doubt, this number includes additional creditors whose Claims became Allowed during this Reporting Period or who partially redeemed their eligible distributions (and may still have outstanding amounts eligible for distribution).  As a result, the difference between this number and the number of creditors with outstanding distributions as of August 22, 2024, may be different than the number of distributions successfully made through Coinbase this Reporting Period.

Post-Effective Date Debtors review the reason the distribution was unsuccessful and either include the creditor in the next cohort (if the error is easily resolvable) or reach out to the creditor to submit corrected information. During this Reporting Period, the Post-Effective Date Debtors have attempted Cash distributions to creditors in 22 cohorts (and have attempted Cash distributions to creditors in 53 cohorts since the Effective Date).

29.    As described by counsel to the Post-Effective Date Debtors at various court hearings, the Cash distribution process has been extremely complex and had lagged a bit behind the Liquid Cryptocurrency distributions, and many factors contributed to delays in this process. Cash distributions have largely caught up to Liquid Cryptocurrency distribution levels due to, among other things, the introduction of Hyperwallet as a Distribution Agent and improvements to the wire transfer information form. The Post-Effective Date Debtors expect that, as they continue to refine the Cash distribution process and Hyperwallet is rolled out to additional creditors, Cash distribution success rates will continue to improve.

30.    The Post-Effective Date Debtors have three methods for making Cash distributions—check, wire transfer, and Hyperwallet. To date, approximately $248 million in Cash is currently eligible to be distributed under the Plan, approximately $210 million (or 85%) of which has been successfully distributed to creditors. The below table summarizes the status of Cash distributions as of October 31, 2024:

| Distribution Method | Amount Currently Eligible for Distribution | Amount Successfully Distributed via Distribution Method | Percent of Value Successfully Distributed | Number of Eligible Creditors Who Successfully Received a Distribution | Percent of Eligible Creditors Who Successfully Received a Distribution |
|---|---|---|---|---|---|
| Check | $6.62 million | $5.01 million | 76% | 3,707 | 49% |
| Wire Transfer | $220.74 million | $198.21 million | 90% | 1,772 | 83% |
| Hyperwallet[8] | $20.36 million | $7.06 million | 35% | 4,547 | 46% |
| **TOTAL:** | $247.72 million | $210.29 million[9] | 85% | 10,026 | 51% |

31.     The below table details the number of Cash distributions currently pending but not completed as of October 31, 2024:[10]

| Size of Creditor Distribution | Creditors with Fiat Distributions in Process as of August 22, 2024 | Creditors with Fiat Distributions in Process as of October 31, 2024 | Total Dollar Value of Outstanding Distributions as of August 22, 2024 | Total Dollar Value of Outstanding Distributions as of October 31, 2024 |
|---|---|---|---|---|
| Less than $100 | 4,751 | 5,274 | $0.15 million | $0.16 million |
| $100 - $1,000 | 3,228 | 2,940 | $1.05 million | $0.94 million |
| $1,000 - $10,000 | 378 | 1,019 | $1.35 million | $3.40 million |

---

[8]     The Post-Effective Date Debtors transitioned certain creditors assigned to receive their distribution via checks or wire transfer to Hyperwallet, which resulted in a $1.4 million increase in the amount currently eligible for distribution through Hyperwallet.

[9]     The number also includes the approximately $13.34 million distributed to creditors via Withdrawal Preference Exposure setoffs and the loan refinancing process.

[10]    After August 22, 2024, the Post-Effective Date Debtors transitioned certain creditors to Cash distribution methods who had previously been assigned to PayPal or Coinbase, were unable to successfully receive a Liquid Cryptocurrency distribution through PayPal or Coinbase, and affirmatively elected to be transitioned to a Cash distribution.

| Greater than $10,000 | 217 | 572 | $15.33 million | $33.11 million |
|---|---|---|---|---|
| **TOTAL:** | 8,574 | 9,805[11] | $17.88 million | $37.60 million |

(a)    Check

32.    In this Reporting Period, the Post-Effective Date Debtors have issued checks valued in the aggregate at approximately $1.1 million, $231,000 of which have been successfully redeemed by creditors.    Certain creditors have informed the Post-Effective Date Debtors that they are unable to cash the check for a variety of reasons, including bank policy reasons.    Still others reported that they never received the check.    In each case, the Post-Effective Date Debtors canceled the outstanding check and worked with creditors regarding their specific issue, including determining if a different Cash distribution method is appropriate.

(b)    Wire Transfer

33.    While wire transfers have been a commonly requested Cash distribution method, the wire transfer process relies on creditors who may not be familiar with the wire transfer process submitting accurate wire transfer instructions.    As mentioned in the Plan Administrator's First Report, the Post-Effective Date Debtors modified the form used by creditors to submit wire transfer information.    The new wire transfer information form includes explanations about the required information in an effort to help creditors submit information necessary to attempt a wire transfer.    Since implementing the new wire transfer information form, 82% of wire transfers have been successful, as compared to 29% of wire transfers attempted based on the prior wire transfer information form.

---

[11]    For the avoidance of doubt, this number includes additional creditors whose Claims became Allowed during this Reporting Period or who partially redeemed their eligible distributions (and may still have outstanding amounts eligible for distribution).    As a result, the difference between this number and the number of creditors with outstanding distributions as of August 22, 2024, may be different than the number of distributions successfully made through Cash distribution methods this Reporting Period.

