UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,<br><br>Post-Effective Date Debtors. | <u>NOT FOR PUBLICATION</u><br><br>Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION AND ORDER SUSTAINING LITIGATION ADMINISTRATOR'S OBJECTION TO CLAIM OF CELLA MLO**

*A P P E A R A N C E S*:

PRYOR CASHMAN LLP
*Co-Counsel to Mohsin Y. Meghji as Litigation Administrator*
7 Times Square
New York, New York 10036
By:    Seth H. Lieberman, Esq.
         Matthew W. Silverman, Esq.
         Andrew S. Richmond, Esq.

Cella Mlo
*Pro se creditor*

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are several letter motions filed by *pro se* claimant Cella Mlo in the above-captioned bankruptcy case: she filed a letter styled as a motion to compel (ECF Doc. # 8089) as well as two other letters seeking the same relief (ECF Doc. ## 8090, 8091), all of which are related to her proof of claim (claim no. 22960). The above-captioned debtor's ("Celsius") litigation administrator ("Litigation Administrator") filed an objection to Mlo's claim ("Objection," ECF Doc. # 8095), as well as a limited objection to other assertions Mlo made in her letters ("Limited Objection," ECF Doc. # 8096). Mlo filed a response ("Response," ECF Doc. # 8099). The Litigation Administrator filed a reply ("Reply," ECF Doc. # 8105), and Mlo

filed a sur-reply ("Sur-Reply," ECF Doc. # 8110) and then a "final sur-reply" (ECF Doc. # 8117).[1] The Litigation Administrator also filed a letter (ECF Doc. # 8118) and a copy of Mlo's proof of claim (ECF Doc. # 8119).

For the following reasons, the Court **SUSTAINS** the Objection and **EXPUNGES** the Claim in full.

I. **BACKGROUND**

One of Celsius's creditors, Cella Mlo, sent a letter to this Court on March 30, 2025, which has not appeared on the docket. Its contents were substantially repeated in two subsequent letters Mlo sent to the Court on April 9, 2025 (ECF Doc. # 8090) and April 15, 2025 (ECF Doc. # 8091), as well as a letter styled as a motion to compel (ECF Doc. # 8089). According to Mlo, she filed her proof of claim (claim no. 22960) in a timely manner on January 2, 2023; Celsius's claims administrator's website confirms that she did file her claim on that date, and hence filed it in a timely manner, as the bar date was April 28, 2023. Her proof of claim was also filed on the docket by the Litigation Administrator (ECF Doc. # 8119). Mlo attached just one relevant document to her proof of claim: an employment agreement. (ECF Doc. # 8119 at 5.) Mlo states in her letters to the Court that she filed a claim for $35,000 consisting of $15,000 in "priority compensation under 11 U.S.C. section 507(a)(4)" (i.e., a claim for wages, salary, commissions, or certain sales commissions, if earned within 180 days of Celsius's filing), and $20,000 as a general unsecured claim, and explains that the claim is "based on a signed employment agreement, earned but unpaid compensation, consulting work, and unreimbursed business expenses." (ECF Doc. # 8091 at 1.) On her proof of claim itself, Mlo indicated that the basis of

---

[1] Mlo also submitted a hardship application to the Court, along with a request to seal its contents ("Sealing Letter," ECF Doc. # 8108; *see also* ECF Doc. # 8109 (cover letter).) The application was never filed on ECF so there is no need to seal it.

the claim was "services performed, wrongful firing." (ECF Doc. # 8119 at 2.) (As discussed below, the Litigation Administrator argues that her claim was based on something distinct—a supposed grant of cryptocurrency tokens in Mlo's employment agreement with Celsius. (POC Objection at 7.)) Mlo claims that Celsius did not send her a "substantive response" until March 2025, at which point she was offered $15,000 in cash and equity to settle her claim. (ECF Doc. ## 8090 at 2, 8091 at 2.) But after she "submitted her signed agreement" (it is unclear whether she means a signed proposed settlement agreement, or her signed employment agreement with Celsius) "and supporting employment documents" to the Litigation Administrator, Mlo claims that Celsius withdrew the offer of $15,000 and replaced it with an offer of $450, "without formal objection, explanation, or due process." (ECF Doc. ## 8090 at 2, 8091 at 2.) She claims that she then sent "a comprehensive supplemental package" to Celsius, presumably in support of her claim, which included "travel documentation, time logs, platform lockout confirmation, and reimbursements." (ECF Doc. # 8091 at 2–3.) She asked Celsius for a "resolution" by April 12 (ECF Doc. # 8089 at 3) and, having received no further response from Celsius by mid-April, Cella Mlo began to file letters on this Court's docket seeking a resolution of her claim.