34.     During this Reporting Period, however, the largest issue by far is still that creditors continue to provide incomplete or inaccurate wire transfer instructions.  Without accurate wire instructions from creditors, the Post-Effective Date Debtors cannot successfully complete a wire transfer, and the wire transfer process to date has encountered difficulties based on inaccurate or incomplete wire instructions from creditors.  International wire transfers are particularly complex, because a creditor must determine whether an intermediary bank needs to be included.  The Post-Effective Date Debtors encourage creditors to contact their bank when completing the wire transfer information form to ensure the information provided is accurate.  Wire transactions also continue to go through a data validation process where additional data is collected, reviewed and, when applicable, adjusted to try to fix simple errors, before submitting to the Post-Effective Date Debtors' bank to initiate transactions.  This manual review process is performed by the Post-Effective Date Debtors with the assistance of their advisors including Stretto, Inc. and Alvarez & Marsal.

35.     The Plan Administrator also became aware of a specific issue with a commonly used intermediary bank—the Bank of New York Mellon—which resulted in numerous wire transfers being reversed.  The Post-Effective Date Debtors worked with affected creditors regarding their wire transfers, including reattempting the wire transfer with another intermediary bank if possible.

(c)     Hyperwallet

36.     On August 19, 2024, the Plan Administrator announced it had entered into an addendum to their distribution agreement with PayPal to use Hyperwallet to make Cash distributions to creditors.  Hyperwallet's distribution services include a self-service portal where—depending on the creditor's jurisdiction—the creditor can select their preferred payment method (*i.e.*, PayPal or Venmo) and input their payment details directly.  To date, approximately

8,900 distributions have been attempted through Hyperwallet, 58% of which were successful. Hyperwallet is currently being used to process Cash distributions to creditors entitled to a distribution of $15,000 or less. The Post-Effective Date Debtors intend to remove this limit with the introduction of the new portal, which enables creditors to self-manage their distributions.

37.    During this Reporting Period, the Post-Effective Date Debtors worked with Hyperwallet and creditors to resolve certain issues related to Hyperwallet transfers. For example, certain creditors have notified the Post-Effective Date Debtors that they are unable to verify their Hyperwallet account due to issues receiving a necessary one-time passcode. The Post-Effective Date Debtors have transitioned these creditors to other Cash distribution methods.

**Conversions from Liquid Cryptocurrency to Cash**

38.    As mentioned above, the Post-Effective Date Debtors offered creditors who have experienced issues claiming their Liquid Cryptocurrency distribution the opportunity to elect to receive a Cash distribution. Creditors who wanted to receive a Cash distribution rather than a Liquid Cryptocurrency distribution were required to submit a conversion form and provide certain information necessary for the Post-Effective Date Debtors to attempt a Cash distribution to such creditor. As part of the conversion process, each creditor consented to receiving its initial distribution and any subsequent distribution in Cash. The Post-Effective Date Debtors agreed to convert the Liquid Cryptocurrency held for such creditor's distribution to Cash at market prices as close as reasonably practicable to the expected Cash distribution date.

39.    Approximately 2,800 creditors completed a conversion form and provided sufficient information for the Post-Effective Date Debtors to process such conversion. As of October 31, 2024, 72% of such creditors who submitted a conversion form providing sufficient information to process such conversion have received a Cash distribution. Initially this conversion process was offered to creditors assigned to Coinbase and creditors who had

previously asked to be converted to Cash. The Post-Effective Date Debtors expect to offer this opportunity to all creditors in the near-term.

### Custody Claims Not Withdrawn by the Deactivation Date

40.     Beginning on or around November 29, 2023, creditors who were (i) Holders of Class 6A General Custody Claims and accepted the Class Claim Settlement and/or (ii) Class 6B Withdrawable Custody Claims were eligible to withdraw their Custody Assets directly from the Celsius platform. Creditors had ninety-two days to withdraw their Custody Assets from the Celsius platform before the platform was deactivated on February 29, 2024. In total, approximately 15,000 creditors, representing $9.7 million in value (as of the Deactivation Date), who were eligible to withdraw their Custody Assets prior to the Deactivation Date have not successfully claimed their Custody Assets remaining on the Celsius platform as of the Deactivation Date. Following the Deactivation Date, the Post-Effective Date Debtors converted the Custody Assets remaining on the Celsius platform to Liquid Cryptocurrency.

41.     In the Plan Administrator's First Report, the Plan Administrator reported that the Litigation Administrator had advised that these distributions should not take place until such time as the Litigation Administrator approves them. As of this Report, the Litigation Administrator has approved these distributions. These distributions are now in process, and the majority of these creditors are assigned to PayPal.

### Retail Advance Obligation Refinancings

42.     In early January 2024, Retail Borrowers received a notification from the Debtors informing them of their options—repay, refinance, or setoff—regarding their Retail Advance Obligation. Retail Borrowers had until January 17, 2024, to notify the creditors if they intended to repay or refinance their Retail Advance Obligation. Retail Borrowers who elected to repay their Retail Advance Obligation had until January 26, 2024, to make such repayment, whereas

Retail Borrowers who elected to refinance their Retail Advance Obligation were informed the refinance process would take place after the Effective Date. Approximately 475 Retail Borrowers representing $82.6 million in total value across approximately 1,650 loans elected to refinance their Retail Advance Obligations.

43. Following the Effective Date, the Post-Effective Date Debtors provided further information regarding the refinance process to those Retail Borrowers who elected to refinance their Retail Advance Obligations. Retail Borrowers then (i) authorized the Post-Effective Date Debtors to share certain information with the Retail Borrower's selected third-party lender and (ii) negotiated with such third-party lender regarding the terms for refinancing their Retail Advance Obligation. In total, approximately 355 Retail Borrowers representing approximately $70.7 million in total value and approximately 1,340 loans successfully refinanced their Retail Advance Obligations. Approximately 50 Retail Borrowers, representing approximately $7.5 million in total value and approximately 180 loans affirmatively rescinded their refinancing election and received the Set Off Treatment. Approximately 60 Retail Borrowers, representing approximately $2.8 million in total value and approximately 120 loans, did not refinance their Retail Advance Obligation by the final August 2024 deadline and received the Set Off Treatment.