Celsius's Litigation Administrator filed an objection to Mlo's proof of claim on April 25, 2025 ("POC Objection," ECF Doc. # 8095), and an objection to Mlo's letters on April 29, 2025 ("Limited Objection," ECF Doc. # 8096). The Litigation Administrator seeks to have Mlo's claim disallowed and expunged in its entirety. (POC Objection at 7.) Mlo attached a single document to her proof of claim: an employment agreement between herself and Celsius. The Litigation Administrator explains that the employment agreement Mlo attached to her proof of claim is dated May 18, 2021, pursuant to which, in addition to her salary, Mlo was eligible to receive 5,397 "CEL tokens" which would vest over a period of three years from the start of her

employment "on a quarterly basis following a one-year cliff and subject to" her continual employment by Celsius. (POC Objection at 5; *see also* ECF Doc. # 8119 at 5.) According to the Litigation Administrator, Mlo started working for Celsius on June 1, 2021, and was terminated for cause on August 6, 2021, before the first milestone date upon which any CEL tokens would vest, according to Celsius's books and records and Mlo's engagement agreement. (POC Objection at 5.) The Litigation Administrator therefore argues that Mlo was not entitled to any CEL token compensation: as she was employed for only 67 days, she "did not satisfy the one-year cliff requirement and did not accrue any vested CEL tokens during her employment." (*Id.* at 7.) In response to inquiries concerning her claim, the Litigation Administrator tried to meet and confer with Mlo in the spring of 2025, during which Mlo "raised several additional purported claims against Celsius that were not included in" her original claim. (*Id.* at 5–6.) Upon review, the Litigation Administrator determined that the additional documents she submitted to support her new theories of liability failed to support a valid claim; the Litigation Administrator claims he offered Mlo an additional chance to provide further support, but she declined to take it. (*Id.* at 5–6.) The Litigation Administrator argues that Mlo failed to establish a valid claim against Celsius; since her $35,000 claim is based on a purported grant of CEL tokens in connection with her employment with Celsius, and since the only document she submitted to support her claim was her employment agreement which did not provide her with the right to any CEL tokens after a mere 67 days of employment, she did not provide support for her $35,000 claim. (*Id.* at 7.) The Litigation Administrator does not address Mlo's claim under section 507(a)(4) of the Code in the Objection, apart from stating that this is one of Mlo's new (post-bar date) theories of liability, that the documents she submitted in support were insufficient to sustain a claim, and that the new theories of liability are untimely. (*Id.* at 5–6, 6 n.4.) The Litigation Administrator

4

attaches a declaration by Kenneth Ehrler, a financial advisor to the Litigation Administrator, to his POC Objection (POC Objection at Exhibit B); in it, Ehrler testifies that "the Mlo Claim asserts a liability that is not an obligation of the Debtors," and the documentation she provided in support "fails to validate any deviation from the Debtors' schedules and Books and Records." (POC Objection at Ex. B.)  He explains that Mlo was hired as a senior quantitative analyst with a start date of June 1, 2021, that she was terminated for cause on August 6, 2021, and that Celsius's books and records do not reflect a CEL token liability owed to Mlo. (*Id.*)

As for its Limited Objection in response to what it calls Mlo's "Motion to Compel Review and Resolution of Claim No. 22960," the Litigation Administrator merely states that he has reviewed Mlo's claim and determined that it should be disallowed and expunged in its entirety, so the relief requested by Mlo—that this Court "take notice of this issue and consider whether the Litigation Administrator's handling of" her claim "aligns with the expectations of fairness and consistency under the confirmed Plan" (ECF Doc. # 8090)—is moot. (Limited Objection at 3.)  The Litigation Administrator does not address the purported $15,000 settlement Mlo claims to have received from Celsius.