**Corporate Creditor Settlement**

44. Prior to the Effective Date, Coinbase agreed to make Liquid Cryptocurrency distributions to 100 corporate creditors. Based on this, and in accordance with their interpretation of the Plan, the Debtors contacted the 250 largest corporate creditors regarding the opportunity to receive a distribution in Liquid Cryptocurrency. Only those corporate creditors who affirmatively elected to receive a Liquid Cryptocurrency distribution had Liquid

Cryptocurrency set aside for their distribution.  All other corporate creditors were scheduled to receive a Cash distribution and the Debtors set aside sufficient Cash for such distributions.

45.     On June 3, 2024, certain corporate creditors filed a motion seeking to compel the Post-Effective Date Debtors to make distributions in Liquid Cryptocurrency to such creditors, which they alleged the Plan required [Docket No. 4911].

46.     In August 2024, the Post-Effective Date Debtors, Coinbase, and the Ad Hoc Committee of Corporate Creditors participated in mediation regarding the method for making distributions to corporate creditors under the Plan.  This ultimately resulted in the Corporate Creditor Settlement, which was approved by the Bankruptcy Court and sets forth the terms and process for making supplemental distributions to corporate creditors who would have been eligible, as of the Effective Date, to receive a Liquid Cryptocurrency distribution if their Claims were Allowed except for the fact that they were a corporate creditor (such creditors, "Eligible Corporate Creditors").  Through the Corporate Creditor Settlement, Eligible Corporate Creditors receive the value they otherwise would have received under the Plan if they had originally been scheduled to receive Liquid Cryptocurrency.

47.     As part of the Corporate Creditor Settlement, the Post-Effective Date Debtors contacted those Eligible Corporate Creditors with Allowed Claims.  Such creditors were provided a link to an election form where they could indicate their preference for a Cash or Liquid Cryptocurrency distribution.  The deadline to submit such form was November 4, 2024.

48.     On November 15, 2024, as more fully set forth in the *Notice of Commencement of Supplemental Corporate Creditor Distributions* [Docket No. 7854], the Post-Effective Date Debtors commenced distributions to Eligible Corporate Creditors based on the election made by each such creditor, or in Cash if an Eligible Corporate Creditor did not complete an election form

by the deadline. The Post-Effective Date Debtors will report on the status of such distributions at upcoming hearings and in future reports.

### Deceased Creditor Distributions

49.     On May 8, 2024, the Bankruptcy Court entered an order approving the Post-Effective Date Debtors proposed procedures for making distributions to the authorized representatives of deceased creditors. [Docket No. 4874]. As part of this process, authorized representatives of deceased creditors are required to open a Customer Support Ticket and submit certain information to confirm the creditor is deceased and that the individual submitting the Customer Care Ticket has authority from the deceased creditor's estate to receive the deceased creditor's distribution. Once an authorized representative of a deceased creditor submits the required documentation, it is reviewed by the Post-Effective Date Debtors. If no further documentation is needed, the Post-Effective Date Debtors send an email to the deceased creditor's email address on file. If no response is received within fourteen days of sending this email, the Post-Effective Date Debtors or Distribution Agent are authorized to distribute the assets to the authorized representative of the deceased creditor.

50.     During this Reporting Period, an additional 33 authorized representatives have submitted tickets to retrieve the distributions of deceased creditors. Since the Effective Date, the Post-Effective Date Debtors have released for distributions those amounts held on account of 113 deceased creditors, including releasing for distribution those amounts held on account of 54 deceased creditors during this Reporting Period. As of the end of this Reporting Period, the Post-Effective Date Debtors have made successful distributions to 65% of such authorized representatives who have submitted a ticket to retrieve the distributions of deceased creditors. The Post-Effective Date Debtors are continuing to reach out to 51 authorized representatives

who have not responded to the Post-Effective Date Debtors' outreach regarding their Customer Care Tickets.

### MiningCo Common Stock Distributions

51.    Certain creditors, depending on the types of Claims a creditor held, are eligible for MiningCo Common Stock under the Plan.  These distributions are being handled by the Stock Transfer Agent, Odyssey Transfer and Trust Company ("Odyssey").  To date, Odyssey has distributed approximately 32.65 million shares of MiningCo Common Stock, approximately 52,800 shares of which were issued this Reporting Period, to eligible creditors, and the Plan Administrator periodically directs that more MiningCo Common Stock be issued to creditors when their Claims become eligible (*e.g.*, when a creditor resolves Withdrawal Preference Exposure and the Litigation Administrator directs the Plan Administrator that such creditor's distribution may be released).  The Plan Administrator and Odyssey also sent creditors who had yet to open an account with Odyssey a reminder to do so.

52.    The Plan Administrator understands that MiningCo is continuing to pursue a public listing of the MiningCo Common Stock with the SEC.  For the avoidance of doubt, the Plan Administrator is not involved in this process.  Both Odyssey and MiningCo have provided answers to frequently asked questions related to the MiningCo Common Stock distribution (collectively,  the "MiningCo Common Stock FAQ").   These answers are available through Odyssey at ionicdigital.odysseytrust.com and through MiningCo at https://www.ionicdigital.com/faq.  Odyssey and MiningCo will continue to update the MiningCo Common Stock FAQ with the latest information.  Creditors should contact Odyssey or MiningCo regarding any questions related to their MiningCo Common Stock.