Mlo filed a response ("Response," ECF Doc. # 8099) to the Litigation Administrator's Objection, dated April 26, 2025.  Mlo argues that her claim is *not* solely based on unvested CEL tokens but is also based on unpaid compensation and consulting services, business-related expenses, "reliance damages arising from a withdrawn settlement offer," and priority wages. (Response at 2.)  She doubles down on her argument that "at least $15,000" of her claim falls under section 507(a)(4) of the Code. (*Id.* at 3.)  Further, she claims that the Litigation Administrator's conduct "violated due process and bankruptcy rules," because he waited for over

5

a year to respond to the claim; she believes her claim should therefore be deemed allowed, due to the long wait. (*Id.* at 3–4.) She seeks an evidentiary hearing "without delay." (*Id.* at 4.)

The Litigation Administrator filed a reply in further support of the Objection to Mlo's claim ("Reply," ECF Doc. # 8105). In it, he maintains that the additional theories Mlo asserted in support of her claim—that she is owed "unpaid compensation earned during the course of informal, post-employment consulting work for Celsius," "work-related travel and equipment expense reimbursements," "a loss of cryptocurrency tokens due to an inability to access the platform after purportedly being wrongfully terminated from Celsius," and "a proposed Settlement Agreement . . . which was sent in error and never effectuated"—are time-barred, as they were asserted over two years after the bar date, but addresses their merits regardless. (Reply at 3.) The Litigation Administrator reasserts his argument concerning Mlo's asserted entitlement to CEL tokens, explaining that per the terms of her employment agreement, Celsius does not owe Mlo any tokens. (*Id.* at 3–4.) He also explains that, in correspondence with Celsius concerning her claim, Mlo asserted a claim for "unpaid compensation for 32 hours worked as an independent consultant for the Debtors," in support of which she submitted "half of a document which purports to demonstrate consulting work" performed in the summer of 2022, and "half of an undated email from 'David Barse.'" (*Id.* at 4.) The Litigation Administrator maintains that Mlo was never retained as an independent consultant, and that the documents she submitted do not support her stance: even if taken at face value, her log of consulting hours contains only generalized descriptions of work that "lack any nexus between the Debtors and [her] purported consulting work." (*Id.* at 4–5.) As for Mlo's claim for travel and expense reimbursements, which include costs for a MacBook Pro computer, a flight from New York to Israel, a stay at a hotel in Israel, and expenses incurred while traveling, the Litigation Administrator explains that

6

Celsius has no record of authorizing any work-related travel for Mlo, nor purchases of equipment. (*Id.* at 5–6.) He explains that, consistent with Celsius's policy of barring employees from using personal equipment for work, the company bought Mlo a laptop and monitor using a company credit card. (*Id.* at 6.) As for the hotel stay, he asserts that the hotel receipt Mlo submitted appears to have been doctored, as it includes duplicative room charges on multiple days, as well as charges on dates after the check-out date (including on June 31, 2021, "which is not a valid calendar date"). (*Id.* at 6–7.) Moreover, Mlo provided no documentation establishing a connection between herself, the hotel stay, and Celsius, which makes sense, as Mlo was hired as a U.S.-based employee. (*Id.* at 7.) The boarding pass Mlo submitted in support of her claimed reimbursement for her New York-Tel Aviv flight also "contains numerous irregularities," such as alleged purchases from an Apple Store; and again, Mlo failed to present any documentation linking the flight to her work or to Celsius at all. (*Id.* at 7.) The same goes for Mlo's "travel expense report" she submitted to support her claim for reimbursement of various expenses such as meals—per the Litigation Administrator, it merely lists certain dates, descriptions of charges, and costs, but does not connect the expenses to Mlo's employment with Celsius, and there is no evidence indicating that Celsius authorized these expenses. (*Id.* at 8.) Finally, as for the settlement offer Mlo received from the Litigation Administrator, he explains that, on March 30, 2025, he mistakenly sent Mlo a form Settlement Agreement intended for former Celsius *customers* who wished to resolve their claims, but under two hours after sending it, he explained to Mlo that it had been sent in error, did not apply to her claims, and was being withdrawn. (*Id.* at 9.) The Settlement Agreement was never executed by either party. (*Id.*) The Litigation Administrator attached another declaration by Kenneth Ehrler in support of his Reply (Reply Ex. A), as well as a declaration by Christopher Ferraro, Celsius's Plan Administrator