**Creditors Not Currently Eligible to Receive a Distribution**

53.     The majority of this Report deals with creditors whose claims are currently eligible for distributions under the Plan.  But there are various creditors who, for one reason or another, are not yet eligible for distributions—the most common reason is that there is litigation that one of the Litigation Administrators has or could bring against the eligible claimant (such as Withdrawal Preference Exposure, equitable subordination, or other litigation).   The Plan Administrator cannot make these distributions until such time as (a) the Litigation Administrator resolves the contingency and (b) the Litigation Administrator directs the Plan Administrator that distributions may be made to this creditor.

54.     Once the applicable outstanding litigation is resolved or the Litigation Administrator otherwise notifies the Plan Administrator that certain Claims are Allowed and eligible for distribution, the Post-Effective Date Debtors expect to attempt these distributions. Because the Post-Effective Date Debtors are processing distributions in batches, there may be some delay between when a Claim is Allowed and when a distribution is attempted.

55.     During this Reporting Period, there were approximately 133 claims that were ineligible as of the Effective Date that became eligible after the Effective Date (*e.g.*, after the Effective Date, the Litigation Administrator entered into a settlement with a creditor to resolve its Withdrawal Preference Exposure and directed the Plan Administrator to make a distribution to such creditor), with a distribution value of approximately $2.4 million.

56.     This section highlights the most common reasons why creditors are not currently eligible for distributions:

| Ineligibility Reason | Number of Creditors | Total Amount of Distributions Withheld (in USD as of January 16) |
|---|---|---|
| Creditors Who Did Not Accept the Custody Settlement | 438 | $7.5 million |
| Creditors Who Opted Out of the Class Claim Settlement and Filed a Proof of Claim | 318 | $8.3 million |
| Creditors with Withdrawal Preference Exposure | 2,824 | $44.2 million |
| Equitably Subordinated Claims | 15 | $14.7 million |

(a)     Creditors Who Did Not Accept the Custody Settlement

57.     On March 21, 2023, the Bankruptcy Court approved the Custody Settlement, pursuant to which participating creditors were eligible to withdraw certain Custody Assets from the Celsius platform. Creditors were able to opt into the Custody Settlement either through an election form or as part of voting on the Plan. Holders of Class 6A General Custody Claims who did not opt-in to the Custody Settlement and did not vote to accept the Plan ("Non-Settling Custody Creditors") remain subject to all Avoidance Actions and other claims with respect to their Custody Assets and their distributions have been withheld pending resolution or release by the Litigation Administrator. On July 26, 2024, the Bankruptcy Court extended the time for the Litigation Administrator to bring any actions with respect to these claims until January 25, 2025, without prejudice to the Litigation Administrator's right to seek further extensions. [Docket No. 7550]. As such, Non-Settling Custody Creditors are not currently eligible for a distribution on account of their Class 6A General Custody Claims unless they enter into a settlement with the Litigation Administrator.

(b)    Creditors Who Opted Out of the Class Claim Settlement and Filed a Proof
of Claim

58.    On August 14, 2023, the Bankruptcy Court approved the Class Claim Settlement, pursuant to which participating creditors received a Claim against each Debtor equal to 105% of the scheduled amount of such Claim.  Creditors were provided the opportunity to opt-out of the Class Claim Settlement through their ballots when voting on the Plan.  If a creditor elected to opt-out of the Class Claim Settlement and filed a Proof of Claim, their Claim was treated as a Disputed Claim under the Plan.  According, such creditors' distributions have been held back to be resolved through the claims reconciliation process by the Litigation Administrator.

(c)    Creditors with Withdrawal Preference Exposure

59.    Creditors with Withdrawal Preference Exposure above $100,000 who were otherwise eligible to participate in the Account Holder Avoidance Action Settlement received offers both pre-emergence and post-emergence from the Debtors and the Litigation Administrator, respectively, to resolve their outstanding Withdrawal Preference Exposure. While many creditors participated in these settlement offers, many others did not.  By July 15, 2024, the Litigation Administrator commenced approximately 2,400 Avoidance Actions against creditors, approximately 360 of which have since been settled.  Pursuant to the Plan, Distribution Agents are not required to make distributions to creditors with unresolved Withdrawal Preference Exposure above $100,000 until such Withdrawal Preference Exposure is resolved. *See* Plan Art. IV.B.3.

(d)    Equitably Subordinated Claims

60.    The Plan contemplated the equitable subordination of those Claims included on the Schedule of Equitable Subordinated Claims, which includes Claims against certain Insiders. Litigation regarding the Equitably Subordinated Claims was stayed pursuant to the Equitable

Subordination Stay Order entered on September 12, 2023. [Docket No. 3450]. The Equitable

Subordination Stay Order provides that litigation regarding the Equitably Subordinated Claims is

stayed until the earlier of (a) September 12, 2024, and (b) the final disposition of the criminal

case pending against Alexander Mashinsky in the Southern District of New York, docketed as

23 CR 347, and may be extended by the Litigation Administrator in consultation with the United

States Attorney's Office for the Southern District of New York.

**Creditors Unable to Receive a Distribution**

61.    Additionally, there are two categories of distributions that, while technically

legally eligible to receive a distribution, are not able to be made at this time:

| Reason for Non-Distribution | Number of Creditors | Total Amount of Distributions Withheld (in USD as of January 16) |
|---|---|---|
| Missing Compliance Information | 2,189 | $19.2 million |
| Located in Unserviceable Jurisdiction | 1,615 | $2.5 million |

(a)    Missing Compliance Information

62.    The Post-Effective Date Debtors have been unable to make distributions to certain

creditors because their account is missing essential information necessary to make a distribution.