7

(Reply Ex. B), both of which support the statements made by the Litigation Administrator in his Reply. He also attached the seven documents Mlo provided to the Litigation Administrator in support of her additional theories of liability (Reply Ex. C); upon review, the Litigation Administrator's description and assessment of these documents appears accurate. (In addition, the room charges Mlo listed on her purported "hotel receipt" do not add up to the total asserted in the document: the individual charges add up to 14,755.50 (presumably shekels), while the total listed on the receipt is 20,257.50, further supporting the Litigation Administrator's argument that this document is fabricated. (Reply Ex. C.))

Finally, Mlo filed a letter styled as a sur-reply on May 7, 2025 ("Sur-Reply," ECF Doc. # 8110). In her telling, her "entire claim originates from a retaliatory termination that occurred shortly after [she] filed a formal complaint with Celsius HR regarding executive misconduct." (Sur-Reply at 1.) (She does not provide any additional support for this claim.) She accuses the Litigation Administrator of acting in bad faith by only attaching a selection of the documents she submitted to him in support of her claim, and submits (1) her signed Celsius employment offer letter "confirming CEL token compensation" and her start date, (2) a pay stub verifying that she was employed by Celsius, and (3) her supplemental statement explaining her HR complaint and the timeline of her termination. (*Id.* at 1, 4-9.) She requests that this Court "strike or disregard" the declaration by Ferraro as the declarant was not involved in Mlo's hiring, termination, or purported consulting engagement and hence does not have "firsthand knowledge" of the situation. (*Id.* at 2.) She does not address the Litigation Administrator's allegation that she fabricated documents. The engagement letter she attaches in her Sur-Reply states that her start date with Celsius was June 1, 2021, and that on top of a salary of $100,000 per year, Celsius was to grant her "5,397 CEL tokens . . . equivalent to the value of $35,000 U.S.D.," which were to

8

"vest over a period of 3 years commencing on the Commencement Date on a quarterly basis following a one-year cliff and subject to [Mlo's] continued engagement with the Company under this Employment Agreement." (Sur-Reply at 4.) In her supplemental statement which Mlo purportedly sent to the Litigation Administrator and which is dated April 1, 2025, Mlo explains that she thinks she is entitled to $14,583 to $17,500 worth of CEL tokens pursuant to the terms of her employment letter because, by Celsius's chapter 11 filing date, "approximately 5–6 quarters had passed" from the start of her employment by Celsius, and the terms of her employment provided for $35,000 worth of tokens "to be vested quarterly over 3 years." (*Id.* at 8.) She also states that, during her employment, she was "directed to work in Tel Aviv where Celsius maintained a headquarters and operations center," and accrued "over $6,000" of "travel and lodging expenses." (*Id.*) She complains that, upon her termination, she did not receive a final paycheck "covering the partially completed quarter," which she (presumably mistakenly) states was "April–July 2022." (*Id.*) As for the asserted liability for post-employment consulting work, she claims that "Celsius reached out for additional financial analysis support" after she was terminated, and that, while she "was not rehired or re-contracted," she "responded to several requests for assistance in good faith." (*Id.* at 8–9.) Despite the absence of any contract, Mlo believes she should be compensated for this "informal support" in the range of "$3,000–$5,000." (*Id.*) She also explains that after she was terminated, she was denied access to the Celsius platform and was hence cut off from "[her] personal digital assets," which included "both employee compensation and customer-deposited assets." (*Id.* at 9.) Finally, she reasserts that her termination was wrongful and retaliatory. (*Id.*)

9

## II.  LEGAL STANDARD

**A. Insufficient Documentation Objections to Proofs of Claim**

Section 501(a) of the Bankruptcy Code provides that "[a] creditor . . . may file a proof of claim" to claim an interest in a debtor's bankruptcy estate.  11 U.S.C. § 501(a).  Section 502(a) provides that a claim or interest, properly filed, "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Bankruptcy Rule 3001 and Official Form 410 govern the form, content and required attachments for proofs of claim.