This is most common where a creditor created an account through a third party, such as

Nuri/Bitwalla or Bitfinex. Because these creditors were routed to Celsius through a third party,

in many instances the Post-Effective Date Debtors are missing crucial information necessary to

make a distribution. In addition to sending emails to such creditors, the Post-Effective Date

Debtors sent physical letters to such creditors informing them of the missing compliance

information and asking them to open a ticket. During this Reporting Period, approximately

1,700 creditors have submitted tickets regarding such missing information and the Post-Effective

Date Debtors have been able to verify and make distributions to approximately 550 such

creditors. The below chart shows how many creditors still have not received a distribution due to missing compliance information.

63. If any creditor signed up through a third party or utilized iCloud Private Relay to login to the Celsius app and has not received emails or other communications from the Debtors, their account may be missing necessary information. If you have not received communications from the Post-Effective Date Debtors and created a Celsius account through a third party, please create a Customer Care Ticket at https://stretto-celsius.freshdesk.com/support/tickets/new, select the most relevant items from each drop-down menu (shown below), and we will work with you to help you resolve your issue.

**What do you need help with? ***

I need to update my Personal Information                                                     ▼

**Please be more specific to submit your request ***

I was sent a request to provide more information (ex. TIN/SSN or KYC/ID)                      ▼

> (b)    Located in an Unserviceable Jurisdiction

64. Certain creditors are located in jurisdictions (the "Unserviceable Jurisdictions") that cannot be serviced by any of the Post-Effective Date Debtors' Distribution Agents for a number of reasons. For example, the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") removed certain designated Russian banks from its system, affecting the ability of non-Russian banks, including the Post-Effective Date Debtors' bank, to process transactions with Russian banks. Unserviceable Jurisdictions include Cuba, Iran, North Korea, Syria, Venezuela, Russia, Belarus as well as the Crimea, Donetsk, and Luhansk regions of Ukraine and Abkhazia and South Ossetia in Georgia. On November 26, 2024, the Post-Effective Date Debtors sent creditors located in Unserviceable Jurisdictions an email explaining the situation and asking them to confirm their personal information is up-to-date to

identify those creditors who may have moved out of an Unserviceable Jurisdiction or if they have a foreign bank to which a distribution can be made. The Post-Effective Date Debtors also intend to send a physical letter to such creditors in January 2025.

**Customer Care Response Efforts**

65.     During this Reporting Period, the Plan Administrator also resolved a number of distribution-related issues raised by creditors through the Post-Effective Date Debtors' customer support system. In total, more than 130,000 Customer Care Tickets through the customer support system have been resolved since the Effective Date. Of these tickets, the overwhelming majority of new tickets are related to claims distribution issues, including approximately 25% related to distribution issues at PayPal and 40% related to distribution issues at Coinbase. When received, these tickets are segmented based on the assigned Distribution Agent and nature of the inquiry. The Customer Care Team reviews and addresses Customer Care Tickets from Monday through Friday from 4 a.m. to 8 p.m. (prevailing Eastern Time), and also log and respond to letters submitted to the Bankruptcy Court by creditors. The Post-Effective Date Debtors have, and will continue to, prioritize identifying and resolving common issues creditors are facing. Doing so has resolved many common issues, including mistaken Convenience Class elections, inability to cash checks of $US Dollars (especially for Australian creditors), and email deliverability issues. In addition, the Post-Effective Date Debtors have been able to assist individual creditors in resolving creditor-specific issues (*e.g.*, wire transfer information issues, Coinbase account issues, PayPal claim code issues, etc.), ultimately resulting in such creditor successfully receiving its distribution.

66.     Most Customer Care Tickets are resolved in a single email (other than the initial confirmatory email sent to creditors when they initially submit their ticket), and more than half of all Customer Care Tickets being resolved in less than a day. For more complex and

creditor-specific distribution issues, however, resolution times are longer. This is because the Post-Effective Date Debtors must work with the creditor to identify and resolve the cause of the issue. Sometimes resolving these issues requires the Post-Effective Date Debtors to develop new processes or solutions, which must be tested before they are implemented to ensure that distributions are still being made in a safe and fully regulatorily compliant manner. In addition, resolution times have increased due to the reduction in support staff.

67.     Kirkland & Ellis LLP ("Kirkland"), one of the Post-Effective Date Debtors' advisors, also responds to creditor inquiries sent to CelsiusCreditorQuestions@kirkland.com ("CelsiusCreditorQuestions"). Questions received through CelsiusCreditorQuestions are either resolved based on information then available to Kirkland or routed to the appropriate team for further investigation. If a creditor has not received a response to a previously submitted Customer Care Ticket within several weeks of submitting such ticket, creditors are encouraged to reach out to CelsiusCreditorQuestions, noting that they previously submitted a Customer Care Ticket and describing their issue. Kirkland will endeavor to investigate the creditor's issue and provide a response. To the extent Kirkland needs additional information from the Post-Effective Date Debtors or their other advisors regarding a creditor's specific issue, it may still take some time to fully resolve such creditor's inquiry.

**Receipts and Distributions**

68.     **Exhibit A** to this Report contains the receipts received and the expenditures made by the Post-Effective Date Debtors during the Reporting Period. As mentioned in the Plan Administrator's First Report, the costs of administering the Plan since the Effective Date have been higher than expected, largely due to the complexities of the distribution process, higher fees to distribution partners due to increased Liquid Cryptocurrency prices, and heightened security

risks. The reasons for these higher costs are explained in more detail further below in this section.