Bankruptcy Rule 3001 provides, in relevant part, that:

(c) Supporting Information.

>  (1) *Claim Based on a Writing.*  Except for a claim governed by paragraph (3) of this subdivision, when a claim, or an interest in property of the debtor securing the claim, is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

> […]

> (f) Evidentiary Effect.  A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

FED. R. BANKR. P. 3001(c), (f).

"The proof of claim, if filed in accordance with section 501 and the pertinent Bankruptcy Rules, constitutes *prima facie* evidence of the validity and amount of the claim under Federal Rule of Bankruptcy 3001(f) and Code section 502(a)."  4 COLLIER ON BANKRUPTCY ¶ 502.02[3][f] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019).  Pursuant to Federal Bankruptcy Rule 3001(f), a claimant establishes a *prima facie* case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim.  If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N.

10

Resnick & Henry J. Sommer eds., 16th ed. 2019).

"To overcome this *prima facie* evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (laying out identical burden-shifting framework); *In re Hopkins Fabrication, LLC*, 600 F. Supp. 3d 215, 241 (D. Conn. 2022) (stating that "the objector [to a prima facie valid claim] must produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves") (cleaned up).

"When, however, a proof of claim fails to comply with Bankruptcy Rule 3001 and Official Form 410, the proof of claim loses its *prima facie* validity and the claimant must come forward with sufficient evidence of the claim's validity and amount in response to the objecting party." *In re Live Primary, LLC*, 626 B.R. 171, 188–89 (Bankr. S.D.N.Y. 2021); *see also In re Lundberg*, No. 02-34542 (LMW), 2008 WL 4829846, at *7–8 (Bankr. D. Conn. Oct. 27, 2008) ("If . . . the claimant fails to allege facts in the proof of claim that are sufficient to support the claim, e.g., by failing to attach sufficient documentation to comply with FED. R. BANKR. P. 3001(c), the claim is . . . deprived of any *prima facie* validity which it could otherwise have obtained."). "[I]n certain circumstances claims can be disallowed for failure to support the claim

with sufficient evidence, even if this is not a specifically enumerated reason for disallowance under 11 U.S.C. § 502(b), because absent adequate documentation, the proof of claim is not sufficient for the objector to concede the validity of a claim." *In re Minbatiwalla*, 424 B.R. 104, 119 (Bankr. S.D.N.Y. 2010).

"The purpose behind Bankruptcy Rule 3001 and Official Form 410's documentary requirements and the shifting burden of proof is two-fold. First, the attachments required by the Bankruptcy Rule 3001 and Official Form 410 are intended to enable the debtor or trustee to evaluate the claim's amount and validity and to challenge portions of the claim that may be inaccurate. . . . Second, the rules governing claims are intended to simplify the claims allowance process and provide a fair and inexpensive process for all parties." *In re Live Primary, LLC*, 626 B.R. at 189 (internal citation omitted). While the question of what documentary evidence is needed to establish and verify the proof of claim is decided on a "case-by-case" basis, *id*., "if a proof of claim lacking proper attachments does not correlate to a debt scheduled by the debtor, or aspects of the claim differ from the scheduled debt, this may give rise to a valid objection by the debtor for lack of verification of ownership," *id.* (citing *In re Burkett*, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005)).

Courts have sustained "insufficient documentation objections" resulting in the disallowance of claims on procedural grounds when the creditor fails to respond to such an objection. *In re Minbatiwalla*, 424 B.R. at 119 (collecting cases and disallowing claim for failure to provide documentation).

### B. Amendments to Timely-Filed Claims

"[B]ar dates, which fix the time within which proofs of claim or interest may be filed, are 'critically important.'" *In re SVB Fin. Grp.*, 660 B.R. 60, 66 (Bankr. S.D.N.Y. 2024) (citing *In*

12

*re Lehman Bros. Holdings, Inc.*, 433 B.R. 113, 119 (Bankr. S.D.N.Y. 2010)). It is the bar date order that "enabl[es] the parties in interest to ascertain with reasonable promptness the identity of those making claims against the estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization." *In re Best Prods. Co., Inc.*, 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992). "Compliance with a bar date is therefore imperative." *In re SVB Fin. Grp.*, 660 B.R at 66.