69.    Although the Plan Administrator has taken steps to reduce costs wherever possible, these costs have been necessary in carrying out the Plan Administrator's duties and making distributions required under the Plan. And the Plan requires that these costs be paid from the Post-Effective Date Debtors' assets, regardless of whether they are over the initial Wind-Down Budget. Specifically, the Plan provides that the Plan Administrator "shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget." Plan Art. IV.K. Importantly, the Plan further provides that "[a]ll costs, expenses, and obligations incurred by the Plan Administrator in administering th[e] Plan . . . shall be paid from the Post-Effective Date Debtors' Assets as such expenses are incurred without the need for Bankruptcy Court approval." Plan Art. IV.K.2.

70.    When the initial Wind-Down Budget was set, the Debtors could not have predicted many of the issues the Plan Administrator has worked to resolve as further detailed in the Plan Administrator's First Report and this Report. Specifically, the Plan Administrator was required to overhaul the Cash distribution system, including switching creditors from check distributions to wire transfers and negotiating and entering into an addendum to the PayPal agreement to use Hyperwallet as a Cash distribution agent. The Plan Administrator also investigated and resolved various deliverability issues preventing creditors from receiving communications from the Post-Effective Date Debtors, which required the Post-Effective Date Debtors to overhaul their communication systems. During this Reporting Period, the Post-Effective Date Debtors also developed, finalized, and launched a new portal for creditors to self-manage their distributions.

71.     But those efforts are not without related costs.  As a result of these and other efforts, the Plan Administrator retained more employees and outside advisors than initially contemplated, which resulted in higher-than-expected costs to the wind-down estate.  To be clear, the Plan Administrator views costs related to ensuring creditors receive their distributions in accordance with the Plan as essential.  These overages are attributable to three main sources: (a) distribution costs; (b) security, engineering, and technology costs; and (c) creditor support costs.

72.     **First**, the Plan Administrator has incurred distribution costs that exceed the previously budgeted amount by approximately $9 million.  These higher costs were driven by a variety of factors.  For example, the Plan Administrator transitioned thousands of creditors previously expected to receive a Cash distribution via check to more costly and time-consuming wire transfers when it became apparent that these creditors would be unable to cash a check. Similarly, due to issues creditors faced in receiving their distribution through their original Distribution Agent, the Plan Administrator transitioned creditors from PayPal to Coinbase or from a Liquid Cryptocurrency distribution to a Cash distribution in an effort to successfully make initial distributions to creditors.  Further, the increase in BTC and ETH prices have also resulted in higher than anticipated distribution costs because fees paid to the Post-Effective Date Debtors' Liquid Cryptocurrency Distribution Agents are based on the Cash value of the Liquid Cryptocurrency successfully distributed to creditors, and those fees were over $3 million higher than expected due to increased Liquid Cryptocurrency prices.  The Plan Administrator also continued to retain Alvarez & Marsal North America, LLC and more employees than initially projected to assist in the distribution process, including making approximately twenty distribution attempts to creditors per month across all Distribution Agents in an effort to increase

the chances for a creditor to successfully receive a distribution.  Finally, the Plan Administrator has also incurred additional distribution-related costs related to, among other things, extending the timeline for applicable creditors to refinance their Retail Advance Obligations.

73.    ***Second***, security, engineering, and technology costs have exceeded what was originally budgeted by approximately $3 million.   Prior to the Effective Date, the Plan Administrator developed technology and processes to facilitate efficient and accurate distributions across multiple Distribution Agents, in both Liquid Cryptocurrency and Cash, including developing processes to minimize the risk of distribution-related errors and to protect against loss or theft.  Over the past 10 months, the Plan Administrator further enhanced its existing technology and processes to resolve a myriad of complex creditor circumstances that required distributions to be regularly reattempted, routed to another Distribution Agent, or converted from Liquid Cryptocurrency to Cash.   The Plan Administrator was required to carefully design and implement each enhancement to these technologies and processes to ensure that there was no risk of duplicate distributions, that the Liquid Cryptocurrency or Cash needed for each distribution attempt were at the appropriate Distribution Agent, and that the time between when Liquid Cryptocurrency was converted to Cash and the subsequent Cash distribution was minimized.  These enhancements contributed to the successful distribution of over $2.6 billion in value (as of January 16, 2024 prices) to approximately 273,000 creditors across over 165 countries through 7 distribution methods.  In addition, the Plan Administrator has developed a claims portal, through which creditors will be able to more effectively manage their distributions, and has had to retain more cybersecurity professionals than originally anticipated due to ongoing cybersecurity threats.  In addition to the phishing attempt against Stretto, which paused distributions, the Plan Administrator and its employees have been the

target of sophisticated phishing attacks requiring the Post-Effective Date Debtors to maintain round-the-clock security coverage in order to safeguard their assets. The Post-Effective Date Debtors have also implemented additional processes related to distributions to protect creditors' assets. These added security processes resulted in higher technology and security vendor costs than previously anticipated.

74. ***Third***, the Post-Effective Date Debtors have incurred an additional $2 million in creditor support costs. These costs are a result of, among other things, the higher than anticipated ticket volume, which required the Post-Effective Date Debtors to continue to employ additional customer support staff to respond to Customer Care Tickets in a timely manner and coordinate hundreds of customized communications to creditors with unique circumstances. Specifically, since distributions began, creditors have submitted approximately 134,000 Customer Care Tickets, approximately 130,500 have been closed. Further, creditors have written over 500 letters to the Bankruptcy Court escalating their unique circumstances, each of which is researched and responded to, which requires both employee and outside advisor resources. The Plan Administrator elected to retain these additional customer support staff, who are paid a salary, rather than rely on Stretto, who charges an hourly fee, for customer support services, including responding to new Customer Care Tickets and working through the approximately 3,500 outstanding Customer Care Tickets. This decision has resulted in lower costs to the estate overall. The Plan Administrator also decided to proactively reach out to creditors who had yet to receive a successful distribution to provide them with specific troubleshooting information and remind them to claim their distribution and to contact the Post-Effective Date Debtors if they were having issues claiming their distribution. Finally, professional fees have been higher than projected due to an active in-court process requiring the

Post-Effective Date Debtors to respond to various motions and letters filed with the Bankruptcy Court as well as litigate two pending appeals.