While Mlo does not style any of her requests as a motion to amend a timely-filed proof of claim, the Litigation Administrator alleges that her original claim was premised solely upon Mlo's employment agreement and her (mistaken) belief that she was entitled to $35,000 worth of CEL tokens per its terms. Mlo does not challenge this characterization of her original proof of claim. Therefore, in asserting new bases of liability in the documents submitted to the Litigation Administrator and to this Court in support of her claim, Mlo is functionally seeking to amend her original claim.

Where a bar date has passed and a creditor seeks to file an amended proof of claim, "[t]he decision to allow the amendment of the claim is committed to the discretion of the bankruptcy judge." *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (internal citations omitted). In the Second Circuit, amendment to a claim is

> freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. However, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment.

*Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (citations omitted). "Courts apply a two-step inquiry when considering whether to allow post-bar date amendments to proofs of claim . . . . First, the court must determine

13

'whether there was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.'" *In re SVB Fin. Grp.*, 660 B.R. at 81 (internal citation omitted). A claim satisfies the first prong if it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *In re Enron Corp.*, 419 F.3d 115, 133 (2d Cir. 2005). "In other words, the amendment must relate back to the original proof of claim." *In re SVB Fin. Grp.*, 660 B.R. at 81. If the relation-back inquiry is satisfied, "courts then examine whether it would be equitable to allow the amendment," and consider the following five equitable factors in deciding whether to allow an amendment: "(i) undue prejudice to opposing party; (ii) bad faith or dilatory behavior on the part of the claimant; (iii) whether other creditors would receive a windfall were the amendment not allowed; (iv) whether other claimants might be harmed or prejudiced; and (v) the justification for the inability to file the amended claim at the time the original claim was filed." *Id.* "The critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Integrated Res.*, 157 B.R. at 70 (citation omitted). Amendments that "plead[] a new theory of recovery based on a new set of facts" do not "relate back" to the original claim and will be rejected. *In re Residential Cap., LLC*, 513 B.R. 856, 870 (Bankr. S.D.N.Y. 2014).

### III.   DISCUSSION

#### A. Mlo's Original Claim is Unsupported

Mlo's proof of claim attaches only an employment offer letter. The Litigation Administrator argues that her claim was originally based on the right to CEL tokens granted in her employment contract which Mlo thought had vested. Mlo does not contest this characterization of her original claim. The Litigation Administrator is correct in arguing that

14

Mlo did not provide sufficient documentation to support her claim. The offer letter Mlo attached to her Sur-Reply clearly states that CEL tokens would only vest "over a period of 3 years commencing on the Commencement Date [presumably, her first day of employment for Celsius] on a quarterly basis following a one-year cliff and subject to [her] continued engagement with the Company under this Employment Agreement." (Sur-Reply at 4.) The Litigation Administrator states that Mlo was fired after 67 days of employment (a statement Mlo does not contest), and that per the terms of her employment agreement, no CEL tokens vested by the time she was let go. That is plainly correct, given the language of the employment agreement. Mlo's calculus in her supplemental statement attached to her Sur-Reply does not account for the fact that she only had a right to CEL tokens so long as she remained employed by Celsius; the clock stopped running, so to speak, once she was fired.

The Litigation Administrator's Objection on the grounds that Mlo failed to support her claim. As discussed below, Mlo's attempts to provide additional supporting documentation have failed, both because these efforts are properly viewed as untimely amendments to her claim and because the additional documentation does not support the merits of her claim.

### B. Mlo's New Theories of Liability are Time-Barred

If the Litigation Administrator's characterization of Mlo's original claim is correct—if her asserted basis of liability in January of 2023 was an entitlement to CEL tokens based on language in her employment agreement—then Mlo's subsequent theories are time-barred as improper amendments to her claim. Both sides agree that Mlo now asserts the following grounds for Celsius's alleged liability: unpaid compensation for post-employment consulting work, work-related travel and equipment expense reimbursements, loss of cryptocurrency tokens due to an inability to access the Celsius platform after being terminated, and a proposed settlement

15

agreement which Celsius then retracted. (*See* Reply, Sur-Reply.) Only one of these theories—the loss of tokens due to being barred from the Celsius app—relates back at all to Mlo's original claim, which apparently was for tokens she believes she is entitled to as compensation.