75.     The Plan Administrator has, and continues to, evaluate the costs of administering the wind-down estate, including taking steps to reduce costs where possible.  For example, the Plan Administrator brought in-house all email communications with creditors, which was previously serviced by Stretto, and decided to end Liquid Cryptocurrency distributions in November 2025, after which all creditors will receive fiat distributions, which will reduce the cost of subsequent distributions.  In addition to these efforts and the other efforts mentioned in this Report, the Plan Administrator has also enacted the following measures to reduce costs:

- developed and introduced a claims portal through which creditors can self-manage issues relating to their distributions, including submitting wire transfer information, updating their AML/KYC Compliance Information (if requested), and updating their Celsius account information (*e.g.*, physical and email address information);

- reduced the frequency of distributions from weekly to monthly;

- introduced Hyperwallet to reduce the Post-Effective Date Debtors' reliance on costly wire transfers;

- moved full-time employees to part-time contracts where possible;

- aggressively reduced employee and contract headcount by 30% from approximately 100 employees or contractors as of the Effective Date to 68 as of October 31, and further expect to be at 50 employees or contractors by the end of 2024; and

- renegotiated essential contracts with third-party vendors and further optimized related demand and routing.

76.     Even with these cost-saving measures, the Plan Administrator has exceeded the initial Wind-Down Budget by approximately $14 million (as of October 2024).  Over the next year, the Plan Administrator expects that costs will continue to exceed the initial Wind-Down Budget.  The Plan Administrator will continue to explore options to minimize ongoing costs with

the expectation of bringing ongoing costs in-line with the initial Wind-Down Budget beginning in 2026.

## Directors and Officers Insurance

77.    The Debtors maintained certain insurance policies covering their directors and officers (the "D&O Policies").    The Debtors' insurance broker, CAC Specialty Insurance Solutions, has been assisting the Plan Administrator with issues related to the D&O Policies, including the allocation of such policies among the various insured individuals (the "Covered Individuals").

78.    On September 18, 2024, an arbitration commenced regarding the allocation of $6 million of excess coverage among the Covered Individuals.    Such excess coverage becomes available when the D&O Policies' Side A, Side B, and Side C limits are exhausted.    As a result of the arbitration, the arbitrator entered an order allocating such excess coverage among the Covered Individuals.    As of this Report, the insurers responsible for the excess policies have, or will soon make, the payments under the arbitrator's order.    Once these excess coverage amounts have been exhausted, the Covered Individuals will only be able to seek coverage for any remaining unreimbursed defense costs from the Side-A only insurers.

## Phishing Attempts and Cybersecurity

79.    Creditors continue to report that they are receiving emails and other communications purporting to be from the Post-Effective Date Debtors but which are actually phishing scams or similar illegitimate communications.    Neither the Post-Effective Date Debtors nor their advisors will ever contact you by telephone call, social media, or text message to request account information or other personal information absent an (a) order by the Court or (b) on-the-record instruction from the Court.    In addition, the Post-Effective Date Debtors will not ask you to connect your wallet through a third-party to receive your distribution.

Specifically, many phishing attempts request creditors to link an ERC-20 compatible non-custodial wallet to complete such creditor's distribution.

80.     The Post-Effective Date Debtors encourage creditors to review the Post-Effective Date Debtors' Recommendations for Phishing Emails, attached hereto as **Exhibit B**, and confirm that any email they receive is legitimate by reviewing the sender's email address.  If a creditor has a question as to the authenticity of a specific email, such creditor should forward the email to CelsiusCreditorQuestions and should not click on any links contained in such email until the Post-Effective Date Debtors confirm it is a legitimate email regarding these Chapter 11 Cases.

*[Remainder of page intentionally left blank.]*

New York, New York
Dated:  December 10, 2024

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

\- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
333 Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Plan Administrator*

**<u>Exhibit A</u>**

**Receipts and Expenditures During Current Reporting Period**

# Post-Effective Date Debtors' Assets (as of Oct. 31,2024)

|  | Crypto | Fiat | Lit Admin Assets [1] | Total |
|---|---|---|---|---|
| Debtors' Assets | $581 M | $224 M | $409 M | $ 1.2 B |
| Remaining Amount Owed in Initial Distribution | $525 M | $ 81 M | $ 0 M | $606 M |
| Net Assets | $56 M | $143 M | $409 M | $608 M |

**Net Assets** will be fully distributed to the creditors once the initial planned distribution is completed

1. Lit Admin Assets include $252 million in proceeds from asset sales and litigation recoveries managed by the Litigation Administrators and approximately $157 million of remaining illiquid assets.

# Plan Administrator's Expenses and Cash Balances (as of Oct. 31, 2024)

| 000s | Q1 2024 | Q2 2024 | Q3 2024 | Inception to Date |
|---|---|---|---|---|
| Opening Cash Balances | 70,000 | 57,201 | 47,470 | 70,000 |
| **Receipts** | | | | |
| Interest Income | 488 | 611 | 416 | 1,515 |
| Rebates / Other Adjustments (1) | 0 | 798 | 278 | 1076 |
| **Total Receipts** | **488** | **1,409** | **694** | **2,591** |
| **Disbursements** | | | | |
| Plan Administration Fees | (600) | (300) | (300) | (1,200) |
| Distribution Costs and Expenses (2) | (4,705) | (1,885) | (3,625) | (10,215) |
| Professional Fees (3) | (1,779) | (1,830) | (5,119) | (8,728) |
| Employee Payroll (4) | (4,205) | (6,078) | (4,441) | (14,724) |
| Other Operating Expenses (5) | (1,998) | (1,046) | (645) | (3,689) |
| **Total Disbursements** | **(13,287)** | **(11,139)** | **(14,130)** | **(38,556)** |
| **Net Change in Cash** | **(12,799)** | **(9,730)** | **(13,436)** | **(35,965)** |
| **Ending Cash Balance** | **57,201** | **47,470** | **34,034** | **34,034** |

(1) Rebates received from Paypal.
(2) Distribution Costs and Expenses driven distribution fees paid to Coinbase $7.5m and Stretto $2.9m
(3) Professional Fees driven by financial advisory $6.2m and Legal Counsel $4.2m
(4) Other Operating Expenses driven by technology spend $1.6m and D&O insurance $1.2m

Q1 2024 represents Feb through April | Q2 2024 represents May through July | Q3 2024 represents Aug through Oct

## Exhibit B

**Post-Effective Date Debtors' Recommendations for Phishing Emails**

## Post-Effective Date Debtors' Recommendations for Phishing Emails

**Be aware of the sender's email address and URLs contained in their messages.** Phishing emails will exploit your trust, expectations, and complacency with interacting with seemingly trusted sources. The first step is always to verify the Email Sender's Identity, and without clicking on the links in the email, confirm where they are directed to.

We recommend users proactively "whitelist" official emails by creating email filters/tags or automation that will only tag Stretto or Celsius emails from legitimate sources.

**Review the below list of official websites and email addresses.** You should disregard anything not coming from these email addresses or proceed with extreme caution.

Legitimate URLs contained in messages, and links contained:

- celsius.network
- stretto.com
- claimsportal.celsius.network
- hello@celsius.network
- app@celsius.network
- claims@distributions.celsius.network
- complianceteam@celsius.network
- do-not-reply@updates.celsius.network
- do-not-reply@claimsportal.celsius.network
- no-reply@cases-cr.stretto-services.com
- celsiusdistribution@stretto.com
- cases.stretto.com
- https://celsiusnetwork.medium.com/
- https://cases.stretto.com/Celsius
- ionicdigital@odysseytrust.com
- do.not.reply@hyperwallet.com
- CelsiusCreditorAnswers@kirkland.com
- CelsiusCreditorQuestions@kirkland.com
- CelsiusLitigationAdmin@m3-partners.com

Note the specific punctuations, and don't be tricked by similar but differently worded or punctuated URLs using dashes instead of periods. Remember some URL and website addresses may seem similar to the above, but you must ensure they are any of the ones shown above.

**Check the sender's email address and where the email links will take you.** Examine the sender's email address carefully. Phishers often use similar-looking addresses to mimic legitimate ones. Look for misspellings, extra characters, or unusual domain names. Verify email content and formatting.

**Be skeptical of emails with poor grammar, spelling errors, or unusual formatting.** Legitimate organizations usually maintain a professional standard in their communication.

**Hover over links.**  If on your computer, hover your mouse over any links in the email to preview the destination URL.  Ensure it matches the expected website and is not a disguised link pointing to a phishing site.

**Check for generic greetings.**  Phishing emails often use generic greetings like "Dear Customer" instead of addressing you by name.  Legitimate organizations typically use your name in their communications.

**Beware of urgent or threatening language.**  Phishing emails often create a sense of urgency or use threatening language to manipulate recipients into taking immediate action.  Be cautious if an email demands urgent attention.

**Verify unexpected attachments.**  Avoid opening unexpected attachments, especially if they come from unknown or unexpected sources.  Malicious attachments may contain malware or phishing links.

Do not open these links for the first time on a mobile phone, as a mobile phone does not allow you to hover over links and ensure the stated link and the hyperlink match.

**Examine the email signature.**  Legitimate emails from companies usually include a consistent and professional email signature.  Lack of contact information or inconsistencies can be red flags.

**Enable two-factor authentication (2FA) everywhere possible.**  Implementing 2FA adds an extra layer of security, making it more challenging for attackers to gain unauthorized access even if they obtain your credentials through phishing.

**Use email security features.**  Many email providers offer built-in security features.  Enable features like spam filters and phishing detection to enhance your email security.

**Educate yourself and stay informed.**  Stay informed about the latest phishing techniques and trends.  Regularly update yourself on common phishing tactics to recognize new and sophisticated attempts.  Review the Celsius Knowledge Base site, as well as the official docket on Stretto to keep yourself up to date.

**https://celsiusdistribution.stretto.com/support/solutions**
**https://cases.stretto.com/Celsius**
**https://twitter.com/celsiusnetwork**
**https://x.com/celsiusnetwork**

**Verify unexpected requests.**  If an email requests sensitive information or actions that seem unusual, independently verify the request by contacting the organization through official channels before providing any personal information.

**Check for HTTPS.**  Verify that the website you are directed to uses HTTPS.  While this alone does not guarantee legitimacy, it adds an additional layer of security.  When in doubt, verify the SSL certificate used.

**Stay cautious with pop-ups and forms.** Be cautious if an email or website opens unexpected pop-ups or prompts you to enter sensitive information in forms. Legitimate organizations typically handle such interactions securely, not over a single-click email.

**Never connect your Crypto Wallet anywhere, even if it looks like a Celsius or Stretto Website.** If you follow the above tips, proceed with caution, and stay up to date with official site updates, you will be more secure in these trying times.