Mlo's consulting work, if it ever actually occurred, took place (by her own admission) after her period of formal employment and appears to be entirely unrelated to her formal employment with Celsius and to her employment agreement. This claim shares no facts or legal bases with Mlo's original claim. Even if it did "relate back" and constitute a proper amendment, Mlo has failed to provide any evidence that shows that she is entitled to compensation for any work she may have done for Celsius after she was fired—which makes sense, as she explains that she "was not rehired or re-contracted by Celsius." (Sur-Reply at 8.) Mlo has not substantiated her claim for compensation from Celsius for any post-employment consulting work.

As for travel and reimbursement expenses, even taking Mlo's version of history at face value, these claims are unrelated to what appears to be her original asserted basis for liability, which is her purported entitlement to CEL tokens. The employment letter she provides with her Sur-Reply says nothing about reimbursing travel or other expenses. These claims are distinct from any (unvested) right to CEL tokens. There is no shared nexus of fact or law between Mlo's new claims for reimbursement and her original claim, so these claims do not "relate back" and do not constitute proper amendments to the original.

Mlo takes issue with the fact that Celsius first extended and then retracted a settlement offer, which she claims was for $15,000. This exchange between the parties occurred in the spring of 2025. Mlo's request for damages resulting from the offer and retraction of the settlement agreement (Response at 2) is unrelated to her original claim for CEL tokens.

16

Moreover, the Litigation Administrator asserts, and Mlo does not contest, that the settlement agreement Celsius sent was never signed by either party. The Court does not have a copy of the proposed settlement agreement Celsius sent to Mlo, but the Litigation Administrator states in his Reply that the settlement agreement contains the following language: "This Settlement Agreement shall become effective upon the [Litigation] Administrator's receipt of a fully executed copy of the Settlement Agreement." (Reply at 9 n.8.) Mlo does not contest this characterization. The Litigation Administrator also asserts that Celsius retracted the offer under two hours after it was made, and he clarified that it was sent to Mlo in error; again, Mlo does not challenge this version of events. There is no evidence that the parties intended to be bound orally (or could be), and language explicitly stating that a contract will not be binding until signed is respected by courts in New York state and federal courts. *See, e.g.*, *In re Motors Liquidation Co.*, 580 B.R. 319, 353 (Bankr. S.D.N.Y. 2018) (finding that unsigned settlement agreement, which provided that it would only "become effective" when "fully executed by each of the" signatories, was not binding); *see also Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir. 1997) (finding there was no binding agreement under New York or federal common law, even though parties stated "we have a deal," where the draft agreement would not become effective until it was "signed by [all parties]"; that provision (and a merger clause) were a clear indication to the court that "the parties did not intend to bind themselves until the settlement had been signed" and were given "considerable weight . . . [to] avoid frustrating the clearly-expressed intentions of the parties").

Finally, as for any cryptocurrency tokens Mlo can no longer access, insofar as this relates to her claim for CEL tokens as part of her compensation as a former Celsius employee, this argument fails for the reasons discussed above. Mlo also asserts in her supplemental statement

17

attached to her Sur-Reply, apparently for the first time, that she was also a *customer* of Celsius's and had digital tokens in a Celsius wallet which she now cannot access. (Sur-Reply at 9.) Such a claim is based on different facts and legal theories than her original claim, as her purported status as a Celsius customer is distinct from her role as a (now-former) employee, and any purchases/deposits of cryptocurrency she may have made on Celsius/into a Celsius wallet are unrelated to her status as an employee. Moreover, apart from providing a single screenshot of a webpage denying her access to the Celsius platform, Mlo provided no evidence to support a finding that she held tokens on Celsius in her capacity as a customer, so even if this claim did "relate back" and constitute an amendment to her original, it is not supported by adequate documentation.

## IV. CONCLUSION

For the foregoing reasons, the Litigation Administrator's Objection is **SUSTAINED** in full and the claim is **EXPUNGED**.

Dated:   May 23, 2025
         New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge